## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE: Finova Group et al

| | | |
|---|---|---|
| Official Committee of Equity Securities Holders, | ) ) ) | Civil Action No. 07-480 (JJF) |
| Appellant | ) ) | |
| v. | ) ) | |
| Finova Group Inc. and Finova Capital Corporation, | ) ) ) | Bankruptcy Case No. 01-698 AP 07-70 |
| Appellees. | | |

## APPENDIX OF EXHIBITS TO MOTION AND OPENING BRIEF OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS IN SUPPORT OF STAY PENDING APPEAL OF THE BANKRUPTCY COURT'S FINAL CLARIFICATION ORDER

William D. Sullivan (No. 2820)
WILLIAM D. SULLIVAN, LLC
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
email: bill@williamdsullivanllc.com

Mark D. Silverschotz, Esq.
James M. Andriola, Esq.
Han J. Ahn, Esq.
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182
Telephone: (212) 278-1000
Facsimile: (212) 278-1733

Attorneys for Appellant, the Official
Committee of Equity Security Holders

August 31, 2007

## Index of Exhibits

A.    **Indenture** for 7.5% Senior Secured Notes, contained in Plan Supplement with Respect to Third Amended and Restated Joint Plan of Reorganization (the "**Plan Supplement**") (July 20, 2001) (Bankr. (Case No. 697) D.I. 745) ...................1

B.    Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1411 Clarifying Provision of Confirmed Plan (the "**Clarification Motion**") (April 1, 2005) (Bankr. D.I. 22) ................................................75

C.    Equity Committee's Response to the Reorganized Debtor's Reply to Objection of First Carolina Investors, Inc. to the Clarification Motion (the "**Equity Committee's Response**") (October 18, 2005) (Bankr. D.I. 62) ..................93

D.    Transcript of Hearing before the Honorable Peter J. Walsh on November 29, 2005 at 2:30 p.m. (Bankr. D.I. 80)..........................................................................126

E.    Order Regarding Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, entered February 11, 2006 ("**First Clarification Order**") (Bankr. D.I. 100)......................................................................................................203

F.    Request for Entry of Final Order in Clarification Motion Contested Matter (the "**Final Order Request**") (January 8, 2007)(Bankr. D.I. 196) ..........................205

G.    The Finova Group, Inc., Annual Report (**Form 10-K**) (Mar. 22, 2007) ...................268

H.    Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), dated June 26, 2007 (the "**Final Clarification Order**") (Bankr. D.I. 220) ................................................................302

I.    Declaration of Richard A. Ross Relating to Appeal Bond dated July 11, 2007 ("**Ross Declaration (July 11, 2007)**") (Bankr. D.I. 229)...........................................305

J.    The Finova Group, Inc., Quarterly Report (**Form 10-Q**) (May 9, 2007) .................310

K.    Transcript of Hearing before the Honorable Peter J. Walsh on July 24, 2007 (the "**July 24, 2007 Transcript**") (Bankr. D.I. 240)..............................................341

L.    Order Pursuant to Federal Rule of Bankruptcy Procedure 8005 Granting 90-Day Stay of the Bankruptcy Court's Order Granting Debtor's Motion Requesting Clarification of Confirmed Chapter 11 Plan, entered August 22, 2007 (the "**90-Day Stay Order**") (Bankr. D.I. 247) .................................................392

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

**THE FINOVA GROUP INC.,**
**FINOVA CAPITAL CORPORATION,**
**FINOVA (CANADA) CAPITAL CORPORATION,**
**FINOVA CAPITAL PLC,**
**FINOVA LOAN ADMINISTRATION INC.,**
**FINOVA MEZZANINE CAPITAL INC.,**
**FINOVA PORTFOLIO SERVICES, INC,**
**FINOVA TECHNOLOGY FINANCE, INC., AND**
**FINOVA FINANCE TRUST,**

Debtors.

Chapter 11

Case Nos. 01-0697 (PJW) through
01-0705 (PJW)

Jointly Administered

## PLAN SUPPLEMENT WITH RESPECT TO THIRD AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

RICHARDS, LAYTON & FINGER, P.A.

Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Deborah E. Spivack (No. 3220)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899

Telephone: (302) 658-6541
Facsimile: (302) 658-6548

GIBSON, DUNN & CRUTCHER LLP

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
The Met Life Building
200 Park Avenue
New York, New York 10166-0193

Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Counsel for Debtors
Dated: July 20, 2001

CERTIFIED:
AS A TRUE COPY:
ATTEST:

DAVID D. BIRD, CLERK
U.S. BANKRUPTCY COURT

BY:

Deputy Clerk 7/26/07

2337169_1.DOC

724

1

## INTRODUCTORY STATEMENT

1.      The FINOVA Group Inc. ("FNV Group") and its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby file this Plan Supplement pursuant to Section 13.1 of the Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code (the "Plan").[1] This Plan Supplement, as it may be amended from time to time, is incorporated into, and is a part of, the Plan as if set forth in full therein, and all references to the Plan refer to the Plan together with all documents contained in the Plan Supplement, as they may be amended from time to time.

2.      Pursuant to Section 13.1 of the Plan, this Plan Supplement has been served upon the Office of the United States Trustee and counsel for Berkadia, Leucadia, Berkshire and the Official Committees (the "Notice Parties"). The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours and through the Debtors' website at www.finova.com

3.      The Debtors reserve the right to amend the documents and information included in this Plan Supplement at any time through and including the date of the hearing on confirmation of the Plan. Any such amendment will be served upon the Notice Parties and made available for inspection on the Debtors' website at www.finova.com.

Dated: July 20, 2001

                              **RICHARDS, LAYTON & FINGER, P.A.**

                              _Rubecca ( . Booth_ (4031)

                              Mark D. Collins (No. 2981)
                              Daniel J. DeFranceschi (No. 2732)
                              Deborah E. Spivack (No. 3220)
                              One Rodney Square
                              P. O. Box 551
                              Wilmington, Delaware 19899
                              Telephone: (302) 658-6541
                              Facsimile: (302) 658-6548

                              -and-

---

[1]     Capitalized terms used but not defined herein shall have the meanings set forth in the Plan.
2337169_1.DOC

**GIBSON, DUNN & CRUTCHER LLP**
Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Co-Counsel to the Debtors and Debtors in Possession

80186792_1.DOC

2337169_1.DOC

3

3

EXHIBIT 6.2(c)(1)-a

## FORM OF NEW SENIOR NOTES INDENTURE

**-- SEE ATTACHED DOCUMENT --**

THE FINOVA GROUP INC.

7.5% SENIOR SECURED NOTES WITH
CONTINGENT INTEREST DUE 2016

INDENTURE

DATED AS OF          , 2001

THE BANK OF NEW YORK,
TRUSTEE

2337178_1.DOC
NY2:\1025570\19\LZC219!.DOC\76830.0246

# TABLE OF CONTENTS

**Page**

ARTICLE 1.    DEFINITIONS AND INCORPORATION BY REFERENCE............ 1

Section 1.01.  Definitions.................................................................... 1

Section 1.02.  Other Definitions ......................................................... 11

Section 1.03.  Incorporation by Reference of Trust Indenture Act..................... 11

Section 1.04.  Rules of Construction .................................................... 11

ARTICLE 2.    THE NOTES.................................................................. 12

Section 2.01.  Form and Dating .......................................................... 12

Section 2.02.  Title and Terms ........................................................... 14

Section 2.03.  Execution and Authentication...................................... 14

Section 2.04.  Registrar and Paying Agent ......................................... 15

Section 2.05.  Paying Agent to Hold Money in Trust........................... 15

Section 2.06.  Holder Lists................................................................. 16

Section 2.07.  Transfer and Exchange ................................................ 16

Section 2.08.  Replacement Notes ...................................................... 18

Section 2.09.  Outstanding Notes........................................................ 18

Section 2.10.  Temporary Notes ......................................................... 18

Section 2.11.  Cancellation ................................................................ 19

Section 2.12.  Voting Record Date ..................................................... 19

Section 2.13.  Computation of Fixed Interest ..................................... 19

Section 2.14.  CUSIP Number ........................................................... 19

Section 2.15.  Issuance of Additional Securities................................. 19

ARTICLE 3.    PREPAYMENT ............................................................. 20

Section 3.01.  Notices to Trustee ....................................................... 20

Section 3.02.  Selection of Notes to be Prepaid................................. 20

Section 3.03.  Notice of Prepayment ................................................. 20

Section 3.04.  Effect of Notice of Prepayment .................................. 22

Section 3.05.  Deposit of Prepayment Price ...................................... 22

Section 3.06.  Notes Prepaid in Part .................................................. 22

Section 3.07.  Optional Prepayment .................................................. 23

ARTICLE 4.    COVENANTS .............................................................. 23

Section 4.01.  Payment of Notes........................................................ 23

# TABLE OF CONTENTS

**Page**

Section 4.02.  Maintenance of Office or Agency ................................................. 23

Section 4.03.  Reports ..................................................................................... 24

Section 4.04.  Compliance Certificate ............................................................. 24

Section 4.05.  Stay, Extension and Usury Laws ............................................... 24

Section 4.06.  Use of Cash .............................................................................. 25

Section 4.07.  Restricted Payments ................................................................. 28

Section 4.08.  Incurrence of Indebtedness ....................................................... 28

Section 4.09.  Existence .................................................................................. 29

Section 4.10.  Limitations on Issuance of Capital Interests of Subsidiaries ....... 29

Section 4.11.  Dividend and Other Payment Restrictions Affecting
               Subsidiaries .............................................................................. 29

Section 4.12.  Further Instruments and Acts .................................................... 30

Section 4.13.  Payment of Taxes and Other Claims ......................................... 30

Section 4.14.  Maintenance of Insurance ......................................................... 30

Section 4.15.  Fall-Away Provision .................................................................. 30

ARTICLE 5.    SUCCESSORS ....................................................................... 31

Section 5.01.  Mergers and Consolidation ....................................................... 31

Section 5.02.  Successor Corporation Substituted ........................................... 31

ARTICLE 6.    DEFAULTS AND REMEDIES ............................................... 32

Section 6.01.  Events of Default ...................................................................... 32

Section 6.02.  Acceleration ............................................................................. 33

Section 6.03.  Other Remedies ........................................................................ 33

Section 6.04.  Waiver of Past Defaults ............................................................ 34

Section 6.05.  Control by Majority .................................................................. 34

Section 6.06.  Limitation on Suits ................................................................... 35

Section 6.07.  Rights of Holders of Notes to Receive Payment ....................... 35

Section 6.08.  Collection Suit ......................................................................... 35

Section 6.09.  Proofs of Claim ........................................................................ 36

Section 6.10.  Priorities .................................................................................. 36

Section 6.11.  Restoration of Rights and Remedies .......................................... 37

Section 6.12.  Rights and Remedies Cumulative .............................................. 37

ii

**TABLE OF CONTENTS**

Page

Section 6.13.  Delay or Omission Not Waiver ..................................................... 37

Section 6.14.  Undertaking for Costs ................................................................. 37

ARTICLE 7.     TRUSTEE ....................................................................................... 38

Section 7.01.  Duties of Trustee ......................................................................... 38

Section 7.02.  Rights of Trustee ......................................................................... 39

Section 7.03.  Individual Rights of Trustee ........................................................ 40

Section 7.04.  Disclaimer ................................................................................... 40

Section 7.05.  Notice of Defaults ....................................................................... 41

Section 7.06.  Reports by Trustee to Holders of the Notes .................................. 41

Section 7.07.  Compensation and Indemnity ...................................................... 41

Section 7.08.  Replacement of Trustee ............................................................... 42

Section 7.09.  Successor Trustee by Merger, etc. ............................................... 43

Section 7.10.  Eligibility; Disqualification .......................................................... 44

Section 7.11.  Preferential Collection of Claims against the Company .............. 44

ARTICLE 8.     LEGAL DEFEASANCE AND COVENANT DEFEASANCE ........ 44

Section 8.01.  Option to Effect Legal Defeasance or Covenant Defeasance ...... 44

Section 8.02.  Legal Defeasance and Discharge .................................................. 44

Section 8.03.  Covenant Defeasance ................................................................... 45

Section 8.04.  Conditions to Legal or Covenant Defeasance ............................... 45

Section 8.05.  Deposited Money and Government Securities to be Held in
               Trust; Other Miscellaneous Provisions .......................................... 47

Section 8.06.  Repayment to the Company .......................................................... 47

Section 8.07.  Defeasance and Certain Other Events of Default ......................... 48

Section 8.08.  Reinstatement .............................................................................. 48

ARTICLE 9.     AMENDMENT, SUPPLEMENT AND WAIVER ........................... 48

Section 9.01.  Without Consent of Holders of the Notes ..................................... 48

Section 9.02.  With Consent of Holders of Notes ................................................ 49

Section 9.03.  Compliance with Trust Indenture Act .......................................... 51

Section 9.04.  Revocation and Effect of Consents ............................................... 51

Section 9.05.  Notation on or Exchange of Notes ................................................ 51

Section 9.06.  Trustee to Sign Amendments, etc. ............................................... 51

## TABLE OF CONTENTS

Page

ARTICLE 10.    COLLATERAL AND SECURITY ...................................................... 52

    Section 10.01. ........................................................Security Agreements 52

    Section 10.02. ................................................... Recording and Opinions 52

    Section 10.03. ...................................................Release of Collateral 53

    Section 10.04. ......................................... Certificates of the Company 54

    Section 10.05. ...............................................Certificates of the Trustee 54

    Section 10.06. Authorization of Actions to Be Taken by the Trustee and the Collateral Agent Und

    Section 10.07. Authorization of Receipt of Funds by the Trustee Under the Security Agreements 5

ARTICLE 11.    SATISFACTION AND DISCHARGE............................................. 55

    Section 11.01. ...................................................... Satisfaction and Discharge 55

    Section 11.02. ........................................... Application of Trust Money 56

ARTICLE 12.    MISCELLANEOUS ........................................................... 57

    Section 12.01. ......................................Trust Indenture Act Controls 57

    Section 12.02. ...........................................................Notices 57

    Section 12.03. Communication by Holders of Notes with Other Holders of Notes 58

    Section 12.04. ...................Certificate and Opinion as to Conditions Precedent 58

    Section 12.05. ...............................Statements Required in Certificate or Opinion 59

    Section 12.06. ........................................... Rules by Trustee and Agents 59

    Section 12.07. No Personal Liability of Directors, Officers, Employees and Stockholders 59

    Section 12.08. ................................................... Governing Law 59

    Section 12.09. ............................ No Adverse Interpretation of Other Agreements 60

    Section 12.10. ...........................................................Successors 60

    Section 12.11. ...........................................................Severability 60

    Section 12.12. ................................................ Counterpart Originals 60

    Section 12.13. ...............................Table of Contents, Headings, etc. 60

# TABLE OF CONTENTS

**Page**

EXHIBITS

Exhibit A          Form of Note

Exhibit B          Collateral Trust Agreement

Exhibit C          Pledge Agreement

# CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | | Indenture Section |
|---|---|---|
| 310 | (a)(1) | 7.10 |
| | (a)(2) | 7.10 |
| | (a)(3) | N.A. |
| | (a)(4) | N.A. |
| | (a)(5) | 7.10 |
| | (b) | 7.10 |
| | (c) | N.A. |
| 311 | (a) | 7.11 |
| | (b) | 7.11 |
| | (c) | N.A. |
| 312 | (a) | 2.06 |
| | (b) | 12.03 |
| | (c) | 12.03 |
| 313 | (a) | 7.06 |
| | (b)(1) | 7.06 |
| | (b)(2) | 7.06; 7.07 |
| | (c) | 7.06;12.02 |
| | (d) | 7.06 |
| 314 | (a) | 4.04;12.05 |
| | (b) | 12.02 |
| | (c)(1) | N.A. |
| | (c)(2) | N.A. |
| | (c)(3) | N.A. |
| | (d) | 10.03;10.04; 10.05 |
| | (e) | 12.05 |
| | (f) | N.A. |
| 315 | (a) | N.A. |
| | (b) | N.A. |
| | (c) | N.A. |
| | (d) | N.A. |
| | (e) | 6.11 |
| 316 | (a)(last sentence) | N.A. |
| | (a)(1)(A) | N.A. |
| | (a)(1)(B) | N.A. |
| | (a)(2) | N.A. |
| | (b) | N.A. |
| | (c) | 2.12 |
| 317 | (a)(1) | N.A. |
| | (a)(2) | N.A. |
| | (b) | N.A. |
| 318 | (a) | N.A. |
| | (b) | N.A. |
| | (c) | 12.01 |

N.A. means not applicable.

i

?2337178_1.DOC

11

*This Cross-Reference Table is not part of this Indenture.

Indenture, dated as of            , 2001, among The FINOVA Group Inc., a Delaware corporation (the "*Company*"), and The Bank of New York, a New York banking corporation, as Trustee.

WHEREAS, the Company and certain of its subsidiaries filed for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"); and

WHEREAS, the Bankruptcy Court has approved the joint plan of reorganization of the Company and such subsidiaries (the "*Plan*"); and

WHEREAS, as part of the Plan, the Company has agreed to issue the Notes (as defined herein) to certain holders of indebtedness of FINOVA Capital Corporation, a subsidiary of the Company ("*FINOVA Capital*"), and holders of the Trust Originated Preferred Securities issued by FINOVA Finance Trust, a subsidiary of the Company, in each case outstanding on the date the Plan was approved by the Bankruptcy Court;

**NOW, THEREFORE,** the Company and the Trustee agree as follows for the equal and ratable benefit of the holders of the Company's 7.5% Senior Secured Notes with Contingent Interest due 2016:

## ARTICLE 1.
## DEFINITIONS AND INCORPORATION
## BY REFERENCE

Section 1.01.  **Definitions.**

"*Additional Notes*" means 7.5% Senior Secured Notes with Contingent Interest due 2016, issued from time to time under this Indenture after the Issue Date pursuant to the Plan.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Agent*" means any Registrar or Paying Agent.

"*Applicable Procedures*" means, with respect to any transfer, exchange, selection or voting of beneficial interests in a Global Note, the rules and procedures of the Depositary that apply to such transfer and exchange.

1

"*Bankruptcy Law*" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"*Berkadia*" means Berkadia LLC and its successors.

"*Berkadia Credit Agreement*" means that certain Credit Agreement, dated as of          , 2001 by and between FINOVA Capital and Berkadia.

"*Berkadia Interest Payment Date*" means each date on which interest payments are due and payable under the Berkadia Loan.

"*Berkadia Loan*" means the $6,000,000,000 aggregate principal amount secured term loan to FINOVA Capital from Berkadia pursuant to the Berkadia Credit Agreement, and the secured Guarantees thereof by the Company and its Subsidiaries, as such Indebtedness may be refunded, refinanced, replaced, renewed, repaid or extended.

"*Berkshire*" means Berkshire Hathaway Inc., a Delaware corporation.

"*Board of Directors*" means the Board of Directors of the Person or any authorized committee of the Board of Directors.

"*Business Day*" means any day other than a Legal Holiday.

"*Capital Interests*" means:

(i)     in the case of a corporation, corporate stock (whether designated as common or preferred);

(ii)     in the case of an association or other business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(iii)     in the case of a partnership, partnership interests (whether general or limited); and

(iv)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Cash Equivalents*" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year or less from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits, bankers acceptances or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any of (i) the fifty (50) largest commercial banks organized under the laws of the United States of America or any state thereof or (ii) the twenty-five (25) largest commercial banks organized under

the laws of a foreign jurisdiction, in each case as determined by deposits held by such banks as reported to *American Banker* magazine, and in all cases having total assets of at least Twenty Billion Dollars ($20,000,000,000) and having a short term deposit rating of at least A-1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc., or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of short term deposits generally; (c) commercial paper of an issuer rated at least A1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc., or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above; and (e) money market accounts or funds with or issued by any bank meeting the qualifications specified in clause (b) above that invests exclusively in investments of the types described in clauses (a) through (d) above.

"*Collateral*" means (i) the outstanding Capital Interests of FINOVA Capital now or hereafter owned by the Company and all dividends and distributions on and proceeds of such Capital Interests and (ii) the Intercompany Notes.

"*Collateral Agent*" means the Collateral Agent named in the Security Agreements, in its capacity as Collateral Agent, until a successor replaces it in accordance with the applicable provisions of this Indenture and the Security Agreements, and thereafter means the successor.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commission*" means the Securities and Exchange Commission.

"*Common Interests*" means any Capital Interests of any class which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up and which are not subject to redemptions by the Company.

"*Contingent Interest*" means the up to $100,000,000 (as such amount may be reduced to reflect a decrease in the principal amount of Notes Outstanding as a result of purchases by the Company pursuant to Section 4.06(a)(iii) hereof, but not prepayments or repayments by the Company in accordance with Section 4.06(a)(v)(A) or Article 3 hereof) of contingent interest on the Notes to be paid as provided for in Section 4.06(a)(vii) hereof.

"*Corporate Trust Office of the Trustee*" shall be at the address of the Trustee specified in Section 12.02 hereof or such other address as to which the Trustee may give notice to the Company.

3

"*Credit Rating*" means the rating assigned to the Notes by Moody's Investor Service, Inc. (or any successor to the rating agency business thereof) or by Standard & Poor's Ratings Group (or any successor to the rating agency business thereof).

"*Deemed Restricted Payments*" means any declaration or payment of any dividend, making of a distribution, or purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company that would have been Restricted Payments prior to repayment of the Notes.

"*Default*" means any event that is or with the passage of time or the giving of notice or both would be an Event of Default.

"*Definitive Notes*" means Notes that are in the form of Exhibit A attached hereto without the Global Note Legend.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.04 hereof as the Depositary with respect to the Notes, until a successor shall have been appointed and become such pursuant to the applicable provisions of this Indenture, and, thereafter, "*Depositary*" shall mean or include such successor.

"*Effective Date*" has the meaning set forth in the Plan.

"*Equity Interests*" means Capital Interests and all warrants, options or other rights to acquire Capital Interests (but excluding any debt security that is convertible into, or exchangeable for, Capital Interests); *provided, however,* that for the purposes of this Indenture, the right of the Holders to receive Contingent Interest shall not constitute Equity Interests of the Company.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"*First Lien Debt*" means the Guarantee by the Company of the Berkadia Loan.

"*Fixed Interest*" means the interest payable on the Notes other than any Contingent Interest.

"*Foreclosure Indebtedness*" means Indebtedness of any Person either (i) existing at the time that such Person becomes a Subsidiary of the Company or any of its Subsidiaries provided that such Person becomes a Subsidiary of the Company as a result of a pre-existing bona fide obligation to the Company or any of its Subsidiaries, (ii) assumed in connection with the acquisition of assets from any such Person provided that such Person had a pre-existing bona fide obligation to the Company or any of its Subsidiaries and that if the Indebtedness so assumed was secured, the Company and its

4

Subsidiaries shall not agree to extend such security interest to any new assets or to any assets of the Company and its Subsidiaries other than the assets of such Person or (iii) incurred to refinance any Indebtedness described in (i) or (ii) above, subject to the same limitations contained in the proviso to the definition of Refinancing Indebtedness.

"*GAAP*" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the date of this Indenture.

"*Global Note Legend*" means the legend set forth in Section 2.07(b) hereof.

"*Global Notes*" means the Global Notes, in the form of Exhibit A hereto issued in accordance with Sections 2.01 or 2.07 hereof.

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America for the payment of which guarantee or obligations the full faith and credit of the United States is pledged.

"*Guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner of all or any part of any Indebtedness.

"*Holder*" means the Person in whose name a Note is registered on the Registrar's books.

"*Impermissible Deemed Restricted Payment*" means a Deemed Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law.

"*Impermissible Restricted Payment*" means a Restricted Payment that, if made by the Company or any of its Subsidiaries, would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law.

"*Indebtedness*" means, with respect to any Person, at any date of determination (without duplication): (i) all indebtedness of such Person in respect of borrowed money, (ii) obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person in respect of letters of credit or other similar instruments (including reimbursement obligations with respect thereto), (iv) all Indebtedness referred to in clauses (i) through (iii) hereof of other Persons secured by a Lien on any asset of such Person whether or not such Indebtedness

is assumed by such Person, (v) all Indebtedness of other Persons guaranteed by such Person and (vi) to the extent not otherwise included in this definition, obligations under currency agreements and interest rate agreements; *provided, however,* that for purposes of this Indenture, the right of Holders to receive Contingent Interest shall not constitute Indebtedness of the Company. The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date (or, in the case of a revolving credit or other similar facility, the total amount of funds outstanding on the date of determination) of all unconditional obligations as described above and, with respect to contingent obligations, the reasonably anticipated maximum liability upon the occurrence of the contingency giving rise to the obligation of the types described above. The accretion of interest with respect to Indebtedness issued with original issue discount shall not constitute an incurrence of additional Indebtedness and Indebtedness shall not include any liability for federal, state, local or other taxes.

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Indirect Participant*" means a Person who holds an interest in the Notes through a Participant.

"*Initial Notes*" means the 7.5% Senior Secured Notes with Contingent Interest due 2016 issued under this Indenture on the Issue Date pursuant to the Plan.

"*Intercompany Notes*" means the promissory notes of FINOVA Capital issued to the Company in an aggregate principal amount equal to the principal amount of Notes issued under this Indenture, including any Additional Notes issued pursuant to the Plan.

"*Interest*" means all Fixed Interest and Contingent Interest on the Notes.

"*Issue Date*" means          , 2001.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions in the City of New York, the city in which the principal Corporate Trust Office of the Trustee is located or at a place of payment are authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, payment shall be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue on such payment for the intervening period.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction).

"*Maturity Date*" means November 15, 2016.

"*Nonrecourse Indebtedness*" means, with respect to any Person, Indebtedness or the portion of Indebtedness (A) as to which neither the Company nor any of its Subsidiaries other than a Subsidiary incurring such Indebtedness (1) provides credit support (including any undertaking, agreement or instrument which would constitute Indebtedness), (2) is directly or indirectly liable or (3) constitutes the lender and (B) no default with respect to which would permit (upon notice, lapse of time or both) any holder of any other Indebtedness of such Person (or the holder of any Indebtedness of the Company or any of its Subsidiaries if they are not the Person incurring such Indebtedness) to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity.

"*Note Custodian*" means the Trustee, when serving as custodian for the Depositary with respect to the Notes in global form, or any successor entity thereto.

"*Notes*" means the Initial Notes and the Additional Notes.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, the Administrator, any Assistant Treasurer, the Controller, the Secretary, the Assistant Secretary or any Vice President of such Person.

"*Officer's Certificate*" means a certificate signed on behalf of each Company by an Officer of the Company, who must be the principal executive officer, the principal financial officer or the principal accounting officer of the Company, that meets the requirements of Section 12.05 hereof.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee that meets the requirements of Section 12.05 hereof. Such counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Trustee.

"*Outstanding*" when used with respect to Notes means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture; except:

(a)    Notes previously cancelled and delivered to the Trustee or delivered to the Trustee for cancellation;

(b)    Notes with respect to which payment or prepayment money in the necessary amount has been previously deposited with the Trustee or any Paying Agent in

trust for the Holders of such Notes, provided that if such Notes are to be prepaid, notice of such prepayment has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made; and

(c)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture.

"*Participant*" means a Person who has an account with DTC.

"*Permitted Acquisitions*" means any acquisition of businesses (a) acquired by foreclosure or in full or partial satisfaction of a bona fide obligation to the Company or any of its Subsidiaries existing prior to such acquisition or (b) related to an existing customer or to a transaction or property in which the Company or its Subsidiaries has an interest and the entity to make such acquisition has determined in good faith that such acquisition is in furtherance of maximizing the ultimate recovery from such entity's asset portfolio.

"*Permitted Indebtedness*" means (a) Indebtedness outstanding (or deemed outstanding under the Plan) on the Effective Date of the Plan including the Berkadia Loan, the Notes and the Intercompany Notes; (b) Refinancing Indebtedness; (c) Indebtedness at any time outstanding of up to $25,000,000, excluding Indebtedness outstanding under clauses (a), (b), (d), (e) or (f) hereof; provided, however, that availability under this clause (c) shall be reduced by the aggregate liquidation preference of any preferred Equity Interests issued to any Person other than the Company or one of its Subsidiaries in accordance with Section 4.08; (d) Foreclosure Indebtedness; (e) intercompany Indebtedness between or among the Company and/or any of its Subsidiaries; and (f) Indebtedness incurred in connection with securitization transactions or asset-backed financing transactions where the proceeds of such Indebtedness, less reasonable expenses incurred in connection with such transactions are used as provided in Section 4.06 hereof.

"*Permitted Nonrecourse Indebtedness*" means, with respect to any Person, Indebtedness or the portion of Indebtedness incurred in connection with the acquisition or lease (as lessor) of equipment or real estate (a) that is secured solely by the equipment or real estate acquired or by assignments of leases where the recourse of the payee of such Indebtedness with respect to payment of such Indebtedness is expressly limited to the lessor's interest in such leases, the rents and other amounts due thereunder and/or the equipment or real estate leased thereunder or the proceeds therefrom and (b) which is otherwise Nonrecourse Indebtedness with respect to the Company or any of its Subsidiaries other than the Subsidiary incurring such Indebtedness with respect to payment of such Indebtedness, provided that all proceeds of such Permitted Nonrecourse Indebtedness, less reasonable expenses incurred in connection with such acquisition or lease, are used as provided in Section 4.06 hereof.

8

"*Person*" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization, limited liability company or any other entity.

"*Plan*" means the Third Amended and Restated Joint Plan of Reorganization in the Chapter 11 cases of the Company and certain of its Subsidiaries, dated June 13, 2001, as such plan may be amended, modified, supplemented or restated from time to time.

"*Pledge Agreement*" means the Pledge and Security Agreement between the Company and the Collateral Trustee, in substantially the form of Exhibit C hereto.

"*Refinancing Indebtedness*" means Indebtedness of the Company or any of its Subsidiaries that is incurred to refund, refinance, replace, renew, repay or extend (including pursuant to any defeasance or discharge mechanism) (collectively, "*refinance*") any Indebtedness existing on the Effective Date of the Plan or incurred in compliance with this Indenture (including Indebtedness of the Company that refinances Indebtedness of any Subsidiary and Indebtedness of any Subsidiary that refinances Indebtedness of another Subsidiary) including Indebtedness that refinances Refinancing Indebtedness; *provided, however,* that (a) such Refinancing Indebtedness is incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate accreted value) not exceeding the then outstanding amount of the Indebtedness being refinanced, plus a reasonable premium (except that no such premium may be paid with respect to the Berkadia Loan) and reasonable costs and expenses paid or incurred in connection with such refinancing, plus capitalized interest, fees and expenses; (b) except with respect to Refinancing Indebtedness incurred to refinance (i) the Notes, (ii) Foreclosure Indebtedness or (iii) Permitted Indebtedness not issued under the Plan, such Refinancing Indebtedness shall either (1) not have a Weighted Average Life to Maturity or maturity date that is earlier than the Indebtedness being refinanced or (2) be Nonrecourse Indebtedness and (c) if the Indebtedness being refinanced is subordinate to the Notes, then such Refinancing Indebtedness shall be subordinated to the Notes at least to the same extent, and if the Indebtedness being refinanced is pari passu with the Notes, then such Refinancing Indebtedness shall be either pari passu with or subordinated to the Notes.

"*Responsible Officer*" when used with respect to the Trustee and/or the Collateral Agent, means any officer of the Trustee or the Collateral Agent, as applicable, with direct responsibility for the administration of the Indenture or the Security Agreements and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"*Restricted Payment*" means:

(i)    the declaration or payment of any dividend or the making of any distribution on account of the Company's Equity Interests (other

than dividends or distributions payable in Equity Interests of the Company); or

(ii)     the purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company other than redemptions, acquisitions or retirements solely in exchange for Equity Interests of the Company.

"*Securities Act*" means the Securities Act of 1933, as amended and the rules and regulations of the Commission promulgated thereunder.

"*Security Agreements*" means the Collateral Trust Agreement dated on or about the date of this Indenture by and among the Trustee, Berkadia, the Company and the Collateral Trustee thereunder in substantially the form of Exhibit B hereto and the Pledge Agreement, as such agreements may be amended, modified, supplemented or restated from time to time.

"*Stated Maturity*" means, with respect to any security, including the Notes, the date specified in such security as the fixed date on which the payment of principal of such security is due and payable.

"*Subsidiary*" means, with respect to any Person, any other Person of which more than 50% of the total voting power of Capital Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees of such other Person is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof).

"*TIA*" means the Trust Indenture Act of 1939 (15 U.S. Code §§77aaa-77bbbb), as amended, as in effect on the Issue Date; *provided, however,* that in the event the Trust Indenture Act of 1939 is amended after the Issue Date, "*TIA*" means, to the extent required by any such amendment, the Trust Indenture Act of 1939 as so amended.

"*Trustee*" means the Person named as Trustee in the preamble hereto until a successor replaces such Person or another successor in accordance with this Indenture and, thereafter, means such successor.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

10

(2) the then outstanding principal amount of such Indebtedness; *provided, however*, that with respect to any revolving Indebtedness, the foregoing calculation of Weighted Average Life to Maturity shall be determined based upon the total available commitments and the required reductions of commitments in lieu of the outstanding principal amount and the required payments of principal, respectively.

Section 1.02.    **Other Definitions.**

| Term | Defined in Section |
|---|---|
| *"Authentication Order"* | 2.03 |
| *"Bankruptcy Court"* | Preamble |
| *"Company"* | Preamble |
| *"incur"* | 4.08 |
| *"Contingent Interest Payment Date"* | 2.02 |
| *"Covenant Defeasance"* | 8.03 |
| *"Custodian"* | 6.01 |
| *"DTC"* | 2.04 |
| *"Event of Default"* | 6.01 |
| *"Interest Payment Date"* | 2.02 |
| *"Legal Defeasance"* | 8.02 |
| *"Maximum Price"* | 4.06 |
| *"Paying Agent"* | 2.04 |
| *"Principal Payment Date"* | 2.02 |
| *"Reference Date"* | 2.02 |
| *"Registrar"* | 2.04 |

Section 1.03.    **Incorporation by Reference of Trust Indenture Act.**

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in, and made a part of, this Indenture.

The following TIA terms used in this Indenture have the following meanings:

*"Indenture securities"* means the Notes;

*"Indenture security holder"* means a Holder of a Note;

*"Indenture to be qualified"* means this Indenture;

*"Indenture Trustee"* or *"institutional Trustee"* means the Trustee; and

*"obligor"* on the Notes means the Company and any successor obligor upon the Notes.

2337178_1.DOC

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by the Commission rule under the TIA have the meanings so assigned to them therein.

Section 1.04. **Rules of Construction.**

Unless the context otherwise requires:

(A) an accounting term not otherwise defined herein has the meaning assigned to it in accordance with GAAP;

(B) "*or*" is not exclusive;

(C) words in the singular include the plural, and in the plural include the singular;

(D) provisions apply to successive events and transactions; and

(E) references to sections of or rules under the Securities Act, the Exchange Act or the TIA shall be deemed to include substitute, replacement or successor sections or rules adopted by the Commission from time to time.

ARTICLE 2.
THE NOTES

Section 2.01. **Form and Dating.**

(a) The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A attached hereto, which is hereby incorporated in and expressly made part of this Indenture. The Notes may have notations, legends or endorsements required by law, stock exchange rule, custom or usage. Each Note shall be dated the date of its authentication. The Notes initially shall be issued in denominations of $1,000 and integral multiples thereof.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b) <u>Global Notes</u>. Notes shall be issued initially in the form of one or more permanent global Notes in definitive, fully registered form without interest coupons

12

and with the Global Notes Legend set forth in Section 2.07(b) hereof (each, a "*Global Note*"), duly executed by the Company and authenticated by the Trustee as hereinafter provided. Such Global Notes shall be deposited on behalf of the Holders with the Trustee, at its New York office, as custodian for the Depositary, and registered in the name of the Depositary or a nominee of the Depositary. The aggregate principal amount of the Global Notes may from time to time be increased or decreased by endorsements made on such Global Notes by the Trustee and the Depositary or its nominee as hereinafter provided. Additional Notes may be issued, authenticated and delivered pursuant to Section 2.15 hereof.

(c)    Book-Entry Provisions.  This Section 2.01(c) shall apply only to Global Notes deposited with the Trustee, as custodian for the Depositary. Participants and Indirect Participants shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary or by the Trustee as the custodian of the Depositary or under such Global Note, and the Depositary itself may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Participants or Indirect Participants, the Applicable Procedures or the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Note.

(d)    Certificated Securities.  If at any time the Depositary notifies the Company that it is unwilling or unable to continue as Depositary or if at any time the Depositary shall no longer be eligible under this Section 2.01, the Company shall appoint a successor Depositary. If a successor Depositary is not appointed by the Company within 90 days after the Company receives such notice or becomes aware of such ineligibility, the Company's election pursuant to Section 2.02 that the Notes be represented by Notes in global form shall no longer be effective and the Company will execute, and the Trustee, upon receipt of a Company order for the authentication and delivery of definitive Notes, will authenticate and deliver, Notes in definitive form, in authorized denominations, in an aggregate principal amount and like terms and tenor equal to the principal amount of the Global Notes in exchange for such Global Notes.

The Company may at any time and in its sole discretion determine that Global Notes shall no longer be represented by such Global Notes. In such event, the Company will execute, and the Trustee, upon receipt of a Company order for the authentication and delivery of definitive Notes of the same terms and tenor, will authenticate and deliver Notes in definitive form, in authorized denominations, and in an aggregate principal amount equal to the principal amount of the Global Notes in exchange for such Global Notes.

If specified by the Company pursuant to Section 2.02 with respect to Global Notes, the Depositary may surrender Global Notes in exchange in whole or in part

13

for Notes in definitive form and of like terms and tenor on such terms as are acceptable to the Company and such Depositary. Thereupon, the Company shall execute, and the Trustee upon receipt of a Company order for the authentication and delivery of definitive Notes, shall authenticate and deliver, without service charge to the holders:

(a)    to each Person specified by such Depositary a new definitive Note or Notes of the same tenor, in authorized denominations, in an aggregate principal amount equal to and in exchange for such Person's beneficial interest in the Global Note; and

(b)    to such Depositary a new Global Note in a denomination equal to the difference, if any, between the principal amount of the surrendered Global Note and the aggregate principal amount of the definitive Notes delivered to holders pursuant to clause (a) above.

(c)    Upon the exchange of a Global Note for Notes in definitive form, such Global Note shall be cancelled by the Trustee or an agent of the Company or the Trustee. Notes issued in definitive form in exchange for a Global Note pursuant to this Section 2.01 shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee or an agent of the Company or the Trustee in writing. The Trustee or such agent shall deliver such Notes to or as directed by the Persons in whose names such Notes are so registered or to the Depositary.

Section 2.02.    **Title and Terms.**

Subject to and to the extent cash or Cash Equivalents are available for payment of principal on the Notes in accordance with Section 4.06 hereof, principal on the Notes shall be payable on each May 15 and November 15, commencing November 15, 2001 (each a "*Principal Payment Date*"). Principal and Fixed Interest on the Notes, to the extent not previously paid in full in cash in accordance with Section 4.06 hereof, shall be due and payable in cash on the Stated Maturity of the Notes, which shall be November 15, 2009.

The Notes shall be known and designated as the "7.5% Senior Secured Notes with Contingent Interest due 2016" of the Company. Fixed Interest on the Notes shall accrue at the rate of 7.5% per annum. Interest shall be paid in accordance with the provisions of Section 4.06 hereof. Subject to and in accordance with the provisions of Section 4.06 hereof, Interest shall be payable on each May 15 and November 15, commencing November 15, 2001 (each an "*Interest Payment Date*"). All obligations with respect to Contingent Interest shall cease on the Maturity Date.

Principal and Interest shall be payable to the Holders of record of the Notes at 5:00 p.m., New York City time, on the fifth Business Day immediately preceding either a Principal Payment Date or an Interest Payment Date (each such date, a "*Reference Date*").

2337178_1.DOC

14

### Section 2.03.    Execution and Authentication.

An Officer shall sign the Notes for the Company by manual or facsimile signature. The Company's seal may be reproduced on the Notes and may be in facsimile form.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated by the Trustee, the Note shall nevertheless be valid.

A Note shall not be valid until authenticated by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee shall, upon a written order of the Company signed by an Officer ("*Authentication Order*") directing the Trustee to authenticate the Notes, authenticate Notes for original issue.

The Trustee may (at the Company's expense) appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Company or an Affiliate of the Company.

### Section 2.04.    Registrar and Paying Agent.

The Company shall maintain (i) an office or agency where Notes may be presented for registration of transfer or for exchange (the "*Registrar*") and (ii) an office or agency where Notes may be presented for payment (the "*Paying Agent*"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars or one or more additional paying agents. The term "*Registrar*" includes any co-registrars and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Note Custodian with respect to the Global Notes. The Company initially appoints the Trustee to act as the Registrar and Paying Agent with respect to any Definitive Notes.

Section 2.05.    **Paying Agent to Hold Money in Trust.**

Not later than 10:00 a.m. New York City time on each due date of the principal or Interest on any of the Notes, the Company shall deposit with the Paying Agent money, in immediately available funds, sufficient to pay such principal or Interest so becoming due. The Company shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or Interest on the Notes, and shall notify the Trustee of any Default by the Company in making any such payment. While any such Default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company) shall have no further liability for the money. If the Company or a Subsidiary of the Company acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee shall serve as Paying Agent for the Notes.

Section 2.06.    **Holder Lists.**

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA §312(a). If the Trustee is not the Registrar, the Company shall furnish to the Trustee at least five Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Company shall otherwise comply with TIA §312(a).

Section 2.07.    **Transfer and Exchange.**

(a)    When Notes are presented to the Registrar with a request to register the transfer or to exchange them for an equal principal amount of Notes of other denominations, the Registrar shall register the transfer or make the exchange if its requirements for such transactions are met; *provided, however,* that any Note presented or surrendered for transfer or exchange shall be duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar and the Trustee duly executed by the Holder thereof or by his attorney duly authorized in writing. To permit registrations of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon the Company's order or at the Registrar's request.

The Registrar shall not be required to register the transfer of or exchange any Note selected for prepayment in whole or in part, except the portion not being paid of any Note being prepaid in part.

The Company shall not be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of mailing of a notice of prepayment of Notes under Section 3.02 hereof and ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for prepayment in whole or in part, except the portion not being paid of any Note being prepaid in part or (C) to register the transfer of or to exchange a Note between a record date and the next succeeding Interest Payment Date.

No service charge shall be made to any Holder of a Note for any registration of transfer or exchange (except as otherwise permitted herein), but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than such transfer tax or similar governmental charge payable upon exchanges pursuant to Sections 2.10, 3.06 and 9.05 hereof, which shall be paid by the Company).

Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and Interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(b)    Global Note Legend. Each Global Note shall bear a legend in substantially the following form:

"UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF."

2337178_1.DOC

(c)  Cancellation and/or Adjustment of Global Notes. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or the Company has repurchased a particular Global Note or a particular Global Note has been prepaid, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

Section 2.08.  **Replacement Notes.**

If any mutilated Note is surrendered to the Trustee, or the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Note, the Company shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are met. An indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Company and the Trustee may charge for their expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.09.  **Outstanding Notes.**

The Notes Outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.09 as not Outstanding. A Note does not cease to be Outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.08 hereof, it ceases to be Outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser.

Section 2.10.   **Temporary Notes.**

Until Definitive Notes are ready for delivery, the Company may prepare and the Trustee shall authenticate temporary Notes upon receipt of an Authentication Order. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Company considers appropriate for temporary Notes. Without unreasonable delay, the Company shall prepare and the Trustee shall upon receipt of an Authentication Order authenticate Definitive Notes in exchange for temporary Notes.

Holders of temporary Notes shall be entitled to all of the benefits of this Indenture.

Section 2.11.   **Cancellation.**

The Company at any time may deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder or which the Company may have acquired pursuant to Section 4.06(a)(iii) or 4.06(b)(vi)(A)(iii) hereof, and all Notes so delivered shall be promptly cancelled by the Trustee. All Notes surrendered for registration of transfer, exchange or payment, if surrendered to any Person other than the Trustee, shall be delivered to the Trustee. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation. All cancelled Notes held by the Trustee shall be disposed of by the Trustee in accordance with its customary procedure, unless by a written order, signed by two Officers of the Company, the Company shall direct that cancelled Notes be returned to it.

Section 2.12.   **Voting Record Date.**

The record date for purposes of determining the identity of Holders of the Notes entitled to vote or consent to any action by vote or consent authorized or permitted under this Indenture shall be determined as provided for in TIA §316(c).

Section 2.13.   **Computation of Fixed Interest.**

Fixed Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

Section 2.14.   **CUSIP Number.**

The Company in issuing the Notes may use a "CUSIP" number, and if it does so, the Trustee shall use the CUSIP number in notices of prepayment or exchange as a convenience to Holders; *provided, however,* that any such notice may state that no representation is made as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes and that reliance may be placed only on the other identification numbers printed on the Notes. The Company shall promptly notify the Trustee of any change in the CUSIP number.

Section 2.15.    **Issuance of Additional Securities.**

The Company shall be entitled to issue Additional Notes under this Indenture which shall have identical terms as the Initial Notes issued on the Issue Date, other than with respect to the date of issuance. The Initial Notes issued on the Issue Date and any Additional Notes shall be treated as a single class for all purposes under this Indenture.

With respect to any Additional Notes, the Company shall set forth in an Officer's Certificate, a copy of which shall be delivered to the Trustee, the following information:

(a)    the aggregate principal amount of such Additional Notes to be authenticated and delivered pursuant to this Indenture; and

(b)    the issue date of such Additional Notes.

## ARTICLE 3.
## PREPAYMENT

Section 3.01.    **Notices to Trustee.**

If the Company elects to prepay the principal of the Notes pursuant to the optional prepayment provisions of Section 3.07 hereof, it shall furnish to the Trustee, at least 10 days but not more than 60 days before a prepayment date, an Officer's Certificate setting forth (i) the clause of this Indenture pursuant to which the prepayment shall occur, (ii) the prepayment date, (iii) the principal amount of Notes to be prepaid and (iv) the prepayment price.

Section 3.02.    **Selection of Notes to be Prepaid.**

If less than all of the Notes are to be prepaid at any time, the Trustee shall select the Notes to be prepaid among the Holders of the Notes in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed, or, if the Notes are not so listed, on a pro rata basis, by lot or in accordance with any other method as the Trustee shall deem fair and appropriate in consultation with the Company. In the event of partial prepayment by lot, the particular Notes to be prepaid shall be selected, unless otherwise provided herein, not less than 30 days prior to the prepayment date by the Trustee from the Outstanding Notes not previously called for prepayment.

The Trustee shall promptly notify the Company in writing of the Notes selected for prepayment and, in case of any Note selected for partial prepayment, the principal amount thereof to be prepaid. Notes and portions of Notes selected shall be in amounts of $1,000 or whole multiples of $1,000; except that if all of the Notes of a Holder are to be prepaid, the entire Outstanding amount of Notes held by such Holder,

2337178_1.DOC

even if not a multiple of $1,000, shall be prepaid. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for prepayment also apply to portions of Notes called for prepayment.

Section 3.03.    **Notice of Prepayment.**

Subject to the provisions of Section 3.07 hereof, at least 10 days but not more than 60 days before a prepayment date, the Company shall mail or cause to be mailed by first class mail, a notice of prepayment to each Holder whose Notes are to be prepaid at its registered address.

The notice shall identify the Notes to be prepaid and shall state:

(A)    the prepayment date;

(B)    the prepayment price for the Notes and accrued and unpaid Fixed Interest, if any;

(C)    if any Note is being prepaid in part, the portion of the principal amount of such Note to be prepaid and that, after the prepayment date, upon surrender of such Note, a new Note or Notes in principal amount equal to the portion not being prepaid shall be issued;

(D)    the name and address of the Paying Agent;

(E)    that Notes called for prepayment must be surrendered to the Paying Agent to collect the prepayment price;

(F)    that, unless the Company defaults in making such prepayment, Fixed Interest on Notes called for prepayment ceases to accrue on and after the prepayment date;

(G)    the paragraph of the Notes and/or section of this Indenture pursuant to which the Notes called for prepayment are being prepaid; and

(H)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee shall give the notice of prepayment in the Company's name and at the Company's expense; *provided, however,* that the Company shall have delivered to the Trustee, at least 30 days, or such shorter period as

21

the Trustee may agree, prior to the prepayment date an Officer's Certificate and an order directing that the Trustee give such notice and setting forth the information to be stated in the notice as provided in the preceding paragraph. The notice mailed in the manner herein provided shall be conclusively presumed to have been duly given whether or not the Holder receives such notice.

Section 3.04.     **Effect of Notice of Prepayment.**

Once notice of prepayment is mailed in accordance with Section 3.03 hereof, Notes called for prepayment become due and payable on the prepayment date at the prepayment price plus accrued and unpaid Fixed Interest to such date. A notice of prepayment may be conditional. Upon surrender of any of the Notes called for prepayment to the Paying Agent, such Notes shall be paid on the prepayment date at the prepayment price, plus accrued and unpaid Fixed Interest to such date.

Section 3.05.     **Deposit of Prepayment Price.**

At or prior to 10:00 a.m., New York City time, on the prepayment date, the Company shall deposit with the Trustee or with the Paying Agent money, in immediately available funds, sufficient to pay the prepayment price of and accrued and unpaid Fixed Interest on all Notes to be prepaid on that date. The Trustee or the Paying Agent shall promptly return to the Company upon their written request any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the prepayment price of and accrued and unpaid Fixed Interest on all Notes to be prepaid.

If Notes called for prepayment are paid or if the Company has deposited with the Trustee or Paying Agent money sufficient to pay the prepayment price of and unpaid and accrued Fixed Interest on all Notes to be prepaid, on and after the prepayment date Fixed Interest shall cease to accrue on the Notes or the portions of Notes called for prepayment (regardless of whether certificates for such securities are actually surrendered); *provided, however,* Contingent Interest will continue to accrue on each Note prepaid pursuant to this Article 3 until such Note is cancelled pursuant to Section 2.11 hereof. If a Note is prepaid on or after an applicable Reference Date but on or prior to the related Fixed Interest payment date, then any accrued and unpaid Fixed Interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for prepayment shall not be so paid upon surrender for prepayment because of the failure of the Company to comply with the preceding paragraph, Fixed Interest shall be paid on the unpaid principal from the prepayment date until such principal is paid at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06.     **Notes Prepaid in Part.**

Upon surrender of a Note that is prepaid in part, the Company shall issue and, upon the Company's written request, the Trustee shall authenticate for the Holder at

the expense of the Company a new Note equal in principal amount to the unprepaid portion of the Note surrendered.

Section 3.07.  **Optional Prepayment.**

Subject to compliance with the provisions of Section 4.06, the Company may, at its option, prepay the Notes in whole at any time or in part from time to time at a prepayment price equal to the principal amount of the Notes or portion thereof being prepaid (subject to the right of Holders of record on the relevant Reference Date to receive Fixed Interest due on the related Interest Payment Date) but without any premium or penalty of any kind, plus accrued and unpaid Fixed Interest to the prepayment date.

ARTICLE 4.
COVENANTS

Section 4.01.  **Payment of Notes.**

The Company shall pay or cause to be paid the principal of and Interest on the Notes on the dates and in the manner provided in Sections 2.02 and 4.06 hereof. An installment of principal and Interest, shall be considered paid for all purposes hereunder on the date the Paying Agent (if other than the Company, a Subsidiary of the Company or an Affiliate of either of them) holds, as of 10:00 a.m. (New York City time) money deposited by the Company in immediately available funds and designated for and sufficient to pay all such principal and Interest then due. If the Company, any Subsidiary of the Company or any Affiliate of any of them acts as Paying Agent, an installment of principal or Interest shall be considered paid on the due date thereof only if the entity acting as Paying Agent complies with the penultimate sentence of Section 2.05.

Section 4.02.  **Maintenance of Office or Agency.**

The Company shall maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of transfer or for exchange or for presentation of payment or prepayment and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however,* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New

23

York for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company in accordance with Section 2.04 hereof.

Section 4.03.     **Reports.**

Whether or not required by the rules and regulations of the Commission, so long as any Notes are Outstanding, the Company will file with the Commission, to the extent such submissions are accepted for filing by the Commission, and furnish to the Trustee within 15 days of the time periods specified in the Commission's rules and regulations for filing reports, (i) all quarterly and annual financial information that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Company were required to file such forms, including a *"Management's Discussion and Analysis of Financial Condition and Results of Operations"* and, with respect to the annual information only, a report on the annual financial statements by the Company's certified independent accountants; (ii) all current reports that would be required to be filed with the Commission on Form 8-K if the Company were required to file such reports and (iii) as long as the Company is required to file information or reports with the Commission by Section 13(a) or 15(d) under the Exchange Act, such information or reports. The Trustee will provide, at the Company's expense, copies of any such information or reports to any Holder that requests copies of such information or reports.

Section 4.04.     **Compliance Certificate.**

On or before a date not more than 90 days after the end of each fiscal year of the Company, the Company shall deliver to the Trustee a certificate signed by the Chief Executive Officer, the Chief Financial Officer or the treasurer of the Company stating that a review has been conducted of the Company's performance under this Indenture and that the Company has fulfilled all obligations hereunder, or, if there has been a Default or an Event of Default, specifying each such Default and Event of Default and the nature and the status thereof. The Company shall also notify the Trustee within 30 days of any such officer having actual knowledge of any Default or Event of Defaults under this Indenture. The Company shall also comply with TIA §314(a).

Section 4.05.     **Stay, Extension and Usury Laws.**

The Company covenants (to the extent it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, (i) that would prohibit or forgive the Company from paying all or a portion of the principal of or Interest on the Notes as contemplated herein or (ii) that may otherwise affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of

any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.06.    **Use of Cash.**

(a)    The Company shall not, and shall not permit any of its Subsidiaries to, use cash and Cash Equivalents in a manner prohibited or not provided for by this Section 4.06. The Company shall and shall cause its Subsidiaries to apply cash and Cash Equivalents,

(i)    FIRST, (A) to pay or to fund their respective operating expenses, taxes, reasonable reserves (which reserve amounts shall be determined in good faith by the Company or the Subsidiary setting such reserves) for revolving commitments, unfunded commitments and general corporate purposes; (B) to pay, when due, interest on and principal of Permitted Indebtedness of the Company or such Subsidiary (other than, (x) in the case of FINOVA Capital, the Berkadia Loan and the Intercompany Notes and (y) in the case of the Company, the Notes), or to fund a reserve to pay interest on such Permitted Indebtedness due on the next interest payment date; (C) to pay, when due, interest on and principal of any Refinancing Indebtedness incurred to refinance the Permitted Indebtedness that may be paid under clause (B), or to fund a reserve to pay interest on such Refinancing Indebtedness due on the next interest payment date; (D) to pay, when due, interest on the Berkadia Loan, or to fund a reserve to pay interest due during the current and/or next succeeding fiscal quarter on the Berkadia Loan; and (E) to make payments permitted under Section 4.07(b) (provided that any payments described in Section 4.07(b)(v) shall not exceed $1 million per year); *provided, however,* that the listing of subclauses (A) through (E) herein shall be for ease of reference only and shall not imply or require any priority of allocation or payment within this Section 4.06(a)(i));

(ii)    SECOND, to pay to the Company, when due, interest on the Intercompany Notes in an amount equal to the lesser of (a) the amount of accrued and unpaid interest to the next interest payment date under the Intercompany Notes or (b) the amount of cash and Cash Equivalents of the Company and its Subsidiaries at the applicable Reference Date (after deducting for item (i) above), or to fund a reserve to pay interest on such Intercompany Notes due on the next succeeding interest payment date under the Intercompany Notes, and the Company shall use the proceeds of such payments together with any other cash or Cash Equivalents the Company has available for such purpose on such Reference Date, to pay accrued and unpaid Fixed Interest on the Notes on the applicable Interest Payment Date;

25

(iii)     THIRD, at the option of the Company and with the consent of Berkadia so long as any payment Obligation under the Berkadia Loan is outstanding, to cause FINOVA Capital to make prepayments of principal and accrued and unpaid interest on the Intercompany Notes or to fund a reserve to make such prepayments; the Company shall use the proceeds from any such prepayments, plus any other cash or Cash Equivalents the Company has available and elects to use for such purpose, to purchase (or to cause a Subsidiary or Subsidiaries to purchase) Notes (including all obligations to pay Contingent Interest in respect of such Notes) at a purchase price not to exceed the outstanding principal amount of such Note plus accrued and unpaid Fixed Interest thereon to the purchase date (the "*Maximum Price*") through, at the Company's discretion, (1) tender offers, (2) open market purchases and (3) privately negotiated transactions; *provided, however,* that (A) if no payment Obligation under the Berkadia Loan is outstanding, such prepayments of the Intercompany Notes and purchases of Notes shall not exceed $150.0 million in the aggregate in any single calendar year and (B) in no event will the aggregate amount of such prepayments or uses of cash or Cash Equivalents exceed $1,500,000,000 during such time as any payment Obligation under the Berkadia Loan is outstanding; *provided, further,* that any such purchases of Notes by the Company shall be made pursuant to procedures adopted by the Company's Board of Directors in good faith to ensure that Berkshire and its Affiliates are not preferred or discriminated against with respect to such purchases;

(iv)     FOURTH, to repay principal of the Berkadia Loan as required under the Berkadia Credit Agreement;

(v)     FIFTH, until the principal of and Fixed Interest on the Notes are each paid in full, to (A) pay to the Company, when due, principal on the Intercompany Notes in an amount equal to the amount of cash and Cash Equivalents of the Company and its Subsidiaries, after deducting for items (i) through (iv) above, at any date (as determined by the Company) on or after the applicable Reference Date, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes until the principal and accrued and unpaid Fixed Interest have been paid in full, and, at the Company's option, to make prepayments at any time of principal and accrued and unpaid interest on the Intercompany Notes, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to prepay all or part of the principal and accrued and unpaid Fixed Interest on the Notes pursuant to Section 3.07, and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the Company, which amounts the Company shall use

together with any other cash the Company has available for such purposes to make Restricted Payments unless the making of any such Restricted Payment would be an Impermissible Restricted Payment, in which event the Company shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments; *provided, however,* that each incremental payment of $0.95 pursuant to clause (A) shall require, to the extent permitted by applicable law, a distribution pursuant to clause (B) of $0.05;

    (vi) SIXTH, until an amount equal to 5.263% of the aggregate principal amount of the Notes issued under this Indenture in accordance with the Plan (whether on the Issue Date or thereafter) has been used either to (A) make Restricted Payments to the Company's holders of Common Stock under Section 4.06(a)(v)(B) or (B) to make Deemed Restricted Payments, after repayment in full of principal and accrued and unpaid Fixed Interest on the Notes, to make Deemed Restricted Payments, unless the making of such Deemed Restricted Payments would be an Impermissible Deemed Restricted Payment, in which event the Company shall retain all such amounts and any such retained amounts shall accumulate and shall be used to make Deemed Restricted Payments at such time, or from time to time, as such payments are not Impermissible Deemed Restricted Payments; and

    (vii) SEVENTH, until an aggregate of up to $100,000,000 (as such amount may be reduced to reflect a decrease in the principal amount of Notes Outstanding as a result of purchases by the Company of Notes in accordance with Section 4.06(a)(iii) (but not as a result of prepayments or repayments made by the Company in accordance with Section 4.06(a)(v)(A) or Article 3 hereof)) has been paid as Contingent Interest, to make distributions on each applicable Interest Payment Date to the Company in an amount equal to cash and Cash Equivalents of the Company and its Subsidiaries, after deducting for uses of cash and Cash Equivalents pursuant to clauses (i) through (vi) above, at any date (as determined by the Company) on or after the applicable Reference Date (A) 95% of which the Company shall use to pay Contingent Interest on each applicable Interest Payment Date to Holders of Outstanding Notes *pro rata* based upon the respective aggregate principal amount of each Holder's Notes and (B) 5% of which the Company will use to make Deemed Restricted Payments on each applicable Interest Payment Date (unless the making of such Deemed Restricted Payments would be an Impermissible Deemed Restricted Payment, in which event the Company shall retain such amounts, and any retained amounts shall accumulate and shall be used to make Deemed

Restricted Payments at such time or from time to time as such payments are not Impermissible Deemed Restricted Payments); *provided, further,* however, that the Company shall not be required to pay, nor shall it be a Default or Event of Default not to pay, Contingent Interest after the Maturity Date.

(b)     Funding and payments in respect of any Refinancing Indebtedness shall have the same priority in this Section 4.06 as corresponds to the Indebtedness so refinanced.

(c)     For purposes of clause 4.06(a)(i) above, "general corporate purposes" shall not include any acquisitions of businesses other than Permitted Acquisitions.

(d)     The Company shall make contributions to its Subsidiaries and shall cause its Subsidiaries to make distributions or contributions, as applicable, to permit the application of cash and Cash Equivalents as set forth in Section 4.06(a); *provided, however,* that, notwithstanding the foregoing, it shall not be a default of this Section 4.06 if a Subsidiary does not make distributions to its parent entity as set forth in Sections 4.06(a)(i)-(vii) above or if interest or principal payments are not made on the Intercompany Notes as set forth in Sections 4.06(a)(ii) and (v) above, or if the Company does not make an interest payment on the Notes as set forth in Section 4.06(a)(ii) above if such dividends, distributions or payments would be Impermissible Restricted Payments or Impermissible Deemed Restricted Payments or would be prohibited by or would result in a default or an event of default under the Berkadia Loan.

(e)     The Company and its Subsidiaries shall hold only those cash equivalents that meet the definition of Cash Equivalents herein.

Section 4.07.    **Restricted Payments.**

(a)     The Company shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, make any Restricted Payments, except such Restricted Payments that are permitted or required by Section 4.06 or Section 4.07(b) hereof.

(b)     The preceding paragraph will not prohibit:

(i)     the repurchase of Capital Interests to eliminate fractional Capital Interests or odd-lots, whether pursuant to a reverse stock-split, odd-lot tender offer or otherwise;

(ii)    cash payments in lieu of issuance of fractional Capital Interests in connection with the exercise of any warrants, rights, options or other securities convertible into or exchangeable for Equity Interests of the Company;

(iii)    the deemed repurchase of the Company's Equity Interests by the Company on the cashless exercise of stock options, if such Equity Interests represent a portion of the exercise price thereof;

(iv)    payments or distributions to dissenting holders of Equity Interests pursuant to applicable law, pursuant to or in connection with a consolidation, merger or transfer of assets which such consolidation, merger or transfer or assets complies with the provisions of this Indenture; or

(v)    repurchases, redemptions, acquisitions or retirements of Equity Interests of the Company from employees, directors or officers of the Company and its Subsidiaries;

provided that the aggregate of all payments in clauses (i), (ii), (iv) and (v) above shall not exceed $5.0 million in any calendar year.

Section 4.08.    **Incurrence of Indebtedness.**

The Company will not, and will not permit FINOVA Capital or any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, *"incur"*) any Indebtedness other than Permitted Indebtedness or Permitted Nonrecourse Indebtedness.

Section 4.09.    **Existence.**

Subject to Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect (i) its existence and the existence of FINOVA Capital in accordance with their respective organizational documents (as the same may be amended from time to time) and (ii) the rights (charter and statutory), licenses and franchises of the Company and FINOVA Capital.

Section 4.10.    **Limitations on Issuance of Capital Interests of Subsidiaries.**

The Company shall not permit FINOVA Capital to issue or sell any Capital Interests (other than to the Company) and shall not permit any of its other Subsidiaries to issue any preferred Equity Interests to any Person (other than the Company or a wholly owned Subsidiary of the Company); *provided, however,* that such Subsidiaries may issue preferred Equity Interests such that the liquidation preference of such preferred Equity Interests does not exceed the amount of Indebtedness that would be permitted to be incurred under Section 4.08 hereof if the liquidation preference of such preferred Equity Interest were treated as Indebtedness for purposes of Section 4.08.

Section 4.11.   **Dividend and Other Payment Restrictions Affecting Subsidiaries**

The Company shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create or permit to exist or become effective any restriction on the ability of any Subsidiary to (a) make any Restricted Payment, (b) make loans or advances to the Company or any of its Subsidiaries or (c) transfer any of its properties or assets to the Company or any of its Subsidiaries.

The preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of:

(a)     the Notes;

(b)     this Indenture;

(c)     the Berkadia Loan;

(d)     the Intercompany Notes;

(e)     the contracts or agreements to which the Company and its Subsidiaries were parties as of February 26, 2001;

(f)     applicable law;

(g)     Refinancing Indebtedness containing restrictions no more restrictive, taken as a whole, than those contained in the Indebtedness so refinanced;

(h)     Permitted Indebtedness described in clause (c) or (d) of the definition of "*Permitted Indebtedness;*" *provided, however*, that restrictions contained therein are no more restrictive, taken as a whole, than those contained in any Permitted Indebtedness; or

(i)     Permitted Nonrecourse Indebtedness incurred by any special purpose Subsidiary; *provided* that the restrictions therein apply only to such special purpose Subsidiary.

Section 4.12.   **Further Instruments and Acts.**

Upon the request of the Trustee, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

Section 4.13.   **Payment of Taxes and Other Claims.**

The Company shall, and shall cause each of its Subsidiaries, to pay or discharge, or cause to be paid or discharged, before the same shall become delinquent (i)

30

all material taxes, assessments and governmental charges levied or imposed upon (a) the Company or any such Subsidiary, (b) the income or profits of any such Subsidiary which is taxed as a corporation under the Code or (c) the property of the Company or any such Subsidiary and (ii) all material, lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Company or any such Subsidiary; provided, however, that there shall not be required to be paid or discharged any such tax, assessment, charge or claim if the amount, applicability or validity thereof is being contested in good faith by appropriate proceedings and adequate provision therefor has been made.

#### Section 4.14.    Maintenance of Insurance.

The Company will provide or cause to be provided, for itself and its Subsidiaries, insurance against loss or damage of the kinds customarily insured against by entities similarly situated and owning like properties, with reputable insurers or with the government of the United States of America, or an agency or instrumentality thereof, in such amounts, with such deductibles and by such methods as shall be customary for entities similarly situated in the industry in which the Company or such Subsidiary, as the case may be, is then conducting business.

#### Section 4.15.    Fall-Away Provision.

The Company's and its Subsidiaries' obligations to comply with Sections 4.07, 4.08, 4.10, 4.11, 4.13 and 4.14 and Article 10 will be terminated upon the payment in full in accordance with the provisions of this Indenture, or the provision for payment in full in accordance with the terms of this Indenture, including Article 8, of the principal and accrued and unpaid Fixed Interest on all Outstanding Notes and such provisions shall thereafter cease to be of any further effect.

### ARTICLE 5.
### SUCCESSORS

#### Section 5.01.    Mergers and Consolidation.

The Company shall not, directly or indirectly, consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person, unless:

> (i)      the entity or Person formed by or surviving any such consolidation or merger (if other than the Company) assumes all the obligations of the Company under the Notes and this Indenture pursuant to a supplemental indenture in a form reasonably satisfactory to the Trustee;

> (ii)     immediately after such consolidation or merger there is no default or event that, with the passage of time or notice or both, would be a Default or Event of Default under this Indenture; and

(iii)    the Credit Rating of the surviving entity immediately following the merger or consolidation would not be lower than that of the Company immediately prior to the effectiveness of the merger or consolidation.

Notwithstanding the foregoing provisions of this Section 5.01, the Company may merge or consolidate with and into FINOVA Capital; *provided, however,* that upon the consummation of such merger or consolidation, the Company and the Trustee execute a supplemental indenture and such additional agreements, including security agreements, as may be necessary or advisable to secure the Company's obligations under this Indenture and the Notes to the same extent as, and with the same collateral as, FINOVA Capital's obligations under the Intercompany Notes are secured.

Section 5.02.    **Successor Corporation Substituted.**

Upon any consolidation or merger of the Company in accordance with Section 5.01 hereof, the successor Person formed by such consolidation or into or with which the Company is merged shall succeed to, and be substituted for (so that from and after the date of such consolidation or merger, the provisions of this Indenture referring to the "*Company*" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein.

ARTICLE 6.
DEFAULTS AND REMEDIES

Section 6.01.    **Events of Default.**

Each of the following constitutes an "*Event of Default*":

(i)    the failure of the Company to pay all or any part of the unpaid principal on the Notes when and as the same becomes due and payable at the Stated Maturity of the Notes referred to in Section 2.02, upon prepayment in accordance with Section 3.07 or by acceleration;

(ii)    failure by the Company to pay installments of Fixed Interest in full on the Notes for two consecutive Interest Payment Dates whether or not required to be paid pursuant to Section 4.06 hereof, provided that both of such installments remain unpaid for 30 days after such second consecutive Interest Payment Date;

(iii)    failure by the Company or any of its Subsidiaries to observe or perform the provisions of Sections 4.01 or 4.06 if such failure is not remedied within 30 days;

(iv)    failure by the Company to observe or perform in all material respects any other covenant or agreement on the part of the Company contained in the Notes, this Indenture or the Pledge Agreement if such failure is not remedied within 60 days after written notice is given to the Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, in either case specifying such default, requiring that such default be remedied and stating that such notice is a "*Notice of Default;*"

(v)    either the Company or FINOVA Capital, pursuant to or within the meaning of Bankruptcy Law:

(A)    commences a voluntary case,

(B)    consents to the entry of an order for relief against it in an involuntary case,

(C)    consents to the appointment of a Custodian of it or for all or substantially all of its property, or

(D)    makes a general assignment for the benefit of its creditors; or

(vi)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)    is for relief against either the Company or FINOVA Capital in an involuntary case;

(B)    appoints a Custodian of either the Company or FINOVA Capital or for all or substantially all of the property of either the Company or FINOVA Capital; or

(C)    orders the liquidation of either the Company or FINOVA Capital;

and the order or decree remains unstayed and in effect for 60 consecutive days.

The term "*Custodian*" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

The Company shall deliver to the Trustee, within 30 days after the occurrence thereof, written notice in the form of an Officers' Certificate of any Event of Default under clauses (ii) or (iii) of this Section 6.01.

2337178_1.DOC

Section 6.02.    **Acceleration.**

If any Event of Default occurs and is continuing, the Trustee or the
Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, by
written notice to the Company (and to the Trustee if such notice is given by the Holders),
may, and the Trustee at the request of such Holders shall, declare the principal of and
accrued Interest on the Outstanding Notes to be immediately due and payable. Upon a
declaration of acceleration, such principal of and accrued Interest shall be immediately
due and payable. Notwithstanding the foregoing, in the case of an Event of Default as
described in (v) and (vi) of Section 6.01 hereof, the Notes shall become due and payable
without further action or notice. Holders of the Notes may not enforce this Indenture or
the Notes except as provided in this Indenture.

Section 6.03.    **Other Remedies.**

If an Event of Default occurs and is continuing, the Trustee may pursue
any available remedy (under this Indenture, or otherwise) to collect the payment of
principal of or interest on the Notes or to enforce the performance of any provision of the
Notes, this Indenture or the Security Agreements.

The Trustee may maintain a proceeding even if it does not possess any of
the Notes or does not produce any of them in the proceeding. A delay or omission by the
Trustee or any Holder of a Note in exercising any right or remedy accruing upon an
Event of Default shall not impair the right or remedy or constitute a waiver of or
acquiescence in the Event of Default. All remedies are cumulative to the extent permitted
by law.

Section 6.04.    **Waiver of Past Defaults.**

Subject to Section 9.02, the Holders of a majority in aggregate principal
amount of the Notes then Outstanding by notice to the Trustee may on behalf of the
Holders of all of the Notes waive any past Default or Event of Default and its
consequences under this Indenture (including any acceleration other than an automatic
acceleration resulting from an Event of Default under clause (v) or (vi) of Section 6.01
hereof) except a continuing Default or Event of Default in the payment of Interest on, or
the principal of, the Notes or in respect of a covenant or provision of this Indenture which
cannot be modified or amended without the consent of the Holder of each outstanding
Note affected; *provided, however,* that in determining whether the Holders of the required
principal amount of Notes have concurred in any such waiver, Notes owned by the
Company, or by any Affiliate of the Company, shall be disregarded, except that for the
purposes of determining whether the Trustee shall be protected in relying on any such
direction, only Notes which such Trustee knows are so owned shall be disregarded.
Upon any such waiver, such Default shall cease to exist, and any Event of Default arising
therefrom shall be deemed to have been cured for every purpose of this Indenture;
*provided, however,* that no such waiver shall extend to any subsequent or other Default or
Event of Default or impair any right consequent thereon.

Section 6.05.   **Control by Majority.**

The Holders of a majority in principal amount of the then Outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to the Notes; *provided, however* that in determining whether the Holders of the required principal amount of Notes have concurred in any such direction, Notes owned by the Company, or by any Affiliate of the Company, shall be disregarded, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, only Notes which such Trustee knows are so owned shall be disregarded. However, (i) the Trustee may refuse to follow any direction that, in the reasonable opinion of counsel to the Trustee, conflicts with law or this Indenture, that the Trustee reasonably determines may be unduly prejudicial to the rights of other Holders of Notes or that may involve the Trustee in personal liability, and (ii) the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction. In case an Event of Default shall occur (which shall not be cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of its own affairs. Notwithstanding any provision to the contrary in this Indenture, the Trustee is under no obligation to exercise any of its rights or powers under this Indenture at the request of any Holder of Notes, unless such Holder shall offer to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

Section 6.06.   **Limitation on Suits.**

A Holder of a Note may pursue a remedy with respect to this Indenture or the Notes only if:

> (i)   the Holder of a Note gives to the Trustee written notice of a continuing Event of Default or the Trustee receives such notice from the Company;

> (ii)   the Holders of at least 25% in aggregate principal amount of the then Outstanding Notes make a written request to the Trustee to pursue the remedy;

> (iii)   such Holder of a Note or Holders of Notes offer and, if requested, provide to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense to be incurred in compliance with such request;

> (iv)   the Trustee does not comply with the request within 60 days after receipt of the request and the offer and, if requested, the provision of indemnity; and

2337178_1.DOC

(v)      during such 60-day period the Holders of a majority in aggregate principal amount of the then Outstanding Notes do not give the Trustee a direction inconsistent with the request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07.    **Rights of Holders of Notes to Receive Payment.**

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal and Interest on such Holder's Notes, on or after the respective due dates expressed in such Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided, however,* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entering of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the lien of this Indenture upon any property subject to such Lien.

Section 6.08.    **Collection Suit.**

If an Event of Default specified in Section 6.01(i) or (ii) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company for the whole amount of principal of, and Interest remaining unpaid on, the Notes and interest on overdue principal, Interest and such further amount as shall be sufficient to cover the costs and expenses of collection and to the extent lawful, with interest on overdue principal and installments of Interest at the rate specified in the Notes in each case, including the reasonable compensation, expenses, disbursements and advances of the Trustee, and its agents and counsel.

Section 6.09.    **Proofs of Claim.**

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, and its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Company, the Company's creditors or the Company's property, to participate as a member, voting or otherwise, of any official committee of creditors appointed in such manner and shall be entitled and empowered to collect, receive and distribute any money or other securities or property payable or deliverable upon the conversion or exchange of the Notes or on any such claims and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee,

36

and its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.    **Priorities.**

If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

First: to the Trustee, the Collateral Agent, and its agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expense and liabilities incurred, and all advances made, by the Trustee and the Collateral Agent and the costs and expenses of collection;

Second: to Holders of Notes for amounts due and unpaid on the Notes for principal and Interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes first for principal, then for Fixed Interest and then for Contingent Interest, respectively;

Third: without duplication, to the Holders for any other Obligations owing to the Holders under this Indenture, the Notes or the Security Agreements; and

Fourth: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11.    **Restoration of Rights and Remedies.**

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then, and in every such case, subject to any determination in such proceeding, the Company, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Company, the Trustee and the Holders shall continue as though no such proceeding had been instituted.

37

Section 6.12.    **Rights and Remedies Cumulative.**

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or wrongfully taken Notes, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.13.    **Delay or Omission Not Waiver.**

No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article Six or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.14.    **Undertaking for Costs.**

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in principal amount of the then Outstanding Notes.

## ARTICLE 7.
## TRUSTEE

Section 7.01.    **Duties of Trustee.**

(a)    If an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee has knowledge, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

38

       (i)     the duties of the Trustee shall be determined solely by the express provisions of this Indenture or the TIA and the Trustee need perform only those duties that are specifically set forth in this Indenture or the TIA and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

       (ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee, and conforming to the requirements of this Indenture. However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

     (c)    The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

       (i)     this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

       (ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

       (iii)   the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

     (d)    Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 7.01.

     (e)    No provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any liability. The Trustee shall be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holders of Notes, including without limitation the provisions of Section 6.05 hereof, unless such Holder shall have offered to the Trustee, security and indemnity satisfactory to it against any loss, liability or expense that might be incurred by it in complying with such request.

     (f)    The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust

by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02.    **Rights of Trustee.**

(a)    The Trustee may conclusively rely on the truth of the statements and correctness of the opinions contained in, and shall be protected from acting or refraining from acting upon, any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificate or Opinion of Counsel. Prior to taking, suffering or admitting any action, the Trustee may consult with counsel of the Trustee's own choosing and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)    The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)    The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company shall be sufficient if signed by an Officer of the Company.

(f)    The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities that might be incurred by it in compliance with such request or direction.

(g)    The Trustee shall not be charged with knowledge of any Default or Event of Default with respect to the Notes unless either (1) a Responsible Officer of the Trustee shall have actual knowledge of such Default or Event of Default or (2) written notice of such Default or Event of Default shall have been given to the Trustee by the Company or by any Holder of the Notes.

(h)    The rights, privileges, protections, immunities and benefits given to the Trustee, including without limitation, its right to be indemnified, are extended to,

40

and shall be enforceable by, the Trustee in each of its capacities hereunder and each agent, custodian and other Person employed to act hereunder.

(i)     The Trustee may request that the Company deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superceded.

Section 7.03.     **Individual Rights of Trustee.**

The Trustee, in its individual or any other capacity may become the owner of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee. However, in the event that the Trustee acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the Commission for permission to continue as Trustee or resign. Any Agent may do the same with like rights and duties. The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04.     **Disclaimer.**

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes; it shall not be accountable for any money paid to the Company or upon the Company's direction under any provision of this Indenture; it shall not be responsible for the use or application of any money received by any Paying Agent other than itself; and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05.     **Notice of Defaults.**

If a Default or Event of Default occurs and is continuing and if it is known to a Responsible Officer of the Trustee, the Trustee shall mail to Holders of Notes a notice of the Default or Event of Default within 90 days after it occurs. Except in the case of a Default or Event of Default in payment on any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

Section 7.06.     **Reports by Trustee to Holders of the Notes.**

Within 60 days after each May 15 beginning with the May 15 following the date of this Indenture, and for so long as Notes remain Outstanding, the Trustee shall mail to the Holders of the Notes a brief report dated as of such reporting date that complies with TIA §313(a) (but if no event described in TIA §313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted). The

41

Trustee also shall comply with TIA §313(b). The Trustee shall also transmit by mail all reports as required by TIA §313(c).

A copy of each report at the time of its mailing to the Holders of Notes shall be mailed to the Company and filed with the Commission and each stock exchange on which the Company has informed the Trustee in writing the Notes are listed in accordance with TIA §313(d). The Company shall promptly notify the Trustee when the Notes are listed on any stock exchange and of any delisting thereof.

Section 7.07.    **Compensation and Indemnity.**

The Company shall pay to the Trustee from time to time compensation as shall be agreed in writing between the Company and the Trustee for its acceptance of this Indenture and services hereunder. To the extent permitted by law, the Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Company shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and actual out of pocket expenses incurred or made by it in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel, but shall not include expenses incurred as a result of the Trustee's negligence or willful misconduct.

The Company shall indemnify each of the Trustee and any predecessor Trustee against any and all losses, liabilities, damages, claims or expenses, including taxes (other than taxes based on or measured by the income or gross receipts of the Trustee) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Company (including this Section 7.07) and defending itself against any claim (whether asserted by the Company or any Holder or any other person) or liability in connection with the exercise or performance of any of its powers or duties hereunder except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Trustee shall notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company shall not relieve the Company of its obligations hereunder, except to the extent of actual prejudice to the Company resulting from such failure. The Company shall defend the claim and the Trustee shall cooperate in the defense. The Trustee may have separate counsel and, if required due to conflicts, the Company shall pay the reasonable fees and expenses of such counsel. The Company need not pay for any settlement made without its consent, which consent may be withheld in its reasonable discretion.

The obligations of the Company under this Section 7.07 shall survive the satisfaction and discharge of this Indenture.

To secure the Company's payment obligations in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by

42

the Trustee, except that held in trust to pay principal and Interest on particular Notes redeemed, defeased, repurchased or otherwise satisfied and discharged. Such Lien shall survive the satisfaction and discharge of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(v) or (vi) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

The Trustee shall comply with the provisions of TIA §313(b)(2) to the extent applicable.

Section 7.08. · **Replacement of Trustee.**

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company. The Holders of a majority in principal amount of the then Outstanding Notes may remove the Trustee by so notifying the Trustee, as applicable, and the Company in writing. The Company may remove the Trustee, as applicable, if:

(a)     the Trustee, as applicable, fails to comply with Section 7.10 hereof;

(b)     the Trustee, as applicable, is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee, as applicable, under any Bankruptcy Law;

(c)     a Custodian or public officer takes charge of the Trustee, as applicable, or its property; or

(d)     the Trustee, as applicable, becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the then Outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company, or the Holders of at least 10% in principal amount of the then Outstanding Notes may petition, at the expense of the Company, any court of competent jurisdiction for the appointment of a successor Trustee.

43

If the Trustee, after written request by any Holder of a Note who has been a Holder of a Note for at least six months, fails to comply with Section 7.10 hereof, such Holder of a Note may petition any court of competent jurisdiction for the removal of the Trustee, as applicable, and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and the duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to the Holders of the Notes. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee provided that all sums owing to the retiring Trustee have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 hereof shall continue for the benefit of the retiring Trustee.

Section 7.09.    **Successor Trustee by Merger, etc.**

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee.

Section 7.10.    **Eligibility; Disqualification.**

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and shall at all times have a combined capital surplus of at least $150.0 million as set forth in its most recent annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of TIA §§310(a)(1), (2) and (5). The Trustee is subject to TIA §310(b).

Section 7.11.    **Preferential Collection of Claims against the Company.**

The Trustee is subject to TIA §311(a), excluding any creditor relationship listed in TIA §311(b). A Trustee who has resigned or been removed shall be subject to TIA §311(a) to the extent indicated therein.

2337178_1.DOC

## ARTICLE 8.
## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

### Section 8.01.    **Option to Effect Legal Defeasance or Covenant Defeasance.**

The Company may, at the option of its Board of Directors evidenced by a resolution set forth in an Officer's Certificate, at any time, elect to have either Section 8.02 or 8.03 hereof be applied to all Outstanding Notes upon compliance with the conditions set forth below in this Article 8.

### Section 8.02.    **Legal Defeasance and Discharge.**

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Company shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from its obligations with respect to all Outstanding Notes on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*"). For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the Outstanding Notes, which shall thereafter be deemed to be "*Outstanding*" only for the purposes of Section 8.05 hereof and the other sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other Obligations under such Notes and this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which shall survive until otherwise terminated or discharged hereunder: (a) the rights of Holders of Outstanding Notes to receive payments in respect of the principal of and Interest on such Notes when such payments are due from the trust referred to in Section 8.04(i); (b) the Company's obligations with respect to such Notes under Sections 2.02, 2.03, 2.04, 2.05, 2.06, 2.07, 2.10 and 4.02 hereof; (c) the rights, powers, trusts, duties and immunities of the Trustee including without limitation thereunder Section 7.07, 8.05 and 8.07 hereof and the Company's Obligations in connection therewith and (d) the provisions of this Section 8.02 (it being understood that such Notes shall not be deemed Outstanding for accounting purposes). Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of the option under Section 8.03 hereof. If the Company exercises the option applicable to this Section 8.02, the Trustee shall notify the Collateral Agent to release the Lien of this Indenture in accordance with the provisions of the Security Agreements and Section 10.03 hereof.

### Section 8.03.    **Covenant Defeasance.**

Upon the exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from its obligations under the covenants contained in Sections 4.03, 4.05, 4.06, 4.07, 4.08, 4.10, 4.11, 4.12, 4.13 and clauses (ii) and (iii) of Section 5.01 hereof with respect to the Outstanding Notes on and after the date the

conditions set forth below are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes shall thereafter be deemed not "*Outstanding*" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "*Outstanding*" for all other purposes hereunder (it being understood that such Notes shall not be deemed Outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the Outstanding Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby. In addition, upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, Sections 6.01(ii) through 6.01(vi) hereof shall not constitute Events of Default. If the Company exercises the option applicable to this Section 8.03, the Trustee shall notify the Collateral Agent to release the Lien of this Indenture in accordance with the provisions of the Security Agreements and Section 10.03 hereof.

Section 8.04.    **Conditions to Legal or Covenant Defeasance.**

The following shall be the conditions to the application of either Section 8.02 or 8.03 hereof to the Outstanding Notes:

In order to exercise either Legal Defeasance or Covenant Defeasance:

(i)      the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as shall be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of Fixed Interest and the maximum remaining amount payable as Contingent Interest, on the Outstanding Notes on the stated maturity or on the next Interest Payment Date, as the case may be, and the Company must specify whether the Notes are being defeased to maturity or to the next Interest Payment Date;

(ii)      in the case of an election under Section 8.02 hereof, the Company shall have delivered to the Trustee either (A)(1) an Opinion of Counsel to the effect that the Holders of the Outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of the Company's exercise of its option under Section 8.02 and will be subject to federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred, which Opinion of Counsel

46

must be based upon (and accompanied by a copy of) a ruling of the Internal Revenue Service to the same effect, unless there has been a change in the applicable federal income tax law after the Closing Date such that a ruling is no longer required or (2) a ruling directed to the Trustee received from the Internal Revenue Service to the same effect as the Opinion of Counsel described in clause (1) above and (B) an Opinion of Counsel to the effect that the creation of the defeasance trust does not violate the Investment Company Act of 1940;

(iii)     in the case of an election under Section 8.03 hereof, the Company shall have delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee confirming that the Holders of the Outstanding Notes shall not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and shall be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(iv)     immediately after giving effect to such deposit, on a pro forma basis, no Default or Event of Default, or event that after notice or lapse of time or both would become an Event of Default, shall have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit);

(v)     such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any material agreement or instrument (other than this Indenture) to which the Company is a party or by which the Company is bound;

(vi)     if at such time the Notes are listed on a national securities exchange, the Company shall have delivered to the Trustee an Officer's Certificate to the effect that the Notes will not be delisted as a result of such deposit, defeasance and discharge; and

(vii)     the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for relating to the Legal Defeasance or the Covenant Defeasance have been satisfied.

Section 8.05.     **Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions.**

Subject to Section 8.06 hereof, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying Trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section

47

8.04 hereof in respect of the Outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non-callable Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the Outstanding Notes.

Anything in this Article 8 to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon the written request of the Company and be relieved of all liability with respect to any money or non-callable Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(i) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06.   **Repayment to the Company.**

Subject to Section 7.07, 8.01, 8.02 and 8.03, any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of and Interest on any Note and remaining unclaimed for one year after such principal and Interest has become due and payable shall be paid to the Company on its written request or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as Trustee thereof, shall thereupon cease; *provided, however,* that the Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense of the Company cause to be published once, in The New York Times and/or The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining shall be repaid to the Company.

Section 8.07.   **Defeasance and Certain Other Events of Default.**

In the event the Company exercises its option to omit compliance with certain covenants and provisions of this Indenture with respect to the Notes pursuant to Section 8.03 and such Notes are declared due and payable because of the occurrence of an Event of Default that remains applicable and the amount of money and/or U.S.

48

Government Obligations on deposit with the Trustee is insufficient to pay amounts due on the Notes at the time of the acceleration resulting from such Event of Default pursuant to Section 6.02, the Company will remain liable for such shortfall.

Section 8.08. **Reinstatement.**

If the Trustee or Paying Agent is unable to apply any United States dollars or non-callable Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the obligations of the Company under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided, however,* that, if the Company makes any payment of principal of and Interest on any Note following the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE 9.
## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01. **Without Consent of Holders of the Notes.**

Notwithstanding Section 9.02 of this Indenture, without the consent of any Holder of Notes, the Company and the Trustee may amend or supplement this Indenture or the Notes:

(i)     to cure any ambiguity, defect or inconsistency which, in the good faith opinion of the Board of Directors of the Company evidenced by a Board Resolution, exists;

(ii)     to provide for uncertificated Notes in addition to or in place of certificated Notes;

(iii)     to comply with Article 5 hereof;

(iv)     to make any change that would provide any additional rights or benefits to the Holders of the Notes or, in the good faith opinion of the Board of Directors of the Company, evidenced by a Board Resolution, does not materially adversely affect the legal rights hereunder of any Holder of the Notes;

(v)     to execute and deliver any documents necessary or appropriate to release Liens on any Collateral as permitted by Section 10.03 or 10.04(b) hereof;

> (vi)   to comply with requirements of the Commission in connection with the qualification of this Indenture under the TIA; or

> (vii)   to substitute a new Trustee pursuant to Sections 7.08 or 7.09.

Upon the written request of the Company accompanied by resolutions of the Board of Directors or other governing body of the Company authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee shall join with the Company in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02.   **With Consent of Holders of Notes.**

Except as provided in the next two succeeding paragraphs, this Indenture and the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the Notes then Outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange offer for Notes), and, in such case, without prior written notice to the Holders and subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default or compliance with any provision of this Indenture or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then Outstanding Notes (including consents obtained in connection with a tender offer or exchange offer for Notes). It is further understood that the provisions of Section 4.06 hereof and any definition set forth herein (other than the definition of "Maturity Date") may be amended or supplemented, or compliance with provisions contained in Section 4.06 or any such definition waived, with the consent of the Holders of at least a majority in principal amount of the Notes then Outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange offer for Notes).

Upon the written request of the Company accompanied by resolutions of the Board of Directors or other governing body of the Company authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee shall join with the Company in the execution of such amended or supplemental indenture unless such amended or supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may, but shall not be obligated to, enter into such amended or supplemental indenture.

50

It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company shall mail to the Holders of each Note affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure or delay of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

Without the consent of each Holder affected, an amendment or waiver, including a waiver pursuant to Section 6.04, may not:

(i)    reduce the percentage or principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(ii)    reduce the principal of or change the Stated Maturity of any Note;

(iii)    reduce the rate of or change the time for payment of Interest on any Note;

(iv)    waive a Default or Event of Default in the payment of principal of or Interest on the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then Outstanding Notes and a waiver of the payment default that resulted from such acceleration);

(v)    make any Note payable in money other than that stated in the Notes; or

(vi)    change the place or currency of payment of principal of or Interest on, any Note;

(vii)    impair the right to institute suit for the enforcement of any payment on or after the Stated Maturity of any Note; or

(viii)    make any change in the foregoing amendment and waiver provisions.

Section 9.03.    **Compliance with Trust Indenture Act.**

Every amendment or supplement to this Indenture or the Notes shall be set forth in an amended or supplemental indenture that complies with the TIA as then in effect.

Section 9.04.    **Revocation and Effect of Consents.**

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the Trustee receives notice evidencing the taking of action by the Holders of the specified percentage in aggregate principal amount specified in this Indenture with respect to such waiver, supplement or amendment. When an amendment, supplement or waiver becomes effective in accordance with its terms, it thereafter binds every Holder.

Section 9.05.    **Notation on or Exchange of Notes.**

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06.    **Trustee to Sign Amendments, etc.**

The Trustee shall sign any amended or supplemental indenture or amended Security Agreements authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Company may not sign an amendment or supplemental indenture until the Board of Directors approves it. In signing or refusing to sign any amended or supplemental indenture the Trustee shall be entitled to receive and (subject to Section 7.01 hereof) shall be fully protected in relying upon, in addition to the documents required by Section 12.04 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture, that it is not inconsistent herewith and therewith, and that it will be valid and binding upon the Company in accordance with its terms.

ARTICLE 10.
COLLATERAL AND SECURITY

Section 10.01.    **Security Agreements.**

The due and punctual payment of the principal of and Fixed Interest, but not Contingent Interest, on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at the Stated Maturity of the Notes referred to in Section 2.02, by acceleration or by prepayment in accordance with Section 3.07, and

52

interest on the overdue principal of and Fixed Interest (to the extent permitted by law) on the Notes and performance of all other obligations of the Company (excluding any and all obligations with respect to any Contingent Interest) to the Holders of Notes, the Trustee or the Collateral Agent under this Indenture, the Security Agreements and the Notes, according to the terms hereunder or thereunder, shall be secured as provided in the Security Agreements which the Company has entered into simultaneously with the execution of this Indenture. Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of the Security Agreements (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with its terms, appoints the Collateral Agent to act as the "*Collateral Agent*" thereunder and authorizes and directs the Collateral Agent to enter into the Security Agreements and to perform its obligations and exercise its rights thereunder in accordance therewith. The Company shall do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Security Agreements, to assure and confirm to the Trustee and the Collateral Agent the security interest in the Collateral contemplated hereby, by the Security Agreements or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed. The Company shall take, or shall cause its Subsidiaries to take any and all actions reasonably required to cause the Security Agreements to create and maintain, as security for the Obligations of the Company hereunder, a valid and enforceable perfected Lien in and on all the Collateral, in favor of the Collateral Agent for its benefit and the ratable benefit of the Holders of Notes, superior to and prior to the rights of all third Persons other than those holding First Lien Debt, and subject to no Liens (other than Liens permitted by the Security Agreements).

Section 10.02.  **Recording and Opinions.**

(a)     The Company shall furnish to the Collateral Agent and the Trustee promptly following the execution and delivery of this Indenture, an Opinion of Counsel, either (i) stating that, in the opinion of such counsel, action has been taken with respect to the recording, registering, filing, re-recording, re-registering and re-filing of all supplemental indentures, financing statements, continuation statements or other instruments of further assurance as is necessary to maintain the Lien of the Security Agreements and reciting with respect to the security interests in the Collateral the details of such action or referring to prior Opinions of Counsel in which such details are given or (ii) stating that, in the opinion of such counsel, no such action is necessary to make such Lien effective.

(b)     The Company shall furnish to the Collateral Agent and the Trustee within three months after each anniversary of the Issue Date an Opinion of Counsel, dated as of such date, either (i) (A) stating that, in the opinion of such counsel, action has been taken with respect to the recording, registering, filing, re-recording, re-registering and re-filing of all supplemental indentures, financing statements, continuation statements or other instruments of further assurance as is necessary to maintain the Lien

of the Security Agreements and reciting with respect to the security interests in the Collateral the details of such action or referring to prior Opinions of Counsel in which such details are given and (B) stating that, based on relevant laws as in effect on the date of such Opinion of Counsel, all financing statements and continuation statements have been executed and filed that are necessary as of such date and during the succeeding 12 months fully to preserve and protect, to the extent such protection and preservation are possible by filing, the rights of the Holders of Notes and the Collateral Agent and the Trustee hereunder and under the Security Documents with respect to the security interests in the Collateral, or (ii) stating that, in the opinion of such counsel, no such action is necessary to maintain such Lien and assignment.

Section 10.03. **Release of Collateral.**

(a)      Subject to subsections (b), (c) and (d) of this Section 10.03, Collateral may be released from the Lien and security interest created by the Security Agreements at any time or from time to time in accordance with the provisions of the Security Agreements and as provided hereby.  The Collateral will be automatically released from the Lien at such time as the Company has paid in full or otherwise provided for the payment in full in accordance with this Indenture of the principal amount and Interest due on all of the Notes.  If the Trustee is not the Collateral Agent, the Trustee shall thereafter deliver a certificate to the Collateral Agent stating that such principal amount and Interest has been paid in full, and instruct the Collateral Agent to release the Liens pursuant to this Indenture and the Security Agreements.  Upon the request of the Company pursuant to an Officer's Certificate certifying that all conditions precedent to such release hereunder and under the Security Agreements have been met, the Collateral Agent shall release the Collateral.  Upon receipt of such Officer's Certificate, the Collateral Agent shall (at the sole cost and expense of the Company) execute, deliver or acknowledge any necessary or proper instruments of termination, satisfaction or release to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Agreements.

(b)      No Collateral shall be released from the Lien and security interest created by the Security Agreements pursuant to the provisions of the Security Agreements unless there shall have been delivered to the Collateral Agent the certificate required by this Section 10.03.

(c)      The release of any Collateral from the terms of this Indenture and the Security Agreements shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Collateral is released pursuant to the terms of the Security Agreements. To the extent applicable, the Company shall cause TIA §313(b), relating to reports, and TIA §314(d), relating to the release of property or securities from the Lien and security interest of the Security Agreements and relating to the substitution therefor of any property or securities to be subjected to the Lien and security interest of the Security Agreements, to be satisfied. Any certificate or opinion required by TIA §314(d) may be made by an Officer of the Company except in cases where TIA §314(d) requires that such certificate or opinion be made by an

54

independent Person, which Person shall be an independent engineer, appraiser or other expert selected or approved by the Company.

### Section 10.04. Certificates of the Company.

The Company shall furnish to the Trustee and the Collateral Agent, prior to each proposed release of Collateral pursuant to the Security Agreements, (i) all documents, if any, required by TIA §314(d) and (ii) an Opinion of Counsel, which may be rendered by internal counsel to the Company, to the effect that such accompanying documents constitute all documents required by TIA §314(d). The Trustee and the Collateral Agent may, to the extent permitted by Sections 7.01 and 7.02 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such documents and such Opinion of Counsel.

### Section 10.05. Certificates of the Trustee.

In the event that the Company wishes to release Collateral in accordance with the Security Agreements and has delivered the certificates and documents required by the Security Agreements and Sections 10.03 and 10.04 hereof, the Trustee shall determine whether it has received all documentation required by TIA §314(d) in connection with such release and, based on such determination and the Opinion of Counsel delivered pursuant to Section 10.02, shall deliver a certificate to the Collateral Agent setting forth such determination; *provided, however,* that so long as the Trustee is the Collateral Agent, the requirement that the Trustee deliver a certificate to the Collateral Agent shall not be applicable.

### Section 10.06. Authorization of Actions to Be Taken by the Trustee and the Collateral Agent Under the Security Agreements.

Subject to the provisions of Section 7.01 and 7.02 hereof, the Trustee shall, in its sole discretion and without the consent of the Holders of Notes, direct, on behalf of the Holders of Notes, the Collateral Agent to take all actions it deems necessary or appropriate in order to (a) enforce any of the terms of the Security Agreements and (b) collect, receive and distribute any and all amounts payable in respect of the Obligations of the Company hereunder or under the Security Agreements. The Trustee and the Collateral Agent shall have power to institute and maintain such suits and proceedings as either may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Security Agreements or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Holders of Notes in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest

hereunder or be prejudicial to the interests of the Holders of Notes or of the Trustee or the Collateral Agent).

Section 10.07. **Authorization of Receipt of Funds by the Trustee Under the Security Agreements.**

The Collateral Agent shall deliver to the Trustee and the Trustee is authorized to receive any funds for the benefit of the Holders of Notes distributed under the Security Agreements, and to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture and the Security Agreements.

ARTICLE 11.
SATISFACTION AND DISCHARGE

Section 11.01. **Satisfaction and Discharge.**

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(1) either:

(a) all Notes that have been authenticated (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company) have been delivered to the Trustee for cancellation; or

(b) the Company has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest, to pay and discharge the entire indebtedness on the Notes not delivered to the Trustee for cancellation for principal on, accrued and unpaid Fixed Interest to the date of Stated Maturity or, if prepaid in accordance with Section 3.07, to the prepayment date set forth in the notice contemplated by Section 3.01 and the maximum remaining amount of Contingent Interest payable on all Outstanding Notes;

(2) no Default or Event of Default shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under, any other material instrument to which the Company is a party or by which the Company is bound;

(3) the Company has paid or caused to be paid all sums payable by it under this Indenture; and

(4) the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or the prepayment date, as the case may be.

56

In addition, the Company must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee pursuant to subclause (b) of clause (1) of this Section, the provisions of Section 12.02 and Section 8.06 shall survive.

Section 11.02. **Application of Trust Money.**

Subject to the provisions of Section 8.06, all money deposited with the Trustee pursuant to Section 11.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and Interest, for whose payment such money has been deposited with the Trustee; *provided, however,* such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 11.01 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's Obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 11.01; *provided, however,* that if the Company has made any payment of principal of Interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

ARTICLE 12.
MISCELLANEOUS

Section 12.01. **Trust Indenture Act Controls.**

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by TIA §318(c), the imposed duties shall control.

Section 12.02. **Notices.**

Any notice or communication by the Company, the Trustee or the Collateral Agent to the other is duly given if in writing and delivered in Person or mailed by first class mail (registered or certified, return receipt requested), telecopier or overnight air courier guaranteeing next day delivery, to the others' address:

57

If to the Company:

The FINOVA Group Inc.
4800 North Scottsdale Road
Scottsdale, Arizona 85251-7623
Attention: President
(480) 636-4800
(480) 636-5036 (facsimile)

If to the Trustee:

The Bank of New York
101 Barclay Street, 21st Floor West
New York, New York 10286
Attention: Corporate Trust Administration
(212) 815-5915 (facsimile)

If to the Collateral Agent, at the address provided in the Security Agreements for notices to be sent.

The Company or the Trustee, by notice to the other may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied; and the next Business Day after timely delivery to the courier, if sent by overnight air courier promising next Business Day delivery, except that notices and communications to the Trustee or the Collateral Agent shall be deemed duly given and effective only upon receipt.

Any notice or communication to a Holder shall be mailed by first class mail or by overnight air courier promising next Business Day delivery to its address shown on the register kept by the Registrar. Any notice or communication shall also be so mailed to any Person described in TIA §313(c), to the extent required by the TIA. Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it shall mail a copy to the Trustee at the same time.

58

### Section 12.03.  **Communication by Holders of Notes with Other Holders of Notes.**

Holders may communicate pursuant to TIA §312(b) with other Holders with respect to their rights under this Indenture, the Notes and the Security Agreements. The Company, the Trustee, the Registrar and anyone else shall have the protection of TIA §312(c).

### Section 12.04.  **Certificate and Opinion as to Conditions Precedent.**

Upon any request or application by the Company to the Trustee and/or the Collateral Agent to take any action under this Indenture, the Company shall furnish to the Trustee, upon request:

(a)     an Officer's Certificate in form and substance reasonably satisfactory to the Trustee, as applicable (which shall include the statements set forth in Section 12.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(b)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

### Section 12.05.  **Statements Required in Certificate or Opinion.**

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to TIA §314(a)(4)) shall comply with the provisions of TIA §314(e) and shall include:

(a)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

59

Section 12.06. **Rules by Trustee and Agents.**

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 12.07. **No Personal Liability of Directors, Officers, Employees and Stockholders.**

No director, officer, employee, incorporator or stockholder of the Company, as such, shall have any liability for any obligations of the Company under the Notes, this Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 12.08. **Governing Law.**

THE INTERNAL LAW OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE AND THE NOTES WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Section 12.09. **No Adverse Interpretation of Other Agreements.**

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 12.10. **Successors.**

All agreements of the Company in this Indenture and the Notes shall bind its successors and assigns. All agreements of the Trustee and/or the Collateral Agent in this Indenture shall bind its successors and assigns.

Section 12.11. **Severability.**

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 12.12. **Counterpart Originals.**

The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

60

Section 12.13.  **Table of Contents, Headings, etc.**

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

[Signatures on following page]

SIGNATURES

Dated as of              , 2001

THE FINOVA GROUP INC.

By:_____
    Name:
    Title:

THE BANK OF NEW YORK, as Trustee

By:_____
    Name:
    Title:

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FINOVA CAPITAL CORPORATION | Case Nos 01-0698 (PJW) |
| | Jointly Administered |
| Reorganized Debtor | **Objection Deadline: TBD**<br>**Hearing Date: TBD** |

## MOTION OF THE REORGANIZED DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE SECTION 1141 CLARIFYING PROVISION OF CONFIRMED PLAN

The above-captioned reorganized debtor (the "Reorganized Debtor" or "FNV Capital")

hereby requests the entry of an order, pursuant to section 1141 of title 11 of the United States

Code, 11 U S C §§ 101-1330 (the "Bankruptcy Code") clarifying certain provisions of the *Third*

*Amended and Restated Joint Plan of Reorganization* [Docket No 534] (the "Plan"), as

confirmed by order of this Court dated August 10, 2001 [Docket No 852] (the "Confirmation

Order")   In support of this Motion, the Reorganized Debtor respectfully represents as follows:

### JURISDICTION

This Court has jurisdiction to consider this Motion pursuant to 28 U S C §§ 157 and

1334  In addition, pursuant to Article 12, section 12 1(m) of the Plan, this Court has retained

jurisdiction to grant the kind of relief requested herein   Section 12 1(l) and (j) of the Plan provide

respectively that "[t]he Bankruptcy Court shall have exclusive jurisdiction of all matters arising

out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of,

sections 105(a) and 1142 of the Bankruptcy Code and for, among other things     [t]o hear and

determine disputes arising in connection with the interpretation, implementation, or enforcement

RLF1-2858480-1

# 22
4/1/05

75

of the Plan        " to and "ensure that distributions and rights granted to holders of Allowed

Claims and Allowed Interest are accomplished as provided        [in the Plan]        " This matter is

a core proceeding under 28 U S C § 157(b),[1] and venue is proper pursuant to 28 U S C §§ 1408

and 1409  The statutory predicate for the relief requested herein is section 1141 of the

Bankruptcy Code  This Motion is properly brought as a contested matter, rather than an

adversary proceeding  *In re Applewood Chair Company,* 203 F 3d 914, 918 (5th Cir  2000)

(motion for clarification of substantially consummated confirmed plan properly brought as a

motion rather than adversary proceeding)

## BACKGROUND

1        On March 7, 2001 (the "Petition Date"), the Reorganized Debtor, along with its

parent, FINOVA Group Inc  ("FNV Group"), and certain other affiliates (collectively with the

Reorganized Debtor and FNV Group, the "Reorganized Debtors"), each filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code  By order of this Court, the Reorganized

Debtors' chapter 11 cases were jointly administered for procedural purposes only

2        On May 2, 2001, the Reorganized Debtors filed their plan of reorganization, which

was subsequently amended on June 1, 2001, June 11, 2001, and June 14, 2001  This Court

confirmed the Plan by the Confirmation Order on August 10, 2001  The Plan became effective on

August 21, 2001 (the "Effective Date")

3        On each of November 18, 2003, December 29, 2004 and March 22, 2005,

pursuant to section 350 of the Bankruptcy Code, this Court issued orders (each a "Final Decree,"

---

[1]        *See In re U S. Brass Corp ,* 301 F 3d 296, 205-306 (5th Cir  2002)(core jurisdiction over issues in substantially consummated plan granted by 28 U S C § 157)

RLF1-2858480-1

2

and collectively, the "Final Decrees") closing the cases of certain of the Reorganized Debtors [2]

Pursuant to each of the Final Decrees, this Court maintained jurisdiction of, among other things,

"the enforcement of the provisions of the Plan (including all related documents contemplated by

the Plan) and the Confirmation Order, and the entry of orders in aid of confirmation and

consummation of the Plan, including, but not limited to, orders resolving disputes regarding

distributions under the Plan "

## RELIEF REQUESTED

4        Pursuant to the Plan, the Reorganized Debtors are required to set aside 5% of their

net cash after provision for payment of certain obligations and expenses ("Available Cash") to

make distributions to equity interests in FNV Group  However, the Plan prevents distributions to

the equity interests under certain conditions of financial impairment of the Reorganized Debtors

Because the Reorganized Debtors have determined that there is no reasonable chance that

distributions can be made to equity interests, by this Motion, the Reorganized Debtor seeks an

order of this Court authorizing it (i) to cease setting aside 5% of the Available Cash for the benefit

of equity interests in FNV Group and (ii) to return the Available Cash in a separate account held

for the benefit of the equity holders in FNV Group (the "Segregated Account") to the

Reorganized Debtors for use in their businesses to pay expenses, debts and other obligations [3]

This Motion was unanimously approved by FNV Group's Board of Directors, the majority of

---

[2]        Pursuant to the November 18, 2003 Order, the case of FINOVA Portfolio Services Inc  (Case No
01-0703) was closed  Pursuant to the December 29, 2004 Order, the following cases were closed:  FINOVA Group,
Inc  (Case No  01-0697); FINOVA (Canada) Capital Corporation (Case No 01-0699); FINOVA Capital plc (Case No
01-0700); FINOVA Loan Administration Inc  (Case No 01-0701); FINOVA Technology Finance, Inc  (Case No  01-
0704); FINOVA Finance Trust (Case No  01-0705)  Pursuant to the March 22, 2005 Order, the case of FINOVA
Mezzanine Capital Inc  (Case No  01-0702) was closed

[3]        FNV Capital, a direct subsidiary of FNV Group, directly funded the 5% Available Cash to the
Segregated Account

whom were originally appointed by Berkadia, LLC ("Berkadia"), whose affiliates own 50% of

FNV Group's equity interests   Thus, Berkadia's affiliates would be entitled to half of the

approximately $57 8 million in the Segregated Account (or $28 9 million) if dividends were ever

paid [4]  Nevertheless, the Board of Directors has determined that due to the Reorganized Debtors'

financial prospects, the funds rightfully belong to the creditors, not equity holders

## ARGUMENT AND BASIS FOR RELIEF

**A.    Indenture Provisions**

5       Pursuant to the Plan, holders of allowed unsecured claims against FNV Capital

received among things, cash equal to 70% of their allowed claims and 7 5% Senior Secured Notes

Maturing 2009 with Contingent Interest Due 2016 (the "New Senior Notes") of FNV Group in

the face amount of 30% of their allowed claims against FNV Capital   FNV Capital entered into

an intercompany note with FNV Group, which backs up the payments to be made under the New

Senior Notes and certain obligations to FNV Group's equity holders   A term sheet describing the

New Senior Notes was attached to the Plan, and, prior to the Effective Date, the forms of the

Indenture (defined below) and the New Senior Notes were filed with the Court in that certain Plan

Supplement With Respect to Third Amended and Restated Joint Plan of Reorganization of

Debtors Under Chapter 11 of the Bankruptcy Code dated July 20, 2001 [Docket No 745] (the

"Plan Supplement")  Pursuant to the Confirmation Order, the Plan Supplement was incorporated

as part of the Plan

---

[4]     Leucadia National Corporation ("Leucadia"), an affiliate of Berkadia, does not, to FINOVA's
knowledge, own any of the New Senior Notes   Therefore, if this Motion is granted, Leucadia will not receive any of the
funds in the Segregated Account   Berkshire Hathaway Inc , an affiliate of Berkadia, owns a portion of the New Senior
Notes, but will receive a substantially lower amount as a holder of the New Senior Notes, as compared to the amount it
would receive as an equity holder

6        The terms of the New Senior Notes are governed by the Indenture between The

FINOVA Group Inc and The Bank of New York, as Trustee, dated as of August 22, 2001 (the

"Indenture"), which provides that after the provision for payment of operating expenses and

certain other obligations, FNV Group will, and will cause its subsidiaries, including FNV Capital,

to use 95% of the Available Cash[5] to pay principal and interest on the New Senior Notes and to

use 5% of the Available Cash to pay dividends to, or make repurchases of, FNV Group's equity

interests [6]

7        The Section 4 06(v) of the Indenture specifically provides that in the event that the

distribution to or repurchase of equity would be:

> "[an] Impermissible Restricted Payment, the Company [FNV Group] shall
> retain such amounts and any such retained amounts shall accumulate and
> shall be used to make Restricted Payments at such time or from time to
> time when such Restricted Payments are not Impermissible Restricted
> Payments        "

An Impermissible Restricted Payment is defined as:

> a Restricted Payment that, if made by the Company or any of its
> Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent
> conveyance by such entity or (iii) not be permitted to be made by such
> entity under applicable law [7]

---

[5]        Section 4 06 of the Indenture sets forth the usage of the cash and cash equivalents of FNV Group and
its subsidiaries

[6]        "Fifth, until the principal of and Fixed Interest on the Notes are paid in full to (A) pay to the
Company, when due the principal on the Intercompany Notes     which amounts the Company shall use together with
any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the
Notes     and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the Company, which
amounts the Company shall use together with any other cash the Company has available for such purposes to make
Restricted Payments     provided, however, that each incremental payment of $0 95 pursuant to Clause (A) shall require
a distribution or retention pursuant to clause (B) of $0 05; "

[7]        Indenture at 6

5

A Restricted Payment is a declaration or distribution of a dividend or any distribution to, or repurchase of, FNV Group's equity interests [8]

8       While the Reorganized Debtors continue to pay their creditors in a timely manner, FNV Group concluded prior to making any payments on account of the Senior Notes that paying dividends to, or repurchasing, its equity interests would be Impermissible Restricted Payments Therefore, FNV Group caused the 5% of the Available Cash to be deposited into the Segregated Account  As of the date of this Motion, there is approximately $57 million in the Segregated Account

9       At this time, it is clear that FNV Group is insolvent   Using year-end 2004 figures, on a consolidated basis, FNV Group and its subsidiaries had cash of just over $480 million and net financial assets worth approximately $605 million (total assets of approximately $1 134 billion), and liabilities of approximately $2 187 billion [9]  Almost half of the financial assets consist of transportation assets, including many older, off-lease aircraft, which are generally not desirable to domestic commercial airlines and have limited prospects of substantially increasing in value. The remaining assets consist of financial assets, such as loans and leases, secured by real estate, equipment or other property, which for a variety of reasons have not previously been liquidated Because liabilities exceed assets by more than $1 billion, the recovery rate on the remaining financial assets would have to be approximately 274% to make up the shortfall in assets [10] Moreover, because the Indenture prohibits the Reorganized Debtors from engaging in new businesses, they do not have the ability to "grow" their way out of the current financial

---

[8]       Indenture at 11

[9]       Form 10-K, FINOVA Group Inc  filed March 22, 2005 for the period ending December 31, 2004 (the "FNV Group 10-K") at A-1

6

circumstances  Accordingly, the Reorganized Debtors have determined that there is no

reasonable chance of financial recovery, and therefore the Reorganized Debtor seeks an order of

this Court to allow it (i) to cease depositing in the Segregated Account the Available Cash that

would have been used to pay or repurchase equity securities and (ii) to use the funds in the

Segregated Account to pay its obligations to creditors [11]

**B.**    <u>Applicable Law</u>

      10    FNV Group is a Delaware corporation and therefore its ability to declare and pay

dividends is governed by the Delaware General Corporation Law (the "DGCL")  Section 170 of

the DGCL, which governs the ability of a Delaware corporation to declare and pay dividends,

provides that a corporation may declare and pay dividends:

> "(1) out of its surplus     or (2) in case there shall be no such surplus, out
> of its net profits for the fiscal year in which the dividend is declared and/or
> the preceding fiscal year "

Section 160 of the DGCL governs the ability of a Delaware corporation to purchase,

redeem or otherwise acquire its own shares  Section 160 provides that:

> "    no corporation shall. (1) [p]urchase or redeem its own shares of
> capital stock for cash or other property when the capital of the corporation
> is impaired or when such purchase or redemption would cause any
> impairment of the capital of the corporation        "

Section 154 of the DGCL defines "Surplus" as.

> "[t]he excess , if any, at any given time, of the net assets of the corporation
> over the amount so determined to be capital "

---

[10]    FNV Group 10-K at A-1

[11]    FNV Capital is current on payments to post-confirmation creditors and in paying its operating
expenses, therefore, as a practical matter, these amounts would be used to make payments on the New Senior Notes

RLF1-2858480-1

Section 154 of the DGCL defines "Capital" as the.

> "amount equal to the aggregate par value of such shares having a par value,
> plus the amount of the consideration for such shares without par value "

Section 154 of the DGCL defines "Net assets" as:

> "    the amount by which total assets exceed total liabilities "

11    By the date of the first distribution to holders of the New Senior Notes, FNV Group determined that it had neither "surplus" nor net profits  Therefore, any dividend or distribution to, or repurchase of equity interests of, FNV Group would have been an Impermissible Restricted Payment  As a result, in accordance with Section 4 06(a)(iv) of the Indenture, FNV Group retained the 5% of Available Cash in the Segregated Account with the intention that such funds would remain in the Segregated Account until the declaration and payment of dividends would not be Impermissible Restricted Payments [12]

12    Because FNV Group cannot, and has no reasonable prospect that it will be able to, pay dividends in the future, there is no purpose is requiring FNV Group to hold the 5% of Available Cash in the Segregated Account  Such amounts should be available to satisfy the Reorganized Debtors' debts

## C.    Need to Clarify Plan Provisions

13    The Indenture was incorporated into and is part of the Plan  While the Indenture contemplated that dividends shall be retained if payments would be impermissible under applicable law, it did not describe what would happen to the amounts retained by FNV Group in the event that FNV Group would never be able to declare and pay dividends  Therefore, this Motion

---

[12]    FNV Group also believes that payments to equity holders cannot be made because such payments would render FNV Group insolvent and/or because FNV Group is already insolvent, and therefore, such payments would be fraudulent conveyances within the definition of Impermissible Restricted Payment

requests a clarification of the treatment of the funds retained by FNV Group in the present situation where there is no reasonable chance that the retained funds will ever be able to be paid to the equity holders of FNV Group

    14    The equity holders of FNV Group will not be harmed by the relief requested in this Motion because the Plan specifically contemplates that the 5% of Available Cash would be retained by FNV Group if applicable law prevented FNV Group fiom declaring or paying dividends fiom funds in the Segregated Account  The Plan's treatment of holders of the New Senior Notes will also not be changed, because the Plan contemplates that they will receive payment on account of the Notes and that equity holders will not receive dividends if such dividends are not permitted under applicable law  Because the Plan's treatment of the New Senior Notes and FNV Group's equity will not be changed by this Motion, this Motion does not seek a modification of the Plan  Theiefore, the relief requested herein is not prohibited by Bankruptcy Code § 1127  *See In re Hubbard*, 161 B R 173 (Bankr N D Tx 1993) (in motion to clarify substantially consummated plan filed more than a year after confiimation, the court found that interest on non-dischargeable debt must be paid, despite plan provision that unsecured claims would receive no interest – decision reached because contrary interpretation of plan would cause it to contravene Bankruptcy Code § 523(a)(7)); *In re Conrad*, 142 B R 314 (Bankr E D Ark 1992) (in motion to clarify substantially consummated plan filed three (3) years after confirmation, court held that plan provided for post-petition interest and legal fees to secured creditor, even though plan did not specifically so provide – decision ieached because plan provided that claimant was fully secured, therefore payment of post-petition interest and legal fees was implied)  Requiring FNV Group to continue to hold the funds in the Segregated Account

and to continue to deposit 5% of the Available Cash therein would serve no purpose [13]

Moreover, it is important to make clear to FNV Group's equity holders that there is no reasonable

chance that they will ultimately receive a portion of the funds in the Segregated Account

Therefore, the Reorganized Debtor respectfully requests the relief sought in this Motion

### BRIEFING

15      The Reorganized Debtor submits that the relevant issues of law are adequately

discussed in this Motion and, therefore, further briefing should not be required  Accordingly, the

Reorganized Debtor respectfully requests that the Court set aside the briefing schedule set forth in

Rule 7 1 2(a) of the Local Rules of Civil Practice and Procedure of the United States District

Court for the District of Delaware, which is incorporated by reference into Rule 1001-1(b) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware

### NOTICE

16      No trustee or examiner was appointed in the Reorganized Debtors' chapter 11

cases  Notice of this Motion and any hearing thereon will be provided to (i) the Office of the

United States Trustee for the District of Delaware, (ii) The Bank of New York, as Trustee under

the Indenture, (iii) all parties entitled to receive notice pursuant to Bankruptcy Rule 2002, (iv) the

Securities and Exchange Commission (the "SEC"), (v) holders of equity interests in FNV Group

by including such notice in the proxy materials sent to equity holders of record as of March 21,

2005 and (vi) the public by inclusion of such notice in a Current Report on SEC Form 8-K to be

---

[13]      FNV Group is in the process of completing the liquidation of its assets and is significantly reducing
the number of its employees

filed with the SEC  In light of the nature of the relief requested herein, the Reorganized Debtors

submit that no further notice need be given

WHEREFORE, the Reorganized Debtors request that this Court enter an order allowing

the Reorganized Debtor (i) to cease setting aside 5% of the Available Cash for the benefit of

equity interests in FNV Group, (ii) to return the Available Cash in the Segregated Account to

FNV Capital for use in its business to pay expenses, debts and other obligations, and (iii) to grant

such other and further relief as may be just and proper.

Dated: April 1, 2005
Wilmington, Delaware

Mark D  Collins (No  2981)
Rebecca Booth (No  4031)
Jason M  Madron (No  4431)
RICHARDS, LAYTON & FINGER, P A
One Rodney Square
P.O  Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Telecopy:  (302) 651-7701

-and-

Jonathan M  Landers
Janet M  Weiss
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 351-4000
Telecopy:  (212) 351-4035

Co-counsel to the Reorganized Debtor

11

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FINOVA CAPITAL CORPORATION | Case Nos 01-0698 (PJW) |
| | Jointly Administered |
| Reorganized Debtor | **Objection Deadline: TBD**<br>**Hearing Date: TBD** |

## NOTICE OF FILING

PLEASE TAKE NOTICE that the above-captioned reorganized debtor (the "Reorganized Debtor") has today filed the attached **Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan** (the "Clarification Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court")

PLEASE TAKE FURTHER NOTICE that objections to the Clarification Motion, if any, must be filed with the Bankruptcy Court, served upon and received by the undersigned counsel on or before a date to be determined by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that if an objection is timely filed, served and received and such objection is not otherwise timely resolved, a hearing to consider such objection and the Clarification Motion will be held before The Honorable Peter J Walsh on a date to be determined by the Bankruptcy Court at the Bankruptcy Court

PLEASE TAKE FURTHER NOTICE that the Reorganized Debtor intends to provide separate notice of the objection deadline and hearing date with respect to the Clarification Motion, once established by the Bankruptcy Court

RLF1-2859156-1

Dated: April 1, 2005
Wilmington, Delaware

Mark D Collins (No 2981)
Rebecca Booth (No 4031)
Jason M Madron (No 4431)
RICHARDS, LAYTON & FINGER, P A
One Rodney Square
P.O Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

Jonathan M Landers
Janet M Weiss
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-counsel to the Reorganized Debtor

## **Proposed Form of Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FINOVA CAPITAL CORPORATION, | Case Nos  01-0698 (PJW) |
| Reorganized Debtor | Re: Docket No. _____ |

ORDER UNDER BANKRUPTCY CODE SECTION 1141
CLARIFYING PROVISION OF CONFIRMED PLAN

Upon the motion (the "Motion") of the above-captioned reorganized debtor (the "Reorganized Debtor," and together with its parent corporation and certain other affiliates, the "Reorganized Debtors") pursuant to section 1141 of the Bankruptcy Code[1] for an order clarifying certain provisions of the Plan to allow FNV Group to return the funds in the Segregated Account to the Reorganized Debtors and to use such funds to pay their creditors, the Court finds and concludes that: (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U S C §§ 157 and 1334, (ii) on May 2, 2001, the Reorganized Debtors filed the Plan, which was subsequently amended on June 1, 2001, June 11, 2001, and June 14, 2001; (iii) the form of the Indenture governing the New Senior Notes was filed with this Court in the Plan Supplement; (iv) this Court confirmed the Plan by order dated August 10, 2001; (v) due notice of the Motion has been provided to, inter alia:

      (a)    the Office of the United States Trustee,

      (b)    The Bank of New York as Trustee under the Indenture,

      (c)    the Securities and Exchange Commission (the "SEC"),

---

[1]    Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Motion

RLF1-2858480-1

    (d)    holders of equity interests in FNV Group by inclusion of such notice in the

            proxy materials sent to equity holders of record as of March 21, 2005, and

    (e)    the public by inclusion of such notice in a Current Report on SEC Form 8-

            K to be filed with the SEC,

and no other notice need be given; (vi) although the Indenture provides for the payment of 5% of

Available Cash to the Equity Holders, such payment may not be made in certain circumstances

including at times when that payment would be illegal under applicable law; (vii) for the reasons

described in the Motion, there is no reasonable possibility that the FNV Group will ever be able to

pay any amount to the Equity Holders; and (viii) the relief requested is in the Motion is in the best

interests of the Reorganized Debtors

        Based upon the above findings and conclusions; upon the Motion, the supporting

papers, the files and records in these cases, and the proceedings had before the Court, if any; and

after due deliberation and sufficient cause appearing therefor, it is hereby

        **ORDERED** that, the Motion is GRANTED; and it is further

        **ORDERED** that FNV Group (i) may cease setting aside 5% of the Available Cash

for the benefit of Equity Interests in FNV Group and (ii) may return the Available Cash in the

Segregated Account to FNV Capital for use in its business to pay expenses, debts and other

obligations

Dated: _____, 2005
      Wilmington, Delaware

                          _____
                          THE HONORABLE PETER J WALSH
                          UNITED STATES BANKRUPTCY JUDGE

2

## CERTIFICATE OF SERVICE

I, Jason M Madron, do hereby certify that on April 1, 2005 a copy of the forgoing

**Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1141**

**Clarifying Provision of Confirmed Plan** was served on the parties on the attached list and in

the manner indicated thereon

Jason M Madron (Bar No 4431)

RLF1-2859126-1

**In re: The FINOVA Group 01-00698 (PJW)**
**Bankruptcy Rule General Service List**

**Via Hand Delivery:**
David Buchbinder
Office of the United States Trustee
844 King St., Suite 2313
Lockbox 35
Wilmington, DE 19801

(Representing Olsen Industries)
Regina A. Iorii
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899

(Representing JPMorgan Chase Bank)
Howard A. Cohen
Reed Smith LLP
1201 N. Market Street, Suite 1500
Wilmington, DE 19801

**Via Federal Express:**
(Representing SMMPP, Inc.)
Gerald. K. Kitano
3435 Wilshire Boulevard, Suite 1800
Los Angeles, CA 90010

(Representing Leucadia)
Martin Bienenstock
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

(Representing HYNIX Semiconductor
America, Inc.
f/k/a Hyundai Electronic America ("HYNIX")
Robert J. Rohrberger
Fox and Fox LLP
70 South Orange Avenue
Livingston, NJ 07039

(Representing JPMorgan Chase Bank)
Robert C. Shenfeld
Reed Smith Crosby Heafey LLP
355 S. Grand Avenue, Suite 2900
Los Angeles, CA 90071

(Representing GE Capital Mortgage
Insurance)
Glenn M. Reisman
Two Corporate Drive
P.O. Box 861
Shelton, CT 06484-0861

(Representing Federal Express Corporation)
Charles J. Filardi, Jr.
Pepe & Hazard LLP
30 Jelliff Lane
Southport, CT 06890-1436

(Representing Debtor)
Jonathan M. Landers
Janet Weiss
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

(Representing the Bank of New York as the
Indenture Trustee for Finova Group Inc.'s
Bonds)
The Bank of New York
Corporate Trust Administration
101 Barclay Street, 21st Floor West
New York, NY 10286

Securities & Exchange Commission
Attention: Nathan Fuchs
233 Broadway
New York, NY 10279

RLF1-2815544-1

92

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FINOVA CAPITAL CORPORATION | : | Case Nos. 01-0698 (PJW) |
| | : | Jointly Administered |
| Reorganized Debtor | : | |
| | : | Related Docket Nos.: 22, 33, 35, 39, 48, 61. |
| | : | |
| | : | Hearing Date: November 29, 2005 |

**THE EQUITY COMMITTEE'S RESPONSE TO THE REORGANIZED DEBTOR'S
REPLY TO OBJECTION OF FIRST CAROLINA INVESTORS, INC. TO MOTION
OF REORGANIZED DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE
SECTION 1141 CLARIFYING PROVISION OF CONFIRMED PLAN**

William D. Sullivan (No. 2820)
Jami B. Nimeroff (No. 4049)
BUCHANAN INGERSOLL
The Nemours Building
1007 N. Orange Street, Suite 1110
Wilmington, DE 19801
Telephone: (302) 428-5500
Facsimile: (302) 428-3996

-- and --

Mark D. Silverschotz
James M. Andriola
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182
Telephone: (212) 278-1000
Facsimile: (212) 278-1733

Docket No. 62
Date 10/18/2005

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

THE RELEVANT PROVISIONS OF THE CONTROLLING
        DOCUMENTS AND THE USE OF CASH TO DATE ...................................................2

THE CLARIFICATION MOTION AND THE APPOINTMENT OF THE
        EQUITY COMMITTEE ................................................................................................5

THE FINANCIAL CONDITION OF THE REORGANIZED DEBTOR .......................................6

ARGUMENT ................................................................................................................................6

A.    New York State Contract Law Governs The Reorganized Debtor's
        Clarification Motion .....................................................................................................6

B.    The Terms Of The Controlling Documents Do Not Support The
        Clarification Proposed By The Reorganized Debtor .........................................................7

C.    The Well-Settled And Basic Law Of Contracts Does Not Support
        The Clarification Proposed By The Reorganized Debtor .................................................11

D.    The Reorganized Debtor Has Failed To Rebut The Objections Of
        First Carolina Investors, Inc. ......................................................................................14

        1.    The Reorganized Debtor Misapprehends The Nature Of Its
                Payment Obligations Under The Plan...................................................................14

        2.    Under Any Analysis The Required Payments To The
                Equity Security Holders Cannot Be Impermissible
                Restricted Payments .........................................................................................19

        3.    Under New York Law The Funds In The Segregated
                Account Are Being Held In Trust For The Equity Security
                Holders ..........................................................................................................22

CONCLUSION ............................................................................................................................1

NYDOCS1-794194.2

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

Atlanta Shipping Corp. v. Chem. Bank, 818 F.2d 240, 249 (2d Cir. 1987) ...................................21

Brass v. America Film Technologies, Inc., 987 F.2d 142 (2d Cir. 1993).......................................11

Carrieri v. Jobs.com, Inc., 393 F.3d 508 (5th Cir. 2004)................................................................16

Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.), 221 B.R. 298
    (2d Cir. BAP 1998).................................................................................................................6, 7

In re Consumers Realty & Development Co., Inc., 238 B.R. 418 (8th Cir. BAP 1999)...............14

Counihan v. Allstate Insurance Co., 194 F.3d 357 (2d Cir. 1999) ......................................22, 23, 24

In re Ernst, 45 B.R. 700 (Bankr. D. Minn. 1985) ..........................................................................14

Geftman v. Commissioner of Internal Revenue, 154 F.3d 61 (3d Cir. 1998) .........................16-17

In re Georgetown Building Associates, 240 B.R. 124 (Bankr. D.D.C. 1999) ...............................16

Gerlach v. The Horn & Hardart Co., 683 F. Supp. 342 (S.D.N.Y. 1988) .....................................12

Golden Budha Corp. v. Canadian Land Co. of America, 931 F.2d 196 (2d Cir. 1991) .........22-23

I.R.V. Merchandising Corp. v. Jay Ward Productions, Inc., 856 F. Supp. 168 (S.D.N.Y.
    1994) ......................................................................................................................................10

In re JLH, L.L.C., 239 F.3d 366 (5th Cir. 2000)..............................................................................9

International Multifoods Corp. v. Commercial Union Insurance Co., 309 F.3d 76 (2d Cir.
    2002) .......................................................................................................................................8

Jones v. Keene Corp., 933 F.2d 209 (3d Cir. 1991) ......................................................................20

Jordanos', Inc. v. Commissioner of Internal Revenue, 396 F.2d 829 (9th Cir. 1968) ..................17

Kreiss v. McCown De Leeuw & Co., 131 F. Supp. 2d 428 (S.D.N.Y. 2001) ...............................11

Lomalio Assocs. Inc. v. LBK Mktg. Corp., No. 94 CIV. 3208 (KTD), 1999 WL. 705208
    (S.D.N.Y. Sept. 10, 1999).......................................................................................................10

**TABLE OF AUTHORITIES**
**(continued)**

Page

In re Leslie Fay Companies, Inc., 207 B.R. 764 (Bankr. S.D.N.Y. 1997)......................................20

In re McCalla, 238 B.R. 94 (Bankr. M.D. Pa. 1999) ............................................................... 12-13

O'Sullivan v. Comm'r of Internal Revenue., No. 30571-88, 1994 WL 444419 (T.C. Aug. 18, 1994) .......................................................................................................................................17

In re Penrod, 169 B.R. 910 (Bankr. N.D. Ind. 1994).....................................................................14

Pereira v. Dow Chemical Co. (In re Trace International Holdings, Inc.), 301 B.R. 801 (Bankr. S.D.N.Y. 2003) .........................................................................................................21

In re Potts, 188 B.R. 575 (Bankr. N.D. Ind. 1995) ......................................................................14

Record Club of America v. United Artists Records, Inc., 890 F.2d 1264 (2d Cir. 1989) .............11

Sergi v. Everett Savings Bank (In re Sergi), 233 B.R. 586 (1st Cir. BAP 1999) ........................6, 7

In re Sugarhouse Realty, Inc., 192 B.R. 355 (E.D. Pa. 1996) .........................................................7

In re Terex Corporation, 984 F.2d 170 (6th Cir. 1993) ............................................................ 12-13

U.S. v. Coluccio, 51 F.3d 337 (2d Cir. 1995) .......................................................................... 22-23

In re Water Gap Village, 99 B.R. 226 (Bankr. D.N.J. 1989)..........................................................14

**STATE CASES**

220 West 42 Associates v. Ronbet Newmark Co., 84 Misc.2d 259, 375 N.Y.S.2d 255 (Sup. Ct. N.Y. County 1975) ...................................................................................................11

Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378 (N.Y. 1919) .....................23

Campanile v. State Farm, 161 A.D.2d 1052, 558 N.Y.S.2d 203 (3d Dep't 1990) .................. 13-14

Coco v. Coco, 107 A.D.2d 21, 485 N.Y.S.2d 286 (2d Dep't 1985)................................................24

Faircloth v. Rash, 373 A.2d 870 (Del. Super. Ct. 1977)................................................................21

Fulweiler v. Spruance, 222 A.2d 555 (Del. Ch. 1966) ..................................................................18

G & M Motor Co. v. Thompson, 567 P.2d 80 (Okla. 1977)...........................................................23

## TABLE OF AUTHORITIES
### (continued)

Page

Goldfield Corp. v. General Host Corp., 29 N.Y.2d 264, 277 N.E.2d 387, 327 N.Y.S.2d
    330 (N.Y. 1971) .........................................................................................................................11

Grossman Steel & Aluminum Corp. v. Samson Window Corp., 54 N.Y.2d 653, 426
    N.E.2d 176, 442 N.Y.S.2d 769 (N.Y. 1981).......................................................................... 8-9

Grossman Steel & Aluminum Corp. v. Samson Window Corp., 78 A.D.2d 871, 433
    N.Y.S.2d 31 (2d Dep't 1980) ...................................................................................................9

Jacobson v. Sassower, 66 N.Y.2d 991, 489 N.E.2d 1283, 499 N.Y.S.2d 381 (N.Y. 1985) ..........12

Latham v. Father Divine, 299 N.Y. 22, 85 N.E.2d 168 (N.Y. 1949)..............................................23

Lui v. Park Ridge at Terryville Association, Inc., 196 A.D.2d 579, 601 N.Y.S.2d 496 (2d
    Dep't 1993).............................................................................................................................10

Manning v. Michaels, 149 A.D.2d 897, 540 N.Y.S.2d 583 (3d Dep't 1989) .................................10

McGrath v. Hilding, 41 N.Y.2d 625, 363 N.E.2d 328, 394 N.Y.S.2d 603 (N.Y. 1977) ...............23

Miller v. Schloss, 219 N.Y. 400, 113 N.E. 337 (N.Y. 1916).........................................................23

Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 660 N.E.2d
    415, 636 N.Y.S.2d 734 (N.Y. 1995) .......................................................................................10

Palazzo v. Palazzo, 121 A.D.2d 261, 503 N.Y.S.2d 381 (1st Dep't 1986) ....................................24

Reape v. New York News, Inc., 122 A.D.2d 29, 504 N.Y.S.2d 469 (2d Dep't 1986), cert.
    denied, 68 N.Y.2d 610, 501 N.E.2d 600, 508 N.Y.S.2d 1027 (1986) ............................... 11-12

In re Rehabilitation of National Heritage Life Ins. Co., 656 A.2d 252 (Del. Ch. 1994) ...............22

Reiner v. Reiner, 100 A.D.2d 872, 474 N.Y.S.2d 538 (2d Dep't 1984) .........................................24

Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 385 N.E.2d 566, 412 N.Y.S.2d
    827 (1978)...............................................................................................................................7

Schuler-Hass Electric Corp. v. Aetna Casualty & Surety Co., 40 N.Y.2d 883, 357 N.E.2d
    1003, 389 N.Y.S.2d 348 (N.Y. 1976) .......................................................................................9

Sharp v. Kosmalski, 40 N.Y.2d 119, 351 N.E.2d 721, 386 N.Y.S.2d 72 (N.Y. 1976)............23, 24

## TABLE OF AUTHORITIES
### (continued)

Page

Simonds v. Simonds, 45 N.Y.2d 233, 380 N.E.2d 189, 408 N.Y.S.2d 359 (N.Y. 1978) ........ 22-23

State v. Benson, 32 Del. 576, 128 A. 107 (Del. Super. Ct. 1924) ................................... 20

Tordai v. Tordai, 109 A.D.2d 996, 486 N.Y.S.2d 802 (3d Dep't 1985) ......................... 24

Trojan Hardware Co. v. Bonacquisti Construction Corp., 141 A.D.2d 278, 534 N.Y.S.2d 789 (3d Dep't 1988) ......................................................................................... 14-15

Twin City Fire Ins. Co. v. Delaware Racing Ass'n, 840 A.2d 624 (Del. 2003) ........................... 12

Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 807 N.E.2d 876, 775 N.Y.S.2d 765 (N.Y. 2004) ....................................................................... 8, 13

William A. White/Tishman East, Inc. v. Banko, 171 A.D.2d 401, 566 N.Y.S.2d 628 (1st Dep't 1991) ...................................................................................................... 12

## FEDERAL STATUTES

11 U.S.C. § 101(5)(A) ................................................................................. 14

11 U.S.C. § 101(12) ................................................................................... 14

## STATE STATUTES

DEL. CODE ANN. tit. 6, § 1303 ..................................................................... 21

DEL. CODE ANN. tit. 8, § 170 ..................................................................... 19-20

DEL. CODE. ANN. tit. 8, § 244 ..................................................................... 20

## MISCELLANEOUS

Restatement (Second) of Contracts § 227(1) (1981) .................................................. 10

The Official Committee of Equity Security Holders (the "Equity Committee"), on

behalf of the shareholders (the "Equity Security Holders") of Finova Group, Inc., the corporate

parent of the above captioned reorganized debtor (the "Reorganized Debtor"), by and through its

undersigned counsel, as its memorandum of law in opposition to: (a) the *Motion of the*

*Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of*

*Confirmed Plan*, dated April 1, 2005 (Docket No. 22) (the "Clarification Motion"); and (b) the

*Reply to Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an*

*Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan* (Docket

No. 61) (the "Reply to Objection"), respectfully states as follows:

### PRELIMINARY STATEMENT

1.      This memorandum demonstrates that the Clarification Motion must be

denied, as a matter of law, irrespective of the within debtor's solvency.  At least four distinct and

independently sufficient grounds exist for denying the requested relief:

- First, the Reorganized Debtor has not (and cannot) cite to any actual provision or language in the controlling documents that would support its position that the Equity Security Holders must now forfeit the funds set aside on their behalf.  Rather, the Reorganized Debtor is left to argue merely that such a forfeiture is "implicit."  The controlling documents – the Plan and the Indenture (each defined below) – each dictate that for every $0.95 of available cash that is used to pay principal and interest on the New Senior Notes, $0.05 must be distributed to, or retained on behalf of, the Equity Security Holders. This pittance in consideration was given to the Equity Security Holders under the Plan to which their class consented.  As a matter of hornbook contract law, such consideration cannot be taken away as the consequence of an inference.

- Second, well-settled principles of the law of contract interpretation prohibit the "clarification" proposed by the Reorganized Debtor. While studiously avoiding use of the term "ambiguous," the Reorganized Debtor admits that the Indenture was ambiguously drafted in that "it did not describe what would happen to the amounts retained by FNV Group," that would have otherwise been distributed to Equity Security Holders but for certain financial conditions alleged by the Reorganized Debtor to currently exist.  See Clarification Motion at ¶ 13. The Reorganized Debtor then asks this Court to issue an order directing that the amounts retained on account of the Equity Security

Holders under the terms of the Indenture be returned to the Reorganized Debtor "for use in its business to pay expenses, debts and other obligations." Proposed Order at p. 2. As will be discussed in more detail below, the Court should not grant the proposed relief because it would require the Court to impermissibly effect a forfeiture and to incorrectly interpret an ambiguous contract provision in favor of the party that drafted that provision.

- Third, in the Reply to Objection, the Reorganized Debtor does not rebut the arguments set forth in the *Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan* (the "First Carolina Objection"). Most notable is the Reorganized Debtor's inability to rebut the inarguable proposition that the confirmed Plan created binding payment obligations owed by the Reorganized Debtor to, among others, the Equity Security Holders.

- Fourth, contrary to the Reorganized Debtor's assertion, the distributions to the Equity Security Holders set forth in the Plan and Indenture are not Impermissible Restricted Payments, as that term is defined in the Indenture. This memorandum will demonstrate that the payments to Equity Security Holders are not Impermissible Restricted Payments because such payments merely fulfill the debt obligations set forth in the Plan and Indenture. Moreover, even if the Reorganized Debtor is correct and the called-for payments are currently Impermissible Restricted Payments, they will no longer be once the Reorganized Debtor ceases to function as an on-going business enterprise.

2.     Accordingly, the Clarification Motion must be denied in order to maintain

the status quo and to prevent the Reorganized Debtor from unjustly enriching itself by

retroactively rewriting the Plan so as to render forfeit the distributions on its debts owed to

Equity Security Holders.

## THE RELEVANT PROVISIONS OF THE CONTROLLING DOCUMENTS AND THE USE OF CASH TO DATE

3.     On or about May 2, 2001, the Reorganized Debtor (and related

companies) filed their plan of reorganization (together with all subsequent amendments thereto,

the "Plan"), which this Court confirmed by order dated August 10, 2001. The Indenture between

the Finova Group, Inc. and The Bank of New York, as Trustee, dated as of August 22, 2001 (the

"Indenture"), was included in the "Plan Supplement" and, pursuant to the confirmation order, the Plan Supplement was incorporated into and made part of the Plan.

        4.      The parties agree that this Court should decide the instant motion based on the terms of the Plan and Indenture.[1] It is not disputed that the Indenture sets forth a series of provisions which govern the use of cash by the Reorganized Debtor. In the words of the Reorganized Debtor, the Indenture "contains detailed provisions for using cash, and a so-called waterfall of payments which can be made." (Reply to Objection at ¶ 6). The waterfall of payments is set forth in Section 4.06(a) of the Indenture. The parties also agree that cash has been applied to the first four waterfall provisions set forth at Sections 4.06(a)(i)-(iv). In February 2004 (approximately two years before the maturity date), the Reorganized Debtor fully repaid the Berkadia Loan described in the fourth waterfall provision. Indenture at § 4.06(a)(4).

        5.      The provision at issue in this case is the fifth waterfall provision, Section 4.06(a)(v), which states in its entirety:

> FIFTH, until the principal of and Fixed Interest on the Notes are each paid in full, to (A) pay to the Company, when due, principal on the Intercompany Notes in an amount equal to the amount of cash and Cash Equivalents of the Company and its Subsidiaries, after deducting for items (i) through (iv) above, at any date (as determined by the Company) on or after the applicable Reference Date, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes until the principal and accrued and unpaid Fixed Interest have been paid in full, and, at the Company's option, to make prepayments at any time of principal and accrued and unpaid interest on the Intercompany Notes, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to prepay all or part of the principal and accrued and unpaid Fixed Interest on the Notes pursuant to Section 3.07, and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the

---

[1] By letter dated October 12, 2005, the Reorganized Debtor has expressly stated that it "does not intend to present oral testimony regarding the background and drafting history of pertinent provisions of the Note Indenture, the Plan and the Disclosure Statement...."

Company, which amounts the Company shall use together with any other cash the Company has available for such purposes to make Restricted Payments unless either (x) the making of any such Restricted Payment would be an Impermissible Restricted Payment, in which event the Company shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments, or (y) a Default or Event of Default has occurred and is continuing, in which event the Company shall retain such amounts and any such retained amounts shall accumulate and shall, subject to Article 6 hereof, be used to make such Restricted Payments at such time or from time to time when such Default or Event of Default is no longer continuing; *provided, however*, that each incremental payment of $0.95 pursuant to clause (A) shall require a distribution or retention pursuant to clause (B) of $0.05.

6.      Pursuant to Section 4.06(a)(v)(A), the Reorganized Debtor has made principal payments in excess of $1.1 billion on the New Senior Notes (term defined in Clarification Motion), and, pursuant to Section 4.06(a)(v)(B), the Reorganized Debtor has retained approximately $65.5 million in a segregated account. This conforms with the obligation "that each incremental payment of $0.95 pursuant to clause (A) shall require a distribution or retention pursuant to clause (B) of $0.05." Indenture at 4.06(a)(v).

7.      The Reorganized Debtor, however, will not transfer the funds held in the segregated account to the Equity Security Holders because it has decided on its own that such a transfer would at this time, and for perpetuity, be an Impermissible Restricted Payment under the Indenture. Under the Indenture, an "'Impermissible Restricted Payment' means a Restricted Payment that, if made by the [Reorganized Debtor], would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law." Indenture at p. 6. Under the Indenture, a "'Restricted Payment' means the declaration or payment of any dividend *or* the making of a distribution on account of the [Reorganized Debtor's] Equity Interests…" Indenture at p. 11 (emphasis added).

8.    The dispute between the parties may be put as follows:  The Reorganized

Debtor believes the distributions are Impermissible Restricted Payments, and believes further

that such status is permanent.  The Equity Committee believes that these distributions were (and

are) on account of contractual debt obligations and, therefore, are not Impermissible Restricted

Payments.  Significantly, under the Reorganized Debtor's theory, insolvency **must** be found in

order for it to prevail.  Conversely, solvency is irrelevant to the Equity Committee's analysis.[2]

### THE CLARIFICATION MOTION AND THE
### APPOINTMENT OF THE EQUITY COMMITTEE

9.    On or about April 1, 2005, the Reorganized Debtor filed the Clarification

Motion.  By the Clarification Motion, the Reorganized Debtor seeks an Order of this Court

permitting it to cease distributing cash to, or retaining cash on behalf of, the Equity Security

Holders.  The Reorganized Debtor also asks this Court to enter an order which would effect a

forfeiture of all rights that the Equity Security Holders may have to the approximately $65

million being held on their behalf in a segregated account.

10.    On or about June 3, 2005, the First Carolina Objection was filed by First

Carolina Investors, Inc. ("First Carolina").  The Equity Committee hereby incorporates the

factual and legal arguments set forth in the First Carolina Objection.

11.    At a hearing on June 10, 2005, the Court appointed an Official Committee

of Equity Security Holders for the limited purpose of responding to the Clarification Motion.

---

[2]    In light of the limited budget provided to the Equity Committee (subject to re-visitation upon motion
on notice to the Reorganized Debtor), the Equity Committee has not expended substantial funds in
pursuit of a plenary forensic accounting analysis of Finova's books and records.  Given its view that
solvency is of no moment, such expenditure would have been wasteful at best.  Rather, the Equity
Committee will likely bring on a motion to increase its cap to allow it to conduct such a plenary
review were the Court (erroneously, in the Committee's view) to conclude that solvency was a
significant issue.  In the interim, it is expected that such a motion will be made solely with respect to
increasing the cap for the full legal and limited-review financial expert fees incurred to date and
projected through oral argument in late November, which amount ought to aggregate well-less than
$200,000.

<u>See</u> Transcript of Motion Hearing before Honorable Peter J. Walsh on June 10, 2005 at 9:30

A.M. (Docket No. 50) (the "Transcript") at p. 27, lines 12-15; p. 38 lines 1-2; p. 44, line 19; <u>see</u>

<u>also</u> Order directing the United States Trustee to Appoint an Official Committee of Equity

Security Holders for a Limited Purpose and Granting Related Relief (Docket No. 48).

        12.     On or about September 19, 2005, the Reorganized Debtor filed its Reply

to Objection, the assertions of which are addressed herein.

<b><u>THE FINANCIAL CONDITION OF THE REORGANIZED DEBTOR</u></b>

        13.     In making the instant motion, the Reorganized Debtor has stressed to the

Court that it and its related companies "are insolvent and have been insolvent for some time."

(Reply to Objection at ¶ 4). The Equity Committee has retained an expert to review (on paper)

the Reorganized Debtor's portfolio of airplanes. Based on the Equity Committee's limited

budget, it does not have the financial resources necessary to conduct a comprehensive analysis of

even the Reorganized Debtor's airplane portfolio, let alone a plenary analysis of the Reorganized

Debtor's alleged insolvency. The Equity Committee believes, however, that the Reorganized

Debtor's financial condition is wholly irrelevant to the proposed Clarification Motion because

that motion should be denied as a matter of law.

<b><u>ARGUMENT</u></b>

**A.**    **New York State Contract Law Governs The Reorganized Debtor's**
        **Clarification Motion**

        14.     It is undisputed that Section 1141(a) of the Bankruptcy Code "establishes

the general rule that 'the provisions of a confirmed plan bind the debtor, any entity issuing

securities under the plan, any entity acquiring property under the plan, and any creditor, equity

security holder, or general partner in the debtor....'" <u>Charter Asset Corp. v. Victory Markets,</u>

<u>Inc. (In re Victory Markets, Inc.)</u>, 221 B.R. 298, 303 (2d Cir. BAP 1998). For this reason, a

"confirmed plan of reorganization is a binding contract…[which] is subject to interpretation pursuant to relevant rules of contract interpretation and construction." Sergi v. Everett Sav. Bank (In re Sergi), 233 B.R. 586, 589 (1st Cir. BAP 1999) (citing In re Sugarhouse Realty, Inc., 192 B.R. 355, 362 (E.D. Pa. 1996)); see also Victory Markets, Inc., 221 B.R. at 303 (holding that "a confirmed plan holds the status of a binding contract").

15.     Of course, state law provides the relevant rules of contract interpretation and construction. See, e.g., Sergi, 233 B.R. at 589 (applying Massachusetts contract law to interpret confirmed plan of reorganization); Victory Markets, Inc., 221 B.R. at 303 (applying New York contract law in interpreting allegedly ambiguous provision of confirmed plan of reorganization). In the present case, the Plan and Indenture each include provisions stating expressly that New York law is to be used in construing those documents. See Plan at § 13.9 and Indenture at § 12.08. As it must, the Reorganized Debtor agrees that New York law governs the Indenture. (Reply to Objection at ¶ 19) ("The Indenture … is governed by New York law.").

**B.      The Terms Of The Controlling Documents Do Not Support The Clarification Proposed By The Reorganized Debtor**

16.     In the instant motion, the Reorganized Debtor argues that "it is **implicit** in the Plan," that under certain financial conditions, the Equity Security Holders must forfeit the entirety of the consideration ($65 million and rising) provided to them under the Plan. (Reply to Objection at ¶ 9) (emphasis added). By making such an argument, the Reorganized Debtor admits that **there is no express language** in the Plan or Indenture that provides for such a forfeiture. In such circumstances, "courts should be extremely reluctant to interpret an agreement as **impliedly** stating something which the parties have neglected to specifically include." Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572, 412 N.Y.S.2d 827, 833 (N.Y. 1978) (emphasis added).

17.    The language of the Indenture provision at issue states that "each incremental payment of $0.95 [to the Company to pay principal and interest on the New Senior Notes] **shall require** a distribution [to Equity Security Holders] or retention [on their behalf]. Indenture at § 4.06(a)(v) (emphasis added).  Under New York law, the terms of a contract generally are afforded their plain and ordinary meaning.  See Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879, 775 N.Y.S.2d 765, 767-68 (N.Y. 2004) (holding that "when parties set down their agreement in a clear, complete document, their writing should…be enforced according to its terms" and "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."); Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 85-87 (2d Cir. 2002).  The plain meaning of this provision is that for every $0.95 that is used to pay principal on the New Senior Notes, $0.05 goes to the Equity Security Holders either at the time of distribution to Senior Noteholders or later.  In order to avoid the obvious impact of such plain language, the Reorganized Debtor argues that discrete limitations placed on the timing of the distribution of funds to the Equity Security Holders, i.e., when such distributions are Impermissible Restricted Payments, create a "condition precedent" to the Equity Security Holders **ever** receiving any payment.  (Reply to Objection at p. 2) ("First Carolina ignores the **condition precedent** to **any** equity distribution – that it would not render the Reorganized Debtors insolvent, would constitute a fraudulent transfer, or would not be permitted under applicable law." (emphasis added)).

18.    The Reorganized Debtor's attempt to conjure a "condition precedent" runs counter to the applicable New York law and, therefore, its repeated incantation of the term "condition precedent" is both wrong and misleading.  Under New York law, language akin to

that relied upon by the Reorganized Debtor has been found **not** to establish a "condition precedent," but rather merely to establish a **time** for payment.  The case of Grossman Steel & Aluminum Corp. v. Samson Window Corp., 54 N.Y.2d 653, 426 N.E.2d 176, 442 N.Y.S.2d 769 (N.Y. 1981) is highly instructive.[3]  In Grossman Steel, a subcontractor sued the general contractor to recover the balance due on a subcontract.  The general contractor argued that a condition precedent to its duty to pay the subcontractor was its receipt of payment from the owner.  Id. at 871, 433 N.Y.S.2d at 32.  The provision in the subcontract at issue provided, in relevant part:  "Retained percentages will be paid to [subcontractor] as and when [general contractor] receive[s] such payment from the [owner] and in the same proportions."  Id.  The Appellate Division, Second Department held that the "plaintiff subcontractor is entitled to payment of the retained percentage in the sum of $35,000, which represents the balance due on its subcontract with defendants…despite the fact that the [owner] has not yet paid said defendants."  Id. (citations omitted).  In affirming the decision of the Appellate Division, the New York Court of Appeals held that the "disputed language…of the contract **did not create a condition precedent to payment** to the subcontractor, **but rather established a time for payment**."  Grossman Steel & Aluminum Corp. v. Samson Window Corp., 54 N.Y.2d 653, 654, 426 N.E.2d 176, 177, 442, N.Y.S.2d 769, 770 (N.Y. 1981) (citing Schuler-Hass Elec. Corp. v. Aetna Cas. & Sur. Co., 40 N.Y.2d 883, 357 N.E.2d 1003, 389 N.Y.S.2d 348 (N.Y. 1976)) (emphasis added); see also In re JLH, L.L.C., 239 F.3d 366 (5th Cir. 2000) (applying New York law to find that language of agreement at issue did not create a condition precedent.).

---

[3]  The relevant facts come from the New York Supreme Court, Appellate Division's decision reported at Grossman Steel & Aluminum Corp. v. Samson Window Corp., 78 A.D.2d 871, 433 N.Y.S.2d 31 (2d Dep't 1980).

19.     Therefore, under applicable New York law, the language in Section 4.06(a)(v) of the Indenture relied upon by the Reorganized Debtor does not establish a condition precedent to payment to the Equity Security Holders, but rather a time for payment. Moreover, to the extent this Court believes there is an ambiguity as to whether or not the language creates a condition precedent, "it is well settled under New York law that where a contract term is ambiguous, **the creation of a condition precedent is disfavored**." Lomalio Assocs. Inc. v. LBK Mktg. Corp., No. 94 CIV. 3208 (KTD), 1999 WL 705208, at *7 (S.D.N.Y. Sept. 10, 1999) (citing I.R.V. Merch. Corp. v. Jay Ward Prods., Inc., 856 F. Supp. 168, 174 (S.D.N.Y. 1994); Lui v. Park Ridge at Terryville Ass'n, Inc., 196 A.D.2d 579, 581-82, 601 N.Y.S.2d 496, 499 (2d Dep't 1993); and Manning v. Michaels, 149 A.D.2d 897, 898, 540 N.Y.S.2d 583, 584 (3d Dep't 1989)) (emphasis added). As per the Court of Appeals, New York courts avoid interpreting "doubtful language" in a contract to be an express condition precedent "**when a finding of [such] an express condition [precedent] would increase the risk of forfeiture by the obligee**." Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 691, 660 N.E.2d 415, 418, 636 N.Y.S.2d 734, 737 (N.Y. 1995) (citing Restatement (Second) of Contracts § 227(1) (1981)) (emphasis added).

20.     The foregoing establishes that the Equity Security Holders received an unconditional right to payment under the Plan and Indenture, subject only to timing constraints. Moreover, the Reorganized Debtor is wrong in its assertion that any payment to the Equity Security Holders is now and forever will be an Impermissible Restricted Payment under the Plan. See section D, 2, infra, at p. 19.

C.     **The Well-Settled And Basic Law Of Contracts Does Not Support The Clarification Proposed By The Reorganized Debtor**

21.     The Reorganized Debtor strains to avoid saying explicitly that the Indenture is "ambiguous." Instead, the Reorganized Debtor asserts that the Indenture is "silent" (see Reply to Objection at ¶ 36) as to a term that it obviously believes is material and the absence of which prompted the instant motion. It is clear, however, that silence as to a material term in a contract is a **type** of ambiguity recognized by the courts. See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 149 (2d Cir. 1993) (holding a contract to be ambiguous where there was "nothing said in the contract" about whether stock shares to be reserved were to be restricted or unencumbered); Record Club of Am. v. United Artists Records, Inc., 890 F.2d 1264, 1269-71 (2d Cir. 1989) (finding a contractual ambiguity rendering summary judgment inappropriate where contract was silent as to the timing of royalty payments); Goldfield Corp. v. Gen. Host Corp., 29 N.Y.2d 264, 272-73, 277 N.E.2d 387, 392-93, 327 N.Y.S.2d 330, 337 (N.Y. 1971) (involving an "ambiguity [in a security agreement] created by silence ....").

22.     The Reorganized Debtor's studied reluctance to declare the Indenture "ambiguous" clearly is because it hopes to avoid the fundamental rules of construction that courts must follow when interpreting ambiguous provisions of disputed contracts. It is beyond peradventure that the "clarification" sought by the Reorganized Debtor would effect a forfeiture of the funds currently being "retained" on account of the Plan-given rights of the Equity Security Holders. Further, it is well-settled that "New York courts will not interpret provisions that are ambiguous on their face to effect a forfeiture...." Kreiss v. McCown De Leeuw & Co., 131 F.Supp.2d 428, 436 (S.D.N.Y. 2001); see also 220 West 42 Assocs. v. Ronbet Newmark Co., 84 Misc.2d 259, 264, 375 N.Y.S.2d 255, 261 (Sup. Ct. N.Y. County 1975) ("[C]ourts should interpret contracts to avoid [forfeiture]"). Accordingly, under this basic rule, Section 4.06(a)(v)

of the Indenture cannot mean that the Equity Security Holders contractual right to payment under the Plan is rendered forever forfeit based on the alleged financial condition of the Reorganized Debtor.

23.    In addition, this Court should construe any and all ambiguities in the Plan and Indenture against the Reorganized Debtor as the drafter of those documents. See Reape v. New York News, Inc., 122 A.D.2d 29, 30, 504 N.Y.S.2d 469, 470 (2d Dep't 1986) (holding that "ambiguities in an agreement should be interpreted most strongly against the draftsman"), cert. denied, 68 N.Y.2d 610, 501 N.E.2d 600, 508 N.Y.S.2d 1027 (1986); William A. White/Tishman East, Inc. v. Banko, 171 A.D.2d 401, 566 N.Y.S.2d 628 (1st Dep't 1991) (same); Gerlach v. The Horn & Hardart Co., 683 F.Supp. 342, 344 (S.D.N.Y. 1988) (noting that "in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language" (quoting Jacobson v. Sassower, 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (N.Y. 1985))); Twin City Fire Ins. Co. v. Delaware Racing Ass'n, 840 A.2d 624, 630 (Del. 2003) (noting that the well-accepted doctrine of construction, contra preferentem, is that ambiguities in a contract should be construed against the drafter). This is not only true as a matter of basic New York and Delaware contract law, but has also been recognized in the bankruptcy plan context. See First Carolina Objection at ¶ 19 (citing In re Terex Corporation, 984 F.2d 170 (6th Cir. 1993) and In re McCalla, 238 B.R. 94 (Bankr. M.D. Pa. 1999)).

24.    To its credit, the Reorganized Debtor does not attempt to dispute the black letter concept that an ambiguous contract provision is to be construed against its drafter. Further, the Reorganized Debtor's conclusory responses to the authorities cited by First Carolina are unavailing. For example, in addressing In re McCalla, supra, the Reorganized Debtor admits that

the court in that case "noted that plan language is typically interpreted against a drafter." (Reply to Objection at ¶ 36). Similarly, in addressing In re Terex Corporation the Reorganized Debtor correctly observes that it is the debtor's obligation "to specify as accurately as possible the amounts which it intends to pay creditors." (Reply to Objection at ¶ 36).

        25.     Here, to the extent the Reorganized Debtor believed that under the Plan and Indenture, in the event of certain financial conditions, the Equity Security Holders would forfeit for all time their right to payment, it was the Reorganized Debtor's obligation to include in the controlling documents an express and unambiguous forfeiture provision.[4]

        26.     The Reorganized Debtor failed to insert such a forfeiture clause into section 4.06(a)(v) at the time it was drafted and the Plan's acceptance was solicited. Accordingly, this Court should not now imply such a term. See Vermont Teddy Bear Co., 1 N.Y.3d at 476, 807 N.E.2d at 880, 775 N.Y.S.2d at 768(declining to add a notice provision where "[t]he parties could have [but did not] negotiated and included an explicit notice requirement").

        27.     Based on the foregoing, the Reorganized Debtor has failed to demonstrate that the Court should do anything other than construe the Plan and Indenture against its drafter, the Reorganized Debtor, and against an interpretation that effects a forfeiture. Clearly, the Reorganized Debtor has not in this regard met its burden of proof. See Campanile v. State Farm, 161 A.D.2d 1052, 1054, 558 N.Y.S.2d 203, 204 (3d Dep't 1990) (holding that burden of proof is

---

[4]   It should be noted that an appropriately express and unambiguous forfeiture provision is found elsewhere in the controlling documents. See Plan at ¶ 9.4(b) ("Any distributions made under the Plan that [are unclaimed or undeliverable for a period of one year] shall be revested in the applicable Reorganized Debtor free of any restrictions thereon, and any entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and forever barred.").

on drafter of agreement and the drafter must show that its construction of the agreement is the "only construction that can be fairly placed upon it").

**D.    The Reorganized Debtor Has Failed To Rebut The Objections Of First Carolina Investors, Inc.**

**1.    The Reorganized Debtor Misapprehends The Nature Of Its Payment Obligations Under The Plan**

28.    As the First Carolina Objection conclusively established, "a confirmed plan of reorganization constitutes a 'new contract' between the debtor and its creditors," to which both a debtor and its creditors are legally bound.  See First Carolina Objection at ¶ 30 (citing In re Ernst, 45 B.R. 700, 702 (Bankr. D. Minn. 1985), In re Consumers Realty & Development Co., Inc., 238 B.R. 418 (8th Cir. BAP 1999); and In re Potts, 188 B.R. 575 (Bankr. N.D. Ind. 1995)).  As the court wrote in In re Ernst, "[t]he effect of confirmation is to discharge the entire preconfirmation debt, replacing it with a new **indebtedness** as provided in the confirmed plan."  45 B.R. at 702 (emphasis added); see also In re Consumers Realty & Development Co., Inc., 238 B.R. 418, 425 (8th Cir. BAP 1999) (confirmation of plan had the effect of replacing the obligations under the promissory notes with the obligations as provided in that plan); In re Penrod, 169 B.R. 910, 916 (Bankr. N.D. Ind. 1994) (effect of confirmation is to discharge the entire pre-confirmation debt, replacing it with a new indebtedness as provided in the confirmed plan.); In re Water Gap Village, 99 B.R. 226, 229 (Bankr.D.N.J.1989).

29.    In addition, under the Bankruptcy Code, "debt" is defined as "liability on a claim" (11 U.S.C. § 101(12)), and "claim" is defined broadly as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A).  This definition is instructive to the case at hand, and the at-issue payment obligations to the Equity Security Holders fall under such a definition of "debt."  The Reorganized Debtor's

payment obligations to the Equity Security Holders, however, also fall under more narrow definitions of debt.  For example, in New York, in <u>Trojan Hardware Co. v. Bonacquisti Construction Corp.</u>, 141 A.D.2d 278, 534 N.Y.S.2d 789 (3d Dep't 1988), the court defined debt "as a fixed and certain obligation," and stated that "debt is generally evidenced by a contract and is a readily discernible amount which can be expected in the normal course of events to be due and owing in the future, although the obligation has not yet ripened." <u>Id</u>. at 281, 534 N.Y.S.2d at 791 (citations omitted).  The contractual obligation to pay the Equity Security Holders $0.05 for every $0.95 paid as principal on the New Senior Notes once available cash had been used to fulfill the four prior waterfall provisions, clearly falls under this more narrow definition of debt as well.  Further, it is undisputed that in the absence of the language in the Plan providing them with the five cents per dollar of liquidation proceeds, no independent contractual basis for such distribution would exist.

30.    The foregoing establishes:  (a) that the Plan constituted a new contract between the Reorganized Debtor and, <u>inter alia</u>, the Equity Security Holders; (b) that pursuant to this new contract (the Plan), the Reorganized Debtor became obligated to make certain payments to Equity Security Holders (and the Equity Security Holders were given the right to such payment); and (c) that such obligations and rights of the respective parties created new "debt" running from the Reorganized Debtor to the Equity Security Holders.

31.    Nevertheless, the Reorganized Debtor boldly argues that its obligations to make certain payments to Equity Security Holders under the plan are simply not "debt

obligations." (Reply to Objection at ¶ 14).[5] The Reorganized Debtor, however, fails to

demonstrate an adequate factual or legal basis to support this position. None of the bankruptcy

cases cited by the Reorganized Debtor in any way address the **post-confirmation rights** of a

party to receive payments **provided for by a plan**, and therefore none are relevant to the present

dispute. Rather, the cited cases deal with the rights of parties respecting **pre-petition** claims.

For example, <u>Carrieri v. Jobs.com, Inc.</u>, 393 F.3d 508 (5th Cir. 2004) involved the objection of a

Chapter 11 debtor as to certain proofs of pre-petition claims filed by shareholders holding its

stock and stock warrants, and <u>In re Georgetown Bldg. Assocs.</u>, 240 B.R. 124 (Bankr. D.D.C.

1999), involved a determination as to how certain pre-petition promissory notes would be

classified under the plan there at issue.

      32.     The Reorganized Debtor argues that "the potential distributions to

Shareholders as described in the Indenture do not have any of the indicia of debt." (Reply to

Objection at ¶ 16). Given the above definitions of debt and the contractual nature of a debtor's

obligations to make payments under a confirmed plan, the Reorganized Debtor's argument fails.

In other words, the "indicia of debt" are the express payment obligations set forth in the Plan and

Indenture. The Reorganized Debtor relies heavily on <u>Geftman v. Commissioner of Internal</u>

<u>Revenue</u>, 154 F.3d 61 (3d Cir. 1998). This reliance is misplaced. In <u>Geftman,</u> the court had to

decide whether the transaction at issue was a loan or a gift. The Third Circuit found that the

transaction at issue was a gift (rather than a loan) because $2.85 million in credit was extended

"with no promise of repayment, no interest charges, no security, and no repayment schedule..."

---

[5]    The Reorganized Debtor makes this argument despite the concessions in its papers that: "the Plan
describes the Reorganized Debtors' debts, liabilities and obligations to creditors and **stockholders**..."
(Reply to Objection at ¶ 14) and that "the [equity security holders] have a conditional **contractual
right to payment** on account of their equity holdings." (Reply to Objection at ¶ 15) (emphases
added).

Id. at 75. Clearly, <u>Geftman</u> is not relevant to the instant motion. In the present case, the Plan and Indenture evidence the Reorganized Debtor's express contractual obligation to make payments to Equity Security Holders and others.

33.    The Reorganized Debtor has repeatedly argued that its payment obligations to the Equity Security Holders are in the nature of a "dividend," rather than a debt. One purported basis for this argument is that "at no time was the obligation to the Shareholders recorded as a debt on the Reorganized Debtors' balance sheets or financial records...." (Reply to Objection at ¶ 16). This argument mistakenly presumes that the Court is beholden to the Reorganized Debtor's internal book-keeping practices. Of course, the Court is not so obliged. <u>See Jordanos', Inc. v. Comm'r of Internal Revenue.</u>, 396 F.2d 829 (9th Cir. 1968) (holding that the court was not bound by classification of gratuity contained in corporate resolutions and it was the substance of the action taken, not the form of the designation, which would control); <u>O'Sullivan v. Comm'r of Internal Revenue.</u>, No. 30571-88, 1994 WL 444419 (T.C. Aug. 18, 1994) ("[t]his Court is not bound by petitioner's self-serving classification of the payments").

34.    The Reorganized Debtor also asserts that the language used in the Disclosure Statement, Plan, and Indenture supports its argument concerning "dividend" versus "debt." (<u>See</u> Reply to Objection at ¶¶ 14-16). In fact, the opposite is true. The Disclosure Statement contains a section entitled: "3. Potential Limitations on or Inability to **Repay Debt** or Make Contingent Interest Payments." (Disclosure Statement at p. 37) (emphasis added). The distributions to Equity Security Holders that are the subject of the Clarification Motion are explicitly described under this heading. <u>See id.</u> ("FNV Group's ability to pay the principal of, and interest on the New Senior Notes, **to make distributions to holders of FNV Group common stock...is dependent on the generation of cash flow**....") (emphasis added).

35.    The Reorganized Debtor in error relies on the definition of "Restricted Payment" found in the Indenture. The Indenture, however, states that a Restricted Payment is "the declaration or payment of any dividend *or* the making of an distribution **on account of** the [Reorganized Debtor's] Equity Interests...." (emphasis added). If it was the intent of the parties that Restricted Payment could mean **only** a "dividend" then the latter portion of the definition would have been superfluous. Of course, it must be remembered that the Reorganized Debtor drafted these documents and, thus, if there is any ambiguity over a term's meaning, it must be construed against the Reorganized Debtor.

36.    Moreover, as the First Carolina Objection demonstrates, the "Delaware Court of Chancery has held specifically that where a company makes a partial payment of income-producing assets to its equity pursuant to a Court order and not as ordinary *or* extra-ordinary dividend, the resulting income is not properly characterized as a 'dividend at all.'" First Carolina Objection at ¶¶ 26 – 28 (discussing Fulweiler v. Spruance, 222 A.2d 555 (Del. Ch. 1966)) (emphasis in original). The Reorganized Debtor argues that Fulweiler is not relevant to the present case because the court in that case "was not asked to decide whether DuPont could properly make the distribution under applicable law..." (See Reply to Objection at ¶ 33). This argument is unavailing since in Fulweiler the court held that the court-ordered distribution to the shareholder therein (like the payments provided for in the Plan and Indenture herein) is **not** a dividend. See Fulweiler, 222 A.2d at 559. In any event, the Reorganized Debtor does not (and cannot) contest the analysis of Fulweiler set forth in the First Carolina Objection. (See Reply to Objection at ¶ 33).

2.     **Under Any Analysis The Required Payments To The Equity
Security Holders Cannot Be Impermissible Restricted
Payments**

37.     The Reorganized Debtor argues that a transfer of the funds being held on
account of the Equity Security Holders in a segregated account will forever be Impermissible
Restricted Payments under the Indenture.  This position is wrong.  Under the Indenture, an
"'Impermissible Restricted Payment' means a Restricted Payment that, if made by the
[Reorganized Debtor], would render such entity insolvent, would be a fraudulent conveyance by
such entity or would not be permitted to be made by such entity under applicable law."
Indenture at p. 6.  None of these categories describe the Plan-mandated payments to the Equity
Security Holders.

38.     The Reorganized Debtor argues that transfer of the funds is against
applicable Delaware law since an entity in its financial condition may not declare "dividends" or
"reduce capital."  Delaware law cannot help the Reorganized Debtor for two reasons.  First, it
has already been demonstrated (see section D, 1, supra, at p. 14) that the Reorganized Debtor's
payment obligations under the Plan and Indenture are **not** in the nature of a dividend.  Second,
even if the distribution to the Equity Security Holders is in the nature of a "dividend" as argued
by the Reorganized Debtor, the payment of such a "dividend" to the Equity Security Holders at
this time would not violate Delaware law.  The Delaware statute relied on by the Reorganized
Debtor, 8 DEL. CODE ANN. § 170, for its proposition that dividends may only be paid out of
"surplus or net profits" has an express exception (applicable to this case) which states:  "Nothing
in this subsection shall invalidate or otherwise effect a note, debenture or other obligation of the
corporation paid by it as a dividend on shares of its stock, or any payment made thereon, if at the
time of such note, debenture or obligation was delivered by the corporation, the corporation has
either surplus or net profits … from which the dividend could lawfully have been paid."  DEL.

CODE ANN. tit. 8, § 170. This carve out is obviously meant to stop a corporation from reneging on a contractual payment obligation made to a stockholder undertaken while the company was solvent, based on a later assertion of insolvency. In other words, this exception was meant to stop exactly what the Reorganized Debtor is attempting to do in this case. The Reorganized Debtor was clearly solvent when the plan was confirmed, and it became contractually committed to the Equity Security Holders to make the disputed payments.[6] Therefore, it cannot selectively renege on such debt obligations based on its current financial condition.

39.    Third, the reduction of capital provision cited by the Reorganized Debtor, DGCL § 244 (DEL. CODE. ANN. tit. 8, § 244), was designed to protect, among others, the stockholders of a corporation. See State v. Benson, 32 Del. 576, 128 A. 107 (Del. Super. Ct. 1924). This section should not be used as a vehicle to obliterate all rights that the Equity Security Holders were given under the Plan.

40.    Further, the Reorganized Debtor has failed to cite any authority for its proposition that Delaware law concerning the declaration of dividends trumps its express payment obligations under a confirmed bankruptcy plan, particularly **those to which affected creditors consented**. In fact, as the First Carolina Objection demonstrated: "[i]f a provision of the Plan, a creature of federal law, conflicts with the law of a state and the state law 'frustrates the full effectiveness of federal law [the state law] is rendered invalid by the Supremacy Clause." First Carolina Objection at ¶ 32 (quoting Jones v. Keene Corp., 933 F.2d 209, 214 (3d Cir. 1991).

---

[6]    In the Disclosure Statement, the Reorganized Debtor stated that it and its related companies "believe that the Plan complies with the financial feasibility standard for confirmation." Disclosure Statement at p. 48. And, it is well settled that "feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success." In re Leslie Fay Companies, Inc., 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997).

41.    The Reorganized Debtor argues that the transfer of funds presumptively would be a fraudulent conveyance since in theory it is now insolvent.  This argument also fails since it has been demonstrated (see section D, 1, supra, at p. 14) that the Reorganized Debtor's payment obligations under the plan are in the nature of a "debt," and it is well-settled that "[a]n 'antecedent debt' satisfies the requirements of fair consideration and reasonably equivalent value, and…the payment of an existing liability is not fraudulent." Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.), 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) ("Trace II") (citing Atlanta Shipping Corp. v. Chem. Bank, 818 F.2d 240, 249 (2d Cir. 1987)).

42.    The same is true under Delaware law.  As one Delaware court observed, "It is clear that under the statute [DEL. CODE ANN. tit. 6, § 1303] an antecedent debt can constitute fair consideration to the extent that such debt is supportable in light of the relationship existing between debtor and creditor." Faircloth v. Rash, 373 A.2d 870, 872 (Del. Super. Ct. 1977); see also DEL. CODE ANN. tit. 6, § 1303 ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied….").

43.    Finally, the Reorganized Debtor maintains that it is at present balance sheet insolvent (see, e.g., Reply to Objection at ¶ 4) and that, therefore, it may not transfer the segregated funds at this time to the Equity Security Holders since it would render it (or render it further) insolvent.  For a number of reasons this argument makes no sense.  First, the funds at issue have **already been paid out**: $1.1 billion (or 95%) has been used to make principal payments on the New Senior Notes, and $65.5 million (or 5%) has been deposited into a segregated account on behalf of the Equity Security Holders.  Thus, the transfer of the segregated funds to the Equity Security Holders would not **render** the Reorganized Debtor (or render it

further) insolvent.  Second, since the Reorganized Debtor's Plan-based payment obligations are in the nature of a debt owed to Equity Security Holders, any payment of such debt will not negatively impact the Reorganized Debtor's balance sheet.

44.    It is clear that, contrary to Reorganized Debtor's argument, the transfer of the funds in the segregated account to the Equity Security Holders is not an Impermissible Restricted Payment.  Furthermore, the Reorganized Debtor has stated that its "estate is winding down quickly" (Reply to Objection at ¶ 42) based on the "continued liquidation of assets." (Reply to Objection at ¶ 4).  Thus, in a short period of time the Reorganized Debtor will no longer be insolvent; it will be non-existent.  See In re Rehabilitation of National Heritage Life Ins. Co., 656 A.2d 252, 260 (Del. Ch. 1994) ("[U]pon dissolution the corporation will cease to exist as a legal entity.").  Thus, even if the even if the Reorganized Debtor is right and the called-for payments are currently Impermissible Restricted Payments, they will no longer be once the Reorganized Debtor ceases to function as an on-going business enterprise.

3.    **Under New York Law The Funds In The Segregated Account Are Being Held In Trust For The Equity Security Holders**

45.    As First Carolina has already demonstrated, the segregated funds are held "in trust" for the Equity Security Holders entitled to distributions under the Plan.  (First Carolina Objection at ¶¶ 34-40).  Such a segregated account is at least susceptible to imposition of a constructive trust for their protection and benefit.

46.    Under New York law, a "constructive trust is an equitable remedy, necessarily flexible to accomplish its purpose."  Counihan v. Allstate Ins. Co., 194 F.3d 357, 361 (2d Cir. 1999) (citing Simonds v. Simonds, 45 N.Y.2d 233, 241, 380 N.E.2d 189, 408 N.Y.S.2d 359 (N.Y. 1978)).  "'[A] constructive trust is the formula through which the conscience of equity finds expression.  When property has been acquired in such circumstances that the holder of the

legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.'" Id. (quoting Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378 (N.Y. 1919)). As noted by the Second Circuit, "[c]onstructive trusts have been imposed in a variety of situations where equity had dictated such a remedy." Counihan, 194 F.3d at 360 (citing U.S. v. Coluccio, 51 F.3d 337, 340 (2d Cir. 1995); Golden Budha Corp. v. Canadian Land Co. of America, 931 F.2d 196, 202 (2d Cir. 1991); Latham v. Father Divine, 299 N.Y. 22, 29, 85 N.E.2d 168 (1949) ; and G & M Motor Co. v. Thompson, 567 P.2d 80, 84 (Okla. 1977)).

47.     The purpose of a constructive trust is to prevent unjust enrichment, and thus, a court will impose one where it "identif[ies] a party who is holding property 'under circumstances that in equity and good conscience he ought not to retain it.'" Counihan, 194 F.3d at 361 (quoting Miller v. Schloss, 219 N.Y. 400, 407, 113 N.E. 337 (N.Y. 1916)). "Whether a party is unjustly enriched is a legal conclusion 'reached through the application of principles of equity.'" Counihan, 194 F.3d at 361 (quoting Sharp v. Kosmalski, 40 N.Y.2d 119, 123, 351 N.E.2d 721, 386 N.Y.S.2d 72 (N.Y. 1976)). The Second Circuit stresses that "[u]njust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain." Counihan, 194 F.3d at 361 (citing McGrath v. Hilding, 41 N.Y.2d 625, 629, 363 N.E.2d 328, 394 N.Y.S.2d 603 (N.Y. 1977)).

48.     In the case of Sharp v. Kosmalski, 40 N.Y.2d 119, 351 N.E.2d 721, 386 N.Y.S.2d 72 (N.Y. 1976), the Court of Appeals of New York noted four elements often considered by courts in determining whether to impose a constructive trust: "(1) a confidential or fiduciary relation; (2) a promise; (3) a transfer in reliance thereon and (4) unjust enrichment." Id. at 121 (citations omitted). Although the Reorganized Debtor cites these elements, it fails to

point out that "the power of equity to employ a constructive trust to reach a just result is not

strictly limited by the conditions set forth in Sharp v. Kosmalski… Rather, the remedy is

available to prevent unjust enrichment in a wide range of circumstances." Palazzo v. Palazzo,

121 A.D.2d 261, 503 N.Y.S.2d 381, 383-84 (1st Dep't 1986); see also Tordai v. Tordai, 109

A.D.2d 996, 486 N.Y.S.2d 802, 804 (3d Dep't 1985) (noting that the Sharp v. Kosmalski factors

are not rigid, but flexible considerations for the court to apply in determining whether a

constructive trust should be imposed); Coco v. Coco, 107 A.D.2d 21, 485 N.Y.S.2d 286, 289 (2d

Dep't 1985) (holding that the Sharp v. Kosmalski factors are "are merely useful guides and are

not talismanic" (quoting Reiner v. Reiner, 100 A.D.2d 872, 474 N.Y.S.2d 538, 541 (2d Dep't

1984))). "What the New York courts do insist upon is a showing that property is held under

circumstances that render unconscionable and inequitable the continued holding of the property

and that the remedy is essential to prevent unjust enrichment." Counihan, 194 F.3d at 362.

       49.    In this instance, the Sharp v. Kosmalski factors, as well as the general

principles set forth above, support the finding of a constructive trust. The funds were put in a

segregated account based on the Reorganized Debtor's obligation (or promise) to make payments

to the Equity Security Holders under the Plan and Indenture. As the only consideration provided

to the Equity Security Holders under the Plan, the Equity Security Holders obviously relied on

the receipt of these funds in consenting to the Plan. Finally, the proposed order submitted with

the instant motion contains a provision stating that it is "ORDERED that FNV Group…(ii) may

return the Available Cash in the Segregated Account to FNV Capital for use in its business to

pay expenses, debts and other obligations." See Proposed Order at p. 2. Clearly, the

Reorganized Debtor would be unjustly enriched to the tune of $65 million and counting if this

Court does not impose a constructive trust in this case.

50.    The Reorganized Debtor also argues that "even if this Court found that the Segregated Account is held 'in trust' for the [Equity Security Holders]," the Equity Security Holders are not entitled to the funds therein since "it must be viewed as a trust with a condition precedent on payment – i.e., that payment does not constitute an Impermissible Restricted Payment." (Reply to Objection at ¶ 25).  This argument also must fail since it has been established that:  (a) the Impermissible Restricted Payment language does not create a "condition precedent;" and (b) the transfer of funds from the segregated account would not constitute an Impermissible Restricted Payment.

## CONCLUSION

The foregoing establishes that neither the language of the controlling documents nor the well-settled and applicable principles of contract construction support the "clarification" proposed by the Reorganized Debtor.  The Reorganized Debtor's contractual payment obligations under the Plan and Indenture are in the nature of debt and the transfer to the Equity Security Holders of the funds which are currently being held in a segregated account on their behalf, would not now, and certainly will not forever, constitute an Impermissible Restricted Payment.

**WHEREFORE**, for the reasons set forth herein and in the First Carolina Objection, the Equity Committee respectfully requests that this Court:  (i) deny the Clarification Motion in its entirety; and (ii) grant to the Equity Committee such other and further relief as may be just and proper under the circumstances.

Dated:    October 18, 2005
        Wilmington, Delaware

                         **BUCHANAN INGERSOLL**

                         */s/ William D. Sullivan*
                         William D. Sullivan (No. 2820)
                         Jami B. Nimeroff (No. 4049)
                         The Nemours Building
                         1007 N. Orange Street, Suite 1110
                         Wilmington, DE  19801
                         Tel:  (302) 428-5500
                         Fax:  (302) 428-3996
                         email: sullivanwd@bipc.com

                                -- and --

                         **ANDERSON KILL & OLICK, P.C.**
                         Mark D. Silverschotz
                         James M. Andriola
                         1251 Avenue of the Americas
                         New York, NY  10020-1182
                         (212) 278-1000

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FINOVA CAPITAL CORPORATION | : | Case Nos. 01-0698 (PJW) |
| | : | Jointly Administered |
| Reorganized Debtor | : | |
| | : | |
| _____ | : | |

### CERTIFICATE OF SERVICE

I, Jami B. Nimeroff, do hereby certify that on October 18, 2005, I caused a copy of the

*The Equity Committee's Response To The Reorganized Debtor's Reply To Objection Of First*

*Carolina Investors, Inc. To Motion Of Reorganized Debtor For An Order Under Bankruptcy*

*Code Section 1141 Clarifying Provision Of Confirmed Plan* to be served on counsel of record in

this matter by hand delivery or first class United States mail:

Mark D. Collins, Esq.
Rebecca L. Booth, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Jonathan M. Landers, Esq.
Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, NY 10166-1093


Dated: October 18, 2005                  /s/    *Jami B. Nimeroff*
                                                  Jami B. Nimeroff

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Bankruptcy No. 01-0698 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| FINOVA CAPITAL CORPORATION, | ) | Wilmington, DE |
| | ) | November 29, 2005 |
| Debtor. | ) | 2:31 p.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          MARK D. COLLINS, ESQUIRE
                          REBECCA L. BOOTH, ESQUIRE
                          RICHARDS, LAYTON, & FINGER, P.A.
                          One Rodney Square
                          920 North King Street
                          P.O. Box 551
                          Wilmington, DE   19899

                          JONATHAN M. LANDERS, ESQUIRE
                          JESSICA BASIL, ESQUIRE
                          GIBSON, DUNN & CRUTCHER, L.L.P.
                          200 Park Avenue
                          New York, NY   10166-1093

                          PHILLIP DONNELLY, ESQUIRE
                          THE FINOVA GROUP, INC.
                          Finova Capital Corporation
                          4800 North Scottsdale Road
                          Scottsdale, AZ 85251-7623

Olsen Industries:         MICHAEL W. BISHOP, ESQUIRE
(Via Telephone)           LOOPER, REED & MCGRAW
                          4100 Thanksgiving Tower
                          1601 Elm Street
                          Dallas, TX 75201

                          REGINA IORRI, ESQUIRE
                          ASHBY & GEDDES

Docket No. __80__
Date __12/13/2005__

2

```
                              222 Delaware Avenue
                              Wilmington, DE 19801


The Equity Committee:         MARK SILVERSCHOTZ, ESQUIRE
                              JAMES ANDRIOLA, ESQUIRE
                              ANDERSON KILL & OLICK, P.C.
                              1251 Avenue of the Americas
                              New York, NY 10020

                              WILLIAM D. SULLIVAN, ESQUIRE
                              BUCHANAN INGERSOLL, P.C.
                              The Nemours Building
                              1007 North Orange Street, Suite 1110
                              Wilmington, DE 19801-1236



Audio Operator:               SHERRY SCARUZZI


Transcribed by:               DIANA DOMAN TRANSCRIBING
                              P.O. Box 129
                              Gibbsboro, New Jersey  08026-0129
                              Office:  (856) 435-7172
                              Fax:     (856) 435-7124
                              E-mail:  Dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

1                              I N D E X

2

3    ARGUMENT:                              PAGE NUMBER

4    Motion on Status Conference:

5          Ms. Booth                              5

6          Mr. Bishop                             5

7

8    Motion to Cease Setting Aside:

9          Mr. Landers                      7, 60, 73

10         Mr. Silverschotz                    22, 57

11

12   Motion to Increase Cap on Fees

13         Mr. Silverschotz                        72

14         Mr. Landers                             73

15

16

17   RULINGS BY THE COURT:

18   Motion on Status Conference                   6

19   Motion to Cease Setting Aside            52, 72

20   Motion to Increase Cap on Fees               76

21

22

23

24

25

Colloquy                                                        4

1           (The following was heard in open court at 2:31 p.m.)

2           THE COURT:   Please be seated.

3           MS. BOOTH:   Good afternoon, Your Honor.   Rebecca

4    Booth of Richards, Layton and Finger, on behalf of Finova

5    Capital Corporation, the reorganized debtor in this case.

6           There are three matters on the Court's agenda for

7    today and we will be taking them in order.   The first item on

8    the agenda is a status conference in the matter of Olsen

9    Industries.   Essentially, the procedural posture, Your Honor,

10   is that Olsen filed a proof of claim alleging damages.   The

11   debtors filed an objection to the proof of claim and we have

12   been conducting discovery and moving forward towards a

13   resolution of that.

14          At the -- at this point, I think all we need to do

15   is present to the Court what we believe to be an agreed upon

16   form of scheduling order and request from the Court some trial

17   dates.   Finova proposes trial towards the end of July, early

18   August.   We believe that will provide sufficient time for the

19   Court to rule on any dispositive motions.   According to our

20   scheduling order, those would be due on April 13th of this

21   year.

22          Mr. Bishop from Looper, Reed and McGraw is on the

23   phone and this I already can introduce him.

24          MR. BISHOP:   Your Honor, Mike Bishop from the law

25   firm of Looper, Reed and McGraw in Dallas, Texas on behalf of

Colloquy                                                    5

1  Olsen Industries, the claimant.

2           THE COURT:   Yes?

3           MS. BOOTH:   Your Honor, next year, not this year

4  obviously.

5           THE COURT:   Yes?

6           MR. BISHOP:   Your Honor, we have agreed to the form

7  of the stipulation and I believe Ms. Iorii has signed off on

8  that form of stipulation on our behalf.  With respect to the

9  trial setting, one of the concerns we have, Your Honor, is

10 that under the plan, the Court's aware that Finova's

11 continuing to liquidate assets and to the extent that

12 continues, I guess the concern is that there won't be

13 sufficient assets to pay the claim at the end of the day if

14 the Court ultimately allows a claim.

15          So, we would request a trial sooner rather than

16 later after the dispositive motion deadline.

17          THE COURT:   When is the dispositive motion deadline?

18          MS. BOOTH:   It's April 13th, Your Honor.

19          THE COURT:   How much trial time do you need?

20          MS. BOOTH:   The debtors would anticipate probably

21 two days, Your Honor.

22          MR. BISHOP:   I agree with that, Your Honor.

23          THE COURT:   Okay, let's try it for May 8 and 9.

24          MS. BOOTH:   Your Honor, I don't even believe that

25 provides sufficient time to complete briefing on the

Colloquy                                    6

1   dispositive motions.  If the dispositive motions are due on

2   April 13th --

3          THE COURT:  Oh, okay, I thought the -- the briefing

4   would be completed by April --

5          MS. BOOTH:  No, I'm sorry, Your Honor.  We believe

6   the briefing to be completed in, you know, mid-May.

7          THE COURT:  Okay.

8          MS. BOOTH:  And will all due respect, these -- this

9   claim and the objection have been outstanding since 2001, so

10  we think that any urgency in having them resolved is not

11  necessarily fair.  We would request again, early August or

12  late July for a trial date.

13         THE COURT:  How about Monday, July 18 and Tuesday?

14         MS. BOOTH:  That would be fine, Your Honor.  Thank

15  you.  I'll write those dates into the stipulation and then

16  hand it up?

17         THE COURT:  Okay.

18         MS. BOOTH:  July 18th, Your Honor?

19         THE COURT:  Yes.

20         MS. BOOTH:  May I approach?

21         THE COURT:  Yes.  Okay.

22         MS. BOOTH:  Thank you, Your Honor.  The other two

23  items on the agenda relate to the debtor's motion to cease

24  setting aside 5 percent under the plan and the Equity

25  Committee's motion for an increase in their cap on fees.

1        I will let Mr. Landers from Gibson Dunn handle those

2    matters.

3        MR. BISHOP:  Your Honor, Mike Bishop on the phone.

4    May I be excused?

5        THE COURT:  Yes.

6        MR. BISHOP:  Thank you, Your Honor.

7        THE COURT:  I assume no one else is on the phone?

8        MS. BOOTH:  No, Your Honor.

9        MR. LANDERS:  Thank you, Your Honor. Jonathon

10   Landers and Jessica Basil, Gibson Dunn and Crutcher; Mark

11   Collins with Richards, Layton for Finova.  With me here today

12   is Mr. Rick Ross, who's the chief financial officer of Finova,

13   as well as Phil Donelly, who is the general counsel of Finova.

14       Your Honor, we're here on a motion to clarify the

15   plan with respect to the 5 percent distribution on account of

16   Equity, which the debtors believe cannot be made and can never

17   be made.  My presentation this morning -- this afternoon will

18   be in three parts.  First I'm going to talk about the

19   provisions of the plan.  Second, I'm going to talk about the

20   debtor's argument.  And finally, I'm going to talk about the

21   Committee's response.

22       The key plan provision is section 4.06(E)(v) of the

23   indenture, which is one of the plan documents.  It says that,

24   "The debtor shall apply cash to repay principal on the new

25   senior notes" -- and here's the critical language -- "and make

1   distributions to Finova Group" -- which is the parent --

2   "which Finova Group will use to make restricted payments" --

3   that's the term of (indiscernible) -- "unless a restricted

4   payment would be an impermissible restricted payment, in which

5   case Finova shall retain the amounts until the restricted

6   payments are no longer impermissible restricted payments."

7           As an aside, I'd observe that -- that there are

8   virtually identical provisions dealing with an event of

9   default.  If there's an event of default, the money is not

10  paid.  It's set aside until the event of default ceases.

11          Under the indenture, a restricted payment is defined

12  as a dividend -- any distribution on account of equity

13  interests, and that's key language, including the purchase,

14  redemption or acquisition of equity.

15          Then we turn to the definition of an impermissible

16  restricted payment.  An impermissible restricted payment is a

17  restricted payment that would render Finova Group insolvent,

18  would be a fraudulent conveyance, or which would not be

19  permitted under applicable law.

20          Then we turn to section 4.07 of the indenture, which

21  prohibits restricted payments unless authorized by section

22  4.07(B), which nobody has argued is applicable here, or

23  section 4.06, which is the section I just referred to.  For

24  the basic -- for the payments here, Equity must look to

25  section 4.06.

1       What to do these provisions essentially do?  Well,
2   they clearly define any payment to Equity whatsoever, as a
3   restricted payment.  A restricted payment is defined as
4   payment on account of Equity interests.  The second thing they
5   do, which is critical, is that they effectively condition any
6   payment on Equity interests to a bunch of conditions, which
7   makes it clear that shareholders do not have an absolute right
8   to payment.  That's the situation.  That's what the indenture
9   says and that's -- that's in essence, the structure that we
10  face.

11      Now, let me turn to the second area, which is the
12  motion.  The basis for the debtor's motion here was simple and
13  straightforward.  It is that the 5 percent payment was on
14  account of Equity interests.  That's what the indenture says.
15  It is that the 5 percent payment cannot be made now because of
16  the conditions to making a restricted payment.  We believe
17  that all three conditions that are conditions of a restricted
18  payment, cannot be satisfied; that is, insolvency, that the
19  payments would be a fraudulent conveyance, and that the
20  payments are not permitted under applicable law.

21      In that connection, Your Honor, we attach to our
22  original papers, both a declaration of Mr. Richard Ross, who
23  is here in court, as well as Finova's mid-year 10-Q statement.
24  Each of these documents showed that liabilities of Finova
25  exceeded assets by more than $1 billion and that the existing

Argument - Mr. Landers                    10

1    assets other than cash would have to more than triple in value

2    in order that Finova would not be insolvent. Mr. Ross's

3    declaration showed that given the nature of the assets that

4    was simply impossible to occur and would not occur.

5            The Equity Committee hasn't, in any way, contested

6    that showing.  They did some diligence but I think in light of

7    the overwhelming showing, I think we understand why they did

8    not contest this.  So that I think we're in a situation now

9    where Finova Capital, under the -- I'm sorry -- Finova Group,

10   the parent, under the indenture, is never going to be

11   permitted to make these -- these payments.

12           Now, the plan itself did not provide specifically

13   for this contingency.  There is a provision in section 9.4 of

14   the plan, which we believe could be applicable by an analogy,

15   which dealt with unclaimed or undeliverable funds.  And it

16   says basically, that the funds revert to Finova after a year

17   and the claim or interest giving rise to the right to the

18   funds or claim on the funds, is extinguished or barred.

19           I think this is a common provision in plans and I

20   would not argue that it's directly intended to deal with these

21   situations but provides what I think is the only analogy that

22   -- that may bear on this situation under the plan.

23           Now in it's response, the Equity Committee has not

24   really contested the plan language.  They haven't said and

25   they haven't raised any question about financial condition.

1    They haven't suggested in any way that these conditions might

2    be satisfied or that the conditions themselves were ambiguous

3    in some way; none of these things.

4         And significantly, Your Honor, they haven't referred

5    at all to pages 41 and 42 of the disclosure statement, which

6    specifically specifies that distributions to stockholders will

7    be subject to meeting legal requirements permitting

8    distributions to stockholders.  It won't be paid if Finova

9    Group is insolvent.  And as we understand it, Delaware law

10   would, in this regard --

11        THE COURT:  I'm sorry.  You say page 41 and 42?

12        MR. LANDERS:  It's 41 and 42.  It's really on the

13   top of page 42 of the disclosure statement.

14        THE COURT:  I think I have a different copy of the

15   disclosure statement than you do.  Mine is docket number 3 --

16   I'm sorry, docket --

17        MR. LANDERS:  Yeah, I have --

18        THE COURT:  -- number 533.

19        MR. LANDERS:  I have the printed version, Your

20   Honor, of the disclosure statement.  It is under the section

21   "Special Risks for Equity Holders", and it's right at the end

22   of --

23        THE COURT:  Okay.  It's on page 48 of my copy.

24        MR. LANDERS:  Okay, thank you, Your Honor.

25        THE COURT:  And you're referring to --

1        MR. LANDERS:  I'm referring to right at the end

2    before the subsection (c) where it says, "subject to meeting

3    the legal requirements" --

4        THE COURT:  -- Okay, I see --

5        MR. LANDERS:  -- "permitting distributions to

6    stockholders."

7        THE COURT:  I see it.

8        MR. LANDERS:  Okay.  Thank you, Your Honor.

9        The Equity Committee has not referred at all to that

10   section, nor to the requirement that to make any distribution

11   to stockholders would require action of the Finova Board of

12   Directors.

13       Let me turn to the arguments of the Equity

14   Committee.  Essentially, Your Honor, when you go through their

15   arguments, all of them seek to ignore in one way or another,

16   the plain meaning of the document, and the conditions

17   precedent in the document to payment.  When you come right to

18   it, all of them say for one reason or another, we don't want

19   to follow those conditions.  We want something that we did not

20   get under the plan.  And all assume in one way or another,

21   that Equity has some sort of vested or unconditional right to

22   the funds, which is simply inconsistent with the plan

23   language.

24       First argument in the argument that the Equity

25   Committee makes is that the distribution is really a debt, and

1    not a distribution on account of Equity interests.  Initially,

2    Your Honor, the argument is contradicted by the express terms

3    of the plan, the definition of restricted payment.  The

4    indenture specifically says that the 5 percent goes to make

5    restricted payments and restricted payments are defined as

6    payments on account of Equity interests.  That's why they get

7    the money.

8            In addition, Your Honor, that argument confuses the

9    concept of obligation with -- with debt.  If you take that

10   argument literally, any obligation under the plan, even the

11   stockholders for Equity would be a debt because it's an

12   obligation.  The case law -- and we've cited the Carrieri case

13   -- suggests that there is a distinction between those cases

14   and in that case, the Courts specifically distinguish between

15   various rights of shareholders and -- and whether or not they

16   constituted claims and said that those were not claims even

17   though they were obligations.

18           In addition, Your Honor, this -- this provision, the

19   5 percent provision, has none of the characteristics of debt.

20   We've discussed those in our memorandum and in, very briefly,

21   Your Honor.  We don't have a note.  We don't have a fixed

22   obligation, we don't have interest payments, we don't have --

23   we would have to declare a dividend or a distribution on the

24   part of the Board of Directors.  These are characteristics of

25   equity interests, not debt.

1           In any event, even if in some sense it wasn't debt,

2      it would still be subject to the condition.  The Equity

3      Committee has not explained how we do away with the condition.

4      Well, then the Equity Committee's second argument is well,

5      we'll admit the condition but we believe the condition is

6      simply a priming restriction.

7           Well, first of all, Your Honor, that argument is

8      simply inconsistent with the language of the plan and with the

9      retention provision.  The indenture specifically says if you

10     can't make the distribution, you retain it.  There would be no

11     purpose in this case of simply retaining the money

12     indefinitely.  What purpose does it serve?  What objective

13     does it serve to say you've got to retain the money

14     indefinitely, unless it's a condition on ultimate payment.

15          The Equity Committee has not suggested a reason or a

16     meshing of their argument that it's simply a timing

17     restriction and the fact there is this retention provision.

18     And again, we turn to the fact that the same provision exists

19     with regard to a default.

20          Again, I think it's implicit in the plan that if

21     there's a default and it continues indefinitely, payment to

22     equity holders would never be paid.  And you've got the

23     identical parallel language for the default provision and the

24     situation where you have an impermissible restricted payment.

25          The debtor then turns and cites various cases that

Argument - Mr. Landers                          15

1    deal with pay, when paid provisions in relationships between

2    contractors and subcontractors.  As we have suggested in our

3    papers, Courts have clearly distinguished those provisions

4    from ordinary conditions.

5           In fact, the <u>Otis Eastern</u>  case, which is cited on

6    page 13 of our memorandum, specifically deals with that issue

7    and specifically upholds a requirement that in order to get

8    paid, a subcontractor has to submit a lien release, which

9    incidentally, Your Honor, included a general release as well.

10   The Court said that condition had to be -- had to be followed.

11          I think if one goes back to the pay when paid

12   provisions, they originated in the case in the -- in the New

13   York courts which basically dealt with situations where a

14   subcontractor was suing on a surety bond and the surety was

15   asserting one of these pay when paid provisions.  And the

16   Court basically said look, that's just inconsistent with the

17   notion of a surety bond but that has to application to this

18   situation.

19          There's no attempt here, and the Equity Committee

20   has not suggested there's been any attempt to transfer risk to

21   a third party of somebody else's default.

22          Finally, Your Honor, the provision does not suggest

23   timing issue in any respect.  The Equity Committee says that

24   various conditions precedent are not favored, but again, we

25   have no ambiguity here, we have the -- the clear language of

140

1    the provision.

2            Then the Equity Committee says well, this would be a

3    forfeiture and everybody knows that the law disfavors

4    forfeitures.  Well, Your Honor, the problem with that argument

5    is that is proves too much.  Any condition of a payment of any

6    sort which is not satisfied, in those terms affects a

7    forfeiture in the sense that you don't get what you hoped to

8    get.  The issue is not whether it's a forfeiture or not, but

9    rather whether the condition has been satisfied.

10           In this case, the Equity Committee -- the equity

11   interests simply have no lien or security interest or

12   entitlement of a type that you can say is forfeited.  They

13   have a conditional right to payment, which condition was

14   simply not -- not followed.

15           Might -- the rule might be different as the Equity

16   Committee suggests of this ambiguity, but there is simply no

17   ambiguity on the conditional nature of the payment.  The

18   ambiguity or the uncertainty, if any there is, is simply what

19   happens if the condition not only cannot be satisfied, but can

20   never be satisfied.  But that's a separate -- that's a

21   different question from whether there is an ambiguity in the

22   conditional nature of the payment in the first instance.

23           The Equity Committee says that the plan should be

24   construed against the drafter.  Well, Your Honor, I'm not sure

25   that that's even applicable here.  Normally the cases they

Argument - Mr. Landers                    17

1    cite are situations where equity interests are asserting that

2    -- that kind of -- I'm sorry -- where creditors who are

3    seeking rights under a plan, are seeking rights that the

4    equity interests say that they shouldn't have.

5            In this case, it's the equity interests that are

6    asserting this issue vis a vie creditors.  But in any case,

7    Your Honor, Finova really stands in the position of a

8    stakeholder here.  It doesn't benefit in some way, in the way

9    those cases addressed.  In this case, either Equity or

10   creditors are going to get the money; it's one or the other.

11   And that's where we are.

12           This is not a situation where, in some way, equity

13   holders are going to try to give creditors less than the

14   creditors think they're entitled to in order to get more under

15   -- under a plan.  The cases, in fact -- and these are cases

16   that are cited by the Equity Committee -- suggest that while

17   the cases that they cite are cited for the proposition that a

18   treatment under a plan creates a new obligation.  What those

19   cases also establish is that whatever the rights are under the

20   plan, the parties getting those rights under the plan are

21   stuck with those rights even if they're worse than what they

22   up.

23           For example, the Consumers Realty case, involved a

24   situation where the creditor was entitled to interest and

25   didn't get it under the plan.  Yet the Court said that they're

142

1    stuck with no interest.  Similarly, the Penrod case involved a
2    secured creditor who found that the lien was taken away by
3    virtue of Section 1141 of the Bankruptcy Code.  Again, the
4    Court said, well, you're just stuck with your -- your
5    treatment under the plan.

6              In addition, Your Honor, in this particular case,
7    the obligation to Equity did not replace debt; it replaced
8    equity.  In fact, it didn't replace anything.  It just gave
9    Equity certain conditional rights under the plan and it has
10   again, none of the characteristics of -- of debt.

11             The Equity Committee says, well, this is not a
12   dividend and cites various cases relating to that issue.  But,
13   Your Honor, we don't think that that makes any difference
14   because this is a distribution by the very terms of the plan
15   on account of equity.  And the disclosure statement makes it
16   clear that it is subject to legal requirements dealing with
17   distributions to shareholders.

18             Even if this is construed as some sort of return of
19   capital or something like that, Section 244(b) of the Delaware
20   Corporations Code specifically says that a reduction of
21   capital is not permitted if the remaining assets are
22   insufficient to pay debt.  In fact, Your Honor, the provisions
23   dealing with restricted payments are parallel in a very
24   significant way, the restrictions under Delaware law on
25   distributions to shareholders.

1          Not only has the Equity Committee not argued that

2     the terms of the plan permit these distributions, but in fact,

3     they've not argued that Delaware law permits these

4     distributions either.  To be sure, they have cited the

5     Fulweiler case, which dealt with whether the spinoff of GM

6     stock by DuPont, should be allocated to the allocated to the

7     husband or the wife under a divorce -- divorce decree.

8          But, Your Honor, that has nothing to do with the

9     question of whether DuPont could have conducted the spinoff as

10    a matter of corporate Delaware law in the first place.  That's

11    the issue here.  The issue is not what side of the ledger it

12    goes on once the funds are distributed.

13         Then the Equity Committee cites Section 170 of the

14    Corporations Code, which says that well, if you deliver a note

15    at a time when you could have declared a dividend, the note is

16    in effect, valid and should be paid.  And then they say, well,

17    this applies because the note, the obligation was, in effect,

18    delivered at the time of plan when Finova could have paid a

19    dividend.  Your Honor, again, that argument fails on multiple

20    grounds.

21         For one thing, in this particular case, a dividend

22    could not have been paid at the time of the plan because the

23    indenture specifically required -- required full payment of

24    the Berkadia loan before any amount was paid on the 5 percent.

25    What they are, in effect, arguing really, again proves too

1    much.   Their argument would be that any general authorization

2    to pay dividends at some point in the future takes the

3    dividends when paid out of the restrictions in Delaware law

4    governing the payment of dividends.

5            There's no indication that I know of that the

6    Delaware statute was intended to basically approve forever and

7    ever, dividends which are not declared but which might be

8    declared in the future.  And as I said before, in this

9    particular case before any distribution whatsoever was

10   distributed to shareholders, it would have to be approved

11   before the Board of Directors.  That simply did not happen

12   when any of these -- when any of these conditions could be

13   satisfied, nor can they be satisfied now.

14           Finally, the Equity Committee says -- says that the

15   plan provisions trump state law if there is an inconsistency.

16   That may be true, Your Honor, but here there is no

17   inconsistency because the plan specifically incorporates state

18   law.  The plan says you can't pay these things if there's a

19   fraudulent conveyance, state law, or it would not be permitted

20   by applicable law, which in this case would be the law of

21   Delaware.

22           So this is not a -- a situation where in some way --

23   this is not what I call a hell or high water provision where

24   the plan said you got to pay this 5 percent to Equity,

25   regardless of anything else.  It's not that kind of provision

1    at all.  It's a provision which is subject to conditions and

2    the conditions specifically incorporate state law.

3         Finally, Your Honor, the Equity Committee says that

4    because Finova chose to set aside the 5 percent in a

5    segregated account gives rise to some sort of constructive

6    trust.  Initially, Your Honor, I observed that there was no

7    segregation requirement under the indenture.  The indenture

8    simply says that the funds must be retained.  According to the

9    indenture, the funds could have been retained in a general

10   bank -- bank account just as well as in a separate -- in a

11   separate account.

12        But in addition, Your Honor, the case law that we've

13   cited establishes that Courts will generally not impose a

14   constructive trust when there is a specific agreement.

15   Instead, the constructive trust remedy is a remedy that's

16   employed when a party gets or retains something, that for a

17   legal reason or an equitable reason, really belongs to a third

18   party.

19        Here, however, Equity does not have a claim of

20   entitlement.  They have a conditional right to payment.  And

21   Equity is really trying to get funds which they are not

22   entitled to under the plan.  This is not a case where somehow

23   Finova got the funds by virtue of wrongdoing or fraud or

24   something like that.  And the Equity Committee has not

25   suggested any -- any such things.

1          Instead, it's simply a case where the Equity

2    Committee would like to obtain funds in a way that, in effect,

3    would require a skewing of the plan provisions and a total

4    disregard of the conditions to payment.

5          Let me conclude, Your Honor.  We believe that the

6    documents are crystal clear that the plain meaning of the

7    documents is clear that this is a restricted payment on

8    account of Equity.  It's subject to conditions and cannot be

9    made.  Therefore, not only can it not be made, but it never

10   can be made.  And therefore, we would urge the Court to grant

11   Finova's motion.

12          Thank you very much, Your Honor.

13          MR. SILVERSCHOTZ:  Good afternoon, Your Honor.  I'm

14   Mark Silverschotz from the Anderson Kill firm and I'm here

15   today with my colleague, James Andriola -- also from Anderson

16   Kill -- and William Sullivan from Buchanan Ingersoll.  And we

17   are counsel to the reconstituted Committee, the Equity

18   Security Holders of the Finova Group.

19          That Committee was formed by the U. S. Trustee at

20   Your Honor's discretion for the sole purpose of responding to

21   the debtor's motion to clarify, which I suppose is the first

22   time anyone has been asked to respond to clarify crystal clear

23   documents.

24          We came into being on the 10th of July and Your

25   Honor, the debtor's motion is ten pages long and there was a

147

1    flurry of motion practice back and forth after that was filed.

2    But if you ignore the intervening motions and just look at the

3    response of First Carolina, the debtor's reply to First

4    Carolina -- our papers and then the debtor's ultimate reply

5    papers -- we have about 100 pages of pleadings which cite, in

6    the aggregate, 117 separate decisions.

7            I am not going to march all 117 opinions but it's

8    appropriate that both the debtor and the Committee and First

9    Carolina cited all these cases because I think, fundamentally

10   we have an issue of law.  And Mr. Landers and I, I believe,

11   agree that we have fundamentally an issue of law.

12           The language of the plan is what it is, and the

13   disclosure statement and the indenture as well, state what

14   they state.  The really key operative documents, of course,

15   are the indenture -- and I agree with Mr. Landers there --

16   and the plan.

17           And I think Mr. Landers would agree there is no

18   intrinsic -- extrinsic -- excuse me -- evidence of which

19   certainly, we're aware that would demonstrate any expectation

20   on the part of any party that on the 9th -- excuse me -- on the

21   11th of September of 2001, terrorists would fly planes into the

22   Pentagon and the fields of Pennsylvania and the World Trade

23   Towers.

24           And why am I bringing that up?  A month prior to

25   that, Your Honor, the plan was uncontested as -- as we stood

1    before you and it was found feasible and it certainly was.

2    And it's important that we put the motion in context because

3    one significant component of the various transactions

4    contemplated by the plan was a $500 million tender that

5    Berkshire Hathaway was expected to make for the new senior

6    notes that were issued pursuant to the plan.

7            And we will recall that after 9/11, exercising what

8    it believed to be its contractual rights, Berkshire Hathaway

9    declined to tender the $500 million for the notes pro rata,

10   asserting, I believe, force majeure and the debtor

11   nevertheless, and I think appropriately, continued on with the

12   effectuation of the plan, which had already gone.  A final had

13   been substantively consummated.

14           And this plan is, as we all agree, a plan of

15   liquidation.  It provided for Berkadia management, it provided

16   the management fees, which we all know are substantial, and

17   creditors got under the plan 70 cents cash on the barrel head

18   and they got new senior notes in the amount of the balance of

19   30 cents.  And as Mr. Landers mentioned, the notes had an

20   indenture and fundamentally, it is the indenture why we are

21   here today.

22           In their motion, the debtor points to the waterfall

23   of payments that's laid out in the indenture and they say

24   we're insolvent, we will always be insolvent.  We therefore,

25   can never distribute the funds to Equity, so therefore, let us

1    take the cash that's on hand now.  It was $65 million;

2    presumably it has gone up somewhat.  And the addendum in their

3    motion and the form of order that they propose says they want

4    to use those funds to "pay expenses, debts and other

5    obligations".

6             However, I think more accurately and in fairness to

7    the debtor, as expressed in footnote 11 of their motion, they

8    -- they gently drop the point that the funds that have been

9    set aside for Equity are actually going to be used to pay

10   either principal or interest on the new senior notes.

11            So, as I stand here, Judge, I think contextually,

12   it's important to recognize that the effect, if not the formal

13   intent, of the motion is to use the funds that were set aside

14   for Equity to pick up.  And we think it's going to go up to

15   about $100 million dollars if we're lucky.  They're going to

16   pick up about one-fifth of the obligation that was declined by

17   Berkshire Hathaway when after 9/11 they declined to tender for

18   the notes.

19            So, what the debtor's really asking for here,

20   contrary, I believe, to what Mr. Landers said, is asking for

21   the Court, after the fact, after confirmation, after

22   substantive consummation, substantial consummation -- excuse

23   me -- first to shift the risk of that non-tender to the Equity

24   and secondly, because the 5 percent that we're talking about

25   is within the fifth tier of the waterfall, where 95 percent

1    goes to the note holders, is asking Your Honor to subordinate

2    that 5 percent to the 95 percent.  And of course, the 95

3    percent is paying the 30 percent that wasn't paid after the 70

4    percent was paid.

5           The indenture is silent with respect to what the

6    debtor is asking the Court to do and because of that, Your

7    Honor, we think, and for a variety of other reasons that we've

8    expressed in our papers that I'm going to go through quickly

9    -- and I'm not going to simply regurgitate my papers -- we

10   think that the debtor's not entitled to the relief, the

11   specific relief that's requested in the motion.

12          Our argument, Your Honor, is that the motion is

13   contrary to law and it should be denied for that reason.  And

14   if we pause the 100 pages and the 115 opinions, we think the

15   argument is fairly simple.  The language of the indenture

16   simply does not say what the debtor wants it to say.  At best,

17   it's ambiguous.  And the silence plays into that ambiguity.

18   It certainly emphasizes the ambiguity.

19          But either way, whether it's silent or not, the

20   payment of the funds reserved for equity is a payment of a

21   plan created contractual obligation.  And that obligation is

22   in the nature of a debt, not a dividend.

23          The debtor's solvency is not a condition precedent

24   to the payment in the fifth charge.  If the operative

25   documents had provided otherwise, we would not be here today,

1    Your Honor, because we would have had an express condition

2    precedent that Mr. Landers has articulated.  But it exists in

3    the ether, it doesn't exist in black and white on paper.

4              And because of that ambiguity, whether of a

5    consequence of the document's silence or otherwise, the

6    language has to be construed in favor of the equity holders

7    because under New York law first, as a matter of contract law,

8    one does not construe ambiguous language to find a condition

9    precedent -- period.

10             Two, one does not under New York law under

11   contracts, construe ambiguous language to effect forfeiture.

12   Three, one does construe language against the drafter, and

13   four, one does construe a plan against a plan proponent under

14   traditional bankruptcy interpretation or more or less, basic

15   contract concepts.

16             The sub issues that, I think, exude from everything

17   Mr. Landers has said and everything I've said thus far and

18   probably will say hereafter.  We're down to, is it a debt and

19   is solvency a condition precedent to any and every

20   distribution of every sort contemplated by the plan,

21   contemplated by the indenture to the senior notes?

22             The waterfall of issues, as opposed the waterfall of

23   payments, is more or less, flows from those two concepts.  The

24   indenture contains that payment waterfall that Mr. Landers

25   went to right away, as well he should have.  The first

Argument - Mr. Silverschotz                    28

1    obligation under that waterfall is for the debtor to pay all

2    of its current debts.  The debts of its liquidation, the

3    associated costs, the obligations at the subsidiary level --

4    and let us recall it is the subsidiaries that are doing the

5    liquidating, paying their costs of liquidating.  And only if

6    they are able to generate positive cash flow, upstream the

7    funds to Group according to the 95/5 split.

8         The indenture says that it has to either distribute

9    or reserve the funds for equity within that fifth tier.  And

10   the 5 cents must be upstreamed according to the expressed

11   language in the indenture.  The end language in that fifth

12   tranche -- and I'll use the term tranche even though it's

13   probably technically inaccurate, but I'm stuck with it because

14   that's what I've written in my notes.  The end language at

15   that fifth tranche says, "Each incremental payment of 95 cents

16   pursuant to clause (a) shall require a distribution or

17   retention pursuant to clause (b) of 5 cents.

18        Now, the 5 cent language is interesting because it

19   says those funds are to be used "to make distributions in

20   respect of Finova Capital's equity interests held by the

21   company."  It says that those funds are then held and then

22   indenture says that if they are retained, "any such retained

23   amounts shall accumulate."  Now, Mr. Landers says what's the

24   point of accumulating those funds?  And that's a fair question

25   and I'm going answer that but I have to come around to it and

153

1    I will do that in a second, Your Honor.

2            Mr. Landers also points out that the indenture says

3    that if a restricted payment is impermissible, the funds shall

4    accumulate.  So, the core of the debtor's contention is that

5    if the funds were once moved up were forever more

6    impermissible, because they would either have paid, would

7    render them insolvent or be a fraudulent conveyance or

8    otherwise impermissible under Delaware law, then they could

9    never do it.  It's the debtor's contention that all three of

10   those apply.  It's our contention contrarily and I suppose,

11   inevitably, that none of them apply.

12           But we also believe, Your Honor, that even if all of

13   them apply and those funds simply accumulate, they're still

14   ours at the end of the day because the first tranche requires

15   everything to be paid.  The 2nd, 3rd and 4th tranches get paid

16   in order and then they get to the 5th tranche, and the 95 cents

17   goes to the creditors and the 5 cents gets upstreamed and held

18   for us.

19           The indenture is silent on what happens, even to an

20   impermissible restricted payment at the end of the day.  Now,

21   at the end of the day is an interesting concept.  And now I'm

22   going to explain why I think it's a significant concept, and

23   I'd like to posit what I'll call a hypothetical but I think

24   it's really something that should happen at the end of the

25   day.

1       Let us presume that the debtor liquidates out
2  completely and does a perfect job.  And there's a hundred --
3  and they continue to reserve the 5 percent and at the end of
4  the day, $100 million is sitting in a segregated account and
5  they've paid every last debt of every last subsidiary and
6  every claim has been resolved forever.  And all that's left is
7  cash that's been segregated, and some senior -- new senior
8  notes that are unpaid.  At that time, how would this motion be
9  considered?

10      In theory, Your Honor, the merits of the motion on
11 that happy day, the merits of the motion should and would be
12 in our view, exactly the same as they are today.  You have
13 creditors who got 70 cents in cash and 30 percent notes, who
14 hopefully will have been paid most of that 30 percent.  But
15 they would have been paid what they were paid out of the 95
16 cents and who already consented in the plan to the split
17 articulated in the fifth tranche, because that's the
18 indenturous part of the plan supplement the debtor points out
19 accurately -- the plan supplement as we always do -- was
20 incorporated into the plan.  And at the end of the day, we
21 have the 5 percent in the bank account and unpaid senior
22 notes.

23      What the debtor would have the Court do is
24 effectively take that 5 percent and subordinate below the 95
25 percent which is something that the plan did not do and the

Argument - Mr. Silverschotz                                    31

1   indenture doesn't do.  We really think that the debtor has

2   gone through a somewhat extraordinary circumlocution to get to

3   that point, you know, articulating various legal theories,

4   particularly in the absence of express language, producing the

5   result that they seek.  And their argument is essentially, and

6   I'll come back to the word essentially, but taking it right

7   out of their papers, they're arguing that this is what common

8   sense requires and that the result is a consequence of the

9   implicit meaning in the plan.

10          Your Honor, we disagree because we think the history

11  of jurisprudence on our collective topics makes clear that

12  common sense means that if you intend for a material term to

13  be in a contract, you put it in.  And if you haven't, one, you

14  don't construe, under New York law, a condition precedent out

15  of gossamer, and two, you don't cause a forfeiture to result

16  as the consequence of an inference.  And that's what the

17  debtor's trying to do.

18          I've framed what we see as the legal issue and, Your

19  Honor, I'd like to just go right into, more or less, pure law

20  that we've all talked about.  And I want to complement the

21  debtor on their pleadings.  I thought, just as counsel to

22  counsel, I thought they were -- they did an excellent job.  I

23  think our's are pretty good, too.  And Mr. Landers got last

24  licks when he filed his papers earlier this month.  If I bring

25  up anything new it will be extremely minor and only in

1    response to something that he may have said in his last set of

2    papers.  And I said before, I'm not going through all 117 that

3    we've collectively cited.

4               There is much about which the debtor and the Equity

5    agree.  We agree the plan is a contract.  It embodies the plan

6    supplement, as I just said, and it binds the parties.  The

7    debtor, when they opposed Mr. Linden's motion to reconstitute

8    the Committee, said that the debtor's goal "is to expressly

9    state what is implicit in the plan and pursuant to applicable

10   law.  At most, the clarification motion seeks to resolve

11   ambiguity in the plan concerning the disposition of the

12   segregated funds."  And that's in the debtor's opposition to

13   Mr. Linden's motion and at page six of their opposition.

14              And a couple of pages later, they go on to say, "The

15   plan recognized that the payment to Equity of the 5 percent of

16   the amount otherwise allocable to the new senior notes, was

17   essentially a dividend."  And Mr. Landers, I believe, used the

18   word essentially during his presentation.  And I have a term

19   for essentially.  It is a weasel word, Your Honor, and I don't

20   think Mr. Landers is a weasel.  I think he's an excellent

21   attorney.  But anything can follow the word essentially.

22              We can say that the payments are essentially a

23   dividend.  We can say they're essentially a prune danish.  It

24   is either is a dividend or it is not as a matter of law.  And

25   we believe it is not.  But what we agree about is that the

1    plan does not expressly state what the debtor wants it to say

2    and that the 5 percent allocated to Equity was not expressly

3    stated to be a dividend.  And we certainly disagree with the

4    notion that the debtor's contractual burden embodied in the

5    indenture is essentially anything other than a contractual

6    obligation creating a debt.

7            In reply to the First Carolina objection, the

8    debtor's said that, "The shareholders are not entitled to more

9    than what is provided for in the plan and to find otherwise

10    would provide an unjust windfall to the shareholders", and we

11    absolutely agree with that assertion.  And I'm sure the debtor

12    would agree that to give the note holders more than they were

13    given by the plan would similarly result in an unjust

14    windfall.

15            We also agree with the debtor, Your Honor, that the

16    contract -- that is the indenture included within the contract

17    that is the plan -- is governed by New York law.  And I'd like

18    briefly to run through some New York contract law.

19            And New York law provides that when one is alleging

20    that a result is implicit or essential, but not express, it is

21    a high bar indeed that must be cleared.  The New York Court of

22    Appeals says, "A party who asserts the existence of an implied

23    in fact covenant bears a heavy burden for it is not the

24    function of the Courts to remake the contract agreed to by the

25    parties, but rather enforce it as it exists."

1          And following on, "This is especially so where the

2     implied covenant sought to be recognized and enforced is of a

3     type not favored by the Courts."  And that's the Rowe versus

4     Great Atlantic and Pacific Tea Company, at 46 NYS2d 62.  That

5     opinion says that where a party is seeking the imposition of a

6     disfavored covenant, failure to impose the unexpressed

7     covenant, has to deprive the party of the "fruits of his

8     bargain" -- quote, unquote -- fruits of his bargain, nor it

9     could gain a judicial imposition.

10         And as I've said before, the plan gave unsecured

11    creditors 70 cents cash, 30 cents in notes.  The notes yield

12    7½ percent.  The notes are not in default.  Mr. Landers

13    alluded before to the default provisions in the indenture.

14    The notes are not in default today and that's important.  And

15    every penny that's been set aside thus far has been set aside

16    because the contract required it because there is -- there is

17    no default.

18         But the plan gave Equity 1/20th of the 30 percent --

19    5 percent of the 95 percent.  Or if you want to do the math

20    slightly differently, 1.5 percent of aggregate distribution,

21    on face at least, taking the notes at par, that was given to

22    the creditors.  So where the motion granted, who would be

23    deprived of the "fruits of their bargain"?  It's our view,

24    Judge, that it's not the creditors.  Not the creditors to whom

25    the debtor seeks to give the funds that have been set aside.

Argument - Mr. Silverschotz                    35

1   We think it's the equity holders who consented to the plan,

2   who didn't stage evaluation fight at confirmation, did dispute

3   the management fees, did dispute the coupon on the notes.

4   They got what they got under the plan.  The creditors got what

5   they got under the plan and we believe the fruit of our

6   bargain is the 5 percent up front where we sit pari passu with

7   the 95 percent distribution to Equity.

8           Fairly recently, the New York Court of Appeals again

9   -- and the New York Court of Appeals is the highest Court, for

10  reasons that no one has really explained to me, rather than

11  being the Supreme Court.  But the Court of Appeals said,

12  "Courts may not by construction add or exercise terms nor

13  distort the meaning of those used and thereby make a new

14  contract for the parties under the guise of interpreting the

15  writing."  And that's the Reese versus Financial Performance

16  Corp. case, citing the case with my favorite name of all the

17  117, The Vermont Teddy Bear Company, Incorporated, and that's

18  at 1 N.Y.3d 72

19          Your Honor, the debtor contends that solvency is an

20  absolute condition precedent to any distributions by the

21  Finova Group to its shareholders, even where those funds have

22  been properly upstreamed.  And even where the senior note

23  holders have received their 95 percent of the windfall.

24          Your Honor, the debtor is seeking to impose a

25  condition precedent that's not written in the papers.  And

1  under New York law, that relief is not available because we

2  referred before under the <u>Rowe versus A & P</u> case, among the

3  disfavored implied covenants are those that seek to imply a

4  condition precedent.  And in a federal case before Judge Duffy

5  in the Southern District of New York, in the <u>Lomaglio</u> case,

6  Judge Duffy noted that in New York, condition precedent

7  imposition is so disfavored that it wouldn't even be done

8  against the drafter, where the shoe on the other foot here,

9  Judge Duffy would not impose a condition precedent that wasn't

10  expressed, even against the drafter of the contract.

11         So, we think that our argument goes even further

12  because we think from the Court of Appeals is that the

13  language at issue doesn't create a condition precedent at all.

14  The language of the indenture that the debtor believes creates

15  this condition precedent, we think again, we think it's

16  created out of -- out of the ether, not out the language

17  because we believe, as Mr. Landers correctly described our

18  view, that the language in the indenture creates a question of

19  timing by the use of the word "when" rather than the creation

20  of the condition of precedent or an issue as to if or unless

21  certain conditions are met, the distributions would be made.

22         I'm going to come back to the word "when", Your

23  Honor, and that's going to be one of the points that I'm going

24  to make a fresh point later on.  But if you think about it,

25  Your Honor, when we talked about the position of the equity

1   funds in the hierarchy of the waterfall, the payment

2   waterfall, the timing restriction makes sense because those

3   funds really ought to be reserved until such time as it is

4   clear that the higher tranches of debt have been paid.

5           And if the consequence of the reservation is that

6   there is a measure of risk associated with the reservation of

7   funds, that is not borne by the 95 percent -- with respect to

8   the 95 percent received by the shareholders.  It should still

9   be at the end of the day, the funds are available but there

10  may be some risk associated with it and the segregated cash

11  should remain on hand.

12          Treating solvency as a permanent condition precedent

13  makes no sense because if the debtor, as I expect, will have

14  done everything right, and at the end of the day all those

15  higher tranches will have been paid in full from the other

16  $400 million in cash that they're holding onto right now.  And

17  the only party that remains that is contesting the

18  allocability of those -- that 5 percent is the party that's

19  already consented to it in the plan.

20          To suggest that the note holder creditors within the

21  same fifth tranche get a second bite at that 1/20 of the

22  distribution reserved for the equity shareholder creditors, we

23  think is not supported by the express language in the plan.

24  And it doesn't even make the common sense that the debtor

25  would suggest to Your Honor -- has suggested to Your Honor.

Argument - Mr. Silverschotz                                    38

1          And to do it by implication in the absence of that

2     language is essentially to effect a subordination of the

3     similarly situated parties within that fifth tranche, and we

4     know under New York law, we don't do that.

5          Over the years, there's been a fair amount written,

6     and I confess that I even wrote an article once about the so-

7     called rule of explicitness.  And it's usually in happier

8     cases that we express the rule of explicitness, Judge, because

9     there's a question of whether or not post-petition interest is

10    susceptible to subordination in the absence of express

11    language that specifically talks about post-petition

12    interests.  And we know that in New York -- although in other

13    states it's not the case -- but in New York, the rule of

14    explicitness is still good law.  And that rule means that we

15    do not impose subordination clauses that haven't been written

16    out in black and white and we think that subordination by

17    implication is exactly what the debtor is arguing for here and

18    we think it's expressly contrary to the law of contracts in

19    New York.

20         We also think that in the presence of an ambiguity

21    in the documents, to effect the forfeiture of the funds set

22    aside on behalf of the parties who agreed previously to the

23    split, is independently disfavored -- and we talked about the

24    Rowe case again referring to disfavored clauses -- and

25    forfeitures are always disfavored, particularly so when it's

1    being done by implication.

2            The Oppenheimer case explained quite clearly the

3    difference between and expressed and an implied one.  It

4    basically adopts a combination of Williston and Restatement.

5    And where there's a disproportionate forfeiture, Oppenheimer

6    won't -- the law of New York is that you don't impose that

7    forfeiture where you have an ambiguous contract.

8            Now, what is the forfeiture that we're talking about

9    here?  The Restatement definition is more or less adopted by

10   the Court in New York in the Oppenheimer case.  And the

11   restatement says forfeiture is "the denial of compensation

12   that results when the obligee loses its right to the agreed

13   exchange after it has relied substantially as by preparation

14   or performance on the expectation of that exchange.  And

15   there's some editorial changes for grammar in  there, but

16   that's the language expressly out of Oppenheimer.  And that's

17   from Restatements, Comment (b) to Section 229 of the

18   Restatement (Second) of Contracts.

19           Your Honor, as I said before, the Equity voted for

20   the plan.  They voted to be diluted, they voted to accept the

21   benefits of the plan such as they were.  We think that's the

22   performance that can trigger a forfeiture or a concern for

23   forfeiture.

24           So, we believe that on our various uncontested

25   facts, the imposition of continued solvency as a condition

Argument – Mr. Silverschotz                    40

1   precedent where it's not expressed in the operative documents,

2   would cause that disproportion forfeiture to the shareholders

3   and we believe that the presence of solvency after all

4   creditors, save for the note holders, have been paid was not a

5   material exchange so you wouldn't be depriving the note

6   holders of a material value that they bargained for.  And we

7   think thus under the _Oppenheimer_ case, the motion is not

8   according to law, not consistent with New York law and should

9   be denied.

10          Now, the debtor and we cite a lot of the same cases

11  and it should be no shock, and I'm sure will be no shock to

12  Your Honor, that we each read them in completely opposite

13  directions.  And the debtor cites the language in _Oppenheimer_

14  to the effect that where the operative language uses "if" --

15  in quotes -- or "unless and until", then it's appropriate to

16  find an express condition in everything that I've talked about

17  thus far.  Thus far falls by the wayside if there's an express

18  condition in the language.

19          The indenture doesn't use that language, Your Honor,

20  and it's important to read _Oppenheimer_ and the indenture side

21  by side.  It says, "When the restricted payments shall no

22  longer be impermissible", and as we said before under the

23  _Grossman_ case, when is a word of temporal impact only.  It's

24  not if and when and the debtor's asking Your Honor to read

25  into the document, really, a non-existent "if".  We think

Argument - Mr. Silverschotz                    41

1  again, that it produces -- the word "when" produces an issue
2  of timing, not an issue of right.

3       We have a disagreement about the impact of the
4  silence of the document, Your Honor, and in its final set of
5  papers, the debtor engages in really some furious backpedaling
6  away from the proposition that the plan is ambiguous.  And I
7  think it's not surprising that they're doing that because from
8  what we've seen, they really have to because the consequences
9  of ambiguity are not good for their arguments.

10       And they cite a variety of cases to the effect that
11  if a plan is otherwise clear, silence on a point, where
12  there's absolutely no other conceivable result, will not in
13  isolation produce ambiguity.  And I agree with that as a
14  proposition.  But I think as we've seen thus far, Your Honor,
15  it is a stretch to allege that these documents are so clear
16  that ambiguity cannot be read into them; not after 100 pages
17  of pleadings and 117 different opinions.

18       And the Goldfield case from the Court of Appeals in
19  New York also expressly notes the potential presence of
20  "ambiguity created by silence."  So, we think that the logical
21  syllogism that the debtor is stuck with, essentially flows
22  from that silence and the indenture's part of the plan.  The
23  indenture is silent on this particular point of concern.

24       Silence equals ambiguity in our case because the
25  operative documents are not clear.  The ambiguity is construed

1   against the plan proponent.  An implied condition precedent

2   can't be imposed.  Forfeiture, under the Restatement

3   definition, would be experienced by the equity creditors, not

4   by the senior note holders if the motion was granted.

5           So, we think the debtor's motion has to be denied

6   for each of these reasons and we haven't even gotten to the

7   issue of whether or not the obligation under the plan is a

8   dividend or a debt.  And First Carolina made, we think,

9   crystal clear in their papers from last summer, that the

10  obligation and the indenture to distribute or segregate the 5

11  percent that was -- the 5 percent that was slated for the

12  equity creditors in the indenture -- is a dead obligation.

13          And again, we agree with the debtor, the plan is a

14  contract.  We agree that the rights under the plan are

15  substituted for all the rights that existed prior to

16  confirmation.  Confirmation brings a new day and supervening

17  obligations between the parties.

18          And of course, we disagree with respect to whether

19  or not it creates a debt.  Let's go back to New York law, the

20  Trojan Hardware case from the Third Department.  That's an

21  intermediate appellate decision, Judge; not the Court of

22  Appeals, but still useful.  It says, "Debt is generally

23  evidenced by a contract and it is a readily discernible amount

24  which can be expected in the normal course of events to be due

25  and owing in the future, although the obligation has not yet

1    ripened."

2              Now, to the equity creditors, that sounds
3    suspiciously familiar.  Our debt is evidenced by a contract,
4    the contract being the plan.  The readily discernible amount
5    is the 5 percent of the amount distributed on account of
6    tranche five of the waterfall.  So, we think this debt, even
7    under the debtor's analysis, depending on the solvency of the
8    debtor or not, it's either a current obligation or it's due
9    and owing in the future.  But it's a debt, but it's not a
10   dividend.

11             And the debtor relies very heavily in their, I
12   think, in both sets of papers that followed the original
13   motion on the Geftman test -- the 16 steps of looking for a
14   debt.  But Geftman was -- we think Geftman is useful for
15   another purpose.  Geftman was a gift versus debt analysis in a
16   tax context.  And I think the lesson from Geftman is you're
17   not, or one is not, and a Court is specifically not
18   constricted by the categorization of a particular obligation
19   based on how it's booked by in Geftman the taxpayer, or here
20   the debtor.

21             Your Honor need not do what the IRS did in Geftman
22   and go through that 16 step test because we have the benefit
23   of having a confirmed plan that creates its own set of
24   obligations in accordance with the language contained within
25   its four corners, including the indenture.

1          The fifth tranche doesn't, or I should say, didn't

2     get paid until the Berkadia loan was paid in full, and Mr.

3     Landers noted that I didn't reference, I think, page 41 and 42

4     of the disclosure statement.  And I will notice in turn that

5     he didn't reference page 37 of the disclosure statement where

6     the mechanism for payments is laid out.  And I won't go

7     through that, Judge, it's in our papers.

8          And I'm sure that Mr. Landers will agree with me

9     that disclosure statements are not operative documents.  They

10    may convey a sense of what the parties believe at a particular

11    time, but I can't recall seeing a plan or a set of plan papers

12    that didn't have something to the effect that the words of the

13    disclosure statement are superceded by the plan in the event

14    of any conflict between the two.

15         And I'm sure we can find misplaced commas in, or

16    colons that benefit either side and throw them back and forth

17    at each other.  But I think we have to focus, essentially, on

18    the key operative documents, which are the plan and the

19    indenture.

20         What is obviously missing in both the disclosure

21    statement, the indenture and the plan, is the word dividend,

22    appended to the 5 percent.  It's not there.  The debtor points

23    to the term restricted payment.  But restricted payment is

24    worded a little more broadly than the debtor would have Your

25    Honor find.  And I don't want to accuse Mr. Landers of

1    anything except perhaps, you know, a logical fallacy.  And I

2    think what he's arguing is the -- is a proposition that falls

3    to the fallacy of the excluded middle.

4              The distribution of the 5 percent is a restricted

5    payment but it's not a dividend.  Nor is it a payment in any

6    way that's contrary to the Delaware statute.  And we've had

7    that all in our papers, Judge, and I'm -- I don't want to use

8    up all the time.  I know you have a 4:00 hearing.

9              Ultimately we think the dividend debt issue is

10   interesting but it's really academic because the obligation is

11   one that's set forth in the plan.  The plan obligation is

12   express and the only party at the end of the day that would be

13   affected by it is the party that's already consented to it.

14             The debtor's sole reply repeats, more or less, the

15   arguments they made in their original papers.  It has six

16   sections and I can go through them very quickly and just touch

17   on them.

18             In the first section, they reiterate the contention

19   that the plan obligations don't create debt an page six of

20   their sur-reply, they bold the language that indicates that

21   the debtor is supposed to "make restricted payments unless" --

22   dot, dot, dot -- "the making of any such restricted payment

23   would be an impermissible restricted payment."

24             But they continue on but they don't bold the -- what

25   the important language because the paragraph continues and

1    says that if the restricted payment is impermissible, then

2    "the company shall retain such amounts and any such retained

3    amounts shall accumulate and shall be used to make restricted

4    payments at such time, or from time to time, when such

5    restricted payments are not impermissible."  Again, we're back

6    to the word "when" and _Grossman_ makes very clear that --

7    that's a word of timing.

8           The other minor newish point I'd like to describe to

9    Your Honor is over the weekend, looking for the word "when" in

10   some New York law and I found it.  And this is 100 percent an

11   argument by analogy but I think it's -- it's useful.  There's

12   a surrogate's case called _In Re O'Hanlon's Will_, (phonetic)

13   it's from 1941 and it's cited at 27 NYS2d 889.  And I don't

14   think the case is going to rise or fall on this but it's an

15   interesting case.

16          And involved the will that said that a beneficiary

17   of the will would retain a benefit -- excuse me -- obtain a

18   benefit when they turned 23, I think the age was 23.  And

19   unfortunately, the beneficiary died before they got to age 23

20   and as wills often do, there was a residual beneficiary.  And

21   there were also heirs to the beneficiary who didn't make it to

22   23.  So the question was, who got that share, the heirs of the

23   beneficiary who didn't make it to 23 or the residual heirs who

24   would get the reversionary interest?

25          And since I'm citing it, Your Honor, you probably

171

Argument - Mr. Silverschotz                          47

1    can probably guess that the heirs of the beneficiary who was

2    to receive the funds when he reached age 23 got the rights,

3    because the rights were vested in the will, not upon the

4    arrival at the age of 23.  It was as in Grossman; it's a

5    timing issue.  The use of the word "when" in New York is

6    interpreted as a question of timing.

7          The -- at page seven, the debtor attempts to foist

8    on us, whether it was really a (indiscernible) by contending

9    that we say that all obligations under a plan to equity are

10   debts.  Of course, we contend nothing of the sort.  Using the

11   debtor's example, a plan provision providing for a

12   distribution of preferred stock, certainly doesn't convert

13   that security into a debt instrument.  The instrument is what

14   it is.

15         But I think it's interesting, Judge, because if the

16   debtor failed to issue the security, failed to perform under

17   the plan, I think a different sort of claim would arise and

18   what's even more interesting is that the example that the

19   debtor gave is exactly what we don't have here.  We didn't get

20   preferred stock.  We didn't get put into the junior tranche.

21   We're in the fifth tranche of the waterfall of the indenture.

22   We are there ratable with the 95 percent that goes to the

23   senior note holders.

24         The debtor's second point focuses again on this

25   condition precedent issue and the debtor says the following:

172

1    "The plan language is not rendered ambiguous by the plan's

2    failure to state how the funds should be treated if the

3    conditions are never capable of satisfaction."  Au contraire.

4         We think that the word "unless" does only one thing

5    and it establishes the time for the funds being upstreamed;

6    they're either upstreamed for distribution or upstreamed for

7    segregation.  And the plan says shall, shall, shall when, with

8    respect to our funds.  The ambiguity in the plan, as the

9    debtor admits, is that the plan is silent on what happens when

10   "when" is never; if "when" is never.

11        And what the debtor really has put together and is

12   presenting to Your Honor for approval is -- is the idea that

13   when everyone north of the sixth tranche -- and that's the one

14   below us -- other than the senior note holders has been paid

15   in full, the senior note holders are entitled to pick our

16   pocket as if we had a subordination.

17        The plan doesn't say that expressly.  If it did, we

18   wouldn't be here.  And because of that, the motion has to be

19   denied.  And they say at page 13 that the debtors are not

20   contractors attempting to distinguish and we agree that the

21   debtor's not a contractor.  There it contends at page 14 that

22   our argument would render plan language superfluous.  We

23   disagree with that, obviously.

24        Their third point is that the distribution of the

25   segregated funds would be impermissible restricted and we

1  disagree because we believe those funds are paid when they're

2  upstreamed.  And we believe that the senior note holders

3  consented to the distribution out or segregation at the time

4  they consented to the plan.  And even if we're wrong on that

5  point, Judge, and I don't we are, the status of

6  impermissibility really is only there to protect the interest

7  of the senior tranches, not the parties that have consented to

8  a distribution.

9        The debtor's fourth point is back to forfeiture.

10  They set up what I think is a straw man when they say that

11  it's -- it's error that our argument is that any -- they say,

12  "any contractual condition to a payment effects a forfeiture."

13  And Mr. Landers said that when he was just standing here right

14  before.  If that's what we had said, then I would agree with

15  that we were wrong.  We do not believe that every failure of

16  the condition -- we don't contend that every failure of

17  condition creates a forfeiture.

18        We say there is not condition and to take our money

19  away would, in fact, cause a forfeiture.  If I had to put what

20  we're saying in one long and fairly complex sentence, I'd say

21  our argument is this:  We say it is impermissible where a

22  document is silent and thus ambiguous, to judicially impose

23  against a non-drafter and non-proponent, a condition precedent

24  that was not clearly expressed in the documents and the

25  consequence of which is the forfeiture of material

Argument - Mr. Silverschotz                    50

1    consideration expected by that non-drafter, non-proponent, or

2    the subordination of those rights in violation of the rule of

3    explicitness respecting subordination.

4            As we mentioned before, New York courts interpreting

5    New York contract law are so loathe to impose a condition

6    precedent by implication, they won't even do it against the

7    drafter of a document.  And at page 16 and 17 of their --

8    their final set of papers, the Judge asks the Court

9    essentially, pay no attention to the admission of ambiguity

10   that they made in page 6 of their opposition to Linden

11   reappoint the committee motion.

12           You know, so now, and we heard it during argument,

13   everything is crystal clear.  And I think Mr. Landers may have

14   actually used the phrase "crystal clear"; if he didn't, I

15   apologize.  Reading this part of the debtor's sur-reply,

16   Judge, given all the protestations by the debtor as to how

17   clear the operative documents supposedly are, one would think

18   that it was the Committee that filed the clarification motion

19   and not the debtor.

20           The debtor's fifth argument is to challenge the idea

21   that silence can produce ambiguity.  We agree that if a

22   document is utterly clear and if no possible result would

23   exist, other than the result being proposed, a side issue

24   inconsequential silence, isn't by itself going to create

25   ambiguity.  We don't -- we don't think that that is our set of

1    facts.

2        We think at page 19 of their final brief, they
3    ultimately paints itself into a corner, where it contends at
4    long last that "because there's no ambiguity, there's nothing
5    for this Court to construe against the reorganized debtor."
6    And I have to ask, then why are we here?  We're not the ones
7    making the motion.  And we believe that the idea that there's
8    no ambiguity in these documents is an unrealistic assertion.

9        The last argument Mr. Landers made -- and to his
10   credit it was a throwaway argument and I think he more or less
11   threw it away during his presentation -- was the idea that the
12   funds are undeliverable and hence they fall into the lawyer-
13   plagued undeliverability clause that's in every plan where
14   somebody has moved and hasn't provided forwarding information
15   or otherwise shown up.  And administratively, to clean up the
16   case, we either pay the money into the registry or have it go
17   to the reorganized debtor.  We agree that -- with the implicit
18   suggestion that that's not really an applicable clause.

19       Finally, the final argument is the issue of -- of
20   constructive trust status.  I don't want to spend a lot of
21   time on it, Judge.  I think that under New York law, the key
22   issue here is unjust enrichment and the imposition of
23   constructive trust in this context is more an issue of remedy
24   rather than the existence per se of a trust in the current
25   status of things.  We think that a constructive trust may be

1    imposed over the funds to ensure that they are reserved for

2    the parties who are entitled to those funds.  We think that

3    party are the equity creditors, whose rights are parried with

4    the 95 percent interest in the fifth tranche of the indenture.

5          Silence in the indenture on this point can only

6    devolve to the benefit of the equity shareholders and not to

7    the senior note holders.  With respect to silence, Your Honor,

8    I'd like to close with an observation made by Thomas Hardy,

9    "that a man's silence is wonderful to listen to."  And with

10   that, I'll sit down.  Thank you.

11         THE COURT:  Okay.  I don't need anymore.  I've had

12   enough.

13         I've spent a lot of time with the relevant

14   documents.  I don't think they're ambiguous and I think the

15   debtor has it right.

16         The multitudinous arguments offered by the

17   Committee, for the most part, are either irrelevant or off the

18   wall.  The concept of forfeiture, subordination, constructive

19   trust, sharing pari passu is all in gross conflict with the

20   terms of the plan and the disclosure statement.  And I want to

21   go through the disclosure statement and the plan and the

22   indenture to -- to make clear why I agree with the debtor on

23   this issue.  I don't think -- the documents are verbose and a

24   bit complex, but I think they are clear on this point.

25         I first looked at the disclosure statement and the

1    summary description of the classes and the treatment of those

2    classes.  And in my copy of the disclosure statement, I'm

3    looking at page 14, which contains a portion of the table

4    describing the classes and the treatment, and the FNV Group 6

5    interest as a relevant class for the Equity Committee.

6            And there it says, "On and after the distribution

7    date, the legal, equitable and contractual rights of holders

8    of allowed interest in class FNV Group 6 (interest), shall

9    remain in effect" -- let me just pause.  What it says there,

10   the interest remain interest -- i.e., the interest is a stock

11   interest.  Then it says, "subject to, number one, additional

12   group common stock to Berkadia and the issuance of additional

13   preferred stock."  And romanette (iii) it says, "the other

14   terms and conditions of the plan."

15           Now, if we then look at the plan on page 21 of my

16   copy where it defines the -- where it describes the class FNV

17   Group 6 (interest), like the summary says, "On and after the

18   distribution date, the legal, equitable and contractual rights

19   of holders of allowed interest in class FNV Group 6 shall

20   remain in effect subject to the effect of, one" -- and then it

21   makes reference to the additional common stock to be issued --

22   "two, the issuance of preferred stock", and romanette (iii),

23   the other terms and conditions of the plan as more fully --

24   more fully described in sections 6.2, 6.3, et cetera.

25           I then turn to the plan section 6.2, which is

1    obviously a description of the senior notes.  And that

2    description refers us to the interim exhibit 6.2(C)(1) and the

3    interim exhibit 6.2(C)(1) -- which is the term sheet -- then

4    describes in detail the, number one, the cash distribution,

5    the waterfall and then it says as a caption -- and there's no

6    pagination for this -- limitation on restricted payments.

7         I quote:  "FNV Group will not directly or indirectly

8    make any restricted payments other than the restricted

9    payments under the 'use of cash' covenant described above."

10   In my view, that is a very plain statement that unless the

11   restricted payments can be made, which are not impermissible

12   restricted payments, then no payments will be made.  The

13   indenture, as I will point out later, makes that point

14   equally, if not equally clear, when I get to it.

15        What is also interesting about this particular

16   provision is in defining the restricted payment, it defines it

17   as a declaration or payment of any dividend or the making of

18   any distribution.  The debtor's position doesn't turn on

19   labeling these as dividends.  It's a distribution with respect

20   to the equity position.

21        It goes on to say, "provided however, the restricted

22   payments shall not include" -- and it then lists five items.

23   It does not include the elimination of fractional shares.  It

24   does not include payments in cash in lieu of fractional

25   shares.  It does not include payments to dissenting

1    shareholders, and most importantly, it does not include

2    repurchases, redemptions, acquisitions or retirements to

3    employees, directors or officers.

4         Then it goes on to say, "provided that the aggregate

5    of all payments in clauses 1, 2, 4, and 5 shall not exceed $5

6    million dollars per calender year."  My interpretation of --

7    well, let me get -- let me go now to the indenture.

8         The indenture, of course, in section -- we've

9    focused on section 4.06, which is the waterfall distribution.

10   But equally important is my view, is 4.07 and that says, and I

11   quote, "The company shall not and shall not permit any of its

12   subsidiaries to directly or indirectly make any restricted

13   payments except such restricted payments that are permitted or

14   required by section 4.06" -- and that's the waterfall -- or

15   section 4.07(B) hereof."  4.07(B) hereof, is the, what was

16   also referred to in the plan as to the five exceptions to the

17   payment of restricted payments, including redemption of shares

18   of directors and employees provided that that will not exceed

19   $5 million dollars in any calender year.

20        Now, I now want to get back to the disclosure

21   statement and elaborate a little further on the point that Mr.

22   Landers made at the outset.  In my -- I'm looking in my copy

23   of the disclosure statement, docket number 533 on page 48.

24   It's a -- it's a discussion captioned "Special risk for equity

25   holders".  Sub part (a) talks about the dilution resulting

1    from the distribution of, to Berkadia, of half of the equity
2    position.
3         The next caption on the top of page 49 is labeled
4    "Dividends".  The second -- third sentence of that paragraph
5    says -- and this is a lengthy reading but I think it's
6    important -- "Subject to applicable corporate law (which
7    limits the circumstances which corporations may legally make
8    distributions to shareholders), limited distributions to
9    shareholders will be permitted as the new senior notes are
10   paid off as described in the next paragraph."
11        I want to then skip to the third -- the fourth
12   sentence of the next paragraph, and it says, "If FNV Group
13   does not have sufficient funds ultimately to repay the new
14   senior notes in full (together with accrued interest therein),
15   it is likely that only limited distributions will be made to
16   shareholders."  Let me pause for a moment and observe that I
17   think that sentence of limited distribution refers to the five
18   exceptions in exhibit 6.2(C)(1) of the plan.  In other words,
19   the $5 million limitation distribution.
20        The next sentence, "There can be no assurance that
21   FNV Group will make any distributions to its equity holders,
22   even if all the contractual prohibitions thereto have been
23   exercised."  That says to me, you are shareholders.  You may
24   or may not get a distribution and if applicable law precludes
25   a distribution or a dividend being made, you get nothing.

1          It goes on to say, "Subject to meeting the legal

2     requirements permitting distributions to shareholders,

3     applicable law and Delaware law, and so long as the making of

4     any such distribution would not render FNV group insolvent" --

5     the issue we have here -- "FNV Group currently intends to make

6     distributions permitted under the terms of the new senior

7     notes as soon as possible."

8          That provision, together with 4.7 of the indenture,

9     in my view shouts at us when it says there are circumstances,

10    plain and simple, which would preclude any payment to any of

11    the shareholders.

12         And now the only question is will these events never

13    go away?  And you've ducked that issue.  Should we just wait

14    until the debtor is finally wound down and you still get

15    nothing?  Or do you want to debate whether those conditions

16    can ever be satisfied?

17         MR. SILVERSCHOTZ:  Your Honor, if the question is do

18    we want to have a lengthy and expensive investigation on

19    whether or -- there are all sorts of issue -- whether you

20    address what we've done, what we haven't done.

21         When last we were here, Your Honor made quite clear

22    that we had a limited budget.  Your Honor felt we could spend

23    about $20,000 -- and I think that was the number that was

24    expressed on the record -- to do a, I don't want to use the

25    phrase drive-by, but a low intensity evaluation of the

Argument - Mr. Silverschotz                          58

1    debtor's assets.  What the Committee did was, after much

2    searching, we found what we thought was an ideal person to

3    review the aircraft assets which are by far, and counsel will

4    correct me if I'm wrong, the largest group of assets of this

5    debtor.

6              THE COURT:  Are these actually aircraft or are

7    they --

8              MR. SILVERSCHOTZ:  They're aircraft --

9              THE COURT:  -- claims against aircraft?

10             MR. SILVERSCHOTZ:  I believe, well, it's probably a

11   combination of -- of every conceivable asset that one can have

12   associated with aircraft.  We'll call them the aircraft

13   related assets, including ownership of -- of planes themselves

14   that are out on lease and there's an income stream.

15             This gentleman had a good, preexisting working

16   knowledge of the Finova fleet.  And working with -- after we

17   entered into a confidentiality agreement, he prepared a

18   report, which we have not shared with the debtor.  His review

19   was -- the results of his review were that he believed that

20   the actual value of the planes was at the very high end of the

21   range that the debtor had given, but it was certainly not a

22   multiple of the values, of the range of values that the debtor

23   gave.

24             So, that's -- that's one thing that we know.

25   Whether we would automatically extrapolate from that, that

1    point, an overall evaluation -- to do an overall evaluation,

2    Judge, I mean, you do that practically every day of the week

3    sitting where you are.  And we all know --

4              THE COURT:  I don't do it.  I hear others do it.

5              MR. SILVERSCHOTZ:  Well, yes.  But Your Honor sits

6    in judgement of what the work that other people -- the work

7    that other people have done.  And it is expensive, it is time-

8    consuming and we think it would have been an error for us to

9    go off and -- and hire, you know, Shannon or Price Waterhouse

10   or one of the other bankruptcy evaluation gurus.  And we

11   haven't done an evaluation of what the debtor's net operating

12   loss is worth in the marketplace.

13             We don't know if the debtor has the ability to use

14   some of that cash and buy back notes and produce value.  We

15   don't know if the debtor had litigation claims.  We don't know

16   if the Berkadia -- excuse me -- the Berkshire Hathaway

17   assertion of force majeure was valid or not.

18             There are all sorts of issue that in theory could --

19             THE COURT:  But that's -- that's an event that took

20   place four years ago, isn't it?

21             MR. SILVERSCHOTZ:  Your Honor, if it's a six year

22   statute on breach of contract, you know, I don't know even as

23   the point Your Honor makes is whether or not that means it's

24   beyond the statute of limitations or not.

25             I can't stand here today, Your Honor, and say -- and

Argument - Mr. Landers                          60

1    throw up my hands and say, sure, they're insolvent today and

2    they're going to be insolvent for all time.  Our view, Judge,

3    is that on the effective date, they had $600 million in

4    shareholders equity and they entered into a contract to pay us

5    5 percent and made it a contract.

6           And I know Your Honor said our arguments were off

7    the wall.  I prefer to think of them as creative and

8    thoughtful.

9           THE COURT:  Maybe some of them were creative.

10          MR. SILVERSCHOTZ:  Thank you, Your Honor.

11          But, we're working here with the -- the facts, the

12   time, the budget and the documents that we have.  If we --

13          THE COURT:  Let me hear from the -- tell me about

14   the wind-up of this corporation.  What is the timetable?

15          MR. LANDERS:  Your Honor, we were specifically

16   talking about that about three hours ago.  And Finova has at

17   least, and I'm a little hesitant to say very much because

18   Finova still isn't public, isn't a public company and some of

19   these things are not public.

20          But as of now, Finova is proceeding to liquidate its

21   assets internally.  Whether at some point there'll be a change

22   in direction is not clear.  Finova has made some efforts to

23   sell assets in bulk to purchasers like a GECC, or somebody

24   like that.  And in general they found that -- that the

25   benefits to everybody -- new senior note holders in Equity --

Argument - Mr. Landers                                    61

1    would be served by continuing the litigation, having

2    considering -- continuing the internal liquidation itself

3    rather than a sale in bulk.

4              I'd say only two other things --

5              THE COURT:  What are the bulk of the assets?  Are

6    they the airplanes?

7              MR. LANDERS:  They are largely aircraft.  In some

8    cases, they're on lease and some cases they're not on lease.

9    Again, if the Court wants to inquire further, Mr. Ross is here

10   and he can -- he's really on this --

11             THE COURT:  I'm just trying to find out, is it next

12   year, two years from now, five years from now?

13             MR. LANDERS:  Well, some of them come off lease

14   periodically but I will say that in the last -- in the last

15   quarter, the company did, unfortunately because of the

16   Northwest bankruptcy, have a further write-down of its -- of

17   its Northwest lease, of its various lease portfolios.

18             I think if Mr. Ross and the Court is free, I would

19   be glad to have Mr. Ross address the Court and answer these

20   questions.  But in essence, the planes tend to be older

21   planes.  Some of them are on lease, some of them not.

22   Northwest, as you might expect, is making noises about trying

23   to --

24             THE COURT:  Here's -- let me tell you what I'm

25   getting at.  Should we give the Committee more money to do

1    evaluation --

2            MR. LANDERS:  Well, Your Honor --

3            THE COURT:  -- or should we sit back and wait until

4    the wind-down is completed?

5            MR. LANDERS:  Well, Your Honor, I don't think that

6    that's -- I don't' think that's fair to anybody and I'll tell

7    you why.  We have made -- if you look at our 10-Qs, our 10-Qs

8    gives intimate detail about the liquidation.  Our 10-Qs, for

9    about four years, have specifically said that we're not likely

10   to have enough assets to repay the new senior notes.

11           It sets forth that information in great detail.

12   That information is reviewed on a quarterly basis and updated.

13   And the situation is that we still have a deficiency of well

14   over $1 billion, with an asset pool of -- I mean, when you

15   look at the assets, you've got to look at them as in different

16   categories.  A portion of the assets are cash, which doesn't

17   appreciate in value.  A portion of the assets are simply

18   receivables from customers that were financed by Finova.  They

19   can't get above the face amount of the paper.

20           Theoretically, the airplanes could decrease but --

21   but the fact of the matter is that the disclosure -- that the

22   10-Qs set out in great detail the present value of the

23   aircraft and gives figures for the values of the various

24   portfolios, and they're very substantially under water.  They

25   did have a consultant who familiar with the portfolio who

1    looked at these things and one can only assume that he didn't

2    find any basis to think that the assets would be worth

3    anything like the multiple that would be required.  And we're

4    not talking about 10 or 15 percent difference.  We're talking

5    about a 300 percent increase in value of basically used

6    aircraft.

7              I mean, I think the odds of that happening are very,

8    very remote and I think that's why the Equity Committee chose

9    not to pursue it.  But that information is all a matter of

10   public record and shareholders have access to that information

11   for four years, and as I said --

12             THE COURT:  That doesn't mean the Committee's not

13   entitled to challenge it.

14             MR. LANDERS:  No, it doesn't mean that, Your Honor,

15   but -- but you have to come -- you have to get to a point

16   where a challenge is frivolous, Your Honor.  I mean, you have

17   to just get to that point where -- where it's so out of line,

18   it's so unlikely that there's no -- that there's no basis for

19   it.  I mean, we have -- well, we have -- okay.

20             THE COURT:  Well, look, but now that I've turned

21   away their -- their legal argument, we have the issue of

22   whether your client is forever insolvent.  And until they say

23   they agree with that, then I say somebody's got to prove it to

24   me.

25             MR. LANDERS:  Well, Your Honor, we -- we have Mr.

1    Ross here.  We didn't -- we didn't prepare to put him on but

2    I'm prepared to have him testify today --

3              THE COURT:  I'm sure the Committee's not prepared to

4    examine him.

5              MR. LANDERS:  No, I know they're not prepared but

6    they were on notice that he was coming and that the reason he

7    was coming was specifically to address these questions if

8    raised by the Court.  And I'd be more than glad to just ask

9    him to come up and tell the Court what the situation is and

10   let the Court determine on the basis of somebody who has the

11   information whether --

12             THE COURT:  Can he tell me how -- when the end of

13   the wind-down will be?

14             MR. LANDERS:  Yes.  It will be no later than 2009.

15             THE COURT:  2009 --

16             MR. LANDERS:  Nine, yes.  And probably before that

17   but that would be the latest possible.

18             MR. SILVERSCHOTZ:  Your Honor, all that suggests to

19   me is that the motion although the debtor may be entitled

20   relief, today it's not emergent.

21             THE COURT:  So, what do you want, to wait until

22   2009?

23             MR. SILVERSCHOTZ:  Well, I'd like to wait forever,

24   Your Honor, but if made until 2009, it certainly, at least as

25   Your Honor reads the documents, if we don't get the money, the

1 money we think has to be reserved under the documents as

2 they're written, at the very least.

3          MR. LANDERS:  Your Honor, there's simply no purpose

4 in spending more money to do -- to do this.  We have conducted

5 the liquidation -- again I defer to Mr. Ross -- but of the

6 assets we started with in 2001 when the plan was confirmed,

7 probably something like 80 to 90 percent of them have been

8 liquidated.

9          THE COURT:  The portfolio of -- of obligations; I

10 don't imagine there's much debate about that.  If they're

11 being paid currently, then presumably they're worth face

12 value.  But most of them, if they're not being current, then

13 look, bankers -- bankers make these judgments every day,

14 whether a claim is collectible and to what extent it's

15 collectible.  You're client has done it.

16          MR. LANDERS:  Yes, Your Honor.  We have done it --

17          THE COURT:  Shouldn't they be able to do that?

18          MR. LANDERS:  Your Honor, they can do it and they

19 don't really even have to do it because it's set forth in the

20 -- in the 10-Q that we filed.  There are judgments made about

21 what the portfolio is and there are reserves taken which are

22 updated on a quarterly basis, based on collections and

23 developments and the like.

24          And there are numbers behind that, which is our

25 matter of public record.  Now, I mean, theoretically they can

Argument - Mr. Landers                                    66

1    look at it, but at the end of the day as you say, people would
2    have to make evaluations of what the worth.  But they can't be
3    worth more than the face value of the paper.  Virtually all of
4    them are in default.

5           The "good" obligations have been collected, were
6    collected a long time ago.  So we're dealing with defaulted
7    obligations and I think this Court, for example, is familiar
8    with one of the larger ones in the portfolio and that may be
9    on a larger scale, typical of what's left in the portfolio.

10          THE COURT:  That would may be resolved after 2009.

11          MR. LANDERS:  Your Honor, if it's ever resolved.

12          THE COURT:  I'm not talking about this level.  I'm
13   talking about the appellate level.

14          MR. LANDERS:  Oh, appellate level.

15          THE COURT:  It'll be resolved at this level long
16   before that.

17          MR. LANDERS:  But the bottom line, that's what's
18   there, is obligations such as that.  I think that may be the
19   biggest one in the -- in the portfolio.  Even if you valued
20   you at the face, which -- you're still not even -- I mean,
21   there's a deficiency of, I've said about a billion two, a
22   billion three in dollars.  You just can't take, let's say,
23   $500 million or $400 million of paper, aircraft leases and
24   aircraft and say that's going to appreciate to -- appreciate
25   and cover a gap of $1.2 billion.  It's just not realistic.

1          Now, I mean, the other point I'd make is that the

2     situation has continued through periods.  In other words, if

3     you look at Finova's statements over the last four years,

4     you'll see that this deficit, in effect, has existed for a

5     long time.  And it hasn't come down in --

6               THE COURT:  I understand everything --

7               MR. LANDERS:  Okay --

8               THE COURT:  -- you're saying.

9               MR. LANDERS:  Okay.

10              THE COURT:  But the Committee doesn't sign off on

11    it.

12              MR. LANDERS:  Well, Your Honor, I think that the

13    question ultimately is  --

14              THE COURT:  -- Then --

15              MR. LANDERS:   -- whether the company should pay for

16    it --

17              THE COURT:  -- Don't we have to have a hearing on

18    that?

19              MR. LANDERS:  Well, I don't think so, Your Honor.

20    We had -- we had a declaration from Mr. Ross, which described

21    the situation and Mr. Ross is here to testify to that if the

22    Court wants to hear it, and he'll be glad to testify.

23              THE COURT:  No, they took a position that made that

24    issue go away.

25              MR. LANDERS:  Well, but --

1          THE COURT:  But now it's back in front of us.

2          MR. LANDERS:  But, Your Honor, they made it go away

3     because they knew that deep down that there was no basis for

4     that position given where -- where things were.  I mean, if

5     again, I think it's a question it's fair to tax the creditors

6     for the costs of doing this and what purpose it served.  In

7     another words, this is not a case where they have a raised a

8     doubt, for example, or whether there's some question or

9     something like that.

10          This is a question where the evidence is here.  It's

11     in court today.  We're prepared to put it -- put it on and the

12     question is whether they've had a preliminary expert look at

13     it.  It's obvious that he was not able to suggest anything

14     that would indicate a major variance in what we're saying.

15     The question is whether they ought to be allowed to do -- I

16     mean, it sort of like, slaying a dragon.  You just can't --

17     you just can't prove a negative like this any other way than

18     to say these are the value, these are the assets and

19     reasonable people have to make judgments as the Court said.

20          I mean, people do this kind of valuations all the

21     time.  And the people who are doing it at Finova are

22     experienced.  They've been doing it for four years.  We have

23     accountants verifying this.  We're an audited company.  I

24     mean, at some point you have to say these people know what

25     they're talking about.

1           So I would urge the Court not to impose this expense

2      on the company.  If they want to do it at the expense of

3      Equity, well, maybe that's okay.  But I don't think this

4      expense should be imposed on the company to do this at this

5      point.  And I can't say it any more strongly, Your Honor.

6           THE COURT:  Well, my view is that they have a bona

7      fide belief that they're in the money.  They should be given

8      an opportunity to prove that.

9           MR. LANDERS:  But they haven't said that, Your

10     Honor.  Mr. Silverschotz has been very careful and I respect

11     him for being careful.  He hasn't -- I mean, a lawyer can

12     always go before the Court and say, well, Your Honor, if you

13     look around you never can tell what we'll find.  And that's

14     probably -- probably true, but you have to deal with

15     probabilities and reasonable expectations and those kinds of

16     things.

17          And you have to basically ask a question whether a

18     whole bunch of people who know enough -- a lot about this

19     asset -- are not only wrong, but wrong by such a wide margin

20     that -- that they ought to be allowed to investigate.  I mean,

21     I think that's the issue.  I mean, to allow them to

22     investigate, you have to say that the company's internal

23     accounting people -- again, Mr. Ross is here -- and their

24     outside accounting just don't know what they're talking about

25     by a wide margin.  At least, I would hope that the Court would

Argument - Mr. Silverschotz                              70

1    not permit them to look on that basis.

2            And again, Mr. Silverschotz has not said anything to

3    suggest any infirmity in the presentation that we've offered

4    on these points.  But again, I'd urge the Court to listen to

5    Mr. Ross and make its own -- make its own conclusions on this.

6            THE COURT:  Well, I don't think today is the

7    appropriate time to do that.  I'm sure that the Committee is

8    not prepared to cross-examine him.

9            MR. LANDERS:  I would agree with that, Your Honor;

10   they're not.  There's nothing else I can say, Your Honor.

11   Thank you.

12           THE COURT:  Do you want to pursue a challenge to the

13   valuation that the debtor has submitted to show that they are

14   insolvent and will forever remain so?

15           MR. SILVERSCHOTZ:  Your Honor, I think the first

16   thing that I'd like to be able to think about challenging with

17   deference in every direction to Your Honor and the reasons you

18   gave for your ruling, the first thing I'd like to consider is

19   the appellate rights of the Committee on the legal issues.

20           We think they are interesting.  We think there's

21   enough to fight about and we think that looking at the

22   various, you know,  toggles of issues as we go through this

23   matter, it may be less expensive to simply pursue the legal

24   issues on an appellate level than engage in a valuation

25   contest and ultimately it becomes a question of cost.

1          Mr. Landers is right. I don't have the top ten

2     reasons why I think the debtor is solvent today. And it is

3     quite possible that even after spending a lot of money, I

4     still won't have those top ten reasons. But I don't know that

5     one or way another as I stand here today. Nor could I even

6     give Your Honor an idea of how much such an undertaking would

7     cost. I frankly have no idea at all. Nor do I know how long

8     it would take, even with parties working as at optimal

9     efficiency and speed.

10          But I think that taking Your Honor -- I don't know

11     if Your Honor intends to simply so order the transcript or

12     write an opinion on this one, but however we go up, I don't

13     know if I'm glad or not to hear that the process is going to

14     take another 2, 3, 4 years before it wraps up. We have plenty

15     of time to go all the way up as far as it's going to go. And

16     I think between the two -- the two sides, we've identified

17     every conceivable legal issue that might, that has to be

18     briefed for consideration.

19          So, it may make more sense to hold that fact issue

20     in abeyance. It's better to hold the cash as well while we

21     pursue our remedies before the District Court or the Court of

22     Appeals and at the end of the day, see where we are. It may

23     very well be that at that time, the Committee's view or the

24     debtor's view is different than it is now as to the need to

25     pursue the fact that -- presumably more expensive fact

1    determination.

2         And who knows?  Maybe the matter will resolve itself

3    in another matter -- another matter.  But I think that's -- as

4    a lawyer standing here now, that's the process that I'm

5    thinking about most.

6         THE COURT:  Okay.  Well, look, I think we need to

7    then address an order.  And my view is that to simply recite

8    that for the reasons that I gave in open court -- refer to the

9    transcript -- I would grant the debtor's motion to the extent

10   that the debtor is presently and will be forever insolvent.

11   But leaving open the issue of whether the debtor is presently

12   or forever insolvent.

13        That way, you can pursue your appeal on the legal

14   issue and if you want to pursue the question of whether there

15   is presently and forever will be an insolvency, we can do that

16   also.

17        MR. SILVERSCHOTZ:  Your Honor, what I would do is

18   consult with my -- I am just the lawyer, and I will consult

19   with my client.

20        We have the -- the interim budget issue.  There's

21   the -- the third matter on the agenda was our firm's motion to

22   increase the cap to 200 and I wish had left that first number

23   blank so I could fill it in, based on the results here today.

24   But on the -- on the calender is that motion.  I believe the

25   debtor wanted to meet us halfway but I think we're easily

1   going to exceed even the -- over the next month or so, or

2   maybe even this month, we've still two days left -- 200,000.

3         I am -- I am very leery of, and although I

4   appreciate very much Your Honor's invitation to pursue the

5   fact issue, we were very careful in our first step.  And I

6   expect us to continue to be very careful in how we pursue the

7   issue because I do not want to treat the debtor's assets like

8   a smorgasbord for professionals.

9         And I know that I want to spend the right amount of

10   money and we -- I think we're appropriately aggressive in

11   terms of pursuing legal issues and I think we'll be equally so

12   on the appeal.  I don't want to be excessively aggressive on

13   the fact issue because those numbers can -- can mount up.  I

14   think our collective experience is that the process of doing

15   this kind of valuation analysis can become very expensive very

16   quickly.

17         So, I'm going to consult with my clients with

18   respect to how they wish to proceed.  But in fairness to Your

19   Honor and fairness to the debtor, the last thing I want to do

20   is, in response to Your Honor, say, you know, yippee, you

21   know, off to the races we go.  Because I think that would be

22   inappropriate and I want to do one thing at a time.  And I

23   think right now, our principal focus should be on the -- on

24   the appellate review of Your Honor's decision, with deference

25   in every direction to Your Honor's decision.

1          MR. LANDERS:  Your Honor, just -- just one thing.

2     Notwithstanding the Court's direction in the order --

3     obviously we will draft it that way -- but I would like the

4     opportunity, if Mr. Silverschotz consents, to submit an order

5     which resolves the financial issues, which I think at the end

6     of the day I'd like to try to convince him.  Because I don't

7     think if you don't do that, that he's going to have a final

8     order for PLR.  I think he's going to have to fuss with that

9     issue on appeal.

10         And I'm not sure, given the relative risks of on the

11    question of insolvency and financial condition versus getting

12    bounced up and down a couple of times, I'd like to try to

13    persuade him that he really doesn't want -- want that kind of

14    order; if the Court would find that acceptable.

15         THE COURT:  Yes, look, these have been SEC filings,

16    representations made under oath.  My guess is that you're

17    probably right, but I just can't deny them  your right --

18         MR. LANDERS:  No, I understand, Your Honor --

19         THE COURT:  -- their right to challenge you.

20         MR. LANDERS:  But all I'm saying is if I was in his

21    position, I would -- I would want a clean, final order to take

22    up to the Appellate Court rather than the uncertainty of when

23    an order like this sort of, is final and it's not final, which

24    I have to say, Your Honor, is an issue that I think the

25    court's have not reached broad consensus on when that occurs.

1    In any case --

2                THE COURT:   Look, I think at the end of the day,

3    what they'll do -- and this is pure speculation -- what I

4    would do is concede on the insolvency, get more money and to

5    take the appeal.

6                MR. LANDERS:   That's -- that's I think what I would

7    do, too, Your Honor, but for the present -- for the present,

8    we still are sticking with our offer of $150,000.  We continue

9    to believe that this is just taking money from creditors, that

10   that is inappropriate and that there's insufficient interest

11   of the equity side to finance these costs, as they've

12   demonstrated consistently throughout this -- this process, to

13   justify putting the burden on them to finance it rather than

14   the creditors or the debtor.

15               THE COURT:   How much have you spent to date?

16               MR. SILVERSCHOTZ:   Your Honor, our bill through

17   September that gave to Mr. Landers was 115 -- that's just

18   Anderson Kill.  I subsequently got my October bill, which is

19   another 50.  I do not have my November bill.

20               The -- I'm pleased to say that Mr. Sullivan's bill

21   is very small.  I think it's less than $5,000.

22               THE COURT:   Okay, what's the total to date?

23               MR. SILVERSCHOTZ:   The total, excluding November,

24   which again, I don't have, we are at 135 including our expert.

25   Just shy of 140 with our -- with Mr. Sullivan.  And if we add

1    the 50 that came in afterwards from October from Anderson

2    Kill, that's 190.  I asked for the cap to be increased to 200

3    but I suppose -- I'm sorry.  Did I -- 190 -- I asked for the

4    account to be increased to 200 but I know I'm going to ask for

5    more in the future if we're going to take an appeal.  Because

6    that obviously doesn't include the month of November and it

7    doesn't include anything for -- for appellate purposes.

8              THE COURT:  Okay.  Well, I'm going to authorize --

9    I'm going to increase it to 200 and you can file your notice

10   of appeal after the order is entered.  And if you want further

11   financing, you're going to have to come back and apply for it.

12             MR. SILVERSCHOTZ:  I will do that, Your Honor.

13             THE COURT:  And given my view of the merits of your

14   case, it will be an interesting discussion.

15             MR. SILVERSCHOTZ:  Message received, Your Honor.

16             THE COURT:  Okay.  We stand in recess.

17             (Proceedings concluded at 4:31 p.m.)

18                            *  *  *

19

20

21

22

23

24

25

77

1                   C E R T I F I C A T I O N

2

3        I, Susan A. Geddes, court approved transcriber, certify

4    that the foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the above-

6    entitled matter.

7    **Susan**    Digitally signed by
                  Susan Geddes
                  DN: CN = Susan
8    **Geddes**   Geddes, C = US
                  Date: 2005.12.09
9    _____    14:51:34 -05'00'        December 8, 2005

10   SUSAN A. GEDDES

11   DIANA DOMAN TRANSCRIBING

12

13

14

15

16

17

18

19

20

21

22

23

24

25

202

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FINOVA CAPITAL CORPORATION, | : | Case Nos. 01-0698 (PJW) |
| | : | |
| Reorganized Debtor | : | Jointly Administered |
| | : | |
| | : | Re: Docket No. 22, 99 |

**ORDER REGARDING DEBTORS' MOTION**
**REQUESTING CLARIFICATION OF CONFIRMED CHAPTER 11 PLAN**

This matter coming before the Court on the Motion of the Reorganized Debtor for

an Order Under Bankruptcy Code Section 1141 Clarifying Provisions of the Confirmed Plan,

dated April 1, 2005 [Docket No. 22] (the "Clarification Motion"),[1] filed by above-captioned

reorganized Debtor (the "Reorganized Debtor"); the Court having reviewed the Clarification

Motion and having heard the statements of counsel regarding the Clarification Motion and any

objections thereto at a hearing held before the Court on November 29, 2005 (the "Hearing"); the

Court having determined that the legal and factual bases set forth in the Clarification Motion

establish just cause for the relief granted herein; the Court having found that notice of the

Clarification Motion as set forth in the Order Approving the Form and Manner of Notice of the

Reorganized Debtor's Motion to Approve Form and Manner of Notice and to Limit Notice of the

Motion of the Reorganized Debtor for an Order Clarifying Provision of Confirmed Plan [Docket

No. 25] was sufficient under the circumstances and that no other or further notice need be

provided; and after due deliberation and sufficient cause appearing therefore;

---

[1] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Clarification Motion.

Docket No. 100
Date 2|1|2006

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.     For the reasons set forth on the record at the Hearing [Docket No. 80] and in the Court's Letter to Counsel With Respect to Court's Ruling on the Reorganized Debtor's Motion for an Order Clarifying the Confirmed Plan, dated December 2, 2005 [Docket No. 78], the Clarification Motion is hereby APPROVED to the extent that the Debtor is presently and will be forever insolvent.

2.     Nothing in this order shall be construed as a finding that the Debtors presently are or will forever be insolvent.

3.     This Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Order.

Dated:  _____, 2006
Wilmington, Delaware


_____
THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 01-0698 (PJW) |
| **FINOVA CAPITAL CORPORATION,** | Jointly Administered |
| Reorganized Debtor. | Objection Date: January 22, 2007 at 4:00 p.m. |
| | Hearing Date: January 29, 2007 at 2:00 p.m. |

## REQUEST FOR ENTRY OF FINAL ORDER IN
## CLARIFICATION MOTION CONTESTED MATTER

The above-captioned reorganized debtor (the "Reorganized Debtor" or "FNV Capital")

hereby files this Request for Entry of Final Order in Clarification Motion Contested Matter, and

would show as follows:

1.     The background of this Motion is well known to this Court and is set forth in

numerous documents filed to date, and will only be briefly recounted here. On April 1, 2005, the

Reorganized Debtor filed its Clarification Motion[1] seeking clarification of the treatment of funds

retained by FNV Group in connection with the so-called "5% Obligation," and requesting an

order of this Court authorizing it (i) to cease setting aside 5% of the Available Cash and (ii) to

return the funds in the Segregated Account to FNV Capital for use in its business to pay

expenses, debts and other obligations.    Several holders of equity interests opposed the

Clarification Motion, and this Court directed the US Trustee to appoint an Equity Committee

---

[1]    Capitalized terms are as set forth in the Motion of the Reorganized Debtor for an Order
Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plant (the
"Clarification Motion") [Docket No. 22].

Docket No. 196
Date  1/8/2007

[Docket Nos. 20 and 21]. After voluminous briefs [Docket Nos. 31, 32, 34, 40, 61, 62 and 65], and oral argument, this Court held that the ". . . the Clarification Motion is hereby APPROVED to the extent that the Debtor is presently and will be forever insolvent," but nothing in the order ". . . shall be construed as a finding that the Debtors presently are or will forever be insolvent." [Docket No. 100]. The Equity Committee appealed to the District Court and the Reorganized Debtor moved to strike the appeal. [Docket Nos. 104, 107, 109 and 110]. The District Court (1) denied the Equity Committee's motion for leave to appeal, and (2) granted the motion to strike on the ground that this Court's order was not a final order subject to appeal. [Docket No. 122]. There have been no further proceedings since the District Court's Order.

2.    Under the Indenture, FINOVA may not make the 5% payment to the holders of equity interests if the payment (i) would render FINOVA insolvent, (ii) would be a fraudulent conveyance or (iii) would be illegal under applicable law. In the Clarification Motion and in subsequent briefing and oral argument, FINOVA argued that this standard was satisfied because FINOVA was hopelessly insolvent, and submitted the Declaration of Richard A. Ross in support of this allegation.[2] However, the Court declined to rule on this issue.

3.    In connection with the present Request, the Debtor hereby submits the Supplemental Declaration of Richard A. Ross as Exhibit A and, attached to said Declaration, is FINOVA's 10-Q Statement for the Third Quarter ending September 30, 2006, as filed on October 30, 2006 (the "October 10-Q"). The Supplemental Declaration and the October 10-Q

---

[2]    The Declaration of Richard A. Ross is attached as Exhibit A to the Reply to Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan. [Docket No. 61]. For the Court's convenience, the Reorganized Debtor has also attached a copy as Exhibit A to the Supplemental Declaration.

show that FINOVA's financial situation has not improved since the filing of the Clarification Motion. In fact, the spread between liabilities and assets now exceeds $1.1 billion but, in light of the continuing liquidation of assets, that deficiency must be made up from significantly *fewer* and *less valuable* assets. Mr. Ross concluded that existing assets would have to appreciate by seven times, or more than $1.1 billion, to make up the deficiency which, given the nature of the assets, he viewed as impossible. Mr. Ross will be in Court at the hearing on this matter, and FINOVA intends to request the Court to hear his oral testimony.

4.    No purpose is served by prolonging this matter any further. The Equity Committee has had a full opportunity to litigate the issue of solvency. In fact, in connection with the earlier proceedings, the Equity Committee retained an aircraft expert to examine FINOVA's financials. FINOVA has provided various documents and information to the Equity Committee and made Mr. Ross available to both the Equity Committee and its expert to supplement his prior Declaration and the publicly available information and to answer any questions. The Equity Committee has even executed a Confidentiality Agreement and was provided with non-public information. While the expert did opine that the values were somewhat higher than those suggested by FINOVA, the differences were not even remotely close to the order of magnitude that would be necessary to even begin to close the gap between liabilities and assets.[3] And, in light of continuing asset liquidations, the situation has become even more hopeless since the expert was retained and a $1.1 billion deficit remains.

5.    FINOVA believes that the Supplemental Declaration and September 10-Q Report show beyond any shadow of a doubt that FINOVA is "hopelessly insolvent." As noted,

---

[3]    The Debtor's counsel intimated as much at the hearing on the Clarification Motion, Transcript of Hearing of November 9, 2005, at pages 52-55; 63-64.

FINOVA already has provided financial information, including non-public information to the Equity Committee, and the Equity Committee has had the benefit of an expert opinion. FINOVA is fully prepared to have Mr. Ross testify at a hearing before this Court. However, there is no purpose or justification for any further delay.

      6.     From time to time, there have been suggestions of the need for some form of expert to confirm that the situation is as stated by Mr. Ross, and the Equity Committee has made a motion seeking additional fees of $100,000 to retain an expert "to assess whether the Debtor is, in fact, insolvent." (Additional Fee Motion, p. 9). Although FINOVA will reply separately and in detail to the Additional Fee Motion, it is clear that such a request cannot be justified in this case. As shown in Mr. Ross' Declaration, the deficiency is so great that there is no possibility that the assets could increase by the more than $1 billion necessary to close the gap between assets and liabilities. The Debtors believe that any request for the funding of such an expert would be close to frivolous and would be totally unwarranted and unjustified.

7.    For the reasons stated, FINOVA requests that this Court (i) enter a final order granting the Clarification Motion substantially in the form attached hereto as <u>Exhibit B</u> and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: January 8, 2007

RICHARDS, LAYTON & FINGER, P.A.

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Jonathan M. Landers
Jessica I. Basil
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-Counsel to the Reorganized Debtor

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

**FINOVA CAPITAL CORPORATION,**

Reorganized Debtor.

Chapter 11

Case No. 01-0698 (PJW)

Jointly Administered

Objection Date: January 22, 2007 at 4:00 p.m.
Hearing Date: January 29, 2007 at 2:00 p.m.

### NOTICE OF HEARING RE:  REQUEST OF FINAL ORDER IN
### CLARIFICATION MOTION AND CONTESTED MATTER

PLEASE TAKE NOTICE that on April 1, 2005, the above-captioned reorganized debtor (the "Reorganized Debtor") filed the Motion for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan (the "Clarification Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that the Bankruptcy Court entered an order holding that  "the Clarification Motion is hereby APPROVED to the extent that the Debtor is presently and will be forever insolvent," but nothing in the order ". . . shall be construed as a finding that the Debtors presently are or will forever be insolvent." [Docket No. 100].   The Equity Committee appealed to the District Court and the Reorganized Debtor moved to strike the appeal. [Docket Nos. 104, 107, 109 and 110].    The District Court (1) denied the Equity Committee's motion for leave to appeal, and (2) granted the motion to strike on the ground that this Bankruptcy Court's order was not a final order subject to appeal. [Docket No. 122].   There have been no further proceedings since the District Court's Order.

PLEASE TAKE FURTHER NOTICE that the Reorganized Debtor has today filed the Reorganized Debtor's Request for Entry of Final Order in Clarification Motion Contested Matter (the "Request"), requesting the entry of a final order granting the Clarification Motion.

PLEASE TAKE FURTHER NOTICE that a hearing on the Request will be held on **January 29, 2007 at 2:00 p.m. (Eastern Time)** before the Bankruptcy Court (6th Floor, Courtroom 2).

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Request must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, and served upon and received by the undersigned counsel on or before **January 22, 2007 at 4:00 p.m. (Eastern Time).**

**[Remainder of Page Intentionally Left Blank]**

2

IF NO OBJECTIONS TO THE REQUEST ARE TIMELY FILED, SERVED, AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE REQUEST WITHOUT FURTHER NOTICE OR HEARING.

Dated: January 8, 2007           RICHARDS, LAYTON & FINGER, P.A.
      Wilmington, Delaware

 

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Jonathan M. Landers
Jessica I. Basil
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-Counsel to the Reorganized Debtor

3

**EXHIBIT A TO REQUEST**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

**FINOVA Capital Corporation,**

Reorganized Debtor.

Chapter 11

Case No. 01-0698 (PJW)

Jointly Administered

Objection Date: January 22, 2007 at 4:00 p.m.
Hearing Date: January 29, 2007 at 2:00 p.m.

## SUPPLEMENTAL DECLARATION OF RICHARD A. ROSS IN SUPPORT OF REQUEST FOR ENTRY OF FINAL ORDER IN CLARIFICATION MOTION CONTESTED MATTER

Richard A. Ross hereby submits this Supplemental Declaration under Penalty of Perjury, and states as follows:

1.    I am the Senior Vice President, Chief Financial Officer and Treasurer of The FINOVA Group Inc. ("FINOVA"), and am the designated "principal financial officer" for SEC reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The facts and opinions in this Supplemental Declaration are known to me personally, and I would be a competent witness as to such matters.

2.    On September 15, 2005, in connection with the Reorganized Debtor's Reply to Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan, Clarification Motion for an Order, I filed a Declaration setting forth information regarding the financial situation of FINOVA (the "2005 Declaration"). A copy of the 2005 Declaration, without the exhibit consisting of FINOVA's August 11, 2005 10-Q Report, is attached hereto as Exhibit A.

3.    I have been employed by FINOVA for twelve years, and for the last six years have held various positions as a senior financial officer. I am fully familiar with the books and

assets , which are unlikely to increase materially in value beyond their carrying value, many of which are in default or otherwise disputed,[1] and (ii) owned assets, most significantly, various types of aircraft most of which are older models. Since my prior Declaration, FINOVA has sold or liquidated significant assets and, as disclosed in the October 10-Q Report (pp. 7, 12), (i) FINOVA expects to liquidate or sell 38 of its 48 aircraft, which are currently committed to assets sales; and (ii) FINOVA has settled the Thaxton matter and any uncertainty regarding the amount of recoveries has been removed. And, as before, the strongest and best assets have largely been sold, and the remaining assets are those which are more difficult to sell. In this regard, the October 10-Q stated that FINOVA had liquidated more than 97% of its assets since emerging from bankruptcy, and "it is becoming increasingly difficult to offset the incremental costs of collecting those assets in an orderly fashion." October 10-Q Report, at page 12.

(e)    The October-10-Q Report noted that as of October 30, all of the top 10 exposures had been liquidated, were subject to letters of intent to sell, or subject to a negotiated settlements, thus further removing valuation uncertainty and negating the possibility of significant further upside. October 10-Q Report, at page 6.

(f)    In my 2005 declaration, I stated that to pay FINOVA's debts, the noncash assets that FINOVA then had would have to more than triple in value. Now, for FINOVA to pay its debts in full, the remaining noncash assets owned by FINOVA as of September 30, 2006, would have to increase in value by more than seven times their carrying value. Put another way, assets with a net carrying value of $171 million would have to increase in value to approximately

---

[1]    The October 10-Q reported that, as of September 30, 2006, $122.1 million of financial assets, or 66.9% of total financial assets (before reserves) were classified as nonaccruing. October 10-Q Report, at page 15.

$1.25 billion, assuming the restricted cash was ultimately repaid to the New Senior Notes holders. There is, in my judgment, no chance that this would occur. Moreover, these figures do not reflect continuing interest accruals on the New Senior Notes, continued (albeit reduced) operating expenses and settlement of other liabilities and claims, which may or may not be required to be paid before the New Senior Notes.

(g)    The discussion on possible asset recoveries in paragraph 3(e) of my 2005 Declaration remains pertinent except, as noted above, the pool of assets has diminished significantly.

5.    From time to time, the question has been raised whether there should be some form of "outside" review of FINOVA's financial situation to confirm that it is hopelessly insolvent within the terms of the Indenture. I believe that such a review would be totally unjustified under the circumstances which would reduce dollar-for-dollar the potential recoveries on the New Senior Notes. My reasons are as follows:

(a)    FINOVA is an SEC Reporting Company, and it prepares audited financial statements. The 2005 audited statements were entirely consistent with the information in my 2005 Declaration, and the information contained in the October 10-Q is entirely consistent with the 2005 audited statements. Moreover, a review of the audited and quarterly statements since FINOVA emerged from bankruptcy shows a consistent pattern of asset valuations, reductions in assets based on asset dispositions and collections on financial assets, and use of the funds to pay operating expenses, bankruptcy claims and obligations on the New Senior Notes. There has been no suggestion by any person at any time that these reports are inaccurate or erroneous in any respect.

4

(b)    As shown above, FINOVA's noncash assets must increase by more than seven times. There is no possibility this will occur. Furthermore, the majority of FINOVA's remaining assets are committed to asset sales or settlements and, as a result, FINOVA can predict the amount of value in excess of its net carrying value with reasonable confidence. The excess value is considerably less than one times the remaining assets net carrying value.

(i)    The major financial assets are financial contracts and financing leases with a net carrying value of $95 million and a face value of approximately $174 million. Given the Thaxton settlement and the values of assets which either have been sold or which are subject to negotiated third party transactions, the maximum possible upside of these assets as well as the aircraft described in paragraph (ii) below, is considerably less than one times their book value. The majority of these assets are currently stated at agreed upon settlement amounts (i.e. Thaxton) and the remainder may increase slightly in excess of their net carrying value, but will not exceeds their face amounts.    Here, there is little chance that these assets would even increase to face value since most of the assets are high risk obligations, and many of them are in default. But, the notion that these assets would increase by seven times their book value cannot be grounded in reality.

(ii)    The other major assets are owned aircraft, which are older and less desirable models. As noted, FINOVA expects to liquidate or dispose of 38 of the 48 aircraft securing not only these assets, but certain of the financing assets noted above during the Fourth Quarter and First Quarter of 2007, and while I cannot disclose the precise amount of recoveries, I can affirm that the recoveries will be considerably less than one times their net carrying values in the October 10-Q Report. This leaves 10 planes remaining, six of which FINOVA has stated in its October 10-Q Report have no remaining value, while the other four aircraft have an estimated

RLF1-3101990-1

value of about $8.5 million. The notion that the owned assets would increase in value by something in the order of more than $1 billion is, as above, absurd.

        (iii)    In connection with its prior diligence, the Equity Committee obtained the services of an aircraft expert who reported in October, 2005 that (A) in his view, the then values of the planes were at the high end of the range of values suggested by FINOVA, (B) about 90% of the aircraft asset values were "already produced in contract form," which means there is virtually no appreciation potential, (C) the jet fleet averaged 20 years in age and, is "uniformly characterized by all out of production aircraft," and (D) with the exception of four B-757 aircraft (consisting of 4 out of 74 aircraft), there is no opportunity for "enhancement projects" and the fleet offers little basis "to make a case" for a significant "upside surprise." In actuality, it has turned out that actual results from sales and liquidations of aircraft have, on an overall basis, been higher than FINOVA's valuations (many were better than expectations, but a few were below expectations), and other events such as airline bankruptcy filings had some negative impact. But at the end of the day, the deficit remains $1.1 billion. There simply is no basis for believing that a dramatically reduced asset pool would produce an "upside surprise" of more than a very small fraction of the deficit.[2]

        (c)    As noted in the October 10-Q, FINOVA is in the final stages of a liquidation of assets, and recently, obtained authorization from this Court to continue and complete the liquidation. It is clear that, in that liquidation, FINOVA will not be able to pay the

---

[2]    I do not agree with much of the analysis of the Committee's expert, and do not believe he fully understood FINOVA's accounting, operations, or status as a liquidating entity. Nevertheless, his results strongly support the Debtor's view that there is no possibility of covering the $1.1 billion deficit, and no purpose would be served by a more extensive discussion of his report.

6

full amount due on the New Senior Notes, and the approximately $1 billion will be unpaid.  The suggestion that there somehow might be an extra billion dollars in assets is patently unreasonable, and any expenditure of funds to confirm this would be an unjustified and wasteful; use of limited funds.

      6.     This Supplemental Declaration is submitted under Penalty of Perjury.


Dated: January 8, 2007

/s/ Richard A. Ross
Richard A. Ross

**EXHIBIT A TO SUPPLEMENTAL DECLARATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:

FINOVA CAPITAL CORPORATION,

Reorganized Debtor.

Chapter 11

Case No. 01-0698 (PJW)

Jointly Administered

Hearing Date: November 29, 2005 at
2:30 P.M.

DECLARATION OF RICHARD A. ROSS IN SUPPORT OF REPLY TO OBJECTION
OF FIRST CAROLINA INVESTORS, INC. TO MOTION OF REORGANIZED
DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE SECTION 1141
CLARIFYING PROVISION OF CONFIRMED PLAN

Richard A. Ross hereby submits this Declaration under Penalty of Perjury, and
states as follows:

1.    I am the Senior Vice President, Chief Financial Officer and Treasurer of The

FINOVA Group Inc. ("FINOVA"), and am the designated "principal financial officer" for SEC

reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The

facts and opinions in this Declaration are known to me personally, and I would be a competent

witness as to such matters.

2.    I have been employed by FINOVA for eleven years, and for the last four years

have held various positions as a senior financial officer. I am fully familiar with the books and

records of FINOVA and its subsidiaries and affiliates, and its financial reporting. On or about

August 11, 2005, FINOVA filed its 10-Q report with the SEC which is attached hereto as Exhibit

B (the "10-Q Report"). The 10-Q Report was prepared under my supervision and pursuant to my

222

direction, and I am fully familiar with its contents. I executed the 10-Q Report as the "principal financial officer" of FINOVA.

3.     The financial situation of FINOVA and its subsidiaries is set forth in great detail in the 10-Q Report, and I will only summarize the highlights here (all figures as of June 30, 2005, and dollars are in thousands). In addition, I have updated this information to reflect recent developments.

(a)     FINOVA had total assets of $789,084, including $249,271 in cash and $60,921 in restricted cash arising from the amount retained and not paid to shareholders on account of the so-called 5% obligation. Since June 30, assets have declined by about 10% (cash has declined to approximately $200,000) and restricted cash has increased to $65,607.

(b)     FINOVA had liabilities of approximately $1,880,000, most of which reflects a $1,810,499 obligation on the New Senior Notes. This liability is recorded on the balance sheet as $1,251,673 because, for accounting purposes, the liability on the New Senior Notes must be reduced by unamortized fresh start discount determined upon the emergence from bankruptcy. Since June 30, payments of $89,000 were made on the New Senior Notes.

(c)     FINOVA's liabilities exceed its assets by more than $1 billion.

(d)     FINOVA has noncash assets of a carrying value of approximately $480,000. These are comprised largely of (i) various financial instruments and obligations, which cannot increase in value beyond the face amount of the instrument or obligation, many of which are in default or otherwise disputed, and (ii) owned asset, most significantly, various types of aircraft, most of which are older models and are not in great demand. In order to pay FINOVA's obligations, these assets would have to more than triple in value. There is, in my judgment, no realistic chance that this would occur. Moreover, these figures do not reflect

2

continuing interest accruals on the New Senior Notes and continued (albeit reduced) operating expenses.

          (e)     While there have been some recoveries on assets, sales of assets above book value, and collections of amounts in excess of book value, the total of these has been only a small fraction of the accumulated deficiency.  In the 10-K Report for the year 2004, which I signed, FINOVA stated that:

> "...unless the actual cash flows from the collection of FINOVA's asset portfolio are substantially greater than the amount assumed to determine the carrying amounts of its assets, FINOVA will not have sufficient assets to fully repay its Senior Debt Obligations. The Company has been successful in its efforts to maximize the value of the portfolio as evidenced by the decline in the asset shortfall, which declined from a high point of $1.7 billion at December 31, 2001 to $1.1 billion at December 31, 2004; however, to eliminate the shortfall, FINOVA would have to liquidate all of its remaining total financial assets at 274% of their book value. Despite the income recorded over the last three years and the progress that has been made in liquidating assets, the required recovery rate to eliminate the shortfall has continued to grow. While the net asset liquidation and collection efforts to date have been in excess of their recorded book values, those recoveries on average have been far below the rate of return necessary to fully repay the Senior Debt Obligations. If this trend continues, a greater asset return must be realized to fully satisfy the obligations. The Company does not believe that the future asset realization will increase sufficiently to fully offset the shortfall due to the fact that many of the more attractive assets within the portfolio have already been liquidated and the Company continues to have significant exposure in its portfolio to non-performing assets and used aircraft."

At present, with a smaller balance of financial assets, FINOVA would have to liquidate such assets at more than 300% of book value to pay its debts without considering interest on the New Senior Notes or continuing expenses.

          4.     In connection with the provision of the Plan requiring 5% of payments on the New Senior Notes to be set aside for the holders of equity, such obligation was never recorded on the books and records of FINOVA as debt and was never shown on any financial statement (including the 10-Q Report) as a liability or debt obligation.  As Chief Financial Officer, I have

3

always considered this obligation as in the nature of a dividend or similar type of distribution to holders of equity interests in FINOVA.

     5.     This Declaration is submitted under Penalty of Perjury.

Dated: September 15 , 2005

                                        Richard A. Ross

80340176_2 DOC

4

**EXHIBIT B TO SUPPLEMENTAL DECLARATION**



# FORM 10−Q

## FINOVA GROUP INC − FNV

**Filed: October 30, 2006 (period: September 30, 2006)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I

FINANCIAL INFORMATION
Item 1.     Financial Statements 1

## PART I

FINANCIAL INFORMATION
Item 1.     Financial Statements
Item 2.     Management s Discussion and Analysis of Financial Condition and Results of Operations
Item 3.     Quantitative and Qualitative Disclosure About Market Risk
Item 4.     Controls and Procedures

## PART II

OTHER INFORMATION
Item 1.     Legal Proceedings
Item 1A.    Risk Factors
Item 6.     Exhibits
Signatures
EXHIBIT INDEX
EX-31.1 (CERTIFICATION OF CEO)

EX-31.2 (CERTIFICATION OF CFO)

EX-32.1 (CERTIFICATION OF CEO)

EX-32.2 (CERTIFICATION OF CFO)

Table of Contents

## UNITED STATES

## SECURITIES AND EXCHANGE COMMISSION

### Washington D.C. 20549

# FORM 10-Q

☑  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30. 2006

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number 001-11011

# THE FINOVA GROUP INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **86-0695381** |
| (State or other jurisdiction of incorporation or organization) | (I R S employer identification no ) |

**4800 North Scottsdale Road**

| | |
|---|---|
| **Scottsdale, AZ** | **85251-7623** |
| (Address of principal executive offices) | (Zip code) |

**Registrant's telephone number, including area code: 480-636-4800**

N/A

(Former name. former address and former fiscal year. If changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months. (or for such shorter period that the registrant was required to file such reports). and (2) has been subject to such filing requirements for the past 90 days

Yes ☑      No ☐

Source: FINOVA GROUP INC. 10-Q. October 30. 2006

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer  See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act  (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non–accelerated filer ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act)

Yes ☐          No ☑

**APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PRECEDING FIVE YEARS:**

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by the court

Yes ☑          No ☐

**APPLICABLE ONLY TO CORPORATE ISSUERS:**

As of October 27, 2006, approximately 122,041,000 shares of Common Stock ($0 01 par value) were outstanding

Source: FINOVA GROUP INC, 10–Q, October 30, 2006

Table of Contents

THE FINOVA GROUP INC.

TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| **PART I FINANCIAL INFORMATION** | | |
| Item 1 | Financial Statements | 1 |
|  | Condensed Consolidated Balance Sheets | 1 |
|  | Condensed Statements of Consolidated Operations | 2 |
|  | Condensed Statements of Consolidated Cash Flows | 3 |
|  | Condensed Statements of Consolidated Stockholders' Equity | 4 |
|  | Notes to Interim Condensed Consolidated Financial Statements | 5 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
|  | Special Note Regarding Forward-Looking Statements | 23 |
| Item 3 | Quantitative and Qualitative Disclosure About Market Risk | 23 |
| Item 4 | Controls and Procedures | 23 |
| **PART II OTHER INFORMATION** | | |
| Item 1 | Legal Proceedings | 24 |
| Item 1A | Risk Factors | 24 |
| Item 6 | Exhibits | 24 |
| Signatures | | 25 |

Source: FINOVA GROUP INC. 10-Q, October 30, 2006

Table of Contents
PART I FINANCIAL INFORMATION

Item 1.    Financial Statements

THE FINOVA GROUP INC.

CONDENSED CONSOLIDATED BALANCE SHEETS

(Dollars in thousands)

| | September 30, 2006 | | December 31, 2005 | |
| --- | --- | --- | --- | --- |
| | (Unaudited) | | (Audited) | |
| **ASSETS** | | | | |
| Cash and cash equivalents | $ | 221,639 | $ | 212,317 |
| Restricted cash – impermissible restricted payments | | 76,542 | | 67,169 |
| **Financing Assets:** | | | | |
| Loans and other financing contracts, net | | 106,330 | | 177,887 |
| Direct financing leases | | 820 | | 77,948 |
| Total financing assets | | 107,150 | | 255,835 |
| Reserve for credit losses | | (11,986) | | (29,032) |
| Net financing assets | | 95,164 | | 226,803 |
| **Other Financial Assets:** | | | | |
| Operating leases | | 36,179 | | 69,784 |
| Investments | | 11,400 | | 22,490 |
| Assets held for sale | | 27,883 | | |
| Assets held for production of income | | | | 7,572 |
| Total other financial assets | | 75,462 | | 99,846 |
| **Total Financial Assets** | | 170,626 | | 326,649 |
| Other assets | | 4,743 | | 5,016 |
| | $ | 473,550 | $ | 611,151 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Liabilities:** | | | | |
| Senior Notes, net (principal amount due of $1.5 billion and $1.7 billion, respectively) | $ | 997,570 | $ | 1,151,491 |
| Interest payable | | 42,887 | | 16,215 |
| Accounts payable and accrued expenses | | 33,585 | | 52,655 |
| Deferred income taxes, net | | 2,407 | | 2,521 |
| **Total Liabilities** | | 1,076,449 | | 1,222,882 |
| **Stockholders' Equity:** | | | | |
| Common stock, $0.01 par value, 400,000,000 shares authorized and 125,873,000 shares issued | | 1,259 | | 1,259 |
| Additional capital | | 113,140 | | 113,140 |
| Accumulated deficit | | (716,762) | | (727,149) |
| Accumulated other comprehensive income | | | | 1,555 |
| Common stock in treasury, 3,832,000 shares | | (536) | | (536) |
| **Total Stockholders' Equity** | | (602,899) | | (611,731) |
| | $ | 473,550 | $ | 611,151 |

*See notes to interim condensed consolidated financial statements*

1

Source: FINOVA GROUP INC, 10-Q, October 30, 2006

Table of Contents

THE FINOVA GROUP INC.

CONDENSED STATEMENTS OF CONSOLIDATED OPERATIONS

(Dollars in thousands, except per share data)

(Unaudited)

| | Three Months Ended Sept. 30, 2006 | Three Months Ended Sept. 30, 2005 | Nine Months Ended Sept. 30, 2006 | Nine Months Ended Sept. 30, 2005 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Interest income | $ 582 | $ 7,742 | $ 5,240 | $ 23,891 |
| Rental income | 1,256 | 2,740 | 4,142 | 9,550 |
| Operating lease income | 6,538 | 8,654 | 21,358 | 31,878 |
| Fees and other income | 3,832 | 3,635 | 13,267 | 11,084 |
| **Total Revenues** | 12,208 | 22,771 | 44,007 | 76,403 |
| Interest expense | (36,823) | (42,419) | (113,291) | (134,917) |
| Operating lease depreciation | (782) | (2,020) | (3,963) | (6,407) |
| **Interest Margin** | (25,397) | (21,668) | (73,247) | (64,921) |
| **Other Revenues and (Expenses):** | | | | |
| Provision for credit losses | (7,212) | 129 | 15,217 | 45,469 |
| Net gain (loss) on financial assets | 49,868 | (2,679) | 106,926 | 17,902 |
| Portfolio expenses | (5,448) | (4,984) | (15,120) | (15,516) |
| General and administrative expenses | (7,176) | (7,958) | (23,389) | (32,120) |
| **Total Other Revenues and (Expenses)** | 30,032 | (15,492) | 83,634 | 15,735 |
| Income (loss) before income taxes | 4,635 | (37,160) | 10,387 | (49,186) |
| Income tax expense | — | — | — | — |
| **Net Income (loss)** | $ 4,635 | $ (37,160) | $ 10,387 | $ (49,186) |
| Basic/diluted earnings (loss) per share | $ 0.04 | $ (0.30) | $ 0.09 | $ (0.40) |
| Weighted average shares outstanding | 122,041,000 | 122,041,000 | 122,041,000 | 122,041,000 |

*See notes to interim condensed consolidated financial statements*

2

Source: FINOVA GROUP INC. 10-Q, October 30, 2006

Table of Contents

THE FINOVA GROUP INC.

CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS

(Dollars in thousands)

(Unaudited)

| | Nine Months Ended September 30, | |
| | 2006 | 2005 |
|---|---|---|
| **Operating Activities:** | | |
| Net income (loss) | $   10,387 | $   (49,186) |
| Adjustments to reconcile net income (loss) to net cash used by operating activities: | | |
| Reversal of provision for credit losses | (15,217) | (45,469) |
| Net cash gain on disposal of financial assets | (91,825) | (26,170) |
| Net non–cash (gain) charge–off on financial assets | (15,101) | 8,268 |
| Depreciation and amortization | 4,726 | 7,021 |
| Deferred income taxes, net | (114) | (252) |
| Fresh–start accretion – assets | (1,293) | (2,135) |
| Fresh–start discount amortization – Senior Notes | 24,156 | 30,221 |
| Change in assets and liabilities: | | |
| Increase in other assets | (490) | (1,885) |
| Decrease in accounts payable and accrued expenses | (7,274) | (13,464) |
| Increase in interest payable | 26,672 | 28,031 |
| **Net Cash Used by Operating Activities** | (65,373) | (65,020) |
| **Investing Activities:** | | |
| Proceeds from disposals of leases and other owned assets | 84,320 | 35,851 |
| Proceeds from sales of investments | 12,792 | 3,654 |
| Proceeds from sales of loans and financing leases | 109,706 | 27,041 |
| Collections and prepayments from financial assets | 105,238 | 218,398 |
| Fundings under existing customer commitments | (5,194) | (11,024) |
| Prepayment of nonrecourse debt on leveraged leases | (25,446) | (12,461) |
| Transfer of cash previously received from the Thaxton Entities | (24,422) | |
| Deposit of impermissible restricted payments into restricted cash account | (9,373) | (23,431) |
| Recoveries of loans previously written off | 5,151 | 9,846 |
| **Net Cash Provided by Investing Activities** | 252,772 | 247,874 |
| **Financing Activities:** | | |
| Principal prepayments of Senior Notes | (178,077) | (445,192) |
| **Net Cash Used by Financing Activities** | (178,077) | (445,192) |
| **Increase (Decrease) in Cash and Cash Equivalents** | 9,322 | (262,338) |
| Cash and Cash Equivalents, beginning of year | 212,317 | 480,485 |
| Cash and Cash Equivalents, end of period | $   221,639 | $   218,147 |

*See notes to interim condensed consolidated financial statements*

3

Source: FINOVA GROUP INC, 10–Q, October 30, 2006

Table of Contents

THE FINOVA GROUP INC.

CONDENSED STATEMENTS OF CONSOLIDATED STOCKHOLDERS' EQUITY

(Dollars in thousands)

(Unaudited)

| | Common Stock | Additional Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Common Stock in Treasury | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| Balance, January 1, 2005 | $ 1,259 | $ 113,140 | $ (632,702) | $ (15,838) | $ (536) | $ (534,677) |
| Comprehensive loss: | | | | | | |
| Net loss | | | (94,447) | | | (94,447) |
| Minimum pension liability adjustment | | | | 16,494 | | 16,494 |
| Net change in unrealized holding gains (losses) | | | | 787 | | 787 |
| Net change in foreign currency translation | | | | 112 | | 112 |
| Comprehensive loss | | | | | | (77,054) |
| Balance, December 31, 2005 | 1,259 | 113,140 | (727,149) | 1,555 | (536) | (611,731) |
| Comprehensive income: | | | | | | |
| Net income | | | 10,387 | | | 10,387 |
| Net change in unrealized holding gains (losses) | | | | (2,002) | | (2,002) |
| Net change in foreign currency translation | | | | 447 | | 447 |
| Comprehensive income | | | | | | 8,832 |
| Balance, September 30, 2006 | $ 1,259 | $ 113,140 | $ (716,762) | $ — | $ (536) | $ (602,899) |

*See notes to interim condensed consolidated financial statements*

4

Source: FINOVA GROUP INC. 10-Q. October 30. 2006

Table of Contents

THE FINOVA GROUP INC.

NOTES TO INTERIM CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

SEPTEMBER 30, 2006

(Dollars in thousands in tables)

(Unaudited)

**A.    Nature of Operations**

The accompanying financial statements and notes hereto should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2005. Capitalized terms not defined herein are used as defined in the Form 10-K.

The notes to the financial statements relate to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital"). FINOVA is a financial services holding company. Through its principal operating subsidiary, FINOVA Capital, the Company has provided a broad range of financing and capital markets products, primarily to mid-size businesses.

The Company's business activities are limited to maximizing the value of its portfolio through the orderly collection of its assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral. The Company has sold substantial portions of its asset portfolio and will consider future sales of any asset if buyers can be found at acceptable prices; however, there can be no assurance that the Company will be successful in its efforts to sell additional assets. The Company is currently offering to sell its remaining assets both by portfolio and individual asset. The Company is prohibited by the Indenture governing its 7.5% Senior Secured Notes (the "Senior Notes") from engaging in any new lending activities or other business, except to honor existing customer commitments and in certain instances, to restructure financing relationships to maximize value. Any funds generated in excess of cash reserves permitted by the Company's debt agreements have been used to reduce FINOVA's obligations to its creditors.

Because substantially all of the Company's assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure its obligations under the promissory notes of FINOVA Capital issued to FINOVA in the aggregate principal amount of the Senior Notes (the "Intercompany Notes"), FINOVA's ability to obtain additional or new financing is severely restricted. Accordingly, FINOVA intends to rely on internally generated cash flows from the liquidation of its assets as its only meaningful source of liquidity.

FINOVA's business continues to be operated under a Management Services Agreement with Leucadia National Corporation ("Leucadia") that expires in 2011. Pursuant to that agreement, Leucadia has designated its employees to act as Chairman of the Board (Ian M. Cumming), President (Joseph S. Steinberg) and Chief Executive Officer (Thomas E. Mara).

**Going Concern**

As of September 30, 2006, the Company has a substantial negative net worth. While FINOVA continues to pay its obligations as they become due, the ability of the Company to continue as a going concern is dependent upon many factors, particularly the ability of its borrowers to repay their obligations to FINOVA and the Company's ability to realize the value of its portfolio. Even if the Company is able to recover the book value of its assets, and there can be no assurance of the Company's ability to do so, the Company would not be able to repay the Senior Notes in their entirety at maturity in November 2009. The accompanying consolidated financial statements do not include any adjustments relating to the recoverability and classification of assets or the amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern. The Company's independent registered public accountants have qualified their report on the Company's financial statements since 2001 due to concerns regarding the Company's ability to continue as a going concern.

**B.    Significant Accounting Policies**

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires FINOVA to use estimates and assumptions that affect reported amounts of assets and liabilities, revenues and expenses and disclosure of contingent liabilities. Those estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. Significant estimates include anticipated

5

Table of Contents
amounts and timing of future cash flows used in the calculation of the reserve for credit losses and measurement of impairment. Other estimates include selection of appropriate risk adjusted discount rates used in net present value calculations, determination of fair values of certain financial assets for which there is not an active market, residual assumptions for leasing transactions and the determination of appropriate valuation allowances against deferred tax assets. Actual results could differ from those estimated

For a listing of the Company's significant accounting policies, see Note B Significant Accounting Policies in the Company's Annual Report on Form 10-K for the year ended December 31, 2005

*Consolidation of Interim Reporting*

The interim condensed consolidated financial statements present the financial position, results of operations and cash flows of FINOVA and its subsidiaries, including FINOVA Capital. These financial statements have been prepared in accordance with U.S. generally accepted accounting principles. All intercompany balances have been eliminated in consolidation

The interim condensed consolidated financial information is unaudited. In the opinion of management, all adjustments consisting of normal recurring items necessary to present fairly the financial position as of September 30, 2006 and the results of operations and cash flows presented herein have been included in the condensed consolidated financial statements. Interim results are not necessarily indicative of results of operations for a full year

**C.    Total Financial Assets**

Total financial assets represent the Company's portfolio of investment activities, which primarily consist of secured financing contracts (such as loans and direct financing leases). In addition to its financing contracts, the Company has other financial assets, including assets held for sale, owned assets (such as operating leases and assets held for the production of income) and investments. As of September 30, 2006 and December 31, 2005, the carrying amount of total financial assets (before reserves) was $182.6 million and $355.7 million, respectively

The following table details the composition and carrying amounts of FINOVA's total financial assets at September 30, 2006:

| | Revenue Accruing Assets | Revenue Accruing Impaired | Nonaccruing Impaired Loans | Nonaccruing Leases & Other | Owned Assets & Investments | Total Financial Assets |
|---|---|---|---|---|---|---|
| Total financial assets | $ | $   12,904 | $   94,247 | $   27,883 | $   47,578 | $   182,612 |
| Reserve for credit losses | | | | | | (11,986) |
| Total | | | | | | $   170,626 |

Since FINOVA's total financial assets are primarily concentrated in specialized industries, the Company is subject to both general economic risk and the additional risk of economic downturns within individual sectors of the economy, particularly those impacting the aviation industry. The Company has also completed multiple financial transactions with individual borrowers and their affiliates, resulting in a greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including transportation) of those borrowers and their affiliates

At September 30, 2006, the carrying value of the Company's top 10 aggregate exposures to borrowers and their affiliates totaled approximately $161.8 million and represented 94.2% of the Company's total financial assets (before reserves and excluding the severance and bonus trusts of $10.9 million), as compared to the top 10 exposures at December 31, 2005 of $220.3 million, which represented 64.6% of total financial assets (before reserves and excluding the severance and bonus trusts of $14.4 million). The top 10 exposures at September 30, 2006, were primarily concentrated in transportation accounts and the loan to The Thaxton Group, which is the Company's largest exposure. As of the date of this report, all of the top 10 exposures have either been liquidated, are under letters of intent to sell or are subject to a negotiated settlement

During the third quarter of 2006, the Company increased the carrying value of two transactions within the top 10 exposures. The carrying value of the loan to the Thaxton Group increased $24.4 million in conjunction with the transfer of all cash received from the Thaxton Entities since commencement of the Thaxton Entities chapter 11 case (an aggregate of

6

Table of Contents
approximately $97 2 million), to a trust account to be held by Thaxton under order of the bankruptcy court The $72 8 million balance of the transferred cash had been held by FINOVA in a reserve account and had not been reflected in FINOVA's balance sheet Refer to Note H "Litigation and Claims" for a further discussion of the Thaxton proceedings

Additionally, during the third quarter of 2006, FINOVA prepaid $25.4 million of nonrecourse debt associated with two leveraged leases to Northwest Airlines on Boeing 757 aircraft, which increased FINOVA's basis in those assets The two Northwest leveraged leases were subsequently sold in the fourth quarter of 2006

At September 30, 2006, the Company's transportation portfolio consisted of the following aircraft:

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (in years) |
|---|---|---|---|---|
| Airbus 300 | 1 | | 1 | 23 |
| Boeing 727 | 1 | | 1 | 28 |
| Boeing 737 | 8 | 8 | | 20 |
| Boeing 757 | 2 | 2 | | 10 |
| McDonnell Douglas DC9 | 4 | 4 | | 34 |
| McDonnell Douglas DC10 | 7 | | 7 | 29 |
| McDonnell Douglas MD-80 Series | 9 | 9 | | 22 |
| Regional jets, corporate aircraft and turbo props | 16 | 16 | | 16 |
| Total | 48 | 39 | 9 | 21 |

At September 30, 2006, 20 aircraft were operated by domestic carriers, while 27 aircraft were operated by foreign carriers Additionally, 1 aircraft was off-lease and parked at a storage facility in the United States The Company's transportation portfolio also includes aircraft engines and other transportation equipment As of the date of this report, the Company had 38 aircraft with a total carrying value of approximately $76.4 million that had either been liquidated subsequent to September 30, 2006, are under individual letters of intent to sell or are committed to a proposed bulk asset sale The proposed bulk asset sale includes 18 aircraft with a total carrying value of approximately $36 7 million The proposed bulk asset sale is pursuant to a non-binding letter of intent, which is subject to inspection of the aircraft and records Due to the fact that the 18 aircraft in this pool are operating throughout the world, additional time will be necessary to complete the inspections FINOVA will hopefully know if an acceptable final purchase price can be obtained for these assets during the fourth quarter of 2006 No assurance can be given that all of the letters of intent will result in actual sales, but the Company anticipates the majority of these committed assets will be sold during the fourth quarter of 2006 for proceeds in excess of FINOVA's carrying values at September 30, 2006 Additionally, six regional jets reflected in the table above are under leveraged leases with Northwest Airlines The outstanding senior debt on these leveraged leases is significantly in excess of the underlying aircraft values As a result, these six assets have virtually no remaining value to FINOVA and previously had been fully written-off The remaining 4 aircraft in the portfolio are currently not subject to any proposed transaction FINOVA continues to offer these assets for sale

In addition to the Thaxton loan, the Company's non-aviation portfolio at September 30, 2006 was comprised of assets with a total carrying value of approximately $15.8 million, including the Company's $10 9 million investment in two grantor trusts to secure severance and bonus obligations to its employees These assets are held primarily for the benefit of the employees, but are recorded as investments due to the Company's retained interest in any excess assets Substantially all of the other non-aviation assets are committed to individual asset sales

7

Table of Contents

**D.    Reserve For Credit Losses**

The following table presents the balances and changes to the reserve for credit losses:

|  | Nine Months Ended September 30, | |
|  | 2006 | 2005 |
|---|---|---|
| Balance, beginning of year | $    29,032 | $   101,270 |
| Reversal of provision for credit losses | (15,217) | (45,469) |
| Write-offs | (6,980) | (15,238) |
| Recoveries | 5,151 | 9,846 |
| Balance, end of period | $    11,986 | $    50,409 |

For the nine months ended September 30, 2006, the Company recorded a $15 2 million net reversal of provision for credit losses to reduce its overall reserve for credit losses  The reserve reduction was primarily due to proceeds received from prepayments and asset sales exceeding recorded carrying amounts (net of reserves), recoveries of amounts previously written off and the Company's detailed assessment of estimated inherent losses in the portfolio  The largest events impacting the reserve during 2006 included a $14 7 million reduction in the reserve for credit losses due to the sale of the Company's non–aviation assets for proceeds in excess of their carrying amount (net of reserves) and the recording during the third quarter of 2006 of an $8 7 million specific reserve related to the Thaxton loan  The specific reserve was necessary to adjust the net book value of the Thaxton loan to its estimated settlement of approximately $81 2 million before interest and opt–outs  Refer to Note H  "Litigation and Claims" for a further discussion of the Thaxton settlement

A summary of the reserve for credit losses by impaired and other assets was as follows:

|  | September 30, 2006 | December 31, 2005 |
|---|---|---|
| Reserves on impaired assets | $    11,986 | $    28,288 |
| Other reserves |  | 744 |
| Reserve for credit losses | $    11,986 | $    29,032 |

At September 30, 2006, the total carrying amount of impaired loans and leases was $135.0 million, of which $12 9 million were revenue accruing  The Company has established impairment reserves of $12.0 million related to $97 1 million of impaired assets  At December 31, 2005, the total carrying amount of impaired loans and leases was $241 1 million, of which $109 1 million were revenue accruing  Impairment reserves at December 31, 2005 totaled $28 3 million related to $85 4 million of impaired assets

During the first nine months of 2006, reserves on impaired assets decreased due primarily to write–offs and proceeds received from prepayments and asset sales exceeding recorded carrying amounts (net of reserves), partially offset by additional reserves recorded on certain existing impaired assets

Accounts classified as nonaccruing were $122 1 million or 66 9% of total financial assets (before reserves) at September 30, 2006 as compared to $131.9 million or 37 1% at December 31, 2005  The decline in nonaccruing assets was primarily attributed to collections and asset sales of $47 9 million and write–offs and net valuation adjustments of $4 0 million, partially offset by an increase following the prepayment of $25 4 million of nonrecourse debt associated with two leveraged leases with Northwest Airlines on Boeing 757 aircraft and the transfer of cash collected ($24.4 million, excluding $72 8 million in cash previously deposited into a reserve account not reflected on FINOVA's balance sheet) from the Thaxton Entities since Thaxton's bankruptcy filing

8

Source: FINOVA GROUP INC. 10–Q, October 30, 2006

Table of Contents

**E.  Debt**

A summary of the Company's total debt outstanding was as follows:

|  | September 30, 2006 | December 31, 2005 |
|---|---|---|
| Senior Notes: | | |
| Principal | $  1,513,654 | $  1,691,731 |
| Fresh−start discount | (516,084) | (540,240) |
| Senior Notes, net | $    997,570 | $  1,151,491 |

During the third quarter of 2006, the Company made no principal prepayments on the Senior Notes  In October 2006, FINOVA announced a $29.7 million principal prepayment that will be made during the fourth quarter of 2006. Following this prepayment, cumulative principal prepayments through November 15. 2006 will total $1 5 billion or 50% of the face amount ($2 97 billion) of the Senior Notes

In accordance with the terms of the Indenture, the Company is required to use any excess cash as defined in the Indenture, to make semi−annual interest and principal payments on the Senior Notes  Additionally, the Indenture permits voluntary prepayments at the Company's option, which FINOVA has previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the potential wind−up of the Company's affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed below in Note H  "Litigation and Claims", the Company anticipates maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit its ability to make future voluntary prepayments

The Company does not believe that it has sufficient assets to fully repay the Senior Notes, and the Indenture prohibits the Company from engaging in new business  Therefore, FINOVA intends to rely on the liquidation of its remaining assets as its only meaningful source of liquidity

At September 30, 2006, the Senior Notes are reflected on the Company's balance sheet net of a remaining $516 1 million unamortized fresh−start discount  The book value of the Senior Notes is scheduled to increase over time through the partial amortization of the discount as interest expense  Discount amortization was accelerated following each of the principal prepayments, which occurred earlier than originally anticipated when fresh−start guidelines were applied upon emergence  Discount amortization is expected to be further adjusted as principal prepayments are made

Stockholders should not expect any payments or distributions from FINOVA  The Indenture contemplates that as principal payments are made on the Senior Notes, FINOVA stockholders will receive a distribution equal to 5 263% (i e , 5%/95%) of each principal prepayment  Ninety−five percent (95%) of the remaining available cash after establishment of cash reserves as defined in the Indenture will be used to make semi−annual prepayments of principal on the Senior Notes and five percent (5%) is identified for distributions to and/or repurchases of stock from common stockholders  However, the Indenture prohibits FINOVA from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law  Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture  Given the Company's significant negative net worth and its belief that the Senior Notes will not be fully repaid, FINOVA is required to retain impermissible restricted payments until such time, if ever, that it is no longer restricted from making a distribution to its stockholders or until it is necessary to use the cash to satisfy its debt obligations

In conjunction with the prepayments of Senior Notes noted above, the Company will have retained a total of $78 1 million as of November 15, 2006  Retained amounts are being segregated and reflected as restricted cash on the balance sheet, pending their final disposition  The Company anticipates that the retained amounts will eventually be paid to the creditors, not to the stockholders  If the funds were to be paid to the stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of FINOVA's common stock, would receive half of the retained amounts  Berkadia has advised the Company that it does not believe that stockholders are entitled to the retained amounts since FINOVA cannot fully satisfy its creditor obligations

9

Table of Contents
As previously reported. FINOVA filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) FINOVA no longer needs to direct funds into a restricted account, and (2) FINOVA may use the funds in the restricted account to satisfy its obligations to creditors  For a further discussion of the motion and its status. see Note H  "Litigation and Claims "

**F.    Costs Associated with Exit or Disposal Activities**

|  | Termination Benefits | Contract Termination Costs |
|---|---|---|
| Balance, beginning of year | $    4,261 | $    3,699 |
| Payments | (2,449) | (371) |
| Net additions (reductions) | 3,443 | (250) |
| Balance, end of period | $    5,255 | $    3,078 |

As of September 30, 2006. FINOVA had accrued a liability for termination benefits (including severance) of $5 3 million related to 43 individuals at various levels within the Company  During the nine months ended September 30, 2006, the Company paid termination benefits of $2 4 million and recorded a net charge of $3 4 million to partially accrue for employees notified of their pending termination

As of September 30, 2006. the Company had a total liability for terminated leases and office space it has ceased using of $3. I million  The decrease since December 31. 2005 was due to the payment of scheduled lease rentals (net of sublease income) and a $250 thousand reduction in estimated lease termination costs

**G.    Income Taxes**

The Company had federal net operating loss carryforwards of $1 3 billion as of September 30, 2006 and $1 2 billion as of December 31, 2005  No income tax expense or benefit was recorded during the nine months ended September 30, 2006 and 2005  Any pre-tax book income or loss has been entirely offset by a decrease or increase in valuation allowances against deferred tax assets, which were previously established due to the Company's concern regarding its ability to utilize income tax benefits generated from losses in prior periods  The Company does not expect to be able to utilize all the deferred tax assets due to uncertainty about the amount of future earnings, a variety of loss or other tax attribute carryover limitations in the various jurisdictions in which the Company files tax returns and uncertainty regarding the timing of the reversal of deferred tax liabilities

**H.    Litigation and Claims**

*Legal Proceedings*

FINOVA is party either as plaintiff or defendant to various actions, proceedings and pending claims, including legal actions. some of which involve claims for compensatory. punitive or other damages in significant amounts  Litigation often results from FINOVA's attempts to enforce its lending agreements against borrowers and other parties to those transactions  Litigation is subject to many uncertainties  It is possible that some of the legal actions. proceedings or claims could be decided against FINOVA  Other than the matters described below, FINOVA believes that any resulting liability from its legal proceedings should not materially affect FINOVA's financial position. results of operations or cash flows  The following matters could have a material adverse impact on FINOVA's financial position, results of operations or cash flows

It is the Company's policy to accrue for loss contingencies, including litigation, only when the losses are probable and estimable  The determination of when losses become probable and estimable is inherently subjective and requires significant judgment, which may change, including in response to factors outside the Company's control

If any legal proceedings result in a significant adverse judgment against the Company, it is unlikely that FINOVA would be able to satisfy that liability due to its financial condition  As previously noted, due to the Company's financial condition, it does not expect that it can satisfy all of its secured debt obligations at maturity  Attempts to collect on those judgments could lead to future reorganization proceedings of either a voluntary or involuntary nature

10

Source: FINOVA GROUP INC. 10-Q. October 30. 2006

Table of Contents
*Litigation Related to Loans to The Thaxton Group Inc. and Related Companies*

The Company's prior periodic filings with the Securities and Exchange Commission have disclosed ongoing litigation against FINOVA Capital with respect to The Thaxton Group Inc ("TGI") and several related entities (collectively, the "Thaxton Entities") The following discussion of the Thaxton litigation should be read in conjunction with those prior disclosures

Pursuant to an order of the Thaxton Entities bankruptcy court dated September 11, 2006. the Company transferred all of the cash received from the Thaxton Entities since commencement of the Thaxton Entities chapter 11 proceedings in October 2003. together with interest earned thereon (an aggregate of approximately $97 2 million). to a trust account to be held by Thaxton under order of the bankruptcy court No funds in this account will be disbursed other than in accordance with the terms of an order of the bankruptcy court

On September 12, 2006, the Company reached a preliminary settlement (the "Settlement") to resolve all outstanding claims in the ongoing litigation between the Company, the Thaxton Entities. the holders of subordinated notes issued by the Thaxton Entities (the "Noteholders"), and the Official Committee of Unsecured Creditors of the Thaxton Entities This Settlement will settle all of the actions involving the Company and the Thaxton Entities, in particular the actions pending in the United States District Court for the District of South Carolina, Anderson Division (the "District Court"). including the previously described new Thaxton action commenced in the District Court in June 2006, as well as claims in the Thaxton Entities chapter 11 proceedings (collectively. the "Thaxton Litigation")

Under the principal terms of the Settlement, which was approved by the Company's Board of Directors on September 11. 2006, on the effective date of the Thaxton Entities plan of reorganization. the Company will receive all amounts it transferred into the trust on September 11. 2006 – i e all amounts paid by the Thaxton Entities to the Company since commencement of the Thaxton Entities chapter 11 proceedings in October 2003 (together with interest earned thereon). minus $16 million, plus interest actually earned thereon from August 16, 2006. which will be retained by the Thaxton Entities In addition. the Company will receive complete releases from all Thaxton parties for all matters related to the Thaxton Entities The Settlement also requires that the summary judgment order of the District Court be vacated. The Settlement will be structured as a class action. and the Company will have the right to reject the Settlement if (i) more than $6 million principal amount of Thaxton subordinated notes opt out of the Settlement. and/or (ii) any of the current individual plaintiffs in the Gregory action opt out of the Settlement

Consummation of the Settlement is subject to (i) final documentation, (ii) approval by the District Court. the Thaxton Entities bankruptcy court and the bankruptcy court in the Company's chapter 11 proceeding, (iii) notice to the class of the Settlement and (iv) final court approval of the Settlement after hearings on the fairness of the Settlement It is anticipated that consummation of the Settlement will not be implemented prior to early 2007

*Motion Regarding Distributions to Stockholders*

As discussed more fully in the Notes to the Consolidated Financial Statements, Note E "Debt". the Indenture contemplates that as principal payments are made on the Senior Notes, FINOVA stockholders will receive a distribution equal to 5 263% of each principal prepayment. The Indenture prohibits distribution of those amounts due to FINOVA's financial condition Those amounts are held in a restricted account, and will total $78 1 million as of November 15. 2006 Because FINOVA will not be able to repay the Senior Notes in full, on April 1, 2005, it filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order (1) to cease directing funds into a restricted account and (2) to allow FINOVA to use the funds in the restricted account to satisfy its obligations to creditors

On February 1, 2006. the Bankruptcy Court issued its order approving FINOVA's April 1. 2005 motion to the extent that FINOVA will be forever insolvent The Bankruptcy Court did not find that FINOVA is presently or will be forever insolvent As a result, FINOVA will continue to direct funds into a restricted account until such time that FINOVA is deemed to be forever insolvent and the funds will then be distributed to FINOVA's creditors On February 10, 2006. the Equity Committee filed a Notice of Appeal of the Bankruptcy Court order to the United States District Court for the District of Delaware On April 13, 2006. the Delaware District Court issued its order denying the appeal of the Equity Committee on the grounds that the February 1, 2006 order of the Bankruptcy Court was not a final appealable order

11

Table of Contents

Item 2.      Management's Discussion and Analysis of Financial Condition and Results of Operations

The following section should be read in conjunction with the Company's Annual Report on Form 10-K for the year ended December 31, 2005 and the Special Note Regarding Forward-Looking Statements included herein. Capitalized terms not defined herein are used as defined in the Form 10-K. The following discussion relates to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including its principal operating subsidiary, FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital")

OVERVIEW

During 2006, the Company has continued to make significant progress in the orderly collection and liquidation of its portfolio. The Company reduced the size of the portfolio since year-end 2005 by nearly 49%, resulting in total financial assets before reserves of just under $183 million at September 30, 2006

As of September 30, 2006, the Company has repaid 49% of the face amount of the Senior Notes and owes approximately $1.5 billion of principal to the Senior Note holders, while only $474 million of total assets remained, including cash reserves and restricted cash. The Company would have to liquidate its remaining financial assets by more than seven times their aggregate carrying value, which is significantly more than past experience would indicate can be achieved, to generate sufficient funds to fully repay the Senior Notes. The Company does not believe there is any chance of this occurring. Although FINOVA will not be able to repay the full amount due under the Senior Notes, the Company will continue to seek to maximize the value of its remaining assets for the benefit of the Note holders

Looking Ahead / Company Direction. The Company has successfully liquidated over 97% of its portfolio, which was approximately $7.6 billion when it emerged from bankruptcy in August 2001. At September 30, 2006, the carrying value of FINOVA's portfolio (before reserve for credit losses) had declined to less than $183 million of financial assets, and it is becoming increasingly more difficult to offset the incremental costs of collecting those assets in an orderly fashion

During the first quarter of 2006, to maximize the value of its assets, the Company began altering it course of action by offering its remaining portfolios for bulk sale. The first step in this process focused on the non-aviation assets (other than the loan to The Thaxton Group), which were substantially liquidated during the second quarter of 2006. Following this liquidation, the remaining portfolio was primarily comprised of aviation assets and the loan to The Thaxton Group. On September 12, 2006, the Company reached a settlement to resolve all outstanding claims in the ongoing litigation between the Company, the Thaxton Entities, the holders of subordinated notes issued by the Thaxton Entities, and the Official Committee of Unsecured Creditors of the Thaxton Entities. Refer to Note H "Litigation and Claims" for a further discussion of the Thaxton settlement

Throughout the third quarter of 2006, the Company continued to market its transportation portfolio by individual asset and for bulk sale. The portfolio has received a high level of interest and activity. The Company believes its individual sales efforts to date have generated substantially more cash than what would have been received in a bulk portfolio sale. However, the size of the transportation portfolio has been rapidly declining and many of the more attractive assets in this portfolio have already been sold or are under letters of intent to sell during 2006. Additionally, the Company was becoming increasingly concerned with world events that could adversely impact the price of oil and the potential value FINOVA could receive for its remaining aircraft. As a result of this and the incremental costs of collection mentioned earlier, the Company began offering the remaining aviation assets not committed to individual sales for bulk sale in order to maximize the value of the remaining aviation assets. The Company solicited interest from over 50 prospective buyers that specialize in aviation assets and through a bid process has narrowed the pool to one buyer

As of the date of this report, the Company had 38 aircraft with a total carrying value of approximately $76.4 million that had either been liquidated subsequent to September 30, 2006, are under individual letters of intent to sell or are committed to a proposed bulk asset sale. The proposed bulk asset sale includes 18 aircraft with a total carrying value of approximately $36.7 million. The proposed bulk asset sale is pursuant to a non-binding letter of intent, which is subject to inspection of the aircraft and records. Due to the fact that the 18 aircraft in this pool are operating throughout the world, additional time will be necessary to complete the inspections. FINOVA will hopefully know if an acceptable final purchase price can be obtained for these assets during the fourth quarter of 2006. No assurance can be given that all of the letters of intent will result in actual sales, but the Company anticipates that the majority of these committed assets will be sold during the fourth quarter of 2006 for proceeds in excess of FINOVA's carrying values at September 30, 2006

12

Table of Contents
The Company anticipates that when all or substantially all of its assets have been liquidated, the affairs of FINOVA will need to be wound-up. The Company continues to analyze potential alternative methods of wind-up and would like to commit to a final plan of liquidation during 2006 or early 2007; however, this will be contingent on obtaining acceptable prices for its remaining assets. Additionally, in considering its alternative wind-up methods, the Company intends to take into consideration the restricted cash related to impermissible restricted payments to stockholders, matters related to Thaxton and other outstanding bankruptcy claims. A final plan of liquidation may or may not be in conjunction with bankruptcy or state law liquidation proceedings. The Company anticipates that in connection with its wind-up, it will seek an order from the bankruptcy court with respect to FINOVA's solvency. The Company cannot predict with certainty the timing or nature of that final wind-up at this point in time, but is working towards accomplishing that end in a prudent manner to maximize the return on the remaining assets.

The Company will continue to retain sufficient cash to fund its expenses, including the costs associated with the potential wind-up of the Company's affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton. As a result, the Company anticipates maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit its ability to make future voluntary principal prepayments.

**No Stockholder Payments / Bankruptcy Court Motion.** While the Indenture governing the Senior Notes contemplated that FINOVA would make payments to its stockholders as the Senior Notes were repaid, the Company has not made those payments. Those stockholder distributions are prohibited due to the Company's present financial condition. Stockholders should not expect any payments or return on their common stock. Those funds are currently being held in a segregated account pending their final disposition. However, the Company anticipates that those funds will eventually be paid to its creditors, not to the stockholders. If the funds were to be paid to the stockholders, affiliates of Berkadia (which are owned by Berkshire Hathaway and Leucadia), as owner of 50% of FINOVA's stock, would receive half of those payments.

As discussed in Note H "Litigation and Claims," FINOVA filed a motion in the United States Bankruptcy Court for the District of Delaware (the court in which the FINOVA reorganization proceedings have taken place), seeking an order that (1) FINOVA no longer needs to direct funds into the restricted account, and (2) FINOVA may use the funds in the restricted account to satisfy its obligations to creditors. The Bankruptcy Court subsequently issued an order approving FINOVA's motion to the extent that FINOVA will be forever insolvent, which the Company believes is clearly the case. Representatives of FINOVA's shareholders appealed the Bankruptcy Court's ruling, and in April 2006, the appeal was denied on the grounds that the Bankruptcy Court's order was not a final appealable order.

**No Restructuring Plan Contemplated.** On numerous occasions, FINOVA has been asked whether there is some plan to save the Company and its net operating loss carryforwards ("NOL.") As FINOVA has noted for some time, the Board remains willing to consider legitimate proposals presented by Note holders or others, but is not formulating a restructuring plan intended to enable FINOVA to emerge as a healthy company.

Many obstacles exist to creation of a viable restructuring plan. A restructuring presumes a sensible business plan emerging from that process. In light of FINOVA's dwindling asset base, the composition of its remaining assets and the competitive environment, the Company believes it would be difficult, if not futile, in these circumstances to develop a business model that can produce returns to the creditors and/or new investors greater than that expected from the present course. Absent that, or a substantial new investment in FINOVA, the Company believes it would be difficult to obtain the requisite approval to restructure the present debt obligations. The task becomes more difficult as the portfolio continues to shrink. FINOVA cautions investors to carefully evaluate applicable tax regulations, which restrict the ability to transfer or use NOLs in a variety of circumstances. FINOVA's financial statements do not anticipate using the NOLs for those and other reasons.

**HIGH INVESTMENT RISK OF SECURITIES.** As previously stated, FINOVA believes that it will be unable to fully repay its Senior Notes and that it is unlikely that it will be able to make any distributions to its stockholders, absent a court order. Consequently, investing in the Senior Notes and common stock involves a high level of risk.

## CRITICAL ACCOUNTING POLICIES

The Company's consolidated financial statements are prepared in accordance with U S generally accepted accounting principles. The preparation of these financial statements requires FINOVA to use estimates and assumptions that affect reported amounts of assets and liabilities, revenues and expenses and disclosure of contingent liabilities. These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and

13

Source: FINOVA GROUP INC. 10-Q, October 30, 2006

Table of Contents
disclosed in the financial statements  The Company believes the following to be among the most critical judgment areas in the application of its accounting policies

*Significant Use of Estimates*

Several of the Company's accounting policies pertain to the ongoing determination of impairment reserves on financing assets and the carrying amount valuation of other financial assets  Determination of impairment reserves and carrying amounts rely, to a great extent, on the estimation and timing of future cash flows  FINOVA's cash flow estimates assume that its assets are collected in an orderly fashion over time

FINOVA's process of determining impairment reserves and carrying amounts includes a periodic assessment of the assets in its portfolio on a transaction–by–transaction basis  Cash flow estimates are based on current information and numerous assumptions concerning general economic conditions and trends, specific market segments, the financial condition of the Company's customers and FINOVA's collateral  In addition, assumptions are sometimes necessary concerning the customer's ability to obtain full refinancing of balloon obligations or residuals at maturity  As a result, the Company's cash flow estimates assume FINOVA incurs refinancing discounts for certain transactions

Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, impairment reserves and carrying amounts

Impairment of financing assets (subsequent to implementation of fresh–start reporting) is recorded through the Company's reserve for credit losses, and accounting rules permit the reserve for credit losses to be increased or decreased as the facts and assumptions change  However, certain financing assets were previously marked down for impairments that existed at the time fresh–start reporting was implemented  These marked–down values became the Company's cost basis in those assets, and accounting rules do not permit the carrying value of these assets to be increased above that fresh–start cost basis if subsequent facts and assumptions result in a projected increase in value  Recoveries of amounts in excess of the fresh–start cost basis are recorded through operations when collected

Impairment of other financial assets is marked down directly against the asset's carrying amount  Accounting rules permit further markdown if changes in facts and assumptions result in additional impairment; however, most of these assets (except certain investments and assets held for sale, which may be marked up for subsequent events) may not be marked up if subsequent facts and assumptions result in a projected increase in value  Recoveries of previous markdowns are recorded through operations when collected

Because of these accounting restrictions, FINOVA is not permitted to fully reflect some estimated improvements in the portfolio until they are actually realized

The carrying amounts and reserve for credit losses recorded on FINOVA's financial statements reflect the Company's expectation of collecting less than the full contractual amounts owed by users of its customers and recovering less than its original investment in certain owned assets. The Company continues to pursue collection of the full contractual amounts and original investments, where appropriate, in an effort to maximize the value of its asset portfolio

Reserve for Credit Losses. The reserve for credit losses represents FINOVA's estimate of losses inherent in the portfolio and includes reserves on impaired assets and on assets that are not impaired  Impairment reserves are created if the carrying amount of an asset exceeds its estimated recovery, which is measured by estimating the present value of expected future cash flows (discounted at contractual rates), market value or the fair value of collateral  These methodologies include the use of significant estimates and assumptions regarding future customer performance (which are inherently dependent upon assumptions about general economic conditions and those affecting the customer's business), amount and timing of future cash flows and collateral value  Reserves on assets that are not impaired are based upon assumptions including general economic conditions, overall portfolio performance, including loss experience, delinquencies and other inherent portfolio characteristics. Actual results have in the past and could in the future, differ from these estimates, resulting in an increase or reversal of reserves  As of September 30, 2006 and December 31, 2005, the reserve for credit losses totaled $12 0 million and $29 0 million, respectively

Owned Assets. Assets held for the production of income and operating leases are carried at amortized cost with impairment adjustments, if any, recorded as permanent markdowns through operations  An owned asset is considered impaired if

14

Table of Contents
anticipated undiscounted cash flows are less than the carrying amount of the asset. Once the asset has been deemed impaired, accounting rules allow for several acceptable methods for measuring the amount of the impairment. FINOVA's typical method of measuring impairment is based on the comparison of the carrying amount of those assets to the present value of estimated future cash flows, using risk adjusted discount rates. These estimates include assumptions regarding lessee performance, the amount and timing of future cash flows, selection of risk–adjusted discount rates for net present value calculations and residual value assumptions for leases. If future portfolio assessments indicate additional impairment, additional markdowns may be necessary. Recoveries of previous markdowns are recorded through operations when collected. As of September 30, 2006 and December 31, 2005, owned assets totaled $36.2 million and $77.4 million, or 19.8% and 21.7% of total financial assets (before reserves), respectively.

**Assets Held for Sale.** Assets held for sale are comprised of assets previously classified as financing transactions and other financial assets that management does not have the intent and/or the expected ability to hold to maturity. These assets are revalued quarterly and are carried at the lower of cost or market less anticipated selling expenses, with adjustment to estimated market value, if any, recorded as a gain or loss on financial assets. Market value is often determined by the estimation of anticipated future cash flows discounted at risk adjusted market rates to determine net present value. Valuation of assets held for sale includes estimates regarding market conditions and ultimate sales prices. Actual sales prices could differ from estimates, impacting results from operations. As of September 30, 2006, assets held for sale totaled $27.9 million or 15.3% of total financial assets (before reserves), while as of December 31, 2005, there were no assets held for sale considered to be of value to the Company.

**Nonaccruing Assets.** Accounts are generally classified as nonaccruing and recognition of income is suspended when a customer becomes 90 days past due on the payment of principal or interest, or earlier, if in the opinion of management, full recovery of contractual income and principal becomes doubtful. The decision to classify accounts as nonaccruing on the basis of criteria other than delinquency, is based on certain assumptions and estimates including current and future general economic conditions, industry specific economic conditions, customer financial performance, the ability of customers to obtain full refinancing of balloons or residuals due to FINOVA at maturity and FINOVA's ability or willingness to provide such refinancing. In certain instances, accounts may be returned to accruing status if sustained contractual performance is demonstrated. Changes in borrower performance, assumptions or estimates could result in a material change in nonaccruing account classification and income recognition. As of September 30, 2006 and December 31, 2005, $122.1 million and $131.9 million, or 66.9% and 37.1% of total financial assets (before reserves), were classified as nonaccruing, respectively.

**RESULTS OF OPERATIONS**

As a result of the Company's continued asset liquidation and shrinking operations, the consolidated financial statements are not necessarily comparable from period to period. Trends during any given period may not be indicative of future trends; however, the following discussion of results may provide useful information regarding the current status of the Company.

|  | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|  | 2006 | 2005 | Change | 2006 | 2005 | Change |
|---|---|---|---|---|---|---|
|  | (Dollars in thousands) | | | (Dollars in thousands) | | |
| Interest margin | $(25,397) | $(21,668) | $(3,729) | $(73,247) | $(64,921) | $(8,326) |
| Provision for credit losses | (7,212) | 129 | (7,341) | 15,217 | 45,469 | (30,252) |
| Net gain (loss) on financial assets | 49,868 | (2,679) | 52,547 | 106,926 | 17,902 | 89,024 |
| Portfolio expenses | (5,448) | (4,984) | (464) | (15,120) | (15,516) | 396 |
| General and administrative expenses | (7,176) | (7,958) | 782 | (23,389) | (32,120) | 8,731 |
| Net income (loss) | $ 4,635 | $(37,160) | $41,795 | $ 10,387 | $(49,186) | $ 59,573 |

*Nine Months Ended September 30, 2006 and 2005*

**Net Income (Loss).** In general, the increase in net income was primarily attributable to the nine months ended September 30, 2006 containing a higher level of asset realization in excess of recorded carrying amounts and a lower level of operating expenses. Asset realization in excess of recorded carrying amounts is primarily reflected in the financial statements as reversals of excess reserve for credit losses, net gains from sales of financial assets and the recognition of suspended income upon the payoff of assets.

15

Table of Contents

The Company continues to experience better than anticipated realization and performance of its asset portfolio. Many of the Company's more desirable and marketable assets have been liquidated and the remaining portfolio is becoming more concentrated in non-performing assets and used aircraft, both of which have been work intensive and difficult to liquidate at acceptable prices. However, during 2006, the aircraft-financing market continued to display a high level of activity and in certain instances improved aircraft values. As a result, the Company's transportation portfolio continued to generate cash in excess of recorded carrying amounts and surpassed the results for the first nine months of 2005. Additionally, results for 2006 were enhanced by the sale of substantially all of the Company's non-aviation assets (other than The Thaxton Group loan) for proceeds of approximately $20 million in excess of their December 31, 2005 carrying values

The Company has seen an increase in demand for certain types of aircraft; however, this demand may decline due to continued uncertainty in the airline industry and airline bankruptcy filings Additionally, the Company is becoming increasingly concerned with world events that could adversely impact the price of oil and the potential value FINOVA could receive for its remaining aircraft FINOVA's ability to realize the recorded values of its aircraft portfolio will depend upon future aircraft lease rates and values, both of which are greatly impacted by the instability of the airline industry

Opportunities for recoveries in excess of recorded values continue to exist and are expected to occur; however, the Company remains concerned about the fragile nature of the airline industry

**Interest Margin.** The Company continues to post a negative interest margin, which was significantly impacted by a lower level of earning assets ($12 9 million and $158 1 million at September 30, 2006 and 2005, respectively) than the principal amount of outstanding debt ($1.5 billion and $1 7 billion at September 30, 2006 and 2005, respectively) and the Company's high aggregate cost of funds (aggregate effective rate of 13 9% and 13 4% for the nine months ended September 30, 2006 and 2005, respectively)

Partially offsetting the negative interest margin was the recognition of previously suspended and deferred income ($2 1 million and $15 0 million for the nine months ended September 30, 2006 and 2005, respectively), which was generated from payoffs of certain assets in excess of their carrying amounts and the return to earning status of certain assets following demonstration of sustained performance The Company believes that further instances where it will recognize suspended and deferred income may occur; however, any income recognition in future periods is not expected to reach 2005 levels

**Reversal of Provision for Credit Losses.** The Company recorded reversals of provision for credit losses to reduce its overall reserve for credit losses The reserve reductions were primarily due to recoveries ($5 2 million and $9 8 million for the nine months ended September 30, 2006 and 2005, respectively) of amounts previously written off, proceeds received from prepayments and asset sales exceeding recorded carrying amounts (net of reserves), improved collection experience and the Company's detailed assessment of estimated inherent losses in its portfolio Additionally, the Company recorded a $14 7 million reversal of provision for credit losses in 2006 to reduce its reserves due to the sale of the Company's non-aviation assets for proceeds in excess of their carrying amount (net of reserves), which was partially offset by the recording during the third quarter of 2006 of an $8 7 million specific reserve related to the Thaxton loan The specific reserve was necessary to adjust the net book value of the Thaxton loan to its estimated settlement of approximately $81 2 million before interest and opt-outs Refer to Note H "Litigation and Claims" for a further discussion of the Thaxton settlement

Amounts collected from the portfolio have often exceeded anticipated cash flows, resulting in a partial reversal of previously established reserves The Company does not expect a significant reversal of provision for credit losses in future periods The Company has already seen a significant decline in realized recoveries of amounts previously written off and expects that declining trend to continue

The measurement of credit impairment and asset valuation is dependent upon the significant use of estimates and management discretion when predicting expected cash flows These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed herein See Item 1A "Risk Factors," "Critical Accounting Policies" and "Special Note Regarding Forward-Looking Statements" for a discussion of these and additional factors impacting the use of estimates

**Net Gain on Financial Assets.** Gains are sporadic in nature and not necessarily comparable from one period to the next; however, the increase over the prior year was primarily attributable to an increase in the overall realization during 2006 from the Company's transportation portfolio

16

Table of Contents

The net gain during 2006 was primarily attributable to sales of owned assets and financing contracts in excess of carrying amounts, the most significant of which included $86 6 million of net gains realized from sales of aircraft, engines, aircraft related notes and claims, and the forfeiture by aircraft operators of security deposits and maintenance reserves, $4.5 million of net gains realized from the previously announced sale of the Company's non-aviation assets (in addition to the reversal of reserves noted above), $9 9 million of net gains realized from the sale and valuation of private and public investments and a $3 6 million gain from the valuation markup of two Boeing 757 leveraged leases with Northwest Airlines, which are classified as assets held for sale  In conjunction with Northwest Airlines' bankruptcy filing in late 2005, the Company previously fully wrote off the remaining book value of these leveraged leases because at the time, the senior outstanding debt exceeded the underlying aircraft values  During the third quarter of 2006, FINOVA entered into an agreement for FINOVA to pay off the remaining senior debt balance ($25.4 million) on these leveraged leases and sell the aircraft to a third party  The Company subsequently completed the sale of these aircraft in the fourth quarter of 2006, realizing the valuation gain noted above

The net gain during 2005 was primarily attributable to $27 1 million of net gains realized from sales of aircraft and parts, and the forfeiture by aircraft operators of security deposits and maintenance reserves, $4 0 million of net gains realized from the sale and valuation of private and public investments and $5 3 million of net gains from the valuation and sale of the Company's last two real estate leveraged leases  Partially offsetting this gain activity were $18 4 million of net valuation markdowns to leveraged leases in the transportation portfolio.

The Company entered into a number of transactions to sell assets over the last couple of years and expects assets sales to continue  As of the date of this report, the Company had 38 aircraft with a total carrying value of approximately $76.4 million that had either been liquidated subsequent to September 30, 2006, are under individual letters of intent to sell or are committed to a proposed bulk asset sale  No assurance can be given that the letters of intent will result in actual sales, but the Company anticipates the majority of these committed assets will be sold during the fourth quarter of 2006 for proceeds in excess of FINOVA's carrying value at September 30, 2006

FINOVA will continue to consider future sales of the remaining portfolio or individual assets, if buyers can be found at acceptable prices; however, there can be no assurance that FINOVA will be successful in its efforts to sell additional assets or that realization will reach prior period levels  In evaluating offers, FINOVA will generally compare offers against FINOVA's internal net present value of estimated future cash flows projected to be collected from those assets less the net present value of FINOVA's operating costs to collect those assets

Portfolio Expense. Portfolio expenses include all costs relating to the maintenance and collection of both performing and non-performing financial transactions  In addition, within the transportation portfolio, portfolio costs include storage, maintenance and costs for potential return to service of aircraft

The transportation portfolio continues to incur a significant portion of the Company's portfolio costs ($4 6 million and $9 2 million during the nine months ended September 30, 2006 and 2005, respectively)  Portfolio costs within the transportation portfolio will fluctuate with the timing and number of maintenance reinvestment projects  The Company expects to continue to invest in aircraft maintenance as long as there is commercial justification for such expenditures

During the nine months ended September 30, 2006 and 2005, the Company incurred $3 7 million and $3 3 million, respectively, of legal costs associated with the matters related to Thaxton  The Company anticipates that the related Thaxton costs will continue at a comparable pace through the consummation of the settlement, which is not anticipated to be completed until early 2007  Refer to Note H  "Litigation and Claims" for a further discussion of this matter

Additionally, the Company experienced increased costs associated with the liquidation of a repossessed property and had a higher level of costs associated with the final liquidation and sale of certain assets

General and Administrative Expenses. The decrease in general and administrative expenses was primarily due to $6 5 million of cost savings resulting from staffing and office occupancy reductions (43 employees at September 30, 2006 compared to 66 at September 30, 2005) and lower severance accruals ($2 5 million)  The dollar level of general and administrative expenses has continued to decrease as portfolio and staffing levels decreased; however, general and administrative expenses as a percentage of assets or revenues has increased over time as a result of certain fixed costs, the costs of being a public company and further costs associated with wind-up of the Company's affairs

17

248

Table of Contents

**Income Tax Expense.** No income tax expense or benefit was recorded during the nine months ended September 30, 2006 and 2005. Any pre-tax book income or loss has been entirely offset by a decrease or increase in valuation allowances against deferred tax assets, which were previously established due to the Company's concern regarding its ability to utilize income tax benefits generated from losses in prior periods. The Company had federal net operating loss carryforwards of $1 3 billion and $1 2 billion as of September 30, 2006 and December 31, 2005, respectively

*Three Months Ended September 30, 2006 and 2005*

**Net Income (Loss).** In general, the increase in net income was primarily attributable to the three months ended September 30, 2006 continuing a significantly higher level of asset realization in excess of recorded carrying amounts. Asset realization in excess of recorded carrying amounts is primarily reflected in the financial statements as reversals of excess reserve for credit losses, net gains from sales of financial assets and the recognition of suspended income upon the payoff of assets

The Company continues to experience better than anticipated realization and performance of its asset portfolio. Many of the Company's more desirable and marketable assets have been liquidated and the remaining portfolio is becoming more concentrated in non-performing assets and used aircraft, both of which have been work intensive and difficult to liquidate at acceptable prices. However, during third quarter of 2006, the aircraft-financing market continued to display a high level of activity and in certain instances improved aircraft values. As a result, the Company's transportation portfolio continued to generate cash in excess of recorded carrying amounts and surpassed the results for the comparable period in 2005

Opportunities for recoveries in excess of recorded values continue to exist and are expected to occur; however, the Company remains concerned about the fragile nature of the airline industry

**Interest Margin.** The Company continues to post a negative interest margin, which was significantly impacted by a lower level of earning assets ($12 9 million and $158 1 million at September 30, 2006 and 2005, respectively) than the principal amount of outstanding debt ($1.5 billion and $1.7 billion at September 30, 2006 and 2005, respectively) and the Company's high aggregate cost of funds (aggregate effective rate of 14.4% and 13 6% for the three months ended September 30, 2006 and 2005, respectively)

Partially offsetting the negative interest margin was the recognition of previously suspended and deferred income ($0 6 million and $5.4 million for the three months ended September 30, 2006 and 2005, respectively), which was generated from payoffs of certain assets in excess of their carrying amounts and the return to earning status of certain assets following demonstration of sustained performance. The Company believes that further instances where it will recognize suspended and deferred income may occur; however, any income recognition in future periods is not expected to reach 2005 levels

**Provision for Credit Losses.** During the third quarter of 2006, the Company recorded a net provision for credit losses of $7 2 million. The provision was necessary to establish an $8.7 million specific reserve related to the Thaxton loan, which adjusts the net book value of the loan to its estimated settlement. Refer to Note H, "Litigation and Claims" for a further discussion of the Thaxton settlement. For the three months ended September 30, 2005, the Company recorded a reversal of provision for credit losses to reduce its overall reserve for credit losses. The reserve reduction was primarily due to recoveries ($3 6 million for the three months ended September 30, 2005) of amounts previously written off, proceeds received from prepayments and asset sales exceeding recorded carrying amounts (net of reserves), improved collection experience and the Company's detailed assessment of estimated inherent losses in its portfolio, partially offset by a slight increase in specific reserves on certain assets

The measurement of credit impairment and asset valuation is dependent upon the significant use of estimates and management discretion when predicting expected cash flows. These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed herein. See Item 1A "Risk Factors," "Critical Accounting Policies" and "Special Note Regarding Forward-Looking Statements" for a discussion of these and additional factors impacting the use of estimates

**Net Gain (Loss) on Financial Assets.** Gains are sporadic in nature and not necessarily comparable from one period to the next; however, the increase over the prior year was primarily attributable to an increase in the overall realization during 2006 from the Company's transportation portfolio

18

Source: FINOVA GROUP INC, 10-Q, October 30, 2006

Table of Contents
The net gain during the third quarter of 2006 was primarily attributable to sales of owned assets and financing contracts in excess of carrying amounts, the most significant of which included $42 8 million of net gains realized from sales of aircraft. engines, aircraft related notes and claims. and the forfeiture by aircraft operators of security deposits and maintenance reserves and $6 5 million of net gains realized primarily from the sale of one private investment

The net loss during the third quarter of 2005 was primarily attributable to $10 4 million of net valuation markdowns to the transportation leveraged lease portfolio. partially offset by $6 1 million of net gains realized from sales of aircraft and parts, and the forfeiture by aircraft operators of security deposits and maintenance reserves and $1 2 million of net gains realized from the sale and valuation of private and public investments

**Portfolio Expense.** Portfolio expenses include all costs relating to the maintenance and collection of both performing and non-performing financial transactions In addition, within the transportation portfolio, portfolio costs include storage, maintenance and costs for potential return to service of aircraft

The transportation portfolio continues to incur a significant portion of the Company's portfolio costs ($1 5 million and $2 2 million during the three months ended September 30. 2006 and 2005. respectively) Portfolio costs within the transportation portfolio will fluctuate with the timing and number of maintenance reinvestment projects The Company expects to continue to invest in aircraft maintenance as long as there is commercial justification for such expenditures

During the three months ended September 30, 2006 and 2005. the Company incurred $2 4 million and $1 8 million. respectively, of legal costs associated with matters related to Thaxton The Company anticipates that the related Thaxton costs will continue at a comparable pace through the consummation of the settlement. which is not anticipated to be completed until early 2007 Refer to Note H "Litigation and Claims" for a further discussion of this matter

Additionally, the Company experienced increased costs associated with the liquidation of a repossessed property and had a higher level of costs associated with the final liquidation and sale of certain assets

**General and Administrative Expenses.** The decrease in general and administrative expenses was primarily due to $1 3 million of cost savings resulting from staffing and office occupancy reductions (43 employees at September 30, 2006 compared to 66 at September 30, 2005). partially offset by incremental costs associated with the evaluation of wind-up alternatives for the Company The dollar level of general and administrative expenses has continued to decrease as portfolio and staffing levels decreased; however, general and administrative expenses as a percentage of assets or revenues has increased over time as a result of certain fixed costs. the costs of being a public company and further costs associated with wind-up of the Company's affairs

**Income Tax Expense.** No income tax expense or benefit was recorded during the three months ended September 30. 2006 and 2005 Any pre-tax book income or loss has been entirely offset by a decrease or increase in valuation allowances against deferred tax assets, which were previously established due to the Company's concern regarding its ability to utilize income tax benefits generated from losses in prior periods The Company had federal net operating loss carryforwards of $1 3 billion and $1 2 billion as of September 30, 2006 and December 31. 2005, respectively

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

Because substantially all of the Company's assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure its obligations under the Intercompany Notes securing the Senior Notes, FINOVA's ability to obtain additional or alternate financing is severely restricted Berkadia has no obligation to lend additional sums to or to further invest in the Company Accordingly, FINOVA intends to rely on internally generated cash flows from the liquidation of its assets as its only meaningful source of liquidity

The terms of the Indenture prohibit the Company from using available funds (after certain permitted uses) for any purpose other than to satisfy its obligations to creditors and to make limited payments to stockholders in certain circumstances. Under the terms of the Indenture. the Company is permitted to establish a cash reserve in an amount not to exceed certain defined criteria Due to the Company's limited sources of liquidity, the estimation of cash reserves is critical to the overall liquidity of the Company Cash reserve estimations are subject to known and unknown risks. uncertainties and other factors that could materially impact the amounts determined Failure to adequately estimate a cash reserve in one period could result in

19

Table of Contents

insufficient liquidity to meet obligations in that period, or in a subsequent period, if actual cash requirements exceed the cash reserve estimates Generally speaking, cash reserves typically equal anticipated cash flows to cover operating costs (which includes legal costs and professional services), tax payments, fundings under existing customer commitments, interest payments and any other necessary cash flows expected to occur during the next six month period The Company has the discretion to, and has from time to time, adjusted its cash reserve methodology

In accordance with the terms of the Indenture, the Company is required to use any excess cash, as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes Additionally, the Indenture permits voluntary prepayments at the Company's option, which FINOVA has previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the potential wind-up of the Company's affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed in Note H "Litigation and Claims", the Company anticipates maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit its ability to make future voluntary prepayments

During the third quarter of 2006, the Company made no principal prepayments on the Senior Notes In October 2006, FINOVA announced a $29.7 million principal prepayment that will be made during the fourth quarter of 2006. Following this prepayment, cumulative principal prepayments through November 15, 2006 will total $1 5 billion or 50% of the face amount ($2 97 billion) of the Senior Notes

The Company does not believe that it has sufficient assets to fully repay the Senior Notes, and the Indenture prohibits the Company from engaging in new business Therefore, FINOVA intends to rely on the liquidation of its remaining assets as its only meaningful source of liquidity The Senior Notes have a first priority security interest in substantially all of FINOVA's remaining assets

Stockholders should not expect any payments or distributions from FINOVA The Indenture contemplates that as principal payments are made on the Senior Notes, FINOVA stockholders will receive a distribution equal to 5 263% of each principal prepayment However, the Indenture prohibits FINOVA from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture Given the Company's significant negative net worth and its belief that the Senior Notes will not be fully repaid, FINOVA is required to retain impermissible restricted payments until such time, if ever, that it is no longer restricted from making a distribution to its stockholders or until it is necessary to use the cash to satisfy its debt obligations

In conjunction with the prepayments of Senior Notes noted above, the Company will have retained a total of $78.1 million as of November 15, 2006 Retained amounts are segregated and reflected as restricted cash on the balance sheet, pending their final disposition. The Company anticipates that the retained amounts will eventually be paid to the creditors, not to the stockholders If the funds were to be paid to the stockholders, affiliates of Berkadia (jointly owned by Berkshire Hathaway and Leucadia), which own 50% of FINOVA's common stock, would receive half of the retained amounts Berkadia has advised the Company that it does not believe that stockholders are entitled to the retained amounts since FINOVA cannot fully satisfy its creditor obligations

In April 2005, FINOVA filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) FINOVA no longer needs to direct funds into a restricted account, and (2) FINOVA may use the funds in the restricted account to satisfy its obligations to creditors For a further discussion of the motion and its status, see Note H "Litigation and Claims "

The Company has a negative net worth of $602.9 million as of September 30, 2006 ($1.1 billion if the Senior Notes are considered at their principal amount due). Based on the Company's current financial condition (including having only $170.6 million of net financial assets), it is highly unlikely there will be funds available to fully repay the outstanding principal on the Senior Notes at maturity or make any 5% distribution to common stockholders, absent a court order As a result, there would not be a return to the Company's stockholders. Consequently, investing in the Senior Notes and common stock involves a high level of risk.

20

Table of Contents
*Obligations and Commitments*

For a detailed listing of FINOVA's significant contractual obligations and contingent commitments, refer to the Company's Annual Report on Form 10-K for the year ended December 31, 2005. There have not been any material changes during the nine months ended September 30, 2006, except for the Senior Note prepayments discussed throughout this document

*Collection of the Portfolio*

As noted previously, the Company's current business activities are limited to maximizing the value of its portfolio through the orderly collection of its assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral. The Company has sold substantial portions of its asset portfolio and will consider future sales of any asset if buyers can be found at acceptable prices. The Company is offering to sell its remaining assets both by portfolio and individual asset. Due to restrictions contained in the Indenture as well as its general inability to access capital in the public and private markets, the Company's only viable source of cash flow is from the collection of its portfolio

The following table presents the activity in total financial assets, net of the reserve for credit losses for the nine months ended September 30, 2006:

| (Dollars in thousands) | |
|---|---:|
| Total financial assets at December 31, 2005 | $ 326,649 |
| Cash activity: | |
| Fundings under existing customer commitments | 5,194 |
| Prepayment of nonrecourse debt on leveraged leases | 25,446 |
| Transfer of cash previously received from the Thaxton Entities | 24,422 |
| Collections and proceeds from financial assets | (225,382) |
| Net cash flows | (170,320) |
| Non-cash activity: | |
| Reversal of provision for credit losses | 15,217 |
| Net gain on financial assets | 3,305 |
| Other non-cash activity | (4,225) |
| Net non-cash activity | 14,297 |
| Total financial assets at September 30, 2006 | $ 170,626 |

Total financial assets, net of the reserve for credit losses, declined to $170.6 million at September 30, 2006, down from $326.6 million at December 31, 2005. During 2006, net cash flows from the portfolio totaled $170.3 million, while non-cash activity resulted in a $14.3 million increase in net financial assets. Components of net cash flows included $110.3 million of collections from financial assets (including recoveries) and $115.0 million from the sale of assets (excluding cash gains), offset by $5.2 million of fundings under existing customer commitments, a $25.4 million prepayment of nonrecourse debt associated with two leveraged leases, which were subsequently sold in the fourth quarter of 2006 and the transfer of $24.4 million of cash collected from the Thaxton Entities since Thaxton's bankruptcy filing. Collections from financial assets include prepayments (customer payments in advance of scheduled due dates). Non-cash activity included a $15.2 million reversal of reserves and a $3.3 million net increase related to the valuation of assets, partially offset by other non-cash activity of $4.2 million

The $156.0 million decline in the carrying value of the Company's portfolio was primarily attributable to asset sales, prepayments, scheduled amortization and write-offs ($57.0 million). During 2006, the Company completed numerous asset sales with a total carrying amount of $115.0 million, while prepayment activity represented $64.3 million of carrying amount. The remaining portfolio as of September 30, 2006 is primarily comprised of aviation assets and the loan to The Thaxton Group. Refer to Note H "Litigation and Claims" for a further discussion of the Thaxton litigation

The majority of the aviation assets are older vintage aircraft, often of class and configuration with limited demand in the aircraft market. While a market for many of these aircraft may never fully return, the Company believes it has maximized the value of the transportation assets by waiting for opportune moments to sell individual assets. During 2006, the Company continued to

21

Source: FINOVA GROUP INC, 10-Q, October 30, 2006

Table of Contents
market its transportation portfolio by individual asset and for bulk sale  The portfolio has received a high level of interest and activity  The Company believes its individual sales efforts to date have generated substantially more cash than what would have been received in a bulk portfolio sale  However, the size of the transportation portfolio has been rapidly declining and many of the more attractive assets in this portfolio have already been sold or are under letters of intent to sell during 2006. Additionally, the Company was becoming increasingly concerned with world events that could adversely impact the price of oil and the potential value FINOVA could receive for its remaining aircraft  As a result of this and the incremental costs of collection mentioned earlier, the Company began offering the remaining aviation assets not committed to individual sales for bulk sale in order to maximize the value of the remaining aviation assets  The Company solicited interest from over 50 prospective buyers that specialize in aviation assets and through a bid process has narrowed the pool to one buyer

As of the date of this report, the Company had 38 aircraft with a total carrying value of approximately $76 4 million that had either been liquidated subsequent to September 30, 2006, are under individual letters of intent to sell or are committed to a proposed bulk asset sale  The proposed bulk asset sale includes 18 aircraft with a total carrying value of approximately $36 7 million  The proposed bulk asset sale is pursuant to a non-binding letter of intent, which is subject to inspection of the aircraft and records  Due to the fact that the 18 aircraft in this pool are operating throughout the world, additional time will be necessary to complete the inspections  FINOVA will hopefully know if an acceptable final purchase price can be obtained for these assets during the fourth quarter of 2006. No assurance can be given that all of the letters of intent will result in actual sales, but the Company anticipates that the majority of these committed assets will be sold during the fourth quarter of 2006 for proceeds in excess of FINOVA's carrying values at September 30, 2006

In addition to the Thaxton loan, the Company's non-aviation portfolio at September 30, 2006 was comprised of assets with a total carrying value of approximately $15 8 million, including the Company's $10 9 million investment in two grantor trusts to secure severance and bonus obligations to its employees  These assets are held primarily for the benefit of the employees, but are recorded as investments due to the Company's retained interest in any excess assets  Substantially all of the other non-aviation assets are committed to individual asset sales

The Company anticipates that when all or substantially all of its assets have been liquidated, the affairs of FINOVA will need to be wound-up  The Company continues to analyze potential alternative methods of wind-up and would like to commit to a final plan of liquidation during 2006 or early 2007; however, this will be contingent on obtaining acceptable prices for its remaining assets  Additionally, in considering its alternative wind-up methods, the Company intends to take into consideration the restricted cash related to impermissible restricted payments to stockholders, matters related to Thaxton and other outstanding bankruptcy claims  A final plan of liquidation may or may not be in conjunction with bankruptcy or state law liquidation proceedings  The Company anticipates that in connection with its wind up, it will seek an order from the bankruptcy court with respect to FINOVA's solvency  The Company cannot predict with certainty the timing or nature of that final wound-up at this point in time, but is working towards accomplishing that end in a prudent manner to maximize the return on the remaining assets

The Company will continue to retain sufficient cash to fund its expenses, including the costs associated with the potential wind-up of the Company's affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton. As a result, the Company anticipates maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit its ability to make future voluntary principal prepayments

FINOVA's reserve for credit losses decreased to $12.0 million at September 30, 2006 from $29 0 million at December 31, 2005  At September 30, 2006, the total carrying amount of impaired loans and leases was $135 0 million, of which $12 9 million were revenue accruing  The Company has established impairment reserves of $12 0 million related to $97 1 million of impaired assets  At December 31, 2005, the total carrying amount of impaired loans and leases was $241.1 million, of which $109 1 million were revenue accruing  Impairment reserves at December 31, 2005 totaled $28 3 million related to $85 4 million of impaired assets

Reserves on impaired assets decreased due primarily to write-offs and proceeds received from prepayments and asset sales exceeding recorded carrying amounts (net of reserves), partially offset by additional reserves recorded on certain existing impaired assets

Accounts classified as nonaccruing were $122 1 million or 66 9% of total financial assets (before reserves) at September 30, 2006 as compared to $131.9 million or 37 1% at December 31, 2005  The decline in nonaccruing assets was primarily attributed to collections and asset sales of $47 9 million and write-offs and net valuation adjustments of $4 0 million, partially offset by an increase following the prepayment of $25 4 million of nonrecourse debt associated with two leveraged leases with

22

Table of Contents
Northwest Airlines on Boeing 757 aircraft and the transfer of cash collected ($24 4 million, excluding $72.8 million in cash previously deposited into a reserve account not reflected on FINOVA's balance sheet) from the Thaxton Entities since Thaxton's bankruptcy filing

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this report are "forward-looking," in that they do not discuss historical fact, but instead reflect future expectations, projections, intentions, or other items. Forward-looking statements are made pursuant to the safe-harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include assumptions, estimates and valuations implicit in the financial statements and related notes, as well as matters discussed throughout this report including but not limited to projections of revenues, income or loss, plans for the continued liquidation of the Company's assets, and assumptions related to the foregoing. They are also made in documents incorporated in this report by reference, or in which this report may be incorporated

Forward-looking statements are inherently subject to risks and uncertainties, many of which cannot be predicted or quantified. When used in this report, the words "estimate," "expects," "anticipates," "believes," "plans," "intends" and similar expressions are intended to identify forward-looking statements that involve known and unknown risks and uncertainties. The risks, uncertainties and other factors that could cause FINOVA's actual results or performance to differ materially from those contemplated by the forward-looking statements include, but are not limited to, the following: whether we will be successful in implementing our business strategy; the impact of general economic conditions and the performance of our borrowers; our ability to retain our employees; the instability and uncertainty in the airline industry, which could adversely affect the value of our aircraft portfolio, lease rates and demand; the increasing difficulty in offsetting costs of collecting the remaining portfolio in view of our decreasing asset pool; our reliance on third parties for information that may not be accurate; our increasing exposure to concentrations of credit risk; and current and future legal and administrative claims and proceedings against us that may result in increased costs and diversion of management's attention. For additional information, see Part I, Item 1A  Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2005

Undue reliance should not be placed on these forward-looking statements, which are applicable only as of the date of this report  FINOVA does not intend to update forward-looking information to reflect actual results or changes in assumptions or other factors that could affect those statements  FINOVA cannot predict the risk from reliance on forward-looking statements in light of the many factors that could affect their accuracy

**Item 3.    Quantitative and Qualitative Disclosure About Market Risk**

There were no material changes from the information provided in the Company's Annual Report on Form 10-K for the year ended December 31, 2005

**Item 4.    Controls and Procedures**

(a)    The Company's management evaluated, with the participation of the Company's principal executive and principal financial officer, the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of September 30, 2006  Based on their evaluation, the Company's principal executive and principal financial officer concluded that the Company's disclosure controls and procedures were effective as of September 30, 2006

(b)    There has been no change in the Company's internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the Company's fiscal quarter ended September 30, 2006, that has materially affected or is reasonably likely to materially affect, the Company's internal control over financial reporting

As a result of Section 404 of the Sarbanes-Oxley Act of 2002 and the rules issued thereunder, the Company is scheduled to include in its Annual Report on Form 10-K for the year ending December 31, 2007 a report on management's assessment of the effectiveness of the Company's internal controls over financial reporting  The Company's independent registered public accountants will also be required to attest to and report on management's assessment

The process of complying with these requirements includes a comprehensive evaluation and documentation of the Company's internal controls over financial reporting  In this regard, management is prepared to dedicate internal

23

Table of Contents
resources and adopt a detailed plan to (i) document the Company's internal controls over financial reporting, (ii) assess the adequacy of the Company's internal controls over financial reporting, (iii) take steps to improve control processes where appropriate and (iv) validate through testing that controls are functioning as documented  There can be no assurance that deficiencies or weaknesses in the design or operation of internal controls over financial reporting will not be found and, if found. that the Company will have sufficient time to remediate any such deficiencies or weaknesses and perform testing procedures before the end of 2007

The Company believes that any system of internal accounting controls, no matter how well designed and operated, can provide only reasonable (and not absolute) assurance that all of its objectives will be met, including the detection of fraud  Furthermore, no evaluation of internal accounting controls can provide absolute assurance that all control issues and instances of fraud. if any. have been detected

The Company continues to reduce its workforce, consolidate its operations and outsource certain functions  Accordingly, responsibility for administration. management and review of many of the Company's assets has transitioned among FINOVA's remaining personnel  Management has supervised these transitions and has implemented procedures it believes provide effective disclosure and internal controls over financial reporting  The Company is assessing the efficacy of these procedures and will continue to do so in subsequent periods  FINOVA recognizes that a substantial unanticipated reduction in employees could increase internal control risk

## PART II OTHER INFORMATION

### Item 1.    Legal Proceedings

See Part I, Item 1, Note H "Litigation and Claims" for a discussion of certain legal proceedings

### Item 1A.    Risk Factors

There were no material changes from the information provided in the Company's Annual Report on Form 10-K for the year ended December 31. 2005

### Item 6.    Exhibits

| | |
|---|---|
| 31 1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31 2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32 1 | Certification of Chief Executive Officer pursuant to 18  U S C  1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32 2 | Certification of Chief Financial Officer pursuant to 18  U S C  1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

24

Source: FINOVA GROUP INC. 10-Q. October 30, 2006

Table of Contents

THE FINOVA GROUP INC.

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized

THE FINOVA GROUP INC.

(Registrant)

Date: October 30, 2006

By:___/s/ Richard A. Ross_____
       Richard A  Ross.

       Senior Vice President – Chief Financial Officer & Treasurer
       (principal financial officer)

25

Source: FINOVA GROUP INC. 10-Q, October 30, 2006

Table of Contents

EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 31 1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes–Oxley Act of 2002 |
| 31 2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes–Oxley Act of 2002 |
| 32 1 | Certification of Chief Executive Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 |
| 32 2 | Certification of Chief Financial Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 |

Source: FINOVA GROUP INC. 10-Q, October 30, 2006

Exhibit 31 1

## CERTIFICATIONS

I, Thomas E Mara. certify that:

1    I have reviewed this quarterly report on Form 10–Q of The FINOVA Group Inc ;

2    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made. not misleading with respect to the period covered by this report;

3    Based on my knowledge, the financial statements. and other financial information included in this report. fairly present in all material respects the financial condition. results of operations and cash flows of the registrant as of. and for. the periods presented in this report;

4    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15 (e) and 15d–15 (e)) for the registrant and have:

    a)    Designed such disclosure controls and procedures. or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant. including its consolidated subsidiaries. is made known to us by others within those entities. particularly during the period in which this report is being prepared;

    b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's third fiscal quarter of 2006 that has materially affected, or is reasonably likely to materially affect. the registrant's internal control over financial reporting; and

5    The registrant's other certifying officer and I have disclosed. based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record. process, summarize and report financial information; and

    b)    Any fraud, whether or not material. that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: October 30, 2006

By:  /s/ Thomas E. Mara
        Thomas E Mara
        Chief Executive Officer

Source: FINOVA GROUP INC. 10–Q. October 30. 2006

Exhibit 31 2

## CERTIFICATIONS

I. Richard A  Ross, certify that:

1       I have reviewed this quarterly report on Form 10–Q of The FINOVA Group Inc ;

2       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made. not misleading with respect to the period covered by this report;

3       Based on my knowledge. the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of. and for. the periods presented in this report;

4       The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15 (e) and 15d–15 (e)) for the registrant and have:

    a)      Designed such disclosure controls and procedures. or caused such disclosure controls and procedures to be designed under our supervision. to ensure that material information relating to the registrant. including its consolidated subsidiaries. is made known to us by others within those entities. particularly during the period in which this report is being prepared;

    b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures. as of the end of the period covered by this report based on such evaluation; and

    c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's third fiscal quarter of 2006 that has materially affected, or is reasonably likely to materially affect. the registrant's internal control over financial reporting; and

5       The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting. to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)      Any fraud, whether or not material. that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: October 30, 2006                                          By:  /s/ Richard A. Ross
                                                                     Richard A  Ross
                                                                     Chief Financial Officer

                                                                     (principal financial officer)

Source: FINOVA GROUP INC. 10–Q. October 30. 2006

259

Exhibit 32 1

## CERTIFICATION

### PURSUANT TO 18 U.S.C. SECTION 1350,

### AS ADOPTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Thomas E Mara, as Chief Executive Officer of The FINOVA Group Inc (the "Company") certify, pursuant to 18 U S C ss 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) the accompanying Form 10-Q report for the quarterly period ending September 30, 2006 as filed with the U.S Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company

Date: October 30, 2006                    By:  /s/ Thomas E. Mara
                                               Thomas E  Mara
                                               Chief Executive Officer

Source: FINOVA GROUP INC. 10-Q, October 30, 2006

Exhibit 32 2

CERTIFICATION

PURSUANT TO 18 U.S.C. SECTION 1350,

AS ADOPTED BY SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002

I, Richard A Ross, as Chief Financial Officer of The FINOVA Group Inc (the "Company") certify, pursuant to 18 U S C ss 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that to my knowledge:

(1) the accompanying Form 10–Q report for the quarterly period ending September 30, 2006 as filed with the U.S Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company

Date: October 30, 2006                                    By:  /s/ Richard A. Ross
                                                               Richard A Ross
                                                               Chief Financial Officer

                                                               (principal financial officer)

Created by 10KWizard    www.10KWizard.com

Source: FINOVA GROUP INC. 10–Q, October 30, 2006

**EXHIBIT B TO REQUEST**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case Nos. 01-06978(PJW) |
| FINOVA CAPITAL CORPORATION, | Jointly Administered |
| Reorganized Debtor. | Re: Docket No. [ ] |

## FINAL ORDER REGARDING DEBTORS' MOTION REQUESTING CLARIFICATION OF CONFIRMED CHAPTER 11 PLAN

This matter coming before the Court on the Request for Entry of Final Order in Clarification Motion Contested Matter (the "Request") relating to the Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provisions of the Confirmed Plan, dated April 1, 200 [Docket No. 22] (the "Clarification Motion");[1] the Court having entered an order on February 1, 2006 [Docket No. 100] ordering that for the reasons set forth on the record at the hearing held before the Court on November 29, 2005 (the "Clarification Hearing") [Docket No. 80] and the Court's Letter to Counsel with respect to Court's Ruling on the Reorganized Debtor's Motion for an Order Clarifying the Confirmed Plan, dated December 2, 2005 (the "Clarification Letter") [Docket No. 78], the Clarification Motion was approved to the extent that the Debtor is presently and will be forever insolvent; and the Court having reviewed the Request and the Supplemental Declaration of Richard A. Ross in Support of Request for Entry of Final Order in Clarification Motion Contested Matter (the "Declaration")

---

[1] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Clarification Motion.

[Docket No. [ ]]; and upon consideration of the supporting papers and the files and records in this case, and upon the arguments and testimony presented at the hearing before the Court (if any), and any objections to the Request having been withdrawn or overruled on the merits, this Court finds and concludes that: (a) the Court has jurisdiction over the subject matter of the Request and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (b) the legal and factual bases set forth in the Request and the Declaration and on the record at the hearing (if any) establish just cause for the relief granted herein; (c) the Reorganized Debtors are and will forever be insolvent; (d) any payment to equity is and will forever be an Impermissible Restricted Payment as defined in the Indenture and the provisions in Section 4.06(a)(v) of the Indenture prohibiting payments to equity will continue indefinitely; and (e) notice of the Request was sufficient under the circumstances, and no other or further notice need be provided.

Based upon the above findings and conclusions, and after due deliberation and sufficient cause appearing therefor,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Request is APPROVED.

2.    For the reasons set forth on the record at the Clarification Hearing, in the Clarification Letter, in the Request and in the Declaration, the Clarification Motion is APPROVED on a final basis.

3.    This Order shall be construed as a finding that the Reorganized Debtors presently are and will forever be insolvent and that any payment to equity is and will forever be an Impermissible Restricted Payment.

2

4.     This Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Order.

Dated: _____, 2007
        Wilmington, Delaware

_____
THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

3

## CERTIFICATE OF SERVICE

I, Michael J. Merchant, hereby certify that on January 8, 2007, I caused copies of

the foregoing **Request for Entry of Final Order in Clarification Motion Contested Matter** to

be served on the attached service list in the manner indicated.

Michael J. Merchant (No. 3854)

RLF1-2659431-1

*Representing Office of the United States Trustee*
David Buchbinder
Office of the United States Trustee
844 King St., Suite 2313
Lockbox 35
Wilmington, DE 19801
*(Via Hand Delivery)*

*Representing the Bank of New York as the Indenture Trustee for Finova Group Inc.'s Bonds)*
The Bank of New York
Corporate Trust Administration
101 Barclay Street, 21st Floor West
New York, NY 10286
*(Via First Class Mail)*

Securities & Exchange Commission
Attention: Nathan Fuchs
233 Broadway
New York, NY 10279
*(Via First Class Mail)*

Securities & Exchange Commission
15th & Pennsylvania Avenue, N.W.
Washington, D.C. 20020
*(Via First Class Mail)*

*Representing First Carolina Investors, Inc. and Eugene Linden and the Official Committee of Equity Security Holders*
William D. Sullivan
Elihu E. Allinson
William D. Sulliva, LLC
4 East 8th Street
Wilmington, Delaware 19801
*(Via Hand Delivery)*

*Representing First Carolina Investors, Inc.*
David M. Stark
Garry M. Graber
Hodgson Russ LLP
One M&T Plaza, Suite 2000
Buffalo, NY 14203-2391
*(Via First Class Mail)*

*Representing Eugene Linden and the Official Committee of Equity Security Holders*
Mark. D. Silverschotz
John L. Scott, Jr.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182
*(Via First Class Mail)*

*Representing Rozann Chernov (Equity Holder)*
Bradley J. Stevens
Janet B. Hutchison
Robbins & Green, P.A.
3300 North Central Avenue, Suite 1800
Phoenix, AX 85012
*(Via First Class Mail)*

*Representing Tennessee Department of Labor & Workforce Development - Unemployment Insurance*
c/o TN Attorney General's Office,
Bankruptcy Division
P.O. Box 20207
Nashville, TN 37202-0207

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington D.C. 20549**

# FORM 10-K

*Annual Report pursuant to Section 13 of the*
*Securities Exchange Act of 1934*

For the fiscal year ended December 31, 2006

Commission file number 1-11011

# THE FINOVA GROUP INC.

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware** | **86-0695381** |
| (State or other jurisdiction of incorporation) | (I.R.S. employer identification no.) |
| **8320 North Hayden Road, Suite C112** | |
| **Scottsdale, AZ** | **85258** |
| (Address of principal executive offices) | (Zip code) |

**Registrant's Telephone Number, Including Area Code: 480-624-4988**

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:

*Title of Class:*
**Common Stock, $0.01 par value**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐  No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.

Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Registration S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment of this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large Accelerated Filer ☐        Accelerated Filer ☐        Non-Accelerated Filer ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐  No ☑

**EXHIBIT**

tabbies

2

On March 19, 2007, the registrant had approximately 122,041,000 shares of Common Stock ($0.01 par value) outstanding.

Aggregate market value of Common Stock, held by nonaffiliates of the registrant as of June 30, 2006 (based on its closing price per share on that date of $0.11) was approximately $6.7 million.

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

Yes ☑   No ☐

**DOCUMENTS INCORPORATED BY REFERENCE:**
None.

269

**TABLE OF CONTENTS**
**NAME OF ITEM**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 5 |
| Item 1B. | Unresolved Staff Comments | 8 |
| Item 2. | Properties | 8 |
| Item 3. | Legal Proceedings | 8 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 10 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 10 |
| Item 6. | Selected Financial Data | 11 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 7A. | Quantitative and Qualitative Disclosure About Market Risk | 12 |
| Item 8. | Financial Statements and Supplemental Data | 12 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 12 |
| Item 9A. | Controls and Procedures | 12 |
| Item 9B. | Other Information | 13 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 13 |
| Item 11. | Executive Compensation | 15 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 19 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 20 |
| Item 14. | Principal Accountant Fees and Services | 22 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 22 |
| Signatures | | 26 |

## PART I

### Item 1.    Business.

#### *General*

The following discussion relates to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital"). FINOVA is a financial services holding company. Through its principal operating subsidiary, FINOVA Capital, the Company has provided a broad range of financing and capital markets products, primarily to mid-size businesses. Throughout this document, "we," "us" and "our" also refer to The FINOVA Group Inc. and its subsidiaries. FINOVA is a Delaware corporation incorporated in 1991. Our principal executive offices have recently moved to 8320 North Hayden Road, Suite C112, Scottsdale, Arizona 85258, telephone (480) 624-4988.

Since emergence from chapter 11 bankruptcy proceedings in August 2001, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of assets. These activities have included collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral. We have sold substantial portions of asset portfolios and are considering future sales of our remaining assets if buyers can be found at acceptable prices; however, there can be no assurance that we will be successful in efforts to sell additional assets. We are currently offering to sell our remaining assets both by portfolio and individual asset. We are prohibited by the Indenture (the "Indenture") governing our 7.5% Senior Secured Notes (the "Senior Notes") from engaging in any new lending activities or other business, except to honor existing customer commitments and in certain instances, to restructure financing relationships to maximize value. Any funds generated in excess of cash reserves permitted by our debt agreements have been used to reduce obligations to our creditors.

As of December 31, 2006, we remain obligated to repay $1.5 billion of principal on the Senior Notes. In accordance with the terms of the Indenture, we are required to use any excess cash, as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at our option. Although we have repaid approximately 50% of the Senior Notes as of the date of this report, we do not have sufficient assets to fully repay the Senior Notes.

On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). On December 4, 2006, the Bankruptcy Court granted our Motion and approved (i) the previously announced settlement of various litigations associated with The Thaxton Group, Inc. (the "Thaxton Settlement"), (ii) the ongoing sale of our remaining assets, the orderly windup of our operations and our future dissolution, (iii) our sale of all or substantially all of our assets without stockholder approval and our future dissolution without stockholder approval at such time as our Board deems to be appropriate and (iv) channeling to the Bankruptcy Court any claims against us that the holders of our Senior Notes or the indenture trustee for the Senior Notes may have arising from or in any way related to our joint chapter 11 plan, the ongoing liquidation of FINOVA, the senior secured notes, or the windup of our operations.

As a result of the aforementioned approvals, we have taken steps to initiate our complete liquidation and as such, the information provided in this Annual Report on Form 10-K reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States. Historical information for periods prior to December 5, 2006 is presented on a going concern basis of accounting. Under the liquidation basis of accounting, we are required to value all assets at their estimated net realizable value, which is the non-discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non-discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs. Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). These estimates will be periodically reviewed and adjusted as appropriate. There can be no assurance that these estimated values will be realized. Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution.

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of the remaining assets, the resolution of claims and other litigation matters, the extent to which reserves for current or future liabilities are required and the length of time required to settle all of our matters. Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims. Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to 24 months or the end of 2008.

1

**Table of Contents**

We will continue to operate as a public company throughout the liquidation period under a Management Services Agreement with Leucadia National Corporation ("Leucadia") that expires in 2011. Pursuant to that agreement, Leucadia has designated its employees to act as Chairman of the Board (Ian M. Cumming), President (Joseph S. Steinberg) and Chief Executive Officer (Thomas E. Mara). We will maintain adequate cash reserves to pay all operating expenses as they come due in accordance with the Indenture.

*High Investment Risk*

**As previously stated, we will not be able to fully repay the Senior Notes or make any distributions to our stockholders, absent a court order in connection with the litigation disclosed in Item 3 "Legal Proceedings – Motion Regarding Distribution to Stockholders." Consequently, investing in the Senior Notes and common stock involves a high level of risk. Refer to Management's Discussion and Analysis of Financial Condition and Results of Operation for a further discussion of the Senior Notes and restrictions on distributions to stockholders.**

Because substantially all of our assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure obligations under the Intercompany Notes (as defined in Management's Discussion and Analysis of Financial Condition and Results of Operations) securing the Senior Notes, our ability to obtain additional or alternate financing is severely restricted. Berkadia LLC ("Berkadia"), an entity jointly owned by Berkshire Hathaway Inc. and Leucadia, has no obligation to lend additional sums to or to further invest in the Company. Accordingly, we intend to rely on internally generated cash flows from the liquidation of assets as our only meaningful source of liquidity.

*Portfolio Composition and Activity*

The asset liquidation process has resulted in a significant reduction to the size of our niche portfolios. To facilitate the orderly collection of our remaining assets, we combined our former operating segments into one operating unit; however, our assets continue to be concentrated in certain specific market niches.

Since our portfolio is primarily concentrated in specialized industries, we are subject to both general economic risk and the additional risk of economic downturns within individual sectors of the economy, particularly those impacting the aviation industry. We also completed multiple financial transactions with individual borrowers and their affiliates, resulting in a greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including aviation) of those borrowers and their affiliates.

At December 31, 2006, the carrying value on a liquidation basis of our top 10 aggregate exposures to borrowers and their affiliates totaled approximately $148.9 million and represented 84.8% of our liquidating portfolio (excluding the severance and bonus trusts of $10.1 million), as compared to our top 10 exposures (on a going concern basis) at December 31, 2005 of $220.3 million, which represented 64.6% of total financial assets (before reserves and excluding the severance and bonus trusts of $14.4 million). The top 10 exposures at December 31, 2006 were primarily concentrated in aviation assets and the loan to The Thaxton Group, which alone makes up about 48% of the net realizable value expected from our liquidating portfolio. As of the date of this report, all of our top 10 exposures have either been liquidated, are under binding definitive agreements or letters of intent to sell or are subject to a negotiated settlement.

2

**Table of Contents**

At December 31, our transportation portfolio consisted of the following aircraft:

**2006**

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (years) |
|---|---|---|---|---|
| Airbus 300 | 1 | | 1 | 23 |
| Boeing 727 | 1 | | 1 | 28 |
| Boeing 737 | 4 | 4 | | 18 |
| McDonnell Douglas DC 10 | 7 | | 7 | 29 |
| McDonnell Douglas MD-80 series | 9 | 9 | | 22 |
| Regional jets, corporate aircraft and turbo props | 10 | 10 | | 20 |
| Total | 32 | 23 | 9 | 23 |

**2005**

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (years) |
|---|---|---|---|---|
| Airbus 300 | 3 | | 3 | 24 |
| Boeing 727 | 9 | 4 | 5 | 26 |
| Boeing 737 | 13 | 13 | | 20 |
| Boeing 747 | 1 | | 1 | 17 |
| Boeing 757 | 4 | 4 | | 12 |
| McDonnell Douglas DC 8 and DC 9 | 4 | 4 | | 34 |
| McDonnell Douglas DC 10 | 9 | 1 | 8 | 28 |
| McDonnell Douglas MD-80 series | 17 | 17 | | 20 |
| Regional jets, corporate aircraft and turbo props | 29 | 29 | | 13 |
| Total | 89 | 72 | 17 | 19 |

The aircraft presented in the tables represent owned assets and collateral supporting financing arrangements.

At December 31, 2006, 12 aircraft were operated by domestic carriers, while 19 aircraft were operated by foreign carriers. Additionally, one aircraft was off-lease and parked at a storage facility in the United States. At December 31, 2005, 33 aircraft were operated by domestic carriers, while 45 aircraft were operated by foreign carriers. Additionally, 11 aircraft were off-lease and parked at various storage facilities in the United States and Europe, including two aircraft, which were identified for potential dismantling or sale at scrap values.

As of the date of this report, we had 32 aircraft with a total carrying value on a liquidation basis of approximately $85.1 million that had either been liquidated subsequent to December 31, 2006, are under individual letters of intent to sell or are subject to a definitive agreement to sell. Due to the fact these aircraft are operating throughout the world, additional time will be necessary to close the sales. It is to our advantage to close these transactions when the aircraft are in tax friendly jurisdictions to minimize transfer taxes. No assurance can be given that all of these commitments will result in actual sales or the timing of such sales, but all of the aircraft are targeted to close by the end of the first quarter of 2007. There is a possibility for a small number of aircraft sales to slide into the second quarter of 2007.

In addition to the aircraft noted above, our transportation portfolio also includes 13 engines, miscellaneous parts and some unsecured aviation notes and claims with a total carrying value on a liquidation basis of approximately $5.0 million as of December 31, 2006. The majority of these assets have either been liquidated subsequent to December 31, 2006, are under individual letters of intent to sell or are subject to a definitive agreement to sell. We are in the process of marketing the remaining uncommitted assets for sale, all of which are targeted for closure by the end of the first quarter of 2007.

Refer to Management's Discussion and Analysis of Financial Condition and Results of Operations for a further discussion of portfolio activity.

3

Table of Contents

### Customer Requirements

Our financing contracts and leases generally require customers to pay taxes, license fees and insurance premiums and to perform maintenance and repairs at the customer's expense. Contract payment rates for existing customers are based on several factors, including the cost of borrowed funds, term of the contract, creditworthiness of the customer, type and nature of collateral and other security and, in leasing transactions, the timing of tax effects and estimated residual values. In true lease transactions, lessees are granted an option to purchase the equipment at the end of the lease term at its then fair market value and, in some cases, are granted an option to renew the lease at its then fair rental value. The extent to which lessees exercise their options to purchase leased equipment varies from year to year, depending on, among other factors, the state of the economy, the financial condition of the lessee, interest rates, and technological developments.

### Portfolio Management

Our portfolio management personnel generally perform detailed reviews and assessments of customer financial statements to analyze financial performance and trends, conduct periodic assessments, appraisals and/or verification of the underlying collateral, seek to identify issues concerning strengths, weaknesses and vulnerabilities of the customer, seek to resolve outstanding issues with the customer, and periodically review and address covenant compliance issues.

Evaluations of borrower performance are an important aspect of the portfolio management review process. In conjunction with this process, portfolio managers update anticipated portfolio cash flows. These evaluations and cash flows serve as a significant component in the determination of portfolio impairment.

### Delinquencies and Workouts

We monitor the timing of payments on our accounts and have established policies and procedures for collection of delinquencies. These policies and procedures are generally employed, unless in the opinion of management, an alternate course is warranted. Generally, for term loans and leases, when an invoice is past due, the customer is contacted and a determination is made as to the extent of the problem, if any. A commitment for immediate payment is pursued and the account is observed closely. If an invoice for principal or interest becomes 31 days past due, it is reported as delinquent. A notice of default is generally sent prior to an invoice becoming 45 days past due if satisfactory discussions are not in progress. Between 60 and 90 days past the due date, if satisfactory negotiations are not underway, outside counsel may be retained to help protect our rights and to pursue remedies. If satisfactory results are not obtained as a result of communication with the customer, guarantors, if any, are usually contacted to advise them of the situation and their potential obligation under the guarantee agreement.

### Governmental Regulation

Our activities, including the financing of our operations, are subject to a variety of federal and state regulations, such as those imposed by the Federal Trade Commission, the Securities and Exchange Commission, the Internal Revenue Service, the Consumer Credit Protection Act, the Equal Credit Opportunity Act and the Interstate Land Sales Full Disclosure Act. Additionally, a majority of states have ceilings on interest rates that are charged to customers in financing transactions. Some of our financing transactions and servicing activities are subject to additional government regulation. For example, aircraft financing is regulated by the Federal Aviation Administration and communications financing is regulated by the Federal Communication Commission. Our international activities are also subject to a variety of laws and regulations of the countries in which business is conducted. Our operations during the reorganization proceedings were also subject to oversight by the bankruptcy court, which has retained jurisdiction to resolve claims resulting from that restructuring.

### Employees

At December 31, 2006, we had 32 employees compared to 60 and 101 at December 31, 2005 and 2004, respectively. As a result of the continued wind-up of our affairs and the sales activity discussed above, we anticipate a significant reduction in employees to occur in early 2007. By the end of April, we anticipate that we will have reduced our workforce to approximately five employees; however, the pace of employee reductions may change as necessitated by our operations, the timing of scheduled asset sales or other factors.

4

**Table of Contents**

The scheduled employee reductions are intended to reflect the significant continuing liquidation of our portfolio, while retaining appropriate oversight of the smaller operation and maintaining adequate resources to deal with outstanding claims and the future dissolution of our entities.

Employees are covered by a severance program, which was approved by our Board of Directors and continues with no fixed expiration date. We have also developed an annual performance-based incentive program for employees. In an effort to maintain the stability of our workforce through the remainder of the liquidation, our Board of Directors previously approved the establishment of two grantor trusts to secure obligations under the severance and bonus programs. These trusts, which did not increase the obligations to employees, were initially funded during 2003 and totaled $10.1 million at December 31, 2006.

### Investor Information

We are subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Accordingly, we file periodic reports and other information with the Securities and Exchange Commission (the "SEC"). Those reports and other information may be obtained by visiting the Public Reference Room of the SEC at 450 Fifth Street, NW, Washington, D.C. 20549 or by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains an Internet site (http://www.sec.gov) that contains reports, information statements and other information regarding issuers that file electronically.

You can access financial and other information on our website. The address is www.finova.com. We also make available on our website, free of charge, copies of our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act within two business days after filing that material with the SEC.

We have a Code of Conduct applicable to all of our employees, including our Chairman, President, Chief Executive Officer and Chief Financial Officer. A copy of the Code of Conduct is available on our website. We intend to post any amendments to, or waivers from, the Code of Conduct applicable to the senior officers listed above.

### Item 1A.    Risk Factors

An investment in our Senior Notes and common stock involves a high degree of risk. The risks can generally be divided into three categories: risks relating to our Plan of Liquidation; risks relating to our assets and liabilities; and risks relating to our organization and structure. The risks, uncertainties and other factors that could cause our net assets in liquidation and cash flows to differ materially from those suggested by this filing or which may materially and adversely affect our performance and the timing and amount repaid to the Senior Note holders include, but are not limited to, those discussed below or identified elsewhere in this Report or from time to time in our public filings.

### Risks related to our Plan of Liquidation

**We cannot assure the Senior Note holders of the timing or amount of their liquidating distributions.** If note holders believe that we will be unable to complete our Plan of Liquidation in a timely manner or if liquidating distributions do not meet current estimates, the market price of our notes may decline.

As a result of the adoption of the Plan of Liquidation, our basis of accounting has changed from the going-concern basis to that of the liquidation basis of accounting. Under the liquidation basis of accounting, assets are stated at their estimated net realizable value and liabilities are stated at their estimated settlement amount. These estimates will be periodically reviewed and adjusted as appropriate. The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances of the net realizable value of our assets and the costs associated with carrying out the Plan of Liquidation based on certain assumptions. The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from the amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material. In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation. Accordingly, it is not possible to predict with certainty the aggregate amount which will ultimately be distributed to note holders and no assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statement of Net Assets in Liquidation or the price at which the Senior Notes have traded or are expected to trade in the future.

5

## Table of Contents

A number of other factors including (i) unknown liabilities or claims, (ii) greater or less than expected expenses, and (iii) greater or less than anticipated net proceeds of asset sales could result in the distributions to the Senior Note holders being more or less than anticipated or delayed.

**As a result of the adoption of a Plan of Liquidation, potential purchasers of our assets may try to take advantage of our liquidation process and offer less-than-optimal prices for our assets.** We cannot predict how these factors and changes in aviation markets and the national economy or other factors may affect the prices that we can obtain from sales of our remaining assets or the timing of such sales.

**It is becoming more difficult to offset the costs of collecting the remaining portfolio.** As we continue to liquidate assets and change our portfolio composition, it becomes increasingly more difficult to offset the costs associated with collecting the remaining portfolio and being a public company. Additionally, we incur the risks of potential liabilities that are associated with dispositions of assets, in the form of indemnifications, representations and warranties.

**Our Board may abandon the Plan of Liquidation without further action by our stockholders or the Bankruptcy Court.** Furthermore, our Board may modify the Plan of Liquidation as necessary, but any material amendment may require further approval of the Bankruptcy Court or stockholders. Thus, we may decide to conduct the liquidation differently than as described, to the extent we are permitted to do so by Delaware law.

At any time, we may transfer to a liquidating trust any assets not sold or distributed, subject to outstanding liabilities. If a liquidating trust were established, we would distribute to the then holders of Senior Notes interests in the liquidating trust in proportion to the number of notes owned by such note holders. Such a distribution could have tax ramifications to note holders.

**Historically, extraordinary corporate actions, such as a plan of liquidation, often lead to securities lawsuits being filed against a company.** We are currently not aware of any pending securities lawsuits relating to our Plan of Liquidation; however, in the event such litigation should occur, it is likely to be expensive and, even if we ultimately prevail, the process will be time consuming and will divert management's attention from implementing the Plan of Liquidation and otherwise operating our business. If we do not prevail in any such lawsuit, we may be liable for damages, the validity of our approval of the Plan of Liquidation may be challenged, or we may be unable to complete some transactions that we contemplated as part of the Plan of Liquidation. We cannot predict the outcome or the amount of expenses and damages, but the amounts could have a material adverse effect on our business, net assets in liquidation, cash flows and the timing and amount of liquidating distributions to Senior Note holders.

### *Risks related to our Assets and Liabilities*

**Our ability to sell the remaining assets is impacted by limitations of buyers.** Risks associated with the sale of our assets, which if they materialize, could have a material adverse effect on our business, net assets in liquidation and cash flows include:

- Lack of demand by prospective buyers;
- Inability to find qualified buyers;
- Inability of buyers to obtain satisfactory financing;
- Lower than anticipated sale prices; and
- The inability to close on sales of assets under contract.

**Our net assets in liquidation and cash flows are greatly affected by economic conditions and the performance of our borrowers.** Economic conditions in general or in particular market segments could impair the ability of our borrowers to operate or expand their businesses, which might result in decreased performance, adversely affecting their ability to repay their obligations to us. If this were to occur, the rate of borrower defaults or bankruptcies may increase. A worsening of economic conditions could adversely affect our ability to realize estimated cash flows.

**Continued instability and uncertainty in the airline industry could adversely affect the value of our aircraft portfolio, lease rates and demand.** Conditions affecting our aircraft portfolio, include changes in Federal Aviation Administration directives and demand for used aircraft and spare parts. Our aircraft are often of older vintage and contain configurations of engines, avionics, fuel tanks and other components that may not be as high in demand as other available aircraft in that class. Future demand for those aircraft may decrease as newer or more desirable aircraft and components become available. High fuel prices may adversely affect the demand for less fuel-efficient aircraft, including many of those in our portfolio.

6

Table of Contents

**We rely on information from third parties, which may not be accurate.** Third party information is supplied by our borrowers or prepared by appraisers. Inaccuracies in that information could lead to inaccuracies in our estimates, including asset valuations and cash flow projections.

**We are increasingly subject to concentrations of credit risk.** As our portfolio declines, increasing concentrations of financial assets in certain industries such as aviation could make our overall portfolio more sensitive to changes in performance in that industry. Additionally, we previously completed multiple financial transactions with individual borrowers and their affiliates. As a result, we are subject to greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including aviation) of such borrowers and their affiliates.

**Current and future legal and administrative claims and proceedings against us may result in increased costs and diversion of management's attention.** We are party either as plaintiff or defendant to various actions, proceedings and pending claims, including legal actions, some of which involve claims for compensatory, punitive or other damages in significant amounts. Litigation often results from our attempts to enforce our lending agreements against borrowers and other parties to those transactions. Litigation is subject to many uncertainties. It is possible that some of the legal actions, proceedings or claims could be decided against us. Legal matters decided against us could have a material adverse impact on our net assets in liquidation or cash flows. See Item 3. "Legal Proceedings," for a discussion of specific claims outstanding against us.

**We have current and future obligations to creditors.** Claims, liabilities and expenses from operations (such as operating costs, salaries, bonuses, management fees, directors' and officers' insurance, payroll and local taxes, legal professional services, accounting and consulting fees and miscellaneous office expenses) will continue to be incurred through the liquidation process. As part of this process, we will attempt to satisfy any obligations with creditors remaining after the sale of our assets. These expenses will reduce the amount of assets available for ultimate distribution to Senior Note holders. To the extent our liabilities exceed the estimates that we have made, the amount of liquidating distributions to Senior Note holders will be reduced.

**Cash reserve estimations are subject to known and unknown risks, uncertainties, and other factors that could materially impact our ability to meet obligations as they come due.** The terms of the Indenture governing the Senior Notes prohibit us from using available funds (after certain permitted uses) for any purpose other than to satisfy our obligations to creditors and to make limited payments to stockholders in certain circumstances. Under the terms of the Indenture, we are permitted to establish a cash reserve in an amount not to exceed certain defined criteria. Due to our limited sources of liquidity, the estimation of cash reserves is critical to our overall liquidity. Failure to adequately estimate a cash reserve in one period could result in insufficient liquidity to meet obligations in that period, or in a subsequent period, if actual cash requirements exceed the cash reserve estimates. Historically, cash reserves typically equaled anticipated cash flows to cover operating costs, tax payments, fundings under existing customer commitments, interest payments and any other necessary cash flows expected to occur during the next six month period. We have the discretion to and have from time to time adjusted our cash reserve methodology. As we continue to liquidate assets, our incoming cash flows will diminish and the estimation of cash reserves will become increasingly more critical to ensure we retain sufficient funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process.

**Cash investments are subject to credit exposure and interest rate fluctuations, which could result in the increase or decrease in the value of the investments.** A substantial portion of our cash reserves are invested in short-term instruments, including money markets, federal agencies, government sponsored enterprises, commercial paper and other investments. Although our investment policy is designed to provide for short-term liquidity and low levels of risk, such investments are subject to credit exposure and interest rate fluctuations. Consequently, the value of investments could increase or decrease accordingly. Any decrease would reduce the amount available for distribution to Senior Note holders.

*Risks related to our Organization and Structure*

**We may not be able to retain key employees.** We must retain a sufficient number of employees with relevant knowledge and skills to continue to monitor, collect and sell our portfolio. Additionally, we must retain key employees that are experienced with our internal systems and have the skills to research information that is vital in our ability to refute known and unknown claims that may surface as we complete the liquidation and dissolution process. Our failure to do so could result in additional losses or more cash being directed towards the settlement of claims. Retention incentives intended to retain those key employees may not be successful in the future. In addition, as staff is reduced, internal controls and procedures must be readjusted to help assure proper handling and reporting of financial and other matters. Doing so becomes more difficult as our staff is reduced, and the loss of key personnel could have a significant impact on our ability to maximize value from our portfolio and minimize the settlement of claims.

7

Table of Contents

**It is unlikely we will be able to utilize our tax attributes.** We have not recorded a benefit in our financial statements for existing tax attributes and estimated future tax deductions since we do not expect to generate the future taxable income needed to use those tax benefits. We do not anticipate being able to use those tax attributes, including most of our net operating loss carryforwards.

**We intend to continue to conduct our operations in a manner that will exempt us from the registration requirements of the Investment Company Act of 1940 (the "1940 Act").** We believe that we are not within or will not be within the definition of "investment company" as that term is defined under the 1940 Act, or alternatively, we may rely on one or more of the 1940 Act's exemptions. If we were deemed to be an investment company because of our investment securities holdings, we must register as an investment company under the 1940 Act. The 1940 Act places significant restrictions on the capital structure and corporate governance of a registered investment company. Compliance with the 1940 Act could also increase our operating costs. Such changes could have a material adverse effect on our business and the timing and amount of liquidating distributions to Senior Note holders.

### Item 1B.    Unresolved Staff Comments.

Not applicable.

### Item 2.    Properties.

Our principal executive offices have recently moved to 8320 North Hayden Road, Suite C112, Scottsdale, Arizona 85258, telephone (480) 624-4988.

As a result of the continued liquidation and sale of assets, we have consolidated operations and reduced staff, resulting in the need for less office space. By early 2007, we have closed all corporate offices and moved the remaining residual staff to the new location, noted above. This new executive office is on a short-term lease and has no termination costs associated with our ultimate departure. The office closures were completed in conjunction with the expiration of their lease terms and as a result, we incurred no termination costs. We continue to maintain a liability for lease termination damages associated with two UK offices that were previously abandoned. Settlement negotiations with these landlords are on going and expected to be resolved during early 2007. See Annex A, Notes to Consolidated Financial Statements, Note L. "Operating Leases" for more information about the termination costs.

### Item 3. Legal Proceedings.

We are party either as plaintiff or defendant to various actions, proceedings and pending claims, including legal actions, some of which involve claims for compensatory, punitive or other damages in significant amounts. Litigation often results from our attempts to enforce our lending agreements against borrowers and other parties to those transactions. Litigation is subject to many uncertainties. It is possible that some of the legal actions, proceedings or claims could be decided against us. Other than the matters described below, we believe that any resulting liability from our legal proceedings should not materially affect our net assets in liquidation or cash flows. The following matters could have a material adverse impact on our net assets in liquidation or cash flows.

It is our policy to accrue for loss contingencies, including litigation, only when the losses are probable and estimable. The determination of when losses become probable and estimable is inherently subjective and requires significant judgment, which may change, including in response to factors outside our control.

If any legal proceedings result in a significant adverse judgment against us, it is unlikely that we would be able to satisfy that liability due to our financial condition. As previously noted, due to our financial condition, we do not expect that we can satisfy all of our secured debt obligations at maturity. Attempts to collect on those judgments could lead to future reorganization proceedings of either a voluntary or involuntary nature.

8

278

Table of Contents

### Litigation Related to Loans to The Thaxton Group Inc. and Related Companies

Our prior periodic filings with the Securities and Exchange Commission have disclosed ongoing litigation against FINOVA Capital with respect to The Thaxton Group Inc. ("TGI") and several related entities (collectively, the "Thaxton Entities").

Pursuant to an order of the Thaxton Entities bankruptcy court dated September 11, 2006, we transferred all of the cash received from the Thaxton Entities since commencement of the Thaxton Entities chapter 11 proceedings in October 2003, together with interest earned thereon (an aggregate of approximately $97.2 million), to a trust account to be held by Thaxton under order of the bankruptcy court. No funds in this account will be disbursed other than in accordance with the terms of an order of the bankruptcy court.

On September 12, 2006, we reached a preliminary settlement (the "Settlement") to resolve all outstanding claims in the ongoing litigation between us, the Thaxton Entities, the holders of subordinated notes issued by the Thaxton Entities (the "Noteholders"), and the Official Committee of Unsecured Creditors of the Thaxton Entities. This Settlement will settle all of the actions involving us and the Thaxton Entities, in particular the actions pending in the United States District Court for the District of South Carolina, Anderson Division (the "District Court"), including the previously described new Thaxton action commenced in the District Court in June 2006, as well as claims in the Thaxton Entities chapter 11 proceedings (collectively, the "Thaxton Litigation").

Under the principal terms of the Settlement, which was approved by our Board of Directors on September 11, 2006 and the bankruptcy court for the FINOVA Capital and Thaxton Entities bankruptcies in December 2006, on the effective date of the Thaxton Entities plan of reorganization, we will receive all amounts we transferred into the trust on September 11, 2006 – i.e. all amounts paid by the Thaxton Entities to us since commencement of the Thaxton Entities chapter 11 proceedings in October 2003 (together with interest earned thereon), minus $16 million, plus interest actually earned thereon from August 16, 2006, which will be retained by the Thaxton Entities. In addition, we will receive complete releases from all Thaxton parties for all matters related to the Thaxton Entities. The Settlement also required that the summary judgment order of the District Court be vacated, which occurred on February 15, 2007. Consummation of the Settlement remains subject to approval of a Plan of Reorganization by the Thaxton Entities bankruptcy court. We anticipate that consummation of the Settlement will be implemented in the second quarter of 2007.

### Thaxton Life Partners Litigation

On February 14, 2007, a group of noteholders of Thaxton Life Partners, Inc. ("TLP") filed suit against the Company and FINOVA Capital, unrelated to the Thaxton Entities noted above. The suit (the "TLP Action") purports to be a class action filed on behalf of approximately 150 TLP noteholders with claims related to approximately $20 million in TLP notes. The TLP Action alleges that, in connection with TLP's sale of its notes, the Company, FINOVA Capital, and several other defendants participated in a civil conspiracy, violated the South Carolina Unfair Trade Practices Act, violated the civil RICO statute, and were unjustly enriched. In its various counts, the TLP Action seeks actual, treble, and/or punitive damages.

The TLP Action is currently pending in the United States District Court for the District of South Carolina (the "South Carolina District Court"). We believe that, under the terms of the TLP notes, the TLP Action must move forward in arbitration. The Company and FINOVA Capital have filed a motion with the South Carolina District Court seeking an order compelling such arbitration. No hearing has yet been scheduled on that motion.

We also believe that all claims against both us and FINOVA Capital are without merit. The Company and FINOVA Capital intend to vigorously defend against the TLP noteholders' claims asserted against them. If, however, the TLP Action results in a significant adverse final determination against us or FINOVA Capital, which is not anticipated, it is unlikely that the Company or FINOVA Capital would be able to satisfy that liability due to our financial condition. As previously disclosed, due to our financial condition, we do not expect that we can satisfy all of our secured debt obligations at maturity. Attempts to collect on any such judgment could lead to future reorganization proceedings of either a voluntary or involuntary nature.

### Motion Regarding Distributions to Stockholders

As discussed more fully in the Notes to the Consolidated Financial Statements, Note G. "Debt", the Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5.263% of each principal prepayment. However, the Indenture prohibits distribution of those amounts due to our financial condition. Those amounts are held in a restricted account, and totaled $78.1 million as of December 31, 2006. Because we will not be able to repay the Senior Notes in full, on April 1, 2005, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order (1) to

9

**Table of Contents**

cease directing funds into the restricted account and (2) to allow us to use the funds in the restricted account to satisfy our obligations to creditors.

On February 1, 2006, the Bankruptcy Court issued its order approving our April 1, 2005 motion to the extent that we will be forever insolvent. The Bankruptcy Court did not find that we are presently or will be forever insolvent. As a result, we will continue to direct funds into a restricted account until such time that we are deemed to be forever insolvent and the funds will then be distributed to our creditors.

On December 22, 2006, the reconstituted equity committee filed a motion with the Bankruptcy Court seeking among other things, appointment of a financial expert to review the issue of our solvency, and up to $100,000 to accomplish this task. Over our objection, the Bankruptcy Court granted the equity committee's motion, ordering that the evaluation be completed within sixty (60) days of an order being entered approving the motion.

**Item 4.    Submission of Matters to a Vote of Security Holders.**

No matters were submitted to a vote of security holders during the fourth quarter of 2006.

## PART II

**Item 5.    Market for Registrant's Common Equity and Related Stockholder Matters.**

Our common stock trades over-the-counter ("OTC") under the symbol "FNVG." At December 31, 2006 and 2005, we had approximately 122,041,000 shares of common stock outstanding, 50% of which are held by an affiliate of Berkadia. The following table summarizes the high and low bid prices as reported on the OTC by Commodity Systems Inc. The OTC market quotations reflect inter-dealer prices, without retail markup, markdown or commission, and may not represent actual transactions.

|  | Sales Price Range of Common Stock | | | |
|  | 2006 | | 2005 | |
| Quarters: | High | Low | High | Low |
|---|---|---|---|---|
| First | $ 0.08 | $ 0.06 | $ 0.18 | $ 0.09 |
| Second | 0.12 | 0.06 | 0.10 | 0.04 |
| Third | 0.12 | 0.08 | 0.14 | 0.06 |
| Fourth | 0.10 | 0.06 | 0.08 | 0.05 |

We did not pay or declare any dividends during 2005 and 2006. Stockholders should not expect any payments or distributions. Refer to Item 3. "Legal Proceedings" and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" for a further discussion of stockholder payments and our motion regarding distributions to stockholders.

We have not included a performance graph, which would compare our cumulative stockholder return to that of our peer group. We believe our peer group, which would include other liquidating entities, would have similar results and a graph would not provide a meaningful comparison.

Our Certificate of Incorporation prohibits persons (except Berkadia and its affiliates) from acquiring 5% or more of Corporation Securities (as defined) unless the purchase is approved by our Board of Directors. Those restrictions did not apply to the acquisition of shares in connection with the reorganization proceedings. The restrictions will remain in effect until the earlier of (a) the repeal of Section 382 of the Internal Revenue Code (or any comparable successor provision) or (b) the beginning of the taxable year to which certain tax benefits may no longer be carried forward.

As of March 19, 2007, there were approximately 14,208 holders of record of The FINOVA Group Inc.'s common stock. The closing price of the common stock on that date was $0.08.

10

Table of Contents

**Item 6.    Selected Financial Data.**

The following table summarizes selected financial data obtained or derived from our audited consolidated financial statements. The information set forth below should be read in conjunction with Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations," our Consolidated Financial Statements and the Notes to Consolidated Financial Statements included in Annex A, as well as the rest of this report.

| | Consolidated Statement of Changes in Net Assets (Liquidation Basis) For the Period Dec. 5, 2006 to Dec. 31, 2006 | Statement of Consolidated Operations (Going Concern Basis) | | | | |
| | | For the Period Jan. 1, 2006 to Dec. 4, 2006 | Years Ended December 31, | | | |
| | | | 2005 | 2004 | 2003 | 2002 |
| | | (Dollars in thousands, except per share data) | | | | |
| Net assets in liquidation - December 4, 2006 | $        — | | | | | |
| Change in estimated net realizable value | 2,149 | | | | | |
| Interest earned on investments & other activity | 1,107 | | | | | |
| Interest accruing on the Senior Notes | (9,275) | | | | | |
| Reduction in estimated settlement of Senior Notes | 6,019 | | | | | |
| Net assets in liquidation - December 31, 2006 | $        — | | | | | |
| Interest margin | | $ (138,497) | $ (90,046) | $ (51,964) | $ 25,794 | $ (69,950) |
| Reversal of provision for credit losses | | 15,426 | 51,811 | 148,527 | 238,786 | 339,986 |
| Net gain (loss) on financial assets | | 113,904 | 37,864 | 108,681 | 63,054 | (81,479) |
| Portfolio expenses | | (17,375) | (23,994) | (28,236) | (29,341) | (46,859) |
| General and administrative expenses | | (28,056) | (45,417) | (44,995) | (70,673) | (108,407) |
| Loss from settlement of pension plan | | | (24,665) | | | |
| Gain from extinguishment of debt, net of fresh-start discount | | | | | 28,493 | 88,237 |
| Net (loss) income | | (8,756) | (94,447) | 132,013 | 256,113 | 121,472 |
| Diluted (loss) earnings per share | | $ (0.07) | $ (0.77) | $ 1.08 | $ 2.10 | $ 1.00 |
| Diluted adjusted weighted average shares outstanding | | 122,041,000 | 122,041,000 | 122,041,000 | 122,041,000 | 122,041,000 |
| Dividends per common share | $        — | $        — | $        — | $        — | $        — | $        — |

| | Consolidated Net Assets in Liquidation (Liquidation Basis) | Summary of Consolidated Balance Sheet Data (Going Conern Basis) | | | |
| | | Years Ended December 31, | | | |
| | 2006 | 2005 | 2004 | 2003 | 2002 |
| Total financial assets | $        — | $ 355,681 | $ 705,935 | $ 1,805,984 | $ 3,696,419 |
| Liquidating portfolio | 185,544 | | | | |
| Reserve for credit losses | | (29,032) | (101,270) | (274,828) | (540,268) |
| Total assets | 443,836 | 611,151 | 1,134,125 | 2,344,176 | 3,759,008 |
| Net assets in liquidation | — | | | | |
| Berkadia Loan | | | | 525,000 | 2,175,000 |
| Senior Notes (1) | 390,628 | 1,151,491 | 1,586,957 | 2,338,791 | 2,381,643 |
| Stockholders' equity | | (611,731) | (534,677) | (652,747) | (970,749) |

(1)    Senior Notes are shown at their estimated net settlement amount at December 31, 2006 and are net of a fresh-start discount of $540,240, $579,646, $629,158 and $686,306 at December 31, 2005, 2004, 2003 and 2002, respectively. We remain obligated for the full outstanding principal amount, which was $1,483,975, $1,691,731, $2,166,603, $2,967,949 and $3,067,949 at December 31, 2006, 2005, 2004, 2003 and 2002, respectively.

11

**Table of Contents**

**Item 7.     Management's Discussion and Analysis of Financial Condition and Results of Operations.**

See pages 1–15 of Annex A.

**Item 7A.    Quantitative and Qualitative Disclosure About Market Risk.**

See page 15 of Annex A.

**Item 8.     Financial Statements and Supplemental Data.**

1.    Financial Statements – See Item 15 hereof and Annex A.

2.    Supplementary Data – See Condensed Quarterly Results included in Annex A, Supplemental Selected Financial Data.

**Item 9.     Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

Not applicable.

**Item 9A.    Controls and Procedures.**

(a)    Our management evaluated, with the participation of our principal executive and principal financial officers, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of December 31, 2006. Based on their evaluation, our principal executive and principal financial officers concluded that our disclosure controls and procedures were effective as of December 31, 2006.

(b)    There has been no change in our internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during our fiscal quarter ended December 31, 2006, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

As a result of Section 404 of the Sarbanes-Oxley Act of 2002 and the rules issued there under, we are scheduled to include in our Annual Report on Form 10-K for the year ending December 31, 2007 a report on management's assessment of the effectiveness of our internal controls over financial reporting. Our independent registered public accountants will not be required to attest to and report on management's assessment until the end of 2008.

The process of complying with these requirements includes a comprehensive evaluation and documentation of our internal controls over financial reporting. In this regard, management is prepared to dedicate internal resources and adopt a detailed plan to (i) document our internal controls over financial reporting, (ii) assess the adequacy of our internal controls over financial reporting, (iii) take steps to improve control processes where appropriate and (iv) validate through testing that controls are functioning as documented. There can be no assurance that deficiencies or weaknesses in the design or operation of internal controls over financial reporting will not be found and, if found, that we will have sufficient time to remediate any such deficiencies or weaknesses and perform testing procedures before the end of 2007.

We believe that any system of internal accounting controls, no matter how well designed and operated, can provide only reasonable (and not absolute) assurance that all of our objectives will be met, including the detection of fraud. Furthermore, no evaluation of internal accounting controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

We continue to reduce our workforce, consolidate operations and outsource certain functions. Accordingly, responsibility for administration, management and review of many of our assets has transitioned among our remaining personnel. In conjunction with further reductions in personnel and the relocation of our corporate office, we have transitioned most of our accounting and business support applications to manual processes supported by a system of manual internal controls and spreadsheets. Management has supervised these transitions and has implemented procedures we believe provide effective disclosure and internal controls over financial reporting. We are assessing the efficacy of these procedures and will continue to do so in subsequent periods.

12

Table of Contents

**Item 9B.    Other Information.**

Not applicable.

## PART III

**Item 10.    Directors, Executive Officers and Corporate Governance.**

Set forth below is information with respect to those individuals who serve as directors or executive officers of FINOVA. Messrs. Cumming, Steinberg and Mara serve pursuant to the Management Services Agreement with Leucadia that expires in 2011. Messrs. Ross, Donnelly and Wifler are "at will" employees and may be terminated at any time.

| Name | Age | Position and Background |
|------|-----|-------------------------|
| Thomas F. Boland | 63 | Director of FINOVA since 2001. |
| Ian M. Cumming | 66 | Chairman of the Board of FINOVA since 2001. Director and Chairman of the Board of Leucadia since 1978. |
| G. Robert Durham | 78 | Director of FINOVA since 1992. |
| Thomas E. Mara | 61 | Director and Chief Executive Officer of FINOVA since 2002. Executive Vice President of Leucadia since 1980 and Treasurer of Leucadia since 1993. |
| R. Gregory Morgan | 53 | Director of FINOVA since 2001. |
| Kenneth R. Smith | 64 | Director of FINOVA since 1992. |
| Joseph S. Steinberg | 63 | Director and President of FINOVA since 2001. Director of Leucadia since 1978 and President of Leucadia since 1979. |
| Richard A. Ross | 39 | Senior Vice President, Chief Financial Officer and Treasurer of FINOVA since 2004. Previously, Vice President – Chief Accounting Officer or similar positions of FINOVA and FINOVA Capital for more than five years. |
| Philip A. Donnelly | 44 | Senior Vice President – General Counsel and Secretary of FINOVA since 2005. Previously, Vice President – Deputy General Counsel and Assistant Secretary or similar positions of FINOVA and FINOVA Capital for more than five years. |
| James M. Wifler | 47 | Senior Vice President – Transportation Group Manager of FINOVA since 2005. Previously, Vice President – Remarketing and Portfolio Management or similar positions of FINOVA and FINOVA Capital for more than five years. |

The recent business experience of our directors is summarized as follows:

**THOMAS F. BOLAND.** Mr. Boland has been a Managing Director of Seneca Financial Group, Inc. (an investment bank specializing in financial restructuring advisory services) from 2001 until 2005. Prior to that, Mr. Boland served as a Managing Director for Citigroup Corporate and Investment Bank, Inc. in charge of Japan, Europe and North America Credit and Operating Risk Management from 1999 to 2001. He served as a Senior Risk Manager for Citibank's Global Relationship Bank and he was Chairman of the Board of Shuttle, Inc. from 1992 to 1997. Mr. Boland has been designated to serve on the Board by the creditors' committee in our reorganization proceedings. Mr. Boland was appointed to our Board of Directors as the designee of the creditors' committee in those proceedings, which was given the right under the plan of reorganization to appoint one director. Our Bylaws provide that our Board will renominate him each year as a director so long as at least $500 million of our 7.5% senior secured notes remain outstanding, unless a majority of the note holders request nomination of a different director, pursuant to procedures set forth in the Bylaws.

**IAN M. CUMMING.** Mr. Cumming has served as Chairman of the Board of FINOVA since August 2001. Since 1978, Mr. Cumming has also served as a director and Chairman of the Board of Leucadia National Corporation, a diversified company engaged in a variety of businesses ("Leucadia"), which has an indirect 25% interest in FINOVA. Mr. Cumming has served as a director of Skywest, Inc. (a Utah-based regional air carrier) since June 1986 and HomeFed Corporation ("HomeFed") (a publicly held real estate development Company)

13

**Table of Contents**

since May 1999. Mr. Cumming has served as a member of the Board of Managers of Premier Entertainment Biloxi, LLC (the owner of Hard Rock Hotel and Casino in Biloxi Mississippi) from April 2005 to present.

**G. ROBERT DURHAM.** Mr. Durham was the Chairman of FINOVA from February to August 2001 and has served as a director of FINOVA since March 1992. He is the retired Chairman and Chief Executive Officer of Walters Industries, Inc. (a homebuilding and financing, building materials, natural resources and industrial manufacturing company), where he served as Chairman and Chief Executive Officer from 1991 to 1996. Mr. Durham was also the former Chairman, President and Chief Executive Officer of Phelps Dodge Corporation (a mining company).

**THOMAS E. MARA.** Mr. Mara has served as Chief Executive Officer of FINOVA since September 2002. Previously, he served as Executive Vice President of FINOVA from 2001 to September 2002. Mr. Mara also serves as Executive Vice President of Leucadia since 1980 and Treasurer of Leucadia since 1993. He has served as a director of Inmet Mining Corporation (a Toronto stock exchange listed Canadian mining company) from August 2005 to present.

**R. GREGORY MORGAN.** Mr. Morgan is Vice President and General Counsel of Massachusetts Institute of Technology. Previously he was a partner in the law firm of Munger, Tolles & Olson LLP, where he practiced law from 1981 through 2004. In 2005 and 2006, he was a member of The Price Group LLC, a private investment partnership.

**KENNETH R. SMITH.** Mr. Smith has been an Eller Distinguished Service Professor of Economics since 1980, Dean of the Eller College of Management from 1980 to 1995, and Vice Provost from 1992 to 1995 of The University of Arizona. He has served as Chairman since 1996 and director since 1990 of Apache Nitrogen Products, Inc.

**JOSEPH S. STEINBERG.** Mr. Steinberg has served as President of FINOVA since August 2001. He has served as director of Leucadia since 1978 and President of Leucadia since 1979. Mr. Steinberg also has served as a director of HomeFed since August 1998 (Chairman of the Board since December 1999), as a director of Jordan Industries, Inc. (a public company that owns and manages manufacturing companies) since June 1998 and as a member of the Board of Managers of Premier Entertainment Biloxi, LLC since April 2006.

### AUDIT COMMITTEE FINANCIAL EXPERT

The Audit Committee consists of Messrs. Morgan (Chairman), Boland and Smith. The Board of Directors has determined that each of Messrs. Boland and Smith qualified as an audit committee financial expert within the meaning of the regulations of the Securities and Exchange Commission (the "SEC"). Applying applicable listing standards of the New York Stock Exchange and the rules and regulations of the SEC, the Board of Directors has determined that Messrs. Morgan and Boland are independent for purposes of the Audit Committee. Although Mr. Smith may have not satisfied such New York Stock Exchange independence criteria due to his prior relationships noted below under Item 13. "Certain Relationships and Related Transactions and Director Independence," the Board of Directors nevertheless deems it appropriate for him to serve on the Audit Committee due to his familiarity with our operations and financial circumstances and believes that Mr. Smith is independent for purposes of serving on the Audit Committee in accordance with the rules and regulations of the SEC.

### SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934 requires our executive officers and directors, and persons who beneficially own more than 10% of a registered class of our equity securities, to file reports of ownership and changes in ownership with the SEC. Based solely upon a review of the copies of the forms furnished to us and written representations from our executive officers, directors and greater than 10% beneficial shareholders, we believe that during the year ended December 31, 2006, all persons subject to the reporting requirements of Sections 16(a) filed the required reports on a timely basis.

### CODE OF CONDUCT

We have a Code of Conduct, which is applicable to all directors, officers and employees of the Company. The Code of Conduct is available on our website, www.finova.com. We intend to post amendments to or waivers from our Code of Conduct on our website.

14

Table of Contents

**Item 11.    Executive Compensation.**

## COMPENSATION DISCUSSION AND ANALYSIS

We are currently in the process of implementing a Plan of Liquidation and many of our programs and historical procedures are being simplified as our structure and organization continues to shrink. At December 31, 2006, we had 32 employees. As a result of the continued wind-up of our affairs and the sale of our remaining assets, we anticipate a significant further reduction in employees to occur in early 2007. By the end of April 2007, we anticipate that we will have reduced our workforce to approximately five employees. The scheduled employee reductions are intended to reflect the significant continuing liquidation of our portfolio, while retaining appropriate oversight of the smaller operation and maintaining adequate resources to deal with outstanding claims and the future dissolution of our entities. These facts and circumstances were taken into consideration during the development of the following discussion and analysis of our compensation programs.

## OVERVIEW OF COMPENSATION PROGRAM

Historically, when there was a large population of employees working in various business units, our Board of Directors (the "Board") actively participated in determining compensation for employees. The Company has downsized dramatically in the past several years and has been in constant internal reorganization. There are only a handful of employees left to wrap up our affairs and as a result, the Board has delegated to the Chief Executive Officer (the "CEO"), the authority to set compensation for the remaining executive and non-executive officers of the Company, while retaining the authority for approval of compensation programs offered to employees through the Human Resources Committee of our Board.

## COMPENSATION PHILOSOPHY AND OBJECTIVES

Our Executive Compensation Program is designed to retain our existing executive officers as well as motivate them to remain focused on maximizing the value of the remaining portfolio and assets while containing expenses for the benefit of our creditors and shareholders. After careful consideration of our circumstances, as described above, and voluntary turnover levels in prior years, retention of key employees has become critical to the liquidation of our remaining portfolio. Many of our employees are highly mobile and could easily obtain employment at other companies with long-term prospects. Our ability to continue to maximize value from our portfolio liquidation and distributions to our creditors would be negatively impacted should we lose key personnel that have specific knowledge of our assets, litigation matters and claims and knowledge of historical company information.

## 2006 EXECUTIVE COMPENSATION COMPONENTS

The CEO has been given the discretion to modify or adjust awards for all executives for the fiscal year ending December 31, 2006. The principal components of compensation for the named executive officers were:

    Base salary
    Discretionary incentive awards
    Retirement; and
    Other personal benefits

## BASE SALARY

We provide executive officers and other employees with base salary to compensate them for services rendered during the fiscal year. Base salary for the named executive officers is determined for each individual officer based on his position and responsibilities, as well as our desire to retain our executive officers in light of the Company's circumstances and the ability of these employees to obtain competitive salaries at alternate employers.

In determining base salary, we use outside market data of companies within similar industries (primarily finance) as a benchmark. The outside market data utilized does not reflect the liquidating nature of the Company but is used as a reference point only of similar businesses within the industry. Market data for other liquidating entities was not available. We have ceased to purchase outside salary data due to cost constraints and have instead utilized the resources of World at Work, a not-for-profit organization which provides human resources professionals with information regarding items such as compensation and benefits, to benchmark the finance industry. The data taken into consideration when assessing base salaries included industry classification, geographic area and size of organization. Within these parameters, trends on compensation as well as the position and function of individuals

15

Table of Contents

were taken into consideration. Historically, base salaries were designed so that salary opportunities for a given position were between 75% and 125% of the midpoint of the base salary range for comparable companies. Generally speaking, we have continued to maintain base salaries in-line with these target levels.

## DISCRETIONARY INCENTIVE AWARDS

As part of our compensation program, employees participate in a bonus program in which they are eligible for a year-end discretionary performance bonus that ranges from 0% to 200% of the employee's base salary. The bonus ranges are set as a percentage of the person's annual salary and bonus percentage ranges will generally increase with the employee's pay grade and level of responsibility and criticality. Bonuses for 2006 were paid based on our subjective determination of the participant's contribution to the continued wind-down of FINOVA, the achievement of the business unit's objectives, and the employee's personal performance, in the complete discretion of the Company. Historically, a participant's performance was measured against objectives established for that participant at the beginning of the year. However, individual objectives are no longer considered to be relevant, as all employees are working towards our overall objective of maximizing value from our liquidation.

## RETIREMENT

All compensated employees, including the named executive officers below, are eligible to participate in The FINOVA Group Inc. Savings Plan (the "Savings Plan"), which is a tax qualified 401(k) program. Employees may elect voluntary wage deductions ranging from 0% to 30% of taxable compensation as prescribed by the Internal Revenue Service to the savings plan on a before tax basis. Our matching contributions are based on employee pre-tax salary deductions, up to a maximum of 100% of the first 6% of salary contributions. All contributions to the Savings Plan as well as any matching contributions are fully vested upon contribution.

The Savings Plan was amended as of January 1, 2005 to include an Age and Service contribution to the Savings Plan. Beginning January 1, 2005, substantially all employees receive an Age and Service contribution to the Savings Plan based on each employee's eligible earnings, age, and years of service. Like other contributions to the Savings Plan, the Age and Service contributions are limited to prescribed limits set forth by the Internal Revenue Service. The Savings Plan will be terminated effective March 31, 2007.

## PERQUISITES AND OTHER PERSONAL BENEFITS

We provide named executive officers with certain financial benefits that we believe are reasonable and consistent with our overall compensation program to enable us to retain superior employees for key positions.

The named executive officers, except for the Leucadia designees, are provided with financial and tax counseling, tax gross ups on the financial counseling, medical expense reimbursements, executive physicals, and auto allowances (which were eliminated during early 2006.) The costs of the financial benefits described above for the named executive officers for the fiscal year ended December 31, 2006 are included in the column labeled "All Other Compensation" of the "Summary Compensation Table" shown below. The amounts attributable to each such perquisite or benefit for each named executive officer does not exceed the greater of $25,000 or 10% of the total amount of perquisites or benefits received by such named executive officer.

The following table summarizes the compensation we paid during 2006 to each of the most highly compensated executive officers based on salary and annual bonus, as well as compensation for one additional person who was a former executive officer. Bonus totals also include amounts paid in 2007, which related to 2006 performance.

16

286

Table of Contents

## SUMMARY COMPENSATION TABLE

| Name and Principal Position (1) | Year | Salary | Bonus (2) | All Other Compensation (3) | Total |
|---|---|---|---|---|---|
| Richard A. Ross | | | | | |
| SVP-Chief Financial Officer & Treasurer | 2006 | $210,000 | $300,000 | $ 56,079 | $566,079 |
| Philip A. Donnelly | | | | | |
| SVP-General Counsel and Secretary | 2006 | $200,000 | $300,000 | $ 21,496 | $521,496 |
| James M. Wifler | | | | | |
| SVP-Transporation Group Manager | 2006 | $200,000 | $200,000 | $ 44,608 | $444,608 |
| Jeffrey D. Weiss (through June 30, 2006) | | | | | |
| Former SVP-Group Manager | 2006 | $117,964 | $150,000 | $ 669,980 | $937,944 |

(1) Ian M. Cumming, our Chairman, Joseph S. Steinberg, our President and Thomas E. Mara, our Chief Executive Officer are not included in this table. Their services are provided to FINOVA under a Management Services Agreement with Leucadia and they receive no compensation as employees. The Management Services Agreement is discussed in more detail in "Certain Relationships and Related Transactions and Director Independence" below.

(2) Bonuses are discretionary payments based on performance of the recipient in relation to our overall objective of maximizing value from the orderly collection of our portfolio. Amounts for 2006 include payments made in February 2007 relating to 2006 performance.

(3) Amounts for the named executive officers include matching payments and other company contributions under the Savings Plan, financial consulting services, executive healthcare, auto allowances, the payout of unused vacation and certain tax gross-ups. Additionally, Mr. Weiss received severance compensation of $610,841.

## COMPENSATION OF DIRECTORS

### CASH COMPENSATION PAID TO BOARD MEMBERS

Directors receive a $30,000 annual retainer. Directors also receive $1,500 for each Board, committee or other meeting attended. In connection with his duties as a member of the Special Committee, Mr. Boland is authorized to receive a stipend at a rate of $2,500 per day for Special Committee business, other than Special Committee meetings. Additionally, during 2006, Messrs. Boland and Smith were appointed by the Board to a special committee comprised of the independent directors to independently evaluate and make recommendations to the Board regarding the Thaxton litigation. Messrs. Boland and Smith were each compensated at the rate of $400 per hour for time spent in connection with such litigation. We reimburse directors for any expenses related to their Board service.

The services of Messrs. Cumming (our Chairman.), Mara and Steinberg are provided to FINOVA under a Management Services Agreement with Leucadia. They receive compensation as directors, including the retainer and meeting fees noted above. The Management Services Agreement is discussed in more detail in "Certain Relationships and Related Transactions and Director Independence" below.

17

287

**Table of Contents**

The table below summarizes the compensation earned by or paid to our Directors for the fiscal year ended December 31, 2006.

### DIRECTOR SUMMARY COMPENSATION TABLE

| Name | Fees Earned or Paid in Cash | | Total |
|------|---:|:--|---:|
| Thomas F. Boland | $ | 83,100 | $83,100 |
| Ian M. Cumming | $ | 37,500 | $37,500 |
| G. Robert Durham | $ | 40,500 | $40,500 |
| Thomas E. Mara | $ | 43,500 | $43,500 |
| R. Gregory Morgan | $ | 49,500 | $49,500 |
| Kenneth R. Smith | $ | 73,600 | $73,600 |
| Joseph S. Steinberg | $ | 36,000 | $36,000 |

### ARRANGEMENTS WITH RESPECT TO SEVERANCE COMPENSATION

Pursuant to letter arrangements, which have been filed as exhibits to this Annual Report on Form 10-K for the fiscal year ended December 31, 2006, executive officers are eligible to receive severance compensation if they are involuntarily terminated other than for cause, with payments based on years of service. Under the terms of our severance arrangements, as of December 31, 2006, the current executive officers would be entitled to a severance payment equal to the product of their base salary for the current fiscal year times an amount based on years of service. Mr. Donnelly would be eligible for 2.1 years; Mr. Ross 2.2 years and Mr. Wifler 2.4 years. Additionally, these officers are also eligible for health insurance and financial counseling for up to 18 months after termination, as well as outplacement assistance. As of December 31, 2006, estimated payments for all severance related benefits would be $460,985, $508,418 and $556,063, respectively, for Messrs. Donnelly, Ross and Wifler. We may supplement those amounts, but may not reduce them below the current levels. Mr. Weiss received severance compensation of $610,841 following his termination in June 2006 and was given continued health insurance for 15 months and financial counseling for one year after termination. The total value of these benefits could be up to approximately $39 thousand.

The Board established and funded two trusts to secure obligations to all of our employees for severance and bonuses. The Trustee of both trusts is Atlantic Trust Company. One trust (the "US Severance Trust") secures the severance and related medical insurance and outplacement obligations for the US employees. The US Severance Trust pays terminated employees their severance benefits if they are otherwise eligible to receive severance and enter into a release of liability, as is required by our policy.

The other trust (the "Bonus Trust") secures the bonus obligations for all employees and the severance obligations for the employees that were based in the United Kingdom. The trust provides that if the Company does not pay the bonus or UK severance payments, the employees can request that the Trustee pay those amounts from the trust, pursuant to procedures established in the Trust Agreement.

We funded these trusts in 2003 with a total of approximately $24 million, which approximated the estimated liability due under those programs at that time, and is not in addition to amounts that would otherwise be due. At December 31, 2006, the trusts totaled $10.1 million. Excess amounts in the trusts, after satisfaction of all obligations to participants and the trustee, would revert to FINOVA.

### COMPENSATION COMMITTEE REPORT

The Human Resources Committee, which performs the services of a compensation committee, has reviewed and discussed the Compensation Discussion and Analysis ("CD&A") contained herein with management of the Company. Based on the Human Resources Committee's review of, and discussions with management with respect to, the CD&A, the Human Resources Committee recommended to the Board of Directors, and the Board of Directors has approved, that the CD&A be included in this Annual Report on Form 10-K for filing with the SEC.

18

288

**Table of Contents**

Respectfully submitted by the Human Resources Committee of the Board of Directors.

Kenneth R. Smith (Chair)
Thomas E. Mara
Joseph S. Steinberg

### COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The members of our Human Resources Committee are Thomas E. Mara, Joseph S. Steinberg and Kenneth R. Smith, who serves as its chair. Due to relationships noted below under Item 13 "Certain Relationships and Related Transactions and Director Independence," the Leucadia affiliated directors, Messrs. Mara and Steinberg, do not satisfy the independence criteria, applying applicable listing standards of the New York Stock Exchange.

Due to relationships noted below under Item 13 "Certain Relationships and Related Transactions and Director Independence," Messrs. Mara and Steinberg are "related persons" under applicable rules and regulations of the SEC. In the past fiscal year, Mr. Steinberg has served on the Board of Directors of Leucadia, certain of whose executive officers served on our board or Human Resources Committee.

### Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

Set forth below is certain information as of February 12, 2007 with respect to the beneficial ownership of common shares by the beneficial owners of at least 5% of our outstanding common shares. Ownership includes direct and indirect (beneficial) ownership, as defined by the SEC rules. To our knowledge, each person, along with his or her spouse, has sole voting and investment power over the shares unless otherwise noted. Information in the first table is as of the latest reports by those entities received by us.

### CERTAIN BENEFICIAL OWNERS

| Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership (1) | Percentage of Shares |
|---|---|---|
| Berkshire Hathaway Inc. | | |
| 1440 Kiewit Plaza | | |
| Omaha, Nebraska 68131 | 30,510,290.5 | 25% |
| Leucadia National Corporation | | |
| 315 Park Avenue South | | |
| New York, NY 10010-3679 | 30,510,290.5 | 25% |

(1)  These shares are owned by an affiliate of Berkadia LLC, a joint venture beneficially owned, through subsidiaries, by Berkshire Hathaway Inc. and Leucadia. Pursuant to the terms of the operating agreements governing Berkadia and its direct members, these shares are to be voted in a manner as determined unanimously by Berkshire Hathaway Inc. and Leucadia. If unanimity cannot be achieved, the shares owned by Berkadia are to be voted 50% as directed by Berkshire Hathaway Inc. and 50% as directed by Leucadia.

19

289

**Table of Contents**

## DIRECTORS AND EXECUTIVE OFFICERS

Set forth below is certain information as of February 12, 2007 with respect to the beneficial ownership of common shares by (1) each director and (2) each of the executive officers named in the Summary Compensation Table under Item 11. "Executive Compensation."

| Name | Position (s) | Amount and Nature of Beneficial Ownership | Percentage of Outstanding Shares |
|------|-------------|-------------------------------------------|----------------------------------|
| Thomas F. Boland | Director | 0 | |
| Ian M. Cumming | Director and Chairman | (1) | |
| G. Robert Durham | Director | 0 | |
| Thomas E. Mara | Director and Chief Executive Officer | 0 | |
| R. Gregory Morgan | Director | 0 | |
| Kenneth R. Smith | Director | 0 | |
| Joseph S. Steinberg | Director and President | (1) | |
| Philip A. Donnelly | SVP - General Counsel and Secretary | 0 | |
| Richard A. Ross | SVP - Chief Financial Officer & Treasurer | 0 | |
| James M. Wifler | SVP - Transportation Group Manager | 0 | |
| Jeffrey D. Weiss | Former SVP - Group Manager | 0 | |
| Directors and Executives, as a group (11 persons) | | 0(1) | * |

* Less than one percent.

(1) Does not include any interest in 30,510,290.5 shares (25%) of FINOVA' s common stock that Leucadia may be deemed to beneficially own under SEC Rule 13d-3 by virtue of its indirect membership interests in an affiliate of Berkadia LLC. Together with certain family members, Mr. Cumming and Mr. Steinberg beneficially own significant amounts of Leucadia stock. By virtue of their beneficial ownership of Leucadia, they may be deemed to be the indirect beneficial owners of their pro rata share of our common stock beneficially owned by Leucadia.

## EQUITY COMPENSATION PLAN INFORMATION

None.

### Item 13.    Certain Relationships and Related Transactions and Director Independence.

During 2004, R. Gregory Morgan retired as a partner of the law firm of Munger, Tolles & Olson LLP. That firm serves as counsel to Berkshire Hathaway Inc. and Berkadia LLC.

As discussed above, Thomas F. Boland was appointed to our Board of Directors as the designee of the creditors' committee in those proceedings, which was given the right under the plan of reorganization to appoint one director. Our Bylaws provide that our Board will renominate him each year as director so long as at least $500 million of our 7.5% senior secured notes remain outstanding, unless a majority of the note holders request nomination of a different director, pursuant to procedures set forth in the Bylaws.

Until 2004, Kenneth R. Smith served as Chairman and Chief Executive Officer of GroupSystems Corporation, formerly known as GroupSystems.com and Ventana Corporation, which markets interactive computer systems software and services. Mr. Smith is no longer a director or officer of that company, but he continues to own just under 6.2% of its stock. FINOVA Capital owned 67,400.64 shares of GroupSystems' common stock, representing 0.86% of its common stock. In addition, FINOVA Capital granted GroupSystems a $1,000,000 line of credit, which was converted in 2000 into a term loan for $870,000. All of FINOVA Capital's interest in the loan, which had an outstanding principal balance of $90,710, and/or equity was sold in June 2006 in conjunction with a bulk portfolio sale of non-aviation assets.

20

## Table of Contents

Set forth below is information concerning agreements or relationships between FINOVA and Leucadia.

Ian M. Cumming is the Chairman of the Board of Leucadia and Joseph S. Steinberg is a director and President of Leucadia. Each beneficially owns in excess of 10% of the outstanding common shares of that company. Thomas E. Mara is Executive Vice President of Leucadia.

Leucadia manages FINOVA pursuant to the Management Services Agreement, which was originally entered into in February 2001, before we commenced the reorganization proceedings. The management agreement expires in 2011 and provides that Leucadia will appoint the Chairman, President and other officers, as it deems necessary to fulfill its duties. Leucadia will generally manage our affairs, subject to direction by the Board of Directors.

The management agreement was entered into in 2001 simultaneously with the execution of a $6 billion loan commitment from Berkadia LLC, a joint venture between Berkshire Hathaway Inc. and Leucadia (the "Berkadia Loan"). As part of the transaction, we paid Berkadia $120 million in commitment and funding fees. Berkadia loaned us $5.6 billion in August 2001 to finance our plan of reorganization. The Berkadia Loan bore annual interest at the London Interbank Offered Rate plus 2.25%, with interest payable monthly. The loan was scheduled to mature in 2006, but principal was to be repaid earlier if excess cash was available, as set forth in our credit agreements. The Berkadia Loan was repaid in full in February 2004.

When the Berkadia Loan was made, we issued Berkadia sufficient common stock in FINOVA to result in Berkadia holding 50% of the total number of outstanding shares of common stock upon emergence from the reorganization proceedings, as required by the plan of reorganization. The bankruptcy court overseeing our reorganization approved the management fee to Leucadia, the fees paid to Berkadia, the issuance of the stock and the terms of the Berkadia Loan.

We pay Leucadia $8 million each year for management fees under the Management Services Agreement. Fees are paid quarterly in advance. As of February 28, 2007, we have paid Leucadia $2 million of management fees during the fiscal year 2007. Leucadia has advised us that the $8 million annual management fee is shared equally with Berkshire Hathaway under the terms of the Berkadia operating agreement.

We do not pay compensation for the services of Messrs. Cumming, Steinberg and Mara or any of Leucadia's other personnel, except for the management fees noted above. Under the management agreement, we pay reasonable out-of-pocket expenses incurred by those individuals. We also pay directors' fees to those who serve on the Board as noted above.

The Company's Audit Committee Charter addresses the reporting, review and approval or ratification of transactions with related persons. The Audit Committee is authorized to review all related person transactions and approve such transactions in advance of such transactions being given effect. The Charter authorizes the Audit Committee to recommend to the Board or to the stockholders any matters for which the approval of the Board or stockholders is required under applicable law.

The Board has determined that Messrs. Boland, Durham and Morgan are independent under applicable listing standards of the New York Stock Exchange. Due to relationships noted above under Item 11. "Compensation Committee Interlocks and Insider Participation" and Item 13. "Certain Relationships and Related Transactions and Director Independence," Mr. Smith may not satisfy the independence criteria for the Audit Committee under applicable listing standards of the New York Stock Exchange, but does not satisfy such criteria under the rules and regulations of the SEC. The Leucadia affiliated directors, Messrs. Steinberg and Mara, who are members of the Human Resources Committee are not independent under applicable listing standards of the New York Stock Exchange. The Board does not have, and historically has never had, a nominating committee. In addition to Messrs. Steinberg, Mara and Smith, Mr. Cumming is also not independent, applying applicable listing standards of the New York Stock Exchange, for purposes of membership on the Board.

21

## Table of Contents

### Item 14.    Principal Accountant Fees and Services.

The following table sets forth the total fees billed or expected to be billed by Ernst & Young LLP for audit services rendered in connection with the audit of our financial statements for 2006 and 2005, and fees billed for other services rendered by that firm for those years:

|  | 2006 | 2005 |
|---|---|---|
| Audit Fees | $407,000 | $454,598 |
| Audit Related Services (1) | 60,500 | 49,500 |
| Tax Fees (2) |  | 7,783 |
| All Other Fees (3) | 1,500 | 1,095 |
| Total Fees | $469,000 | $512,976 |

(1)   Audit Related Services included audits of our benefit plans.

(2)   Tax Fees included aggregate fees billed for tax compliance services.

(3)   All Other Fees included fees billed for access to on-line accounting research tools and publications.

The Audit Committee has considered whether the provision of the non-audit services is compatible with the maintenance of the auditors' independence. The Audit Committee approved all of those services and fees. The Audit Committee has adopted policies and procedures for pre-approving all audit and non-audit work performed by our independent auditor, Ernst & Young LLP. Specifically, the committee has pre-approved certain specific categories of work and an initially authorized annual amount for each category. For additional services or services in an amount above the initially authorized annual amount, additional authorization from the Audit Committee is required. All requests for services to be provided by Ernst & Young LLP that do not require specific approval by the Audit Committee must be submitted to the Chief Financial Officer of the Company, who determines that such services are in fact within the scope of those services that have been pre-approved by the Audit Committee. The Chief Financial Officer reports to the Audit Committee periodically.

## PART IV

### Item 15.    Exhibits and Financial Statement Schedules.

Documents filed.

1)   Financial Statements.

The following financial information is included in Annex A:

| | Page |
|---|---|
| Management's Discussion and Analysis of Financial Condition and Results of Operations | A-1 |
| Quantitative and Qualitative Disclosure about Market Risk | A-15 |
| Report of Independent Registered Public Accounting Firm | A-16 |
| Consolidated Statement of Net Assets in Liquidation (liquidation basis) at December 31, 2006 | A-17 |
| Consolidated Statement of Changes in Net Assets in Liquidation (liquidation basis) for the Period December 5, 2006 to December 31, 2006 | A-18 |
| Consolidated Balance Sheet (going concern basis) at December 31, 2005 | A-19 |
| Statements of Consolidated Operations (going concern basis) for the Period January 1, 2006 to December 4, 2006 and for the Years Ended December 31, 2005 and 2004 | A-20 |
| Statements of Consolidated Cash Flows (going concern basis) for the Period January 1, 2006 to December 4, 2006 and for the Years Ended December 31, 2005 and 2004 | A-21 |
| Statements of Consolidated Stockholders' Equity (going concern basis) for the Period January 1, 2006 to December 4, 2006 and for the Years Ended December 31, 2005 and 2004 | A-22 |
| Notes to Consolidated Financial Statements | A-23 |
| Supplemental Selected Financial Data (unaudited) | A-45 |

2)   Financial Statement Schedules.

All schedules have been omitted because they are not applicable or the required information is shown in the financial statements or related notes.

22

292

**Table of Contents**

3)    Exhibits.

|  |  | Incorporated by Reference From: | | |
|---|---|---|---|---|
| **Exhibit** |  | **Report on Form** | **Date Filed** | **Exhibit** |
| (2.A) | Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code. | 8-K | 6/22/01 | 10.A |
| (2.B) | Revised Technical Amendments to Third Amended and Restated Joint Plan of Reorganization. | 8-K | 8/27/01 | 2.B |
| (2.C) | Form of Plan of Liquidation and Dissolution. | * | | |
| (3.A) | Amended and Restated Certificate of Incorporation of FINOVA. | 8-K | 8/27/01 | 3.A |
| (3.B) | Amended and Restated Bylaws of FINOVA. | 8-K | 8/27/01 | 3.B |
| (4.A) | Form of Common Stock Certificate. | 10-K | 3/15/02 | 4.A |
| (4.B) | Relevant provisions of FINOVA's Certificate of Incorporation and Bylaws included in Exhibits 3.A and 3.B above are incorporated by reference. | | | 3.A and 3.B |
| (4.C) | Long-term debt instruments with principal amounts not exceeding 10% of FINOVA's total consolidated assets are not filed as exhibits to this report. FINOVA will furnish a copy of these agreements to the SEC on request. | | | |
| (10.A) | Credit Agreement, dated as of August 21, 2001, by and between FINOVA Capital and Berkadia. | 8-K | 8/27/01 | 10.A |
| (10.B) | Indenture, dated as of August 22, 2001, between FINOVA and The Bank of New York, as trustee (the "Indenture Trustee"), with respect to FINOVA's 7.5% Senior Secured Notes Maturing 2009 with Contingent Interest Due 2016, including the form of Senior Secured Note. | 8-K | 8/27/01 | 10.B |
| (10.C) | Form of Intercompany Notes by FINOVA Capital payable to FINOVA. | 8-K | 8/27/01 | 10.C |
| (10.D) | Collateral Trust Agreement, dated as of August 21, 2001, among FINOVA, FINOVA Capital, Berkadia, Wilmington Trust Company, as collateral trustee (the "Collateral Trustee"), the Indenture Trustee and each grantor from time to time party thereto. | 8-K | 8/27/01 | 10.D |
| (10.E) | Guaranty, dated as of August 21, 2001, by FINOVA in favor of Berkadia. | 8-K | 8/27/01 | 10.E |
| (10.F) | Guaranty, dated as of August 21, 2001, by FINOVA Capital and certain subsidiaries of FINOVA Capital (the "Subsidiary Guarantors"), in favor of Berkadia. | 8-K | 8/27/01 | 10.F |
| (10.G) | Pledge Agreement, dated as of August 21, 2001, by FINOVA, in favor of the Collateral Trustee. | 8-K | 8/27/01 | 10.G |
| (10.H) | Pledge and Security Agreement, dated as of August 21, 2001, by FINOVA Capital and the Subsidiary Guarantors, in favor of the Collateral Trustee. | 8-K | 8/27/01 | 10.H |
| (10.I.1) | Novation Agreement and Amendment to Registration Rights Agreement, dated as of August 23, 2002, among FINOVA, Berkadia and Berkadia Equity Holdings LLC. | 10-K | 3/21/03 | 10.I.1 |

23

## Table of Contents

| Exhibit | | Report on Form | Date Filed | Exhibit |
|---|---|---|---|---|
| | | *Incorporated by Reference From:* | | |
| (10.J) | Voting Agreement, dated as of August 21, 2001, among FINOVA, Berkadia, Berkshire and Leucadia. | 8-K | 8/27/01 | 10.J |
| (10.K) | Amended and Restated Management Agreement among FINOVA, FINOVA Capital and Leucadia, dated April 3, 2001.+ | 10-K | 4/26/01 | 10.T.1 |
| (10.L.1) | Form of Letter for the Bonus Program.+ | 10-K | 3/15/02 | 10.L |
| (10.L.2) | 2006 Annual Incentive Plan Rules.+ | 10-K | 3/16/06 | 10.L.3 |
| (10.L.3) | 2007 Annual Incentive Plan Rules.+ | 8-K | 1/23/07 | 10.A |
| (10.M.1) | Severance Plan.+ | 10-K | 3/15/02 | 10.M.1 |
| (10.M.2) | Enhanced Severance Plan. + | 10-K | 3/15/02 | 10.M.2 |
| (10.M.3) | Amended and Restated Severance Pay Plan and Summary Plan Description.+ | 10-Q | 8/11/05 | 10.B |
| (10.P.1) | Letter from FINOVA to Jeffrey D. Weiss dated February 20, 2006.+ | 10-K | 3/16/06 | 10.P.8 |
| (10.P.2) | Letter from FINOVA to Philip A. Donnelly dated February 20, 2006.+ | 10-K | 3/16/06 | 10.P.9 |
| (10.P.3) | Letter from FINOVA to Richard A. Ross dated February 20, 2006.+ | 10-K | 3/16/06 | 10.P.10 |
| (10.P.4) | Letter from FINOVA to James M. Wifler dated February 20, 2006.+ | 10-K | 3/16/06 | 10.P.11 |
| (10.P.5) | Letter from FINOVA to Philip A. Donnelly dated March 20, 2007.+ | * | | |
| (10.P.6) | Letter from FINOVA to Richard A. Ross dated March 20, 2007.+ | * | | |
| (10.P.7) | Letter from FINOVA to James M. Wifler dated March 20, 2007.+ | * | | |
| (10.Q) | Executive Severance Plan, Tier III.+ | 10-K | 3/15/02 | 10.X |
| (10.R) | Severance Trust Agreement between FINOVA and Atlantic Trust Company, dated as of November 1, 2003.+ | 10-K | 3/30/04 | 10.R |
| (10.S) | Bonus and United Kingdom Trust Agreement between FINOVA and Atlantic Trust Company, dated as of November 1, 2003.+ | 10-K | 3/30/04 | 10.S |
| (10.T) | Form of Master Settlement Agreement, dated as of October 31, 2006, by and among the Company, the Thaxton Entities, the holders of subordinated notes issued by the Thaxton Entities, and the Official Committee of Unsecured Creditors of the Thaxton Entities. | 8-K | 11/06/06 | 10.1 |
| (10.U) | Asset Purchase Agreement by and among FINOVA Capital Corporation, Cactus Resort Properties, Inc., Desert Communications I, LLC and FCC Resort, LLC as sellers and SPCP Group, LLC as buyer, dated May 1, 2006. | 8-K | 5/04/06 | 10.A |

24

**Table of Contents**

| Exhibit | | Incorporated by Reference From: | | |
|---|---|---|---|---|
| | | Report on Form | Date Filed | Exhibit |
| (10.V) | Purchase and Sale Agreement by and among FINOVA Capital Corporation and AIRCRAFT 48008/48009, LLC as Sellers and FAP, LLC as buyer, dated January 17, 2007. | 8-K | 1/18/07 | 10.A |
| (12) | Computation of Ratio of Income to Fixed Charges. | * | | |
| (14) | Code of Conduct (Code of Ethics). | * | | |
| (21) | Subsidiaries. | * | | |
| (23) | Consent of Independent Auditors from Ernst & Young LLP. | * | | |
| (31.1) | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Securities Exchange Act, as amended. | * | | |
| (31.2) | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Securities Exchange Act, as amended. | * | | |
| (32.1) | Certification of Chief Executive Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | ** | | |
| (32.2) | Certification of Chief Financial Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | ** | | |
| (99.A) | Order entered August 10, 2001 confirming the Third Amended and Restated Joint Plan of Reorganization, as amended and supplemented. | 8-K | 8/27/01 | 99.B |

\*    Filed with this report

\*\*   Furnished with this report pursuant to Item 601 (b) (32) of Regulation S-K

\+    Relating to management compensation

25

295

**Table of Contents**

**Signatures**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE FINOVA GROUP INC.

March 21, 2007

By:  /s/ Richard A. Ross
Richard A. Ross
Senior Vice President – Chief Financial Officer and Treasurer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name and Title | Date | Signature |
|---|---|---|
| **Principal Executive Officer:** | | |
| Thomas E. Mara<br>Chief Executive Officer and a Director | March 21, 2007 | /s/ Thomas E. Mara |
| **Principal Financial and Accounting Officer:** | | |
| Richard A. Ross<br>Senior Vice President – Chief Financial Officer<br>and Treasurer | March 21, 2007 | /s/ Richard A. Ross |
| **Directors:** | | |
| Thomas F. Boland | March 21, 2007 | /s/ Thomas F. Boland |
| Ian M. Cumming | March 21, 2007 | /s/ Ian M. Cumming |
| G. Robert Durham | March 21, 2007 | /s/ G. Robert Durham |
| R. Gregory Morgan | March 21, 2007 | /s/ R. Gregory Morgan |
| Kenneth R. Smith | March 21, 2007 | /s/ Kenneth R. Smith |
| Joseph S. Steinberg | March 21, 2007 | /s/ Joseph S. Steinberg |

26

296

**Table of Contents**

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| (2.A) | Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code (filed as Exhibit 10.A to the Current Report on Form 8-K dated June 22, 2001 (the "June 22, 2001 8-K")). |
| (2.B) | Revised Technical Amendments to Third Amended and Restated Joint Plan of Reorganization (filed as Exhibit 2.B to the Current Report on Form 8-K dated August 27, 2001 (the "August 27, 2001 8-K")). |
| (2.C) | Form of Plan of Liquidation and Dissolution. |
| (3.A) | Amended and Restated Certificate of Incorporation of FINOVA (filed as Exhibit 3.A to the August 27, 2001 8-K). |
| (3.B) | Amended and Restated Bylaws of FINOVA (filed as Exhibit 3.B to the August 27, 2001 8-K). |
| (4.A) | Form of Common Stock Certificate (filed as Exhibit 4.A to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2001 (the "2001 10-K")). |
| (4.B) | Relevant provisions of FINOVA's Certificate of Incorporation and Bylaws included in Exhibits 3.A and 3.B above are incorporated by reference. |
| (4.C) | Long-term debt instruments with principal amounts not exceeding 10% of FINOVA's total consolidated assets are not filed as exhibits to this report. FINOVA will furnish a copy of these agreements to the SEC on request. |
| (10.A) | Credit Agreement, dated as of August 21, 2001, by and between FINOVA Capital and Berkadia (filed as Exhibit 10.A to the August 27, 2001 8-K). |
| (10.B) | Indenture, dated as of August 22, 2001, between FINOVA and The Bank of New York, as trustee (the "Indenture Trustee"), with respect to FINOVA's 7.5% Senior Secured Notes Maturing 2009 with Contingent Interest Due 2016, including the form of Senior Secured Note (filed as Exhibit 10.B to the August 27, 2001 8-K). |
| (10.C) | Form of Intercompany Notes by FINOVA Capital payable to FINOVA (filed as Exhibit 10.C to the August 27, 2001 8-K). |
| (10.D) | Collateral Trust Agreement, dated as of August 21, 2001, among FINOVA, FINOVA Capital, Berkadia, Wilmington Trust Company, as collateral trustee (the "Collateral Trustee"), the Indenture Trustee and each grantor from time to time party thereto (filed as Exhibit 10.D to the August 27, 2001 8-K). |
| (10.E) | Guaranty, dated as of August 21, 2001, by FINOVA in favor of Berkadia (filed as Exhibit 10.E to the August 27, 2001 8-K). |
| (10.F) | Guaranty, dated as of August 21, 2001, by FINOVA Capital and certain subsidiaries of FINOVA Capital (the "Subsidiary Guarantors"), in favor of Berkadia (filed as Exhibit 10.F to the August 27, 2001 8-K). |

27

**Table of Contents**

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| (10.G) | Pledge Agreement, dated as of August 21, 2001, by FINOVA, in favor of the Collateral Trustee (filed as Exhibit 10.G to the August 27, 2001 8-K). |
| (10.H) | Pledge and Security Agreement, dated as of August 21, 2001, by FINOVA Capital and the Subsidiary Guarantors, in favor of the Collateral Trustee (filed as Exhibit 10.H to the August 27, 2001 8-K). |
| (10.I.1) | Novation Agreement and Amendment to Registration Rights Agreement, dated as of August 23, 2002, among FINOVA, Berkadia and Berkadia Equity Holdings LLC (filed as Exhibit 10.1.1 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2002 (the "2002 10-K")). |
| (10.J) | Voting Agreement, dated as of August 21, 2001, among FINOVA, Berkadia, Berkshire and Leucadia (filed as Exhibit 10.J to the August 27, 2001 8-K). |
| (10.K) | Amended and Restated Management Agreement among FINOVA, FINOVA Capital and Leucadia, dated April 3, 2001 (filed as Exhibit 10.T.1 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2000 (the "2000 10-K")). |
| (10.L.1) | Form of Letter for the Bonus Program (filed as Exhibit 10.L to the 2001 10-K). |
| (10.L.2) | 2006 Annual Incentive Plan Rules (filed as Exhibit 10.L.3 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2005 (the "2005 10-K")). |
| (10.L.3) | 2007 Annual Incentive Plan Rules (filed as Exhibit 10.A to the Current Report on Form 8-K dated January 23, 2007 (the "January 23, 2007 8-K")). |
| (10.M.1) | Severance Plan (filed as Exhibit 10.M.1 to the 2001 10-K). |
| (10.M.2) | Enhanced Severance Plan (filed as Exhibit 10.M.2 to the 2001 10-K). |
| (10.M.3) | Amended and Restated Severance Pay Plan and Summary Plan Description (filed as Exhibit 10.B to the Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2005 (the "2nd Quarter 2005 10-Q)). |
| (10.P.1) | Letter from FINOVA to Jeffrey D. Weiss dated February 20, 2006 (filed as Exhibit 10.P.8 to the 2005 10-K). |
| (10.P.2) | Letter from FINOVA to Philip A. Donnelly dated February 20, 2006 (filed as Exhibit 10.P.9 to the 2005 10-K). |
| (10.P.3) | Letter from FINOVA to Richard A. Ross dated February 20, 2006 (filed as Exhibit 10.P.10 to the 2005 10-K). |
| (10.P.4) | Letter from FINOVA to James M. Wifler dated February 20, 2006 (filed as Exhibit 10.P.11 to the 2005 10-K). |
| (10.P.5) | Letter from FINOVA to Philip A. Donnelly dated March 20, 2007. |
| (10.P.6) | Letter from FINOVA to Richard A. Ross dated March 20, 2007. |

28

**Table of Contents**

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| (10.P.7) | Letter from FINOVA to James M. Wifler dated March 20, 2007. |
| (10.Q) | Executive Severance Plan, Tier III (filed as Exhibit 10.X to the 2001 10-K). |
| (10.R) | Severance Trust Agreement between FINOVA and Atlantic Trust Company, dated as of November 1, 2003 (filed as Exhibit 10.R to the Annual Report on Form 10-K for the fiscal year ended December 31, 2003 (the "2003 10-K")). |
| (10.S) | Bonus and United Kingdom Trust Agreement between FINOVA and Atlantic Trust Company, dated as of November 1, 2003 (filed as Exhibit 10.S to the 2003 10-K). |
| (10.T) | Form of Master Settlement Agreement, dated as of October 31, 2006, by and among the Company, the Thaxton Entities, the holders of subordinated notes issued by the Thaxton Entities, and the Official Committee of Unsecured Creditors of the Thaxton Entities (filed as Exhibit 10.1 to the Current Report on Form 8-K dated November 6, 2006 (the "November 6, 2006 8-K")). |
| (10.U) | Asset Purchase Agreement by and among FINOVA Capital Corporation, Cactus Resort Properties, Inc., Desert Communications I, LLC and FCC Resort, LLC as sellers and SPCP Group, LLC as buyer, dated May 1, 2006 (filed as Exhibit 10.A to the Current Report on Form 8-K dated May 4, 2006 (the "May 4, 2006 8-K")). |
| (10.V) | Purchase and Sale Agreement by and among FINOVA Capital Corporation and AIRCRAFT 48008/48009, LLC as Sellers and FAP, LLC as buyer, dated January 17, 2007 (filed as Exhibit 10.A to the Current Report on Form 8-K dated January 18, 2007 (the "January 18, 2007 8-K")) |
| (12) | Computation of Ratio of Income to Fixed Charges. |
| (14) | Code of Conduct (Code of Ethics) . |
| (21) | Subsidiaries. |
| (23) | Consent of Independent Auditors from Ernst & Young LLP. |
| (31.1) | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Securities Exchange Act, as amended. |
| (31.2) | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Securities Exchange Act, as amended. |
| (32.1) | Certification of Chief Executive Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| (32.2) | Certification of Chief Financial Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| (99.A) | Order entered August 10, 2001 confirming the Third Amended and Restated Joint Plan of Reorganization, as amended and supplemented. |

29

**ANNEX A**

**THE FINOVA GROUP INC.
INDEX TO CONSOLIDATED FINANCIAL INFORMATION**

| | Page |
|---|---|
| Management's Discussion and Analysis of Financial Condition and Results of Operations | A-1 |
| Quantitative and Qualitative Disclosure about Market Risk | A-15 |
| Consolidated Financial Statements: | |
| Report of Independent Registered Public Accounting Firm | A-16 |
| Consolidated Statement of Net Assets in Liquidation (liquidation basis) at December 31, 2006 | A-17 |
| Consolidated Statement of Changes in Net Assets in Liquidation (liquidation basis) for the Period December 5, 2006 to December 31, 2006 | A-18 |
| Consolidated Balance Sheet (going concern basis) at December 31, 2005 | A-19 |
| Statements of Consolidated Operations (going concern basis) for the Period January 1, 2006 to December 4, 2006 and for the Years Ended December 31, 2005 and 2004 | A-20 |
| Statements of Consolidated Cash Flows (going concern basis) for the Period January 1, 2006 to December 4, 2006 and for the Years Ended December 31, 2005 and 2004 | A-21 |
| Statements of Consolidated Stockholders' Equity (going concern basis) for the Period January 1, 2006 to December 4, 2006 and for the Years Ended December 31, 2005 and 2004 | A-22 |
| Notes to Consolidated Financial Statements | A-23 |
| Supplemental Selected Financial Data (unaudited) | A-45 |

A-i

# Exhibits and Annex A Omitted

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|                                          |     |                              |
|------------------------------------------|-----|------------------------------|
| In re:                                   | §   | Chapter 11                   |
|                                          | §   |                              |
| THE FINOVA GROUP INC.,                   | §   | Case Nos. 01-0698 (PJW)      |
| FINOVA CAPITAL CORPORATION,              | §   |                              |
|                                          | §   | Jointly Administered         |
| Reorganized Debtor                       | §   |                              |
|                                          | §   | Re: Docket Nos. 22, 100, 196 |
|                                          | §   |                              |

**ORDER GRANTING DEBTORS' MOTION REQUESTING**
**CLARIFICATION OF CONFIRMED CHAPTER 11 PLAN**

On April 1, 2005, the Debtors filed their Motion of the Reorganized Debtor for an

Order Under Bankruptcy Code Section 1141 Clarifying Provisions of the Confirmed Plan [Dkt.

No. 22] (the "Clarification Motion"). A hearing was held on November 29, 2005, following

which on February 1, 2006 this Court entered an Order Regarding Debtors' Motion Requesting

Clarification of Confirmed Chapter 11 Plan [Dkt. No. 100], which specifically provided that,

inter alia, (1) the Clarification Motion is "APPROVED to the extent that the Debtor is presently

and will be forever insolvent", and (2) the Order shall not "be construed as a finding that the

Debtors presently are or will forever be insolvent."

On January 8, 2007, the Debtors filed a Request for Entry of Final Order in

Clarification Motion Contested Matter [Dkt. No. 196], which included the Supplemental

Declaration of Richard Ross relating to the financial condition of the Debtors and attached filings

of the Debtors with the SEC. The Official Committee of Equity Security Holders ("Equity

Committee") objected to this Request, and sought an increase in the fee cap for the purpose, inter

alia, of retaining a Financial Consultant for the limited purpose of reviewing the financial

situation of the Debtors. On January 29, 2007, this Court held a hearing on the Request, and at

the hearing, heard direct and cross-examination of Richard A. Ross on the financial condition of

Docket No. 220
Date 6|26|2007

the Debtors. Mr. Ross testified, in essence, that the Debtors were hopelessly insolvent and there was no realistic possibility that the situation would change. On February 6, 2007, the Court entered an Order [Dkt. Item 205] which authorized the increase in the fee cap so that the Debtors could retain a Financial Consultant. The Equity Committee retained Traxi LLC ("Traxi") as its Financial Consultant. On or about April 2, 2007, Traxi furnished its report which concluded that it has "no reason to dispute the solvency position of the Company at any prior date as reported in Finova's filing with the SEC."

Based on the record at the January 29, 2007 hearing, the Supplemental Declaration of Richard A. Ross and the 10Q Report attached to said Supplemental Declaration, the testimony of Richard A. Ross at the January 29, 2007 hearing, and the Traxi Report, as well as the prior proceedings and hearings relating to the Clarification Motion, the Court hereby finds that (1) the Debtors presently are and will be forever insolvent, (2) under the Indenture dated as of August 22, 2001 governing the issuance of the 7.5% Senior Secured Notes Maturing 2009 of The FINOVA Group Inc. (the "New Senior Notes"), the payment of any amount to or on account of the Equity Interests of The FINOVA Group Inc. ("FNV Group") would be an Impermissible Restricted Payment and cannot be made pursuant to section 4.06(a)(v), FIFTH, clause (x) of the Indenture, (3) there is no reasonable probability that, under the terms of the Indenture, any such payment on account of the Equity Interests of FNV Group will be permitted in the future, and (4) the legal and factual basis set forth in record of hearings on the Motion, and prior rulings and orders of this Court, establish just cause for the relief set forth in the Clarification Motion. Based on the foregoing and paragraph 1 of the Order of February 1, 2006 referred to above,

IT IS HEREBY ORDERED THAT:

2

1.    The Clarification Motion is granted in its entirety and on a Final basis. All objections to the Clarification Motion or the relief requested therein that have not been withdrawn, waived or settled, are hereby overruled on the merits.

2.    The Debtors (a) shall be permitted to use the funds presently set aside in a segregated account in the amount of 5% of Available Cash for possible distribution to holders of Equity Interests in FNV Group (as described in the Clarification Motion), in the approximate amount of $81,228,000 (as of May 15, 2007) [ (the "5% Funds") for general corporate purposes including, without limitation, payment of amounts due on the New Senior Notes, and (b) shall no longer be required to set aside 5% of Available Cash or any other amounts for possible distribution to holders of Equity Interests in FNV Group; provided, however, that the Debtors shall not distribute or otherwise use the 5% Funds for a period of 30 days following the entry of this Order.

3.    The Court shall retain jurisdiction over all matters relating to this Order.

Dated: June 26, 2007
Wilmington Delaware

THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| THE FINOVA GROUP INC , FINOVA CAPITAL CORPORATION, | § § § § | Case Nos. 01-0698 (PJW) |
| Reorganized Debtor | § § § § | Jointly Administered Re: Docket No. 22, 100, 196 |

## DECLARATION OF RICHARD A. ROSS RELATING TO APPEAL BOND

Richard A. Ross, for his Declaration, hereby states the foregoing, under Penalty of Perjury:

1. I am the Senior Vice President, Chief Financial Officer and Treasurer of The FINOVA Group, Inc. ("FINOVA") and its designated "principal financial officer" for SEC reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The facts and opinions in this Declaration are known to me personally, and I would be a competent witness as to such matters.

2. I have been employed by FINOVA for thirteen years, and for the last six years have held various positions as a senior financial officer. In that capacity, I have directly supervised the continued liquidation of the assets the above-captioned debtors ("Debtors") and the planning for a complete termination their business activities. As of now, substantially all of the assets of the Debtors have been liquidated.

3 On December 4, 2006, this Court entered an order which authorized the implementation of procedures to accomplish the final wind-down of all business operations of the Debtors and the termination of FINOVA as a legal entity. In FINOVA's 10-Q Report, filed

Docket No. 229
Date 7|11|2007

305

on May 9, 2007 ("FQR"), FINOVA stated that its goal was to wind-up all business activities and terminate its existence by the end of 2007, and it had prepared its budgets on the assumption of a December 2007 wind-up. FQR pp. 5, 13. A copy of the FQR is attached hereto as Exhibit A. As of today, this continues to be the corporate objective of FINOVA; however, delays in resolving this matter before the Court may necessitate extending the Liquidation period.

4. I am fully familiar with matters relating to the Clarification Motion and the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, dated June 24, 2007 ("Clarification Order"), and the motion of the Official Committee of Equity Security Holders ("Equity Committee") for a stay of the Clarification Order ("Stay Motion"). In connection with that Stay Motion, I would bring the following facts to the Court's attention:

a. In light of the Clarification Motion and the wind-down schedule, FINOVA anticipates distributing the amount in the Restricted Fund containing 5% of Available Cash to holders of New Senior Notes some time during the Third or Fourth Quarters of this year.

b. From the time the decision is made to distribute funds to holders of New Senior Notes until the actual distribution requires a period of approximately 45 days. Among the steps required are the initial notification of the trustee and confirmation of a date of record; sending formal written notification in accordance with the Indenture to the trustee including a notice of prepayment, an Officers Certificate, legal opinion and the form of notice of partial prepayment the trustee will send to holders of New Senior Notes; filing a Form 8-K with the SEC announcing the prepayment; the trustee sending formal notice to the Noteholders instructing physical holders to surrender their physical notes in order to receive their payment and receive a new note of their remaining balance; and confirmation between the trustee and FINOVA of the total amount due including principal and interest.

c. If the Stay Motion is granted and FINOVA cannot distribute the funds in the Restricted Fund and must keep setting aside 5% of distributions of Available Cash, it will be unable to wind-up its affairs by the end of 2007, and it will continue to incur operating expenses including employees, administrative costs and supplies, professional costs and rent in 2008 and possibly thereafter. Among other things, FINOVA would have to maintain continuing records, and the administrative staff to make an eventual distribution of funds. Moreover, since FINOVA is an SEC reporting company, it would have to continue as such and would have to comply with various SEC reporting and record keeping requirements. The latter is necessary because, if the Clarification Order is reversed, FINOVA would be required to distribute funds to holders of common stock.

5. I am advised by counsel that the timing of the appellate process could last well into 2008, or later. During the existence of a stay, the expenses described in paragraph 4(c) would be incurred, and there would be an additional period of approximately 90-120 days for completing the wind-up after a final and unstayed order was entered. FINOVA estimates that the cost of such process would range between $14 and $18 million for the full year of 2008, and additional amounts thereafter. Under these circumstances, I believe that a bond in the amount of $25 million would be necessary to protect FINOVA during the appellate process.

6. As stated above, it is FINOVA's corporate goal to wind-up by the conclusion of 2007. However, I should note that matters other than the Clarification Motion which could delay the wind-up, including but are not limited to the resolution of outstanding litigation and bankruptcy claims, the withdrawal of doing business in each state, unforeseen new litigation and dissolution of legal entities. See FQR p. 13. Nevertheless, I believe that the 2007 wind-up goal

is realizable and, in any event, it is likely that the wind-up can occur early in 2008 but for any proceedings on the Clarification Motion.

       7. I will be present in Court at the hearing on the Stay Motion, and will be prepared to testify to the foregoing.

       8. The above is submitted under Penalty of Perjury.

Dated: July 11, 2008

Phoenix, Arizona

                        Richard A. Ross

# Exhibit A to Ross Declaration
## Finova 10-Q Report, filed May 9, 2007
## (see Tab J)



# FORM 10-Q

## FINOVA GROUP INC – FNV

**Filed: May 09, 2007 (period: March 31, 2007)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I

FINANCIAL INFORMATION
Item 1.    Financial Statements

## PART I

FINANCIAL INFORMATION
Item 1.    Financial Statements
Item 2.    Management s Discussion and Analysis of Financial Condition and Results of
            Operations
Item 3.    Quantitative and Qualitative Disclosure About Market Risk
Item 4.    Controls and Procedures

## PART II

OTHER INFORMATION
Item 1.    Legal Proceedings
Item 1A.  Risk Factors
Item 6.    Exhibits
Signatures
EXHIBIT INDEX
EX-31.1 (CERTIFICATION OF CEO PURSUANT TO SECTION 302)

EX-31.2 (CERTIFICATION OF CFO PURSUANT TO SECTION 302)

EX-32.1 (CERTIFICATION OF CEO PURSUANT TO SECTION 906)

EX-32.2 (CERTIFICATION OF CFO PURSUANT TO SECTION 906)

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

## FORM 10-Q

☑   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2007

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from                 to

Commission file number 001-11011

# THE FINOVA GROUP INC.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 86-0695381 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |

| | |
|---|---|
| 8320 North Hayden Road, Suite C112 | |
| Scottsdale, AZ | 85258 |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: 480-624-4988

N/A

(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days

Yes ☑   No☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐   Accelerated filer ☐   Non-accelerated filer ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)

Yes ☐   No ☑

#### APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PRECEDING FIVE YEARS:

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by the court

Yes ☑   No ☐

#### APPLICABLE ONLY TO CORPORATE ISSUERS:

As of May 8, 2007, approximately 122,041,000 shares of Common Stock ($0.01 par value) were outstanding

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

THE FINOVA GROUP INC.

TABLE OF CONTENTS

| | | Page No. |
|---|---|---|
| **PART I   FINANCIAL INFORMATION** | | |
| Item 1 | Financial Statements | |
| | Consolidated Statements of Net Assets in Liquidation (liquidation basis) at March 31, 2007 (unaudited) and December 31, 2006 | 1 |
| | Consolidated Statement of Changes in Net Assets in Liquidation (liquidation basis) (unaudited) for the Three Months Ended March 31, 2007 | 2 |
| | Condensed Statement of Consolidated Operations (going concern basis) (unaudited) for the Three Months Ended March 31, 2006 | 3 |
| | Condensed Statement of Consolidated Cash Flows (going concern basis) (unaudited) for the Three Months Ended March 31, 2006 | 4 |
| | Notes to Interim Condensed Consolidated Financial Statements (unaudited) | 5 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations Special Note Regarding Forward-Looking Statements | 12 |
| Item 3 | Quantitative and Qualitative Disclosure about Market Risk | 20 |
| Item 4 | Controls and Procedures | 20 |
| **PART II   OTHER INFORMATION** | | |
| Item 1 | Legal Proceedings | 21 |
| Item 1A | Risk Factors | 21 |
| Item 6 | Exhibits | 21 |
| Signatures | | 22 |

Source: FINOVA GROUP INC. 10-Q. May 09. 2007

Table of Contents
PART I   FINANCIAL INFORMATION

Item 1.     Financial Statements

THE FINOVA GROUP INC.

CONSOLIDATED STATEMENTS OF NET ASSETS IN LIQUIDATION (LIQUIDATION BASIS)
(Dollars in thousands)

| | March 31, 2007 (Unaudited) | December 31, 2006 (Audited) |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 235,562 | $ 177,311 |
| Restricted cash—impermissible restricted payments | 78,104 | 78,104 |
| **Liquidating Portfolio:** | | |
| Net realizable value supported by underlying loan or direct financing agreements | 88,152 | 105,829 |
| Net realizable value supported by underlying operating leases and other owned assets | 21,504 | 68,624 |
| Investments | 9,463 | 11,091 |
| Total Liquidating Portfolio | 119,119 | 185,544 |
| Other assets and deposits | 2,046 | 2,877 |
| Total Assets | $ 434,831 | $ 443,836 |
| | | |
| **LIABILITIES (excluding Senior Notes)** | | |
| Interest payable on the Senior Notes | $ 42,046 | $ 14,222 |
| Accounts payable and other liabilities | 10,328 | 14,727 |
| Reserve for estimated costs during the liquidation period | 18,772 | 24,259 |
| Total Liabilities (excluding Senior Notes) | 71,146 | 53,208 |
| Net Assets Available for Settlement of Senior Notes | 363,685 | 390,628 |
| Senior Notes with outstanding principal of $1.5 billion, at estimated settlement amount | 363,685 | 390,628 |
| Net Assets in Liquidation | $ — | $ — |

*See notes to interim condensed consolidated financial statements*

1

Source: FINOVA GROUP INC. 10-Q. May 09, 2007

Table of Contents

THE FINOVA GROUP INC.

CONSOLIDATED STATEMENT OF CHANGES IN NET ASSETS IN LIQUIDATION (LIQUIDATION BASIS)

FOR THE THREE MONTHS ENDED MARCH 31, 2007
(Dollars in thousands)
(Unaudited)

| | |
|---|---:|
| Net Assets in Liquidation at December 31, 2006 | $    — |
| Changes in net assets in liquidation from January 1, 2007 through March 31, 2007: | |
| Change in estimated net realizable value of assets | (1,810) |
| Interest earned on investment of cash reserves and other operating activity | 3,416 |
| Increase in estimated costs during the liquidation period | (724) |
| Interest accruing on the Senior Notes | (27,825) |
| Reduction in the estimated settlement of the Senior Notes | 26,943 |
| Net Change in Net Assets in Liquidation from January 1, 2007 through March 31, 2007 | $    — |
| Net Assets in Liquidation at March 31, 2007 | $    — |

*See notes to interim condensed consolidated financial statements*

2

Source: FINOVA GROUP INC. 10-Q. May 09. 2007

Table of Contents

THE FINOVA GROUP INC.

CONDENSED STATEMENT OF CONSOLIDATED OPERATIONS (GOING CONCERN BASIS)

FOR THE THREE MONTHS ENDED MARCH 31, 2006
(Dollars in thousands, except per share data)
(Unaudited)

| | |
|---|---:|
| **Revenues:** | |
| Interest income | $ 3,714 |
| Rental income | 1,481 |
| Operating lease income | 8,389 |
| Fees and other income | 5,322 |
| **Total Revenues** | 18,906 |
| Interest expense | (38,976) |
| Operating lease depreciation | (1,658) |
| **Interest Margin** | (21,728) |
| **Other Revenues and (Expenses):** | |
| Reversal of provision for credit losses | 21,103 |
| Net gain on financial assets | 28,783 |
| Portfolio expenses | (5,484) |
| General and administrative expenses | (7,329) |
| **Total Other Revenues and (Expenses)** | 37,073 |
| Income before income taxes | 15,345 |
| Income tax expense | — |
| **Net Income** | $ 15,345 |
| Basic/diluted earnings per share | $ 0.13 |
| Weighted average shares outstanding | 122,041,000 |

*See notes to interim condensed consolidated financial statements*

3

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

THE FINOVA GROUP INC.

CONDENSED STATEMENT OF CONSOLIDATED CASH FLOWS (GOING CONCERN BASIS)

FOR THE THREE MONTHS ENDED MARCH 31, 2006
(Dollars in thousands)
(Unaudited)

| | |
|---|---:|
| **Operating Activities:** | |
| Net income | $ 15,345 |
| Adjustments to reconcile net income to net cash used by operating activities: | |
| Reversal of provision for credit losses | (21,103) |
| Net cash gain on disposal of financial assets | (27,820) |
| Net non–cash gain on financial assets | (963) |
| Depreciation and amortization | 1,849 |
| Deferred income taxes, net | (126) |
| Fresh–start accretion—assets | (289) |
| Fresh–start discount amortization—Senior Notes | 8,028 |
| Change in assets and liabilities: | |
| Decrease in other assets | 435 |
| Decrease in accounts payable and accrued expenses | (9,748) |
| Increase in interest payable | 30,036 |
| **Net Cash Used by Operating Activities** | (4,356) |
| **Investing Activities:** | |
| Proceeds from disposals of leases and other owned assets | 26,431 |
| Proceeds from sales of investments | 1,809 |
| Proceeds from sales of loans and financing leases | 34,078 |
| Collections and prepayments from financial assets | 32,658 |
| Fundings under existing customer commitments | (3,636) |
| Deposit of impermissible restricted payments into restricted cash account | (3,125) |
| Recoveries of loans previously written off | 1,503 |
| **Net Cash Provided by Investing Activities** | 89,718 |
| **Financing Activities:** | |
| Principal prepayments of Senior Notes | (59,359) |
| **Net Cash Used by Financing Activities** | (59,359) |
| **Increase in Cash and Cash Equivalents** | 26,003 |
| **Cash and Cash Equivalents, beginning of year** | 212,317 |
| **Cash and Cash Equivalents, end of period** | $238,320 |

*See notes to interim condensed consolidated financial statements*

-4-

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

THE FINOVA GROUP INC.

NOTES TO INTERIM CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

MARCH 31, 2007
(Dollars in thousands in tables)
(Unaudited)

A.    Nature of Operations and Plan of Liquidation

The accompanying financial statements and notes hereto should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006. Capitalized terms not defined herein are used as defined in the Form 10-K.

The notes to the financial statements relate to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital") FINOVA is a financial services holding company. Through its principal operating subsidiary, FINOVA Capital, the Company provided a broad range of financing and capital markets products, primarily to mid-size businesses. Throughout this document, "we," "us" and "our" also refer to The FINOVA Group Inc. and its subsidiaries.

Since emergence from chapter 11 bankruptcy proceedings in August 2001, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of our assets. These activities have included collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral. We have sold substantial portions of asset portfolios and are considering future sales of our remaining assets if buyers can be found at acceptable prices; however, there can be no assurance that we will be successful in efforts to sell additional assets. We are currently offering to sell our remaining assets both by portfolio and individual asset. We are prohibited by the Indenture governing our 7 5% Senior Secured Notes (the "Senior Notes") from engaging in any new lending activities or other business, except to honor existing customer commitments and in certain instances, to restructure financing relationships to maximize value. Any funds generated in excess of cash reserves permitted by our debt agreements have been used to reduce obligations to our creditors.

Because substantially all of our assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure obligations under the promissory notes of FINOVA Capital issued to us in the aggregate principal amount of the Senior Notes (the "Intercompany Notes"), our ability to obtain additional or alternate financing is severely restricted. Accordingly, we intend to rely on internally generated cash flows from the liquidation of assets as our only meaningful source of liquidity.

Plan of Liquidation

On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") On December 4, 2006, the Bankruptcy Court granted our Motion and approved (i) the previously announced settlement of various litigations associated with The Thaxton Group, Inc. (the "Thaxton Settlement"), (ii) the ongoing sale of our remaining assets, the orderly windup of our operations and our future dissolution, (iii) our sale of all or substantially all of our assets without stockholder approval and our future dissolution without stockholder approval at such time as our Board deems to be appropriate and (iv) channeling to the Bankruptcy Court any claims against us that the holders of our Senior Notes or the indenture trustee for the Senior Notes may have arising from or in any way related to our joint chapter 11 plan, the ongoing liquidation of FINOVA, the senior secured notes, or the windup of our operations

Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims. Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008. The reserve for estimated costs reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

As a result of the aforementioned approvals, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10-Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States. Historical information

5

Table of Contents

for periods prior to December 5, 2006 is presented on a going concern basis of accounting. Under the liquidation basis of accounting, we are required to value all assets at their estimated net realizable value, while liabilities are reported at their estimated net settlement amount. Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). These estimates will be periodically reviewed and adjusted as appropriate. There can be no assurance that these estimated values will be realized. Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution.

We will continue to operate as a public company throughout the liquidation period under a Management Services Agreement with Leucadia National Corporation ("Leucadia") that expires in 2011. Pursuant to that agreement, Leucadia has designated its employees to act as Chairman of the Board (Ian M. Cumming), President (Joseph S. Steinberg) and Chief Executive Officer (Thomas E. Mara). We continue to maintain adequate cash reserves to pay all operating expenses as they come due in accordance with the Indenture.

**B.    Significant Accounting Policies**

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires us to use estimates and assumptions that affect reported amounts of assets and liabilities. These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. Significant estimates include anticipated amounts and timing of future cash flows used in the calculation of net realizable value, reserve for future costs and settlement amounts. Actual results could differ from those estimated.

*Consolidation of Interim Reporting*

The interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles. All intercompany balances have been eliminated in consolidation. The interim consolidated financial information is unaudited. In the opinion of management, all adjustments consisting of normal recurring items necessary to present fairly our net assets in liquidation as of March 31, 2007 and the changes in net assets presented herein have been included in our consolidated financial statements.

For a complete listing of our significant accounting policies, see Note B "Significant Accounting Policies" in our Annual Report on Form 10-K for the year ended December 31, 2006. The policies related to the liquidation basis of accounting were the only policies presented herein. With the adoption of the liquidation basis of accounting, all anticipated improvements or deterioration in the portfolio are fully reflected in our financial statements as facts and assumptions change.

*Liquidation Basis of Accounting*

With the approval of our Plan of Liquidation by the Bankruptcy Court, our complete liquidation is considered to be imminent and as such, we adopted the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States. A Statement of Net Assets in Liquidation and a Statement of Changes in Net Assets in Liquidation are the principal financial statements presented under the liquidation basis of accounting. Under the liquidation basis of accounting, assets are stated at their estimated net realizable value, which is the non–discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non–discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs. Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). These estimates will be periodically reviewed and adjusted as appropriate. There can be no assurance that these estimated values will be realized. Such amounts should not be taken as an indication of the timing or amount of future distributions to be made. The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances, of the net realizable value of the assets and the costs associated with carrying out the Plan of Liquidation based on the assumptions set forth below. The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material. In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation. Accordingly, it is not possible to predict with certainty the timing or aggregate amount which will ultimately be distributed to note holders and no

6

Table of Contents

assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statement of Net Assets in Liquidation or the price at which our Senior Notes have traded or are expected to trade in the future

The following are the significant assumptions utilized by management in assessing the value of our liquidating portfolio and the expected settlement amount of liabilities included in the Statement of Net Assets in Liquidation at March 31, 2007 and December 31, 2006

**Net Realizable Value Supported by Underlying Loan or Direct Financing Agreements.** All loans and direct financing leases were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales and settlement proceeds, principal collections, scheduled rental payments and interest. Anticipated cash collections were partially offset by any known direct costs and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts, settlement agreements or letters of intent to sell. The net realizable values for the remainder of the loans and direct financing leases were based upon estimated cash flows on a transaction-by-transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, the financial condition of our customers and collateral. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values

**Net Realizable Value Supported by Underlying Operating Leases and Other Owned Assets.** All owned assets (operating leases and off-lease assets) were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales proceeds and scheduled rental payments. Anticipated cash collections were partially offset by any known direct costs such as maintenance and make ready costs for certain aircraft and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts or letters of intent to sell. The net realizable values for the remainder of the owned assets were based upon estimated cash flows on a transaction-by-transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, lessee performance and residual value assumptions for leases. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values

**Investments.** All investments are reported at either their fair value or estimated net realizable values, based on published information, quotes by registered securities brokers or signed contracts. Investments for which market information is not readily available were valued based on estimated future cash flows that may be realized from the investment, if any

**Reserve for Estimated Costs during the Liquidation Period.** Under the liquidation basis of accounting, we are required to estimate and accrue for costs associated with implementing and completing the Plan of Liquidation. The reserve for estimated costs includes four primary areas of accruals including people costs (payroll, benefits and severance), Leucadia management fees, professional services and litigation costs and corporate expenses (insurance, directors' fees and entity related expenses). These amounts can vary significantly due to, among other things, the timing of assets sales, the timing and amounts associated with discharging known and contingent liabilities and claims, the costs associated with cessation of our operations including an estimate of costs subsequent to that date (which would include reserve contingencies for the appropriate statutory periods) and the costs of retaining knowledgeable personnel and others to oversee the liquidation. As a result, we have accrued the projected costs including corporate overhead and specific liquidation costs of severance and performance bonuses, professional fees and various other wind-up costs expected to be incurred during the projected period to complete the liquidation and dissolution. These expense accruals will be periodically reviewed for adequacy and adjusted from time to time as projections and assumptions change. Changes to the accruals will be recorded as adjustments to net assets in liquidation in future periods

C.    Effects of the Liquidation Basis of Accounting

During the three months ended March 31, 2007, the estimated net realizable value of our liquidating portfolio decreased a net $1.8 million primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset. Additionally, during the three months ended March 31, 2007, we accrued $27.8 million of additional interest on the Senior Notes and earned interest income on cash investments and

7

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

320

Table of Contents

other operating activity of $3 4 million  As a result of the adoption of the liquidation basis of accounting and valuation of our liquidating portfolio at its estimated net realizable value, income is no longer being recognized on our portfolio  All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments  Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection

Under the liquidation basis of accounting, we are also required to establish and maintain a reserve for all future general and administrative expenses and other costs expected to be incurred during the liquidation period (estimated to be the end of 2007)  The following is a summary of and changes to the reserve for estimated costs during the liquidation period:

|  | December 31, 2006 | Adjustments and Payments | March 31, 2007 |
|---|---|---|---|
| People costs (payroll, benefits and severance) | $   4,144 | $   (1,318) | $   2,826 |
| Leucadia management fees | 8,000 | (2,000) | 6,000 |
| Professional services and litigation costs | 10,431 | (2,003) | 8,428 |
| General corporate expenses | 1,684 | (166) | 1,518 |
| Total reserve for estimated costs during the liquidation period | $ 24,259 | $   (5,487) | $ 18,772 |

During the three months ended March 31, 2007, the reserve declined to $18 8 million due to the payment of expenses, partially offset by an increase caused by retaining certain employees for a slightly longer period of time than previously estimated. The staff retention is directly related to aircraft sales sliding into the second quarter and additional time consumed by the equity committee's review of our solvency (for further details, see Note G  "Litigation and Claims"), both of which have caused delays to the overall liquidation process (including the dissolution of entities and resolution of claims)

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes  During the three months ended March 31, 2007, the estimated settlement amount of the Senior Notes was reduced by $26 9 million to a balance of $363 7 million; however, we currently estimate the Senior Note holders will receive total liquidation distributions (total principal and interest) of approximately $405 7 million, which is a $0 9 million increase over our year-end estimate

### D.    Liquidating Portfolio

As a result of the adoption of the liquidation basis of accounting, most of the prior disclosures related to total financial assets are no longer applicable  Our liquidating portfolio is now recorded at its estimated net realizable value, which incorporates all future cash flows, including earnings expected to be collected

Since our total financial assets were primarily concentrated in specialized industries, we were subject to both general economic risk and the additional risk of economic downturns within individual sectors of the economy, particularly those impacting the aviation industry  We also completed multiple financial transactions with individual borrowers and their affiliates, resulting in a greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including aviation) of those borrowers and their affiliates

At March 31, 2007, the carrying value on a liquidation basis of our top 10 aggregate exposures to borrowers and their affiliates totaled approximately $109 4 million and represented 98 5% of our liquidating portfolio (excluding the severance and bonus trusts of $8 1 million), as compared to our top 10 exposures (on a liquidation basis) at December 31, 2006 of $148 9 million, which represented 84 8% of our liquidating portfolio (excluding the severance and bonus trusts of $10.1 million)  The top 10 exposures at March 31, 2007 were primarily concentrated in aviation assets and the loan to The Thaxton Group, which alone made up 75 3% of the net realizable value expected from our liquidating portfolio  We subsequently received $83 7 million on April 16, 2007 in full and final settlement of the Thaxton loan  As of the date of this report, all of our top 10 exposures have either been liquidated; are under binding definitive agreements or letters of intent to sell; or are subject to a negotiated settlement

8

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

At March 31, 2007, our transportation portfolio consisted of the following aircraft:

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (in years) |
|---|---|---|---|---|
| McDonnell Douglas DC10 | | | 1 | 32 |
| McDonnell Douglas MD–80 Series | 7 | 7 | | 23 |
| Regional jets, corporate aircraft and turbo props | 7 | 7 | | 24 |
| Total | 15 | 14 | 1 | 24 |

At March 31, 2007, five aircraft were operated by domestic carriers, while 10 aircraft were operated by foreign carriers. In addition to the aircraft, our transportation portfolio also includes two aircraft engines, a small number of miscellaneous parts and some unsecured aviation notes and claims with a total carrying value on a liquidation basis of approximately $1.0 million as of March 31, 2007. As of the date of this report, we had 15 aircraft with a total carrying value on a liquidation basis of approximately $24.7 million. All of these assets have either been liquidated subsequent to March 31, 2007 or are subject to a definitive agreement to sell. Due to the fact that these aircraft are operating throughout the world, additional time will be necessary to close the sales. It is to our advantage to close these transactions when the aircraft are in tax friendly jurisdictions to minimize transfer taxes. No assurance can be given that all of these commitments will result in actual sales or the timing of such sales, but the remaining aircraft are targeted to close during the second quarter of 2007.

Our non–aviation portfolio, in addition to the Thaxton loan, at March 31, 2007 was comprised of assets with a net realizable value of approximately $9.7 million, including our $8.1 million investment in two grantor trusts to secure severance and bonus obligations to our employees. These assets are held primarily for the benefit of our employees, but are recorded as investments due to our retained interest in any excess assets. Substantially all of the other non–aviation assets are in the process of being liquidated.

The estimated net realizable value of our portfolio included, among other transactions, a number of customer judgments and claims, non–marketable private equity securities and certain obligations owed to us by companies that are in liquidation. In many of these instances, we did not attribute any net realizable value to these assets due to our inability to predict the collection of any cash flows from the transactions with even a remote level of confidence. Most of these transactions were previously included in due diligence materials in an attempt to sell the assets, but were excluded on multiple occasions by prospective buyers because of costs of collection and potential liability concerns of the buyers. We continue to monitor these accounts for changes in facts and circumstances that would allow us to attribute value to these assets. As a result, there is the possibility that some net realizable value will be attributed to these assets in the future. An increase in the estimated net realizable value of these assets, if any, will be reflected as a change in net assets in liquidation in future filings. Additionally, we continue to occasionally receive small amounts of proceeds typically from trustees for assets that in certain cases were written off years ago. These cash flows are reflected as a change in net assets in liquidation as they are received.

E.     Debt

A summary of our total debt outstanding on a liquidation basis was as follows:

| | March 31, 2007 | December 31, 2006 |
|---|---|---|
| Senior Notes: | | |
| Principal | $ 1,483,975 | $ 1,483,975 |
| Senior Notes principal estimated to not be settled or repaid | (1,120,290) | (1,093,347) |
| Senior Notes | $ 363,685 | $ 390,628 |

During the first quarter of 2007, we made no principal prepayments on the Senior Notes. In April 2007, we announced a partial prepayment of $59.4 million that will be paid on May 15, 2007. Following this prepayment, cumulative prepayments will total $1.54 billion or approximately 52% of the face amount ($2.97 billion) of the Senior Notes. Additionally, bonds with a face amount of $900 thousand and outstanding principal balance of $450 thousand reverted back to us under the sunset provisions of the Indenture and on April 5, 2007 the trustee cancelled these bonds, reducing the March 31, 2007, principal amount by

9

Table of Contents

$450 thousand. Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405.7 million, which is considerably less than the total principal and interest due of approximately $1.5 billion. The estimated settlement amount was determined solely based on the net assets available for settlement of the Senior Notes and is subject to change due to changes in the estimated net realizable value of our net assets. We clearly do not have sufficient assets to fully repay the Senior Note obligation

While, the Senior Notes have a first priority security interest in substantially all of our remaining assets, the Indenture requires us to first use any cash and cash equivalents to pay or fund operating expenses, taxes and reasonable reserves for commitments and general corporate purposes. In accordance with the terms of the Indenture, we are required to use any excess cash as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at our option, which we have previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed below in Note G "Litigation and Claims", we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of our remaining assets, the resolution of claims and other litigation matters, the extent to which reserves for current or future liabilities are required and the length of time required to settle all of our matters. Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims. Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008

Stockholders should not expect any payments or distributions. The Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5.263% (i.e., 5%/95%) of each principal prepayment. Ninety-five percent (95%) of the remaining available cash after establishment of cash reserves as defined in the Indenture will be used to make semi-annual prepayments of principal on the Senior Notes and five percent (5%) is identified for distributions to and/or repurchases of stock from common stockholders. However, the Indenture prohibits us from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law. Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture. Based upon the fact that the Senior Notes will not be fully repaid, we are required to retain impermissible restricted payments until such time, if ever, that we are no longer restricted from making a distribution to our stockholders or until it is necessary to use the cash to satisfy our debt obligations

In conjunction with the prepayments of Senior Notes noted above, we will have retained a total of $81.2 million as of May 15, 2007. Retained amounts are being segregated and reflected as restricted cash in our financial statements, pending their final disposition. We anticipate that the retained amounts will eventually be paid to our creditors, not our stockholders. If the funds were to be paid to our stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of our common stock, would receive half of the retained amounts. Berkadia has advised us that it does not believe that stockholders are entitled to the retained amounts since we cannot fully satisfy our creditor obligations

As previously reported, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors. For a further discussion of the motion and its status, see Note G "Litigation and Claims."

F.    Income Taxes

Our federal net operating loss carryforwards of $1.3 billion have remained relatively unchanged since year end. No income tax expense or benefit was recorded during the three months ended March 31, 2007 and 2006. Any income or loss has been entirely offset by a decrease or increase in valuation allowances against deferred tax assets, which were previously established due to concern regarding our ability to utilize income tax benefits generated from losses in prior periods. We do not expect to be able to utilize all the deferred tax assets due to uncertainty about the amount of future earnings, a variety of loss or other tax attribute carryover limitations in the various jurisdictions in which we file tax returns and uncertainty regarding the timing of the reversal of deferred tax liabilities

10

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents
G. Litigation and Claims

*Legal Proceedings*

We are party either as plaintiff or defendant to various actions, proceedings and pending claims. including legal actions, some of which involve claims for compensatory, punitive or other damages in significant amounts. Litigation often results from our attempts to enforce our lending agreements against borrowers and other parties to those transactions. Litigation is subject to many uncertainties. It is possible that some of the legal actions, proceedings or claims could be decided against us. Other than the matters described below, we believe that any resulting liability from our legal proceedings should not materially affect our net assets in liquidation or cash flows. The following matters could have a material adverse impact on our net assets in liquidation or cash flows.

Historically, it was our policy to accrue for loss contingencies, including litigation, only when the losses were probable and estimable. The determination of when losses became probable and estimable was inherently subjective and required significant judgment. Under the liquidation basis of accounting, liabilities for loss contingencies and claims are reported at their estimated net settlement amount, which is the non-discounted amount of cash expected to be paid to liquidate or settle an obligation in the due course of business

If any legal proceedings result in a significant adverse judgment against us. it is unlikely that we would be able to satisfy that liability due to our financial condition. As previously noted, due to our financial condition. we do not expect that we can satisfy all of our secured debt obligations at maturity. Attempts to collect on those judgments could lead to future reorganization proceedings of either a voluntary or involuntary nature

*Litigation Related to Loans to The Thaxton Group Inc. and Related Companies*

Our prior periodic filings with the Securities and Exchange Commission have disclosed ongoing litigation against FINOVA Capital with respect to The Thaxton Group Inc. ("TGI") and several related entities (collectively. the "Thaxton Entities")

Pursuant to an order of the Thaxton Entities bankruptcy court dated September 11, 2006, we transferred all of the cash received from the Thaxton Entities since commencement of the Thaxton Entities chapter 11 proceedings in October 2003. together with interest earned thereon (an aggregate of approximately $97.2 million). to a trust account to be held by Thaxton under order of the bankruptcy court

On September 12, 2006. we reached a preliminary settlement (the "Settlement") to resolve all outstanding claims in the ongoing litigation between us. the Thaxton Entities. the holders of subordinated notes issued by the Thaxton Entities (the "Noteholders"). and the Official Committee of Unsecured Creditors of the Thaxton Entities This Settlement will settle all of the actions involving us and the Thaxton Entities. in particular the actions pending in the United States District Court for the District of South Carolina. Anderson Division (the "District Court"). including the previously described new Thaxton action commenced in the District Court in June 2006. as well as claims in the Thaxton Entities chapter 11 proceedings (collectively. the "Thaxton Litigation")

The principal terms of the Settlement were approved by our Board of Directors on September 11. 2006 and the bankruptcy court for the FINOVA Capital and Thaxton Entities bankruptcies in December 2006. The Thaxton Plan of Reorganization was approved by the bankruptcy court on April 3, 2007, and became effective on April 16, 2007. On April 16, 2007, we received $83.7 million, representing all amounts we transferred into the trust on September 11, 2006 – i.e. all amounts paid by the Thaxton Entities to us since commencement of the Thaxton Entities chapter 11 proceedings in October 2003 (together with interest earned thereon), minus $16 million, plus interest actually earned thereon from August 16, 2006. which will be retained by the Thaxton Entities. In addition. we received complete releases from all Thaxton parties for all matters related to the Thaxton Entities and the summary judgment order of the District Court was vacated

*Thaxton Life Partners Litigation*

On February 14, 2007. a group of noteholders of Thaxton Life Partners, Inc ("TLP") filed suit against the Company and FINOVA Capital (the "TLP Action"), unrelated to the Thaxton Entities litigation noted above. The TLP Action purports to be a class action filed on behalf of approximately 150 TLP note holders with claims related to approximately $20 million in TLP

11

Table of Contents
notes  The TLP Action alleges that, in connection with TLP's sale of its notes, the Company, FINOVA Capital, and several other defendants participated in a civil conspiracy, violated the South Carolina Unfair Trade Practices Act, violated the civil RICO statute, and were unjustly enriched  In its various counts, the TLP Action seeks actual, treble, and/or punitive damages

The TLP Action is currently pending in the United States District Court for the District of South Carolina (the "South Carolina District Court")  We believe that, under the terms of the TLP notes, the TLP Action must move forward in arbitration  The Company and FINOVA Capital have filed a motion with the South Carolina District Court seeking an order compelling such arbitration  No order has yet been issued with respect to this issue  We also believe that all claims against both us and FINOVA Capital are without merit  The Company and FINOVA Capital intend to vigorously defend against the TLP note holders' claims asserted against them  If, however, the TLP Action results in a significant adverse final determination against us or FINOVA Capital, which is not anticipated, it is unlikely that the Company or FINOVA Capital would be able to satisfy that liability due to our financial condition  As previously disclosed, due to our financial condition, we do not expect that we can satisfy all of our secured debt obligations at maturity  Attempts to collect on any such judgment could lead to future reorganization proceedings of either a voluntary or involuntary nature

### Motion Regarding Distributions to Stockholders

As discussed more fully in Note E  "Debt", the Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5 263% of each principal prepayment  However, the Indenture prohibits distribution of those amounts due to our financial condition  Those amounts are held in a restricted account, and will total $81 2 million as of May 15, 2007  Because we will not be able to repay the Senior Notes in full, on April 1, 2005, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order (1) to cease directing funds into the restricted account and (2) to allow us to use the funds in the restricted account to satisfy our obligations to creditors

On February 1, 2006, the Bankruptcy Court issued its order approving our April 1, 2005 motion to the extent that we will be forever insolvent  The Bankruptcy Court did not find that we are presently or will be forever insolvent  As a result, we will continue to direct funds into the restricted account until such time that we are deemed to be forever insolvent

On December 22, 2006, the reconstituted equity committee filed a motion with the Bankruptcy Court seeking among other things, appointment of a financial expert to review this issue of our solvency, and up to $100,000 to accomplish this task  Over our objection, the Bankruptcy Court granted the equity committee's motion, ordering that the evaluation be completed within sixty (60) days of an order being entered approving the motion  As expected, the financial expert concluded that FINOVA is insolvent  The parties will seek a final order of the bankruptcy court declaring FINOVA's insolvency  Once issued, the equity committee may then appeal the underlying ruling of the bankruptcy court should they so desire

Item 2.        Management's Discussion and Analysis of Financial Condition and Results of Operations

The following section should be read in conjunction with our Annual Report on Form 10–K for the year ended December 31, 2006 and the Special Note Regarding Forward–Looking Statements included herein  Capitalized terms not defined herein are used as defined in the Form 10–K  The following discussion relates to The FINOVA Group Inc  and its subsidiaries (collectively "FINOVA" or the "Company"), including its principal operating subsidiary, FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital")

### OVERVIEW

During the first quarter of 2007, we continued to make significant progress in the orderly collection and liquidation of our assets  Our liquidating portfolio declined by approximately 36% since year–end 2006, reducing the net realizable value of our remaining assets to just over $119 million at March 31, 2007  As we previously mentioned, it has become increasingly more difficult for us to offset the incremental costs of collecting our assets in an orderly fashion and as a result, to maximize the value of our remaining assets, we initiated efforts to accelerate the liquidation process  The vast majority of the remaining assets are expected to be liquidated during the second quarter of 2007

Plan of Liquidation  On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court")  On December 4, 2006, the Bankruptcy Court granted our Motion and approved (i) the previously announced settlement of various litigations associated with The Thaxton Group, Inc  (the "Thaxton

12

Table of Contents

Settlement"). (ii) the ongoing sale of our remaining assets. the orderly windup of our operations and our future dissolution, (iii) our sale of all or substantially all of our assets without stockholder approval and our future dissolution without stockholder approval at such time as our Board deems to be appropriate and (iv) channeling to the Bankruptcy Court any claims against us that the holders of our Senior Notes or the indenture trustee for the Senior Notes may have arising from or in any way related to our joint chapter 11 plan, the ongoing liquidation of FINOVA. the senior secured notes. or the windup of our operations

As a result of the aforementioned approvals, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10−Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States Thaxton & Company Historical information for periods prior to December 5, 2006 is presented on a going concern basis of accounting Under the liquidation basis of accounting, we are required to value all assets at their estimated net realizable value, while liabilities are reported at their estimated net settlement amount Additionally. under the liquidation basis of accounting. we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense) These estimates will be periodically reviewed and adjusted as appropriate There can be no assurance that these estimated values will be realized Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of the remaining assets, the resolution of claims and other litigation matters. the extent to which reserves for current or future liabilities are required and the length of time required to settle all our matters  Our goal is to wind−up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims  Accordingly. the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008  The reserve for estimated costs ($18 8 million) reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

We continue to retain sufficient cash reserves to fund our expenses. including the costs associated with the wind−up of our affairs. resolution of outstanding bankruptcy claims and matters related to Thaxton  As a result, we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures and claims, which could limit our ability to make and the timing of future voluntary principal prepayments

**Anticipated Shortfall.** In April 2007. we announced a partial prepayment of $59 4 million that will be paid on May 15, 2007  Following this prepayment. cumulative prepayments will total $1 54 billion or approximately 52% of the face amount ($2 97 billion) of the Senior Notes  Based on the revaluation of our assets at their estimated net realizable value and liabilities at estimated net settlement amount. we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405 7 million. which is considerably less than the total principal and interest due of approximately $1 5 billion  We clearly do not have sufficient assets to fully repay the Senior Note obligation  In order to eliminate the shortfall, the remaining assets (excluding cash and cash equivalents), which have already been marked up from their historical going concern basis, would have to increase in value by more than ten times their already marked up value  We do not believe there is any chance of this occurring

**No Stockholder Payments Anticipated.** While the Indenture contemplated we would make payments to our stockholders as the Senior Notes were repaid. we have not made those payments  Distributions to stockholders are prohibited due to our financial condition  Based on our liquidation basis financial statements. we will not be able to repay more than $1 1 billion of the Senior Notes  As a result. stockholders should not expect any payments or return on their common stock Funds related to the restricted distributions are currently being held in a segregated account. pending their final disposition  We anticipate that those funds will eventually be paid to our creditors. not to our stockholders  If the funds were to be paid to our stockholders, affiliates of Berkadia (which are owned by Berkshire Hathaway and Leucadia). as owner of 50% of our stock. would receive half of those payments

As discussed in Note G  Litigation and Claims." we filed a motion in the United States Bankruptcy Court for the District of Delaware, seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors

13

Table of Contents

**No Restructuring Plan Contemplated.** On numerous occasions, we have been asked whether there is some plan to save the Company and our net operating loss carryforwards ("NOL") As we have noted for some time, the Board remains willing to consider legitimate proposals presented by note holders or others, but we are not formulating a restructuring plan intended to enable us to emerge as a healthy company

Many obstacles exist to creation of a viable restructuring plan A restructuring presumes a sensible business plan emerging from that process In light of our dwindling asset base, the composition of our remaining assets and the competitive environment, we believe it would be difficult, if not futile, in these circumstances to develop a business model that can produce returns to the creditors and/or new investors greater than that expected from the present course Absent that, or a substantial new investment in FINOVA, we believe it would be difficult to obtain the requisite approval to restructure the present debt obligations  The task becomes more difficult as the portfolio continues to shrink  We caution investors to carefully evaluate applicable tax regulations, which restrict the ability to transfer or use NOLs in a variety of circumstances  Our financial statements do not anticipate using the NOLs for those and other reasons

**HIGH INVESTMENT RISK OF SECURITIES.** As previously stated, we will not be able to fully repay the Senior Notes or make any distributions to our stockholders, absent a court order in connection with the motion referred to above. Consequently, investing in our Senior Notes and common stock involves a high level of risk.

## CRITICAL ACCOUNTING POLICIES

Our consolidated financial statements continue to be prepared in accordance with U S  generally accepted accounting principles. The preparation of these financial statements requires us to use estimates and assumptions that affect reported amounts of assets and liabilities  These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements  See Item 1A  "Risk Factors" and "Special Note Regarding Forward-Looking Statements" in our Annual Report on Form 10-K for the year ended December 31, 2006 for more information on these risks and uncertainties  We believe the following to be among the most critical judgment areas in the application of our accounting policies

### *Liquidation Basis of Accounting*

With the approval of our Plan of Liquidation by the Bankruptcy Court, our complete liquidation is considered to be imminent and as such, we adopted the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States  A Statement of Net Assets in Liquidation and a Statement of Changes in Net Assets in Liquidation are the principal financial statements presented under the liquidation basis of accounting  Under the liquidation basis of accounting, assets are stated at their estimated net realizable value, which is the non-discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non-discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs  Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense)  These estimates will be periodically reviewed and adjusted as appropriate  There can be no assurance that these estimated values will be realized  Such amounts should not be taken as an indication of the timing or amount of future distributions to be made  The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances, of the net realizable value of the assets and the costs associated with carrying out the Plan of Liquidation based on the assumptions set forth below  The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material  In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation. Accordingly, it is not possible to predict with certainty the timing or aggregate amount which will ultimately be distributed to note holders and no assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statement of Net Assets in Liquidation or the price at which our Senior Notes have traded or are expected to trade in the future

The following are the significant assumptions utilized by management in assessing the value of our liquidating portfolio and the expected settlement amount of liabilities included in the Statement of Net Assets in Liquidation at March 31, 2007 and December 31, 2006

14

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

**Net Realizable Value Supported by Underlying Loan or Direct Financing Agreements.** All loans and direct financing leases were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales and settlement proceeds, principal collections, scheduled rental payments and interest. Anticipated cash collections were partially offset by any known direct costs and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts, settlement agreements or letters of intent to sell. The net realizable values for the remainder of the loans and direct financing leases were based upon estimated cash flows on a transaction–by–transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, the financial condition of our customers and collateral. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values.

**Net Realizable Value Supported by Underlying Operating Leases and Other Owned Assets.** All owned assets (operating leases and off–lease assets) were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales proceeds and scheduled rental payments. Anticipated cash collections were partially offset by any known direct costs such as maintenance and make ready costs for certain aircraft and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts or letters of intent to sell. The net realizable values for the remainder of the owned assets were based upon estimated cash flows on a transaction–by–transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, lessee performance and residual value assumptions for leases. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values.

**Investments.** All investments are reported at either their fair value or estimated net realizable values, based on published information, quotes by registered securities brokers or signed contracts. Investments for which market information is not readily available were valued based on estimated future cash flows that may be realized from the investment, if any.

**Reserve for Estimated Costs during the Liquidation Period.** Under the liquidation basis of accounting, we are required to estimate and accrue for costs associated with implementing and completing the Plan of Liquidation. The reserve for estimated costs includes four primary areas of accruals including people costs (payroll, benefits and severance), Leucadia management fees, professional services and litigation costs and corporate expenses (insurance, directors' fees and entity related expenses). These amounts can vary significantly due to, among other things, the timing of assets sales, the timing and amounts associated with discharging known and contingent liabilities and claims, the costs associated with cessation of our operations including an estimate of costs subsequent to that date (which would include reserve contingencies for the appropriate statutory periods) and the costs of retaining knowledgeable personnel and others to oversee the liquidation. As a result, we have accrued the projected costs including corporate overhead and specific liquidation costs of severance and performance bonuses, professional fees and various other wind–up costs expected to be incurred during the projected period to complete the liquidation and dissolution. These expense accruals will be periodically reviewed for adequacy and adjusted from time to time as projections and assumptions change. Changes to the accruals will be recorded as adjustments to net assets in liquidation in future periods.

With the adoption of the liquidation basis of accounting, all anticipated improvements or deterioration in the portfolio are fully reflected in our financial statements as facts and assumptions change.

15

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents
CHANGES IN NET ASSETS AND RESULTS OF OPERATIONS

The following table summarizes the changes in net assets in liquidation for the three months ended March 31, 2007 (dollars in thousands):

| | |
|---|---:|
| Net Assets in Liquidation at December 31, 2006 | $    — |
| | |
| Changes in net assets in liquidation for the three months ended March 31, 2007: | |
|     Change in estimated net realizable value of assets | (1,810) |
|     Interest earned on investment of cash reserves and other operating activity | 3,416 |
|     Increase in estimated costs during the liquidation period | (724) |
|     Interest accruing on the Senior Notes | (27,825) |
|     Reduction in the estimated settlement of the Senior Notes | 26,943 |
| Net change in value of assets and liabilities | — |
| Net Assets in Liquidation at March 31, 2007 | $    — |

Changes in Net Assets in Liquidation for the three months ended March 31, 2007

During the three months ended March 31, 2007, the estimated net realizable value of our liquidating portfolio decreased a net $1 8 million primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset

During the three months ended March 31, 2007, we accrued $27 8 million of additional interest on the Senior Notes and earned interest income on cash investments and other operating activity of $3 4 million  As a result of the adoption of the liquidation basis of accounting and valuation of our liquidating portfolio at its estimated net realizable value, income is no longer being recognized on the portfolio  All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments  Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection

Additionally, as previously discussed, we established a reserve for estimated costs during the liquidation period (estimated to be the end of 2007) and all future expenditures for operating expenses are charged directly against the reserve  During the three months ended March 31, 2007, the reserve declined to $18 8 million due to the payment of expenses, partially offset by an increase caused by retaining certain employees for a slightly longer period of time than previously estimated  The staff retention is directly related to aircraft sales sliding into the second quarter and additional time consumed by the equity committee's review of our solvency (for further details, see Note G  "Litigation and Claims"), both of which have caused delays to the overall liquidation process (including the dissolution of entities and resolution of claims)

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes  During the three months ended March 31, 2007, the estimated settlement amount of the Senior Notes was reduced by $26 9 million to a balance of $363 7 million; however, we currently estimate the Senior Notes holders will receive total liquidation distributions (total principal and interest) of approximately $405 7 million, which is a $0 9 million increase over our year-end estimate

Results of Operations for the three months ended March 31, 2006

During the three months ended March 31, 2006, we generated net income (on a going concern basis) of $15 3 million  In general, the net income was primarily attributable to asset realization in excess of recorded carrying amounts, partially offset by a negative interest margin and normal operating expenses  Under the going concern basis, asset realization in excess of recorded carrying amounts was primarily reflected in the financial statements as reversals of excess reserve for credit losses, net gains from sales of financial assets and the recognition of suspended income upon the payoff of assets

16

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

During 2006, the aircraft–finance market continued to display a high level of activity and in certain instances improved aircraft values. As a result, our transportation portfolio continued to generate cash in excess of recorded carrying amounts, which resulted in $23 5 million of the $28 8 million net gains we recognized during the first quarter of 2006 Additionally, results for the first quarter of 2006 were enhanced by a revaluation of our non–aviation assets in conjunction with their classification as held for sale and subsequent sale, which resulted in $14 7 million of our $21 1 million reversal of provision for credit losses

Our asset realization in excess of recorded carrying amounts was partially offset by a $21 7 million negative interest margin, which is primarily due to our portfolio containing a lower level of earning assets ($104 7 million at March 31, 2006) than the principal amount of outstanding debt ($1 6 billion at March 31, 2006) and a high aggregate cost of funds (aggregate effective rate of 13 6% for the first quarter of 2006)

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

Because substantially all of our assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure obligations under the Intercompany Notes securing the Senior Notes, our ability to obtain additional or alternate financing is severely restricted Berkadia has no obligation to lend additional sums to or to further invest in FINOVA Accordingly, we intend to rely on internally generated cash flows from the liquidation of assets as our only meaningful source of liquidity

The terms of the Indenture prohibit us from using available funds (after certain permitted uses) for any purpose other than to satisfy our obligations to creditors and to make limited payments to stockholders in certain circumstances Under the terms of the Indenture, we are permitted to establish a cash reserve in an amount not to exceed certain defined criteria Due to our limited sources of liquidity, the estimation of cash reserves is critical to our overall liquidity. Cash reserve estimations are subject to known and unknown risks, uncertainties, and other factors that could materially impact the amounts determined. Failure to adequately estimate a cash reserve in one period could result in insufficient liquidity to meet obligations in that period, or in a subsequent period, if actual cash requirements exceed the cash reserve estimates Historically, cash reserves typically equaled anticipated cash flows to cover operating costs, tax payments, fundings under existing customer commitments, interest payments and any other necessary cash flows expected to occur during the next six month period. We have the discretion to and have from time to time adjusted our cash reserve methodology As we continue to liquidate assets, our incoming cash flows will diminish and the estimation of cash reserves will become increasingly more critical to ensure we retain sufficient funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process

In accordance with the terms of the Indenture, we are required to use any excess cash, as defined in the Indenture, to make semi–annual interest and principal payments on the Senior Notes Additionally, the Indenture permits voluntary prepayments at our option, which we have previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the wind–up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed in Note G "Litigation and Claims," we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of our remaining assets, the resolution of claims and other litigation matters, the extent to which reserves for current or future liabilities are required and the length of time required to settle all of our matters Our goal is to wind–up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008. The reserve for estimated costs ($18 8 million) reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

During the first quarter of 2007, we made no principal prepayments on the Senior Notes In April 2007, we announced a partial prepayment of $59 4 million that will be paid on May 15, 2007. Following this prepayment, cumulative prepayments will total $1 54 billion or approximately 52% of the face amount ($2 97 billion) of the Senior Notes Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405 7 million, which is considerably less than the total principal and interest due of approximately $1 5 billion The estimated settlement amount was determined solely based on the net assets available for settlement of the Senior Notes and is subject to change due to changes in the estimated net realizable value of our net assets We clearly do not have sufficient assets to fully repay the Senior Note obligation

17

Table of Contents

The Senior Notes have a first priority security interest in substantially all of our remaining assets; however, as noted above, the Indenture requires us to first use any cash and cash equivalents to pay or to fund operating expenses, taxes and reasonable reserves for commitments and general corporate purposes

Stockholders should not expect any payments or distributions  The Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5.263% of each principal prepayment  However, the Indenture prohibits us from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law  Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture  Based upon the fact that the Senior Notes will not be fully repaid, we are required to retain impermissible restricted payments until such time, if ever, that we are no longer restricted from making a distribution to our stockholders or until it is necessary to use the cash to satisfy our debt obligations

In conjunction with the prepayments of Senior Notes noted above, we will have retained a total of $81.2 million as of May 15, 2007  Retained amounts are being segregated and reflected as restricted cash in our financial statements, pending their final disposition  We anticipate that the retained amounts will eventually be paid to our creditors, not our stockholders  If the funds were to be paid to our stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of our common stock, would receive half of the retained amounts  Berkadia has advised us that it does not believe that stockholders are entitled to the retained amounts since we cannot fully satisfy our creditor obligations

As previously reported, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors  For a further discussion of the motion and its status, see Note G  "Litigation and Claims "

**Based on our financial condition and imminent liquidation, there will not be sufficient funds available to fully repay the outstanding principal on the Senior Notes or make any 5% distribution to common stockholders, absent a court order in connection with the motion referred to above. As a result, there will not be a return to our stockholders. Consequently, investing in the Senior Notes and common stock involves a high level of risk.**

*Obligations and Commitments*

For a detailed listing of our significant contractual obligations and contingent commitments, refer to our Annual Report on Form 10-K for the year ended December 31, 2006  There have not been any material changes during the three months ended March 31, 2007, except for the payment of our quarterly management fees to Leucadia

*Collection of the Portfolio*

As noted previously, our current business activities have been limited to maximizing the value of our portfolio through the orderly collection of assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments, sales of assets or collateral  We have sold substantial portions of asset portfolios and are considering future sales of our remaining assets if buyers can be found at acceptable prices; however, there can be no assurance that we will be successful in efforts to sell additional assets  We are currently offering to sell our remaining assets both by portfolio and individual asset  Due to restrictions contained in the Indenture as well as our general inability to access capital in the public and private markets, our only viable source of cash flow is from the collection of our portfolio

18

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

**Table of Contents**

The following table presents the activity in our liquidating portfolio for the three months ended March 31, 2007:

| | |
|---|---:|
| **Liquidating Portfolio at December 31, 2006** | $185,544 |
| **Cash activity:** | |
| Collections and proceeds | (64,442) |
| **Non-cash activity:** | |
| Change in estimated net realizable value of assets | (1,983) |
| **Liquidating Portfolio at March 31, 2007** | $119,119 |

Our liquidating portfolio declined to $119 1 million at March 31, 2007, down from $185 5 million at December 31, 2006  During the first quarter of 2007, our cash activity was comprised of customer collections (including recoveries) and proceeds received from the sale of assets, while non–cash activity resulted in a decrease to the estimated net realizable value of certain assets. The decrease in value of these assets was primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset

The remaining portfolio as of March 31, 2007 is primarily comprised of aviation assets and the loan to The Thaxton Group  Refer to Note G  "Litigation and Claims" for a further discussion of the settlement of the Thaxton litigation

As of the date of this report, we had 15 aircraft with a total carrying value on a liquidation basis of approximately $24 7 million  All of these assets have either been liquidated subsequent to March 31, 2007 or are subject to a definitive agreement to sell  Due to the fact that these aircraft are operating throughout the world, additional time will be necessary to close the sales. It is to our advantage to close these transactions when the aircraft are in tax friendly jurisdictions to minimize transfer taxes  No assurance can be given that all of these commitments will result in actual sales or the timing of such sales, but the remaining aircraft are targeted to close during the second quarter of 2007  In addition to the aircraft, our transportation portfolio also includes two aircraft engines, a small number of miscellaneous parts and some unsecured aviation notes and claims with a total carrying value on a liquidation basis of approximately $1 0 million as of March 31, 2007

Our non–aviation portfolio, in addition to the Thaxton loan, at March 31, 2007 was comprised of assets with a net realizable value of approximately $9 7 million, including our $8 1 million investment in two grantor trusts to secure severance and bonus obligations to our employees  These assets are held primarily for the benefit of our employees, but are recorded as investments due to our retained interest in any excess assets  Substantially all of the other non–aviation assets are in the process of being liquidated

The estimated net realizable value of our portfolio included, among other transactions, a number of customer judgments and claims, non–marketable private equity securities and certain obligations owed to us by companies that are in liquidation  In many of these instances, we did not attribute any net realizable value to these assets due to our inability to predict the collection of any cash flows from the transactions with even a remote level of confidence  Most of these transactions were previously included in due diligence materials in an attempt to sell the assets, but were excluded on multiple occasions by prospective buyers because of costs of collection and potential liability concerns of the buyers  We continue to monitor these accounts for changes in facts and circumstances that would allow us to attribute value to these assets  As a result, there is the possibility that some net realizable value will be attributed to these assets in the future  An increase in the estimated net realizable value of these assets, if any, will be reflected as a change in net assets in liquidation in future filings  Additionally, we continue to occasionally receive small amounts of proceeds typically from trustees for assets that in certain cases were written off years ago  These cash flows are reflected as a change in net assets in liquidation as they are received

As we continue to liquidate assets, our incoming cash flows will diminish and the estimation of cash reserves will become increasingly more critical to ensure we retain sufficient funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process  Due to the uncertainty of cash requirements associated with the wind–up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed in Note G  "Litigation and Claims," we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments

19

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents
Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims. Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008. We will continue to operate as a public company throughout the liquidation period under a Management Services Agreement with Leucadia that expires in 2011.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this report are "forward-looking," in that they do not discuss historical fact, but instead reflect future expectations, projections, intentions, or other items. Forward-looking statements are made pursuant to the safe-harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include assumptions, estimates and valuations implicit in the financial statements and related notes, as well as matters discussed throughout this report including, but not limited to projections, our Plan of Liquidation, sections captioned Item 2 "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 3 "Quantitative and Qualitative Disclosure About Market Risk." They are also made in documents incorporated in this report by reference, or in which this report may be incorporated.

Forward-looking statements are inherently subject to risks and uncertainties, many of which cannot be predicted or quantified. When used in this report, the words "estimate," "expects," "anticipates," "believes," "plans," "intends" and similar expressions are intended to identify forward-looking statements that involve known and unknown risks and uncertainties. The risks, uncertainties and other factors that could cause our actual results or performance to differ materially from those contemplated by the forward-looking statements include, but are not limited to, the following: whether we can assure Senior Note holders of the timing or amount of their liquidating distributions; whether potential purchasers of our assets may try to take advantage of our liquidation process and offer less-than-optimal prices for our assets; the increasing difficulty in offsetting costs of collecting the remaining portfolio in view of our decreasing asset pool; our Board may abandon the Plan of Liquidation; whether new securities lawsuits will be filed against us; our ability to sell the remaining assets; the impact of general economic conditions and the performance of our borrowers; the instability and uncertainty in the airline industry, which could adversely affect the value of our aircraft portfolio, lease rates and demand; our reliance on third parties for information that may not be accurate; our increasing exposure to concentrations of credit risk; current and future legal and administrative claims and proceedings against us that may result in increased costs and diversion of management's attention; current and future obligations to creditors; our ability to meet obligations is impacted by cash reserve estimations; cash investments are subject to credit exposure and interest rate fluctuations; our ability to retain our employees; our ability to utilize tax attributes; and our ability to be exempt from the registration requirements of the Investment Company Act of 1940. For additional information, see Part I, Item 1A. Risk Factors in our Annual Report on Form 10-K for the year ended December 31, 2006.

Undue reliance should not be placed on these forward-looking statements, which are applicable only as of the date of this Report. We do not intend to update forward-looking information to reflect actual results or changes in assumptions or other factors that could affect those statements. We cannot predict the risk from reliance on forward-looking statements in light of the many factors that could affect their accuracy.

Item 3.      Quantitative and Qualitative Disclosure About Market Risk

There were no material changes from the information provided in our Annual Report on Form 10-K for the year ended December 31, 2006.

Item 4.      Controls and Procedures

(a)      Our management evaluated, with the participation of our principal executive and principal financial officers, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of March 31, 2007. Based on their evaluation, our principal executive and principal financial officers concluded that our disclosure controls and procedures were effective as of March 31, 2007.

20

Source: FINOVA GROUP INC, 10-Q, May 09, 2007

Table of Contents

(b)     There has been no change in our internal controls over financial reporting (as defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) that occurred during our fiscal quarter ended March 31, 2007, that has materially affected or is reasonably likely to materially affect, our internal control over financial reporting

As a result of Section 404 of the Sarbanes–Oxley Act of 2002 and the rules issued there under, we are scheduled to include in our Annual Report on Form 10–K for the year ending December 31, 2007 a report on management's assessment of the effectiveness of our internal controls over financial reporting Our independent registered public accountants will not be required to attest to and report on management's assessment until the end of 2008

The process of complying with these requirements includes a comprehensive evaluation and documentation of our internal controls over financial reporting In this regard, management is prepared to dedicate internal resources and adopt a detailed plan to (i) document our internal controls over financial reporting, (ii) assess the adequacy of our internal controls over financial reporting. (iii) take steps to improve control processes where appropriate and (iv) validate through testing that controls are functioning as documented. There can be no assurance that deficiencies or weaknesses in the design or operation of internal controls over financial reporting will not be found and. if found, that we will have sufficient time to remediate any such deficiencies or weaknesses and perform testing procedures before the end of 2007

We believe that any system of internal accounting controls, no matter how well designed and operated, can provide only reasonable (and not absolute) assurance that all of our objectives will be met, including the detection of fraud Furthermore, no evaluation of internal accounting controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected

We continue to reduce our workforce, consolidate operations and outsource certain functions Accordingly, responsibility for administration, management and review of many of our assets has transitioned among our remaining personnel In conjunction with further reductions in personnel and the relocation of our corporate office, we have transitioned most of our accounting and business support applications to manual processes supported by a system of manual internal controls and spreadsheets Management has supervised these transitions and has implemented procedures we believe provide effective disclosure and internal controls over financial reporting We are assessing the efficacy of these procedures and will continue to do so in subsequent periods

# PART II   OTHER INFORMATION

## Item 1.      Legal Proceedings

See Part I, Item 1. Note G  "Litigation and Claims" for a discussion of certain legal proceedings

## Item 1A.      Risk Factors

There were no material changes from the information provided in our Annual Report on Form 10–K for the year ended December 31, 2006

## Item 6.      Exhibits

| | |
|---|---|
| 31 1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes–Oxley Act of 2002 |
| 31 2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes–Oxley Act of 2002 |
| 32 1 | Certification of Chief Executive Officer pursuant to 18 U S C  1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002. |
| 32 2 | Certification of Chief Financial Officer pursuant to 18 U S C  1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 |

21

Source: FINOVA GROUP INC. 10-Q, May 09. 2007

Table of Contents

THE FINOVA GROUP INC.

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

THE FINOVA GROUP INC
(Registrant)

Date: May 9, 2007

By:  /s/ Richard A. Ross
Richard A  Ross, Senior Vice President – Chief Financial Officer &
Treasurer
(principal financial officer)

22

Source: FINOVA GROUP INC, 10-Q, May 09, 2007

335

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 31 1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31 2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32 1 | Certification of Chief Executive Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32 2 | Certification of Chief Financial Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

Source: FINOVA GROUP INC. 10-Q, May 09. 2007

Exhibit 31.1

## CERTIFICATIONS

I, Thomas E. Mara, certify that:

1    I have reviewed this quarterly report on Form 10-Q of The FINOVA Group Inc.:

2    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 9, 2007                By:  /s/ Thomas E. Mara
                                Thomas E. Mara
                                Chief Executive Officer

Source: FINOVA GROUP INC, 10-Q, May 09, 2007

Exhibit 31.2

## CERTIFICATIONS

I, Richard A  Ross. certify that:

1    I have reviewed this quarterly report on Form 10-Q of The FINOVA Group Inc :

2    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3    Based on my knowledge, the financial statements. and other financial information included in this report, fairly present in all material respects the financial condition. results of operations and cash flows of the registrant as of. and for. the periods presented in this report;

4    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant. including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    Designed such internal control over financial reporting. or caused such internal control over financial reporting to be designed under our supervision. to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected. or is reasonably likely to materially affect. the registrant's internal control over financial reporting; and

5    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record. process. summarize and report financial information; and

    b)    Any fraud. whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 9, 2007

By:  /s/ Richard A. Ross
       Richard A  Ross
       Chief Financial Officer
       (principal financial officer)

Source: FINOVA GROUP INC. 10-Q. May 09. 2007

Exhibit 32.1

CERTIFICATION

PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED BY SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002

I, Thomas E. Mara, as Chief Executive Officer of The FINOVA Group Inc. (the "Company") certify, pursuant to 18 U.S.C. ss. 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that to my knowledge:

(1) the accompanying Form 10–Q report for the quarterly period ended March 31, 2007 as filed with the U.S. Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 9, 2007                                      By:  /s/ Thomas E. Mara
                                                          Thomas E. Mara
                                                          Chief Executive Officer

Source: FINOVA GROUP INC, 10–Q, May 09, 2007

Exhibit 32.2

## CERTIFICATION

### PURSUANT TO 18 U.S.C. SECTION 1350,
### AS ADOPTED BY SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002

I, Richard A Ross, as Chief Financial Officer of The FINOVA Group Inc (the "Company") certify, pursuant to 18 U S C ss 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that to my knowledge:

(1) the accompanying Form 10–Q report for the quarterly period ended March 31, 2007 as filed with the U.S. Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company

Date: May 9, 2007

By:   /s/ Richard A. Ross
      Richard A Ross
      Chief Financial Officer
      (principal financial officer)

Created by 10KWizard    www.10KWizard.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Case No. 01-000698(PJW) |
| | ) Chapter 11 |
| FINOVA CAPITAL CORPORATION | ) |
| and THE FINOVA GROUP, INC., | ) |
| | ) Courtroom No. 2 |
| Reorganized Debtors. | ) 824 Market Street |
| | ) Wilmington, Delaware 19801 |
| | ) |
| | ) July 24, 2007 |
| | ) 1:27 P.M. |

TRANSCRIPT OF MOTION FOR STAY PENDING APPEAL
BEFORE HONORABLE PETER J. WALSH
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:         Richards Layton & Finger, PA
                         By:  MARK COLLINS, ESQ.
                         One Rodney Square, P.O. Box 551
                         Wilmington, Delaware 19899

                         Gibson Dunn & Crutcher
                         By:  ROBERT DAKIS, ESQ.
                              JONATHAN LANDERS, ESQ.
                         200 Park Avenue
                         New York, New York 10166-0193

ECR Operator:            Anissa Cothran

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

# TRANSCRIPTS PLUS
### 435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail CourtTranscripts@aol.com

**215-862-1115     (FAX) 215-862-6639**

Docket No. 240
Date 7/31/2007

2

```
Appearances:
 (Continued)

For the Equity          William D. Sullivan LLC
Committee:              By:  ELIHU ALLINSON, ESQ.
                        4 East 8th Street, Suite 400
                        Wilmington, Delaware 19801

                        Anderson Kill and Olick, P.C.
                        By:  JAMES ANDRIOLA, ESQ
                        1251 Avenue of the Americas
                        New York, NY 10020
```

3

## INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RICHARD A. ROSS | | | | |
| By Mr. Andriola | 5 | | | |
| By Mr. Landers | | 31 | | |

| EVIDENCE | | ID | EVID |
|---|---|---|---|
| Exhibit 1 | Declaration | 5 | 35 |
| Exhibit 4 | Notice of cross appeal | 19 | 35 |
| Exhibit 3 | Agreement with Leucadia | 27 | 35 |

4

1        THE COURT:  Please be seated.  Ready to proceed?

2        MR. ANDRIOLA:  Good afternoon, Your Honor.  James

3  Andriola of Anderson Kill and Olick on behalf of the Equity

4  Committee.

5        Your Honor, in opposing our motion for a stay, the

6  debtor submitted a declaration from Richard Ross, the CFO and

7  Treasurer of Finova Group, Inc.

8        In his declaration, Mr. Ross states that he will be

9  present in court at the hearing.  And I actually recognize him

10  from prior hearings.

11        He also says he'll be prepared to testify about his

12  declaration.

13        So, what I would like to do at this time is go ahead

14  and call Mr. Ross to the stand for a brief cross examination

15  about his declaration.  After my examination, my follow-up by

16  Mr. Landers, I'd like to then just come back and briefly go

17  over the factual and legal basis upon which the Equity

18  Committee believes the stay should be granted.

19        THE COURT:  Any objection?

20        UNIDENTIFIED ATTORNEY:  No, Your Honor.

21        THE COURT:  Okay.  Proceed.

22        MR. ANDRIOLA:  Your Honor, I have a bound copy of the

23  few exhibits I have for this witness for Your Honor.

24        THE COURT:  Okay.

25        MR. ANDRIOLA:  May I approach?

1                          **(Pause)**

2                **CLERK:**  Please state and spell your full name for the

3    record.

4                **MR. ROSS:**  Richard A. Ross, R-O-S-S.

5          **RICHARD A. ROSS, EQUITY COMMITTEE'S WITNESS, SWORN**

6                      **DIRECT EXAMINATION**

7    BY MR. ANDRIOLA:

8    Q    Good afternoon, Mr. Ross.

9    A    Good afternoon.

10   Q    I'd like to -- in front of you I've placed a small stack

11   of exhibits.  If I could ask you to look at Exhibit Number 1.

12   A    Okay.

13   Q    Is that -- do you recognize this document?

14   A    Yes, it's the declaration that I prepared with, uh -- with

15   assistance of an attorney.

16   Q    Okay.  And that's your signature that appears on Page 4 of

17   this document, correct?

18   A    It is.

19   Q    And is there an exhibit that was attached to your

20   declaration?

21   A    Uh, probably the 10Q, first quarter 10Q filing is

22   attached.

23   Q    And that's a Form 10Q that was filed by, uh, Finova on May

24   9th, 2007?

25   A    Filed with the SEC, yes.

1  Q    Okay.  Did you personally have any role in preparing the

2  Form 10Q?

3  A    I did.

4  Q    Could you describe your role?

5  A    Uh, you know, I participated in a lot of the drafting of

6  the 10Q, and I provided my certification in conjunction with

7  that, as well.

8  Q    Okay.  Now, is it your testimony, Mr. Ross, that without

9  the stay sought by the Equity Committee here today Finova will

10  definitely wind up its affairs during 2007?

11  A    I would not say definitely.  That is our goal, that's what

12  we're working towards.  There's a number of factors that could

13  come up that could delay that that are beyond our control.  But

14  as of this point, nothing has -- other than the motions by the

15  Equity Committee, nothing has come up that would -- that would

16  cause us at this point to think that we won't get done by year

17  end.

18  Q    Okay.  Now, I want to draw your attention to Paragraph 6

19  of your declaration.

20  A    6, okay.  Yes.

21  Q    And the -- I'm going to read into the record the sentence

22  that begins, "Nevertheless."  That's the third sentence into

23  the paragraph.

24  A    Okay.

25  Q    Quote, "Nevertheless, I believe that the 2007 wind up goal

Ross - Direct                                            7

1    is realizable.  And, in any event, it is likely the wind up can

2    occur early in 2008 but for any proceedings on the

3    clarification motion."

4            Did I read that correctly?

5    A    Yes.

6    Q    Okay.

7    A    Yeah.

8    Q    Now, what did you mean by early in 2008?

9    A    My thought would be that the latest by the first quarter

10   of 2008.  But as stated, our goal is still to wind up in '07.

11   Q    But based on what -- what you drafted here and prepared in

12   Paragraph 6, isn't what you're saying here is that even if the

13   Equity Committee were to dissolve tomorrow, and the appeal goes

14   away, Finova's wind up is likely to occur in early 2000 --

15   early in 2008 as opposed to during 2007?

16   A    No.  I think it's most likely to occur in '07.  And if you

17   look at our -- our public filing, we -- we clearly state in

18   there that our goal is to wind up in '07, and then we set up a

19   liability that estimated a taking through the end of '07.

20           We were merely saying that there are things beyond

21   our control that could cause delays, none of those have arisen

22   yet.  So, our goal and our best intentions at this point is to

23   wrap up by the end of '07, barring items that can delay it.

24   And we think those things that can delay it more likely would

25   just slide it to early '08.

Ross - Direct                                    8

1    Q    Okay.  You agree with me that in Paragraph 6, you say that

2    it's likely that the wind up can occur in early 2008, correct?

3    A    Correct.

4    Q    Okay.

5    A    Despite that.

6    Q    And also prior to -- that's the nevertheless sentence in

7    Paragraph 6, you list a number of factors other than the

8    clarification motion and any appeal of the clarification motion

9    which could delay the debtors' wind up, correct?

10   A    Correct.

11   Q    Now I want to draw your attention to Page 5 of the 10Q,

12   it's attached to your declaration.

13   A    All right.

14   Q    It's the -- the paragraph I'm going to be asking you

15   about is the second paragraph under the heading Plan of

16   Liquidation.

17            THE COURT:  I'm sorry.  Where do I find the

18   pagination?

19            MR. ANDRIOLA:  Uh, it should be --

20            THE COURT:  Okay.  I think I found it.

21            MR. ANDRIOLA:  -- in the middle.  Small number in the

22   middle of --

23            THE COURT:  I see it.

24            MR. ANDRIOLA:  And, again, for the sake of the

25   record, I'll go ahead and read in that very small paragraph or

Ross - Direct                                    9

1   two-sentence that's there.  Quote, "Our goal is to wind up the

2   affairs of the company during 2007.  However, we cannot control

3   the exact time of resolving legal matters and claims.

4   Accordingly, the liquidation period may extend beyond 2007 and

5   conservative estimates are up to the end of 2008."

6   BY MR. ANDRIOLA:

7   Q    And did I read that accurately into the record?

8   A    Yes, you did.

9   Q    Okay.  Did you draft this specific language?

10  A    I did.

11  Q    What did you mean by conservative estimates?

12  A    Well, what I'm meaning with that -- that sentence is our

13  goal and what we're shooting for is to wind up by the end of

14  '07.  But in SEC filings, anything that's an estimate, you're

15  supposed to put sensitivities and let the reader understand

16  where it could take longer.

17       And so we feel that it could -- if everything kind of

18  went against us and contemplating taking in consideration the

19  Equity Committee appeal, so that conservative estimates was

20  assuming that the Equity Committee would have an appeal and

21  would lose the first appeal, and even go on to a second appeal.

22  And that's where we get to the estimates that the most

23  conservative being that it could be at the end of '08.

24       Do we believe that's going to happen?  No, and that's

25  why further in that sentence it says, we assumed a liquidation

349

Ross - Direct                                      10

1  period through the end of '07, which the accounting rules say

2  that you have to put your best estimate of what you think the

3  costs are going to be.

4         So, at this point, we think the costs are going to

5  run through the end of '07.  Now with this matter before the

6  Court, and depending how this turns out, we may have to change

7  our estimates and expand those out further.

8  Q    Okay.

9  A    This -- so, this is just forewarning that our goal is '07,

10 but things could -- that are beyond our control could arise

11 that could cause it to be later.

12 Q    And this was a -- you use -- actually it says conservative

13 estimates, plural.  Who -- who made these estimates?

14 A    Oh, well, it's based off discussions with myself, with

15 management.  And a lot of it came from talking also with our --

16 our counsel who had told me that if the appeal process went on

17 and went through multiple layers of appeal, it could take up to

18 a year to get through that process.

19        So, that is most specifically tied to the appeal of

20 the Equity Committee in the matters before the Court.

21 Q    Okay.  And this estimate -- this 10Q was prepared before

22 the current motion for a stay was filed, correct?

23 A    That's correct.

24 Q    Okay.  In making your estimate, did you anticipate a stay

25 being requested and actually granted?

1  A    I did not -- I did not think of the stay, but I did assume

2  an appeal.

3  Q    Okay.

4  A    And from my, you know, lay terms, an appeal would mean

5  that we were barred from paying out the money and that we would

6  have to wait to hear us through the appeal before the funds

7  could be disbursed.

8  Q    When is it that you gained that lay understanding of --

9  A    Uh, probably in -- probably third quarter of '06 through

10 discussions with counsel and as the matters were proceeding

11 and, you know, constantly we -- we talk about the next steps

12 that we have, and which are the obstacles that can delay

13 things.  And so there was talk for some time that we felt we

14 would prevail in the matters, but that there could have to be

15 more legal hurdles that we would have to go through before we

16 can get resolutions.

17 Q    But it was your understanding an appeal itself would

18 prevent Finova from disbursing the segregated funds, is that

19 your testimony?

20 A    That was -- you know, that was never told to me.  But that

21 was just my understanding that I just assumed that if an appeal

22 was -- was filed, that we would be restricted at that point in

23 time.  I'm not as familiar with the stays and appeals, what's

24 all encompassed with each -- each one of those items.

25 Q    And is that still your understanding of what would happen

Ross - Direct                                    12

1  under -- when an appeal is filed?

2  A    No.  I mean through this, I -- I've got clarification that

3  the stay would be the thing that would stop us from being able

4  to disburse the funds.  And the appeal is just appealing the

5  actual ruling that happened.

6         So, I understand that if a stay is not granted today,

7  we would be allowed to disburse the funds.

8  Q    In the event the Court were to issue a six-month stay

9  today, I'm not saying it will, but just in -- in that event,

10 would such a six-month period fit within the conservative

11 estimate you give for winding up the affairs of the company?

12 A    Well, I don't know that it's the stay itself.  It's going

13 through the whole appeal process.  So, it was my understanding

14 that you have also filed an appeal.  So, however long it takes

15 for the appeal to potentially also be heard, and if we have to

16 still come before the Court and deal with things.

17        But, you know, our goal would be to -- once that stay

18 would be lifted, would be to disburse the funds.

19 Q    Okay.  And going back to my question, I'm sorry, I don't

20 think I got an answer there.

21 A    All right.

22 Q    If -- if the Court told you you can't disburse the funds

23 for six months from today --

24 A    Right.

25 Q    -- would that impact on your conservative estimate?  Or

1  would that time frame actually fit within your conservative

2  estimate --

3  A    I --

4  Q    -- in the 10Q?

5  A    I think there's a chance that it would cause our estimate

6  to slide into that early part of '08.  I -- I wouldn't think

7  that it would cause it to go beyond the early '08.  But it

8  could take it beyond the end of '07.

9  Q    Okay.  And I was referring to your conservative estimate

10 of up to the end of 2008.

11 A    Oh, no.  I think it would stay within that -- that '08.

12 Because that '08 assumed not only a first level appeal, but

13 going through a second layer of appeals.

14 Q    Okay.  Is Finova -- is it Finova's intention that -- or

15 understanding of how this process works that the company can't

16 wind up its affairs until the appeal is concluded?  Regardless

17 of whether a stay is issued?

18 A    No, but it -- it causes delays with just everything else

19 from dissolving the entities -- because it's my understanding

20 that we need to keep the legal entities still in place.  And we

21 wouldn't dissolve until after all the matters before the Court

22 were resolved and the funds were disbursed.

23 Q    Okay.  Going back to your language from 10K that we talked

24 about -- I'm sorry, Paragraph 6 of your declaration.  You

25 stating that -- I'm picking up in the middle of the sentence,

Ross - Direct                                    14

1  quote, "It is likely that the wind up can occur early in 2008,

2  but for any proceedings on the clarification motion."  Correct?

3  A     Where are you at?

4  Q     I'm in your Paragraph 6 --

5  A     Oh.

6  Q     -- the sentence that begins, "Nevertheless" --

7  A     Okay.

8  Q     -- in your declaration.

9  A     Okay.  I'm -- I'm at the spot.  Now, what's your question

10  again?  I'm sorry.

11  Q     Quoting the portion where it states, quote, "It is likely

12  that the wind up can occur early in 2008, but for any

13  proceedings on the clarification motion."  Do you recall --

14  A     Okay.

15  Q     -- preparing that language?

16  A     Yes.

17  Q     Okay.  And, again, that -- that means -- what you meant by

18  that is the existence of any proceedings on the clarification

19  motion will prevent Finova from winding up, correct?

20  A     Uh, I -- I wouldn't say necessarily any -- anything.  But

21  that was assuming that this caused further delays that the stay

22  would probably be granted and an appeal process would go

23  forward.

24  Q     Okay.  But in your -- in your declaration, you don't

25  mention anything about a stay.  You say "but for any

Ross - Direct                                    15

1  proceedings on the clarification motion."

2  A     Right.

3  Q     Okay.

4  A     Right.

5  Q     So, it is your testimony before this Court that as long as

6  the appeal process exists on the clarification motion, the

7  company won't be able to wind up its affairs, correct?

8           MR. LANDERS:  Your Honor, I object.  This has been

9  asked and answered several times.  And Mr. Ross clarified his

10 testimony about that.  That matter is repetitive.  And I'd also

11 say it's duplicate of a prior testimony.

12          THE COURT:  I think it's repetitious.

13 BY MR. ANDRIOLA:

14 Q     Let's -- let's turn to your Paragraph 4C of your

15 declaration.  The -- midway through the paragraph, there's a

16 sentence that begins with, "Moreover."  And I'll read it for

17 the -- for the record, quote, "Moreover, since Finova is an SEC

18 reporting company, it would have to continue as such and would

19 have to comply with various SEC reporting and record keeping

20 requirements.  That latter is necessary because if the

21 clarification order is reversed, Finova would be required to

22 distribute funds to holders of common stock."

23          Did I read those two sentences accurately?

24 A     Yes, sir.

25 Q     Okay.  And, again, this -- Finova's need to continue its

1  existence as an SEC reporting company would -- would -- would

2  happen whether or not a stay is granted today, correct?

3        MR. LANDERS:  Your Honor, object.  Counsel has not

4  called Mr. Ross's attention to the preface of that which

5  Paragraph C says, "If the stay motion is granted," and then

6  says a bunch of things.  And counsel is asking the question

7  totally out of context.

8        MR. ANDRIOLA:  I don't mean to do that.

9  BY MR. ANDRIOLA:

10 Q    Feel free to read the whole paragraph before answering my

11 question.

12                        (Pause)

13 A    Okay.  So, what this paragraph is saying is if Finova has

14 to continue to stay in existence because there's matters before

15 the Court, and we have not been able to dissolve the entity, we

16 are a public company and have to comply with the rules of the

17 SEC.

18 Q    Okay.

19 A    So, as long as we are an existing company, we have to

20 comply with the SEC rules, is my understanding.  If -- if you

21 know of a way that we can dissolve the company and still keep

22 everything here, you know, but I -- but it was not my

23 understanding.

24 Q    Okay.  And those requirements will be in effect regardless

25 of whether a stay is entered today, correct?

Ross - Direct                                    17

1          MR. LANDERS:  Objection, the --

2  Q    So long as the appeal exists, correct?

3          MR. LANDERS:  Objection, Your Honor.

4  Mischaracterizes the testimony.

5          THE COURT:  I'm sorry.  Restate your question,

6  please.  I missed it.

7  Q    The question was whether the -- the SEC reporting

8  requirements are going to keep going forward regardless of

9  whether a stay is granted so long as the appeal exists,

10 correct?

11 A    I think what this paragraph is saying, if we're not able

12 to wind up by the end of '07, and we have to keep the company

13 running to '08, then we will have to comply with the SEC

14 rules.

15          And we are saying in this paragraph that we feel that

16 we still can continue to wind up this year, aside from the

17 matters before the Court here.  So, if these matters continue

18 on, we feel there's a likelihood that that could cause us to be

19 extended further.  And as such, we have to continue to be a

20 public company and continue to pay all expenses in accordance

21 with the contracts and everything that's in place.

22 Q    All right.  I -- I thought my question was just more

23 focused.  I understand you invoking the whole paragraph.  My

24 only question is, is it your testimony that so long as the

25 appeal is going forward, the SEC requires you to not wind up

357

Ross - Direct                                18

1  your affairs as a company?

2          MR. LANDERS:  Your Honor, object.  It calls for a

3  legal conclusion.

4          THE COURT:  Well, he's --

5          MR. ANDRIOLA:  He's opined on it in his Paragraph C.

6          THE COURT:  Yeah, I think he can answer.

7          MR. LANDERS:  Well, I don't -- I don't -- okay.  Your

8  Honor, I don't think he said that.  I think he -- as I said,

9  the preface says if the stay motion is granted, and then it

10 says a bunch of things that will happen.  It isn't a general

11 discuss of thing about what happens under SEC requirements

12 regardless of the stay motion.  It talks specifically about the

13 stay motion.

14         MR. ANDRIOLA:  See, what's going on here, Your Honor,

15 and I'm -- the witness will get the advantage of hearing me ask

16 -- you know, explain to you why I'm asking these questions.

17 The -- when you look at Mr. Ross's declaration, it's hard to

18 get a sense of --

19         THE COURT:  Let me -- let me ask a question.

20         MR. ANDRIOLA:  Okay.

21         THE COURT:  If the stay is not granted, but there

22 exists the possibility that on appeal, my ruling would be

23 reversed, would that require you to maintain compliance with

24 the SEC?

25         MR. ANDRIOLA:  I would say not necessarily.  You

1  know, from what I've been told from our counsel, if -- if this

2  -- if the stay is granted and the appeal moves forward, that

3  it's going to cause delays in our whole process.

4          If the stay is not granted, I'm not completely sure

5  whether the appeal has the same strength to it and would that -

6  - because we would then disburse the funds and we could

7  continue to wrap up a lot of the other matters.

8          THE COURT:  Okay.  Well, I guess that is a legal

9  question then.  I don't know the answer.

10 BY MR. ANDRIOLA:

11 Q    I'd like you to take a look at Exhibit 4 that I've given

12 you in the -- should be at the bottom of the pile.

13 A    Okay.

14 Q    Do you recognize this document?

15 A    I have seen it, yes.

16 Q    Okay.  Could you just tell us for the record what your

17 understanding of this document is?

18 A    I would not say that I have -- I was not involved with the

19 preparation of this document.  So, I wouldn't say that I have a

20 strong legal understanding of the document.

21 Q    Just your lay understanding of the document.

22 A    That it's a notice of cross appeal.  That Finova is

23 appealing, as well, as to your appeal.

24 Q    Okay.  And what exactly is it?  Do you know what Finova's

25 appealing?

Ross - Direct                                     20

1  A    Yeah, I mean exactly what it's -- it's saying in here.

2  Finova is appealing the existence of the Equity Committee, that

3  it -- that it was ever formed, and the fees that were paid to

4  the Committee.

5  Q    Does the existence of Finova's cross appeal have any

6  affect on Finova's ability to wind up, do you know?

7  A    Not that I'm aware of.

8  Q    It's Finova's intention to go forward with the wind up

9  regardless of the existence of that cross appeal.

10 A    I would think, you know, that would be our intent, yes.

11 Q    And your Paragraph 4B of your declaration, you describe

12 certain actions that you say Finova must take to distribute the

13 segregated funds to holders of new senior notes, correct?

14 A    Correct.

15 Q    Okay.  And when I say the segregated funds, you know what

16 I'm referring to?

17 A    Well, this is talking about any distribution, that's the

18 way it was written, the process we go through in making any

19 distribution to the senior note holders.

20 Q    Okay.  And just so the record's clear, when I -- the term

21 segregate funds as used in the motion papers, what is your

22 understanding of the segregated funds?

23 A    It's the five percent that was set aside that was to be

24 paid to the shareholders, but was impermissible under the

25 indenture, and was required to be set aside.

Ross - Direct                                21

1  Q    Okay.  And what's the current amount of that segregated

2  funds?

3  A    A little over $81 million.

4  Q    Okay.

5  A    I don't know the exact number.

6  Q    And correct me if I'm wrong, but you state it will take

7  approximately 45 days to complete the actions that are

8  described in Paragraph 4B, is that correct?

9  A    Yeah, that's what we've mutually agreed with the Trustee

10  all along, that they wanted 45 days.  So, that was a little

11  different than what's in the actual agreement.  But the Trustee

12  had requested additional time, and we've always complied with

13  that.

14  Q    Okay.  Well, have you begun any of the actions that appear

15  in Paragraph 4B?

16  A    In regards to -- we've done these with other payments

17  we've made.  We have not done any of this in regards to the --

18  this -- the $81 million.  Because at this point, we're still

19  told -- we don't make any decision.  Because once you send that

20  first notice, it's an irrevocable payment.  So, the process

21  doesn't even begin until we know we have funds that's available

22  to be disbursed.  We never do it based on any projection of

23  funds that we may receive.  We've always done it that way.  We

24  -- we look at funds available on a particular date, and then we

25  begin from that point.

1  Q    And that's a notice that's given to the -- to the --

2  A    To the Trustee.

3  Q    -- to the note holders.  Oh, to the Trustee?

4  A    We give notice to the Trustee, which is Bank of New York.

5  Bank of New York, in turn, as it's spelled out here, then gives

6  notice to the actual bond holders.

7  Q    Okay.  And the notice with respect to the 40 -- 81 million

8  hasn't been given, correct?

9  A    No.

10 Q    Are there certain expenses that will be incurred by Finova

11 in this notice process?

12 A    Very minimal expenses.

13 Q    That's something that's -- the Trustee handles or --

14 A    Yeah.  I mean we -- we virtually have no expenses, other

15 than we do an 8K filing with the SEC.  So, we have a small

16 Edgar fee filing, and we may have some legal review costs of

17 that 8K filing.  So, very minimal expenses from -- from our

18 standpoint.

19        And a Trustee incurs the expenses of notices to the

20 bondholders, but then the Trustee has annual fees.  And if they

21 have any additional legal costs, we're required to pay that on

22 top of their annual fees, which we have, from time to time, had

23 to pay.

24 Q    So, now I'm going to jump ahead to your Paragraph 5.

25 A    Okay.

1 Q    And in this paragraph, you give an estimate of additional
2 costs that you believe Finova would incur as a result of the
3 stay being granted, is that correct?
4 A    No.   These are an estimate of costs if the company's
5 around one more full year, which would be the very
6 conservative.   If the stay is granted, and things are resolved
7 sooner, we would have lower costs than this.   This clearly says
8 if we were required to be a full year of 2008, here's the
9 estimate of cost that would be incurred.
10 Q    Okay.   And these costs would -- let me scratch that.   Can
11 you give us a brief breakdown of the cost and where you get to
12 the fourteen to $18 million range?
13 A    Yeah.   The largest individual component are management
14 fees to Leucadia, which are $8 million annually.   The next
15 largest portion would be what I refer to as public company
16 cost, such as we have to continue to carry D and O insurance,
17 we'd have to continue to be audited by a public accounting
18 firm.
19         And then the next largest individual component would
20 probably be additional people cost, which are salaries of the
21 employees that would be maintained, any training, any
22 certifications, insurance, benefits, et cetera, bonuses that
23 would go to those employees.
24 Q    All right.   And --
25 A    And then you'd have various miscellaneous kind of office

1   costs, archiving, you know, other items.

2   Q    What's your early rent these days, sir, for the year?

3   This calendar year, what would it be?

4   A    I think -- calendar -- we pay about 8,000 a month.  So,

5   under $100,000, or about 100,000.

6   Q    And how many employees are left working at Finova at this

7   time?

8   A    We currently have six, and we have leaving at the end of

9   August, so we'll be down to four employees at the end of

10  August.

11  Q    And what would -- if they -- can you project what those

12  four employees would be paid during the year 2008?

13  A    You know, I don't know the exact thing.  Three of those

14  four employees would be officers.  It would be myself, a

15  controller for -- financial controller, and a tax controller.

16  So, it's the fairly senior employees that have the knowledge to

17  deal with the things, and then one administrative person.

18  Q    All right.

19  A    But I would -- the salaries for -- just the straight

20  salaries for those people would be under a half million

21  dollars.

22  Q    Are there any budgeted -- would there be any bonuses

23  budgeted for 2008?

24  A    There would be bonuses budgeted, which is a real guessing

25  game because we don't control what those bonuses would be.  But

1  we would, you know, there's a range that each employee has

2  applicable to them, and we would have probably factored in the

3  higher end of that range just to make sure that we -- you know,

4  we would err on the high side rather than the low side.  But

5  the numbers could come slightly less than that.

6  Q    And what was the last year you -- what was your salary and

7  bonus for '06?  You personally.

8  A    Uh, '06, my salary was -- I think about $210,000.  And

9  then I was paid a bonus this past year of 300,000.

10 Q    And the other officers, same approximate level?

11 A    Uh, their salaries would have been anywhere from the one

12 thirty to one seventy range.  And their bonuses would have been

13 no higher probably than one fifty.

14 Q    Does Leucadia play any role in the day-to-day management

15 of Finova?

16 A    I would not say in the day-to-day kind of operations.  But

17 any time there's any decision, anything that we're doing that

18 hasn't been approved, we contact Tom Mara, the CO, and if there

19 was anything that was a large scale, we would contact the Board

20 and the other members, which include two other Leucadia

21 employees, as well.

22        But any significant decision has to go through either

23 Tom and/or the Board.

24 Q    Is there any reason Leucadia couldn't -- Leucadia

25 employees couldn't handle your job, as well as the other two

1  officers?

2  A    Uh, you know, in theory, they could.  In practicality, it

3  would be difficult because of the historical knowledge.  What's

4  left and what we're having to do are the tax filings, which it

5  would take a lot more work for them to do it without any of the

6  historical knowledge, any information.  They would have a

7  harder time talking to our company and knowing what's going on

8  on a daily basis.  And then there would have to be someone who

9  would be willing to do the financial certifications under the

10  SEC Rules, which there is liability and exposure.  And I don't

11  -- I wouldn't say that's something that someone should do

12  without having detailed knowledge of the financial information

13  and financial reporting.

14        It's not that they couldn't get there, but it would

15  take some time to get up to speed.

16  Q    In your most recent 10Q, I believe you -- the company

17  talks about its continuing obligations to Leucadia, is that

18  correct?

19  A    There's a management service agreement that runs through,

20  I believe, November, 2009.  And so we continue to honor that

21  agreement.

22        And in that agreement, it says that as long as we are

23  a company that's in operation.  So, it's my understanding and

24  my interpretation of that agreement that when we ceased to

25  exist as a company, so when the entity is dissolved, we will no

Ross - Direct                                    27

1   longer be making payments to them.

2           So, the longer this gets stretched out, we pay them

3   $2 million quarterly in advance under that agreement.

4   Q    All right.  And that's -- what you just described for me,

5   your understanding of, I guess, Finova's ability to end its --

6   prematurely end its obligations to Leucadia, that's not

7   described anywhere in your 10Q, is it?

8   A    Well, we talked about the management agreement, and then

9   we actually filed -- the management agreement has been filed

10  and it's on record with the SEC, and we talked about it -- uh,

11  this Q talks about Anu (phonetic/sic) but in some of our 10K's,

12  we talked about that that's paid quarterly and -- and in

13  advance.

14  Q    But you don't mention the fact that you can prematurely

15  end the management fees to Leucadia, do you, in the 10Q?

16  A    I don't recall that we ever have.  But the actual

17  agreement, so a reader can -- has every bit of the information

18  that we -- that we have.

19  Q    All right.  And the agreement that -- look at Exhibit 3,

20  if you don't mind.

21  A    Okay.

22  Q    Is this the effective agreement for Leucadia?  Or the

23  effective management agreement?

24  A    I can only assume that it is because this is not an

25  executed copy.  It looks like an electronically filed one.  So,

Ross - Direct                                    28

1  I assume if you took this from our SEC -- from the SEC web

2  site, that this is the executed one.  So, that's what we filed

3  with the SEC.

4  Q    Just for your -- I'll make the representation I was able

5  to print it from the Finova web site as an attachment to an 8Q

6  -- I'm sorry -- 8A --

7  A    Okay.

8  Q    -- several years back.

9  A    Okay.

10 Q    Could you demonstrate to me where Finova would be allowed

11 to cease making payments?

12 A    You know, I'm not actually the most familiar with this.  I

13 haven't looked at this one in some time.  So, I'd have to have

14 a look at it here.

15                         (Pause)

16 A    I'm personally not seeing it.  And off -- offhand, I know

17 we have the agreement reviewed by outside counsel who said that

18 in their opinion, and that was by Weil Gotshal, we utilized

19 them, that their initial interpretation was that the fees would

20 continue only as long as the company continued to be in

21 operation.  I'm not seeing the specific reference to that.  I

22 would -- you know, so I would have to kind of defer or consult

23 with them to kind of point out exactly the language since I'm

24 not an attorney, that they were seeing and understanding it.

25 Q    Okay.

1          MR. ANDRIOLA:  I'm almost done, Your Honor.

2  Q    Do you personally have an employment contract with Finova?

3  A    I -- I would say I do not have an employment contract.  I

4  do have a letter that was issued to me that just outlined what

5  my severance benefits are, but I do not consider that to be an

6  employment contract.

7  Q    Have you begun to search for post Finova employment?

8  A    I have not yet because of, you know, the exact timing of

9  it.  People want to know -- I've received numerous calls at

10 times with people having jobs available, but I keep telling

11 them I don't know the exact timing.  And I will start here if -

12 - if things look like they continue to proceed, I'll start here

13 shortly.

14 Q    Okay.  And the last time you were here and testifying, you

15 went over a booklet that set forth certain assets of Finova

16 that --

17 A    Right.

18 Q    -- still remain to be liquidated, is that correct?

19 A    Uh, yes, the last time I was here.

20 Q    Can you give a generalized description or estimate of --

21 really a generalized description of what assets are left to be

22 liquidated at this point.

23 A    Very little.  Virtually everything that we estimated with

24 value at that last time has been liquidated.  We no longer have

25 any aircraft.  We liquidated all assets with any significant

Ross - Direct                                30

1  value.

2        There were a few things listed on that last time,

3  like various claims and judgment that we could not estimate any

4  value and some old securities.  Those are the things that are

5  still left.  So, I wouldn't say that there's any real value.

6  We will make a final decision kind of on those.

7        But I would think the assets that are left in total,

8  probably a couple million dollars worth in value, at most.

9  Q    And what's Finova's intentions with those assets?

10 A    The last ones will be liquidated.  We actually had

11 meetings today to accelerate the final disposition of those

12 final remaining ones since there's no substantial value and we

13 want to continue on with our plan to be wrapped up by the end

14 of year.

15        So, we're working towards a year end wrap up.  You

16 know, and we've begun the next stage in our process since the

17 assets have been substantially liquidated, we've moved on to

18 the next steps in the liquidation process.

19        MR. ANDRIOLA:  I -- I have nothing further for the

20 witness, Your Honor.

21        THE COURT:  Do you have any questions?

22        MR. LANDERS:  Yes, Your Honor.  I have very, very

23 few.

24                   CROSS EXAMINATION

25 BY MR. LANDERS:

1 Q    First of all, Mr. Ross, let me confirm.  Your

2 understanding is that if -- if a stay is entered by this Court,

3 Finova must remain as a public company?

4 A    It -- it is my understanding we would not be able to

5 disburse the funds, which then requires us to stay around until

6 we can take care of the matters that we have to.  So, -- and if

7 we stay around as a company, we would stay around as a public

8 company, yes.

9 Q    I'm just asking now for your understanding.  And you've

10 testified that you're not a lawyer.  But it's your

11 understanding that if the company dissolves, it no longer has

12 to pay the fees to Leucadia.

13 A    That is my understanding, yes.

14 Q    And finally, Mr. Ross, I'd like to very briefly go through

15 some of these costs.  You said that the Leucadia fees are $8

16 million per year.

17 A    Correct.

18 Q    You said that the second biggest component was public

19 company costs.

20 A    Correct.

21 Q    Can you say about how much those would be?

22 A    I would say they're probably in the two to two and a half

23 million.  One thing that's difficult for us to exactly

24 estimate, unfortunately if we go beyond year end, Finova then

25 has to comply with the Sarbanes-Oxley 404 rules for

Ross - Cross                                           32

1   certification of internal controls.  So, we don't know exactly

2   how much that's going to cost us, but that's going to be a very

3   cumbersome process that we really would like to try to avoid

4   because everything I've read is not the most pleasing thing to

5   deal with and it's not going to add value to the company.

6   Q    You said basically your best estimate is two -- two and a

7   half million dollars?

8   A    Two to two and a half, yes.

9   Q    And that -- what -- what does that include?

10  A    The largest things in there would be insurance, D and O

11  insurance, fidelity insurance, fiduciary insurance.  And then

12  the other one would be auditor cost for the -- using Ernst &

13  Young as our public accounting firm for their audit, their

14  quarterly reviews out of any other plans that we have.

15  Q    Now, you testified on salaries.  And when I added up the

16  numbers that you came to, I came to numbers between an

17  aggregate assuming that they were the same from year-to-year,

18  between a million and a million and a half dollars.  Is that --

19  and I'm looking obviously for an all end cost, including

20  benefits and the like.  Is that a reasonable amount?

21  A    Yeah, probably a little higher than a million to a million

22  and a half, probably in that million and a half to a million

23  seven fifty range.  Because also in there are benefits that we

24  did not talk about, training, workers' comp insurance, we put

25  in that because they're all related to employees.  So, we refer

Ross - Cross                                33

1  to those as people cost.  Travel, you know, travel, et cetera.

2  Q    Now, in addition, would you expect that there'd be

3  professional costs?

4  A    That would be the other component that's -- what causes

5  the big range.  We're about to speak to that, kind of with it.

6  That's a wild card.  You know, the longer we seem to be around,

7  the more things come out of -- out of the, you know, out of the

8  woodwork.  We thought we were completely done with the Thaxton

9  matter as soon as we reached a settlement in that, and it was

10 done, then -- now we get filed a new Thaxton TLP settlement.

11 And, you know, so -- those things could happen, those can

12 happen whether we're around or not.  But our, you know, the

13 longer we stay an existing company, we believe there's -- we

14 kind of continue to be a target out there and it increases the

15 likelihood that more lawsuits will be filed against us.

16          MR. LANDERS:  I have no further questions, Your

17 Honor.

18          THE COURT:  Okay.  I just have a couple questions.

19          THE WITNESS:  Yes.

20          THE COURT:  Did you say the Thaxton Life Partners

21 suit has been settled?

22          THE WITNESS:  No.  The Thaxton -- the -- the Thaxton

23 Group suit was settled.  Thaxton Life Partners came about right

24 while the other Thaxton Group was settled.  We never

25 contemplated that one coming about.

Ross - Court                                    34

1           THE COURT:  Okay.  And I see that was just filed in

2   February of this year.

3           THE WITNESS:  Yes.

4           THE COURT:  Now, in the -- on Page 5 of the 10Q where

5   you talked about winding up the affairs.  And that's the term

6   you used, wind up the affairs of the company --

7           THE WITNESS:  Yes.

8           THE COURT:  -- what do you mean by that?  Is that --

9           THE WITNESS:  The wind up is --

10          THE COURT:  -- spend the last dollar --

11          THE WITNESS:  Right.

12          THE COURT:  -- employees are gone, turn out --

13          THE WITNESS:  Everything.

14          THE COURT:  -- the lights?

15          THE WITNESS:  Yeah.  Liquidate -- liquidated all

16  assets, shut down all programs, withdrew licenses from every

17  state that we were allowed to do business, finalize last tax

18  filings, you know, with the IRS, and got tax clearance --

19          THE COURT:  Okay.

20          THE WITNESS:  -- for the --

21          THE COURT:  And I --

22          THE WITNESS:  -- withdraw, and then dissolving the

23  entity.

24          THE COURT:  Okay.  And I assume that also means the

25  conclusion of the Thaxton Life Partners litigation.

35

1          THE WITNESS:  Thaxton Life Partners, you know, that's
2   one thing that we've always said could be.  That we could set
3   money aside for that, or we can stay around.  So, that one
4   could go kind of either way since that's kind of -- we can set
5   -- set funds aside.
6          But for all intents and purposes, we wouldn't
7   probably stay around to resolve that, as well, if possible.
8   But a decision has to be made as we progress.
9          THE COURT:  Okay.  That's all I have.
10         MR. LANDERS:  Your Honor, at this point, I'd like to
11  move the admission of the four exhibits that you introduced.
12         MR. ANDRIOLA:  We have no objection, Your Honor.
13         THE COURT:  Okay.  They're admitted
14         MR. ROSS:  Am I excused?
15         THE COURT:  Oh, you may step down.
16         MR. ROSS:  Thank you.
17                     (Pause)
18         THE COURT:  Anything else?
19         MR. ANDRIOLA:  If the Court would permit it, I would
20  just kind of briefly summarize our arguments, but --
21         THE COURT:  Okay.  Proceed.
22         MR. ANDRIOLA:  At the outset, I want to -- I took
23  some advice from your decision in the In Re: Genesis Health
24  Ventures case.  And that is as to the limited nature of the
25  stay that you granted.  And I'd like to clarify and modify the

375

36

1    request in our papers to seek the same sort of stay that was
2    granted in that case, Your Honor.  And that was a stay that
3    would expire at the earliest of six months, or entry of a
4    ruling affirming your decision on the clarification motion.

5              I think that would resolve realistically the concerns
6    Finova has and would fall squarely within their conservative
7    estimate, as I thought the witness acknowledged.

8              Just very briefly, Your Honor.  On the issue of harm.
9    We submit to you if the stay is not granted -- well, if the
10   stay is not granted, they've told us they're going to disburse
11   the $81 million in segregated funds that are subject of the
12   clarification motion.  That is being appealed to the District
13   Court.

14             We think it's obviously that once such a distribution
15   is made, it's going to be next to impossible for the equity
16   holders to somehow reclaim those funds.  We think that is a
17   clear demonstration of irreparable harm that the equity holders
18   will suffer if the stay is not granted.

19             The next party, I think we need to consider, are the
20   note holders.  And I would just say that they failed to file
21   any objection to the stay requested in this case.

22             Finally we have the debtor who did file an objection
23   to the requested stay.  And essentially the debtor alleges that
24   it would be harmed if a stay is granted, as opposed to the
25   other way around, as we allege.  And the alleged harm being an

1  additional year's worth of operating expenses.

2       I submit to the Court that the only reasonable
3  interpretation of Mr. Ross's testimony, based on what he said
4  in court today and what actually appears in his -- his
5  declaration is that it is the existence of the appeal that
6  will, if anything, require Finova's continued existence.  Those
7  are the words in his declaration, I know he, I think, changed
8  that slightly today, and I think it's up to the Court to judge
9  on that.

10      The -- I'll just repeat again that the six-month
11  stay, I've now told you that we're seeking, falls within the
12  conservative estimates of all the different 10Q filings.

13      On the topic of merits, I'm obviously not going to
14  convince you that your decision was wrong in the first place.
15  Thankfully that's not a requirement for a stay pending -- uh --
16  since such requirement would, I think for all intense and
17  purposes, be illogical.

18      I do want to point out that I think this -- this is a
19  case where -- really a case of first impression in that I don't
20  have all the briefs memorized by heart, but I don't remember
21  either party claiming -- even claiming the existence of case
22  law that is directly on point to the situation that was raised
23  by this case.  So, I think that's important to note.

24      I also -- in conclusion on the merits issue, I think
25  this is a case where the Court should agree to disagree with

38

1  the Equity Committee as to the legal issues on appeal, but

2  grant the limited requested stay because of the irreparable

3  harm to the Equity Committee in the absence of a stay and the

4  lack of any demonstrable harm to the other interested parties.

5          Thank you, Your Honor.

6          MR. LANDERS:  Your Honor, I will take a few minutes

7  longer than Mr. Andriola.

8          I will respond in due course to his request for

9  basically a six-month stay.  But I think that that puts the

10 cart before the -- before the horse.

11         The issue here is whether they're entitled to a stay.

12 Whether it be a six-day stay, or anything else.  And the fact

13 of the matter is, Your Honor, that they haven't demonstrated

14 that they have any right to any stay whatsoever under the

15 criteria that have been recognized by this Court, and a number

16 of other courts in this Circuit.

17         Your Honor, at the outset, this is a dispute between

18 creditors and equity.  And for the better part of two years,

19 the creditors have been bearing both the risk and the expense

20 for both sides.

21         At no point has the Equity Committee or members of

22 equity been willing to step up and say we ought to bear the

23 risks here.  And that's really what's at stake here.

24         Now, the factual background of this case is very well

25 known to the Court.  Mr. Andriola says, well, there's no case

39

law.  Of course, there's no case law.  There's no case law
because the case involved the construction of an indenture.
The indenture said, you're limited in making restricted
payments.  You can't make them if it would constitute an
impermissible restricted payment.  And that was defined as a
payment that would cause insolvency, would lead to a possible
fraudulent transfer, or would be illegal under State law.

        This Court read the indenture in great detail in its
opinion, went through the -- went through the language of the
opinion, went through the disclosure statement and said it's
clear.  It's clear that the -- under the indenture itself, that
the equity are not entitled to these payments if the conditions
are not met.

        What's more, the Court went on and said the equity,
the shareholders had fair warning of this from the disclosure
statement and other documents that were executed at the time of
the plan.

        And that's the situation we have here.  I can't
imagine that there would ever be a case, a reported case in
which this Court would find a situation that is really close.
Actually there is a case.  Um -- uh -- and I'm just trying to
find it.  And it's a case that the Committee cited where what
happened was there was -- um -- the plan provided that a class
of creditors would get money from one pot and money from
another pot, which was supposed to add up to 100 percent.  And,

40

1  in fact, what happened was they got more money in one pot than
2  was expected, than was anticipated, and the result was they
3  received an over-recovery.

4        The proponent of the plan then sought to modify the
5  plan basically to prevent the -- it's the Saint Mary's case, by
6  the way, Your Honor.  The proponents sought to modify the plan
7  to basically limit the amount of the recovery to the amount of
8  the claims.

9        And the Court said in connection with denying a --
10  denying a stay, the Court said, here this -- the plan wasn't
11  ambiguous.  There's no ambiguity and we're not going to create
12  ambiguity.  And we're not going to -- and this is the Court's
13  words, torture the language to create an ambiguity.

14        And that's what's involved here, Your Honor.  It's a
15  reading of an indenture.  It doesn't take any more or less than
16  that.

17        Now, let's turn specifically to the four stay
18  factors:

19        First of all, a strong showing on the merits.  That's
20  what they're required to prove, and that -- Courts say that's
21  the most important factor.  They turn this factor -- they turn
22  this factor around and say, well, we really don't have to
23  comply with this because the Court will -- the Court which
24  ruled against us is never going to find that factor satisfied.
25        But that's not what the cases say.  The cases are

41

1  legion, including a large number that they cited in which

2  courts decided against the party then went on in connection

3  with the stay to say that the test -- the strong likelihood of

4  success on the merit test is death.  And this Court went

5  through just such an analysis in the Genesis case.  So, courts

6  do that.

7        The fact that this Court rules -- ruled against them

8  is not a factor in favor of the stay, and they are trying to

9  turn it around to that.

10        The fact of the matter is that in all of the papers,

11  and they had two sets of papers here, they haven't filed one

12  piece of paper which suggests anything new, any new factor, any

13  new case or anything else that would suggest that the Court's

14  decision was wrong, was likely to be reversed, or that they

15  were likely to win -- win on appeal.

16        The case does not involve factual issues.  It's a

17  simple construction of -- of an indenture.  The fact of the

18  matter is they simply haven't attempted to satisfy that prong

19  of the stay test.

20        The second test is irreparable injury.  First they

21  talk about mootness and not being able to get the money back.

22  But the cases, including cases cited in their own memoranda,

23  suggest that simply preserving the -- a desire to preserve the

24  status quo is not irreparable injury.  That they're not

25  entitled to irreparable -- uh -- a stay simply to preserve the

42

1   status quo.

2          The Courts find a change in -- the kind of injury
3   that's being talked about here involves major changes in
4   position, being asked to give something up that you already
5   have.  Or never being able to confirm a plan.

6          Or, in one case that they cite, which is not a
7   bankruptcy case, <u>Evans against Buchanan</u>, the Court's approval
8   of a very comprehensive desegregation plan that would almost be
9   impossible to unscramble.  Nothing of that sort is involved
10  here.

11         The third element of the test is injury to the
12  debtors and -- and its creditors.  Well, first of all, the
13  first thing they say is they make what I consider a somewhat
14  disingenuous argument.  That no bondholder has stepped up to
15  oppose the stay.

16         Well, Your Honor, the debtor has been fighting this
17  battle on behalf of bondholders for two years.  There's
18  absolutely no reason for a bondholder at this point, after the
19  debtor has prevailed on the merits of this dispute, to say, oh,
20  we object to the stay.  Why would anybody want to take the
21  Court's time with that kind of pleading when it's clear that
22  the debtors are prosecuting this case in order to pay its
23  creditors, in order to make up the deficiency of over $1
24  billion to creditors?  There's no reason at all for bondholders
25  to make an appearance and go through that.

43

 1          And finally we have the public interest.  The
 2   Committee doesn't even argue this point.  As we suggest in our
 3   memorandum, there are no public interest factors.  This is a
 4   dispute between -- between creditors and equity, and that's all
 5   it is.
 6          We suggest, however, there are two public interest
 7   factors that support the debtor's request:
 8          One is simply the Absolute Priority Rule.  And the
 9   fact of the matter is that every dollar that goes to this,
10   every delay simply is taking money from unsecured credit --
11   from creditors that are not going to get paid in full that are
12   suffering a one -- over a $1 billion deficiency.  That's what
13   all this is about.
14          THE COURT:  But the $81 million is earning interest,
15   isn't it?
16          MR. LANDERS:  The 81 is, but if we have to --
17          THE COURT:  So, the --
18          MR. LANDERS:  If --
19          THE COURT:  So, the pot is improving --
20          MR. LANDERS:  The pot is --
21          THE COURT:  -- with every day.
22          MR. LANDERS:  The pot is improving, although, Your
23   Honor, you will not be surprised that some of our investors are
24   bondholders and hedge funds and things like that, and think
25   that they can get a bit more on the -- in the market than we're

44

1   getting.

2          But the fact of the matter is I'm talking about the

3   expenses of proceeding and the possible expenses of an extra

4   year, which I'll come back to in a minute.

5          If we have to bear those expenses without -- if we

6   have to bear those expenses, that money is coming dollar-for-

7   dollar from creditors.  And also, the strong preference

8   recognition of courts, the deference to the Court that is

9   interpreting its own plan.

10          The Committee cites a 2nd Circuit opinion that

11   purports to follow a different rule.  But if you trace that

12   case back, it really is generated from an insurance -- an

13   insurance contract case and the Court didn't really analyze the

14   unique situation of a court interpreting the plan.

15          And we've cited in our memorandum the First Western

16   case which discusses this issue and cites decisions from the

17   6th, 7th and 11th Circuits which specifically recognize the

18   special deference given to the Bankruptcy Court.

19          The bottom line, Your Honor, is they haven't

20   satisfied any of the standards at all for granting a stay of

21   even one day, let alone six months, which is what they're --

22   they're asking for.

23          Now, let's turn to the six-month request.  I would

24   suggest at the outset, if the Court is inclined to do that, the

25   Court should require them to post a bond.  The cases on posting

45

1  a bond are quite clear that posting a bond by the losing party
2  is -- is the norm.  Judge Scheindlin, in the recent Adelphia
3  case said that you ought to provide a bond except for
4  exceptional circumstances and a good reason for not posting a
5  bond.

6          The Committee has not shown any reason at all for not
7  posting a bond in this case.  And they simply haven't satisfied
8  the burden that is imposed on them.

9          Well, they say, why not just let six months.  Well,
10  let's -- let's just play that out.  If we have -- I mean
11  obviously, Your Honor, there's some period of time.  Six days,
12  12 days, that won't cause prejudice.  But it's a slippery slope
13  here.

14          Mr. Ross has already testified that it takes 45 days
15  to distribute the funds.  So, assuming that you've got to give
16  notices beforehand, that really puts early November as the
17  latest time that you could distribute the funds.

18          I'm not sure if you distributed early November that
19  you could get the liquidation complete by the end of the year.
20  Remember we've got to distribute the funds as a prelude to
21  liquidation.  So, you've got to distribute the funds and then
22  you've got to take whatever other steps have to be taken after
23  that.

24          Mr. Ross testified -- Mr. Ross's declaration talked
25  about a period, I believe, of 90 to 120 days after everything

46

1  was sort of over for the final wind down, closing up shop,

2  turning off the lights and all those things to be done.  And

3  that's why the company specifically suggested in Mr. Ross's

4  declaration that the distribution would be made in the third or

5  very early fourth quarter.  So, that the notices could be given

6  earlier, and so that the company would have a substantial

7  period to wind up its affairs.

8           That's -- that's where we are.  Mr. Ross's testimony,

9  I think, is very strong on the amount involved.  He's gone

10  through the numbers and he's explained exactly what the cost

11  items are.  And the bottom line here, Your Honor, is that if --

12  if they lost, if anybody takes the risk here, the Committee

13  ought to take the risk of the appeal.  I mean that's where we

14  are.  Somebody's got to bear the risks and the costs of the

15  appeal.  The Committee ought to bear the costs and risks of an

16  appeal, and not -- not the debtors in -- in this case.

17           As I said, the burden is simply on them to do it.

18  The timing simply doesn't work for six months.  You just -- you

19  just won't get the thing done in a six-month period.

20           And finally, Your Honor, I'd emphasize one point:

21           If they post the bond and the appeal gets over early,

22  we can wind up early or something like that, no damages are

23  due.  The cases are clear, cited by both parties.  That the

24  bond simply is a cap on damages.  It does not establish -- if

25  they post a bond for X million, it doesn't mean if they lose

47

1  the appeal, they put up X million.  We still have to prove our

2  damages.

3          But the point is, there's money there that's

4  collectible to stand for the damages.  And our point would be

5  that if there's any risk here at all, they ought to bear that

6  risk, not the company.

7          For those reasons, Your Honor, we would urge the

8  Court, number one, to deny a stay what -- at all.  But if

9  granting a stay, to require them to post a substantial bond and

10 bear the risk of the appeal.

11         Thank you very much.

12         THE COURT:  Okay.  There's two factors that are

13 primarily implicated in this matter, and they're conflicting.

14         Number one, the merits of the appeal, I can't

15 overstate how strongly I feel that there is no merit to the

16 Committee's position.

17         On the other hand, if I'm wrong and they're right,

18 then I think there is a serious risk of irreparable harm, which

19 raises this point:  If there is a possibility that this ruling

20 could be reversed on appeal, and I don't claim to have any

21 expertise in this area, I strongly suspect that the company

22 would have to continue SEC compliance because there's a

23 potential for equity interest being involved, and I assume the

24 equity interest is what requires the filing of the -- of the

25 periodic reports.

48

1      So, it may well be that even without a stay, this

2 company will not be able to wind up.

3      Secondly, we have the Thaxton Life Partners suit

4 which, in my view, would have to be resolved in order for this

5 company to terminate all employees and turn off the lights and

6 terminate all kinds of O and D insurance.

7      But given the fact I feel so strongly that there's no

8 merit to the Committee's position, I'm going to suggest what I

9 hope will be a solution:

10      I'm going to grant a 90-day stay.  And within that

11 period, I would assume that the appeal briefing will be

12 completed.  And I suspect it's going to be a very thin record.

13 As far as I'm concerned, there's only three documents involved.

14 And if the Committee files the -- if they complete the briefing

15 and they file a motion with the District Court for a stay, my

16 guess is that a District Court Judge, in three to four hours,

17 could read the documents and come to a conclusion either, one,

18 that I'm right.  Or, two, that I'm wrong.  Or, three, it's a

19 close question.  And with respect to the latter two, he might,

20 therefore, be inclined to grant a stay.

21      So, given the fact that I think the District Court's

22 decision will not be difficult to be arrived at, restating, I

23 think, in three to four hours any reasonable judge could

24 conclude as to the merits of the Committee's position.

25      Now, having said that, I have no idea how the

388

49

1  District Court will look at this matter or whether they will

2  simply say to the appellant, you have to stand in line and

3  we've got a year or two of cases ahead of you, or whether they

4  would take it out of order.

5        And I should also observe that we're one judge short

6  over there.  So, I suspect their calendar is pretty crowded.

7        But in any event, I think the appropriate way is to

8  allow someone other than myself, i.e., the District Court

9  Judge, to look at what I looked at.  And hopefully would, if

10  not rule on the merits, then at least be able to make a

11  judgment as to whether a stay should be authorized by the

12  District Court.

13        And I will not require the posting of a bond.

14        Any questions?

15        MR. LANDERS:  Yes, Your Honor.  I guess I would -- I

16  would -- I don't -- I'm not going to reargue the issues, but --

17  but I just think that there's no evidence in the record which

18  suggests that Finova will have to stay as a public company if

19  there's no -- if there's no stay entered.

20        That's -- if that's the critical thing, we'd like an

21  opportunity to specifically present some data on that.  Mr.

22  Ross testified he's not a lawyer.  And -- and that's really a

23  legal question --

24        THE COURT:  Well, aside from that --

25        MR. LANDERS:  -- at the end.

389

50

1          THE COURT:  -- I think he testified he didn't know

2     whether they will have to stay in business to address the

3     Thaxton Life Partners.

4          MR. LANDERS:  That's true.  That's true, Your Honor.

5          THE COURT:  So, that means they might and they might

6     not.

7          MR. LANDERS:  That's right, Your Honor.  I just

8     wanted to be -- I just wanted to be clear on the other point,

9     Your Honor, because I think that, as I said, we're not -- there

10    is no real evidence of somebody who knows whether we have to

11    stay in existence because --

12         THE COURT:  Okay.

13         MR. LANDERS:  -- of Thaxton.

14         THE COURT:  Okay.  All right.  I'll ask the Committee

15    to submit an order on notice.

16         MR. LANDERS:  And --

17         THE COURT:  And --

18         MR. LANDERS:  -- just --

19         THE COURT:  Yes?

20         MR. LANDERS:  Just so I understand, Your Honor, the

21    90 days begins from today?

22         THE COURT:  Today.

23         MR. LANDERS:  Thank you, Your Honor.

24         THE COURT:  Any other questions?

25         MR. ANDRIOLA:  No, Your Honor.

51

1          THE COURT:  Okay.  We stand in recess.

2              (Proceedings Adjourn at 2:39 P.M.)

3

4

5              C E R T I F I C A T I O N

6

7      I, Karen Hartmann, certify that the foregoing is a

8  correct transcript to the best of my ability, from the

9  electronic sound recording of the proceedings in the above-

10 entitled matter.

11

12  _/s/_ _Karen Hartmann_____          Date:  July 29, 2007

13 TRANSCRIPTS PLUS

14

15

16

17

18

19

20

21

22

23

24

25

391

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| THE FINOVA GROUP, INC., and | : | |
| FINOVA CAPITAL CORPORATION | : | Case Nos. 01-0698 (PJW) |
| | : | |
| Reorganized Debtors. | : | Jointly Administered |
| | : | |
| | : | **RE: Docket No. 222** |
| | : | |

**ORDER PURSUANT TO FEDERAL RULE OF BANKRUPTCY**
**PROCEDURE 8005 GRANTING 90-DAY STAY OF THE BANKRUPTCY**
**COURT'S ORDER GRANTING DEBTOR'S MOTION REQUESTING**
**CLARIFICATION OF CONFIRMED CHAPTER 11 PLAN**

Upon the motion of the Official Committee of Equity Security Holders (the "Equity Committee"), on behalf of the shareholders (the "Equity Holders") of Finova Group, Inc., the corporate parent of Finova Capital Corporation (collectively, the "Reorganized Debtors"), for a stay pending final resolution of any appeal of the Bankruptcy Court's Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan dated June 26, 2007 in this case (the "Final Clarification Order") (Docket No. 220), and after a hearing on the motion held on July 17, 2007, the record of which is incorporated herein, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

The Equity Committee's motion for a stay is granted as follows:

1.    The provisions of paragraph 2 of the Final Clarification Order and all authority granted therein is stayed from July 24, 2007 through and including October 22, 2007 (the "Stay Period").

392

#247

2.      The Stay Period shall end on October 22, 2007; provided that, during the Stay Period, the Equity Committee may seek an additional stay from the District Court pursuant to Federal Rule of Bankruptcy Procedure 8005 and this Order shall be deemed to satisfy the requirement of Rule 8005 that a motion for a stay "must ordinarily be presented to the bankruptcy judge in the first instance."

3.      This Court shall retain jurisdiction to interpret, amend and enforce the terms of this Order.

Dated: August 2, 2007
        Wilmington, Delaware

                            _____
                            HONORABLE PETER J. WALSH
                            UNITED STATES BANKRUPTCY JUDGE

## CERTIFICATE OF SERVICE

I, William D. Sullivan, hereby certify that on the 31st day of August 2007, I caused a copy of the foregoing *Appendix of Exhibits to Motion and Opening Brief of the Official Committee of Equity Security Holders in Support of Stay Pending Appeal of the Bankruptcy Court's Final Clarification Order* to be served upon the parties listed below in the manner indicated.

**HAND DELIVERY**
Mark D. Collins
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19801

**FIRST CLASS MAIL**
Jonathan M. Landers, Esq.
Paul Guillotte, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

*August 31, 2007*
Date

*/s/ William D. Sullivan*
William D. Sullivan