**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re )<br><br>)<br>THE FINOVA GROUP INC., )<br>FINOVA CAPITAL CORPORATION, )<br><br>)<br>Reorganized Debtors. )<br>)<br>Official Committee of Equity Security )<br>Holders, )<br>)<br>Appellant, )<br>)<br>v. )<br>)<br>Finova Group Inc. and )<br>Finova Capital Corporation, )<br>)<br>Appellees. )<br> | Chapter 11<br><br>Case No. 01-0698 (PJW)<br><br>Jointly Administered<br><br><br><br><br>C.A. No. 07-480 (JJF)<br><br>Bankruptcy Case No. 01-698<br>AP 07-70 |

**OBJECTION AND ANSWERING BRIEF OF
FINOVA GROUP, INC. AND FINOVA CAPITAL CORP.
TO MOTION AND OPENING BRIEF OF THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS IN SUPPORT OF A STAY PENDING
APPEAL OF THE BANKRUPTCY COURT'S FINAL CLARIFICATION ORDER**

Dated: September 20, 2007
    Wilmington, Delaware

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

-and-

Jonathan M. Landers
Robert K. Dakis
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166

*Co-Counsel to the Reorganized Debtors, Appellees*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... ii

Preliminary Statement ........................................................................................................ 1

Background ......................................................................................................................... 4

    I.     General Background ........................................................................................... 4

          A.    Background Regarding Reorganized Debtors' Financial Condition ......... 4

          B.    Background Regarding Distributions to Creditors and Shareholders ....... 4

          C.    Proceedings in Front of the Bankruptcy Court ........................................ 6

The Equity Committee Has Failed to Satisfy the Standards for Granting a Stay
Pending Appeal ................................................................................................................ 10

          A.    The Equity Committee Cannot Demonstrate that It Has A Likelihood
              of Success on the Merits of the Appeal ................................................. 11

          B.    The Equity Committee Should Not Be Relieved of Its Burden to
              Demonstrate A Strong Likelihood of Success on the Merits ................. 16

          C.    The Equity Committee Has Shown No Irreparable Injury. .................... 17

          D.    The Debtors Will Be Harmed By a Stay................................................. 19

          E.    The Public Interest Would Not Be Served By A Stay. ........................... 20

In The Event The Court Grants a Stay, the Equity Committee Should be Required
To Post a Bond ................................................................................................................ 21

Conclusion ....................................................................................................................... 23

## TABLE OF AUTHORITIES

### CASES

*In re 203 N. LaSalle Street Partnership,*
    190 B.R. 595 (N.D. Ill. 1995) ........................................................................................18

*Adams v. Freedom Forge Corp.,*
    204 F.3d 475 (3d Cir. 2000) ....................................................................................17, 18

*In re Adelphia Communications Corp.,*
    361 B.R. 337 (S.D.N.Y. 2007) ......................................................................18, 19, 21, 22

*In re ANC Rental Corp.,*
    2002 WL 1058196 at *2 (D. Del. May 22, 2002) ..........................................................10

*In re Armstrong World, Inc.,*
    432 F.3d 507 (3d Cir. 2005) .........................................................................................20

*In re Blackwell,*
    162 B.R. 117 (E.D. Pa. 1993) .......................................................................................10

*In re Camden Ordnance Manufacturing Co. of Arkansas, Inc.,*
    238 B.R. 292 (E.D. Pa. 1999) .......................................................................................10

*Campbell Soup Co. v. ConAgra, Inc.,*
    977 F.2d 86 (3d Cir. 1992) ...........................................................................................16

*In re Dakota Rail, Inc.,*
    111 B.R. 818 (Bankr. D. Minn. 1990) ...........................................................................18

*In re Dow Corning Corp.,*
    456 F.3d 668 (6th Cir. 2006) ........................................................................................16

*Evans v. Buchanan,*
    435 F. Supp. 832 (D. Del. 1977) ..................................................................................11

*Family Kingdom, Inc. v. EMIF New Jersey L.P.,*
    225 B.R. 65 (D.N.J. 1998) ......................................................................................16, 17

*First Pennsylvania Bank N.A. v. Intermet Realty Partnership (In re Intermet Realty P'ship),*
    27 B.R. 938 (Bankr. E.D. Pa. 1983) .............................................................................21

*First Western SBLC, Inc. v. Mac-Tav, Inc.,*
    231 B.R. 878 (D.N.J. 1999) ..........................................................................................16

*In re Forty-Eight Insulations Corporation,*
115 F.3d 1294 (7th Cir. 1997) ...................................................................................17

*Geftman v. Commissioner of Internal Revenue,*
154 F.3d 61 (3d Cir. 1998) .......................................................................................12

*Hill Int'l v. Nat'l R.R. Passenger Corp.,*
957 F.Supp. 548 (D.N.J. 1996) ................................................................................17

*Hoxworth v. Blinder, Robinson & Co., Inc.,*
903 F.2d 186 (3d Cir. 1990) .....................................................................................16

*In re John Joseph Edwards,*
228 B.R. 573 (Bankr. E.D. Pa. 1999) .......................................................................11

*Pension Benefit Guaranty Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.),*
159 B.R. 730 (Bankr. W.D. Pa. 1993) ......................................................................10

*In re Polaroid Corp.,*
2004 WL 253477 *1 (D. Del. 2004) ....................................................................10, 11

*In re Public Serv. Co. of N.H.,*
116 BR 347 (Bankr. D.N.H. 1990) ...........................................................................11

*Reserve Mining Co. v. United States,*
498 F.2d 1073 (8th Cir. 1974) ..................................................................................11

*In re Richmond Metal Finishers, Inc.,*
6 B.R. 270 (Bankr. E.D. Va. 1984) ...........................................................................11

*Schulz v. United States Boxing Association,*
05 F.3d 127 (3d Cir. 1997) .......................................................................................16

*In re The Columbia Gas Sys., Inc.,*
1992 U.S. Dist. LEXIS 3253 at *4 (D. Del. Mar. 10, 1992) ........................................11

*In re Trans World Airlines, Inc.,*
2001 WL 1820019 *1 (Bankr. D. Del. Mar. 16, 2001) ....................................10, 11, 18

*In re United Merchants & Manufacturers, Inc.,*
138 B.R. 426 (D. Del. 1992) .....................................................................................21

*VFB L.L.C. v. The Money's Trust (In re VF Brands, Inc.),*
282 B.R. 134 (Bankr. D. Del. 2002) .....................................................................10, 11

iii

## OTHER

8 Del. Code Ann. § 170 ................................................................................................................ 15

Fed. R. Bankr. P. 8005 ......................................................................................................... 10, 21

The FINOVA Group, Inc. ("FNV Group") and FINOVA Capital Corporation (together "FINOVA" or the "Debtors"), hereby submit the following opposition to the Motion and Opening Brief of the Official Committee of Equity Security Holders (the "Equity Committee") in Support of a Stay Pending Appeal of the Bankruptcy Court's Final Clarification Order (the "Stay Motion"). For the reasons stated below, the Stay Motion should be denied as the Equity Committee has failed to satisfy the requirements for a stay pending appeal; however, should the District Court be inclined to grant the relief requested in the Stay Motion, such order should be conditioned on the Equity Committee's posting of a bond.

## PRELIMINARY STATEMENT

1.      In March of 2001, the Debtors filed for relief under chapter 11 of the Bankruptcy Code. The Debtors moved swiftly to negotiate and confirm a plan of reorganization (the "Plan") that would have paid creditors in full and, if the Debtors remained solvent, would have provided limited recovery to equity holders. Pursuant to the Plan, the Debtors' unsecured creditors received notes in an aggregate amount of $3,250,478,000 (the "New Senior Notes") in partial satisfaction of their claims. This appeal involves the question whether certain funds set aside for possible payments on account of Equity Interests should be used to pay the operating expenses and obligations of the Debtors (including the New Senior Notes) or to make a distribution on account of Equity Interests (i.e., to Shareholders).

2.      The Indenture governing the New Senior Notes (the "Indenture"), attached to the Stay Motion as Exhibit A,[1] has a waterfall provision for distribution of cash ("Available Cash"). This dispute revolves around the provisions of the Fifth Step in the waterfall, which

---

[1] Many of the pertinent documents are contained in the Appendix filed with the Stay Motion, and are cited by this reference.

1

provides that (a) Available Cash will be distributed to repay the principal on the New Senior Notes, (b) 5% of the distribution (the "5% Payment") shall be used with other cash which is available to make "Restricted Payments" (i.e., a dividend or "any distribution on account of . . . Equity Interests") to Shareholders, and (c) if the "making of any such Restricted Payment would be an Impermissible Restricted Payment" (one that would render the company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law), FINOVA would retain and accumulate the amount of the 5% Payment and make the Restricted Payments when they were no longer Impermissible Restricted Payments. The Indenture did not, however, specifically provide for a situation where FINOVA was "forever insolvent," and as a result, any payments to Shareholders would always be Impermissible Restricted Payments. In fact, as a result of factors beyond the Debtors' control, they became hopelessly insolvent.

3.    In April, 2005, with the Debtors insolvent by more than $1 billion dollars, they filed a Clarification Motion which alleged that (a) the Debtors would be forever insolvent, (b) any payment on account of Equity Interests would always be an "impermissible restricted payment" and could never be made, and (c) therefore, the Debtors should be authorized to cease setting aside the 5% Payment and the accumulated amounts (approximately $81,228,000), and should be permitted to use the amounts for general purposes, largely to pay the New Senior Notes. (Stay Motion Exhibit B.) Several holders of Equity Interests objected. Thereafter, the Bankruptcy Court authorized the reformation of an Equity Committee to review the Clarification Motion and, if it deemed appropriate, object to the Motion, and provided for limited funding (which was increased three times).

4.    Ultimately, the Equity Committee objected to the Clarification Motion. The Committee's objection ignored the language of the Indenture which forbade any payment

2

which would be an Impermissible Restricted Payment but, instead, argued that the payments were in the nature of a debt and a variety of state law doctrines required payment. The Bankruptcy Court, after voluminous briefing and a lengthy hearing, found that there was absolutely no merit to the Equity Committee's arguments and, indeed, that they were largely "either irrelevant or off the wall" (Stay Motion Exhibit D, p. 52), but reserved decision on whether the Debtors were "forever insolvent." Later, after further proceedings, the Bankruptcy Court granted the Clarification Motion in its entirety and entered an order providing that the Debtors could stop setting 5% of Available Cash as a possible distribution to holders of Equity Interests, and could use the funds previously set aside for possible distribution to holders of Equity Interests for general corporate purposes, including payments on the New Senior Notes. (Clarification Order, at Stay Motion Exhibit H.)

       5.     The Equity Committee has appealed the Clarification Order, and moved in the Bankruptcy Court for a stay pending appeal. The Bankruptcy Court granted a 90-day stay despite stating that it couldn't "overstate how strongly I feel there is no merit to the Committee's position" and that the issues in the Committee's appeal were straight forward and should take the District Court little more than three or four hours to decide. (Stay Motion Exhibit K, pp. 47, 48) Now, the Equity Committee is seeking to extend the 90-day stay until this Court decides the merits of the appeal. The Equity Committee has not, however, presented any support for its arguments. In the first instance, the Equity Committee has made no showing that it is likely to win on appeal and, instead, reiterates precisely the same arguments categorically rejected by the Bankruptcy Court. In apparent recognition of the weaknesses of its arguments on the merits, the Equity Committee argues that a strong showing of a likelihood of success is not necessary because irreparable harm would result from allowing the Debtors to access the segregated funds.

3

This argument misconstrues relevant Third Circuit case law, which has plainly rejected the notion of a sliding scale with respect to the likelihood of success in preliminary injunction cases, and misconstrues applicable law on the "irreparable harm" element.

6.    There are strong public policy reasons for not extending the stay pending appeal. From its inception, the Equity Committee has shifted the burdens of this case to the Debtors and their creditors, in complete violation of the absolute priority rule and principles of fairness and equity. Indeed, the real harm of granting any extension of the stay pending appeal falls directly upon the Debtors and their creditors.

## BACKGROUND

### I.    GENERAL BACKGROUND

7.    On March 7, 2001, the Debtors, and certain other affiliates, each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On May 2, 2001, the Debtors filed the Plan which was subsequently amended on June 1, 2001, June 11, 2001, and June 14, 2001. On August 10, 2001, the Bankruptcy Court confirmed the Plan.

#### A.    Background Regarding Reorganized Debtors' Financial Condition

8.    The Debtors have been clearly insolvent for a long time, and have disclosed the insolvency in public filings going back more than three years. When the Clarification Motion was filed, the Debtors were insolvent by more than $1 billion dollars and, by that time, had already liquidated 92% of their assets and there was no reasonable chance of reversing the situation.

#### B.    Background Regarding Distributions to Creditors and Shareholders

9.    At the center of this dispute is the Bankruptcy Court's interpretation of key provisions of the Indenture. (Stay Motion Exhibit A) Section 4.06(a) provides that the Debtors shall not "use cash and Cash Equivalents in a manner prohibited or not provided for" by

4

this Section 4.06. Section 4.06(a)(v) then provides that, after the provision for payment of operating expenses and certain other obligations, the Debtors will use 95% of their Available Cash to pay principal and interest on the New Senior Notes and to use 5% of the Available Cash to make Restricted Payments, i.e., on account of Equity Interests. Specifically, section 4.06(a)(v) provides that, the Debtors shall apply cash and Cash Equivalents:

> ". . . until the principal of and Fixed Interest on the Notes are paid in full to (A) pay to the Company [FNV Group], when due the principal on the Intercompany Notes . . . which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes . . . and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the Company, which amounts the Company shall use together with any other cash the Company has available for such purposes to make Restricted Payments unless the making of any such Restricted Payment would be an Impermissible Restricted Payment, the Company shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments; *provided*, *however*, that each incremental payment of $0.95 pursuant to Clause (A) shall require a distribution or retention pursuant to clause (B) of $0.05;"

10.      Any distributions to Shareholders constitute "Restricted Payments." The Indenture defines "Restricted Payments" as:

> "(i)      the declaration or payment of any dividend or the making of any distribution on account of the Company's [FNV Group's] Equity Interests (other than dividends or distributions payable in Equity Interests of the Company); or

> (ii)      the purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company other than redemptions, acquisitions or retirements solely in exchange for Equity Interests of the Company."

Indenture at p. 11.

11.      An Impermissible Restricted Payment is defined as:

5

> "a Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law."

Indenture at p. 6.

12.     Finally, section 4.07 prohibits Restricted Payments except those permitted by sections 4.06 or 4.07. Under section 4.06(a)(v) discussed above, it is a condition precedent to the Shareholders' right to receive any distributions under the Plan that such distributions do not constitute Impermissible Restricted Payments. Here, given the insolvency of the Debtors, any distribution to equity clearly would be Impermissible Restricted Payments and cannot be made under section 4.06; the distributions permitted by section 4.07(b) are not pertinent to the 5% Payment.

13.     In sum, the key provisions of the Indenture are as follows. First, any use of cash or cash equivalents is prohibited unless permitted by the Indenture. Second, 5% of Available Cash may be used to make Restricted Payments. Third, a Restricted Payment is the payment of a dividend or any payment on account of Equity Interests. Fourth, a Restricted Payment may not be made if, as here, the payment would be an Impermissible Restricted Payment. Fifth, sections 4.06 and 4.07 specifically prohibit the making of Restricted Payments if not specifically authorized, and the making of an Impermissible Restricted Payments is prohibited and the funds must be retained by FINOVA. There simply is no way around these provisions, and the Equity Committee has never suggested otherwise.

### C.     Proceedings in Front of the Bankruptcy Court

14.     On or about April 1, 2005, the Debtors filed their Motion of the Reorganized Debtor for an Order Under Bankruptcy Code 1141 Clarifying Provision of Confirmed Plan of Reorganization (the "Clarification Motion") [Docket no. 22]. The

6

Clarification Motion sought a determination that, under the Indenture, the Debtors were not required to set aside 5% of Available Cash on account of the Shareholders so long as the Debtors were insolvent or in financial distress and, since the Debtors would be "forever insolvent," funds previously placed in a segregated fund should be returned to the Debtors for payment of operating expenses, distributions to creditors or other corporate purposes.

15.    The Equity Committee was re-formed to investigate and, if appropriate object to, the Clarification Motion. The Equity Committee filed an objection arguing that the Debtors' obligations to the Shareholders under the Plan and Indenture were essentially "debt" obligations because the payment provisions were part of the Plan (although the Indenture provided otherwise), and that various state law doctrines required payment.

16.    At a hearing held on November 29, 2005, the Bankruptcy Court ruled that the Equity Committee's construction of the arguments was not sound and that it was granting the Clarification Motion insofar as the Debtors were insolvent. At the beginning of its ruling on the Clarification Motion, the Court said:

> The multitudinous arguments offered by the Committee, for the most part, are either irrelevant or off the wall. The concept of forfeiture, subordination, constructive trust, sharing pari passu is all in gross conflict with the terms of the plan and disclosure statement.

(Stay Motion Exhibit D, p. 47) The Bankruptcy Court said that it "spent a lot of time with the relevant documents [and] I don't think they're ambiguous and I think the debtor has it right." *Id.* In order to provide some context to its discussion, the Bankruptcy Court first noted that the disclosure statement approved in connection with the Plan stated that "'the legal, equitable and contractual rights of holders of allowed interest in class FNV Group 6 (interest), shall remain in effect,'" that "the interest is a stock interest," and that the stock interest was subject to "'the other terms and conditions of the plan.'" *Id.*

7

17.    The Court next examined the Plan, which contained similar language, and referred specifically to section 6.2 of the Plan and the attached term sheet for the New Senior Notes. The Court found that section 6.2 of the Plan, and the term sheet, clearly set out the terms of the cash distribution and the "limitation on restricted payments," which prevented the use of cash "to make any restricted payments except such restricted payments" as referred to in either (i) the waterfall now reflected in section 4.06 (which prevented impermissible restricted payments) or (ii) section 4.07 which contained five exceptions to provision preventing restricted payments (none of which is applicable here). The Bankruptcy Court further noted that the disclosure statement, in a section titled "'special risks for equity holders,'" clearly explained that "'[s]ubject to applicable corporate law (which limits the circumstances which corporations may legally make distributions to shareholders),'" limited distributions could be made to Shareholders, but added that "'[i]f FNV Group does not have sufficient funds ultimately to repay the new senior notes in full . . . it is likely that only limited distributions will be made to shareholders . . .'" *Id.* p. 50-51.)

18.    The Bankruptcy Court further explained that the Plan clearly warned Shareholders that: "[Y]ou are shareholders. You may or may not get a distribution and if applicable law precludes a distribution or a dividend being made, you get nothing." *Id.* at 51. Further, subject to meeting the legal requirements for distributions to shareholders and "'so long as the making of any such distribution would not render FNV group insolvent'" -- which is precisely what occurred -- the Debtors intended to make the distributions. The Bankruptcy Court concluded that this provision, together with 4.07 of the Indenture, "in my view shouts at us when it says there are circumstances, plain and simple, which would preclude any payment to any of

8

the shareholders." *Id.*[2]    On February 1, 2006, the Bankruptcy Court entered an order memorializing its opinion. (Stay Motion Exhibit E.)

19.    On June 26, 2007, the Bankruptcy Court, after a subsequent hearing, entered the Clarification Order, finding that the Debtors were forever insolvent.  Under the Clarification Order, the Debtors were authorized to cease setting aside 5% of Available Cash for possible distribution to holders of Equity Interests in FNV Group and were further authorized to use funds in the segregated account consisting of 5% Available Cash for general corporate purposes, including payment on the New Senior Notes.  The Clarification Order also provided that the Debtors would not make any such distributions for 30 days following entry of the Final Order so that the Equity Committee could file a motion for a stay pending appeal.

20.    On June 28, 2007, the Equity Committee filed its motion seeking a stay pending appeal.  The Bankruptcy Court held a hearing on the first stay motion on July 24, 2007. At the hearing the Bankruptcy Court found that "I can't overstate how strongly I feel that there is no merit to the Committee's position."  *See* Stay Motion Exhibit K.  The Bankruptcy Court, however, granted a 90-day stay pending appeal, and its ruling was further influenced by the belief that

> it's going to be a very thin record. As far as I'm concerned, there's only three documents involved. And if the Committee files the -- if they complete the briefing and they file a motion with the District Court for a stay, my guess is that a District Court Judge, in three to

---

[2] Thereafter, in a follow up letter of December 2, 2005, the Bankruptcy Court found that the Equity Committee's pleadings were intentionally "misleading," because the Committee:

> by the use of an ellipsis and some bold font, . . . [had] shifted the focus of the clause from Contingent Interest to common stock.  In short, one cannot explain the waterfall entitlement of the Noteholders to the Contingent Interest without noting the preceding Restricted Payments to the shareholders.

> four hours, could read the documents and come to a conclusion
> either, one, that I'm right. Or, two, that I'm wrong. Or, three, it's a
> close question.

*Id.*

## THE EQUITY COMMITTEE HAS FAILED TO SATISFY THE STANDARDS FOR GRANTING A STAY PENDING APPEAL.

21.     Bankruptcy Rule 8005 provides that a bankruptcy court may "suspend or order the continuation of other proceedings . . . or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest." Fed. R. Bankr. P. 8005. Rule 8005, however, does not provide any standards for granting a stay pending appeal. Courts in this circuit have likened a stay pending appeal to a preliminary injunction and have applied a similar test in granting relief:

> (1) that there is a strong likelihood of success of the appeal on the
> merits; (2) that the movant will suffer substantial irreparable injury
> if the stay is denied; (3) that substantial harm will not be suffered by
> other parties if the stay is granted; and (4) that issuance of the stay
> would not involve harm to the public interest.

*In re Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 238 B.R. 292, 293 (E.D. Pa. 1999); *In re Blackwell*, 162 B.R. 117, 119 (E.D. Pa. 1993); *see also*, *In re Trans World Airlines, Inc.*, 2001 WL 1820019 *1 (Bankr. D. Del. Mar. 16, 2001); *Pension Benefit Guaranty Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 733 (Bankr. W.D. Pa. 1993).

22.     This Court has found that a failure to satisfy one of the elements is grounds to deny a stay pending appeal. *See, e.g., In re Polaroid Corp.*, 2004 WL 253477, *1 (D. Del. 2004) (denying a stay pending appeal because the applicant failed to establish a likelihood pf success on the merits and holding that "[i]f a party fails to establish one of the four prongs, a court may deny the requested stay"); *see also, In re ANC Rental Corp.*, 2002 WL 1058196 at *2 (D. Del. May 22, 2002); *In re Blackwell*, 162 B.R. at 120; *VFB L.L.C. v. The*

10

*Money's Trust (In re VF Brands, Inc.)*, 282 B.R. 134, 137-40 (Bankr. D. Del. 2002) (denying stay pending appeal and holding applicant failed to satisfy any factor); *In re Trans World Airlines, Inc.*, 2001 WL 1820019 at *1 (denying a stay pending appeal where the applicant failed to satisfy any of the factors).

A.      **The Equity Committee Cannot Demonstrate that It Has A Likelihood of Success on the Merits of the Appeal.**

23.     First, the Equity Committee must demonstrate "a strong showing that [it] is likely to succeed on the merits of the appeal . . . " *Reserve Mining Co. v. United States*, 498 F.2d 1073, 1076 (8th Cir. 1974), *cited in Evans v. Buchanan*, 435 F. Supp. 832, 844 (D. Del. 1977). This element is satisfied where the movant has established that it has "a 'substantial case,' or a strong case on appeal. *In re Polaroid Corp.*, 2004 WL 253477, at *1, *citing In re The Columbia Gas Sys., Inc.*, 1992 U.S. Dist. LEXIS 3253 at *4 (D. Del. Mar. 10, 1992) (quoting *In re Public Serv. Co. of N.H.*, 116 BR 347, 349 (Bankr. D.N.H. 1990). Courts generally look to whether there is a "divergence of legal authority or case law on a particular question . . . ." *In re Edwards*, 228 B.R. at 576 (quoting *In re Richmond Metal Finishers, Inc.*, 36 B.R. 270, 272 (Bankr. E.D. Va. 1984)). Indeed, the applicant for a stay pending appeal must do more than simply repeat its prior arguments. *See, e.g., In re Olick*, 1996 WL 287344, *1 (E.D. Pa. May 29, 1996) (dismissing motion seeking stay pending appeal, *inter alia*, where applicant failed to satisfy likelihood of success on the merits and holding "with respect to the instant motion, [the applicant] has not presented any arguments or authority not considered previously by this court"). The Committee has not come close to meeting this standard.

24.     To the Debtors (and the Bankruptcy Court), the issue begins and ends with the terms of the Indenture. The Indenture could not be more clear that 5% of each payment of principal of the New Senior Notes was to be used to make "Restricted Payments," which are

11

specifically defined as the payment of "any dividend or the making of any distribution on account of the Company's Equity Interests." Likewise, it is clear that, given the financial condition of the Debtors, any such payment on account of Equity Interests would be an Impermissible Restricted Payment, and the Debtors cannot make the payment but must "accumulate" the funds to make payments "when such Restricted Payments are not Impermissible Restricted Payments." This condition can never occur because the Debtors will be "forever insolvent" so the payments can never be made. This point is emphasized by the proviso to section 4.06(v) which states that each payment of $.95 on the New Senior Notes "shall require a distribution or retention... of 0.05." (emphasis added). In fact, the Equity Committee never contested the Debtors' construction of the words of the Indenture.

        25.    The Indenture provisions for distributions to Shareholders have none of the characteristics of debt--i.e., the recipients are Shareholders (and were shareholders before the Plan was confirmed), the payments are "on account of Equity Interests," the payments are not reflected in notes or similar debt instruments, no interest is paid or accrued, the payment restrictions in the definition of Impermissible Restricted Payments are akin to restrictions under both bankruptcy law and Delaware law to restrictions on distributions to shareholders, the introduction to section 4.06(a) and section .07 of the Indenture specifically prohibit payments which are prohibited or not specifically permitted, payments of debt are ordinarily not conditional in this manner, and the obligation was granted specifically to Shareholders qua Shareholders under the Plan. *See Geftman v. Commissioner of Internal Revenue,* 154 F.3d 61 (3d Cir. 1998) (listing objective aspects of transactions giving rise to debt; none is suggestive of debt and ##2, 7, 10, 11, 13 and 16 are suggestive of equity) Indeed, the Committee has never argued that the 5% Payment should not have been withheld in the first place, never explained

why the funds would be withheld if the obligations were "debts" which must ultimately be paid, and never explained the provision that the funds should "accumulate" until the payments "are not Impermissible Restricted Payments."

26.    The Equity Committee, apparently recognizing that there is no basis for their arguments under the Plan and Indenture, retreats to arguing that the Debtors' obligation is akin to a "debt" obligation, even though this argument finds no support in any document and the Indenture specifically describes the obligation as a Restricted Payment – *i.e.*, "on account of Equity Interests." The Equity Committee offers a series of arguments which were extensively considered in briefs filed in the Bankruptcy Court, which are attached hereto as Exhibits 1 and 2. Briefly, these arguments are discussed below.

(a)    The Committee argues that the Plan is a binding contract and, under New York law, and the Indenture clearly provides that each incremental payment "shall require" a distribution [to Equity Security Holders] or retention [on their behalf]." Stay Motion ¶ 16. The Indenture says no such thing and the Equity Committee's quote is misleading. What the Indenture says is that each incremental payment "shall require, to the extent permitted by applicable law, a distribution pursuant to clause (B)"; the Equity Committee has omitted the phrase "to the extent permitted by law," and the bracketed "on their behalf" does not appear in the Indenture. What does appear in the Indenture is that the payment is a Restricted Payment and cannot be made if it is an Impermissible Restricted Payment. To the extent New York law insists on the enforcement of contractual provisions as made, the Equity Committee is bound by these provisions. Moreover, the notion that the Clarification Order is a "forfeiture" is absurd; one cannot forfeit what one never had and, because of the conditions to payment, Shareholders never had any right to the 5% Payment. The fact is that the Shareholders do not hold a lien or

13

security interest in any property or any specific interest or entitlement or interest in an escrow fund or property, but only a conditional right to a payment which condition has not been met.

(b)     The Committee argues that the condition in the Indenture that the payment not be an Impermissible Restricted Payment was not really a condition to payment but merely specified a time for payment. At the outset, this argument is inconsistent with the words themselves which never specify a time for the 5% Payment but prohibit it as long as the conditions to payment are not met. As shown in the Debtors' Sur Reply Brief (Exhibit 2), such conditions in the Indenture are conditions precedent to payment under New York law, and the cases cited by the Committee involve so-called "pay-when-paid" contracts involving contractors and subcontractors which have nothing to do with the present situation.

(c)     The Committee argues that ambiguities in the contract should be construed against the Debtor as drafters of the documents. Initially, this has no application because, as shown above, there is no ambiguity of any sort. Instead, the Committee mistakenly conflates any potential "ambiguity" caused by the silence of the Indenture regarding the situation where the Debtors are forever insolvent, with the conditions precedent to distributions to holders of Equity Interests which are clear and unambiguous. The fact is that Shareholders are not entitled to payments if, as here, they would be Impermissible Restricted Payments. Moreover, it must be remembered that the Debtors drafted the Plan on behalf of all parties, creditors and equity, and in fact, debtors are more often identified with equity interests than creditor interests. In essence, this is a fight between creditors and equity, not equity and the Debtors.

(d)     The Committee argues that the Plan was a new contract, but then go on to assume that the Bankruptcy Court "essentially wiped out the new contractual obligation running in favor of the Equity Holders." In fact, the Bankruptcy Court didn't wipe out anything,

14

but simply enforced the provisions of the Indenture which made it clear that the Debtors' obligation was conditional, and that the condition had not been met and could never be met. In fact, the Equity Committee is trying to rewrite the Indenture to give Shareholders funds to which they have no legal entitlement.

(e)    The Committee argues that, pursuant to 8 Del. Code Ann. § 170, the payment obligation essentially accrued when the Plan was confirmed. This is completely inconsistent with Delaware law and the Indenture. It assumes the "obligation" was unconditional when it was in fact conditional and the conditions have not been met. It ignores the character of the payments as "Restricted Payments," ignores the fact that under Delaware law, such payments cannot be made unless and until authorized by the Board of Directors, and ignores Delaware law which would forbid payments to shareholders on account of equity interests by a company that is "forever insolvent." And, it ignores the fact that, because of the waterfall provisions, no payment would ever be made until the first four steps in the waterfall were satisfied and, even then, could only be made out of Available Cash.

(f)    Finally, the Bankruptcy Court did not "rely" on the disclosure statement. Instead, the Bankruptcy Court meticulously reviewed the Indenture and the Plan, and found the provisions unambiguous. In that context, it noted that the Disclosure Statement alerted creditors to the fact that if the Debtors ran out of money, they probably would receive no distribution.

27.    In light of these entirely meritless arguments, and the Bankruptcy Court's harsh rejection of the Equity Committee's position, it is hard to understand the basis of the Equity Committee's argument that it is likely to prevail on appeal. Indeed, such a possibility is even more remote given the fact that appellate Courts give particular deference to a Bankruptcy

Judge construing a plan which he confirmed. *See In re Dow Corning Corp.*, 456 F.3d 668, 676 (6th Cir. 2006) ("Although the interpretation of an amended plan of reorganization is analogous in many respects to the construction of a contract, we remain mindful that the law of this circuit requires that we review a bankruptcy court's interpretation of its own decisions with significant deference"); *First Western SBLC, Inc. v. Mac-Tav, Inc.*, 231 B.R. 878, 883-84 (D.N.J. 1999) (collecting cases and holding that the court reviews "the bankruptcy court's interpretation of the Confirmation Plan under the abuse of discretion standard"). In short, the Equity Committee does not come close to establishing the success on the merits factor.

**B.      The Equity Committee Should Not Be Relieved of Its Burden to Demonstrate A Strong Likelihood of Success on the Merits.**

28.      The Equity Committee argues that the Third Circuit has adopted a sliding scale with respect to these elements such that where the applicant demonstrates significant harm, it can make a less than strong showing of its likelihood of success on the merits of this appeal. *See* Stay Motion at 10. This position has been rejected by courts in this Circuit.

Most recently, in a case before the District of New Jersey, an applicant seeking a stay pending appeal before the district court "suggested that the 'likelihood of success' factor may be 'relaxed' where the party moving for the stay has made affirmative showings on the three other factors." *Family Kingdom, Inc. v. EMIF New Jersey L.P.*, 225 B.R. 65, 69 n.6 (D.N.J. 1998). The court rejected this position and held that "this is not the rule for preliminary injunctions in the Third Circuit" *Id.*, *citing Schulz v. United States Boxing Ass'n*, 105 F.3d 127, 131 n. 6 (3d Cir. 1997) ("In district courts within this circuit, in order to support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm") (internal quotations omitted); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90-91 (3d Cir. 1992); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197 (3d Cir.

1990); *Hill Int'l v. Nat'l R.R. Passenger Corp.*, 957 F.Supp. 548 (D.N.J. 1996). Indeed, the

Third Circuit has held that:

> In order to obtain a preliminary injunction, plaintiffs must show
> both (1) that they are likely to experience irreparable harm without
> an injunction and (2) that they are reasonably likely to succeed on
> the merits. A court may not grant this kind of injunctive relief
> without satisfying these requirements, regardless of what the
> equities seem to require. If relevant, the court should also examine
> the likelihood of irreparable harm to the nonmoving party and
> whether the injunction serves the public interest.

*Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000) (citations omitted)

(considering whether there was a showing of success on the merits even after the Court found

that there was irreparable harm). Thus:

> not only is the "relaxation principle" not the law in the Third Circuit
> or in the majority of circuits, some courts have held that "in the
> context of a stay pending appeal, where the applicant's arguments
> have already been evaluated on the success scale, the applicant must
> make a stronger threshold showing of likelihood of success to meet
> [its] burden." *See, e.g.*, *Forty-Eight Insulations*, 115 F.3d at 1301
> (emphasis added).

*Family Kingdom, Inc.*, 225 B.R. at 69 n.6.

For nearly two years, the Bankruptcy Court has cautioned the Equity Committee

that its arguments were simply not supportable. *See, e.g.*, Stay Motion Exhibit D, p. 47 ("The

multitudinous arguments offered by the Committee, for the most part, are either irrelevant or off

the wall"); Stay Motion Exhibit K, p. 47 ("I can't overstate how strongly I feel that there is no

merit to the Committee's position"). The Equity Committee should not be excused from making

a strong showing of a likelihood of success on the merits simply because it has a weak case.

C.    **The Equity Committee Has Shown No Irreparable Injury.**

29.    Second, the applicant must demonstrate that it will be irreparably injured

if a stay is not granted. But, "more than preservation of the status quo is necessary to show

17

irreparable harm." *In re Edwards*, 228 B.R. 573, 580 (Bankr. E.D. Pa. 1999) (finding no irreparable injury to individual debtor seeking to challenge a sale of his assets); *In re Trans World Airlines*, 2001 WL 1820325 (Bankr. D. Del. Mar. 27, 2001) (finding no irreparable injury where granting a stay pending appeal will not result in any greater recovery for the applicant). "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d at 484-485.

30.    In the first instance, the courts in this Circuit have held that, absent some mitigating factor such as a likelihood of success on appeal, the mere fact that an appeal could be rendered moot does not rise to the level of irreparable injury. *See In re Trans World Airlines, Inc.*, 2001 WL 1820325 at * 10 (noting that "[i]t is well settled that an appeal being moot does not itself constitute irreparable harm" (quoting *In re 203 N. LaSalle Street P'ship*, 190 B.R. 595, 598 (N.D. Ill. 1995)); *In re Dakota Rail, Inc.*, 111 B.R. 818, 821 (Bankr. D. Minn. 1990) ("But the mooting of his appeal is not sufficient, by itself, to establish that Ross will be injured by denying the stay"). Absent any suggestion of injury apart from the possible mooting of its appeal, the Equity Committee has not shown any irreparable injury.

31.    The Equity Committee attempts to rely on the Southern District of New York's opinion in *In re Adelphia Communications Corp.*, 361 B.R. 337 (S.D.N.Y. 2007), for the proposition that rendering its appeal moot would somehow cause irreparable harm. In *Adelphia*, however, the District Court found that there was a substantial chance appellants would succeed, and described in considerable detail the likely erroneous rulings of the Bankruptcy Court. Here, the Equity Committee's entire appeal is premised on an argument that the Bankruptcy Court wrongly interpreted the Plan and Indenture. For the reason set forth above, the Equity

Committee cannot demonstrate a strong likelihood that it will succeed on appeal and therefore reliance on *Adelphia* is misplaced. And despite the finding of likely success, the Court in *Adelphia* ordered a bond exceeding $1 billion dollars. Ultimately, there is no irreparable injury if a stay is not granted.

**D.    The Debtors Will Be Harmed By a Stay.**

32.    The Committee argues that there is no harm to the Debtors if the stay is granted because (i) the funds have been segregated for some time, (ii) a delay would have very little effect on the Reorganized Debtors' operations, and (iii) in any event, the Debtors cannot completely wind down while this appeal is pending. They do not discuss the factual basis for these arguments and, instead, completely misconstrue the Debtors' position before the Bankruptcy Court.

33.    The Debtors have submitted the Declaration of Richard A. Ross with this Brief. Mr. Ross's declaration shows that (a) the Debtors seek the power to distribute the funds involved when warranted in their corporate judgment, (b) their winding up process is nearly complete, there is only one major matter outstanding, the Thaxton Life Partners matter, which could delay final liquidation and dissolution, (c) the Debtors now hope to wind up by the end of the first quarter of 2008, although there is a possibility this could be delayed, (d) the pendency of this appeal would not stop any final liquidation unless a stay is granted and (e) if a stay is granted by this court which delays the ability of the Debtors to liquidate and dissolve, significant costs and expenses, including the costs of remaining a public company, ultimately will be borne by the holders of the New Senior Notes.

34.    Finally, the Committee states that "The Bankruptcy Court has already determined that no other party to this proceeding will be injured if a stay pending appeal is granted." Stay Motion, p. 12. The Court made no such determination. The Court did state that

19

two other factors were primarily implicated (Stay Motion Exhibit K, p. 47) and separately asked if the funds were earning interest, but the Court made no ruling on the question of whether the Debtors or any other party would be harmed. The Committee then repeats the argument that the noteholders did not even lodge an objection to the stay motion. *Id.* However, there is absolutely no reason for the noteholders to object under present circumstances. Instead, as Mr. Ross states in his Declaration, the Debtors have consistently taken the position that they thought the funds in question should be paid to the holders of New Senior Notes, and that they have told him that they had not objected because FINOVA was taking their side in the dispute.[3]

### E.   The Public Interest Would Not Be Served By A Stay.

35.   The Equity Committee conceded that a stay pending appeal would not benefit the public interest. Public interest, however, clearly militates in favor of not extending the stay, and therefore this Court should not ignore the factor.

36.   Here, continuing the stay pending appeal would sanction the continued violation the principles of the absolute priority rule, which is a basic element of bankruptcy law. *See, e.g., In re Armstrong World, Inc.*, 432 F.3d 507 (3d Cir. 2005) (denying plan of reorganization as violative of absolute priority rule). At the outset, the appointment of the Equity Committee was not justified because it was clear that there were equity holders of Equity Interests who had the financial interest and resources to oppose the Clarification Motion. Thereafter, the Equity Committee has received more than $400,000 for professional assistance, all of which comes dollar for dollar from holders of New Senior Notes, who face a deficiency exceeding $1 billion. Now, the Equity Committee seeks to impose only costs and delays in

---

[3] Note that this statement is not submitted for the truth of the facts, but simply, for Mr. Ross's statement that that is what he was told.

winding up which result from this appeal by seeking a stay. Such efforts reflect a direct violation of the fair and equitable principle and involve a transfer of value from creditors to equity. At the end of the day, this is a fight between debt and equity, and the Equity Committee seeks to require the creditors to pay for both sides.

## IN THE EVENT THE COURT GRANTS A STAY, THE EQUITY COMMITTEE SHOULD BE REQUIRED TO POST A BOND

37.    Bankruptcy Rule 8005 provides that the "district court . . . may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court." Fed. R. Bankr. P. 8005. The purpose of the bonding requirements is to "protect the adverse party from potential losses resulting from the stay." *In re United Merchants & Manufacturers, Inc.*, 138 B.R. 426, 430 (D. Del. 1992); *First Pennsylvania Bank N.A. v. Intermet Realty P'ship (In re Intermet Realty P'ship)*, 27 B.R. 938, 940 (Bankr. E.D. Pa. 1983) (requiring a bond to mitigate loss to bank as a result of stay preventing bank from liquidating real property). Absent exceptional circumstances, an applicant for a stay pending appeal must post a bond. *See, e.g., In re Adelphia Communications Corp.*, 361 B.R. at 350. ("Because a supersedeas bond is designed to protect the appellee, the party seeking a stay without bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment.") Merely setting the bond does not establish the amount that must be paid by Appellant but, instead, the Debtors will still have to prove their actual damages from the stay. *See In re Adelphia Communications Corp.*, 361 B.R. at 368 n.167 ("Rather, if Appellants ultimately lose the appeal, in order for Appellees to recover any portion of the bond they will be required to prove up the amount of damages that they actually suffered during and as a result of

21

the stay. Once proven, that amount will be drawn from the bond fund, and the remainder will revert to Appellants.").

      38.    The Equity Committee failed to argue before the Bankruptcy Court, and similarly has neglected to argue here, why it should not be required to post a bond. And, the Bankruptcy Court made no findings on this issue. Indeed, given the substantial likelihood that the Equity Committee will not be successful on appeal, a bond is particularly appropriate. The Debtors and their creditors could suffer financial harm as a result of a stay of this appeal, and given the weaknesses of the Equity Committee's case, the potential risks of harm should be imposed on the Committee. Moreover, given the weaknesses of the Committee's case and the absolute priority rule, the Equity Committee should bear the risk of delaying the ability to wind up and dissolve because of a stay, and any damages that may result. Indeed, in *Adelphia*, notwithstanding the Court's view that the appeal was probably meritorious, a bond exceeding $1 billion dollars was required. As a result, the Debtors request a bond in the amount of $25 million.

## CONCLUSION

39.     For the reasons stated, the Debtors request that the Stay Motion be denied

or, if the Court is inclined to grant, that the Equity Committee be required to post a bond in the

amount of $25 million.

Dated: September 20, 2007
        Wilmington, Delaware

                              Mark D. Collins (No. 2981)
                              Jason M. Madron (No. 4431)
                              RICHARDS, LAYTON & FINGER, P.A.
                              One Rodney Square
                              920 North King Street
                              Wilmington, Delaware  19801
                              Telephone: (302) 651-7700
                              Telecopy:  (302) 651-7701

                              -and-

                              Jonathan M. Landers
                              Robert K. Dakis
                              GIBSON, DUNN & CRUTCHER LLP
                              200 Park Avenue
                              New York, New York  10166
                              Telephone:  (212) 351-4000
                              Telecopy:  (212) 351-4035

                              *Co-Counsel to the Reorganized Debtors, Appellees*

23

# Exhibit 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **FINOVA CAPITAL CORPORATION,** | Case Nos. 01-0698 (PJW) |
| | Jointly Administered |
| **Reorganized Debtor.** | Hearing Date: November 29, 2005 at 2:30 p.m. |

**REPLY TO OBJECTION OF FIRST CAROLINA INVESTORS, INC. TO MOTION OF
REORGANIZED DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE SECTION
1141 CLARIFYING PROVISION OF CONFIRMED PLAN [DOCKET NO. 22]**

Mark D. Collins (No. 2981)
Rebecca Booth (No. 4031)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

Jonathan M. Landers
Janet M. Weiss
Jessica I. Basil
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-counsel to the Reorganized Debtor

Dated: September 16, 2005

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................. 2

A.    General Background ........................................................................................... 2

B.    Background Regarding Reorganized Debtors' Financial Condition .................. 3

C.    Background Regarding Distributions to Creditors and Shareholders ............... 5

D.    Procedural History ............................................................................................. 7

ARGUMENT ................................................................................................................... 9

A.    The Obligations to the Shareholders under the Plan are Not in the Nature of Debt .......... 9

B.    The Monies in the Segregated Account are Not Being Held "in Trust" for the Shareholders ................................................................................................... 13

C.    Distribution of Funds Held in the Segregated Account to the Shareholders is Prohibited Under the Express Terms of the Indenture ......................................................... 19

D.    The Plan Cannot be Construed to Allow for the Payment of Distributions to the Shareholders .................................................................................................... 24

E.    The Relief Requested in the Clarification Motion is Not Procedurally Defective, is Ripe for Judicial Review and Does not Amount to a De Facto Modification of the Plan ..... 26

    a.    The Relief Requested is Properly Sought Through a Motion ..................... 26

    b.    The Relief Requested in the Clarification Motion is Ripe for Judicial Review .... 27

    c.    The Relief Requested in the Clarification Motion Does Not Amount to a De Facto Modification of the Plan ............................................................................ 28

CONCLUSION ............................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*In re Applewood Chair Company,*
203 F.3d 914 (5th Cir. 2000) .................................................................. 27

*In re Apponline.com, Inc.,*
315 B.R. 259 (Bankr. E.D.N.Y. 2004), *citing In re Ames Dep't Stores, Inc.,*
274 B.R. 600 (Bankr. S.D.N.Y. 2002) ..................................... 14, 15, 16

*Armstrong World Industries, Inc. v. Adams, et al.,*
961 F.2d 405 (3d Cir. 1992) ................................................................ 28

*In re Beal Bank, S.S.B.,*
201 B.R. 376 (E.D. Pa. 1996) ......................................................... 29, 30

*In re Brentwood-Lexford Partners, LLC,*
292 B.R. 255 (Bankr. N.D. Tx. 2003) ............................................... 21

*Carrieri v. Jobs.com Inc.,*
393 F.3d 508 (5th Cir. 2004) ............................................................ 11

*In re Color Tile, Inc.,*
2000 WL 152129 (D. Del. Feb 9 2000) ............................................. 21

*Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority,*
72 B.R. 619 (E.D. Pa. 1985) ............................................................. 17

*Elyachar v. Gerel Corporation,*
583 F. Supp. 907 (S.D.N.Y. 1984) ................................................... 14

*Fin Hay Realty Co. v. United States,*
398 F.2d 694 (3d Cir. 1968) ............................................................. 11

*In re First Central Financial Corporation,*
377 F.3d 209 (2d Cir. 2004) ............................................................. 15

*Fulweiler v. Spruance,*
222 A.2d 555 (Del. Ch. 1966) ...................................................... 22, 23

*Geftman v. Commission of Internal Revenue,*
154 F.3d 61 (3d Cir. 1998) .......................................................... 11, 12

*In re Georgetown Bldg. Assocs.,*
240 B.R. 124 (Bankr. D.D.C. 1999) ................................................. 11

*In re Handy Andy Home Improvement Centers, Inc.,*
196 B.R. 87 (Bankr. N.D. Ill. 1996) ................................................. 19

ii

*In re Health Care Products, Inc.,*
159 B.R. 332 (M.D. Fla. 1993) ............................................................................... 16

*In re Howard's Appliance Corp.,*
874 F.2d 88 (2d Cir. 1989) ...................................................................................... 14

*In re Koreag, Controle et Revision S.A.,*
961 F.2d 341 (2d Cir. 1992), *cert. denied* 506 U.S. 865 (1992) ............................. 14

*In re McCalla,*
238 B.R. 94 (M.D. Pa. 1999) .................................................................................... 24

*In re O'Brien,*
94 B.R. 583 (W.D. Mo. 1988) .................................................................................. 19

*Rexton,*
240 B.R. 211 (Banrk. E.D. Pa. 1999) ....................................................................... 30

*In re Szostek,*
886 F.2d 1405 (3d Cir. 1989) ................................................................................... 30

*TTS, Inc. v. Citibank, N.A. et al.,*
158 B.R. 583 (D. Del. 1993) ..................................................................................... 17

*In re Terex Corporation,*
984 F.2d 170 (6th Cir. 1993) .................................................................................... 24

*In re Trace International Holdings, Inc.,*
289 B.R. 548 (Bankr. S.D.N.Y. 2003) ...................................................................... 21

*United States of America v. APT Industries, Inc.,*
128 B.R. 145 (W.D.N.C 1991) ................................................................................. 28

*In re Washington Group, International, Inc.,*
2003 Bankr. LEXIS 1669 (Bankr. D. Nv. 2003) ...................................................... 26

## STATUTES

Section 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 .................... 1

The above-captioned reorganized debtor (the "Reorganized Debtor" or "FNV Capital") hereby submits this reply to the objection of First Carolina Investors, Inc. ("First Carolina") dated June 3, 2005 (the "Objection") [Docket No. 46] in opposition to the Reorganized Debtor's motion dated April 1, 2005 (the "Clarification Motion") [Docket No. 22] for an order pursuant to Section 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") clarifying certain provisions of the *Third Amended and Restated Joint Plan of Reorganization* [Docket No. 534] (the "Plan"), as confirmed by order of this Court dated August 10, 2001 [Docket No. 852] (the "Confirmation Order"). In support of this Reply, the Reorganized Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

The Plan Documents provide that the Reorganized Debtors will make payments on account of Equity Interests of 5% of the amounts paid on the New Senior Notes unless the payments would render the Reorganized Debtors insolvent, would be a fraudulent conveyance, or would "not be permitted under applicable law." It is difficult to imagine more straightforward language. It is likewise difficult to understand how such language could possibly be construed to permit payments to the Reorganized Debtors' Shareholders at a time when the Reorganized Debtors' debts exceed their assets by more than $1 billion. Nevertheless, First Carolina has raised a number of theories which would give Shareholders rights that they did not obtain under the Plan or and Plan Documents

Specifically, First Carolina argues that the obligation of the Reorganized Debtors is essentially a debt obligation, even though this theory finds no support in any language in the Plan or Plan Documents, and such documents specifically describe the obligation as being "on account of equity." First Carolina then argues that the funds involved are held in escrow or are trust funds even

1

though the Plan and Plan Documents do not describe them as such, there are no provisions for a trust or escrow relationship, and the Reorganized Debtors' only obligation is to "retain the funds " Finally, First Carolina specifically ignores the condition precedent to any equity distribution – that it would not render the Reorganized Debtors insolvent, would constitute a fraudulent transfer, or would not be permitted under applicable law. It neither suggests that these conditions are satisfied – an argument that would be frivolous given the Reorganized Debtors' financial condition – nor does it offer any legal basis for ignoring the conditions. Briefly, the holders of Equity Interests simply do not have a vested interest in any funds or a right to receive anything, now or in the future.

First Carolina does not disagree that the Plan is silent with respect to the treatment of funds now held in the Segregated Account if the conditions precedent to making distributions will *never* be satisfied, as is presently the case. For this reason, the Reorganized Debtors have filed the Clarification Motion to allow the Reorganized Debtors to return the funds to their creditors. Because First Carolina has not shown that the Shareholders are the holders of debt or are the beneficiaries of a trust or escrow, and have not shown that the condition precedent to making distributions can ever be satisfied, this Court should grant the relief requested in the Clarification Motion.

## BACKGROUND

### A.    General Background

1    On March 7, 2001 (the "Petition Date"), the Reorganized Debtor, along with its parent, FINOVA Group Inc. ("FNV Group" or the "Company"), and certain other affiliates (collectively with the Reorganized Debtor and FNV Group, the "Reorganized Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. By order of this Court, the Reorganized Debtors' chapter 11 cases were jointly administered for procedural purposes only.

2

2.      On May 2, 2001, the Reorganized Debtors filed their plan of reorganization, which was subsequently amended on June 1, 2001, June 11, 2001, and June 14, 2001. This Court confirmed the Plan by the Confirmation Order on August 10, 2001. The Plan became effective on August 21, 2001 (the "Effective Date").

3       On each of November 18, 2003, December 29, 2004 and March 22, 2005, pursuant to section 350 of the Bankruptcy Code, this Court issued orders (collectively, the "Final Decrees," individually a "Final Decree") closing the cases of certain of the Reorganized Debtors.[2] Pursuant to each of the Final Decrees, this Court retained jurisdiction for, among other things, "the enforcement of the provisions of the Plan (including all related documents contemplated by the Plan) and the Confirmation Order, and the entry of orders in aid of confirmation and consummation of the Plan, including, but not limited to, orders resolving disputes regarding distributions under the Plan."

**B.    Background Regarding Reorganized Debtors' Financial Condition**

4.      It is clear that the Reorganized Debtors are insolvent and have been insolvent for some time. Attached hereto is the Declaration of Richard Ross in Support of Reply to Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan (the "Ross Declaration"). Mr. Ross is the Chief Financial Officer of the Reorganized Debtors and attached to the Ross Declaration is the Form 10-Q Statement for FNV Group filed with the Securities and Exchange Commission on or about August 11, 2005 ("Form 10-Q"). Briefly, the Form 10-Q shows that, as of June 30, 2005 (all figures

---

[1] Pursuant to the November 18, 2003 Order, the case of FINOVA Portfolio Services Inc (Case No 01-0703) was closed. Pursuant to the December 29, 2004 Order, the following cases were closed: FINOVA Group, Inc (Case No 01-0697); FINOVA (Canada) Capital Corporation (Case No 01-0699); FINOVA Capital plc (Case No 01-0700); FINOVA Loan Administration Inc. (Case No 01-0701); FINOVA Technology Finance, Inc (Case No 01-0704); FINOVA Finance Trust (Case No 01-0705). Pursuant to the March 22, 2005 Order, the case of FINOVA Mezzanine Capital Inc (Case No 01-0702) was closed

3

are in thousands of dollars), (a) the Reorganized Debtors have assets of $789,084 and liabilities of

approximately $1,870,000,[2] (b) most of the Reorganized Debtors' remaining assets consist of (i) cash

($249,271) and restricted cash ($60,921) which do not appreciate except for minimal short term

earnings, (ii) financial assets which have a maximum value of the face amounts of the instruments

(and no appreciation potential), many of which are currently in default and not paying interest, and

(iii) used aircraft, many of which are older aircraft not in great demand, (c) although the Reorganized

Debtors have recently experienced some recoveries on both financial assets and the value of aircraft,

such recoveries were not significant in light of the deficiency of more than $1 billion, and (d) the

Reorganized Debtors' non-cash assets of roughly $480,000 would have to more than triple in value

to pay their obligations. No serious argument can be made that this is a realistic possibility. Finally,

the Reorganized Debtors are prohibited by the Indenture between The FINOVA Group Inc. and The

Bank of New York, as Trustee, dated as of August 22, 2001 (the "Indenture") governing the New

Senior Notes from engaging in new businesses and have no ability to "grow" their way out of their

financial circumstances. For this reason, the Reorganized Debtors advised FNV Group's equity

security holders (the "Shareholders") that they do not have sufficient assets to fully repay the New

Senior Notes, that it will rely on the continued liquidation of assets as the only meaningful source of

liquidity, and that "Stockholders should not expect any payments or distributions." Form 10-Q, at p.

9. Similar statements have repeatedly been made in prior filings.

---

[2] The balance sheet shows the liability on the New Senior Notes for accounting purposes of $1,251,673, which amount reflects the unamortized portion of discount resulting from the use of fresh start accounting upon the emergence from bankruptcy. The actual liability on the 7 5% Senior Secured Notes Maturing 2009 with Contingent Interest Due 2016 of FNV Group (the "New Senior Notes") is approximately $1,800,000

4

C.    **Background Regarding Distributions to Creditors and Shareholders**

5    Pursuant to the Plan, holders of allowed unsecured claims against FNV Capital

received, among other things, cash equal to 70% of their allowed claims and New Senior Notes in

the face amount of 30% of their allowed claims against FNV Capital. FNV Capital entered into an

intercompany note with FNV Group, which backs up the payments to be made under the New Senior

Notes and certain obligations to FNV Group's equity holders. A term sheet describing the New

Senior Notes was attached to the Plan, and prior to the Effective Date, the forms of the Indenture and

the New Senior Notes were filed with the Court in that certain Plan Supplement With Respect to

Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the

Bankruptcy Code dated July 20, 2001 [Docket No 745] (the "Plan Supplement"). Pursuant to the

Confirmation Order, the Plan Supplement was incorporated as part of the Plan.

6.    The terms of the New Senior Notes are governed by the Indenture, which contains

detailed provisions for using cash, and a so-called waterfall of payments which can be made. It

provides that after the provision for payment of operating expenses and certain other obligations,

FNV Group will, and will cause its subsidiaries, including FNV Capital, to use 95% of their net cash

after provision for payment of certain obligations and expenses ("Available Cash")[3] to pay principal

and interest on the New Senior Notes and to use 5% of the Available Cash to pay dividends to, make

distributions on account of, or make repurchases of, FNV Group's equity interests. Specifically,

Section 4 06(a)(v) of the Indenture provides that, the Reorganized Debtors shall apply cash and Cash

Equivalents:

---

[3] Section 4 06 of the Indenture sets forth the usage of the cash and cash equivalents of FNV Group and its subsidiaries

": until the principal of and Fixed Interest on the Notes are paid in full to (A) pay to the Company, when due the principal on the Intercompany Notes . . . which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes . . and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the Company, which amounts the Company shall use together with any other cash the Company has available for such purposes to make Restricted Payments . . . *provided, however*, that each incremental payment of $0.95 pursuant to Clause (A) shall require a distribution or retention pursuant to clause (B) of $0 05;"

7.     The Indenture defines "Restricted Payments" as:

"(i)     the declaration or payment of any dividend or the making of any distribution on account of the Company's [FNV Group's] Equity Interests (other than dividends or distributions payable in Equity Interests of the Company); or

(ii)     the purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company other than redemptions, acquisitions or retirements solely in exchange for Equity Interests of the Company."

Indenture at 11. Therefore, any distributions to Shareholders under the Indenture constitute

"Restricted Payments." Section 4 06(a)(v) of the Indenture specifically provides that in the event

that any such Restricted Payment to the Shareholders would be:

"[an] Impermissible Restricted Payment, the Company [FNV Group] shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments . . . "

An Impermissible Restricted Payment is defined as:

"a Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law."

6

Indenture at p. 6. As such, it is a condition precedent to the Shareholders' right to receive any distributions under the Plan that such distributions do not constitute Impermissible Restricted Payments

8.       While the Reorganized Debtors continue to pay their creditors in a timely manner, FNV Group concluded before making any payments on account of the New Senior Notes that any distribution to Shareholders would be an Impermissible Restricted Payment. Therefore, FNV Group caused the 5% of the Available Cash to be deposited into a separate account (the "Segregated Account") for possible distributions to Shareholders if and when such distributions are not Impermissible Restricted Payments. As of August 15, 2005, there was approximately $65.5 million in the Segregated Account. Such retained amounts are being reflected as restricted cash on the balance sheet, pending their final disposition.

## D.    Procedural History

9.       The Reorganized Debtors have determined that they will never be able to make the Restricted Payments to Shareholders because of their financial condition. However, although the Indenture provides for "retain[ing]" and "accumulat[ing]" such funds until they are no longer Impermissible Restricted Payments, it does not provide for the situation where the Reorganized Debtors will never be able to make the payments because the condition to payment never can be satisfied. The Reorganized Debtors' believe it is implicit in the Plan that, in such event, the funds are to be used to pay creditors. Therefore, on April 1, 2005, the Reorganized Debtor filed the Clarification Motion seeking clarification of the treatment of the funds retained by FNV Group and seeking an order of this Court authorizing it (i) to cease setting aside 5% of the Available Cash and

7

(ii) to return the funds in the Segregated Account to FNV Capital for use in its business to pay expenses, debts and other obligations.[4]

10      In response to the Clarification Motion, on May 26, 2005, Eugene Linden filed a motion for an order recognizing the continued existence of the official committee of equity holders or in the alternative for the reconstitution of the equity committee, for the limited purpose of responding to the Clarification Motion. [Docket No. 35 ]. Also on May 26, 2005, First Carolina filed a motion for continuance of the objection deadline and the hearing on the Clarification Motion. [Docket No. 39]. Rozann Chernov filed a joinder to each of these motions. [Docket Nos. 34 and 35]. In response to these pleadings, on June 1, 2005 the Reorganized Debtors filed their response and objection to the motion for continuance of the objection deadline and hearing on the Clarification Motion. [Docket No. 37] and on June 3, 2005 the Reorganized Debtors filed their objection to the motion of Eugene Linden [Docket No. 39]. On June 3, 2005, First Carolina filed the Objection

11.     A hearing was held on June 10, 2005 to consider the Clarification Motion and the related pleadings. The Court determined that the equity committee was not still in existence, but the Court exercised its authority under section 105 of the Bankruptcy Code and appointed an Equity Committee with a $100,000 cap on its professional fees. *See* Transcript of Motion Hearing before Honorable Peter J. Walsh on June 10, 2005 at 9:30 a.m. [Docket No. 50] (the "Transcript"), at p 27 lines 12-15; p.38 lines 1-2; p. 44 line 19; *see also* Order Directing the United States Trustee to Appoint an Official Committee of Equity Security Holders for a Limited Purpose and Granting Related Relief [Docket No. 48] The Court also decided that it would not rule on the Clarification

---

[4] FNV Capital, a direct subsidiary of FNV Group, directly funded the 5% Available Cash to the Segregated Account

8

Motion and directed the Reorganized Debtors to respond to the issues raised in the Objection. Transcript p. 4 lines 10-13; p 15 lines 8-10. The Court also determined that it would continue the hearing to allow the parties time to address the factual issue of the Reorganized Debtor's solvency. Transcript p. 15 lines 1-3.

12     On August 26, 2005, the Court entered a scheduling order [Docket No. 59] (the "Scheduling Order") ordering the record on the Clarification Motion to be supplemented as follows: (a) the Reorganized Debtors shall file a reply to the Objection by September 16, 2005; (b) the Shareholders shall file a response to the Reorganized Debtors reply by October 18, 2005; and (c) the Reorganized Debtors may, but are not required to, file a sur-reply to the Shareholders response by November 8, 2005.

13     In accordance with the Scheduling Order, the Reorganized Debtors have filed this Reply to respond to the issues raised in the Objection.

## ARGUMENT

### A.     The Obligations to the Shareholders under the Plan are Not in the Nature of Debt

14.     First Carolina asserts that, because the Shareholders' conditional right to distributions is set forth in a confirmed plan of reorganization, any such distributions are in the form of debt, not equity  Objection ¶¶ 30-31  Although it is true that the Plan describes the Reorganized Debtors' debts, liabilities and obligations to creditors and stockholders, it does not follow that all obligations are debt obligations. Quite the contrary: over and over again, the rights of Shareholders to the 5% payment is described as a conditional distribution on account of their equity interests and not as a debt  For Example, the Disclosure Statement discusses the payment in the section on "Dividends" as a "distribution[] to stockholders" which is subject to "meeting legal requirements for distributions to stockholders  . " Disclosure Statement pp. 41-42. Indeed, the only authorization for making the

9

payment at all is a limited conditional carve out from the general prohibition on Restricted Payments.[5]

15.    The Indenture specifically describes the obligation to shareholders as a Restricted Payment, and a Restricted Payment is defined as a "dividend or the making of any distribution on account of the Company's Equity Interests . . . ," a distribution on account of equity interests, or the purchase, redemption or acquisition of equity interests. These definitions are especially significant because they parallel the distributions which may be made to shareholders under Delaware law – a purchase, redemption or acquisition (8 Del. C. §160(a)), dividend (8 Del. C. § 170(a)), or reduction of capital (8 Del. C. § 244). Significantly, each of these forms of distributions to Shareholders under Delaware law is subject to conditions which are similar to those which would make the payments to Shareholders an Impermissible Restricted Payment under the Indenture – e.g., 6 Del. C. § 1304 (fraudulent conveyance law), 8 Del. C. § 244(b) (reductions in capital not permitted when remaining assets are insufficient to pay debt), 8 Del. C. § 160 (redemption subject to conditions in section 244); and 8 Del. C. § 170 (dividends payable out of surplus or net profits; the Reorganized Debtors have neither). Thus, contrary to First Carolina's claim that the fact that the Shareholders hold shares in FNV Group has no bearing on the determination of whether a distribution is equity or debt, here, their only right to payment is "on account of equity" – i.e., the holding of shares in FNV Group. In short, the Shareholders have a conditional contractual right to payment on account of their equity

---

[5] Under the terms of the Indenture, distributions to Shareholders constitute "Restricted Payments" and FNV Group specifically covenanted not to make any Restricted Payments except as permitted by Section 4.06 or Section 4.07(b) of the Indenture. Indenture at p. 32. Rather than an absolute right of payment, Section 4.06(a)(v) of the Indenture grants the Shareholders only a contingent right to payment by providing that FNV Group will *not* make any distributions to Shareholders if "the making of any such Restricted Payment would be an Impermissible Restricted Payment . . ." Indenture at p. 30. As such, there is a condition precedent to the Reorganized Debtors making of, and the Shareholders right to receive, distributions – that future Restricted Payments are not Impermissible Restricted Payments In order for this condition precedent to be satisfied, the making of the distribution must not (i) render the Reorganized Debtors insolvent, (ii) be a fraudulent conveyance or (ii) be prohibited under applicable law. Indenture at 6.

10

holdings. *See Carrieri v. Jobs com Inc*, 393 F.3d 508, 525 (5th Cir. 2004) (finding that the terms

"claim" and "debt" "obviously do not include a right to payment based on an equity security or other

interest in the debtor arising from capital contributions" and that "[j]ust because the 'interest in the

debtor gives rise to a right to payment does not make that interest a claim.'" ); *citing In re*

*Georgetown Bldg. Assocs.*, 240 B.R. 124, 139 (Bankr. D.D.C. 1999).

16.    The Plan could have provided for a distribution of debt to the Shareholders but it did

not do so. Clearly the parties knew how to create a debt instrument or obligation because they did so

with respect to the New Senior Notes. However, at no time was the obligation to the Shareholders

recorded as a debt on the Reorganized Debtors' balance sheets and financial records, or reported as

debt in it public filings  *See* Ross Declaration at ¶ 4. Moreover, the potential distributions to

Shareholders as described in the Indenture do not have any of the indicia of debt. In a case analyzing

the proper characterization of payments from a trust, the court in *Geftman v. Commission of Internal*

*Revenue*, 154 F.3d 61 (3d Cir. 1998) noted that "[t]he necessary intent to create a bona fide

indebtedness can be inferred not only from expressions of the parties intentions, but also from

objective aspects of the transaction such as the presence *vel non* of notes or other debt instruments,

security or collateral, interest charges, repayment schedules or deadlines, book entries recording loan

balances or payments, actual repayments, or any other factors indicative of an unconditional

obligation to repay." *Id.* at 70; *see also Fin Hay Realty Co v United States*, 398 F.2d 694, 696 (3d

Cir 1968). In making a determination of whether an advance was a capital contribution or a true

indebtedness, the court listed the following criteria by which to judge whether an investment is a

debt:

> (1) the intent of the parties; (2) the identity between creditors and
> shareholders; (3) the extent of participation in management by the

11

> holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Id.* While not all of these factors are relevant, those that are present clearly demonstrate that there is no debt.

17. Looking at the "objective aspects of the transaction" as set forth in *Geftman*, neither the Plan nor the Indenture provide the slightest hint of a "bona fide indebtedness" – *i.e.*, there are no notes or debt instruments, security or collateral, interest charges, repayment schedules or deadlines, book entries recording loan balances or payments, actual repayments or other factors indicating an "unconditional obligation to repay." Instead, the Plan, Disclosure Statement and Indenture consistently describe the distributions as Restricted Payments on account of equity interests. A clearer evidence of intent is hard to imagine. Turning to the sixteen factors identified in *Geftman*, none is suggestive of debt but many indicate the contrary. Thus, ostensible creditors and shareholders are the same and, indeed, the "purported debt" travels with the shares (#2), there is no formal indicial of debt (#7), no interest is paid (#10), there is a contingency on repayment (#11), there is no payment schedule or fixed maturity date (#13), and there was no advance but, instead, the obligation was granted specifically to Shareholders *qua* Shareholders as part of the Plan (#16). Indeed, in light of the clear and express contingency on the obligation to pay the Shareholders the distributions, the Shareholders cannot show that the Reorganized Debtors have undertaken an

12

"unconditional obligation to repay." Given the lack of any formal indicia showing otherwise, there is no basis for First Carolina's claim that the Shareholders are the holders of debt.

18.     First Carolina's reliance on the Supremacy Clause mandating that bankruptcy law prevails over conflicting state law to bolster its argument that the Shareholders are the holders of debt is similarly misplaced. Objection at ¶ 32. According to First Carolina, although Delaware law prohibits the Reorganized Debtors from making any distributions to Shareholders, under federal law the distributions would be allowed  To be sure, if the Plan provided for an absolute right of payment that otherwise would have been prohibited by Delaware law then First Carolina might have a valid argument that the Plan trumps the provisions of Delaware Law.  But this is not the case.  As discussed below, under the clear terms of the Plan, there is no absolute right of payment; instead, distributions to Shareholders can only be made if such distributions are permitted to be made under applicable law.  Therefore, rather than superseding or overriding state law, the Plan specifically incorporates state law.  As such, there is no conflict between federal and state law in this case.

## B.     The Monies in the Segregated Account are Not Being Held "in Trust" for the Shareholders

19.     First Carolina also asserts that the funds held in the Segregated Account are held "in trust" for the Shareholders and as the beneficiaries of the trust, they have a vested interest in the funds  Objection at ¶ 34. However, First Carolina has provided no basis for this assertion  There is clearly no escrow agreement or express trust. The Indenture, which contains all of the rights of the Shareholders with respect to any distributions or monies held in the Segregated Account, is governed by New York law. Under New York law, in order to establish an express trust there must be "(i) a designated beneficiary; (ii) a designated trustee who is not the beneficiary; (iii) a fund or other property sufficient designated or identified to enable title thereto to pass to the trustee; and (iv) the

13

actual delivery or legal assignment of the fund or other property." *In re Apponline.com., Inc*, 315 B.R. 259, 274 (Bankr. E.D.N.Y. 2004), *citing In re Ames Dep't Stores, Inc*, 274 B.R. 600, 623 (Bankr. S.D.N.Y. 2002)

20.     The Indenture does not create a trust arrangement in favor of the Shareholders. All that the Indenture provides is that if the Reorganized Debtors cannot make a distribution to the Shareholders because such payments would be Impermissible Restricted Payments, the Reorganized Debtors "shall *retain* such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payment at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments." Indenture at Section 4.06(v) (emphasis added) These provision hardly establish a designated trustee, title passing to the trustee, and a delivery of legal assignment of the funds as required to establish a trust. Indeed, the Indenture does not even require segregation of the funds and does not come close to meeting the required showing that the grantor's "intent to create a trust [has been] established beyond any reasonable doubt." *Elyachar v. Gerel Corporation*, 583 F. Supp. 907, 922 (S.D.N.Y. 1984)

21.     Likewise, First Carolina has not made out a case under a constructive trust theory. One must look to state law to determine whether a court will impose a constructive trust on property and "as a general rule, the law of the situs of the property, and therefore the trust, governs this determination." *In re Howard's Appliance Corp*, 874 F.2d 88, 93-94 (2d Cir. 1989). Therefore, because the Segregated Account is in New York, the laws of New York apply. The elements of constructive trust under New York law are: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied, (3) a transfer made in reliance on that promise and (4) unjust enrichment." *Apponline.com*, 315 B.R. at 276 (citing *In re Koreag, Controle et Revision S.A.*, 961

14

F 2d 341, 352 (2d Cir. 1992), *cert. denied* 506 U.S. 865 (1992). The Second Circuit has recognized that the fourth element is the most important, and has held that there is a general rule barring a finding of unjust enrichment when there is a valid and enforceable written agreement between the parties. *In re First Central Financial Corporation*, 377 F 3d 209, 213 (2d Cir. 2004) In the present case, the Indenture is an enforceable agreement and the Indenture specifically prohibits distributions to Shareholders if such payments constitute Impermissible Restricted Payments. Requiring the Reorganized Debtors to make the distributions notwithstanding the clear prohibition in the Indenture would result in an unjust enrichment of the *Shareholders* because they would obtain greater rights than they were otherwise provided Further, there is no evidence of any fraud or wrongdoing by the Reorganized Debtors to otherwise support a constructive trust. While not explicitly a requisite element, the Second Circuit has noted that the New York law is clear that "a constructive trust is an equitable remedy intended to be 'fraud-rectifying' rather than 'intent-enforcing.'" *Id.* at 216

22    First Carolina then argues that the funds are held in escrow. But the Indenture also does not create an escrow arrangement Under New York law, in order to establish an escrow arrangement "there must be a written agreement under which the grantor deposits property with and *relinquishes control to* an escrowee with the subsequent delivery of the property by the escrowee to the grantee conditioned upon the happening of some event." *Apponline com,* 315 B.R at 274 (emphasis added) *citing In re Treiling,* 21 B R 940, 943 (Bankr. E.D N Y 1982) Not only is the Indenture not a written escrow agreement, it does not even require that the Reorganized Debtors create a segregated account let alone relinquish control of the funds While the Reorganized Debtors have chosen to place the funds in the Segregated Account for tracking and accounting purposes, the Reorganized Debtors never relinquished legal title to the funds and at all time exercised dominion

15

and control over those funds. In addition, a proponent "must also show that the alleged escrow agent agreed to accept that responsibility." *Apponline.com,* 315 B.R. at 274 *citing Friedman v. Stern,* 1992 WL 58878, *2 (S.D.N.Y. 1992). The Indenture does not provide for a designated trustee or escrow agent to hold the funds and the Reorganized Debtors never expressly agreed to operate as such for the benefit of the Shareholders. As New York law makes clear, "neither the 'understanding' [of the parties] nor 'standard industry practice' is sufficient to overcome the requirement that a binding escrow agreement be in writing, or that an entity agreed to assume the responsibilities of an escrow agent, or that any of the elements of an express trust were met...." *Apponline.com,* 315 B.R. at 275.

23.    Under analogous facts, the court in *In re Health Care Products, Inc.,* 159 B.R. 332 (M.D. Fla. 1993) held that the creation of a segregated account is not sufficient to support a finding that an escrow arrangement was created. *Health Care Products* involved a debtor that was required, under the terms of a consent decree, to open "segregated accounts" in order to assure payment of restitution amounts to certain consumers. *Id.* at 334. The consent decree provided that the funds could not be withdrawn from the account without the consent of both the Debtor and the State of Iowa. *Id.* at 338. The court found that the "Segregated Account" required by a consent decree did *not* constitute an escrow account because the segregated account "was not ordered to be held by a third party depository; the accounts were titled only in Debtor's name". *Id.* As in the *Health Care Products* case, the Segregated Account is not held by a third party, the Segregated Account is titled only in the Reorganized Debtors' names and the Reorganized Debtor retained control over withdrawals. As such, the Segregated Account is not an escrow account and, absent a formal escrow arrangement, the designation of a trustee or escrow agent and the passing of legal title, First Carolina's argument that the monies held in the Segregated Account are held "in trust" must fail.

16

24.    First Carolina's reliance on *TTS, Inc. v. Citibank, N.A. et al.*, 158 B.R. 583 (D. Del. 1993) and *Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*, 72 B.R. 619 (E.D. Pa 1985) to bolster its argument that the Shareholders have greater rights to the funds is misplaced because both of these cases involved actual escrow agreements and cases whose existence of an escrow was not in dispute. Objection at ¶¶ 36-37. This distinction is critical because the grantor in an escrow arrangement has made an irrevocable transfer of funds and placed them beyond its possession and control, thereby giving the grantee a vested interest as the named beneficiary of the escrow account. The holder of a conditional contractual right of payment has no such vested interest. In the present case, the funds in the Segregated Account remained in possession and control of the Reorganized Debtors, there is no escrow agent and there is no indication that the depositing of funds in the Segregated Account constituted an irrevocable transfer. First Carolina has not made any showing that the Shareholders hold a vested equitable interest in funds in an escrow account and cannot simply declare that the Shareholders are entitled to greater rights than the Indenture and the Plan provide.

25    In fact, even if this Court found that the Segregated Account is held "in trust" for the Shareholders, there is still no basis for First Carolina's claim that the Shareholders are entitled to the funds. The establishment of a trust does not, in and of itself, entitle beneficiaries to payment. If the Segregated Account is to be viewed as a trust then it must be viewed as a trust with a condition precedent on payment – *i.e.* that payment does not constitute an Impermissible Restricted Payment. Moreover, the condition is valid and central to the very purpose of the "trust". *See* The Law of Trusts – Fourth Edition, Aspen Publishers, Inc., ("Scott on Trusts") Vol. 1, Chpt. 1, Trusts Sec. 11 (stating that it is possible for the owner of a property to create a trust under which the interest of a

beneficiary is subject to a condition and "[i]f the condition is valid and has not been performed, the beneficiary will not be entitled to the interest."). When a condition precedent fails for impossibility, whether the beneficiary has a right in the property depends on "what the settlor intended or probably would have intended if he had foreseen the failure of the condition." Scott on Trusts, Vol. 1A, Chpt. 2, Topic 13A. Although the Plan does not state that the funds in the Segregated Account should be returned to the Reorganized Debtor, the Plan clearly states that the Reorganized Debtors did not intend for funds to go to the Shareholders if the condition precedent is not satisfied. Declaring the funds in the Segregated Account to be held in trust does not mean that the conditions to payment can be ignored just because they are not going to be met, especially when they are central to the purpose of the "trust" and the Reorganized Debtors clearly expressed their intent that the funds would not be paid to the Shareholders unless and until such payment would not constitute an Impermissible Restricted Payment. First Carolina has not provided any support for their assertion that they are entitled to payment notwithstanding the existence of a condition that is not capable of being met.

26. First Carolina's efforts to circumvent this express condition by arguing that the financial impairments identified in the Indenture and the Clarification Motion dictate only the timing of the distributions to the Shareholders must also fail. Objection at ¶ 35. The nature of the condition on payment was such that it was possible, as is the case now, that there would *never* be a time when the Shareholders are entitled to payment. If the Reorganized Debtors were required to make the payments at some point and could not otherwise use the funds for other purposes, there would have been no purpose in delaying the payments to the Shareholders in the first place. Significantly, the clear language on the Indenture does *not* state that the Shareholders have an absolute right of

18

payment that is subject only to restrictions on the timing of payout; rather, the condition limits the Shareholders underlying right to receive the payment at all.

27.    Moreover First Carolina's reliance on section 541 of the Bankruptcy Code is inapposite. To begin with, the Reorganized Debtors are not in bankruptcy and this Court need not ascertain what constitutes a "bankruptcy estate." Even if the Reorganized Debtors were in bankruptcy, numerous cases hold that, under comparable circumstances, that the Segregated Account would be property of the Reorganized Debtors' estates, and the Shareholders would not be able to establish the necessary escrow or trust arrangement to avoid such result pursuant to section 541(d) of the Bankruptcy Code. *See, e.g., In re Handy Andy Home Improvement Centers, Inc.*, 196 B.R. 87, 92 (Bankr. N.D. Ill 1996) (finding that funds in a segregated account were property of the estate because the there was no showing that the debtor was limited in its access to the funds and no showing that there was an escrow account or resulting trust); *see also In re O'Brien*, 94 B.R. 583 (W.D. Mo 1988) (finding that debtor's Keogh account balance held as a segregated account and the debtor's account balance in a corporate profit sharing plan were included in the bankruptcy estate because they were not spendthrift trusts). And, in any event, any rights of Shareholders would be limited by the condition on payment since it is well established that a debtor takes property *cum onere – i.e.*, subject to all limitations. It is First Carolina, not the Reorganized Debtors, that is asserting greater rights to the Segregated Account than it actually has.

### C.    Distribution of Funds Held in the Segregated Account to the Shareholders is Prohibited Under the Express Terms of the Indenture

28    First Carolina has asserted that, even if distributions do not constitute debt and are not held in an escrow or trust, the distributions are not Impermissible Restricted Payments because they are not prohibited by applicable law and, as such, the condition precedent to the Shareholders' right

to receive such distributions has been satisfied    Objection at ¶ 23    However, the Indenture specifically prohibits the distributions to Shareholders if (a) FNV Group would be rendered insolvent,[6] (b) the payment would be a fraudulent conveyance or (c) the payment would "not be permitted to be made by such entity under applicable law "  While only one of these conditions is sufficient to preclude making a payment, here each condition prevents the payment.

29.    First Carolina has asserted that, even if distributions do not constitute debt and are not held in an escrow or trust, the distributions are not Impermissible Restricted Payments because they are not prohibited by applicable law and, as such, the condition precedent to the Shareholders' right to receive such distributions has been satisfied    Objection at ¶ 23    However, the Indenture specifically prohibits the distributions to Shareholders if (a) FNV Group would be rendered insolvent,[7] (b) the payment would be a fraudulent conveyance or (c) the payment would "not be permitted to be made by such entity under applicable law "  While only one of these conditions is sufficient to preclude making a payment, here each of the conditions prevent the payment.

30.    First, distributions to Shareholders are not permitted if such payment would "render [FNV Group] insolvent "  Here, FNV Group already is insolvent and there is no hope of financial recovery  See Ross Declaration at ¶¶ 3,4    Certainly, First Carolina cannot seriously argue that a distribution which would render FNV Group insolvent cannot be made, but the payment can be made if it already insolvent    Instead, distributions to Shareholders are now and will always be

---

[6] Similarly, any subsidiary of FNV Group would be prohibited from making a Restricted Payment if such Restricted Payment would render it insolvent  Indenture at 6

[7] Similarly, any subsidiary of FNV Group would be prohibited from making a Restricted Payment if such Restricted Payment would render it insolvent  Indenture at 6

20

Impermissible Restricted Payments which cannot be made under the Indenture. It is noteworthy that First Carolina has not argued that the payment can be made under this provision

31.    Second, distributions to Shareholders are not permitted if such payment would "be a fraudulent conveyance by such entity." While the Indenture does not identify what law provides guidance, the result is the same under either Delaware law or section 548 of the Bankruptcy Code. Case law makes it clear that distributions "on account of equity" are not for "reasonably equivalent value" under either section 548 or Delaware law. *See, e.g., In re Brentwood-Lexford Partners, LLC,* 292 B.R. 255, 267 (Bankr. N.D. Tx. 2003) (interpreting section 548 and finding that distributions to equity holders on account of their equity interest amounted to dividends and "[a]s a result, [the debtor] did not receive reasonably equivalent value for the distributions."). Given that, and given the fact that FNV Capital is insolvent, there is a classic fraudulent conveyance. *See, e.g., In re Trace International Holdings, Inc.,* 289 B.R. 548, 560-561 (Bankr. S.D.N.Y. 2003) (interpreting Delaware law and section 548 of the Bankruptcy Code and finding that (a) an insolvent Delaware corporation cannot pay a dividend and "the unlawful dividend is voidable and may be recovered by the trustee as a fraudulent transfer" and (b) insolvent corporations cannot make distributions to shareholders, by redemption or dividend, even if the corporation purportedly enters into a contract obligating it to pay a dividend) (internal citations omitted); *see also In re Color Tile, Inc.,* 2000 WL 152129 at *5 (D. Del. Feb 9 2000) (finding that a dividend declared by an insolvent Delaware corporation is not "lawful" and is not an "antecedent debt" under fraudulent transfer law) (reversed on other grounds). And, while the result might be different if the obligation was a "debt," we have shown above that the obligation has none of the characteristics of debt. Again, distributions to Shareholders now and will

21

always be Impermissible Restricted Payments which cannot be made under the Indenture. It is again noteworthy that First Carolina has not argued that the payment can be made under this provision.

32.    Third, the payment is not permitted if it is "not permitted to be made by [FNV Group] . . . under applicable law." Indenture at p. 6. FNV Group is a Delaware corporation and therefore the appropriate "applicable law" governing any distribution to Shareholders is the Delaware General Corporation Law ("DGCL"). Whether described as dividends or any other distribution to Shareholders on account of their equity interest, the distributions are prohibited by Delaware law and First Carolina does not argue otherwise. *See ¶ 15, supra.* Thus, the Court need not decide whether the distributions to Shareholders permitted by the Indenture are "dividends" because, regardless of the name ascribed, the DCGL and the Indenture prohibit the Reorganized Debtors from making such distributions.

33.    First Carolina argues that the distribution of the funds in the Segregated Account to the Shareholders is not a prohibited dividend under the DGCL, but rather is a distribution of the productive assets of a company made pursuant to an order of the Court, thereby constituting a "return of capital." Objection at ¶¶24, 29. First Carolina's view is an oversimplification of the facts and its reliance on *Fulweiler v. Spruance*, 222 A.2d 555 (Del. Ch. 1966) is misplaced. *Fulweiler* was not a case which involved the legality of a payment to shareholders by a corporation or even the character of the distribution as debt or equity by the corporation. Instead, *Fulweiler* was a dispute between a former husband and wife under their divorce agreement, in which dividends were treated in one way and a return of capital in a different way. Ultimately, the Court analyzed the nature of a distribution of GM stock that duPont holding company made to its shareholders when forced by court order to divest itself of GM stock and found that the distribution of GM stock was a return of capital (a court-

22

ordered distribution of income producing assets) But for the present, the significant facts are that the Court did not decide and had no reason to decide whether the payment constituted payment of a "debt," the Court was not asked to decide whether duPont could properly make the distribution under applicable law, and in fact, whether characterized as a dividend or a return of capital, the distribution could not have been made under Delaware law if duPont had been in financial distress, insolvent, or if the distribution would be a fraudulent conveyance. Moreover, regardless of the nature of the obligation, here the distribution – whatever its character – is subject to specific conditions

34      The Plan itself has no mention of a distribution of the Reorganized Debtors "productive assets," and by approving the Plan, the Court ordered the Reorganized Debtors to comply with the terms of the Indenture which specifically set forth the condition governing distributions  Instead, the Plan permits "distributions in respect of. . .Equity Interests. . .to make Restricted Payments," which are specifically defined as dividends, distributions on account of equity or redemptions or repurchases of stock. Indenture at p 11. Delaware corporate law does not even contain a provision dealing with distributions of "productive assets." Regardless of what they are called, the conditional distributions to holders of equity interests on account of such interests are prohibited by Delaware law.

35.      Most importantly, however, First Carolina completely ignores the fact that even if such distributions were somehow deemed to be a return of capital, the DGCL still prohibits FNV Group from making such distributions. While the Court in *Fulweiler* discussed the nature of a distribution, tax consequences relating to its nature and proper allocation in the hands of the recipient, the Court did not address the *legality* or the *ability* of the company to make such a distribution in the first place, which is the issue at hand in the present case. Even assuming that

23

capital can be returned to shareholders absent a declaration of a dividend or a stock repurchase, any

return of capital by a company, by definition, must reduce the capital of the company. Section 244 of

the DGCL, which governs the ability of a Delaware corporation to reduce its capital, provides that

> ". ..no reduction of capital shall be made or effected unless the assets
> of the corporation remaining after such reduction shall be sufficient to
> pay any debts of the corporation for which payment has not been
> otherwise provided."

As discussed above, FNV Group is insolvent and does not believe that there are sufficient assets to

fully repay the New Senior Notes. Therefore, FNV Group cannot reduce its capital because there

will not be sufficient assets remaining to pay its debts. In short, the distributions to Shareholders are

Impermissible Restricted Payments which cannot be made.

**D.    The Plan Cannot be Construed to Allow for the Payment of Distributions to the Shareholders**

36.    First Carolina has asserted that the Plan should be construed against the Reorganized

Debtors in an effort to bolster its claim that the Shareholders should receive the funds held in the

Segregated Account. Objection at ¶ 21. However, the Reorganized Debtors are seeking clarification

as to a point on which the Plan is *silent* and even construing the Plan against the interests of the

Reorganized Debtors, as First Carolina urges this Court to do, there is no way in which the silence

can be construed so as to allow the Shareholders to receive any distributions. None of the cases cited

by First Carolina is applicable in the present case. The Court in *In re Terex Corporation*, 984 F.2d

170, (6th Cir. 1993) provides that "[i]t is the debtor's obligation when seeking the court's

confirmation to specify as accurately as possible the amounts which it intends to pay the creditors."

However, in the present case there is no ambiguity in the Plan regarding the dollar amount to be paid

to the Shareholders, provided that the condition precedent is satisfied. Additionally, while the Court

in *In re McCalla*, 238 B.R. 94 (M.D. Pa. 1999) addressed a chapter 13 plan and the interpretation of

24

mortgage claims and noted that plan language is typically interpreted against a drafter, it did not make a determination regarding plan language.

37      The Indenture is clear when it states that the Shareholders are not entitled to receive any distributions if such distributions are Impermissible Restricted Payments. This is not an ambiguous condition that needs to be interpreted by this Court. First Carolina would have this Court ignore this clear and express condition simply because the Plan is silent as to how the funds should be treated if the condition is never capable of satisfaction, and rewrite the Plan based on perceived inequities. As such, First Carolina is asking this Court to ignore the fact that a strict reading of the Plan would require the Reorganized Debtors to continue to retain funds in perpetuity because there will never be a time when the condition precedent to the Shareholders' right to receive the funds will be satisfied and instead rewrite the Plan based on its own perceived inequities. However, the Shareholders are not entitled to more than what is provided for in the Plan – to find otherwise would provide an unjust windfall to the Shareholders.

38.     Moreover, this is not really a dispute between the Reorganized Debtors on the one hand and the Shareholders on the other. If the Court grants the Clarification Motion, the Reorganized Debtors will not profit; rather, the funds will be distributed to creditors, who, given the Reorganized Debtors' financial condition, will not be paid in full. In determining the proper treatment of the retained funds, the Court should consider the absolute priority rule which provides that creditors must get paid in full before there can be a distribution on account of equity. Indeed, the condition set forth in the Indenture, which specifically prohibits the Reorganized Debtors from making distributions to the Shareholders if this would render them insolvent or if such distributions are not permitted under applicable law, should be viewed as a means of ensuring compliance with

25

the absolute priority rule. The Court should not construe the silence in the Plan as a deviation from this creditor protection.

**E.    The Relief Requested in the Clarification Motion is Not Procedurally Defective, is Ripe for Judicial Review and Does not Amount to a De Facto Modification of the Plan**

    **a.    The Relief Requested is Properly Sought Through a Motion.**

39.    First Carolina has argued that that, because the relief requested in the Clarification Motion involves a declaratory judgment with respect to certain property in which there are conflicting claims of ownership and entitlement, the relief must be sought through an adversary proceeding. Objection at ¶ 9. First Carolina relies on Rule 7001(a) which defines an adversary proceeding to include a proceeding "to determine the validity, priority or extent of a lien or other interest in property. . " However, as discussed above, it is clear that the Shareholders do not hold a lien or security interest in any property, any specific interest or entitlement, or interest in an escrow fund or property held in trust, but only a conditional right of payment. While the Reorganized Debtors are not disputing or challenging the fact that the Shareholders have a right to future distributions *if and when* the condition precedent is satisfied, this conditional right to payment does not fall within the interest in property as per a lien covered by Rule 7001(2) of the Federal Rules of Bankruptcy Procedure. Here, because distributions to Shareholders will always be Impermissible Restricted Payments, (i) the condition precedent to the Shareholders' right to receive any distributions is never capable of satisfaction and (ii) the Shareholders have no right to receive any payments under the Plan. And, there is no indication that an adversary proceeding is required to determine contract rights of a type asserted by the Shareholders. Instead, the claim is similar to that of a contract creditor asserting a claim and such matters can be resolved on motion. *See, e.g., In re Washington Group, International, Inc.*, 2003 Bankr. LEXIS 1669 at * 9 (Bankr. D. Nv. 2003)

26

(determining that the legal question of whether an insurance policy provided for coverage for certain claims can raised through a motion commencing a contested matter and need not be determined by an adversary proceeding).

40.    As in *In re Applewood Chair Company*, 203 F 3d 914, 918 (5th Cir 2000), the Reorganized Debtors are merely seeking a clarification of the terms of a substantially consummated confirmed plan. While it is true that the court in *Applewood* noted that the validity of the lien of the creditor requesting the clarification was not in question, this is a distinction without substance because the Shareholders have no lien, valid or otherwise, in the present case. As noted above, the Reorganized Debtors are not seeking to modify or challenge any interests of the Shareholders and the relief sought in the Clarification Motion will in no way affect the Shareholders rights because the Shareholders are not entitled to any distributions under the express language of the Indenture. Here, the Reorganized Debtors are only seeking a clarification as to a point on which the Plan is silent, namely how to treat the funds that they are otherwise required to retain indefinitely, and, as the court in *Applewood* noted, this relief is properly sought through a motion

### b.    The Relief Requested in the Clarification Motion is Ripe for Judicial Review.

41    First Carolina has argued that the relief requested in the Clarification Motion is premature because there has been no payment default under the New Senior Notes and the Reorganized Debtors are merely projecting an inability to comply with the Plan in the future. Objection at ¶¶41, 45. However, contrary to First Carolina's assertion, the relief requested in the Clarification Motion is ripe for judicial review. The Reorganized Debtors' declaration that they will be unable to pay the New Senior Notes in full and that the condition precedent to making distributions to Shareholders will never be satisfied in the future is not mere conjecture. Because the

27

Indenture prohibits the Reorganized Debtors from engaging in new business, thereby preventing them from growing their way out of the current financial circumstances, the Reorganized Debtors have no reasonable chance of financial recovery. Absent a financial recovery, there are simply not enough assets to pay the New Senior Notes in full and distributions to Shareholders will always constitute Impermissible Restricted Payments, both because of the Reorganized Debtors' insolvency and because the Reorganized Debtors will never have surplus or net profits from which they can declare a dividend. As such, there is no possible way that the Shareholders will ever be entitled to distributions under the Plan.

42    The Reorganized Debtors are, therefore, not faced with an abstract concern regarding how to treat the funds held in the Segregated Account and funds that will be retained due to future distributions being Impermissible Restricted Payments. Rather, because the condition precedent to the Shareholders ability to receive a distribution under the Plan is *never* capable of satisfaction, and the Plan is silent on how to treat funds in such a situation, there is a real legal controversy that affects parties in a concrete manner with issues that are sharp enough for judicial resolution. *See Armstrong World Industries, Inc. v. Adams, et al.,* 961 F.2d 405, 410 (3d Cir. 1992). Given the fact that the estate is winding down quickly, there is no reason for this court to postpone making a determination on the relief requested in the Clarification Motion.

### c.    The Relief Requested in the Clarification Motion Does Not Amount to a De Facto Modification of the Plan.

43    First Carolina has asserted that, through the relief requested in the Clarification Motion, the Reorganized Debtors are seeking to modify the Plan. Objection at ¶ 46. However, as set forth in the Clarification Motion and herein, the Reorganized Debtors are merely seeking *clarification* with respect to a point on which the Plan is silent – the treatment of funds where there is

28

no reasonable chance that the condition precedent to distributing funds to the Shareholders will ever

be satisfied – and such relief does not amount to a modification of the Plan *See United States of*

*America v. APT Industries, Inc.*, 128 B.R. 145, 147 (W.D.N.C 1991) (stating that when an order did

not change any material terms of the plan, but instead clarified the plan where previously it had been

silent, "[t]he Court does not believe such an Order amounts to a modification."); *see also In re Beal*

*Bank, S.S.B.*, 201 B.R. 376, 380 (E.D. Pa. 1996) (stating that a bankruptcy court may clarify a plan

where it is silent or ambiguous).

44.    The fact that the Shareholders will not receive distributions from the Reorganized

Debtors does not transform the Clarification Motion into a request to modify the Plan because it is

the impossibility of the express condition in the Indenture, not any action on the part of the

Reorganized Debtors or any relief requested in the Clarification Motion, that prevents the

Reorganized Debtors from ever making distributions to the Shareholders. There is no harm to the

Shareholders in granting the relief requested in the Clarification Motion because the Shareholders

never had an absolute unconditional right of payment under the Plan and the Plan provides that funds

will be retained by the Reorganized Debtors if the condition precedent to payment is not satisfied.

Likewise, the Plan's treatment of holders of the New Senior Notes will not be changed because the

Plan already contemplates that they will receive payment on account of their New Senior Notes and

that Shareholders will not receive distributions if such distributions are prohibited due to the

Reorganized Debtors' financial condition or otherwise under applicable law.

45.    Contrary to First Carolina's assertion that the Reorganized Debtors are seeking to

rewrite the Plan in order to "completely divest" the Shareholders of their interest in the funds

contained in the Segregated Account, it is First Carolina who is seeking a modification of the Plan in

29

order to obtain a payment to which it is not entitled. Objection at ¶¶ 9, 46. First Carolina is asking this Court to both (i) ignore the conditions to Shareholder distributions and (ii) interpret the silence with respect to the ultimate disposition of funds when the condition precedent to making distributions has not been satisfied as a justification to ignore this express condition precedent, and instead determine that the Shareholders have some sort of vested interest in the funds. It is clear that First Carolina is unsatisfied with the terms of the Plan but, as First Carolina itself has noted through its citations of *In re Szostek*, 886 F.2d 1405 (3d Cir. 1989), *In re Beal Bank,* 201 B.R. 376 and *In re Rexton*, 240 B.R. 211 (Banrk. E.D. Pa. 1999) to support its assertion that the terms of a confirmed plan should be upheld and cannot be rewritten, the Court cannot rewrite the Plan based on perceived inequities. Objection at ¶ 20. The Plan has been substantially consummated and, as such, the Court cannot make the modification that First Carolina is seeking.

## CONCLUSION

WHEREFORE, for all of the reasons stated in this Reply, the Reorganized Debtors respectfully request entry of the order submitted to this Court with the Clarification Motion allowing the Reorganized Debtors (i) to cease setting aside 5% of the Available Cash for the benefit of the Shareholders, (ii) to return the Available Cash in the Segregated Account to FNV Capital for use in its business to pay expenses, debts and other obligations and (iii) to grant such other and further relief as may be just and proper.

30

Dated: September 16, 2005
    Wilmington, Delaware

Mark D. Collins (No. 2981)
Rebecca Booth (No 4031)
RICHARDS, LAYTON & FINGER, P A.
One Rodney Square
P O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Telecopy:  (302) 651-7701

-and-

Jonathan M Landers
Janet M. Weiss
Jessica I. Basil
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 351-4000
Telecopy:  (212) 351-4035

Co-counsel to the Reorganized Debtor

31

# Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **FINOVA CAPITAL CORPORATION** | Case Nos  01-0698 (PJW) |
| | Jointly Administered |
| Reorganized Debtor | |
| | **Hearing Date: November 29, 2005 at 2:30 p.m.** |

### REORGANIZED DEBTOR'S SUR-REPLY TO THE EQUITY COMMITTEE'S RESPONSE TO THE REORGANIZED DEBTOR'S REPLY TO OBJECTION OF FIRST CAROLINA INVESTORS, INC. TO MOTION OF REORGANIZED DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE <u>SECTION 1141 CLARIFYING PROVISION OF CONFIRMED PLAN</u>

Mark D  Collins (No  2981)
Rebecca Booth (No  4031)
RICHARDS, LAYTON & FINGER, P A
One Rodney Square
P O  Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Telecopy:  (302) 651-7701

-and-

Jonathan M  Landers
Janet M  Weiss
Jessica I  Basil
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone.  (212) 351-4000
Telecopy  (212) 351-4035

Co-counsel to the Reorganized Debtor

Dated: November 8, 2005

Table of Contents

Page

I     PRELIMINARY STATEMENT                                                          4

      A     The Obligations to the Shareholders under the Plan are Not in the
            Nature of Debt                                                           6

      B     Distribution of Funds Held in the Segregated Account to the Shareholders if
            Prohibited Under the Express Terms of the Indenture Because the Conditions
            Precedent to Distribution Have Not Been and Will Not Be Satisfied        9

      C     Distributions of Funds held in the Segregated Account are  Impermissible
            Restricted Payments                                                      14

      D     Granting the Relief Requested in the Clarification Motion will not Create a
            Forfeiture                                                               16

      E     The Silence in the Plan Cannot Be Construed to Authorize the  Payment of
            Distributions to Shareholders                                           17

      F     The Monies Held in the Segregated Account are Not Held in  Trust for the
            Shareholders                                                            21

II    CONCLUSION                                                                     23

# TABLE OF AUTHORITIES

## CASES

195 U S  624 (1904) . . . . . . . . . . . . . . . . . . . . . . . 18

*Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.,*
853 F  Supp  791 (S D N Y  1994) . . . . . . . . . . . . 14, 15, 20

*Brass v. Am  Film Techs , Inc.,*
987 F 2d 142 (2d Cir  1992) . . . . . . . . . . . . . . . . . 19

*Carrieri v. Jobs.com, Inc ,*
393 F 3d 508 (5th Cir  2004) . . . . . . . . . . . . . . . . . 8

*Columbus Park Corp  v. Department of Housing Preservation and Development,*
80 N Y 2d 19 (1992) . . . . . . . . . . . . . . . . . . . . 20

*In re Consumers Realty & Development Co , Inc,*
238 B R  418 (8th Cir  BAP 1999) and *In re* . . . . . . . 7

*Counihan v  Allstate Ins  Co.,*
194 F 3d 357 (2d Cir  1999), *citing McGrath v. Hilding,* 41 N Y 2d 625 (N Y  1977) . . . 22

*In re Ernst,*
45 B R  700 (Bankr  D  Minn  1985) . . . . . . . . . . . . 7

*In re First Central Financial Corporation,*
377 F 3d 209 (2d Cir  2004) . . . . . . . . . . . . . . . 21, 22

*Galli v. Metz,*
973 F 2d 145 (2d Cir  1992) . . . . . . . . . . . . . . . . 14, 20

*Geftman v. Commission of Internal Revenue,*
154 F 3d 61 (3d Cir  1998) . . . . . . . . . . . . . . . . . 8

*Ginett v  Computer Task Group, Inc ,*
962 F 2d 1085 (2d Cir  1992) . . . . . . . . . . . . . . . 12

*Grossman Steel & Aluminum Corp  v  Samson Window Corp ,*
54 N Y 2d 653 (N Y  1981) . . . . . . . . . . . . . . . . 12, 13

*Hatzel & Buehler, Inc  v  Lovisa Construction Co , Inc ,*
1993 U S  Dist  LEXIS 9899 (E D N Y  1993) . . . . . . . 13

*Int'l Multifoods Corp  v. Commercial Union Ins  Co ,*
309 F 3d 76 (2d Cir  2002) . . . . . . . . . . . . . . . . . 11

*Kirschten v. Research Institutes of America, Inc.*,
1997 U.S. Dist. LEXIS 24037 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
716 F. Supp. 1504 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*,
86 N.Y. 2d 685 (N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

*Otis Eastern Service, Inc. v. Raytheon Engineers & Constructors, Inc.*,
15 F. Supp. 2d 318 (W.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Palazzo v. Palazzo*,
503 N.Y.S. 2d 381 (1st Dep't 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Penrod*,
169 B.R. 910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Reiss v. Fin. Performance Co.*,
764 N.E. 2d 958 (N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Richard H. Friedberg*,
192 B.R. 338 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Richard Hall Lightfoot v. Union Carbide Corp.*,
110 F. 3d 898 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Schuler-Hass Elec. Corp. v. Aetna Cas. & Cur. Co.*,
40 N.Y. 2d 883 (N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Stock Exchanges Options Trading Antitrust Litigation*,
2005 U.S. LEXIS 13734 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*Trustees of Freeholders & Commonalty v. Jessup*,
173 N.Y. 84 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## STATUTES

Section 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 . . . . . . . . 3

## MISCELLANEOUS

Restatement (Second) of Contracts § 226 . . . . . . . . . . . . . . . . . . . . . . . . 10, 16, 17

Restatement (Second) of Contracts § 299, comment a, at 185 . . . . . . . . . . . . . . . . 17

## UNRECOGNIZED

The entries below, although they look like citations, could not be fully processed, since they did not contain any reporters built into the Full Authority dictionary

8 Del C § 170                                                                          15, 16

*Vermont Teddy Bear*, 1 N Y 3d at 475                                                    11

*Vermont Teddy Bear Co v. 538 Madison Realty Co.*, 1 N Y 3d 470, 475 (N Y 2004)          11

The above-captioned reorganized debtor (the "Reorganized Debtor" or "FNV Capital")

hereby submits this sur-reply (the "Sur-Reply")[1] to the Official Committee of Equity Security

Holders (the "Equity Committee") response (the "Response") [Docket No  62] to the

Reorganized Debtor's reply (the "Reply") [Docket No  63] to the objection of First Carolina

Investors, Inc  ("First Carolina") dated June 3, 2005 (the "Objection") [Docket No  46] in

opposition to the Reorganized Debtor's motion dated April 1, 2005 (the "Clarification Motion")

[Docket No  22] for an order pursuant to Section 1141 of title 11 of the United States Code, 11

U S C  §§ 101-1330 (the "Bankruptcy Code") clarifying certain provisions of the Third

Amended and Restated Joint Plan of Reorganization [Docket No  534] (the "Plan"), as confirmed

by order of this Court dated August 10, 2001 [Docket No  852] (the "Confirmation Order")   In

support of this Sur-Reply, the Reorganized Debtor respectfully represents as follows.

---

[1] Capitalized terms used herein but not defined shall have their respective meanings set forth in the Response

## PRELIMINARY STATEMENT

As discussed fully in the Reply, the Shareholders are not the holders of debt, are not

beneficiaries of a trust or escrow, and are not able to show that the conditions precedent to

making distributions to Shareholders set forth in the Plan are ever capable of satisfaction

However, notwithstanding the clear and unambiguous language in the Plan to the contrary, the

Equity Committee would have this Court rewrite the Plan and permit payments to the

Shareholders  While the Equity Committee has repeated a number of theories originally set forth

in the Objection to give Shareholders rights that they did not obtain under the Plan or the Plan

Documents, these theories are wholly unavailing

Specifically, the Equity Committee continues to assert that the Shareholders are the

holders of debt obligations simply because the distribution scheme was set forth in a confirmed

plan  The Equity Committee's reliance on a line of cases dealing with distributions to **creditors**

holding **pre-confirmation debt** is misplaced because the Shareholders were neither creditors nor

holders of debt prior to confirmation  Moreover, as the Equity Committee has acknowledged,

the Plan is a new contract and the parties are bound by the terms of that contract  As such, the

Equity Committee cannot ignore the fact that the language in the Plan describes the distribution

to Shareholders as dividends or distributions "on account of equity" and includes no indicia of

debt  In addition, the Equity Committee's argument that the Reorganized Debtors have an

obligation to make distributions or retain funds thereby giving the Shareholders have a vested

right to receive those funds ignores the express conditions precedent governing the Shareholders'

right to payment  The Equity Committee assertion that the relief requested in the Clarification

Motion would result in a forfeiture of funds that have been set aside for their behalf is similarly

4

unavailing because the Shareholders never had a vested right to receive payments and cannot forfeit that which they do not have

The Equity Committee also continues to ignore the express conditions precedent to any equity distribution – that it would not render the Reorganized Debtors insolvent, would constitute a fraudulent transfer, or would not be permitted under applicable law   Rather than asserting that such conditions have been satisfied – which it is unable to do – the Equity Committee argues that such express conditions are in fact mere timing restraints   The Equity Committee mistakenly relies on a line of cases dealing with "pay-when-paid" contracts which are clearly distinguishable from the express conditions set forth in the Plan   Moreover, if the Shareholders in fact had a vested right to receive a payment, it would render clear language delaying payments to Shareholders superfluous, a result which is contrary to contract interpretation and the holdings of the Second Circuit   In addition, contrary to all evidence, the Equity Committee even argues that payments to Shareholders are not Impermissible Restricted Payments   However, because the Reorganized Debtors are insolvent, the Shareholders are not the holders of debt and Delaware law clearly prohibits the making of such payments, distributions to Shareholders clearly constitute Impermissible Restricted Payments

Further, the Equity Committee goes to great length to assert that the Plan is ambiguous and that such ambiguity somehow justifies payment to Shareholders   However, the Equity Committee mistakenly conflates any potential "ambiguity" caused by the silence in the Plan with respect to the treatment of funds if conditions precedent to distribution are not satisfied with the specific conditions precedent themselves, which are clear and unambiguous   In short, there is no justification for ignoring the express conditions precedent which prevent payment of funds to the Shareholders

5

Because the Equity Committee has not shown that the Shareholders have a vested right to

payment or that the conditions to any payment are ever capable of satisfaction, this Court should

grant the relief requested in the Clarification Motion

A.    **The Obligations to the Shareholders under the Plan are Not in the Nature of Debt**

1        Although fully refuted in the Reply, the Equity Committee insists on ignoring

express provisions of the Plan and asserting that the Shareholders are the holders of debt

Response at ¶ 28-30   The Reorganized Debtors and the Equity Committee agree that the fifth

waterfall provision, Section 4 06(a)(v) of the Indenture, is the provision that governs distribution

to Shareholders   Reply at ¶ 5   This provision **clearly and unambiguously** provides that the

Reorganized Debtors shall apply cash and Cash Equivalents to make "Restricted Payments" if

certain conditions are satisfied:

> "    to make distributions in respect of FINOVA Capital's Equity Interests
> held by [FNV Group], which amounts [FNV Group] shall use together with
> any other cash the Company has available for such purposes to make
> **Restricted Payments unless      the making of any such Restricted**
> **Payment would be an Impermissible Restricted Payment**, in which event
> the Company shall retain such amounts and any such retained amounts shall
> accumulate and shall be used to make Restricted Payments at such time or
> from time to time when such Restricted Payments are not Impermissible
> Restricted Payment       "

(emphasis added)   As such, the only possible distribution to Shareholders are in the form of

"Restricted Payments" that are not "Impermissible Restricted Payments "   As noted in the Reply,

the Indenture specifically describes the potential obligations to Shareholders as a "Restricted

Payment," which is defined as a dividend, a distribution on account of equity interests, or the

purchase, redemption or acquisition of equity interests   The definition of "Restricted Payment"

clearly tracks the distributions which may be made to **shareholders** under Delaware law and any

such distributions lack any indicia of debt   Reply at ¶ 14, 16

6

2       The Equity Committee has been unable to point to any provision of the Plan that creates a debt obligation in favor of the Shareholders because there is no such provision  Rather, the Equity Committee relies on a line of cases to support the proposition that any post-confirmation distribution from a debtor is automatically a debt obligation  However, these cases deal with the treatment of **creditors** who receive set distributions under confirmed plans of reorganization and the Equity Committee is inappropriately extrapolating their holdings to the treatment of **shareholders**  By the Equity Committee's own admission, *In re Ernst*, 45 B R 700, 702 (Bankr D Minn 1985); *In re Consumers Realty & Development Co, Inc*, 238 B R 418, 425 (8th Cir BAP 1999) and *In re Penrod*, 169 B R 910, 916, all dealt with the discharge of pre-confirmation *debt* and the creation of new obligations to *creditors* under a confirmed plan and did not address the treatment of shareholders or dividends or distributions "on account of equity"  Response at ¶ 26   There can be no dispute that before the confirmation of the Plan, the Shareholders were **not** creditors of the Debtors and were **not** holders of pre-confirmation debt that was discharged   As such, the authority cited by the Equity Committee is clearly distinguishable from the present case

3       Moreover, following the Equity Committee's logic that *all* distributions under a plan, whether to creditors or shareholders, are debt obligations simply because they are set forth in a confirmed plan, leads to an absurd result  For example, certainly a plan provision providing for a distribution of preferred stock does not transform such stock into a debt instrument because it was provided for in a plan  Here, the Plan clearly identifies the distribution as a Restricted Payment – *i e*, a "dividend or the making of any distribution on account of the Company's Equity Interests   "  Indenture at p 11  As the Equity Committee acknowledges, a plan of reorganization creates a "new contract" and all prior obligations and rights of the parties are

7

extinguished and replaced by the plan  Reply at ¶ 28, *In re Richard H. Friedberg*, 192 B R  338,

341 (S D N Y  1996) ("The Plan is essentially a contract between the parties to the Plan ")  It is

the terms of the Plan itself, as a contract, that govern the nature of a distribution, not the fact that

the distribution is provided for in the Plan  As such, contrary to the Shareholders' assertion, case

law discussing the necessary attributes or indicia of debt that should be present in a contract are

clearly relevant to the present dispute, even if the contracts at issue in such cases were not plans

of reorganization  Reply at ¶ 16-17, *see also Carrieri v  Jobs com, Inc* , 393 F 3d 508 (5th Cir

2004) (finding that the terms "claim" and "debt" "obviously do not include a right to payment

based on an equity security or other interest in the debtor arising from capital contribution"),

*Geftman v  Commission of Internal Revenue*, 154 F 3d 61 (3d Cir  1998) (setting forth the criteria

by which to judge whether an investment is a debt)  In the present case, while the Reorganized

Debtors are "obligated" to comply with the terms of the Plan, the "obligation" to make dividends

or distributions on account of equity if such distributions are not Impermissible Restricted

Payments means that the Shareholders have a conditional contractual right to payment on

account of their equity holdings, not a debt

    4      The Equity Committee also misconstrues the nature of the distribution to

Shareholders by ignoring all conditions to distribution and stating that"[t]he contractual

obligation to pay the Equity Security Holders $0 05 for every $0 95 paid as principal on the New

Senior Notes   clearly falls under this more narrow definition of debt as well "  Response at ¶

29  However, the Plan does **not** provide for a set distribution of $0 05 for every $0 95 to the

Shareholders  Rather, the Plan provides that **FINOVA Capital** must make a distribution in

respect of its equity interests held by **FNV Group**, and with the upstreamed funds, **FNV Group**

8

will then make a Restricted Payment provided it is not an Impermissible Restricted Payment [2] The Equity Committee has clearly ignored the fact that the only way that a distribution is made to the Shareholders is if such distribution is a Restricted Payment, which is in the form of a dividend or distribution on account of equity, and not a debt, and therefore subject to Delaware law and the rules governing distributions to shareholders  In addition, the Equity Committee's inference that because a distribution can be "on account of equity" rather than just dividends it is somehow not subject to the provisions of Delaware law prohibiting such distribution is clearly unavailing  Response at ¶ 35  As discussed more fully in the Reply, it is irrelevant whether distributions to the Shareholders are labeled "dividends," "returns of capital" or otherwise, the making of such distributions are clearly prohibited by Delaware law and therefore constitute "Impermissible Restricted Payments "  Reply at ¶¶ 32-35

5    As a last ditch effort to support its untenable position, the Equity Committee points to section headings in the Disclosure Statement and assert that because the distributions to Shareholders are described under a particular heading that such distributions are debt obligations  Response at ¶ 34  However, it is standard in contract construction and interpretation that section headings are inserted for convenience of reference only and are not intended to modify or restrict any of the terms or provisions of the agreement  In this regard, the Disclosure Statement specifically provides that "all summaries are qualified by the Plan itself, which is controlling in the event of any inconsistency "  Disclosure Statement at p  2  Because the Plan clearly states that distributions to Shareholders are Restricted Payments and not debt, the Equity Committee's reference to a section heading in the Disclosure Statement is unavailing

---

[2] The Equity Committee has mistakenly read the first distribution by FINOVA Capital as one to Equity Security Holders rather than to FNV Group  Response at  17

RLF1-2943455-1

**B.    Distribution of Funds Held in the Segregated Account to the Shareholders if Prohibited Under the Express Terms of the Indenture Because the Conditions Precedent to Distribution Have Not Been and Will Not Be Satisfied**

6      As discussed above, the Equity Committee has mischaracterized the nature of distributions to Shareholders and has failed to distinguish between the obligation of the Reorganized Debtors to retain the funds, which it has done, and the obligation to distribute the funds, which is subject to conditions precedent that have not and cannot be met  The Reorganized Debtors do not dispute that they are required to distribute or retain $0 05 for every $0 95 paid to holders of the New Senior Notes  In fact, the Reorganized Debtors have consistently complied with this requirement by retaining funds in the Segregated Account However, while there is no condition on the Reorganized Debtors' obligation to distribute or retain these funds, there is a very clear and unambiguous condition on the distribution of such funds to Shareholders  Thus, while the Indenture states that "each incremental payment of $0 95 shall require a distribution or retention    of $0 05", the Equity Committee completely ignores the requirement **in the very same provision** that states that the Reorganized Debtors are using funds that have been upstreamed by FINVOA Capital to "make Restricted Payments **unless**    the making of any such Restricted Payment would be an Impermissible Restricted Payment, **in which event** the Company shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments    when such Restricted Payments are not Impermissible Restricted Payments "  Indenture at p  26-27 (emphasis added) As such, the Plan does not provide that the Shareholders shall **receive** $0 05 for every $0 95 distributed to noteholders; but rather, that the Reorganized Debtors shall distribute **or** retain such amount  The only possible distributions to Shareholders are in the form of Restricted Payments that are not Impermissible Restricted Payments

10

7       The Equity Committee has also mistakenly conflated what it sees as "ambiguity" with respect to the distribution of funds if certain conditions precedent are not capable of satisfaction with an "ambiguity" in the conditions precedent themselves in an effort to justify ignoring those conditions  Response at ¶ 16   As noted above, however, the language of the Plan clearly states that the Reorganized Debtor will not make a distribution to Shareholders if such distribution is an Impermissible Restricted Payment and the Equity Committee has not argued that there is any ambiguity in these provisions  This plain language is not rendered ambiguous by the Plan's failure to state how the funds should be treated if the conditions are never capable of satisfaction  As the Equity Committee has noted, terms of a contract generally are afforded their plain and ordinary meaning  Response at ¶ 17, *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N Y 3d 470, 475 (N.Y 2004); *Int'l Multifoods Corp. v. Commercial Union Ins. Co*, 309 F 3d 76, 85-87 (2d Cir 2002)   The Reorganized Debtors have complied with the plain language of the Plan by retaining $0.05 for every $0 95 distributed to noteholders, the Equity Committee must also agree to live with the plain language of the Plan which provides certain conditions on their right to receive such funds  The Equity Committee acknowledges that "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing " *Vermont Teddy Bear*, 1 N Y 3d at 475   However, by failing to cite the language of the Plan which states that the only mechanism for distribution to Shareholders is through Restricted Payments "**unless**    the making of any such Restricted Payment would be an Impermissible Restricted Payment," the Equity Committee has itself asked this Court to excise key and unambiguous terms of the Plan limiting distributions to Shareholders  By the Equity Committee's own admission, such a rewriting of the Plan is not allowed   Reply at ¶ 17

11

8       Contrary to the Equity Committee's assertion, the plain language of the Plan establishes a condition precedent to the Shareholders' right to receive any distributions Response at ¶ 18   A condition precedent is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises" *Oppenheimer & Co , Inc  v  Oppenheim, Appel , Dixon & Co* , 86 N Y  2d 685, 690 (N Y  1995)   Parties often use language such as "if," "on condition that," "provided that," "in the event that" and "subject to" to make an event a condition, but other words may suffice Restatement (Second) of Contracts § 226, *Ginett v  Computer Task Group, Inc* , 962 F 2d 1085, 1100 (2d Cir 1992); Oppenheimer, 86 N Y  2d at 691 (finding that the language of the agreement unambiguously established an express condition precedent rather than a promise, "as the parties employed the unmistakable language of condition ('if', 'unless and until') ")   In the present case, the Plan clearly states that the Reorganized Debtors shall "make Restricted Payments **unless**     the making of any such Restricted Payment would be an Impermissible Restricted Payment    ," thereby employing the unmistakable language of conditions precedent Given the clear language of the Plan that setting forth the condition precedents, the Equity Committee's reliance on cases holding that when contract terms are ambiguous the creation of a condition precedent is disfavored is misplaced    Response at ¶ 19

9       The Equity Committee's attempt to recharacterize the conditions precedent to distribution as mere limitations placed on the timing of distributions is also wholly unavailing Response at ¶ 18   The Equity Committee relies heavily on *Grossman Steel & Aluminum Corp  v Samson Window Corp* , 54 N Y  2d 653 (N Y  1981) and *Schuler-Hass Elec  Corp  v  Aetna Cas & Cur  Co* , 40 N Y  2d 883 (N Y  1976), which held that when a contract provides that a subcontractor will be paid when the contractor receives payment, such language establishes a

12

time for payment and does not create a condition precedent *Grossman Steel*, 54 N Y 2d at 654

However, contrary to the Equity Committee's assertion, this line of cases does not analyze

"language akin to that relied upon by the Reorganized Debtor" and is readily distinguished from

the present case

      10      The contracts in question in *Grossman Steel* and *Schuler-Haas* were so-called

"pay-when-paid" contracts in the context of contractors and subcontractors  In finding that there

was a condition precedent to a payment, the court in *Otis Eastern Service, Inc  v  Raytheon

Engineers & Constructors, Inc.*, 15 F Supp 2d 318, 322 n 4 (W D N Y 1998) (resolving a

dispute between a contractor and a subcontractor and determining that contractual language that

provided that payment would not be made to a subcontractor until a release is executed creates a

condition precedent, not mere timing restriction) distinguished the line of cases dealing with

"pay-when-paid" provisions by noting that because the present case "was not a situation where a

contractor was attempting to transfer risk of nonpayment or default by the owner to the

subcontractor    the "pay-when-paid" provisions are not relevant to the issue before the court "

*See also Hatzel & Buehler, Inc  v  Lovisa Construction Co , Inc.*, 1993 U S Dist  LEXIS 9899,

*8 (E D N Y 1993) (stating that "Schuler-Haas stands **only** for the proposition that absent a

clearly expressed intent that no subcontractor has a right to be paid or to sue on a payment bond

until the owner has paid the general contractor, a pay when paid clause will not be construed to

condition payment of the subcontractor on the general contractor's actual receipt of payment

from the owner ") (emphasis added)    Certainly the Equity Committee would agree that the

Reorganized Debtors is not a contractor, the Shareholders are not subcontractors and the Plan

does not deal with an attempted transfer of risk of nonpayment  In addition, unlike the "pay-

when-paid" cases where all work has been completed other than the passage of time, the

13

payment of any distributions to Shareholders first requires an affirmative declaration by the Reorganized Debtors' Board as well as compliance with applicable law and therefore, more than the mere passage of time is required

11    Moreover, if the Shareholders in fact had a vested right to receive a payment, there would have been no purpose in delaying the payments to the Shareholders in the first place The Equity Committee's interpretation renders the clear provision that states that distributions can not be made if such distributions would be Impermissible Restricted Payments irrelevant As the Second Circuit has clearly stated, "[u]nder New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless    is not preferred and will be avoided if possible   Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect " *Galli v. Metz*, 973 F 2d 145, 149 (2d Cir  1992) (internal quotation marks and citations omitted)   *See also Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.*, 853 F Supp  791, 795 (S D N Y  1994) (stating that a court must "avoid an interpretation that would leave contractual clauses meaningless ")   As such, it is clear that the Plan must be read as creating conditions precedent to Shareholder distributions

## C.    Distributions of Funds held in the
### Segregated Account are Impermissible Restricted Payments

12    The Equity Committee has also asserted that the transfer of funds held in the Segregated Account would not be Impermissible Restricted Payments   Response at ¶ 37   The Equity Committee reaches this bizarre conclusion through a series of misinterpretations, mistaken extrapolations and impermissible rewritings of the express provisions of the Plan   An Impermissible Restricted Payment is defined as distributions "if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such

14

entity or (iii) not be permitted to be made by such entity under applicable law " Indenture at p 6
All three of these conditions are incapable of satisfaction  First, as has been fully established in
the Reply, the Reorganized Debtors are insolvent, a fact that the Equity Committee has not
refuted at this time [3]  Ross Declaration attached as Exhibit A to the Reply  Second, because the
distributions to Shareholders are not in the nature of debt, the Equity Committee's reliance on the
theory that antecedent debt satisfies the requirements of fair consideration is misplaced  Reply at
¶ 31  Third, applicable law clearly prohibits the payment of any distributions to Shareholders
Reply at  ¶¶ 32-35

13    As discussed above and in the Reply, the payment obligations under the Plan are
in the nature of a dividend or similar distribution on account of **equity** interests and are not debt
obligations  Reply at ¶¶ 14-15   As such, distributions to Shareholders are Impermissible
Restricted Payments because such distributions are expressly prohibited by various provisions of
Delaware law (which is the relevant "applicable law")  *Id.*  The Equity Committee attempts to
do an end run around the provisions of 8 Del C  § 170 that states that dividends are payable out
of surplus or net profits, neither of which the Reorganized Debtors have, by noting that this
provision also provides that it does not invalidate or otherwise effect a note or obligation of the
corporation paid by it as a dividend on shares of its stock if at the time of such note or obligation
the corporation has either surplus or net profits from which the dividend could lawfully have
been paid  Response at ¶ 38  The Equity Committee's reliance on this carve out is misplaced
First, as discussed above, the Reorganized Debtors have not issued a note or created a debt
obligation in favor of the Shareholders  Moreover, even if this Court was inclined to find that an

---

[3]  The Equity Committee's Response alleges the issue is irrelevant under its view of the law  Be that as it
may, the Equity Committee has not attempted to refute this contention despite at least some discovery on this
issue  The reason is undoubtedly because the Equity Committee had absolutely no basis for doing so

RLF1-2943455-1

obligation was created, the creation of such obligation would not be on the date of confirmation of the Plan, as the Equity Committee asserts, but rather on the date that the payment to the Shareholders was first due  As of such date, the Reorganized Debtors had neither surplus nor net profits, which is why the Reorganized Debtors have been retaining funds in the Segregated Account since the very first payments on account of the New Senior Notes  Reply at ¶ 8  Therefore, the carve-out to 8 Del C  § 170 is not sufficient to extract the distributions to Shareholders from the definition of Impermissible Restricted Payments  Finally, in any event, the "distribution" was clearly subject to a condition precedent, to which specifically incorporated Delaware law must be observed as of the time of "making of any such Restricted Payment "  Indenture at § 4 06(a)(v)(A)

### D.  Granting the Relief Requested in the Clarification Motion will not Create a Forfeiture

14    The Equity Committee frequently argues that the Reorganized Debtors are trying to bring about a "forfeiture," but all of these arguments simply ignore the specific language in the Plan  Response at ¶ 16  Indeed, the Equity Committee's argument is essentially that any contractual condition to payment effects a "forfeiture "  The term "forfeiture" has been defined as "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance on the expectation of that exchange "  *Oppenheimer & Co., Inc  v  Oppenheim, Appel, Dixon & Co*, 86 N Y  2d at 691 n 2 (citing Restatement (Second) of Contracts at § 229 comment b   As the terms of the Plan clearly state, and as fully set forth in the Reply, the Shareholders do not hold a lien or security interest in property, any specific interest or entitlement, or interest in an escrow fund or property held in trust, but only a conditional right of payment, and the Reorganized Debtors have not requested that the Shareholders forfeit this right  Because the conditions precedent to such

16

payments are never capable of satisfaction, the Shareholders will never have a **vested** right to receive a distribution capable of forfeiture  Reply at ¶ 28-35

15    The Equity Committee relies on case law that states that New York courts will not interpret provisions that are ambiguous on their face to effect a forfeiture  Response at ¶ 22 However, in the present case there is neither a forfeiture nor ambiguous language for the Court to interpret  The Court in *Oppenheimer* clearly stated that interpretation of the terms of a contract as a means of reducing the risk of forfeiture cannot be employed if "the occurrence of the event as a condition is expressed in unmistakable language "  *Id.* (citing Restatement (Second) of Contracts § 299, comment a, at 185, § 227, comment b (where language is clear, "(t)he policy favoring freedom of contract requires that, within broad limits, the agreement of the parties should be honored even through forfeiture results ")  As discussed above, the terms of the Plan unambiguously state that there are conditions precedent to the making of a distribution to Shareholders  This is the "agreed upon exchange" and the fact that the Shareholders will never receive a distribution because the conditions precedent cannot be satisfied does not allow the Equity Committee to rewrite the Plan and create a better deal

**E.    The Silence in the Plan Cannot Be Construed to**
       **<u>Authorize the Payment of Distributions to Shareholders</u>**

16    The Equity Committee argues that the Plan is ambiguous and should be construed against the Reorganized Debtors  Response at ¶¶ 23-24  Initially, this doctrine is of questionable relevance where the Reorganized Debtors are essentially stakeholders with obligations to both creditors and Shareholders  This is not a situation where the Reorganized Debtors themselves benefit from the relief they are seeking  In any event, this doctrine is not applicable

17

17    Contrary to the Equity Committee's assertion, silence is not the same thing as ambiguity  Response at ¶ 21, *see Richard Hall Lightfoot v. Union Carbide Corp*, 110 F 3d 898, 906 (2d Cir 1997) (cautioning against "conflat[ing] ambiguity and omission ")   As the New York Court of Appeals explained, an ambiguity "must relate to a subject treated of in the paper, and must arise out of words used in treating that subject  Such an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful "  *Trustees of Freeholders & Commonalty v. Jessup*, 173 N Y  84, 89-90 (1903, writ of error dismissed, 195 U S  624 (1904), *Metropolitan Life Ins  Co  v  RJR Nabisco, Inc.*, 716 F  Supp  1504, 1515 (S D N Y  1989) (finding that "[w]hile it may be true that no explicitly provision either permits or prohibits an LBO, such contractual silence itself cannot create ambiguity    "), *In re Stock Exchanges Options Trading Antitrust Litigation*, 2005 U S LEXIS 13734 *23 (S D N Y  2005) (stating that "[t]here is a difference, however, between contractual language that is ambiguous and a contractual provision that simply omits certain language "  *Id.* at *23; *Reiss v. Fin  Performance Co*, 764 N E  2d 958, 960-961 (N Y  2001) ("An omission or mistake in a contract does not constitute an ambiguity    " (internal quotation marks omitted))

18    Moreover, because the payment of distributions to Shareholders is clearly not an essential term of the Indenture as a whole, silence with respect to treatment of when the condition precedent to making such distributions is not satisfied does not make the Indenture ambiguous to justify looking outside of the document to construe its meaning  As the Court in *Kirschten v  Research Institutes of America, Inc.*, 1997 U S  Dist  LEXIS 24037 *21-22 (S D N Y  1997) noted, even if a contract is silent on an issue, the complaining party must still segue from silence to "ambiguity "  When a contract is silent on a point that the parties dispute,

18

evidence outside the language of the contract may be considered only if the point in issue is one

that is "essential" to the contract, *i e* without which a contract could not be found   *Id*   The

Court clarifies the holding of *Brass v Am. Film Techs , Inc* , 987 F 2d 142, 149 (2d Cir 1992),

which was cited by the Equity Committee for the proposition that a contract is ambiguous where

there is silence as to a particular provision, by noting that the assertion that *Brass* states that "the

Second Circuit has expressly ruled that when a contract is silent as to particular rights or

obligations, the contract is considered ambiguous as to those rights and obligations"

misconstrues the holding in that case and the application of the principle of ambiguity   *Id*   at 22

When courts have spoken of an agreement's silence on an issue as having the effect of rendering

the agreement "ambiguous," it is only in cases in which the issue is one **material** to the contract

*Id*   at 22 n 4   Rather, "the black letter rule of law is that 'an omission    in a contract does not

constitute an ambiguity    "   *Id*   at 23 (citing *Schmidt v Magnetic Head Corp* , 468 N Y S 2d

649, 654 (2d Dept 1983))   Because there is no "ambiguity", there is nothing for this Court to

construe against the Reorganized Debtor

      19      The Reorganized Debtors have no "studied reluctance to declare the Indenture

'ambiguous'" as the Equity Committee asserts   Reply at  22   Even if this Court found that the

Indenture was ambiguous and the Court was inclined to construe the silence against the

Reorganized Debtors as drafters of the Indenture, as the Equity Committee urges this Court to

do, there is no possible way to construe the silence so as to allow the Shareholders to receive any

distributions   As discussed more fully in the Reply, the Indenture is clear when it states that the

Shareholders are not entitled to any payments if such distributions are Impermissible Restricted

payments   Reply at ¶ 37   There is no ambiguity with respect to this condition   In order to find

that the Shareholders are entitled to the funds in the Segregated Account and future distributions,

19

the Equity Committee urges this Court to use an "ambiguity" with respect to the treatment of such funds if the conditions are not capable of satisfaction to rewrite the Plan and excise the clear and unambiguous conditions that state that the Shareholders are not entitled to such distributions, notwithstanding the fact that the Equity Committee has acknowledged that the Court should not excise terms of a contract. Response at ¶ 17

20    In addition, the use of any perceived ambiguity to hold that the Shareholders are entitled to payment notwithstanding the express conditions precedent to the contrary would render such conditions precedent meaningless  As discussed above, the Second Circuit has clearly stated that contractual interpretations that render clauses superfluous or meaningless should be avoided  *Galli v. Metz*, 973 F 2d at 149 (2d Cir. 1992),*Alternative Thinking Systems, Inc.* 853 F  Supp  at 795  Moreover, enforcing the clear and unambiguous conditions precedent will also give reasonable effect to the purposes of the Plan as a whole  As discussed in the Reply, if the Court grants the Clarification Motion, the funds currently being retained in the Segregated Account will be distributed to creditors who, given the Reorganized Debtors' financial condition, will not be paid in full  Such a distribution should be viewed as a means of ensuring compliance with the absolute priority rule which provides that creditors must get paid in full before there can be a distribution on account of equity  Reply at ¶ 38  Because the purpose of the Plan is to make distributions in accordance with the absolute priority, granting the relief requested in the Clarification Motion is consistent with that purpose  *See Columbus Park Corp. v. Department of Housing Preservation and Development*, 80 N Y  2d 19, 27 (1992) (stating that courts must give contracts a fair and reasonable interpretation consistent with its purposes)

21    In fact, the relief requested in the Clarification Motion is contemplated within the four corners of the Plan  As the Equity Committee itself has noted, the Plan provides that "[a]ny

20

distribution made under the Plan that [are unclaimed or undeliverable for a period of one year] shall be revested in the applicable Reorganized Debtor free of any restrictions thereon, and any entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and forever barred " Plan at 9 4(b), Response at ¶ 25 n 4  The funds held in the Segregated Account are, in fact, "undeliverable" because the conditions precedent to their delivery will never be satisfied  Because this plan provision applies to **all** distributions under the Plan, and specifically includes distributions to Shareholders, the Court should not construe a contrary result because this language was not repeated in the provisions setting forth the conditions to Shareholder distributions  *See In re Stock Exchanges Options Trading Antitrust Litigation*, 2005 U S  LEXIS 13734 *22 (S D N Y  2005) (stating that the court must read the contract as a whole to determine the intent of the parties)

### F.    The Monies Held in the Segregated Account are Not Held in Trust for the Shareholders

22    The Equity Committee continues to assert that the funds held in the Segregated Account are held "in trust" for the Shareholders  Response at ¶ 45  However, the Equity Committee now acknowledges that the Indenture neither creates an express trust nor an escrow account  Instead, the Equity Committee stretches the doctrine of constructive trust in an effort to create rights for the Shareholders that were not provided in the Plan  As more fully discussed in the Reply, the elements of constructive trust under New York law include unjust enrichment and there is a general rule barring a finding of unjust enrichment when there is a valid and enforceable written agreement between the parties  Reply at ¶ 21, *In re First Central Financial Corporation*, 377 F 3d 209, 213 (2d Cir  2004)  In the present case, there is an enforceable agreement and the Indenture specifically prohibits distributions to Shareholders if such payments constitute Impermissible Restricted Payments  Furthermore, as the Equity Committee itself

21

noted, the Second Circuit has stressed that "[u]njust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain." Response at ¶ 47 (citing *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999), *citing* McGrath v. *Hilding*, 41 N.Y. 2d 625, 629 (N.Y. 1977)) Requiring the Reorganized Debtors to ignore the express conditions in the Indenture and make the distributions anyway would not unjustly enrich the Reorganized Debtors, but rather, would create a windfall to the **Shareholders** by granting them greater rights than they were otherwise provided  The Shareholders would obtain a benefit that would be inequitable for them to retain if a constructive trust were imposed

23      As the Equity Committee notes, courts are not limited to a set list of elements that must be shown in order to find a constructive trust  Response at ¶ 48; *Palazzo v. Palazzo*, 503 N.Y.S. 2d 381, 383-84 (1st Dep't 1986)  However, the Equity Committee has failed to supply any alternative factors that support a constructive trust and has ignored the Second Circuit's guidance when it noted that the New York law is clear that "a constructive trust is an equitable remedy intended to be 'fraud-rectifying' rather than 'intent-enforcing.'" *In re First Central Financial Corporation*, 377 F.3d 209, 216 (2d Cir. 2004)  The Equity Committee has made no showing of any fraud or wrongdoing by the Reorganized Debtors and has ignored the fact that it is the Shareholders, not the Reorganized Debtors, that would be unjustly enriched by such a finding  As such, no constructive trust can be found  Moreover, because there are conditions precedent to the Shareholders rights to receive any distributions under the Plan that have not been satisfied, even if a constructive trust was found, the Shareholders have no right to receive any distribution  Reply at ¶ 25

22

**CONCLUSION**

Contrary to the Equity Committee's assertion, as shown in the foregoing and in the Reply, both the language of the controlling documents as well as the well-settled and applicable principles of contract construction support the clarification requested by the Reorganized Debtors  The Shareholders contingent right to payment under the Plan are not in the nature of debt, the conditions precedent to such distributions are never capable of satisfaction, and the relief requested in the Clarification Motion would not result in a forfeiture

WHEREFORE, for all of the reasons stated in the Reply and this Sur-Reply, the Reorganized Debtors respectfully request entry of the order submitted to this Court with the Clarification Motion allowing the Reorganized Debtors (i) to cease setting aside 5% of the Available Cash for the benefit of the Shareholders, (ii) to return the Available Cash in the Segregated Account to FNV Capital for use in its business to pay expenses, debts and other obligations and (iii) to grant such other and further relief as may be just and proper

Dated  November 8, 2005
    Wilmington, Delaware

                                 Mark D  Collins (No  2981)
                                 Rebecca Booth (No  4031)
                                 RICHARDS, LAYTON & FINGER, P A
                                 One Rodney Square
                                 P O  Box 551
                                 Wilmington, Delaware 19899
                                 Telephone:  (302) 651-7700
                                 Telecopy.  (302) 651-7701

                                 -and-

Jonathan M. Landers
Janet M. Weiss
Jessica I. Basil
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-counsel to the Reorganized Debtor

24

## CERTIFICATE OF SERVICE

I, Jason M. Madron, do hereby certify that on September 20, 2007 a copy of the foregoing **Objection and Answering Brief of FINOVA Group, Inc. and FINOVA Capital Corp. to Motion and Opening Brief of the Official Committee of Equity Security Holders in Support of a Stay Pending Appeal of the Bankruptcy Court's Final Clarification Order** was served on the parties on the attached list and in the manner indicated thereon.

Jason M. Madron (Bar No. 4431)

### *FINOVA Capital Corporation - Service List*
### *Local via Hand Delivery / Non-Local via First Class Mail*

David Buchbinder
George M. Conway
Office of the United States Trustee
844 King St., Suite 2313
Lockbox 35
Wilmington, DE 19801 USA

William D. Sullivan
Elihu E. Allinson
4 East 8th Street, Suite 400
Wilmington, DE 19801

Howard A. Cohen
Reed Smith LLP
1201 N. Market St., Suite 1500
Wilmington, DE 19801

Francis A. Monaco, Jr.
Monzack & Monaco, P.A.
1201 N. Orange Street
P.O. Box 2031
Wilmington, DE 19899-2031

James R. Adams
Department of Justice
Carvel State Building, 6th Floor
820 N. French Street
Wilmington, DE 19801

James Gadsden
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005

Andrea A. Bernstein
Martin Bienenstock
Bethany J. Cooper
Weil, Gotshal & Manges LLP
767 Fifth Ave.
New York, NY 10153

Charles J. Filardi, Jr.
Pepe & Hazard LLP
30 Jeliff Lane
Southport, CT 06890-1436 USA

RLF1-3203175-1

Claudia King, President
Claudia King & Associates, Inc.
P.O. Box 2742
Carefree, AZ 85377

Gerald K. Kitano, Esq.
Michael M. Hirotsu, Esq.
Law Offices of Gerald K. Kitano
3435 Wilshire Blvd., Suite 1800
Los Angeles, CA 90010

Jonathan M. Landers, Esq.
Paul Guillotte, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Ave.
New York, NY 10166

Rick Lieberman
Senior VP/General Counsel
The Finova Capital Corporation
4800 North Scottsdale Road
Scottsdale, AZ 85251

Mark D. Silverschotz
James Andriola
John L. Scott, Jr.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

Robert C. Shenfeld
Reed Smith Crosby Heafey LLP
335 S. Grand Ave., Suite 2900
Los Angeles, CA 90017

Robert J. Rohrberger, Esq.
Fox and Fox LLP
70 South Orange Ave.
Livingston, NJ 07039

Bradley J. Stevens
Janet B. Hutchison
Robbins & Green, P.A.
3300 North Central Avenue, Suite 1800
Phoenix, AZ 85012 USA