## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE: Finova Group et al

| | |
|---|---|
| Official Committee of Equity Securities Holders, | ) )  |
| | ) Civil Action No. 07-480 (JJF) |
| Appellant | ) |
| | ) |
| v. | ) |
| | ) |
| Finova Group Inc. and | ) Bankruptcy Case No. 01-698 |
| Finova Capital Corporation, | ) AP 07-70 |
| | ) |
| Appellees. | |

## REPLY TO OBJECTION AND ANSWERING BRIEF OF FINOVA GROUP, INC. AND FINOVA CAPITAL CORP. TO MOTION AND OPENING BRIEF OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS IN SUPPORT OF STAY PENDING APPEAL OF THE BANKRUPTCY COURT'S FINAL CLARIFICATION ORDER

William D. Sullivan (No. 2820)
WILLIAM D. SULLIVAN, LLC
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
email: bill@williamdsullivanllc.com

Mark D. Silverschotz, Esq.
James M. Andriola, Esq.
Han J. Ahn, Esq.
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182
Telephone: (212) 278-1000
Facsimile: (212) 278-1733

Attorneys for Appellant, the Official
Committee of Equity Security Holders

September 27, 2007

## Table of Contents

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT  THIS COURT SHOULD ISSUE A STAY PENDING APPEAL ........................ 2

    A.    The Applicable Standard................................................................................... 2

    B.    The Debtors Do Not Dispute That The Bankruptcy Court Has
Already Held That Equity Holders Will Be Irreparably Harmed If
A Stay Pending Appeal Is Not Granted ................................................................. 3

    C.    The Debtors Do Not Dispute That The Bankruptcy Court Has
Already Held That The Issuance Of A Stay Will Not Substantially
Injure Other Parties To The Proceeding ................................................................ 4

    D.    The Merits of the Equity Committee's Appeal ...................................................... 6

        1.    The Debtors Have Admitted That The Indenture At Issue Is
Ambiguous................................................................................................7

        2.    There Are *No* Terms In The Indenture That Support The
Debtors' Proposed Use Of The Segregated Funds ..................................10

        3.    The Disclosure Statement Issues .............................................................11

        4.    The Indenture Created Debt Obligations Running From
The Debtors To The Equity Holders.........................................................12

        5.    The Bankruptcy Court And The Debtors Misapprehend The
Delaware Law Provisions On Which They Rely ......................................13

    E.    The Public Interest Will Be Served By Granting The Requested
Stay ................................................................................................................. 14

    F.    A Bond Is Not Warranted In This Case .............................................................. 14

CONCLUSION.................................................................................................................. 15

## Table of Authorities

Page

*Abrons v. Maree,*
    911 A.2d 805 (Del. Ch. 2006)......................................................................................3

*In re Bridgepoint Nurseries, Inc.,*
    190 B.R. 215 (Bankr. D.N.J. 1996) ............................................................................11

*In re Byrd,*
    172 B.R. 970 (Bankr. W.D. Wash. 1994)...................................................................14

*Constr. Ass'n of W. Pa. v. Kreps,*
    573 F.2d 811 (3d Cir. 1978).....................................................................................2, 3

*In re Ernst,*
    45 B.R. 700 (Bankr. D. Minn. 1985) .........................................................................12

*Family Kingdom, Inc. v. EMIF New Jersey Ltd.,*
    225 B.R. 65 (D.N.J. 1998) ...........................................................................................2

*Geftman v. Comm'r of Internal Revenue,*
    154 F.3d 61 (3d Cir. 1998).........................................................................................12

*I.R.V. Merch. Corp. v. Jay Ward Prods., Inc.,*
    856 F. Supp. 168 (S.D.N.Y. 1994) ..............................................................................9

*Khouzmam v. Hogan,*
    497 F. Supp. 2d 615 (M.D. Pa. 2007) .........................................................................3

*Kreiss v. McCown De Leeuw & Co.,*
    131 F. Supp. 2d 428 (S.D.N.Y. 2001).........................................................................9

*Lomalio Assocs. Inc. v. LBK Mktg. Corp.,*
    No. 94 CIV. 3208 (KTD), 1999 WL 705208 (S.D.N.Y. Sept. 10, 1999).....................9

*In re NVF Co.,*
    309 B.R. 698 (D. Del. 2004)......................................................................................12

*N.Y. City Employees' Ret. Sys. v. Sapir (In re Taylor),*
    243 F.3d 124 (2d Cir. 2001).........................................................................................6

*In re Netia Holdings S.A.,*
    278 B.R. 344 (Bankr. S.D.N.Y. 2002) .........................................................................4

**Table of Authorities**
**(continued)**

Page

*Reape v. New York News, Inc.*,
 122 A.D.2d 29, 504 N.Y.S.2d 469 (2d Dep't 1986), *cert. denied*, 68 N.Y.2d
 610, 501 N.E.2d 600, 508 N.Y.S.2d 1027 (1986)............................................................8

*Republic of Philippines v. Westinghouse Electric Corp.*,
 949 F.2d 653 (3d Cir.1991)..........................................................................................2

*Rowe v. Great Atlantic & Pacific Tea Co.*,
 46 N.Y.2d 62, 385 N.E.2d 566, 412 N.Y.S.2d 827 (1978)...........................................10

*Rubin v. Pringle (In re Focus Media Inc.)*,
 387 F.3d 1077 (9th Cir. 2004) .....................................................................................4

*Scholastic Funding Group, LLC v. Kimble*,
No. 07-557, 2007 WL. 1231795 (D.N.J. Apr. 24, 2007).......................................................3

*Sergi v. Everett Sav. Bank (In re Sergi)*,
 233 B.R. 586 (B.A.P. 1st Cir. 1999)............................................................................7

*In re Silverman v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA (In re Suprema
 Specialties, Inc.)*,
 330 B.R. 93 (S.D.N.Y. 2005)......................................................................................14

*In re Sugarhouse Realty, Inc.*,
 192 B.R. 355 (E.D. Pa. 1996) .....................................................................................7

*William A. White/Tishman East, Inc. v. Banko*,
 171 A.D.2d 401, 566 N.Y.S.2d 628 (1st Dep't 1991).....................................................8

## STATUTES

11 U.S.C. § 1141(a) ........................................................................................................7

Del. Code Ann. tit. 8, § 170 ............................................................................................13

Fed. R. Bankr. P. 8005 .............................................................................................1, 14

## MISCELLANEOUS

9E Am. Jur. 2d *Bankruptcy* § 3826 (2006) ...................................................................14

## INTRODUCTION

The Appellant, the Official Committee of Equity Security Holders (the "Equity Committee"), on behalf of the shareholders (the "Equity Holders") of Finova Group, Inc., the corporate parent of Finova Capital Corporation (collectively, the "Debtors" or "Reorganized Debtors"), by and through its undersigned counsel, submits this reply to the objection and answering brief of the Debtors dated September 20, 2007 (D.I. 6) which was filed in opposition to the Equity Committee's motion, pursuant to Federal Rule of Bankruptcy Procedure 8005, seeking a stay pending final resolution of any appeal of the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), dated June 26, 2007 (the "Final Clarification Order") (Bankr. D.I. 220) [App., Ex. H].[1]

The Equity Committee's motion seeks to convert and/or extend the Bankruptcy Court's 90-Day Stay Order,[2] which is scheduled to expire on October 22, 2007, into a stay pending final resolution of any appeal of the Final Clarification Order. It should be noted that, based on the Stipulation Regarding (I) Mediation Bypass and (II) The Establishment of Briefing Schedule for Appeal that was filed with the Court on September 26, 2007 (D.I. 8), the appeal on the merits should be fully briefed by the parties and submitted to Court by no later than December 3, 2007.

---

[1]  "Bankr. D.I." refers to the docket of the Bankruptcy Court in case no. 01-00698-PJW and "Bankr. (Case No. 697) D.I." refers to the docket of the Bankruptcy Court in case no. 01-00697-PJW. References to the Appendix of Exhibits submitted in connection with the Equity Committee's Motion and Opening Brief will be made as "App., Ex. __" or, for a particular page of an Exhibit, "App. at __, Ex. __".

[2]  Order Pursuant to Federal Rule of Bankruptcy Procedure 8005 Granting 90-Day Stay of the Bankruptcy Court's Order Granting Debtor's Motion Requesting Clarification of Confirmed Chapter 11 Plan entered by the Bankruptcy Court on or about August 22, 2007 (Bankr. D.I. 247).

The irreparable harm to the Equity Holders if a stay is not granted pending appeal has already been recognized by the Bankruptcy Court and the Debtors objection to the present motion essentially concedes the point. The Debtors' objection also further demonstrates the lack of harm to any party if a stay is not granted. Under these circumstances, and the demonstrated strength of the Equity Committee's arguments on the merits, it is submitted that the prudent and equitable course of action is for this Court to issue a stay pending appeal and let the funds at issue remain in the same interest bearing account in which they have been held for many years.

## ARGUMENT

## THIS COURT SHOULD ISSUE A STAY PENDING APPEAL

### A.    The Applicable Standard

The parties are in accord as to the showing necessary for a stay pending appeal: (1) a strong showing of likelihood of success on the merits; (2) irreparable harm absent a stay; (3) that issuance of the stay will not substantially injure the other parties to the proceeding; and (4) that a stay is in the public interest. *See, e.g.*, *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir.1991).

Furthermore, the Equity Committee's opening brief established that where a factor such as irreparable harm strongly favors the moving party (as it does in this case), an injunction might be appropriate "even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required." *Constrs. Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978). In their objection, the Debtors rely on the 1998 opinion of the District of New Jersey in *Family Kingdom, Inc. v. EMIF New Jersey Ltd.*, 225 B.R. 65 (D.N.J. 1998), to argue that this Court should not follow the above-quoted guidance of the Third Circuit Court of Appeals set forth in *Constructors Ass'n of W. Pa. See* Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 28 (citations omitted). It is unclear how a decision from the District of New

Jersey would trump the Third Circuit Court of Appeals. Moreover, as recently as five months ago, the District of New Jersey stated that "if all other factors of the preliminary injunction test are present, the requirement of likelihood of success can be eased a bit." *Scholastic Funding Group, LLC v. Kimble*, No. 07-557, 2007 WL 1231795, at *4 (D.N.J. Apr. 24, 2007) (copy attached hereto as Exhibit 1) (citing, with approval, *Constrs. Ass'n of W. Pa. v. Kreps*, 573 F.2d 811(3d Cir. 1978)).[3]

Finally on this topic, the Court of Chancery of Delaware has also recently acknowledged that while all three elements for a preliminary injunction are required, "a particularly strong showing in one facet of the test will compensate for a relatively weak showing on another." *Abrons v. Maree*, 911 A.2d 805, 810 (Del. Ch. 2006); *see also Khouzmam v. Hogan*, 497 F. Supp. 2d 615, 627 (M.D. Pa. 2007) ("a stay may be ordered even where the likelihood of prevailing is not compelling if the other considerations weigh heavily in the moving party's favor.") (citing *Marxe v. Jackson*, 83 F.2d 1121, 1127–28 (3d Cir. 1987)).

For the reasons set forth in the opening brief as well as below, the Equity Committee submits that it has made the requisite showing to warrant a stay pending appeal regardless of whether the Court applies a sliding scale approach.

**B.      The Debtors Do Not Dispute That The Bankruptcy Court Has Already Held That Equity Holders Will Be Irreparably Harmed If A Stay Pending Appeal Is Not Granted**

The Equity Committee's opening brief established that this is the most important factor in addressing a stay motion and that there has already been a determination by the Bankruptcy Court that "… there is a serious risk of irreparable harm…" if a stay pending appeal

---

[3]      In their objection, the Debtors refer to the *1998* decision in the *Family Kingdom* case as having been issued, "[m]ost recently." See Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 28. It is assumed this was a typographical error.

is not granted. *See* July 24, 2007 Transcript (Bankr. D.I. 240) at 47:17–18 [App. at 387, Ex. K].

This determination by the Bankruptcy Court was based on the obvious fact that, in the absence of

a stay pending appeal, the Debtors intend to disperse the $81 million dollars in Segregated Funds

(defined in opening brief) that are the subject of this appeal.[4]  In their objection, the Debtors do

not dispute any of the foregoing or assert in any way that the Bankruptcy Court erred in issuing

the 90-Day Stay Order.

     Based on the foregoing, there can be no dispute that Equity Holders will suffer

irreparable harm if a stay pending appeal is not granted.

### C.    The Debtors Do Not Dispute That The Bankruptcy Court Has Already Held That The Issuance Of A Stay Will Not Substantially Injure Other Parties To The Proceeding

     The Equity Committee's opening brief established that the Bankruptcy Court has

already made a determination that *no* other party to this proceeding will be injured if a stay

pending appeal is granted.  First of all, the noteholders did not file any objection to the stay

motion in the Bankruptcy Court.  Moreover, even if they had filed such an objection, in

addressing the lack of any harm to noteholders, the Bankruptcy Court observed, "the $81 million

is earning interest isn't it?… [so the] pot [of money] is improving with every day." *See* July 24,

2007 Transcript (Bankr. D.I. 240) at 43:14–21 [App. at 383, Ex. K].  And, in addressing the lack

of any harm to the Debtors despite their arguments to the contrary, the Bankruptcy Court stated

that:

> If there is a possibility that this ruling could be reversed on appeal, and I
> don't claim to have any expertise in this area, I strongly suspect that the
> company would have to continue SEC compliance because there's a
> potential for equity interest involved, and I assume the equity interest is

---

[4]    *See Rubin v. Pringle (In re Focus Media Inc.)*, 387 F.3d 1077 (9th Cir. 2004); *In re Netia Holdings S.A.*, 278 B.R. 344, 357 (Bankr. S.D.N.Y. 2002).

> what requires the filing of the – of the periodic reports. So, it may well be that even without a stay, this company will not be able to wind up. Secondly, we have the Thaxton Life Partners suit [a lawsuit recently commenced against the Debtors] which, in my view, would have to be resolved in order for this company to terminate all employees and turn off the lights and terminate all kinds of D and O insurance.

July 24, 2007 Transcript (Bankr. D.I. 240) at 47:19–48:6 [App. at 387-388, Ex. K].[5]

In their objection to the present motion, the Debtors state, without citation, that the "Court made no such determination [that no other party to this proceeding will be injured if a stay pending appeal is granted]." Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 34. The Debtors, however, do not dispute the specific findings quoted above or in any way assert in their objection that the Bankruptcy Court erred in making these findings. The Debtors have submitted a short declaration from their Chief Financial Officer which attaches and updates his previous declaration. *See* Declaration of Richard A. Ross Relating to Appeal Bond (District Court) ("Ross Decl. (September 20, 2007)") (D.I. 7). Of most significance, Mr. Ross does not seek to modify his prior testimony or challenge the Bankruptcy Court's observation that, regardless of whether or not a stay is issued, the Debtors cannot wind up their affairs until the appeal of the Clarification Motion is concluded. *Id.*

Also, of significance, Mr. Ross indicates that, separate and apart from the appeal of the Clarification Motion and the requested stay pending appeal, Finova will not be able to wind up its affairs until the resolution of the "Thaxton Life Partners matter – a litigation by

---

[5]    This finding was actually supported by the submission of the Debtor's Chief Financial Officer who swore under oath that "I believe that the 2007 wind-up goal is realizable and, in any event, it is likely that the wind-up can occur early in 2008 *but for any proceedings* on the Clarification Motion. *See* Ross Decl. (July 11, 2007) at ¶ 6 (Bankr. D.I. 229) [App. at 307-308, Ex. I] (emphasis added).

noteholders of Thaxton Life Partners ("TLP") against the Debtors." *Id.* at ¶ 4. Mr. Ross goes on to state "[i]t is impossible to say how long the TLP matter will proceed." *Id.*

Mr. Ross concludes his new declaration with the statement that "I have been in conversations with noteholders [and they told me] that they had not intervened [in the Equity Committee's stay motions] because Finova was taking their side in the dispute." Ross Decl. (September 20, 2007) at ¶ 7. This admittedly hearsay statement (*see* Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 34, n.3) is meaningless and should be disregarded by the Court.

Based on the foregoing, it is beyond dispute that *no* party to this proceeding will be harmed if a stay pending appeal is granted.

### D.    The Merits of the Equity Committee's Appeal

With its opening brief, the Equity Committee submitted a complete copy of the Equity Committee's Response to the Reorganized Debtor's Reply to Objection of First Carolina Investors, Inc. to the Clarification Motion (the "Equity Committee's Response") (Bankr. D.I. 63) and summarized a number of the errors made by the Bankruptcy Court. The Equity Committee believes that its prior submission on the merits, combined with the indisputable harm to Equity Holders if a stay is not granted (and the lack of harm to *any* party if a stay is granted), should be a sufficient basis for this Court to enter a stay pending appeal. In any event, because of the emphasis placed by the Debtors on the ultimate merits of the case, the Equity Committee will take this opportunity to rebut a number of the arguments raised by the Debtors in objecting to the present stay motion.

At the outset of this discussion, it is important to note that, as set forth in the opening brief and not contested by the Debtors' objection, the Bankruptcy Court's decision on the Clarification Motion reflects a legal determination and, as such this Court's review is *de novo*. The Debtors have asserted that "appellate Courts give particular deference to a

Bankruptcy Judge construing a plan which he confirmed." *See* Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 27 (citations omitted). However, contrary to the Debtors' assertions, not all appellate courts give such deference to a bankruptcy court's interpretation of a plan of reorganization. *See, e.g., N.Y. City Employees' Ret. Sys. v. Sapir (In re Taylor)*, 243 F.3d 124, 128 (2d Cir. 2001) ("The Bankruptcy Court's interpretation of the text of the Plan, the Confirmation Order, and the Final Decree are conclusions of law reviewed *de novo*."). Moreover, the Debtors cite no authority from either the Court of Appeals for the Third Circuit or the District of Delaware that supports their position that a bankruptcy court's interpretation of a plan is reviewable under an "abuse of discretion" standard. Also, there is no dispute that a "confirmed plan of reorganization is a binding contract…[which] is subject to interpretation pursuant to relevant rules of contract interpretation and construction,"[6] or that New York law is to be applied to the interpretation and construction of the Plan and Indenture in this case. *See* (Bankr. D.I. 61) at ¶ 19[7] (Debtors agree that the "Indenture … is governed by New York law.").

For the reasons set forth in the Equity Committee's Response as well as the rebuttal set forth below, the Equity Committee submits that this Court should, upon the conclusion of its *de novo* review, reverse the appealed-from decision.

### 1. The Debtors Have Admitted That The Indenture At Issue Is Ambiguous

**clar·i·fy**: *verb* (1) to make (an idea, statement, etc.) clear or intelligible; to free from ***ambiguity***.[8]

---

[6] *Sergi v. Everett Sav. Bank (In re Sergi)*, 233 B.R. 586, 589 (B.A.P. 1st Cir. 1999) (citing *In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 362 (E.D. Pa. 1996)); *see also* 11 U.S.C. § 1141(a).

[7] Debtor's Reply to Objection of First Carolina Investors . . . . , ¶19, attached as Exhibit 1 to Debtor's Objection to Stay Motion (D.I. 6).

[8] *See* www.dictionary.com (last visited Sept. 27, 2007) (emphasis added).

On appeal before this Court is a decision of the Bankruptcy Court resulting from the "Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1411 **Clarifying** Provision of Confirmed Plan" (defined above as the "Clarification Motion") (emphasis added). By making such a motion "to clarify," the Debtors have admitted that there was an ambiguity that needed clarifying in the first place. Or, as in the words of Debtors' counsel: "[a]t most, the Clarification Motion seeks to resolve ***ambiguity*** in the Plan concerning the disposition of the Segregated Funds in the event of the Reorganized Debtor's continued insolvency." (Bankr. D.I. 39 at ¶ 11). Despite the foregoing, in objecting to the present motion, the Debtors have bravely asserted that "there is no ambiguity of any sort [in the Plan or Indenture at Issue]." *See* Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 26(c). Rather, the Debtors now assert they were talking about a "potential 'ambiguity'" as to what should be done with the Segregated Funds under the current circumstances. *Id.* Of course, since we have, by definition, reached the current circumstances, the ambiguity in the Indenture no longer seems to be of a "potential" nature.

Before the Bankruptcy Court, the interpretation offered by the Debtors was that, under the circumstances, the Segregated Funds they had retained on behalf of Equity Holders pursuant to the Indenture should be "return[ed] … to FNV Capital for use in its business to pay expenses, debts and other obligations." (Bankr. D.I. 22, proposed order) [App. at 90, Ex. B]. The more plausible (or at the least, equally plausible) interpretation offered by the Equity Committee was that, under the circumstances, the Segregated Funds should be distributed to the Equity Holders at once or when the Debtors ceased to function as an on-going business enterprise.

As summarized in the Equity Committee's opening brief on the stay motion and as discussed in detail in the Equity Committee's Response filed in the Bankruptcy Court, based on the applicable and well-established principles of New York contract law, any and all ambiguities in the Plan and Indenture should have been construed against the Debtors as the drafters of those documents. *See Reape v. New York News, Inc.*, 122 A.D.2d 29, 30, 504 N.Y.S.2d 469, 470 (2d Dep't 1986), *cert. denied*, 68 N.Y.2d 610, 501 N.E.2d 600, 508 N.Y.S.2d 1027 (1986); *William A. White/Tishman East, Inc. v. Banko*, 171 A.D.2d 401, 566 N.Y.S.2d 628 (1st Dep't 1991) (same).

The Debtors have never challenged that New York contract law controls, or that under New York contract law, any and all ambiguities in the Plan and Indenture must, as a matter of law, be construed against the Debtors as the drafters of same. Instead, to avoid the obvious and fatal implications to their position, the Debtors simply assert that "there is no ambiguity of any sort [in the Plan and Indenture at issue]" (*see* Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 26(c)) even though they have already acknowledged that there is an ***ambiguity*** that they asked a court to ***clarify*** based on the Debtors' current circumstances. The Bankruptcy Court's statement that it: "spent a lot of time with the relevant documents [and] ***I don't think they're ambiguous***…" (Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 16 (quoting November 29, 2005 Transcript at 47) [App. at 172, Ex. D]), demonstrates clear error on the part of the Bankruptcy Court.

The Debtors' prior admission as to the ambiguous nature of the Plan and Indenture, and the Bankruptcy Court's failure to take this into account, is itself a basis upon which this Court should reverse the appealed-from order of the Bankruptcy Court. Moreover, the Bankruptcy Court's failure to recognize the ambiguous nature of the documents at issue, lead

to further reversible errors in that: (i) the Bankruptcy Court interpreted an ambiguous provision to effect a forfeiture against the Equity Holders (*see Kreiss v. McCown De Leeuw & Co.*, 131 F. Supp. 2d 428, 436 (S.D.N.Y. 2001) ("New York courts will not interpret provisions that are ambiguous on their face to effect a forfeiture....")); and (ii) the Bankruptcy Court interpreted an ambiguous provision to create a condition precedent to the Equity Holders receipt of the Segregated Funds. *See Lomalio Assocs. Inc. v. LBK Mktg. Corp.*, No. 94 CIV. 3208 (KTD), 1999 WL 705208, at *7 (S.D.N.Y. Sept. 10, 1999) (copy attached hereto as Exhibit 2) (citing *I.R.V. Merch. Corp. v. Jay Ward Prods., Inc.*, 856 F. Supp. 168, 174 (S.D.N.Y. 1994) ("it is well settled under New York law that where a contract term is ambiguous, ***the creation of a condition precedent is disfavored.***") (emphasis added).  These additional misapplications and/or misapprehensions of the controlling law are each separate and distinct bases upon which this Court should reverse the appealed-from order of the Bankruptcy Court.

### 2. There Are *No* Terms In The Indenture That Support The Debtors' Proposed Use Of The Segregated Funds

In objecting to the present motion, the Debtors state that: "[t]o the Debtors (and the Bankruptcy Court) the issue begins and ends with ***the terms of the Indenture***." Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 24 (emphasis added).  This is a remarkable statement given that the Debtors cannot point to any actual provision or language in the Plan or Indenture that calls for the funds being set aside on behalf of Equity Holders to be returned to the Debtors or turned over to the noteholders.[9]  Even more remarkably, the Debtors then attempt to emphasize their

---

[9]     The Debtors have admitted as much by arguing that the return of the funds they are seeking "is ***implicit*** in the Plan." (Bankr. D.I. 61 at ¶ 9) (Appellee's Exhibit 1, p. 7) (emphasis added).  Of course, "courts should be extremely reluctant to interpret an agreement as ***impliedly*** stating something which the parties have neglected to specifically include." *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572, 412 N.Y.S.2d 827, 833 (1978)

position by pointing out "the proviso to section 4.06(v) which states that each payment of $.95 on the New Senior Notes '***shall require*** a distribution or retention… of 0.05 [to Equity Holders or on behalf of Equity Holders].'" *Id.* (quoting Indenture at Section 4.06(v)) (emphasis added). The only thing that is made clear by the quoted language is that a 5 cents on the dollar distribution to, or retention on behalf of, Equity Holders is ***required*** under the Indenture. However, the Bankruptcy Court (at the Debtors' urging) overlooked this ***requirement*** and ordered that the pile of nickels set aside for Equity Holders was to be turned over to the Debtors to be used for their general business purposes. The Bankruptcy Court clearly erred in so doing.

### 3.    The Disclosure Statement Issues

In the opening brief, the Equity Committee noted that the Bankruptcy Court misread and, erred in relying on, the non-binding language of the Disclosure Statement to interpret the relevant Plan provisions. *In re Bridgepoint Nurseries, Inc.*, 190 B.R. 215, 222 (Bankr. D.N.J. 1996) (holding that it is the confirmed plan, not the disclosure statement, which binds the debtor and creditors). In their objection, the Debtors argue that "the Bankruptcy Court did not 'rely' on the disclosure statement. Instead, the Bankruptcy Court meticulously reviewed the Indenture and the Plan and found the provisions unambiguous." Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 26 (f). It is unclear how the Debtors can say (or even know) that the Bankruptcy Court's review was "meticulous." The Bankruptcy Court issued no written opinion and its analysis of the issues set forth on the record encompasses approximately 5 pages of the hearing transcript (Bankr. D.I. 80) [App. at 177-182, Ex. D]. This Court can see for itself that,

---

(emphasis added). This is yet another controlling legal concept that the Bankruptcy Court failed to apply.

despite the Debtors' assertions to the contrary, the Bankruptcy Court did indeed rely on the disclosure statement in reaching its decision. *Id.*

In addition, if it was going to rely on the Disclosure Statement, the Bankruptcy Court should have noted that the distributions to Equity Holders that were the subject of the Clarification Motion were explicitly described under the following heading: "3. Potential Limitations on or Inability to ***Repay Debt*** or Make Contingent Interest Payments." (Bankr. (Case No. 697) (D.I. 553) (Disclosure Statement at p. 37) (attached hereto as Exhibit 3) (emphasis added). In other words, the Disclosure Statement expressly described the distribution obligations to Equity Holders as "***debt***" obligations.

### 4.    The Indenture Created Debt Obligations Running From The Debtors To The Equity Holders

As mentioned in the opening brief and expounded upon in the Equity Committee's Response filed in the Bankruptcy Court, a confirmed plan of reorganization constitutes a "new contract" among the affected parties by which all are legally bound. *See In re NVF Co.*, 309 B.R. 698, 701 (D. Del. 2004). And, "[t]he effect of confirmation is to discharge the entire preconfirmation debt, replacing it with a new indebtedness as provided in the confirmed plan." *In re Ernst*, 45 B.R. 700, 702 (Bankr. D. Minn. 1985). In their objection, the Debtors, relying on *Geftman v. Commissioner of Internal Revenue*, 154 F.3d 61 (3d Cir. 1998), argue that the "Indenture provisions [at issue] have none of the characteristics of debt." Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 25. The Debtors reliance on *Geftman* is misplaced since in that case, the court had to decide whether the transaction at issue was a loan or a gift. The Third Circuit found that the transaction at issue was a gift (rather than a loan) because $2.85 million in credit was extended "with no promise of repayment, no interest charges, no security, and no repayment schedule…" *Id.* at 75. Clearly, *Geftman* is not relevant to the instant appeal. In the

present case, the Plan and Indenture evidence the Debtors' express contractual obligation to make payments to Equity Holders and others.

### 5.    The Bankruptcy Court And The Debtors Misapprehend The Delaware Law Provisions On Which They Rely

In his opinion on the record, the Bankruptcy Court read the Disclosure Statement to mean: "You are shareholders. You may or may not get a distribution and if applicable law precludes a distribution or a dividend being made you get nothing." (Bankr. D.I. 80) [App. at 181, Ex. D]. The Bankruptcy Court then apparently went on to assume that there was an applicable law provision that it believed would preclude a distribution to Equity Holders. The Bankruptcy Court, however, did not even attempt to deal with the fact that the Delaware statute relied on by the Debtors, 8 DEL. CODE ANN. § 170, for the proposition that dividends may only be paid out of "surplus or net profits" has an express exception applicable to this case. The exception states: "Nothing in this subsection shall invalidate or otherwise effect a note, debenture or *other obligation* of the corporation paid by it as a dividend on shares of its stock, or *any payment made thereon*, if at the time of such note, debenture or *obligation* was delivered by the corporation, the corporation has either surplus or net profits ... from which the dividend could lawfully have been paid." DEL. CODE ANN. tit. 8, § 170 (emphasis added). In their objection to the present motion, the Debtors fail to set forth any legal or factual basis as to why this exception would not apply to the present case. *See* Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 26 (e).

\* \* \* \* \*

In conclusion, the Equity Committee submits that it has made a sufficiently strong showing that it is likely to succeed on the merits of its appeal.

**E.    The Public Interest Will Be Served By Granting The Requested Stay**

As stated in the Equity Committee's opening brief, based on the demonstration of irreparable harm to the Equity Holders if a stay is not granted, the lack of any harm to the Debtors if a stay is granted, and the fact that the noteholders have not filed any objection to the instant motion, it is submitted that the requested stay will serve the public interest.

**F.    A Bond Is Not Warranted In This Case**

Finally, the Debtors argue that in the event the Court grants a stay, the Equity Committee should be required to post a $25 million bond. In issuing the 90-Day Stay Order, the Bankruptcy Court rejected a similar request by the Debtors. *See* July 24, 2007 Transcript (Bankr. D.I. 240) at 49 [App. at 389, Ex. K] ("And I will not require the posting of a bond."). Moreover, the Bankruptcy Court also observed that: "it may well be that even without a stay, this company will not be able to wind up." *Id.* at 48. In their current objection, the Debtors have not even asserted that the Bankruptcy Court erred in making this finding. Thus, it has already been determined that there will be no financial harm to the Debtors – the purported basis for requiring a bond – if a stay pending appeal is granted.

In addition, Bankruptcy Rule 8005 provides, in pertinent part, that "the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal *on such terms as will protect the rights of all parties in interest*." Fed. R. Bankr. P. 8005 (emphasis added). Courts have held, therefore, that a stay pending appeal need not be conditioned upon the posting of a supersedeas bond and that a "court may exercise its discretion and waive the bond requirement under the particular circumstances of the case." 9E Am. Jur. 2d *Bankruptcy* § 3826 (2006); *see also In re Silverman v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA (In re Suprema Specialties, Inc.)*, 330 B.R. 93, 96 (S.D.N.Y. 2005); *In re Byrd*, 172 B.R. 970, 974 (Bankr. W.D.

Wash. 1994) (noting that a "court has the discretion to grant a stay pending appeal under Rule 8005...and it need not require the posting of a supersedeas bond.").

**CONCLUSION**

**WHEREFORE**, for the foregoing reasons, the Equity Committee respectfully requests that this Court enter an order: (i) staying the effect of the Bankruptcy Court's Clarification Order pending final resolution of any appeal of same; and (ii) granting such other and further relief as may be just and proper under the circumstances.

Dated:    September 27, 2007
          Wilmington, Delaware

**WILLIAM D. SULLIVAN, LLC**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
email: bill@williamdsullivanllc.com

-- and --

**ANDERSON KILL & OLICK, P.C.**
Mark D. Silverschotz, Esq.
James Andriola, Esq.
Han J. Ahn, Esq.
1251 Avenue of the Americas
New York, NY 10020-1182
Tel: (212) 278-1000
Fax: (212) 278-1733

# EXHIBIT 1

Westlaw

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 1231795 (D.N.J.)
**(Cite as: Slip Copy)**

**C**
Scholastic Funding Group, LLC v. Kimble
D.N.J.,2007.
Only the Westlaw citation is currently available.NOT FOR PUBLICATION
    United States District Court,D. New Jersey.
    SCHOLASTIC FUNDING GROUP, LLC, Plaintiff,
                    v.
    Herbert KIMBLE, et al., Defendants.
        **Civil Action No. 07-557 (JLL).**

            April 24, 2007.

Zachary D. Rosenbaum, Lowenstein Sandler PC, Roseland, NJ, for Plaintiff.
Jon W. Green, Claudia A. Reis, Green, Savits & Lenzo, LLC, Morristown, NJ, David R. Strickler, Norris, McLaughlin & Marcus, PC, Somerville, NJ, for Defendants.

LINARES, District Judge.
*1 This matter comes before the Court on Plaintiff Scholastic Funding Group, LLC's ("Plaintiff" or "Scholastic") motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 and Defendant Herbert Kimble's ("Defendant" or "Kimble") motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. The Court has considered the submissions of the parties and has heard oral argument. For the reasons set forth in this Opinion, Plaintiff's motion is denied in part and granted in part and Defendant's motion is denied.

            **A. Procedural History**

On January 25, 2007, Scholastic filed a Verified Complaint and application for an Order to Show Cause in the Superior Court of New Jersey, Chancery Division, Bergen County, alleging claims for breach of contract, breach of the covenant of good faith and fair dealing, misappropriation of confidential information, breach of the duty of loyalty, and various state law tort claims pursuant to New Jersey law. The Honorable Peter E. Doyne, P.J.S.C.

issued an Order to Show Cause with temporary restraints on January 29, 2007 (the "State Court TRO"). Defendants University Loan Services, LLC ("University") and Globex Marketing Services, LLC ("Globex") removed to this Court on February 2, 2007 with the consent of Kimble, invoking this Court's diversity jurisdiction.

On March 7, 2007 Kimble filed an Answer, Counterclaim, and Third Party Complaint as well as a motion for an Order to Show Cause with temporary restraints. Kimble sought to (1) enjoin Scholastic from enforcing Article 5 of the Employment Agreement, except that Kimble shall not solicit or induce any of Scholastic's employees to terminate their employment in order to become employed with University or for any other reason; and (2) declare that Kimble may become employed with University if these parties so choose to resume their employment relationship. The Court heard oral argument on March 9, 2007 and thereafter denied Kimble's request for temporary restraints. The Court also set a briefing schedule for Kimble's pending motion for preliminary injunction and also for any contemplated cross-motion by Plaintiff. Plaintiff filed its motion for a preliminary injunction on March 16, 2007. The Court heard argument on April 5, 2007 regarding both motions. The instant Opinion addresses both the Plaintiff's and Defendant's motions for preliminary injunctive relief.

            **B. Factual Background**

The parties have made extensive and detailed factual submissions to the Court. However, for the purposes of these motions, only the relevant factual background will be recounted.

Scholastic is a company involved in consolidation of student loans. In the course of its business, Scholastic purchases lists of potential customers-student loan holders-scrubs these lists of ineligible customers, and then calls the customers to inquire whether they are interested in consolidation. When Scholastic began its operations, it sub-contracted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1231795 (D.N.J.)
**(Cite as: Slip Copy)**

Page 2

with a call center in the Philippines and paid the call center on a per-customer/per-call basis.

**\*2** On April 4, 2006, Scholastic hired Kimble as its Vice President of Operations. With Kimble's assistance and input, Scholastic later determined that its prior business model might not be the most cost-efficient. Scholastic then completed a study of its revenue and costs and concluded that it should change the structure of its operations. Scholastic then changed its operations and began to utilize a wholly-owned, subsidiary call center in the Philippines rather than paying an outside center on a per-lead basis.

At the start of his employment with Scholastic, Kimble signed an employment agreement (the "Agreement") with Scholastic. Article 4 of the Agreement pertains to the Records, Trade Secrets & Inventions of Scholastic. Section 4.02(a) of the Agreement defines "Confidential Information" of Scholastic as the following:"various trade secrets, consisting of code, compilations of data and information, devices, documents, drawings, equipment, files, formulas, inventions, patterns, processes, programs, records, sources of data and information, specifications, and similar items relating to the business of Scholastic, all of which are owned by Scholastic and regularly used in the operation of Scholastic's business." (Kimble Cert. Ex. 5) (the "Confidentiality Provision"). Section 4.02(b) stipulates that all Confidential Information, whether or not a trade secret, is the exclusive property of Scholastic and 4.02(c) prohibits any employee from misusing, misappropriating, giving, selling, furnishing, or disclosing during or after employment any trade secret. (*Id.*). Section 4.02(c) also prohibits an employee from disclosing information about Scholastic's customers or vendors and from soliciting customers whom the employee called on during employment with Scholastic.(*Id.*). Finally, Section 4.02(e) directs an employee to return all Confidential Information to Scholastic upon termination of employment.

Article 5 sets forth a non-competition provision (the "Non-Compete Provision"). The Non-Compete

Provision prohibits Kimble from competing either directly or indirectly for one year following termination. (*Id.*). Article 5(b) defines "not compete" as requiring the employee "not to engage or participate in any business that is substantially similar to, or competitive with, the present business of Scholastic."(*Id.*).

Article 5, Section (d) also sets forth a non-solicitation provision (the "Non-Solicitation Provision") which prohibits Kimble from soliciting or inducing any of Scholastic's employees to terminate their employment or form an organization competing with Scholastic for a period of one year following termination of employment. (*Id.*).

On January 15, 2007 Kimble resigned from Scholastic. Kimble commenced employment with University on January 22, 2007. The parties do not dispute that University is a direct competitor of Scholastic. Pursuant to the terms of the Order to Show Cause issued by Judge Doyne, Kimble ceased working for University on January 29, 2007.

## A. Legal Standard for Preliminary Injunctive Relief

**\*3** A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted."*Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993). Nonetheless, a trial court's decision to issue a preliminary injunction is discretionary. *New England Braiding Co., v. A.W. Chesterton Co.,* 970 F.2d 878, 882 (Fed Cir.1992). The Third Circuit has held that "a district court has the authority to grant injunctive relief in an arbitrable dispute, provided that the traditional prerequisites for such relief are satisfied."*Ortho Pharm. Corp. v. Amgen, Inc.,* 882 F.2d 806, 812 (3d Cir.1989). The court identified those "traditional prerequisites" as follows: (1) whether the movant has demonstrated reasonable probability of eventual success in the litigation; (2) whether the movant has demonstrated that it will be irreparably injured if pendente lite relief is not granted to prevent a change in the status quo; (3) the possibility of harm to other interested persons from the grant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or denial of the injunction; and (4) the public interest. *Ortho Pharm.,* 882 F.2d at 812-13;*see also Wright Med. Tech., Inc. v. Somers* 37 F.Supp.2d 673 (D.N.J.1999). The court further noted that "the 'preservation of the status quo' represents the goal of preliminary injunctive relief in any litigation, including in an arbitrable dispute."*Id.* at 813.

Furthermore, in this Circuit, it is clear that preliminary injunctions may be granted to enforce noncompetition agreements. *See e.g., BP Chem. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254 (3d Cir.2000); *Arch Pers. Care Prod., L.P. v. Malmstrom,* 90 Fed.Appx. 17 (3d Cir.2003).

**B. Plaintiff's Motion for Preliminary Injunction**

Plaintiff's motion for a preliminary injunction asks this Court to:
1) Preliminarily enjoin Kimble from:
a) accepting or continuing employment with, consulting, advising, and/or providing services directly or indirectly to University or any affiliate, etc, to the extent that such services would involve, in any manner, the marketing, development, construction, or operation of a company in the business of consolidating and/or refinancing student loans;
b) soliciting or inducing employees of Plaintiff or any affiliate/subsidiary to terminate their employment.
2) Preliminarily enjoin and restrain all Defendants, and all persons acting in concert with them, from:
a) directly or indirectly obtaining, using, transmitting, divulging or communicating in any fashion or manner Plaintiff's Confidential Information, including any documents containing or evidencing Confidential Information;
b) directly or indirectly doing business with (which shall include servicing, selling, and/or soliciting) any, clients, affiliates, partners or prospects to become any of the foregoing whom Plaintiff serviced, worked with, sold to, and/or solicited during Kimble's employment with Plaintiff;
3) Compel all Defendants, their agents, servants, representatives, employees, successors, and all other persons acting on their behalf or in concert with them, to cease from using and return forthwith any

and all of Plaintiff's property, including, but not limited to Plaintiff's Confidential Information, in their possession, custody or control.

**\*4** During oral argument, when asked by the Court which claims of the Verified Complaint are those upon which Plaintiff seeks injunctive relief, counsel for Plaintiff responded that such relief truly turns on the Agreement. (Tr. 8:24-25) [FN1]. Accordingly, the Court will focus its analysis on Plaintiff's breach of contract claim.

> FN1. All citations to the Transcript are to the record of the oral argument held April 5, 2007.

**1. Likelihood of Success on the Merits**

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation."*Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir.1982). In evaluating whether a moving party has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits."*Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir.1975) (citations omitted). Further, if all other factors of the preliminary injunction test are present, the requirement of likelihood of success can be eased a bit. *Constructors Ass'n of W. Pa. v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978).

Here, the Court must examine the likelihood of Plaintiff's success in showing it has a reasonable probability of success against Defendants on its claim for breach of contract.

Under New Jersey law, the following four elements are necessary in a breach of contract claim:"(1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that plaintiff performed its own contractual duties." *Hutchinson v. Del. Sav. Bank FSB, et al.,* 410 F.Supp.2d 374, 385 n. 21 (D.N.J.2006). Plaintiff's breach of contract claim is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

best analyzed under the three provisions of the Agreement Defendant Kimble has allegedly breached.

### a) *Non-Compete Provision*

Here, there is clearly the existence of a contract signed by Kimble which contains a specific non-compete provision. Plaintiff argues that Kimble breached this provision when he began his employment with University. Kimble argues that the non-compete provision is invalid because it is unreasonable in scope and does not pertain to a protectible interest of Plaintiff's. Thus Kimble argues that Plaintiff is unable to demonstrate a likelihood of success on the merits of this claim.

It is settled law in New Jersey that restrictive covenants are valid in appropriate circumstances. *Solari Indus., Inc. v. Malady,* 55 N.J. 571, 576 (1970). A covenant by an employee not to compete with his employer after their employment relationship ceases will be found to be enforceable if it is reasonable in light of the totality of circumstances. *Id.* A covenant that "simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public" will generally be upheld. *Id.;Ingersoll-Rand Co. v. Ciavatta,* 110 N .J. 609, 628 (1988).

**\*5** Here, the Agreement in question seeks to protect Plaintiff's "various trade secrets, consisting of code, compilations of data and information, devices, documents, drawings, equipment, files, formulas, inventions, patterns, processes, programs, records, sources of data and information, specifications, and similar items relating to the business of [Scholastic], all of which are owned by [Scholastic] and regularly used in the operation of [Scholastic's] business."(Agreement 4.02(a)). Defendants argue that the Non-Compete Provision does not protect the legitimate interests of Plaintiff and is thus unreasonable.

It is well-settled that a non-compete agreement which seeks only to restrain competition is unreasonable. *Whitmyer Bros., Inc. v. Doyle,* 58 N.J. 25, 32-33 (1971). However, the New Jersey Supreme

Court recognizes that an "employer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships. *Id.* at 33.During oral argument, counsel for Kimble acknowledged that the process which Plaintiff claims it used to implement a change in its operations is confidential. (Tr. 82:2-6). It can thus be said that Plaintiff necessarily has a protectible interest in its revenue/cost analysis since it constitutes confidential business information. The Court need not analyze whether Plaintiff maintains other legitimate interests, since Plaintiff's interest in protecting this undisputedly confidential business information satisfies the test for reasonableness of the Non-Compete Provision.

The Court now turns to whether the Non-Compete Provision is reasonable as to its duration and scope. Here, the Non-Compete Provision prohibits Kimble from obtaining employment with and performing certain services for direct competitors of Plaintiff for twelve months and contains no geographic limitation. In determining reasonableness, New Jersey courts consider duration, geographic limits and the scope of activities prohibited. *The Cmty. Hosp. Group, Inc. v. More,* 183 N.J. 36, 58 (2005)."Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests."*Id.* at 58 (citing *Karlin v. Weinberg,* 77 N.J. 423 (1987). Here, it cannot be said that the one-year limitation is onerous or unreasonable. One year limitations have been upheld by New Jersey courts. *See e.g., Balsamides v. Protameen Chems, Inc.,* 160 N.J. 352 (1999). Further, the Court does not find the lack of geographic limitation on the Non-Compete Provision unreasonable. Since the telemarketing industry is broad-ranging in its scope by the nature of its business (placing nationwide telephone calls), the geographic scope of the covenant, or lack thereof, is likely a reasonable restriction.

Kimble also argues that the terms of the Non-Compete Provision impose an undue hardship upon him since he is allegedly unable to procure employment within the telemarketing industry. *Coskey's*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Television v. Foti,* 253 N.J.Super. 626, 633 (App.Div.1992). However, this case is distinguishable from the facts of *Coskey's Television.*Here, the Non-Compete Provision at issue does not render Kimble an "indentured servant" in effect. *Id.* at 636.Rather, Kimble is restricted only from seeking employment with a direct competitor of Plaintiff's involved in student loan-related telemarketing. Kimble himself certifies that of his over seventeen (17) years of experience within the telemarketing and call center industry, his first exposure to the student loan sector was in August, 2005. (Kimble Certification 3/7/07 ¶ 1). Thus, at the time of his resignation from his position with Scholastic, Kimble had only a year and a half of experience in this particular niche of the broader industry. *(Id.).* Accordingly, the Court dismisses Kimble's argument that the Non-Compete Provision imposes an undue hardship upon him.

**\*6** Next, the Court must determine whether Kimble breached the Non-Compete Provision. Plaintiff is likely to satisfy this element since Kimble undisputedly accepted and began employment with University, a close competitor of Plaintiff who is also engaged in the business of student loan consolidation telemarketing. Plaintiff also is likely to establish that it has

suffered damages stemming from Kimble's breach of the Non-Compete Provision, since Plaintiff is a new company, lost its highest-paid executive to a direct competitor and has suffered lower revenues since that point in time. For these reasons, the Court determines that Plaintiff has a likelihood of success on the merits of its claim that Kimble breached the Non-Compete Provision.

### b) *Non-Solicitation Provision*

Article 5, Section (d) sets forth a non-solicitation provision (the "Non-Solicitation Provision") which prohibits Kimble from soliciting or inducing any of Scholastic's employees to terminate their employment or form an organization competing with Scholastic for a period of one year following termination of employment. (Kimble Cert. Ex. 5).

Here, a valid contract clearly exists between Kimble and Plaintiff which contains a non-solicitation provision. Plaintiff argues that Kimble breached this provision when he solicited two Scholastic employees/affiliated employees to join the employ of University. Kimble denies soliciting these employees and argues that their departure from Plaintiff was mere coincidence. However, given the timing of their departure from Scholastic (so close in time to Kimble), and Kimble's counsel's representation on the record before this Court that Kimble and one of the departing employees, Ms. Olive Manlapaz, are close friends, this Court finds it likely that Plaintiff will succeed in demonstrating that Kimble breached the Non-Solicitation Provision. The Court also finds it likely that Plaintiff is likely to succeed in demonstrating the existence of damages stemming from the breach since Plaintiff has had to expend resources to replace the departed employees. Accordingly, the Court determines that Plaintiff is likely to succeed on the merits of its breach of contract claim with respect to the Non-Solicitation Provision.

### c) *Confidentiality Provision*

Here, a contract exists, signed by Kimble, which contains a specific confidentiality provision. Plaintiff argues that Kimble breached this provision of the Agreement when he obtained and passed along certain confidential information to University, including 1) information pertaining to "leads" purchased and potential customer lists; 2) information related to Plaintiff's relationships with certain lenders; 3) Plaintiff's call transfer protocols; 4) Plaintiff's call center and agent scripts; 5) employee training manuals and methods; 6) employee payroll and contact information; and 7) Plaintiff's unique captive call center model/process. Kimble argues that Plaintiff is unable to demonstrate a likelihood of success on the merits on this claim because none of the information cited to by Plaintiff is in fact confidential. At oral argument, the parties agreed that certain information was confidential-namely, any list of *existing* customers of Plaintiff and the financial methodology used by Plaintiff in its operations analysis which resulted in an over-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1231795 (D.N.J.)
**(Cite as: Slip Copy)**

Page 6

haul of its operations.

**\*7** Here, it is established in the record that before hiring Kimble, University utilized a captive call center in Florida, but did not employ one in the Philippines until after Kimble's start with the company. (Tr. 66:24-67:15). Further, Plaintiff has cited to an email sent by Kimble to Adam Shorr, a principal of University, which attached a copy of the financial study conducted by Plaintiff regarding its operations. Kimble admits sending this email and attachment, but contends it was with the knowledge of Plaintiff and was without any objection. (Kimble Cert. ¶¶ 72-73). Based upon the timing of this email, Kimble's acceptance of a position with University despite his current employment with Plaintiff, and University's subsequent switch to utilization of a call center in the Philippines, this Court determines that Plaintiff is likely to succeed in proving that Plaintiff has breached the Confidentiality Provision. The Court also finds that Plaintiff is likely to succeed on the merits that it has suffered damages as a result of this breach. As a new company with financial struggles, it is likely that having its direct competitor gain access to its confidential business information will likely result in lower revenues, thus causing damages. Accordingly, Plaintiff has demonstrated that it has a likelihood of success on the merits on its breach of contract claim with respect to the Confidentiality Provision.

**2. Irreparable Harm**

In order to satisfy the second requirement for a preliminary injunction, the movant must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial."*Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir.1989). In the context of noncompetition agreements, irreparable injury may be shown if the former employee may "avail himself of sensitive product strategies both as to development and marketing," which may be of extreme value to the competitor. *Bausch & Lomb Inc. v. Smith,* 630 F.Supp. 262, 265 (W.D.N.Y.1986).*See also Manhattan Associates, Inc. v. Ruderman,* 2005 WL 2290297 (D.N.J.2005). Furthermore,

"[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998).

Here, Plaintiff contends that it has satisfied the irreparable harm requirement because the disclosure of confidential and proprietary information can constitute the basis for damages irreparable by way of money damages. Plaintiff contends that it has "direct evidence that confidential information was taken, and, given Defendants' intimate knowledge of and possession of Plaintiff's trade secrets, confidential, proprietary, and sensitive business and technical information, it is only a matter of time before Defendants will inevitably utilize and disclose Plaintiff's confidential information."(Pl. Br. at 28). Notably, however, Plaintiff also concedes that "it appears [Defendants] have already done so."(*Id.*). That is, Plaintiff appears to concede that Defendants have already utilized and disclosed Plaintiff's allegedly confidential information. This appears to indicate that any harm, if realized, is already completed and cannot thus be considered immediate.

**\*8** Kimble argues that there is no risk of further harm in the absence of an injunction because Kimble is no longer employed by Scholastic and thus has no access to Scholastic's allegedly confidential information or employee contact information. (Kimble Br. Opp'n at 28). Kimble further argues that any harm sustained can be remedied by way of money damages. (*Id.*).

Defendant University and Globex argue that the Court must deny Plaintiff's motion for a preliminary injunction because Plaintiff is unable to demonstrate that it possesses protectible proprietary information and thus cannot establish irreparable harm. (University Br. Opp'n at 11). These Defendants argue that Plaintiff has made only conclusory statements regarding irreparable harm which are insufficient. (*Id.* at 30). To the extent that Plaintiff argues it has lost business opportunities or customers, Globex and University argue that such losses can clearly be remedied by an accounting and subsequent money damages.(*Id.*). These Defendants ar-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 7
Slip Copy, 2007 WL 1231795 (D.N.J.)
**(Cite as: Slip Copy)**

gue that Kimble has no specific technical knowledge or other confidential information stored in his brain, nor has Plaintiff established that imminent disclosure would be harmful.

The Third Circuit has held that

**more than a *risk* of irreparable harm** must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury', or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights'-'[i]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued to restrain one from doing what he is not attempting and does not intend to do.

*Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 359 (3d Cir.1980) (citations omitted) (emphasis added). The moving party must demonstrate an "**imminent threat of disclosure**." *E.R. Squibb & Sons, Inc. v. Hollister, Inc.,* 1991 WL 15296 (D.N .J.1991) (emphasis added)."[I]n the context of of determining whether a threat of disclosure exists, it is but a finding as to the probable future consequences of a course of voluntary action undertaken by the defendants. Courts are frequently called upon to draw such conclusions based on a weighing of the probabilities, and while a conclusion that a certain result will probably follow may not ultimately be vindicated, courts are nonetheless entitled to decide or 'predict' the likely consequences arising from a given set of facts and to grant legal remedies on that basis."*Nat'l Starch and Chem. Corp. v. Parker Chem. Corp.,* 219 N.J.Super. 158, 163 (App.Div.1987).

To demonstrate irreparable harm, the moving party must show more than a mere risk that information will be disclosed-the party must instead demonstrate a clear threat of misappropriation or imminent threat of disclosure. *E.R. Squibb & Sons,* 1991 WL 15296, *10;*PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995).

**\*9** Here, the Court will analyze whether Plaintiff

has met the requirement of irreparable harm for each type of injunctive relief requested.

### a) *Enjoining Kimble from Violating the Non-Compete Provision*

Plaintiff argues that if Kimble is not restrained from competing with Plaintiff, it will suffer loss of goodwill and loss of control over its reputation with respect to its customers and competitors. This Circuit recognizes that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998). Should Kimble start communicating with vendors and other business entities on behalf of University, when just months ago he was likely contacting these same entities on behalf of Plaintiff, there is a risk that this will affect these parties' perception of Plaintiff's industry reputation. Accordingly, the Court finds that if it does not grant the relief requested by Plaintiff in enjoining Kimble from violating the Non-Compete Provision, Plaintiff will suffer an immediate, irreparable harm.

### b) *Enjoining Kimble from Violating the Non-Solicitation Provision*

Plaintiff seeks to restrain Kimble from soliciting or inducing employees of Plaintiff or any affiliate/ subsidiary to terminate their employment. Plaintiff argues that if Kimble is not restrained from violating the Non-Solicitation Provision Plaintiff will lose key employees to an industry competitor, creating the risk of immediate, irreparable harm. However, Kimble maintains that he has not, and is not, soliciting employees of Plaintiff.

For reasons similar to those just discussed, the Court determines that if Kimble if not restrained from violating the Non-Solicitation Provision, Plaintiff's reputation and goodwill will be damaged since its competitors and clients will likely view any "defection" of employees to a competitor in a negative light. Further, since Plaintiff is a relatively young company, any harm to its reputation will be amplified. Accordingly, the Court finds that if Kimble is not enjoined from violating the Non-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Solicitation Provision, Plaintiff faces a risk of immediate, irreparable harm to its goodwill and reputation.

### c) *Enjoining/Restraining Defendants from Obtaining, Using and/or Divulging Plaintiff's Confidential Information*

Plaintiff seeks to restrain/enjoin Defendants from directly or indirectly obtaining, using, transmitting, divulging or communicating in any fashion or manner Plaintiff's confidential information, including any documents containing or evidencing confidential information. Kimble argues that to the extent this relief seeks to restrain him from obtaining, transmitting, or communicating any alleged confidential information, such relief is moot since he no longer has access to same. Defendants University and Globex argue that there is no risk of immediate, irreparable harm because they do not have any such information in their possession so there is no risk of them using, transmitting, divulging, or communicating same.

**\*10** During argument, the Court questioned Plaintiff's counsel at length regarding the element of immediate irreparable harm with respect to the Confidentiality Provision. The Court asked Plaintiff's counsel how a risk of immediate harm could exist if Kimble had, as alleged, already disclosed the methodology and the lists of existing customers to University. (Tr. 13:7-15:2). However, counsel focused only on the irreparable portion of the analysis, and did not fully address the Court's line of questioning. (Tr. 15:3-20). With respect to confidential information, the moving party must demonstrate an "imminent threat of disclosure," *E.R. Squibb & Sons,* 1991 WL 15296 at \*10, yet even the Plaintiff's Verified Complaint alleges that Kimble has already disclosed the information at issue, rendering any "threat" of disclosure moot. While the Court has reviewed the cases cited by Plaintiff during argument in detail, the Court finds that these cases only lend support to its argument of irreparability, not immediacy. Accordingly, since there exists no imminent threat of disclosure as to Plaintiff's alleged confidential and protectible in-

formation since same has been disclosed, the Court finds that Plaintiff fails to make such the requisite showing of immediacy.

This Circuit has placed particular weight on the probability of irreparable harm and the likelihood of success on the merits elements of the standard for preliminary injunction, stating:"[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 197 (3d Cir.1990) (quoting *In re Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1143 (3d Cir.1982)); *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989); *Morton v. Beyer,* 822 F.2d 364, 367 (3d Cir.1987); *Freixenet, S .A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 151 (3d Cir.1984). Thus, Plaintiff's motion for a preliminary injunction is denied to the extent that it seeks injunctive relief seeking to enforce the Confidentiality Provision.

### d) *Enjoining/Restraining Defendants From Doing Business With Any Existing or Potential Clients of Plaintiff.*

Plaintiff seeks to enjoin/restrain Defendants from directly or indirectly doing business with (which shall include servicing, selling, and/or soliciting) any, clients, affiliates, partners or prospects to become any of the foregoing whom Plaintiff serviced, worked with, sold to, and/or solicited during Kimble's employment with Plaintiff. As discussed above, the Court finds that Plaintiff has failed to demonstrate a lack of immediate, irreparable harm with respect to disclosure of its client lists since same have already been disclosed. Thus, to the extent that the relief listed above references clients of Plaintiff, the Court declines to impose such relief. To the extent that the relief references affiliates, partners or prospects of Plaintiff, such relief is denied for failure to demonstrate that any harm suffered by Plaintiff from such solicitation is both an immediate threat and irreparable by way of money damages. Plaintiff concedes that its prospective clients are drawn from a common database to which all similarly situated companies have ac-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cess. Thus, Plaintiff is unable to establish that it will suffer immediate, irreparable harm without this relief being imposed since all companies, not only Kimble and University, have access to these customers' information.

**\*11** With respect to the "affiliates" and "partners" of Plaintiff, the Court finds that Plaintiff has failed to establish that it will be irreparably harmed without injunctive relief. In fact, Plaintiff has not clarified who these entities *are,* let alone how it will be irreparably harmed if the relief requested is not imposed. A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted."*Intel Corp.,* 995 F.2d at 1568. Thus, without these parties being defined, let alone specifically briefed by Plaintiff, the Court is unwilling to impose injunctive relief restraining Defendants from doing business with same. Accordingly, Plaintiff's motion for a preliminary injunction is denied to the extent that it seeks injunctive relief restraining/enjoining Defendants from directly or indirectly doing business with (which shall include servicing, selling, and/or soliciting) any, clients, affiliates, partners or prospects to become any of the foregoing whom Plaintiff serviced, worked with, sold to, and/or solicited during Kimble's employment with Plaintiff since Plaintiff has failed to establish one of the requisite elements for an injunction.

e) *Compelling Defendants to Cease from Using, and to Return, All of Plaintiff's Property in Their Possession, Including any Confidential Informa- tion.*

The State Court TRO ordered Kimble, University and Globex "to cease from using and return forthwith any and all of Plaintiff's property, including, but not limited to Plaintiff's Confidential Information, in their [possession], custody or control."Consequently, the Court asked the parties during argument whether they had complied with this portion of the State Court TRO. All Defendants represented to the Court that everything had been turned over to counsel and that they no longer retained any information alleged as Confidential In-

formation or other property belonging to Plaintiff. (Tr. 6:10-25-7:1). Further, in its submissions to the Court in conjunction with its motion, Plaintiff does not specifically identify any document or information it claims has been withheld by Defendants in violation of the State Court TRO. Accordingly, the Court deems Plaintiff's motion for a preliminary injunction moot to the extent that it requests Defendants to cease from using and return any of Plaintiff's information in their possession.

### 3. Balancing of Harms & the Public Interest

The Court must next analyze the remaining prerequisites for imposition of preliminary injunctive relief: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest.*Ortho Pharm.,* 882 F.2d at 812-13;*see also Wright Med. Tech., Inc. v. Somers* 37 F.Supp.2d 673 (D.N.J.1999).

With respect to the balancing of harms, the Court determines that this factor weighs in favor of Plaintiff. It is undisputed that Kimble left Plaintiff's employ on his own accord. Although Kimble now attempts to justify this decision with allegations pertaining to misconduct of Plaintiff in the Philippines and with respect to certain other of its business practices, these concerns are generally unsubstantiated and are disputed by Plaintiff. Further, as the Court noted during oral argument, such alleged misconduct by Plaintiff and alleged harm to Kimble would exist even in the absence of the pending motions and civil action herein. (Tr. 32:19-34:8). Thus, the Court determines that these allegations are irrelevant to its analysis. Plaintiff, University and Globex are all companies attempting to establish a foothold in the student loan servicing telemarketing industry. If the Court were to allow Kimble to resume employment with University, this would undoubtedly cause hardship for Plaintiff which outweighs any harm to Kimble. Notably, Kimble is not barred from working in the entire telemarketing industry, only from performing similar services for a direct competitor of Plaintiff's.

**\*12** Further, the Court notes that if, as Kimble says

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1231795 (D.N.J.)
**(Cite as: Slip Copy)**

Page 10

is true, he is not soliciting current employees of Plaintiff to join University, then this Court's enforcement of the Non-Solicitation Provision via the present injunction will cause no hardship to Kimble. However, if this Court were to decline to enforce this provision of the Agreement, Plaintiff could suffer hardship as the result of losing key employees to a close competitor. Kimble clearly agreed to be bound by this Agreement and represents to the Court that he has not, is not, and will not, solicit Plaintiff's employees. As such, the balance of harms weighs in Plaintiff's favor.

Although this matter is a private dispute between private parties, the Court nevertheless finds that issuance of an injunction is in the public interest. *See Score Board Inc. v. Upper Deck Co.,* 959 F.Supp. 234, 240 (D.N.J.1997). While the public has an interest in free competition, its interest is also furthered by protection of private contractual rights. "Judicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships."*Wright Med. Tech., Inc. v. Somers,* 37 F.Supp.2d at 684 (citing *AmeriGas Propane, Inc. v. Crook,* 844 F.Supp. 379, 390 (M.D.Tenn.1993). The Court determines that the public interest is best served by enforcement of the Agreement via preliminary injunctive relief.

Accordingly, the Court finds that Plaintiff has satisfied the final two elements of the standard for issuance of a preliminary injunction with respect to the relief not already denied *supra.*The specific relief will be set forth in an Order accompanying this Opinion.

### C. Defendant's Motion for Preliminary Injunction

Kimble requests the Court to impose the following preliminary injunctive relief:
1) enjoin Scholastic from enforcing Article 5 of the Agreement, except that Kimble shall not solicit or induce any of Scholastic's employees to terminate their employment in order to become employed with University or for any other reason; and

2) declare that Kimble may become employed with University if these parties so choose to resume their employment relationship.

This Court denied Kimble's prior request for these restraints to be imposed on a temporary basis based upon its determination that Kimble had failed to demonstrate the risk of immediate, irreparable harm as required by the Third Circuit. The Court found that since the risk posed to Kimble was his alleged inability to gain employment, such harm was purely monetary in nature, and thus fully reparable by way of later money damages. The Court finds that nothing in the briefing submitted by Kimble in conjunction with the motion discussed herein nor argued by his counsel during oral argument has altered this finding. Even in the face of the current injunction now imposed by the Court, Kimble remains free to seek and gain employment in the broader telemarketing industry so long as he does not seek employment with a competitor of Plaintiff as defined in the Non-Compete Provision. Kimble's arguments that he is unable to gain employment in the broader telemarketing industry because Plaintiff's actions have damaged his professional reputation is unsupported. Kimble has not come forward with evidence that he has sought or been rejected by other employers, let alone that any rejection was caused by the actions of Plaintiff. Accordingly, Kimble's motion for a preliminary injunction is hereby denied.

**\*13** For the reasons set forth in this Opinion, Plaintiff's motion for a preliminary injunction is granted in part and denied in part. Defendant Kimble's motion for a preliminary injunction is denied. An appropriate Order accompanies this Opinion.

D.N.J.,2007.
Scholastic Funding Group, LLC v. Kimble
Slip Copy, 2007 WL 1231795 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Date of Printing: SEP 27,2007

**KEYCITE**

**C**Scholastic Funding Group, LLC v. Kimble, 2007 WL 1231795 (D.N.J., Apr 24, 2007) (NO. CIV A 07-557 JLL)

### Citing References

### Secondary Sources (U.S.A.)

1 Investigating Employee Conduct s 14:12, s 14:12. Good faith and fair dealing (2007)

### Court Documents

### Trial Court Documents (U.S.A.)

**Trial Motions, Memoranda and Affidavits**

2 ESQUIRE DEPOSITION SERVICES, LLC, a Delaware limited liability company, Plaintiff, v. KLEIN, BURY, REIF, APPLEBAUM & ASSOCIATES, INC., a Florida corporation, d/b/a U.S. Legal Support; U.S. Legal Support, Inc., a Texas corporation; David Doroshow; and Lana J. Shrode, Defendants., 2007 WL 1986643, *1986643+ (Trial Motion, Memorandum and Affidavit) (S.D.Fla. May 21, 2007) **Plaintiff Esquire Deposition Services, LLC's ...** (NO. 06-CV-80847-HURLEY/H) ✦✦✦

© Copyright 2007 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

H
Lomaglio Associates Inc. v. LBK Marketing Corp.
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
LOMAGLIO ASSOCIATES INCORPORATED,
Plaintiff,
v.
LBK MARKETING CORP., Defendant.
**No. 94 CIV. 3208(KTD).**

Sept. 10, 1999.

Perry Ashley, Esq., Seaman and Ashley, New York,
for Plaintiff.
Marc Cohn, Esq., Robert J. Dubyak, Esq., Mc-
Carthy, Lebit, Crystal & Haiman Co., L.P.A., Clev-
eland, OH, for Defendant.

OPINION
DUFFY, D.J.
*1 Plaintiff Lomaglio Associates Incorporated
("Lomaglio, Inc.") brought this diversity action for
breach of contract against defendant LBK Market-
ing Corporation ("LBK").

The dispute centers around a written agreement
between the parties whereby the parties agreed that
Lomaglio would serve as LBK's exclusive sales
representative to Avon Products Incorporated
("Avon"). Lomaglio, Inc. claims that it is owed
$128,132.00 in commissions under the agreement
for an order Avon placed with LBK and that LBK
agreed to but subsequently failed to fill.

The parties stipulated to an agreed set of facts in
the Joint Pre-Trial Order ("JPTO"). I heard testi-
mony and received evidence at the two-day bench
trial of this matter on May 4 and 5, 1999. The fol-
lowing constitutes my findings of fact and conclu-
sions of law.

*Findings of Fact*

Plaintiff Lomaglio, Inc. is a corporation organized
under the laws of New Jersey engaged in the busi-

ness of marketing services and contract manufac-
turing. (JPTO at 3; Pl.Ex. 1.) Defendant LBK is a
corporation organized under the laws of Ohio with
offices in Jacksonville, Florida, engaged in the pro-
duction of ceramic products. (JPTO at 3; Pl.Ex. 3.)

A. The Sales Representation Agreement

In September or October 1992, executives from
LBK attended a "Bed and Bath Show" at the Jacob
Javitz Center in New York City. (Trial Tr. at 5-6;
Gleason Dep. at 11-12.) Al Lomaglio, president of
Lomaglio, Inc., also attended the Show and met
with the LBK executives. (Trial Tr. at 5-6; Gleason
Dep. at 12-13.)

At the Show and on other occasions, Lomaglio and
LBK executives discussed Lomaglio, Inc. serving
as LBK's sales representative to various consumers
of porcelain products. (Gleason Dep. at 11-14.) Lo-
maglio, Inc. had established business relationships
with several such consumers, including the Avon
Corporation-the cosmetics giant based in New York
City. (Trial Tr. at 58-59.)

These discussions led to a one page written agree-
ment entitled "Sales Representation Agreement"
and dated October 12, 1992 (the "Agreement"). The
Agreement was signed by Al Lomaglio and David
Gleason, LBK's Vice-President of National Ac-
counts.

The Agreement provides, in pertinent part:
It is agreed that [Lomaglio, Inc.] will act as [LBK's]
exclusive sales representative to Avon Products.
LBK agrees to refrain from calling on Avon
Products directly or through middlemen.
[Lomaglio, Inc.] agrees to refrain from presenting
any competing suppliers to Avon.
Commissions will be determined prior to quoting
and will be included in the cost quoted to the cus-
tomer. Commissions will be paid upon payment for
merchandise by the customer. Deductions will be
made for returns or credits.

(Agreement, Pl.Ex. 1.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

### B. Negotiations With Avon

Shortly after the Agreement was signed, Lomaglio arranged a meeting between representatives of LBK and Avon at Avon's headquarters in New York City. The meeting took place in late October 1992, as Lomaglio accompanied Gleason to Avon's offices, where the pair met with Mary McHugh, a manager for purchasing and materials at Avon. (JPTO at 3; Trial Tr. at 9-10; Gleason Dep. at 17 .) Gleason brought samples of ceramic products to the meeting for McHugh's inspection. (Trial Tr. at 10.)

**\*2** Either at the meeting or in telephone conversations shortly after the meeting, McHugh, Gleason and Lomaglio discussed LBK's producing a particular figurine for Avon-the "Mrs. Albee figurine". (Trial Tr. at 10.) Thousands of the nine-and-three-quarter inch porcelain likenesses of the first "Avon Lady" are presented by Avon to its representatives each year. (Trial Tr. at 57-58.) Gleason and Lomaglio hoped to obtain an order for the 1994 Mrs. Albee figurine.

On November 3, 1992, McHugh and others from Avon joined Gleason and Lomaglio on a trip to Piedras Negras, Mexico to visit the factory where LBK's porcelain products were manufactured-the "Cermex" factory. (Trial Tr. at 60.)

Over the next several months, discussions continued concerning the Mrs. Albee figurine. On May 26, 1993, Lomaglio sent a letter to McHugh stating in relevant part:
This will serve as our quotation for the Mrs. Albee statue, a sample of which was left with you recently.
The cost price of $21.97 per unit includes all packaging identical to the packaging components provided by you. This price assumes a total usage of 80,000 pieces and is quoted FOB Eagle Pass, Texas on a letter of credit basis. As you know the item is manufactured in Pedras Negras, Mexico.

(Pl.Ex. 7.) Lomaglio also sent a copy of this letter to Gleason along with a cover letter. The cover letter, also dated May 26, states that the letter to McHugh "reflects the details you and I worked out

on Tuesday and today" and that Lomaglio, Inc.'s commission on the order would be $1.555 per unit. (Pl.Ex. 6.)

### C. Avon Awards the Mrs. Albee Order to LBK

On or about June 7, 1993, McHugh called Lomaglio and stated that Avon had awarded LBK the order to produce the Mrs. Albee figurines. (Trial Tr. at 65.) Lomaglio immediately informed representatives of LBK about the Mrs. Albee order. (Trial Tr. at 17.)

On June 8, 1993, the following letter on LBK letterhead was sent to McHugh:
Al Lomaglio informed us on Monday afternoon that you have awarded LBK the order to produce the "Mrs. Albee" figurine for 1994.
David Bailys and I are most appreciative of this opportunity for our Cermex factory, but also very much aware of the responsibility that goes along with a project of this magnitude ...
Again, Mary, thank you for this nice order and we look forward to a positive working relationship with you and Avon.

(Pl.Ex. 8.) The letter was signed by Gleason and David Bailys, President of LBK.

Over the remainder of the summer of 1993, Lomaglio, Gleason, McHugh and others at Avon exchanged correspondence concerning the manufacture of the Mrs. Albee figurines. A timetable for delivery was established, with the shipments to begin in December 1993 and continue through January 1995 at the rate of several thousand units per month. (Pl.Ex. 12, 14.) In addition, Avon increased the amount of figurines in the order to 82,400 units-and LBK accepted this increase. (Pl.Ex. 14.)

**\*3** Samples of the figurine were also exchanged throughout the summer, as Avon made comments and alterations to the design, and those changes were conveyed by Gleason to the Cermex factory. (Pl.Exs.13-15.) In a letter dated August 10, 1993 on "Cermex Limited Corporation" letterhead [FN1], Gleason wrote to Mary McHugh that "the majority of the design corrections" for the figurine had been

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

completed. (Def.Ex. 3.)

> FN1. The address and phone number of Cermex on this letterhead is precisely the same as the address and phone number of LBK on its letterhead.

In the same letter, Gleason also stated that:
As I stated last month after we were awarded this important Avon order, Cermex would be comfortable with a stand by [letter of credit] ...

(Def.Ex. 3.) Thus, Gleason requested that a stand by letter of credit be opened on October 1, 1993 in favor of Cermex in the amount of $325,000. Gleason also stated that "Payment is due Cermex Limited Corporation 10 days upon receipt of invoice."[FN2](Def.Ex. 3.)

> FN2. Apparently, Avon's "standard" practice was to make payment thirty days after invoice. (Trial Tr. at 36, 79.)

> D. The Alleged Superseding Agreement

On or about August 16, 1999, Lomaglio received a letter-again on Cermex letterhead-which read in its entirety:
Dear Lomaglio & Associates:
I am writing to confirm that Cermex Ltd. Corp. will be producing Avon's Mrs. Albee Award for 1994.
The price to Avon will be $21.97 per unit, F.O.B., Eagle Pass, Texas, payable net 10 days. In consideration for Lomaglio & Associates services, Cermex Ltd Corp. will pay a commission to Lomaglio & Associates of $1.555 per unit shipped. Commissions will be paid on the 15th of the month following shipment.
Please acknowledge you are in agreement with the above information by signing below.
Sincerely,
Cermex Ltd. Corp.
Hideo Asai
President

(Def.Ex. 4A.) The sole signature on the letter was that of Al Lomaglio-who signed the letter in accordance with the instruction .[FN3](Trial Tr. at

39-40.)

> FN3. Lomaglio testified that Gleason discussed the letter with him, they exchanged drafts, and Lomaglio eventually faxed it back to Gleason. Later, during his closing, counsel for LBK indicated that Gleason sent the letter to Lomaglio. (Trial Tr. at 114.) However, in his deposition, Gleason claimed that he had no involvement in the preparation and exchange of the letter. (Gleason Dep. at 38-39.)

Through September 1, progress continued on the Mrs. Albee order. Additional representatives from Avon visited the Cermex factory and, by all indications, the Mrs. Albee order was going forward. (Pl.Ex. 17.)

In fact, in a memorandum from Gleason to Avon dated September 16, 1993, Gleason included photographs of the Cermex factory that, he claimed, showed "our personnel putting the final quality touches on Avon's Mrs. Albee figurine 1994."(Def.Ex. 24.) Apparently, this memorandum was never sent.

On or about September 12, 1993, Gleason visited Lomaglio at his offices in New Jersey and informed him that the Mrs. Albee figurines would not be produced for "financial reasons". (JPTO at 4; Trial Tr. at 25-26.) Both Lomaglio and McHugh tried to persuade Gleason and others at LBK to reconsider, but to no avail. (Trial Tr. 25-26, 70-72.)

Needless to say, LBK never advanced Lomaglio, Inc. commissions pursuant to the Agreement. (Trial Tr. 28-29.)

> E. Testimony Concerning the LBK/Cermex Relationship

One issue which remains unclear-even after a review of the testimony and exhibits in this case-is the relationship between LBK and Cermex.

The sole witness called by LBK at trial, William Rein, claimed to be the chairman of the board of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

directors and major shareholder of Cermex Ltd. Corp. (Trial Tr. at 93.) Rein testified that Cermex was an entirely separate company from LBK, and that there was no connection between the two companies other than the fact that "a couple of the executives at LBK were shareholders of Cermex."(Trial Tr. at 93-94.)

**\*4** However, Rein later admitted when questioned by the court that these "common" shareholders also worked for Cermex. (Trial Tr. at 106.) Rein also admitted-as evidenced by the letterhead-that LBK and Cermex conducted business activities out of the same offices in Jacksonville. (Trial Tr. at 106.)

Similarly, the fact that Gleason continually referred to the Mexican facility as "our Cermex" factory in correspondence seeking the Mrs. Albee order-all on LBK letterhead-further undercuts Rein's claims. (Pl.Exs.2, 3, 4, 8.)

Gleason's deposition testimony also contains similar waffling and inconsistencies with regard to the relationship between Cermex and LBK. (Gleason Dep. 36-37.) Moreover, Al Lomaglio testified that Gleason told him that LBK owned Cermex. (Trial Tr. at 12-13.)

Perhaps most damning is Defendants Exhibit 24B-a draft of Defendant's Exhibit 24, the memorandum dated September 16, 1993. In Exhibit 24B, Cermex is described as a "separate operating division of LBK Marketing Corporation."[FN4]

> FN4. Defendant's Exhibit 24 describes Cermex as a "sister corporation" to LBK.

The nature of the relationship between Cermex and LBK is, essentially, irrelevant to my decision in this case.[FN5]However, Gleason and Rein's transparent attempts-for whatever reason-to color-over the relationship between LBK and Cermex have cast the credibility of all their testimony in doubt.

> FN5. The nature and existence of a Cermex corporate entity is also irrelevant to my decision. Accordingly, LBK's post-trial motion to supplement the record with evid-

ence of Cermex's incorporation and dissolution in the state of Delaware is denied as moot.

### F. The Reasons for the Failure to Produce the Figurines

Rein also claimed that the reason the Mrs. Albee figurines were not produced is because-as of early September 1993-Avon never issued a written purchase order or opened a letter of credit. (Trial Tr. at 99.) Rein's claim is, however, against the weight of the evidence. That fact, plus the questions regarding Rein's credibility raised above, lead me to the conclusion that Rein's claims as to the reasons for the failure to produce the figurines cannot be believed.

The evidence that contradicts Rein's claims includes Gleason's testimony in his deposition and his handwritten notes introduced at trial. In his testimony and his notes, Gleason listed several reasons why the figurines would not be produced. Gleason explained that the reasons were provided by LBK and Cermex officials-and most strikingly, Avon's failure to provide a written purchase order and letter of credit were not among those reasons. (Gleason Dep. 57-73; Pl.Ex. 21.)

Moreover, in the reams of correspondence exchanged between LBK, Cermex, Avon and Lomaglio, Inc.-all addressing a host of concerns-there is no mention of the lack of a written purchase order or the fact that the letter of credit had not been opened as of early September. Nor is there even the hint that these two factors could in any way affect production of the figurines.

In addition, Lomaglio and McHugh testified that no one from LBK verbally requested a written purchase order or indicated that the lack of a written purchase order would affect production of the figurines. (Trial Tr. at 25, 72.) Lomaglio and McHugh also testified that no one from LBK or Cermex ever raised concerns about the timing of the letter of credit that would preclude production of the figurines. (Trial Tr. at 25-26, 71-72.) Moreover, both Lomaglio and McHugh testified that, in speaking to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

representatives of LBK and Cermex after learning that the figurines would not be produced, they were not told that the absence of a written purchase order or concerns about the letter of credit were factors in the decision not to produce the figurines. (Trial Tr. 25-26, 71-72.)

**\*5** Similarly, Lomaglio testified that he met with Rein shortly after he was informed that the figurines would not be produced. Lomaglio testified that he asked Rein why the figurines were not produced, and Rein informed him that financial problems were the cause. Lomaglio also stated that Rein never mentioned the letter of credit or the purchase order as possible causes. (Trial Tr. at 52.)

In sum, I find Rein's claim that the failure to produce the Mrs. Albee figurine was somehow caused by Avon's failure to produce a written purchase order or open a line of credit in early September to be entirely unworthy of belief.

*Conclusions of Law* [FN6]

> FN6. Both parties agree that New York law governs in this case.

At trial, Lomaglio, Inc. advanced only one legal theory-that LBK breached the Agreement by refusing to pay Lomaglio, Inc. commissions with regard to the Mrs. Albee order.[FN7]Lomaglio, Inc. contends that this alleged breach gives rise to an actionable breach of contract claim against LBK for the commissions.

> FN7. This breach of contract claim is Lomaglio, Inc.'s first cause of action in the amended complaint. Lomaglio, Inc. has withdrawn its second cause of action for harm to its business reputation, and the third cause of action for misrepresentation was dismissed. (JPTO at 2.)

Under New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."*First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d

Cir.1998) (internal quotation marks and citation omitted).

Here, the existence of a contract between Lomaglio and LBK-the Agreement-has clearly been established. As detailed below, Lomaglio, Inc. has established each of the other above-mentioned elements by a preponderance of the evidence. Moreover, LBK has failed to come forward with any credible evidence to support the defenses it claims.

### A. Lomaglio, Inc. Rendered Full Performance Under the Agreement

Pursuant to the Agreement, Lomaglio, Inc. was to act as LBK's "exclusive sales representative" to Avon. The evidence adduced at trial clearly demonstrates that Lomaglio, Inc. fully performed its services as such a representative. Lomaglio, Inc.'s efforts led to a completed sale in the form of an enforceable contract between LBK and Avon for the 1994 Mrs. Albee figurine.

That contract is embodied in LBK's offer to Avon-communicated through their sales representative, Lomaglio, Inc. As evidenced by Plaintiff's Exhibits 6 and 7-letters from Lomaglio, Inc. to Avon and LBK-the offer clearly indicated price, quantity and delivery terms.

Avon accepted the offer orally-again through Lomaglio, Inc., LBK's sales representative. LBK then confirmed the order by letter signed by two of its officers the following day. These events gave rise to a binding contract, and LBK's arguments to the contrary are to no avail.

### 1. The LBK/Avon Contract Is Not Barred by the Statute of Frauds

LBK argues that any contract between LBK and Avon would not be enforceable because it could not satisfy the requirements of the New York Statute of Frauds. In support of this claim, LBK points to Section 2-201(1) of the New York Uniform Commercial Code.Section 2-201(1) provides that a contract for the sale of goods over $500-like the contract between Avon and LBK-must be in writing and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

signed by the party to be charged in order to be en-
forced.

**\*6** However, Section 2-201(2) provides that "if
within a reasonable time a writing in confirmation
of the contract and sufficient against the sender is
received and the party receiving it has reason to
know its contents, it satisfies the requirements
of"Section 2-201(1). Here, the confirmatory letter
sent on LBK letterhead to Avon constitutes just
such a confirmation. Accordingly, LBK's conten-
tion that the contract would be unenforceable for
lack of a sufficient writing is without merit.[FN8]

> FN8. LBK also contends that Avon's fail-
> ure to issue a purchase order somehow af-
> fected the formation or performance of the
> contract. Aside from the credibility prob-
> lems with this claim detailed above, I fail
> to see how the lack of a purchase order has
> any affect at all on the contract- especially
> in light of the fact that LBK confirmed the
> order in writing. Moreover, there is no
> credible evidence that LBK insisted upon
> or even requested a written purchase order,
> and all parties conducted themselves as if
> the order was going forward regardless of
> the issuance of such an order.

### 2. The LBK/Avon Contract Would Not Fail for Lack of Definiteness

LBK also contends that any contract between LBK
and Avon for the production of the Mrs. Albee fig-
urines would fail for lack of definiteness. This con-
tention is also entirely without merit.

Courts are loath to deny enforcement of agreements
on indefiniteness grounds.*Cleveland Wrecking Co.
v. Hercules Const. Co.,* 23 F.Supp.2d 287, 293
(E.D.N.Y.1998). Generally, a contract must be def-
inite with respect to essential terms in order to be
enforceable. *Fakhoury Enterprises, Inc. v. J.T. Dis-
tributors,* No. 94 Civ. 2729(PKL), 1997 WL
291961, at \*3 (S.D.N .Y. June 2, 1997) (citing John
D. Calamari & Joseph M. Perillo, Contracts § 2-13,
at 43 (2d ed.1977)).

"In a contract for a sale of goods, the essential
terms are quantity, price, and time and manner of
delivery."*Id.* at \*3 (quoting *Judal Indus. v. Wels-
bach Elec. Corp.,* 526 N.Y.S.2d 154, 156 (2d
Dept.1988)). The fact that one or more of these
terms is left open is not fatal. *Id. See also City
Univ. of New York v. Finalco, Inc.,* 461 N.Y.S.2d
830, 831-32 (1st Dept.1983). However, when a dis-
pute as to a material term manifests a lack of inten-
tion to form a contract, no enforceable contract res-
ults. *Fakhoury,* 1997 WL 291961, at \*3 (citing
*Kleinschmidt Div. of SCM Corp. v. Futuronics
Corp.,* 363 N.E.2d 701, 702 (N.Y.1977)).

Here, none of the "essential" terms remained open.
Agreements had been reached between Avon and
LBK as to quantity, price and time and manner of
delivery for the figurines. The only alleged dispute
over a possibly essential term-whether payment
would be made ten or thirty days after shipment of
each batch of figurines-was not a dispute at all.
Avon had not specifically responded to this request,
but it was clear that it would not, according to
McHugh, be a "problem".

Finally, LBK claims that if an enforceable contract
for the production of the Mrs. Albee figurines exis-
ted, it existed between Avon and Cermex. This con-
tention is absolutely ridiculous. There is no writing,
no admissible testimony-no evidence of any sort-
that any agreement at all existed between Avon and
Cermex.

In sum, an enforceable contract existed between
Avon and LBK for the production of the 1994 Mrs.
Albee figurines.

### B. LBK Breached the Agreement

By failing to pay Lomaglio, Inc. its agreed upon
commission after Lomaglio, Inc. fully performed its
obligations under the Agreement, LBK breached
the Agreement. LBK's contentions to the contrary
are again entirely without merit.

### 1. Payment by Avon was not a Condition Precedent to Payment of the Commissions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                       Page 7
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*7** LBK argues that, because the Agreement provides that "Commissions will be paid upon payment for the merchandise by the customer", Avon's payment to LBK was a condition precedent to payment of Lomaglio, Inc.'s commissions. LBK argues that this language is "an ambiguity", and because the Agreement was drafted by Al Lomaglio, the language must be construed against Lomaglio, Inc. to constitute a condition precedent.

While it may be that ambiguous contract language is generally construed against the drafter, it is well settled under New York law that where a contract term is ambiguous, the creation of a condition precedent is disfavored. *See, e.g., I.R.V. Merchandising Corp. v. Jay Ward Prod., Inc.,* 856 F.Supp. 168, 174 (S.D.N.Y.1994); *Lui v. Park Ridge at Terryville Ass'n, Inc.,* 601 N.Y.S.2d 496, 499 (2d Dept.1993); *Manning v. Michaels,* 540 N.Y.S.2d 583, 584 (3rd Dept.1989). Moreover, absent a clear expression to the contrary, a "pay-when-paid" clause does not establish a condition precedent but merely fixes a time for payment. *See, e.g., Grossman Steel and Aluminum Corp. v. Samson Window Corp.,* 426 N.E.2d 176, 177 (N.Y.1981), *aff'g,*433 N.Y.S.2d 31, 32 (2d Dept.1980); *Otis Elevator Co. v. George A. Fuller Co.,* 569 N.Y.S.2d 118, 120 (2d Dept.1991); *Action Interiors, Inc. v. Component Assembly Systems, Inc.,* 535 N.Y.S.2d 55, 56 (2d Dept.1991).

Thus, the ambiguous language can only be interpreted as fixing a time for payment of the commissions, and certainly not a condition precedent to their payment.[FN9]

> FN9. Even if the language in the Agreement did constitute a condition precedent, LBK still could not avoid liability under the Agreement because it was their failure to produce the figurines pursuant to the contract with Avon that prevented Avon from making payment. *See Cauff, Lippman & Co. v. Apogee Fin Group,* 807 F.Supp. 1007, 1022 (S.D.N.Y.1992).

2. The Agreement was not "Superseded"

LBK also contends that the Agreement was "superseded" by an agreement between Cermex and Lomaglio, Inc. (Trial Tr. at 9.) LBK claims that the superseding agreement is embodied in Defendant's Exhibit 4A-the letter from Cermex to Lomaglio, Inc.

However, all Defendant's Exhibit 4A demonstrates is that Lomaglio, Inc. consented to payment of its commissions from Cermex. There is absolutely no evidence that Lomaglio, Inc. intended such consent to act as a complete substitute for the Agreement. Similarly, there is no evidence that Lomaglio, Inc. intended to release LBK from its obligations if Cermex failed to pay the commissions.

To prove that a new arrangement is a substituted agreement or novation that superseded the Agreement, LBK must, *inter alia,* demonstrate that both parties clearly expressed or manifested such an intent. *See Chardin v. Turkie,* No. 97 Civ. 4643(JSM), 1999 WL 194626, at \*2 (S.D.N.Y. April 9, 1999) (citing *Northville Indus. v. Fort Neck Oil Terminals Corp.,* 474 N.Y.S.2d 122, 125 (2d Dept.1984)).*See also Lloyds Bank PLC v. Republic of Ecuador,* No. 96 Civ. 1789(DC), 1998 WL 118170, at \*10 (S.D.N.Y. March 16, 1998); *VJK Prods., Inc. v. Friedman/Meyer Prods., Inc.,* 565 F.Supp. 916, 921 (S.D.N.Y.1983) ("a novation [must] never be presumed").

Because there is no evidence that Lomaglio, Inc. intended there to be a substituted agreement or novation, the arrangement between Cermex and Lomaglio, Inc. was merely an accord in which Lomaglio, Inc. agreed to accept payment of its commissions under the Agreement from Cermex rather than LBK. *See Chardin,* 1999 WL 194626, at \*2 (citing *Denberg v. Parker Chapin Flattau & Kimpl,* 624 N.E.2d 995, 1000-01 (N.Y.1993)).

**\*8** Because Cermex never paid the commissions, the accord was never satisfied. Unlike a novation or a substitute agreement, an accord does not extinguish an existing contract. Thus, LBK is not relieved of its responsibilities under the agreement to pay Lomaglio, Inc. its commissions.*Id. See also*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*Koening Iron Works, Inc. v. Sterling Factories, Inc.,* No. 89 Civ. 4257(THK), 1999 WL 178785, at *7-8 (S.D.N.Y. March 30, 1999).

### C. Damages

In assessing damages, it is axiomatic that a party injured by a breach of contract must be placed in the same economic position in which he would have been, had the contract been fully performed. *V .S. Intern. S.A. v. Boyden World Corp.,* 862 F.Supp. 1188, 1197 (S.D.N.Y.1994) (citing cases). With respect to proving such damages, the plaintiff must demonstrate the existence of damages with certainty in order to recover for breach of contract. *Id.* (citing cases).

Here, it is certain that had the Agreement been fully performed by LBK, Lomaglio, Inc. would have received a commission of $1.555 per figurine. Because the contract between Avon and LBK called for 82,400 figurines to be produced, Lomaglio, Inc.'s commission would have been $128,132.00.

### *Conclusion*

For the reasons stated above, this court finds for plaintiff Lomaglio, Inc. on the sole claim advanced at trial.

Lomaglio, Inc. is directed to submit a proposed judgment to the court- including a revised commissions schedule reflecting interest calculations up to and including the date of this Memorandum and Order-within ten days.

After entering said judgment, the Clerk of the Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,1999.
Lomaglio Associates Inc. v. LBK Marketing Corp.
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Date of Printing: SEP 27,2007

## KEYCITE

**ℍLomaglio Associates Inc. v. LBK Marketing Corp., 1999 WL 705208 (S.D.N.Y., Sep 10, 1999) (NO. 94 CIV. 3208 (KTD))**

### Citing References

### Positive Cases (U.S.A.)

#### ★★ Cited

ℍ    1 Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd., 2004 WL 1444868, *6+ (S.D.N.Y. Jun 25, 2004) (NO. 03 CIV. 5539 (NRB)) "

### Secondary Sources (U.S.A.)

2 New York Practice Series - New York Contract Law s 8:21, s 8:21. Novation (2007)

C    3 COMMERCIAL LAW, 51 Syracuse L. Rev. 279, 349+ (2001)

### Court Documents

### Appellate Court Documents (U.S.A.)

**Appellate Briefs**

4 INDUSTRY TO INDUSTRY, INC., Plaintiff-Appellant, v. HILLSMAN MODULAR MOLD-ING, INC., Defendant-Respondent., 2000 WL 34220167, *34220167+ (Appellate Brief) (Wis.App. II Dist. 2000) **Reply Brief of Plaintiff-Appellant Industry to ...** (NO. 00-2180) " ★ ★

© Copyright 2007 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:            Chapter 11

The FINOVA Group Inc.,              Case Nos. 01-0697 (PJW) through
FINOVA Capital Corporation,         01-0705 (PJW)
FINOVA (Canada) Capital
Corporation,
FINOVA Capital plc,                 Jointly Administered
FINOVA Loan Administration Inc.,    Case No. 01-0697 (PJW)
FINOVA Mezzanine Capital Inc.,
FINOVA Portfolio Services, Inc.,
FINOVA Technology Finance, Inc., and
FINOVA Finance Trust,

Debtors.

THIRD AMENDED AND RESTATED DISCLOSURE STATEMENT
WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF
DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

RICHARDS, LAYTON & FINGER, P.A.        GIBSON, DUNN & CRUTCHER LLP

Mark D. Collins (No.2981)              Jonathan M. Landers
Daniel J. DeFranceschi (No. 2732)      Janet M. Weiss
Deborah E. Spivack (No.3220)           M. Natasha Labovitz
One Rodney Square                      Thayer H. Thompson
P. O. Box 551                          200 Park Avenue
Wilmington, Delaware 19899             New York, New York 10166-0193

Telephone:(302) 658-6541               Telephone: (212) 351-4000
Facsimile:(302) 658-6548               Facsimile: (212) 351-4035

Counsel for Debtors
Dated: June 13, 2001

TABLE OF CONTENTS

I. INTRODUCTION........................................................    1

II. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS.....................    2
    A. Purpose of Disclosure Statement...................................    2
    B. Voting on the Plan...............................................    3
    C. Confirmation of the Plan.........................................    6
    D. Limitations.....................................................    6

III. OVERVIEW OF THE PLAN...............................................    6

IV. BACKGROUND CONCERNING THE DEBTORS...................................   19
    A. General Background..............................................   19
    B. Supplemental or Updated Information..............................   19
        1.  Legal Proceedings..........................................   19
        2.  Taxation...................................................   19
        3.  Equity Ownership...........................................   20
        4.  Debt Structure.............................................   20
        5.  Management.................................................   21
        6.  Related Party Transactions.................................   23

V. THE DEBTORS' CHAPTER 11 CASES........................................   24
    A. Events Preceding the Filing of the Chapter 11 Cases..............   24
    B. The Commencement of the Chapter 11 Cases.........................   24
    C. Significant Parties in Interest.................................   25
        1.  Creditors' Committee.......................................   25
        2.  Equity Committee...........................................   26
    D. Events During Chapter 11 Cases..................................   26

VI. DESCRIPTION OF THE PLAN OF REORGANIZATION...........................   26
    A. Overview and Restructuring Transactions.........................   26
    B. Classification and Treatment of Claims and Interests.............   27
    C. Implementation and Other Provisions of the Plan.................   27
        1.  Assumption or Rejection of Executory Contracts and Unexpired
            Leases.....................................................   27
        2.  Issuance of New Debt and Equity Securities.................   27
        3.  Corporate Governance Matters...............................   28
        4.  Plan Distribution Entitlement; Dispute Provisions..........   28
        5.  Distribution Procedures....................................   29
        6.  Retention of Causes of Action..............................   29
        7.  Effect of Confirmation of Plan.............................   30
        8.  Implementing Documents and Transactions; No Transfer Taxes.   31
        9.  Amendment of Plan; Severability; Revocation................   32
        10.  Retention of Jurisdiction.................................   32
    D. Treatment of Securities Litigation..............................   32
    E.  Conditions to Confirmation and Effective Date of the Plan.......   32
        1.  Conditions to Confirmation.................................   32
        2.  Conditions to the Effective Date...........................   33

VII. SPECIAL PROVISIONS RELATING TO SECURITIES ISSUED OR OUTSTANDING UNDER
     THE PLAN..........................................................   33
    A. New Senior Notes, Additional Group Common Stock, New Group Preferred
       Stock and Additional Mezzanine Common Stock.....................   33
    B. Common Stock....................................................   34
    C. Post-Confirmation Business Plan.................................   34

i

    1. Business Plan--General.................................................... 34
    2. Asset Sales............................................................... 35
    3. New Business Opportunities................................................ 35
  D. Certain Factors to be Considered........................................... 36
    1. Portfolio Maximization.................................................... 36
    2. Leverage.................................................................. 37
    3. Potential Limitations on or Inability to Repay Debt or Make
       Contingent Payments....................................................... 37
    4. Potential Insufficiency of Collateral for New Senior Notes; Value
       of Collateral............................................................ 38
    5. Interest Spread; Interest Rate Matching................................... 38
    6. Leveraged Leases.......................................................... 39
    7. Aircraft Residual Risk.................................................... 39
    8. Projections............................................................... 40
    9. Competition............................................................... 40
   10. Dependence on Key Personnel; Management Agreement........................ 40
   11. Termination of Berkadia's Commitment to Make the Berkadia Loan........... 40
   12. Lack of Established Market for New Senior Notes, New Group
       Preferred Stock, and Additional Mezzanine Common Stock.................... 41
   13. Special Risks for Equity Holders.......................................... 41

VIII. VOTING PROCEDURES........................................................... 43
  A. Parties Entitled to Vote on the Plan........................................ 43
  B. Ballot...................................................................... 43
  C. General Procedures and Deadlines for Casting Votes.......................... 44
  D. Special Procedures Applicable to Voting of Debt Securities Claims and
     Equity Interests............................................................ 45

IX. CONFIRMATION OF THE PLAN..................................................... 45
  A. Classification of Claims and Interests...................................... 47
  B. Best Interests of Unsecured Creditors....................................... 47
  C. Feasibility................................................................. 48
  D. Acceptance.................................................................. 48
  E. Confirmation Without Acceptance by All Impaired Classes..................... 49

X. ALTERNATIVES TO THE PLAN...................................................... 49

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN........................... 50
  A. Consequences to the Debtors................................................. 51
    1. Cancellation of Debt...................................................... 51
    2. Limitation on NOL Carryforwards and Other Tax Attributes.................. 51
    3. Alternative Minimum Tax................................................... 53
    4. Issuance of the New Senior Notes.......................................... 54
  B. Consequences to Holders of Certain Claims................................... 54
    1. Consequences to Holders of Allowed Convenience Claims..................... 54
    2. Consequences to Holders of Allowed General Unsecured Claims (other
       than Allowed Convenience Claims) against FNV Capital...................... 55
    3. Consequences to Holders of Debt Securities (S) 510(b) Claims and
       Equity Securities (S) 510(b) Claims....................................... 57
    4. Withholding............................................................... 57
  C. Consequences to Holders of Allowed Interests................................ 58
    1. Holders of Interests in FNV Group......................................... 58
    2. Holders of Allowed TOPrS Interests........................................ 58

XII. CONCLUSION.................................................................. 61

```
Exhibit A  --The Plan
Exhibit B  --Order of the Bankruptcy Court
Exhibit C  --Second Amended and Restated Management Services Agreement
Exhibit D  --Commitment Letter
Exhibit E  --Letter Agreement Related to the Tender Offer
Exhibit F  --Financial Projections
Exhibit G  --Liquidation Analysis
Exhibit H  --Corporate Structure of the Debtors
Exhibit I  --Term Sheet for New Group Preferred Stock
Exhibit J  --FNV Group Annual Report on Form 10-K/A
Exhibit K  --FNV Group Quarterly Report on Form 10-Q
Exhibit L  --Unaudited Balance Sheets for each Debtor, dated as of
             March 7, 2001 and March 31, 2001
```

iii

## I.

### INTRODUCTION

This Third Amended and Restated Disclosure Statement amends and restates in its entirety that certain Second Amended and Restated Disclosure Statement, dated as of June 11, 2001 (as amended and restated, this "Disclosure Statement"). This Disclosure Statement has been prepared by The FINOVA Group Inc. ("FNV Group"), a Delaware corporation, and eight of its direct and indirect subsidiaries, including FINOVA Capital Corporation ("FNV Capital"), also a Delaware corporation (collectively, the "Debtors"). The Debtors are debtors in possession in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases"). The Debtors have filed in their Chapter 11 Cases a Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code (the "Plan"), a copy of which is attached hereto as Exhibit A. Unless otherwise defined in this Disclosure Statement, capitalized terms used, and not otherwise defined, will have the same meanings given to them in the Plan.

This Disclosure Statement applies only to the Plan and should not be relied upon if the Plan is revoked. The terms and conditions upon which the Plan may be revoked are set forth in the letter agreement dated as of June 10, 2001, and as modified by letter agreement dated as of June 13, 2001, annexed hereto as part of Exhibit D.

The Plan contemplates implementation of a comprehensive restructuring transaction with Berkadia LLC ("Berkadia"), a joint venture of Berkshire Hathaway Inc. ("Berkshire") and Leucadia National Corporation ("Leucadia"), that was first announced on February 27, 2001, and revised on May 2, 2001, May 30, 2000, June 10, 2001 and June 13, 2001. As described more fully herein, Berkadia will make a $6,000,000,000 loan (the "Berkadia Loan") to FNV Capital that, together with the Debtors' cash on hand and the issuance by FNV Group of approximately $3,260,000,000 aggregate principal amount of New Senior Notes, will enable the Debtors to restructure their debt. As soon as reasonably practicable after the Effective Date, Berkshire will commence a tender offer (the "Tender Offer") for up to $500,000,000 in aggregate principal amount of New Senior Notes, at a cash purchase price of 70% of par ($700 per $1,000 principal amount).

The Debtors expect to emerge from chapter 11 on or before August 31, 2001. Pursuant to a Management Services Agreement, which was entered into prior to these Chapter 11 Cases, and which was amended and restated on April 3, 2001 and further amended and restated on June 10, 2001, Leucadia is providing advice and assistance during the bankruptcy cases related to the restructuring and the Debtors' asset portfolio, subject to oversight by the FNV Group Board of Directors and a special committee of the Board, and will provide management functions to the Reorganized Debtors upon the effectiveness of the Plan.

The Plan constitutes separate plans of reorganization for each of the nine Debtors. After implementation of the Plan, each Debtor, other than FINOVA Finance Trust ("FNV Trust"), will emerge from chapter 11 as a separate corporate entity. Under the Plan, FNV Trust will dissolve. As more fully described herein, the Plan contemplates that all creditors of each of the Debtors, other than general unsecured creditors of FNV Capital, holders of TOPrS Interests and the related Group Subordinated Debentures, and holders of Securities Litigation Claims, will receive either reinstatement of their Claims or payment in Cash on the Effective Date unless they agree with the Debtors to alternate treatment. With respect to creditors with secured Claims, the Plan also permits the Debtors to surrender the asset securing the Claim. The Plan further contemplates that general unsecured creditors of FNV Capital and holders of TOPrS Interests will receive the proceeds of the Berkadia Loan, the New Senior Notes and Cash in satisfaction of their Claims.

Under the Plan, equity Interest holders in each of the Debtors, other than FNV Trust, will retain their Interests in the applicable Reorganized Debtor. Under the Plan, the holders of preferred equity Interests in FNV Trust, also called TOPrS, will receive a distribution of Cash and New Senior Notes in the aggregate amount of 75% of the liquidation preference attributable to such Interests, as more fully described herein. The Group Subordinated Debentures related to the TOPrS will be cancelled. The Plan further provides for the treatment of claimants in various Securities Litigation actions now pending against the Debtors and others. Specifically, the

1

Plan contemplates the issuance of Preferred Stock of FNV Group to satisfy any final judgments against FNV Capital arising from an existing class action Securities Litigation against FNV Capital and the issuance of Additional Mezzanine Common Stock to satisfy any final judgments against FINOVA Mezzanine Capital Inc. ("FNV Mezzanine") arising from an existing class action Securities Litigation against FNV Mezzanine. Finally, the Plan contemplates the issuance of Additional Group Common Stock, (i) to the Berkadia Parties, in an amount that will constitute 51%, or a lesser amount as may be agreed by the Berkadia Parties, of the outstanding equity of FNV Group on a Fully Diluted Basis as of the Effective Date and (ii) to satisfy any final judgment against FNV Group arising from an existing Securities Litigation against FNV Group. For all issuances of stock in connection with the Securities Litigation described in this paragraph, holders of Allowed Claims shall receive stock having a value as determined by Final Order equal to the amount of such Claims that is not covered by applicable insurance policies. In the event that any Additional Group Common Stock is issued after the Effective Date, the Berkadia Parties shall contemporaneously receive additional FNV Group common stock in the amount that they would have received if such issuances had occurred before the Effective Date.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS AND INTEREST HOLDERS. ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO VOTE IN FAVOR OF THE PLAN BY NO LATER THAN 5:00 P.M. MOUNTAIN STANDARD TIME ON AUGUST 1, 2001 (THE "VOTING DEADLINE").

II.

NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

A. Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired or as an equity Interest holder whose equity Interest is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan. It also sets forth information regarding the history of the Debtors, their businesses, the filing of the Chapter 11 Cases, the Plan and alternatives to the Plan. Finally, this Disclosure Statement enables the Bankruptcy Court to make an informed decision whether the Plan complies with the requirements of the Bankruptcy Code.

EACH CREDITOR AND INTEREST HOLDER SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. No person has been authorized to use any information concerning the Debtors or their businesses other than this information for the purpose of solicitation. For convenience, the terms of the Plan are summarized in this Disclosure Statement, but all summaries are qualified by the Plan itself, which is controlling in the event of any inconsistency.

For your convenience, copies of the following documents are attached as Exhibits to this Disclosure Statement:

. The Plan (Exhibit A);

. Order of the Bankruptcy Court, dated June 14, 2001 (the "Disclosure Statement Order"), which, among other things, approves the Disclosure Statement and establishes certain procedures for the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

. Second Amended and Restated Management Services Agreement among FNV Group, Leucadia and Leucadia International Corporation, dated June 10, 2001 (Exhibit C);

. Commitment Letter among Berkshire, Leucadia, Berkadia, FNV Group and FNV Capital, dated February 26, 2001, and letter agreement among Berkshire, Leucadia, Berkadia, FNV Group and FNV Capital, dated as of May 2, 2001, which annexes the term sheet for the Berkadia Loan and the term sheet

2

for the New Senior Notes, as modified by letter agreement among Berkadia, Berkshire, Leucadia, FNV Group and FNV Capital, dated May 30, 2001, and as further modified by letter agreement among Berkadia, Berkshire, Leucadia, FNV Group and FNV Capital, dated June 10, 2001, which also annexes the term sheet for the Intercompany Note, and as further modified by letter agreement among Berkadia, Berkshire, Leucadia, FNV Group and FNV Capital, dated June 13, 2001 (Exhibit D);

. Letter Agreement among Berkshire, FNV Group and FNV Capital, dated June 13, 2001, related to the Tender Offer (Exhibit E);

. FNV Group, et al. financial projections (Exhibit F);

. FNV Group, et al. liquidation analysis (Exhibit G);

. Chart of corporate structure of the Debtors (Exhibit H);

. Summary of Terms of New Group Preferred Stock (Exhibit I);

. FNV Group Annual Report on Form 10-K for the year ended December 31, 2000, filed with the Securities and Exchange Commission on April 17, 2001, as amended by Form 10-K/A, filed with the Securities and Exchange Commission on April 26, 2001 (the "10-K/A"), which, among other things, contains detailed information on the Debtors and their subsidiaries, their assets and businesses and audited consolidated financial statements for FNV Group for the year ended December 31, 2000 (Exhibit J);

. FNV Group Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, filed with the Securities and Exchange Commission on May 15, 2001 (the "10-Q") (Exhibit K); and

. Unaudited balance sheets, dated as of March 7, 2001 and March 31, 2001, for each Debtor (Exhibit L).

At a hearing held on June 13, 2001, after notice, the Bankruptcy Court approved this Disclosure Statement, including the Exhibits, pursuant to section 1125 of the Bankruptcy Code as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims or equity Interests of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT IS NOT A DETERMINATION BY THE BANKRUPTCY COURT EITHER OF THE FAIRNESS AND MERITS OF THE PLAN OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

The statements contained in this Disclosure Statement are made as of the date on the front cover unless otherwise specified, and the statements on Exhibits are made as of the date thereof. Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, imply that there has been no change in the facts since that date. The information contained in this Disclosure Statement has been prepared by the Debtors in good faith, based on information available to the Debtors. THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT CONCERNING THE PLAN HAS NOT BEEN SUBJECT TO AN AUDIT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. All financial information was compiled from the records of the Debtors. The Debtors believe that this Disclosure Statement complies with the requirements of the Bankruptcy Code.

B. Voting on the Plan

After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and return it in the postage-paid envelope provided. Although the Plan is one document, it is structured as a separate plan of reorganization for each of the nine Debtors. You may vote to accept or reject only the Plan of the Debtor or Debtors against which you have a Claim or in which you have an Interest. You may receive a voting ballot with

respect to the Plan of one or more of the Debtors. Mark and return only the ballot or ballots with respect to the Debtors in which you hold a Claim or equity Interest. In addition, your Claims or equity Interests may be classified in multiple classes. DETAILED INSTRUCTIONS REGARDING VOTING, INCLUDING THE NAMES AND ADDRESSES OF THE PERSONS YOU MAY CONTACT IF YOU HAVE QUESTIONS REGARDING THE VOTING PROCEDURES, ARE INCLUDED IN SECTION VIII OF THIS DISCLOSURE STATEMENT ("VOTING PROCEDURES"). PLEASE REVIEW THE INSTRUCTIONS SET FORTH IN THAT SECTION IN DETAIL.

It is important that creditors and equity security holders exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by the Plan, if it is accepted by the requisite holders of Claims or equity Interests.

Pursuant to the provisions of the Bankruptcy Code, only holders of Claims and Interests in the following Classes, as defined in the Plan, (the "Voting Classes") are impaired and entitled to vote on the Plan (section references below are references to the Plan):

FNV Group:
Section 3.1(c)--(Group Subordinated Debenture Claims)
Section 3.1(d)--(General Unsecured Claims)
Section 3.1(e)--(Convenience Claims)
Section 3.1(f)--(Interests)
Section 3.1(g)--(Equity Securities (S) 510(b) Claims)

FNV Capital:
Section 3.2(c)--(General Unsecured Claims)
Section 3.2(d)--(Convenience Claims)
Section 3.2(e)--(Debt Securities (S) 510(b) Claims)

FNV Canada:
None

FNV UK:
None

FNV Loan:
Section 3.5(c)--(General Unsecured Claims)
Section 3.5(d)--(Convenience Claims)

FNV Mezzanine:
Section 3.6(c)--(General Unsecured Claims)
Section 3.6(d)--(Convenience Claims)
Section 3.6(e)--(Interests)
Section 3.6(f)--(Equity Securities (S) 510(b) Claims)

FNV Portfolio:
Section 3.7(c)--(General Unsecured Claims)
Section 3.7(d)--(Convenience Claims)

FNV Technology:
Section 3.8(c)--(General Unsecured Claims)
Section 3.8(d)--(Convenience Claims)

FNV Trust:
Section 3.9(c)--(General Unsecured Claims)
Section 3.9(d)--(Convenience Claims)
Section 3.9(e)--(TOPrS Interests)
Section 3.9(f)--(Interests)

Holders of Claims and Interests in the following Classes are not entitled to vote on the Plan and are deemed to have accepted the Plan because their Claims are not impaired by the Plan:

FNV Group:
Section 3.1(a)--(Secured Claims)
Section 3.1(b)--(Other Priority Claims)

FNV Capital:
Section 3.2(a)--(Secured Claims)
Section 3.2(b)--(Other Priority Claims)
Section 3.2(f)--(Interests)

FNV Canada:
Section 3.3(a)--(Secured Claims)
Section 3.3(b)--(Other Priority Claims)
Section 3.3(c)--(General Unsecured Claims)
Section 3.3(d)--(Interests)

FNV UK:
Section 3.4(a)--(Secured Claims)
Section 3.4(b)--(Other Priority Claims)
Section 3.4(c)--(General Unsecured Claims)
Section 3.4(d)--(FNV Capital Intercompany Loan)
Section 3.4(e)--(Interests)

4

```
                FNV Loan:                              FNV Mezzanine:
    Section 3.5(a)--(Secured Claims)       Section 3.6(a)--(Secured Claims)
    Section 3.5(b)--(Other Priority        Section 3.6(b)--(Other Priority
              Claims)                                 Claims)
       Section 3.5(e)--(Interests)

               FNV Portfolio:                          FNV Technology:
    Section 3.7(a)--(Secured Claims)       Section 3.8(a)--(Secured Claims)
    Section 3.7(b)--(Other Priority        Section 3.8(b)--(Other Priority
              Claims)                                 Claims)
       Section 3.7(e)--(Interests)            Section 3.8(e)--(Interests)


                              FNV Trust:
                  Section 3.9(a)--(Secured Claims)
                Section 3.9(b)--(Other Priority Claims)
```

Notwithstanding the foregoing, only holders of Allowed Claims or Allowed Interests in the Voting Classes are entitled to vote on the Plan. A Disputed Claim (as defined in the Plan) or Interest that is not Allowed (as defined in the Plan) is not entitled to vote unless and until either (i) the dispute with respect to the Claim or Interest is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction or pursuant to agreement with the Debtors or (ii) the Bankruptcy Court deems the Disputed Claim or Interest to be an Allowed Claim or Allowed Interest on a provisional basis, for purposes of voting on the Plan. Therefore, even if there is a ballot enclosed with this Disclosure Statement, the votes cast by the holders of any Claim or Interest that is not Allowed as of the Voting Deadline will not be counted unless the Bankruptcy Court provisionally allows those Claims or Interests for purposes of voting on the Plan. If your Claim or Interest not Allowed, it is your obligation to obtain an order provisionally allowing your Claim or Interest.

Holders of Claims and Interests in the voting classes may vote on the Plan only if they are holders as of the Voting Record Date. The "Voting Record Date" is June 13, 2001.

A ballot to be used for voting to accept or reject the Plan, together with a postage-prepaid envelope, is enclosed with copies of this Disclosure Statement that are mailed to creditors and stockholders entitled to vote on the Plan. If there is no ballot enclosed, or if you have any questions concerning voting procedures, you may contact the voting agent as follows:

```
                      The FINOVA Group Inc.
                 c/o Claudia King & Associates, Inc.
                          P.O. BOX 2742
                       Carefree, AZ 85377-2742
                          (by U.S. Mail)

                               and

                      The FINOVA Group Inc.
                 c/o Claudia King & Associates, Inc.
                   7301 E. Sundance Trail--Suite D-201
                          Carefree, AZ 85377
                       (by delivery or courier)
```

To be counted, your vote must be received, on the ballot provided, by the voting agent at the address set forth above, before the voting deadline of 5:00 p.m. Mountain Standard Time on August 1, 2001. FURTHER VOTING INSTRUCTIONS ARE SET FORTH ON THE BALLOT AND IN SECTION VIII OF THIS DISCLOSURE STATEMENT ("VOTING PROCEDURES"). PLEASE REVIEW THOSE INSTRUCTIONS IN DETAIL.

BALLOTS MUST BE RECEIVED BY 5:00 P.M. MOUNTAIN STANDARD TIME, ON AUGUST 1, 2001, TO BE CONSIDERED IN DETERMINING WHETHER THE PLAN HAS BEEN ACCEPTED OR REJECTED. FAXED BALLOTS WILL NOT BE ACCEPTED.

BALLOTS THAT ARE RECEIVED BUT NOT SIGNED OR THAT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL NOT BE COUNTED. THE DEBTORS RECOMMEND A VOTE IN FAVOR OF THE PLAN.

THE DEBTORS URGE ALL CREDITORS AND STOCKHOLDERS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE DEADLINE.

C. Confirmation of the Plan

The requirements for Confirmation, including the vote of creditors to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are set forth in Section IX of this Disclosure Statement ("CONFIRMATION OF THE PLAN"). The Plan constitutes a separate plan of reorganization for each of the nine Debtors. Accordingly, the voting and other Confirmation requirements must be satisfied with respect to the Plan for each of the Debtors, and separate ballots and other voting materials will be furnished as to each of the nine Debtors. Confirmation of the Plan and the occurrence of the Effective Date are subject to a number of significant provisions, which are summarized in Section VI-E of this Disclosure Statement ("Conditions to Confirmation and Effective Date of the Plan"). There can be no assurance that these conditions will be satisfied. If not all conditions are satisfied for all Plans, the Debtors reserve the right to amend or withdraw any or all of the Plans, all as described more fully in Section VI-E.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on August 10, 2001 at 9:30 a.m., Eastern Daylight Time, in Courtroom 2 at 824 Market Street, 6th Floor, Wilmington, Delaware 19801 or such other location as the Bankruptcy Court may announce. The hearing may be adjourned from time to time without notice beyond that given in open court. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be filed and served on or before August 3, 2001, in the manner described in Section IX of this Disclosure Statement ("CONFIRMATION OF THE PLAN").

D. Limitations

NO SOLICITATION OF VOTES ON THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE. IN VOTING ON THE PLAN, CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS AND THEIR BUSINESSES OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ALL EXHIBITS TO EITHER.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE ON THE FRONT COVER UNLESS OTHERWISE NOTED, AND STATEMENTS CONTAINED IN THE EXHIBITS ARE MADE AS OF THE DATE THEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THIS INFORMATION SINCE THOSE DATES. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS. CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND WHERE POSSIBLE CONSULT WITH COUNSEL, PRIOR TO VOTING.

III.

OVERVIEW OF THE PLAN

The following is a brief overview of the provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A, and the Plan Supplement. For a more detailed description of the terms and provisions of the Plan, see Section VI of this Disclosure Statement ("DESCRIPTION OF THE PLAN OF REORGANIZATION").

The Plan contemplates the restructuring and payment of the bank, bond and other debt of the Debtors through Berkadia's extension of a $6,000,000,000 loan to FNV Capital that, together with the Debtors' cash on hand and the issuance by FNV Group of approximately $3,260,000,000 aggregate principal amount of New Senior Notes, will enable the Debtors to restructure their debt. Holders of unsecured Claims against FNV Capital will receive (i) a Cash payment equal to 70% of the general unsecured Claims against FNV Capital (not including prepetition or postpetition interest), (ii) a Cash payment equal to the amount of accrued and unpaid prepetition and postpetition interest on such general unsecured Claims (the Debtors estimate the aggregate amount of pre-petition interest payments to be approximately $155 million and, assuming an Effective Date of August 31, 2001 and assuming an interest rate of 6.037% per annum(/1/), the aggregate amount of post-petition interest payments to be approximately $345 million) and (iii) New Senior Notes having an aggregate principal amount equal to 30% of such general unsecured Claims (not including prepetition and postpetition interest). Holders of TOPrS Interests with respect to FNV Group will receive (i) a Cash payment equal to 52.5% of the liquidation preference attributable to such Interests (not including prepetition or postpetition dividends), (ii) a Cash payment equal to 75% of each of accrued and unpaid prepetition and postpetition dividends attributable to such Interests (the Debtors estimate the aggregate amount of accrued and unpaid prepetition dividends to be approximately $900,000 and, assuming an Effective Date of August 31, 2001, the aggregate amount of accrued post-petition dividends to be approximately $2.3 million) and (iii) New Senior Notes having an aggregate principal amount equal to 22.5% of the liquidation preference attributable to such Interests (not including prepetition and postpetition dividends). The Group Subordinated Debentures related to the TOPrS Interests will be cancelled. For complete descriptions of the Berkadia Loan and the New Senior Notes, see the Commitment Letter (attached hereto as Exhibit D) and the term sheets for the Berkadia Loan and New Senior Notes annexed as exhibits to the Plan. The term sheets annexed to the Plan set forth all terms as modified by the letter agreements dated May 2, 2001, May 30, 2001, June 10, 2001 and June 13, 2001.

Berkshire has guaranteed 90% of Berkadia's commitment to make the Berkadia Loan; Leucadia has guaranteed 10% of Berkadia's commitment to make the Berkadia Loan; and Berkshire has secondarily guaranteed the 10% of Berkadia's commitment to make the Berkadia Loan that is guaranteed by Leucadia. FNV Group and all of its direct and indirect subsidiaries (other than (x) FNV Capital, and (y) any special purpose subsidiary that is contractually prohibited (as of February 26, 2001) from acting as a guarantor) (the "Guarantors") will guarantee repayment by FNV Capital of the Berkadia Loan. The guarantees described in the preceding sentence shall be secured by substantially all of the Guarantors' assets.

The New Senior Notes (i) will be issued by FNV Group, (ii) will mature eight (8) years after the Effective Date, and (iii) will bear interest, payable semi-annually out of "available cash" (as defined in the New Senior Notes Indenture), at a fixed rate of seven and one-half percent (7.5%) per annum. FNV Group's obligations with respect to the payment of interest (but not Contingent Interest) and principal under the New Senior Notes will be secured by a second-priority security interest in (x) all of the capital stock of FNV Capital and (y) a promissory note of FNV Capital issued to FNV Group in the principal amount of the aggregate amount of New Senior Notes (the "Intercompany Note"), which will be secured by a second priority lien on the assets of FNV Capital pledged to secure the Berkadia Loan. The holders of the New Senior Notes will have no right to enforce their security interests until the Berkadia Loan is paid in full.

Under the New Senior Notes, "available cash," after paying or funding a reserve to pay accrued interest on the Berkadia Loan, paying or funding taxes, operating and other corporate expenses (including interest on and principal of certain permitted indebtedness (as defined in the New Senior Notes Indenture)) and reasonable reserves, will be used to pay accrued interest on the New Senior Notes. No payments of principal will be made on the New Senior Notes until the Berkadia Loan is paid in full; provided that FNV Group may, with the prior consent of Berkadia if the Berkadia Loan is still outstanding, repurchase New Senior Notes at a price not to exceed par plus accrued and unpaid interest thereon, through tender offers, open market purchases and/or privately negotiated transactions or otherwise. As long as the Berkadia Loan is outstanding, such repurchases shall not exceed $1.5 billion in the aggregate, and at such time when the Berkadia Loan is no longer outstanding, such repurchases shall not exceed $150 million per calendar year. In the event that FNV Group elects to make such repurchases, the board of directors of Reorganized FNV Group will adopt procedures in connection with repurchases of New Senior Notes neither to prefer nor to discriminate against Berkshire.

--------
(1) The actual interest rate will be calculated as set forth in Section 5.11(a) of the Plan and will depend upon the applicable LIBO rates during the period from and including the Petition Date to but excluding the

In connection with the Plan, Berkshire has agreed that if the Berkadia Loan is funded and the New Senior Notes are issued as contemplated in the Plan, then as soon as reasonably practicable thereafter, Berkshire or a direct or indirect subsidiary of Berkshire will commence a Tender Offer, as more fully described in Exhibit E, for up to $500 million in aggregate principal amount of New Senior Notes at a cash purchase price of 70% of par ($700 per $1,000 principal amount of New Senior Notes). Berkshire has advised the Debtors that the Tender Offer will be subject to conditions to be specified in the Tender Offer documents which will be customary, but will not be subject to any financing condition. The Tender Offer will be made in compliance with all applicable securities laws and will remain open for the longer of twenty Business Days or thirty days. Berkshire (or its subsidiary) will purchase any and all New Senior Notes validly tendered, up to the $500 million aggregate principal amount limit, and will pro rate among tendering holders if the Tender Offer is oversubscribed.

Berkshire, together with its direct and indirect subsidiaries, has agreed to retain ownership of all New Senior Notes received by Berkshire pursuant to the Plan or purchased through the Berkshire Tender Offer for a period of four years from the Effective Date of the Plan. If Berkshire acquires New Senior Notes in addition to those received by it on the Effective Date of the Plan or purchased through the Tender Offer, Berkshire may sell or otherwise dispose of any New Senior Notes it owns so long as at all times during the four (4) years after the Effective Date it owns not less than the aggregate principal amount of New Senior Notes that it received on the Effective Date pursuant to the Plan and purchased through the Tender Offer. Berkshire's agreement does not restrict Berkshire or any of its direct and indirect subsidiaries from transferring New Senior Notes among or between themselves.

After payment in full of the Berkadia Loan, making payments or funding reserves required prior to making an interest payment on the New Senior Notes (as described above), paying accrued interest on the New Senior Notes and optional purchases of New Senior Notes in permitted amounts, ninety-five percent (95%) of the remaining "available cash" will be used to make semi-annual prepayments of principal on the New Senior Notes and five percent (5%) will be used for distributions to and/or repurchases of stock from FNV Group stockholders. The board of directors of Reorganized FNV Group will adopt procedures in connection with any non-pro rata purchase of FNV Group common stock neither to prefer nor to discriminate against the Berkadia Parties in any such purchases.

After payment in full of the outstanding principal of the New Senior Notes, optional purchases of New Senior Notes in permitted amounts, and payments to FNV Group common stockholders in an aggregate amount equal to 5.263% of the aggregate principal amount of New Senior Notes issued pursuant to the Plan, ninety-five percent (95%) of any "available cash" will be used to pay Contingent Interest to holders of New Senior Notes in an aggregate amount of up to $100 million (as such amount may be reduced to reflect a decrease in the principal amount of New Senior Notes outstanding as a result of repurchases (but not prepayments or repayments) by FNV Group) and five percent (5%) of such remaining "available cash" will be used for distributions to and/or repurchase of stock from FNV Group stockholders. Contingent Interest payments will terminate fifteen (15) years after the Effective Date.

The Plan proposes either reinstatement, surrender of collateral or Cash payment, with postpetition interest, for all secured Claims. The Plan proposes either reinstatement or payment of Cash for all unsecured Claims against any of the Debtors, other than general unsecured Claims against FNV Capital and holders of TOPrS Interests and the related Group Subordinated Debentures.

Under the Plan, all existing equity Interests of Debtors other than FNV Trust will be Reinstated and will be retained by the existing holders, subject to dilution in certain cases as described herein. Under the Plan, FNV Trust will be dissolved, the holders of TOPrS will receive cash and New Senior Notes as described above, and common equity Interests in FNV Trust will be cancelled and FNV Group, as the holder thereof, will receive and retain nothing on account of its Interests. The Plan contemplates that all existing common stock of FNV Mezzanine will be retained by FNV Capital as the existing holder, but that Additional Mezzanine Common Stock may be issued to satisfy final judgments, if any, for plaintiffs in an existing Securities Litigation against FNV Mezzanine. Further, the Plan contemplates that all existing common stock of FNV Group will be retained by the existing holders thereof, but that New Group Preferred Stock will be issued to satisfy final judgments, if any, for

plaintiffs in an existing Securities Litigation against FNV Capital and Additional Group Common Stock will be issued (i) to the Berkadia Parties, in an amount that will constitute 51% (or a lesser amount as may be agreed by the Berkadia Parties) of the outstanding equity of FNV Group on a Fully Diluted Basis as of the Effective Date after giving effect to any other issuances of Additional Group Common Stock contemplated by the Plan and (ii) to satisfy final judgments, if any, for plaintiffs in an existing Securities Litigation against FNV Group. For all issuances of stock described in this paragraph relating to the Securities Litigation, holders of Allowed Claims shall receive stock having a value, as determined by Final Order, equal to the amount of such Claims that is not covered by applicable insurance policies. In the event that any Additional Group Common Stock is issued, the Berkadia Parties shall contemporaneously receive additional FNV Group common stock in the amount that they would have received if such issuances had occurred before the Effective Date.

In addition, the Plan contemplates that, upon the Effective Date, Berkadia will designate a majority of the Board of Directors of Reorganized FNV Group as of the Effective Date, that two members of the Board of Directors of Reorganized FNV Group will be directors currently serving on FNV Group's Board of Directors and that one member will be designated by the creditors. Finally, the Plan contemplates that the Debtors' businesses will be operated after the Effective Date under a Management Services Agreement with Leucadia, pursuant to which Leucadia will designate its employees to act as Chairman of the Board and President of Reorganized FNV Group. For a more detailed description of the consideration to Berkadia and the Management Services Agreement, see the Commitment Letter attached hereto as Exhibit D and the Management Services Agreement attached hereto as Exhibit C.

The steering committee composed of certain lenders to FNV Capital pursuant to the Bank Credit Agreements contends that the calculation of postpetition interest contained in Section 5.11(a) of the Plan should be calculated by using the Base Rates as defined in the Bank Credit Agreements. The Debtors disagree with this contention and the Plan provides otherwise.

As described more fully below in Section VII-C of this Disclosure Statement ("Post-Confirmation Business Plan"), the Debtors' post-confirmation business plan does not contemplate any new business activities related to new customers. While other activities may be initiated or undertaken in the future, the main objective of the Debtors' post-confirmation business plan is to maximize the value of their portfolio through the orderly liquidation of the portfolio over time.

The Pension Benefit Guaranty Corporation ("PBGC") is the United States government agency that administers the mandatory termination insurance program for defined benefit pension plans under Title IV of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. (S)(S) 1301-1461 (1994 & Supp. IV 1998). A defined benefit pension plan is one that provides an employee, upon retirement, a fixed, periodic payment as determined by the terms of the plan. See 29 U.S.C. (S) 1002(35). The PBGC guarantees the payment of certain pension benefits upon termination of a defined benefit pension plan. See 29 U.S.C. (S)(S) 1321, 1322.

The Debtors established and maintain the Retirement Plan for certain of their employees known as The FINOVA Group Inc. Pension Plan. The Retirement Plan is covered by Title IV of ERISA. The Debtors understand that they and all members of the controlled group are obligated to contribute to the Retirement Plan the amounts necessary to satisfy ERISA's minimum funding standards, 29 U.S.C. (S) 1082; 26 U.S.C. (S) 412. In addition, in the event of a termination of the Retirement Plan, the Debtors and all members of the controlled group may be jointly and severally liable for the unfunded benefit liabilities of the Retirement Plan. See 29 U.S.C. (S) 1362(a).

The Debtors intend to continue their liability as either the contributing sponsors or controlled group members to fund the Retirement Plan in accordance with the minimum funding standards under ERISA, pay all required PBGC insurance premiums, and comply with all applicable requirements of the Retirement Plan and ERISA. The Debtors further understand that the Retirement Plan may be terminated only if the statutory requirements of either sections 4041 or 4042 of ERISA are met. 29 U.S.C. (S)(S) 1341, 1342. In addition, the Debtors' reorganization proceedings, and in particular the Plan, the Confirmation Order and section 1141 of the Bankruptcy Code, shall not in any way be construed as discharging, releasing or relieving the Debtors, or any other party, in any capacity, from any liability with respect to the Retirement Plan under any law, governmental policy or regulatory provision. PBGC and the Retirement Plan shall not be enjoined or precluded from enforcing such liability as a result of any of the provisions of the Plan or the Plan's confirmation.

The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan.

Administrative Claims...... Except as described in the next paragraph, each holder of an Allowed Administrative Claim against any Debtor shall receive on the Distribution Date, at the sole option of the relevant Debtor, (a) payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Claim or (b) such other treatment as to which the relevant Debtor and such Claim holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims against a Debtor representing liabilities incurred in the ordinary course of business during the Chapter 11 Cases or liabilities arising under loans or advances to or other obligations incurred by the Debtors that were authorized and approved by the Bankruptcy Court shall be paid and performed by the appropriate Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

Any Person seeking an award by the Bankruptcy Court of an Allowed Administrative Claim on account of Professional Fees, services rendered, or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, shall file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date no later than thirty days after the Effective Date (except to the extent that such Person is an Ordinary Course Professional, in which case the procedures set forth in the Ordinary Course Professional Order shall be followed). Objections to final applications for payment of Professional Fees must be filed no later than 60 days after the Confirmation Date. To the extent that such an award is granted by the Bankruptcy Court or allowed by the Ordinary Course Professional Order, the requesting Person shall receive, (i) payment on the Distribution Date of Cash in an amount equal to the amount allowed by the Bankruptcy Court or Ordinary Course Professional Order, (ii) payment on such other terms as may be mutually agreed upon by the holder of the Allowed Administrative Claim and the applicable Debtor or (iii) payment in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. All Professional Fees for services rendered in connection with the Chapter 11 Cases and the Plan after the Confirmation Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of causes of action preserved hereunder and the resolution of Disputed Claims, shall be paid by the applicable Debtor upon receipt of an invoice therefor, or on such other terms as such Debtor may agree to, without the requirement of further Bankruptcy Court authorization or entry of a Final Order.

Priority Tax Claims........ Each holder of an Allowed Priority Tax Claim against a Debtor shall receive, at the sole option of the relevant Debtor: (a) payment on the Distribution Date of Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim; (b) Cash payments over a period not

exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest accruing from the Effective Date, calculated at the effective interest rate for 90-day securities obligations issued by the United States Treasury on the Effective Date or, if no such securities were issued on the Effective Date, on the date of issuance immediately preceding the Effective Date; (c) payment upon such other terms determined by the Bankruptcy Court to provide the holder of such Claim with deferred Cash payments having a value, as of the Effective Date, equal to such Claim; or (d) such other treatment agreed to by the Allowed Priority Tax Claim holder and the applicable Debtor.

FNV Group-1 (Secured Claims).....................

On the Distribution Date, each holder of an Allowed Claim in Class FNV Group-1 shall receive one of the following treatments, to be determined at the sole option of FNV Group: (i) Reinstatement of such Allowed Secured Claim, (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case the Lien arising from such Allowed Secured Claim shall be released upon payment, (iii) surrender by FNV Group of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV Group and such holder shall have agreed upon in writing. At the option of FNV Group, FNV Group may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

FNV Group-2 (Other Priority Claims)...........

On the Distribution Date, the Allowed Claims in Class FNV Group-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Group and such holder shall have agreed upon in writing.

FNV Group-3 (Group Subordinated Debenture Claims).....................

On the Distribution Date, (i) the Allowed Claims in Class FNV Group-3 shall be satisfied by the treatment of the beneficial holders of claims in Class FNV Trust-5 (TOPrS Interests), provided, however, that Allowed Claims of the Indenture Trustees (including, but not limited to, prepetition and postpetition fees, costs, expenses, indemnification, disbursements, advances and reasonable compensation for the Indenture Trustee's counsel) shall be paid in full in Cash on the Distribution Date, and (ii) the Group Subordinated Debentures shall be cancelled.

FNV Group-4 (General Unsecured Claims)..........

On the Distribution Date, each holder of an Allowed Claim in Class FNV Group-4 shall receive one of the following treatments, to be determined at the sole option of FNV Group: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim, (ii) Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV Group and such holder shall have agreed upon in writing.

11

FNV Group-5 (Convenience
Claims).....................     On the Distribution Date, each holder of an
                                Allowed Claim in Class FNV Group-5 shall receive
                                payment in full, without postpetition interest,
                                in Cash, not to exceed $25,000, of such Allowed
                                Convenience Claim.

FNV Group-6 (Interests)....
                                On and after the Distribution Date, the legal,
                                equitable and contractual rights of holders of
                                Allowed Interests in Class FNV Group-6 shall
                                remain in effect, subject to the effects of (i)
                                the issuance of Additional Group Common Stock (x)
                                to the Berkadia Parties, and (y) to the holders
                                of Allowed Equity Securities (S) 510(b) Claims in
                                FNV Group-7, if any, (ii) the issuance of New
                                Group Preferred Stock to the holders of Allowed
                                Debt Securities (S) 510(b) Claims in Class FNV
                                Capital-5, if any, and (iii) the other terms and
                                conditions of the Plan, including cancellation of
                                certain options, warrants and rights, as more
                                fully described therein.

FNV Group-7 (Equity
Securities (S) 510(b)           On the Distribution Date, each holder of an
Claims).....................     Allowed Equity Securities (S) 510(b) Claim in
                                Class FNV Group-7, if any, shall receive a
                                distribution by Reorganized FNV Group of
                                Additional Group Common Stock having a value, as
                                determined by a Final Order, equal to the
                                holder's Pro Rata Share of the Excess Amount with
                                respect to all Allowed Equity Securities (S)
                                510(b) Claims in Class FNV Group-7.

FNV Capital-1 (Secured
Claims).....................     On the Distribution Date, each holder of an
                                Allowed Claim in Class FNV Capital-1 shall
                                receive one of the following treatments, to be
                                determined at the sole option of FNV Capital: (i)
                                Reinstatement of such Allowed Secured Claim, (ii)
                                payment of Cash in an amount equal to the unpaid
                                portion of such Allowed Secured Claim plus
                                postpetition interest, in which case the Lien
                                arising from such Allowed Secured Claim shall be
                                released upon payment, (iii) surrender by FNV
                                Capital of the asset subject to the Lien of the
                                holder of the Allowed Secured Claim, or (iv) such
                                other treatment as to which FNV Capital and such
                                holder shall have agreed upon in writing. At the
                                option of FNV Capital, FNV Capital may elect to
                                exercise a different option for each asset
                                subject to the Lien of the holder of an Allowed
                                Secured Claim.

FNV Capital-2 (Other
Priority Claims)...........      On the Distribution Date, the Allowed Claims in
                                Class FNV Capital-2 shall (i) be Reinstated,
                                provided, however, that such treatment shall be
                                no less favorable than that provided in section
                                1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii)
                                receive such other treatment as to which FNV
                                Capital and such holder shall have agreed upon in
                                writing.

FNV Capital-3 (General
Unsecured Claims)..........      On the Distribution Date, each holder of an
                                Allowed Claim in Class FNV Capital-3 shall
                                receive a distribution, equal to the full amount
                                of such General Unsecured Claim plus postpetition
                                interest, composed of (i) a Cash payment equal to
                                70% of the principal amount of that General
                                Unsecured Claim (not including prepetition or
                                postpetition

12

interest), (ii) a Cash payment equal to the amount of accrued and unpaid prepetition and postpetition interest on the General Unsecured Claim, and (iii) New Senior Notes in the principal amount of 30% of the principal amount of that General Unsecured Claim (not including prepetition or postpetition interest), provided, however, that Allowed Claims of the Indenture Trustees (including, but not limited to, prepetition and postpetition fees, costs, expenses, indemnification, disbursements, advances and reasonable compensation for the Indenture Trustee's counsel) shall be paid in full in Cash on the Distribution Date.

FNV Capital-4 (Convenience Claims)..................... On the Distribution Date, each holder of an Allowed Claim in Class FNV Capital-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

FNV Capital-5 (Debt Securities (S) 510(b) Claims)..................... On the Distribution Date, each holder of an Allowed Debt Securities (S) 510(b) Claim in Class FNV Capital-5, if any, shall receive a distribution by Reorganized FNV Group of New Group Preferred Stock having a value, as determined by a Final Order, equal to the holder's Pro Rata Share of the Excess Amount with respect to all Allowed Debt Securities (S) 510(b) Claims in Class FNV Capital-5.

FNV Capital-6 (Interests)................ On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Capital-6 shall be Reinstated.

FNV Canada-1 (Secured Claims)..................... On the Distribution Date, each holder of an Allowed Claim in Class FNV Canada-1 shall receive one of the following treatments, to be determined at the sole option of FNV Canada: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Canada of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV Canada and such holder shall have agreed upon in writing. At the option of FNV Canada, FNV Canada may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

FNV Canada-2 (Other Priority Claims)........... On the Distribution Date, the Allowed Claims in Class FNV Canada-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Canada and such holder shall have agreed upon in writing.

FNV Canada-3 (General Unsecured Claims).......... On the Distribution Date, each holder of an Allowed Claim in Class FNV Canada-3 shall receive one of the following treatments, to be determined at the sole option of FNV Canada: (i) payment of Cash in

13

an amount equal to the unpaid portion of such Allowed General Unsecured Claim plus postpetition interest, (ii) except in the case of Bank Claims against FNV Canada, Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV Canada and such holder shall have agreed upon in writing.

FNV Canada-4 (Interests)...

On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Canada-4 shall be Reinstated.

FNV UK-1 (Secured Claims)....................

On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-1 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV UK of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV UK and such holder shall have agreed upon in writing. At the option of FNV UK, FNV UK may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

FNV UK-2 (Other Priority Claims)....................

On the Distribution Date, the Allowed Claims in Class FNV UK-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV UK and such holder shall have agreed upon in writing.

FNV UK-3 (General Unsecured Claims)..........

On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-3 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed General Unsecured Claim plus postpetition interest, (ii) except in the case of Bank Claims against FNV UK, Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV UK and such holder shall have agreed upon in writing.

FNV UK-4 (FNV Capital Intercompany Loan).........

On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-4 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) payment of Cash in an amount equal to the unpaid portion of the Claim plus postpetition interest, or (ii) Reinstatement of the Claim.

FNV UK-5 (Interests).......

On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV UK-5 shall be Reinstated.

14

| | |
|---|---|
| FNV Loan-1 (Secured Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-1 shall receive one of the following treatments, to be determined at the sole option of FNV Loan: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Loan of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Loan and such holder shall have agreed upon in writing. At the option of FNV Loan, FNV Loan may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |
| FNV Loan-2 (Other Priority Claims).................... | On the Distribution Date, the Allowed Claims in Class FNV Loan-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Loan and such holder shall have agreed upon in writing. |
| FNV Loan-3 (General Unsecured Claims).......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-3 shall receive one of the following treatments, to be determined at the sole option of FNV Loan: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim, (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Loan and such holder shall have agreed upon in writing. |
| FNV Loan-4 (Convenience Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |
| FNV Loan-5 (Interests)..... | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Loan-5 shall be Reinstated. |
| FNV Mezzanine-1 (Secured Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Mezzanine-1 shall receive one of the following treatments, to be determined at the sole option of FNV Mezzanine: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Mezzanine of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Mezzanine and such holder shall have agreed upon in writing. At the option of FNV Mezzanine, FNV Mezzanine may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |

15

FNV Mezzanine-2 (Other
Priority Claims) ...........   On the Distribution Date, the Allowed Claims in
                              Class FNV Mezzanine-2 shall (i) be Reinstated,
                              provided, however, that such treatment shall be
                              no less favorable than that provided in section
                              1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii)
                              receive such other treatment as to which FNV
                              Mezzanine and such holder shall have agreed upon
                              in writing.

FNV Mezzanine-3 (General
Unsecured Claims) ..........   On the Distribution Date, each holder of an
                              Allowed Claim in Class FNV Mezzanine-3 shall
                              receive one of the following treatments, to be
                              determined at the sole option of FNV Mezzanine:
                              (i) payment of Cash in an amount equal to the
                              unpaid portion, without postpetition interest, of
                              such Allowed General Unsecured Claim; (ii)
                              Reinstatement of such Allowed General Unsecured
                              Claim or (iii) such other treatment as to which
                              FNV Mezzanine and such holder shall have agreed
                              upon in writing.

FNV Mezzanine-4
(Convenience Claims) .......   On the Distribution Date, each holder of an
                              Allowed Claim in Class FNV Mezzanine-4 shall
                              receive payment in full, without postpetition
                              interest, in Cash, not to exceed $25,000, of such
                              Allowed Convenience Claim.

FNV Mezzanine-5
(Interests) ................   On the Distribution Date, the legal, equitable
                              and contractual rights of holders of Allowed
                              Interests in Class FNV Mezzanine-5 shall remain
                              in effect, subject to the effect of the issuance
                              of Additional Mezzanine Common Stock to holders
                              of Allowed Equity Securities (S) 510(b) Claims in
                              Class FNV Mezzanine-6, if any.

FNV Mezzanine-6 (Equity
Securities (S) 510(b)
Claims) ....................   On the Distribution Date, each holder of an
                              Allowed Equity Securities (S) 510(b) Claim in
                              Class FNV Mezzanine-6, if any, shall receive a
                              distribution of Additional Mezzanine Common Stock
                              having a value, as determined by a Final Order,
                              equal to the holder's Pro Rata Share of the
                              Excess Amount with respect to all Allowed Equity
                              Securities (S) 510(b) Claims in Class FNV
                              Mezzanine-6.

FNV Portfolio-1 (Secured
Claims) ....................   On the Distribution Date, each holder of an
                              Allowed Claim in Class FNV Portfolio-1 shall
                              receive one of the following treatments, to be
                              determined at the sole option of FNV Portfolio:
                              (i) Reinstatement of such Allowed Secured Claim;
                              (ii) payment of Cash in an amount equal to the
                              unpaid portion of such Allowed Secured Claim plus
                              postpetition interest, in which case, the Lien
                              arising from such Allowed Secured Claim shall be
                              released upon payment; (iii) surrender by FNV
                              Portfolio of the asset subject to the Lien of the
                              holder of the Allowed Secured Claim or (iv) such
                              other treatment as to which FNV Portfolio and
                              such holder shall have agreed upon in writing. At
                              the option of FNV Portfolio, FNV Portfolio may
                              elect to exercise a different option for each
                              asset subject to the Lien of the holder of an
                              Allowed Secured Claim.

16

FNV Portfolio-2 (Other Priority Claims) . . . . . . . . . . . On the Distribution Date, the Allowed Claims in Class FNV Portfolio-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Portfolio and such holder shall have agreed upon in writing.

FNV Portfolio-3 (General Unsecured Claims) . . . . . . . . . . On the Distribution Date, each holder of an Allowed Claim in Class FNV Portfolio-3 shall receive one of the following treatments, to be determined at the sole option of FNV Portfolio: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim; (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Portfolio and such holder shall have agreed upon in writing.

FNV Portfolio-4 (Convenience Claims) . . . . . . . On the Distribution Date, each holder of an Allowed Claim in Class FNV Portfolio-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

FNV Portfolio-5 (Interests) . . . . . . . . . . . . . . . On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Portfolio-5 shall be Reinstated.

FNV Technology-1 (Secured Claims) . . . . . . . . . . . . . . . . . . . . On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-1 shall receive one of the following treatments, to be determined at the sole option of FNV Technology: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Technology of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Technology and such holder shall have agreed upon in writing. At the option of FNV Technology, FNV Technology may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

FNV Technology-2 (Other Priority Claims) . . . . . . . . . . . On the Distribution Date, the Allowed Claims in Class FNV Technology-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Technology and such holder shall have agreed upon in writing.

17

| FNV Technology-3 (General Unsecured Claims).......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-3 shall receive one of the following treatments, to be determined at the sole option of FNV Technology: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim; (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Technology and such holder shall have agreed upon in writing. |
| FNV Technology-4 (Convenience Claims)....... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |
| FNV Technology-5 (Interests)................ | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Technology-5 shall be Reinstated. |
| FNV Trust-1 (Secured Claims)..................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Trust-1 shall receive one of the following treatments, to be determined at the sole option of FNV Trust: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (ii) surrender by FNV Trust of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iii) such other treatment as to which FNV Trust and such holder shall have agreed upon in writing. At the option of FNV Trust, FNV Trust may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |
| FNV Trust-2 (Other Priority Claims)........... | On the Distribution Date, the Allowed Claims in Class FNV Trust-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Trust and such holder shall have agreed upon in writing. |
| FNV Trust-3 (General Unsecured Claims).......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Trust-3 shall receive one of the following treatments, to be determined at the sole option of FNV Trust: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim or (ii) such other treatment as to which FNV Trust and such holder shall have agreed upon in writing. |
| FNV Trust-4 (Convenience Claims)..................... | On the Distribution Date, holders of Allowed Claims in Class FNV Trust-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |

18

FNV Trust-5 (TOPrS
Interests)................. On the Distribution Date, each holder of an
Allowed Interest in Class FNV Trust-5 shall
receive a distribution composed of (i) a Cash
payment equal to 52.5% of the liquidation
preference attributable to such Allowed Interest
(not including prepetition or postpetition
dividends), (ii) a Cash payment equal to 75% of
the amount of accrued and unpaid prepetition and
postpetition dividends attributable to such
Allowed Interest and (iii) New Senior Notes in
the principal amount of 22.5% of the liquidation
preference attributable to such Allowed Interest
(not including prepetition or postpetition
dividends) provided, however, that Allowed Claims
of the Indenture Trustees (including, but not
limited to, prepetition and postpetition fees,
costs, expenses, indemnification, disbursements,
advances and reasonable compensation for the
Indenture Trustee's counsel) shall be paid in
full in Cash on the Distribution Date.

FNV Trust-6 (Interests)....
On the Distribution Date, the legal, equitable
and contractual rights of holders of Allowed
Interests in Class FNV Trust-6 shall be
cancelled. Holders of Allowed Interests in Class
FNV Trust-6 shall receive any property of the
Estate of FNV Trust remaining after payment of
all other classes of Claims against and TOPrS
Interests in FNV Trust; provided, however, that
any Group Subordinated Debentures that otherwise
would be distributed to FNV Group hereunder shall
be cancelled.

IV.

BACKGROUND CONCERNING THE DEBTORS

A. General Background

For general background regarding the Debtors, creditors and Interest
holders should read the attached 10-K/A and 10-Q. The 10-K/A and 10-Q contain
information concerning the Debtors, their assets and their businesses, audited
consolidated financial statements for the year ended December 31, 2000 and
unaudited consolidated financial statements for the quarter ended March 31,
2001, and certain other financial information. In addition, for your ease of
reference, a chart of the corporate structure of the Debtors is attached
hereto as Exhibit H.

B. Supplemental or Updated Information

1. Legal Proceedings

The Debtors are debtors in possession in the Chapter 11 Cases and are
involved in the related legal proceedings, as described in Section V of this
Disclosure Statement ("THE DEBTORS' CHAPTER 11 CASES").

Prior to the commencement of the Chapter 11 Cases, the Debtors were parties
to certain other legal proceedings as more fully described in the attached 10-
K/A and 10-Q. Creditors and Interest holders are referred to Item 3, "Legal
Proceedings," of the 10-K/A and Part I, Item 1, Note H "Legal Proceedings," of
the 10-Q for information regarding those legal proceedings.

As they continue to operate, but subject to the automatic stay during the
pendency of the Chapter 11 Cases, the Debtors may become involved in future
legal proceedings arising in the ordinary course of their business.

2. Taxation

For a discussion of the federal tax attributes of the Debtors and the
federal tax consequences of the Plan, see Section XI of this Disclosure
Statement ("CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN").

3. Equity Ownership

   FNV Group is the ultimate parent company of the other Debtors. The common
stock of FNV Group is traded on the NYSE under the symbol "FNV." See "Market
Price Of And Dividends On The Registrant's Common Equity & Related Shareowner
Matters" in Item 5 of the 10-K/A for information regarding historic trading
information of the FNV Group Common Stock. Each share of common stock is
entitled to one vote per share.

   The following table sets forth information concerning the ownership of FNV
Group Common Stock by persons or groups owning in excess of 5% of the
outstanding stock, based on SEC filings made by those persons or groups. The
information is as of the date of those reports, which is indicated below.

| Name of Beneficial Owner | Number of Common Shares | Percent of Total Voting Power |
|---|---|---|
| Legg Mason Investment Trust, Inc. and affiliates (as of May 31, 2001).................................... | 5,900,000 | 9.65% |
| Barclays Global Investors and affiliates (as of June 1, 2001)............................................ | 4,125,000 | 6.74% |
| James D. Bennett and affiliates (as of February 12, 2001)................................................ | 3,468,100 | 5.66% |

4. Debt Structure

   A detailed description of the Debtors' debt structure is set forth in the
attached 10-K/A and March 31, 2001 Form 10-Q. As additional information, the
following table sets forth the actual consolidated capitalization of the
Debtors as of August 31, 2001 (the assumed Effective Date) and the pro forma
consolidated capitalization of the Debtors as of August 31, 2001 after giving
effect to the Plan. Dollar amounts are in thousands.

| | March 31, 2001(1) | August 31, 2001 Projected (2) | Pro Forma (2) (3) |
|---|---|---|---|
| Cash and cash equivalents............. | $ 1,624,207 | $ 2,481,252 | $  100,000 (4) |
| Long-Term Debt: | | | |
| Senior Debt(5)...................... | 11,191,207 | 11,485,404 | |
| Berkadia Loan Agreement............. | | | 5,985,841 |
| New Senior Notes.................... | | | 3,255,293 |
| Total Long-Term Debt.................. | 11,191,207 | 11,485,404 | 9,241,134 |
| TOPrS................................. | 111,550 | 111,550 | |
| Shareowners' Equity: | | | |
| Common Stock, $.01 par, 64,849,000, 64,849,000 and 128,568,000 issued, respectively...................... | 648 | 648 | 1,286 |
| Additional Capital.................. | 1,113,064 | 1,103,642 | 1,103,004 |
| Retained (Deficit).................. | (359,181) | (277,709) | (282,241) |
| Accumulated Other Comprehensive Loss.............................. | (1,115) | | |
| Common Stock in Treasury, 3,693,000, 3,629,000 and 3,629,000 shares, respectively...................... | (172,496) | (169,739) | (169,739) |
| Total Shareowners' Equity............. | 580,920 | 656,842 | 652,310 |
| Total Capitalization.................. | $11,883,677 | $12,253,796 | $9,893,444 |
| Secured Debt(6)....................... | $ 1,515,650 | $ 1,483,534 | $1,483,534 |

--------

(1) Represents historical information as reported in the Debtors' attached
    Form 10-Q. The historic information is presented in conformity with
    generally accepted accounting principles.
(2) Adjustments have been made to the historical accounting basis of certain
    of the Debtors' assets and liabilities as of the Effective Date. These
    adjustments include the charge-off of all remaining goodwill

($43.3 million); the charge-off of unamortized deferred loan origination costs ($32.9 million); the charge-off of unamortized debt discounts and deferred debt issuance costs ($28.2 million); the recognition of deferred net gains from the termination of interest rate swap agreements ($74.0 million); and a gain recognized on the discounted payment with respect to the TOPrS ($28.9 million). Amounts for long-term debt and TOPrS are reflected at face amounts or par. As a result of these adjustments and the manner in which the pro forma adjustments were reflected below, this presentation does not conform to generally accepted accounting principles.

(3) The pro forma capitalization amounts include adjustments of projected results for the transactions contemplated in the Plan. The par value of stock to be issued to the Berkadia Parties on the Effective Date (approximately 63.7 million shares) has been allocated from additional capital to common stock; no adjustments have been made to reflect the fair value of the stock issued. All debt amounts are reflected at face value. The amounts do not reflect the application of fresh start accounting procedures, which, if applicable, would generally require assets and liabilities to be stated at fair values and certain other adjustments.

(4) The pro forma information reflects payment of the funding fee of $60 million to Berkadia, other estimated financing costs related to the Berkadia Loan of $20 million and payment of prepetition and postpetition interest and dividends of approximately $500 million.

(5) The historic and projected results reflect book value (net of unamortized discounts) of the outstanding debt plus accrued interest. The balances exclude all nonrecourse debt and various other payables and deposits totaling $96.5 million at August 31, 2001.

(6) The amounts presented in total capitalization exclude substantially all of the secured debt. Secured debt primarily consists of nonrecourse debt applicable to leveraged leases wherein the lender only has recourse to the assets being leased. For reporting purposes, the nonrecourse debt has been netted against the investment in leveraged leases on the consolidated balance sheet. This item does not include the Berkadia Loan or the New Senior Notes, which will be secured when issued.

5. Management

    FNV Group, the ultimate parent of the other Debtors, is managed by its executive officers, subject to the supervision of the Board of Directors. FNV Group has entered into a Management Services Agreement with Leucadia, a copy of which is attached hereto as Exhibit C. The Bankruptcy Court approved that agreement on June 13, 2001. The agreement provides that, prior to the Effective Date, Leucadia, on behalf of Berkadia, will provide advice and assistance to the Debtors related to the restructuring and management of the Debtors' asset portfolio, subject to oversight by FNV Group's Board and a special committee of the Board. Following the Effective Date, Leucadia will have management responsibility for FNV Group, subject to the authority of the Board of Directors. Leucadia and Berkshire have agreed that Leucadia will exercise its authority under the Management Services Agreement in a manner mutually acceptable to Leucadia and Berkshire. The Plan provides that the Berkadia Parties will be entitled to designate a majority of the Board of Directors of Reorganized FNV Group at the Effective Date.

    The members of the current Board of Directors of FNV Group are:

. G. Robert Durham. Chairman of the Board since March 2001, and Board member since 1992. Retired Chairman and Chief Executive Officer of Walter Industries, Inc. (a homebuilding and financing, building materials, natural resources and industrial manufacturing company) since 1996. He served as Chairman and Chief Executive Officer from 1991 to 1996. Former Chairman, President and Chief Executive Officer of Phelps Dodge Corporation (a mining company). Director of The MONY Group Inc. (formerly Mutual Life Insurance Company of New York), Amphenol Corp. and Earle M. Jorgensen Co. Age 72.

. Robert H. Clark, Jr. Board member since 1997. Chairman since 1999, Chief Executive Officer since 1993, President since 1983 and a director since 1968 of Case, Pomeroy & Company, Inc. (real estate, oil & gas and investment activities). Also a director of Homestake Mining Company. Age 60.

. Constance R. Curran. Board member since 1998. President of Cardinal
  Health Consulting Services since 2000. Previously was President and Chief
  Executive Officer of CurranCARE, Inc. (a nationwide healthcare management
  company) since 1995. Vice Chairman and National Director of APM, Patient
  Care Services from 1990-1995. Formerly Vice President of the American
  Hospital Association and Dean, the Medical College of Wisconsin. Editor
  of Nursing Economic$ since 1990. Age 53.

. James L. Johnson. Board member since 1992. Chairman Emeritus of GTE
  Corporation (a diversified telecommunications company) since 1993. Before
  that he was its Chairman and Chief Executive Officer. Director of The
  MONY Group Inc. (formerly Mutual Life Insurance Company of New York),
  Harte/Hanks Communications Co., Inc., Cell Star Corporation, Valero
  Energy Corporation and Walter Industries, Inc. Age 73.

. Kenneth R. Smith. Board member since 1992. Eller Distinguished Service
  Professor of Economics since 1980, Dean of the Karl Eller Graduate School
  of Management and the Eller College of Business and Public Administration
  from 1980 to 1995, and Vice Provost from 1992 to 1995 of The University
  of Arizona. Chairman since 1996 and director since 1990 of Apache
  Nitrogen Products, Inc. Chairman of GroupSystems.com, Inc. Former
  director of Southwest Gas Corporation. Age 58.

. Shoshana B. Tancer. Board member since 1994. Professor Emeritus of
  International Studies since 2001 and a Professor for more than five years
  and Director of the North American Free Trade Agreement Center since 1993
  of Thunderbird, the American Graduate School of International Management.
  Formerly of-counsel to the law firm of Ryley, Carlock & Applewhite, P.A.
  since 1999. Previously of-counsel to O'Connor, Cavanagh, Anderson,
  Killingsworth & Beshears for more than five years. Former director of
  Mountain Bell (the predecessor of U.S. West, Inc.) and three subsidiaries
  of Merabank, a Federal Savings Bank. Age 65.

. John W. Teets. Board member since 1992. Chairman and Chief Executive
  Officer of J.W. Teets Enterprises, L.L.C. since 1997. Before that he was
  the Chairman and Chief Executive Officer or similar positions of Viad
  Corp, formerly The Dial Corp, for more than 5 years. Age 67.

The executive officers of FNV Group are:

. William J. Hallinan. President and Chief Executive Officer, General
  Counsel and Secretary of FNV Group, and President, Chief Executive
  Officer and General Counsel of FNV Capital since March 2001. Previously,
  Senior Vice President-General Counsel and Secretary of FNV Group and FNV
  Capital for more than five years. Age 58.

. Derek C. Bruns. Senior Vice President--Internal Audit of FNV Group and
  FNV Capital for more than five years. Age 41.

. Jack Fields III. Executive Vice President or similar positions of FNV
  Capital for more than five years. Age 46.

. Bruno A. Marszowski. Senior Vice President--Controller and Chief
  Financial Officer of FNV Group and FNV Capital for more than five years.
  Age 59.

. William C. Roche. Senior Vice President--Human Resources & Facilities
  Planning of FNV Group and FNV Capital for more than five years. Age 47.

. Stuart C. Tashlik. Senior Vice President--Planning & Communications of
  FNV Group since 1999. Previously, Senior Vice President or similar
  positions of FNV Capital for more than five years. Age 45.

As of the Effective Date, the members of the Reorganized FNV Group Board of
Directors shall be:

. Ian M. Cumming. A director and Chairman of the Board of Leucadia since
  June 1978. In addition, a director of Allcity Insurance Company
  ("Allcity") and MK Gold Company ("MK Gold"), two consolidated
  subsidiaries of Leucadia. Allcity is a property and casualty insurer and
  MK Gold is an international mining company. Also a director of Skywest,
  Inc., a Utah-based regional air carrier, and HomeFed Corporation
  ("HomeFed"), a publicly held real estate development company. Age 60.

22

. Joseph S. Steinberg. A director of Leucadia since December 1978 and President of Leucadia since January 1979. Also, Chairman of the Board of HomeFed and Allcity and a director of MK Gold and Jordan Industries, Inc., a public company, approximately 10% of the common stock of which is beneficially owned by Leucadia, which owns and manages manufacturing companies. Age 57.

. Lawrence S. Hershfield. An executive officer of subsidiaries of Leucadia since November 1995, with diverse managerial and business development responsibilities. From September 1993 to October 1995, he served as Executive Vice President of Leucadia. Age 44.

. R. Gregory Morgan. A partner in the law firm of Munger, Tolles & Olson LLP, counsel to Berkshire, where he has practiced since 1981. Age 47.

. G. Robert Durham. Chairman of the Board since March 2001, and Board member since 1992. Retired Chairman and Chief Executive Officer of Walter Industries, Inc. (a homebuilding and financing, building materials, natural resources and industrial manufacturing company) since 1996. He served as Chairman and Chief Executive Officer from 1991 to 1996. Former Chairman, President and Chief Executive Officer of Phelps Dodge Corporation (a mining company). Director of The MONY Group Inc. (formerly Mutual Life Insurance Company of New York), Amphenol Corp. and Earle M. Jorgensen Co. Age 72.

. Kenneth R. Smith. Board member since 1992. Eller Distinguished Service Professor of Economics since 1980, Dean of the Karl Eller Graduate School of Management and the Eller College of Business and Public Administration from 1980 to 1995, and Vice Provost from 1992 to 1995 of The University of Arizona. Chairman since 1996 and director since 1990 of Apache Nitrogen Products, Inc. Chairman of GroupSystems.com, Inc. Former director of Southwest Gas Corporation. Age 58.

. There shall be one additional member of the Reorganized FNV Group Board of Directors designated by the Creditors' Committee. The Plan Supplement shall set forth the identity of this director.

Pursuant to the New Bylaws of FNV Group that will be adopted as of the Effective Date, the Board of Directors will consist of no fewer than five persons. The compensation of officers and directors of FNV Group who are current insiders is set forth in the 10-K/A.

As previously discussed, FNV Group is a holding company. The principal operating subsidiary of FNV Group, FNV Capital, is primarily responsible for the operation and management of the Debtors' business. The directors of FNV Capital are Messrs. Durham and Smith, whose biographies are summarized above. Pursuant to the New Bylaws of FNV Capital, the Board of Directors is to consist of no fewer than five persons. As of the Effective Date, the members of the Reorganized FNV Capital Board of Directors shall be the same seven individuals who are members of the Reorganized FNV Group Board of Directors.

The Post-Effective Date officers and directors of (i) FINOVA (Canada) Capital Corporation ("FNV Canada"); (ii) FINOVA Capital plc ("FNV UK"); (iii) FINOVA Loan Administration Inc. ("FNV Loan"); (iv) FNV Mezzanine; (v) FINOVA Portfolio Services, Inc. ("FNV Portfolio"); and (vi) FINOVA Technology Finance, Inc. ("FNV Technology") and the terms and compensation of officers and directors of those Debtors and of FNV Capital who are current insiders will be set forth in the Plan Supplement.

6. Related Party Transactions

For a description of the Debtors' transactions with related parties, see the attached 10-K/A.

23

V.

THE DEBTORS' CHAPTER 11 CASES

A. Events Preceding the Filing of the Chapter 11 Cases

Reference is made to Annex A of the attached 10-K/A, in the section entitled, "Management's Discussion and Analysis of Financial Condition and Results of Operations-Recent Developments and Business Outlook," for a discussion of events preceding the filing of the Chapter 11 Cases.

In an effort to maximize value to the creditors of the Debtors, FNV Group and FNV Capital entered into a transaction with Berkadia that contemplates, among other things, the restructuring of the Debtors' bank and bond debt in these Chapter 11 Cases. For a brief description of this transaction, see Article III of this Disclosure Statement ("OVERVIEW OF THE PLAN"). Reference is further made to the Commitment Letter attached hereto as Exhibit D and to the term sheets for the Berkadia Loan, New Senior Notes and the Intercompany Note (the "Term Sheets"), each of which is attached as an exhibit to the Plan. The description in Article III of this Disclosure Statement is qualified in its entirety by the Plan and the Term Sheets, and the provisions of the Plan and Term Sheets are controlling in the event of any inconsistency.

B. The Commencement of the Chapter 11 Cases

The Debtors filed voluntary petitions commencing the Chapter 11 Cases on March 7, 2001 (the "Petition Date"), to assure that the interests of creditors, stockholders and other parties in interest would be protected and treated fairly.

Because of the interrelationships among the Debtors, and to avoid duplication resulting from separate handling of their Chapter 11 Cases, the Bankruptcy Court has ordered the joint administration of the Debtors' Chapter 11 Cases. Joint administration provides only procedural relief that allows the Chapter 11 Cases to be administered as a single case. It does not affect the substantive rights of the Debtors or their creditors and stockholders. The assets and liabilities of the Debtors will remain separate and distinct, unless otherwise ordered by the Bankruptcy Court.

Except as otherwise provided in the Bankruptcy Code, the Debtors are "debtors in possession" with full authority to continue to operate and manage their businesses in the ordinary course, without prior approval of the Bankruptcy Court. Generally, only transactions that are outside of the ordinary course of business require prior approval.

On the Petition Date, the Debtors sought and were granted certain relief necessary to the continued operation of their businesses and an effective reorganization. First, the Bankruptcy Court entered an order clarifying the Debtors' authority to undertake all of their ordinary business functions, including but not limited to (i) honoring, renewing, increasing and/or funding prepetition commitments in the ordinary course of business, (ii) honoring existing servicing obligations in the ordinary course of business, (iii) selling or leasing repossessed, refurbished and leased assets in the ordinary course of business, (iv) managing their loan portfolios in the ordinary course of business, (v) making intercompany loans, payments and transfers in the ordinary course of business, and (vi) paying third party obligations and prepetition Claims to preserve, enhance and maximize the value of estate assets and/or as necessary to the performance of the actions approved above.

Second, the Bankruptcy Court entered orders authorizing (i) the payment of the Debtors' prepetition tax and fee obligations owing to federal, state and local governmental entities, both domestic and foreign, (ii) the payment, in the ordinary course of business, as and when due, of any prepetition Claims owing by the Debtors to certain foreign creditors, (iii) the payment of prepetition employee and director compensation, benefits and expense reimbursement owing by the Debtors to employees (including former and temporary employees) and directors, and (iv) the continuation, in the ordinary course of business, of all programs, policies and plans with respect to employees, including retired and former employees, that were in effect as of the Petition Date, including payments under the prepetition retention and severance plans and obligations customarily associated with the delivery of employee benefits, including, if necessary, any workers' compensation premiums and deductibles that were owed in respect of prepetition injuries.

24

Third, the Bankruptcy Court entered orders (i) authorizing the retention and compensation of certain professionals utilized in the ordinary course of the Debtors' businesses, within certain specified limits in place of the normal restriction imposed by the Bankruptcy Code, (ii) authorizing the Debtors' investment guidelines, and (iii) permitting the continued use of the Debtors' existing bank accounts and cash management systems.

In addition, the Debtors were authorized to retain the following professionals to represent their interests in the Chapter 11 Cases:

| | |
|---|---|
| Gibson, Dunn & Crutcher LLP<br>The Met Life Building<br>200 Park Avenue<br>New York, New York 10166-0193 | The Debtors' Restructuring and Corporate Counsel |
| Richards, Layton & Finger, P.A.<br>One Rodney Square<br>P.O. Box 551<br>Wilmington, Delaware 19899 | The Debtors' Delaware Restructuring Counsel |
| Ernst & Young LLP<br>40 North Centre Avenue<br>Phoenix, Arizona 85004 | The Debtors' Accountants |
| Rothschild, Inc.<br>1251 Avenue of the Americas<br>New York, New York 10020 | The Debtors' Financial Advisors (/2/) |
| Secured Capital Corp.<br>11150 Santa Monica Blvd Suite 1400<br>Los Angeles, California 90025 | The Debtors' Broker in Connection with the Sale of Certain Assets |

C. Significant Parties in Interest

1. Creditors' Committee

On March 20, 2001, the United States Trustee appointed an official committee of creditors to represent the interests of creditors holding general unsecured Claims. The Creditors' Committee is currently composed of:

    Angelo Gordon & Co., L.P.
    Pacific Investment Management Co., LLC
    Oaktree Capital Management, LLC
    Franklin Mutual Advisors, LLC
    Metropolitan West Asset Management
    Appaloosa Management, L.P.
    The Chase Manhattan Bank
    Citibank
    The Bank of New York
    Wilmington Trust Company
--------
(2)  A motion has been filed; however, an order approving such financial advisor has not yet been entered.

2. Equity Committee

On or about April 27, 2001, the United States Trustee appointed an official committee of equity holders to represent the interests of holders of equity Interests (the "Equity Committee"). The Equity Committee is currently composed of:

    Legg Mason Investment Trust, Inc.
    Bennett Management
    Greenlight Capital
    Dimensional Fund Advisors
    Samuel H. Park, M.D.
    Nicholas A. Rago
    Eugene Linden

D. Events During Chapter 11 Cases

On March 6, 2001, the day before the Petition Date, a creditor's bankruptcy petition was filed against FNV Canada in the Ontario Superior Court of Justice in Bankruptcy by The Bank of Nova Scotia, as agent for FNV Canada's bank lenders. Also on March 6, The Bank of Nova Scotia obtained an injunction from the Ontario Superior Court of Justice (Commercial List), on an ex parte basis, restricting the ability of FNV Canada from transferring its assets to or for the benefit of FNV Capital or its other affiliates. In response to a motion for an order granting relief from the automatic stay and a motion for a preliminary injunction and temporary restraining order, filed in the Bankruptcy Court by The Bank of Nova Scotia, the Debtors have entered into a stipulation, and an extension of such stipulation, with The Bank of Nova Scotia whereby the Debtors have permitted The Bank of Nova Scotia to apply for an extension of the injunction issued by the Ontario Superior Court of Justice through August 31, 2001, which extension has been granted.

The Debtors have also entered into a stipulation with ABN AMRO Bank, N.V. ("ABN AMRO"), as agent for FNV UK's bank lenders, whereby the Debtors have agreed to provide ABN AMRO with no less than 15 days' prior written notice before transferring any of the assets of FNV UK to or for the benefit of the other Debtors or their non-debtor affiliates. Upon receipt of such notice, ABN AMRO may object to such a transfer and request a hearing before the Bankruptcy Court.

During the Chapter 11 Cases, certain parties in interest have filed motions for relief from the automatic stay to allow such parties to pursue their interests in the Debtors' property. The resolution of the majority of those motions is currently pending. In addition, during the Chapter 11 Cases, the Debtors have sought approval of the Bankruptcy Court to implement certain incentive and retention plans regarding the Debtors' employees and to sell certain of their loans outside the ordinary course of business as part of a program to divest discontinued and other operations. Finally, during the Chapter 11 Cases, the Debtors have filed a motion for an order clarifying that no part of the trust estate under their Leveraged Leases (except the Debtors' beneficial interest as owner participant thereunder) shall be included in, or be subject to, any declaration or adjudication of, or proceedings with respect to the Debtors' bankruptcy cases.

VI.

DESCRIPTION OF THE PLAN OF REORGANIZATION

A. Overview and Restructuring Transactions

For a brief description of certain material provisions of the Plan, see Article III of this Disclosure Statement ("OVERVIEW OF THE PLAN"). Reference is further made to the Commitment Letter and the Term Sheets for the Berkadia Loan and New Senior Notes (attached as Exhibit D hereto). The description in Article III of this Disclosure Statement is qualified in its entirety by the Plan and the Term Sheets, and the provisions of the Plan and Term Sheets are controlling in the event of any inconsistency.

26

B. Classification and Treatment of Claims and Interests

The Plan consists of nine separate plans of reorganization, one for each Debtor entity, which are as follows: FNV Group; FNV Capital; FNV Canada; FNV UK; FNV Loan; FNV Mezzanine; FNV Portfolio; FNV Technology; and FNV Trust.

Specific information regarding the treatment of Claims against and Interests in each Debtor is set forth in Section III of this Disclosure Statement ("OVERVIEW OF THE PLAN").

C. Implementation and Other Provisions of the Plan

1. Assumption or Rejection of Executory Contracts and Unexpired Leases

The Bankruptcy Code authorizes the Debtors, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. The Debtors may assume or reject those contracts or leases during the Chapter 11 Cases or pursuant to the Plan.

The Plan provides that all executory contracts and unexpired leases that exist between the Debtors and any person will be assumed as of the Effective Date, including Leveraged Leases (to the extent deemed executory contracts of the Debtors' estate), except for any contract or lease that has already been rejected in the Chapter 11 Cases or that is listed on Exhibit 7.1 to the Plan (as it may be amended from time to time).

The Debtors are parties to the following agreements with Holiday Hospitality Franchising, Inc. f/k/a Holiday Inns Franchising, Inc. ("Holiday"): (1) September 20, 1995, Comfort Letter from Holiday to FNV Capital in connection with the Holiday Inn Hotel located at Lafayette, IN #2811; (2) March 17, 1998 Comfort Letter from Holiday to FNV Capital, successor in interest to Belgravia Capital Corporation, in connection with the Holiday Inn Hotel located at Lauderdale by the Sea, FL #2898; (3) June 8, 1998, Comfort Letter from Holiday to FNV Capital, successor in interest to Belgravia Capital Corporation, in connection with the Holiday Inn Hotel located at Phoenix Old Town Scottsdale, AZ #4334; (4) October 28, 1999, Comfort Letter from Holiday to FNV Capital in connection with the Holiday Inn Sunspree Resort Hotel located at Great Smokies Asheville, NC #9549; and (5) any other Comfort Letter between Holiday and the Debtors (the "Comfort Letters"). Holiday contends that the Debtors may not assume and assign the Comfort Letters pursuant to 11 U.S.C. (S) 365(c). The Debtors reserve their rights to review the Comfort Letters and all other contracts to determine whether they are executory. The Debtors' proposed treatment of contracts and leases will be disclosed in the Plan Supplement.

Under the Bankruptcy Code, as a condition to assuming executory contracts and unexpired leases, the Debtors are required to cure any and all monetary defaults under the contracts and leases, and to provide adequate assurance of future performance thereunder. In the event of a dispute as to the existence of a default, or the nature, extent or amount of any required cure or adequate assurance will be determined by the Bankruptcy Court. The Debtors believe that they are substantially current on their obligations under executory contracts and unexpired leases. As a result, the Debtors do not expect to incur any material cure costs in connection with assumed executory contracts and unexpired leases.

Non-debtor parties to executory contracts and unexpired leases that are rejected by the Debtors pursuant to the Plan must assert any Claim arising out of the rejection by filing a proof of Claim no later than thirty (30) days after the date of service of the Confirmation Order. In the absence of a timely filed proof of Claim, any such Claims will be forever barred and will not be enforceable against the Debtors.

2. Issuance of New Debt and Equity Securities

The issuance by the appropriate Debtors of the New Senior Notes, the Intercompany Note, the note to be issued pursuant to the Berkadia Loan, the Additional Group Common Stock, the New Group Preferred Stock and the Additional Mezzanine Common Stock, if any, and the execution of the documentation relating to the Berkadia Loan and the New Senior Notes by the Debtors on the terms previously described, will be deemed

27

authorized as of the Effective Date without further act or action by any person, except as required by applicable law, regulation, order, or rule. All documents evidencing those securities will be executed and delivered by the Debtors as provided for in the Plan.

After the issuance of Additional Group Common Stock pursuant to the Restructuring Transactions, the beneficial owners (as such term is defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of more than 5% of the issued and outstanding common stock of Reorganized FNV Group are projected to be as follows:

| Name of Beneficial Owner | Percent of Total Voting Power |
| --- | --- |
| Berkshire Hathaway Inc. | up to 25.5% |
| Leucadia National Corporation | up to 25.5% |

3. Corporate Governance Matters

The Plan requires certain of the Debtors to amend and restate their corporate governance documents (certificates of incorporation, formation or registration, articles of incorporation or association, memoranda of association, memoranda of continuance, charters, bylaws, or one or more similar agreements, instruments or documents constituting the organization or formation of each of the Debtors) to the extent necessary to, among other things, (a) authorize the Restructuring Transactions, including but not limited to the issuance of stock contemplated to be issued under the Plan, (b) at the option of Berkadia, impose restrictions on the direct or indirect transferability of the common stock or other equity of Reorganized FNV Group such that (i) no Person (other than the Berkadia Parties) may acquire or accumulate five percent or more (as determined under tax law principles governing the application of Section 382 of the Tax Code) of the common stock or other equity of Reorganized FNV Group and (ii) no Person (other than the Berkadia Parties) owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to the Plan, or after any subsequent issuance of Additional Group Common Stock pursuant to the Plan, five percent or more (as determined under such tax law principles) of the common stock or other equity of Reorganized FNV Group, may acquire additional shares of that common stock or other equity of Reorganized FNV Group, subject to certain exceptions, (c) prohibit the issuance of non-voting equity securities, (d) with respect to FNV Group, eliminate, among other things, the provision relating to certain Business Combinations (as defined in FNV Group's pre-Effective Date Certificate of Incorporation), and (e) with respect to FNV Group, terminate the Rights Plan without any payment by FNV Group and without the Rights thereunder having separated from the FNV Group common stock or having become exercisable. Copies of the New Corporate Documents will be filed with the Plan Supplement.

4. Plan Distribution Entitlement; Dispute Provisions

Distribution or retention of property as provided in the Plan is available only for Allowed Claims and Allowed Interests. Claims and Interests that are not Allowed as of the Effective Date but which ultimately become Allowed will be entitled to the treatment provided in the Plan as if such Claims or Interests had been Allowed on the Distribution Date, and such Claims or Interests will receive distributions within 30 days after the Claim or Interest becomes Allowed.

Under the Plan, the Reorganized Debtors have the exclusive right to make and file Objections to and settle, compromise or otherwise resolve Claims and Interests, except that as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, objections may be made in accordance with the applicable Bankruptcy Rules by parties in interest in these Chapter 11 Cases. In addition, the Debtors may, at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest subject to estimation under section 502(c) of the Bankruptcy Code and for which the Debtors may be liable under this Plan, including any Disputed Claim for taxes, to the extent permitted by section 502(c) of the

28

Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim. In the event that the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim or Interest, that estimated amount will constitute (at the Debtors' option, to be exercised at the commencement of the estimation proceeding) either the Allowed amount of such Claim or Interest or a maximum limitation on the Allowed amount of such Claim or Interest, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim or Interest, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate allowance on such Claim or Interest. Furthermore, after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Interest without approval of the Bankruptcy Court.

### 5. Distribution Procedures

The Plan provides that all distributions of property to holders of Allowed Claims or Allowed Interests shall be made by the applicable Disbursing Agent on the later of the Effective Date or 30 days after the date that a particular Claim or Interest becomes Allowed. Distributions will be made to holders of Allowed Claims and Allowed Interests as of the Distribution Record Date, and the Disbursing Agent shall not honor any transfers of Claims or Interests occurring after the Distribution Record Date. However, no distribution under the Plan shall be made to or on behalf of any holder of an Allowed Claim evidenced by a note or other document unless and until such instruments, securities or other documentation are surrendered to and received by the Disbursing Agent.

Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day. Plan distributions that are not claimed or are undeliverable for a period of one year following the applicable Distribution Date shall revert to the applicable Reorganized Debtor, free of any restrictions thereon, and any entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and forever barred.

All distributions under the Plan on account of Allowed Claims shall be made by the Disbursing Agent to the holder of the Allowed Claim, as of the Distribution Record Date, (a) if a proof of Claim is filed in respect of a particular Claim, at the address of such holder set forth in the relevant proof of Claim, as such address may have been updated pursuant to Bankruptcy Rule 2002(g) or (b) if no proof of Claim is filed in respect of a particular Claim, at the address set forth in the relevant Debtor's Schedules, as such address may have been updated pursuant to Bankruptcy Rule 2002(g). All distributions under the Plan on account of Allowed Interests shall be made by the Disbursing Agent to the holder of the Allowed Interest, as of the Distribution Record Date, at the address of such holder as listed in the equity interest ledger maintained by or on behalf of the applicable Debtor as of the Distribution Record Date. However, if the Debtors or the Reorganized Debtors have been notified, no later than ten Business Days prior to the Distribution Record Date, in writing of a change of address by such holder that provides an address different from that specified in the preceding sentences, then the distribution shall be made at the address contained in the written notification. Nothing contained in the Plan will require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim or Allowed Interest.

### 6. Retention of Causes of Action

With the exception of any claims, rights or causes of action against (i) Berkadia, Leucadia, Berkshire and their respective Affiliates, and the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of each of Berkadia, Leucadia, Berkshire and their respective Affiliates, and (ii) each of the Official Committees, their current and former respective members (in their capacities as members of such Official Committees), and their agents, advisors, attorneys and representatives (in such capacities), which the Debtors will release pursuant to the Commitment Letter and the Plan, the Debtors do not release or abandon any claims, rights or causes of action held by them or their estates, and the Reorganized Debtors may seek to assert such claims, rights and causes of action against any persons at any time, subject to any applicable statutes of limitation. Because of the significant recoveries for creditors provided pursuant to the Plan, the Debtors do not believe that there will be any material recovery on account of avoidance actions. Nevertheless, the Debtors do not believe that it is in the best interest of their estates to abandon these causes of action. Any recoveries

29

realized by the Reorganized Debtors from the assertion of any claims, rights and causes of action will be the sole property of the Reorganized Debtors. To the extent necessary, the Reorganized Debtors will be deemed representatives of their former estates under section 1123(b) of the Bankruptcy Code.

7. Effect of Confirmation of Plan

The Plan as confirmed by the Bankruptcy Court is binding on and shall inure to the benefit of the Debtors and all holders of Claims and Interests.

On the Effective Date, the property of the Estates of each of the Debtors, other than FNV Trust, will revest in the respective Reorganized Debtors, free and clear of all Claims and Interests, unless otherwise provided in the Plan. The Debtors will be free to operate their businesses and to use, acquire and dispose of property without any restrictions arising from the Bankruptcy Code, subject to any limitations imposed by the Plan.

The treatment of Claims and Interests provided in the Plan is in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on any Claims from and after the Petition Date, against the Debtors or any of their assets or properties. Unless the Plan otherwise provides, the Debtors are discharged from any and all Claims whether or not a proof of Claim, a proof of Interest or request for payment of a Claim was filed and whether or not the holder of a Claim voted on the Plan. Judgments and Liens obtained against the Debtors on account of Claims that accrued prior to the Petition Date will be discharged by the Plan. All persons are enjoined from commencing or continuing any action, employing process, or taking any act to collect, recover or offset any Claim or other debt against any Debtor that arose prior to the Petition Date.

On the Effective Date, in exchange for their receipt of distributions and other treatment contemplated under this Plan, each holder of a Claim or Interest shall release unconditionally any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against (i) any Debtor or Affiliate thereof and (ii) Berkadia, Leucadia, Berkshire and their respective Affiliates, and the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of each of Berkadia, Leucadia, Berkshire and their respective Affiliates, whether then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, provided, however, that neither any Debtor nor any entity that is an Affiliate of any Debtor prior to the Effective Date shall be released from (a) the right to enforce the Debtors' or the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, (b) any rights under assumed contracts, Loan Commitments, Leveraged Leases, Retirement Agreements and other contracts that are not rejected or otherwise extinguished by order of the Bankruptcy Court or pursuant to the Plan, or (c) any rights, claims or interests that are Reinstated under the terms of the Plan.

In addition, on the Effective Date, each of the Debtors shall release unconditionally, and shall be deemed forever to release unconditionally, (i) Berkadia, Leucadia, Berkshire and their respective Affiliates and each of the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of Berkadia, Leucadia, Berkshire and their respective Affiliates, and (ii) each of the Official Committees, their current and former respective members (in their capacities as members of such Official Committees), and their agents, advisors, attorneys and representatives (in such capacities), from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce their respective obligations to the Debtors or the Reorganized Debtors under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement.

The Confirmation Order will constitute an injunction permanently enjoining the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claim, demand, debt, liability, cause of action, right or Interest released and waived pursuant to the Plan against the released parties.

After the Effective Date, the Official Committees will cease to exist and their members, employees and agents will have no further authority or duties in connection with the applicable Official Committee, except with respect to (i) all applications for Professional Fees, until such matters are finally resolved, (ii) any post-Confirmation modifications to the Plan or Confirmation Order, and (iii) any matters pending as of the Effective Date before the Bankruptcy Court to which the applicable Official Committee is a party, until such matters are finally resolved.

The Debtors may employ and pay professionals, including any professionals retained in the Chapter 11 Cases, with respect to services to be rendered after the Effective Date, including services in connection with the implementation and consummation of the Plan, without further order of the Bankruptcy Court.

8. Implementing Documents and Transactions; No Transfer Taxes

All material documents necessary to effectuate the Plan will be provided in the Plan Supplement, which will be filed by the Debtors with the Bankruptcy Court no later than ten Business Days prior to the deadline for objections to entry of the Confirmation Order. Among the documents to be included in the Plan Supplement will be the Berkadia Loan Documents, the documentation for the New Senior Notes, the New Corporate Documents, the New Group Preferred Stock, the Intercompany Note and Exhibits to the Plan that are finalized after the date hereof. Term sheets for the Berkadia Loan, the New Senior Notes and the Intercompany Note are annexed as exhibits to the Plan which is annexed hereto as Exhibit A. Upon its filing with the Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Debtors' counsel. A copy of the Plan Supplement will also be posted at www.finova.com.

Appropriate officers, directors and trustees of each Debtor or Reorganized Debtor, as further described in the Plan, will be authorized to execute documents and take all other actions as may be necessary or appropriate to effectuate and implement the terms and provisions of the Plan and the transactions contemplated thereby.

Pursuant to section 1146(c) of the Bankruptcy Code, no stamp, real estate transfer, mortgage recording or other similar tax may be imposed upon the issuance, transfer or exchange of notes or equity securities under the Plan, including, without limitation, the New Senior Notes, the Intercompany Note, the note issued to evidence the Berkadia Loan, including security interests to be granted pursuant to the Berkadia Loan, the New Senior Notes or the Intercompany Note, all other debt public and private or the New Group Preferred Stock (if any is issued), the Additional Group Common Stock or the Additional Mezzanine Common Stock (if any is issued), the creation of any Lien, the making, assignment or surrender of any lease or sublease, the creation of any mortgage, deed of trust or other security interest, the making or delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in connection with the Plan, whether involving real or personal property, including, without limitation, any merger agreements or agreements of amalgamation or consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan. All sale transactions (i) consummated by the Debtors and (ii) either (A) approved by the Bankruptcy Court in the Ordinary Course of Business Order, or (B) approved in the ordinary course of the Debtors' business by separate order of the Bankruptcy Court on or after the Petition Date through and including the Effective Date, involving the sale by the Debtors of owned property in the ordinary course or pursuant to section 363(b) of the Bankruptcy Code or otherwise and the assumption, assignment and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of and in connection with the Plan and, thus, shall not be subject to any stamp tax, real estate transfer, mortgage recording or other similar tax. If the Debtors pay or have paid any such tax, they will be entitled to a refund thereof upon or after the Effective Date.

31

9. Amendment of Plan; Severability; Revocation

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, if the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before the Effective Date, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court after notice and hearing confirms the Plan as altered, amended or modified. A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of the holder. Otherwise, the Debtors may alter, amend or modify the treatment of Claims and Interests provided for under the Plan only if the holders of Claims or Interests affected thereby agree or consent to any such alteration, amendment or modification. Berkadia will have no obligation to fund the Berkadia Loan if the Plan as altered, amended or modified is not in form and substance reasonably satisfactory to Berkadia.

The Plan constitutes a separate plan of reorganization for each of the nine Debtors. Accordingly, the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Should any of such separate plans not be confirmed, the other Debtors may elect to alter, amend, revoke or withdraw the other separate plans or to seek Confirmation thereof. Should the Plan as altered, amended, revoked or withdrawn not be reasonably satisfactory, in form and substance, to Berkadia, or should any of the Debtors' separate plans of reorganization not be confirmed and the Debtors elect to consummate any or all of the other separate plans, Berkadia will have no obligation to fund the Berkadia Loan.

The Debtors may revoke or withdraw the Plan at any time prior to the Confirmation Date, in which event the Plan will be null and void and will have no effect on, and will not constitute a waiver or release of, any claims or rights of the Debtors, any other party in interest or any person in any further proceedings involving the Debtors.

10. Retention of Jurisdiction

The Plan provides for the Bankruptcy Court to retain broad, exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan.

D. Treatment of Securities Litigation

The Plan provides that no distribution shall be made on account of any Securities Litigation Claims unless and until such Claims are Allowed by Final Order of a court having jurisdiction over the matter. In the event that any Securities Litigation Claims become Allowed, they shall be treated as follows: holders of Allowed Equity (S) 510(b) Claims against FNV Group shall receive Additional Group Common Stock; holders of Allowed Debt (S) 510(b) Claims against FNV Capital shall receive New Group Preferred Stock of FNV Group, the terms of which are set forth on Exhibit I; and holders of Allowed Equity (S) 510(b) Claims against FNV Mezzanine shall receive Additional Mezzanine Common Stock. For all issuances of stock in connection with the Securities Litigation described in this paragraph, holders of Allowed Claims shall receive stock having a value, as determined by Final Order, equal to the amount of such Claims that is not covered by applicable insurance policies. In the event that any Additional Group Common Stock is issued after the Effective Date, the Berkadia Parties shall contemporaneously receive additional FNV Group common stock in the amount that they would have received if such issuances had occurred before the Effective Date.

E. Conditions to Confirmation and Effective Date of the Plan

1. Conditions to Confirmation

The following conditions shall be met prior to Confirmation of the Plan: (i) the Bankruptcy Court shall have entered a Disclosure Statement Order no later than July 6, 2001; (ii) the Bankruptcy Court shall have entered an Order approving the Debtors' entry into the Commitment Letter, including with respect to all fees set forth

therein, no later than the earlier of (x) the date of entry of the Disclosure
Statement Order, and (y) July 6, 2001; and (iii) the Bankruptcy Court shall
have entered an Order approving the Debtors' entry into the Management
Services Agreement no later than the earlier of (x) the date of entry of the
Disclosure Statement Order, and (y) July 6, 2001. Failure to satisfy any of
the foregoing conditions will permit Berkadia to terminate its commitment to
fund the Berkadia Loan. The Bankruptcy Court entered an Order on June 13, 2001
approving the Commitment Letter and the Management Services Agreement, and
entered an Order on June 14, 2001 approving this Disclosure Statement.

2. Conditions to the Effective Date

    The following are conditions precedent to, or shall occur simultaneously
with, the Effective Date, each of which must be satisfied unless waived: (i) a
Confirmation Order, in form and substance reasonably acceptable to the parties
to the Restructuring Transactions, shall have been entered and become a Final
Order; (ii) the Additional Group Common Stock shall be duly authorized,
validly issued and outstanding; (iii) all necessary governmental approvals for
the Restructuring Transactions, including, but not limited to, approval under
the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the
Competition Act of Canada and the Competition Act of England, if required,
shall have been obtained; (iv) the Additional Group Common Stock to be issued
to the Berkadia Parties shall have been approved for listing upon official
notice of issuance on the New York Stock Exchange, if the FNV Group common
stock is listed on the New York Stock Exchange on the Effective Date; (v) all
conditions precedent to the Restructuring Transactions, as set forth herein
and in the Commitment Letter, the Management Services Agreement and other
relevant documentation, shall have been satisfied; (vi) no request for
revocation of the Confirmation Order under section 1144 of the Bankruptcy Code
shall be pending as of the Effective Date or, if such a request has been made,
then such request shall have been denied by a Final Order; (vii) the New
Corporate Documents shall have been adopted and, to the extent necessary under
applicable law, filed and shall be in full force and effect and the Rights
Plan shall have been amended to provide for the termination thereof and the
expiration of Rights thereunder in accordance with the terms of the Plan;
(viii) the New Senior Notes Indenture shall have been qualified under the
Trust Indenture Act of 1939, as amended; and (ix) all actions, other documents
and agreements necessary to implement the Plan shall have been effected or
executed and delivered.

    In the event that the conditions specified in the preceding paragraph have
not been satisfied or waived on or before August 31, 2001, then upon written
notification filed by the Debtors with the Bankruptcy Court and served upon
counsel for Berkadia, Berkshire, Leucadia and the Official Committees and the
Office of the United States Trustee, (a) the Confirmation Order shall be
vacated, (b) no distributions under the Plan shall be made, (c) the Debtors
and all holders of Claims and Interests shall be restored to their respective
status and positions as of the day immediately preceding the Confirmation Date
as though the Confirmation Date had never occurred, and (d) all the Debtors'
obligations with respect to the Claims and Interests shall remain unchanged
and nothing contained herein shall be deemed to constitute a waiver or release
of any claims by or against the Debtors or any other party in interest or to
prejudice in any manner the rights of the Debtors or any person in any further
proceedings involving the Debtors.

VII.

SPECIAL PROVISIONS RELATING TO
SECURITIES ISSUED OR OUTSTANDING UNDER THE PLAN

A. New Senior Notes, Additional Group Common Stock, New Group Preferred Stock
   and Additional Mezzanine Common Stock

    The New Senior Notes, any Additional Group Common Stock issued to holders
of FNV Group-7 Claims, any New Group Preferred Stock issued to holders of FNV
Capital-5 Claims and any Additional Mezzanine Common Stock issued to holders
of FNV Mezzanine-6 Claims will not be registered under the Securities Act of
1933, as amended (the "Securities Act"), or under any state or local
securities laws in reliance upon the exemption from registration contained in
section 1145 of the Bankruptcy Code.

33

In general, unless a holder is an "underwriter," as that term is defined in the Bankruptcy Code with respect to such securities, such securities may be resold by such holder without registration under the Securities Act or under state securities laws. An underwriter is defined by the Bankruptcy Code as a person or entity who: (i) purchases a claim against or equity interest in the debtor with a view to the distribution of such securities received on account of such claim or equity interest; (ii) offers to sell such securities on behalf of the holders thereof (except certain offers to sell fractional interests); (iii) offers to buy such securities with a view to the distribution thereof pursuant to an agreement made in connection with the plan; or (iv) is a control person of the issuer (generally a person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the issuer). In these cases, such securities may be sold, disposed of or otherwise transferred only pursuant to an effective registration statement covering such securities, in privately negotiated transactions in which the transferee will be subject to restrictions on transfer, or in accordance with Rule 144 under the Securities Act or other applicable rules and regulations of the Securities and Exchange Commission, and in compliance with applicable state and foreign securities laws.

Persons who are underwriters may not sell, dispose of or otherwise transfer such securities except pursuant to an effective registration statement under federal securities laws or pursuant to an exemption from the registration or qualification requirements of federal and state securities laws.

THE DISCUSSION ABOVE IS A SUMMARY OF REGISTRATION REQUIREMENTS OF THE SECURITIES LAWS ON ISSUANCE AND RESALE OF SECURITIES RECEIVED UNDER THE PLAN. THE EFFECTS MAY VARY BASED ON YOUR INDIVIDUAL CIRCUMSTANCES. THE SECURITIES AND EXCHANGE COMMISSION HAS NOT REVIEWED OR PASSED ON ANY ASPECT OF THESE MATTERS. YOU ARE URGED TO CONSULT WITH YOUR ATTORNEYS ON FEDERAL, STATE AND FOREIGN SECURITIES LAW REQUIREMENTS, INCLUDING BUT NOT LIMITED TO WHETHER OR NOT YOU ARE AN UNDERWRITER AS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE (WHETHER BY VIRTUE OF BEING AN AFFILIATE OF THE ISSUER OR OTHERWISE) AND THE EFFECT OF ANY APPLICABLE FEDERAL, STATE OR FOREIGN LAW RESTRICTIONS ON RESALES OF SECURITIES.

B. Common Stock

The issuance of the Additional Group Common Stock to the Berkadia Parties will be issued pursuant to an exemption from the registration requirements of the Securities Act under Section 4(2) thereof, and pursuant to exemptions under applicable state and foreign securities laws. FNV Group will enter into a registration rights agreement with the Berkadia Parties with respect to the Additional Group Common Stock to be issued to them.

C. Post-Confirmation Business Plan

The Debtors' post-confirmation business plan has been developed with the intention of maximizing the value of the Debtors' assets for the benefit of all of the Debtors' creditors and equityholders. Significant risks are inherent in the Debtors' ability to accomplish successfully this business plan. You should carefully consider the factors disclosed in Section VII-D of this Disclosure Statement ("Certain Factors to be Considered").

1. Business Plan--General

The Debtors' business plan does not contemplate any new business activities related to new customers, although it does provide for the ability to increase lending limits to existing customers under certain conditions. The business plan further envisions that all existing lending commitments will be fulfilled. The Debtors expect to achieve their plan through the implementation of numerous tactical and strategic initiatives, a number of which are already underway, as follows:

. Certain senior management changes have been made. The Debtors believe that the current team is highly focused on the main objective of portfolio recovery maximization.

. The Debtors' business focus has been changed to eliminate the objective of generating new business and to substitute portfolio recovery maximization as the primary goal. This is being accomplished by eliminating all marketing positions and activities, changing the compensation structure and making company-wide communications on the subject.

. A work-out group has been established at headquarters with the responsibility of overseeing and working with the lines of business ("LOBs") on all watch list and non-earning accounts. This group and LOB-level portfolio managers expect to take a heightened role in monitoring customers with the objective of predicting and mitigating problems as early as possible.

. Detailed, periodic reviews of each LOB's portfolio with senior management have been conducted and are scheduled to continue. In addition, senior management is generally anticipated to be involved in negotiating resolution of the Debtors' largest problem accounts. Revised reporting procedures are being implemented by LOBs to assist senior management in tracking developments regarding problematic assets.

. New guidelines have been implemented with respect to renewing, extending or modifying existing assets.

. Significant reductions in overhead expense are being achieved. In addition to the elimination of personnel and other costs associated with new business generation, certain other organizational changes and reductions have been made. These changes will not only reduce expense levels, but are also designed to increase the Debtors' ability to focus on portfolio maximization.

2. Asset Sales

As described in Section VII-D ("Certain Factors to be Considered"), the Debtors do not believe that a significant percentage of their assets are capable of being sold at attractive prices, compared to the ultimate value to be realized from holding these assets. There can be no assurance that any assets will be sold, or if sold, that proceeds equal to or greater than their carrying amounts will be received.

Certain assets may be sold as follows:

. The assets of the Realty Capital LOB, consisting of "bridge" loans to real estate owners and developers, have been priced and underwritten for sale from the time that the LOB was established. The Debtors believe that a sale of these assets is likely to result in proceeds that will exceed the ultimate value to be realized through the continued management and collection of these assets. Prior to its bankruptcy filing, the Debtors began working with Secured Capital Corp., an experienced broker retained to sell the assets of this LOB.

. The Debtors are currently analyzing the financial and tax impact of a sale of some or all of their leveraged lease assets because, among other things, the Debtors believe that the tax deductions generated from these investments are not expected to provide a satisfactory return under the Debtors' new business plan. As of December 31, 2000, the carrying amounts of the Debtors' investment in leveraged leases was approximately $800 million of assets, net of non-recourse debt.

. Within other LOBs, asset sales are expected to be evaluated on a case-by-case basis.

3. New Business Opportunities

Other than as set forth above with respect to potential increases in, or renewals of, loans to existing customers, the Debtors' business plan does not contemplate any new business activities, although it is possible that new business opportunities may present themselves in the future. For example, the Reorganized Debtors will be staffed with personnel having significant expertise in the collection and work-out of difficult credits. It is possible that, in the future, the Reorganized Debtors will manage such activities for others (on a fee and/or a success basis). In this regard, it is noted that it is possible that the Reorganized Debtors may accumulate substantial tax loss carry forwards, and that new business opportunities may have enhanced value to the Reorganized Debtors as a result. The projections included in this Disclosure Statement do not include any income from these or any other possible new business opportunities, and there can be no assurance that any will arise, or if they do arise, that they will be successfully implemented.

D. Certain Factors to be Considered

As stated above, the Debtors' business plan does not contemplate the generation of any business activities related to new customers. Accordingly, the overall feasibility of the Plan is predicated upon the maximization of the Debtors' existing portfolio of assets for the benefit of all of their creditors and equity Interest holders. To achieve this objective, the Debtors have implemented and propose to implement a variety of tactical and strategic initiatives, as described in Section VII-C of this Disclosure Statement ("Post-Confirmation Business Plan"). However, the potential recoveries by creditors under the New Senior Notes, and by holders of existing FNV Group common stock and holders of Additional Group Common Stock, New Group Preferred Stock and Additional Mezzanine Common Stock, if any, issued to holders of FNV Group-7 Claims, FNV Capital-5 Claims or FNV Mezzanine-6 Claims, respectively, remain subject to a number of material risks, including those summarized below. Prior to voting on the Plan, you should carefully consider the risk factors summarized below as well as the Debtors' business plan description contained elsewhere in this Disclosure Statement, and consult with your own advisors in arriving at your own independent assessment of the Plan and Disclosure Statement.

1. Portfolio Maximization

(a) Management's Strategic Initiatives. Although the Debtors' have implemented numerous tactical and strategic initiatives with a view toward ensuring that the portfolio will be managed for the maximum return to creditors and equity Interest holders as described in Section VII-C of this Disclosure Statement ("Post-Confirmation Business Plan"), there can be no assurance that the Debtors' initiatives will, in fact, enhance the realizable value of the portfolio. These initiatives depend, in part, on the continued retention of experienced personnel to manage the portfolio, and their ability to implement those new strategies.

(b) Significant Factors Affecting Portfolio Value. As indicated in Section VII-C of this Disclosure Statement ("Post-Confirmation Business Plan"), the main objective of the Debtors' post-confirmation business plan is to maximize the value of their portfolio through the orderly liquidation of the portfolio over time. There are, however, substantial risks inherent in the Debtors' ability to maximize the value of the portfolio.

A significant portion of the Debtors' portfolio consists of assets that cannot be quickly or easily converted to cash, for a number of reasons, including:

. The Debtors lent money to a number of their customers at higher advance rates (i.e., at higher loan to collateral ratios) than did many of their competitors.

. The risk profiles of a number of the Debtors' customers are higher than those targeted by many of their competitors. That higher risk, in combination with the weakening U.S. economy, has resulted in increased problem accounts and corresponding decreased expected values for those assets.

. The Debtors have a number of exposures in which the amount is lent to a group of related borrowers. Some of these borrowers are experiencing financial difficulties, and in such cases, the related loans or leases have been classified as impaired. Failure of one borrower may adversely impact the ability of others to repay their debt.

. For these reasons, many of the Debtors' customers may not be able to refinance their obligations with a new lender unless the Debtors are willing to accept a discount, which may be significant. Likewise, the Debtors may not be able to sell many of these assets unless they are willing to accept discounts. Thus, the Debtors believe that there will be no quick conversion of their assets to cash.

The Debtors recorded substantial write-downs and reserves in 2000, and there can be no assurance that there will not be significant additional future losses. At December 31, 2000, the Debtors had approximately $1.2 billion of impaired, repossessed and non-accruing assets in their continuing operations and had reserves of $579 million. There can be no assurance that losses from impaired assets will not exceed the specific reserves allocated to these assets or that losses from future impaired assets will not exceed the general reserve. In addition, at such date there were approximately $490 million of impaired, repossessed and non-accruing assets, which have been marked down to estimated net realizable value, in the Debtors' discontinued operations. See the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of the 10-K/A and Part II, Item 2 of the 10-Q.

36

Consequently, the Debtors' business plan calls for the collection and management of the portfolio over time with only limited asset sales. The longer that it takes the Debtors to liquidate their assets, the greater is the risk that unforeseen events will adversely affect the realizable value of these assets.

2. Leverage

The Debtors are highly leveraged. Excluding leveraged leases and the related non-recourse secured debt, at December 31, 2000 the Debtors had consolidated assets of $12,089,086,000 and consolidated liabilities of $11,419,602,000, including the $115,000,000 aggregate liquidation amount of the TOPrS. Creditors and stockholders should be aware that the Plan does not significantly reduce the Debtors' leverage. Notwithstanding this amount of debt, the Debtors expect to be able to pay their debts as they fall due.

The Debtors' highly leveraged financial position could pose substantial risks to the holders of the New Senior Notes, the Additional Group Common Stock, the existing FNV Group common stock and, if issued, the Additional Mezzanine Common Stock and the New Group Preferred Stock, by having a material adverse effect on the marketability, price and future value of such securities. This highly leveraged position also is likely to affect the Debtors' future operations by: (i) impairing the Debtors' ability to obtain replacement or additional financing (assuming such financing would otherwise be available) for working capital, capital expenditures, debt service requirements, or other general corporate purposes; (ii) requiring that a substantial portion of the Debtors' operating cash flow be used to pay principal and interest expense, thereby reducing funds available for operations and other corporate purposes; (iii) limiting the Debtors' ability to withstand competitive pressures or to adjust to changing market conditions; and (iv) making the Debtors more vulnerable to the effects of a downturn in their businesses or the economy in general.

3. Potential Limitations on or Inability to Repay Debt or Make Contingent Payments

FNV Group has no business operations of its own and has no significant assets other than the shares of FNV Capital. FNV Group will derive virtually all of its cash flow from interest payments on the Intercompany Note, dividends, other payments and intercompany loans from its direct and indirect subsidiaries. A chart of the corporate structure of the Debtors is attached hereto as Exhibit H.

FNV Group's ability to pay the principal of, and interest on, the New Senior Notes, to make distributions to holders of FNV Group common stock or New Group Preferred Stock and to make payments of Contingent Interest (as defined in the term sheet for the New Senior Notes) is dependent on the generation of cash flow by its subsidiaries and the ability of the subsidiaries to make cash available to FNV Group, by dividend, payment of the Intercompany Note or otherwise. The ability of these subsidiaries to transfer funds will be limited by the terms of the Berkadia Loan, the Intercompany Note and the New Senior Notes and further may be affected by prevailing economic conditions and financial, business and other factors, as well as the subsidiaries' level of indebtedness from time to time. The ability of subsidiaries to transfer funds to FNV Group may be further restricted by the laws of the jurisdictions of their incorporation and applicable bankruptcy, federal, state or foreign fraudulent conveyance or dividend restriction laws.

Although semi-annual interest payment dates will be established under the terms of the New Senior Notes, FNV Group will not be required to make any interest payments or any principal prepayments on the New Senior Notes or make any payments of Contingent Interest unless it has cash available for that purpose as set forth in the Term Sheet for the New Senior Notes (which is attached as an exhibit to the Plan annexed hereto as Exhibit A); except that it is an event of default under the terms of the New Senior Notes if FNV Group fails to pay interest in full on the New Senior Notes for two consecutive interest payment dates. Furthermore, FNV Group will not be required to make any payments in respect of Contingent Interest unless and until an amount equal to 5.263% of the aggregate principal amount of the New Senior Notes issued under the Plan (whether on or after the Effective Date) is paid to the common stockholders of FNV Group. As reflected in the Debtors' projections attached hereto as Exhibit F, the Debtors believe that payments in respect of the New Senior Notes will be made on a semi-annual basis. Nevertheless, under the terms of the New Senior Notes, it is possible that interest and principal payments will not be paid in full until 2009, when the principal on the New Senior Notes matures. It is also possible that no payments of Contingent Interest will ever be made. Further detail is provided in the Term Sheet for the New Senior Notes.

Pro forma cash flows from operations for the first four full years after the Effective Date are set forth in the Projections attached hereto as Exhibit F. A portion of the cash flows will be dedicated to debt service on the Berkadia Loan, the New Senior Notes and, at FNV Group's option, to use up to $1.5 billion in the aggregate to make purchases of the New Senior Notes at a price not to exceed par plus accrued and unpaid interest thereon, subject to the consent of Berkadia, while the Berkadia Loan is outstanding, and up to $150 million per calendar year for such purchases following the repayment in full of the Berkadia Loan (as described in the term sheet for the New Senior Notes, attached to Commitment Letter (which is attached hereto as Exhibit D)). There can be no assurance that the Debtors' businesses will continue to generate cash flow at levels sufficient to satisfy FNV Group's debt service and operational requirements. Many factors that will affect the Debtors' future cash flow are beyond their control, including the general level of interest rates. Changes in the interest rate environment may further reduce profit margins. Also, changes in government regulations, tax rates and similar matters could significantly increase the cost of doing business. General adverse economic conditions, as well as adverse conditions in particular market segments, could cause the Debtors' borrowers to be unable to make timely payments or payment in full on loans made by the Debtors, resulting in a higher rate of non-collectible or non-earning assets. If, in the future, the Debtors are unable to generate sufficient cash from their operations to enable FNV Capital to make interest and principal payments on the Berkadia Loan and to enable FNV Group to make interest and principal payments on, and purchases of, the New Senior Notes, the Debtors will be required to take other measures, such as refinancing or restructuring their indebtedness, selling assets, deferring necessary capital expenditures or seeking to raise additional debt or equity capital. There can be no assurance that any of these measures could be effected on a timely basis or on satisfactory terms. Furthermore, there can be no assurance as to the timing of any such transactions or the proceeds that the Debtors could realize from any such sales or capital-raising transaction. The Debtors' ability to sell assets also will be limited by the terms of the Berkadia Loan and may be limited by the other terms of any financing agreements.

4. Potential Insufficiency of Collateral for New Senior Notes; Value of Collateral

The New Senior Notes will be secured by second priority security interests in the capital stock (but not the assets) of FNV Capital and in the Intercompany Note (which, in turn, will be secured by a second-priority lien on the assets of FNV Capital pledged to Berkadia as security for the Berkadia Loan) (the "Collateral"). These security interests will be junior to the security interest in the Collateral held by Berkadia as security for FNV Group's guarantee of the Berkadia Loan. Enforcement of the New Senior Notes' security interest will not be allowed until the Berkadia Loan is paid in full.

If FNV Group defaults on its obligations to make payments in respect of the New Senior Notes (but not Contingent Interest), holders of the New Senior Notes would be entitled to payment out of proceeds from the sale or other liquidation of the Collateral prior in right to any general unsecured creditors of FNV Group, but only after payment in full of the Berkadia Loan. The ability of the holders of the New Senior Notes to realize such value upon the sale of the Collateral will depend upon general market and economic conditions, the market value of the Collateral, the results of operations of FNV Capital and its subsidiaries and the availability of buyers and other similar factors at the time of sale. It is unlikely that the value of the Collateral in a "forced" or "fire" sale would be sufficient to satisfy payment of the New Senior Notes. In addition, the value of the Collateral may decline over time in response to fluctuations in interest rates or certain other market fluctuations, and there can be no assurance that the future value of the Collateral will not be considerably less than its current value. Accordingly, the proceeds of any sale of the Collateral following an Event of Default on the New Senior Notes may not be sufficient to satisfy payments due on the New Senior Notes. If the proceeds from a sale of the Collateral are not sufficient to satisfy payments due on the New Senior Notes, holders of the New Senior Notes (to the extent not repaid from the proceeds of the sale of the Collateral) will have unsecured Claims against the remaining assets of FNV Group, which are not anticipated to have significant value.

5. Interest Spread; Interest Rate Matching

See "Annex A--Quantitative and Qualitative Disclosure About Market Risk" in the 10-K/A and Part II, Item 3, "Quantitative and Qualitative Disclosure About Market Risk" in the 10-Q for a discussion of risks associated with interest rate spread and interest rate matching.

6. Leveraged Leases

The Debtors' investment in Leveraged Leases has a book value of approximately $800 million, net of non-recourse debt, as of December 31, 2000, consisting primarily of real estate and aircraft. At the time the Leveraged Leases were entered into, a significant portion of the Debtors' projected return on them was to have resulted from the tax benefits the Debtors expected to receive through accelerated depreciation and interest expense deductions. However, there can be no assurance that the Debtors will, in fact, have sufficient taxable income to enable them to realize some or all of the projected returns on these assets.

It is the Debtors' position that only the Debtors' beneficial interest as owner participant under their Leveraged Leases (not the trust estate) is subject to the Debtors' bankruptcy cases and that the leases within the trust estate are not subject to any declarations, adjudications or proceedings in these cases.

7. Aircraft Residual Risk

The Debtors' largest line of business is Transportation Finance, which primarily consists of various forms of financing of used aircraft. In addition, the Debtors finance corporate and other types of aircraft through the Commercial Equipment Finance line of business. Most of these financings (excluding Leveraged Leases) are relatively short term (in many cases the sole source of cash flow is a lease of less than five years). These lines of business are highly dependent on market conditions for the releasing or selling of the aircraft when leases terminate, a highly specialized activity. The Debtors have estimated the "residual value" of each aircraft at lease termination, i.e., the value to be recovered (usually through releasing but occasionally from sale) upon the future termination of each lease. Residual estimation is a highly subjective exercise, particularly for older aircraft, and there can be no assurance that the values used by the Debtors and reflected in the Debtors' projections included elsewhere herein will be achieved. There also can be no assurance that aircraft returned to the Debtors (or to their borrowers) at lease termination will not remain off-lease for substantial periods of time.

The decision as to whether or not to convert aircraft from passenger to cargo service, as well as the management of these conversions, is a highly specialized and important skill, since large amounts of money are involved (a typical conversion costs between $4 and $20 million). Historically, the Debtors have acquired a modest number of aircraft with the intention of converting them to cargo service, and have financed customers who have likewise engaged in such conversions, in both cases prior to having a lease in place for the converted aircraft. The Debtors have in-process conversion projects involving five DC10-30s and one B747-300. There can be no assurance that converted aircraft will not remain off-lease or unsold for extended periods.

The Debtors historically have managed the releasing and conversions of aircraft that they own (that is, aircraft leased directly by the Debtors to operators), but have relied on their customers to manage these activities where the aircraft is owned by the Debtors' customer and the customer is borrowing funds from the Debtors. Because most of these loans are recourse only to the collateral value of the aircraft securing the loans, and given the current difficult market for releasing or selling used aircraft, the Debtors believe that they will need to take a more active role in this process and will need to increase significantly their expertise in this area to be effective. The Debtors intend either to recruit additional personnel or to enter into a joint venture or other co-management arrangement with an industry expert. No assurance can be given, however, that the Debtors will be successful in this endeavor.

The Debtors' aircraft finance business is affected by developments at large users in the industry. The Debtors (or their customers) are lessors to a number of passenger and cargo airlines that have recently filed for protection under the Bankruptcy Code. The bankruptcy of a large user often has a negative impact on the industry wide lease rates that can be obtained for the affected aircraft types, even in cases where the Debtors or their customers are not themselves leasing to the carrier in bankruptcy. In addition, large contracts can affect the entire industry: the recent decision of the United States Postal Service to give its overnight shipping business to Federal Express has caused a significant number of other carriers' 727s to become surplus. This has had a significant impact both on the Debtor's existing 727 customers and on the short-term leasing prospects for the Debtors' off-lease 727s.

39

The aircraft owned and financed by the Debtors may be the subject of changes in regulations, particularly new "air worthiness directives" issued by the Federal Aviation Administration or other U.S. or foreign regulators. There can be no assurance that no directives will be issued in the future or that, if issued, such directives will not render certain aircraft economically unviable.

## 8. Projections

The Plan is dependent upon the feasibility of the assumptions included in the financial projections attached hereto as Exhibit F and the successful implementation of the business plan described herein. The financial projections reflect numerous assumptions, some of which involve factors outside the control of the Debtors, as well as estimates of value that may never be realized. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors, the actual results achieved throughout the periods will vary (either positively or negatively) from the results projected, and those variations may be material. Other potential adverse factors beyond the Debtors' control that may affect such results are described in Exhibit F. These events may cause the Debtors to fail to achieve their projected levels of operating revenues, earnings and cash flow.

## 9. Competition

The Debtors do not expect to be competing for new customers. However, given the highly competitive nature of the Debtors' industry, competition will be a factor with respect to retention of existing customers. It is the Debtors' plan to retain their best customers as long as they can do so at attractive rates. However, it is likely that competitors will also solicit these customers. Since almost all of the Debtors' competitors are in stronger financial condition than the Debtors (and can thereby represent that they offer a better financing "partner" for the customer), and since almost all of these competitors have a lower cost of funding than the Debtors, the Debtors may be unable to retain their best customers. Although in many cases there are significant pre-payment or exit fees that a departing customer must incur, there can be no assurance that customers will not choose to refinance with competitors or that the effect of such competition will not force the Debtors to reduce their rates to certain customers.

## 10. Dependence on Key Personnel; Management Agreement

As stated above, the Debtors' portfolio is highly leveraged and has a substantial level of impaired assets. For these reasons, management expertise and involvement is extremely important in order to maximize value. In particular, many of the Debtors' assets are "story" assets, as to which retention of individuals with knowledge as to the history of the assets is very valuable. The Debtors have relied, and expect to continue to rely, upon key individuals who have substantial familiarity and expertise in the Debtors' continuing business operations. There can be no assurance that the Debtors will be able to retain key employees, although the Debtors have implemented employee incentive plans and are seeking Bankruptcy Court approval to implement other such plans.

FNV Group has entered into a ten-year management agreement with Leucadia, pursuant to which Leucadia will provide management services to FNV Group and its subsidiaries. However, if the Commitment Letter is terminated or a plan of reorganization other than the Plan is confirmed by order of the Bankruptcy Court, Leucadia or FNV Group would have the right to terminate the agreement. If that were to occur, management services from Leucadia would terminate and the Debtors would have to determine whether alternate management arrangements would be necessary, which could include entering into a new management agreement with a third party or enhancing the Debtors' existing management team.

## 11. Termination of Berkadia's Commitment to Make the Berkadia Loan

Funding of the Plan is dependent upon FNV Capital's ability to borrow the Berkadia Loan under the Berkadia Credit Agreement. Pursuant to the terms of the Commitment Letter, Berkadia's commitment to fund the Berkadia Loan will terminate on the first to occur of (x) August 31, 2001, unless the Berkadia Credit

Agreement closes and funds on or before that date or (y) the earlier of the
date this Disclosure Statement is approved by the Bankruptcy Court or July 6,
2001, if the Bankruptcy Court has not approved the Commitment Letter and the
fees payable thereunder by that date. Berkadia's commitment to fund the
Berkadia Loan may be terminated earlier by Berkadia (i) if any event occurs or
information has become available that, in its reasonable judgment, results in,
or is likely to result in, the occurrence of any of the events referred to in
clause (vi) of the paragraph captioned "Conditions Precedent" in the
Commitment Letter or the failure of any other condition referred to under
"Conditions Precedent" in the Commitment Letter, or (ii) upon termination of
the Management Services Agreement. If any of the foregoing occur, there can be
no assurance of whether, or under what terms, Berkadia would extend the terms
of the commitment or would agree to waive its termination rights.

12. Lack of Established Market for New Senior Notes, New Group Preferred
    Stock, and Additional Mezzanine Common Stock

    There is no existing market for the New Senior Notes, New Group Preferred
Stock, and Additional Mezzanine Common Stock. No assurance can be given that
an active market will develop in such securities or, if such a market
develops, that the market will develop or retain sufficient liquidity or a
constant value. A number of factors contribute to this uncertainty, including
the possible lack of broker-dealers willing to make a market in these
securities. It is possible that these securities will trade at less than par.
The price of such securities will be determined in the marketplace and may be
influenced by many factors, including:

    . the specific terms (including coupon rate, if applicable) of the
      security;

    . depth and liquidity of the market for the security;

    . developments affecting the Debtors' business generally;

    . investor perception of the Debtors' business; and

    . general economic and market conditions.

13. Special Risks for Equity Holders

    (a) Dilution. Under the Plan, existing equity holders of FNV Group
(together with any other parties that have equity Interests) will retain their
existing shares of common stock of FNV Group. However, as a result of the
issuance to the Berkadia Parties of Additional Group Common Stock under the
Plan, the common stock currently outstanding may represent only 49% of the
shares of the FNV Group common stock to be outstanding following the Effective
Date. Therefore, existing equity Interests will experience material dilution,
without any material reduction in the outstanding consolidated debt of FNV
Group. Existing equity Interests of FNV Group may experience further dilution
if Additional Group Common Stock or New Group Preferred Stock is required to
be issued to claimants as a consequence of the existing Securities Litigation
against FNV Group. Under the Plan and the New Corporate Documents, there is no
limitation on the right of the Reorganized Debtors to issue preferred stock
that has rights prior to those of the New Group Preferred Stock or the
Additional Group Common Stock. Further, under the Plan and the New Corporate
Documents there is no limitation on the right of the Reorganized Debtors to
issue additional shares of FNV Group common stock or additional shares of FNV
Mezzanine common stock, which would result in a dilution of the holders of
Additional Group Common Stock and Additional Mezzanine Common Stock,
respectively.

    (b) Dividends. Post-confirmation equity holders will be precluded from
receiving dividends or other distributions from FNV Group until the Berkadia
Loan is repaid. If New Group Preferred Stock is issued, distributions to
common stockholders will not be permitted to be made unless a concurrent
distribution is made to holders of the New Group Preferred Stock. Subject to
applicable corporate law (which limits the circumstances in which corporations
may legally make distributions to stockholders), limited distributions to
stockholders will be permitted as the New Senior Notes are paid off, as
described in the next paragraph.

    The New Senior Notes will provide that after repayment in full of the
Berkadia Loan, 5% of the Debtors' cash available for this purpose (as defined
in the New Senior Notes Indenture) will be used to make distributions to
stockholders. Accordingly, unless principal payments are made on the New
Senior Notes, no distributions will

be made to stockholders. Further, such distributions will not be made if any default exists under the New Senior Notes. If FNV Group does not have sufficient funds ultimately to repay the New Senior Notes in full (together with accrued interest thereon), it is likely that only limited distributions would be made to stockholders. There can be no assurance that FNV Group will make any distributions to its equityholders even if all contractual prohibitions thereto have expired. Subject to meeting the legal requirements permitting distributions to stockholders, and so long as the making of any such distributions would not render FNV Group insolvent, FNV Group currently intends to make distributions permitted under the terms of the New Senior Notes as soon as practicable. It is likely that FNV Group will not fully repay the New Senior Notes in fewer than eight years.

(c) Transactions with Interested Stockholders. The new certificate of incorporation of FNV Group will not include many of the provisions contained in the current certificate of incorporation of FNV Group. One of these provisions requires supermajority approval by the FNV Group stockholders for the following specified transactions involving an "Interested Stockholder" or its affiliates:

. a merger or consolidation of FNV Group or any subsidiary with an Interested Stockholder or its affiliates;

. any sale, lease, exchange or other disposition of assets of FNV Group or its subsidiaries with an aggregate fair market value of $10,000,000 or more to any Interested Stockholder or its affiliates;

. the issuance to an Interested Stockholder or any of its affiliates of securities of FNV Group or any subsidiary for consideration having an aggregate fair market value of $10,000,000 or more;

. the adoption of any plan or proposal for liquidation or dissolution of FNV Group proposed by or on behalf of any Interested Stockholder or its affiliates; and

. any reclassification of securities, recapitalization of FNV Group, merger or consolidation of FNV Group with any of its subsidiaries or any other transaction (whether or not an Interested Stockholder is a party) which has the direct or indirect effect of increasing the proportionate share of equity or convertible securities of FNV Group or any subsidiary owned directly or indirectly by an Interested Stockholder or its affiliates.

Any transaction that is subject to this provision must be approved by the affirmative vote of holders of at least 66 2/3% of FNV Group's voting stock, including the affirmative vote of holders of at least 66 2/3% of FNV Group's voting stock not owned directly or indirectly by the Interested Stockholder or its affiliates, unless the transaction either is approved by a majority of the "Continuing Directors" (as defined in the certificate of incorporation) or meets certain price and procedure requirements.

An "Interested Stockholder" is any stockholder that (i) together with its affiliates, beneficially owns more than 10% of the outstanding voting stock of FNV Group, (ii) is an affiliate of FNV Group and within the two year period preceding the date in question was, together with its affiliates, the beneficial owner of more than 10% of the outstanding voting stock, or (iii) has acquired, other than in a public offering, voting stock that was beneficially owned by an Interested Stockholder within the two-year period immediately before the date in question.

A "Continuing Director" is any member of the FNV Group Board of Directors who is unaffiliated with the Interested Stockholder and who either was a member of the Board of Directors before the Interested Stockholder became an Interested Stockholder or has been recommended for appointment or election to the Board of Directors by a majority of the Continuing Directors then on the Board.

The new certificate of incorporation of FNV Group will not contain any provision comparable to the foregoing. As a result, transactions of the type described above with any of the Berkadia Parties (each of which would be considered an Interested Stockholder under the existing certificate of incorporation upon acquisition of 50% of FNV Group common stock) or their affiliates will not, under the new certificate of incorporation, be subject to any supermajority or unaffiliated holder approval requirements.

42

VIII.

VOTING PROCEDURES

A. Parties Entitled to Vote on the Plan

Pursuant to section 1126 of the Bankruptcy Code, each class of "impaired" Claims or Equity Interests that is not deemed to reject the Plan is entitled to vote on acceptance or rejection of the Plan. A class is impaired unless that class is to have its legal, equitable and contractual rights left unaltered by the reorganization. A list of classes entitled to vote on the Plan is set forth in Section II-B of this Disclosure Statement ("Voting on the Plan").

Notwithstanding the foregoing, only holders of Allowed Claims or Allowed Interests in the Voting Classes are entitled to vote on the Plan. A Disputed Claim (as defined in the Plan) or Interest that is not Allowed (as defined in the Plan) is not entitled to vote unless and until either (i) the dispute with respect to the Claim or Interest is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction or pursuant to agreement with the Debtors or (ii) the Bankruptcy Court deems the Disputed Claim or Interest to be an Allowed Claim or Allowed Interest on a provisional basis, for purposes of voting on the Plan. Therefore, even if there is a ballot enclosed with this Disclosure Statement, the votes cast by the holders of any Claim or Interest that is not Allowed as of the Voting Deadline will not be counted unless the Bankruptcy Court provisionally allows those Claims or Interests for purposes of voting on the Plan. If your Claim or Interest is not Allowed, it is your obligation to obtain an order provisionally allowing your Claim or Interest.

Holders of Claims and Interests in the voting classes may vote on the Plan only if they are holders as of the Voting Record Date. The Voting Record Date is June 13, 2001.

B. Ballot

A ballot to be used for voting to accept or reject the Plan, together with a postage-prepaid return envelope, is enclosed with copies of this Disclosure Statement that are mailed to creditors and stockholders entitled to vote on the Plan.

After carefully reviewing this Disclosure Statement and the Plan, creditors and stockholders entitled to vote should indicate their acceptance or rejection of the Plan by completing the enclosed ballot. All ballots should be returned to the Debtors as directed below.

If you do not receive a ballot for a certain Claim that you believe you hold and that is in a class that is entitled to vote, or if your ballot has been damaged or lost, or if you have any questions regarding the procedures for voting on the Plan please contact the voting agent as follows:

The FINOVA Group Inc.
c/o Claudia King & Associates
P.O. Box 2742
Carefree, AZ 85377-2742
(by U.S. Mail)

and

The FINOVA Group Inc.
c/o Claudia King & Associates, Inc.
7301 E. Sundance Trail--Suite D-201
Carefree, AZ 85377
(by delivery or courier)

43

C. General Procedures and Deadlines for Casting Votes

The following information is qualified in all respects by the instructions that will accompany your ballot. Please review those instructions carefully before completing your ballot.

All creditors and stockholders entitled to vote may cast their votes by completing, dating and signing the ballot that accompanies this Disclosure Statement, and by returning the ballot once it has been completed, dated and signed in the enclosed postage-prepaid envelope, by first class mail. To be counted, your vote must be received, pursuant to the following instructions, by the voting agent at the following address, before the voting deadline of 5:00 p.m. Mountain Standard Time on August 1, 2001.

The FINOVA Group Inc.
c/o Claudia King & Associates
P.O. Box 2742
Carefree, AZ 85377-2742
(by U.S. Mail)

and

The FINOVA Group Inc.
c/o Claudia King & Associates, Inc.
7301 E. Sundance Trail—Suite D-201
Carefree, AZ 85377
(by delivery or courier)

To be counted, all ballots must be completed and signed, and must be returned in time to be actually received by the Debtors at the above address by 5:00 p.m. Mountain Standard Time, on August 1, 2001. Since mail delays may occur, it is important that your ballot be mailed or delivered well in advance of the specified date.

Any ballot received after 5:00 p.m. Mountain Standard Time on August 1, 2001 will not be counted or otherwise included in any calculations to determine whether the Plan has been accepted or rejected.

If a ballot is signed and returned without casting a vote or providing other instruction as to acceptance or rejection of the Plan, the signed ballot will not be counted or otherwise included in any calculations to determine whether the Plan has been accepted or rejected. The Debtors, in their discretion, may request that the voting agent attempt to contact voters to cure any defects in the ballots.

When a ballot is returned indicating acceptance or rejection of the Plan, but such ballot is unsigned, the ballot will not be counted or otherwise included in any calculations to determine whether the Plan has been accepted or rejected.

Any voter that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the voting agent before the voting deadline. To be valid, the notice of withdrawal must (a) be signed by the party who signed the ballot to be revoked, and (b) be received by the voting agent before the voting deadline. The Debtors may contest the validity of any withdrawals.

Any holder that has delivered a valid ballot may change its vote by delivering to the voting agent a properly completed subsequent ballot so as to be received before the voting deadline. In the case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

44

D. Special Procedures Applicable to Voting of Debt Securities Claims and
Equity Interests

IF YOU ARE, AS OF THE JUNE 13, 2001 RECORD DATE, THE BENEFICIAL OWNER OF A
NOTE OR SHARES:

If the Notes or Shares are registered in your own name: Please complete the
information requested on the ballot; sign, date, and indicate your vote on
the ballot; and return the ballot in the enclosed, pre-addressed, postage-
paid envelope so that it is actually received by the voting agent before
the voting deadline.

If the Notes or Shares are registered in "street name":

If your ballot has already been signed (or "prevalidated") by your nominee
(your broker, bank, other nominee or their agent): Please complete the
information requested on the ballot, indicate your vote on the ballot, and
return your completed ballot in the enclosed pre-addressed postage-paid
envelope so that it is actually received by the voting agent before the
voting deadline; or

If your ballot has NOT been signed (or "prevalidated") by your nominee
(your broker, bank, other nominee, or their agent): Please complete the
information requested on the ballot; sign, date and indicate your vote on
the ballot; and return the ballot to your nominee in sufficient time for
your nominee to then forward your vote to the voting agent so that it is
actually received by the voting agent before the voting deadline.

IF YOU ARE THE NOMINEE FOR A BENEFICIAL OWNER, AS OF THE JUNE 13, 2001
RECORD DATE, OF THE NOTES OR SHARES: Please forward a copy of this Disclosure
Statement and the appropriate ballot to each beneficial owner, AND:

All ballots that you have signed (or "prevalidated") should be completed by
the beneficial owners and returned by the beneficial owners directly to the
voting agent so that the voting agent receives such ballots before the
voting deadline.

All ballots that you have NOT signed (or "prevalidated") must be collected
by you, and you should complete the "master ballot," and deliver the completed
master ballot to the voting agent so that it is actually received by the
voting agent before the voting deadline.

IF YOU ARE A SECURITIES CLEARING AGENCY: Please arrange for your respective
participants to vote by executing an omnibus proxy in their favor.

THE DEBTORS ARE NOT AT THIS TIME REQUESTING THE DELIVERY OF, AND NEITHER
THE DEBTORS NOR THE VOTING AGENT WILL ACCEPT, CERTIFICATES REPRESENTING ANY OF
THE NOTES. IN CONNECTION WITH THE EFFECTIVE DATE, THE DEBTORS WILL FURNISH ALL
HOLDERS OF NOTES WITH APPROPRIATE LETTERS OF TRANSMITTAL TO BE USED TO REMIT
THOSE CERTIFICATES IN EXCHANGE FOR THE DISTRIBUTION UNDER THE PLAN.
INFORMATION REGARDING THE REMITTANCE PROCEDURE (TOGETHER WITH ALL APPROPRIATE
MATERIALS) WILL BE DISTRIBUTED BY THE DEBTORS AFTER CONFIRMATION OF THE PLAN.

IX.

CONFIRMATION OF THE PLAN

The Bankruptcy Court has scheduled a hearing to consider confirmation of
the Plan to commence on August 10, 2001, at 9:30 a.m. Eastern Daylight Time.
That hearing will be held at the United States Bankruptcy Court for the
District of Delaware, at in Courtroom 2 at 824 Market Street, 6th Floor,
Wilmington, Delaware 19801, or such other location as designated by the
Bankruptcy Court, before the Honorable Peter J. Walsh.

45

Parties in interest have the right to object to confirmation of the Plan. Any objections to confirmation of the Plan must be in writing and filed with the Bankruptcy Court by no later than August 3, 2001, at 4 o'clock p.m. Eastern Daylight Time. In addition, copies of such objections must be received no later than August 3, 2001, at 4 o'clock p.m. Eastern Daylight Time by the following persons:

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Co-Counsel for the Debtors

Mark D. Collins
Daniel J. DeFranceschi
Deborah E. Spivack
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (212) 658-6541
Facsimile: (212) 658-6548
Co-Counsel for the Debtors

Chaim J. Fortgang
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Counsel for Creditors' Committee

Andrew Rahl
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10020-1182
Telephone: (212) 278-1000
Facsimile: (212) 278-1733
Counsel for Equity Committee

Rule 9014 of the Federal Rules of Bankruptcy Procedure governs objections to confirmation of the Plan. Unless an objection to confirmation is timely filed and served, it may not be considered by the Bankruptcy Court.

At the confirmation hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether (i) the Plan has classified Allowed Claims and Allowed Interests in a permissible manner, (ii) the contents of the Plan comply with the technical requirements of the Bankruptcy Code, (iii) the Debtors have proposed the Plan in good faith, and (iv) the Debtors' disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the Chapter 11 Cases, as well as the identity, affiliations and compensation to be paid to all officers, directors and other insiders. The Debtors believe that the Plan satisfies all of the requisites for confirmation and will present such evidence and argument as may be necessary or appropriate at or prior to the hearing on confirmation.

46

As further described herein, the Bankruptcy Code also requires that the Plan be accepted by requisite votes of creditors and stockholders (except to the extent provided in Section 1129(b) of the Bankruptcy Code), that the Plan be feasible, and that confirmation be in the "best interests" of all creditors and stockholders. To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met. Thus, even if the creditors and stockholders of the Debtors accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings respecting the Plan's feasibility and whether it is in the best interests of the Debtors' creditors and stockholders before it may confirm the Plan.

A. Classification of Claims and Interests

The Bankruptcy Code requires that each claim and equity interest in a class be "substantially similar" to the other claims and equity interests in such class. The Debtors believes that the Claims and Interests in each class under the Plan are substantially similar and that the classification proposed in the Plan is appropriate under the Bankruptcy Code.

B. Best Interests of Unsecured Creditors

The Debtors believe that the Plan affords creditors and stockholders the potential for the greatest recovery from the assets of the Debtors. The Debtors have considered alternatives to the Plan, such as the liquidation of the Estates, the possibility of alternative business plans, substantively consolidating the Debtors or, with respect to FNV Canada and FNV UK, separate insolvency proceedings in the courts of the countries in which they are incorporated. In the view of the Debtors, the Plan is the best alternative available to maximize the value of the assets of the Debtors and their Estates and, therefore, the Plan is in the best interests of all parties.

Notwithstanding acceptance of the Plan by each impaired class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interest of the holders of Claims or Interests in each class. In order to satisfy the "best interests" requirement, the Debtors must establish, to the satisfaction of the Bankruptcy Court, that the Plan provide each creditor and each stockholder in each class with property that has a value, as of the Effective Date of the Plan, at least equal to the value of the distribution that such creditor or stockholder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code under then prevailing market conditions.

To estimate the distribution that the creditors and stockholders in each impaired class would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available for distribution if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the assets of the Debtors were liquidated by a chapter 7 trustee (the "Liquidation Value").

The Liquidation Value of the Debtors would consist of the net proceeds available from the disposition of the assets of the Debtors, increased by the Cash held by the Debtors and decreased by, among other things, the Allowed Claims of secured creditors, to the extent of the value of their collateral, the costs, fees and expenses incurred in the administration of the chapter 7 cases, including the liquidation and any unpaid administrative expenses arising out of the Chapter 11 Cases.

The primary assets of the Debtors consist of their investments in financing transactions and other investments. The Debtors believe that any sale or liquidation of those assets will provide less value to unsecured creditors and stockholders of the Debtors than the reorganization proposed under the Plan. The current market conditions in the Debtors' business and the economy generally, the limited credit available to potential purchasers, and a variety of other factors all would adversely and materially affect the ability of a chapter 7 trustee to liquidate the Debtors' assets within a reasonable period or at a reasonable price.

In addition, the liquidation itself could materially reduce the Liquidation Value and increase the Claims against the Debtors, further reducing proceeds to unsecured creditors and stockholders. For example, additional tax liabilities could be incurred or accelerated. The costs of liquidation in a chapter 7 case also would include

47

the compensation of a chapter 7 trustee, as well as that of counsel and other professionals employed by such a trustee, asset disposition expenses, applicable taxes, and litigation costs. The Debtors believe that liquidation could also generate a significant increase in unsecured Claims (such as, for example, Claims arising from the rejection of executory contracts that are otherwise assumed under the Plan).

On the basis of this analysis, the Debtors firmly believe that Debtors' creditors and stockholders will receive greater value as of the Effective Date under the Plan than such creditors or stockholders would receive in a chapter 7 liquidation.

C. Feasibility

As a condition to confirmation, the Debtors must establish that confirmation is not likely to be followed by their liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this "feasibility" standard, the Debtors have prepared the financial projections attached as Exhibit F to this Disclosure Statement relating to the performance models that can be reasonably anticipated from the Debtors' operations. The projections illustrate the ability of the Debtors to meet their obligations under the Plan while retaining a sufficient amount of cash to carry on their operations.

The financial projections set forth herein include a projected consolidated balance sheet, showing the pro forma effect of the reorganization of the Debtors pursuant to the Plan, and projected consolidated statements of operations and statements of cash flow for several years thereafter. The projected financial statements are based on the assumption that the Bankruptcy Court will confirm the Plan and that the Effective Date will be August 31, 2001.

The Debtors caution that although these projected financial statements have been derived in part from the Debtors' audited financial statements for the fiscal year ended December 31, 2000, no assurance can be given that the Debtors will achieve the results projected. Many of the assumptions upon which these projections are based are subject to uncertainties. Some assumptions inevitably may not materialize and unanticipated events and circumstances could occur which would affect the actual financial results. Therefore, the actual results achieved by the Debtors may vary, either positively or negatively, from the projected results and the variations may be material.

Based on the financial projections, the Debtors believe that the Plan complies with the financial feasibility standard for confirmation. The Debtors believe that the assumptions are reasonable, that the projections are attainable on an operational basis and that they will have sufficient funds available to meet their obligations under the Plan.

D. Acceptance

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or equity interests accept a plan, with the exceptions described in the following section. The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims of that class, but for that purpose counts only the vote of those creditors who actually vote to accept or to reject the plan. The Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by two-thirds of the number of shares, but for this purpose counts only shares actually voted. Holders of claims or equity interests who fail to vote are not counted as either accepting or rejecting the plan.

Classes of claims and equity interests that are not "impaired" under a plan are deemed as a matter of law to have accepted the plan and therefore are not permitted to vote on the plan. Classes of claims and equity interests that receive no distributions under a plan are deemed as a matter of law to have rejected the plan, so that it is unnecessary to solicit their votes. The Debtors are soliciting acceptances of the Plan only from those persons who hold Claims or Interests that are impaired under the Plan and who are to receive distributions or retain property on account of their Allowed Claims or Allowed Interests.

48

A class of claims or equity interests is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any manner other than those specifically permitted under the Bankruptcy Code. A list of impaired Classes is set forth in Section II-B of this Disclosure Statement ("Voting on the Plan").

E. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code sets forth the requirements for confirming a plan of reorganization where one or more impaired classes have not voted to accept the plan. If a plan is not accepted by an impaired class, including nonacceptance by means of deemed rejection, the plan may still be confirmed, provided that the plan has been accepted by at least one impaired class of claims and the other requirements for confirmation (except the requirement that the plan be accepted by all impaired classes) are met.

If a class of secured claims rejects a plan, the plan may still be confirmed so long as the Plan does not discriminate unfairly as to a class and is "fair and equitable" to that class under Section 1129(b) of the Bankruptcy Code and applicable case law. The "fair and equitable" standard requires, among other things, that the plan provides that (i) the lien securing the claims of each member of the class is preserved and the plan provides for deferred cash payments with a present value equal to the lesser of the allowed amount of their claims or the value of the collateral securing their claims, (ii) the collateral securing the claim be sold free of the lien with the lien attaching to the proceeds and with the lien on the proceeds being treated under one of the two other standards described in this paragraph, or (iii) the claim receives treatment that is the "indubitable equivalent" of the claim.

If a class of unsecured claims rejects a plan, the plan may still be confirmed so long as the plan provides that (i) each holder of a claim included in the rejecting class receives or retains on account of the claim, property that has a value, as of the effective date, equal to the allowed amount of the claim, or (ii) the holder of any claim or interest that is junior to the claims of that class will not receive or retain any property on account of the junior claim or interest.

If a class of equity interests rejects a plan, the plan may still be confirmed so long as the plan provides that (i) each holder of an equity interest included in the rejecting class receives or retains, on account of that equity interest, property that has a value, as of the effective date, equal to the greatest allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of that equity interest, or (ii) the holder of any equity interest that is junior to the interests of that class will not receive or retain any property on account of that junior interest.

If one or more classes of impaired Claims or equity Interests rejects the Plan in these Chapter 11 Cases, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate against, any rejecting impaired class. The Debtors reserve the right (a) to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, (b) to reallocate distribution of assets to Claims and Interests if necessary to obtain entry of the Confirmation Order, and (c) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

X.

ALTERNATIVES TO THE PLAN

The Debtors believe that the Plan provides the Debtors' creditors and equity security holders with the earliest and greatest possible value that can be realized on their respective Claims and Interests. As discussed below, the alternatives to confirmation of the Plan are the submission of an alternative plan or plans of reorganization by any other party in interest or the liquidation of the Debtors under the Bankruptcy Code and/or, with respect to FNV Canada and FNV UK, the institution of insolvency proceedings in the foreign countries in which each of the Debtors are incorporated.

49

If the Plan is not accepted, other persons may have an opportunity to file another plan of reorganization. The Debtors believe that no alternative plan would result in distribution of greater value to creditors and stockholders than that contemplated under the Plan, because any alternative plan would involve greater feasibility risks, delay in confirmation, or litigation costs than the Plan proposed at this time. Alternatively, a liquidation of the Debtors could be conducted as described in Section IX.B of this Disclosure Statement ("Best Interests of Unsecured Creditors"). For the reasons described therein, the Debtors believe that the distributions to each impaired class of creditors and stockholders under the Plan will be greater than the distributions that might be received after a chapter 7 liquidation of the Debtors.

The Debtors believe that confirmation of the Plan is preferable to any alternative mentioned above because the Plan maximizes the distributions to all classes of creditors and stockholders and because any alternative to confirmation will result in reduced recoveries and substantial delays in the distribution of any recoveries available under such alternative.

XI.

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Interests. The following summary does not address the federal income tax consequences to holders whose Claims or Interests are entitled to reinstatement or payment in full in Cash under the Plan, such as holders of Allowed Administrative Claims, Allowed Professional Compensation and Expense Reimbursement Claims, Allowed Other Priority Claims, Allowed Secured Claims, Allowed General Unsecured Claims against the Debtors other than FNV Capital, Allowed FNV Capital Intercompany Loans Claims and Allowed Interests (other than Interests in FNV Group and FNV Trust).

The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt concerning any issue discussed herein. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

This discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form. For example, it is assumed for purposes hereof that the New Senior Notes will be respected as debt, and not treated as equity, for federal income tax purposes. There is no assurance, however, that the IRS will not take contrary positions to those described herein or upon which this summary is based.

Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim or Interest. All holders of Claims and Interests are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable under the Plan.

A. Consequences to the Debtors

FNV Group files a consolidated federal income tax return with the affiliated group of corporations of which it is the common parent (the "FNV Tax Group," and on and after the Effective Date, the "Reorganized FNV Tax Group"), the members of which include all of the Debtors other than FNV Trust, FNV UK and FNV Canada. The FNV Tax Group has reported a consolidated net operating loss ("NOL") carryforward for federal income tax purposes of approximately $220 million for the taxable year ended December 31, 1999, and expects to report additional NOLs of approximately $250 million for the taxable year ended December 31, 2000. Approximately $48 million of these NOL carryforwards are subject to existing limitations under the Tax Code and Treasury Regulations as a result of prior ownership changes. In addition, the amount of such NOL carryforwards remains subject to adjustment by the IRS.

As discussed below, the NOL carryforwards, and possibly certain other tax attributes, of the FNV Tax Group may be significantly reduced or eliminated or otherwise restricted upon the implementation of the Plan.

1. Cancellation of Debt

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes--such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets--by the amount of any cancellation of debt ("COD"). COD is the amount by which the indebtedness discharged exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent the amount of COD exceeds the tax attributes available for reduction, the excess COD is simply forgiven. Although existing authorities appear to support the position that any reduction in tax attributes generally should occur on a separate company basis, even though the respective debtors file a consolidated federal income tax return, the IRS has, in certain cases, asserted the contrary position. Consequently, if the Debtors choose to apply the attribute reduction on a separate company basis, there is no assurance that the IRS would not challenge such position.

As a result of the Plan's treatment of Allowed General Unsecured Claims against FNV Capital as well as the Plan's treatment of Allowed TOPrS Interests, the Reorganized FNV Tax Group is expected to realize significant COD. The extent of such COD and resulting tax attribute reduction will depend, in part, on the amount of Cash and the "issue price" of the New Senior Notes (as determined for federal income tax purposes) distributed in exchange for such Claims and Interests.

It is possible that the Reorganized FNV Tax Group may incur COD in excess of any consolidated NOL carryforwards and other credit and loss carryforwards attributable on a separate company basis to Reorganized FNV Capital; as a consequence, Reorganized FNV Capital's tax basis in its assets, effective as of the beginning of the taxable year following the taxable year in which the Effective Date occurs, would be reduced. If advantageous, the Reorganized FNV Tax Group could elect to reduce the basis of depreciable property prior to any reduction in NOL carryforwards. In addition, as discussed above, the Reorganized FNV Tax Group may take the position (or may be required to report) that tax attributes, such as NOLs and credits, are reduced on a consolidated (rather than separate company) basis. In any event, however, it is expected that the COD generated by the Plan may significantly reduce (or, possibly, eliminate) the Reorganized FNV Tax Group's NOLs and credit carryovers, and it is possible that there could also be a reduction in the tax basis of Reorganized FNV Capital's assets.

2. Limitation on NOL Carryforwards and Other Tax Attributes

If, following the implementation of the Plan, the Reorganized FNV Tax Group retains consolidated NOLs (and carryforwards thereof) and/or certain other tax attributes, in either case allocable to periods prior to the Effective Date, the use of those attributes will be subject to the application of Section 382 of the Tax Code unless the special bankruptcy exception discussed below applies.

51

Under Section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized for tax purposes) as of the date of the ownership change that are subsequently recognized. In general, an "ownership change" is a more than 50 percentage point cumulative change in ownership during the relevant testing period (not to exceed three years). The Debtors currently anticipate that the issuance of the Additional Group Common Stock to the Berkadia Parties pursuant to the Plan will constitute an ownership change of the FNV Tax Group, and the Plan has been fashioned in a manner intended to permit qualification under the special bankruptcy exception if the Debtors determine such qualification to be advisable or prudent.

(a) General Section 382 Limitation. The amount of the annual limitation to which a loss corporation may be subject (i) depends, in part, on whether the corporation is in bankruptcy and the ownership change occurs pursuant to a plan of reorganization confirmed by the bankruptcy court, and (ii) within the context of an affiliated group of corporations that file a consolidated federal income tax return, generally applies on a consolidated basis. As discussed below, under a special bankruptcy exception, a corporation in bankruptcy may also be able to avoid any annual limitation.

In general, the amount of the annual limitation to which a corporation (or consolidated group) would be subject would be equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.96% for ownership changes occurring in June 2001). If a corporation (or, presumably, as in the case of the FNV Tax Group, its common parent) is in bankruptcy, and the corporation undergoes the ownership change pursuant to a confirmed plan, the fair market value of the corporation's (or its common parent's) stock generally is determined immediately after (rather than before) the ownership change. The Tax Code provides for the reduction of such value in certain circumstances, including, for example, where the corporation has substantial non-business assets.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

(b) Built-In Gains and Losses. If a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change (determined by taking into account most assets and all items of "built-in" income and deductions), any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

On the other hand, if the loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then any built-in losses--meaning losses that are built-in at the time of the ownership change--that are recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and will be subject to the annual limitation in the same fashion as a pre-change NOL carryforward. In addition, although this net built-in loss rule generally applies to consolidated groups on a consolidated basis, any corporation that joined the consolidated group within the preceding five years may have to be excluded from the group computation and tested for a net built-in loss on a separate company basis. Accordingly, even though a consolidated group of corporations may not have a net unrealized built-in loss on an overall group basis, the group may have a net unrealized built-in loss if certain members of the group are required to be excluded. Additionally, if the excluded member has a net built in loss when tested on a separate company basis, any subsequently recognized built-in losses of such corporation may be subject to a more restrictive annual limitation based on the separate value of such member.

A loss corporation's (or consolidated group's) net unrealized built-in gain or loss generally will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its gross assets (with certain adjustments) immediately before the ownership change.

At this time, the Debtors do not expect that the FNV Tax Group will emerge from the Plan with a net unrealized built-in loss, although it is possible that the FNV Tax Group will, in fact, emerge with an unrealized built-in loss and/or that one or more members of the FNV Tax Group which joined such group within the last five years may emerge with a net unrealized built-in loss as a result of being tested on a separate company basis, as described above. If the FNV Tax Group emerges from the Plan with little or no unrealized built-in loss, or no NOLs, the Section 382 limitation on NOLs and net unrealized built-in losses would be largely irrelevant. However, given that, prior to the Effective Date, the Debtors cannot be certain of these conclusions, due in part to the inability to estimate the amount of COD attributable to the Plan and the difficulties inherent in attempting to estimate the fair market value of the FNV Tax Group's assets as of a date in the future, the Plan has been fashioned in a manner intended to permit qualification under the following special bankruptcy exception if the Debtors determine such qualification to be advisable or prudent.

(c) Special Bankruptcy Exception. An exception to the general annual limitation described above (including the built-in gain and loss rules) applies where the stockholders and/or qualified creditors of a debtor retain or receive (other than for new value) at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis (although they are subject to reduction in certain circumstances not expected to be relevant here). However, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

The Debtors intend that, if determined by the Debtors to be advisable or prudent, the Plan will be adjusted to permit qualification for this exception. The statute does not address whether this exception can be applied on a consolidated basis or only on a separate company basis. Accordingly, it is possible that only any pre-change losses attributable to FNV Group itself (rather than to the other members of the FNV Tax Group) may be able to benefit from this exception. If the exception were applicable only to FNV Group itself, it appears that the pre-change losses--i.e., NOLs and net unrealized built-in losses, if any--attributable to the other members of the FNV Tax Group would be subject to the annual limitation rules described above, determined as if FNV Group had not qualified for this exception.

3. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of Section 382 and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. The application of this provision is unaffected by whether the special bankruptcy exception to the annual limitation (and built-in gain and loss) rules of Section 382 applies.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

53

4. Issuance of the New Senior Notes

It is expected that the New Senior Notes will be treated as issued with original issue discount ("OID"). See "Consequences to Holders of Certain Claims--Ownership and Disposition of the New Senior Notes," below. Any such OID should be amortizable by Reorganized FNV Group utilizing the constant interest method, and deductible as interest, subject, among other things, to the application of any special limitations on interest deductibility, such as the applicable high-yield discount obligation ("AHYDO") rules of Section 163(e)(5) of the Tax Code.

The New Senior Notes will be treated as AHYDOs if, among other requirements, their yield to maturity is at least five percentage points over the applicable federal rate in effect for the calendar month in which such notes are issued (4.96% compounded semiannually for the month of June 2001) and the notes have significant OID (in general, where there is unamortized OID as of the end of the fifth year after issuance that exceeds the amount of one year's interest, both actual and imputed). The FNV Group will not be able to determine whether the New Senior Notes will be treated as AHYDOs until after they have been issued, at which time their issue price can be established.

If the New Senior Notes are treated as AHYDOs, a portion of the interest deduction otherwise allowable as OID would be disallowed, and the balance of such deduction would be deferred until actually paid in cash. The disallowed portion of any interest deduction otherwise allowable as OID on an AHYDO is that portion, if any, of the total OID multiplied by a fraction, the numerator of which is equal to the "disqualified yield" (i.e., the excess of the yield to maturity of the notes over the sum of the applicable federal rate for the calendar month in which the notes are issued plus six percentage points) and the denominator of which is equal to the total yield to maturity of the notes.

B. Consequences to Holders of Certain Claims

1. Consequences to Holders of Allowed Convenience Claims

Pursuant to the Plan, a holder of an Allowed Convenience Claim will receive payment in full in Cash, not to exceed $25,000, in satisfaction of its Claim.

In general, each holder of such an Allowed Convenience Claim will recognize gain or loss in an amount equal to the difference between (i) the amount of Cash received by such holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

In general, to the extent that any amount of Cash received by a holder of an Allowed Convenience Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. Pursuant to the Plan, all distributions in respect of a Claim will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. Each holder of an Allowed Convenience Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest or OID for tax purposes.

54

2. Consequences to Holders of Allowed General Unsecured Claims (other than
   Allowed Convenience Claims) against FNV Capital

   Pursuant to the Plan, holders of Allowed General Unsecured Claims (other
than Allowed Convenience Claims) against FNV Capital will be entitled to
receive Cash and New Senior Notes in satisfaction of their Claims.

   The following discussion assumes, as is likely the case, that, with respect
to holders of Allowed Claims who are also holders of Allowed Secondary
Liability Claims in respect of the same underlying obligation, amounts
received in respect of each Claim will be treated, for federal income tax
purposes, as payment on a single obligation represented by the underlying
Claim. Accordingly, no specific reference will be made hereafter to Secondary
Liability Claims.

   (a) Gain or Loss. In general, each holder of an Allowed General Unsecured
Claim (other than an Allowed Convenience Claim) against FNV Capital should
recognize gain or loss in an amount equal to the difference between (x) the
"amount realized" by the holder in satisfaction of its Claim (exclusive of any
Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis
in its Claim (exclusive of any Claim for accrued but unpaid interest). The
"amount realized" by a holder of such an Allowed General Unsecured Claim will
equal the sum of the amount of any Cash and the "issue price" of any New
Senior Notes received for such Claim. See "Treatment of Interest and Original
Issue Discount," below. For a discussion of the tax consequences relating to
Claims for accrued interest, see "Distribution in Discharge of Accrued
Interest," below.

   Where gain or loss is recognized by a holder, the character of such gain or
loss as long-term or short-term capital gain or loss or as ordinary income or
loss will be determined by a number of factors, including the tax status of
the holder, whether the Claim constitutes a capital asset in the hands of the
holder and how long it has been held, whether the Claim was acquired at a
market discount, and whether and to what extent the holder previously had
claimed a bad debt deduction.

   The tax basis in a New Senior Note received by the holder of an Allowed
General Unsecured Claim against FNV Capital will equal the "issue price" of
such note. The holding period for such New Senior Note generally will begin
the day following the issuance of such note.

   (b) Distribution in Discharge of Accrued Interest. Pursuant to the Plan,
all distributions in respect of a Claim (other than the distribution of
interest on Allowed General Unsecured Claims (other than Allowed Convenience
Claims) against FNV Capital) will be allocated first to the principal amount
of such Claim, as determined for federal income tax purposes, and thereafter,
to the remaining portion of such Claim, if any. However, there is no assurance
that such allocation would be respected by the IRS for federal income tax
purposes. In general, to the extent that any amount received (whether stock,
cash, or other property) by a holder of a debt is received in satisfaction of
accrued interest during its holding period, such amount will be taxable to the
holder as interest income (if not previously included in the holder's gross
income). Conversely, a holder generally recognizes a deductible loss to the
extent any accrued interest or OID was previously included in its gross income
and is not paid in full. Each holder of a Claim is urged to consult its tax
advisor regarding the allocation of consideration and the deductibility of
accrued but unpaid interest or OID for tax purposes.

   (c) Ownership and Disposition of the New Senior Notes. Pursuant to the
Plan, the New Senior Notes will bear stated interest annually at a rate of
7.5%, and the stated principal and interest on such notes will be payable in
full in 8 years to the extent not paid earlier. Payments of stated principal
and interest will be made semi-annually if and to the extent that Reorganized
FNV Group has available cash for such purposes under the terms of the New
Senior Notes. In addition, the New Senior Notes will provide for payments of
Contingent Interest (over and above the amount of stated principal and
interest) if and to the extent that FNV Group has available cash for such
purposes under the terms of the New Senior Notes at the requisite payment
dates (not to exceed 15 years from the Effective Date).

55

(i) Treatment of Interest and Original Issue Discount. The New Senior Notes should be treated as issued with OID to the extent projected payments provided for under the New Senior Notes (as described below) exceed the "issue price" of the New Senior Notes. In general, the "issue price" of the New Senior Notes will be equal to their fair market value at the time of issuance. Thus, for federal income tax purposes, the stated interest and Contingent Interest on the New Senior Notes will be treated as components of the OID, and will not be recognized as income separately.

Because mandatory pre-payments of both stated interest and principal are contingent upon cash flow, and payments of Contingent Interest beyond such amounts (up to $100 million) may also be made depending upon cash flow, the New Senior Notes will be governed by the Treasury Regulations applicable to contingent payment debt instruments. In general, under such Treasury Regulations, each holder of a New Senior Note will be required to accrue the OID in respect of its New Senior Note under the noncontingent bond method, and include such amount in its gross income as interest, over the term of the note based on the constant interest method and the yield to maturity of the note, as described below. Accordingly, each holder generally will be required to include amounts in gross income in advance of the payment of Cash in respect of such income.

Under the Treasury Regulations, the yield to maturity will be the comparable yield at which Reorganized FNV Group would issue a comparable fixed rate debt instrument with terms and conditions similar to those of the New Senior Notes, including the level of subordination, term, timing of payments and general market conditions. No adjustment is made for the riskiness of the contingencies or the liquidity of the debt instrument. The comparable yield must be determined in good faith to be a reasonable yield for Reorganized FNV Group.

In addition, Reorganized FNV Group must determine a projected payment schedule based on the reasonably expected value of the contingent payments as of the issue date but adjusted to the extent necessary to produce the comparable yield, taking into account the issue price and the terms of the New Senior Notes. Further adjustments may be required to the projected payment schedule if and when a payment becomes fixed more than six months prior to the projected payment date.

The adjusted issue price of each New Senior Note at the beginning of each annual accrual period will be multiplied by the New Senior Note's comparable yield and the daily portions of the amount so determined will constitute the interest to be included in the holder's income for the days in the period during which the New Senior Note was held.

If, during any taxable year, a holder of a New Senior Note receives actual payments with respect to such note for that taxable year that in the aggregate exceed the total amount of projected payments for that taxable year, such holder will have additional interest income for the taxable year equal to such excess. If actual payments for the taxable year are in the aggregate less than the amount of projected payments for that taxable year, such holder will first reduce its interest income (i.e., its accrual of the OID) on the New Senior Note for that taxable year and then, in the event such reduction would produce a "negative" amount for the year, such negative amount will be (i) currently deductible as an ordinary loss to the extent of any prior interest included in income with respect to the note (which was not previously reversed by similar negative amounts in prior years), and (ii) otherwise carried forward and taken into account in determining the next year's adjustment.

If, upon sale, exchange or retirement of a New Senior Note, after taking into account the determination of any interest accrual for such year, the above adjustment would produce a "negative" amount, such amount will reduce such holder's amount realized on such sale, exchange or retirement. See "Sale, Exchange or Redemption of the New Senior Notes," below.

A holder's tax basis in a New Senior Note generally will be increased by the interest previously accrued thereon based on the comparable yield and decreased by the projected amount of any contingent payments previously made on such New Senior Note to the holder, whether denominated as interest or principal.

The Debtors will be required to provide the projected payment schedule to the holders of New Senior Notes in accordance with the Treasury Regulations. Such projected payment schedule will be binding upon each holder

of a New Senior Note, unless such schedule is unreasonable and a holder determines its own projected payment schedule and explicitly discloses to the IRS such determination and the reason therefor in its federal income tax return for the taxable year that includes the acquisition date of the New Senior Notes. In addition, the Debtors will also provide a Form 1099 to holders of New Senior Notes reflecting OID accruals, as required by law.

If the comparable yield as determined by Reorganized FNV Group is successfully challenged by the IRS, the redetermined yield could be materially greater or less than the comparable yield provided by the company. Moreover, in such event, the projected payment schedule could differ materially from that previously determined.

The comparable yield and the schedule of projected payments are not determined for any purpose other than for the determination of a holder's interest (OID) accruals and adjustments thereof in respect of the New Senior Notes for federal income tax purposes, and do not constitute a projection or representation regarding the actual amounts payable on the New Senior Notes.

(ii) High-Yield Discount Obligation Rules. As discussed above (see "Consequences to the Debtors--Issuance of the New Senior Notes," above), certain debt obligations that are issued with substantial OID and have a maturity of over five years are treated as applicable high yield discount obligations (AHYDOs) within the meaning of the Tax Code. With respect to such obligations, a portion of a corporate holder's income with respect to such accrued OID may be treated as a dividend for purposes of the dividend-received-deduction to the extent such amount would be so treated if it had been a distribution made by the issuer with respect to its stock (that is, to the extent the issuer has sufficient earnings and profits such that a distribution in respect of stock would constitute a dividend for federal income tax purposes and, presumably, subject to certain holding period and taxable income requirements and other limitations on the dividend-received-deduction).

(iii) Sale, Exchange or Redemption of the New Senior Notes. In general, any gain realized upon the disposition of a New Senior Note will be treated as interest income, while any loss will be treated as ordinary or capital depending upon the circumstances. See "Treatment of Interest and Original Issue Discount," above. Each holder of an Allowed General Unsecured Claim (other than a Convenience Claim) against FNV Capital is urged to consult its own tax advisors regarding the tax consequences of the disposition of a New Senior Note.

3. Consequences to Holders of Debt Securities (S) 510(b) Claims and Equity Securities (S) 510(b) Claims

Pursuant to the Plan, holders of Allowed Debt Securities (S) 510(b) Claims against FNV Capital, Allowed Debt Securities (S) 510(b) Claims against FNV Mezzanine and Allowed Equity Securities (S) 510(b) Claims against FNV Group will be entitled to receive New Group Preferred Stock, Additional Mezzanine Common Stock, and Additional Group Common Stock, respectively, in satisfaction of their Claims.

The federal income tax consequences of the treatment of Allowed Debt Securities (S) 510(b) Claims and Allowed Equity Securities (S) 510(b) Claims are complex and depend, in part, upon whether the holder continues to hold the debt or equity underlying such holder's securities' law Claim and whether the holder of such Claim is the original holder thereof. Each holder of a Debt Securities (S) 510(b) Claim or Equity Securities (S) 510(b) Claim is urged to consult its tax advisor regarding the tax consequences of the treatment of its Claim, including whether the receipt of consideration pursuant to the Plan will be treated as a taxable or tax-free exchange, and the tax consequences of the ownership and disposition of any New Group Preferred Stock, Additional Mezzanine Common Stock, and Additional Group Common Stock received.

4. Withholding

All distributions to holders of Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a rate of 31%. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under

certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

C. Consequences to Holders of Allowed Interests

1. Holders of Interests in FNV Group

Pursuant to the Plan, holders of Allowed Interests in FNV Group will retain their Interests subject to certain modifications to the charter provisions with respect to such Interests. The changes to the charter provisions may constitute a "recapitalization" for federal income tax purposes. Whether or not so treated, the holder of an Allowed Interest in FNV Group generally should not recognize gain or loss as a result of such charter modifications and should retain its aggregate tax basis and holding period in its Interest.

2. Holders of Allowed TOPrS Interests

Pursuant to the Plan, holders of Allowed TOPrS Interests will receive Cash and New Senior Notes in exchange for their Interests. For federal income tax purposes, FNV Trust has been treated as a disregarded entity and the holders of the Allowed TOPrS Interests have been treated as owning a pro rata share of the Group Subordinated Debentures held by FNV Trust. Accordingly, for federal income tax purposes, holders of Allowed TOPrS Interests will be treated as exchanging their proportionate share of the Group Subordinated Debentures in exchange for Cash and New Senior Notes.

The federal income tax consequences of the Plan to holders of Allowed TOPrS Interests depend, in part, on whether the Group Subordinated Debentures and the New Senior Notes constitute "securities" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (e.g., trade debt and revolving credit obligations) do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. However, the characterization of debt obligations with a weighted average maturity greater than five years but fewer than ten years is unclear. Each holder of an Allowed TOPrS Interest is urged to consult its tax advisor regarding the status of the underlying Group Subordinated Debentures and the New Senior Notes as "securities."

(a) Treatment of Exchange as Recapitalization. If, for federal income tax purposes, both the Group Subordinated Debentures and the New Senior Notes constitute "securities," the receipt by a holder of an Allowed TOPrS Interest of New Senior Notes in partial satisfaction of the holder's allocable share of the Group Subordinated Debentures would be a "recapitalization" for federal income tax purposes. As a consequence, in general, the holder would not recognize loss upon such exchange, but would recognize gain (computed as described below, under C.2.(b), Treatment of Exchange as Non-Recapitalization), if any, to the extent of Cash received in the exchange, excluding the portion thereof allocable to accrued but unpaid dividends. (See the discussion below for the tax consequences of the receipt of Cash in respect of accrued and unpaid prepetition and postpetition dividends attributable to the Allowed TOPrS Interests.) The character and timing of such gain would also be determined in accordance with the principles discussed below with respect to treatment of the exchange as a non-recapitalization.

If the exchange by holders of Allowed TOPrS Interests is treated as a "recapitalization," a holder will have an aggregate tax basis in the New Senior Notes received equal to the holder's adjusted tax basis in its Allowed TOPrS Interest (including any claim for accrued but unpaid dividends) increased by any gain or income

58

recognized in respect thereof, and decreased by the amount of Cash received (including to the extent allocable to accrued and unpaid dividends) and any deductions claimed in respect of any previously accrued and unpaid dividends. A holder's holding period for New Senior Notes in this instance will include that holder's holding period for the Allowed TOPrS Interest. 

(b) Treatment of Exchange as Non-Recapitalization. On the other hand, it is possible that, for federal income tax purposes, either the Group Subordinated Notes or the New Senior Notes will not be treated as "securities." In that case, holders of Allowed TOPrS Interests who receive Cash and New Senior Notes will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Interest (other than any claim for accrued but unpaid dividends), and (ii) the holder's adjusted tax basis in its Interest (excluding the portion, if any, of such tax basis allocable to accrued but unpaid dividends). (See the discussion below for the tax consequences of the receipt of Cash in respect of accrued and unpaid dividends attributable to the Allowed TOPrS Interests.)

For these purposes, the "amount realized" by a holder will equal the sum of the Cash and the "issue price" of any New Senior Notes received by the holder (see discussion above concerning the "issue price" of the New Senior Notes, captioned Treatment of Interest and Original Issue Discount). Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction. A holder's tax basis in any New Senior Notes received will equal the "issue price" of such notes. If the exchange is not treated as a recapitalization, the holding period for New Senior Notes generally will begin the day following the issuance thereof.

(c) Distribution in Discharge of Accrued Dividends. As noted above, holders of the Allowed TOPrS Interests are treated, for tax purposes, as holding direct interests in the underlying Group Subordinated Debentures; as such, payments under the Plan for accrued and unpaid dividends should be treated as payments to holders of the underlying interest. Pursuant to the Plan, holders of Allowed TOPrS Interests will receive a Cash distribution equal to 75% of the amount of accrued and unpaid dividends attributable to such Interests. There is no assurance that such allocation would be respected by the IRS. In general, to the extent that any amount received (whether Cash or other property) by a holder of debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Interest is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid dividends (or interest) for tax purposes.

(d) Market Discount. A holder that purchased its Interest from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

To the extent that a holder's Interest constitutes a "security" and is exchanged in a "recapitalization" for federal income tax purposes, the Treasury Department is expected to promulgate regulations that will provide that any accrued "market discount" not treated as ordinary income upon such exchange would carry over to the nonrecognition property received in the exchange. If such regulations are promulgated and applicable to the Plan (and arguably even without issuance of regulations), any holder of an Interest that is exchanged in a "recapitalization" would carry over any accrued market discount incurred in respect of such Interest to the New Senior Notes received, such that any gain recognized by the holder upon a subsequent disposition of such New Senior Notes would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

(e) Ownership and Disposition of the New Senior Notes. Generally, the federal income tax consequences to a holder of an Allowed TOPrS Interest of owning and disposing of a New Senior Note will be the same as those applicable to the holders of Allowed General Unsecured Claims (subject to the discussion above regarding market discount in the event the exchange by holders of such Interests is treated as a "recapitalization"). For a discussion of the tax treatment of owning and disposing of the New Senior Notes, see the discussion above captioned Ownership and Disposition of the New Senior Notes.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XII.

### CONCLUSION

This Disclosure Statement has been prepared and presented for the purpose of permitting all creditors and stockholders to make an informed judgment to accept or reject the Plan. Please read this Disclosure Statement and the Plan in full and consult with your counsel if you have questions.

60

If the Plan is confirmed, its terms and conditions will be binding on all creditors and stockholders whether or not they accept the Plan and whether or not they receive distributions under the Plan. The Debtors believe that acceptance of the Plan by creditors and stockholders is in their best interest and that confirmation of the Plan will provide the best recovery for creditors and stockholders.

The FINOVA Group Inc., et al.,
Debtors

/s/ William J. Hallinan

By: _____
       William J. Hallinan
       Authorized Officer for the Debtors

Richards, Layton & Finger, P.a.

/s/ Deborah E. Spivack

By: _____
       Mark D. Collins (No. 2981)
       Daniel J. DeFranceschi (No. 2732)
       Deborah E. Spivack (No. 3220)
       One Rodney Square
       P. O. Box 551
       Wilmington, Delaware 19899
       Telephone: (302) 658-6541
       Facsimile: (302) 658-6548

       -and-

       Jonathan M. Landers
       Janet M. Weiss
       M. Natasha Labovitz
       Thayer H. Thompson
       GIBSON, DUNN & CRUTCHER LLP
       200 Park Avenue
       New York, New York 10166-0193
       Telephone: (212) 351-4000
       Facsimile: (212) 351-4035

       Attorneys for Debtors

Dated: June 13, 2001
Wilmington, Delaware

## CERTIFICATE OF SERVICE

I, William D. Sullivan, certify that I am not less than 18 years of age, and that on this 27th day of September 2007, I caused a copy of the foregoing *Reply to Objection and Answering Brief of Finova Group, Inc. and Finova Capital Corp. to Motion and Opening Brief of the Official Committee of Equity Security Holders in Support of a Stay Pending Appeal of the Bankruptcy Court's Final Clarification Order* to be served upon the parties listed below in the manner indicated.

**HAND DELIVERY**
Mark D. Collins
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19801

**FIRST CLASS MAIL**
Jonathan M. Landers, Esq.
Paul Guillotte, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Under penalty of perjury, I hereby declare that the foregoing is true and correct.

*September 27, 2007*
Date

*/s/ William D. Sullivan*
William D. Sullivan