## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| THE FINOVA GROUP, INC., and ) | Case Nos. 01-0698 (PJW) |
| FINOVA CAPITAL CORPORATION, ) | |
| ) | Jointly Administered |
| Reorganized Debtors. ) | |
| _____ ) | |
| THE OFFICIAL COMMITTEE OF EQUITY ) | |
| SECURITY HOLDERS of FINOVA GROUP, INC.) | |
| ) | |
| Appellant, ) | Civil No. 07-480 (JJF) |
| ) | |
| v. ) | Bankruptcy Case No. 01-698 |
| ) | AP 07-70 |
| THE FINOVA GROUP, INC., and ) | |
| FINOVA CAPITAL CROPORATION, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

## APPELLANT'S OPENING BRIEF

William D. Sullivan (No. 2820)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
email: bill@williamdsullivanllc.com

-- and --

ANDERSON KILL & OLICK, P.C.
Mark D. Silverschotz, Esq.
James Andriola, Esq.
Han J. Ahn, Esq.
1251 Avenue of the Americas
New York, NY 10020-1182
Tel: (212) 278-1000
Fax: (212) 278-1733

Dated: October 22, 2007
    Wilmington, Delaware

*Attorneys for Appellant,*
*The Official Committee of Equity Security*
*Holders of Finova Group Inc.*

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

THE NATURE AND STAGE OF THE PROCEEDINGS.................................................2

SUMMARY OF THE ARGUMENT .........................................................................4

STATEMENT OF FACTS ......................................................................................7

The Debtors' Bankruptcy Cases, the Plan and Indenture, and the Use of Cash ................7

The Clarification Motion ......................................................................................9

Objections To The Clarification Motion.................................................................10

The First Clarification Order ...............................................................................11

The Equity Committee's Attempt to Appeal the First Clarification Order .....................11

The Final Clarification Order................................................................................11

ARGUMENT.....................................................................................................13
THE FIRST CLARIFICATION ORDER AND THE FINAL CLARIFICATION ORDER
SHOULD BE REVERSED.....................................................................................13

A.    Standard of Review................................................................................13

B.    Controlling Law.....................................................................................14

C.    The Bankruptcy Court's Decision .............................................................15

D.    The Bankruptcy Court Improperly Relied On And Then Misconstrued Certain
      Provisions Of The Disclosure Statement .............................................................16

E.    The Bankruptcy Court Failed To Apply And/Or Misapprehended Controlling
      New York Law.......................................................................................20

      1.    In Making The Clarification Motion, The Debtors Admitted That The
            Indenture At Issue Is Ambiguous;  The Bankruptcy Court Erred In
            Finding A Lack Of Ambiguity.................................................................20

      2.    The Bankruptcy Court Erred In Adopting The Debtors' Interpretation Of
            The Ambiguous Indenture Provision ........................................................22

**TABLE OF CONTENTS**

**Page**

    (a)    The Bankruptcy Court's Orders Would Effect An Impermissible Forfeiture.............................................................22

    (b)    The Ambiguous Plan Must Be Construed Against the Debtors....................24

    3.    The Terms Of The Controlling Documents Do Not Support The Clarification Proposed By The Debtor And The Bankruptcy Court Erred In Finding Otherwise ..................................................................................26

F.    The Bankruptcy Court Erred in Failing to Recognize that the Indenture Created Debt Obligations Running From the Debtors to the Equity Holders....................................30

G.    The Required Payments To The Equity Holders Are Not Impermissible Restricted Payments Under The Indenture And The Applicable Law....................................................33

    1.    The Plan Mandated Payments To Equity Holders Were Not "Dividends" .............33

    2.    The Plan Mandated Payments To Equity Holders Do Not Violate Delaware Corporate Law .........................................................................................34

    3.    The Plan Mandated Payments To Equity Holders Would Not Impermissibly Reduce The Debtors' Capital...........................................................35

    4.    The Plan Mandated Payments To Equity Holders Would Not Be Fraudulent Conveyances, Nor Render The Debtors "Further Insolvent" .................35

CONCLUSION.............................................................................................................................38

# TABLE OF AUTHORITIES

Page

## CASES

Assocs. v. Ronbet Newmark Co.,
  84 Misc. 2d 259, 375 N.Y.S.2d 255 (Sup. Ct. N.Y. County 1975) ...................................23

Bank One Texas, N.A. v. Ameritrust Texas, N.A.,
  858 S.W.2d 516 (Tex. App. 1993)...................................................................................23

Banner v. Bagen (In re Bagen),
  186 B.R. 824 (Bankr. S.D.N.Y. 1995)...........................................................................24

Brass v. Am. Film Techs., Inc.,
  987 F.2d 142 (2d Cir. 1993)...........................................................................................21

In re Bridgepoint Nurseries, Inc.,
  190 B.R. 215 (Bankr. D.N.J. 1996) ...............................................................................16

Campanile v. State Farm,
  161 A.D.2d 1052, 558 N.Y.S.2d 203 (3d Dep't 1990)....................................................25

Carrieri v. Jobs.com, Inc.,
  393 F.3d 508 (5th Cir. 2004) .........................................................................................31

Charter Asset Corp. v. Victory Mkts., Inc. (In re Victory Mkts., Inc.),
  221 B.R. 298 (B.A.P. 2d Cir. 1998)...............................................................................14

In re Consumers Realty & Dev. Co., Inc.,
  238 B.R. 418 (B.A.P. 8th Cir. 1999)..............................................................................30

Faircloth v. Rash,
  373 A.2d 870 (Del. Super. Ct. 1977) .............................................................................35

Fulweiler v. Spruance,
  22 A.2d 555 (Del. 1966) ................................................................................................32

Gallo v. Rea Motors, Inc.,
  34 A.D.3d 635, 823 N.Y.S.2d 700 (2d Dep't 2006)....................................................5, 29

Geftman v. Comm'r of Internal Revenue,
  154 F.3d 61 (3d Cir. 1998)............................................................................................32

In re Georgetown Bldg. Assocs.,
  240 B.R. 124 (Bankr. D.D.C. 1999) ..............................................................................32

# TABLE OF AUTHORITIES

**Page**

*Gerlach v. The Horn & Hardart Co.,*
    683 F. Supp. 342 (S.D.N.Y. 1988) ...................................................................24

*Goldfield Corp. v. Gen. Host Corp.,*
    29 N.Y.2d 264, 277 N.E.2d 387, 327 N.Y.S.2d 330 (1971)..............................................21

*Grossman Steel & Aluminum Corp. v. Samson Window Corp.,*
    54 N.Y.2d 653, 426 N.E.2d 176, 442 N.Y.S.2d 769 (1981)....................................5, 27, 28

*Grossman Steel & Aluminum Corp. v. Samson Window Corp.,*
    78 A.D.2d 871, 433 N.Y.S.2d 31 (2d Dep't 1980).........................................................27, 28

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.,*
    309 F.3d 76 (2d Cir. 2002).......................................................................................26

*In re JLH, L.L.C.,*
    239 F.3d 366 (5th Cir. 2000) ...............................................................................28

*Jacobson v. Sassower,*
    66 N.Y.2d 991, 489 N.E.2d 1283, 499 N.Y.S.2d 381 (N.Y. 1985) ..................................24

*Jones v. Keene Corp.,*
    933 F.2d 209 (3d Cir. 1991)................................................................................35

*In re Kaiser Group Int'l, Inc.,*
    307 B.R. 449 (D. Del. 2004)..............................................................................13

*Kreiss v. McCown De Leeuw & Co.,*
    131 F. Supp. 2d 428 (S.D.N.Y. 2001).........................................................................5, 23

*In re Leslie Fay Cos., Inc.,*
    207 B.R. 764 (Bankr. S.D.N.Y. 1997)..............................................................................34

*Lomaglio Assocs. Inc. v. LBK Mktg. Corp.,*
    No. 94 CIV. 3208, 1999 WL 705208 (S.D.N.Y. Sept. 10, 1999)..............................28, 29

*Mid-Island Hosp., Inc. v. Empire Blue  Cross & Blue Shield (In re Mid-Island Hosp., Inc.),*
    276 F.3d 123 (2d Cir. 2002).........................................................................................23

*Miller v. Miller,*
    31 S.E.2d 844 (W. Va. 1944)...............................................................................23

# TABLE OF AUTHORITIES

**Page**

*Estate of Mitchell,*
    91 Cal. Rptr. 2d 192 (Cal. Ct. App. 1999) ........................................................................23

*In re Montgomery Ward Holding Corp.,*
    306 B.R. 489 (Bankr. D. Del. 2004) ..............................................................................6, 30

*N.Y. City Employees' Ret. Sys. v. Sapir (In re Taylor),*
    243 F.3d 124 (2d Cir. 2001)..........................................................................................13

*In re Newman,*
    88 B.R. 191 (Bankr. C.D. Ill. 1987), *rev'd on other grounds Newman v. Magill,* 99
    B.R. 881 (C.D. Ill. 1989) ..............................................................................................24

*Northwestern Corp. v. Ammondson (In re Northwestern Corp.),*
    324 B.R. 529 (Bankr. D. Del. 2005) ...........................................................................4, 16

*In re O'Hanlon's Will,*
    27 N.Y.S.2d 889 (Sur. Ct. Richmond County 1941) ..................................................28, 29

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,*
    86 N.Y.2d 685, 660 N.E.2d 415, 636 N.Y.S.2d 734 (1995)............................................30

*In re Penrod,*
    169 B.R. 910 (Bankr. N.D. Ind. 1994)............................................................................30

*Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.),*
    301 B.R. 801 (Bankr. S.D.N.Y. 2003) ...........................................................................35

*Reape v. New York News, Inc.,*
    122 A.D.2d 29, 504 N.Y.S.2d 469 (2d Dep't 1986)......................................................4, 24

*Record Club of Am. v. United Artists Records, Inc.,*
    890 F.2d 1264 (2d Cir. 1989)........................................................................................21

*In re Rehab. of Nat'l Heritage Life Ins. Co.,*
    656 A.2d 252 (Del. Ch. 1994).......................................................................................36

*Rowe v. Great Atl. & Pac. Tea Co.,*
    46 N.Y.2d 62, 385 N.E.2d 566, 412 N.Y.S.2d 827 (1978)............................................5, 26

*Sergi v. Everett Sav. Bank (In re Sergi),*
    233 B.R. 586 (B.A.P. 1st Cir. 1999) ...............................................................................14

# TABLE OF AUTHORITIES

**Page**

*In re Sims,*
    358 B.R. 217 (Bankr. E.D. Pa. 2006) ...............................................................25

*State v. Benson,*
    32 Del. 576, 128 A. 107 (Del. Super. Ct. 1924) ...............................................35

*In re Sugarhouse Realty, Inc.,*
    192 B.R. 355 (E.D. Pa. 1996) ..........................................................................14

*In re Terex Corp.,*
    984 F.2d 170 (6th Cir. 1993) ...........................................................................25

*In re Toney,*
    349 B.R. 516 (Bankr. E.D. Tenn. 2006) ...........................................................25

*Trojan Hardware Co. v. Bonacquisti Constr. Corp.,*
    141 A.D.2d 278, 534 N.Y.S.2d 789 (3d Dep't 1988).........................................31

*In re Turek,*
    346 B.R. 350 (Bankr. M.D. Pa. 2006) ..............................................................25

*Twin City Fire Ins. Co. v. Delaware Racing Ass'n,*
    840 A.2d 624 (Del. 2003) .................................................................................24

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.,*
    1 N.Y.3d 470, 807 N.E.2d 876, 775 N.Y.S.2d 765 (2004).........................25, 26

*In re Water Gap Village,*
    99 B.R. 226 (Bankr. D.N.J. 1989) ....................................................................30

*William A. White/Tishman East, Inc. v. Banko,*
    171 A.D.2d 401, 566 N.Y.S.2d 628 (1st Dep't 1991)....................................24, i

## STATUTES

11 U.S.C. § 541(a)(1)...........................................................................................23

Del. Code Ann. tit. 6, § 1303 ..........................................................................35, 36

Del. Code Ann. tit. 8, § 170 ..................................................................................34

## TABLE OF AUTHORITIES

**Page**

### MISCELLANEOUS

73 C.J.S. *Property* § 10 (2007) ......................................................................................................23

Restatement (Second) of Contracts § 227(1) (1981) .....................................................................30

R. Franklin Balotti & Jesse A. Finkelstein, Del. L. of Corp. & Bus. Org. § 5.26 (2007)..............32

## INTRODUCTION

Appellant, the Official Committee of Equity Security Holders (the "Equity Committee"), on behalf of the shareholders (the "Equity Holders") of Finova Group, Inc., the corporate parent of Finova Capitol Corporation (collectively "Debtors" or "Reorganized Debtors"), appeals from: (i) the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on June 26, 2007 (the "Final Clarification Order") (Bankr. D.I. 220) [App., Ex. O]; and (ii) the Order Regarding Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan entered by the Bankruptcy Court on February 1, 2006 (the "First Clarification Order") (Bankr. D.I. 100) [App., Ex. N].[1]

This is an appeal from a final order resolving the Debtors' motion to "clarify" its plan of reorganization (defined below as the "Plan"). Under the Plan, which was confirmed in August 2001, once senior debts were paid, the balance of the proceeds from the liquidation of the Debtors' assets were to be split between holders of New Senior Notes (defined below) and Equity Holders on a 95% to 5% basis. Under certain circumstances, including the Debtors' post-confirmation insolvency, the 5% set aside for Equity Holders was temporarily to be held by the Debtors and not immediately distributed to Equity Holders. The Plan is silent on what happens to those funds once: (i) all of the Debtors' assets are liquidated, (ii) the New Senior Notes have not fully been paid; and (iii) consequently the Debtors remain insolvent. This silence, and the resulting ambiguity in the Plan, was admitted by the Debtors before the Bankruptcy Court.

---

[1] "Bankr. D.I." refers to the docket of the Bankruptcy Court in case no. 01-00698-PJW and "Bankr. (Case No. 697) D.I." refers to the docket of the Bankruptcy Court in case no. 01-00697-PJW. "D.I." refers to the docket of this Court in case no. 07-480 (JJF) and "D.I. (Case No. 487)" refers to the docket of this Court in case no. 07-487 (JJF). References to the Appendix of Exhibits submitted in connection with this motion and brief will be made as "App., Ex. __" or, for a particular page of an Exhibit, "App. at __, Ex. __".

Nevertheless and unsurprisingly, the Debtors now contend – and the Bankruptcy Court wrongly held – that the Plan's operative language was unambiguous. As will be demonstrated herein, the Bankruptcy Court's conclusion was mistaken. Further, given the admitted ambiguity in the Plan, black-letter New York law (which, it is not contested, governs the operative documents) requires that the existing language describing the rights of the affected parties produce a result exactly opposite of what was held by the Bankruptcy Court.

## THE NATURE AND STAGE OF THE PROCEEDINGS

On or about July 6, 2007, the Equity Committee filed its notice of appeal of the Final Clarification Order and the First Clarification Order. (D.I. 1; Bankr. D.I. 226). On or about July 16, 2007, the Debtors filed a notice of cross appeal addressing four separate orders. (Bankr. D.I. 231).[2] The Equity Committee and the Debtors have filed their respective designations of the record and statements of issues on appeal and cross appeal. (D.I. 2; Bankr. D.I. 233, 239, 242). By a letter to Counsel dated August 6, 2007, the parties were advised that the Equity Committee's appeal was referred to the Appellate Mediation Panel as per a Standing Order of the District Court. On or about September 26, 2007, the parties and the mediator filed in the District Court a Stipulation Regarding (I) Mediation Bypass, and (II) the Establishment of Briefing Schedule for Appeal. (D.I. 8).

---

[2] The four orders are: (1) the July 6, 2007 Order Pursuant to Section 328 of the Bankruptcy Code Increasing the Cap Previously Imposed on Fees and Expenses which Can be Incurred on Behalf of the Equity Committee (the "July 6, 2007 Fee Cap Order") (Bankr. D.I. 225); (2) the February 6, 2007 Order Pursuant to Section 328 of the Bankruptcy Code Increasing the Cap Previously Imposed on Fees and Expenses which Can be Incurred on Behalf of the Equity Committee (the "February 6, 2007 Fee Cap Order") (Bankr. D.I. 205); (3) the December 30, 2005 Order Pursuant to Section 328 of the Bankruptcy Code Increasing the Cap Previously Imposed on Fees and Expenses which Can be Incurred on Behalf of the Equity Committee (the "December 30, 2005 Fee Cap Order") (Bankr. D.I. 93); and (4) the June 16, 2005 Order Directing the Office of the United States Trustee to Appoint an Official Committee of Equity Security Holders for a Limited Purpose and Granting Related Relief (the "Appointment Order") (Bankr. D.I. 48).

On or about August 31, 2007, the Equity Committee filed a motion for a stay pending appeal of the Final Clarification Order (the "District Court Stay Motion") (D.I. 4). The District Court Stay Motion was fully briefed and submitted to this Court by September 27, 2007. On or about October 4, 2007, the Debtors filed a motion for leave to file a sur-reply in connection with the District Court Stay Motion (D.I. 13), which has been opposed by the Equity Committee. (D.I. 15). On or about September 25, 2007, the Equity Committee filed a motion to dismiss any appeal of three of the orders set forth in the Debtors' Notice of Cross-Appeal (the "Dismissal Motion") (D.I. (Case No. 487) 5). The Dismissal Motion was fully briefed and submitted to this Court by October 11, 2007.

## SUMMARY OF THE ARGUMENT

The Equity Committee submits that, upon its *de novo* review, this Court will hold

that the Final Clarification Order and the First Clarification Order should be reversed for the

following reasons:

1.      In reaching its decision, the Bankruptcy Court ignored the Plan and instead

misconstrued non-operative provisions of the Disclosure Statement. *See Northwestern Corp. v.*

*Ammondson (In re Northwestern Corp.)*, 324 B.R. 529, 533 (Bankr. D. Del. 2005).  When read

properly, the Disclosure Statement provisions indicate that, under the Plan, even if the Debtors

ultimately cannot pay the New Senior Notes in full, the Equity Holders will still receive some level

of distribution (i.e., a nickel for each payment of $0.95 given to noteholders until such time as the

Debtors run out of non-reserved funds to keep making such $0.95 payments).

2.      By making a motion to "***clarify***," the Debtors admitted that the Plan and

Indenture at issue were ambiguous and the Bankruptcy Court erred in finding a lack of ambiguity.

*See* (Bankr. D.I. 39 at ¶ 11) (In the words of Debtors' counsel:  "[a]t most, the Clarification Motion

seeks to resolve ***ambiguity*** in the Plan concerning the disposition of the Segregated Funds in the

event of the Reorganized Debtor's continued insolvency."  (emphasis added).

3.      While it was undisputed that the Bankruptcy Court's interpretation of the

Plan was to be governed by New York State contract law, the Bankruptcy Court either ignored or

misapprehended well-established principles pertaining to the interpretation of contracts:

(a) The Bankruptcy Court erred in that it should have construed any and all

ambiguities in the Plan and Indenture against the Debtors as the drafter of those documents.

*See Reape v. New York News, Inc.*, 122 A.D.2d 29, 30, 504 N.Y.S.2d 469, 470 (2d Dep't

1986);

(b) The Bankruptcy Court erred in that it interpreted the admittedly ambiguous provisions of the Plan and Indenture to effect a forfeiture of the only right to payment provided to Equity Holders under such documents. *See Kreiss v. McCown De Leeuw & Co.*, 131 F. Supp. 2d 428, 436 (S.D.N.Y. 2001);

(c) The Bankruptcy Court erred in that the terms of the controlling documents do not support the clarification proposed by the Debtors and accepted by the Bankruptcy Court. *See Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572, 412 N.Y.S.2d 827, 833 (1978) ("courts should be extremely reluctant to interpret an agreement as *impliedly* stating something which the parties have neglected to specifically include."). (emphasis added); and

(d) The Bankruptcy Court erred in that it interpreted the admittedly ambiguous provisions of the Plan and Indenture in a way that created a condition precedent to the Equity Holders' only right to payment under such documents. *See Gallo v. Rea Motors, Inc.*, 34 A.D.3d 635, 823 N.Y.S.2d 700, 701 (2d Dep't 2006) ("where there is ambiguity in a contractual term, the law does not favor a construction which creates a condition precedent."). *See also Grossman Steel & Aluminum Corp. v. Samson Window Corp.*, 54 N.Y.2d 653, 426 N.E.2d 176, 442 N.Y.S.2d 769 (1981) (the New York Court of Appeals held, in similar circumstances, that the "disputed language...of the contract ***did not create a condition precedent to payment*** to the subcontractor, ***but rather established a time for payment***.").

4.    The Bankruptcy Court erred in failing to recognize:  (a) that the Plan constituted a new contract between the (reorganized) Debtors and, *inter alia*, the Equity Holders; (b) that pursuant to this new contract (the Plan), the Debtors became obligated to make certain

payments to Equity Holders (and the Equity Holders were given the right to such payment); and (c) that such obligations and rights of the respective parties were new Plan-created "debt" running from the Debtors to the Equity Holders. *See, e.g., In re Montgomery Ward Holding Corp.*, 306 B.R. 489, 495 (Bankr. D. Del. 2004) (a confirmed Chapter 11 plan of reorganization constitutes a new contract between the debtor and its creditors, to which both a debtor and its creditors are legally bound).

5.    The applicable law does not support the Debtors' argument that payment of the Segregated Funds (defined below) to the Equity Holders would now and will forever be an "Impermissible Restricted Payment" under the Plan and Indenture. To the extent the Bankruptcy Court made such a finding – it was not expressly stated in that court's analysis – it committed reversible error.

## STATEMENT OF FACTS

### The Debtors' Bankruptcy Cases, the Plan and Indenture, and the Use of Cash

On March 7, 2001, the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. By order of the Bankruptcy Court, the Debtors' Chapter 11 cases were jointly administered. On or about June 14, 2001, the Debtors (and related companies) filed their Third Amended and Restated Joint Plan of Reorganization (the "Plan") (Bankr. (Case No. 697) D.I. 553), which the Bankruptcy Court confirmed by order dated August 10, 2001. (Bankr. (Case No. 697) D.I. 852). The Indenture between the Finova Group, Inc. and The Bank of New York, as Trustee, dated as of August 22, 2001 (the "Indenture"), was included in the Plan Supplement with Respect to the Third Amended and Restated Joint Plan of Reorganization (the "Plan Supplement") (Bankr. (Case No. 697) D.I. 745) and, pursuant to the confirmation order, the Plan Supplement was incorporated into and made part of the Plan.

Under the Plan, general unsecured creditors received a distribution that is composed of (i) a Cash payment equal to 70% of the principal amount of the General Unsecured Claim; (ii) a Cash payment for the amount of accrued and unpaid pre-petition and post-petition interest; and (3) New Senior Notes in the amount of 30% of the principal amount of the General Unsecured Claim. *See* Plan at section 5.2(c) (capitalized terms in this paragraph are defined in the Plan) [App. at 91, Ex. B].

In connection with the Plan, Berkadia LLC and its affiliates (collectively, "Berkadia") made a loan to the Debtors in the amount of approximately $6 billion (the "Berkadia Loan"). *See* Plan at section 6.2(a) [App. at 98, Ex. B]. In addition, Berkshire Hathaway Inc. ("Berkshire") agreed that it would commence a tender offer (the "Tender Offer") for up to $500 million of the New Senior Notes which were issued pursuant to the Plan at a cash purchase price of 70% of par. *See* Plan at section 6.2(b) [App. at 98-9, Ex. B]. However, Berkshire subsequently

-7-

refused to proceed with the Tender Offer because it took the position that the events of September 11, 2001 terminated its obligation to go forward with the Tender Offer. *See* Berkshire Hathaway, Inc., Annual Report (Form 10-K), at 16 (2001) [App. at 239, Ex. D]. Upon information and belief, neither the Debtors nor Berkadia, which controls them, objected to Berkshire's refusal to proceed with the Tender Offer. Notwithstanding Berkshire's action, the Debtors have asserted that they have yet to default on any outstanding obligations. *See* Clarification Motion (defined below) (Bankr. D.I. 22) at 7, n.11 [App. at 264, Ex. F]. Significantly, the Reorganized Debtors fully repaid the Berkadia Loan in February 2004, approximately two years before its maturity date. *See* Debtors' Form 10-K filed March 22, 2005 for the Fiscal Year ended December 31, 2004 at p. 1 [App. at 247, Ex. E].

        The appeal presently before this Court concerns only the terms set forth in the Plan and the Indenture. The Indenture, at Section 4.06(a), contains "waterfall" provisions which govern the permissible use of cash by the Debtors. The waterfall provisions dictate the payment of specific sequential obligations under the Indenture. Put simply, when the obligations at one level are fully satisfied, the money is then applied to the obligations of the next lower level.

        It is undisputed that cash has been applied to pay in full the parties favored by treatment in the first four waterfall levels set forth at Indenture Sections 4.06(a)(i)-(iv). The Equity Committee's appeal, however, concerns the fifth waterfall provision, Indenture Section 4.06(a)(v), which states in its entirety:

> FIFTH, until the principal of and Fixed Interest on the Notes are each paid in full, to (A) pay to the Company, when due, principal on the Intercompany Notes in an amount equal to the amount of cash and Cash Equivalents of the Company and its Subsidiaries, after deducting for items (i) through (iv) above, at any date (as determined by the Company) on or after the applicable Reference Date, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes until the principal and

accrued and unpaid Fixed Interest have been paid in full, and, at the
Company's option, to make prepayments at any time of principal and
accrued and unpaid interest on the Intercompany Notes, which amounts the
Company shall use together with any other cash or Cash Equivalents the
Company has available for such purpose on such date to prepay all or part of
the principal and accrued and unpaid Fixed Interest on the Notes pursuant to
Section 3.07, and (B) to make distributions in respect of FINOVA Capital's
Equity Interests held by the Company, which amounts the Company shall
use together with any other cash the Company has available for such
purposes to make Restricted Payments unless either (x) the making of any
such Restricted Payment would be an Impermissible Restricted Payment, in
which event the Company shall retain such amounts and any such retained
amounts shall accumulate and shall be used to make Restricted Payments at
such time or from time to time when such Restricted Payments are not
Impermissible Restricted Payments, or (y) a Default or Event of Default has
occurred and is continuing, in which event the Company shall retain such
amounts and any such retained amounts shall accumulate and shall, subject
to Article 6 hereof, be used to make such Restricted Payments at such time
or from time to time when such Default or Event of Default is no longer
continuing; *provided, however*, that each incremental payment of $0.95
pursuant to clause (A) shall require a distribution or retention pursuant to
clause (B) of $0.05.

Pursuant to Section 4.06(a)(v)(A), as of the filing of the Clarification Motion

(defined below), the Debtors had made principal payments in excess of $1.1 billion on the New

Senior Notes, and pursuant to Section 4.06(a)(v)(B), the Reorganized Debtors had retained

approximately $65.5 million in a segregated account (the "Segregated Funds").[3] This conforms

with the specific obligation "that each incremental payment of $0.95 pursuant to clause (A) shall

require a distribution or retention pursuant to clause (B) of $0.05." Indenture at 4.06(a)(v) [App. at

187, Ex. C].

### The Clarification Motion

On or about April 1, 2005, the Debtors filed the Motion of the Reorganized Debtor

for an Order Under Bankruptcy Code Section 1411 Clarifying Provision of Confirmed Plan (the

---

[3] The current amount of the Segregated Funds is approximately $81.2 million. *See* July 24, 2007 Transcript
21:1-3. (Bankr. D.I. 240).

"Clarification Motion") (Bankr. D.I. 22), in which they sought an order of the Bankruptcy Court permitting them to cease distributing cash to, or retaining cash on behalf of, the Equity Holders. The Debtors argued that any distribution to Equity Holders would at that time, and for perpetuity, be an Impermissible Restricted Payment under the Indenture. *Id.* Under the Indenture, an "'Impermissible Restricted Payment' means a Restricted Payment that, if made by [one of the Debtors], would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law." Indenture at 5 [App. at 165, Ex. C]. Under the Indenture, a "'Restricted Payment' means the declaration or payment of any dividend *or* the making of a distribution on account of the [Debtors'] Equity Interests…" Indenture at 9-10 (emphasis added) [App. at 169-70, Ex. C].

### Objections To The Clarification Motion

On or about June 3, 2005, First Carolina Investors, Inc. ("First Carolina") filed an objection to the Clarification Motion (the "First Carolina Objection") (Bankr. D.I. 40). At a hearing on June 10, 2005, the Bankruptcy Court noted that: "quite frankly, the objection raised by First Carolina, there's *at least half a dozen issues they raise that I think are interesting.*" *See* Transcript of Hearing before the Honorable Peter J. Walsh on June 10, 2005 ("June 10, 2005 Transcript") (Bankr. D.I. 50) 4:23-25 (emphasis added) [App. at 316, Ex. I].

By Order dated June 16, 2005 (the "Appointment Order") ( Bankr. D.I. 48), the Bankruptcy Court, over the Debtors' objection (Bankr. D.I. 39) [App., Ex. G], directed the Office of the United States Trustee to appoint the Equity Committee for the limited purpose of responding to the Clarification Motion. Thereafter, the Equity Committee opposed the Clarification Motion (Bankr. D.I. 63) on a number of grounds that will be discussed at length in the Argument section, below. On November 29, 2005, the Bankruptcy Court heard argument, and rendered a partial decision respecting the Clarification Motion. *See* Transcript of Hearing before the Honorable

Peter J. Walsh on November 29, 2005 (the "November 29, 2005 Transcript") (Bankr. D.I. 80) [App., Ex. L].

### The First Clarification Order

By Order dated February 1, 2006 (defined above as the "First Clarification Order") (Bankr. D.I. 100), the Bankruptcy Court ordered that "*[f]or the reasons set forth on the record at the Hearing* [Docket No. 80] and in the Court's Letter to Counsel With Respect to Court's Ruling on the Reorganized Debtor's Motion for an Order Clarifying the Confirmed Plan, dated December 2, 2005 [Docket No. 78], the Clarification Motion is hereby APPROVED to the extent that the Debtor is presently and will be forever insolvent." (emphasis added) [App. at 552, Ex. M]. The First Clarification Order goes on to state that "[n]othing in this order shall be construed as a finding that the Debtors presently are or will forever be insolvent." *Id.*

The "reasons set forth on the record" by the Bankruptcy Court will be addressed in the Argument section, below.

### The Equity Committee's Attempt to Appeal the First Clarification Order

Because it believed that the Bankruptcy Court had improperly interpreted the relevant provisions of the Plan in granting the relief requested in the Clarification Motion, the Equity Committee moved for leave to appeal the First Clarification Order. (Bankr. D.I. 104). On or about April 18, 2006, this Court declined to address the merits of the Equity Committee's appeal on an interlocutory basis and, accordingly, denied the Equity Committee's motion for leave to appeal. (Bankr. D.I. 121, 122).

### The Final Clarification Order

On or about January 8, 2007, the Debtors filed their Request for Entry of Final Order in Clarification Motion Contested Matter (the "Final Order Request") (Bankr. D.I. 196). On or about June 26, 2007, the Bankruptcy Court entered the Final Clarification Order, which finds

that "the Debtors presently are and will be forever insolvent" and grants the Clarification Motion "in its entirety and on a Final basis." Final Clarification Order at 2 and 3, ¶ 1 (Bankr. D.I. 220) [App. at 554-55, Ex. D].

The Final Clarification Order permits Debtors to use the Segregated Funds "for general corporate purposes including, without limitation, payment of amounts due on the New Senior Notes" and authorizes Debtors to cease setting aside 5% of Available Cash (defined in Clarification Motion) for possible distribution to Equity Holders. Final Clarification Order at 3, ¶ 1. In addition, the Debtors have advised that they intend to distribute the Segregated Funds to holders of the New Senior Notes. *See* Declaration of Richard A. Ross Relating to Appeal Bond dated July 11, 2007 ("Ross Decl. (July 11, 2007)") at 4a (Bankr. D.I. 229) [App. at 557, Ex. P].

On or about July 6, 2007, the Equity Committee filed its notice of appeal of the Final Clarification Order and the First Clarification Order. (D.I. 1; Bankr. D.I. 226).

## ARGUMENT

### THE FIRST CLARIFICATION ORDER AND
### THE FINAL CLARIFICATION ORDER SHOULD BE REVERSED

**A.    Standard of Review**

This Court reviews a bankruptcy court's legal determinations *de novo* and its

factual findings for clear error. *In re Kaiser Group Int'l, Inc.*, 307 B.R. 449, 453-54 (D. Del.

2004). "With mixed questions of law and fact, the Court must accept the Bankruptcy Court's

finding of historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of

the trial court's choice and interpretation of legal precepts and its application of those precepts to

the historical facts." *Id.* at 454 (quoting *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d

635, 642 (3d Cir. 1999)) (internal quotation marks omitted). Here, the Bankruptcy Court's

decision on the Clarification Motion reflects a legal determination and, as such this Court's review

is *de novo*. *See N.Y. City Employees' Ret. Sys. v. Sapir (In re Taylor)*, 243 F.3d 124, 128 (2d Cir.

2001) ("[t]he Bankruptcy Court's interpretation of the text of the Plan, the Confirmation Order,

and the Final Decree are conclusions of law reviewed de novo.").

In prior motion practice before this Court, the Debtors have asserted that "appellate

Courts give particular deference to a Bankruptcy Judge construing a plan which he confirmed."

*See* Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 27 (citations omitted). However, contrary to the

Debtors' assertions, not all appellate courts give such deference to a bankruptcy court's

interpretation of a plan of reorganization. *See, e.g.*, *In re Taylor*, 243 F.3d at 128. Moreover, the

Debtors cite no authority from either the Court of Appeals for the Third Circuit or the District of

Delaware that supports their position that a bankruptcy court's interpretation of a plan is

reviewable under an "abuse of discretion" standard.

**B.     Controlling Law**

The Bankruptcy Court's decision on the Debtors' Clarification Motion should have been governed by New York State contract law.  It is undisputed that Section 1141(a) of the Bankruptcy Code "establishes the general rule that 'the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor....'"  *Charter Asset Corp. v. Victory Mkts., Inc. (In re Victory Mkts., Inc.)*, 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998).  For this reason, a "confirmed plan of reorganization is a binding contract...[which] is subject to interpretation pursuant to relevant rules of contract interpretation and construction."  *Sergi v. Everett Sav. Bank (In re Sergi)*, 233 B.R. 586, 589 (B.A.P. 1st Cir. 1999) (citing *In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 362 (E.D. Pa. 1996)); *see also Victory Mkts., Inc.*, 221 B.R. at 303 (holding that "a confirmed plan holds the status of a binding contract").

Of course, state law provides the relevant rules of contract interpretation and construction.  *See, e.g.*, *Sergi*, 233 B.R. at 589 (applying Massachusetts contract law to interpret confirmed plan of reorganization); *Victory Mkts., Inc.*, 221 B.R. at 303 (applying New York contract law in interpreting allegedly ambiguous provision of confirmed plan of reorganization).  In the present case, the Plan and Indenture each include provisions stating expressly that New York law is to be used in construing those documents.  *See* Plan at § 13.9 and Indenture at § 12.08 [App. at 113, Ex. B; App. at 220, Ex. C].  Before the Bankruptcy Court, the Debtors agreed that New York law governs the Indenture and, therefore, any interpretation of same Debtor's Clarification Motion Reply.  (Bankr. D.I. 61) at ¶ 19 ("The Indenture … is governed by New York law.") [App. at 377, Ex. J].  Based on the documents' unequivocal language and the parties' agreement as to the applicability of New York State contract law, the Bankruptcy Court ought to

have applied New York law when considering the Debtors' requested clarification of the Plan. It did not.

### C.    The Bankruptcy Court's Decision

To address the "at least half a dozen issues" thought to be "interesting" by the Bankruptcy Court (*see* June 10, 2005 Transcript (Bankr. D.I. 50) 4:23-25) [App. at 316, Ex. I], the parties – First Carolina, the Debtors and the Equity Committee – submitted briefs totaling more than 100 pages and citing at least 117 different legal authorities. On November 29, 2005, the Bankruptcy Court heard argument, and rendered a partial decision respecting the Clarification Motion. *See* November 29, 2005 Transcript (Bankr. D.I. 80). Despite the numerous "interesting" legal issues involved, the Bankruptcy Court issued no written opinion and its entire analysis of the issues involved is set forth on approximately 5 pages of the hearing transcript. *Id.* at 52–57 [App. at 522-27, Ex. L].[4]

As the transcript makes clear, the Bankruptcy Court did not cite any case authority or otherwise address in any level of detail the numerous legal arguments raised by the Equity Committee. In reaching its decision, the Bankruptcy Court instead heavily relied on selected portions of the Third Amended and Restated Disclosure Statement with Respect to Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code (the "Disclosure Statement") (Bankr. D.I. 522). Indeed, the Bankruptcy Court's analysis begins and ends with the Disclosure

---

[4] In addition to the reasons set forth on the record, the First Clarification Order also refers to the reasons set forth in the Bankruptcy Court's Letter to Counsel With Respect to Court's Ruling on the Reorganized Debtor's Motion for an Order Clarifying the Confirmed Plan, dated December 2, 2005 (the "Supplemental Letter") (Bankr. D.I. 78). The Supplemental Letter, did not, however, expound on the Bankruptcy Court's analysis on the record. Rather, the sole apparent purpose of the Supplemental Letter was to chastise Equity Committee Counsel's use of an ellipsis and bold font in one particular quotation. *See id.* at 3. As discussed in section D, below, this criticism was completely unwarranted.

Statement. *See* November 29, 2005 Transcript 52:25-53:14, 55:20-57:11 (Bankr. D.I. 80) [App. at 522-23, 525-27, Ex. L].

In recent motion practice, the Debtors erroneously have argued that "the Bankruptcy Court did not 'rely' on the disclosure statement. Instead, the Bankruptcy Court meticulously reviewed the Indenture and the Plan and found the provisions unambiguous." Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 26(f) [App. at 611, Ex. Q]. Given the lack of a written opinion and the brevity of the Bankruptcy Court's analysis on the record, it is unclear how the Debtors can assert (or even believe) that the Bankruptcy Court's review was "meticulous." The record makes clear, despite the Debtors' assertions to the contrary, that, in reaching its decision, the Bankruptcy Court indeed did rely on the Disclosure Statement.

The Bankruptcy Court's complete over-reliance on the Disclosure Statement itself is a basis upon which the appealed orders should be reversed. *Northwestern Corp. v. Ammondson (In re Northwestern Corp.)*, 324 B.R. 529, 533 (Bankr. D. Del. 2005) (finding that the "disclosure statement does not bind anyone to any legal status or obligation.....this Court must look to the Plan, not the Disclosure Statement, to determine what affect the Confirmation Order had upon the rights of the Pensioners."). *See also In re Bridgepoint Nurseries, Inc.*, 190 B.R. 215, 222 (Bankr. D.N.J. 1996) (holding that it is the confirmed plan, not the disclosure statement, which binds the debtor and creditors).

Moreover, as next will be shown, the Bankruptcy Court misconstrued the Disclosure Statement provisions upon which it relied.

### D.    The Bankruptcy Court Improperly Relied On And Then Misconstrued Certain Provisions Of The Disclosure Statement

In addition to its improper reliance on the Disclosure Statement, the Bankruptcy Court misconstrued and ignored contradictory provisions of the Disclosure Statement. For

example, in reaching its decision, the Bankruptcy Court selectively quoted from a section entitled

"Dividends," in the Disclosure Statement. Disclosure Statement § 13(b) [App. at 48, Ex. A]. In

fact, when reviewed in its entirety, that section actually supports the Equity Committee's

interpretation of the Plan. It states (with some emphasis added):

> (b) **Dividends.** *Post-confirmation equity holders will be precluded from receiving dividends or other distributions from FNV Group until the Berkadia Loan is repaid.* If New Group Preferred Stock is issued, distributions to common stockholders will not be permitted to be made unless a concurrent distribution is made to holders of the New Group Preferred Stock. Subject to applicable corporate law (which limits the circumstances in which corporations may legally make distributions to stockholders), *limited distributions to stockholders will be permitted as the New Senior Notes are paid off,* as described in the next paragraph.
>
> *The New Senior Notes will provide that after repayment in full of the Berkadia Loan, 5% of the Debtors' cash available for this purpose (as defined in the New Senior Notes Indenture) will be used to make distributions to stockholders.* Accordingly, unless principal payments are made on the New Senior Notes, no distributions will be made to stockholders. Further, such distributions will not be made if any default exists under the New Senior Notes. *If FNV Group does not have sufficient funds ultimately to repay the New Senior Notes in full (together with accrued interest thereon), it is likely that only limited distributions would be made to stockholders.* There can be no assurance that FNV Group will make any distributions to its equityholders even if all contractual prohibitions thereto have expired. Subject to meeting the legal requirements permitting distributions to stockholders, and so long as the making of any such distributions would not render FNV Group insolvent, FNV Group currently intends to make distributions permitted under the terms of the New Senior Notes as soon as practicable. It is likely that FNV Group will not fully repay the New Senior Notes in fewer than eight years.

To summarize, this section states "Post-confirmation equity holders will be

*precluded* from receiving dividends or other distributions from FNV Group until the Berkadia

Loan is repaid." (emphasis added). Given that the Berkadia Loan has been repaid, there is no

other circumstance identified in this section, including the lack of funds to repay the New Senior

Notes in full, pursuant to which "equity holders will be *precluded* from receiving dividends or

other distributions" from the Debtors.

The drafters of the Disclosure Statement (i.e., the Debtors) easily could have stated: "If FNV Group does not have sufficient funds ultimately to repay the New Senior Notes in full (together with accrued interest thereon), equity holders will be ***precluded*** from receiving dividends or other distributions" from the Debtors. They did not. In essence, the Bankruptcy Court, at the Debtors' request, read such a non-existent provision into the Disclosure Statement.

The actual section does go on to state: "[i]f FNV Group does not have sufficient funds ultimately to repay the New Senior Notes in full (together with accrued interest thereon), ***it is likely that only limited distributions would be made to stockholders***." (emphasis added). The plain meaning of the quoted sentence favors the Equity Committee's interpretation in that even if the Debtors can not ultimately pay the New Senior Notes in full, the Equity Holders will still receive **some** level of distribution, i.e., a nickel for each payment of $0.95 given to noteholders at least until such time as the Debtors run out of non-reserved funds to keep making such $.95 payments. The Bankruptcy Court over-looked this obvious meaning and stated: "I think that sentence of limited distribution refers to the five exceptions in exhibit 6.2(C)(1) of the Plan," which is the New Senior Notes Term Sheet. *See* November 29, 2005 transcript 56:16-18 [App. at 526, Ex. L].

With all due respect, the Bankruptcy Court's reasoning is illogical. First, the Disclosure Statement itself does not in any way refer the reader to the term sheet annexed to the Plan upon which the Bankruptcy Court relied for guidance. Also, at other places in the Disclosure Statement there are explicit references to the term sheet. *See, e.g.,* (Bankr. (Case No. 697) D.I. 553) (Disclosure Statement at 37) (". . .payments of Contingent Interest *(as defined in the term sheet for the New Senior Notes)* is dependent . . .") (emphasis added).

- 18 -

The "exceptions" referenced by the Bankruptcy Court come from a provision of the term sheet that defines a "Restricted Payment" under the Indenture as "the declaration or payment of any dividend or the making of any distribution on account of FNV Group's Equity Interests." Indenture § 1.01 [App. at 169-70, Ex. C]. But, the identified exceptions to Restricted Payments are repurchases of shares or other payments that are not to be considered *"dividends"* under the Plan and Indenture. It defies common sense to assert that when a Disclosure Statement section entitled "Dividends" discusses "limited distributions to stockholders," it was actually referring to payments or distributions that were specifically exempted from treatment as dividends altogether.[5]

The Equity Committee, in rebutting the Debtors' argument that the language used in the Disclosure Statement supported its position concerning "dividend" versus "debt" (*see, e.g.*, Bankr. D.I. 61 at ¶ 14), demonstrated to the Bankruptcy Court that the distributions to Equity Holders that were the subject of the Clarification Motion were explicitly described under the following heading: "3. Potential Limitations on or Inability to *Repay Debt* or Make Contingent Interest Payments." (Bankr. (Case No. 697) D.I. 553) (Disclosure Statement at 37) (emphasis added) [App. at 44, Ex. A]. There is a sentence within that section stating (with emphasis added):

> FNV Group's ability to pay the principal of, and interest on, the New Senior Notes, *to make distributions to holders of FNV Group common stock* or New Group Preferred Stock and to make payments of Contingent Interest (as defined in the term sheet for the New Senior Notes) is dependent on the generation of cash flow by its subsidiaries and the ability of the subsidiaries to make cash available to FNV Group, *by dividend, payment of the Intercompany Note or otherwise.*

---

[5] It is also notable that in the exceptions upon which the Bankruptcy Court relied, the term "distributions" only appears *once*, under one exception: "(iv) payments or distributions to dissenting shareholders pursuant to applicable law, pursuant to or in connection with a consolidation, merger or transfer of assets." Indenture § 4.07(iv). It is quite a stretch to conclude that this was the limited distribution referred to in the Disclosure Statement.

Here, the Disclosure Statement expressly describes FNV Group's ability to, among other things, make the distributions to Equity Holders at issue in this case underneath the heading quoted above, which refers to the Debtors' ability to repay "*debt*." In the Supplemental Letter (Bankr. D.I. 78) [App., Ex. M], the Bankruptcy Court stated that "the provision simply was not intended to address the treatment of equity interests. Rather the provision deals with the payments on the New Senior Notes and the Contingent Interest on those Notes." Supplemental Letter at 2 [App. at 549, Ex. M]. The Equity Committee submits that upon its review of the Disclosure Statement provision, this Court will find that the Bankruptcy Court's analysis is wrong and, therefore, there was no basis upon which to issue the Supplemental Letter.

### E.    The Bankruptcy Court Failed To Apply And/Or Misapprehended Controlling New York Law

The Bankruptcy Court either simply ignored or otherwise misconstrued well-established principles of New York law pertaining to the interpretation of contracts, including the Plan.

#### 1.    In Making The Clarification Motion, The Debtors Admitted That The Indenture At Issue Is Ambiguous; The Bankruptcy Court Erred In Finding A Lack Of Ambiguity

clar·i·fy: *verb* (1) to make (an idea, statement, etc.) clear or intelligible; to free from *ambiguity*.[6]

On appeal before this Court is a decision of the Bankruptcy Court resulting from the "Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1411 *Clarifying* Provision of Confirmed Plan" (defined above as the "Clarification Motion") (emphasis added). By making such a motion "to clarify," the Debtors, *ab initio*, have admitted that there was an ambiguity that needed clarifying. Or, in the words of Debtors' counsel: "[a]t most, the

---

[6]    *See* www.dictionary.com (last visited Sept. 27, 2007) (emphasis added).

Clarification Motion seeks to resolve *ambiguity* in the Plan concerning the disposition of the Segregated Funds in the event of the Reorganized Debtor's continued insolvency." *See* Debtor's Objection to Equity Committee Reconstitution (Bankr. D.I. 39 at ¶ 11) (emphasis added) [App. at 279, Ex. G].

Not surprisingly, having recognized the controlling consequence of such admission, in recent motion practice before this Court, the Debtors brazenly have asserted that "there is no ambiguity of any sort [in the Plan or Indenture at Issue]." *See* Debtors' Obj. to Stay Motion (D.I. 6) at ¶ 26(c) [App. at 610, Ex. Q]. Rather, the Debtors now assert they merely were talking about a "potential 'ambiguity'" as to what, under the current circumstances, should be done with the Segregated Funds. *Id.* This is nonsense. *See* (Bankr. D.I. 22) at ¶ 13 ("this Motion requests a *clarification* of the treatment of the funds retained by FNV Group *in the present situation*...") (emphasis added).

The Debtors also have asserted that rather than being ambiguous, the Indenture is just "silent" (*see* Bankr. D.I. 61) at ¶ 36) as to a term that they obviously believe is material and the absence of which prompted the instant motion. It is clear, however, that silence as to a material term in a contract is a *type* of ambiguity recognized by the courts. *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 149 (2d Cir. 1993) (holding a contract to be ambiguous where there was "nothing said in the contract" about whether stock shares to be reserved were to be restricted or unencumbered); *Record Club of Am. v. United Artists Records, Inc.*, 890 F.2d 1264, 1269-71 (2d Cir. 1989) (finding a contractual ambiguity rendering summary judgment inappropriate where contract was silent as to the timing of royalty payments); *Goldfield Corp. v. Gen. Host Corp.*, 29 N.Y.2d 264, 272-73, 277 N.E.2d 387, 392-93, 327 N.Y.S.2d 330, 337 (1971) (involving an "ambiguity [in a security agreement] created by silence ....").

Despite the Debtors' admission that the motion at issue involved an ***ambiguity*** that they asked a court to ***clarify*** based on the Debtors' "present situation," the Bankruptcy Court still, somehow stated that: "I spent a lot of time with the relevant documents [and] ***I don't think they're ambiguous***…" *See* November 29, 2005 Transcript 52:13-14 (Bankr. D.I. 80) [App. at 522, Ex. L]. This improper finding which ignored the movant's own admissions as to the existence of an ambiguity is itself a basis upon which this Court should reverse the appealed from orders of the Bankruptcy Court. Moreover, the Bankruptcy Court's failure to recognize the ambiguous nature of the documents at issue, lead to further reversible errors of law discussed below.

### 2. The Bankruptcy Court Erred In Adopting The Debtors' Interpretation Of The Ambiguous Indenture Provision

It is uncontested that the Clarification Motion required the Bankruptcy Court to interpret certain provisions of the Plan and Indenture. The interpretation offered by the Debtors is that, under the circumstances, the Segregated Funds they had retained on behalf of Equity Holders pursuant to the Indenture should be used by the Debtors "for general corporate purposes including, without limitation, payment of amounts due on the New Senior Notes." *See* Final Clarification Order at 3, ¶ 1. The more plausible (or at the least, equally plausible) interpretation offered by the Equity Committee was that, under the circumstances, the Segregated Funds should be distributed to the Equity Holders at once or when the Debtors' assets were fully liquidated and the Debtors ceased to function as on-going business enterprises. Applicable New York law obliged the Bankruptcy Court to interpret the Indenture in favor of the Equity Holders.

### (a) The Bankruptcy Court's Orders Would Effect An Impermissible Forfeiture

First, it is beyond peradventure that the "clarification" sought by the Debtors would effect a forfeiture of the funds currently being "retained" on account of the Plan-based rights of the Equity Holders. Further, it is well-settled that "New York courts will not interpret provisions that

are ambiguous on their face to effect a forfeiture...." *Kreiss v. McCown De Leeuw & Co.*, 131 F.

Supp. 2d 428, 436 (S.D.N.Y. 2001); *see also 220 West 42 Assocs. v. Ronbet Newmark Co.*, 84

Misc. 2d 259, 264, 375 N.Y.S.2d 255, 261 (Sup. Ct. N.Y. County 1975) ("[C]ourts should interpret

contracts to avoid [forfeiture]"). Accordingly, under this basic rule, ambiguous Section 4.06(a)(v)

of the Indenture cannot be interpreted to mean that the Equity Holders' contractual right to

payment under the Plan is rendered forever forfeit as a consequence of the financial condition of

the Debtors.

   In a recent filing, the Debtors argued to this Court that "the notion that the

Clarification Order is a 'forfeiture' is absurd; one cannot forfeit what one never had and, because

of the conditions of payment, Shareholders never had any right to the 5% Payment." *See* Debtors'

Obj. to Stay Motion (D.I. 6) at ¶ 26(a). In fact, it is the Debtors' assertion which is "absurd."

Even assuming that the Equity Holders' right to payment was of a "conditional" or "contingent"

nature (it was not), under the law, the loss of such a contingent right is still a forfeiture of property.

It is a fundamental legal principle that a "contingent right or interest which, on the occurrence of

an event possible to happen, would ripen into a complete ownership thereof, is property...." 73

C.J.S. *Property* § 10 (2007) (citing *Estate of Mitchell*, 91 Cal. Rptr. 2d 192 (Cal. Ct. App. 1999);

*Bank One Texas, N.A. v. Ameritrust Texas, N.A.*, 858 S.W.2d 516 (Tex. App. 1993); *Miller v.*

*Miller*, 31 S.E.2d 844 (W. Va. 1944)). In fact, courts have recognized this tenet of property law in

the bankruptcy context, noting that the Bankruptcy Code defines property of the estate to include

"all legal or equitable interests of the debtor in property as of the commencement of the case." 11

U.S.C. § 541(a)(1). As the Court of Appeals for the Second Circuit pointed out, "[t]his definition

is broad and includes even strictly contingent interests." *Mid-Island Hosp., Inc. v. Empire Blue*

*Cross & Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 128 (2d Cir. 2002) (citation omitted).

The fallacy of the Debtors' argument that a contingent right cannot be subject to forfeiture is further highlighted by the recognition in case law that a contingent interest is certainly something of value. *See, e.g., Banner v. Bagen (In re Bagen)*, 186 B.R. 824, 829 (Bankr. S.D.N.Y. 1995) (citing *In re Newman*, 88 B.R. 191, 192 (Bankr. C.D. Ill. 1987), *rev'd on other grounds Newman v. Magill*, 99 B.R. 881 (C.D. Ill. 1989)), which states that a "contingency merely affects the value of the property interest"). Therefore, no matter how the Debtors try to spin it, the Equity Holders' loss even of a contingent or conditional right to payment would still constitute an impermissible "forfeiture."

### (b)    The Ambiguous Plan Must Be Construed Against The Debtors As Drafters

Second, this Court should construe any and all ambiguities in the Plan and Indenture against the Debtors as the drafter of those documents. *See Reape v. New York News, Inc.*, 122 A.D.2d 29, 30, 504 N.Y.S.2d 469, 470 (2d Dep't 1986) (holding that "ambiguities in an agreement should be interpreted most strongly against the draftsman"), *cert. denied*, 68 N.Y.2d 610, 501 N.E.2d 600, 508 N.Y.S.2d 1027 (1986); *William A. White/Tishman East, Inc. v. Banko*, 171 A.D.2d 401, 566 N.Y.S.2d 628 (1st Dep't 1991) (same); *Gerlach v. The Horn & Hardart Co.*, 683 F. Supp. 342, 344 (S.D.N.Y. 1988) (noting that "in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language" (quoting *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (N.Y. 1985))); *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 630 (Del. 2003) (noting that the well-accepted doctrine of construction, *contra preferentem,* is that ambiguities in a contract should be construed against the

drafter). This is not only true as a matter of basic New York and Delaware contract law, but has also been recognized in the bankruptcy plan context. *See In re Terex Corp.*, 984 F.2d 170 (6th Cir. 1993); *In re Turek*, 346 B.R. 350, 355 (Bankr. M.D. Pa. 2006); *In re Toney*, 349 B.R. 516, 520 (Bankr. E.D. Tenn. 2006); *In re Sims*, 358 B.R. 217, 225 (Bankr. E.D. Pa. 2006) (all holding that ambiguity in plan is construed against the debtor, as drafter of the plan).

        Here, to the extent the Debtors believed that under the Plan and Indenture, in the event of certain financial conditions, the Equity Holders would forfeit, for all time, their right to payment, it was the Debtors' obligation to include in the controlling documents an express and unambiguous forfeiture provision.[7] The Debtors failed to insert such a forfeiture clause into section 4.06(a)(v) at the time it was drafted and the Plan's acceptance was solicited, and such a term should not now be implied. *See Vermont Teddy Bear Co.*, 1 N.Y.3d at 476, 807 N.E.2d at 880, 775 N.Y.S.2d at 768 (declining to add a notice provision where "[t]he parties could have [but did not] negotiated and included an explicit notice requirement"). Clearly, the Debtors failed to meet the required burden of proof in this regard. *See Campanile v. State Farm*, 161 A.D.2d 1052, 1054, 558 N.Y.S.2d 203, 204 (3d Dep't 1990) (holding that burden of proof is on drafter of agreement and the drafter must show that its construction of the agreement is the "only construction that can be fairly placed upon it").

        Based on the foregoing, the Bankruptcy Court committed reversible error by failing to construe properly the Plan and Indenture against its drafter, the Debtors, and by adopting an interpretation that effects a impermissible forfeiture.

---

[7]    It should be noted that an appropriately express and unambiguous forfeiture provision is found elsewhere in the controlling documents. *See* Plan at ¶ 9.4(b) ("Any distributions made under the Plan that [are unclaimed or undeliverable for a period of one year] shall be revested in the applicable Reorganized Debtor free of any restrictions thereon, and any entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and forever barred.").

3.    **The Terms Of The Controlling Documents Do Not Support The Clarification Proposed By The Debtor And The Bankruptcy Court Erred In Finding Otherwise**

In making the Clarification Motion, the Debtors argued that "it is ***implicit*** in the Plan" (Bankr. D.I. 61) at ¶ 7) (emphasis added) [App. at 371, Ex. J], that under certain financial conditions, the Equity Holders must forfeit the entirety of the consideration ($81 million and rising) provided to them under the Plan.  By making such an argument, the Debtors admitted that ***there is no express language*** in the Plan or Indenture that provides for such a forfeiture.  In such circumstances, "courts should be extremely reluctant to interpret an agreement as ***impliedly*** stating something which the parties have neglected to specifically include." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572, 412 N.Y.S.2d 827, 833 (1978) (emphasis added).

The language of the Indenture provision at issue states that "each incremental payment of $0.95 pursuant to Clause A [to the Company to pay principal and interest on the New Senior Notes] ***shall require*** a distribution [to Equity Security Holders] or retention [on their behalf] pursuant to Clause (B) of $0.05."  Indenture at § 4.06(a)(v) (emphasis added) [App. at 187, Ex. C].  Under New York law, the terms of a contract generally are afforded their plain and ordinary meaning. *See Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879, 775 N.Y.S.2d 765, 767-68 (2004) (holding that "when parties set down their agreement in a clear, complete document, their writing should…be enforced according to its terms" and "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 85-87 (2d Cir. 2002).  The plain meaning of this provision is that for every $0.95 that is used to pay principal on the New Senior Notes, $0.05 goes to the Equity Holders either at the time of distribution to Senior Noteholders or later.

- 26 -

The Debtors sought to avoid the obvious impact of such plain language, by arguing to the Bankruptcy Court that discrete limitations placed on the timing of the distribution of funds to the Equity Holders, i.e., when such distributions are Impermissible Restricted Payments, create a "condition precedent" to the Equity Holders *ever* receiving any payment. (Bankr. D.I. 61) at 2 ("First Carolina specifically ignores the *condition precedent* to *any* equity distribution – that it would not render the Reorganized Debtors insolvent, would constitute a fraudulent transfer, or would not be permitted under applicable law." (emphasis added)) [App. at 366, Ex. J]. As the Equity Committee pointed out to the Bankruptcy Court, the Debtors' attempt to conjure a "condition precedent" runs counter to the applicable New York law and, therefore, its repeated incantation of the term "condition precedent" was both wrong and misleading.

Under New York law, language akin to that relied upon by the Reorganized Debtor has been found *not* to establish a "condition precedent," but rather merely to establish a *time* for payment. The case of *Grossman Steel & Aluminum Corp. v. Samson Window Corp.*, 54 N.Y.2d 653, 426 N.E.2d 176, 442 N.Y.S.2d 769 (1981) is highly instructive.[8] In *Grossman Steel*, a subcontractor sued the general contractor to recover the balance due on a subcontract. The general contractor argued that a condition precedent to its duty to pay the subcontractor was its receipt of payment from the owner. *Id.* at 871, 433 N.Y.S.2d at 32. The provision in the subcontract at issue provided, in relevant part: "Retained percentages will be paid to [subcontractor] as and when [general contractor] receive[s] such payment from the [owner] and in the same proportions." *Id.* The Appellate Division, Second Department held that the "plaintiff subcontractor is entitled to payment of the retained percentage in the sum of $35,000, which represents the balance due on its

---

[8]    The relevant facts come from the New York Supreme Court, Appellate Division's decision reported at *Grossman Steel & Aluminum Corp. v. Samson Window Corp.*, 78 A.D.2d 871, 433 N.Y.S.2d 31 (2d Dep't 1980).

subcontract with defendants…despite the fact that the [owner] has not yet paid said defendants."
*Id.* (citations omitted). In affirming the decision of the Appellate Division, the New York Court of
Appeals held that the "disputed language…of the contract ***did not create a condition precedent to***
***payment*** to the subcontractor, ***but rather established a time for payment.***" *Grossman Steel*, 54
N.Y.2d at 654 (citing *Schuler-Hass Elec. Corp. v. Aetna Cas. & Sur. Co.*, 40 N.Y.2d 883, 357
N.E.2d 1003, 389 N.Y.S.2d 348 (N.Y. 1976)) (emphasis added); *see also In re JLH, L.L.C.*, 239
F.3d 366 (5th Cir. 2000) (applying New York law to find that language of agreement at issue did
not create a condition precedent).

      Before the Bankruptcy Court, the Debtors argued that the *Grossman Steel* line of
cases are not applicable because "the Reorganized Debtors is not a contractor, the Shareholders are
not subcontractors and the Plan does not deal with an attempted transfer of risk of nonpayment."
(Bankr. D.I. 65) at ¶ 10. This argument was and is unavailing as the principles underpinning the
holding of *Grossman Steel* are not restricted to the construction industry. *See, e.g., In re JLH,
L.L.C.*, 239 F.3d 366 (5th Cir. 2000); *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, No. 94 CIV.
3208, 1999 WL 705208 (S.D.N.Y. Sept. 10, 1999) (each applying *Grosman Steel* in a non-
construction context, i.e. breach of asset purchase agreement and sales representation contract,
respectively). Moreover, nowhere does the Plan provide for the divesting of the Equity Holders
right to payment in favor of the noteholders. Accordingly, the non-issue of "transfer of risk" is a
classic "red-herring."

      In addition to *Grossman Steel*, the case of *In re O'Hanlon's Will*, 27 N.Y.S.2d 889
(Sur. Ct. Richmond County 1941) also is instructive. The *O'Hanlon* case involved the
interpretation of a will that devised property to the decedent's grandnephew, provided that the
grandnephew reached the age of 23. *Id.* at 896. The will also provided a gift to the decedent's

nephew if the grandnephew died before reaching the age of 23. *Id.* The O'Hanlon Court held, that the grandnephew, under the age of 23, possessed a ***present right*** to future enjoyment of the property and took a vested estate, not future and contingent upon the attaining the age of 23. *Id.* at 897-98.

More particularly, the *O'Hanlon* court held that "[t]he words 'I give and bequeath' and 'I make the following requests' are words of ***present*** gift and not of future gift limited by a condition precedent. The words '***when*** they each ***become*** twenty-three years of age' has ***no greater effect than to postpone*** the time of enjoyment of the gift ***already vested***. *Id.* at 900-01 (emphasis added). The language of *O'Hanlon* is no different than the language of the Plan which expressly requires the (at the time) present payment or reservation of the Equity Holders' funds. Just as in *O'Hanlon*, where the failure of a beneficiary to reach the age of 23 would not divest his estate of the gift made at the time of the will's execution, so did the Plan similarly create a present obligation to pay or reserve the Equity Holders 5%, with the status of "Impermissible Restricted Payments" having "no greater effect than to postpone the time of enjoyment of the [payment obligation] already vested." *Id.*

Moreover, as shown above, the Debtors have admitted that the Indenture at issue is ambiguous. And, "it is well settled under New York law that where a contract term is ambiguous, ***the creation of a condition precedent is disfavored***." *Lomaglio Assocs. Inc.*, 1999 WL 705208, at *7 (citations omitted) (emphasis added) [App. at 636, Ex. S]; *see also Gallo v. Rea Motors, Inc.*, 34 A.D.3d 635, 823 N.Y.S.2d 700, 701 (2d Dep't 2006) ("where there is ambiguity in a contractual term, the law does not favor a construction which creates a condition precedent."). New York courts avoid interpreting "doubtful language" in a contract to be an express condition precedent "***when a finding of [such] an express condition [precedent] would increase the risk of forfeiture***

*by the obligee.*" *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 691, 660

N.E.2d 415, 418, 636 N.Y.S.2d 734, 737 (1995) (citing Restatement (Second) of Contracts §

227(1) (1981)) (emphasis added).

The foregoing demonstrates that, under applicable New York law, the language in

Section 4.06(a)(v) of the Indenture relied upon by the Reorganized Debtor does not establish a

condition precedent to payment to the Equity Holders, but rather delays the time for payment.

While the Bankruptcy Court did not use the term "condition precedent" in its analysis, it

essentially adopted the Debtors' position that the Indenture should be interpreted to include such a

condition precedent. *See, e.g.*, November 29, 2005 Transcript 52-57 (Bankr. D.I. 80) [App. at 522-

27, Ex. L].

F.    **The Bankruptcy Court Erred in Failing to Recognize that the Indenture
      Created Debt Obligations Running From the Debtors to the Equity
      Holders**

It is well-settled that a confirmed Chapter 11 plan of reorganization constitutes a

new contract between the debtor and its creditors, to which both a debtor and its creditors are

legally bound. *See In re Montgomery Ward Holding Corp.*, 306 B.R. 489, 495 (Bankr. D. Del.

2004) (noting that "[t]he new indebtedness is in essence a new and binding contract between the

debtor and the creditor.") (citations omitted). *See also In re Consumers Realty & Dev. Co., Inc.*,

238 B.R. 418, 425 (B.A.P. 8th Cir. 1999) (confirmation of plan had the effect of replacing the

obligations under the promissory notes with the obligations as provided in that plan); *In re Penrod*,

169 B.R. 910, 916 (Bankr. N.D. Ind. 1994) (effect of confirmation is to discharge the entire pre-

confirmation debt, replacing it with a new indebtedness as provided in the confirmed plan.); *In re*

*Water Gap Village*, 99 B.R. 226, 229 (Bankr. D.N.J. 1989).

Under applicable New York law, debt has been defined "as a fixed and certain

obligation," and "debt is generally evidenced by a contract and is a readily discernible amount

which can be expected in the normal course of events to be due and owing in the future, although

the obligation has not yet ripened." *Trojan Hardware Co. v. Bonacquisti Constr. Corp.*, 141

A.D.2d 278, 281, 534 N.Y.S.2d 789, 791 (3d Dep't 1988). The contractual obligation to pay the

Equity Holders $0.05 for every $0.95 paid as principal on the New Senior Notes once available

cash had been used to fulfill the four prior waterfall provisions, clearly fits within this definition of

debt. Further, it is undisputed that in the absence of the language in the Plan providing them with

the five cents per dollar of liquidation proceeds, no independent contractual basis for such

distribution would exist.

      The foregoing establishes: (a) that the Plan constituted a new contract between the

(reorganized) Debtors and, *inter alia*, the Equity Holders; (b) that pursuant to this new contract

(the Plan), the Debtors became obligated to make certain payments to Equity Holders (and the

Equity Holders were given the right to such payment); and (c) that such obligations and rights of

the respective parties created new "debt" running from the Debtors to the Equity Holders.

      Nevertheless, the Debtors have boldly argued that its obligations to make certain

payments to Equity Holders under the Plan are simply not "debt obligations." (Bankr. D.I. 61) at ¶

14 [App. at 373-74, Ex. J]. The Debtors, however, have failed to demonstrate an adequate factual

or legal basis to support this position. None of the cases cited by the Debtors before the

Bankruptcy Court in any way address the ***post-confirmation rights*** of a party to receive payments

***provided for by a plan***, and therefore none are relevant to the present dispute. Rather, the cited

cases deal with the rights of parties respecting ***pre-petition*** claims. For example, *Carrieri v.

Jobs.com, Inc.*, 393 F.3d 508 (5th Cir. 2004), involved the objection of a Chapter 11 debtor as to

certain proofs of pre-petition claims filed by shareholders holding its stock and stock warrants, and

*In re Georgetown Bldg. Assocs.*, 240 B.R. 124 (Bankr. D.D.C. 1999), involved a determination as to how certain pre-petition promissory notes would be classified under the plan there at issue.

The Debtors also argued that "the potential distributions to Shareholders as described in the Indenture do not have any of the indicia of debt." (Bankr. D.I. 61) at ¶16 [App. at 375-76, Ex. J]. Given the above definitions of debt and the contractual nature of a debtor's obligations to make payments under a confirmed plan, the Debtors' argument fails. In other words, the "indicia of debt" are the express payment obligations set forth in the Plan and Indenture. The Reorganized Debtor relies heavily on *Geftman v. Commissioner of Internal Revenue*, 154 F.3d 61 (3d Cir. 1998). This reliance is misplaced. In *Geftman*, the court had to decide whether the transaction at issue was a loan or a gift. The Third Circuit found that the transaction at issue was a gift (rather than a loan) because $2.85 million in credit was extended "with no promise of repayment, no interest charges, no security, and no repayment schedule..." *Id.* at 75. Clearly, *Geftman* is not relevant to the instant motion. In the present case, the Plan and Indenture evidence the Debtors' express contractual obligation to make payments to Equity Holders and others.

In granting the Clarification Motion, the Bankruptcy Court did not even mention, let alone deal with, the Equity Committee's legal arguments on this topic.[9] In so failing to recognize that the Indenture created debt obligations running from the Debtors to the Equity Holders, the Bankruptcy Court committed reversible error.

---

[9] While the Bankruptcy Court noted that such a distinction did not effect its decision in this case, it did find that the payment obligations to the Equity Holders at issue should not be labeled "dividends" as asserted by Debtors, but "a distribution with respect to the equity position." *See* November 29, 2005 Transcript (Bankr. D.I. 80) at p. 54:19-20 [App. at 524, Ex. L]. *See also* R. Franklin Balotti & Jesse A. Finkelstein, Del. L. of Corp. & Bus. Org. § 5.26 (2007) (citing *Fulweiler v. Spruance*, 22 A.2d 555 (Del. 1966) (a "partial distribution of income producing assets pursuant to an order of the court does not constitute a dividend.").

G.    **The Required Payments To The Equity Holders Are Not Impermissible Restricted Payments Under The Indenture And The Applicable Law**

In the Final Clarification Order, the Bankruptcy Court finds that "the Debtors presently are and will be forever insolvent." Final Clarification Order at 2 (Bankr. D.I. 220) [App. at 554, Ex. O]. While it never made specific findings to such effect, in order to turn over the Segregated Funds to the note holders (instead of the Equity Holders), the Bankruptcy Court had to have also found that any transfer of the Segregated Funds to Equity Holders will forever be an Impermissible Restricted Payment under the Indenture. To the extent the Court made such a finding, it was an error for the reasons explained herein.[10]

As defined in the Indenture, "'Impermissible Restricted Payment' means a Restricted Payment that, if made by [one of the Debtors], would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law." Indenture at 5 [App. at 165, Ex. C]. None of these categories describe the Plan-mandated payments to the Equity Holders.

1.    **The Plan Mandated Payments To Equity Holders Were Not "Dividends"**

Before the Bankruptcy Court, the Debtor argued that transfer of the funds is against applicable Delaware law since an entity in its financial condition may not declare "dividends" or "reduce capital." Delaware law, however, does not support the Debtors' position. First, it has already been demonstrated (*see* section D, supra, at 16-20) that the Debtors' payment obligations under the Plan and Indenture are *not* in the nature of a dividend. Indeed, the Bankruptcy Court

---

[10] In reaching its decision on the Clarification Motion, the Bankruptcy Court failed to address any of the arguments discussed in this section.

- 33 -

found that the transfer at issue was not a "dividend," but "a distribution with respect to the equity position." *See* November 29, 2005 Transcript 54:19-20 (Bankr. D.I. 80) [App. at 524, Ex. L].

### 2.    The Plan Mandated Payments To Equity Holders Do Not Violate Delaware Corporate Law

Second, even if the distribution to the Equity Holders is in the nature of a "dividend" as argued by the Debtor, the payment of such a "dividend" to the Equity Holders at this time would not violate Delaware law. The Delaware statute relied on by the Debtors, 8 DEL. CODE ANN. § 170, for its proposition that dividends may only be paid out of "surplus or net profits," has an express exception (applicable to this case) which states: "Nothing in this subsection shall invalidate or otherwise effect a note, debenture or other obligation of the corporation paid by it as a dividend on shares of its stock, or any payment made thereon, if at the time of such note, debenture or obligation was delivered by the corporation, the corporation has either surplus or net profits ... from which the dividend could lawfully have been paid." DEL. CODE ANN. tit. 8, § 170. This carve out is obviously meant to stop a corporation from reneging on a contractual payment obligation made to a stockholder undertaken while the company was solvent, based on a later assertion of insolvency. In other words, this exception was meant to stop exactly what the Debtors are attempting to do in this case. The Debtors were clearly solvent when the plan was confirmed, and it became contractually committed to the Equity Holders to make the disputed payments.[11] Therefore, the Debtors cannot selectively renege on such contractual obligations based on their current financial condition.

---

[11]    In the Disclosure Statement, the Reorganized Debtor stated that it and its related companies "believe that the Plan complies with the financial feasibility standard for confirmation." Disclosure Statement at 48. And, it is well settled that "feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success." *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997).

### 3.    The Plan Mandated Payments To Equity Holders Would Not Impermissibly Reduce The Debtors' Capital

Third, the reduction of capital provision cited by the Reorganized Debtor, DGCL §

244 (DEL. CODE. ANN. tit. 8, § 244), was designed to protect, among others, the stockholders of a

corporation. *See State v. Benson*, 32 Del. 576, 128 A. 107 (Del. Super. Ct. 1924). This section

should not be used as a vehicle to obliterate all rights that the Equity Security Holders were given

under the Plan. Furthermore, the Debtors failed to cite any authority for their proposition that

Delaware law concerning the declaration of dividends trumps its express payment obligations

under a confirmed bankruptcy plan, particularly ***those to which affected creditors consented***. In

fact, if a provision of the Plan, a creature of federal law, conflicts with the law of a state and the

state law "frustrates the full effectiveness of federal law [the state law] is rendered invalid by the

Supremacy Clause." *Jones v. Keene Corp.*, 933 F.2d 209, 214 (3d Cir. 1991).

### 4.    The Plan Mandated Payments To Equity Holders Would Not Be Fraudulent Conveyances, Nor Render The Debtors "Further Insolvent"

The Debtors also argued that the transfer of funds to Equity Holders would be a

fraudulent conveyance since the Debtors are now insolvent. This argument is not convincing since

it has been demonstrated (*see* section D, *supra*, at 19-20) that the Debtors' payment obligations

under the Plan are in the nature of a "debt," and it is well-settled that "[a]n 'antecedent debt'

satisfies the requirements of fair consideration and reasonably equivalent value, and...the payment

of an existing liability is not fraudulent." *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings,

Inc.)*, 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) ("Trace II") (citing *Atlanta Shipping Corp. v.

Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987)). The same is true under Delaware law. As one

Delaware court observed, "It is clear that under the statute [DEL. CODE ANN. tit. 6, § 1303] an

antecedent debt can constitute fair consideration to the extent that such debt is supportable in light

of the relationship existing between debtor and creditor." *Faircloth v. Rash*, 373 A.2d 870, 872

(Del. Super. Ct. 1977); *see also* DEL. CODE ANN. tit. 6, § 1303 ("Value is given for a transfer or an

obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent

debt is secured or satisfied....").

       Lastly, the Debtors asserted that since they are balance sheet insolvent any transfer

of the Segregated Funds to the Equity Holders is not permitted since it would render the Debtors

(or render them further) insolvent. This argument makes no sense. The funds at issue have

***already been paid out***: as of the filing of the Clarification Motion, $1.1 billion (or 95%) had been

used to make principal payments on the New Senior Notes, and $65.5 million (or 5%) had been

deposited into a segregated account on behalf of the Equity Holders. Thus, the transfer of the

segregated funds to the Equity Security Holders would not ***render*** the Debtors (or render them

further) insolvent. In addition, since the Debtors' Plan-based payment obligations are in the nature

of a debt owed to Equity Holders, any payment of such debt will not negatively impact the

Debtors' balance sheet.

       It is clear that, contrary to the various arguments asserted by the Debtors before the

Bankruptcy Court, the transfer of the Segregated Funds to the Equity Holders would not be an

Impermissible Restricted Payment. Furthermore, "[i]n FINOVA's 10-Q Report dated May 9,

2007, FINOVA stated that its goal was to wind-up all business activities and terminate its

existence by the end of 2007, and it had prepared budgets on that assumption." *See* Declaration of

Richard A. Ross Relating to Appeal Bond (District Court) ("Ross Decl. (September 20, 2007)")

(D.I. 7) at ¶ 3 [App. at 621, Ex. R]. Thus, in a short period of time the Debtors will no longer be

insolvent; it will be non-existent. *See In re Rehab. of Nat'l Heritage Life Ins. Co.*, 656 A.2d 252,

260 (Del. Ch. 1994) ("[U]pon dissolution the corporation will cease to exist as a legal entity.").

Thus, even if the Debtors are right and the called-for payments are currently Impermissible

Restricted Payments, they will no longer be once the Debtors cease to function as an on-going

business enterprise.

## CONCLUSION

**WHEREFORE,** for the foregoing reasons, the Equity Committee respectfully

requests that this Court enter an order:  (i) reversing the First Clarification Order and the Final

Clarification Order; and (ii) granting such other and further relief as may be just and proper under

the circumstances.

Dated:    October 22, 2007
          Wilmington, Delaware

                                               **WILLIAM D. SULLIVAN, LLC**

                                                  */s/ William D. Sullivan*

                                        William D. Sullivan (No. 2820)
                                        4 East 8th Street, Suite 400
                                        Wilmington, DE  19801
                                        Tel:  (302) 428-8191
                                        Fax:  (302) 428-8195
                                        email:  bill@williamdsullivanllc.com

                                             -- and --

                                        **ANDERSON KILL & OLICK, P.C.**
                                        Mark D. Silverschotz, Esq.
                                        James Andriola, Esq.
                                        Han J. Ahn, Esq.
                                        1251 Avenue of the Americas
                                        New York, NY  10020-1182
                                        Tel:  (212) 278-1000
                                        Fax:  (212) 278-1733

## <u>CERTIFICATE OF SERVICE</u>

I, William D. Sullivan, hereby certify that on the 22nd day of October 2007, I caused a copy of the foregoing *Appellant's Opening Brief* to be served upon the parties listed below in the manner indicated.

<u>HAND DELIVERY</u>
Mark D. Collins
Richards Layton & Finger
One Rodney Square
Wilmington, DE  19801

<u>FIRST CLASS MAIL</u>
Jonathan M. Landers, Esq.
Paul Guillotte, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166

<u>FIRST CLASS MAIL</u>
James Gadsden, Esq.
Carter Ledyard & Milburn, LLP
2 Wall Street
New York, NY  10005

*October 22, 2007*                         */s/ William D. Sullivan*
Date                                        William D. Sullivan