**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| THE FINOVA GROUP, INC., and FINOVA CAPITAL CORPORATION, | ) | Case Nos. 01-0698 (PJW) |
| | ) | Jointly Administered |
| Reorganized Debtors. | ) | |
| THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS of FINOVA GROUP, INC. | ) | |
| Appellant, | ) | Civil No. 07-480 (JJF) |
| v. | ) | Bankruptcy Case No. 01-698 AP 07-70 |
| THE FINOVA GROUP, INC., and FINOVA CAPITAL CROPORATION, | ) | |
| Appellees. | ) | |

**APPENDIX OF EXHIBITS TO APPELLANT'S OPENING BRIEF**

William D. Sullivan (No. 2820)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
email: bill@williamdsullivanllc.com

-- and --

ANDERSON KILL & OLICK, P.C.
Mark D. Silverschotz, Esq.
James Andriola, Esq.
Han J. Ahn, Esq.
1251 Avenue of the Americas
New York, NY 10020-1182
Tel: (212) 278-1000
Fax: (212) 278-1733

Dated: October 22, 2007
Wilmington, Delaware

*Attorneys for Appellant,*
*The Official Committee of Equity Security Holders of Finova Group Inc.*

**Index of Exhibits**

A. Third Amended and Restated **Disclosure Statement** with Respect to Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code (June 14, 2001) (Bankr. (Case No. 697) D.I. 552) ....................1

B. Third Amended and Restated **Joint Plan of Reorganization** of Debtors Under Chapter 11 of the Bankruptcy Code (June 14, 2001) (Bankr. (Case No. 697) D.I. 553) ....................69

C. **Indenture** for 7.5% Senior Secured Notes, contained in Plan Supplement with Respect to Third Amended and Restated Joint Plan of Reorganization (contained in the "**Plan Supplement**") (July 20, 2001) (Bankr. (Case No. 697) D.I. 745) ....................149

D. Berkshire Hathaway 2001 Annual Report (excerpt) ....................223

E. Debtor's 2004 Form 10-K (March 22, 2005) (excerpt) ....................242

F. Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1411 Clarifying Provision of Confirmed Plan (the "**Clarification Motion**") (April 1, 2005) (Bankr. D.I. 22) ....................258

G. Reorganized Debtor's Objection to the Motion of Eugene Linden for an Order which Recognizes the Continued Existence of the Official Committee of Equity Holders, or in the Alternative for the Reconstitution of the Equity Committee, for the Limited Purpose of Responding to the Debtors' Motion for an Order Clarifying Provision of Confirmed Plan (June 3, 2005) (Bankr. D.I. 39) ("**Objection to Equity Committee Reconstitution**") ....................274

H. **Objection of First Carolina Investors**, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan (June 3, 2005) (Bankr. D.I. 40) ....................287

I. Transcript of Hearing before the Honorable Peter J. Walsh on June 10, 2005 at 9:30 a.m. (Bankr. D.I. 50) ("**June 10, 2005 Transcript**") ....................313

J. **Debtor's Reply** to Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan (September 16, 2005) (Bankr. D.I. 61)......361

K. Equity Committee's Response to the Reorganized Debtor's Reply to Objection of First Carolina Investors, Inc. to the Clarification Motion (the "**Equity Committee's Response**") (October 18, 2005) (Bankr. D.I. 62) ....................439

L. Transcript of Hearing before the Honorable Peter J. Walsh on November 29, 2005 at 2:30 p.m. (Bankr. D.I. 80) ("**November 29, 2005 Transcript**") ....................471

M. **Supplemental Letter** from the Honorable Peter J. Walsh, dated December 2, 2005 (December 5, 2007) (Bankr. D.I. 78) ........ 548

N. Order Regarding Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, entered February 11, 2006 ("**First Clarification Order**") (Bankr. D.I. 100) ........ 551

O. Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), dated June 26, 2007 (the "**Final Clarification Order**") (Bankr. D.I. 220) ........ 553

P. Declaration of Richard A. Ross Relating to Appeal Bond dated July 11, 2007 ("**Ross Declaration (July 11, 2007)**") (Bankr. D.I. 229) ........ 556

Q. Objection and Answering Brief of Finova Group, Inc. and Finova Capital Corp. to Motion and Opening Brief of the Official Committee of Equity Security Holders in Support of a Stay Pending Appeal of the Bankruptcy Court's Final Clarification Order (September 20, 2007) (District Ct. (Case No. 480) D.I. 6) ("**Objection to Stay Pending Appeal**") ........ 592

R. Declaration of Richard A. Ross Relating to Appeal Bond (District Court) (September 20, 2007) (District Ct. (Case No. 480) D.I. 7) ("**Ross Declaration September 20, 2007)** ........ 620

**Unreported Decisions**

S. *Lomaglio Associates Incorporated v. LBK Marketing Corp.* (F.Supp.2d, 1999 WL 705208 (S.D.N.Y.) ........ 630

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re: Chapter 11

The FINOVA Group Inc.,
FINOVA Capital Corporation,
FINOVA (Canada) Capital Corporation,
FINOVA Capital plc,
FINOVA Loan Administration Inc.,
FINOVA Mezzanine Capital Inc.,
FINOVA Portfolio Services, Inc.,
FINOVA Technology Finance, Inc., and
FINOVA Finance Trust,

Debtors.

Case Nos. 01-0697 (PJW) through 01-0705 (PJW)

Jointly Administered
Case No. 01-0697 (PJW)

THIRD AMENDED AND RESTATED DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

RICHARDS, LAYTON & FINGER, P.A.

Mark D. Collins (No.2981)
Daniel J. DeFranceschi (No. 2732)
Deborah E. Spivack (No.3220)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899

Telephone:(302) 658-6541
Facsimile:(302) 658-6548

GIBSON, DUNN & CRUTCHER LLP

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
Thayer H. Thompson
200 Park Avenue
New York, New York 10166-0193

Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Counsel for Debtors
Dated: June 13, 2001

TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS .......... 2
A. Purpose of Disclosure Statement .......... 2
B. Voting on the Plan .......... 3
C. Confirmation of the Plan .......... 6
D. Limitations .......... 6

III. OVERVIEW OF THE PLAN .......... 6

IV. BACKGROUND CONCERNING THE DEBTORS .......... 19
A. General Background .......... 19
B. Supplemental or Updated Information .......... 19
1. Legal Proceedings .......... 19
2. Taxation .......... 19
3. Equity Ownership .......... 20
4. Debt Structure .......... 20
5. Management .......... 21
6. Related Party Transactions .......... 23

V. THE DEBTORS' CHAPTER 11 CASES .......... 24
A. Events Preceding the Filing of the Chapter 11 Cases .......... 24
B. The Commencement of the Chapter 11 Cases .......... 24
C. Significant Parties in Interest .......... 25
1. Creditors' Committee .......... 25
2. Equity Committee .......... 26
D. Events During Chapter 11 Cases .......... 26

VI. DESCRIPTION OF THE PLAN OF REORGANIZATION .......... 26
A. Overview and Restructuring Transactions .......... 26
B. Classification and Treatment of Claims and Interests .......... 27
C. Implementation and Other Provisions of the Plan .......... 27
1. Assumption or Rejection of Executory Contracts and Unexpired Leases .......... 27
2. Issuance of New Debt and Equity Securities .......... 27
3. Corporate Governance Matters .......... 28
4. Plan Distribution Entitlement; Dispute Provisions .......... 28
5. Distribution Procedures .......... 29
6. Retention of Causes of Action .......... 29
7. Effect of Confirmation of Plan .......... 30
8. Implementing Documents and Transactions; No Transfer Taxes .......... 31
9. Amendment of Plan; Severability; Revocation .......... 32
10. Retention of Jurisdiction .......... 32
D. Treatment of Securities Litigation .......... 32
E. Conditions to Confirmation and Effective Date of the Plan .......... 32
1. Conditions to Confirmation .......... 32
2. Conditions to the Effective Date .......... 33

VII. SPECIAL PROVISIONS RELATING TO SECURITIES ISSUED OR OUTSTANDING UNDER THE PLAN .......... 33
A. New Senior Notes, Additional Group Common Stock, New Group Preferred Stock and Additional Mezzanine Common Stock .......... 33
B. Common Stock .......... 34
C. Post-Confirmation Business Plan .......... 34

1. Business Plan--General .......... 34
2. Asset Sales .......... 35
3. New Business Opportunities .......... 35
D. Certain Factors to be Considered .......... 36
1. Portfolio Maximization .......... 36
2. Leverage .......... 37
3. Potential Limitations on or Inability to Repay Debt or Make Contingent Payments .......... 37
4. Potential Insufficiency of Collateral for New Senior Notes; Value of Collateral .......... 38
5. Interest Spread; Interest Rate Matching .......... 38
6. Leveraged Leases .......... 39
7. Aircraft Residual Risk .......... 39
8. Projections .......... 40
9. Competition .......... 40
10. Dependence on Key Personnel; Management Agreement .......... 40
11. Termination of Berkadia's Commitment to Make the Berkadia Loan .......... 40
12. Lack of Established Market for New Senior Notes, New Group Preferred Stock, and Additional Mezzanine Common Stock .......... 41
13. Special Risks for Equity Holders .......... 41

VIII. VOTING PROCEDURES .......... 43
A. Parties Entitled to Vote on the Plan .......... 43
B. Ballot .......... 43
C. General Procedures and Deadlines for Casting Votes .......... 44
D. Special Procedures Applicable to Voting of Debt Securities Claims and Equity Interests .......... 45

IX. CONFIRMATION OF THE PLAN .......... 45
A. Classification of Claims and Interests .......... 47
B. Best Interests of Unsecured Creditors .......... 47
C. Feasibility .......... 48
D. Acceptance .......... 48
E. Confirmation Without Acceptance by All Impaired Classes .......... 49

X. ALTERNATIVES TO THE PLAN .......... 49

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 50
A. Consequences to the Debtors .......... 51
1. Cancellation of Debt .......... 51
2. Limitation on NOL Carryforwards and Other Tax Attributes .......... 51
3. Alternative Minimum Tax .......... 53
4. Issuance of the New Senior Notes .......... 54
B. Consequences to Holders of Certain Claims .......... 54
1. Consequences to Holders of Allowed Convenience Claims .......... 54
2. Consequences to Holders of Allowed General Unsecured Claims (other than Allowed Convenience Claims) against FNV Capital .......... 55
3. Consequences to Holders of Debt Securities (S) 510(b) Claims and Equity Securities (S) 510(b) Claims .......... 57
4. Withholding .......... 57
C. Consequences to Holders of Allowed Interests .......... 58
1. Holders of Interests in FNV Group .......... 58
2. Holders of Allowed TOPrS Interests .......... 58

XII. CONCLUSION .......... 61

Exhibit A --The Plan
Exhibit B --Order of the Bankruptcy Court
Exhibit C --Second Amended and Restated Management Services Agreement
Exhibit D --Commitment Letter
Exhibit E --Letter Agreement Related to the Tender Offer
Exhibit F --Financial Projections
Exhibit G --Liquidation Analysis
Exhibit H --Corporate Structure of the Debtors
Exhibit I --Term Sheet for New Group Preferred Stock
Exhibit J --FNV Group Annual Report on Form 10-K/A
Exhibit K --FNV Group Quarterly Report on Form 10-Q
Exhibit L --Unaudited Balance Sheets for each Debtor, dated as of March 7, 2001 and March 31, 2001

I.

INTRODUCTION

This Third Amended and Restated Disclosure Statement amends and restates in its entirety that certain Second Amended and Restated Disclosure Statement, dated as of June 11, 2001 (as amended and restated, this "Disclosure Statement"). This Disclosure Statement has been prepared by The FINOVA Group Inc. ("FNV Group"), a Delaware corporation, and eight of its direct and indirect subsidiaries, including FINOVA Capital Corporation ("FNV Capital"), also a Delaware corporation (collectively, the "Debtors"). The Debtors are debtors in possession in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases"). The Debtors have filed in their Chapter 11 Cases a Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code (the "Plan"), a copy of which is attached hereto as Exhibit A. Unless otherwise defined in this Disclosure Statement, capitalized terms used, and not otherwise defined, will have the same meanings given to them in the Plan.

This Disclosure Statement applies only to the Plan and should not be relied upon if the Plan is revoked. The terms and conditions upon which the Plan may be revoked are set forth in the letter agreement dated as of June 10, 2001, and as modified by letter agreement dated as of June 13, 2001, annexed hereto as part of Exhibit D.

The Plan contemplates implementation of a comprehensive restructuring transaction with Berkadia LLC ("Berkadia"), a joint venture of Berkshire Hathaway Inc. ("Berkshire") and Leucadia National Corporation ("Leucadia"), that was first announced on February 27, 2001, and revised on May 2, 2001, May 30, 2000, June 10, 2001 and June 13, 2001. As described more fully herein, Berkadia will make a $6,000,000,000 loan (the "Berkadia Loan") to FNV Capital that, together with the Debtors' cash on hand and the issuance by FNV Group of approximately $3,260,000,000 aggregate principal amount of New Senior Notes, will enable the Debtors to restructure their debt. As soon as reasonably practicable after the Effective Date, Berkshire will commence a tender offer (the "Tender Offer") for up to $500,000,000 in aggregate principal amount of New Senior Notes, at a cash purchase price of 70% of par ($700 per $1,000 principal amount).

The Debtors expect to emerge from chapter 11 on or before August 31, 2001. Pursuant to a Management Services Agreement, which was entered into prior to these Chapter 11 Cases, and which was amended and restated on April 3, 2001 and further amended and restated on June 10, 2001, Leucadia is providing advice and assistance during the bankruptcy cases related to the restructuring and the Debtors' asset portfolio, subject to oversight by the FNV Group Board of Directors and a special committee of the Board, and will provide management functions to the Reorganized Debtors upon the effectiveness of the Plan.

The Plan constitutes separate plans of reorganization for each of the nine Debtors. After implementation of the Plan, each Debtor, other than FINOVA Finance Trust ("FNV Trust"), will emerge from chapter 11 as a separate corporate entity. Under the Plan, FNV Trust will dissolve. As more fully described herein, the Plan contemplates that all creditors of each of the Debtors, other than general unsecured creditors of FNV Capital, holders of TOPrS Interests and the related Group Subordinated Debentures, and holders of Securities Litigation Claims, will receive either reinstatement of their Claims or payment in Cash on the Effective Date of the Plan, unless they agree with the Debtors to alternate treatment. With respect to creditors with secured Claims, the Plan also permits the Debtors to surrender the asset securing the Claim. The Plan further contemplates that general unsecured creditors of FNV Capital and holders of TOPrS Interests will receive the proceeds of the Berkadia Loan, the New Senior Notes and Cash in satisfaction of their Claims.

Under the Plan, equity Interest holders in each of the Debtors, other than FNV Trust, will retain their Interests in the applicable Reorganized Debtor. Under the Plan, the holders of preferred equity Interests in FNV Trust, also called TOPrS, will receive a distribution of Cash and New Senior Notes in the aggregate amount of 75% of the liquidation preference attributable to such Interests, as more fully described herein. The Group Subordinated Debentures related to the TOPrS will be cancelled. The Plan further provides for the treatment of claimants in various Securities Litigation actions now pending against the Debtors and others. Specifically, the

Plan contemplates the issuance of Preferred Stock of FNV Group to satisfy any final judgments against FNV Capital arising from an existing class action Securities Litigation against FNV Capital and the issuance of Additional Mezzanine Common Stock to satisfy any final judgments against FINOVA Mezzanine Capital Inc. ("FNV Mezzanine") arising from an existing class action Securities Litigation against FNV Mezzanine. Finally, the Plan contemplates the issuance of Additional Group Common Stock, (i) to the Berkadia Parties, in an amount that will constitute 51%, or a lesser amount as may be agreed by the Berkadia Parties, of the outstanding equity of FNV Group on a Fully Diluted Basis as of the Effective Date and (ii) to satisfy any final judgment against FNV Group arising from an existing Securities Litigation against FNV Group. For all issuances of stock in connection with the Securities Litigation described in this paragraph, holders of Allowed Claims shall receive stock having a value as determined by Final Order equal to the amount of such Claims that is not covered by applicable insurance policies. In the event that any Additional Group Common Stock is issued after the Effective Date, the Berkadia Parties shall contemporaneously receive additional FNV Group common stock in the amount that they would have received if such issuances had occurred before the Effective Date.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS AND INTEREST HOLDERS. ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO VOTE IN FAVOR OF THE PLAN BY NO LATER THAN 5:00 P.M. MOUNTAIN STANDARD TIME ON AUGUST 1, 2001 (THE "VOTING DEADLINE").

## II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

### A. Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired or as an equity Interest holder whose equity Interest is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan. It also sets forth information regarding the history of the Debtors, their businesses, the filing of the Chapter 11 Cases, the Plan and alternatives to the Plan. Finally, this Disclosure Statement enables the Bankruptcy Court to make an informed decision whether the Plan complies with the requirements of the Bankruptcy Code.

EACH CREDITOR AND INTEREST HOLDER SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. No person has been authorized to use any information concerning the Debtors or their businesses other than this information for the purpose of solicitation. For convenience, the terms of the Plan are summarized in this Disclosure Statement, but all summaries are qualified by the Plan itself, which is controlling in the event of any inconsistency.

For your convenience, copies of the following documents are attached as Exhibits to this Disclosure Statement:

- The Plan (Exhibit A);
- Order of the Bankruptcy Court, dated June 14, 2001 (the "Disclosure Statement Order"), which, among other things, approves the Disclosure Statement and establishes certain procedures for the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);
- Second Amended and Restated Management Services Agreement among FNV Group, Leucadia and Leucadia International Corporation, dated June 10, 2001 (Exhibit C);
- Commitment Letter among Berkshire, Leucadia, Berkadia, FNV Group and FNV Capital, dated February 26, 2001, and letter agreement among Berkshire, Leucadia, Berkadia, FNV Group and FNV Capital, dated as of May 2, 2001, which annexes the term sheet for the Berkadia Loan and the term sheet

for the New Senior Notes, as modified by letter agreement among Berkadia, Berkshire, Leucadia, FNV Group and FNV Capital, dated May 30, 2001, and as further modified by letter agreement among Berkadia, Berkshire, Leucadia, FNV Group and FNV Capital, dated June 10, 2001, which also annexes the term sheet for the Intercompany Note, and as further modified by letter agreement among Berkadia, Berkshire, Leucadia, FNV Group and FNV Capital, dated June 13, 2001 (Exhibit D);

- Letter Agreement among Berkshire, FNV Group and FNV Capital, dated June 13, 2001, related to the Tender Offer (Exhibit E);
- FNV Group, et al. financial projections (Exhibit F);
- FNV Group, et al. liquidation analysis (Exhibit G);
- Chart of corporate structure of the Debtors (Exhibit H);
- Summary of Terms of New Group Preferred Stock (Exhibit I);
- FNV Group Annual Report on Form 10-K for the year ended December 31, 2000, filed with the Securities and Exchange Commission on April 17, 2001, as amended by Form 10-K/A, filed with the Securities and Exchange Commission on April 26, 2001 (the "10-K/A"), which, among other things, contains detailed information on the Debtors and their subsidiaries, their assets and businesses and audited consolidated financial statements for FNV Group for the year ended December 31, 2000 (Exhibit J);
- FNV Group Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, filed with the Securities and Exchange Commission on May 15, 2001 (the "10-Q") (Exhibit K); and
- Unaudited balance sheets, dated as of March 7, 2001 and March 31, 2001, for each Debtor (Exhibit L).

At a hearing held on June 13, 2001, after notice, the Bankruptcy Court approved this Disclosure Statement, including the Exhibits, pursuant to section 1125 of the Bankruptcy Code as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims or equity Interests of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT IS NOT A DETERMINATION BY THE BANKRUPTCY COURT EITHER OF THE FAIRNESS AND MERITS OF THE PLAN OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

The statements contained in this Disclosure Statement are made as of the date on the front cover unless otherwise specified, and the statements on Exhibits are made as of the date thereof. Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, imply that there has been no change in the facts since that date. The information contained in this Disclosure Statement has been prepared by the Debtors in good faith, based on information available to the Debtors. THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT CONCERNING THE PLAN HAS NOT BEEN SUBJECT TO AN AUDIT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. All financial information was compiled from the records of the Debtors. The Debtors believe that this Disclosure Statement complies with the requirements of the Bankruptcy Code.

B. Voting on the Plan

After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and return it in the postage-paid envelope provided. Although the Plan is one document, it is structured as a separate plan of reorganization for each of the nine Debtors. You may vote to accept or reject only the Plan of the Debtor or Debtors against which you have a Claim or in which you have an Interest. You may receive a voting ballot with

respect to the Plan of one or more of the Debtors. Mark and return only the ballot or ballots with respect to the Debtors in which you hold a Claim or equity Interest. In addition, your Claims or equity Interests may be classified in multiple classes. DETAILED INSTRUCTIONS REGARDING VOTING, INCLUDING THE NAMES AND ADDRESSES OF THE PERSONS YOU MAY CONTACT IF YOU HAVE QUESTIONS REGARDING THE VOTING PROCEDURES, ARE INCLUDED IN SECTION VIII OF THIS DISCLOSURE STATEMENT ("VOTING PROCEDURES"). PLEASE REVIEW THE INSTRUCTIONS SET FORTH IN THAT SECTION IN DETAIL.

It is important that creditors and equity security holders exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by the Plan, if it is accepted by the requisite holders of Claims or equity Interests.

Pursuant to the provisions of the Bankruptcy Code, only holders of Claims and Interests in the following Classes, as defined in the Plan, (the "Voting Classes") are impaired and entitled to vote on the Plan (section references below are references to the Plan):

FNV Group:
Section 3.1(c)--(Group Subordinated Debenture Claims)
Section 3.1(d)--(General Unsecured Claims)
Section 3.1(e)--(Convenience Claims)
Section 3.1(f)--(Interests)
Section 3.1(g)--(Equity Securities (S) 510(b) Claims)

FNV Capital:
Section 3.2(c)--(General Unsecured Claims)
Section 3.2(d)--(Convenience Claims)
Section 3.2(e)--(Debt Securities (S) 510(b) Claims)

FNV Canada:
None

FNV UK:
None

FNV Loan:
Section 3.5(c)--(General Unsecured Claims)
Section 3.5(d)--(Convenience Claims)

FNV Mezzanine:
Section 3.6(c)--(General Unsecured Claims)
Section 3.6(d)--(Convenience Claims)
Section 3.6(e)--(Interests)
Section 3.6(f)--(Equity Securities (S) 510(b) Claims)

FNV Portfolio:
Section 3.7(c)--(General Unsecured Claims)
Section 3.7(d)--(Convenience Claims)

FNV Technology:
Section 3.8(c)--(General Unsecured Claims)
Section 3.8(d)--(Convenience Claims)

FNV Trust:
Section 3.9(c)--(General Unsecured Claims)
Section 3.9(d)--(Convenience Claims)
Section 3.9(e)--(TOPrS Interests)
Section 3.9(f)--(Interests)

Holders of Claims and Interests in the following Classes are not entitled to vote on the Plan and are deemed to have accepted the Plan because their Claims are not impaired by the Plan:

FNV Group:
Section 3.1(a)--(Secured Claims)
Section 3.1(b)--(Other Priority Claims)

FNV Capital:
Section 3.2(a)--(Secured Claims)
Section 3.2(b)--(Other Priority Claims)
Section 3.2(f)--(Interests)

FNV Canada:
Section 3.3(a)--(Secured Claims)
Section 3.3(b)--(Other Priority Claims)
Section 3.3(c)--(General Unsecured Claims)
Section 3.3(d)--(Interests)

FNV UK:
Section 3.4(a)--(Secured Claims)
Section 3.4(b)--(Other Priority Claims)
Section 3.4(c)--(General Unsecured Claims)
Section 3.4(d)--(FNV Capital Intercompany Loan)
Section 3.4(e)--(Interests)

FNV Loan:
Section 3.5(a)--(Secured Claims)
Section 3.5(b)--(Other Priority Claims)
Section 3.5(e)--(Interests)

FNV Mezzanine:
Section 3.6(a)--(Secured Claims)
Section 3.6(b)--(Other Priority Claims)

FNV Portfolio:
Section 3.7(a)--(Secured Claims)
Section 3.7(b)--(Other Priority Claims)
Section 3.7(e)--(Interests)

FNV Technology:
Section 3.8(a)--(Secured Claims)
Section 3.8(b)--(Other Priority Claims)
Section 3.8(e)--(Interests)

FNV Trust:
Section 3.9(a)--(Secured Claims)
Section 3.9(b)--(Other Priority Claims)

Notwithstanding the foregoing, only holders of Allowed Claims or Allowed Interests in the Voting Classes are entitled to vote on the Plan. A Disputed Claim (as defined in the Plan) or Interest that is not Allowed (as defined in the Plan) is not entitled to vote unless and until either (i) the dispute with respect to the Claim or Interest is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction or pursuant to agreement with the Debtors or (ii) the Bankruptcy Court deems the Disputed Claim or Interest to be an Allowed Claim or Allowed Interest on a provisional basis, for purposes of voting on the Plan. Therefore, even if there is a ballot enclosed with this Disclosure Statement, the votes cast by the holders of any Claim or Interest that is not Allowed as of the Voting Deadline will not be counted unless the Bankruptcy Court provisionally allows those Claims or Interests for purposes of voting on the Plan. If your Claim or Interest not Allowed, it is your obligation to obtain an order provisionally allowing your Claim or Interest.

Holders of Claims and Interests in the voting classes may vote on the Plan only if they are holders as of the Voting Record Date. The "Voting Record Date" is June 13, 2001.

A ballot to be used for voting to accept or reject the Plan, together with a postage-prepaid envelope, is enclosed with copies of this Disclosure Statement that are mailed to creditors and stockholders entitled to vote on the Plan. If there is no ballot enclosed, or if you have any questions concerning voting procedures, you may contact the voting agent as follows:

The FINOVA Group Inc.
c/o Claudia King & Associates, Inc.
P.O. BOX 2742
Carefree, AZ 85377-2742
(by U.S. Mail)

and

The FINOVA Group Inc.
c/o Claudia King & Associates, Inc.
7301 E. Sundance Trail--Suite D-201
Carefree, AZ 85377
(by delivery or courier)

To be counted, your vote must be received, on the ballot provided, by the voting agent at the address set forth above, before the voting deadline of 5:00 p.m. Mountain Standard Time on August 1, 2001. FURTHER VOTING INSTRUCTIONS ARE SET FORTH ON THE BALLOT AND IN SECTION VIII OF THIS DISCLOSURE STATEMENT ("VOTING PROCEDURES"). PLEASE REVIEW THOSE INSTRUCTIONS IN DETAIL.

BALLOTS MUST BE RECEIVED BY 5:00 P.M. MOUNTAIN STANDARD TIME, ON AUGUST 1, 2001, TO BE CONSIDERED IN DETERMINING WHETHER THE PLAN HAS BEEN ACCEPTED OR REJECTED. FAXED BALLOTS WILL NOT BE ACCEPTED.

BALLOTS THAT ARE RECEIVED BUT NOT SIGNED OR THAT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL NOT BE COUNTED. THE DEBTORS RECOMMEND A VOTE IN FAVOR OF THE PLAN.

THE DEBTORS URGE ALL CREDITORS AND STOCKHOLDERS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE DEADLINE.

C. Confirmation of the Plan

The requirements for Confirmation, including the vote of creditors to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are set forth in Section IX of this Disclosure Statement ("CONFIRMATION OF THE PLAN"). The Plan constitutes a separate plan of reorganization for each of the nine Debtors. Accordingly, the voting and other Confirmation requirements must be satisfied with respect to the Plan for each of the Debtors, and separate ballots and other voting materials will be furnished as to each of the nine Debtors. Confirmation of the Plan and the occurrence of the Effective Date are subject to a number of significant provisions, which are summarized in Section VI-E of this Disclosure Statement ("Conditions to Confirmation and Effective Date of the Plan"). There can be no assurance that these conditions will be satisfied. If not all conditions are satisfied for all Plans, the Debtors reserve the right to amend or withdraw any or all of the Plans, all as described more fully in Section VI-E.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on August 10, 2001 at 9:30 a.m., Eastern Daylight Time, in Courtroom 2 at 824 Market Street, 6th Floor, Wilmington, Delaware 19801 or such other location as the Bankruptcy Court may announce. The hearing may be adjourned from time to time without notice beyond that given in open court. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be filed and served on or before August 3, 2001, in the manner described in Section IX of this Disclosure Statement ("CONFIRMATION OF THE PLAN").

D. Limitations

NO SOLICITATION OF VOTES ON THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE. IN VOTING ON THE PLAN, CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS AND THEIR BUSINESSES OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ALL EXHIBITS TO EITHER.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE ON THE FRONT COVER UNLESS OTHERWISE NOTED, AND STATEMENTS CONTAINED IN THE EXHIBITS ARE MADE AS OF THE DATE THEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THIS INFORMATION SINCE THOSE DATES. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS. CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND WHERE POSSIBLE CONSULT WITH COUNSEL, PRIOR TO VOTING.

III.

OVERVIEW OF THE PLAN

The following is a brief overview of the provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A, and the Plan Supplement. For a more detailed description of the terms and provisions of the Plan, see Section VI of this Disclosure Statement ("DESCRIPTION OF THE PLAN OF REORGANIZATION").

The Plan contemplates the restructuring and payment of the bank, bond and other debt of the Debtors through Berkadia's extension of a $6,000,000,000 loan to FNV Capital that, together with the Debtors' cash on hand and the issuance by FNV Group of approximately $3,260,000,000 aggregate principal amount of New Senior Notes, will enable the Debtors to restructure their debt. Holders of unsecured Claims against FNV Capital will receive (i) a Cash payment equal to 70% of the general unsecured Claims against FNV Capital (not including prepetition or postpetition interest), (ii) a Cash payment equal to the amount of accrued and unpaid prepetition and postpetition interest on such general unsecured Claims (the Debtors estimate the aggregate amount of pre-petition interest payments to be approximately $155 million and, assuming an Effective Date of August 31, 2001 and assuming an interest rate of 6.037% per annum(/1/), the aggregate amount of post-petition interest payments to be approximately $345 million) and (iii) New Senior Notes having an aggregate principal amount equal to 30% of such general unsecured Claims (not including prepetition and postpetition interest). Holders of TOPrS Interests with respect to FNV Group will receive (i) a Cash payment equal to 52.5% of the liquidation preference attributable to such Interests (not including prepetition or postpetition dividends), (ii) a Cash payment equal to 75% of each of accrued and unpaid prepetition and postpetition dividends attributable to such Interests (the Debtors estimate the aggregate amount of accrued and unpaid prepetition dividends to be approximately $900,000 and, assuming an Effective Date of August 31, 2001, the aggregate amount of accrued post-petition dividends to be approximately $2.3 million) and (iii) New Senior Notes having an aggregate principal amount equal to 22.5% of the liquidation preference attributable to such Interests (not including prepetition and postpetition dividends). The Group Subordinated Debentures related to the TOPrS Interests will be cancelled. For complete descriptions of the Berkadia Loan and the New Senior Notes, see the Commitment Letter (attached hereto as Exhibit D) and the term sheets for the Berkadia Loan and New Senior Notes annexed as exhibits to the Plan. The term sheets annexed to the Plan set forth all terms as modified by the letter agreements dated May 2, 2001, May 30, 2001, June 10, 2001 and June 13, 2001.

Berkshire has guaranteed 90% of Berkadia's commitment to make the Berkadia Loan; Leucadia has guaranteed 10% of Berkadia's commitment to make the Berkadia Loan; and Berkshire has secondarily guaranteed the 10% of Berkadia's commitment to make the Berkadia Loan that is guaranteed by Leucadia. FNV Group and all of its direct and indirect subsidiaries (other than (x) FNV Capital, and (y) any special purpose subsidiary that is contractually prohibited (as of February 26, 2001) from acting as a guarantor) (the "Guarantors") will guarantee repayment by FNV Capital of the Berkadia Loan. The guarantees described in the preceding sentence shall be secured by substantially all of the Guarantors' assets.

The New Senior Notes (i) will be issued by FNV Group, (ii) will mature eight (8) years after the Effective Date, and (iii) will bear interest, payable semi-annually out of "available cash" (as defined in the New Senior Notes Indenture), at a fixed rate of seven and one-half percent (7.5%) per annum. FNV Group's obligations with respect to the payment of interest (but not Contingent Interest) and principal under the New Senior Notes will be secured by a second-priority security interest in (x) all of the capital stock of FNV Capital and (y) a promissory note of FNV Capital issued to FNV Group in the principal amount of the aggregate amount of New Senior Notes (the "Intercompany Note"), which will be secured by a second priority lien on the assets of FNV Capital pledged to secure the Berkadia Loan. The holders of the New Senior Notes will have no right to enforce their security interests until the Berkadia Loan is paid in full.

Under the New Senior Notes, "available cash," after paying or funding a reserve to pay accrued interest on the Berkadia Loan, paying or funding taxes, operating and other corporate expenses (including interest on and principal of certain permitted indebtedness (as defined in the New Senior Notes Indenture)) and reasonable reserves, will be used to pay accrued interest on the New Senior Notes. No payments of principal will be made on the New Senior Notes until the Berkadia Loan is paid in full; provided that FNV Group may, with the prior consent of Berkadia if the Berkadia Loan is still outstanding, repurchase New Senior Notes at a price not to exceed par plus accrued and unpaid interest thereon, through tender offers, open market purchases and/or privately negotiated transactions or otherwise. As long as the Berkadia Loan is outstanding, such repurchases shall not exceed $1.5 billion in the aggregate, and at such time when the Berkadia Loan is no longer outstanding, such repurchases shall not exceed $150 million per calendar year. In the event that FNV Group elects to make such repurchases, the board of directors of Reorganized FNV Group will adopt procedures in connection with repurchases of New Senior Notes neither to prefer nor to discriminate against Berkshire.

--------

(1) The actual interest rate will be calculated as set forth in Section 5.11(a) of the Plan and will depend upon the applicable LIBO rates during the period from and including the Petition Date to but excluding the

Distribution Date.

7

In connection with the Plan, Berkshire has agreed that if the Berkadia Loan is funded and the New Senior Notes are issued as contemplated in the Plan, then as soon as reasonably practicable thereafter, Berkshire or a direct or indirect subsidiary of Berkshire will commence a Tender Offer, as more fully described in Exhibit E, for up to $500 million in aggregate principal amount of New Senior Notes at a cash purchase price of 70% of par ($700 per $1,000 principal amount of New Senior Notes). Berkshire has advised the Debtors that the Tender Offer will be subject to conditions to be specified in the Tender Offer documents which will be customary, but will not be subject to any financing condition. The Tender Offer will be made in compliance with all applicable securities laws and will remain open for the longer of twenty Business Days or thirty days. Berkshire (or its subsidiary) will purchase any and all New Senior Notes validly tendered, up to the $500 million aggregate principal amount limit, and will pro rate among tendering holders if the Tender Offer is oversubscribed.

Berkshire, together with its direct and indirect subsidiaries, has agreed to retain ownership of all New Senior Notes received by Berkshire pursuant to the Plan or purchased through the Berkshire Tender Offer for a period of four years from the Effective Date of the Plan. If Berkshire acquires New Senior Notes in addition to those received by it on the Effective Date of the Plan or purchased through the Tender Offer, Berkshire may sell or otherwise dispose of any New Senior Notes it owns so long as at all times during the four (4) years after the Effective Date it owns not less than the aggregate principal amount of New Senior Notes that it received on the Effective Date pursuant to the Plan and purchased through the Tender Offer. Berkshire's agreement does not restrict Berkshire or any of its direct and indirect subsidiaries from transferring New Senior Notes among or between themselves.

After payment in full of the Berkadia Loan, making payments or funding reserves required prior to making an interest payment on the New Senior Notes (as described above), paying accrued interest on the New Senior Notes and optional purchases of New Senior Notes in permitted amounts, ninety-five percent (95%) of the remaining "available cash" will be used to make semi-annual prepayments of principal on the New Senior Notes and five percent (5%) will be used for distributions to and/or repurchases of stock from FNV Group stockholders. The board of directors of Reorganized FNV Group will adopt procedures in connection with any non-pro rata purchase of FNV Group common stock neither to prefer nor to discriminate against the Berkadia Parties in any such purchases.

After payment in full of the outstanding principal of the New Senior Notes, optional purchases of New Senior Notes in permitted amounts, and payments to FNV Group common stockholders in an aggregate amount equal to 5.263% of the aggregate principal amount of New Senior Notes issued pursuant to the Plan, ninety-five percent (95%) of any "available cash" will be used to pay Contingent Interest to holders of New Senior Notes in an aggregate amount of up to $100 million (as such amount may be reduced to reflect a decrease in the principal amount of New Senior Notes outstanding as a result of repurchases (but not prepayments or repayments) by FNV Group) and five percent (5%) of such remaining "available cash" will be used for distributions to and/or repurchase of stock from FNV Group stockholders. Contingent Interest payments will terminate fifteen (15) years after the Effective Date.

The Plan proposes either reinstatement, surrender of collateral or Cash payment, with postpetition interest, for all secured Claims. The Plan proposes either reinstatement or payment of Cash for all unsecured Claims against any of the Debtors, other than general unsecured Claims against FNV Capital and holders of TOPrS Interests and the related Group Subordinated Debentures.

Under the Plan, all existing equity Interests of Debtors other than FNV Trust will be Reinstated and will be retained by the existing holders, subject to dilution in certain cases as described herein. Under the Plan, FNV Trust will be dissolved, the holders of TOPrS will receive cash and New Senior Notes as described above, and common equity Interests in FNV Trust will be cancelled and FNV Group, as the holder thereof, will receive and retain nothing on account of its Interests. The Plan contemplates that all existing common stock of FNV Mezzanine will be retained by FNV Capital as the existing holder, but that Additional Mezzanine Common Stock may be issued to satisfy final judgments, if any, for plaintiffs in an existing Securities Litigation against FNV Mezzanine. Further, the Plan contemplates that all existing common stock of FNV Group will be retained by the existing holders thereof, but that New Group Preferred Stock will be issued to satisfy final judgments, if any, for

plaintiffs in an existing Securities Litigation against FNV Capital and Additional Group Common Stock will be issued (i) to the Berkadia Parties, in an amount that will constitute 51% (or a lesser amount as may be agreed by the Berkadia Parties) of the outstanding equity of FNV Group on a Fully Diluted Basis as of the Effective Date after giving effect to any other issuances of Additional Group Common Stock contemplated by the Plan and (ii) to satisfy final judgments, if any, for plaintiffs in an existing Securities Litigation against FNV Group. For all issuances of stock described in this paragraph relating to the Securities Litigation, holders of Allowed Claims shall receive stock having a value, as determined by Final Order, equal to the amount of such Claims that is not covered by applicable insurance policies. In the event that any Additional Group Common Stock is issued, the Berkadia Parties shall contemporaneously receive additional FNV Group common stock in the amount that they would have received if such issuances had occurred before the Effective Date.

In addition, the Plan contemplates that, upon the Effective Date, Berkadia will designate a majority of the Board of Directors of Reorganized FNV Group as of the Effective Date, that two members of the Board of Directors of Reorganized FNV Group will be directors currently serving on FNV Group's Board of Directors and that one member will be designated by the creditors. Finally, the Plan contemplates that the Debtors' businesses will be operated after the Effective Date under a Management Services Agreement with Leucadia, pursuant to which Leucadia will designate its employees to act as Chairman of the Board and President of Reorganized FNV Group. For a more detailed description of the consideration to Berkadia and the Management Services Agreement, see the Commitment Letter attached hereto as Exhibit D and the Management Services Agreement attached hereto as Exhibit C.

The steering committee composed of certain lenders to FNV Capital pursuant to the Bank Credit Agreements contends that the calculation of postpetition interest contained in Section 5.11(a) of the Plan should be calculated by using the Base Rates as defined in the Bank Credit Agreements. The Debtors disagree with this contention and the Plan provides otherwise.

As described more fully below in Section VII-C of this Disclosure Statement ("Post-Confirmation Business Plan"), the Debtors' post-confirmation business plan does not contemplate any new business activities related to new customers. While other activities may be initiated or undertaken in the future, the main objective of the Debtors' post-confirmation business plan is to maximize the value of their portfolio through the orderly liquidation of the portfolio over time.

The Pension Benefit Guaranty Corporation ("PBGC") is the United States government agency that administers the mandatory termination insurance program for defined benefit pension plans under Title IV of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. (S)(S) 1301-1461 (1994 & Supp. IV 1998). A defined benefit pension plan is one that provides an employee, upon retirement, a fixed, periodic payment as determined by the terms of the plan. See 29 U.S.C. (S) 1002(35). The PBGC guarantees the payment of certain pension benefits upon termination of a defined benefit pension plan. See 29 U.S.C. (S)(S) 1321, 1322.

The Debtors established and maintain the Retirement Plan for certain of their employees known as The FINOVA Group Inc. Pension Plan. The Retirement Plan is covered by Title IV of ERISA. The Debtors understand that they and all members of the controlled group are obligated to contribute to the Retirement Plan the amounts necessary to satisfy ERISA's minimum funding standards, 29 U.S.C. (S) 1082; 26 U.S.C. (S) 412. In addition, in the event of a termination of the Retirement Plan, the Debtors and all members of the controlled group may be jointly and severally liable for the unfunded benefit liabilities of the Retirement Plan. See 29 U.S.C. (S) 1362(a).

The Debtors intend to continue their liability as either the contributing sponsors or controlled group members to fund the Retirement Plan in accordance with the minimum funding standards under ERISA, pay all required PBGC insurance premiums, and comply with all applicable requirements of the Retirement Plan and ERISA. The Debtors further understand that the Retirement Plan may be terminated only if the statutory requirements of either sections 4041 or 4042 of ERISA are met. 29 U.S.C. (S)(S) 1341, 1342. In addition, the Debtors' reorganization proceedings, and in particular the Plan, the Confirmation Order and section 1141 of the Bankruptcy Code, shall not in any way be construed as discharging, releasing or relieving the Debtors, or any other party, in any capacity, from any liability with respect to the Retirement Plan under any law, governmental policy or regulatory provision. PBGC and the Retirement Plan shall not be enjoined or precluded from enforcing such liability as a result of any of the provisions of the Plan or the Plan's confirmation.

The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan.

| | |
|---|---|
| Administrative Claims...... | Except as described in the next paragraph, each holder of an Allowed Administrative Claim against any Debtor shall receive on the Distribution Date, at the sole option of the relevant Debtor, (a) payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Claim or (b) such other treatment as to which the relevant Debtor and such Claim holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims against a Debtor representing liabilities incurred in the ordinary course of business during the Chapter 11 Cases or liabilities arising under loans or advances to or other obligations incurred by the Debtors that were authorized and approved by the Bankruptcy Court shall be paid and performed by the appropriate Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.<br><br>Any Person seeking an award by the Bankruptcy Court of an Allowed Administrative Claim on account of Professional Fees, services rendered, or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, shall file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date no later than thirty days after the Effective Date (except to the extent that such Person is an Ordinary Course Professional, in which case the procedures set forth in the Ordinary Course Professional Order shall be followed). Objections to final applications for payment of Professional Fees must be filed no later than 60 days after the Confirmation Date. To the extent that such an award is granted by the Bankruptcy Court or allowed by the Ordinary Course Professional Order, the requesting Person shall receive, (i) payment on the Distribution Date of Cash in an amount equal to the amount allowed by the Bankruptcy Court or Ordinary Course Professional Order, (ii) payment on such other terms as may be mutually agreed upon by the holder of the Allowed Administrative Claim and the applicable Debtor or (iii) payment in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. All Professional Fees for services rendered in connection with the Chapter 11 Cases and the Plan after the Confirmation Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of causes of action preserved hereunder and the resolution of Disputed Claims, shall be paid by the applicable Debtor upon receipt of an invoice therefor, or on such other terms as such Debtor may agree to, without the requirement of further Bankruptcy Court authorization or entry of a Final Order. |
| Priority Tax Claims........ | Each holder of an Allowed Priority Tax Claim against a Debtor shall receive, at the sole option of the relevant Debtor: (a) payment on the Distribution Date of Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim; (b) Cash payments over a period not |

exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest accruing from the Effective Date, calculated at the effective interest rate for 90-day securities obligations issued by the United States Treasury on the Effective Date or, if no such securities were issued on the Effective Date, on the date of issuance immediately preceding the Effective Date; (c) payment upon such other terms determined by the Bankruptcy Court to provide the holder of such Claim with deferred Cash payments having a value, as of the Effective Date, equal to such Claim; or (d) such other treatment agreed to by the Allowed Priority Tax Claim holder and the applicable Debtor.

FNV Group-1 (Secured Claims).................... On the Distribution Date, each holder of an Allowed Claim in Class FNV Group-1 shall receive one of the following treatments, to be determined at the sole option of FNV Group: (i) Reinstatement of such Allowed Secured Claim, (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case the Lien arising from such Allowed Secured Claim shall be released upon payment, (iii) surrender by FNV Group of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV Group and such holder shall have agreed upon in writing. At the option of FNV Group, FNV Group may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

FNV Group-2 (Other Priority Claims)........... On the Distribution Date, the Allowed Claims in Class FNV Group-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Group and such holder shall have agreed upon in writing.

FNV Group-3 (Group Subordinated Debenture Claims).................... On the Distribution Date, (i) the Allowed Claims in Class FNV Group-3 shall be satisfied by the treatment of the beneficial holders of claims in Class FNV Trust-5 (TOPrS Interests), provided, however, that Allowed Claims of the Indenture Trustees (including, but not limited to, prepetition and postpetition fees, costs, expenses, indemnification, disbursements, advances and reasonable compensation for the Indenture Trustee's counsel) shall be paid in full in Cash on the Distribution Date, and (ii) the Group Subordinated Debentures shall be cancelled.

FNV Group-4 (General Unsecured Claims).......... On the Distribution Date, each holder of an Allowed Claim in Class FNV Group-4 shall receive one of the following treatments, to be determined at the sole option of FNV Group: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim, (ii) Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV Group and such holder shall have agreed upon in writing.

| | |
|---|---|
| FNV Group-5 (Convenience Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Group-5 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |
| FNV Group-6 (Interests).... | On and after the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Group-6 shall remain in effect, subject to the effects of (i) the issuance of Additional Group Common Stock (x) to the Berkadia Parties, and (y) to the holders of Allowed Equity Securities (S) 510(b) Claims in FNV Group-7, if any, (ii) the issuance of New Group Preferred Stock to the holders of Allowed Debt Securities (S) 510(b) Claims in Class FNV Capital-5, if any, and (iii) the other terms and conditions of the Plan, including cancellation of certain options, warrants and rights, as more fully described therein. |
| FNV Group-7 (Equity Securities (S) 510(b) Claims).................... | On the Distribution Date, each holder of an Allowed Equity Securities (S) 510(b) Claim in Class FNV Group-7, if any, shall receive a distribution by Reorganized FNV Group of Additional Group Common Stock having a value, as determined by a Final Order, equal to the holder's Pro Rata Share of the Excess Amount with respect to all Allowed Equity Securities (S) 510(b) Claims in Class FNV Group-7. |
| FNV Capital-1 (Secured Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Capital-1 shall receive one of the following treatments, to be determined at the sole option of FNV Capital: (i) Reinstatement of such Allowed Secured Claim, (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case the Lien arising from such Allowed Secured Claim shall be released upon payment, (iii) surrender by FNV Capital of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV Capital and such holder shall have agreed upon in writing. At the option of FNV Capital, FNV Capital may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |
| FNV Capital-2 (Other Priority Claims)........... | On the Distribution Date, the Allowed Claims in Class FNV Capital-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Capital and such holder shall have agreed upon in writing. |
| FNV Capital-3 (General Unsecured Claims).......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Capital-3 shall receive a distribution, equal to the full amount of such General Unsecured Claim plus postpetition interest, composed of (i) a Cash payment equal to 70% of the principal amount of that General Unsecured Claim (not including prepetition or postpetition |

interest), (ii) a Cash payment equal to the amount of accrued and unpaid prepetition and postpetition interest on the General Unsecured Claim, and (iii) New Senior Notes in the principal amount of 30% of the principal amount of that General Unsecured Claim (not including prepetition or postpetition interest), provided, however, that Allowed Claims of the Indenture Trustees (including, but not limited to, prepetition and postpetition fees, costs, expenses, indemnification, disbursements, advances and reasonable compensation for the Indenture Trustee's counsel) shall be paid in full in Cash on the Distribution Date.

FNV Capital-4 (Convenience Claims).................... On the Distribution Date, each holder of an Allowed Claim in Class FNV Capital-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

FNV Capital-5 (Debt Securities (S) 510(b) Claims).................... On the Distribution Date, each holder of an Allowed Debt Securities (S) 510(b) Claim in Class FNV Capital-5, if any, shall receive a distribution by Reorganized FNV Group of New Group Preferred Stock having a value, as determined by a Final Order, equal to the holder's Pro Rata Share of the Excess Amount with respect to all Allowed Debt Securities (S) 510(b) Claims in Class FNV Capital-5.

FNV Capital-6 (Interests)................ On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Capital-6 shall be Reinstated.

FNV Canada-1 (Secured Claims).................... On the Distribution Date, each holder of an Allowed Claim in Class FNV Canada-1 shall receive one of the following treatments, to be determined at the sole option of FNV Canada: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Canada of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV Canada and such holder shall have agreed upon in writing. At the option of FNV Canada, FNV Canada may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

FNV Canada-2 (Other Priority Claims)........... On the Distribution Date, the Allowed Claims in Class FNV Canada-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Canada and such holder shall have agreed upon in writing.

FNV Canada-3 (General Unsecured Claims).......... On the Distribution Date, each holder of an Allowed Claim in Class FNV Canada-3 shall receive one of the following treatments, to be determined at the sole option of FNV Canada: (i) payment of Cash in

| | |
|---|---|
| | an amount equal to the unpaid portion of such Allowed General Unsecured Claim plus postpetition interest, (ii) except in the case of Bank Claims against FNV Canada, Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV Canada and such holder shall have agreed upon in writing. |
| FNV Canada-4 (Interests)... | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Canada-4 shall be Reinstated. |
| FNV UK-1 (Secured Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-1 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV UK of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV UK and such holder shall have agreed upon in writing. At the option of FNV UK, FNV UK may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |
| FNV UK-2 (Other Priority Claims).................... | On the Distribution Date, the Allowed Claims in Class FNV UK-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV UK and such holder shall have agreed upon in writing. |
| FNV UK-3 (General Unsecured Claims).......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-3 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed General Unsecured Claim plus postpetition interest, (ii) except in the case of Bank Claims against FNV UK, Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV UK and such holder shall have agreed upon in writing. |
| FNV UK-4 (FNV Capital Intercompany Loan)......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-4 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) payment of Cash in an amount equal to the unpaid portion of the Claim plus postpetition interest, or (ii) Reinstatement of the Claim. |
| FNV UK-5 (Interests)....... | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV UK-5 shall be Reinstated. |

| | |
|---|---|
| FNV Loan-1 (Secured Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-1 shall receive one of the following treatments, to be determined at the sole option of FNV Loan: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Loan of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Loan and such holder shall have agreed upon in writing. At the option of FNV Loan, FNV Loan may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |
| FNV Loan-2 (Other Priority Claims).................... | On the Distribution Date, the Allowed Claims in Class FNV Loan-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Loan and such holder shall have agreed upon in writing. |
| FNV Loan-3 (General Unsecured Claims).......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-3 shall receive one of the following treatments, to be determined at the sole option of FNV Loan: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim, (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Loan and such holder shall have agreed upon in writing. |
| FNV Loan-4 (Convenience Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |
| FNV Loan-5 (Interests)..... | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Loan-5 shall be Reinstated. |
| FNV Mezzanine-1 (Secured Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Mezzanine-1 shall receive one of the following treatments, to be determined at the sole option of FNV Mezzanine: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Mezzanine of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Mezzanine and such holder shall have agreed upon in writing. At the option of FNV Mezzanine, FNV Mezzanine may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |

| | |
|---|---|
| FNV Mezzanine-2 (Other Priority Claims).......... | On the Distribution Date, the Allowed Claims in Class FNV Mezzanine-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Mezzanine and such holder shall have agreed upon in writing. |
| FNV Mezzanine-3 (General Unsecured Claims)......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Mezzanine-3 shall receive one of the following treatments, to be determined at the sole option of FNV Mezzanine: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim; (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Mezzanine and such holder shall have agreed upon in writing. |
| FNV Mezzanine-4 (Convenience Claims)....... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Mezzanine-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |
| FNV Mezzanine-5 (Interests)............... | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Mezzanine-5 shall remain in effect, subject to the effect of the issuance of Additional Mezzanine Common Stock to holders of Allowed Equity Securities (S) 510(b) Claims in Class FNV Mezzanine-6, if any. |
| FNV Mezzanine-6 (Equity Securities (S) 510(b) Claims).................. | On the Distribution Date, each holder of an Allowed Equity Securities (S) 510(b) Claim in Class FNV Mezzanine-6, if any, shall receive a distribution of Additional Mezzanine Common Stock having a value, as determined by a Final Order, equal to the holder's Pro Rata Share of the Excess Amount with respect to all Allowed Equity Securities (S) 510(b) Claims in Class FNV Mezzanine-6. |
| FNV Portfolio-1 (Secured Claims).................. | On the Distribution Date, each holder of an Allowed Claim in Class FNV Portfolio-1 shall receive one of the following treatments, to be determined at the sole option of FNV Portfolio: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Portfolio of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Portfolio and such holder shall have agreed upon in writing. At the option of FNV Portfolio, FNV Portfolio may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |

| | |
|---|---|
| FNV Portfolio-2 (Other Priority Claims).......... | On the Distribution Date, the Allowed Claims in Class FNV Portfolio-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Portfolio and such holder shall have agreed upon in writing. |
| FNV Portfolio-3 (General Unsecured Claims)......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Portfolio-3 shall receive one of the following treatments, to be determined at the sole option of FNV Portfolio: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim; (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Portfolio and such holder shall have agreed upon in writing. |
| FNV Portfolio-4 (Convenience Claims)....... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Portfolio-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |
| FNV Portfolio-5 (Interests)............... | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Portfolio-5 shall be Reinstated. |
| FNV Technology-1 (Secured Claims)................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-1 shall receive one of the following treatments, to be determined at the sole option of FNV Technology: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Technology of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Technology and such holder shall have agreed upon in writing. At the option of FNV Technology, FNV Technology may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |
| FNV Technology-2 (Other Priority Claims).......... | On the Distribution Date, the Allowed Claims in Class FNV Technology-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Technology and such holder shall have agreed upon in writing. |

| | |
|---|---|
| FNV Technology-3 (General Unsecured Claims).......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-3 shall receive one of the following treatments, to be determined at the sole option of FNV Technology: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim; (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Technology and such holder shall have agreed upon in writing. |
| FNV Technology-4 (Convenience Claims)....... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |
| FNV Technology-5 (Interests)................ | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Technology-5 shall be Reinstated. |
| FNV Trust-1 (Secured Claims).................... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Trust-1 shall receive one of the following treatments, to be determined at the sole option of FNV Trust: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest, in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (ii) surrender by FNV Trust of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iii) such other treatment as to which FNV Trust and such holder shall have agreed upon in writing. At the option of FNV Trust, FNV Trust may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim. |
| FNV Trust-2 (Other Priority Claims).......... | On the Distribution Date, the Allowed Claims in Class FNV Trust-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Trust and such holder shall have agreed upon in writing. |
| FNV Trust-3 (General Unsecured Claims).......... | On the Distribution Date, each holder of an Allowed Claim in Class FNV Trust-3 shall receive one of the following treatments, to be determined at the sole option of FNV Trust: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim or (ii) such other treatment as to which FNV Trust and such holder shall have agreed upon in writing. |
| FNV Trust-4 (Convenience Claims).................... | On the Distribution Date, holders of Allowed Claims in Class FNV Trust-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim. |

| | |
|---|---|
| FNV Trust-5 (TOPrS Interests)................ | On the Distribution Date, each holder of an Allowed Interest in Class FNV Trust-5 shall receive a distribution composed of (i) a Cash payment equal to 52.5% of the liquidation preference attributable to such Allowed Interest (not including prepetition or postpetition dividends), (ii) a Cash payment equal to 75% of the amount of accrued and unpaid prepetition and postpetition dividends attributable to such Allowed Interest and (iii) New Senior Notes in the principal amount of 22.5% of the liquidation preference attributable to such Allowed Interest (not including prepetition or postpetition dividends) provided, however, that Allowed Claims of the Indenture Trustees (including, but not limited to, prepetition and postpetition fees, costs, expenses, indemnification, disbursements, advances and reasonable compensation for the Indenture Trustee's counsel) shall be paid in full in Cash on the Distribution Date. |
| FNV Trust-6 (Interests).... | On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Trust-6 shall be cancelled. Holders of Allowed Interests in Class FNV Trust-6 shall receive any property of the Estate of FNV Trust remaining after payment of all other classes of Claims against and TOPrS Interests in FNV Trust; provided, however, that any Group Subordinated Debentures that otherwise would be distributed to FNV Group hereunder shall be cancelled. |

# IV.

# BACKGROUND CONCERNING THE DEBTORS

## A. General Background

For general background regarding the Debtors, creditors and Interest holders should read the attached 10-K/A and 10-Q. The 10-K/A and 10-Q contain information concerning the Debtors, their assets and their businesses, audited consolidated financial statements for the year ended December 31, 2000 and unaudited consolidated financial statements for the quarter ended March 31, 2001, and certain other financial information. In addition, for your ease of reference, a chart of the corporate structure of the Debtors is attached hereto as Exhibit H.

## B. Supplemental or Updated Information

### 1. Legal Proceedings

The Debtors are debtors in possession in the Chapter 11 Cases and are involved in the related legal proceedings, as described in Section V of this Disclosure Statement ("THE DEBTORS' CHAPTER 11 CASES").

Prior to the commencement of the Chapter 11 Cases, the Debtors were parties to certain other legal proceedings as more fully described in the attached 10-K/A and 10-Q. Creditors and Interest holders are referred to Item 3, "Legal Proceedings," of the 10-K/A and Part I, Item 1, Note H "Legal Proceedings," of the 10-Q for information regarding those legal proceedings.

As they continue to operate, but subject to the automatic stay during the pendency of the Chapter 11 Cases, the Debtors may become involved in future legal proceedings arising in the ordinary course of their business.

### 2. Taxation

For a discussion of the federal tax attributes of the Debtors and the federal tax consequences of the Plan, see Section XI of this Disclosure Statement ("CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN").

3. Equity Ownership

FNV Group is the ultimate parent company of the other Debtors. The common stock of FNV Group is traded on the NYSE under the symbol "FNV." See "Market Price Of And Dividends On The Registrant's Common Equity & Related Shareowner Matters" in Item 5 of the 10-K/A for information regarding historic trading information of the FNV Group Common Stock. Each share of common stock is entitled to one vote per share.

The following table sets forth information concerning the ownership of FNV Group Common Stock by persons or groups owning in excess of 5% of the outstanding stock, based on SEC filings made by those persons or groups. The information is as of the date of those reports, which is indicated below.

| Name of Beneficial Owner | Number of Common Shares | Percent of Total Voting Power |
|---|---|---|
| Legg Mason Investment Trust, Inc. and affiliates (as of May 31, 2001) | 5,900,000 | 9.65% |
| Barclays Global Investors and affiliates (as of June 1, 2001) | 4,125,000 | 6.74% |
| James D. Bennett and affiliates (as of February 12, 2001) | 3,468,100 | 5.66% |

4. Debt Structure

A detailed description of the Debtors' debt structure is set forth in the attached 10-K/A and March 31, 2001 Form 10-Q. As additional information, the following table sets forth the actual consolidated capitalization of the Debtors as of August 31, 2001 (the assumed Effective Date) and the pro forma consolidated capitalization of the Debtors as of August 31, 2001 after giving effect to the Plan. Dollar amounts are in thousands.

| | | August 31, 2001 | |
|---|---|---|---|
| | March 31, 2001(1) | Projected | Pro Forma (2) (3) |
| Cash and cash equivalents | $ 1,624,207 | $ 2,481,252 | $ 100,000 (4) |
| Long-Term Debt: | | | |
| Senior Debt(5) | 11,191,207 | 11,485,404 | |
| Berkadia Loan Agreement | | | 5,985,841 |
| New Senior Notes | | | 3,255,293 |
| Total Long-Term Debt | 11,191,207 | 11,485,404 | 9,241,134 |
| TOPrS | 111,550 | 111,550 | |
| Shareowners' Equity: | | | |
| Common Stock, $.01 par, 64,849,000, 64,849,000 and 128,568,000 issued, respectively | 648 | 648 | 1,286 |
| Additional Capital | 1,113,064 | 1,103,642 | 1,103,004 |
| Retained (Deficit) | (359,181) | (277,709) | (282,241) |
| Accumulated Other Comprehensive Loss | (1,115) | | |
| Common Stock in Treasury, 3,693,000, 3,629,000 and 3,629,000 shares, respectively | (172,496) | (169,739) | (169,739) |
| Total Shareowners' Equity | 580,920 | 656,842 | 652,310 |
| Total Capitalization | $11,883,677 | $12,253,796 | $9,893,444 |
| Secured Debt(6) | $ 1,515,650 | $ 1,483,534 | $1,483,534 |

--------

(1) Represents historical information as reported in the Debtors' attached Form 10-Q. The historic information is presented in conformity with generally accepted accounting principles.

(2) Adjustments have been made to the historical accounting basis of certain of the Debtors' assets and liabilities as of the Effective Date. These adjustments include the charge-off of all remaining goodwill

($43.3 million); the charge-off of unamortized deferred loan origination costs ($32.9 million); the charge-off of unamortized debt discounts and deferred debt issuance costs ($28.2 million); the recognition of deferred net gains from the termination of interest rate swap agreements ($74.0 million); and a gain recognized on the discounted payment with respect to the TOPrS ($28.9 million). Amounts for long-term debt and TOPrS are reflected at face amounts or par. As a result of these adjustments and the manner in which the pro forma adjustments were reflected below, this presentation does not conform to generally accepted accounting principles.

(3) The pro forma capitalization amounts include adjustments of projected results for the transactions contemplated in the Plan. The par value of stock to be issued to the Berkadia Parties on the Effective Date (approximately 63.7 million shares) has been allocated from additional capital to common stock; no adjustments have been made to reflect the fair value of the stock issued. All debt amounts are reflected at face value. The amounts do not reflect the application of fresh start accounting procedures, which, if applicable, would generally require assets and liabilities to be stated at fair values and certain other adjustments.

(4) The pro forma information reflects payment of the funding fee of $60 million to Berkadia, other estimated financing costs related to the Berkadia Loan of $20 million and payment of prepetition and postpetition interest and dividends of approximately $500 million.

(5) The historic and projected results reflect book value (net of unamortized discounts) of the outstanding debt plus accrued interest. The balances exclude all nonrecourse debt and various other payables and deposits totaling $96.5 million at August 31, 2001.

(6) The amounts presented in total capitalization exclude substantially all of the secured debt. Secured debt primarily consists of nonrecourse debt applicable to leveraged leases wherein the lender only has recourse to the assets being leased. For reporting purposes, the nonrecourse debt has been netted against the investment in leveraged leases on the consolidated balance sheet. This item does not include the Berkadia Loan or the New Senior Notes, which will be secured when issued.

5. Management

FNV Group, the ultimate parent of the other Debtors, is managed by its executive officers, subject to the supervision of the Board of Directors. FNV Group has entered into a Management Services Agreement with Leucadia, a copy of which is attached hereto as Exhibit C. The Bankruptcy Court approved that agreement on June 13, 2001. The agreement provides that, prior to the Effective Date, Leucadia, on behalf of Berkadia, will provide advice and assistance to the Debtors related to the restructuring and management of the Debtors' asset portfolio, subject to oversight by FNV Group's Board and a special committee of the Board. Following the Effective Date, Leucadia will have management responsibility for FNV Group, subject to the authority of the Board of Directors. Leucadia and Berkshire have agreed that Leucadia will exercise its authority under the Management Services Agreement in a manner mutually acceptable to Leucadia and Berkshire. The Plan provides that the Berkadia Parties will be entitled to designate a majority of the Board of Directors of Reorganized FNV Group at the Effective Date.

The members of the current Board of Directors of FNV Group are:

- G. Robert Durham. Chairman of the Board since March 2001, and Board member since 1992. Retired Chairman and Chief Executive Officer of Walter Industries, Inc. (a homebuilding and financing, building materials, natural resources and industrial manufacturing company) since 1996. He served as Chairman and Chief Executive Officer from 1991 to 1996. Former Chairman, President and Chief Executive Officer of Phelps Dodge Corporation (a mining company). Director of The MONY Group Inc. (formerly Mutual Life Insurance Company of New York), Amphenol Corp. and Earle M. Jorgensen Co. Age 72.

- Robert H. Clark, Jr. Board member since 1997. Chairman since 1999, Chief Executive Officer since 1993, President since 1983 and a director since 1968 of Case, Pomeroy & Company, Inc. (real estate, oil & gas and investment activities). Also a director of Homestake Mining Company. Age 60.

- Constance R. Curran. Board member since 1998. President of Cardinal Health Consulting Services since 2000. Previously was President and Chief Executive Officer of CurranCARE, Inc. (a nationwide healthcare management company) since 1995. Vice Chairman and National Director of APM, Patient Care Services from 1990-1995. Formerly Vice President of the American Hospital Association and Dean, the Medical College of Wisconsin. Editor of Nursing Economic$ since 1990. Age 53.

- James L. Johnson. Board member since 1992. Chairman Emeritus of GTE Corporation (a diversified telecommunications company) since 1993. Before that he was its Chairman and Chief Executive Officer. Director of The MONY Group Inc. (formerly Mutual Life Insurance Company of New York), Harte/Hanks Communications Co., Inc., Cell Star Corporation, Valero Energy Corporation and Walter Industries, Inc. Age 73.

- Kenneth R. Smith. Board member since 1992. Eller Distinguished Service Professor of Economics since 1980, Dean of the Karl Eller Graduate School of Management and the Eller College of Business and Public Administration from 1980 to 1995, and Vice Provost from 1992 to 1995 of The University of Arizona. Chairman since 1996 and director since 1990 of Apache Nitrogen Products, Inc. Chairman of GroupSystems.com, Inc. Former director of Southwest Gas Corporation. Age 58.

- Shoshana B. Tancer. Board member since 1994. Professor Emeritus of International Studies since 2001 and a Professor for more than five years and Director of the North American Free Trade Agreement Center since 1993 of Thunderbird, the American Graduate School of International Management. Formerly of-counsel to the law firm of Ryley, Carlock & Applewhite, P.A. since 1999. Previously of-counsel to O'Connor, Cavanagh, Anderson, Killingsworth & Beshears for more than five years. Former director of Mountain Bell (the predecessor of U.S. West, Inc.) and three subsidiaries of Merabank, a Federal Savings Bank. Age 65.

- John W. Teets. Board member since 1992. Chairman and Chief Executive Officer of J.W. Teets Enterprises, L.L.C. since 1997. Before that he was the Chairman and Chief Executive Officer or similar positions of Viad Corp, formerly The Dial Corp, for more than 5 years. Age 67.

The executive officers of FNV Group are:

- William J. Hallinan. President and Chief Executive Officer, General Counsel and Secretary of FNV Group, and President, Chief Executive Officer and General Counsel of FNV Capital since March 2001. Previously, Senior Vice President-General Counsel and Secretary of FNV Group and FNV Capital for more than five years. Age 58.

- Derek C. Bruns. Senior Vice President--Internal Audit of FNV Group and FNV Capital for more than five years. Age 41.

- Jack Fields III. Executive Vice President or similar positions of FNV Capital for more than five years. Age 46.

- Bruno A. Marszowski. Senior Vice President--Controller and Chief Financial Officer of FNV Group and FNV Capital for more than five years. Age 59.

- William C. Roche. Senior Vice President--Human Resources & Facilities Planning of FNV Group and FNV Capital for more than five years. Age 47.

- Stuart C. Tashlik. Senior Vice President--Planning & Communications of FNV Group since 1999. Previously, Senior Vice President or similar positions of FNV Capital for more than five years. Age 45.

As of the Effective Date, the members of the Reorganized FNV Group Board of Directors shall be:

- Ian M. Cumming. A director and Chairman of the Board of Leucadia since June 1978. In addition, a director of Allcity Insurance Company ("Allcity") and MK Gold Company ("MK Gold"), two consolidated subsidiaries of Leucadia. Allcity is a property and casualty insurer and MK Gold is an international mining company. Also a director of Skywest, Inc., a Utah-based regional air carrier, and HomeFed Corporation ("HomeFed"), a publicly held real estate development company. Age 60.

- Joseph S. Steinberg. A director of Leucadia since December 1978 and President of Leucadia since January 1979. Also, Chairman of the Board of HomeFed and Allcity and a director of MK Gold and Jordan Industries, Inc., a public company, approximately 10% of the common stock of which is beneficially owned by Leucadia, which owns and manages manufacturing companies. Age 57.

- Lawrence S. Hershfield. An executive officer of subsidiaries of Leucadia since November 1995, with diverse managerial and business development responsibilities. From September 1993 to October 1995, he served as Executive Vice President of Leucadia. Age 44.

- R. Gregory Morgan. A partner in the law firm of Munger, Tolles & Olson LLP, counsel to Berkshire, where he has practiced since 1981. Age 47.

- G. Robert Durham. Chairman of the Board since March 2001, and Board member since 1992. Retired Chairman and Chief Executive Officer of Walter Industries, Inc. (a homebuilding and financing, building materials, natural resources and industrial manufacturing company) since 1996. He served as Chairman and Chief Executive Officer from 1991 to 1996. Former Chairman, President and Chief Executive Officer of Phelps Dodge Corporation (a mining company). Director of The MONY Group Inc. (formerly Mutual Life Insurance Company of New York), Amphenol Corp. and Earle M. Jorgensen Co. Age 72.

- Kenneth R. Smith. Board member since 1992. Eller Distinguished Service Professor of Economics since 1980, Dean of the Karl Eller Graduate School of Management and the Eller College of Business and Public Administration from 1980 to 1995, and Vice Provost from 1992 to 1995 of The University of Arizona. Chairman since 1996 and director since 1990 of Apache Nitrogen Products, Inc. Chairman of GroupSystems.com, Inc. Former director of Southwest Gas Corporation. Age 58.

- There shall be one additional member of the Reorganized FNV Group Board of Directors designated by the Creditors' Committee. The Plan Supplement shall set forth the identity of this director.

Pursuant to the New Bylaws of FNV Group that will be adopted as of the Effective Date, the Board of Directors will consist of no fewer than five persons. The compensation of officers and directors of FNV Group who are current insiders is set forth in the 10-K/A.

As previously discussed, FNV Group is a holding company. The principal operating subsidiary of FNV Group, FNV Capital, is primarily responsible for the operation and management of the Debtors' business. The directors of FNV Capital are Messrs. Durham and Smith, whose biographies are summarized above. Pursuant to the New Bylaws of FNV Capital, the Board of Directors is to consist of no fewer than five persons. As of the Effective Date, the members of the Reorganized FNV Capital Board of Directors shall be the same seven individuals who are members of the Reorganized FNV Group Board of Directors.

The Post-Effective Date officers and directors of (i) FINOVA (Canada) Capital Corporation ("FNV Canada"); (ii) FINOVA Capital plc ("FNV UK"); (iii) FINOVA Loan Administration Inc. ("FNV Loan"); (iv) FNV Mezzanine; (v) FINOVA Portfolio Services, Inc. ("FNV Portfolio"); and (vi) FINOVA Technology Finance, Inc. ("FNV Technology") and the terms and compensation of officers and directors of those Debtors and of FNV Capital who are current insiders will be set forth in the Plan Supplement.

6. Related Party Transactions

For a description of the Debtors' transactions with related parties, see the attached 10-K/A.

V.

THE DEBTORS' CHAPTER 11 CASES

A. Events Preceding the Filing of the Chapter 11 Cases

Reference is made to Annex A of the attached 10-K/A, in the section entitled, "Management's Discussion and Analysis of Financial Condition and Results of Operations-Recent Developments and Business Outlook," for a discussion of events preceding the filing of the Chapter 11 Cases.

In an effort to maximize value to the creditors of the Debtors, FNV Group and FNV Capital entered into a transaction with Berkadia that contemplates, among other things, the restructuring of the Debtors' bank and bond debt in these Chapter 11 Cases. For a brief description of this transaction, see Article III of this Disclosure Statement ("OVERVIEW OF THE PLAN"). Reference is further made to the Commitment Letter attached hereto as Exhibit D and to the term sheets for the Berkadia Loan, New Senior Notes and the Intercompany Note (the "Term Sheets"), each of which is attached as an exhibit to the Plan. The description in Article III of this Disclosure Statement is qualified in its entirety by the Plan and the Term Sheets, and the provisions of the Plan and Term Sheets are controlling in the event of any inconsistency.

B. The Commencement of the Chapter 11 Cases

The Debtors filed voluntary petitions commencing the Chapter 11 Cases on March 7, 2001 (the "Petition Date"), to assure that the interests of creditors, stockholders and other parties in interest would be protected and treated fairly.

Because of the interrelationships among the Debtors, and to avoid duplication resulting from separate handling of their Chapter 11 Cases, the Bankruptcy Court has ordered the joint administration of the Debtors' Chapter 11 Cases. Joint administration provides only procedural relief that allows the Chapter 11 Cases to be administered as a single case. It does not affect the substantive rights of the Debtors or their creditors and stockholders. The assets and liabilities of the Debtors will remain separate and distinct, unless otherwise ordered by the Bankruptcy Court.

Except as otherwise provided in the Bankruptcy Code, the Debtors are "debtors in possession" with full authority to continue to operate and manage their businesses in the ordinary course, without prior approval of the Bankruptcy Court. Generally, only transactions that are outside of the ordinary course of business require prior approval.

On the Petition Date, the Debtors sought and were granted certain relief necessary to the continued operation of their businesses and an effective reorganization. First, the Bankruptcy Court entered an order clarifying the Debtors' authority to undertake all of their ordinary business functions, including but not limited to (i) honoring, renewing, increasing and/or funding prepetition commitments in the ordinary course of business, (ii) honoring existing servicing obligations in the ordinary course of business, (iii) selling or leasing repossessed, refurbished and leased assets in the ordinary course of business, (iv) managing their loan portfolios in the ordinary course of business, (v) making intercompany loans, payments and transfers in the ordinary course of business, and (vi) paying third party obligations and prepetition Claims to preserve, enhance and maximize the value of estate assets and/or as necessary to the performance of the actions approved above.

Second, the Bankruptcy Court entered orders authorizing (i) the payment of the Debtors' prepetition tax and fee obligations owing to federal, state and local governmental entities, both domestic and foreign, (ii) the payment, in the ordinary course of business, as and when due, of any prepetition Claims owing by the Debtors to certain foreign creditors, (iii) the payment of prepetition employee and director compensation, benefits and expense reimbursement owing by the Debtors to employees (including former and temporary employees) and directors, and (iv) the continuation, in the ordinary course of business, of all programs, policies and plans with respect to employees, including retired and former employees, that were in effect as of the Petition Date, including payments under the prepetition retention and severance plans and obligations customarily associated with the delivery of employee benefits, including, if necessary, any workers' compensation premiums and deductibles that were owed in respect of prepetition injuries.

Third, the Bankruptcy Court entered orders (i) authorizing the retention and compensation of certain professionals utilized in the ordinary course of the Debtors' businesses, within certain specified limits in place of the normal restriction imposed by the Bankruptcy Code, (ii) authorizing the Debtors' investment guidelines, and (iii) permitting the continued use of the Debtors' existing bank accounts and cash management systems.

In addition, the Debtors were authorized to retain the following professionals to represent their interests in the Chapter 11 Cases:

| | |
|---|---|
| Gibson, Dunn & Crutcher LLP<br>The Met Life Building<br>200 Park Avenue<br>New York, New York 10166-0193 | The Debtors' Restructuring and Corporate Counsel |
| Richards, Layton & Finger, P.A.<br>One Rodney Square<br>P.O. Box 551<br>Wilmington, Delaware 19899 | The Debtors' Delaware Restructuring Counsel |
| Ernst & Young LLP<br>40 North Centre Avenue<br>Phoenix, Arizona 85004 | The Debtors' Accountants |
| Rothschild, Inc.<br>1251 Avenue of the Americas<br>New York, New York 10020 | The Debtors' Financial Advisors(/2/) |
| Secured Capital Corp.<br>11150 Santa Monica Blvd Suite 1400<br>Los Angeles, California 90025 | The Debtors' Broker in Connection with the Sale of Certain Assets |

C. Significant Parties in Interest

1. Creditors' Committee

On March 20, 2001, the United States Trustee appointed an official committee of creditors to represent the interests of creditors holding general unsecured Claims. The Creditors' Committee is currently composed of:

Angelo Gordon & Co., L.P.
Pacific Investment Management Co., LLC
Oaktree Capital Management, LLC
Franklin Mutual Advisors, LLC
Metropolitan West Asset Management
Appaloosa Management, L.P.
The Chase Manhattan Bank
Citibank
The Bank of New York
Wilmington Trust Company

--------

(2) A motion has been filed; however, an order approving such financial advisor has not yet been entered.

2. Equity Committee

On or about April 27, 2001, the United States Trustee appointed an official committee of equity holders to represent the interests of holders of equity Interests (the "Equity Committee"). The Equity Committee is currently composed of:

Legg Mason Investment Trust, Inc.
Bennett Management
Greenlight Capital
Dimensional Fund Advisors
Samuel H. Park, M.D.
Nicholas A. Rago
Eugene Linden

D. Events During Chapter 11 Cases

On March 6, 2001, the day before the Petition Date, a creditor's bankruptcy petition was filed against FNV Canada in the Ontario Superior Court of Justice in Bankruptcy by The Bank of Nova Scotia, as agent for FNV Canada's bank lenders. Also on March 6, The Bank of Nova Scotia obtained an injunction from the Ontario Superior Court of Justice (Commercial List), on an ex parte basis, restricting the ability of FNV Canada from transferring its assets to or for the benefit of FNV Capital or its other affiliates. In response to a motion for an order granting relief from the automatic stay and a motion for a preliminary injunction and temporary restraining order, filed in the Bankruptcy Court by The Bank of Nova Scotia, the Debtors have entered into a stipulation, and an extension of such stipulation, with The Bank of Nova Scotia whereby the Debtors have permitted The Bank of Nova Scotia to apply for an extension of the injunction issued by the Ontario Superior Court of Justice through August 31, 2001, which extension has been granted.

The Debtors have also entered into a stipulation with ABN AMRO Bank, N.V. ("ABN AMRO"), as agent for FNV UK's bank lenders, whereby the Debtors have agreed to provide ABN AMRO with no less than 15 days' prior written notice before transferring any of the assets of FNV UK to or for the benefit of the other Debtors or their non-debtor affiliates. Upon receipt of such notice, ABN AMRO may object to such a transfer and request a hearing before the Bankruptcy Court.

During the Chapter 11 Cases, certain parties in interest have filed motions for relief from the automatic stay to allow such parties to pursue their interests in the Debtors' property. The resolution of the majority of those motions is currently pending. In addition, during the Chapter 11 Cases, the Debtors have sought approval of the Bankruptcy Court to implement certain incentive and retention plans regarding the Debtors' employees and to sell certain of their loans outside the ordinary course of business as part of a program to divest discontinued and other operations. Finally, during the Chapter 11 Cases, the Debtors have filed a motion for an order clarifying that no part of the trust estate under their Leveraged Leases (except the Debtors' beneficial interest as owner participant thereunder) shall be included in, or be subject to, any declaration or adjudication of, or proceedings with respect to the Debtors' bankruptcy cases.

VI.

DESCRIPTION OF THE PLAN OF REORGANIZATION

A. Overview and Restructuring Transactions

For a brief description of certain material provisions of the Plan, see Article III of this Disclosure Statement ("OVERVIEW OF THE PLAN"). Reference is further made to the Commitment Letter and the Term Sheets for the Berkadia Loan and New Senior Notes (attached as Exhibit D hereto). The description in Article III of this Disclosure Statement is qualified in its entirety by the Plan and the Term Sheets, and the provisions of the Plan and Term Sheets are controlling in the event of any inconsistency.

B. Classification and Treatment of Claims and Interests

The Plan consists of nine separate plans of reorganization, one for each Debtor entity, which are as follows: FNV Group; FNV Capital; FNV Canada; FNV UK; FNV Loan; FNV Mezzanine; FNV Portfolio; FNV Technology; and FNV Trust.

Specific information regarding the treatment of Claims against and Interests in each Debtor is set forth in Section III of this Disclosure Statement ("OVERVIEW OF THE PLAN").

C. Implementation and Other Provisions of the Plan

1. Assumption or Rejection of Executory Contracts and Unexpired Leases

The Bankruptcy Code authorizes the Debtors, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. The Debtors may assume or reject those contracts or leases during the Chapter 11 Cases or pursuant to the Plan.

The Plan provides that all executory contracts and unexpired leases that exist between the Debtors and any person will be assumed as of the Effective Date, including Leveraged Leases (to the extent deemed executory contracts of the Debtors' estate), except for any contract or lease that has already been rejected in the Chapter 11 Cases or that is listed on Exhibit 7.1 to the Plan (as it may be amended from time to time).

The Debtors are parties to the following agreements with Holiday Hospitality Franchising, Inc. f/k/a Holiday Inns Franchising, Inc. ("Holiday"): (1) September 20, 1995, Comfort Letter from Holiday to FNV Capital in connection with the Holiday Inn Hotel located at Lafayette, IN #2811; (2) March 17, 1998 Comfort Letter from Holiday to FNV Capital, successor in interest to Belgravia Capital Corporation, in connection with the Holiday Inn Hotel located at Lauderdale by the Sea, FL #2898; (3) June 8, 1998, Comfort Letter from Holiday to FNV Capital, successor in interest to Belgravia Capital Corporation, in connection with the Holiday Inn Hotel located at Phoenix Old Town Scottsdale, AZ #4334; (4) October 28, 1999, Comfort Letter from Holiday to FNV Capital in connection with the Holiday Inn Sunspree Resort Hotel located at Great Smokies Asheville, NC #9549; and (5) any other Comfort Letter between Holiday and the Debtors (the "Comfort Letters"). Holiday contends that the Debtors may not assume and assign the Comfort Letters pursuant to 11 U.S.C. (S) 365(c). The Debtors reserve their rights to review the Comfort Letters and all other contracts to determine whether they are executory. The Debtors' proposed treatment of contracts and leases will be disclosed in the Plan Supplement.

Under the Bankruptcy Code, as a condition to assuming executory contracts and unexpired leases, the Debtors are required to cure any and all monetary defaults under the contracts and leases, and to provide adequate assurance of future performance thereunder. In the event of a dispute as to the existence of a default, or the nature, extent or amount of any required cure or adequate assurance will be determined by the Bankruptcy Court. The Debtors believe that they are substantially current on their obligations under executory contracts and unexpired leases. As a result, the Debtors do not expect to incur any material cure costs in connection with assumed executory contracts and unexpired leases.

Non-debtor parties to executory contracts and unexpired leases that are rejected by the Debtors pursuant to the Plan must assert any Claim arising out of the rejection by filing a proof of Claim no later than thirty (30) days after the date of service of the Confirmation Order. In the absence of a timely filed proof of Claim, any such Claims will be forever barred and will not be enforceable against the Debtors.

2. Issuance of New Debt and Equity Securities

The issuance by the appropriate Debtors of the New Senior Notes, the Intercompany Note, the note to be issued pursuant to the Berkadia Loan, the Additional Group Common Stock, the New Group Preferred Stock and the Additional Mezzanine Common Stock, if any, and the execution of the documentation relating to the Berkadia Loan and the New Senior Notes by the Debtors on the terms previously described, will be deemed

authorized as of the Effective Date without further act or action by any person, except as required by applicable law, regulation, order, or rule. All documents evidencing those securities will be executed and delivered by the Debtors as provided for in the Plan.

After the issuance of Additional Group Common Stock pursuant to the Restructuring Transactions, the beneficial owners (as such term is defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of more than 5% of the issued and outstanding common stock of Reorganized FNV Group are projected to be as follows:

| Name of Beneficial Owner | Percent of Total Voting Power |
|---|---|
| Berkshire Hathaway Inc. | up to 25.5% |
| Leucadia National Corporation | up to 25.5% |

3. Corporate Governance Matters

The Plan requires certain of the Debtors to amend and restate their corporate governance documents (certificates of incorporation, formation or registration, articles of incorporation or association, memoranda of association, memoranda of continuance, charters, bylaws, or one or more similar agreements, instruments or documents constituting the organization or formation of each of the Debtors) to the extent necessary to, among other things, (a) authorize the Restructuring Transactions, including but not limited to the issuance of stock contemplated to be issued under the Plan, (b) at the option of Berkadia, impose restrictions on the direct or indirect transferability of the common stock or other equity of Reorganized FNV Group such that (i) no Person (other than the Berkadia Parties) may acquire or accumulate five percent or more (as determined under tax law principles governing the application of Section 382 of the Tax Code) of the common stock or other equity of Reorganized FNV Group and (ii) no Person (other than the Berkadia Parties) owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to the Plan, or after any subsequent issuances of Additional Group Common Stock pursuant to the Plan, five percent or more (as determined under such tax law principles) of the common stock or other equity of Reorganized FNV Group, may acquire additional shares of that common stock or other equity of Reorganized FNV Group, subject to certain exceptions, (c) prohibit the issuance of non-voting equity securities, (d) with respect to FNV Group, eliminate, among other things, the provision relating to certain Business Combinations (as defined in FNV Group's pre-Effective Date Certificate of Incorporation), and (e) with respect to FNV Group, terminate the Rights Plan without any payment by FNV Group and without the Rights thereunder having separated from the FNV Group common stock or having become exercisable. Copies of the New Corporate Documents will be filed with the Plan Supplement.

4. Plan Distribution Entitlement; Dispute Provisions

Distribution or retention of property as provided in the Plan is available only for Allowed Claims and Allowed Interests. Claims and Interests that are not Allowed as of the Effective Date but which ultimately become Allowed will be entitled to the treatment provided in the Plan as if such Claims or Interests had been Allowed on the Distribution Date, and such Claims or Interests will receive distributions within 30 days after the Claim or Interest becomes Allowed.

Under the Plan, the Reorganized Debtors have the exclusive right to make and file Objections to and settle, compromise or otherwise resolve Claims and Interests, except that as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, objections may be made in accordance with the applicable Bankruptcy Rules by parties in interest in these Chapter 11 Cases. In addition, the Debtors may, at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest subject to estimation under section 502(c) of the Bankruptcy Code and for which the Debtors may be liable under this Plan, including any Disputed Claim for taxes, to the extent permitted by section 502(c) of the

Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim. In the event that the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim or Interest, that estimated amount will constitute (at the Debtors' option, to be exercised at the commencement of the estimation proceeding) either the Allowed amount of such Claim or Interest or a maximum limitation on the Allowed amount of such Claim or Interest, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim or Interest, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate allowance on such Claim or Interest. Furthermore, after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Interest without approval of the Bankruptcy Court.

5. Distribution Procedures

The Plan provides that all distributions of property to holders of Allowed Claims or Allowed Interests shall be made by the applicable Disbursing Agent on the later of the Effective Date or 30 days after the date that a particular Claim or Interest becomes Allowed. Distributions will be made to holders of Allowed Claims and Allowed Interests as of the Distribution Record Date, and the Disbursing Agent shall not honor any transfers of Claims or Interests occurring after the Distribution Record Date. However, no distribution under the Plan shall be made to or on behalf of any holder of an Allowed Claim evidenced by a note or other document unless and until such instruments, securities or other documentation are surrendered to and received by the Disbursing Agent.

Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day. Plan distributions that are not claimed or are undeliverable for a period of one year following the applicable Distribution Date shall revert to the applicable Reorganized Debtor, free of any restrictions thereon, and any entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and forever barred.

All distributions under the Plan on account of Allowed Claims shall be made by the Disbursing Agent to the holder of the Allowed Claim, as of the Distribution Record Date, (a) if a proof of Claim is filed in respect of a particular Claim, at the address of such holder set forth in the relevant proof of Claim, as such address may have been updated pursuant to Bankruptcy Rule 2002(g) or (b) if no proof of Claim is filed in respect of a particular Claim, at the address set forth in the relevant Debtor's Schedules, as such address may have been updated pursuant to Bankruptcy Rule 2002(g). All distributions under the Plan on account of Allowed Interests shall be made by the Disbursing Agent to the holder of the Allowed Interest, as of the Distribution Record Date, at the address of such holder as listed in the equity interest ledger maintained by or on behalf of the applicable Debtor as of the Distribution Record Date. However, if the Debtors or the Reorganized Debtors have been notified, no later than ten Business Days prior to the Distribution Record Date, in writing of a change of address by such holder that provides an address different from that specified in the preceding sentences, then the distribution shall be made at the address contained in the written notification. Nothing contained in the Plan will require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim or Allowed Interest.

6. Retention of Causes of Action

With the exception of any claims, rights or causes of action against (i) Berkadia, Leucadia, Berkshire and their respective Affiliates, and the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of each of Berkadia, Leucadia, Berkshire and their respective Affiliates, and (ii) each of the Official Committees, their current and former respective members (in their capacities as members of such Official Committees), and their agents, advisors, attorneys and representatives (in such capacities), which the Debtors will release pursuant to the Commitment Letter and the Plan, the Debtors do not release or abandon any claims, rights or causes of action held by them or their estates, and the Reorganized Debtors may seek to assert such claims, rights and causes of action against any persons at any time, subject to any applicable statutes of limitation. Because of the significant recoveries for creditors provided pursuant to the Plan, the Debtors do not believe that there will be any material recovery on account of avoidance actions. Nevertheless, the Debtors do not believe that it is in the best interest of their estates to abandon these causes of action. Any recoveries

realized by the Reorganized Debtors from the assertion of any claims, rights and causes of action will be the sole property of the Reorganized Debtors. To the extent necessary, the Reorganized Debtors will be deemed representatives of their former estates under section 1123(b) of the Bankruptcy Code.

7. Effect of Confirmation of Plan

The Plan as confirmed by the Bankruptcy Court is binding on and shall inure to the benefit of the Debtors and all holders of Claims and Interests.

On the Effective Date, the property of the Estates of each of the Debtors, other than FNV Trust, will revest in the respective Reorganized Debtors, free and clear of all Claims and Interests, unless otherwise provided in the Plan. The Debtors will be free to operate their businesses and to use, acquire and dispose of property without any restrictions arising from the Bankruptcy Code, subject to any limitations imposed by the Plan.

The treatment of Claims and Interests provided in the Plan is in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on any Claims from and after the Petition Date, against the Debtors or any of their assets or properties. Unless the Plan otherwise provides, the Debtors are discharged from any and all Claims whether or not a proof of Claim, a proof of Interest or request for payment of a Claim was filed and whether or not the holder of a Claim voted on the Plan. Judgments and Liens obtained against the Debtors on account of Claims that accrued prior to the Petition Date will be discharged by the Plan. All persons are enjoined from commencing or continuing any action, employing process, or taking any act to collect, recover or offset any Claim or other debt against any Debtor that arose prior to the Petition Date.

On the Effective Date, in exchange for their receipt of distributions and other treatment contemplated under this Plan, each holder of a Claim or Interest shall release unconditionally and shall be deemed forever to release unconditionally any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against (i) any Debtor or Affiliate thereof and (ii) Berkadia, Leucadia, Berkshire and their respective Affiliates, and the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of each of Berkadia, Leucadia, Berkshire and their respective Affiliates, whether then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, provided, however, that neither any Debtor nor any entity that is an Affiliate of any Debtor prior to the Effective Date shall be released from (a) the right to enforce the Debtors' or the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, (b) any rights under assumed contracts, Loan Commitments, Leveraged Leases, Retirement Agreements and other contracts that are not rejected or otherwise extinguished by order of the Bankruptcy Court or pursuant to the Plan, or (c) any rights, claims or interests that are Reinstated under the terms of the Plan.

In addition, on the Effective Date, each of the Debtors shall release unconditionally, and shall be deemed forever to release unconditionally, (i) Berkadia, Leucadia, Berkshire and their respective Affiliates and each of the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of Berkadia, Leucadia, Berkshire and their respective Affiliates, and (ii) each of the Official Committees, their current and former respective members (in their capacities as members of such Official Committees), and their agents, advisors, attorneys and representatives (in such capacities), from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce their respective obligations to the Debtors or the Reorganized Debtors under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement.

The Confirmation Order will constitute an injunction permanently enjoining the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claim, demand, debt, liability, cause of action, right or Interest released and waived pursuant to the Plan against the released parties.

After the Effective Date, the Official Committees will cease to exist and their members, employees and agents will have no further authority or duties in connection with the applicable Official Committee, except with respect to (i) all applications for Professional Fees, until such matters are finally resolved, (ii) any post-Confirmation modifications to the Plan or Confirmation Order, and (iii) any matters pending as of the Effective Date before the Bankruptcy Court to which the applicable Official Committee is a party, until such matters are finally resolved.

The Debtors may employ and pay professionals, including any professionals retained in the Chapter 11 Cases, with respect to services to be rendered after the Effective Date, including services in connection with the implementation and consummation of the Plan, without further order of the Bankruptcy Court.

8. Implementing Documents and Transactions; No Transfer Taxes

All material documents necessary to effectuate the Plan will be provided in the Plan Supplement, which will be filed by the Debtors with the Bankruptcy Court no later than ten Business Days prior to the deadline for objections to entry of the Confirmation Order. Among the documents to be included in the Plan Supplement will be the Berkadia Loan Documents, the documentation for the New Senior Notes, the New Corporate Documents, the New Group Preferred Stock, the Intercompany Note and Exhibits to the Plan that are finalized after the date hereof. Term sheets for the Berkadia Loan, the New Senior Notes and the Intercompany Note are annexed as exhibits to the Plan which is annexed hereto as Exhibit A. Upon its filing with the Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Debtors' counsel. A copy of the Plan Supplement will also be posted at www.finova.com.

Appropriate officers, directors and trustees of each Debtor or Reorganized Debtor, as further described in the Plan, will be authorized to execute documents and take all other actions as may be necessary or appropriate to effectuate and implement the terms and provisions of the Plan and the transactions contemplated thereby.

Pursuant to section 1146(c) of the Bankruptcy Code, no stamp, real estate transfer, mortgage recording or other similar tax may be imposed upon the issuance, transfer or exchange of notes or equity securities under the Plan, including, without limitation, the New Senior Notes, the Intercompany Note, the note issued to evidence the Berkadia Loan, including security interests to be granted pursuant to the Berkadia Loan, the New Senior Notes or the Intercompany Note, all other debt public and private or the New Group Preferred Stock (if any is issued), the Additional Group Common Stock or the Additional Mezzanine Common Stock (if any is issued), the creation of any Lien, the making, assignment or surrender of any lease or sublease, the creation of any mortgage, deed of trust or other security interest, the making or delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in connection with the Plan, whether involving real or personal property, including, without limitation, any merger agreements or agreements of amalgamation or consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan. All sale transactions (i) consummated by the Debtors and (ii) either (A) approved by the Bankruptcy Court in the Ordinary Course of Business Order, or (B) approved in the ordinary course of the Debtors' business by separate order of the Bankruptcy Court on or after the Petition Date through and including the Effective Date, involving the sale by the Debtors of owned property in the ordinary course or pursuant to section 363(b) of the Bankruptcy Code or otherwise and the assumption, assignment and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of and in connection with the Plan and, thus, shall not be subject to any stamp tax, real estate transfer, mortgage recording or other similar tax. If the Debtors pay or have paid any such tax, they will be entitled to a refund thereof upon or after the Effective Date.

9. Amendment of Plan; Severability; Revocation

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, if the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before the Effective Date, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court after notice and hearing confirms the Plan as altered, amended or modified. A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of the holder. Otherwise, the Debtors may alter, amend or modify the treatment of Claims and Interests provided for under the Plan only if the holders of Claims or Interests affected thereby agree or consent to any such alteration, amendment or modification. Berkadia will have no obligation to fund the Berkadia Loan if the Plan as altered, amended or modified is not in form and substance reasonably satisfactory to Berkadia.

The Plan constitutes a separate plan of reorganization for each of the nine Debtors. Accordingly, the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Should any of such separate plans not be confirmed, the other Debtors may elect to alter, amend, revoke or withdraw the other separate plans or to seek Confirmation thereof. Should the Plan as altered, amended, revoked or withdrawn not be reasonably satisfactory, in form and substance, to Berkadia, or should any of the Debtors' separate plans of reorganization not be confirmed and the Debtors elect to consummate any or all of the other separate plans, Berkadia will have no obligation to fund the Berkadia Loan.

The Debtors may revoke or withdraw the Plan at any time prior to the Confirmation Date, in which event the Plan will be null and void and will have no effect on, and will not constitute a waiver or release of, any claims or rights of the Debtors, any other party in interest or any person in any further proceedings involving the Debtors.

10. Retention of Jurisdiction

The Plan provides for the Bankruptcy Court to retain broad, exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan.

D. Treatment of Securities Litigation

The Plan provides that no distribution shall be made on account of any Securities Litigation Claims unless and until such Claims are Allowed by Final Order of a court having jurisdiction over the matter. In the event that any Securities Litigation Claims become Allowed, they shall be treated as follows: holders of Allowed Equity (S) 510(b) Claims against FNV Group shall receive Additional Group Common Stock; holders of Allowed Debt (S) 510(b) Claims against FNV Capital shall receive New Group Preferred Stock of FNV Group, the terms of which are set forth on Exhibit I; and holders of Allowed Equity (S) 510(b) Claims against FNV Mezzanine shall receive Additional Mezzanine Common Stock. For all issuances of stock in connection with the Securities Litigation described in this paragraph, holders of Allowed Claims shall receive stock having a value, as determined by Final Order, equal to the amount of such Claims that is not covered by applicable insurance policies. In the event that any Additional Group Common Stock is issued after the Effective Date, the Berkadia Parties shall contemporaneously receive additional FNV Group common stock in the amount that they would have received if such issuances had occurred before the Effective Date.

E. Conditions to Confirmation and Effective Date of the Plan

1. Conditions to Confirmation

The following conditions shall be met prior to Confirmation of the Plan: (i) the Bankruptcy Court shall have entered a Disclosure Statement Order no later than July 6, 2001; (ii) the Bankruptcy Court shall have entered an Order approving the Debtors' entry into the Commitment Letter, including with respect to all fees set forth

therein, no later than the earlier of (x) the date of entry of the Disclosure Statement Order, and (y) July 6, 2001; and (iii) the Bankruptcy Court shall have entered an Order approving the Debtors' entry into the Management Services Agreement no later than the earlier of (x) the date of entry of the Disclosure Statement Order, and (y) July 6, 2001. Failure to satisfy any of the foregoing conditions will permit Berkadia to terminate its commitment to fund the Berkadia Loan. The Bankruptcy Court entered an Order on June 13, 2001 approving the Commitment Letter and the Management Services Agreement, and entered an Order on June 14, 2001 approving this Disclosure Statement.

2. Conditions to the Effective Date

The following are conditions precedent to, or shall occur simultaneously with, the Effective Date, each of which must be satisfied unless waived: (i) a Confirmation Order, in form and substance reasonably acceptable to the parties to the Restructuring Transactions, shall have been entered and become a Final Order; (ii) the Additional Group Common Stock shall be duly authorized, validly issued and outstanding; (iii) all necessary governmental approvals for the Restructuring Transactions, including, but not limited to, approval under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Competition Act of Canada and the Competition Act of England, if required, shall have been obtained; (iv) the Additional Group Common Stock to be issued to the Berkadia Parties shall have been approved for listing upon official notice of issuance on the New York Stock Exchange, if the FNV Group common stock is listed on the New York Stock Exchange on the Effective Date; (v) all conditions precedent to the Restructuring Transactions, as set forth herein and in the Commitment Letter, the Management Services Agreement and other relevant documentation, shall have been satisfied; (vi) no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall be pending as of the Effective Date or, if such a request has been made, then such request shall have been denied by a Final Order; (vii) the New Corporate Documents shall have been adopted and, to the extent necessary under applicable law, filed and shall be in full force and effect and the Rights Plan shall have been amended to provide for the termination thereof and the expiration of Rights thereunder in accordance with the terms of the Plan; (viii) the New Senior Notes Indenture shall have been qualified under the Trust Indenture Act of 1939, as amended; and (ix) all actions, other documents and agreements necessary to implement the Plan shall have been effected or executed and delivered.

In the event that the conditions specified in the preceding paragraph have not been satisfied or waived on or before August 31, 2001, then upon written notification filed by the Debtors with the Bankruptcy Court and served upon counsel for Berkadia, Berkshire, Leucadia and the Official Committees and the Office of the United States Trustee, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Interests shall be restored to their respective status and positions as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) all the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other party in interest or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## VII.

## SPECIAL PROVISIONS RELATING TO SECURITIES ISSUED OR OUTSTANDING UNDER THE PLAN

### A. New Senior Notes, Additional Group Common Stock, New Group Preferred Stock and Additional Mezzanine Common Stock

The New Senior Notes, any Additional Group Common Stock issued to holders of FNV Group-7 Claims, any New Group Preferred Stock issued to holders of FNV Capital-5 Claims and any Additional Mezzanine Common Stock issued to holders of FNV Mezzanine-6 Claims will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or under any state or local securities laws in reliance upon the exemption from registration contained in section 1145 of the Bankruptcy Code.

In general, unless a holder is an "underwriter," as that term is defined in the Bankruptcy Code with respect to such securities, such securities may be resold by such holder without registration under the Securities Act or under state securities laws. An underwriter is defined by the Bankruptcy Code as a person or entity who: (i) purchases a claim against or equity interest in the debtor with a view to the distribution of such securities received on account of such claim or equity interest; (ii) offers to sell such securities on behalf of the holders thereof (except certain offers to sell fractional interests); (iii) offers to buy such securities with a view to the distribution thereof pursuant to an agreement made in connection with the plan; or (iv) is a control person of the issuer (generally a person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the issuer). In these cases, such securities may be sold, disposed of or otherwise transferred only pursuant to an effective registration statement covering such securities, in privately negotiated transactions in which the transferee will be subject to restrictions on transfer, or in accordance with Rule 144 under the Securities Act or other applicable rules and regulations of the Securities and Exchange Commission, and in compliance with applicable state and foreign securities laws.

Persons who are underwriters may not sell, dispose of or otherwise transfer such securities except pursuant to an effective registration statement under federal securities laws or pursuant to an exemption from the registration or qualification requirements of federal and state securities laws.

THE DISCUSSION ABOVE IS A SUMMARY OF REGISTRATION REQUIREMENTS OF THE SECURITIES LAWS ON ISSUANCE AND RESALE OF SECURITIES RECEIVED UNDER THE PLAN. THE EFFECTS MAY VARY BASED ON YOUR INDIVIDUAL CIRCUMSTANCES. THE SECURITIES AND EXCHANGE COMMISSION HAS NOT REVIEWED OR PASSED ON ANY ASPECT OF THESE MATTERS. YOU ARE URGED TO CONSULT WITH YOUR ATTORNEYS ON FEDERAL, STATE AND FOREIGN SECURITIES LAW REQUIREMENTS, INCLUDING BUT NOT LIMITED TO WHETHER OR NOT YOU ARE AN UNDERWRITER AS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE (WHETHER BY VIRTUE OF BEING AN AFFILIATE OF THE ISSUER OR OTHERWISE) AND THE EFFECT OF ANY APPLICABLE FEDERAL, STATE OR FOREIGN LAW RESTRICTIONS ON RESALES OF SECURITIES.

B. Common Stock

The issuance of the Additional Group Common Stock to the Berkadia Parties will be issued pursuant to an exemption from the registration requirements of the Securities Act under Section 4(2) thereof, and pursuant to exemptions under applicable state and foreign securities laws. FNV Group will enter into a registration rights agreement with the Berkadia Parties with respect to the Additional Group Common Stock to be issued to them.

C. Post-Confirmation Business Plan

The Debtors' post-confirmation business plan has been developed with the intention of maximizing the value of the Debtors' assets for the benefit of all of the Debtors' creditors and equityholders. Significant risks are inherent in the Debtors' ability to accomplish successfully this business plan. You should carefully consider the factors disclosed in Section VII-D of this Disclosure Statement ("Certain Factors to be Considered").

1. Business Plan--General

The Debtors' business plan does not contemplate any new business activities related to new customers, although it does provide for the ability to increase lending limits to existing customers under certain conditions. The business plan further envisions that all existing lending commitments will be fulfilled. The Debtors expect to achieve their plan through the implementation of numerous tactical and strategic initiatives, a number of which are already underway, as follows:

- Certain senior management changes have been made. The Debtors believe that the current team is highly focused on the main objective of portfolio recovery maximization.

- The Debtors' business focus has been changed to eliminate the objective of generating new business and to substitute portfolio recovery maximization as the primary goal. This is being accomplished by eliminating all marketing positions and activities, changing the compensation structure and making company-wide communications on the subject.

- A work-out group has been established at headquarters with the responsibility of overseeing and working with the lines of business ("LOBs") on all watch list and non-earning accounts. This group and LOB-level portfolio managers expect to take a heightened role in monitoring customers with the objective of predicting and mitigating problems as early as possible.

- Detailed, periodic reviews of each LOB's portfolio with senior management have been conducted and are scheduled to continue. In addition, senior management is generally anticipated to be involved in negotiating resolution of the Debtors' largest problem accounts. Revised reporting procedures are being implemented by LOBs to assist senior management in tracking developments regarding problematic assets.

- New guidelines have been implemented with respect to renewing, extending or modifying existing assets.

- Significant reductions in overhead expense are being achieved. In addition to the elimination of personnel and other costs associated with new business generation, certain other organizational changes and reductions have been made. These changes will not only reduce expense levels, but are also designed to increase the Debtors' ability to focus on portfolio maximization.

2. Asset Sales

As described in Section VII-D ("Certain Factors to be Considered"), the Debtors do not believe that a significant percentage of their assets are capable of being sold at attractive prices, compared to the ultimate value to be realized from holding these assets. There can be no assurance that any assets will be sold, or if sold, that proceeds equal to or greater than their carrying amounts will be received.

Certain assets may be sold as follows:

- The assets of the Realty Capital LOB, consisting of "bridge" loans to real estate owners and developers, have been priced and underwritten for sale from the time that the LOB was established. The Debtors believe that a sale of these assets is likely to result in proceeds that will exceed the ultimate value to be realized through the continued management and collection of these assets. Prior to its bankruptcy filing, the Debtors began working with Secured Capital Corp., an experienced broker retained to sell the assets of this LOB.

- The Debtors are currently analyzing the financial and tax impact of a sale of some or all of their leveraged lease assets because, among other things, the Debtors believe that the tax deductions generated from these investments are not expected to provide a satisfactory return under the Debtors' new business plan. As of December 31, 2000, the carrying amounts of the Debtors' investment in leveraged leases was approximately $800 million of assets, net of non-recourse debt.

- Within other LOBs, asset sales are expected to be evaluated on a case-by-case basis.

3. New Business Opportunities

Other than as set forth above with respect to potential increases in, or renewals of, loans to existing customers, the Debtors' business plan does not contemplate any new business activities, although it is possible that new business opportunities may present themselves in the future. For example, the Reorganized Debtors will be staffed with personnel having significant expertise in the collection and work-out of difficult credits. It is possible that, in the future, the Reorganized Debtors will manage such activities for others (on a fee and/or a success basis). In this regard, it is noted that it is possible that the Reorganized Debtors may accumulate substantial tax loss carry forwards, and that new business opportunities may have enhanced value to the Reorganized Debtors as a result. The projections included in this Disclosure Statement do not include any income from these or any other possible new business opportunities, and there can be no assurance that any will arise, or if they do arise, that they will be successfully implemented.

D. Certain Factors to be Considered

As stated above, the Debtors' business plan does not contemplate the generation of any business activities related to new customers. Accordingly, the overall feasibility of the Plan is predicated upon the maximization of the Debtors' existing portfolio of assets for the benefit of all of their creditors and equity Interest holders. To achieve this objective, the Debtors have implemented and propose to implement a variety of tactical and strategic initiatives, as described in Section VII-C of this Disclosure Statement ("Post-Confirmation Business Plan"). However, the potential recoveries by creditors under the New Senior Notes, and by holders of existing FNV Group common stock and holders of Additional Group Common Stock, New Group Preferred Stock and Additional Mezzanine Common Stock, if any, issued to holders of FNV Group-7 Claims, FNV Capital-5 Claims or FNV Mezzanine-6 Claims, respectively, remain subject to a number of material risks, including those summarized below. Prior to voting on the Plan, you should carefully consider the risk factors summarized below as well as the Debtors' business plan description contained elsewhere in this Disclosure Statement, and consult with your own advisors in arriving at your own independent assessment of the Plan and Disclosure Statement.

1. Portfolio Maximization

(a) Management's Strategic Initiatives. Although the Debtors' have implemented numerous tactical and strategic initiatives with a view toward ensuring that the portfolio will be managed for the maximum return to creditors and equity Interest holders as described in Section VII-C of this Disclosure Statement ("Post-Confirmation Business Plan"), there can be no assurance that the Debtors' initiatives will, in fact, enhance the realizable value of the portfolio. These initiatives depend, in part, on the continued retention of experienced personnel to manage the portfolio, and their ability to implement those new strategies.

(b) Significant Factors Affecting Portfolio Value. As indicated in Section VII-C of this Disclosure Statement ("Post-Confirmation Business Plan"), the main objective of the Debtors' post-confirmation business plan is to maximize the value of their portfolio through the orderly liquidation of the portfolio over time. There are, however, substantial risks inherent in the Debtors' ability to maximize the value of the portfolio.

A significant portion of the Debtors' portfolio consists of assets that cannot be quickly or easily converted to cash, for a number of reasons, including:

- The Debtors lent money to a number of their customers at higher advance rates (i.e., at higher loan to collateral ratios) than did many of their competitors.

- The risk profiles of a number of the Debtors' customers are higher than those targeted by many of their competitors. That higher risk, in combination with the weakening U.S. economy, has resulted in increased problem accounts and corresponding decreased expected values for those assets.

- The Debtors have a number of exposures in which the amount is lent to a group of related borrowers. Some of these borrowers are experiencing financial difficulties, and in such cases, the related loans or leases have been classified as impaired. Failure of one borrower may adversely impact the ability of others to repay their debt.

- For these reasons, many of the Debtors' customers may not be able to refinance their obligations with a new lender unless the Debtors are willing to accept a discount, which may be significant. Likewise, the Debtors may not be able to sell many of these assets unless they are willing to accept discounts. Thus, the Debtors believe that there will be no quick conversion of their assets to cash.

The Debtors recorded substantial write-downs and reserves in 2000, and there can be no assurance that there will not be significant additional future losses. At December 31, 2000, the Debtors had approximately $1.2 billion of impaired, repossessed and non-accruing assets in their continuing operations and had reserves of $579 million. There can be no assurance that losses from impaired assets will not exceed the specific reserves allocated to these assets or that losses from future impaired assets will not exceed the general reserve. In addition, at such date there were approximately $490 million of impaired, repossessed and non-accruing assets, which have been marked down to estimated net realizable value, in the Debtors' discontinued operations. See the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of the 10-K/A and Part II, Item 2 of the 10-Q

36

Consequently, the Debtors' business plan calls for the collection and management of the portfolio over time with only limited asset sales. The longer that it takes the Debtors to liquidate their assets, the greater is the risk that unforeseen events will adversely affect the realizable value of these assets.

2. Leverage

The Debtors are highly leveraged. Excluding leveraged leases and the related non-recourse secured debt, at December 31, 2000 the Debtors had consolidated assets of $12,089,086,000 and consolidated liabilities of $11,419,602,000, including the $115,000,000 aggregate liquidation amount of the TOPrS. Creditors and stockholders should be aware that the Plan does not significantly reduce the Debtors' leverage. Notwithstanding this amount of debt, the Debtors expect to be able to pay their debts as they fall due.

The Debtors' highly leveraged financial position could pose substantial risks to the holders of the New Senior Notes, the Additional Group Common Stock, the existing FNV Group common stock and, if issued, the Additional Mezzanine Common Stock and the New Group Preferred Stock, by having a material adverse effect on the marketability, price and future value of such securities. This highly leveraged position also is likely to affect the Debtors' future operations, by: (i) impairing the Debtors' ability to obtain replacement or additional financing (assuming such financing would otherwise be available) for working capital, capital expenditures, debt service requirements, or other general corporate purposes; (ii) requiring that a substantial portion of the Debtors' operating cash flow be used to pay principal and interest expense, thereby reducing funds available for operations and other corporate purposes; (iii) limiting the Debtors' ability to withstand competitive pressures or to adjust to changing market conditions; and (iv) making the Debtors more vulnerable to the effects of a downturn in their businesses or the economy in general.

3. Potential Limitations on or Inability to Repay Debt or Make Contingent Payments

FNV Group has no business operations of its own and has no significant assets other than the shares of FNV Capital. FNV Group will derive virtually all of its cash flow from interest payments on the Intercompany Note, dividends, other payments and intercompany loans from its direct and indirect subsidiaries. A chart of the corporate structure of the Debtors is attached hereto as Exhibit H.

FNV Group's ability to pay the principal of, and interest on, the New Senior Notes, to make distributions to holders of FNV Group common stock or New Group Preferred Stock and to make payments of Contingent Interest (as defined in the term sheet for the New Senior Notes) is dependent on the generation of cash flow by its subsidiaries and the ability of the subsidiaries to make cash available to FNV Group, by dividend, payment of the Intercompany Note or otherwise. The ability of these subsidiaries to transfer funds will be limited by the terms of the Berkadia Loan, the Intercompany Note and the New Senior Notes and further may be affected by prevailing economic conditions and financial, business and other factors, as well as the subsidiaries' level of indebtedness from time to time. The ability of subsidiaries to transfer funds to FNV Group may be further restricted by the laws of the jurisdictions of their incorporation and applicable bankruptcy, federal, state or foreign fraudulent conveyance or dividend restriction laws.

Although semi-annual interest payment dates will be established under the terms of the New Senior Notes, FNV Group will not be required to make any interest payments or any principal prepayments on the New Senior Notes or make any payments of Contingent Interest unless it has cash available for that purpose as set forth in the Term Sheet for the New Senior Notes (which is attached as an exhibit to the Plan annexed hereto as Exhibit A); except that it is an event of default under the terms of the New Senior Notes if FNV Group fails to pay interest in full on the New Senior Notes for two consecutive interest payment dates. Furthermore, FNV Group will not be required to make any payments in respect of Contingent Interest unless and until an amount equal to 5.263% of the aggregate principal amount of the New Senior Notes issued under the Plan (whether on or after the Effective Date) is paid to the common stockholders of FNV Group. As reflected in the Debtors' projections attached hereto as Exhibit F, the Debtors believe that payments in respect of the New Senior Notes will be made on a semi-annual basis. Nevertheless, under the terms of the New Senior Notes, it is possible that interest and principal payments will not be paid in full until 2009, when the principal on the New Senior Notes matures. It is also possible that no payments of Contingent Interest will ever be made. Further detail is provided in the Term Sheet for the New Senior Notes.

Pro forma cash flows from operations for the first four full years after the Effective Date are set forth in the Projections attached hereto as Exhibit F. A portion of the cash flows will be dedicated to debt service on the Berkadia Loan, the New Senior Notes and, at FNV Group's option, to use up to $1.5 billion in the aggregate to make purchases of the New Senior Notes at a price not to exceed par plus accrued and unpaid interest thereon, subject to the consent of Berkadia, while the Berkadia Loan is outstanding, and up to $150 million per calendar year for such purchases following the repayment in full of the Berkadia Loan (as described in the term sheet for the New Senior Notes, attached to Commitment Letter (which is attached hereto as Exhibit D)). There can be no assurance that the Debtors' businesses will continue to generate cash flow at levels sufficient to satisfy FNV Group's debt service and operational requirements. Many factors that will affect the Debtors' future cash flow are beyond their control, including the general level of interest rates. Changes in the interest rate environment may further reduce profit margins. Also, changes in government regulations, tax rates and similar matters could significantly increase the cost of doing business. General adverse economic conditions, as well as adverse conditions in particular market segments, could cause the Debtors' borrowers to be unable to make timely payments or payment in full on loans made by the Debtors, resulting in a higher rate of non-collectible or non-earning assets. If, in the future, the Debtors are unable to generate sufficient cash from their operations to enable FNV Capital to make interest and principal payments on the Berkadia Loan and to enable FNV Group to make interest and principal payments on, and purchases of, the New Senior Notes, the Debtors will be required to take other measures, such as refinancing or restructuring their indebtedness, selling assets, deferring necessary capital expenditures or seeking to raise additional debt or equity capital. There can be no assurance that any of these measures could be effected on a timely basis or on satisfactory terms. Furthermore, there can be no assurance as to the timing of any such transactions or the proceeds that the Debtors could realize from any such sales or capital-raising transaction. The Debtors' ability to sell assets also will be limited by the terms of the Berkadia Loan and may be limited by the other terms of any financing agreements.

4. Potential Insufficiency of Collateral for New Senior Notes; Value of Collateral

The New Senior Notes will be secured by second priority security interests in the capital stock (but not the assets) of FNV Capital and in the Intercompany Note (which, in turn, will be secured by a second-priority lien on the assets of FNV Capital pledged to Berkadia as security for the Berkadia Loan) (the "Collateral"). These security interests will be junior to the security interest in the Collateral held by Berkadia as security for FNV Group's guarantee of the Berkadia Loan. Enforcement of the New Senior Notes' security interest will not be allowed until the Berkadia Loan is paid in full.

If FNV Group defaults on its obligations to make payments in respect of the New Senior Notes (but not Contingent Interest), holders of the New Senior Notes would be entitled to payment out of proceeds from the sale or other liquidation of the Collateral prior in right to any general unsecured creditors of FNV Group, but only after payment in full of the Berkadia Loan. The ability of the holders of the New Senior Notes to realize such value upon the sale of the Collateral will depend upon general market and economic conditions, the market value of the Collateral, the results of operations of FNV Capital and its subsidiaries and the availability of buyers and other similar factors at the time of sale. It is unlikely that the value of the Collateral in a "forced" or "fire" sale would be sufficient to satisfy payment of the New Senior Notes. In addition, the value of the Collateral may decline over time in response to fluctuations in interest rates or certain other market fluctuations, and there can be no assurance that the future value of the Collateral will not be considerably less than its current value. Accordingly, the proceeds of any sale of the Collateral following an Event of Default on the New Senior Notes may not be sufficient to satisfy payments due on the New Senior Notes. If the proceeds from a sale of the Collateral are not sufficient to satisfy payments due on the New Senior Notes, holders of the New Senior Notes (to the extent not repaid from the proceeds of the sale of the Collateral) will have unsecured Claims against the remaining assets of FNV Group, which are not anticipated to have significant value.

5. Interest Spread; Interest Rate Matching

See "Annex A--Quantitative and Qualitative Disclosure About Market Risk" in the 10-K/A and Part II, Item 3, "Quantitative and Qualitative Disclosure About Market Risk" in the 10-Q for a discussion of risks associated with interest rate spread and interest rate matching.

6. Leveraged Leases

The Debtors' investment in Leveraged Leases has a book value of approximately $800 million, net of non-recourse debt, as of December 31, 2000, consisting primarily of real estate and aircraft. At the time the Leveraged Leases were entered into, a significant portion of the Debtors' projected return on them was to have resulted from the tax benefits the Debtors expected to receive through accelerated depreciation and interest expense deductions. However, there can be no assurance that the Debtors will, in fact, have sufficient taxable income to enable them to realize some or all of the projected returns on these assets.

It is the Debtors' position that only the Debtors' beneficial interest as owner participant under their Leveraged Leases (not the trust estate) is subject to the Debtors' bankruptcy cases and that the leases within the trust estate are not subject to any declarations, adjudications or proceedings in these cases.

7. Aircraft Residual Risk

The Debtors' largest line of business is Transportation Finance, which primarily consists of various forms of financing of used aircraft. In addition, the Debtors finance corporate and other types of aircraft through the Commercial Equipment Finance line of business. Most of these financings (excluding Leveraged Leases) are relatively short term (in many cases the sole source of cash flow is a lease of less than five years). These lines of business are highly dependent on market conditions for the releasing or selling of the aircraft when leases terminate, a highly specialized activity. The Debtors have estimated the "residual value" of each aircraft at lease termination, i.e., the value to be recovered (usually through releasing but occasionally from sale) upon the future termination of each lease. Residual estimation is a highly subjective exercise, particularly for older aircraft, and there can be no assurance that the values used by the Debtors and reflected in the Debtors' projections included elsewhere herein will be achieved. There also can be no assurance that aircraft returned to the Debtors (or to their borrowers) at lease termination will not remain off-lease for substantial periods of time.

The decision as to whether or not to convert aircraft from passenger to cargo service, as well as the management of these conversions, is a highly specialized and important skill, since large amounts of money are involved (a typical conversion costs between $4 and $20 million). Historically, the Debtors have acquired a modest number of aircraft with the intention of converting them to cargo service, and have financed customers who have likewise engaged in such conversions, in both cases prior to having a lease in place for the converted aircraft. The Debtors have in-process conversion projects involving five DC10-30s and one B747-300. There can be no assurance that converted aircraft will not remain off-lease or unsold for extended periods.

The Debtors historically have managed the releasing and conversions of aircraft that they own (that is, aircraft leased directly by the Debtors to operators), but have relied on their customers to manage these activities where the aircraft is owned by the Debtors' customer and the customer is borrowing funds from the Debtors. Because most of these loans are recourse only to the collateral value of the aircraft securing the loans, and given the current difficult market for releasing or selling used aircraft, the Debtors believe that they will need to take a more active role in this process and will need to increase significantly their expertise in this area to be effective. The Debtors intend either to recruit additional personnel or to enter into a joint venture or other co-management arrangement with an industry expert. No assurance can be given, however, that the Debtors will be successful in this endeavor.

The Debtors' aircraft finance business is affected by developments at large users in the industry. The Debtors (or their customers) are lessors to a number of passenger and cargo airlines that have recently filed for protection under the Bankruptcy Code. The bankruptcy of a large user often has a negative impact on the industry wide lease rates that can be obtained for the affected aircraft types, even in cases where the Debtors or their customers are not themselves leasing to the carrier in bankruptcy. In addition, large contracts can affect the entire industry: the recent decision of the United States Postal Service to give its overnight shipping business to Federal Express has caused a significant number of other carriers' 727s to become surplus. This has had a significant impact both on the Debtor's existing 727 customers and on the short-term leasing prospects for the Debtors' off-lease 727s.

The aircraft owned and financed by the Debtors may be the subject of changes in regulations, particularly new "air worthiness directives" issued by the Federal Aviation Administration or other U.S. or foreign regulators. There can be no assurance that no directives will be issued in the future or that, if issued, such directives will not render certain aircraft economically unviable.

8. Projections

The Plan is dependent upon the feasibility of the assumptions included in the financial projections attached hereto as Exhibit F and the successful implementation of the business plan described herein. The financial projections reflect numerous assumptions, some of which involve factors outside the control of the Debtors, as well as estimates of value that may never be realized. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors, the actual results achieved throughout the periods will vary (either positively or negatively) from the results projected, and those variations may be material. Other potential adverse factors beyond the Debtors' control that may affect such results are described in Exhibit F. These events may cause the Debtors to fail to achieve their projected levels of operating revenues, earnings and cash flow.

9. Competition

The Debtors do not expect to be competing for new customers. However, given the highly competitive nature of the Debtors' industry, competition will be a factor with respect to retention of existing customers. It is the Debtors' plan to retain their best customers as long as they can do so at attractive rates. However, it is likely that competitors will also solicit these customers. Since almost all of the Debtors' competitors are in stronger financial condition than the Debtors (and can thereby represent that they offer a better financing "partner" for the customer), and since almost all of these competitors have a lower cost of funding than the Debtors, the Debtors may be unable to retain their best customers. Although in many cases there are significant pre-payment or exit fees that a departing customer must incur, there can be no assurance that customers will not choose to refinance with competitors or that the effect of such competition will not force the Debtors to reduce their rates to certain customers.

10. Dependence on Key Personnel; Management Agreement

As stated above, the Debtors' portfolio is highly leveraged and has a substantial level of impaired assets. For these reasons, management expertise and involvement is extremely important in order to maximize value. In particular, many of the Debtors' assets are "story" assets, as to which retention of individuals with knowledge as to the history of the assets is very valuable. The Debtors have relied, and expect to continue to rely, upon key individuals who have substantial familiarity and expertise in the Debtors' continuing business operations. There can be no assurance that the Debtors will be able to retain key employees, although the Debtors have implemented employee incentive plans and are seeking Bankruptcy Court approval to implement other such plans.

FNV Group has entered into a ten-year management agreement with Leucadia, pursuant to which Leucadia will provide management services to FNV Group and its subsidiaries. However, if the Commitment Letter is terminated or a plan of reorganization other than the Plan is confirmed by order of the Bankruptcy Court, Leucadia or FNV Group would have the right to terminate the agreement. If that were to occur, management services from Leucadia would terminate and the Debtors would have to determine whether alternate management arrangements would be necessary, which could include entering into a new management agreement with a third party or enhancing the Debtors' existing management team.

11. Termination of Berkadia's Commitment to Make the Berkadia Loan

Funding of the Plan is dependent upon FNV Capital's ability to borrow the Berkadia Loan under the Berkadia Credit Agreement. Pursuant to the terms of the Commitment Letter, Berkadia's commitment to fund the Berkadia Loan will terminate on the first to occur of (x) August 31, 2001, unless the Berkadia Credit

Agreement closes and funds on or before that date or (y) the earlier of the date this Disclosure Statement is approved by the Bankruptcy Court or July 6, 2001, if the Bankruptcy Court has not approved the Commitment Letter and the fees payable thereunder by that date. Berkadia's commitment to fund the Berkadia Loan may be terminated earlier by Berkadia (i) if any event occurs or information has become available that, in its reasonable judgment, results in, or is likely to result in, the occurrence of any of the events referred to in clause (vi) of the paragraph captioned "Conditions Precedent" in the Commitment Letter or the failure of any other condition referred to under "Conditions Precedent" in the Commitment Letter, or (ii) upon termination of the Management Services Agreement. If any of the foregoing occur, there can be no assurance of whether, or under what terms, Berkadia would extend the terms of the commitment or would agree to waive its termination rights.

12. Lack of Established Market for New Senior Notes, New Group Preferred Stock, and Additional Mezzanine Common Stock

There is no existing market for the New Senior Notes, New Group Preferred Stock, and Additional Mezzanine Common Stock. No assurance can be given that an active market will develop in such securities or, if such a market develops, that the market will develop or retain sufficient liquidity or a constant value. A number of factors contribute to this uncertainty, including the possible lack of broker-dealers willing to make a market in these securities. It is possible that these securities will trade at less than par. The price of such securities will be determined in the marketplace and may be influenced by many factors, including:

. the specific terms (including coupon rate, if applicable) of the security;

. depth and liquidity of the market for the security;

. developments affecting the Debtors' business generally;

. investor perception of the Debtors' business; and

. general economic and market conditions.

13. Special Risks for Equity Holders

(a) Dilution. Under the Plan, existing equity holders of FNV Group (together with any other parties that have equity Interests) will retain their existing shares of common stock of FNV Group. However, as a result of the issuance to the Berkadia Parties of Additional Group Common Stock under the Plan, the common stock currently outstanding may represent only 49% of the shares of the FNV Group common stock to be outstanding following the Effective Date. Therefore, existing equity Interests will experience material dilution, without any material reduction in the outstanding consolidated debt of FNV Group. Existing equity Interests of FNV Group may experience further dilution if Additional Group Common Stock or New Group Preferred Stock is required to be issued to claimants as a consequence of the existing Securities Litigation against FNV Group. Under the Plan and the New Corporate Documents, there is no limitation on the right of the Reorganized Debtors to issue preferred stock that has rights prior to those of the New Group Preferred Stock or the Additional Group Common Stock. Further, under the Plan and the New Corporate Documents there is no limitation on the right of the Reorganized Debtors to issue additional shares of FNV Group common stock or additional shares of FNV Mezzanine common stock, which would result in a dilution of the holders of Additional Group Common Stock and Additional Mezzanine Common Stock, respectively.

(b) Dividends. Post-confirmation equity holders will be precluded from receiving dividends or other distributions from FNV Group until the Berkadia Loan is repaid. If New Group Preferred Stock is issued, distributions to common stockholders will not be permitted to be made unless a concurrent distribution is made to holders of the New Group Preferred Stock. Subject to applicable corporate law (which limits the circumstances in which corporations may legally make distributions to stockholders), limited distributions to stockholders will be permitted as the New Senior Notes are paid off, as described in the next paragraph.

The New Senior Notes will provide that after repayment in full of the Berkadia Loan, 5% of the Debtors' cash available for this purpose (as defined in the New Senior Notes Indenture) will be used to make distributions to stockholders. Accordingly, unless principal payments are made on the New Senior Notes, no distributions will

be made to stockholders. Further, such distributions will not be made if any default exists under the New Senior Notes. If FNV Group does not have sufficient funds ultimately to repay the New Senior Notes in full (together with accrued interest thereon), it is likely that only limited distributions would be made to stockholders. There can be no assurance that FNV Group will make any distributions to its equityholders even if all contractual prohibitions thereto have expired. Subject to meeting the legal requirements permitting distributions to stockholders, and so long as the making of any such distributions would not render FNV Group insolvent, FNV Group currently intends to make distributions permitted under the terms of the New Senior Notes as soon as practicable. It is likely that FNV Group will not fully repay the New Senior Notes in fewer than eight years.

(c) Transactions with Interested Stockholders. The new certificate of incorporation of FNV Group will not include many of the provisions contained in the current certificate of incorporation of FNV Group. One of these provisions requires supermajority approval by the FNV Group stockholders for the following specified transactions involving an "Interested Stockholder" or its affiliates:

- a merger or consolidation of FNV Group or any subsidiary with an Interested Stockholder or its affiliates;
- any sale, lease, exchange or other disposition of assets of FNV Group or its subsidiaries with an aggregate fair market value of $10,000,000 or more to any Interested Stockholder or its affiliates;
- the issuance to an Interested Stockholder or any of its affiliates of securities of FNV Group or any subsidiary for consideration having an aggregate fair market value of $10,000,000 or more;
- the adoption of any plan or proposal for liquidation or dissolution of FNV Group proposed by or on behalf of any Interested Stockholder or its affiliates; and
- any reclassification of securities, recapitalization of FNV Group, merger or consolidation of FNV Group with any of its subsidiaries or any other transaction (whether or not an Interested Stockholder is a party) which has the direct or indirect effect of increasing the proportionate share of equity or convertible securities of FNV Group or any subsidiary owned directly or indirectly by an Interested Stockholder or its affiliates.

Any transaction that is subject to this provision must be approved by the affirmative vote of holders of at least 66 2/3% of FNV Group's voting stock, including the affirmative vote of holders of at least 66 2/3% of FNV Group's voting stock not owned directly or indirectly by the Interested Stockholder or its affiliates, unless the transaction either is approved by a majority of the "Continuing Directors" (as defined in the certificate of incorporation) or meets certain price and procedure requirements.

An "Interested Stockholder" is any stockholder that (i) together with its affiliates, beneficially owns more than 10% of the outstanding voting stock of FNV Group, (ii) is an affiliate of FNV Group and within the two year period preceding the date in question was, together with its affiliates, the beneficial owner of more than 10% of the outstanding voting stock, or (iii) has acquired, other than in a public offering, voting stock that was beneficially owned by an Interested Stockholder within the two-year period immediately before the date in question.

A "Continuing Director" is any member of the FNV Group Board of Directors who is unaffiliated with the Interested Stockholder and who either was a member of the Board of Directors before the Interested Stockholder became an Interested Stockholder or has been recommended for appointment or election to the Board of Directors by a majority of the Continuing Directors then on the Board.

The new certificate of incorporation of FNV Group will not contain any provision comparable to the foregoing. As a result, transactions of the type described above with any of the Berkadia Parties (each of which would be considered an Interested Stockholder under the existing certificate of incorporation upon acquisition of 50% of FNV Group common stock) or their affiliates will not, under the new certificate of incorporation, be subject to any supermajority or unaffiliated holder approval requirements.

VIII.

VOTING PROCEDURES

A. Parties Entitled to Vote on the Plan

Pursuant to section 1126 of the Bankruptcy Code, each class of "impaired" Claims or Equity Interests that is not deemed to reject the Plan is entitled to vote on acceptance or rejection of the Plan. A class is impaired unless that class is to have its legal, equitable and contractual rights left unaltered by the reorganization. A list of classes entitled to vote on the Plan is set forth in Section II-B of this Disclosure Statement ("Voting on the Plan").

Notwithstanding the foregoing, only holders of Allowed Claims or Allowed Interests in the Voting Classes are entitled to vote on the Plan. A Disputed Claim (as defined in the Plan) or Interest that is not Allowed (as defined in the Plan) is not entitled to vote unless and until either (i) the dispute with respect to the Claim or Interest is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction or pursuant to agreement with the Debtors or (ii) the Bankruptcy Court deems the Disputed Claim or Interest to be an Allowed Claim or Allowed Interest on a provisional basis, for purposes of voting on the Plan. Therefore, even if there is a ballot enclosed with this Disclosure Statement, the votes cast by the holders of any Claim or Interest that is not Allowed as of the Voting Deadline will not be counted unless the Bankruptcy Court provisionally allows those Claims or Interests for purposes of voting on the Plan. If your Claim or Interest is not Allowed, it is your obligation to obtain an order provisionally allowing your Claim or Interest.

Holders of Claims and Interests in the voting classes may vote on the Plan only if they are holders as of the Voting Record Date. The Voting Record Date is June 13, 2001.

B. Ballot

A ballot to be used for voting to accept or reject the Plan, together with a postage-prepaid return envelope, is enclosed with copies of this Disclosure Statement that are mailed to creditors and stockholders entitled to vote on the Plan.

After carefully reviewing this Disclosure Statement and the Plan, creditors and stockholders entitled to vote should indicate their acceptance or rejection of the Plan by completing the enclosed ballot. All ballots should be returned to the Debtors as directed below.

If you do not receive a ballot for a certain Claim that you believe you hold and that is in a class that is entitled to vote, or if your ballot has been damaged or lost, or if you have any questions regarding the procedures for voting on the Plan please contact the voting agent as follows:

The FINOVA Group Inc.
c/o Claudia King & Associates
P.O. Box 2742
Carefree, AZ 85377-2742
(by U.S. Mail)

and

The FINOVA Group Inc.
c/o Claudia King & Associates, Inc.
7301 E. Sundance Trail--Suite D-201
Carefree, AZ 85377
(by delivery or courier)

C. General Procedures and Deadlines for Casting Votes

The following information is qualified in all respects by the instructions that will accompany your ballot. Please review those instructions carefully before completing your ballot.

All creditors and stockholders entitled to vote may cast their votes by completing, dating and signing the ballot that accompanies this Disclosure Statement, and by returning the ballot once it has been completed, dated and signed in the enclosed postage-prepaid envelope, by first class mail. To be counted, your vote must be received, pursuant to the following instructions, by the voting agent at the following address, before the voting deadline of 5:00 p.m. Mountain Standard Time on August 1, 2001.

The FINOVA Group Inc.
c/o Claudia King & Associates
P.O. Box 2742
Carefree, AZ 85377-2742
(by U.S. Mail)

and

The FINOVA Group Inc.
c/o Claudia King & Associates, Inc.
7301 E. Sundance Trail--Suite D-201
Carefree, AZ 85377
(by delivery or courier)

To be counted, all ballots must be completed and signed, and must be returned in time to be actually received by the Debtors at the above address by 5:00 p.m. Mountain Standard Time, on August 1, 2001. Since mail delays may occur, it is important that your ballot be mailed or delivered well in advance of the specified date.

Any ballot received after 5:00 p.m. Mountain Standard Time on August 1, 2001 will not be counted or otherwise included in any calculations to determine whether the Plan has been accepted or rejected.

If a ballot is signed and returned without casting a vote or providing other instruction as to acceptance or rejection of the Plan, the signed ballot will not be counted or otherwise included in any calculations to determine whether the Plan has been accepted or rejected. The Debtors, in their discretion, may request that the voting agent attempt to contact voters to cure any defects in the ballots.

When a ballot is returned indicating acceptance or rejection of the Plan, but such ballot is unsigned, the ballot will not be counted or otherwise included in any calculations to determine whether the Plan has been accepted or rejected.

Any voter that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the voting agent before the voting deadline. To be valid, the notice of withdrawal must (a) be signed by the party who signed the ballot to be revoked, and (b) be received by the voting agent before the voting deadline. The Debtors may contest the validity of any withdrawals.

Any holder that has delivered a valid ballot may change its vote by delivering to the voting agent a properly completed subsequent ballot so as to be received before the voting deadline. In the case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

D. Special Procedures Applicable to Voting of Debt Securities Claims and Equity Interests

IF YOU ARE, AS OF THE JUNE 13, 2001 RECORD DATE, THE BENEFICIAL OWNER OF A NOTE OR SHARES:

If the Notes or Shares are registered in your own name: Please complete the information requested on the ballot; sign, date, and indicate your vote on the ballot; and return the ballot in the enclosed, pre-addressed, postage-paid envelope so that it is actually received by the voting agent before the voting deadline.

If the Notes or Shares are registered in "street name":

If your ballot has already been signed (or "prevalidated") by your nominee (your broker, bank, other nominee or their agent): Please complete the information requested on the ballot, indicate your vote on the ballot, and return your completed ballot in the enclosed pre-addressed postage-paid envelope so that it is actually received by the voting agent before the voting deadline; or

If your ballot has NOT been signed (or "prevalidated") by your nominee (your broker, bank, other nominee, or their agent): Please complete the information requested on the ballot; sign, date and indicate your vote on the ballot; and return the ballot to your nominee in sufficient time for your nominee to then forward your vote to the voting agent so that it is actually received by the voting agent before the voting deadline.

IF YOU ARE THE NOMINEE FOR A BENEFICIAL OWNER, AS OF THE JUNE 13, 2001 RECORD DATE, OF THE NOTES OR SHARES: Please forward a copy of this Disclosure Statement and the appropriate ballot to each beneficial owner, AND:

All ballots that you have signed (or "prevalidated") should be completed by the beneficial owners and returned by the beneficial owners directly to the voting agent so that the voting agent receives such ballots before the voting deadline.

All ballots that you have NOT signed (or "prevalidated") must be collected by you, and you should complete the "master ballot," and deliver the completed master ballot to the voting agent so that it is actually received by the voting agent before the voting deadline.

IF YOU ARE A SECURITIES CLEARING AGENCY: Please arrange for your respective participants to vote by executing an omnibus proxy in their favor.

THE DEBTORS ARE NOT AT THIS TIME REQUESTING THE DELIVERY OF, AND NEITHER THE DEBTORS NOR THE VOTING AGENT WILL ACCEPT, CERTIFICATES REPRESENTING ANY OF THE NOTES. IN CONNECTION WITH THE EFFECTIVE DATE, THE DEBTORS WILL FURNISH ALL HOLDERS OF NOTES WITH APPROPRIATE LETTERS OF TRANSMITTAL TO BE USED TO REMIT THOSE CERTIFICATES IN EXCHANGE FOR THE DISTRIBUTION UNDER THE PLAN. INFORMATION REGARDING THE REMITTANCE PROCEDURE (TOGETHER WITH ALL APPROPRIATE MATERIALS) WILL BE DISTRIBUTED BY THE DEBTORS AFTER CONFIRMATION OF THE PLAN.

IX.

CONFIRMATION OF THE PLAN

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan to commence on August 10, 2001, at 9:30 a.m. Eastern Daylight Time. That hearing will be held at the United States Bankruptcy Court for the District of Delaware, at in Courtroom 2 at 824 Market Street, 6th Floor, Wilmington, Delaware 19801, or such other location as designated by the Bankruptcy Court, before the Honorable Peter J. Walsh.

Parties in interest have the right to object to confirmation of the Plan. Any objections to confirmation of the Plan must be in writing and filed with the Bankruptcy Court by no later than August 3, 2001, at 4 o'clock p.m. Eastern Daylight Time. In addition, copies of such objections must be received no later than August 3, 2001, at 4 o'clock p.m. Eastern Daylight Time by the following persons:

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Co-Counsel for the Debtors

Mark D. Collins
Daniel J. DeFranceschi
Deborah E. Spivack
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (212) 658-6541
Facsimile: (212) 658-6548
Co-Counsel for the Debtors

Chaim J. Fortgang
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Counsel for Creditors' Committee

Andrew Rahl
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10020-1182
Telephone: (212) 278-1000
Facsimile: (212) 278-1733
Counsel for Equity Committee

Rule 9014 of the Federal Rules of Bankruptcy Procedure governs objections to confirmation of the Plan. Unless an objection to confirmation is timely filed and served, it may not be considered by the Bankruptcy Court.

At the confirmation hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether (i) the Plan has classified Allowed Claims and Allowed Interests in a permissible manner, (ii) the contents of the Plan comply with the technical requirements of the Bankruptcy Code, (iii) the Debtors have proposed the Plan in good faith, and (iv) the Debtors' disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the Chapter 11 Cases, as well as the identity, affiliations and compensation to be paid to all officers, directors and other insiders. The Debtors believe that the Plan satisfies all of the requisites for confirmation and will present such evidence and argument as may be necessary or appropriate at or prior to the hearing on confirmation.

As further described herein, the Bankruptcy Code also requires that the Plan be accepted by requisite votes of creditors and stockholders (except to the extent provided in Section 1129(b) of the Bankruptcy Code), that the Plan be feasible, and that confirmation be in the "best interests" of all creditors and stockholders. To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met. Thus, even if the creditors and stockholders of the Debtors accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings respecting the Plan's feasibility and whether it is in the best interests of the Debtors' creditors and stockholders before it may confirm the Plan.

A. Classification of Claims and Interests

The Bankruptcy Code requires that each claim and equity interest in a class be "substantially similar" to the other claims and equity interests in such class. The Debtors believes that the Claims and Interests in each class under the Plan are substantially similar and that the classification proposed in the Plan is appropriate under the Bankruptcy Code.

B. Best Interests of Unsecured Creditors

The Debtors believe that the Plan affords creditors and stockholders the potential for the greatest recovery from the assets of the Debtors. The Debtors have considered alternatives to the Plan, such as the liquidation of the Estates, the possibility of alternative business plans, substantively consolidating the Debtors or, with respect to FNV Canada and FNV UK, separate insolvency proceedings in the courts of the countries in which they are incorporated. In the view of the Debtors, the Plan is the best alternative available to maximize the value of the assets of the Debtors and their Estates and, therefore, the Plan is in the best interests of all parties.

Notwithstanding acceptance of the Plan by each impaired class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interest of the holders of Claims or Interests in each class. In order to satisfy the "best interests" requirement, the Debtors must establish, to the satisfaction of the Bankruptcy Court, that the Plan provide each creditor and each stockholder in each class with property that has a value, as of the Effective Date of the Plan, at least equal to the value of the distribution that such creditor or stockholder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code under then prevailing market conditions.

To estimate the distribution that the creditors and stockholders in each impaired class would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available for distribution if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the assets of the Debtors were liquidated by a chapter 7 trustee (the "Liquidation Value").

The Liquidation Value of the Debtors would consist of the net proceeds available from the disposition of the assets of the Debtors, increased by the Cash held by the Debtors and decreased by, among other things, the Allowed Claims of secured creditors, to the extent of the value of their collateral, the costs, fees and expenses incurred in the administration of the chapter 7 cases, including the liquidation and any unpaid administrative expenses arising out of the Chapter 11 Cases.

The primary assets of the Debtors consist of their investments in financing transactions and other investments. The Debtors believe that any sale or liquidation of those assets will provide less value to unsecured creditors and stockholders of the Debtors than the reorganization proposed under the Plan. The current market conditions in the Debtors' business and the economy generally, the limited credit available to potential purchasers, and a variety of other factors all would adversely and materially affect the ability of a chapter 7 trustee to liquidate the Debtors' assets within a reasonable period or at a reasonable price.

In addition, the liquidation itself could materially reduce the Liquidation Value and increase the Claims against the Debtors, further reducing proceeds to unsecured creditors and stockholders. For example, additional tax liabilities could be incurred or accelerated. The costs of liquidation in a chapter 7 case also would include

the compensation of a chapter 7 trustee, as well as that of counsel and other professionals employed by such a trustee, asset disposition expenses, applicable taxes, and litigation costs. The Debtors believe that liquidation could also generate a significant increase in unsecured Claims (such as, for example, Claims arising from the rejection of executory contracts that are otherwise assumed under the Plan).

On the basis of this analysis, the Debtors firmly believe that Debtors' creditors and stockholders will receive greater value as of the Effective Date under the Plan than such creditors or stockholders would receive in a chapter 7 liquidation.

C. Feasibility

As a condition to confirmation, the Debtors must establish that confirmation is not likely to be followed by their liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this "feasibility" standard, the Debtors have prepared the financial projections attached as Exhibit F to this Disclosure Statement relating to the performance models that can be reasonably anticipated from the Debtors' operations. The projections illustrate the ability of the Debtors to meet their obligations under the Plan while retaining a sufficient amount of cash to carry on their operations.

The financial projections set forth herein include a projected consolidated balance sheet, showing the pro forma effect of the reorganization of the Debtors pursuant to the Plan, and projected consolidated statements of operations and statements of cash flow for several years thereafter. The projected financial statements are based on the assumption that the Bankruptcy Court will confirm the Plan and that the Effective Date will be August 31, 2001.

The Debtors caution that although these projected financial statements have been derived in part from the Debtors' audited financial statements for the fiscal year ended December 31, 2000, no assurance can be given that the Debtors will achieve the results projected. Many of the assumptions upon which these projections are based are subject to uncertainties. Some assumptions inevitably may not materialize and unanticipated events and circumstances could occur which would affect the actual financial results. Therefore, the actual results achieved by the Debtors may vary, either positively or negatively, from the projected results and the variations may be material.

Based on the financial projections, the Debtors believe that the Plan complies with the financial feasibility standard for confirmation. The Debtors believe that the assumptions are reasonable, that the projections are attainable on an operational basis and that they will have sufficient funds available to meet their obligations under the Plan.

D. Acceptance

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or equity interests accept a plan, with the exceptions described in the following section. The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims of that class, but for that purpose counts only the vote of those creditors who actually vote to accept or to reject the plan. The Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by two-thirds of the number of shares, but for this purpose counts only shares actually voted. Holders of claims or equity interests who fail to vote are not counted as either accepting or rejecting the plan.

Classes of claims and equity interests that are not "impaired" under a plan are deemed as a matter of law to have accepted the plan and therefore are not permitted to vote on the plan. Classes of claims and equity interests that receive no distributions under a plan are deemed as a matter of law to have rejected the plan, so that it is unnecessary to solicit their votes. The Debtors are soliciting acceptances of the Plan only from those persons who hold Claims or Interests that are impaired under the Plan and who are to receive distributions or retain property on account of their Allowed Claims or Allowed Interests.

A class of claims or equity interests is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any manner other than those specifically permitted under the Bankruptcy Code. A list of impaired Classes is set forth in Section II-B of this Disclosure Statement ("Voting on the Plan").

E. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code sets forth the requirements for confirming a plan of reorganization where one or more impaired classes have not voted to accept the plan. If a plan is not accepted by an impaired class, including nonacceptance by means of deemed rejection, the plan may still be confirmed, provided that the plan has been accepted by at least one impaired class of claims and the other requirements for confirmation (except the requirement that the plan be accepted by all impaired classes) are met.

If a class of secured claims rejects a plan, the plan may still be confirmed so long as the Plan does not discriminate unfairly as to a class and is "fair and equitable" to that class under Section 1129(b) of the Bankruptcy Code and applicable case law. The "fair and equitable" standard requires, among other things, that the plan provides that (i) the lien securing the claims of each member of the class is preserved and the plan provides for deferred cash payments with a present value equal to the lesser of the allowed amount of their claims or the value of the collateral securing their claims, (ii) the collateral securing the claim be sold free of the lien with the lien attaching to the proceeds and with the lien on the proceeds being treated under one of the two other standards described in this paragraph, or (iii) the claim receives treatment that is the "indubitable equivalent" of the claim.

If a class of unsecured claims rejects a plan, the plan may still be confirmed so long as the plan provides that (i) each holder of a claim included in the rejecting class receives or retains on account of the claim, property that has a value, as of the effective date, equal to the allowed amount of the claim, or (ii) the holder of any claim or interest that is junior to the claims of that class will not receive or retain any property on account of the junior claim or interest.

If a class of equity interests rejects a plan, the plan may still be confirmed so long as the plan provides that (i) each holder of an equity interest included in the rejecting class receives or retains, on account of that equity interest, property that has a value, as of the effective date, equal to the greatest allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of that equity interest, or (ii) the holder of any equity interest that is junior to the interests of that class will not receive or retain any property on account of that junior interest.

If one or more classes of impaired Claims or equity Interests rejects the Plan in these Chapter 11 Cases, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate against, any rejecting impaired class. The Debtors reserve the right (a) to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, (b) to reallocate distribution of assets to Claims and Interests if necessary to obtain entry of the Confirmation Order, and (c) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

X.

ALTERNATIVES TO THE PLAN

The Debtors believe that the Plan provides the Debtors' creditors and equity security holders with the earliest and greatest possible value that can be realized on their respective Claims and Interests. As discussed below, the alternatives to confirmation of the Plan are the submission of an alternative plan or plans of reorganization by any other party in interest or the liquidation of the Debtors under the Bankruptcy Code and/or, with respect to FNV Canada and FNV UK, the institution of insolvency proceedings in the foreign countries in which each of the Debtors are incorporated.

If the Plan is not accepted, other persons may have an opportunity to file another plan of reorganization. The Debtors believe that no alternative plan would result in distribution of greater value to creditors and stockholders than that contemplated under the Plan, because any alternative plan would involve greater feasibility risks, delay in confirmation, or litigation costs than the Plan proposed at this time. Alternatively, a liquidation of the Debtors could be conducted as described in Section IX.B of this Disclosure Statement ("Best Interests of Unsecured Creditors"). For the reasons described therein, the Debtors believe that the distributions to each impaired class of creditors and stockholders under the Plan will be greater than the distributions that might be received after a chapter 7 liquidation of the Debtors.

The Debtors believe that confirmation of the Plan is preferable to any alternative mentioned above because the Plan maximizes the distributions to all classes of creditors and stockholders and because any alternative to confirmation will result in reduced recoveries and substantial delays in the distribution of any recoveries available under such alternative.

## XI.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Interests. The following summary does not address the federal income tax consequences to holders whose Claims or Interests are entitled to reinstatement or payment in full in Cash under the Plan, such as holders of Allowed Administrative Claims, Allowed Professional Compensation and Expense Reimbursement Claims, Allowed Other Priority Claims, Allowed Secured Claims, Allowed General Unsecured Claims against the Debtors other than FNV Capital, Allowed FNV Capital Intercompany Loans Claims and Allowed Interests (other than Interests in FNV Group and FNV Trust).

The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt concerning any issue discussed herein. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

This discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form. For example, it is assumed for purposes hereof that the New Senior Notes will be respected as debt, and not treated as equity, for federal income tax purposes. There is no assurance, however, that the IRS will not take contrary positions to those described herein or upon which this summary is based.

Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim or Interest. All holders of Claims and Interests are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable under the Plan.

A. Consequences to the Debtors

FNV Group files a consolidated federal income tax return with the affiliated group of corporations of which it is the common parent (the "FNV Tax Group," and on and after the Effective Date, the "Reorganized FNV Tax Group"), the members of which include all of the Debtors other than FNV Trust, FNV UK and FNV Canada. The FNV Tax Group has reported a consolidated net operating loss ("NOL") carryforward for federal income tax purposes of approximately $220 million for the taxable year ended December 31, 1999, and expects to report additional NOLs of approximately $250 million for the taxable year ended December 31, 2000. Approximately $48 million of these NOL carryforwards are subject to existing limitations under the Tax Code and Treasury Regulations as a result of prior ownership changes. In addition, the amount of such NOL carryforwards remains subject to adjustment by the IRS.

As discussed below, the NOL carryforwards, and possibly certain other tax attributes, of the FNV Tax Group may be significantly reduced or eliminated or otherwise restricted upon the implementation of the Plan.

1. Cancellation of Debt

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes--such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets--by the amount of any cancellation of debt ("COD"). COD is the amount by which the indebtedness discharged exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent the amount of COD exceeds the tax attributes available for reduction, the excess COD is simply forgiven. Although existing authorities appear to support the position that any reduction in tax attributes generally should occur on a separate company basis, even though the respective debtors file a consolidated federal income tax return, the IRS has, in certain cases, asserted the contrary position. Consequently, if the Debtors choose to apply the attribute reduction on a separate company basis, there is no assurance that the IRS would not challenge such position.

As a result of the Plan's treatment of Allowed General Unsecured Claims against FNV Capital as well as the Plan's treatment of Allowed TOPrS Interests, the Reorganized FNV Tax Group is expected to realize significant COD. The extent of such COD and resulting tax attribute reduction will depend, in part, on the amount of Cash and the "issue price" of the New Senior Notes (as determined for federal income tax purposes) distributed in exchange for such Claims and Interests.

It is possible that the Reorganized FNV Tax Group may incur COD in excess of any consolidated NOL carryforwards and other credit and loss carryforwards attributable on a separate company basis to Reorganized FNV Capital; as a consequence, Reorganized FNV Capital's tax basis in its assets, effective as of the beginning of the taxable year following the taxable year in which the Effective Date occurs, would be reduced. If advantageous, the Reorganized FNV Tax Group could elect to reduce the basis of depreciable property prior to any reduction in NOL carryforwards. In addition, as discussed above, the Reorganized FNV Tax Group may take the position (or may be required to report) that tax attributes, such as NOLs and credits, are reduced on a consolidated (rather than separate company) basis. In any event, however, it is expected that the COD generated by the Plan may significantly reduce (or, possibly, eliminate) the Reorganized FNV Tax Group's NOLs and credit carryovers, and it is possible that there could also be a reduction in the tax basis of Reorganized FNV Capital's assets.

2. Limitation on NOL Carryforwards and Other Tax Attributes

If, following the implementation of the Plan, the Reorganized FNV Tax Group retains consolidated NOLs (and carryforwards thereof) and/or certain other tax attributes, in either case allocable to periods prior to the Effective Date, the use of those attributes will be subject to the application of Section 382 of the Tax Code unless the special bankruptcy exception discussed below applies.

Under Section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized for tax purposes) as of the date of the ownership change that are subsequently recognized. In general, an "ownership change" is a more than 50 percentage point cumulative change in ownership during the relevant testing period (not to exceed three years). The Debtors currently anticipate that the issuance of the Additional Group Common Stock to the Berkadia Parties pursuant to the Plan will constitute an ownership change of the FNV Tax Group, and the Plan has been fashioned in a manner intended to permit qualification under the special bankruptcy exception if the Debtors determine such qualification to be advisable or prudent.

(a) General Section 382 Limitation. The amount of the annual limitation to which a loss corporation may be subject (i) depends, in part, on whether the corporation is in bankruptcy and the ownership change occurs pursuant to a plan of reorganization confirmed by the bankruptcy court, and (ii) within the context of an affiliated group of corporations that file a consolidated federal income tax return, generally applies on a consolidated basis. As discussed below, under a special bankruptcy exception, a corporation in bankruptcy may also be able to avoid any annual limitation.

In general, the amount of the annual limitation to which a corporation (or consolidated group) would be subject would be equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.96% for ownership changes occurring in June 2001). If a corporation (or, presumably, as in the case of the FNV Tax Group, its common parent) is in bankruptcy, and the corporation undergoes the ownership change pursuant to a confirmed plan, the fair market value of the corporation's (or its common parent's) stock generally is determined immediately after (rather than before) the ownership change. The Tax Code provides for the reduction of such value in certain circumstances, including, for example, where the corporation has substantial non-business assets.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

(b) Built-In Gains and Losses. If a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change (determined by taking into account most assets and all items of "built-in" income and deductions), any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

On the other hand, if the loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then any built-in losses--meaning losses that are built-in at the time of the ownership change--that are recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and will be subject to the annual limitation in the same fashion as a pre-change NOL carryforward. In addition, although this net built-in loss rule generally applies to consolidated groups on a consolidated basis, any corporation that joined the consolidated group within the preceding five years may have to be excluded from the group computation and tested for a net built-in loss on a separate company basis. Accordingly, even though a consolidated group of corporations may not have a net unrealized built-in loss on an overall group basis, the group may have a net unrealized built-in loss if certain members of the group are required to be excluded. Additionally, if the excluded member has a net built in loss when tested on a separate company basis, any subsequently recognized built-in losses of such corporation may be subject to a more restrictive annual limitation based on the separate value of such member.

A loss corporation's (or consolidated group's) net unrealized built-in gain or loss generally will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its gross assets (with certain adjustments) immediately before the ownership change.

At this time, the Debtors do not expect that the FNV Tax Group will emerge from the Plan with a net unrealized built-in loss, although it is possible that the FNV Tax Group will, in fact, emerge with an unrealized built-in loss and/or that one or more members of the FNV Tax Group which joined such group within the last five years may emerge with a net unrealized built-in loss as a result of being tested on a separate company basis, as described above. If the FNV Tax Group emerges from the Plan with little or no unrealized built-in loss, or no NOLs, the Section 382 limitation on NOLs and net unrealized built-in losses would be largely irrelevant. However, given that, prior to the Effective Date, the Debtors cannot be certain of these conclusions, due in part to the inability to anticipate the amount of COD attributable to the Plan and the difficulties inherent in attempting to estimate the fair market value of the FNV Tax Group's assets as of a date in the future, the Plan has been fashioned in a manner intended to permit qualification under the following special bankruptcy exception if the Debtors determine such qualification to be advisable or prudent.

(c) Special Bankruptcy Exception. An exception to the general annual limitation described above (including the built-in gain and loss rules) applies where the stockholders and/or qualified creditors of a debtor retain or receive (other than for new value) at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis (although they are subject to reduction in certain circumstances not expected to be relevant here). However, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

The Debtors intend that, if determined by the Debtors to be advisable or prudent, the Plan will be adjusted to permit qualification for this exception. The statute does not address whether this exception can be applied on a consolidated basis or only on a separate company basis. Accordingly, it is possible that only any pre-change losses attributable to FNV Group itself (rather than to the other members of the FNV Tax Group) may be able to benefit from this exception. If the exception were applicable only to FNV Group itself, it appears that the pre-change losses--i.e., NOLs and net unrealized built-in losses, if any--attributable to the other members of the FNV Tax Group would be subject to the annual limitation rules described above, determined as if FNV Group had not qualified for this exception.

3. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of Section 382 and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. The application of this provision is unaffected by whether the special bankruptcy exception to the annual limitation (and built-in gain and loss) rules of Section 382 applies.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

4. Issuance of the New Senior Notes

It is expected that the New Senior Notes will be treated as issued with original issue discount ("OID"). See "Consequences to Holders of Certain Claims--Ownership and Disposition of the New Senior Notes," below. Any such OID should be amortizable by Reorganized FNV Group utilizing the constant interest method, and deductible as interest, subject, among other things, to the application of any special limitations on interest deductibility, such as the applicable high-yield discount obligation ("AHYDO") rules of Section 163(e)(5) of the Tax Code.

The New Senior Notes will be treated as AHYDOs if, among other requirements, their yield to maturity is at least five percentage points over the applicable federal rate in effect for the calendar month in which such notes are issued (4.96% compounded semiannually for the month of June 2001) and the notes have significant OID (in general, where there is unamortized OID as of the end of the fifth year after issuance that exceeds the amount of one year's interest, both actual and imputed). The FNV Group will not be able to determine whether the New Senior Notes will be treated as AHYDOs until after they have been issued, at which time their issue price can be established.

If the New Senior Notes are treated as AHYDOs, a portion of the interest deduction otherwise allowable as OID would be disallowed, and the balance of such deduction would be deferred until actually paid in cash. The disallowed portion of any interest deduction otherwise allowable as OID on an AHYDO is that portion, if any, of the total OID multiplied by a fraction, the numerator of which is equal to the "disqualified yield" (i.e., the excess of the yield to maturity of the notes over the sum of the applicable federal rate for the calendar month in which the notes are issued plus six percentage points) and the denominator of which is equal to the total yield to maturity of the notes.

B. Consequences to Holders of Certain Claims

1. Consequences to Holders of Allowed Convenience Claims

Pursuant to the Plan, a holder of an Allowed Convenience Claim will receive payment in full in Cash, not to exceed $25,000, in satisfaction of its Claim.

In general, each holder of such an Allowed Convenience Claim will recognize gain or loss in an amount equal to the difference between (i) the amount of Cash received by such holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

In general, to the extent that any amount of Cash received by a holder of an Allowed Convenience Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. Pursuant to the Plan, all distributions in respect of a Claim will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. Each holder of an Allowed Convenience Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest or OID for tax purposes.

2. Consequences to Holders of Allowed General Unsecured Claims (other than Allowed Convenience Claims) against FNV Capital

Pursuant to the Plan, holders of Allowed General Unsecured Claims (other than Allowed Convenience Claims) against FNV Capital will be entitled to receive Cash and New Senior Notes in satisfaction of their Claims.

The following discussion assumes, as is likely the case, that, with respect to holders of Allowed Claims who are also holders of Allowed Secondary Liability Claims in respect of the same underlying obligation, amounts received in respect of each Claim will be treated, for federal income tax purposes, as payment on a single obligation represented by the underlying Claim. Accordingly, no specific reference will be made hereafter to Secondary Liability Claims.

(a) Gain or Loss. In general, each holder of an Allowed General Unsecured Claim (other than an Allowed Convenience Claim) against FNV Capital should recognize gain or loss in an amount equal to the difference between (x) the "amount realized" by the holder in satisfaction of its Claim (exclusive of any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (exclusive of any Claim for accrued but unpaid interest). The "amount realized" by a holder of such an Allowed General Unsecured Claim will equal the sum of the amount of any Cash and the "issue price" of any New Senior Notes received for such Claim. See "Treatment of Interest and Original Issue Discount," below. For a discussion of the tax consequences relating to Claims for accrued interest, see "Distribution in Discharge of Accrued Interest," below.

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

The tax basis in a New Senior Note received by the holder of an Allowed General Unsecured Claim against FNV Capital will equal the "issue price" of such note. The holding period for such New Senior Note generally will begin the day following the issuance of such note.

(b) Distribution in Discharge of Accrued Interest. Pursuant to the Plan, all distributions in respect of a Claim (other than the distribution of interest on Allowed General Unsecured Claims (other than Allowed Convenience Claims) against FNV Capital) will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent that any amount received (whether stock, cash, or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest or OID for tax purposes.

(c) Ownership and Disposition of the New Senior Notes. Pursuant to the Plan, the New Senior Notes will bear stated interest annually at a rate of 7.5%, and the stated principal and interest on such notes will be payable in full in 8 years to the extent not paid earlier. Payments of stated principal and interest will be made semi-annually if and to the extent that Reorganized FNV Group has available cash for such purposes under the terms of the New Senior Notes. In addition, the New Senior Notes will provide for payments of Contingent Interest (over and above the amount of stated principal and interest) if and to the extent that FNV Group has available cash for such purposes under the terms of the New Senior Notes at the requisite payment dates (not to exceed 15 years from the Effective Date).

(i) Treatment of Interest and Original Issue Discount. The New Senior Notes should be treated as issued with OID to the extent projected payments provided for under the New Senior Notes (as described below) exceed the "issue price" of the New Senior Notes. In general, the "issue price" of the New Senior Notes will be equal to their fair market value at the time of issuance. Thus, for federal income tax purposes, the stated interest and Contingent Interest on the New Senior Notes will be treated as components of the OID, and will not be recognized as income separately.

Because mandatory pre-payments of both stated interest and principal are contingent upon cash flow, and payments of Contingent Interest beyond such amounts (up to $100 million) may also be made depending upon cash flow, the New Senior Notes will be governed by the Treasury Regulations applicable to contingent payment debt instruments. In general, under such Treasury Regulations, each holder of a New Senior Note will be required to accrue the OID in respect of its New Senior Note under the noncontingent bond method, and include such amount in its gross income as interest, over the term of the note based on the constant interest method and the yield to maturity of the note, as described below. Accordingly, each holder generally will be required to include amounts in gross income in advance of the payment of Cash in respect of such income.

Under the Treasury Regulations, the yield to maturity will be the comparable yield at which Reorganized FNV Group would issue a comparable fixed rate debt instrument with terms and conditions similar to those of the New Senior Notes, including the level of subordination, term, timing of payments and general market conditions. No adjustment is made for the riskiness of the contingencies or the liquidity of the debt instrument. The comparable yield must be determined in good faith to be a reasonable yield for Reorganized FNV Group.

In addition, Reorganized FNV Group must determine a projected payment schedule based on the reasonably expected value of the contingent payments as of the issue date but adjusted to the extent necessary to produce the comparable yield, taking into account the issue price and the terms of the New Senior Notes. Further adjustments may be required to the projected payment schedule if and when a payment becomes fixed more than six months prior to the projected payment date.

The adjusted issue price of each New Senior Note at the beginning of each annual accrual period will be multiplied by the New Senior Note's comparable yield and the daily portions of the amount so determined will constitute the interest to be included in the holder's income for the days in the period during which the New Senior Note was held.

If, during any taxable year, a holder of a New Senior Note receives actual payments with respect to such note for that taxable year that in the aggregate exceed the total amount of projected payments for that taxable year, such holder will have additional interest income for the taxable year equal to such excess. If actual payments for the taxable year are in the aggregate less than the amount of projected payments for that taxable year, such holder will first reduce its interest income (i.e., its accrual of the OID) on the New Senior Note for that taxable year and then, in the event such reduction would produce a "negative" amount for the year, such negative amount will be (i) currently deductible as an ordinary loss to the extent of any prior interest included in income with respect to the note (which was not previously reversed by similar negative amounts in prior years), and (ii) otherwise carried forward and taken into account in determining the next year's adjustment.

If, upon sale, exchange or retirement of a New Senior Note, after taking into account the determination of any interest accrual for such year, the above adjustment would produce a "negative" amount, such amount will reduce such holder's amount realized on such sale, exchange or retirement. See "Sale, Exchange or Redemption of the New Senior Notes," below.

A holder's tax basis in a New Senior Note generally will be increased by the interest previously accrued thereon based on the comparable yield and decreased by the projected amount of any contingent payments previously made on such New Senior Note to the holder, whether denominated as interest or principal.

The Debtors will be required to provide the projected payment schedule to the holders of New Senior Notes in accordance with the Treasury Regulations. Such projected payment schedule will be binding upon each holder

of a New Senior Note, unless such schedule is unreasonable and a holder determines its own projected payment schedule and explicitly discloses to the IRS such determination and the reason therefor in its federal income tax return for the taxable year that includes the acquisition date of the New Senior Notes. In addition, the Debtors will also provide a Form 1099 to holders of New Senior Notes reflecting OID accruals, as required by law.

If the comparable yield as determined by Reorganized FNV Group is successfully challenged by the IRS, the redetermined yield could be materially greater or less than the comparable yield provided by the company. Moreover, in such event, the projected payment schedule could differ materially from that previously determined.

The comparable yield and the schedule of projected payments are not determined for any purpose other than for the determination of a holder's interest (OID) accruals and adjustments thereof in respect of the New Senior Notes for federal income tax purposes, and do not constitute a projection or representation regarding the actual amounts payable on the New Senior Notes.

(ii) High-Yield Discount Obligation Rules. As discussed above (see "Consequences to the Debtors--Issuance of the New Senior Notes," above), certain debt obligations that are issued with substantial OID and have a maturity of over five years are treated as applicable high yield discount obligations (AHYDOs) within the meaning of the Tax Code. With respect to such obligations, a portion of a corporate holder's income with respect to such accrued OID may be treated as a dividend for purposes of the dividend-received-deduction to the extent such amount would be so treated if it had been a distribution made by the issuer with respect to its stock (that is, to the extent the issuer has sufficient earnings and profits such that a distribution in respect of stock would constitute a dividend for federal income tax purposes and, presumably, subject to certain holding period and taxable income requirements and other limitations on the dividend-received-deduction).

(iii) Sale, Exchange or Redemption of the New Senior Notes. In general, any gain realized upon the disposition of a New Senior Note will be treated as interest income, while any loss will be treated as ordinary or capital depending upon the circumstances. See "Treatment of Interest and Original Issue Discount," above. Each holder of an Allowed General Unsecured Claim (other than a Convenience Claim) against FNV Capital is urged to consult its own tax advisors regarding the tax consequences of the disposition of a New Senior Note.

3. Consequences to Holders of Debt Securities (S) 510(b) Claims and Equity Securities (S) 510(b) Claims

Pursuant to the Plan, holders of Allowed Debt Securities (S) 510(b) Claims against FNV Capital, Allowed Debt Securities (S) 510(b) Claims against FNV Mezzanine and Allowed Equity Securities (S) 510(b) Claims against FNV Group will be entitled to receive New Group Preferred Stock, Additional Mezzanine Common Stock, and Additional Group Common Stock, respectively, in satisfaction of their Claims.

The federal income tax consequences of the treatment of Allowed Debt Securities (S) 510(b) Claims and Allowed Equity Securities (S) 510(b) Claims are complex and depend, in part, upon whether the holder continues to hold the debt or equity underlying such holder's securities' law Claim and whether the holder of such Claim is the original holder thereof. Each holder of a Debt Securities (S) 510(b) Claim or Equity Securities (S) 510(b) Claim is urged to consult its tax advisor regarding the tax consequences of the treatment of its Claim, including whether the receipt of consideration pursuant to the Plan will be treated as a taxable or tax-free exchange, and the tax consequences of the ownership and disposition of any New Group Preferred Stock, Additional Mezzanine Common Stock, and Additional Group Common Stock received.

4. Withholding

All distributions to holders of Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a rate of 31%. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under

certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

C. Consequences to Holders of Allowed Interests

1. Holders of Interests in FNV Group

Pursuant to the Plan, holders of Allowed Interests in FNV Group will retain their Interests subject to certain modifications to the charter provisions with respect to such Interests. The changes to the charter provisions may constitute a "recapitalization" for federal income tax purposes. Whether or not so treated, the holder of an Allowed Interest in FNV Group generally should not recognize gain or loss as a result of such charter modifications and should retain its aggregate tax basis and holding period in its Interest.

2. Holders of Allowed TOPrS Interests

Pursuant to the Plan, holders of Allowed TOPrS Interests will receive Cash and New Senior Notes in exchange for their Interests. For federal income tax purposes, FNV Trust has been treated as a disregarded entity and the holders of the Allowed TOPrS Interests have been treated as owning a pro rata share of the Group Subordinated Debentures held by FNV Trust. Accordingly, for federal income tax purposes, holders of Allowed TOPrS Interests will be treated as exchanging their proportionate share of the Group Subordinated Debentures in exchange for Cash and New Senior Notes.

The federal income tax consequences of the Plan to holders of Allowed TOPrS Interests depend, in part, on whether the Group Subordinated Debentures and the New Senior Notes constitute "securities" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (e.g., trade debt and revolving credit obligations) do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. However, the characterization of debt obligations with a weighted average maturity greater than five years but fewer than ten years is unclear. Each holder of an Allowed TOPrS Interest is urged to consult its tax advisor regarding the status of the underlying Group Subordinated Debentures and the New Senior Notes as "securities."

(a) Treatment of Exchange as Recapitalization. If, for federal income tax purposes, both the Group Subordinated Debentures and the New Senior Notes constitute "securities," the receipt by a holder of an Allowed TOPrS Interest of New Senior Notes in partial satisfaction of the holder's allocable share of the Group Subordinated Debentures would be a "recapitalization" for federal income tax purposes. As a consequence, in general, the holder would not recognize loss upon such exchange, but would recognize gain (computed as described below, under C.2.(b), Treatment of Exchange as Non-Recapitalization), if any, to the extent of Cash received in the exchange, excluding the portion thereof allocable to accrued but unpaid dividends. (See the discussion below for the tax consequences of the receipt of Cash in respect of accrued and unpaid prepetition and postpetition dividends attributable to the Allowed TOPrS Interests.) The character and timing of such gain would also be determined in accordance with the principles discussed below with respect to treatment of the exchange as a non-recapitalization.

If the exchange by holders of Allowed TOPrS Interests is treated as a "recapitalization," a holder will have an aggregate tax basis in the New Senior Notes received equal to the holder's adjusted tax basis in its Allowed TOPrS Interest (including any claim for accrued but unpaid dividends) increased by any gain or income

recognized in respect thereof, and decreased by the amount of Cash received (including to the extent allocable to accrued and unpaid dividends) and any deductions claimed in respect of any previously accrued and unpaid dividends. A holder's holding period for New Senior Notes in this instance will include that holder's holding period for the Allowed TOPrS Interest. 

(b) Treatment of Exchange as Non-Recapitalization. On the other hand, it is possible that, for federal income tax purposes, either the Group Subordinated Notes or the New Senior Notes will not be treated as "securities." In that case, holders of Allowed TOPrS Interests who receive Cash and New Senior Notes will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Interest (other than any claim for accrued but unpaid dividends), and (ii) the holder's adjusted tax basis in its Interest (excluding the portion, if any, of such tax basis allocable to accrued but unpaid dividends). (See the discussion below for the tax consequences of the receipt of Cash in respect of accrued and unpaid dividends attributable to the Allowed TOPrS Interests.)

For these purposes, the "amount realized" by a holder will equal the sum of the Cash and the "issue price" of any New Senior Notes received by the holder (see discussion above concerning the "issue price" of the New Senior Notes, captioned Treatment of Interest and Original Issue Discount). Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction. A holder's tax basis in any New Senior Notes received will equal the "issue price" of such notes. If the exchange is not treated as a recapitalization, the holding period for New Senior Notes generally will begin the day following the issuance thereof.

(c) Distribution in Discharge of Accrued Dividends. As noted above, holders of the Allowed TOPrS Interests are treated, for tax purposes, as holding direct interests in the underlying Group Subordinated Debentures; as such, payments under the Plan for accrued and unpaid dividends should be treated as payments to holders of the underlying interest. Pursuant to the Plan, holders of Allowed TOPrS Interests will receive a Cash distribution equal to 75% of the amount of accrued and unpaid dividends attributable to such Interests. There is no assurance that such allocation would be respected by the IRS. In general, to the extent that any amount received (whether Cash or other property) by a holder of debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Interest is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid dividends (or interest) for tax purposes.

(d) Market Discount. A holder that purchased its Interest from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

To the extent that a holder's Interest constitutes a "security" and is exchanged in a "recapitalization" for federal income tax purposes, the Treasury Department is expected to promulgate regulations that will provide that any accrued "market discount" not treated as ordinary income upon such exchange would carry over to the nonrecognition property received in the exchange. If such regulations are promulgated and applicable to the Plan (and arguably even without issuance of regulations), any holder of an Interest that is exchanged in a "recapitalization" would carry over any accrued market discount incurred in respect of such Interest to the New Senior Notes received, such that any gain recognized by the holder upon a subsequent disposition of such New Senior Notes would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

(e) Ownership and Disposition of the New Senior Notes. Generally, the federal income tax consequences to a holder of an Allowed TOPrS Interest of owning and disposing of a New Senior Note will be the same as those applicable to the holders of Allowed General Unsecured Claims (subject to the discussion above regarding market discount in the event the exchange by holders of such Interests is treated as a "recapitalization"). For a discussion of the tax treatment of owning and disposing of the New Senior Notes, see the discussion above captioned Ownership and Disposition of the New Senior Notes.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XII.

## CONCLUSION

This Disclosure Statement has been prepared and presented for the purpose of permitting all creditors and stockholders to make an informed judgment to accept or reject the Plan. Please read this Disclosure Statement and the Plan in full and consult with your counsel if you have questions.

If the Plan is confirmed, its terms and conditions will be binding on all creditors and stockholders whether or not they accept the Plan and whether or not they receive distributions under the Plan. The Debtors believe that acceptance of the Plan by creditors and stockholders is in their best interest and that confirmation of the Plan will provide the best recovery for creditors and stockholders.

The FINOVA Group Inc., et al.,
Debtors

/s/ William J. Hallinan

By: ______________________________
William J. Hallinan
Authorized Officer for the Debtors

Richards, Layton & Finger, P.a.

/s/ Deborah E. Spivack

By: ______________________________
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Deborah E. Spivack (No. 3220)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 658-6541
Facsimile: (302) 658-6548

-and-

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
Thayer H. Thompson
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for Debtors

Dated: June 13, 2001
Wilmington, Delaware

# EXHIBIT B

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re: Chapter 11

The FINOVA Group Inc.,
FINOVA Capital Corporation,
FINOVA (Canada) Capital Corporation,
FINOVA Capital plc,
FINOVA Loan Administration Inc.,
FINOVA Mezzanine Capital Inc.,
FINOVA Portfolio Services, Inc.,
FINOVA Technology Finance, Inc., and
FINOVA Finance Trust,

Debtors.

Case Nos. 01-0697 (PJW) through 01-0705 (PJW)

Jointly Administered
Case No. 01-0697 (PJW)

THIRD AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION
OF DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

RICHARDS, LAYTON & FINGER, P.A.

Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Deborah E. Spivack (No. 3220)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899

Telephone: (302) 658-6541
Facsimile: (302) 658-6548

GIBSON, DUNN & CRUTCHER LLP

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
The Met Life Building
200 Park Avenue
New York, New York 10166-0193

Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Counsel for Debtors
Dated: June 13, 2001

TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| INTRODUCTION | | | 7 |
| ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION | | | 7 |
| A. | Scope of Definitions | | 7 |
| B. | Definitions | | 7 |
| | 1.1. | Additional Group Common Stock | 7 |
| | 1.2. | Additional Mezzanine Common Stock | 7 |
| | 1.3. | Administrative Bar Date | 7 |
| | 1.4. | Administrative Claim | 7 |
| | 1.5. | Affiliate | 7 |
| | 1.6. | Allowed | 7 |
| | 1.7. | Allowed Claim | 7 |
| | 1.8. | Allowed Interest | 8 |
| | 1.9. | Ballot | 8 |
| | 1.10. | Bank Claims | 8 |
| | 1.11. | Bank Credit Agreements | 8 |
| | 1.12. | Bankruptcy Code | 8 |
| | 1.13. | Bankruptcy Court | 8 |
| | 1.14. | Bankruptcy Rules | 8 |
| | 1.15. | Bar Date | 8 |
| | 1.16. | Bar Date Order | 8 |
| | 1.17. | Berkadia | 8 |
| | 1.18. | Berkadia Credit Agreement | 8 |
| | 1.19. | Berkadia Loan | 8 |
| | 1.20. | Berkadia Loan Documents | 8 |
| | 1.21. | Berkadia Parties | 9 |
| | 1.22. | Berkshire | 9 |
| | 1.23. | Business Day | 9 |
| | 1.24. | Cash or $ | 9 |
| | 1.25. | Chapter 11 Case | 9 |
| | 1.26. | Claim | 9 |
| | 1.27. | Class | 9 |
| | 1.28. | Commitment Letter | 9 |
| | 1.29. | Confirmation | 9 |
| | 1.30. | Confirmation Date | 9 |
| | 1.31. | Confirmation Hearing | 9 |
| | 1.32. | Confirmation Order | 9 |
| | 1.33. | Convenience Claim | 9 |
| | 1.34. | Contingent Interest | 9 |
| | 1.35. | Creditor | 9 |
| | 1.36. | Cure Amount | 9 |
| | 1.37. | Debt Securities | 9 |
| | 1.38. | Debt Securities Claims | 9 |
| | 1.39. | Debt Securities (S) 510(b) Claims | 9 |
| | 1.40. | Debt Securities Indentures | 10 |
| | 1.41. | Dilutive Issuance | 10 |
| | 1.42. | Debtor | 10 |
| | 1.43. | Disbursing Agent | 10 |
| | 1.44. | Disclosure Statement | 10 |

| | | Page |
|---|---|---|
| 1.45. | Disputed Claim | 10 |
| 1.46. | Distribution Address | 10 |
| 1.47. | Distribution Date | 10 |
| 1.48. | Distribution Record Date | 10 |
| 1.49. | Effective Date | 10 |
| 1.50. | Equity Securities (S) 510(b) Claims | 10 |
| 1.51. | Estate | 10 |
| 1.52. | Excess Amount | 10 |
| 1.53. | Final Order | 10 |
| 1.54. | FNV Canada | 11 |
| 1.55. | FNV Capital | 11 |
| 1.56. | FNV Capital Intercompany Loans | 11 |
| 1.57. | FNV Group | 11 |
| 1.58. | FNV Loan | 11 |
| 1.59. | FNV Mezzanine | 11 |
| 1.60. | FNV Portfolio | 11 |
| 1.61. | FNV Technology | 11 |
| 1.62. | FNV Trust | 11 |
| 1.63. | FNV UK | 11 |
| 1.64. | Fully Diluted Basis | 11 |
| 1.65. | General Unsecured Claim | 11 |
| 1.66. | Group Subordinated Debentures | 11 |
| 1.67. | Group Subordinated Debenture Claim | 11 |
| 1.68. | Group Subordinated Debenture Indenture | 12 |
| 1.69. | Indenture Trustees | 12 |
| 1.70. | Intercompany Note | 12 |
| 1.71. | Intercompany Claim | 12 |
| 1.72. | Interest | 12 |
| 1.73. | IRS | 12 |
| 1.74. | Leucadia | 12 |
| 1.75. | Leveraged Leases | 12 |
| 1.76. | Letter Agreement | 12 |
| 1.77. | Lien | 12 |
| 1.78. | Loan Commitments | 12 |
| 1.79. | Management Agreement | 12 |
| 1.80. | New Corporate Documents | 12 |
| 1.81. | New Group Preferred Stock | 12 |
| 1.82. | New Senior Notes | 12 |
| 1.83. | New Senior Notes Indenture | 12 |
| 1.84. | Objection | 12 |
| 1.85. | Official Committees | 12 |
| 1.86. | Ordinary Course of Business Order | 13 |
| 1.87. | Ordinary Course Professional | 13 |
| 1.88. | Ordinary Course Professional Order | 13 |
| 1.89. | Other Priority Claim | 13 |
| 1.90. | Person | 13 |
| 1.91. | Petition Date | 13 |
| 1.92. | Plan | 13 |
| 1.93. | Plan Supplement | 13 |
| 1.94. | Priority Tax Claim | 13 |
| 1.95. | Professionals | 13 |

Page

1.96. Professional Fees....................................... 13
1.97. Pro Rata Share.......................................... 13
1.98. Reinstated or Reinstatement............................. 14
1.99. Reorganized............................................. 14
1.100. Restructuring Documents................................ 14
1.101. Restructuring Transactions............................. 14
1.102. Retirement Agreements.................................. 14
1.103. Retirement Plan........................................ 14
1.104. Rights Plan............................................ 14
1.105. Schedules.............................................. 14
1.106. Secondary Liability Claim.............................. 14
1.107. Secured Claim.......................................... 14
1.108. Securities Litigation.................................. 14
1.109. Tax Code............................................... 15
1.110. TOPrS.................................................. 15
1.111. TOPrS Interests........................................ 15
1.112. Unclaimed Property..................................... 15
1.113. Voting Deadline........................................ 15
1.114. Voting Record Date..................................... 15
C. Rules of Interpretation........................................ 15
D. Computation of Time............................................ 15

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS........... 15
2.1. Administrative Claims.................................... 15
2.2. Bar Date for Administrative Claims....................... 16
2.3. Professional Compensation and Expense Reimbursement Claims.................................................. 16
2.4. Priority Tax Claims...................................... 16

ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS................... 17
3.1. FNV Group Plan........................................... 17
3.2. FNV Capital Plan......................................... 17
3.3. FNV Canada Plan.......................................... 17
3.4. FNV UK Plan.............................................. 18
3.5. FNV Loan Plan............................................ 18
3.6. FNV Mezzanine Plan....................................... 18
3.7. FNV Portfolio Plan....................................... 18
3.8. FNV Technology Plan...................................... 19
3.9. FNV Trust Plan........................................... 19

ARTICLE IV. IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS............................................................ 19
4.1. Unimpaired Classes of Claims and Interests............... 19
4.2. Impaired Classes of Claims and Interests................. 20
4.3. Impairment Dispute....................................... 20

ARTICLE V. TREATMENT OF CLAIMS AND INTERESTS.......................... 21
5.1. FNV Group Plan........................................... 21
5.2. FNV Capital Plan......................................... 22
5.3. FNV Canada Plan.......................................... 22
5.4. FNV UK Plan.............................................. 23
5.5. FNV Loan Plan............................................ 23
5.6. FNV Mezzanine Plan....................................... 24
5.7. FNV Portfolio Plan....................................... 25
5.8. FNV Technology Plan...................................... 25

| | | Page |
|---|---|---|
| 5.9. | FNV Trust Plan | 26 |
| 5.10. | Debtor's Election of Claim Treatment | 27 |
| 5.11. | Special Provisions Regarding Treatment of Certain Claims | 27 |
| ARTICLE VI. THE RESTRUCTURING TRANSACTION AND THE EFFECT OF THE PLAN ON CLAIMS AND INTERESTS | | 29 |
| 6.1. | Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors | 29 |
| 6.2. | The Restructuring Transactions | 29 |
| 6.3. | Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs | 30 |
| 6.4. | Obtaining Cash and Securities for Plan Distributions and Transfers of Funds and Securities Among the Debtors | 32 |
| 6.5. | Preservation of Rights of Action | 32 |
| 6.6. | Effect of Plan on Certain Securities | 32 |
| 6.7. | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 32 |
| ARTICLE VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 33 |
| 7.1. | Executory Contracts and Unexpired Leases to be Rejected | 33 |
| 7.2. | Executory Contracts and Unexpired Leases to be Assumed | 33 |
| 7.3. | Special Executory Contract and Unexpired Lease Issues and Treatment of the Retirement Plan | 34 |
| ARTICLE VIII. PROVISIONS REGARDING VOTING AND CONFIRMATION REQUIREMENTS | | 35 |
| 8.1. | Voting of Claims and Interests | 35 |
| 8.2. | Confirmability and Severability of Plan | 35 |
| 8.3. | Nonconsensual Confirmation | 36 |
| ARTICLE IX. IMPLEMENTATION OF THE PLAN | | 36 |
| 9.1. | General Distribution Provisions | 36 |
| 9.2. | Method of Making Distributions to Disputed Claims and Disputed Interests | 38 |
| 9.3. | Estimation of Disputed Claims | 38 |
| 9.4. | Treatment of Unclaimed Property | 38 |
| 9.5. | Surrender of Instruments, Securities and Other Documentation | 38 |
| ARTICLE X. DISCHARGE, TERMINATION, INJUNCTION AND RELEASES | | 39 |
| 10.1. | Discharge of Debtors | 39 |
| 10.2. | Injunction Related to the Discharge | 39 |
| 10.3. | Release of Liens | 40 |
| 10.4. | Term of Bankruptcy Injunction or Stays | 40 |
| 10.5. | Releases | 40 |
| ARTICLE XI. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE | | 41 |
| 11.1. | Conditions to Confirmation | 41 |
| 11.2. | Conditions to the Effective Date | 41 |
| 11.3. | Waiver of Conditions | 42 |
| 11.4. | Effect of Failure of Conditions | 42 |
| ARTICLE XII. ADMINISTRATIVE PROVISIONS | | 42 |
| 12.1. | Retention of Jurisdiction | 42 |
| ARTICLE XIII. MISCELLANEOUS PROVISIONS | | 43 |
| 13.1. | Plan Supplement | 43 |
| 13.2. | Termination of Official Committees | 43 |
| 13.3. | Employment and Payment of Debtors' Professionals After Effective Date | 43 |

| | | Page |
|---|---|---|
| 13.4. | Limitation of Liability........................... | 43 |
| 13.5. | Amendment or Modification of Plan................. | 44 |
| 13.6. | Severability...................................... | 44 |
| 13.7. | Inconsistency..................................... | 44 |
| 13.8. | Revocation or Withdrawal of Plan.................. | 44 |
| 13.9. | Governing Law..................................... | 44 |
| 13.10. | Binding Effect.................................... | 45 |
| 13.11. | Headings.......................................... | 45 |
| 13.12. | Notices........................................... | 45 |

| | |
|---|---|
| Exhibit 1.11 | -- Bank Credit Agreements |
| Exhibit 1.37 | -- Debt Securities |
| Exhibit 1.69 | -- Indenture Trustees |
| Exhibit 1.75 | -- Leveraged Leases |
| Exhibit 1.81 | -- New Group Preferred Stock Term Sheet |
| Exhibit 6.2(a) | -- Berkadia Loan Term Sheet (Loan Documents to be provided in Plan Supplement) |
| Exhibit 6.2(c)(1) | -- New Senior Notes Term Sheet (Indenture to be provided in Plan Supplement) |
| Exhibit 6.2(c)(2) | -- Intercompany Note Term Sheet (Intercompany Note to be provided in Plan Supplement) |
| Exhibit 6.3(a) | -- New Corporate Documents (to be provided in Plan Supplement) |
| Exhibit 6.3(b) | -- Board of Directors for FNV Group (to be provided in Plan Supplement) |
| Exhibit 6.3(c) | -- Board of Directors for other Debtors (to be provided in Plan Supplement) |
| Exhibit 7.1 | -- List of Rejected Executory Contracts/Unexpired Leases (to be provided in Plan Supplement) |
| Exhibit 7.2 | -- List of Assumed Executory Contracts/Unexpired Leases (to be provided in Plan Supplement) |

INTRODUCTION

The FINOVA Group Inc. and the other debtors in the above-captioned jointly administered chapter 11 cases (collectively, the "Debtors") propose the following third amended and restated plan of reorganization (the "Plan") for the resolution of the Debtors' outstanding creditor claims and equity interests. Reference is made to the Debtors' third amended and restated disclosure statement, filed contemporaneously with the Plan (the "Disclosure Statement"), for a discussion of the Debtors' history, businesses, properties, results of operations and projections for future operations, and for a summary and analysis of the Plan and certain related matters. The Debtors are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, 11 U.S.C. (S) 1129. All holders of claims against and equity interests in the Debtors are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.

ARTICLE I.

DEFINED TERMS AND RULES OF INTERPRETATION

A. Scope of Definitions

For purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

B. Definitions

1.1. Additional Group Common Stock means the common stock of Reorganized FNV Group to be issued pursuant to the Plan, which common stock shall have a par value of $0.01 per share.

1.2. Additional Mezzanine Common Stock means the common stock of Reorganized FNV Mezzanine that may be issued pursuant to the Plan, which common stock shall have a par value of $1.00 per share.

1.3. Administrative Bar Date shall have the meaning set forth in Section 2.2.

1.4. Administrative Claim means a Claim for costs and expenses of administration allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the respective Estates and operating the businesses of the Debtors; (b) the costs of curing defaults under leases and executory contracts assumed pursuant to Article VII; (c) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under section 330(a) or 331 of the Bankruptcy Code; (d) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. (S)(S) 1911-1930; and (e) all Intercompany Claims arising on or after the Petition Date.

1.5. Affiliate means an "affiliate," as defined in section 101(2) of the Bankruptcy Code.

1.6. Allowed means an Allowed Claim or an Allowed Interest in a particular Class or specified category.

1.7. Allowed Claim means

(a) a Claim against a Debtor, proof of which was filed on or before the Bar Date, as to which no Objection has been timely interposed; or

(b) a Claim against a Debtor, for which no proof of Claim or motion for allowance of Claim was filed on or before the Bar Date, that has been or hereafter is listed by a Debtor in its Schedules (as such Schedules may be amended from time to time) as liquidated in amount and not disputed or contingent as to liability, and as to which no Objection has been timely interposed; or

(c) any other Claim against a Debtor, to the extent that such Claim has been allowed (i) by a Final Order (including any such order that is termed "Stipulation and Order"); or (ii) pursuant to the express terms of this Plan.

1.8. Allowed Interest means an Interest that (a) was registered or listed as of the Distribution Record Date in a stock register that is maintained by or on behalf of a Debtor and (b) either (i) has not been the subject of any Objection or (ii) has been allowed (A) by a Final Order (including any such order that is termed "Stipulation and Order") or (B) pursuant to the express terms of this Plan.

1.9. Ballot means the form or forms distributed by the Debtors to each holder of an impaired Claim or impaired Interest on which the holder is to indicate acceptance or rejection of this Plan.

1.10. Bank Claims means, collectively, all Claims asserted pursuant to the Bank Credit Agreements.

1.11. Bank Credit Agreements means, collectively, all prepetition credit agreements as listed and defined on Exhibit 1.11.

1.12. Bankruptcy Code means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases as filed on the Petition Date. No amendment to the Bankruptcy Code enacted after the Petition Date shall be applicable to these Chapter 11 Cases except to the extent that a statute expressly provides that the amendment shall have retroactive effect to cases pending on the Petition Date.

1.13. Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware or, if such court ceases to exercise jurisdiction over any Chapter 11 Case or proceeding thereof, such court or adjunct thereof having jurisdiction over such case or proceeding in lieu of the United States Bankruptcy Court for the District of Delaware.

1.14. Bankruptcy Rules means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as amended from time to time, as applicable to the Chapter 11 Cases as filed on the Petition Date. No amendment to the Bankruptcy Rules effected after the Petition Date shall be applicable to these Chapter 11 Cases except to the extent that a statute or rule expressly provides that the amendment shall have retroactive effect to cases pending on the Petition Date.

1.15. Bar Date means the applicable deadline by which a proof of Claim, proof of Interest or motion for allowance of Claim must have been or must be filed, as established by this Plan or an order of the Bankruptcy Court including, but not limited to, the Bar Date Order and the Confirmation Order. The term "Bar Date" shall include any applicable deadline for filing Administrative Claims, including Claims for Professional Fees, or Claims arising from rejection of executory contracts and unexpired leases.

1.16. Bar Date Order means an order or orders to be entered by the Bankruptcy Court setting procedures and a deadline for the filing of proofs of Claim, including any order regarding Administrative Claims, and, if appropriate, proofs of Interest.

1.17. Berkadia means Berkadia LLC, a Delaware limited liability company whose members are Berkshire and Leucadia or their respective subsidiaries.

1.18. Berkadia Credit Agreement shall have the meaning ascribed thereto in Section 6.2.

1.19. Berkadia Loan shall have the meaning ascribed thereto in Section 6.2(a).

1.20. Berkadia Loan Documents means the collective reference to the Berkadia Credit Agreement and any and all exhibits, schedules, instruments or other documents, including guarantees and pledge and security agreements, as well as all other collateral documents, created or executed pursuant thereto.

1.21. Berkadia Parties means Berkadia, Berkshire and/or Leucadia (or their respective subsidiaries, as shall be designated by Berkadia, Berkshire and Leucadia).

1.22. Berkshire means Berkshire Hathaway Inc., a Delaware corporation.

1.23. Business Day means any day, other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a).

1.24. Cash or $ means legal tender of the United States of America and equivalents thereof, except as specified in Section 9.1(c).

1.25. Chapter 11 Case means the case of any Debtor under chapter 11 of the Bankruptcy Code, as currently being administered in the Bankruptcy Court under Chapter 11 Case Nos. 01-0697 (PJW) through 01-0705 (PJW).

1.26. Claim means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.27. Class means a category of holders of Claims or Interests, as described in Article III.

1.28. Commitment Letter means that certain Commitment Letter among Berkshire, Leucadia, Berkadia, FNV Group and FNV Capital, dated February 26, 2001, including all documents annexed thereto, as amended and modified by letter agreements dated May 2, 2001, May 30, 2001 and June 10, 2001 and by the Letter Agreement, as approved by the Bankruptcy Court on June 13, 2001, and as the Commitment Letter and annexed documents may be or may have been further amended, modified or supplemented from time to time.

1.29. Confirmation means issuance by the Bankruptcy Court of the Confirmation Order.

1.30. Confirmation Date means the date on which the Bankruptcy Court issues the Confirmation Order.

1.31. Confirmation Hearing means the hearing held by the Bankruptcy Court to consider Confirmation, as such hearing may be adjourned or continued from time to time.

1.32. Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.33. Convenience Claim means (a) an Allowed General Unsecured Claim (other than a Bank Claim or Debt Securities Claim) in an amount equal to or less than $25,000 or (b) an Allowed General Unsecured Claim (other than a Bank Claim or Debt Securities Claim) in an amount greater than $25,000 where the holder of such claim has made an election to reduce the Allowed amount of such Claim to $25,000 or less pursuant to Section 5.11(d).

1.34. Contingent Interest means the Pro Rata Share of an aggregate of up to $100 million that the holders of the New Senior Notes may have the right to receive pursuant to the terms of the New Senior Notes.

1.35. Creditor means the holder of a Claim.

1.36. Cure Amount means the amount necessary to cure defaults in any assumed executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.37. Debt Securities means the prepetition debt instruments listed on Exhibit 1.37, including all public notes issued by FNV Capital.

1.38. Debt Securities Claims means, collectively, all Claims (other than Claims within the scope of section 510(b) of the Bankruptcy Code) asserted by holders of Debt Securities or pursuant to Debt Securities Indentures.

1.39. Debt Securities (S) 510(b) Claims means, collectively, (a) all Claims asserted in the Securities Litigation on account of or for the benefit of the current or former holders of Debt Securities and (b) all other

Claims within the scope of section 510(b) of the Bankruptcy Code asserted by, on account of, or for the benefit of current or former holders of Debt Securities, whether or not outstanding on the Petition Date.

1.40. Debt Securities Indentures means, collectively, all indentures pursuant to which the Debt Securities were issued.

1.41. Dilutive Issuance shall have the meaning ascribed thereto in Section 5.11(f).

1.42. Debtor means any of the above-captioned debtors and debtors in possession.

1.43. Disbursing Agent means each Reorganized Debtor in its individual case, or its designee, or, in the case of FNV Trust, the Indenture Trustee for the Group Subordinated Debentures.

1.44. Disclosure Statement means the disclosure statement relating to the Plan including all exhibits and schedules thereto and all documents incorporated by reference therein, in the form approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

1.45. Disputed Claim means a Claim that (a) is not Allowed and (b) has not been disallowed or otherwise expunged by a Final Order.

1.46. Distribution Address shall mean the address to which a particular distribution is to be mailed pursuant to Section 9.1(a).

1.47. Distribution Date, when used with respect to each Claim and Interest, means the date of, or as soon as practicable after, the later of (a) the Effective Date and (b) 30 days after the date upon which the Claim or Interest becomes an Allowed Claim or Allowed Interest.

1.48. Distribution Record Date means the Confirmation Date.

1.49. Effective Date means the fifth Business Day, or such other day as shall be determined by the Debtors and Berkadia (in consultation with the Official Committees), after the satisfaction or waiver of all of the conditions specified in Section 11.2 other than those conditions to be satisfied or waived on the Effective Date.

1.50. Equity Securities (S) 510(b) Claims means, collectively, (a) all Claims asserted in the Securities Litigation on account of or for the benefit of current or former holders of Interests or equity securities of any Debtor or predecessor thereof and (b) all other Claims within the scope of section 510(b) of the Bankruptcy Code asserted by, on account of, or for the benefit of current or former holders of Interests or equity securities of any Debtor or predecessor thereof, whether or not outstanding on the Petition Date.

1.51. Estate means, as to each Debtor, the estate created for that Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.52. Excess Amount means, with respect to Allowed Debt Securities (S) 510(b) Claims and Allowed Equity Securities (S) 510(b) Claims against any Debtor, the dollar amount, if any, that is the sole responsibility of that Debtor, in excess of, apart from or in connection with amounts which are or may be payable by, or obligations under, insurance policies available to satisfy such claims.

1.53. Final Order means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, administrative agency or other tribunal, as entered on the docket in any Chapter 11 Case or such other court, (a) which has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek certiorari or move for reargument or rehearing has expired, and no appeal, petition for certiorari, or motion for reargument or rehearing has been timely taken, or (b) as to which any appeal has been taken, any petition for certiorari or motion for reargument or rehearing has been filed, and such appeal, petition or motion has been conclusively withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument or rehearing was sought.

1.54. FNV Canada means FINOVA (Canada) Capital Corporation, a Canadian corporation, the Debtor in Chapter 11 Case No. 01-0699 (PJW).

1.55. FNV Capital means FINOVA Capital Corporation, a Delaware corporation, the Debtor in Chapter 11 Case No. 01-0698 (PJW).

1.56. FNV Capital Intercompany Loans means (a) the note made by FNV UK in favor of FNV Capital pursuant to that certain agreement dated on December 22, 1999 between FNV Capital and FNV UK and (b) the note made by FNV UK in favor of FNV Capital pursuant to that certain agreement dated March 19, 1992 among Greyhound Financial Corporation (predecessor-in-interest to FNV Capital) and Greyhound Bank plc and Greyhound Financial Services Limited (predecessors-in-interest to FNV UK).

1.57. FNV Group means The FINOVA Group Inc., a Delaware corporation, the Debtor in Chapter 11 Case No. 01-0697 (PJW).

1.58. FNV Loan means FINOVA Loan Administration Inc., a Utah corporation, the Debtor in Chapter 11 Case No. 01-0701 (PJW).

1.59. FNV Mezzanine means FINOVA Mezzanine Capital Inc., a Tennessee corporation, the Debtor in Chapter 11 Case No. 01-0702 (PJW).

1.60. FNV Portfolio means FINOVA Portfolio Services, Inc., an Arizona corporation, the Debtor in Chapter 11 Case No. 01-703 (PJW).

1.61. FNV Technology means FINOVA Technology Finance, Inc., a Delaware corporation, the Debtor in Chapter 11 Case No. 01-704 (PJW).

1.62. FNV Trust means FINOVA Finance Trust, a Delaware business trust, the Debtor in Chapter 11 Case No. 01-705 (PJW).

1.63. FNV UK means FINOVA Capital plc, a United Kingdom corporation, the Debtor in Chapter 11 Case No. 01-700 (PJW).

1.64. Fully Diluted Basis means, with respect to the calculation of a percentage of stock ownership at any date, such calculation performed (a) assuming the exercise of all options, warrants and rights of conversion or exchange that were not cancelled or expunged by the Plan and that are outstanding or in effect as of the Effective Date and as of the date of calculation, provided, however, that for the purposes of this calculation no effect shall be given to potential issuances of Additional Common Stock to Securities Litigation claimants, unless, until and except to the extent that such stock is actually issued, and (b) giving effect to all actual issuances of stock pursuant to the Plan, whether on or after the Effective Date, but not giving effect to any post-Effective Date issuance of stock not expressly contemplated and required by the Plan.

1.65. General Unsecured Claim means a Claim that is not secured by a valid, perfected and enforceable Lien against property of a Debtor (including, without limitation, any Debt Securities Claim, Bank Claim or Intercompany Claim), other than an Administrative Claim, a Debt Securities (S) 510(b) Claim, an Equity Securities (S) 510(b) Claim, a Group Subordinated Debentures Claim, an Other Priority Claim, or a Priority Tax Claim.

1.66. Group Subordinated Debentures means the 5 1/2% Convertible Subordinated Debentures due 2016 issued by FNV Group pursuant to the Group Subordinated Debenture Indenture.

1.67. Group Subordinated Debenture Claim means, collectively, all claims asserted pursuant to the Group Subordinated Debentures.

1.68. Group Subordinated Debenture Indenture means the Indenture between FNV Group and Fleet National Bank, as Trustee, dated as of December 11, 1996 providing for the issuance of 5 1/2% Convertible Subordinated Debentures due 2016.

1.69. Indenture Trustees means, collectively, all indenture trustees as listed and defined on Exhibit 1.69, or their successors.

1.70. Intercompany Note shall have the meaning set forth in Section 6.2(c).

1.71. Intercompany Claim means a Claim held by a Debtor or an Affiliate that arose, either before or after the Petition Date, under any intercompany transaction as reflected in the Debtors' books and records.

1.72. Interest means the rights of the holders of shares of equity securities of any Debtor authorized, issued and outstanding as of the Petition Date.

1.73. IRS means the Internal Revenue Service.

1.74. Leucadia means Leucadia National Corporation, a New York corporation.

1.75. Leveraged Leases means the leases set forth on the attached Exhibit 1.75, as such Exhibit may be amended from time to time before Confirmation.

1.76. Letter Agreement means the letter agreement dated June 13, 2001 among Berkadia, Berkshire, Leucadia, FNV Group and FNV Capital modifying, subject to Bankruptcy Court approval, certain terms of the Berkadia Loan and the New Senior Notes.

1.77. Lien has the meaning set forth in section 101(37) of the Bankruptcy Code; provided, however, that a lien avoided in accordance with sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code shall not constitute a Lien.

1.78. Loan Commitments means the commitments by each of the Debtors or any of their Affiliates to make loans, advances or other financial accommodations to their customers.

1.79. Management Agreement means that certain Second Amended and Restated Management Services Agreement, dated as of June 10, 2001, among FNV Group, Leucadia and Leucadia International Corporation, a Utah corporation, as amended, supplemented or otherwise modified.

1.80. New Corporate Documents shall have the meaning set forth in Section 6.3(a).

1.81. New Group Preferred Stock means preferred stock of Reorganized FNV Group that may be issued to holders of Allowed Claims in Class FNV Capital-5 (Debt Securities (S) 510(b) Claims against FNV Capital), which shall have the terms and rights set forth in Exhibit 1.81.

1.82. New Senior Notes means the secured notes to be issued by FNV Group pursuant to the New Senior Notes Indenture substantially in the form provided therein.

1.83. New Senior Notes Indenture means the indenture to be entered into between FNV Group and the trustee named therein, substantially in the form of Exhibit 6.2(c).

1.84. Objection means an objection to the allowance of a Claim or Interest interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court.

1.85. Official Committees means the committees of creditors and equity security holders that are or may be appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as the same may be constituted from time to time.

1.86. Ordinary Course of Business Order means the Order (1) Authorizing the Debtors to (A) Renew, Increase and/or Fund Prepetition Commitments, (B) Honor Existing Servicing Obligations in the Ordinary Course of Business, (C) Sell or Lease Assets in the Ordinary Course of Business, (D) Manage Loan Portfolios in the Ordinary Course of Business, (E) Make Intercompany Loans, Payments and Transfers in the Ordinary Course of Business and (F) Pay Prepetition Claims to Preserve, Enhance and Maximize the Value of Estate Assets and/or to Effectuate Approved Transactions and (2) Authorizing and Directing Banks to Honor Checks and Fund Transfer Requests Relating to Such Approved Transactions, dated March 7, 2001.

1.87. Ordinary Course Professional means a professional retained by a Debtor pursuant to the Ordinary Course Professional Order.

1.88. Ordinary Course Professional Order means the Order Superseding March 7, 2001 Order Pursuant to 11 U.S.C. (S)(S) 105 and 327 Authorizing Retention and Compensation of Professionals Utilized in Ordinary Course of Business, dated March 30, 2001, and any subsequent amendments thereto or notices filed pursuant thereto authorizing the Debtors to retain, employ and compensate certain professionals in the ordinary course of the Debtors' businesses.

1.89. Other Priority Claim means a Claim (or portion thereof), if any, entitled to priority under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

1.90. Person means any individual, entity, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, estate, trust, unincorporated association or organization, Official Committee, ad hoc committee, governmental agency or political subdivision thereof, the United States Trustee, and any successors or assigns of any of the foregoing.

1.91. Petition Date means March 7, 2001, the date on which the Debtors commenced the Chapter 11 Cases.

1.92. Plan means this third amended and restated plan of reorganization for each of the Debtors, to the extent applicable to any Debtor, and all exhibits and schedules annexed hereto or referenced herein, as the same may be amended, modified or supplemented.

1.93. Plan Supplement means the supplement, containing copies of certain exhibits or schedules to the Plan, which shall be filed with the Bankruptcy Court pursuant to Section 13.1.

1.94. Priority Tax Claim means any Claim of a governmental unit entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.95. Professionals means those Persons (a) employed pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code, for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(1) of the Bankruptcy Code or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.96. Professional Fees means the fees for professional services rendered, and expenses incurred in connection with such services, by Professionals.

1.97. Pro Rata Share means the proportion that the amount of any Claim or Interest in a particular Class bears to the aggregate amount of all Claims or Interests in that Class, as of the date of determination, or, when used with respect to an Allowed Claim or Allowed Interest, the proportion that the amount of any Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in that Class.

1.98. Reinstated or Reinstatement means rendering a Claim or Interest "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

1.99. Reorganized means, when used with reference to a particular Debtor, such Debtor on and after the Effective Date.

1.100. Restructuring Documents means the collective reference to the Commitment Letter and to the Berkadia Loan Documents, the New Senior Notes Indenture, the Management Agreement, the Intercompany Note, and any and all exhibits, schedules, instruments or other documents, including collateral documents, created or executed pursuant thereto.

1.101. Restructuring Transactions means the transactions described in Section 6.2.

1.102. Retirement Agreements means (i) existing ERISA-qualified pension plans of any Debtor; (ii) existing unqualified Supplemental Employee Retirement Plans of any Debtor, (iii) existing obligations of FNV UK under individual pension arrangements with current or former employees, (iv) employer obligations under existing 401(k) plans of any Debtor and (v) existing retiree medical plans of any Debtor.

1.103. Retirement Plan means The FINOVA Group Inc. Pension Plan, a tax qualified defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. (S)(S)1301 et seq. (1994 & Supp. IV 1988).

1.104. Rights Plan means the Rights Plan of FNV Group dated as of February 15, 1992, as amended and restated as of September 14, 1995, as further amended from time to time.

1.105. Schedules means the Debtors' schedules of assets and liabilities and statements of financial affairs, as they may be amended from time to time, filed with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.

1.106. Secondary Liability Claim means a Claim against a Debtor as a guarantor of, or otherwise being jointly, severally, or secondarily liable for, any contractual, tort or other obligation of another Debtor, including any Claim based on: (a) guaranties of collection, payment or performance of an obligation of another Debtor; (b) indemnity bonds, obligations to indemnify or obligations to hold harmless; (c) performance bonds; (d) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or other transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor relating to the obligations or performance of another Debtor; (e) vicarious liability; or (f) any other joint or several liability that any Debtor may have in respect of any obligation of another Debtor that is the basis of a Claim.

1.107. Secured Claim means any Claim that is (a) secured by a valid, perfected and enforceable Lien on or against property of a Debtor's Estate, but only to the extent of the value (as agreed to by the holder of such Claim and the Debtor or as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code) of the Claim holder's interest in the Estate's interest in the property securing the Claim or (b) subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the amount subject to setoff and only if a valid proof of secured claim reflecting the setoff right is filed on or before the Bar Date.

1.108. Securities Litigation means the following actions currently pending against the Debtors and/or their current or former officers and directors for alleged violations of securities laws and/or breaches of fiduciary duty: (i) In re FINOVA Group Inc. Securities Litigation, No. CIV 00-619-PHX-SMM, currently pending in the United States District Court for the District of Arizona; (ii) Cartwright v. Sirrom Capital Corp., et al., No. CIV 01-158-PHX-SMM, currently pending in the United States District Court for the District of Arizona, consolidated for all purposes with In re FINOVA Group, Inc. Securities Litigation; (iii) Sirrom Partners and Sirrom G-1 v. The FINOVA Group Inc., et al., No. CIV 01-152-PHX-SMM, currently pending in the United States District Court for the District of Arizona, consolidated for pretrial purposes with In re FINOVA Group Inc. Securities Litigation; (iv) William Kass v. Matthew M. Breyne, et al., No. 18306-NC, currently pending in the Court of Chancery in

New Castle County, Delaware; (v) Cindy Burkholder, et al. v. Samuel L. Eichenfield, et al., No. CIV 00-1737-PHX-LOA, currently pending in the United States District Court for the District of Arizona; and, (vi) Ronald Benkler v. George M. Miller, II, et al., No. 00C2630, currently pending in the Circuit Court for the State of Tennessee, 20th Judicial District.

1.109. Tax Code means the Internal Revenue Code of 1986, as amended.

1.110. TOPrS means the outstanding Trust Originated Preferred Securities issued by FNV Trust.

1.111. TOPrS Interests means all equitable interests and legal or contractual rights held by the holders of the TOPrS.

1.112. Unclaimed Property shall have the meaning set forth in Section 9.4(a).

1.113. Voting Deadline means August 1, 2001.

1.114. Voting Record Date means June 13, 2001.

C. Rules of Interpretation

For purposes of this Plan (1) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (2) any reference in the Plan to an existing exhibit or schedule to the Plan or document referenced therein means such exhibit, schedule or document as it may have been or may be amended, modified or supplemented, (3) unless otherwise specified, all references in the Plan to Schedules, Exhibits, Articles and Sections are references to Schedules, Exhibits, Articles and Sections of or to the Plan, (4) the words "herein," "hereof," "hereunder," "hereto" and other words of similar import refer to the Plan in its entirety rather than to a particular portion of the Plan, (5) whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, (6) whenever it appears appropriate from the context, each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter, (7) whenever it appears appropriate from the context, each reference to a Debtor includes the applicable Reorganized Debtor and (8) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

D. Computation of Time

In computing time prescribed or allowed by the Plan, unless otherwise expressly provided, Bankruptcy Rule 9006(a) applies.

ARTICLE II.

ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

The Claims treatments set forth below shall apply to the plans for each of the Debtors.

2.1. Administrative Claims. Each holder of an Allowed Administrative Claim (other than a claim described in Section 2.3) against any Debtor shall receive, at the sole option of the relevant Debtor, (a) payment on the Distribution Date of Cash in an amount equal to the unpaid portion of such Allowed Administrative Claim or (b) such other treatment as to which the relevant Debtor and such Claim holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims against a Debtor representing liabilities incurred in the ordinary course of business during the Chapter 11 Cases or liabilities arising under loans or advances to or other obligations incurred by the Debtors that were authorized and approved by the Bankruptcy Court shall be paid and performed by the appropriate Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

2.2. Bar Date for Administrative Claims. Each holder of an Administrative Claim (other than a claim described in Section 2.3) against a Debtor shall file a request for allowance and payment of such claim with the Bankruptcy Court and serve such request upon counsel for the Debtors and each Official Committee no later than thirty days after the Effective Date (the "Administrative Bar Date"). Unless the Debtors object to an Administrative Claim within thirty days after the Administrative Bar Date, such Administrative Claim shall be deemed to be Allowed in the amount requested. In the event that the Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable by a Debtor in the ordinary course of its business or for fees due to the United States Trustee under chapter 123 of title 28 of the United States Code, 28 U.S.C. (S)(S) 1911-1930.

2.3. Professional Compensation and Expense Reimbursement Claims. Any Person seeking an award by the Bankruptcy Court of an Allowed Administrative Claim on account of Professional Fees or services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, shall file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date no later than the Administrative Bar Date (except to the extent that such Person is an Ordinary Course Professional, in which case the procedures set forth in the Ordinary Course Professional Order shall be followed). Objections to final applications for payment of Professional Fees must be filed no later than 60 days after the Confirmation Date. To the extent that such an award is granted by the Bankruptcy Court or allowed by the Ordinary Course Professional Order, the requesting Person shall receive, (i) payment on the Distribution Date of Cash in an amount equal to the amount allowed by the Bankruptcy Court or Ordinary Course Professional Order, (ii) payment on such other terms as may be mutually agreed upon by the holder of the Allowed Administrative Claim and the applicable Debtor or (iii) payment in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. All Professional Fees for services rendered in connection with the Chapter 11 Cases and the Plan after the Confirmation Date including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of causes of action preserved hereunder and the resolution of Disputed Claims, shall be paid by the applicable Debtor upon receipt of an invoice therefor, or on such other terms as such Debtor may agree to, without the requirement of further Bankruptcy Court authorization or entry of a Final Order.

2.4. Priority Tax Claims. Each holder of an Allowed Priority Tax Claim against a Debtor shall receive, at the sole option of the relevant Debtor: (a) payment on the Distribution Date of Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim; (b) Cash payments over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest accruing from the Effective Date, calculated at the effective interest rate for 90-day securities obligations issued by the United States Treasury on the Effective Date or, if no such securities were issued on the Effective Date, on the date of issuance immediately preceding the Effective Date; (c) payment upon such other terms determined by the Bankruptcy Court to provide the holder of such Claim with deferred Cash payments having a value, as of the Effective Date, equal to such Claim; or (d) such other treatment agreed to by the applicable Debtor and the holder of such Claim.

ARTICLE III.

CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in each of the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8), respectively, of the Bankruptcy Code have not been classified and their treatment is set forth in Article II.

3.1. FNV Group Plan.

(a) Class FNV Group-1. Class FNV Group-1 consists of all Secured Claims against FNV Group.

(b) Class FNV Group-2. Class FNV Group-2 consists of all Other Priority Claims against FNV Group.

(c) Class FNV Group-3. Class FNV Group-3 consists of the Group Subordinated Debenture Claims.

(d) Class FNV Group-4. Class FNV Group-4 consists of all General Unsecured Claims, other than Convenience Claims, against FNV Group.

(e) Class FNV Group-5. Class FNV Group-5 consists of all Convenience Claims against FNV Group.

(f) Class FNV Group-6. Class FNV Group-6 consists of all Interests in FNV Group.

(g) Class FNV Group-7. Class FNV Group-7 consists of all Equity Securities (S) 510(b) Claims against FNV Group.

3.2. FNV Capital Plan.

(a) Class FNV Capital-1. Class FNV Capital-1 consists of all Secured Claims against FNV Capital.

(b) Class FNV Capital-2. Class FNV Capital-2 consists of all Other Priority Claims against FNV Capital.

(c) Class FNV Capital-3. Class FNV Capital-3 consists of all General Unsecured Claims, other than Convenience Claims, against FNV Capital.

(d) Class FNV Capital-4. Class FNV Capital-4 consists of all Convenience Claims against FNV Capital.

(e) Class FNV Capital-5. Class FNV Capital-5 consists of all Debt Securities (S) 510(b) Claims against FNV Capital.

(f) Class FNV Capital-6. Class FNV Capital-6 consists of all Interests in FNV Capital.

3.3. FNV Canada Plan.

(a) Class FNV Canada-1. Class FNV Canada-1 consists of all Secured Claims against FNV Canada.

(b) Class FNV Canada-2. Class FNV Canada-2 consists of all Other Priority Claims against FNV Canada.

(c) Class FNV Canada-3. Class FNV Canada-3 consists of all General Unsecured Claims against FNV Canada.

(d) Class FNV Canada-4. Class FNV Canada-4 consists of all Interests in FNV Canada.

3.4. FNV UK Plan.

(a) Class FNV UK-1.    Class FNV UK-1 consists of all Secured Claims against FNV UK.

(b) Class FNV UK-2.    Class FNV UK-2 consists of all Other Priority Claims against FNV UK.

(c) Class FNV UK-3.    Class FNV UK-3 consists of all General Unsecured Claims against FNV UK.

(d) Class FNV UK-4.    Class FNV UK-4 consists of all FNV Capital Intercompany Loans.

(e) Class FNV UK-5.    Class FNV UK-5 consists of all Interests in FNV UK.

3.5. FNV Loan Plan.

(a) Class FNV Loan-1. Class FNV Loan-1 consists of all Secured Claims against FNV Loan.

(b) Class FNV Loan-2. Class FNV Loan-2 consists of all Other Priority Claims against FNV Loan.

(c) Class FNV Loan-3. Class FNV Loan-3 consists of all General Unsecured Claims, other than Convenience Claims, against FNV Loan.

(d) Class FNV Loan-4. Class FNV Loan-4 consists of all Convenience Claims against FNV Loan.

(e) Class FNV Loan-5. Class FNV Loan-5 consists of all Interests in FNV Loan.

3.6. FNV Mezzanine Plan.

(a) Class FNV Mezzanine-1.    Class FNV Mezzanine-1 consists of all Secured Claims against FNV Mezzanine.

(b) Class FNV Mezzanine-2.    Class FNV Mezzanine-2 consists of all Other Priority Claims against FNV Mezzanine.

(c) Class FNV Mezzanine-3.    Class FNV Mezzanine-3 consists of all General Unsecured Claims, other than Convenience Claims, against FNV Mezzanine.

(d) Class FNV Mezzanine-4.    Class FNV Mezzanine-4 consists of all Convenience Claims against FNV Mezzanine.

(e) Class FNV Mezzanine-5.    Class FNV Mezzanine-5 consists of all Interests in FNV Mezzanine.

(f) Class FNV Mezzanine-6.    Class FNV Mezzanine-6 consists of all Equity Securities (S) 510(b) Claims against FNV Mezzanine.

3.7. FNV Portfolio Plan.

(a) Class FNV Portfolio-1.    Class FNV Portfolio-1 consists of all Secured Claims against FNV Portfolio.

(b) Class FNV Portfolio-2.    Class FNV Portfolio-2 consists of all Other Priority Claims against FNV Portfolio.

(c) Class FNV Portfolio-3.    Class FNV Portfolio-3 consists of all General Unsecured Claims, other than Convenience Claims, against FNV Portfolio.

(d) Class FNV Portfolio-4. Class FNV Portfolio-4 consists of all Convenience Claims against FNV Portfolio.

(e) Class FNV Portfolio-5. Class FNV Portfolio-5 consists of all Interests in FNV Portfolio.

3.8. FNV Technology Plan.

(a) Class FNV Technology-1. Class FNV Technology-1 consists of all Secured Claims against FNV Technology.

(b) Class FNV Technology-2. Class FNV Technology-2 consists of all Other Priority Claims against FNV Technology.

(c) Class FNV Technology-3. Class FNV Technology-3 consists of all General Unsecured Claims, other than Convenience Claims, against FNV Technology.

(d) Class FNV Technology-4. Class FNV Technology-4 consists of all Convenience Claims against FNV Technology.

(e) Class FNV Technology-5. Class FNV Technology-5 consists of all Interests in FNV Technology.

3.9. FNV Trust Plan.

(a) Class FNV Trust-1. Class FNV Trust-1 consists of all Secured Claims against FNV Trust.

(b) Class FNV Trust-2. Class FNV Trust-2 consists of all Other Priority Claims against FNV Trust.

(c) Class FNV Trust-3. Class FNV Trust-3 consists of all General Unsecured Claims, other than Convenience Claims, against FNV Trust.

(d) Class FNV Trust-4. Class FNV Trust-4 consists of all Convenience Claims against FNV Trust.

(e) Class FNV Trust-5. Class FNV Trust-5 consists of all preferred equity Interests represented by the TOPrS.

(f) Class FNV Trust-6. Class FNV Trust-6 consists of all common equity Interests in FNV Trust.

ARTICLE IV.

IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS

4.1. Unimpaired Classes of Claims and Interests. Classes described in the following Sections are not impaired under this Plan:

FNV Group:
Section 3.1(a)--(Secured Claims)
Section 3.1(b)--(Other Priority Claims)

FNV Capital:
Section 3.2(a)--(Secured Claims)
Section 3.2(b)--(Other Priority Claims)
Section 3.2(f)--(Interests)

FNV Canada:
Section 3.3(a)--(Secured Claims)
Section 3.3(b)--(Other Priority Claims)
Section 3.3(c)--(General Unsecured Claims)
Section 3.3(d)--(Interests)

FNV UK:
Section 3.4(a)--(Secured Claims)
Section 3.4(b)--(Other Priority Claims)
Section 3.4(c)--(General Unsecured Claims)
Section 3.4(d)--(FNV Capital Intercompany Loan)
Section 3.4(e)--(Interests)

FNV Loan:
Section 3.5(a)--(Secured Claims)
Section 3.5(b)--(Other Priority Claims)
Section 3.5(e)--(Interests)

FNV Mezzanine:
Section 3.6(a)--(Secured Claims)
Section 3.6(b)--(Other Priority Claims)

FNV Portfolio:
Section 3.7(a)--(Secured Claims)
Section 3.7(b)--(Other Priority Claims)
Section 3.7(e)--(Interests)

FNV Technology:
Section 3.8(a)--(Secured Claims)
Section 3.8(b)--(Other Priority Claims)
Section 3.8(e)--(Interests)

FNV Trust:
Section 3.9(a)--(Secured Claims)
Section 3.9(b)--(Other Priority Claims)

4.2. Impaired Classes of Claims and Interests. Classes described in the following Sections are impaired under this Plan:

FNV Group:
Section 3.1(c)--(Group Subordinated Debenture Claims)
Section 3.1(d)--(General Unsecured Claims)
Section 3.1(e)--(Convenience Claims)
Section 3.1(f)--(Interests)
Section 3.1(g)--(Equity Securities (S) 510(b) Claims)

FNV Capital:
Section 3.2(c)--(General Unsecured Claims)
Section 3.2(d)--(Convenience Claims)
Section 3.2(e)--(Debt Securities (S) 510(b) Claims)

FNV Canada:
None

FNV UK:
None

FNV Loan:
Section 3.5(c)--(General Unsecured Claims)
Section 3.5(d)--(Convenience Claims)

FNV Mezzanine:
Section 3.6(c)--(General Unsecured Claims)
Section 3.6(d)--(Convenience Claims)
Section 3.6(e)--(Interests)
Section 3.6(f)--(Equity Securities (S) 510(b) Claims)

FNV Portfolio:
Section 3.7(c)--(General Unsecured Claims)
Section 3.7(d)--(Convenience Claims)

FNV Technology:
Section 3.8(c)--(General Unsecured Claims)
Section 3.8(d)--(Convenience Claims)

FNV Trust:
Section 3.9(c)--(General Unsecured Claims)
Section 3.9(d)--(Convenience Claims)
Section 3.9(e)--(TOPrS Interests)
Section 3.9(f)--(Interests)

4.3. Impairment Dispute. If a holder of a Claim or Interest files a timely objection with the Bankruptcy Court as to whether any Claims or Interests, or any class of Claims or Interests, are impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such objection.

ARTICLE V.

TREATMENT OF CLAIMS AND INTERESTS

5.1. FNV Group Plan.

(a) Class FNV Group-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Group-1 shall receive one of the following treatments, to be determined at the sole option of FNV Group: (i) Reinstatement of such Allowed Secured Claim, (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case the Lien arising from such Allowed Secured Claim shall be released upon payment, (iii) surrender by FNV Group of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV Group and such holder shall have agreed upon in writing. At the option of FNV Group, FNV Group may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV Group-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV Group-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Group and such holder shall have agreed upon in writing.

(c) Class FNV Group-3 (Group Subordinated Debenture Claims). On the Distribution Date, (i) the Allowed Claims in Class FNV Group-3 shall be satisfied by the treatment of the beneficial holders of claims in Class FNV Trust-5 (TOPrS Interests), provided, however, that Allowed Claims of the Indenture Trustees (including, but not limited to, prepetition and postpetition fees, costs, expenses, indemnification, disbursements, advances and reasonable compensation for the Indenture Trustee's counsel) shall be paid in full in Cash on the Distribution Date, and (ii) the Group Subordinated Debentures shall be cancelled.

(d) Class FNV Group-4 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Group-4 shall receive one of the following treatments, to be determined at the sole option of FNV Group: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim, (ii) Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV Group and such holder shall have agreed upon in writing.

(e) Class FNV Group-5 (Convenience Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Group-5 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

(f) Class FNV Group-6 (Interests). On and after the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Group-6 shall remain in effect, subject to the effects of (i) the issuance of Additional Group Common Stock (x) to the Berkadia Parties, as described in Sections 5.11(f) and 6.2(b), and (y) to the holders of Allowed Equity Securities (S) 510(b) Claims in FNV Group-7, if any, as described in Sections 5.1(g), (ii) the issuance of New Group Preferred Stock to the holders of Allowed Debt Securities (S) 510(b) Claims in Class FNV Capital-5, if any, as described in Section 5.2(e) and (iii) the other terms and conditions of the Plan (including the cancellation of certain options, warrants and rights), as more fully described in Sections 6.2, 6.3(a), 6.6(a) and 7.1.

(g) Class FNV Group-7 (Equity Securities (S) 510(b) Claims). On the Distribution Date, each holder of an Allowed Equity Securities (S) 510(b) Claim in Class FNV Group-7, if any, shall receive a distribution by Reorganized FNV Group of Additional Group Common Stock having a value, as determined by a Final Order, equal to the holder's Pro Rata Share of the Excess Amount with respect to all Allowed Equity Securities (S) 510(b) Claims in Class FNV Group-7.

5.2. FNV Capital Plan.

(a) Class FNV Capital-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Capital-1 shall receive one of the following treatments, to be determined at the sole option of FNV Capital: (i) Reinstatement of such Allowed Secured Claim, (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment, (iii) surrender by FNV Capital of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV Capital and such holder shall have agreed upon in writing. At the option of FNV Capital, FNV Capital may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV Capital-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV Capital-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Capital and such holder shall have agreed upon in writing.

(c) Class FNV Capital-3 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Capital-3 shall receive a distribution, equal to the full amount of such General Unsecured Claim plus postpetition interest calculated pursuant to Section 5.11(a), composed of (i) a Cash payment equal to 70% of the principal amount of that General Unsecured Claim (not including prepetition or postpetition interest), (ii) a Cash payment equal to the amount of accrued and unpaid prepetition and postpetition interest on the General Unsecured Claim (with prepetition and postpetition interest being calculated pursuant to section 5.11(a)) and (iii) New Senior Notes in the principal amount of 30% of the principal amount of that General Unsecured Claim (not including prepetition or postpetition interest), provided, however, that Allowed Claims of Indenture Trustees (including, but not limited to, prepetition and postpetition fees, costs, expenses, indemnification, disbursements, advances and reasonable compensation for the Indenture Trustee's counsel) shall be paid in full in Cash on the Distribution Date.

(d) Class FNV Capital-4 (Convenience Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Capital-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

(e) Class FNV Capital-5 (Debt Securities (S) 510(b) Claims). On the Distribution Date, each holder of an Allowed Debt Securities (S) 510(b) Claim in Class FNV Capital-5, if any, shall receive a distribution by Reorganized FNV Group of New Group Preferred Stock having a value, as determined by a Final Order, equal to the holder's Pro Rata Share of the Excess Amount with respect to all Allowed Debt Securities (S) 510(b) Claims in Class FNV Capital-5.

(f) Class FNV Capital-6 (Interests). On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Capital-6 shall be Reinstated.

5.3. FNV Canada Plan.

(a) Class FNV Canada-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Canada-1 shall receive one of the following treatments, to be determined at the sole option of FNV Canada: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Canada of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV Canada and such holder shall have agreed upon in writing. At the option of FNV Canada, FNV Canada may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV Canada-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV Canada-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Canada and such holder shall have agreed upon in writing.

(c) Class FNV Canada-3 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Canada-3 shall receive one of the following treatments, to be determined at the sole option of FNV Canada: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed General Unsecured Claim plus postpetition interest calculated pursuant to Section 5.11(a), (ii) except in the case of Bank Claims against FNV Canada, Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV Canada and such holder shall have agreed upon in writing.

(d) Class FNV Canada-4 (Interests). On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Canada-4 shall be Reinstated.

5.4. FNV UK Plan.

(a) Class FNV UK-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-1 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV UK of the asset subject to the Lien of the holder of the Allowed Secured Claim, or (iv) such other treatment as to which FNV UK and such holder shall have agreed upon in writing. At the option of FNV UK, FNV UK may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV UK-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV UK-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV UK and such holder shall have agreed upon in writing.

(c) Class FNV UK-3 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-3 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed General Unsecured Claim plus postpetition interest calculated pursuant to Section 5.11(a), (ii) except in the case of Bank Claims against FNV UK, Reinstatement of such Allowed General Unsecured Claim, or (iii) such other treatment as to which FNV UK and such holder shall have agreed upon in writing.

(d) Class FNV UK-4 (FNV Capital Intercompany Loan). On the Distribution Date, each holder of an Allowed Claim in Class FNV UK-4 shall receive one of the following treatments, to be determined at the sole option of FNV UK: (i) payment of Cash in an amount equal to the unpaid portion of the Claim plus postpetition interest calculated pursuant to Section 5.11(a), or (ii) Reinstatement of the Claim.

(e) Class FNV UK-5 (Interests). On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV UK-5 shall be Reinstated.

5.5. FNV Loan Plan.

(a) Class FNV Loan-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-1 shall receive one of the following treatments, to be determined at the sole option of FNV Loan: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV

Loan of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Loan and such holder shall have agreed upon in writing. At the option of FNV Loan, FNV Loan may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV Loan-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV Loan-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Loan and such holder shall have agreed upon in writing.

(c) Class FNV Loan-3 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-3 shall receive one of the following treatments, to be determined at the sole option of FNV Loan: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim, (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Loan and such holder shall have agreed upon in writing.

(d) Class FNV Loan-4 (Convenience Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Loan-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

(e) Class FNV Loan-5. (Interests). On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Loan-5 shall be Reinstated.

5.6. FNV Mezzanine Plan.

(a) Class FNV Mezzanine-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Mezzanine-1 shall receive one of the following treatments, to be determined at the sole option of FNV Mezzanine: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Mezzanine of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Mezzanine and such holder shall have agreed upon in writing. At the option of FNV Mezzanine, FNV Mezzanine may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV Mezzanine-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV Mezzanine-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Mezzanine and such holder shall have agreed upon in writing.

(c) Class FNV Mezzanine-3 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Mezzanine-3 shall receive one of the following treatments, to be determined at the sole option of FNV Mezzanine: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim; (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Mezzanine and such holder shall have agreed upon in writing.

(d) Class FNV Mezzanine-4 (Convenience Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Mezzanine-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

(e) Class FNV Mezzanine-5 (Interests). On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Mezzanine-5 shall remain in effect, subject to the effect of the issuance of Additional Mezzanine Common Stock to holders of Allowed Equity Securities (S) 510(b) Claims in Class FNV Mezzanine-6, if any, as described in Section 5.6(f).

(f) Class FNV Mezzanine-6 (Equity Securities (S) 510(b) Claims). On the Distribution Date, each holder of an Allowed Equity Securities (S) 510(b) Claim in Class FNV Mezzanine-6, if any, shall receive a distribution of Additional Mezzanine Common Stock having a value, as determined by a Final Order, equal to the holder's Pro Rata Share of the Excess Amount with respect to all Allowed Equity Securities (S) 510(b) Claims in Class FNV Mezzanine-6.

5.7. FNV Portfolio Plan.

(a) Class FNV Portfolio-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Portfolio-1 shall receive one of the following treatments, to be determined at the sole option of FNV Portfolio: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Portfolio of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Portfolio and such holder shall have agreed upon in writing. At the option of FNV Portfolio, FNV Portfolio may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV Portfolio-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV Portfolio-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Portfolio and such holder shall have agreed upon in writing.

(c) Class FNV Portfolio-3 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Portfolio-3 shall receive one of the following treatments, to be determined at the sole option of FNV Portfolio: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim; (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Portfolio and such holder shall have agreed upon in writing.

(d) Class FNV Portfolio-4 (Convenience Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Portfolio-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

(e) Class FNV Portfolio-5 (Interests). On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Portfolio-5 shall be Reinstated.

5.8. FNV Technology Plan.

(a) Class FNV Technology-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-1 shall receive one of the following treatments, to be determined at the sole option of FNV Technology: (i) Reinstatement of such Allowed Secured Claim; (ii) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (iii) surrender by FNV Technology of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iv) such other treatment as to which FNV Technology and such holder shall have agreed upon in writing. At the option of FNV Technology, FNV Technology may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV Technology-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV Technology-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Technology and such holder shall have agreed upon in writing.

(c) Class FNV Technology-3 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-3 shall receive one of the following treatments, to be determined at the sole option of FNV Technology: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim; (ii) Reinstatement of such Allowed General Unsecured Claim or (iii) such other treatment as to which FNV Technology and such holder shall have agreed upon in writing.

(d) Class FNV Technology-4 (Convenience Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Technology-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

(e) Class FNV Technology-5 (Interests). On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Technology-5 shall be Reinstated.

5.9. FNV Trust Plan.

(a) Class FNV Trust-1 (Secured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Trust-1 shall receive one of the following treatments, to be determined at the sole option of FNV Trust: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed Secured Claim plus postpetition interest calculated pursuant to Section 5.11(a), in which case, the Lien arising from such Allowed Secured Claim shall be released upon payment; (ii) surrender by FNV Trust of the asset subject to the Lien of the holder of the Allowed Secured Claim or (iii) such other treatment as to which FNV Trust and such holder shall have agreed upon in writing. At the option of FNV Trust, FNV Trust may elect to exercise a different option for each asset subject to the Lien of the holder of an Allowed Secured Claim.

(b) Class FNV Trust-2 (Other Priority Claims). On the Distribution Date, the Allowed Claims in Class FNV Trust-2 shall (i) be Reinstated, provided, however, that such treatment shall be no less favorable than that provided in section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (ii) receive such other treatment as to which FNV Trust and such holder shall have agreed upon in writing.

(c) Class FNV Trust-3 (General Unsecured Claims). On the Distribution Date, each holder of an Allowed Claim in Class FNV Trust-3 shall receive one of the following treatments, to be determined at the sole option of FNV Trust: (i) payment of Cash in an amount equal to the unpaid portion, without postpetition interest, of such Allowed General Unsecured Claim or (ii) such other treatment as to which FNV Trust and such holder shall have agreed upon in writing.

(d) Class FNV Trust-4 (Convenience Claims). On the Distribution Date, holders of Allowed Claims in Class FNV Trust-4 shall receive payment in full, without postpetition interest, in Cash, not to exceed $25,000, of such Allowed Convenience Claim.

(e) Class FNV Trust-5 (TOPrS Interests). On the Distribution Date, each holder of an Allowed Interest in Class FNV Capital-3 shall receive a distribution composed of (i) a Cash payment equal to 52.5% of the liquidation preference attributable to such Allowed Interest (not including prepetition or postpetition dividends), (ii) a Cash payment equal to 75% of the amount of accrued and unpaid prepetition and postpetition dividends attributable to such Allowed Interest and (iii) New Senior Notes in the principal amount of 22.5% of the liquidation preference attributable to such Allowed Interest (not including prepetition or postpetition dividends) provided, however, that Allowed Claims of Indenture Trustees (including, but not limited to, prepetition and post- petition fees, costs, expenses, indemnification, disbursements, advances and reasonable compensation for the Indenture Trustee's counsel) shall be paid in full in Cash on the Distribution Date.

(f) Class FNV Trust-6 (Interests). On the Distribution Date, the legal, equitable and contractual rights of holders of Allowed Interests in Class FNV Trust-6 shall be cancelled. Holders of Allowed Interests in Class FNV Trust-6 shall receive any property of the Estate of FNV Trust remaining after payment of all other classes of Claims against and TOPrS Interests in FNV Trust.

5.10. Debtor's Election of Claim Treatment. Where the Plan specifies that a Claim shall receive one of two or more specified treatments, to be determined at the sole option of the applicable Debtor or Reorganized Debtor, the Debtor's election as to the treatment that the Claim shall receive shall be made and notice given to the holder of the Claim on or before the Distribution Date.

5.11. Special Provisions Regarding Treatment of Certain Claims.

(a) Accrual of Prepetition and Postpetition Interest. Where the Plan specifies that prepetition or postpetition interest shall be paid with respect to any Claim, such interest shall be calculated as simple interest at the following interest rate: (i) for Claims based upon a contract between the Claim holder and a Debtor that specifies payment of interest at a fixed rate upon amounts owed by the Debtor to the Claim holder, the fixed rate (but not at the default rate, and excluding facility or other fees or any change in rates due to failure to elect interest rates or periods from and after the Petition Date, and without regard to the availability or unavailability of specified rates or the inability to select specified rates as a result of a default, financial condition or otherwise) specified in the contract; (ii) for Claims based upon a contract between the Claim holder and a Debtor that specifies payment of interest at a variable rate upon amounts owed by the Debtor to the Claim holder, the variable rate (but not the default rate, and excluding facility or other fees or any changes in rates due to the failure to elect interest rates or periods from or after the Petition Date, and without regard to the availability or unavailability of specified rates or the inability to select specified rates as a result of a default, financial condition or otherwise) (x) with respect to prepetition interest as specified in the contract as in effect on the day such interest payment was due, and (y) with respect to postpetition interest, calculated as specified in the contract, provided that the component of any such variable rate based on the London Interbank Offered Rate ("LIBOR") for U.S. dollar deposits shall be 30-day LIBOR as was in effect on the Petition Date for the period from the Petition Date through and including the last day of March 2001, and thereafter for each subsequent month, 30-day LIBOR as of the first business day of such month for such month or partial month; and (iii) for Claims not based upon any contract that specifies payment of interest at a fixed or variable rate, the federal judgment rate of interest as determined on a calculation date to be determined by the Debtors and the Berkadia Parties, which date shall be within the 5 days prior to the Effective Date. If any contract under which a Claim arises specifies more than one rate of non-default interest, postpetition interest shall be provided at the lower contract rate. For prepetition interest, the interest rate shall be calculated from and including the date such interest payment was due to but excluding the Petition Date. For postpetition interest, the interest rate shall be calculated from and including the Petition Date to but excluding the Distribution Date for such claim.

(b) Special Provisions Regarding Treatment of Allowed Secondary Liability Claims. On the Effective Date:

(i) Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any (i) Allowed Claim that is being Reinstated under the Plan or (ii) executory contract or unexpired lease that is being assumed by another Debtor, will be Reinstated;

(ii) Except as provided in (i), above, holders of Allowed Secondary Liability Claims arising from or related to a Debtor's guarantees of payment or collection of Allowed Claims against another Debtor shall be entitled to only one distribution from the Debtor that is primarily liable for the underlying Allowed Claim, which distribution will be as provided in the Plan in respect of such underlying Allowed Claim, and such Allowed Secondary Liability Claim shall be deemed satisfied in full by the distribution on account of the related underlying Claim; provided, however, that if an underlying Allowed Claim is not satisfied in full by the treatment of the related underlying Claim, then the holder of the Allowed Claim shall be entitled to receive a distribution on account of its Allowed Secondary Liability Claim (which shall be Allowed only in the amount of the difference between the underlying Allowed Claim and the value of the distribution thereon), in accordance with the Plan classification thereof;

(iii) Notwithstanding any other provisions in this Plan, no multiple recovery on account of any Allowed Secondary Liability Claim will be provided or permitted.

(c) Special Provisions Regarding Indemnification Claims. All Claims against FNV Group for indemnification asserted by current or former officers or directors thereof shall be Reinstated. All Claims against FNV Capital for indemnification asserted by current or former officers or directors thereof shall be assumed by and shall continue as obligations of FNV Group, but any obligations of FNV Capital thereunder shall be extinguished and rejected, and the holders thereof shall have Claims in Class FNV Capital-3 (General Unsecured Claims). All Claims against FNV Mezzanine or any other Debtor for indemnification asserted by current or former officers or directors of FNV Mezzanine shall be recognized, in the aggregate and on a pro rata basis, up to a maximum of the $1 million deductible under the applicable insurance policies, but shall otherwise be extinguished and rejected, and the holders thereof shall have claims in Class FNV Mezzanine-3 (General Unsecured Claims). Except as provided above in this Section 5.11(c), all Claims against any Debtor for indemnification asserted by current or former officers or directors of any Debtor shall be extinguished and rejected, and the holders thereof shall have General Unsecured Claims against the appropriate Debtor.

(d) Special Provisions Regarding Convenience Claims. If the holder of an Allowed General Unsecured Claim (other than a Bank Claim or Debt Securities Claim) in an amount greater than $25,000 makes an election to reduce the Allowed amount of such Claim to an amount equal to or less than $25,000, such claim shall be treated as a Convenience Claim for such purposes. Such election shall be made on the Ballot, which shall be completed and returned by the Voting Deadline. A holder of an Allowed General Unsecured Claim (other than a Bank Claim or Debt Securities Claim) who shall make this election shall be deemed to have accepted the Plan by such election and such election shall be irrevocable.

(e) Special Provisions Regarding Reinstatement of Claims. Reinstatement with respect to any Claim or Interest shall be without prejudice to any Debtor's or Reorganized Debtor's right to contest or otherwise defend against such Claim or Interest in the appropriate forum when and if such Claim or Interest is sought to be enforced by the holder of such Claim or Interest. The holder of a Claim or Interest that is Reinstated pursuant to the Plan shall not be entitled to any penalty, default interest, acceleration or similar remedial measure with respect to the Reinstated Claim or Reinstated Interest.

(f) Special Provisions Regarding Additional Group Common Stock. If, after the Effective Date, FNV Group issues Additional Group Common Stock to holders of Allowed Claims in Class FNV Group-7 (Equity Securities (S) 510(b) Claims), then, each such time (a "Dilutive Issuance"), FNV Group will contemporaneously issue to the Berkadia Parties the number of shares of Additional Group Common Stock that the Berkadia Parties would have received pursuant to the Plan on the Effective Date (i.e. in addition to the shares the Berkadia Parties did receive on the Effective Date) if the Dilutive Issuance had occurred immediately before the Effective Date. The consideration furnished by Berkadia in connection with the Restructuring Transactions shall be deemed to include, as a portion thereof, consideration for the Additional Group Common Stock issued to the Berkadia Parties pursuant to this section in an amount equal to the aggregate par value of such stock.

(g) Special Provisions Regarding Intercompany Claims and Subsidiary Interests. All Intercompany Claims shall be Allowed Claims in the amounts reflected in the books and records of the Debtors and listed on the Schedules. No proofs of Claim evidencing Intercompany Claims must be filed. All Interests of a Debtor held by another Debtor shall be Allowed Interests in the amounts reflected in the books and records of the Debtors and listed on the Schedules. No proofs of Interest evidencing Interests of a Debtor held by another Debtor must be filed.

(h) Special Provisions Regarding Employee Claims. All prepetition Claims of the Debtors' employees, directors and other parties that were authorized to be paid under the Order Authorizing Payment of Prepetition Employee and Director Compensation, Benefits and Expense Reimbursements, and Certain Related Items, entered by the Bankruptcy Court on March 7, 2001, that have not been paid as of the Effective Date shall be paid by the applicable Reorganized Debtor after the Effective Date in the ordinary course of business, and no proof of Claim need be filed with respect to any such Claim.

ARTICLE VI.

THE RESTRUCTURING TRANSACTION AND THE EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

6.1. Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors. Each Debtor other than FNV Trust shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate entity, with all of the powers of such an entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under the applicable law of its jurisdiction of incorporation. Except as otherwise provided in the Plan, on or after the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under any provision of the Plan, shall vest in the applicable Reorganized Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Interests of any type or nature (except to the extent that Claims, Liens or Interests are expressly Reinstated or granted by operation of the Plan). On and after the Effective Date, each Reorganized Debtor may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. FNV Trust shall be dissolved, and its assets and liabilities shall be dealt with as set forth in this Plan, as of the Effective Date.

6.2. The Restructuring Transactions. The Plan contemplates, and is conditioned upon, the implementation of a comprehensive loan and restructuring transaction with Berkadia, and certain related transactions, all as described in the Restructuring Documents and herein (the "Restructuring Transactions"). The Credit Agreement between Berkadia and Reorganized FNV Capital, to be dated as of the Effective Date (the "Berkadia Credit Agreement"), shall contain the terms and conditions pursuant to which Berkadia will make the Berkadia Loan to Reorganized FNV Capital. The terms and conditions of the Restructuring Transactions will be as set forth in the Restructuring Documents. If there are any inconsistencies between the Plan and the Restructuring Documents, the Restructuring Documents shall control.

(a) The Berkadia Loan. On the Effective Date, Berkadia shall lend to Reorganized FNV Capital a five-year amortizing secured term loan in the principal amount of $6,000,000,000 (the "Berkadia Loan"). Proceeds of the Berkadia Loan will be used solely to fund distributions to holders of Allowed Claims in Class FNV Group-3 (Group Subordinated Debentures), as described in Section 5.1(c), Class FNV Capital-3 (General Unsecured Claims), as described in Section 5.2(c), and holders of Allowed Interests in Class FNV Trust-5 (TOPrS Interests), as described in Section 5.9(e). The terms and conditions of the Berkadia Loan are set forth in the Term Sheet for the Berkadia Loan attached hereto as an Interim Exhibit 6.2(a). The Berkadia Loan Documents will be filed with the Plan Supplement and made a part hereof as Exhibit 6.2(a).

(b) Restructuring Transactions. The Restructuring Transactions will be governed by the terms of the Restructuring Documents and consist principally of: (i) the execution by the Debtors of, and borrowing under, the Berkadia Loan Documents, (ii) the execution by FNV Capital of the Intercompany Note and the delivery of the Intercompany Note to FNV Group and (iii) the distribution by FNV Capital of the proceeds of the Berkadia Loan, other available Cash and the New Senior Notes to the holders of Allowed Claims in Class FNV Group-3 (General Unsecured Claims), Class FNV Capital-3 (General Unsecured Claims) and holders of Allowed Interests in Class FNV Trust-5 (TOPrS Interests). Pursuant to the Restructuring Transactions, as of the Effective Date, (i) FNV Group and FNV Capital shall adopt amended and restated Certificates of Incorporation and Bylaws in form and substance satisfactory to Berkadia, (ii) designees of Berkadia shall constitute a majority of the boards of directors of Reorganized FNV Group and Reorganized FNV Capital as constituted on the Effective Date, with at least two members of each of those boards being current members of the board of directors of FNV Group as of the Petition Date and at least one member of each of those boards being designated by the official committee of unsecured creditors appointed in the Chapter 11 Cases, and (iii) Reorganized FNV Group shall issue to the Berkadia Parties Additional Group Common Stock such that the Berkadia Parties will own up to 51%, or such lesser amount as may be agreed by the Berkadia Parties, of the outstanding common stock of Reorganized FNV

Group on a Fully Diluted Basis as of the Effective Date, subject to the issuance of additional shares of Additional Group Common Stock pursuant to Section 5.11(f). In addition, Berkshire or an Affiliate thereof will commit to make a tender offer as soon as practicable after the Effective Date to purchase up to $500,000,000 principal amount of New Senior Notes at a Cash price equal to 70% of the face amount thereof. The tender offer will be in compliance with all applicable securities laws, and subject to customary conditions, but will not be subject to any financing condition, and will remain open for the longer of twenty (20) Business Days and thirty (30) days. The consideration furnished by Berkadia in connection with the Restructuring Transactions shall be deemed to include, as a portion thereof, consideration for the Additional Group Common Stock issued to the Berkadia Parties pursuant to this Section 6.2(b) or Section 5.11(f) in an amount equal to the aggregate par value of such stock. By approving this Plan, the FNV Group Board of Directors approves, for purposes of section 203 of the Delaware General Corporations Law, the acquisition by any one or more of the Berkadia Parties of any shares of FNV Group common stock, including all or any part of the Additional Group Common Stock issued to it or them under the Plan, with the intention that no Berkadia Party shall be or become an "interested shareholder" within the meaning of that section by virtue of the acquisition of Additional Group Common Stock or any other acquisition of common stock of FNV Group.

(c) The New Senior Notes. On the Effective Date, FNV Group will enter into the New Senior Note Indenture and issue New Senior Notes in the principal amount necessary to pay 30% of all General Unsecured Claims against FNV Capital pursuant to the provisions of Section 5.2(c) and 22.5% of the liquidation preference of Allowed TOPrS Interests pursuant to the provisions of Section 5.9(e), which principal amount the Debtors estimate to be approximately $3.26 billion. Among other things, in accordance with the terms of the Berkadia Loan and the New Senior Notes, the New Senior Note Indenture will provide that, subject to the prior payment or satisfaction of all obligations under the Berkadia Loan and certain other conditions, FNV Group will pay its obligations on the New Senior Notes out of cash dividends, distributions or loans from FNV Capital and that the New Senior Notes will be secured by a second-priority lien on (i) the common stock of FNV Capital held by FNV Group and (ii) a promissory note of FNV Capital to be issued to FNV Group in the principal amount of the aggregate amount of New Senior Notes (the "Intercompany Note"), which note shall be secured by a second-priority lien on the assets of FNV Capital pledged to Berkadia to secure the Berkadia Loan. The form of the New Senior Note Indenture and the Intercompany Note will be filed with the Plan Supplement and made a part hereof as Exhibit 6.2(c)(1) and Exhibit 6.2(c)(2), respectively; the Term Sheets for the New Senior Note Indenture, and the Term Sheet for the Intercompany Note are attached hereto as Interim Exhibit 6.2(c)(1) and Interim Exhibit 6.2(c)(2), respectively.

(d) The Management Agreement. Pursuant to the Management Agreement, Leucadia shall designate, to be effective on the Effective Date and as disclosed pursuant to Section 6.3(b), the Chairman of the Board and the President of Reorganized FNV Group.

(e) Dissolution of FNV Trust. On the Effective Date, FNV Trust will be dissolved and its assets, if any, shall be distributed pursuant to Section 5.9.

6.3. Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs.

(a) Certificates of Incorporation and Bylaws. The bylaws, certificates of incorporation and other organizing documents of FNV Group and FNV Capital and, to the extent necessary or appropriate to effectuate the Plan or the Restructuring Transactions, the bylaws, certificates of incorporation and other organizing documents of the other Debtors (collectively, as amended, the "New Corporate Documents") shall be amended and restated as of the Effective Date to the extent necessary to, among other things, (i) authorize the Restructuring Transactions, including but not limited to the issuance of the Additional Group Common Stock, New Group Preferred Stock, Additional Mezzanine Common Stock and the transactions identified in Section 6.2, (ii) if requested by the Berkadia parties, impose restrictions on the direct or indirect transferability of the common stock or other equity of Reorganized FNV Group such that (x) no Person (other than the Berkadia Parties) may

acquire or accumulate five percent or more (as determined under tax law principles governing the application of section 382 of the Tax Code) of the common stock or other equity of Reorganized FNV Group and (y) no Person (other than the Berkadia Parties) owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to the Plan, or after any subsequent issuances of Additional Group Common Stock pursuant to the Plan, five percent or more (as determined under such tax law principles) of the common stock or other equity of Reorganized FNV Group, may acquire additional shares of that common stock or other equity of Reorganized FNV Group, subject to certain exceptions, (iii) prohibit the issuance of non-voting equity securities, (iv) with respect to FNV Group, eliminate Article IX of the Certificate of Incorporation of FNV Group relating to certain Business Combinations (as defined therein) and (v) with respect to FNV Group, terminate the Rights Plan without any payment by FNV Group and without the Rights thereunder having separated from the FNV Group common stock or become exercisable. Copies of the New Corporate Documents will be filed with the Plan Supplement and made a part hereof as Exhibit 6.3(a).

(b) Directors and Officers of Reorganized FNV Group. Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the majority of the board of directors of Reorganized FNV Group as of the Effective Date shall be persons designated by Berkadia. The members of the Reorganized FNV Group board of directors, as of the Effective Date, shall include the directors who are listed as such on Exhibit 6.3(b). The officers of Reorganized FNV Group on the Effective Date shall be those persons listed as such on Exhibit 6.3(b). Each such director and officer shall serve from and after the Effective Date until his or her term of office expires or he or she resigns or is removed pursuant to the terms of the applicable certificate of incorporation, the applicable bylaws or similar corporate governance documents and applicable state law. No designation in Exhibit 6.3(b) of a person as a director or officer of Reorganized FNV Group shall create a contract of employment.

(c) Directors and Officers of Other Reorganized Debtors. Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the directors and officers of each Reorganized Debtor other than Reorganized FNV Group shall be as listed as such on Exhibit 6.3(c). Each such director and officer shall serve from and after the Effective Date until he or she resigns or is removed pursuant to the terms of the applicable certificate or articles of incorporation, the applicable bylaws or similar corporate governance documents and applicable state law. No designation in Exhibit 6.3(c) of a person as a director or officer of a Reorganized Debtor shall create a contract of employment.

(d) Corporate Actions. The borrowing under the Berkadia Loan; the adoption of New Corporate Documents; the initial selection of directors and officers of the Reorganized Debtors; the distribution of Cash; the issuance and distribution of New Senior Notes, the Intercompany Note, Additional Group Common Stock, New Group Preferred Stock (if any) and Additional Mezzanine Common Stock (if any); the allocation according to the Plan of a portion of the consideration furnished by Berkadia in connection with the Restructuring Transactions as consideration for the issuance of Additional Group Common Stock to the Berkadia Parties; the grant, pledge, assignment or other transfer of mortgages, deeds of trust, Liens and other security interests in connection with the Berkadia Loan and the New Senior Notes Indenture; the adoption, execution, delivery, performance and implementation of all contracts, leases, instruments, releases, indentures and other agreements related to any of the foregoing, including the Berkadia Loan Documents and the New Senior Notes Indenture; and all other actions or matters provided for under the Plan or contemplated by the Restructuring Transactions involving the corporation or trust structure of any Debtor or Reorganized Debtor or corporate, shareholder, trust, trustee, or holder of trust interest action to be taken by or required of any Debtor or Reorganized Debtor or their respective shareholders or holders of trust interests shall be deemed to have been authorized and effective as provided herein upon Confirmation and the occurrence of the Effective Date, and shall be authorized and approved in all respects without any requirement of further action by shareholders, directors or trustees of any of the Debtors or the Reorganized Debtors, all pursuant to section 303 of the Delaware General Corporate Law with respect to those Debtors that are Delaware corporations and to comparable provisions of applicable law, if any, with respect to the other Debtors.

6.4. Obtaining Cash and Securities for Plan Distributions and Transfers of Funds and Securities Among the Debtors. All Cash necessary for the Disbursing Agent or Agents to make payments pursuant to the Plan shall be obtained from the Berkadia Loan, the Debtors' existing cash balances, the operations of the Debtors or the Reorganized Debtors or post-confirmation working capital. Cash and securities payments to be made pursuant to the Plan shall be made by the Disbursing Agent or Agents from the Estate of the Debtor that is liable on the underlying Allowed Claim; provided, however, that the Debtors and the Reorganized Debtors shall be entitled to transfer funds and securities between and among themselves as they determine to be necessary or appropriate to enable each Reorganized Debtor to satisfy its obligations under the Plan. Any intercompany balances resulting from such transfers shall be settled in accordance with the Debtors' historical intercompany account settlement practices.

6.5. Preservation of Rights of Action. Except as expressly provided herein or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce any claims, rights and causes of action, whether arising before or after the Petition Date, that any Debtor or Estate may hold against any entity or person. The Reorganized Debtors or their successors may pursue such retained claims, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the successors holding such rights of action. The Reorganized Debtors may pursue, abandon, settle or release any or all such claims, rights and causes of action, as they may deem appropriate. No creditor or shareholder shall have any right or power to pursue or commence any litigation, whether direct or derivative, in regard to such claims, rights and causes of action.

6.6. Effect of Plan on Certain Securities.

(a) Cancellation. On the Effective Date, (i) the notes and other documents or instruments evidencing the Bank Claims and the Debt Securities, the Bank Credit Agreements, the Debt Securities Indentures, the Group Subordinated Debentures, and all other credit instruments, provided, however, that the instruments evidencing the Loan Commitments shall not be affected by this provision, (ii) the certificates and other documents evidencing the TOPrS Interests and the common beneficial Interests in FNV Trust held by FNV Group, (iii) all rights issued under the Rights Plan and (iv) all rights under existing options, warrants and rights of conversion shall be deemed canceled and shall be of no further force and effect, without any further action on the part of the Bankruptcy Court or any Debtor or Reorganized Debtor. The holders of such canceled instruments, securities and other documentation shall have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no distribution under the Plan shall be made to or on behalf of any holder of an Allowed Claim evidenced by such canceled instruments, securities or other documentation unless and until such instruments, securities or other documentation are received by the Disbursing Agent pursuant to Section 9.5.

(b) Continuing Rights. Each indenture or other agreement that governs the rights of the holder of a Claim and that is administered by an Indenture Trustee or an agent shall continue in effect solely for the purposes of (a) allowing such Indenture Trustee or agent to make the distributions to be made on account of such Claims under this Plan, and (b) permitting such Indenture Trustee or agent to receive payment in accordance with the terms of Sections 5.1(c), 5.2(c) and 5.9(e); provided, however, that the foregoing shall not affect the discharge of Debtors' liabilities under the Bankruptcy Code and the Confirmation Order.

6.7. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes. The Chairman of the Board, President, any Vice President, any Director, the Secretary, any Assistant Secretary or the Regular Trustee of each Debtor or Reorganized Debtor shall be authorized to execute, deliver, file or record such

contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary, any Assistant Secretary or the Regular Trustee of each Debtor or Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(c) of the Bankruptcy Code, no stamp, real estate transfer, mortgage recording or other similar tax may be imposed upon the issuance, transfer or exchange of notes or equity securities under the Plan, including, without limitation, the New Senior Notes, any notes related to the Berkadia Loan, the Berkadia Credit Agreement, all debt public and private, the New Group Preferred Stock (if any is issued), the Additional Group Common Stock or the Additional Mezzanine Common Stock (if any is issued), the creation of any Lien, the making, assignment or surrender of any lease or sublease, the creation of any mortgage, deed of trust or other security interest, the making or delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in connection with the Plan, whether involving real or personal property, including, without limitation, any merger agreements or agreements of amalgamation or consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan. Any sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code or otherwise and any assumption, assignment and sale by the Debtors of unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, if (i) consummated by the Debtors and (ii) either (A) approved by the Bankruptcy Court in the Ordinary Course of Business Order, or (B) approved in the ordinary course of the Debtors' business by separate order of the Bankruptcy Court on or after the Petition Date through and including the Effective Date, shall be deemed to have been made under, in furtherance of and in connection with the Plan and, thus, shall not be subject to any stamp tax, real estate transfer, mortgage recording or other similar tax. If the Debtors pay or have paid any such tax, they shall be entitled to a refund thereof upon or after the Effective Date.

## ARTICLE VII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1. Executory Contracts and Unexpired Leases to be Rejected.

(a) Rejections Generally. Each of the executory contracts and unexpired leases listed on Exhibit 7.1, which shall be filed with the Plan Supplement and which may be amended at any time prior to the Effective Date, shall be rejected as of the Effective Date. Each contract and lease listed on Exhibit 7.1 shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Regardless of whether the Debt Security Indentures, Bank Credit Agreements, TOPrS, Group Subordinated Debentures or existing options, warrants and rights of conversion are or may be executory contracts, such indentures, agreements and securities shall be rejected and canceled pursuant to section 1123(a)(5)(F) of the Bankruptcy Code.

(b) Bar Date for Rejection Damages. If the rejection of any executory contract, unexpired lease, option, warrant, right of conversion or the Rights Plan pursuant to Section 7.1(a) gives rise to a Claim by the non-Debtor party or parties to such contract, lease, option, warrant or right, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, their respective successors or their respective properties unless a proof of Claim is filed and served on the appropriate Reorganized Debtor within 30 days after the date of service of the Confirmation Order.

7.2. Executory Contracts and Unexpired Leases to be Assumed

(a) Assumptions and Assignments Generally. Except as otherwise provided in this Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors shall assume (i) each of the executory contracts and unexpired leases listed on Exhibit 7.2, which shall be filed with the Plan Supplement

and which may be amended at any time prior to the Effective Date, and (ii) all other executory contracts and unexpired leases that have not been either assumed or rejected pursuant to section 365 of the Bankruptcy Code prior to the Effective Date or rejected as of the Effective Date pursuant to Section 7.1, other than the Loan Commitments. Each contract or lease assumed pursuant to this Section 7.2 shall be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.

(b) Assumptions of Leveraged Leases. Each Leveraged Lease of any of the Debtors, whether or not listed on Exhibit 7.2, shall be assumed by the applicable Debtor on the Effective Date unless listed on Exhibit 7.1 or rejected by express order of the Bankruptcy Court prior to the Effective Date.

(c) Approval of Assumptions. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in this Section 7.2, pursuant to section 365 of the Bankruptcy Code.

(d) Payment of Cure Amounts. Any Cure Amount related to an executory contract and unexpired lease to be assumed pursuant to the Plan that is in default shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code at the option of the Debtor assuming such contract or lease (i) by payment of the Cure Amount in Cash as soon as practicable after the later of (A) the Effective Date and (B) ten days following entry of a Final Order approving the assumption of such contract or lease or (ii) on such other terms as are agreed to by the parties to such executory contract or unexpired lease. For assumptions of executory contracts and unexpired leases between or among Debtors, if any, the Debtor or Reorganized Debtor assuming such contract or lease may cure any monetary default through an intercompany account balance in lieu of payment of Cash. The Debtors reserve the right, in their sole discretion, as to any executory contract or unexpired lease designated for assumption as to which the Cure Amount is disputed (before or after resolution of such dispute by Final Order) to withdraw that designation and reject the contract or lease.

(e) Determination of Cure Amounts; Resolution of Disputes. The Cure Amount, according to the Debtors' books and records, for each contract and unexpired lease to be assumed pursuant to the Plan is set forth on Exhibit 7.2. Any objection to (i) the Cure Amount as listed on Exhibit 7.2, (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance," within the meaning of section 365 of the Bankruptcy Code, under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, must be filed on or before the deadline set for objections to the Plan or, to the extent that Exhibit 7.2 is amended after such date to change the treatment of the contract at issue, within ten Business Days after the filing of such amendment. If such an objection is filed, the applicable contract or unexpired lease shall be assumed upon the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption, and the Cure Amount shall be satisfied pursuant to Section 7.2(d).

7.3. Special Executory Contract and Unexpired Lease Issues and Treatment of the Retirement Plan.

(a) Rejection or Cancellation of Securities and Bank Credit Agreements. Notwithstanding the rejection or cancellation of the Debt Securities Indentures, the TOPrS and the Bank Credit Agreements, such rejection or cancellation shall not impair the rights of the holders of any Allowed Debt Securities Claims or Allowed Bank Claims to receive distributions as holders of General Unsecured Claims or the rights of any holders of TOPrS to receive distributions on account of their TOPrS Interests in these Chapter 11 Cases.

(b) Loan Commitments. The Loan Commitments shall be neither assumed nor rejected by any Debtor under the Plan and the rights and obligations of the Debtor and non-Debtor parties thereto shall not be affected by this Article VII or the Plan.

(c) Retirement Agreements. Each Retirement Agreement of any of the Debtors that is not rejected by an order of the Bankruptcy Court prior to the Effective Date, whether or not listed on Exhibit 7.2, shall be assumed by the applicable Debtor on the Effective Date or, to the extent that any Retirement Agreement is not an executory contract, Allowed Claims arising under such Retirement Agreement shall be Reinstated as of the Effective Date.

(d) Postpetition Executory Contracts and Unexpired Leases. Executory contracts and unexpired leases entered into after the Petition Date by any Debtor shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business, subject to the rights of the Debtors under those agreements and at law. Accordingly, such executory contracts and unexpired leases shall survive and remain unaffected by Confirmation.

(e) Indemnity Rights. To the extent that the rights of indemnity, if any, of the current or former officers and directors of any Debtor other than FNV Group may be considered to be rights under executory contracts, such contracts are rejected, except that rights of indemnity are retained to the extent provided in Section 5.11(c).

(f) No Admission. Listing a contract or lease on Exhibit 7.1 or Exhibit 7.2 shall not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that a Debtor or Reorganized Debtor has any liability thereunder.

(g) Retirement Plan. The Debtors affirm and agree that they are and will continue to be contributing sponsors of the Retirement Plan, as defined under 29 U.S.C. (S) 1301 (a)(13) and 29 C.F.R. (S) 4001.2, or a member of the contributing sponsor's controlled group, as defined under 29 U.S.C. (S) 1302 (a)(14) and 29 C.F.R. (S) 4001.2. As contributing sponsors (or members of the controlled group) of the Retirement Plan, the Debtors intend to fund the Retirement Plan in accordance with the minimum funding standards under ERISA, 29 U.S.C. (S) 1082, pay all required PBGC insurance premiums, 29 U.S.C. (S) 1307, and comply with all requirements of the Retirement Plan and ERISA. The Retirement Plan is a defined benefit pension insured by the Pension Benefit Guaranty Corporation under Title IV of ERISA, 29 U.S.C. (S)(S) 1301-1461. The Retirement Plan is subject to the minimum funding requirements of ERISA, 29 U.S.C. (S) 1084, and section 412 of the Internal Revenue Code, 26 U.S.C. (S) 412. No provision of or proceeding within the Debtor's reorganization proceedings, the Plan, nor the Confirmation Order shall in any way be construed as discharging, releasing or relieving the Debtors, Reorganized Debtors, or any other party in any capacity, from any liability with respect to the Retirement Plan or any other defined benefit pension plan under any law, government policy or regulatory provision. PBGC and the Retirement Plan shall not be enjoined or precluded from enforcing liability resulting from any of the provisions of the Plan or Plan's confirmation.

## ARTICLE VIII.

## PROVISIONS REGARDING VOTING AND CONFIRMATION REQUIREMENTS

8.1. Voting of Claims and Interests. No holder of an Allowed Claim or Allowed Interest in an unimpaired Class is entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim or Interest. Each holder of an Allowed Claim or Allowed Interest in an impaired Class that retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court. Each holder of an Allowed Claim or Allowed Interest in an impaired Class that does not retain or receive any property under the Plan is deemed to have rejected the Plan. The designation of Classes as "impaired" or "unimpaired" is set forth in Sections 4.1 and 4.2.

8.2. Confirmability and Severability of Plan. The confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the incorporation of the separate plans of reorganization for each debtor in a single joint plan of reorganization for purposes of, among other things, economy and efficiency, Section 5.1 shall be deemed a separate plan of reorganization for FNV Group, Section 5.2 shall be deemed a separate plan of reorganization for FNV Capital, Section 5.3 shall be deemed a separate plan of reorganization for FNV Canada, Section 5.4 shall be deemed a separate plan of reorganization for FNV UK, Section 5.5 shall be deemed a separate plan of reorganization for

FNV Loan, Section 5.6 shall be deemed a separate plan of reorganization for FNV Mezzanine, Section 5.7 shall be deemed a separate plan of reorganization for FNV Portfolio, Section 5.8 shall be deemed a separate plan of reorganization for FNV Technology and Section 5.9 shall be deemed a separate plan of reorganization for FNV Trust. Should any of such separate plans not be confirmed, the other Debtors may elect to alter, amend, revoke or withdraw the other separate plans or to seek Confirmation thereof. Should any of the Debtors' separate plans of reorganization not be confirmed, Berkadia shall have no obligation to provide financing under the Berkadia Loan in the event that the Debtors elect to consummate any or all of the other separate plans.

8.3. Nonconsensual Confirmation. If any impaired Class does not accept the Plan by the requisite statutory majorities provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired Class is deemed to have rejected the Plan, the Debtors reserve the right (a) to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, (b) to reallocate distribution of assets to Claims and Interests if necessary to obtain entry of the Confirmation Order and (c) to amend the Plan in accordance with Section 13.5 as necessary to obtain entry of the Confirmation Order.

ARTICLE IX.

IMPLEMENTATION OF THE PLAN

9.1 General Distribution Provisions.

(a) Distribution Address. Subject to Bankruptcy Rule 9019, all distributions under the Plan shall be made by the Disbursing Agent (i) if a proof of Claim is filed in respect of a particular Claim, to the holder, as of the Distribution Record Date, of each Allowed Claim at the address of such holder set forth in the relevant proof of claim, as such address may have been updated pursuant to Bankruptcy Rule 2002(g), (ii) if no proof of claim is filed in respect of a particular Claim, to the holder, as of the Distribution Record Date, of each Allowed Claim at the address set forth in the relevant Debtor's Schedules, as such address may have been updated pursuant to Bankruptcy Rule 2002(g) or (iii) to the holder, as of the Distribution Record Date, of each Allowed Interest at the address of such holder as listed in the equity interest ledger maintained by or on behalf of the applicable Debtor as of the Distribution Record Date; provided, however, that if the Debtors or the Reorganized Debtors have been notified, no later than ten Business Days prior to the Distribution Record Date, in writing of a change of address by such holder that provides an address different from that specified in (i), (ii) or (iii), above, then the distribution shall be made at the address contained in the written notification. Nothing contained in the Plan will require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim or Allowed Interest.

(b) Distributions to Holders as of the Distribution Record Date. As of the Distribution Record Date, the respective transfer registers for Claims and Interests, as maintained by the Debtors or their agents, will be closed. The Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Allowed Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute to only those holders of Allowed Claims or Allowed Interest who are holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date. The Disbursing Agent and the Reorganized Debtors shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan pursuant to Section 8.1) with only those record holders stated on the official claims register (for Claims) and official transfer ledgers (for Interests) as of the close of business on the Distribution Record Date.

(c) Plan Distributions. On the Distribution Date, the Disbursing Agent shall make all distributions or notifications contemplated under the Plan to the holder, as of the Distribution Record Date, of each Allowed Claim or Allowed Interest at the Distribution Address of such holder. Except as otherwise specified herein, payments made pursuant to the Plan will be in Cash by checks drawn on a domestic bank, or by wire transfer from a domestic bank, in each case at the option of the Disbursing Agent; provided, however, that Cash payments

to foreign holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(d) Allocation of Plan Distribution Between Principal and Interest. All distributions in respect of any Allowed Claim (other than the distribution of interest on Allowed Claims in Class FNV Capital-3) shall be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any.

(e) Distributions on Non-Business Days. Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

(f) No Distribution Pending Allowance. Notwithstanding any other provision of this Plan, no Cash or other property shall be distributed under this Plan on account of any Disputed Claim or Disputed Interest, unless and until such Claim becomes an Allowed Claim or Allowed Interest.

(g) No Distribution in Excess of Allowed Amount of Claim. Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution (of a value set forth herein or in the Disclosure Statement) in excess of the Allowed amount of such Claim, except that the foregoing shall not limit holders of Disputed Claims from receiving accrued interest as provided in this Plan, if that holder's Disputed Claim becomes Allowed.

(h) Setoffs. The Debtors are authorized, pursuant to section 553 of the Bankruptcy Code, to set off against any Allowed Claim or Allowed Interest and the distributions to be made on account of such Allowed Claim or Allowed Interest, the claims, rights and causes of action of any nature that the Debtors may hold against the holder of such Allowed Claim or Allowed Interest; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtors of any such claims, rights and causes of action that the Debtors may possess against such holder.

(i) Disputed Payments. If any dispute arises as to the identity of a holder of an Allowed Claim or Allowed Interest who is to receive any distribution, the Disbursing Agent may, in lieu of making such distribution to such Person, make such distribution into an escrow account to be held in trust for the benefit of such holder and such distribution shall not constitute property of the Debtors or their Estates. Such distribution shall be held in escrow until the disposition thereof shall be determined by Final Order or by written agreement among the interested parties to such dispute.

(j) Withholding Taxes. In connection with the consummation of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

(k) Obligations Incurred After the Confirmation Date. Payment obligations incurred after the date and time of entry of the Confirmation Order, including, without limitation, the Professional Fees of the Debtors through the Effective Date, shall not be subject to application or proof of Claim and may be paid by the Debtors in the ordinary course of business and without further Bankruptcy Court approval, as Administrative Claims.

(l) No Distribution of Fractional Securities. Notwithstanding any other provisions of the Plan, to the extent that any Additional Group Common Stock, New Group Preferred Stock, Additional Mezzanine Common Stock or New Senior Notes are issued to holders of Allowed Claims, only whole numbers of such shares or notes shall be issued. The New Senior Notes shall be issued in denominations of $1,000 or multiples thereof (with denominations of $500 or less rounded down to the nearest $1,000 and with denominations greater than $500 rounded up to the nearest $1,000). When any distribution of stock or rights on account of an Allowed Claim would otherwise result in the issuance of a number of shares that is not a whole number, the Disbursing Agent shall extinguish all fractional shares otherwise then distributable.

9.2. Method of Making Distributions to Disputed Claims and Disputed Interests.

(a) Distributions Upon Allowance of Disputed Claims and Disputed Interests. Disputed Claims or Disputed Interests that become Allowed after the Effective Date shall receive the distribution set forth in the applicable section of Article V. Cash payments to be made on account of any such Claims shall be paid by the applicable Reorganized Debtor from operating capital in the ordinary course of its business.

(b) Resolution of Disputed Claims and Disputed Interests. No distribution or payment shall be made on account of a Disputed Claim or Disputed Interest unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest. Unless otherwise ordered by the Bankruptcy Court, after the Effective Date, the Reorganized Debtors shall have the exclusive right to make and file Objections to and settle, compromise or otherwise resolve Claims and Interests, except that as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, objections may be made in accordance with the applicable Bankruptcy Rules by parties in interest in these Chapter 11 Cases. The Debtors or Reorganized Debtors, as applicable, shall file and serve a copy of each Objection upon the holder of the relevant Claim or Interest as soon as practicable, but in no event later than (i) 60 days after the Effective Date, or (ii) such other time as may be fixed or extended by the order of the Bankruptcy Court. After the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

9.3. Estimation of Disputed Claims and Disputed Interests. The Debtors may, at any time, request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest subject to estimation under section 502(c) of the Bankruptcy Code and for which the Debtors may be liable under this Plan, including any Disputed Claim or Disputed Interest for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim or Interest; and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim or Disputed Interest pursuant to section 502(c) of the Bankruptcy Code at any time during litigation concerning any objection to the Claim or Interest. In the event that the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim or Disputed Interest, that estimated amount will constitute (at the Debtors' option, to be exercised at the commencement of the estimation proceeding) either the Allowed amount of such Claim or Interest or a maximum limitation on the Allowed amount of such Claim or Interest, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim or Interest, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim or Interest. All of the aforementioned Disputed Claims or Disputed Interests objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Disputed Claims or Disputed Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

9.4. Treatment of Unclaimed Property.

(a) Unclaimed or Undeliverable Distributions. Any distributions under the Plan, in respect of an Allowed Claim or Allowed Interest, that are unclaimed or undeliverable for a period of one year after the applicable Distribution Date thereof shall be classified as "Unclaimed Property."

(b) Distribution of Unclaimed Property. Any distributions made under the Plan that become Unclaimed Property pursuant to Section 9.4(a) shall be revested in the applicable Reorganized Debtor, free of any restrictions thereon, and any entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and forever barred.

9.5. Surrender of Instruments, Securities and Other Documentation. Following the Effective Date, holders of Bank Claims, Debt Securities Claims and TOPrS will receive from their respective Indenture Trustee, agents, or from the Disbursing Agent specific instructions regarding the time and manner in which the instruments relating to such Claims and Interests are to be surrendered. All Distributions under this Plan in

respect of Allowed Bank Claims and Allowed Debt Securities Claims and Allowed TOPrS Interests shall be made to the applicable Indenture Trustee or agent for the benefit of such holders, and shall be subject to any rights or liens that the applicable Indenture Trustees may have for fees, costs, expenses and indemnification under the respective indentures or other agreement. Any note evidencing the Bank Claims or the Debt Securities Claims or any security evidencing the TOPrS Interests which is lost, stolen, mutilated or destroyed, shall be deemed surrendered when the holder of a Claim or Interest based thereon delivers to the applicable Indenture Trustee, agent, or the Disbursing Agent (a) evidence satisfactory to the Indenture Trustee, agent, or Disbursing Agent of the loss, theft, mutilation or destruction of such instrument or certificate, and (b) such security or indemnity as may be required by the Indenture Trustee, agent, or the Disbursing Agent to hold each of them harmless with respect thereto. No holder of a Bank Claim, Debt Securities Claim or TOPrS Interest shall receive any distribution on account of its Claim or Interest under this Plan until it has complied with the provisions of this Section 9.5. The applicable Indenture Trustee or agent shall return to the applicable Reorganized Debtor any distributions that become Unclaimed Property pursuant to Section 9.4(a) and such amounts shall be revested in the applicable Reorganized Debtor, except in the case of FNV Trust, for which any Unclaimed Property shall be vested in Reorganized FNV Group on account of its cancelled Interests in FNV Trust.

## ARTICLE X.

## DISCHARGE, TERMINATION, INJUNCTION AND RELEASES

10.1. Discharge of Debtors. Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (i) discharge the Debtors from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code or (C) the holder of a Claim based on such debt has accepted the Plan; (ii) cancel all Interests and other rights of equity security holders in the Debtors except to the extent that the Plan expressly provides for the retention or Reinstatement of such Interests, whether or not (A) a proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (B) an Interest is Allowed pursuant to section 502 of the Bankruptcy Code or (C) the holder of an Interest has accepted the Plan; and (iii) preclude all persons from asserting against the Reorganized Debtors, their successors, or their assets or properties, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this Section 10.1 shall void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim or canceled Interest.

10.2. Injunction Related to the Discharge. Except as otherwise provided in the Plan or the Confirmation Order, all entities that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors, or an Interest or other right of an equity security holder in any or all of the Debtors, that are discharged pursuant to the terms of the Plan are permanently enjoined, on and after the Effective Date, from taking any of the following actions on account of any such Claims, debts, liabilities or Interests or rights: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest or right, other than to enforce any right to a distribution pursuant to the Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or their property or interests in property, on account of any such Claim, debt, liability, Interest or right; (iii) creating, perfecting, or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their property or interests in property on account of any such Claim, debt, liability, Interest or right; (iv) asserting any right of setoff, subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors or against their property or interests in property on account of any such Claim, debt, liability, Interest or right; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan

or the Confirmation Order. Such injunction shall extend to any successor of the Debtors (including, without limitation, the Reorganized Debtors) and their respective property and interests in property. Any entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

10.3. Release of Liens. Except as otherwise expressly provided in the Plan or in any contract, instrument, indenture or other agreement or document expressly incorporated by reference in the Plan, on the Effective Date, all Liens and rights of setoff against the property of any Estate shall be released, and all of the right, title and interest of any holder of any Lien shall revert to the applicable Reorganized Debtor and its successors and assigns.

10.4. Term of Bankruptcy Injunction or Stays. All injunctions or stays provided for in the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date or the date on which the last Disputed Claim has been resolved, whether by consent, Final Order or otherwise.

10.5. Releases.

(a) Releases by the Debtors. As of the Effective Date, each of the Debtors releases, unconditionally and forever, (i) Berkadia, Leucadia, Berkshire and their respective Affiliates, and the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of each of Berkadia, Leucadia, Berkshire and their respective Affiliates and (ii) each of the Official Committees, their current and former respective members (in their capacities as members of such Official Committees), and their agents, advisors, attorneys and representatives (in such capacities), from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce their respective obligations to the Debtors or the Reorganized Debtors under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, as applicable), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement.

(b) Releases by Holders of Claims and Interests. As of the Effective Date, in exchange for their receipt of distributions and other treatment contemplated under this Plan, each holder of a Claim or Interest releases, unconditionally and forever, any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than (i) the right to enforce the Debtors' or the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, (ii) any rights under assumed contracts, Loan Commitments, Leveraged Leases and other contracts that are not rejected or otherwise extinguished by order of the Bankruptcy Court or pursuant to the Plan and (iii) any rights, claims or interests that are Reinstated under the terms of the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, against (A) any Debtor or Affiliate thereof, and (B) Berkadia, Leucadia, Berkshire and their respective Affiliates, and the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of each of Berkadia, Leucadia, Berkshire and their respective Affiliates, whether then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement.

(c) Injunction Related to Releases. The Confirmation Order will constitute an injunction permanently enjoining the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claim, demand, debt, liability, cause of action, right or Interest released and waived pursuant to the Plan against the released parties.

ARTICLE XI.

CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

11.1. Conditions to Confirmation. The following conditions shall be met prior to Confirmation of the Plan:

(a) Disclosure Statement Order. An Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been issued by the Bankruptcy Court no later than July 6, 2001.

(b) Approval of Commitment Letter. An Order approving the Debtors' entry into the Commitment Letter, including with respect to all fees and expenses set forth therein, shall have been issued by the Bankruptcy Court no later than the earlier of (i) the date of issuance of the order approving the Disclosure Statement, as described in Section 11.1(a), and (ii) July 6, 2001.

(c) Approval of Management Agreement. An Order approving the Debtors' entry into the Management Agreement, including with respect to all fees and expenses set forth therein, shall have been issued by the Bankruptcy Court no later than the earlier of (i) the date of issuance of the order approving the Disclosure Statement, as described in Section 11.1(a), and (ii) July 6, 2001.

11.2. Conditions to the Effective Date. The following are conditions precedent to, or shall occur simultaneously with, the Effective Date:

(a) Confirmation Order. A Confirmation Order, in form and substance reasonably satisfactory to the Debtors, Berkadia, Leucadia and Berkshire, shall have been entered by the Bankruptcy Court and become a Final Order.

(b) Additional Group Common Stock. The Additional Group Common Stock to be issued to the Berkadia Parties shall be duly authorized and, with the occurrence of the Effective Date, validly issued and outstanding, fully paid, and nonassessable.

(c) Necessary Approvals. All necessary governmental approvals for the Restructuring Transactions, including but not limited to approval under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Competition Act of Canada, and the Competition Act of England, if required, shall have been obtained. The Additional Group Common Stock to be issued to the Berkadia Parties on the Effective Date shall have been approved for listing on the New York Stock Exchange upon official notice of issuance, if the common stock of FNV Group is listed on the New York Stock Exchange on such date (or approved for listing or quotation by such other securities exchange or quotation system on which the FNV Group common stock is then listed or quoted).

(d) Restructuring Transactions. All conditions precedent to the Restructuring Transactions, as set forth herein or in a Restructuring Document, shall have been satisfied.

(e) No Revocation. No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall be pending as of the Effective Date or, if such a request has been made, then such request shall have been denied by a Final Order.

(f) New Corporate Documents. The New Corporate Documents referenced in Section 6.3(a) shall have been authorized and, to the extent necessary under applicable law, filed; the Rights Plan shall have been amended to provide for the termination thereof and for the expiration of the Rights thereunder, without any payment by FNV Group and without the Rights thereunder having separated from the FNV Group common stock or having become exercisable; and such Corporate Documents and Rights Plan amendment shall, with the occurrence of the Effective Date, be in full force and effect.

(g) New Senior Notes Indenture. The New Senior Notes Indenture shall be qualified under the Trust Indenture Act of 1939, as amended.

(h) Other. All actions, other documents and agreements necessary to implement the Plan shall be executed and delivered on the Effective Date.

11.3. Waiver of Conditions. The Debtors may, at their option, but only with Berkadia's written consent, waive the conditions set forth in Sections 11.1 and 11.2, provided, however, that the Debtors may not waive entry of the Disclosure Statement Order, entry of the Confirmation Order, or any condition the waiver of which is proscribed by law. Any such waivers shall be evidenced by a writing, signed by the waiving parties and served upon counsel for the Official Committees and the United States Trustee and filed with the Bankruptcy Court. The waiver may be a conditional one, such as to extend the time under which a condition may be satisfied.

11.4. Effect of Failure of Conditions. In the event that the conditions specified in Section 11.2 have not been satisfied or waived in the manner provided in Section 11.3 on or before August 31, 2001, then upon written notification filed by the Debtors with the Bankruptcy Court and served upon counsel for Berkadia, Berkshire, Leucadia and the Official Committees and the Office of the United States Trustee, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) all the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## ARTICLE XII.

## ADMINISTRATIVE PROVISIONS

12.1. Retention of Jurisdiction. The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, and the allowance of Claims resulting therefrom;

(b) To determine any and all applications, adversary proceedings and contested matters commenced in connection with the Chapter 11 Cases, whether commenced prior to or after the Effective Date;

(c) To hear and determine any objections to Administrative Claims or to other Claims or any controversies as to the classification of any Claims, provided that only the Debtors may file objections to Claims;

(d) To liquidate, or address any issue involving, any Disputed Claim or Disputed Interest;

(e) To determine any Claim of or liability to a governmental unit that may be asserted as a result of the transactions contemplated herein;

(f) To enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(g) To issue such orders in aid of execution of the Plan as may be necessary or appropriate to carry out its intent and purpose or to implement the Plan; or in furtherance of the discharge, to the extent authorized by section 1142 of the Bankruptcy Code;

(h) To consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order as may be necessary to carry out its purpose and the intent of the Plan;

(i) To hear and determine all applications by Professionals for compensation and reimbursement of expenses;

(j) To ensure that distributions and rights granted to holders of Allowed Claims and Allowed Interests are accomplished as provided herein;

(k) To value the Additional Group Common Stock, New Group Preferred Stock and Additional Mezzanine Common Stock, if any, to be distributed pursuant to the Plan;

(l) To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(m) To enforce this Plan, the Confirmation Order and any other order, judgment, injunction or ruling entered or made in the Chapter 11 Cases, including, without limitation, the injunction, exculpation and releases provided for in this Plan;

(n) To recover all assets of the Debtors and all property of their Estates, wherever located;

(o) To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(p) To determine the validity, extent, priority and nonavoidability of Liens and other encumbrances;

(q) To hear any other matter not inconsistent with the Bankruptcy Code; and

(r) To enter a final decree closing the Chapter 11 Cases.

ARTICLE XIII.

MISCELLANEOUS PROVISIONS

13.1. Plan Supplement. No later than ten Business Days prior to the deadline for objections to Confirmation, the Debtors shall file with the Bankruptcy Court in the Plan Supplement such Exhibits, Schedules, agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Such documents shall include the Berkadia Loan Documents, the Restructuring Documents and the New Corporate Documents, as well as any Exhibits to the Plan that have not already been filed or that have been amended since the original filing date. Upon the filing of the Plan Supplement with the Court, (i) the Debtors will serve copies of the Plan Supplement on the Office of the United States Trustee and counsel for Berkadia, Leucadia, Berkshire and the Official Committees and (ii) the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Debtors' counsel. The Plan Supplement is incorporated into, and is a part of, this Plan as if set forth in full herein, and all references to this Plan shall refer to this Plan together with all documents contained in the Plan Supplement.

13.2. Termination of Official Committees. Except as otherwise provided in this Section 13.2, on the later of the date on which (a) the Effective Date has occurred and (b) the Confirmation Order has become a Final Order, the Official Committees shall cease to exist and their members, employees or agents (including without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) shall be released and discharged from any further authority, duties, responsibilities and obligations relating to, arising from, or in connection with the applicable Official Committee. The Official Committees shall continue to exist after such date solely with respect to (i) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional, and any matters pending as of the Effective Date in the Chapter 11 Cases, until such matters are finally resolved, (ii) any post-Confirmation modifications to the Plan or Confirmation Order and (iii) any matters pending as of the Effective Date before the Bankruptcy Court to which the applicable Official Committee is a party, until such matters are resolved.

13.3. Employment and Payment of Debtors' Professionals After Effective Date. The Reorganized Debtors may employ and pay professionals, including any Professionals retained in the Chapter 11 Cases, with respect to services to be rendered after the Effective Date, including services in connection with the implementation and consummation of the Plan, without further order of the Bankruptcy Court.

13.4. Limitation of Liability. The Debtors, the Reorganized Debtors, Berkadia, Leucadia, Berkshire and their respective Affiliates, and the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of Berkadia, Leucadia, Berkshire or their respective Affiliates (acting in such

capacity), shall neither have nor incur any liability to any entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken in connection with the Plan; provided, however, that, with respect to any Person (other than Berkadia, Leucadia, Berkshire and their respective Affiliates, and the respective officers, directors, employees, members, managers, agents, advisors, attorneys and representatives of each of Berkadia, Leucadia, Berkshire and their respective Affiliates (acting in such capacity)), the foregoing provisions of this Section 13.4 shall have no effect on the liability that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

13.5. Amendment or Modification of Plan. Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, if the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before the Effective Date, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court after notice and hearing confirms the Plan as altered, amended or modified. A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of the holder. Otherwise, the Debtors may alter, amend or modify the treatment of Claims and Interests provided for under the Plan only if the holders of Claims or Interests affected thereby agree or consent to any such alteration, amendment or modification. Without limiting the conditions set forth in Article XI, Berkadia shall not be required to fund the Berkadia Loan unless the Plan as altered, amended or modified is in form and substance reasonably satisfactory to Berkadia.

13.6. Severability. In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, the Debtors may, at their option, (a) treat such provision as invalid, void or unenforceable with respect to the holder or holders of such Claims or Interests as to which the provision is determined to be invalid, void or unenforceable, in which case such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan, or (b) alter, amend, revoke, or withdraw the Plan; provided, however, that Berkadia shall not be required to fund the Berkadia Loan unless the Plan after such severance, alteration, amendment or modification is in form and substance reasonably satisfactory to Berkadia.

13.7. Inconsistency. Except as provided in the following sentence, in the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or Disclosure Statement or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern. In the event of any inconsistency between the Plan and the Restructuring Documents, any exhibit thereto or any other instrument or document created or executed pursuant to the Restructuring Documents, the Restructuring Documents shall govern.

13.8. Revocation or Withdrawal of Plan. The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

13.9. Governing Law. Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, or other federal laws apply, and except for Reinstated Claims or assumed executory contracts or unexpired leases governed by another jurisdiction's law, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

13.10. Binding Effect. Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of this Plan shall be binding upon and inure to the benefit of the Debtors, any holder of a Claim against, or Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such holder has accepted this Plan.

13.11. Headings. Captions and headings to Articles and Sections are used in this Plan for convenience and reference only and are not intended to be a part of or to affect the interpretation of the Plan.

13.12. Notices. Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, (c) facsimile or (d) reputable overnight delivery service, freight prepaid. If to the Debtors, any such notice shall be directed to the following at the addresses set forth below:

The FINOVA Group Inc., et al.
4800 N. Scottsdale Road, 6W90
Scottsdale, Arizona 85251-7623
Attention: William J. Hallinan
Richard Lieberman

with a copy to

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: Jonathan M. Landers
Janet M. Weiss

The FINOVA Group Inc., et al.,
Debtors

/s/ William J. Hallinan
By: ______________________________
William J. Hallinan
Authorized Officer for the Debtors

Richards, Layton & Finger, P.A.

/s/ Deborah E. Spivack
By: ______________________________
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Deborah E. Spivack (No. 3220)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 658-6541
Facsimile: (302) 658-6548

-and-

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for Debtors

Dated: June 13, 2001
Wilmington, Delaware

EXHIBIT 1.11--BANK CREDIT AGREEMENTS
(As of March 7, 2001)

| Entity | Facility |
|---|---|
| FINOVA Capital Corporation.......... | $1 Billion Credit Agreement (Short Term Facility) dated as of May 16, 1994 |
| FINOVA Capital Corporation.......... | $1 Billion Sixth Amendment and Restatement dated as of May 16, 1994 of Credit Agreement dated as of May 31, 1976 |
| FINOVA Capital Corporation.......... | $600 Million Credit Agreement dated as of May 19, 1998 |
| FINOVA Capital Corporation.......... | $500 Million Credit Agreement (Short Term Facility) dated as of May 5, 1999 |
| FINOVA Capital Corporation.......... | $700 Million Credit Agreement dated as of March 21, 1995 |
| FINOVA Capital Corporation.......... | $700 Million Credit Agreement dated as of May 15, 1996 |
| FINOVA Capital plc.................. | $100 Million Credit and Guarantee Agreement dated as of July 7, 1997 |
| FINOVA (Canada) Capital Corporation.. | CAD $150 Million Credit Agreement dated as of July 23, 1998 |

EXHIBIT 1.37--DEBT SECURITIES(1)

| | INDENTURE | CURRENT TRUSTEE: | DATED AS OF: | PRINCIPAL AMOUNT OUTSTANDING: |
|---|---|---|---|---|
| 1. | Security Pacific National Bank | US Bancorp Trust National Association | November 1, 1990 Supp. Indentures: 1st--2/12/92; 2nd--2/20/92; 3rd--5/4/92; 4th--4/17/92 | $ 305,675,000 |
| 2. | Greyhound Financial Corporation and the Chase Manhattan Bank, N.A. | HSBC | September 1, 1992 | $ 230,000,000 |
| 3. | First Interstate Bank of Arizona, N.A. | The Bank of New York | October 1, 1995 | $ 970,000,000 |
| 4. | First National Bank of Chicago | Wilmington Trust | March 20, 1998 | $1,900,000,000 |
| 5. | Norwest Bank Minnesota, N.A. | Wilmington Trust | May 15, 1999 | $ 250,000,000 |
| 6. | FMB Bank | Wilmington Trust | May 15, 1999 | $ 225,000,000 |
| 7. | First National Bank of Chicago | Wilmington Trust | May 15, 1999 | $2,005,000,000 |
| 8. | The Chase Manhattan Bank--London branch (no US registration or Indenture) | Chase London (Fiscal Agent) | June 4, 1998 (covenants contained in Terms and Conditions of Notes) | $ 418,592,000 (FINOVA Capital as guarantor) |
| 9. | Bear Stearns Securities Corp formerly Prudential Securities | | February 11, 1982 | $ 4,000,000 |
| 10. | Morgan Guaranty Trust Company for Kingsley & Co. (Sundstrand Lease) | | December 14, 1987 | $ 5,812,928 |
| 11. | Phoenix Home Life Mutual Insurance | | September 1, 1996 | $ 950,000 |

Company

| | | | | |
|---|---|---|---|---|
| 12. | Fleet National Bank (FINOVA Finance Trust) | State Street Bank | December 11, 1996 | $ 115,000,000(2) |

--------

(1) PLEASE NOTE: THE DEFINED TERM "DEBT SECURITIES" INCLUDES ALL PUBLIC NOTES ISSUED BY FNV CAPITAL.

(2) (This amount excludes securities that are owned indirectly by FNV Group.)

EXHIBIT 1.69--INDENTURE TRUSTEES

FINOVA Capital Corporation
Trustees as of 3/7/01
(in millions)

| Institution | Creditor Type | Debt Outstanding | Contact Name | Address | Phone Number | Fax Number |
|---|---|---|---|---|---|---|
| The Bank of New York | Indenture Trustee | $ 920.00 | Walter Gitlin | 101 Barclay Street<br>New York, NY 10286 | (212) 815-5375 | (212) 815-5915 |
| Chase Manhattan Bank--London | Indenture Trustee | $ 418.59 | Mark Storey | 1 Chaseside<br>Bournemouth BH7 7DB<br>United Kingdom | 44 1 202 347 436 | 44 1 202 347 438 |
| US Bank Trust National Association | Indenture Trustee | $ 305.68 | Robert Von Hess | 101 N. First Avenue,<br>Suite 2000<br>Phoenix, AZ 85003 | (602) 371-3568 | (602) 371-3728 |
| HSBC Bank USA (formerly Chase) | Indenture Trustee | $ 230.00 | Rosario Palladino | Issuer Services<br>452 Fifth Avenue<br>New York, NY 10018-2706 | (212) 525-1324 | (212) 525-1300 |
| Wilmington Trust (successor trustee to Bank One, Allfirst, Wells) | Indenture Trustee | $4,380.00 | Steven Cimalore | Rodney Square North<br>1100 North Market Street<br>Wilmington DE 19890-0001 | (302) 651-8681 | (302) 427-4749 |
| State Street Bank--TOPrS--FINOVA Finance Trust | Trustee | $ 115.00 | Robert Butzier | | (617) 662-1751 | |

EXHIBIT 1.75--LEVERAGED LEASES(1)

| Line of Business | Customer Name | Equity State | EMA as of 12/31/00 |
|---|---|---|---|
| Specialty Real Estate | Accor/Sofitel Hotels | PA | $ 5,518,502 |
| Specialty Real Estate | Accor/Sofitel Hotels | NY | $10,309,438 |
| Specialty Real Estate | Barclays Wall Street Realty Co | NY | $14,129,880 |
| Specialty Real Estate | BellSouth Corporation | FL | $ 9,105,318 |
| Specialty Real Estate | BellSouth Corporation | NC | $21,300,204 |
| Specialty Real Estate | Branch Banking & Trust Co. | NC | $ 5,181,879 |
| Specialty Real Estate | CBS, Inc. | MD | $ 6,923,279 |
| Specialty Real Estate | CBS, Inc. | FL | $10,384,919 |
| Specialty Real Estate | CBS, Inc. | PA | $42,375,243 |
| Specialty Real Estate | Continental Corp. | NY | $ 3,495,677 |
| Specialty Real Estate | Continental Corp. | NJ | $ 6,340,888 |
| Specialty Real Estate | Continental Corp. | OH | $ 5,796,144 |
| Specialty Real Estate | Cornerstone Columbia Devel. Co | WA | $24,002,609 |
| Specialty Real Estate | Kroger Company | LA | $ 506,135 |
| Specialty Real Estate | Kroger Company | KY | $ 557,483 |
| Specialty Real Estate | Kroger Company | NC | $ 572,153 |
| Specialty Real Estate | Kroger Company | MS | $ 623,500 |
| Specialty Real Estate | Kroger Company | MO | $ 660,177 |
| Specialty Real Estate | Kroger Company | TN | $ 1,247,000 |
| Specialty Real Estate | Kroger Company | GA | $ 1,364,365 |
| Specialty Real Estate | Kroger Company | TX | $ 1,804,483 |
| Specialty Real Estate | Nevada Savings & Loan Assoc. | NV | $33,214,899 |
| Specialty Real Estate | Safeway Stores, Inc. | AZ | $ 1,336,012 |
| Specialty Real Estate | Safeway Stores, Inc. | MO | $ 1,799,905 |
| Specialty Real Estate | Safeway Stores, Inc. | FL | $ 3,618,367 |
| Specialty Real Estate | Safeway Stores, Inc. | WA | $ 5,211,425 |
| Specialty Real Estate | Safeway Stores, Inc. | TX | $ 6,605,839 |
| Specialty Real Estate | Sundstrand Corporation | IL | $ 3,474,203 |
| Specialty Real Estate | Sundstrand Corporation | IL | $ 5,907,193 |
| Specialty Real Estate | Swiss Bank Corporation | CT | $26,021,064 |
| Specialty Real Estate | Winn-Dixie Stores, Inc. | FL | $ 3,375,065 |
| Transportation Finance | A.I. Leasing II, Inc. | VA | $ 6,675,739 |
| Transportation Finance | ACA/7/22 | VA | $ 5,207,895 |
| Transportation Finance | Alaska Airlines, Inc. 756/760 | WA | $21,595,754 |
| Transportation Finance | Alaska Airlines, Inc. N788 | WA | $10,353,607 |
| Transportation Finance | Alaska N769AS | WA | $10,618,227 |
| Transportation Finance | Alaska N791AS | WA | $10,174,491 |
| Transportation Finance | American Trans Air, Inc.--516 | IN | $23,003,306 |
| Transportation Finance | American Trans Air, Inc.--517 | IN | $16,493,165 |
| Transportation Finance | American Trans Air, Inc.--Engine 449 | IN | $ 2,970,736 |
| Transportation Finance | ATL--ACA7186 | VA | $ 5,238,877 |
| Transportation Finance | ATL--ACA7211 | VA | $ 5,199,222 |
| Transportation Finance | ATL--ACA7214 | VA | $ 5,160,681 |
| Transportation Finance | ATLAS--N491MC | CO | $45,235,677 |
| Transportation Finance | ATLAS--N493MC | CO | $46,430,840 |
| Transportation Finance | Cargill | MN | $10,805,107 |
| Transportation Finance | Con N27610 | TX | $ 9,206,418 |
| Transportation Finance | Conrail 30 | PA | $17,356,592 |

--------

(1) Leveraged Leases with respect to Continental Airlines, Inc., include leases with respect to aircraft numbers N16234, N14237, N14604, N16607, N33608, N27610, N14613, N16618, N18622, N17245 and N14628. In addition, the Debtors are reviewing whether the transaction with respect to aircraft number N14810 is a Leveraged Lease.

| Line of Business | Customer Name | Equity State | EMA as of 12/31/00 |
|---|---|---|---|
| Transportation Finance | Continental 11/99 | TX | $11,486,401 |
| Transportation Finance | Continental 604 | TX | $ 7,802,456 |
| Transportation Finance | Continental 607 | TX | $ 7,714,118 |
| Transportation Finance | Continental 608 | TX | $ 7,698,123 |
| Transportation Finance | Continental 613 | TX | $ 8,123,315 |
| Transportation Finance | Continental 618 | TX | $ 7,910,188 |
| Transportation Finance | Continental 622 | TX | $ 7,954,258 |
| Transportation Finance | Continental 628 | TX | $ 9,960,051 |
| Transportation Finance | Continental N14237 | TX | $11,266,016 |
| Transportation Finance | Continental N16234 | TX | $11,253,017 |
| Transportation Finance | Delta N617DL | GA | $15,460,540 |
| Transportation Finance | GATC -501 railcars | TX | $16,034,555 |
| Transportation Finance | Horizon 345 | WA | $ 2,677,903 |
| Transportation Finance | Horizon 346 | WA | $ 2,687,483 |
| Transportation Finance | Horizon 347 | WA | $ 2,706,644 |
| Transportation Finance | Horizon 348 | WA | $ 2,728,201 |
| Transportation Finance | Horizon 354 | WA | $ 2,885,335 |
| Transportation Finance | Horizon 356 | WA | $ 2,864,287 |
| Transportation Finance | Horizon 358 | WA | $ 2,546,744 |
| Transportation Finance | Horizon 359 | WA | $ 2,557,446 |
| Transportation Finance | Horizon 360 | WA | $ 2,606,315 |
| Transportation Finance | Horizon 362 | WA | $ 2,659,581 |
| Transportation Finance | Horizon 364 | WA | $ 2,775,675 |
| Transportation Finance | Horizon 365PH | WA | $ 2,785,334 |
| Transportation Finance | Horizon 366 | WA | $ 2,763,085 |
| Transportation Finance | Horizon 367PH | WA | $ 2,785,348 |
| Transportation Finance | Northwest Airlines 1995 N535US | MN | $24,930,313 |
| Transportation Finance | Northwest Airlines 1996 N537US | MN | $19,037,868 |
| Transportation Finance | Northwest Airlines N501/6 | MN | $35,606,538 |
| Transportation Finance | Union Pacific | NE | $17,353,984 |
| Transportation Finance | United 505 | IL | $12,363,443 |
| Transportation Finance | United 517 | IL | $13,241,357 |
| Transportation Finance | United 525 | IL | $15,718,811 |
| Transportation Finance | UP St Louis SW | NE | $ (16,204) |
| Transportation Finance | US Airways N101 | VA | $11,464,260 |
| Transportation Finance | US Airways N706 | VA | $ 9,855,646 |
| Transportation Finance | US Airways N707 | VA | $ 9,854,922 |
| Transportation Finance | Western Fuels Assoc. Inc. | CO | $ 1,818,750 |

EXHIBIT 1.81--NEW GROUP PREFERRED STOCK TERM SHEET

| | |
|---|---|
| Issuer...................... | The FINOVA Group Inc. |
| Security.................... | Shares of 6% Perpetual Non-Cumulative Redeemable Preferred Stock (the "New Group Preferred Stock") with an aggregate liquidation preference equal to the Excess Amount, if any, attributable to Allowed Debt Securities (S)510(b) Claims in Class FNV Capital-5. |
| Dividends................... | Non-cumulative cash dividends on the New Group Preferred Stock will be payable at a rate of 6% per annum of the per share liquidation preference when, as and if declared by the Board of Directors. To the extent dividends are declared, they will be payable semi-annually on the semi-annual payment dates for the New Senior Notes. |
| Ranking..................... | The New Group Preferred Stock will rank senior to the FNV Group common stock (and any other FNV Group stock without a liquidation preference) and pari passu with or junior to any other FNV Group preferred stock, as determined by the FNV Group Board of Directors, both as to dividends and upon liquidation, dissolution or winding up. No dividends on the FNV Group common stock may be paid unless dividends for the then current period (but not prior periods) are paid on the New Group Preferred Stock. |
| Liquidation Preference....... | If FNV Group dissolves, is liquidated or is wound up, holders of the New Group Preferred Stock will be entitled to receive, out of any assets available for distribution to stockholders after satisfaction of the preferences of any FNV Group preferred stock that is senior to the New Group Preferred Stock, up to the per share liquidation preference, plus declared and unpaid dividends, if any, prior to any payment being made to the holders of FNV Group common stock or any other junior stock with respect to the distribution of assets upon dissolution, winding up or liquidation. |
| Optional Redemption.......... | FNV Group will have the option to redeem the New Group Preferred Stock at any time or from time to time, in whole or in part, at a redemption price equal to the per share liquidation preference, plus declared and unpaid dividends, if any, to the redemption date. |
| Open Market or Negotiated Repurchases................ | FNV Group may repurchase New Group Preferred Stock at any time and from time to time, in whole or in part, in the open market or negotiated transactions. |

Voting Rights................ None, except:

- with respect to changes in the terms of the New Group Preferred Stock that are materially adverse to the holders of the New Group Preferred Stock; and
- in the event the FNV Group Board of Directors does not declare dividends on the New Group Preferred Stock for six consecutive dividend periods, the size of the Board of Directors will be increased by one and the holders of the New Group Preferred Stock, voting as a separate class, will be entitled to elect one director, who shall serve until such time as dividends have been declared and have been paid with respect to one semi-annual dividend period.

EXHIBIT 6.2(a)--BERKADIA LOAN TERM SHEET

This Summary of Terms and Conditions outlines certain terms of the Facility referred to in the Commitment Letter dated February 26, 2001 among The FINOVA Group Inc. ("FNV"), FINOVA Capital Corporation (the "Company" or the "Borrower"), Lender, Berkshire and Leucadia (the "Commitment Letter") as amended by letter agreements dated May 2, 2001, May 30, 2001, June 10, 2001 and June 13, 2001. This Summary of Terms and Conditions is part of and subject to the Commitment Letter. Certain capitalized terms used herein are defined in the Commitment Letter.

Borrower:.................... The Company.

Guarantors:.................. FNV and all of FNV's direct and indirect subsidiaries other than (i) the Company and (ii) any special purpose subsidiary that is contractually prohibited (as of February 26, 2001) from acting as a guarantor (the "Guarantors").

Lender:...................... Berkadia LLC ("Lender").

The Facility:................ A five-year amortizing term loan made to the Borrower in a single drawing on the Closing Date in a principal amount of $6,000,000,000 (the "Term Loan"), mandatorily prepayable with cash flows as set forth under "Prepayments."

The final maturity date for the Term Loan will be five years from the Closing Date.

Closing Date:................ On or before August 31, 2001.

Purpose:..................... Proceeds of the Term Loan will be used solely to repay a portion of the pre-petition debt and post-petition interest of the Company and its subsidiaries in accordance with the Plan.

Interest:.................... The Term Loan will bear interest at a floating rate equal to:

the current LIBO rate (for a period not to exceed six months and to be determined prior to execution of the loan documentation) as quoted by Telerate Page 3750, adjusted for reserve requirements, if any, applicable to Lender's source of funds and subject to customary change of circumstance provisions and reserve requirements applicable to Lender and Lender's provider of funds (the "LIBO Rate"), plus 2.25% per annum.

The interest rate shall be reset daily and interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.

Interest shall be payable quarterly.

Default Interest:............ During the continuance of an event of default (as defined in the loan documentation), the Term Loan (including unpaid interest and unpaid default interest) will bear interest at an additional 2% per annum.

Prepayments:................ Following the (i) payment of or funding of a reserve for accrued interest on the Term Loan, (ii) payment of operating expenses and taxes of FNV, the Company and their respective subsidiaries, (iii) funding of reasonable reserves for (a) revolving and unfunded commitments existing at the Closing Date and acceptable to Lender, (b) commitments otherwise acceptable to Lender and (c) general corporate purposes of FNV, the Company and their respective subsidiaries, and (iv) payment of accrued interest on the Senior Notes, mandatory prepayments of the Term Loan without premium thereon shall be required in an amount equal to the aggregate net positive amount of each of (x) 100% of the net sale proceeds from asset sales, (y) 100% of excess cash flow (to be defined in the loan documentation) and (z) 100% of net proceeds from insurance and condemnation, in each case received by FNV, the Company or any of its subsidiaries, except to the extent any special purpose subsidiary is subject (as of February 26, 2001) to a contractual restriction on making distributions to its parent entity. In no event shall the Company or its subsidiaries make any prepayment on the Term Loan out of any refinancing or issuance of securities.

Security:................... All amounts owing by and the obligations of the Company under the Term Loan and the Guarantors in respect thereof will be secured by (i) a first priority perfected pledge of (x) all notes owned by the Company and the Guarantors and (y) all capital stock, securities, partnership and LLC interests owned by the Company and the Guarantors and (ii) a first priority perfected security interest in all other assets owned by the Company and the Guarantors, including, without limitation, accounts, inventory, equipment, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, subject to customary exceptions for transactions of this type.

Conditions Precedent to the Closing:.................... The loan documentation will contain conditions to the closing of the Facility customarily found in loan agreements for similar financings and transactions of this type and other conditions deemed by Lender to be appropriate to the specific transaction and in any event including without limitation:

. All documentation relating to the Facility shall be in form and substance satisfactory to the Company and its counsel and Lender and its counsel. Guarantees in form and substance satisfactory to the Lender and its counsel shall have been executed and delivered by the Guarantors, and shall be in full force and effect.

. FNV and the Company shall not be in default of any of their obligations under the Commitment Letter.

. The terms and conditions of, and documentation relating to the Senior Notes, the principal terms of which are outlined on Exhibit A to this Annex I together with any changes thereto as may be agreed to by Lender, shall be satisfactory to Lender, including in the case of such debt the extent of subordination, security, absence

of guarantees, amortization, maturity, prepayments, limitations on remedies and acceleration, covenants, events of default, interest rate and other intercreditor arrangements. All conditions precedent to the issuance of the Senior Notes shall have been satisfied or, with the prior approval of Lender, waived and the Senior Notes shall be issued concurrently with the closing of the Facility.

. FNV, the Company and certain of their subsidiaries (the "Debtors") shall have filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Bankruptcy Court and (i) all motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the Facility and the Management Agreement, the fees and transactions contemplated thereby and the approval thereof and (ii) the plan of reorganization of each of the Debtors shall be in form and substance reasonably satisfactory to Lender.

. An order of the Bankruptcy Court granting approval and confirmation of the Plan of each of the Debtors shall have been entered and have become final and nonappealable (the "Final Order"), which Final Order and plans shall provide for, among other things, (i) borrowing under the Facility, including first priority liens on all collateral thereunder, (ii) the use of proceeds of the Facility to make the Existing Debt Repayment and cash payments to the holders of Trust Originated Preferred Securities of FINOVA Finance Trust ("TOPrS") interests, (iii) issuance of the Senior Notes to holders of allowed general unsecured claims against the Company, (iv) issuance of New Senior Notes to holders of TOPrS (v) the adoption by each of FNV and the Company of a Certificate of Incorporation and By-laws in form and substance acceptable to Lender, (vi) the designees of Lender constituting not less than a majority of the Boards of Directors of FNV and the Company, at least two (2) of the remaining members of which shall be selected from the current Board of Directors of FNV as of the date hereof and one (1) of which shall be designated by the creditors of the Company, (vii) the issuance by FNV to Lender, and/or Berkshire and Leucadia (the "Berkadia Parties") and/or their subsidiaries for no additional consideration of shares of common stock of FNV such that such parties will own, in the aggregate, 51% (or a lesser amount as agreed by the Berkadia Parties) of the outstanding equity of FNV on a fully diluted basis (and an allocation of consideration for such issuance to the capital of FNV in an amount equal to the aggregate par value represented by such equity interests so that such equity interests are fully paid and non-assessable), (viii) the release, in form and substance satisfactory to Lender, Leucadia and Berkshire, of each Indemnified Party (as defined in the Commitment Letter) from any and all claims or liabilities that any creditor or other party in interest has or could have had in connection with or arising out of the Chapter 11 Cases, the Commitment Letter, the Management Agreement and/or any action, authority, event or transaction contemplated by any of the

foregoing, (ix) such other terms as shall be acceptable to Lender in its reasonable discretion, and (x) such other terms as are requested by Lender following the initial date of filing of the Plan and that do not adversely affect the holders of claims against or interests in any of the debtors in the Chapter 11 Cases.

. All fees and expenses (including reasonable fees and expenses of counsel) required to be paid or reimbursed to Lender, Berkshire and Leucadia on or before the Closing Date shall have been paid.

. Lender shall be satisfied in its reasonable judgment that there shall not occur as a result of the funding of the Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any debt instruments and other material agreements of FNV, the Company or any of their respective subsidiaries that exist following the effective date of the plans of reorganization of the Debtors.

. Lender shall have received satisfactory opinions of counsel to FNV and the Company, addressing such matters as Lender shall reasonably request, including, without limitation, the enforceability of all loan documentation, compliance with all laws and regulations (including Regulations T, U and X of the Board of Governors of the Federal Reserve System), the perfection of all security interests purported to be granted and no conflicts with material agreements.

. There shall not have occurred any change, occurrence or development that could, in Lender's reasonable opinion, result in a material adverse change in (i) the business, condition (financial or otherwise), operations, performance, properties, assets, liabilities (actual or contingent) or prospects of FNV, the Company and their respective subsidiaries taken as a whole since June 7, 2001 (other than the commencement and continuation of the Chapter 11 Cases and the consequences that would normally result therefrom), (ii) the ability of the Company to perform its obligations under the loan documentation, (iii) the ability of the Guarantors (other than Guarantors as to which Lender, in its reasonable judgment, is satisfied that their inability, individually or in the aggregate, to perform their obligations is not material) to perform their obligations under the loan documentation or (iv) the ability of Lender to enforce the loan documentation (any of the foregoing being a "Material Adverse Change").

. There shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Change or, if adversely determined, could reasonably be expected to result in a Material Adverse Change or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Facility, the plans of reorganization of the Debtors or the transactions contemplated thereby.

- All necessary governmental and material third party consents and approvals necessary in connection with the Facility, the plans of reorganization of the Debtor and the transactions contemplated thereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to Lender) and shall remain in effect, and all applicable governmental filings have been made and all applicable waiting periods shall have expired without in either case any action being taken by any competent authority; and no law or regulation shall be applicable in the judgment of Lender that restrains, prevents or imposes materially adverse conditions upon the Facility or the transactions contemplated thereby.

- No information shall have come to the attention of Lender following the date hereof that leads Lender to determine that, and Lender shall not have become aware of any fact or condition not disclosed to them prior to the date hereof which leads Lender to determine that, the Company's or any of its subsidiaries' condition (financial or otherwise), operations, performance, properties, assets, liabilities (actual or contingent) or prospects are different in any material adverse respect from that known to Lender as of this date.

- Lender shall have a valid and perfected first priority lien on and security interest in the collateral referred to above under Security (other than collateral which Lender is satisfied in its reasonable judgment is not material, individually or in the aggregate); all filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid.

- Lender shall have received endorsements naming Lender as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of the Company and its subsidiaries forming part of Lender's collateral.

- The Management Agreement shall be in full force and effect, and there shall be no cause for termination thereunder.

- There shall not exist or have occurred any defaults, prepayment events or creation of liens under debt instruments that exist following the effective date of the Plan or otherwise as a result of the Facility, the plans of reorganization of the Debtors, or the transactions contemplated thereby.

- FNV shall have granted registration rights to the Berkadia Parties and/or their affiliates relating to the shares of common stock of FNV issued pursuant to the Plan in form and substance reasonably satisfactory to the Berkadia Parties.

Conditions Precedent to the Loan:...................... On the funding date of the Term Loan (if different from the closing date of the Facility) (i) there shall exist no default under the loan documentation, (ii) the representations and warranties of the Company and each Guarantor therein shall be true and correct

immediately prior to, and after giving effect to, funding, and (iii) the making of the Term Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

Representations and Warranties:................. The loan documentation will contain representations and warranties customarily found in loan documentation for similar financings and transactions of this type and other representations and warranties deemed by Lender appropriate to the specific transaction (which will be applicable to FNV, the Company and their respective subsidiaries) including, without limitation with respect to: valid existence, requisite power, due authorization, no conflict with agreements or applicable law, enforceability of loan documentation, validity, priority and perfection of security interests and enforceability of liens, accuracy of financial statements and all other information provided, compliance with law, absence of Material Adverse Change, no default under the loan documentation, absence of material litigation, ownership of properties and necessary rights to intellectual property, no burdensome restrictions and inapplicability of Investment Company Act or Public Utility Holding Company Act.

Affirmative and Financial Covenants:.................. The loan documentation will contain affirmative and financial covenants customarily found in loan documentation for similar financings and transactions of this type and other covenants deemed by Lender appropriate to the specific transaction (which will be applicable to FNV, the Company and their respective subsidiaries), including, without limitation, the following:

. Comply in all material respects with laws (including, without limitation, ERISA and environmental laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents and other intellectual property, preserve corporate existence, maintain accurate books and records, maintain properties, maintain appropriate and adequate insurance, permit inspection of properties, books and records, use loan proceeds as specified and provide further assurances as required.

. Perform obligations under leases, contracts and other agreements.

. Conduct all transactions with affiliates on terms reasonably equivalent to those obtainable in arm's length transactions, including, without limitation, restrictions on management fees to affiliates.

. Maintain with a bank satisfactory to Lender main cash concentration accounts and blocked accounts into which all cash flows of the Borrower and proceeds of collateral are paid and which are swept daily (and with respect to accounts at other banks, which will be limited, blocked account agreements in form and substance acceptable to Lender have been executed).

. Financial covenants as follows:

Minimum net worth of $400 million; and

Maximum capital expenditures (excluding expenditures made with respect to portfolio assets held for sale, lease or disposition) of $10 million per year, cumulative, but not to exceed $20 million in any year.

. Maintain a loan-to-collateral value ratio of no greater than 1:1.60 for periods ending prior to June 30, 2002 and 1:1.75 for periods ending on and after June 30, 2002. For purposes of this covenant, "collateral" (i) shall only include the net book value of the tangible assets of the Company and the Guarantors that have been specifically identified by the Company and that are subject to a perfected, first priority security interest in favor of the Lender (and shall exclude all assets of (a) any special purpose subsidiary of the Company that is subject to contractual or legal restrictions on making distributions to its parent entity and (b) any Guarantor for which the Company does not exercise sole voting control and/or for which all of the capital stock is not subject to a perfected, first priority pledge to Lender) and (ii) shall be net of all specific and general reserves.

Negative Covenants:.......... The loan documentation will contain negative covenants customarily found in loan documentation for similar financings and transactions of this type (which will be applicable to FNV, the Company and their respective subsidiaries). Each of FNV, the Company and their respective subsidiaries shall agree that (i) except pursuant to the Plan, or (ii) without the consent of Lender, it will not:

. Incur or assume any debt (whether or not non-recourse) other than the Term Loan or the Senior Notes (as the case may be); give any guaranties; create any liens, charges or encumbrances; incur additional lease obligations; merge or consolidate with any other person, or change the nature of business or corporate structure or create any new subsidiaries or amend its charter or by-laws; sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale leaseback transaction), except for asset sales for cash where seller retains no residual interest in such assets and proceeds are applied as set forth under "Prepayments;" give a negative pledge on any assets in favor of any person other than Lender; permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Company; or permit to exist any restrictions on the ability of the Company to prepay the Term Loan.

. Prepay, redeem, purchase, defease, exchange, refinance or repurchase any debt including, without limitation, the Senior Notes, or amend or modify any of the terms of any such debt or other similar agreements, or other material agreements, entered into or binding upon FNV, the Company or their respective subsidiaries.

. Make any loans or advances, capital contributions or acquisitions (except to fund existing commitments not discharged in the Chapter 11 Cases) or form any joint ventures or partnerships or make any other investments in subsidiaries or any other person.

- Make or commit to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions to shareholders, except the commitment contemplated under the terms of the Senior Notes following the payment in full of the Term Loan.

- Permit any change in ownership or control of the Company or any of its respective subsidiaries or any change in accounting treatment or reporting practices, except as required by GAAP and as permitted by the loan documentation.

- Redeem or otherwise acquire any shares of its capital stock, or issue or sell any securities (other than the issuance of the Senior Notes, pursuant to the exercise of options or conversion of outstanding securities or otherwise pursuant to the Plan) or grant any option, warrant or right relating to its capital stock or split, combine or reclassify any of its capital stock, other than pursuant to a stock option plan adopted following the effective date of the Plan and reasonably acceptable to Berkadia.

- Make any material amendment to any existing or enter into any new employment, consulting, severance, change in control or similar agreement or establish any new compensation or benefit or commission plans or arrangements for directors or employees.

- Merge, amalgamate or consolidate with any other entity in any transaction, sell all or any substantial portion of its business or assets, or acquire all or substantially all of the business or assets of any other entity, other than acquisitions of businesses in connection with foreclosures in the ordinary course of business and mergers or consolidations among wholly-owned subsidiaries of the Company.

- File any petition for voluntary reorganization or enter into any reorganization plan or recapitalization, dissolution or liquidation of the Company.

- Take any action that would have a material impact on the consolidated federal income tax return filed by FNV as the common parent, make or rescind any express or deemed material election relating to taxes, settle or compromise any material claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to taxes, enter into any material tax ruling, agreement, contract, arrangement or plan, file any amended tax return, or, except as required by applicable law or GAAP or in accordance with past practices, make any material change in any method of accounting for taxes or otherwise or any tax or accounting practice or policy.

- Enter into any contract, understanding or commitment that restrains, restricts, limits or impedes the ability of FNV or any of its subsidiaries to compete with or conduct any business or line of business in any geographic area.

- Permit FNV to engage in any business or activity, or hold any assets, other than holding the capital stock of the Company.

. Pay any management or similar fees, other than pursuant to the Management Agreement.

Financial Reporting Requirements:................ The Company shall provide: (i) monthly consolidated financial statements of FNV, the Company and their respective subsidiaries, including balance sheet, income statement and cash flow statement within 30 days of month-end, certified by the chief financial officer of FNV or the Company, as appropriate; (ii) quarterly consolidated and consolidating financial statements of FNV, the Company and its subsidiaries within 45 days of quarter-end, certified by the chief financial officer of FNV or the Company, as appropriate; (iii) annual audited consolidated and consolidating financial statements of FNV, the Company and their subsidiaries within 90 days of year-end, certified with respect to such consolidated statements by independent certified public accountants acceptable to Lender; (iv) copies of all reports on Form 10-K, 10-Q or 8-K filed by FNV or the Company with the Securities and Exchange Commission; (v) projections for the balance of the term of the Facility provided annually and annual business and financial plans provided in each case at least 30 days prior to fiscal year-end, with the business and financial plans being updated quarterly; (vi) periodic compliance certificates; and (vii) periodic certifications as to collateral value, loan and asset classification and reserves.

Other Reporting Requirements:................ The loan documentation will contain other reporting requirements customarily found in loan documentation for similar financings and transactions of this type and other reporting requirements deemed by Lender appropriate to the specific transaction, including, without limitation, with respect to litigation, contingent liabilities, defaults, ERISA or environmental events and potential defaults or events of default relating to loans or assets held by the Company and its subsidiaries at such times and in form and substance as is satisfactory to Lender.

Events of Default:.......... The loan documentation will contain events of default customarily found in loan documentation for similar financings and transactions of this type and other events of default deemed by Lender appropriate to the specific transaction (which will be applicable to FNV, the Company and their respective subsidiaries), including, without limitation, failure to make payments when due, defaults or accelerations under other indebtedness, noncompliance with covenants, breaches of representations and warranties, bankruptcy and insolvency events, failure to satisfy or stay execution of judgments in excess of specified amounts, the existence of certain materially adverse employee benefit or environmental liabilities, impairment of loan documentation or security, Material Adverse Change, actual or asserted invalidity of the guarantees, the security documents or the liens of Lender, change of ownership or control, and defaults under material contracts, including the Management Agreement.

Indemnification:............ The Company shall indemnify and hold harmless Lender, Berkshire and Leucadia and each of their respective affiliates, officers, directors, employees, members, managers, agents, advisors,

attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the Facility, the loan documentation or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the Facility, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction (or admitted by an Indemnified Party pursuant to a written settlement agreement) to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by FNV, the Company, any of their respective directors, securityholders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The Company further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any of its securityholders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final non-appealable judgment by a court of competent jurisdiction (or admitted by an Indemnified Party pursuant to a written settlement agreement) to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct and any liability of any Indemnified Party shall be limited to the amount of fees actually received hereunder by such Indemnified Party.

Expenses:.................... FNV, the Company and each of their respective subsidiaries shall jointly and severally pay all (i) reasonable costs and expenses of Lender, Berkshire and Leucadia (including all reasonable fees, expenses and disbursements of outside counsel) in connection with the preparation, execution and delivery of the loan documentation and the funding of all loans under the Facility, and all search, filing and recording fees, incurred or sustained by Lender, Berkshire and Leucadia in connection with the Facility, the loan documentation or the transactions contemplated thereby, the administration of the Facility and any amendment or waiver of any provision of the loan documentation and (ii) costs and expenses of Lender, Berkshire and Leucadia (including fees, expenses and disbursements of counsel) in connection with the enforcement of any of their rights and remedies under the loan documentation.

| | |
|---|---|
| Miscellaneous:.............. | The loan documentation will include standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes) relating to Lender and Lender's provider of funds. |
| Fees and Expenses:........... | Commitment Fee: A commitment fee of $60,000,000 shall be due and payable to Lender upon execution of the Commitment Letter. |
| | Funding Fee: A funding fee of $60,000,000 shall be due and payable to Lender upon the closing of and borrowing under the Facility. |
| | Termination Fee: A termination fee of $60,000,000 shall be due and payable to Lender if the Company does not borrow under the Facility for any reason (including the termination of Lender's obligations under the Commitment Letter, whether or not the Facility agreements have been entered) unless the Company's failure to borrow is solely due to (x) the failure by Lender to fund in violation of its obligations under the Commitment Letter or, (y) following confirmation of the Plan by the Bankruptcy Court, a Material Adverse Change has occurred. |
| | Reimbursement Fees: All fees, if any, and expenses incurred from time to time by Lender and its affiliates relating to its financing for the Facility shall be due and payable to Lender or such affiliates when incurred by Lender or such affiliates, not to exceed $30,000,000 in the aggregate. |
| Governing Law and Submission to Jurisdiction:............ | State of New York. |

EXHIBIT 6.2(c)(1)--NEW SENIOR NOTES TERM SHEET

| | |
|---|---|
| Issuer...................... | The FINOVA Group Inc. ("FNV Group"). |
| Aggregate Principal Amount... | Approximately $3.26 billion, representing 30% of (i) the aggregate principal amount of Allowed General Unsecured Claims (as defined in the Joint Plan of Reorganization (the "Plan") of FNV Group and the debtors named therein) against FINOVA Capital Corporation ("FNV Capital") (but not including pre-petition or post-petition interest) and (ii) 22.5% of the liquidation preference attributable to the Allowed TOPrS Interests (as defined in the Plan) of FINOVA Finance Trust (not including pre-petition or post-petition accrued and unpaid dividends). |
| Term........................ | Eight (8) years, subject to prepayment as described below. |
| Annual Interest Rate......... | The annual interest rate on the New Senior Notes will be 7.5%. |
| Payment..................... | Interest will be paid on semi-annual interest payment dates if and to the extent that (i) FNV Group has available cash on such dates for that purpose as described below under clause SECOND of the "Use of Cash" covenant and (ii) no default or event of default has occurred and is continuing on such dates under the credit agreement pursuant to which Berkadia LLC ("Berkadia") will make a $6 billion five-year amortizing senior secured term loan (the "Berkadia Loan") to FNV Capital (the "Berkadia Credit Agreement").<br><br>Each $1,000 principal amount of the New Senior Notes issued under the Plan (whether issued on the Effective Date or later) will entitle the holder thereof to receive such holder's pro rata share of an aggregate of up to $100 million of additional interest ("Contingent Interest") in respect of all New Senior Notes issued under the Plan (whether issued on the Effective Date or later) . Contingent Interest will be paid on semi-annual interest payment dates if and to the extent that FNV Group has available cash on such dates for that purpose as described below under clause Seventh of the "Use of Cash" covenant until the first to occur of (i) the payment of an aggregate of $100 million in Contingent Interest (as such amount may be reduced as described below under clause Seventh of the "Use of Cash" covenant) or (ii) 15 years after the Effective Date of the Plan.<br><br>Principal will be paid on semi-annual principal payment dates if and to the extent that FNV Group has available cash on such dates for that purpose as described below under clause Fifth of the "Use of Cash" covenant. |
| Optional Prepayment......... | Subject to compliance with the "Use of Cash" covenant, FNV Group will have the option to prepay the principal of the New Senior Notes, in whole or in part, at any time and from time to time, without premium or penalty, by delivering to the indenture |

trustee under the New Senior Notes indenture (the "Indenture Trustee") an amount equal to the principal to be repaid, plus interest from the last interest payment date on which interest was paid to the prepayment date; provided that such prepayment will not release FNV Group from its obligations to pay Contingent Interest with respect to the New Senior Notes so prepaid.

Priority and Collateral Security.................... FNV Group will grant to the Collateral Trustee under a collateral trust agreement among the Indenture Trustee, Berkadia, FNV Group and the Collateral Trustee a security interest for the benefit of the holders of the New Senior Notes in (i) all of the capital stock of FNV Capital and (ii) a promissory note of FNV Capital issued to FNV Group in the principal amount of the aggregate amount of New Senior Notes issued under the Indenture (the "Intercompany Note"). The Intercompany Note Term Sheet sets forth the principal terms of the Intercompany Note.

These security interests shall be released upon payment in full of all interest (other than Contingent Interest) on and principal of the New Senior Notes. Until such time as all obligations under the Berkadia Loan and related guarantees are paid in full or otherwise satisfied, the security interest to be granted to the Collateral Trustee for the benefit of the holders of New Senior Notes will be junior to the perfected, first priority security interests in the capital stock of FNV Capital and the Intercompany Note granted to the Collateral Trustee for the benefit of Berkadia to secure FNV Group's guarantee of the Berkadia Loan. The holders of the New Senior Notes will have no right to instruct the Collateral Trustee to take action to enforce or otherwise realize on the security interests held by the Collateral Trustee unless and until all obligations under the Berkadia Loan and related FNV Group guarantee have been paid in full or otherwise satisfied or released. Neither the indenture governing the New Senior Notes nor the security agreements effecting the grant of the security interests (the "Security Agreements") will restrict the sale of collateral, other than as required by the Trust Indenture Act of 1939, as amended.

The Collateral Trust Agreement will reflect appropriate intercreditor arrangements among Berkadia, the Indenture Trustee, FNV Group and FNV Capital.

The payment of Contingent Interest will not be secured by the security interest or otherwise. Contingent Interest shall constitute general unsecured obligations of FNV Group.

Covenants................... The indenture governing the New Senior Notes will contain the following covenants:

Use of Cash

To the extent not prohibited by the Berkadia Credit Agreement so long as the Berkadia Loan is outstanding, FNV Group will, and will cause its subsidiaries including FNV Capital to, apply the aggregate net positive amount of each of (x) 100% of the net sale proceeds

from asset sales, (y) 100% of available cash (to be defined in the indenture) and (z) 100% of net proceeds from insurance and condemnation, in each case received by FNV Group or any of its subsidiaries, except to the extent any special purpose subsidiary is subject to a contractual restriction (which existed on February 26, 2001) or legal restriction on making distributions to its parent entity, to the following purposes in the following order:

First:

For FNV Group or any of its subsidiaries (a) to pay or to fund its operating expenses, taxes, reasonable reserves (which reserve amounts shall be determined in good faith by the entity setting such reserves) for revolving commitments, unfunded commitments and general corporate purposes, (b) to pay when due interest on and principal of Permitted Indebtedness (as defined below) of such entity (other than, in the case of FNV Capital, the Berkadia Loan and the Intercompany Note, or, in the case of FNV Group, the New Senior Notes, the payment of each of which is provided for specifically below), (c) to pay when due interest on and principal of any Refinancing Indebtedness (as defined below) incurred to refinance the Permitted Indebtedness described in clause (b), (d) to pay or to fund a reserve to pay the next quarterly interest due on the Berkadia Loan, and (e) to make payments excluded from the definition of Restricted Payments (as defined below) under the proviso contained in the definition of Restricted Payments (provided that any payments described in clause (v) of such proviso shall not exceed $1 million per year); provided that FNV Capital and its subsidiaries may make distributions to any parent entity, including FNV Group, which entity shall use such distributions, plus any other cash it has available for this purpose, to satisfy its obligations under this clause First (it being understood that the listing of subclauses (a) through (e) herein shall be for ease of reference only and shall not imply any priority of allocation or payment within this clause First);

Second:

to pay when due interest on the Intercompany Note to FNV Group, which shall use such payments plus any other cash it has available for this purpose, to pay accrued and unpaid interest on the New Senior Notes when due;

Third:

at the option of FNV Group, to make prepayments of principal and accrued interest on the Intercompany Note, which FNV Group shall use, plus any other cash FNV Group has available and elects to use for this purpose, to purchase New Senior Notes (including the Contingent Interest in respect of such New Senior Notes) at a purchase price not to exceed par plus accrued and unpaid interest thereon (the "Maximum Price") through (a) tender offers, (b) open market purchases and/or (c) privately negotiated transactions, in all cases at FNV Group's discretion; provided, that, if the Berkadia Loan is outstanding, no distribution to FNV Group or use by it of cash to purchase New Senior Notes shall be made under this clause

Third without the prior consent of Berkadia and such distribution or use of cash shall not exceed $1.5 billion in the aggregate; and provided, further, that if the Berkadia Loan is not outstanding, such distribution or use of cash shall not exceed $150 million per calendar year and, provided further, any such purchases of New Senior Notes by FNV Group shall be made pursuant to procedures adopted by the Board of Directors of FNV Group to protect against preferring or discriminating against Berkadia and its affiliates with respect to such purchases;

Fourth:

to make distributions to FNV Capital, or in the case of FNV Group to make contributions to FNV Capital, which shall use such distributions or contributions, plus any other cash it has available for this purpose, to repay principal of the Berkadia Loan as required under the Berkadia Credit Agreement;

Fifth:

until the principal of and interest (but not Contingent Interest) on the New Senior Notes are paid in full, to pay principal on the Intercompany Note and to make distributions to FNV Group, (A) 95% of which FNV Group will use to repay principal of the New Senior Notes until the principal of the New Senior Notes has been paid in full and/or, at FNV Group's option, to prepay all or part of the New Senior Notes as described under "Optional Prepayment" and (B) 5% of which FNV Group will use to make Restricted Payments (unless the making of any such Restricted Payments would be an "Impermissible Restricted Payment" (as defined below), in which event FNV Group shall retain such amounts and any retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time, as such Restricted Payments are not Impermissible Restricted Payments);

Sixth:

until an amount equal to 5.263% of the aggregate principal amount of the New Senior Notes issued under the Plan (whether on the Effective Date or later) has been used to make Restricted Payments to FNV Group's common stockholders under clause Fifth or, after repayment of the New Senior Notes, has been used to make "Deemed Restricted Payments" (as defined below), to make Deemed Restricted Payments (unless the making of such Deemed Restricted Payments would be an "Impermissible Deemed Restricted Payment," (as defined below) in which event FNV Group shall retain such amounts and any retained amounts shall accumulate and shall be used to make Deemed Restricted Payments at such time or from time to time, as such Deemed Restricted Payments are not Impermissible Deemed Restricted Payments); and

Seventh:

until an aggregate of up to $100 million (as such amount may be reduced to reflect a decrease in the principal amount of New Senior Notes outstanding as a result of purchases (but not prepayments or repayments) by FNV Group under clause Third above) has been

paid as Contingent Interest, to make distributions to FNV Group (i) 95% of which will be used to pay Contingent Interest and (ii) 5% of which will be used by FNV Group to make Deemed Restricted Payments) (unless the making of such Deemed Restricted Payments would be an Impermissible Deemed Restricted Payment, in which event FNV Group shall retain such amounts and any retained amounts shall accumulate and shall be used to make Deemed Restricted Payments at such time or from time to time, as such Deemed Restricted Payments are not Impermissible Deemed Restricted Payments);.

provided that, notwithstanding the foregoing, it shall not be a default of this "Use of Cash" covenant if a subsidiary does not make distributions to its parent entity as set forth in First through Seventh above if such dividends or distributions would be Impermissible Restricted Payments or Impermissible Deemed Restricted Payments.

Funding and payments in respect of any Refinancing Indebtedness (as defined below) will have the same priority in this "Use of Cash" covenant as corresponds to the Indebtedness so refinanced.

"Deemed Restricted Payments" means any payments to FNV Group's stockholders that would have been Restricted Payments prior to repayment of the New Senior Notes.

"Impermissible Deemed Restricted Payments" means a Deemed Restricted Payment that, if made by FNV Group or any of its subsidiaries, would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law.

"Impermissible Restricted Payments" means a Restricted Payment that, if made by FNV Group or any of its subsidiaries, would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law.

For purposes of clause First above, "general corporate purposes" shall not include any acquisitions of businesses, except (i) those acquired by foreclosure or in full or partial satisfaction of a bona fide obligation to FNV Group or any of its subsidiaries existing prior to such acquisition and (ii) those related to an existing customer or to a transaction or property in which FNV Group or its subsidiaries has an interest and the entity to make such acquisition has determined in good faith that such acquisition is in furtherance of maximizing the ultimate recovery from such entity's asset portfolio.

Limitation on Restricted Payments

FNV Group will not, directly or indirectly, make any Restricted Payments, other than Restricted Payments permitted under the "Use of Cash" covenant described above.

"Restricted Payment" means (i) the declaration or payment of any dividend or the making of any distribution on account of FNV Group's equity interests (other than dividends or distributions payable in equity interests of FNV Group) and (ii) the purchase, redemption or other acquisition or retirement for value of any equity interests of FNV Group, other than redemptions, acquisitions or retirements in exchange for equity interests of FNV Group; provided, however, that Restricted Payments shall not include (i) repurchase of shares to eliminate fractional shares or odd-lots, whether pursuant to a reverse stock-split, odd-lot tender offer or otherwise; (ii) cash payments in lieu of issuance of fractional shares in connection with the exercise of any warrants, rights, options or other securities convertible into or exchangeable for FNV Group equity interests, (iii) the deemed repurchase of FNV Group's equity interests by FNV Group on the cashless exercise of stock options; (iv) payments or distributions to dissenting shareholders pursuant to applicable law, pursuant to or in connection with a consolidation, merger or transfer of assets; or (v) repurchases, redemptions, acquisitions or retirements of equity interests of FNV Group from employees, directors or officers of FNV Group and its subsidiaries; provided that the aggregate of all payments in clauses (i), (ii), (iv) and (v) hereof shall not exceed $5 million per calendar year

Limitation on Incurrence of Indebtedness

FNV Group will not, and will not permit any of its subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, for or with respect to (collectively, "incur") any Indebtedness other than Permitted Indebtedness or Permitted Nonrecourse Indebtedness.

"Indebtedness" means any indebtedness in respect of borrowed money.

"Permitted Indebtedness" means (A) Indebtedness outstanding (or deemed outstanding under the Plan) on the Effective Date of the Plan, including the Berkadia Loan and the New Senior Notes; (B) Refinancing Indebtedness; (C) Indebtedness at any time outstanding of up to $25 million, excluding Indebtedness outstanding under clause (A) or (B); provided, however, that availability under this clause (C) shall be reduced by the aggregate liquidation preference of any preferred equity interests issued to any person other than FNV Group or a subsidiary thereof in accordance with the "Limitation on Issuance of Capital Stock of Subsidiaries" covenant; (D) Foreclosure Indebtedness and (E) intercompany Indebtedness between or among FNV Group and/or any of its subsidiaries.

"Foreclosure Indebtedness" means Indebtedness of any person either (i) existing at the time that such person becomes a subsidiary of FNV Group or any of its subsidiaries provided that such person becomes a subsidiary of FNV Group as a result of a pre-existing

bona fide obligation to FNV Group or any of its subsidiaries, (ii) assumed in connection with the acquisition of assets from any such person provided that such person had a pre-existing bona fide obligation to FNV Group or any of its subsidiaries and that if the Indebtedness so assumed was secured, FNV Group and its subsidiaries shall not agree to extend such security interest to any new assets or to any assets of FNV Group and its subsidiaries or (iii) incurred to refinance (as defined below) any Indebtedness described in (i) or (ii) above, subject to the same limitations contained in the proviso to the definition of Refinancing Indebtedness below.

"Refinancing Indebtedness" means Indebtedness of FNV Group or any of its subsidiaries that is incurred to refund, refinance, replace, renew, repay or extend (including pursuant to any defeasance or discharge mechanism) (collectively, "refinance") any Indebtedness issued under the Plan and/or outstanding or deemed to be outstanding on the Effective Date of the Plan or incurred in compliance with the New Senior Notes Indenture (including Indebtedness of FNV Group that refinances Indebtedness of any subsidiary and Indebtedness of any subsidiary that refinances Indebtedness of another subsidiary) including Indebtedness that refinances Refinancing Indebtedness; provided, however, that (a) such Refinancing Indebtedness is incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate accreted value) not exceeding the then outstanding amount of the Indebtedness being refinanced, plus a reasonable premium (except with respect to the Berkadia Loan) and reasonable costs and expenses paid or incurred in connection with such refinancing (b) except with respect to Refinancing Indebtedness incurred to refinance (i) the New Senior Notes, (ii) Foreclosure Indebtedness or (iii) Permitted Indebtedness not issued under the Plan, such Refinancing Indebtedness shall not have a weighted average life to maturity or maturity date that is earlier than the Indebtedness being refinanced and (c) if the Indebtedness being refinanced is subordinate to the New Senior Notes, then such Refinancing Indebtedness shall be subordinate to the New Senior Notes at least to the same extent. The accretion of interest with respect to Indebtedness issued with original issue discount shall not constitute an incurrence of additional Indebtedness.

"Permitted Nonrecourse Indebtedness" means Indebtedness incurred in connection with the acquisition or lease (as lessor) of equipment or real estate (a) that is secured solely by the equipment or real estate acquired or leased, (b) with respect to which the holder of such Indebtedness has recourse only to such equipment or real estate, and (c) which is otherwise nonrecourse to FNV Group or any subsidiary thereof, provided that all proceeds of such Indebtedness, less reasonable expenses incurred in connection with such acquisition or lease, are used as provided in the "Use of Cash" covenant.

Limitation on Issuance of Capital Stock of Subsidiaries.

FNV Group will not permit FNV Capital to issue any additional equity interests to any person other than to FNV Group and will not permit any other subsidiary of FNV Group to issue any preferred equity interests to any person other than to FNV Group or a subsidiary thereof, except that preferred equity interests may be issued such that the liquidation preference of such preferred equity interests is equal to the amount of Indebtedness that would be permitted to be incurred under the "Limitation on Incurrence of Indebtedness" covenant if the liquidation preference of such preferred equity interest were treated as Indebtedness for purposes of the "Limitation on Incurrence of Indebtedness" covenant.

Mergers and Consolidations

FNV Group will not, directly or indirectly, consolidate or merge with or into another person (whether or not FNV Group is the surviving person) unless the person formed by or surviving any such consolidation or merger (if other than FNV Group) assumes all of the obligations under the New Senior Notes and the indenture and, immediately after such consolidation or merger, there is no default or event that, with the passage of time or notice or both, would be a default under the indenture and the credit rating of the surviving entity immediately following the merger or consolidation would not be lower than that of FNV Group immediately prior to the effectiveness of the merger or consolidation. Notwithstanding the foregoing, FNV Group shall not merge or consolidate with or into FNV Capital.

No Payment Restrictions Affecting Subsidiaries

FNV Group and its subsidiaries will not permit their respective subsidiaries to create any restriction on the ability of any subsidiary to make Restricted Payments, to make loans or advances to its parent entity or to transfer any property or assets to its parent entity, except for restrictions pursuant to (i) the New Senior Notes, (ii) the Berkadia Loan, (iii) contracts as of February 26, 2001 restricting special purpose subsidiaries, (iv) applicable law, (v) Refinancing Indebtedness containing restrictions no more restrictive, taken as a whole, than those contained in the Indebtedness so refinanced, (vi) Permitted Indebtedness described in clause C or D of the definition of Permitted Indebtedness, provided restrictions contained therein are no more restrictive, taken as a whole, than restrictions contained in any Permitted Indebtedness, or (vii) Permitted Nonrecourse Indebtedness incurred by any special purpose subsidiary.

The right to receive Contingent Interest under the New Senior Notes shall not constitute any equity interest or indebtedness of FNV Group for purposes of the indenture.

The covenants described under "Limitation on Restricted Payments," "Limitation on Incurrence of Indebtedness," "Limitation on Issuance of Capital Stock of FNV Subsidiaries" and

"No Payment Restrictions Affecting Subsidiaries" will no longer apply to FNV Group or its subsidiaries upon payment in full of all interest on (other than Contingent Interest) and principal of the New Senior Notes.

Additional Covenants......... Additional affirmative covenants typically included in indentures for publicly issued debt securities will be added to the indenture, including financial reporting requirements.

Event of Default............ Each of the following will constitute an "Event of Default": (i) default in the payment of all or any part of the unpaid principal, if any, and accrued and unpaid interest, if any, on the New Senior Notes at maturity; (ii) failure to pay interest in full on the New Senior Notes for two consecutive interest payment dates; (iii) failure by FNV Group or any of its subsidiaries to observe or perform in all material respects the provisions of the "Payment" covenant and of clauses First through Seventh of the "Use of Cash" covenants for 30 days; (iv) failure by FNV Group to observe or perform in all material respects any other covenant or agreement on the part of FNV Group contained in the New Senior Notes, the indenture or the Security Agreements if that failure is not remedied within 60 days after written notice is given to FNV Group by the trustee or to FNV Group and the trustee by the holders of at least 25% in aggregate principal amount of the New Senior Notes then outstanding, specifying such default, requiring that it be remedied and stating that such notice is a "Notice of Default" under the indenture; and (v) certain events of bankruptcy, dissolution or reorganization of FNV Group or FNV Capital.

Book-Entry; Delivery and Form....................... New Senior Notes will be represented by one or more permanent global notes in definitive, fully registered form, deposited with the Indenture Trustee as custodian for, and registered in the name of, a nominee of the Depository Trust Company.

EXHIBIT 6.2(c)(2)--INTERCOMPANY NOTE TERM SHEET

(Capitalized terms used without definition are defined in the New Senior Notes Term Sheet)

| | |
|---|---|
| Issuer...................... | FINOVA Capital Corporation ("FNV Capital"). |
| Aggregate Principal Amount .. | Same as New Senior Notes. |
| Term........................ | Same as New Senior Notes (without regard to Contingent Interest). |
| Annual Interest Rate......... | Same as New Senior Notes. |
| Payment..................... | Same as New Senior Notes, with payments applied to interest (other than Contingent Interest) and/or principal in the same manner as applicable to New Senior Notes. No payments will be made under the Intercompany Note with respect to Contingent Interest. |
| Optional Prepayment.......... | Same as New Senior Notes. |
| Subordination................ | Subordinated in right of payment to the Berkadia Loan. |
| Priority and Collateral Security.................... | FNV Capital will grant to the Collateral Trustee under a Collateral Trust Agreement among the Indenture Trustee, Berkadia, FNV Group and the Collateral Trustee for the benefit of the holder of the Intercompany Note a security interest in all assets of FNV Capital as to which a lien has been granted to secure the Berkadia Loan. This security interest shall be junior to the first priority perfected security interest granted to Berkadia to secure the Berkadia Loan. This security interest shall be released upon payment in full of all interest on and principal of the Intercompany Note. The holder of the Intercompany Note will have no right to instruct the Collateral Trustee to take action to enforce or otherwise realize on the security interests held by the Collateral Trustee unless and until all obligations under the Berkadia Loan have been paid in full or otherwise satisfied or released. Neither the Intercompany Note, nor the security agreements effecting the grant of the security interests, will restrict the sale, lease or other disposition of collateral, or the amendment of any of the Berkadia loan documents. |
| Covenants................... | None. |
| Event of Default............ | None, other than (i) cross-acceleration of New Senior Notes and (ii) certain events of bankruptcy, dissolution or reorganization of FNV Capital. |

EXHIBIT 6.3(a) TO THE PLAN

NEW CORPORATE DOCUMENTS

TO BE PROVIDED IN PLAN SUPPLEMENT

75

EXHIBIT 6.3(b) TO THE PLAN

BOARD OF DIRECTORS FOR FNV GROUP

TO BE PROVIDED IN PLAN SUPPLEMENT

76

EXHIBIT 6.3(c) TO THE PLAN

BOARD OF DIRECTORS FOR OTHER DEBTORS

TO BE PROVIDED IN PLAN SUPPLEMENT

EXHIBIT 7.1 TO THE PLAN

LIST OF REJECTED EXECUTORY CONTRACTS/UNEXPIRED LEASES

TO BE PROVIDED IN PLAN SUPPLEMENT

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| In re:<br><br>THE FINOVA GROUP INC.,<br>FINOVA CAPITAL CORPORATION,<br>FINOVA (CANADA) CAPITAL CORPORATION,<br>FINOVA CAPITAL PLC,<br>FINOVA LOAN ADMINISTRATION INC.,<br>FINOVA MEZZANINE CAPITAL INC.,<br>FINOVA PORTFOLIO SERVICES, INC,<br>FINOVA TECHNOLOGY FINANCE, INC., AND<br>FINOVA FINANCE TRUST,<br><br>Debtors. | Chapter 11<br><br>Case Nos. 01-0697 (PJW) through 01-0705 (PJW)<br><br>Jointly Administered |
|---|---|

US BANKRUPTCY COURT
DISTRICT OF DELAWARE
2001 JUL 20 PM 6:30
FILED

**PLAN SUPPLEMENT WITH RESPECT TO THIRD AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

RICHARDS, LAYTON & FINGER, P.A.

Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Deborah E. Spivack (No. 3220)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899

Telephone: (302) 658-6541
Facsimile: (302) 658-6548

GIBSON, DUNN & CRUTCHER LLP

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
The Met Life Building
200 Park Avenue
New York, New York 10166-0193

Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Counsel for Debtors

Dated: July 20, 2001

CERTIFIED:
AS A TRUE COPY:
ATTEST:
DAVID D. BIRD, CLERK
U.S. BANKRUPTCY COURT
BY: [signature]
Deputy Clerk 7/26/07

2337169_1.DOC

724

# INTRODUCTORY STATEMENT

1. The FINOVA Group Inc. ("FNV Group") and its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby file this Plan Supplement pursuant to Section 13.1 of the Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code (the "Plan").[1] This Plan Supplement, as it may be amended from time to time, is incorporated into, and is a part of, the Plan as if set forth in full therein, and all references to the Plan refer to the Plan together with all documents contained in the Plan Supplement, as they may be amended from time to time.

2. Pursuant to Section 13.1 of the Plan, this Plan Supplement has been served upon the Office of the United States Trustee and counsel for Berkadia, Leucadia, Berkshire and the Official Committees (the "Notice Parties"). The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours and through the Debtors' website at www.finova.com

3. The Debtors reserve the right to amend the documents and information included in this Plan Supplement at any time through and including the date of the hearing on confirmation of the Plan. Any such amendment will be served upon the Notice Parties and made available for inspection on the Debtors' website at www.finova.com.

Dated: July 20, 2001

RICHARDS, LAYTON & FINGER, P.A.

Rebecca L. Booth (4031)
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Deborah E. Spivack (No. 3220)
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 658-6541
Facsimile: (302) 658-6548

-and-

1 Capitalized terms used but not defined herein shall have the meanings set forth in the Plan.

2337169_1.DOC

**GIBSON, DUNN & CRUTCHER LLP**
Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Co-Counsel to the Debtors and Debtors in Possession

80186792_1.DOC

# EXHIBIT 6.2(c)(1)-a

## FORM OF NEW SENIOR NOTES INDENTURE

-- SEE ATTACHED DOCUMENT --

---

THE FINOVA GROUP INC.

---

7.5% SENIOR SECURED NOTES WITH
CONTINGENT INTEREST DUE 2016

---

INDENTURE

DATED AS OF , 2001

THE BANK OF NEW YORK,
TRUSTEE

---

2337178_1.DOC
NY2:\1025570\19\LZC219!.DOC\76830.0246

**TABLE OF CONTENTS**

**Page**

ARTICLE 1. DEFINITIONS AND INCORPORATION BY REFERENCE .......... 1

Section 1.01. Definitions .......... 1

Section 1.02. Other Definitions .......... 11

Section 1.03. Incorporation by Reference of Trust Indenture Act .......... 11

Section 1.04. Rules of Construction .......... 11

ARTICLE 2. THE NOTES .......... 12

Section 2.01. Form and Dating .......... 12

Section 2.02. Title and Terms .......... 14

Section 2.03. Execution and Authentication .......... 14

Section 2.04. Registrar and Paying Agent .......... 15

Section 2.05. Paying Agent to Hold Money in Trust .......... 15

Section 2.06. Holder Lists .......... 16

Section 2.07. Transfer and Exchange .......... 16

Section 2.08. Replacement Notes .......... 18

Section 2.09. Outstanding Notes .......... 18

Section 2.10. Temporary Notes .......... 18

Section 2.11. Cancellation .......... 19

Section 2.12. Voting Record Date .......... 19

Section 2.13. Computation of Fixed Interest .......... 19

Section 2.14. CUSIP Number .......... 19

Section 2.15. Issuance of Additional Securities .......... 19

ARTICLE 3. PREPAYMENT .......... 20

Section 3.01. Notices to Trustee .......... 20

Section 3.02. Selection of Notes to be Prepaid .......... 20

Section 3.03. Notice of Prepayment .......... 20

Section 3.04. Effect of Notice of Prepayment .......... 22

Section 3.05. Deposit of Prepayment Price .......... 22

Section 3.06. Notes Prepaid in Part .......... 22

Section 3.07. Optional Prepayment .......... 23

ARTICLE 4. COVENANTS .......... 23

Section 4.01. Payment of Notes .......... 23

## TABLE OF CONTENTS

Page

Section 4.02. Maintenance of Office or Agency .......... 23
Section 4.03. Reports .......... 24
Section 4.04. Compliance Certificate .......... 24
Section 4.05. Stay, Extension and Usury Laws .......... 24
Section 4.06. Use of Cash .......... 25
Section 4.07. Restricted Payments .......... 28
Section 4.08. Incurrence of Indebtedness .......... 28
Section 4.09. Existence .......... 29
Section 4.10. Limitations on Issuance of Capital Interests of Subsidiaries .......... 29
Section 4.11. Dividend and Other Payment Restrictions Affecting Subsidiaries .......... 29
Section 4.12. Further Instruments and Acts .......... 30
Section 4.13. Payment of Taxes and Other Claims .......... 30
Section 4.14. Maintenance of Insurance .......... 30
Section 4.15. Fall-Away Provision .......... 30
ARTICLE 5. SUCCESSORS .......... 31
Section 5.01. Mergers and Consolidation .......... 31
Section 5.02. Successor Corporation Substituted .......... 31
ARTICLE 6. DEFAULTS AND REMEDIES .......... 32
Section 6.01. Events of Default .......... 32
Section 6.02. Acceleration .......... 33
Section 6.03. Other Remedies .......... 33
Section 6.04. Waiver of Past Defaults .......... 34
Section 6.05. Control by Majority .......... 34
Section 6.06. Limitation on Suits .......... 35
Section 6.07. Rights of Holders of Notes to Receive Payment .......... 35
Section 6.08. Collection Suit .......... 35
Section 6.09. Proofs of Claim .......... 36
Section 6.10. Priorities .......... 36
Section 6.11. Restoration of Rights and Remedies .......... 37
Section 6.12. Rights and Remedies Cumulative .......... 37

## TABLE OF CONTENTS

Page

Section 6.13. Delay or Omission Not Waiver........................................................37

Section 6.14. Undertaking for Costs....................................................................37

ARTICLE 7. TRUSTEE...........................................................................................38

Section 7.01. Duties of Trustee...........................................................................38

Section 7.02. Rights of Trustee............................................................................39

Section 7.03. Individual Rights of Trustee..........................................................40

Section 7.04. Disclaimer.......................................................................................40

Section 7.05. Notice of Defaults...........................................................................41

Section 7.06. Reports by Trustee to Holders of the Notes....................................41

Section 7.07. Compensation and Indemnity..........................................................41

Section 7.08. Replacement of Trustee...................................................................42

Section 7.09. Successor Trustee by Merger, etc....................................................43

Section 7.10. Eligibility; Disqualification...........................................................44

Section 7.11. Preferential Collection of Claims against the Company.................44

ARTICLE 8. LEGAL DEFEASANCE AND COVENANT DEFEASANCE........44

Section 8.01. Option to Effect Legal Defeasance or Covenant Defeasance......44

Section 8.02. Legal Defeasance and Discharge.....................................................44

Section 8.03. Covenant Defeasance.......................................................................45

Section 8.04. Conditions to Legal or Covenant Defeasance.................................45

Section 8.05. Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions........................................47

Section 8.06. Repayment to the Company............................................................47

Section 8.07. Defeasance and Certain Other Events of Default...........................48

Section 8.08. Reinstatement...................................................................................48

ARTICLE 9. AMENDMENT, SUPPLEMENT AND WAIVER...........................48

Section 9.01. Without Consent of Holders of the Notes........................................48

Section 9.02. With Consent of Holders of Notes...................................................49

Section 9.03. Compliance with Trust Indenture Act.............................................51

Section 9.04. Revocation and Effect of Consents..................................................51

Section 9.05. Notation on or Exchange of Notes...................................................51

Section 9.06. Trustee to Sign Amendments, etc.....................................................51

## TABLE OF CONTENTS

Page

ARTICLE 10. COLLATERAL AND SECURITY ... 52

Section 10.01. ... Security Agreements 52

Section 10.02. ... Recording and Opinions 52

Section 10.03. ... Release of Collateral 53

Section 10.04. ... Certificates of the Company 54

Section 10.05. ... Certificates of the Trustee 54

Section 10.06. Authorization of Actions to Be Taken by the Trustee and the Collateral Agent Und

Section 10.07. Authorization of Receipt of Funds by the Trustee Under the Security Agreements 5

ARTICLE 11. SATISFACTION AND DISCHARGE ... 55

Section 11.01. ... Satisfaction and Discharge 55

Section 11.02. ... Application of Trust Money 56

ARTICLE 12. MISCELLANEOUS ... 57

Section 12.01. ... Trust Indenture Act Controls 57

Section 12.02. ... Notices 57

Section 12.03. Communication by Holders of Notes with Other Holders of Notes 58

Section 12.04. ... Certificate and Opinion as to Conditions Precedent 58

Section 12.05. ... Statements Required in Certificate or Opinion 59

Section 12.06. ... Rules by Trustee and Agents 59

Section 12.07. No Personal Liability of Directors, Officers, Employees and Stockholders 59

Section 12.08. ... Governing Law 59

Section 12.09. ... No Adverse Interpretation of Other Agreements 60

Section 12.10. ... Successors 60

Section 12.11. ... Severability 60

Section 12.12. ... Counterpart Originals 60

Section 12.13. ... Table of Contents, Headings, etc. 60

# TABLE OF CONTENTS

Page

EXHIBITS

Exhibit A          Form of Note

Exhibit B          Collateral Trust Agreement

Exhibit C          Pledge Agreement

## CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | | Indenture Section |
|---|---|---|
| 310 | (a)(1) | 7.10 |
| | (a)(2) | 7.10 |
| | (a)(3) | N.A. |
| | (a)(4) | N.A. |
| | (a)(5) | 7.10 |
| | (b) | 7.10 |
| | (c) | N.A. |
| 311 | (a) | 7.11 |
| | (b) | 7.11 |
| | (c) | N.A. |
| 312 | (a) | 2.06 |
| | (b) | 12.03 |
| | (c) | 12.03 |
| 313 | (a) | 7.06 |
| | (b)(1) | 7.06 |
| | (b)(2) | 7.06; 7.07 |
| | (c) | 7.06;12.02 |
| | (d) | 7.06 |
| 314 | (a) | 4.04;12.05 |
| | (b) | 12.02 |
| | (c)(1) | N.A. |
| | (c)(2) | N.A. |
| | (c)(3) | N.A. |
| | (d) | 10.03;10.04; 10.05 |
| | (e) | 12.05 |
| | (f) | N.A. |
| 315 | (a) | N.A. |
| | (b) | N.A. |
| | (c) | N.A. |
| | (d) | N.A. |
| | (e) | 6.11 |
| 316 | (a)(last sentence) | N.A. |
| | (a)(1)(A) | N.A. |
| | (a)(1)(B) | N.A. |
| | (a)(2) | N.A. |
| | (b) | N.A. |
| | (c) | 2.12 |
| 317 | (a)(1) | N.A. |
| | (a)(2) | N.A. |
| | (b) | N.A. |
| 318 | (a) | N.A. |
| | (b) | N.A. |
| | (c) | 12.01 |

N.A. means not applicable.

*This Cross-Reference Table is not part of this Indenture.

Indenture, dated as of , 2001, among The FINOVA Group Inc., a Delaware corporation (the "*Company*"), and The Bank of New York, a New York banking corporation, as Trustee.

WHEREAS, the Company and certain of its subsidiaries filed for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"); and

WHEREAS, the Bankruptcy Court has approved the joint plan of reorganization of the Company and such subsidiaries (the "*Plan*"); and

WHEREAS, as part of the Plan, the Company has agreed to issue the Notes (as defined herein) to certain holders of indebtedness of FINOVA Capital Corporation, a subsidiary of the Company ("*FINOVA Capital*"), and holders of the Trust Originated Preferred Securities issued by FINOVA Finance Trust, a subsidiary of the Company, in each case outstanding on the date the Plan was approved by the Bankruptcy Court;

**NOW, THEREFORE,** the Company and the Trustee agree as follows for the equal and ratable benefit of the holders of the Company's 7.5% Senior Secured Notes with Contingent Interest due 2016:

## ARTICLE 1.
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. **Definitions.**

"*Additional Notes*" means 7.5% Senior Secured Notes with Contingent Interest due 2016, issued from time to time under this Indenture after the Issue Date pursuant to the Plan.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling,*" "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Agent*" means any Registrar or Paying Agent.

"*Applicable Procedures*" means, with respect to any transfer, exchange, selection or voting of beneficial interests in a Global Note, the rules and procedures of the Depositary that apply to such transfer and exchange.

"*Bankruptcy Law*" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"*Berkadia*" means Berkadia LLC and its successors.

"*Berkadia Credit Agreement*" means that certain Credit Agreement, dated as of            , 2001 by and between FINOVA Capital and Berkadia.

"*Berkadia Interest Payment Date*" means each date on which interest payments are due and payable under the Berkadia Loan.

"*Berkadia Loan*" means the $6,000,000,000 aggregate principal amount secured term loan to FINOVA Capital from Berkadia pursuant to the Berkadia Credit Agreement, and the secured Guarantees thereof by the Company and its Subsidiaries, as such Indebtedness may be refunded, refinanced, replaced, renewed, repaid or extended.

"*Berkshire*" means Berkshire Hathaway Inc., a Delaware corporation.

"*Board of Directors*" means the Board of Directors of the Person or any authorized committee of the Board of Directors.

"*Business Day*" means any day other than a Legal Holiday.

"*Capital Interests*" means:

(i)    in the case of a corporation, corporate stock (whether designated as common or preferred);

(ii)    in the case of an association or other business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(iii)    in the case of a partnership, partnership interests (whether general or limited); and

(iv)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Cash Equivalents*" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year or less from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits, bankers acceptances or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any of (i) the fifty (50) largest commercial banks organized under the laws of the United States of America or any state thereof or (ii) the twenty-five (25) largest commercial banks organized under

the laws of a foreign jurisdiction, in each case as determined by deposits held by such banks as reported to *American Banker* magazine, and in all cases having total assets of at least Twenty Billion Dollars ($20,000,000,000) and having a short term deposit rating of at least A-1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc., or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of short term deposits generally; (c) commercial paper of an issuer rated at least A1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc., or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above; and (e) money market accounts or funds with or issued by any bank meeting the qualifications specified in clause (b) above that invests exclusively in investments of the types described in clauses (a) through (d) above.

"*Collateral*" means (i) the outstanding Capital Interests of FINOVA Capital now or hereafter owned by the Company and all dividends and distributions on and proceeds of such Capital Interests and (ii) the Intercompany Notes.

"*Collateral Agent*" means the Collateral Agent named in the Security Agreements, in its capacity as Collateral Agent, until a successor replaces it in accordance with the applicable provisions of this Indenture and the Security Agreements, and thereafter means the successor.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commission*" means the Securities and Exchange Commission.

"*Common Interests*" means any Capital Interests of any class which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up and which are not subject to redemptions by the Company.

"*Contingent Interest*" means the up to $100,000,000 (as such amount may be reduced to reflect a decrease in the principal amount of Notes Outstanding as a result of purchases by the Company pursuant to Section 4.06(a)(iii) hereof, but not prepayments or repayments by the Company in accordance with Section 4.06(a)(v)(A) or Article 3 hereof) of contingent interest on the Notes to be paid as provided for in Section 4.06(a)(vii) hereof.

"*Corporate Trust Office of the Trustee*" shall be at the address of the Trustee specified in Section 12.02 hereof or such other address as to which the Trustee may give notice to the Company.

"*Credit Rating*" means the rating assigned to the Notes by Moody's Investor Service, Inc. (or any successor to the rating agency business thereof) or by Standard & Poor's Ratings Group (or any successor to the rating agency business thereof).

"*Deemed Restricted Payments*" means any declaration or payment of any dividend, making of a distribution, or purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company that would have been Restricted Payments prior to repayment of the Notes.

"*Default*" means any event that is or with the passage of time or the giving of notice or both would be an Event of Default.

"*Definitive Notes*" means Notes that are in the form of Exhibit A attached hereto without the Global Note Legend.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.04 hereof as the Depositary with respect to the Notes, until a successor shall have been appointed and become such pursuant to the applicable provisions of this Indenture, and, thereafter, "*Depositary*" shall mean or include such successor.

"*Effective Date*" has the meaning set forth in the Plan.

"*Equity Interests*" means Capital Interests and all warrants, options or other rights to acquire Capital Interests (but excluding any debt security that is convertible into, or exchangeable for, Capital Interests); *provided, however,* that for the purposes of this Indenture, the right of the Holders to receive Contingent Interest shall not constitute Equity Interests of the Company.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"*First Lien Debt*" means the Guarantee by the Company of the Berkadia Loan.

"*Fixed Interest*" means the interest payable on the Notes other than any Contingent Interest.

"*Foreclosure Indebtedness*" means Indebtedness of any Person either (i) existing at the time that such Person becomes a Subsidiary of the Company or any of its Subsidiaries provided that such Person becomes a Subsidiary of the Company as a result of a pre-existing bona fide obligation to the Company or any of its Subsidiaries, (ii) assumed in connection with the acquisition of assets from any such Person provided that such Person had a pre-existing bona fide obligation to the Company or any of its Subsidiaries and that if the Indebtedness so assumed was secured, the Company and its

Subsidiaries shall not agree to extend such security interest to any new assets or to any assets of the Company and its Subsidiaries other than the assets of such Person or (iii) incurred to refinance any Indebtedness described in (i) or (ii) above, subject to the same limitations contained in the proviso to the definition of Refinancing Indebtedness.

"*GAAP*" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the date of this Indenture.

"*Global Note Legend*" means the legend set forth in Section 2.07(b) hereof.

"*Global Notes*" means the Global Notes, in the form of Exhibit A hereto issued in accordance with Sections 2.01 or 2.07 hereof.

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America for the payment of which guarantee or obligations the full faith and credit of the United States is pledged.

"*Guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner of all or any part of any Indebtedness.

"*Holder*" means the Person in whose name a Note is registered on the Registrar's books.

"*Impermissible Deemed Restricted Payment*" means a Deemed Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law.

"*Impermissible Restricted Payment*" means a Restricted Payment that, if made by the Company or any of its Subsidiaries, would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law.

"*Indebtedness*" means, with respect to any Person, at any date of determination (without duplication): (i) all indebtedness of such Person in respect of borrowed money, (ii) obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person in respect of letters of credit or other similar instruments (including reimbursement obligations with respect thereto), (iv) all Indebtedness referred to in clauses (i) through (iii) hereof of other Persons secured by a Lien on any asset of such Person whether or not such Indebtedness

is assumed by such Person, (v) all Indebtedness of other Persons guaranteed by such Person and (vi) to the extent not otherwise included in this definition, obligations under currency agreements and interest rate agreements; *provided, however,* that for purposes of this Indenture, the right of Holders to receive Contingent Interest shall not constitute Indebtedness of the Company. The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date (or, in the case of a revolving credit or other similar facility, the total amount of funds outstanding on the date of determination) of all unconditional obligations as described above and, with respect to contingent obligations, the reasonably anticipated maximum liability upon the occurrence of the contingency giving rise to the obligation of the types described above. The accretion of interest with respect to Indebtedness issued with original issue discount shall not constitute an incurrence of additional Indebtedness and Indebtedness shall not include any liability for federal, state, local or other taxes.

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Indirect Participant*" means a Person who holds an interest in the Notes through a Participant.

"*Initial Notes*" means the 7.5% Senior Secured Notes with Contingent Interest due 2016 issued under this Indenture on the Issue Date pursuant to the Plan.

"*Intercompany Notes*" means the promissory notes of FINOVA Capital issued to the Company in an aggregate principal amount equal to the principal amount of Notes issued under this Indenture, including any Additional Notes issued pursuant to the Plan.

"*Interest*" means all Fixed Interest and Contingent Interest on the Notes.

"*Issue Date*" means , 2001.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions in the City of New York, the city in which the principal Corporate Trust Office of the Trustee is located or at a place of payment are authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, payment shall be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue on such payment for the intervening period.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction).

"*Maturity Date*" means November 15, 2016.

"*Nonrecourse Indebtedness*" means, with respect to any Person, Indebtedness or the portion of Indebtedness (A) as to which neither the Company nor any of its Subsidiaries other than a Subsidiary incurring such Indebtedness (1) provides credit support (including any undertaking, agreement or instrument which would constitute Indebtedness), (2) is directly or indirectly liable or (3) constitutes the lender and (B) no default with respect to which would permit (upon notice, lapse of time or both) any holder of any other Indebtedness of such Person (or the holder of any Indebtedness of the Company or any of its Subsidiaries if they are not the Person incurring such Indebtedness) to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity.

"*Note Custodian*" means the Trustee, when serving as custodian for the Depositary with respect to the Notes in global form, or any successor entity thereto.

"*Notes*" means the Initial Notes and the Additional Notes.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, the Administrator, any Assistant Treasurer, the Controller, the Secretary, the Assistant Secretary or any Vice President of such Person.

"*Officer's Certificate*" means a certificate signed on behalf of each Company by an Officer of the Company, who must be the principal executive officer, the principal financial officer or the principal accounting officer of the Company, that meets the requirements of Section 12.05 hereof.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee that meets the requirements of Section 12.05 hereof. Such counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Trustee.

"*Outstanding*" when used with respect to Notes means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture; except:

(a)    Notes previously cancelled and delivered to the Trustee or delivered to the Trustee for cancellation;

(b)    Notes with respect to which payment or prepayment money in the necessary amount has been previously deposited with the Trustee or any Paying Agent in

trust for the Holders of such Notes, provided that if such Notes are to be prepaid, notice of such prepayment has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made; and

(c)    Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture.

"*Participant*" means a Person who has an account with DTC.

"*Permitted Acquisitions*" means any acquisition of businesses (a) acquired by foreclosure or in full or partial satisfaction of a bona fide obligation to the Company or any of its Subsidiaries existing prior to such acquisition or (b) related to an existing customer or to a transaction or property in which the Company or its Subsidiaries has an interest and the entity to make such acquisition has determined in good faith that such acquisition is in furtherance of maximizing the ultimate recovery from such entity's asset portfolio.

"*Permitted Indebtedness*" means (a) Indebtedness outstanding (or deemed outstanding under the Plan) on the Effective Date of the Plan including the Berkadia Loan, the Notes and the Intercompany Notes; (b) Refinancing Indebtedness; (c) Indebtedness at any time outstanding of up to $25,000,000, excluding Indebtedness outstanding under clauses (a), (b), (d), (e) or (f) hereof; provided, however, that availability under this clause (c) shall be reduced by the aggregate liquidation preference of any preferred Equity Interests issued to any Person other than the Company or one of its Subsidiaries in accordance with Section 4.08; (d) Foreclosure Indebtedness; (e) intercompany Indebtedness between or among the Company and/or any of its Subsidiaries; and (f) Indebtedness incurred in connection with securitization transactions or asset-backed financing transactions where the proceeds of such Indebtedness, less reasonable expenses incurred in connection with such transactions are used as provided in Section 4.06 hereof.

"*Permitted Nonrecourse Indebtedness*" means, with respect to any Person, Indebtedness or the portion of Indebtedness incurred in connection with the acquisition or lease (as lessor) of equipment or real estate (a) that is secured solely by the equipment or real estate acquired or by assignments of leases where the recourse of the payee of such Indebtedness with respect to payment of such Indebtedness is expressly limited to the lessor's interest in such leases, the rents and other amounts due thereunder and/or the equipment or real estate leased thereunder or the proceeds therefrom and (b) which is otherwise Nonrecourse Indebtedness with respect to the Company or any of its Subsidiaries other than the Subsidiary incurring such Indebtedness with respect to payment of such Indebtedness, provided that all proceeds of such Permitted Nonrecourse Indebtedness, less reasonable expenses incurred in connection with such acquisition or lease, are used as provided in Section 4.06 hereof.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization, limited liability company or any other entity.

"*Plan*" means the Third Amended and Restated Joint Plan of Reorganization in the Chapter 11 cases of the Company and certain of its Subsidiaries, dated June 13, 2001, as such plan may be amended, modified, supplemented or restated from time to time.

"*Pledge Agreement*" means the Pledge and Security Agreement between the Company and the Collateral Trustee, in substantially the form of Exhibit C hereto.

"*Refinancing Indebtedness*" means Indebtedness of the Company or any of its Subsidiaries that is incurred to refund, refinance, replace, renew, repay or extend (including pursuant to any defeasance or discharge mechanism) (collectively, "*refinance*") any Indebtedness existing on the Effective Date of the Plan or incurred in compliance with this Indenture (including Indebtedness of the Company that refinances Indebtedness of any Subsidiary and Indebtedness of any Subsidiary that refinances Indebtedness of another Subsidiary) including Indebtedness that refinances Refinancing Indebtedness; *provided, however,* that (a) such Refinancing Indebtedness is incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate accreted value) not exceeding the then outstanding amount of the Indebtedness being refinanced, plus a reasonable premium (except that no such premium may be paid with respect to the Berkadia Loan) and reasonable costs and expenses paid or incurred in connection with such refinancing, plus capitalized interest, fees and expenses; (b) except with respect to Refinancing Indebtedness incurred to refinance (i) the Notes, (ii) Foreclosure Indebtedness or (iii) Permitted Indebtedness not issued under the Plan, such Refinancing Indebtedness shall either (1) not have a Weighted Average Life to Maturity or maturity date that is earlier than the Indebtedness being refinanced or (2) be Nonrecourse Indebtedness and (c) if the Indebtedness being refinanced is subordinate to the Notes, then such Refinancing Indebtedness shall be subordinated to the Notes at least to the same extent, and if the Indebtedness being refinanced is pari passu with the Notes, then such Refinancing Indebtedness shall be either pari passu with or subordinated to the Notes.

"*Responsible Officer*" when used with respect to the Trustee and/or the Collateral Agent, means any officer of the Trustee or the Collateral Agent, as applicable, with direct responsibility for the administration of the Indenture or the Security Agreements and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"*Restricted Payment*" means:

(i) the declaration or payment of any dividend or the making of any distribution on account of the Company's Equity Interests (other

than dividends or distributions payable in Equity Interests of the Company); or

(ii)   the purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company other than redemptions, acquisitions or retirements solely in exchange for Equity Interests of the Company.

"*Securities Act*" means the Securities Act of 1933, as amended and the rules and regulations of the Commission promulgated thereunder.

"*Security Agreements*" means the Collateral Trust Agreement dated on or about the date of this Indenture by and among the Trustee, Berkadia, the Company and the Collateral Trustee thereunder in substantially the form of Exhibit B hereto and the Pledge Agreement, as such agreements may be amended, modified, supplemented or restated from time to time.

"*Stated Maturity*" means, with respect to any security, including the Notes, the date specified in such security as the fixed date on which the payment of principal of such security is due and payable.

"*Subsidiary*" means, with respect to any Person, any other Person of which more than 50% of the total voting power of Capital Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees of such other Person is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof).

"*TIA*" means the Trust Indenture Act of 1939 (15 U.S. Code §§77aaa-77bbbb), as amended, as in effect on the Issue Date; *provided, however,* that in the event the Trust Indenture Act of 1939 is amended after the Issue Date, "*TIA*" means, to the extent required by any such amendment, the Trust Indenture Act of 1939 as so amended.

"*Trustee*" means the Person named as Trustee in the preamble hereto until a successor replaces such Person or another successor in accordance with this Indenture and, thereafter, means such successor.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2) the then outstanding principal amount of such Indebtedness; *provided, however*, that with respect to any revolving Indebtedness, the foregoing calculation of Weighted Average Life to Maturity shall be determined based upon the total available commitments and the required reductions of commitments in lieu of the outstanding principal amount and the required payments of principal, respectively.

Section 1.02. **Other Definitions.**

| Term | Defined in Section |
|---|---|
| "*Authentication Order*" | 2.03 |
| "*Bankruptcy Court*" | Preamble |
| "*Company*" | Preamble |
| "*incur*" | 4.08 |
| "*Contingent Interest Payment Date*" | 2.02 |
| "*Covenant Defeasance*" | 8.03 |
| "*Custodian*" | 6.01 |
| "*DTC*" | 2.04 |
| "*Event of Default*" | 6.01 |
| "*Interest Payment Date*" | 2.02 |
| "*Legal Defeasance*" | 8.02 |
| "*Maximum Price*" | 4.06 |
| "*Paying Agent*" | 2.04 |
| "*Principal Payment Date*" | 2.02 |
| "*Reference Date*" | 2.02 |
| "*Registrar*" | 2.04 |

Section 1.03. **Incorporation by Reference of Trust Indenture Act.**

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in, and made a part of, this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"*Indenture securities*" means the Notes;

"*Indenture security holder*" means a Holder of a Note;

"*Indenture to be qualified*" means this Indenture;

"*Indenture Trustee*" or "*institutional Trustee*" means the Trustee; and

"*obligor*" on the Notes means the Company and any successor obligor upon the Notes.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by the Commission rule under the TIA have the meanings so assigned to them therein.

Section 1.04.    **Rules of Construction.**

Unless the context otherwise requires:

(A)    an accounting term not otherwise defined herein has the meaning assigned to it in accordance with GAAP;

(B)    "*or*" is not exclusive;

(C)    words in the singular include the plural, and in the plural include the singular;

(D)    provisions apply to successive events and transactions; and

(E)    references to sections of or rules under the Securities Act, the Exchange Act or the TIA shall be deemed to include substitute, replacement or successor sections or rules adopted by the Commission from time to time.

ARTICLE 2.
THE NOTES

Section 2.01.    **Form and Dating.**

(a)    The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A attached hereto, which is hereby incorporated in and expressly made part of this Indenture. The Notes may have notations, legends or endorsements required by law, stock exchange rule, custom or usage. Each Note shall be dated the date of its authentication. The Notes initially shall be issued in denominations of $1,000 and integral multiples thereof.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    <u>Global Notes</u>.  Notes shall be issued initially in the form of one or more permanent global Notes in definitive, fully registered form without interest coupons

and with the Global Notes Legend set forth in Section 2.07(b) hereof (each, a "*Global Note*"), duly executed by the Company and authenticated by the Trustee as hereinafter provided. Such Global Notes shall be deposited on behalf of the Holders with the Trustee, at its New York office, as custodian for the Depositary, and registered in the name of the Depositary or a nominee of the Depositary. The aggregate principal amount of the Global Notes may from time to time be increased or decreased by endorsements made on such Global Notes by the Trustee and the Depositary or its nominee as hereinafter provided. Additional Notes may be issued, authenticated and delivered pursuant to Section 2.15 hereof.

(c)    Book-Entry Provisions. This Section 2.01(c) shall apply only to Global Notes deposited with the Trustee, as custodian for the Depositary. Participants and Indirect Participants shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary or by the Trustee as the custodian of the Depositary or under such Global Note, and the Depositary shall be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Participants or Indirect Participants, the Applicable Procedures or the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Note.

(d)    Certificated Securities. If at any time the Depositary notifies the Company that it is unwilling or unable to continue as Depositary or if at any time the Depositary shall no longer be eligible under this Section 2.01, the Company shall appoint a successor Depositary. If a successor Depositary is not appointed by the Company within 90 days after the Company receives such notice or becomes aware of such ineligibility, the Company's election pursuant to Section 2.02 that the Notes be represented by Notes in global form shall no longer be effective and the Company will execute, and the Trustee, upon receipt of a Company order for the authentication and delivery of definitive Notes, will authenticate and deliver, Notes in definitive form, in authorized denominations, in an aggregate principal amount and like terms and tenor equal to the principal amount of the Global Notes in exchange for such Global Notes.

The Company may at any time and in its sole discretion determine that Global Notes shall no longer be represented by such Global Notes. In such event, the Company will execute, and the Trustee, upon receipt of a Company order for the authentication and delivery of definitive Notes of the same terms and tenor, will authenticate and deliver Notes in definitive form, in authorized denominations, and in an aggregate principal amount equal to the principal amount of the Global Notes in exchange for such Global Notes.

If specified by the Company pursuant to Section 2.02 with respect to Global Notes, the Depositary may surrender Global Notes in exchange in whole or in part

for Notes in definitive form and of like terms and tenor on such terms as are acceptable to the Company and such Depositary. Thereupon, the Company shall execute, and the Trustee upon receipt of a Company order for the authentication and delivery of definitive Notes, shall authenticate and deliver, without service charge to the holders:

(a) to each Person specified by such Depositary a new definitive Note or Notes of the same tenor, in authorized denominations, in an aggregate principal amount equal to and in exchange for such Person's beneficial interest in the Global Note; and

(b) to such Depositary a new Global Note in a denomination equal to the difference, if any, between the principal amount of the surrendered Global Note and the aggregate principal amount of the definitive Notes delivered to holders pursuant to clause (a) above.

(c) Upon the exchange of a Global Note for Notes in definitive form, such Global Note shall be cancelled by the Trustee or an agent of the Company or the Trustee. Notes issued in definitive form in exchange for a Global Note pursuant to this Section 2.01 shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee or an agent of the Company or the Trustee in writing. The Trustee or such agent shall deliver such Notes to or as directed by the Persons in whose names such Notes are so registered or to the Depositary.

Section 2.02. **Title and Terms.**

Subject to and to the extent cash or Cash Equivalents are available for payment of principal on the Notes in accordance with Section 4.06 hereof, principal on the Notes shall be payable on each May 15 and November 15, commencing November 15, 2001 (each a "*Principal Payment Date*"). Principal and Fixed Interest on the Notes, to the extent not previously paid in full in cash in accordance with Section 4.06 hereof, shall be due and payable in cash on the Stated Maturity of the Notes, which shall be November 15, 2009.

The Notes shall be known and designated as the "7.5% Senior Secured Notes with Contingent Interest due 2016" of the Company. Fixed Interest on the Notes shall accrue at the rate of 7.5% per annum. Interest shall be paid in accordance with the provisions of Section 4.06 hereof. Subject to and in accordance with the provisions of Section 4.06 hereof, Interest shall be payable on each May 15 and November 15, commencing November 15, 2001 (each an "*Interest Payment Date*"). All obligations with respect to Contingent Interest shall cease on the Maturity Date.

Principal and Interest shall be payable to the Holders of record of the Notes at 5:00 p.m., New York City time, on the fifth Business Day immediately preceding either a Principal Payment Date or an Interest Payment Date (each such date, a "*Reference Date*").

Section 2.03. **Execution and Authentication.**

An Officer shall sign the Notes for the Company by manual or facsimile signature. The Company's seal may be reproduced on the Notes and may be in facsimile form.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated by the Trustee, the Note shall nevertheless be valid.

A Note shall not be valid until authenticated by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee shall, upon a written order of the Company signed by an Officer ("*Authentication Order*") directing the Trustee to authenticate the Notes, authenticate Notes for original issue.

The Trustee may (at the Company's expense) appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Company or an Affiliate of the Company.

Section 2.04. **Registrar and Paying Agent.**

The Company shall maintain (i) an office or agency where Notes may be presented for registration of transfer or for exchange (the "*Registrar*") and (ii) an office or agency where Notes may be presented for payment (the "*Paying Agent*"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars or one or more additional paying agents. The term "*Registrar*" includes any co-registrars and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Note Custodian with respect to the Global Notes. The Company initially appoints the Trustee to act as the Registrar and Paying Agent with respect to any Definitive Notes.

Section 2.05.   **Paying Agent to Hold Money in Trust.**

Not later than 10:00 a.m. New York City time on each due date of the principal or Interest on any of the Notes, the Company shall deposit with the Paying Agent money, in immediately available funds, sufficient to pay such principal or Interest so becoming due. The Company shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or Interest on the Notes, and shall notify the Trustee of any Default by the Company in making any such payment. While any such Default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company) shall have no further liability for the money. If the Company or a Subsidiary of the Company acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee shall serve as Paying Agent for the Notes.

Section 2.06.   **Holder Lists.**

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA §312(a). If the Trustee is not the Registrar, the Company shall furnish to the Trustee at least five Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Company shall otherwise comply with TIA §312(a).

Section 2.07.   **Transfer and Exchange.**

(a)   When Notes are presented to the Registrar with a request to register the transfer or to exchange them for an equal principal amount of Notes of other denominations, the Registrar shall register the transfer or make the exchange if its requirements for such transactions are met; *provided, however,* that any Note presented or surrendered for transfer or exchange shall be duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar and the Trustee duly executed by the Holder thereof or by his attorney duly authorized in writing. To permit registrations of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon the Company's order or at the Registrar's request.

The Registrar shall not be required to register the transfer of or exchange any Note selected for prepayment in whole or in part, except the portion not being paid of any Note being prepaid in part.

The Company shall not be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of mailing of a notice of prepayment of Notes under Section 3.02 hereof and ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for prepayment in whole or in part, except the portion not being paid of any Note being prepaid in part or (C) to register the transfer of or to exchange a Note between a record date and the next succeeding Interest Payment Date.

No service charge shall be made to any Holder of a Note for any registration of transfer or exchange (except as otherwise permitted herein), but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than such transfer tax or similar governmental charge payable upon exchanges pursuant to Sections 2.10, 3.06 and 9.05 hereof, which shall be paid by the Company).

Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and Interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(b) Global Note Legend. Each Global Note shall bear a legend in substantially the following form:

> "UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.
>
> TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF."

(c)   Cancellation and/or Adjustment of Global Notes. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or the Company has repurchased a particular Global Note or a particular Global Note has been prepaid, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

Section 2.08.   **Replacement Notes.**

If any mutilated Note is surrendered to the Trustee, or the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Note, the Company shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are met. An indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Company and the Trustee may charge for their expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.09.   **Outstanding Notes.**

The Notes Outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.09 as not Outstanding. A Note does not cease to be Outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.08 hereof, it ceases to be Outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser.

Section 2.10. **Temporary Notes.**

Until Definitive Notes are ready for delivery, the Company may prepare and the Trustee shall authenticate temporary Notes upon receipt of an Authentication Order. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Company considers appropriate for temporary Notes. Without unreasonable delay, the Company shall prepare and the Trustee shall upon receipt of an Authentication Order authenticate Definitive Notes in exchange for temporary Notes.

Holders of temporary Notes shall be entitled to all of the benefits of this Indenture.

Section 2.11. **Cancellation.**

The Company at any time may deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder or which the Company may have acquired pursuant to Section 4.06(a)(iii) or 4.06(b)(vi)(A)(iii) hereof, and all Notes so delivered shall be promptly cancelled by the Trustee. All Notes surrendered for registration of transfer, exchange or payment, if surrendered to any Person other than the Trustee, shall be delivered to the Trustee. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation. All cancelled Notes held by the Trustee shall be disposed of by the Trustee in accordance with its customary procedure, unless by a written order, signed by two Officers of the Company, the Company shall direct that cancelled Notes be returned to it.

Section 2.12. **Voting Record Date.**

The record date for purposes of determining the identity of Holders of the Notes entitled to vote or consent to any action by vote or consent authorized or permitted under this Indenture shall be determined as provided for in TIA §316(c).

Section 2.13. **Computation of Fixed Interest.**

Fixed Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

Section 2.14. **CUSIP Number.**

The Company in issuing the Notes may use a "CUSIP" number, and if it does so, the Trustee shall use the CUSIP number in notices of prepayment or exchange as a convenience to Holders; *provided, however,* that any such notice may state that no representation is made as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes and that reliance may be placed only on the other identification numbers printed on the Notes. The Company shall promptly notify the Trustee of any change in the CUSIP number.

Section 2.15. **Issuance of Additional Securities.**

The Company shall be entitled to issue Additional Notes under this Indenture which shall have identical terms as the Initial Notes issued on the Issue Date, other than with respect to the date of issuance. The Initial Notes issued on the Issue Date and any Additional Notes shall be treated as a single class for all purposes under this Indenture.

With respect to any Additional Notes, the Company shall set forth in an Officer's Certificate, a copy of which shall be delivered to the Trustee, the following information:

(a) the aggregate principal amount of such Additional Notes to be authenticated and delivered pursuant to this Indenture; and

(b) the issue date of such Additional Notes.

ARTICLE 3.
PREPAYMENT

Section 3.01. **Notices to Trustee.**

If the Company elects to prepay the principal of the Notes pursuant to the optional prepayment provisions of Section 3.07 hereof, it shall furnish to the Trustee, at least 10 days but not more than 60 days before a prepayment date, an Officer's Certificate setting forth (i) the clause of this Indenture pursuant to which the prepayment shall occur, (ii) the prepayment date, (iii) the principal amount of Notes to be prepaid and (iv) the prepayment price.

Section 3.02. **Selection of Notes to be Prepaid.**

If less than all of the Notes are to be prepaid at any time, the Trustee shall select the Notes to be prepaid among the Holders of the Notes in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed, or, if the Notes are not so listed, on a pro rata basis, by lot or in accordance with any other method as the Trustee shall deem fair and appropriate in consultation with the Company. In the event of partial prepayment by lot, the particular Notes to be prepaid shall be selected, unless otherwise provided herein, not less than 30 days prior to the prepayment date by the Trustee from the Outstanding Notes not previously called for prepayment.

The Trustee shall promptly notify the Company in writing of the Notes selected for prepayment and, in case of any Note selected for partial prepayment, the principal amount thereof to be prepaid. Notes and portions of Notes selected shall be in amounts of $1,000 or whole multiples of $1,000; except that if all of the Notes of a Holder are to be prepaid, the entire Outstanding amount of Notes held by such Holder,

even if not a multiple of $1,000, shall be prepaid. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for prepayment also apply to portions of Notes called for prepayment.

Section 3.03. **Notice of Prepayment.**

Subject to the provisions of Section 3.07 hereof, at least 10 days but not more than 60 days before a prepayment date, the Company shall mail or cause to be mailed by first class mail, a notice of prepayment to each Holder whose Notes are to be prepaid at its registered address.

The notice shall identify the Notes to be prepaid and shall state:

(A) the prepayment date;

(B) the prepayment price for the Notes and accrued and unpaid Fixed Interest, if any;

(C) if any Note is being prepaid in part, the portion of the principal amount of such Note to be prepaid and that, after the prepayment date, upon surrender of such Note, a new Note or Notes in principal amount equal to the portion not being prepaid shall be issued;

(D) the name and address of the Paying Agent;

(E) that Notes called for prepayment must be surrendered to the Paying Agent to collect the prepayment price;

(F) that, unless the Company defaults in making such prepayment, Fixed Interest on Notes called for prepayment ceases to accrue on and after the prepayment date;

(G) the paragraph of the Notes and/or section of this Indenture pursuant to which the Notes called for prepayment are being prepaid; and

(H) that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee shall give the notice of prepayment in the Company's name and at the Company's expense; *provided, however,* that the Company shall have delivered to the Trustee, at least 30 days, or such shorter period as

the Trustee may agree, prior to the prepayment date an Officer's Certificate and an order directing that the Trustee give such notice and setting forth the information to be stated in the notice as provided in the preceding paragraph. The notice mailed in the manner herein provided shall be conclusively presumed to have been duly given whether or not the Holder receives such notice.

Section 3.04. **Effect of Notice of Prepayment.**

Once notice of prepayment is mailed in accordance with Section 3.03 hereof, Notes called for prepayment become due and payable on the prepayment date at the prepayment price plus accrued and unpaid Fixed Interest to such date. A notice of prepayment may be conditional. Upon surrender of any of the Notes called for prepayment to the Paying Agent, such Notes shall be paid on the prepayment date at the prepayment price, plus accrued and unpaid Fixed Interest to such date.

Section 3.05. **Deposit of Prepayment Price.**

At or prior to 10:00 a.m., New York City time, on the prepayment date, the Company shall deposit with the Trustee or with the Paying Agent money, in immediately available funds, sufficient to pay the prepayment price of and accrued and unpaid Fixed Interest on all Notes to be prepaid on that date. The Trustee or the Paying Agent shall promptly return to the Company upon their written request any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the prepayment price of and accrued and unpaid Fixed Interest on all Notes to be prepaid.

If Notes called for prepayment are paid or if the Company has deposited with the Trustee or Paying Agent money sufficient to pay the prepayment price of and unpaid and accrued Fixed Interest on all Notes to be prepaid, on and after the prepayment date Fixed Interest shall cease to accrue on the Notes or the portions of Notes called for prepayment (regardless of whether certificates for such securities are actually surrendered); *provided, however,* Contingent Interest will continue to accrue on each Note prepaid pursuant to this Article 3 until such Note is cancelled pursuant to Section 2.11 hereof. If a Note is prepaid on or after an applicable Reference Date but on or prior to the related Fixed Interest payment date, then any accrued and unpaid Fixed Interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for prepayment shall not be so paid upon surrender for prepayment because of the failure of the Company to comply with the preceding paragraph, Fixed Interest shall be paid on the unpaid principal from the prepayment date until such principal is paid at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06. **Notes Prepaid in Part.**

Upon surrender of a Note that is prepaid in part, the Company shall issue and, upon the Company's written request, the Trustee shall authenticate for the Holder at

the expense of the Company a new Note equal in principal amount to the unprepaid portion of the Note surrendered.

Section 3.07. **Optional Prepayment.**

Subject to compliance with the provisions of Section 4.06, the Company may, at its option, prepay the Notes in whole at any time or in part from time to time at a prepayment price equal to the principal amount of the Notes or portion thereof being prepaid (subject to the right of Holders of record on the relevant Reference Date to receive Fixed Interest due on the related Interest Payment Date) but without any premium or penalty of any kind, plus accrued and unpaid Fixed Interest to the prepayment date.

ARTICLE 4.
COVENANTS

Section 4.01. **Payment of Notes.**

The Company shall pay or cause to be paid the principal of and Interest on the Notes on the dates and in the manner provided in Sections 2.02 and 4.06 hereof. An installment of principal and Interest, shall be considered paid for all purposes hereunder on the date the Paying Agent (if other than the Company, a Subsidiary of the Company or an Affiliate of either of them) holds, as of 10:00 a.m. (New York City time) money deposited by the Company in immediately available funds and designated for and sufficient to pay all such principal and Interest then due. If the Company, any Subsidiary of the Company or any Affiliate of any of them acts as Paying Agent, an installment of principal or Interest shall be considered paid on the due date thereof only if the entity acting as Paying Agent complies with the penultimate sentence of Section 2.05.

Section 4.02. **Maintenance of Office or Agency.**

The Company shall maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of transfer or for exchange or for presentation of payment or prepayment and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however,* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New

York for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Company in accordance with Section 2.04 hereof.

Section 4.03. **Reports.**

Whether or not required by the rules and regulations of the Commission, so long as any Notes are Outstanding, the Company will file with the Commission, to the extent such submissions are accepted for filing by the Commission, and furnish to the Trustee within 15 days of the time periods specified in the Commission's rules and regulations for filing reports, (i) all quarterly and annual financial information that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Company were required to file such forms, including a "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and, with respect to the annual information only, a report on the annual financial statements by the Company's certified independent accountants; (ii) all current reports that would be required to be filed with the Commission on Form 8-K if the Company were required to file such reports and (iii) as long as the Company is required to file information or reports with the Commission by Section 13(a) or 15(d) under the Exchange Act, such information or reports. The Trustee will provide, at the Company's expense, copies of any such information or reports to any Holder that requests copies of such information or reports.

Section 4.04. **Compliance Certificate.**

On or before a date not more than 90 days after the end of each fiscal year of the Company, the Company shall deliver to the Trustee a certificate signed by the Chief Executive Officer, the Chief Financial Officer or the treasurer of the Company stating that a review has been conducted of the Company's performance under this Indenture and that the Company has fulfilled all obligations hereunder, or, if there has been a Default or an Event of Default, specifying each such Default and Event of Default and the nature and the status thereof. The Company shall also notify the Trustee within 30 days of any such officer having actual knowledge of any Default or Event of Defaults under this Indenture. The Company shall also comply with TIA §314(a).

Section 4.05. **Stay, Extension and Usury Laws.**

The Company covenants (to the extent it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, (i) that would prohibit or forgive the Company from paying all or a portion of the principal of or Interest on the Notes as contemplated herein or (ii) that may otherwise affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of

any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.06. **Use of Cash.**

(a) The Company shall not, and shall not permit any of its Subsidiaries to, use cash and Cash Equivalents in a manner prohibited or not provided for by this Section 4.06. The Company shall and shall cause its Subsidiaries to apply cash and Cash Equivalents,

(i) FIRST, (A) to pay or to fund their respective operating expenses, taxes, reasonable reserves (which reserve amounts shall be determined in good faith by the Company or the Subsidiary setting such reserves) for revolving commitments, unfunded commitments and general corporate purposes; (B) to pay, when due, interest on and principal of Permitted Indebtedness of the Company or such Subsidiary (other than, (x) in the case of FINOVA Capital, the Berkadia Loan and the Intercompany Notes and (y) in the case of the Company, the Notes), or to fund a reserve to pay interest on such Permitted Indebtedness due on the next interest payment date; (C) to pay, when due, interest on and principal of any Refinancing Indebtedness incurred to refinance the Permitted Indebtedness that may be paid under clause (B), or to fund a reserve to pay interest on such Refinancing Indebtedness due on the next interest payment date; (D) to pay, when due, interest on the Berkadia Loan, or to fund a reserve to pay interest due during the current and/or next succeeding fiscal quarter on the Berkadia Loan; and (E) to make payments permitted under Section 4.07(b) (provided that any payments described in Section 4.07(b)(v) shall not exceed $1 million per year); *provided, however*, that the listing of subclauses (A) through (E) herein shall be for ease of reference only and shall not imply or require any priority of allocation or payment within this Section 4.06(a)(i));

(ii) SECOND, to pay to the Company, when due, interest on the Intercompany Notes in an amount equal to the lesser of (a) the amount of accrued and unpaid interest to the next interest payment date under the Intercompany Notes or (b) the amount of cash and Cash Equivalents of the Company and its Subsidiaries at the applicable Reference Date (after deducting for item (i) above), or to fund a reserve to pay interest on such Intercompany Notes due on the next succeeding interest payment date under the Intercompany Notes, and the Company shall use the proceeds of such payments together with any other cash or Cash Equivalents the Company has available for such purpose on such Reference Date, to pay accrued and unpaid Fixed Interest on the Notes on the applicable Interest Payment Date;

(iii) THIRD, at the option of the Company and with the consent of Berkadia so long as any payment Obligation under the Berkadia Loan is outstanding, to cause FINOVA Capital to make prepayments of principal and accrued and unpaid interest on the Intercompany Notes or to fund a reserve to make such prepayments; the Company shall use the proceeds from any such prepayments, plus any other cash or Cash Equivalents the Company has available and elects to use for such purpose, to purchase (or to cause a Subsidiary or Subsidiaries to purchase) Notes (including all obligations to pay Contingent Interest in respect of such Notes) at a purchase price not to exceed the outstanding principal amount of such Note plus accrued and unpaid Fixed Interest thereon to the purchase date (the "*Maximum Price*") through, at the Company's discretion, (1) tender offers, (2) open market purchases and (3) privately negotiated transactions; *provided, however*, that (A) if no payment Obligation under the Berkadia Loan is outstanding, such prepayments of the Intercompany Notes and purchases of Notes shall not exceed $150.0 million in the aggregate in any single calendar year and (B) in no event will the aggregate amount of such prepayments or uses of cash or Cash Equivalents exceed $1,500,000,000 during such time as any payment Obligation under the Berkadia Loan is outstanding; *provided, further,* that any such purchases of Notes by the Company shall be made pursuant to procedures adopted by the Company's Board of Directors in good faith to ensure that Berkshire and its Affiliates are not preferred or discriminated against with respect to such purchases;

(iv) FOURTH, to repay principal of the Berkadia Loan as required under the Berkadia Credit Agreement;

(v) FIFTH, until the principal of and Fixed Interest on the Notes are each paid in full, to (A) pay to the Company, when due, principal on the Intercompany Notes in an amount equal to the amount of cash and Cash Equivalents of the Company and its Subsidiaries, after deducting for items (i) through (iv) above, at any date (as determined by the Company) on or after the applicable Reference Date, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes until the principal and accrued and unpaid Fixed Interest have been paid in full, and, at the Company's option, to make prepayments at any time of principal and accrued and unpaid interest on the Intercompany Notes, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to prepay all or part of the principal and accrued and unpaid Fixed Interest on the Notes pursuant to Section 3.07, and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the Company, which amounts the Company shall use

together with any other cash the Company has available for such purposes to make Restricted Payments unless the making of any such Restricted Payment would be an Impermissible Restricted Payment, in which event the Company shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments; *provided, however,* that each incremental payment of $0.95 pursuant to clause (A) shall require, to the extent permitted by applicable law, a distribution pursuant to clause (B) of $0.05;

(vi)     SIXTH, until an amount equal to 5.263% of the aggregate principal amount of the Notes issued under this Indenture in accordance with the Plan (whether on the Issue Date or thereafter) has been used either to (A) make Restricted Payments to the Company's holders of Common Stock under Section 4.06(a)(v)(B) or (B) to make Deemed Restricted Payments, after repayment in full of principal and accrued and unpaid Fixed Interest on the Notes, to make Deemed Restricted Payments, unless the making of such Deemed Restricted Payments would be an Impermissible Deemed Restricted Payment, in which event the Company shall retain all such amounts and any such retained amounts shall accumulate and shall be used to make Deemed Restricted Payments at such time, or from time to time, as such payments are not Impermissible Deemed Restricted Payments; and

(vii)     SEVENTH, until an aggregate of up to $100,000,000 (as such amount may be reduced to reflect a decrease in the principal amount of Notes Outstanding as a result of purchases by the Company of Notes in accordance with Section 4.06(a)(iii) (but not as a result of prepayments or repayments made by the Company in accordance with Section 4.06(a)(v)(A) or Article 3 hereof)) has been paid as Contingent Interest, to make distributions on each applicable Interest Payment Date to the Company in an amount equal to cash and Cash Equivalents of the Company and its Subsidiaries, after deducting for uses of cash and Cash Equivalents pursuant to clauses (i) through (vi) above, at any date (as determined by the Company) on or after the applicable Reference Date (A) 95% of which the Company shall use to pay Contingent Interest on each applicable Interest Payment Date to Holders of Outstanding Notes *pro rata* based upon the respective aggregate principal amount of each Holder's Notes and (B) 5% of which the Company will use to make Deemed Restricted Payments on each applicable Interest Payment Date (unless the making of such Deemed Restricted Payments would be an Impermissible Deemed Restricted Payment, in which event the Company shall retain such amounts, and any retained amounts shall accumulate and shall be used to make Deemed

Restricted Payments at such time or from time to time as such payments are not Impermissible Deemed Restricted Payments); *provided, further,* however, that the Company shall not be required to pay, nor shall it be a Default or Event of Default not to pay, Contingent Interest after the Maturity Date.

(b) Funding and payments in respect of any Refinancing Indebtedness shall have the same priority in this Section 4.06 as corresponds to the Indebtedness so refinanced.

(c) For purposes of clause 4.06(a)(i) above, "general corporate purposes" shall not include any acquisitions of businesses other than Permitted Acquisitions.

(d) The Company shall make contributions to its Subsidiaries and shall cause its Subsidiaries to make distributions or contributions, as applicable, to permit the application of cash and Cash Equivalents as set forth in Section 4.06(a); *provided, however,* that, notwithstanding the foregoing, it shall not be a default of this Section 4.06 if a Subsidiary does not make distributions to its parent entity as set forth in Sections 4.06(a)(i)-(vii) above or if interest or principal payments are not made on the Intercompany Notes as set forth in Sections 4.06(a)(ii) and (v) above, or if the Company does not make an interest payment on the Notes as set forth in Section 4.06(a)(ii) above if such dividends, distributions or payments would be Impermissible Restricted Payments or Impermissible Deemed Restricted Payments or would be prohibited by or would result in a default or an event of default under the Berkadia Loan.

(e) The Company and its Subsidiaries shall hold only those cash equivalents that meet the definition of Cash Equivalents herein.

Section 4.07. **Restricted Payments.**

(a) The Company shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, make any Restricted Payments, except such Restricted Payments that are permitted or required by Section 4.06 or Section 4.07(b) hereof.

(b) The preceding paragraph will not prohibit:

(i) the repurchase of Capital Interests to eliminate fractional Capital Interests or odd-lots, whether pursuant to a reverse stock-split, odd-lot tender offer or otherwise;

(ii) cash payments in lieu of issuance of fractional Capital Interests in connection with the exercise of any warrants, rights, options or other securities convertible into or exchangeable for Equity Interests of the Company;

(iii) the deemed repurchase of the Company's Equity Interests by the Company on the cashless exercise of stock options, if such Equity Interests represent a portion of the exercise price thereof;

(iv) payments or distributions to dissenting holders of Equity Interests pursuant to applicable law, pursuant to or in connection with a consolidation, merger or transfer of assets which such consolidation, merger or transfer or assets complies with the provisions of this Indenture; or

(v) repurchases, redemptions, acquisitions or retirements of Equity Interests of the Company from employees, directors or officers of the Company and its Subsidiaries;

provided that the aggregate of all payments in clauses (i), (ii), (iv) and (v) above shall not exceed $5.0 million in any calendar year.

Section 4.08. **Incurrence of Indebtedness.**

The Company will not, and will not permit FINOVA Capital or any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "*incur*") any Indebtedness other than Permitted Indebtedness or Permitted Nonrecourse Indebtedness.

Section 4.09. **Existence.**

Subject to Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect (i) its existence and the existence of FINOVA Capital in accordance with their respective organizational documents (as the same may be amended from time to time) and (ii) the rights (charter and statutory), licenses and franchises of the Company and FINOVA Capital.

Section 4.10. **Limitations on Issuance of Capital Interests of Subsidiaries.**

The Company shall not permit FINOVA Capital to issue or sell any Capital Interests (other than to the Company) and shall not permit any of its other Subsidiaries to issue any preferred Equity Interests to any Person (other than the Company or a wholly owned Subsidiary of the Company); *provided, however,* that such Subsidiaries may issue preferred Equity Interests such that the liquidation preference of such preferred Equity Interests does not exceed the amount of Indebtedness that would be permitted to be incurred under Section 4.08 hereof if the liquidation preference of such preferred Equity Interest were treated as Indebtedness for purposes of Section 4.08.

Section 4.11. **Dividend and Other Payment Restrictions Affecting Subsidiaries**

The Company shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create or permit to exist or become effective any restriction on the ability of any Subsidiary to (a) make any Restricted Payment, (b) make loans or advances to the Company or any of its Subsidiaries or (c) transfer any of its properties or assets to the Company or any of its Subsidiaries.

The preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of:

(a) the Notes;

(b) this Indenture;

(c) the Berkadia Loan;

(d) the Intercompany Notes;

(e) the contracts or agreements to which the Company and its Subsidiaries were parties as of February 26, 2001;

(f) applicable law;

(g) Refinancing Indebtedness containing restrictions no more restrictive, taken as a whole, than those contained in the Indebtedness so refinanced;

(h) Permitted Indebtedness described in clause (c) or (d) of the definition of "*Permitted Indebtedness;*" *provided, however*, that restrictions contained therein are no more restrictive, taken as a whole, than those contained in any Permitted Indebtedness; or

(i) Permitted Nonrecourse Indebtedness incurred by any special purpose Subsidiary; *provided* that the restrictions therein apply only to such special purpose Subsidiary.

Section 4.12. **Further Instruments and Acts.**

Upon the request of the Trustee, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

Section 4.13. **Payment of Taxes and Other Claims.**

The Company shall, and shall cause each of its Subsidiaries, to pay or discharge, or cause to be paid or discharged, before the same shall become delinquent (i)

all material taxes, assessments and governmental charges levied or imposed upon (a) the Company or any such Subsidiary, (b) the income or profits of any such Subsidiary which is taxed as a corporation under the Code or (c) the property of the Company or any such Subsidiary and (ii) all material, lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Company or any such Subsidiary; provided, however, that there shall not be required to be paid or discharged any such tax, assessment, charge or claim if the amount, applicability or validity thereof is being contested in good faith by appropriate proceedings and adequate provision therefor has been made.

Section 4.14. **Maintenance of Insurance.**

The Company will provide or cause to be provided, for itself and its Subsidiaries, insurance against loss or damage of the kinds customarily insured against by entities similarly situated and owning like properties, with reputable insurers or with the government of the United States of America, or an agency or instrumentality thereof, in such amounts, with such deductibles and by such methods as shall be customary for entities similarly situated in the industry in which the Company or such Subsidiary, as the case may be, is then conducting business.

Section 4.15. **Fall-Away Provision.**

The Company's and its Subsidiaries' obligations to comply with Sections 4.07, 4.08, 4.10, 4.11, 4.13 and 4.14 and Article 10 will be terminated upon the payment in full in accordance with the provisions of this Indenture, or the provision for payment in full in accordance with the terms of this Indenture, including Article 8, of the principal and accrued and unpaid Fixed Interest on all Outstanding Notes and such provisions shall thereafter cease to be of any further effect.

ARTICLE 5.
SUCCESSORS

Section 5.01. **Mergers and Consolidation.**

The Company shall not, directly or indirectly, consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person, unless:

(i) the entity or Person formed by or surviving any such consolidation or merger (if other than the Company) assumes all the obligations of the Company under the Notes and this Indenture pursuant to a supplemental indenture in a form reasonably satisfactory to the Trustee;

(ii) immediately after such consolidation or merger there is no default or event that, with the passage of time or notice or both, would be a Default or Event of Default under this Indenture; and

(iii) the Credit Rating of the surviving entity immediately following the merger or consolidation would not be lower than that of the Company immediately prior to the effectiveness of the merger or consolidation.

Notwithstanding the foregoing provisions of this Section 5.01, the Company may merge or consolidate with and into FINOVA Capital; *provided, however*, that upon the consummation of such merger or consolidation, the Company and the Trustee execute a supplemental indenture and such additional agreements, including security agreements, as may be necessary or advisable to secure the Company's obligations under this Indenture and the Notes to the same extent as, and with the same collateral as, FINOVA Capital's obligations under the Intercompany Notes are secured.

Section 5.02. **Successor Corporation Substituted.**

Upon any consolidation or merger of the Company in accordance with Section 5.01 hereof, the successor Person formed by such consolidation or into or with which the Company is merged shall succeed to, and be substituted for (so that from and after the date of such consolidation or merger, the provisions of this Indenture referring to the "*Company*" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein.

## ARTICLE 6.
## DEFAULTS AND REMEDIES

Section 6.01. **Events of Default.**

Each of the following constitutes an "*Event of Default*":

(i) the failure of the Company to pay all or any part of the unpaid principal on the Notes when and as the same becomes due and payable at the Stated Maturity of the Notes referred to in Section 2.02, upon prepayment in accordance with Section 3.07 or by acceleration;

(ii) failure by the Company to pay installments of Fixed Interest in full on the Notes for two consecutive Interest Payment Dates whether or not required to be paid pursuant to Section 4.06 hereof, provided that both of such installments remain unpaid for 30 days after such second consecutive Interest Payment Date;

(iii) failure by the Company or any of its Subsidiaries to observe or perform the provisions of Sections 4.01 or 4.06 if such failure is not remedied within 30 days;

(iv) failure by the Company to observe or perform in all material respects any other covenant or agreement on the part of the Company contained in the Notes, this Indenture or the Pledge Agreement if such failure is not remedied within 60 days after written notice is given to the Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, in either case specifying such default, requiring that such default be remedied and stating that such notice is a "*Notice of Default;*"

(v) either the Company or FINOVA Capital, pursuant to or within the meaning of Bankruptcy Law:

(A) commences a voluntary case,

(B) consents to the entry of an order for relief against it in an involuntary case,

(C) consents to the appointment of a Custodian of it or for all or substantially all of its property, or

(D) makes a general assignment for the benefit of its creditors; or

(vi) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A) is for relief against either the Company or FINOVA Capital in an involuntary case;

(B) appoints a Custodian of either the Company or FINOVA Capital or for all or substantially all of the property of either the Company or FINOVA Capital; or

(C) orders the liquidation of either the Company or FINOVA Capital;

and the order or decree remains unstayed and in effect for 60 consecutive days.

The term "*Custodian*" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

The Company shall deliver to the Trustee, within 30 days after the occurrence thereof, written notice in the form of an Officers' Certificate of any Event of Default under clauses (ii) or (iii) of this Section 6.01.

Section 6.02. **Acceleration.**

If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, by written notice to the Company (and to the Trustee if such notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the principal of and accrued Interest on the Outstanding Notes to be immediately due and payable. Upon a declaration of acceleration, such principal of and accrued Interest shall be immediately due and payable. Notwithstanding the foregoing, in the case of an Event of Default as described in (v) and (vi) of Section 6.01 hereof, the Notes shall become due and payable without further action or notice. Holders of the Notes may not enforce this Indenture or the Notes except as provided in this Indenture.

Section 6.03. **Other Remedies.**

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy (under this Indenture, or otherwise) to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or the Security Agreements.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.04. **Waiver of Past Defaults.**

Subject to Section 9.02, the Holders of a majority in aggregate principal amount of the Notes then Outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any past Default or Event of Default and its consequences under this Indenture (including any acceleration other than an automatic acceleration resulting from an Event of Default under clause (v) or (vi) of Section 6.01 hereof) except a continuing Default or Event of Default in the payment of Interest on, or the principal of, the Notes or in respect of a covenant or provision of this Indenture which cannot be modified or amended without the consent of the Holder of each outstanding Note affected; *provided, however*, that in determining whether the Holders of the required principal amount of Notes have concurred in any such waiver, Notes owned by the Company, or by any Affiliate of the Company, shall be disregarded, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, only Notes which such Trustee knows are so owned shall be disregarded. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; *provided, however*, that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

Section 6.05. **Control by Majority.**

The Holders of a majority in principal amount of the then Outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to the Notes; *provided, however* that in determining whether the Holders of the required principal amount of Notes have concurred in any such direction, Notes owned by the Company, or by any Affiliate of the Company, shall be disregarded, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, only Notes which such Trustee knows are so owned shall be disregarded. However, (i) the Trustee may refuse to follow any direction that, in the reasonable opinion of counsel to the Trustee, conflicts with law or this Indenture, that the Trustee reasonably determines may be unduly prejudicial to the rights of other Holders of Notes or that may involve the Trustee in personal liability, and (ii) the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction. In case an Event of Default shall occur (which shall not be cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of its own affairs. Notwithstanding any provision to the contrary in this Indenture, the Trustee is under no obligation to exercise any of its rights or powers under this Indenture at the request of any Holder of Notes, unless such Holder shall offer to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

Section 6.06. **Limitation on Suits.**

A Holder of a Note may pursue a remedy with respect to this Indenture or the Notes only if:

(i) the Holder of a Note gives to the Trustee written notice of a continuing Event of Default or the Trustee receives such notice from the Company;

(ii) the Holders of at least 25% in aggregate principal amount of the then Outstanding Notes make a written request to the Trustee to pursue the remedy;

(iii) such Holder of a Note or Holders of Notes offer and, if requested, provide to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense to be incurred in compliance with such request;

(iv) the Trustee does not comply with the request within 60 days after receipt of the request and the offer and, if requested, the provision of indemnity; and

(v) during such 60-day period the Holders of a majority in aggregate principal amount of the then Outstanding Notes do not give the Trustee a direction inconsistent with the request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07. **Rights of Holders of Notes to Receive Payment.**

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal and Interest on such Holder's Notes, on or after the respective due dates expressed in such Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided, however,* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entering of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the lien of this Indenture upon any property subject to such Lien.

Section 6.08. **Collection Suit.**

If an Event of Default specified in Section 6.01(i) or (ii) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company for the whole amount of principal of, and Interest remaining unpaid on, the Notes and interest on overdue principal, Interest and such further amount as shall be sufficient to cover the costs and expenses of collection and to the extent lawful, with interest on overdue principal and installments of Interest at the rate specified in the Notes in each case, including the reasonable compensation, expenses, disbursements and advances of the Trustee, and its agents and counsel.

Section 6.09. **Proofs of Claim.**

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, and its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Company, the Company's creditors or the Company's property, to participate as a member, voting or otherwise, of any official committee of creditors appointed in such manner and shall be entitled and empowered to collect, receive and distribute any money or other securities or property payable or deliverable upon the conversion or exchange of the Notes or on any such claims and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee,

and its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.    **Priorities.**

If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

First: to the Trustee, the Collateral Agent, and its agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expense and liabilities incurred, and all advances made, by the Trustee and the Collateral Agent and the costs and expenses of collection;

Second: to Holders of Notes for amounts due and unpaid on the Notes for principal and Interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes first for principal, then for Fixed Interest and then for Contingent Interest, respectively;

Third: without duplication, to the Holders for any other Obligations owing to the Holders under this Indenture, the Notes or the Security Agreements; and

Fourth: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11.    **Restoration of Rights and Remedies.**

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then, and in every such case, subject to any determination in such proceeding, the Company, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Company, the Trustee and the Holders shall continue as though no such proceeding had been instituted.

Section 6.12. **Rights and Remedies Cumulative.**

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or wrongfully taken Notes, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.13. **Delay or Omission Not Waiver.**

No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article Six or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.14. **Undertaking for Costs.**

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in principal amount of the then Outstanding Notes.

ARTICLE 7.
TRUSTEE

Section 7.01. **Duties of Trustee.**

(a) If an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee has knowledge, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default:

(i) the duties of the Trustee shall be determined solely by the express provisions of this Indenture or the TIA and the Trustee need perform only those duties that are specifically set forth in this Indenture or the TIA and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee, and conforming to the requirements of this Indenture. However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c) The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d) Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 7.01.

(e) No provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any liability. The Trustee shall be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holders of Notes, including without limitation the provisions of Section 6.05 hereof, unless such Holder shall have offered to the Trustee, security and indemnity satisfactory to it against any loss, liability or expense that might be incurred by it in complying with such request.

(f) The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust

by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02. **Rights of Trustee.**

(a) The Trustee may conclusively rely on the truth of the statements and correctness of the opinions contained in, and shall be protected from acting or refraining from acting upon, any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificate or Opinion of Counsel. Prior to taking, suffering or admitting any action, the Trustee may consult with counsel of the Trustee's own choosing and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c) The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e) Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company shall be sufficient if signed by an Officer of the Company.

(f) The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities that might be incurred by it in compliance with such request or direction.

(g) The Trustee shall not be charged with knowledge of any Default or Event of Default with respect to the Notes unless either (1) a Responsible Officer of the Trustee shall have actual knowledge of such Default or Event of Default or (2) written notice of such Default or Event of Default shall have been given to the Trustee by the Company or by any Holder of the Notes.

(h) The rights, privileges, protections, immunities and benefits given to the Trustee, including without limitation, its right to be indemnified, are extended to,

and shall be enforceable by, the Trustee in each of its capacities hereunder and each agent, custodian and other Person employed to act hereunder.

(i)    The Trustee may request that the Company deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superceded.

Section 7.03.    **Individual Rights of Trustee.**

The Trustee, in its individual or any other capacity may become the owner of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee. However, in the event that the Trustee acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the Commission for permission to continue as Trustee or resign. Any Agent may do the same with like rights and duties. The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04.    **Disclaimer.**

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes; it shall not be accountable for any money paid to the Company or upon the Company's direction under any provision of this Indenture; it shall not be responsible for the use or application of any money received by any Paying Agent other than itself; and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05.    **Notice of Defaults.**

If a Default or Event of Default occurs and is continuing and if it is known to a Responsible Officer of the Trustee, the Trustee shall mail to Holders of Notes a notice of the Default or Event of Default within 90 days after it occurs. Except in the case of a Default or Event of Default in payment on any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

Section 7.06.    **Reports by Trustee to Holders of the Notes.**

Within 60 days after each May 15 beginning with the May 15 following the date of this Indenture, and for so long as Notes remain Outstanding, the Trustee shall mail to the Holders of the Notes a brief report dated as of such reporting date that complies with TIA §313(a) (but if no event described in TIA §313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted). The

Trustee also shall comply with TIA §313(b). The Trustee shall also transmit by mail all reports as required by TIA §313(c).

A copy of each report at the time of its mailing to the Holders of Notes shall be mailed to the Company and filed with the Commission and each stock exchange on which the Company has informed the Trustee in writing the Notes are listed in accordance with TIA §313(d). The Company shall promptly notify the Trustee when the Notes are listed on any stock exchange and of any delisting thereof.

Section 7.07. **Compensation and Indemnity.**

The Company shall pay to the Trustee from time to time compensation as shall be agreed in writing between the Company and the Trustee for its acceptance of this Indenture and services hereunder. To the extent permitted by law, the Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Company shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and actual out of pocket expenses incurred or made by it in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel, but shall not include expenses incurred as a result of the Trustee's negligence or willful misconduct.

The Company shall indemnify each of the Trustee and any predecessor Trustee against any and all losses; liabilities, damages, claims or expenses, including taxes (other than taxes based on or measured by the income or gross receipts of the Trustee) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Company (including this Section 7.07) and defending itself against any claim (whether asserted by the Company or any Holder or any other person) or liability in connection with the exercise or performance of any of its powers or duties hereunder except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Trustee shall notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company shall not relieve the Company of its obligations hereunder, except to the extent of actual prejudice to the Company resulting from such failure. The Company shall defend the claim and the Trustee shall cooperate in the defense. The Trustee may have separate counsel and, if required due to conflicts, the Company shall pay the reasonable fees and expenses of such counsel. The Company need not pay for any settlement made without its consent, which consent may be withheld in its reasonable discretion.

The obligations of the Company under this Section 7.07 shall survive the satisfaction and discharge of this Indenture.

To secure the Company's payment obligations in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by

the Trustee, except that held in trust to pay principal and Interest on particular Notes redeemed, defeased, repurchased or otherwise satisfied and discharged. Such Lien shall survive the satisfaction and discharge of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(v) or (vi) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

The Trustee shall comply with the provisions of TIA §313(b)(2) to the extent applicable.

Section 7.08.  **Replacement of Trustee.**

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company. The Holders of a majority in principal amount of the then Outstanding Notes may remove the Trustee by so notifying the Trustee, as applicable, and the Company in writing. The Company may remove the Trustee, as applicable, if:

(a)  the Trustee, as applicable, fails to comply with Section 7.10 hereof;

(b)  the Trustee, as applicable, is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee, as applicable, under any Bankruptcy Law;

(c)  a Custodian or public officer takes charge of the Trustee, as applicable, or its property; or

(d)  the Trustee, as applicable, becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the then Outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company, or the Holders of at least 10% in principal amount of the then Outstanding Notes may petition, at the expense of the Company, any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder of a Note who has been a Holder of a Note for at least six months, fails to comply with Section 7.10 hereof, such Holder of a Note may petition any court of competent jurisdiction for the removal of the Trustee, as applicable, and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and the duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to the Holders of the Notes. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee provided that all sums owing to the retiring Trustee have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 hereof shall continue for the benefit of the retiring Trustee.

Section 7.09.    **Successor Trustee by Merger, etc.**

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee.

Section 7.10.    **Eligibility; Disqualification.**

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and shall at all times have a combined capital surplus of at least $150.0 million as set forth in its most recent annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of TIA §§310(a)(1), (2) and (5). The Trustee is subject to TIA §310(b).

Section 7.11.    **Preferential Collection of Claims against the Company.**

The Trustee is subject to TIA §311(a), excluding any creditor relationship listed in TIA §311(b). A Trustee who has resigned or been removed shall be subject to TIA §311(a) to the extent indicated therein.

## ARTICLE 8.
## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

### Section 8.01. **Option to Effect Legal Defeasance or Covenant Defeasance.**

The Company may, at the option of its Board of Directors evidenced by a resolution set forth in an Officer's Certificate, at any time, elect to have either Section 8.02 or 8.03 hereof be applied to all Outstanding Notes upon compliance with the conditions set forth below in this Article 8.

### Section 8.02. **Legal Defeasance and Discharge.**

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Company shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from its obligations with respect to all Outstanding Notes on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*"). For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the Outstanding Notes, which shall thereafter be deemed to be "*Outstanding*" only for the purposes of Section 8.05 hereof and the other sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other Obligations under such Notes and this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which shall survive until otherwise terminated or discharged hereunder: (a) the rights of Holders of Outstanding Notes to receive payments in respect of the principal of and Interest on such Notes when such payments are due from the trust referred to in Section 8.04(i); (b) the Company's obligations with respect to such Notes under Sections 2.02, 2.03, 2.04, 2.05, 2.06, 2.07, 2.10 and 4.02 hereof; (c) the rights, powers, trusts, duties and immunities of the Trustee including without limitation thereunder Section 7.07, 8.05 and 8.07 hereof and the Company's Obligations in connection therewith and (d) the provisions of this Section 8.02 (it being understood that such Notes shall not be deemed Outstanding for accounting purposes). Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of the option under Section 8.03 hereof. If the Company exercises the option applicable to this Section 8.02, the Trustee shall notify the Collateral Agent to release the Lien of this Indenture in accordance with the provisions of the Security Agreements and Section 10.03 hereof.

### Section 8.03. **Covenant Defeasance.**

Upon the exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from its obligations under the covenants contained in Sections 4.03, 4.05, 4.06, 4.07, 4.08, 4.10, 4.11, 4.12, 4.13 and clauses (ii) and (iii) of Section 5.01 hereof with respect to the Outstanding Notes on and after the date the

conditions set forth below are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes shall thereafter be deemed not "*Outstanding*" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "*Outstanding*" for all other purposes hereunder (it being understood that such Notes shall not be deemed Outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the Outstanding Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby. In addition, upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, Sections 6.01(ii) through 6.01(vi) hereof shall not constitute Events of Default. If the Company exercises the option applicable to this Section 8.03, the Trustee shall notify the Collateral Agent to release the Lien of this Indenture in accordance with the provisions of the Security Agreements and Section 10.03 hereof.

Section 8.04. **Conditions to Legal or Covenant Defeasance.**

The following shall be the conditions to the application of either Section 8.02 or 8.03 hereof to the Outstanding Notes:

In order to exercise either Legal Defeasance or Covenant Defeasance:

(i) the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as shall be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of Fixed Interest and the maximum remaining amount payable as Contingent Interest, on the Outstanding Notes on the stated maturity or on the next Interest Payment Date, as the case may be, and the Company must specify whether the Notes are being defeased to maturity or to the next Interest Payment Date;

(ii) in the case of an election under Section 8.02 hereof, the Company shall have delivered to the Trustee either (A)(1) an Opinion of Counsel to the effect that the Holders of the Outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of the Company's exercise of its option under Section 8.02 and will be subject to federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred, which Opinion of Counsel

must be based upon (and accompanied by a copy of) a ruling of the Internal Revenue Service to the same effect, unless there has been a change in the applicable federal income tax law after the Closing Date such that a ruling is no longer required or (2) a ruling directed to the Trustee received from the Internal Revenue Service to the same effect as the Opinion of Counsel described in clause (1) above and (B) an Opinion of Counsel to the effect that the creation of the defeasance trust does not violate the Investment Company Act of 1940;

(iii) in the case of an election under Section 8.03 hereof, the Company shall have delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee confirming that the Holders of the Outstanding Notes shall not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and shall be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(iv) immediately after giving effect to such deposit, on a pro forma basis, no Default or Event of Default, or event that after notice or lapse of time or both would become an Event of Default, shall have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit);

(v) such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any material agreement or instrument (other than this Indenture) to which the Company is a party or by which the Company is bound;

(vi) if at such time the Notes are listed on a national securities exchange, the Company shall have delivered to the Trustee an Officer's Certificate to the effect that the Notes will not be delisted as a result of such deposit, defeasance and discharge; and

(vii) the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for relating to the Legal Defeasance or the Covenant Defeasance have been satisfied.

Section 8.05. **Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions.**

Subject to Section 8.06 hereof, all money and non-callable Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying Trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section

8.04 hereof in respect of the Outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non-callable Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the Outstanding Notes.

Anything in this Article 8 to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon the written request of the Company and be relieved of all liability with respect to any money or non-callable Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(i) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06. **Repayment to the Company.**

Subject to Section 7.07, 8.01, 8.02 and 8.03, any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of and Interest on any Note and remaining unclaimed for one year after such principal and Interest has become due and payable shall be paid to the Company on its written request or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as Trustee thereof, shall thereupon cease; *provided, however,* that the Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense of the Company cause to be published once, in The New York Times and/or The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining shall be repaid to the Company.

Section 8.07. **Defeasance and Certain Other Events of Default.**

In the event the Company exercises its option to omit compliance with certain covenants and provisions of this Indenture with respect to the Notes pursuant to Section 8.03 and such Notes are declared due and payable because of the occurrence of an Event of Default that remains applicable and the amount of money and/or U.S.

Government Obligations on deposit with the Trustee is insufficient to pay amounts due on the Notes at the time of the acceleration resulting from such Event of Default pursuant to Section 6.02, the Company will remain liable for such shortfall.

Section 8.08. **Reinstatement.**

If the Trustee or Paying Agent is unable to apply any United States dollars or non-callable Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the obligations of the Company under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided, however,* that, if the Company makes any payment of principal of and Interest on any Note following the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

ARTICLE 9.
AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01. **Without Consent of Holders of the Notes.**

Notwithstanding Section 9.02 of this Indenture, without the consent of any Holder of Notes, the Company and the Trustee may amend or supplement this Indenture or the Notes:

(i) to cure any ambiguity, defect or inconsistency which, in the good faith opinion of the Board of Directors of the Company evidenced by a Board Resolution, exists;

(ii) to provide for uncertificated Notes in addition to or in place of certificated Notes;

(iii) to comply with Article 5 hereof;

(iv) to make any change that would provide any additional rights or benefits to the Holders of the Notes or, in the good faith opinion of the Board of Directors of the Company, evidenced by a Board Resolution, does not materially adversely affect the legal rights hereunder of any Holder of the Notes;

(v) to execute and deliver any documents necessary or appropriate to release Liens on any Collateral as permitted by Section 10.03 or 10.04(b) hereof;

(vi)     to comply with requirements of the Commission in connection with the qualification of this Indenture under the TIA; or

(vii)    to substitute a new Trustee pursuant to Sections 7.08 or 7.09.

Upon the written request of the Company accompanied by resolutions of the Board of Directors or other governing body of the Company authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee shall join with the Company in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02.    **With Consent of Holders of Notes.**

Except as provided in the next two succeeding paragraphs, this Indenture and the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the Notes then Outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange offer for Notes), and, in such case, without prior written notice to the Holders and subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default or compliance with any provision of this Indenture or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then Outstanding Notes (including consents obtained in connection with a tender offer or exchange offer for Notes). It is further understood that the provisions of Section 4.06 hereof and any definition set forth herein (other than the definition of "Maturity Date") may be amended or supplemented, or compliance with provisions contained in Section 4.06 or any such definition waived, with the consent of the Holders of at least a majority in principal amount of the Notes then Outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange offer for Notes).

Upon the written request of the Company accompanied by resolutions of the Board of Directors or other governing body of the Company authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee shall join with the Company in the execution of such amended or supplemental indenture unless such amended or supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee  may, but shall not be obligated to, enter into such amended or supplemental indenture.

It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company shall mail to the Holders of each Note affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure or delay of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

Without the consent of each Holder affected, an amendment or waiver, including a waiver pursuant to Section 6.04, may not:

 (i) reduce the percentage or principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

 (ii) reduce the principal of or change the Stated Maturity of any Note;

 (iii) reduce the rate of or change the time for payment of Interest on any Note;

 (iv) waive a Default or Event of Default in the payment of principal of or Interest on the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then Outstanding Notes and a waiver of the payment default that resulted from such acceleration);

 (v) make any Note payable in money other than that stated in the Notes; or

 (vi) change the place or currency of payment of principal of or Interest on, any Note;

 (vii) impair the right to institute suit for the enforcement of any payment on or after the Stated Maturity of any Note; or

 (viii) make any change in the foregoing amendment and waiver provisions.

Section 9.03. **Compliance with Trust Indenture Act.**

Every amendment or supplement to this Indenture or the Notes shall be set forth in an amended or supplemental indenture that complies with the TIA as then in effect.

Section 9.04. **Revocation and Effect of Consents.**

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the Trustee receives notice evidencing the taking of action by the Holders of the specified percentage in aggregate principal amount specified in this Indenture with respect to such waiver, supplement or amendment. When an amendment, supplement or waiver becomes effective in accordance with its terms, it thereafter binds every Holder.

Section 9.05. **Notation on or Exchange of Notes.**

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06. **Trustee to Sign Amendments, etc.**

The Trustee shall sign any amended or supplemental indenture or amended Security Agreements authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Company may not sign an amendment or supplemental indenture until the Board of Directors approves it. In signing or refusing to sign any amended or supplemental indenture the Trustee shall be entitled to receive and (subject to Section 7.01 hereof) shall be fully protected in relying upon, in addition to the documents required by Section 12.04 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture, that it is not inconsistent herewith and therewith, and that it will be valid and binding upon the Company in accordance with its terms.

ARTICLE 10.
COLLATERAL AND SECURITY

Section 10.01. **Security Agreements.**

The due and punctual payment of the principal of and Fixed Interest, but not Contingent Interest, on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at the Stated Maturity of the Notes referred to in Section 2.02, by acceleration or by prepayment in accordance with Section 3.07, and

interest on the overdue principal of and Fixed Interest (to the extent permitted by law) on the Notes and performance of all other obligations of the Company (excluding any and all obligations with respect to any Contingent Interest) to the Holders of Notes, the Trustee or the Collateral Agent under this Indenture, the Security Agreements and the Notes, according to the terms hereunder or thereunder, shall be secured as provided in the Security Agreements which the Company has entered into simultaneously with the execution of this Indenture. Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of the Security Agreements (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with its terms, appoints the Collateral Agent to act as the "*Collateral Agent*" thereunder and authorizes and directs the Collateral Agent to enter into the Security Agreements and to perform its obligations and exercise its rights thereunder in accordance therewith. The Company shall do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Security Agreements, to assure and confirm to the Trustee and the Collateral Agent the security interest in the Collateral contemplated hereby, by the Security Agreements or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed. The Company shall take, or shall cause its Subsidiaries to take any and all actions reasonably required to cause the Security Agreements to create and maintain, as security for the Obligations of the Company hereunder, a valid and enforceable perfected Lien in and on all the Collateral, in favor of the Collateral Agent for its benefit and the ratable benefit of the Holders of Notes, superior to and prior to the rights of all third Persons other than those holding First Lien Debt, and subject to no Liens (other than Liens permitted by the Security Agreements).

Section 10.02. **Recording and Opinions.**

(a) The Company shall furnish to the Collateral Agent and the Trustee promptly following the execution and delivery of this Indenture, an Opinion of Counsel, either (i) stating that, in the opinion of such counsel, action has been taken with respect to the recording, registering, filing, re-recording, re-registering and re-filing of all supplemental indentures, financing statements, continuation statements or other instruments of further assurance as is necessary to maintain the Lien of the Security Agreements and reciting with respect to the security interests in the Collateral the details of such action or referring to prior Opinions of Counsel in which such details are given or (ii) stating that, in the opinion of such counsel, no such action is necessary to make such Lien effective.

(b) The Company shall furnish to the Collateral Agent and the Trustee within three months after each anniversary of the Issue Date an Opinion of Counsel, dated as of such date, either (i) (A) stating that, in the opinion of such counsel, action has been taken with respect to the recording, registering, filing, re-recording, re-registering and re-filing of all supplemental indentures, financing statements, continuation statements or other instruments of further assurance as is necessary to maintain the Lien

of the Security Agreements and reciting with respect to the security interests in the Collateral the details of such action or referring to prior Opinions of Counsel in which such details are given and (B) stating that, based on relevant laws as in effect on the date of such Opinion of Counsel, all financing statements and continuation statements have been executed and filed that are necessary as of such date and during the succeeding 12 months fully to preserve and protect, to the extent such protection and preservation are possible by filing, the rights of the Holders of Notes and the Collateral Agent and the Trustee hereunder and under the Security Documents with respect to the security interests in the Collateral, or (ii) stating that, in the opinion of such counsel, no such action is necessary to maintain such Lien and assignment.

Section 10.03. **Release of Collateral.**

(a) Subject to subsections (b), (c) and (d) of this Section 10.03, Collateral may be released from the Lien and security interest created by the Security Agreements at any time or from time to time in accordance with the provisions of the Security Agreements and as provided hereby. The Collateral will be automatically released from the Lien at such time as the Company has paid in full or otherwise provided for the payment in full in accordance with this Indenture of the principal amount and Interest due on all of the Notes. If the Trustee is not the Collateral Agent, the Trustee shall thereafter deliver a certificate to the Collateral Agent stating that such principal amount and Interest has been paid in full, and instruct the Collateral Agent to release the Liens pursuant to this Indenture and the Security Agreements. Upon the request of the Company pursuant to an Officer's Certificate certifying that all conditions precedent to such release hereunder and under the Security Agreements have been met, the Collateral Agent shall release the Collateral. Upon receipt of such Officer's Certificate, the Collateral Agent shall (at the sole cost and expense of the Company) execute, deliver or acknowledge any necessary or proper instruments of termination, satisfaction or release to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Agreements.

(b) No Collateral shall be released from the Lien and security interest created by the Security Agreements pursuant to the provisions of the Security Agreements unless there shall have been delivered to the Collateral Agent the certificate required by this Section 10.03.

(c) The release of any Collateral from the terms of this Indenture and the Security Agreements shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Collateral is released pursuant to the terms of the Security Agreements. To the extent applicable, the Company shall cause TIA §313(b), relating to reports, and TIA §314(d), relating to the release of property or securities from the Lien and security interest of the Security Agreements and relating to the substitution therefor of any property or securities to be subjected to the Lien and security interest of the Security Agreements, to be satisfied. Any certificate or opinion required by TIA §314(d) may be made by an Officer of the Company except in cases where TIA §314(d) requires that such certificate or opinion be made by an

independent Person, which Person shall be an independent engineer, appraiser or other expert selected or approved by the Company.

Section 10.04. **Certificates of the Company.**

The Company shall furnish to the Trustee and the Collateral Agent, prior to each proposed release of Collateral pursuant to the Security Agreements, (i) all documents, if any, required by TIA §314(d) and (ii) an Opinion of Counsel, which may be rendered by internal counsel to the Company, to the effect that such accompanying documents constitute all documents required by TIA §314(d). The Trustee and the Collateral Agent may, to the extent permitted by Sections 7.01 and 7.02 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such documents and such Opinion of Counsel.

Section 10.05. **Certificates of the Trustee.**

In the event that the Company wishes to release Collateral in accordance with the Security Agreements and has delivered the certificates and documents required by the Security Agreements and Sections 10.03 and 10.04 hereof, the Trustee shall determine whether it has received all documentation required by TIA §314(d) in connection with such release and, based on such determination and the Opinion of Counsel delivered pursuant to Section 10.02, shall deliver a certificate to the Collateral Agent setting forth such determination; *provided, however,* that so long as the Trustee is the Collateral Agent, the requirement that the Trustee deliver a certificate to the Collateral Agent shall not be applicable.

Section 10.06. **Authorization of Actions to Be Taken by the Trustee and the Collateral Agent Under the Security Agreements.**

Subject to the provisions of Section 7.01 and 7.02 hereof, the Trustee shall, in its sole discretion and without the consent of the Holders of Notes, direct, on behalf of the Holders of Notes, the Collateral Agent to take all actions it deems necessary or appropriate in order to (a) enforce any of the terms of the Security Agreements and (b) collect, receive and distribute any and all amounts payable in respect of the Obligations of the Company hereunder or under the Security Agreements. The Trustee and the Collateral Agent shall have power to institute and maintain such suits and proceedings as either may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Security Agreements or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Holders of Notes in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest

hereunder or be prejudicial to the interests of the Holders of Notes or of the Trustee or the Collateral Agent).

Section 10.07. **Authorization of Receipt of Funds by the Trustee Under the Security Agreements.**

The Collateral Agent shall deliver to the Trustee and the Trustee is authorized to receive any funds for the benefit of the Holders of Notes distributed under the Security Agreements, and to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture and the Security Agreements.

ARTICLE 11.
SATISFACTION AND DISCHARGE

Section 11.01. **Satisfaction and Discharge.**

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(1) either:

(a) all Notes that have been authenticated (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Company) have been delivered to the Trustee for cancellation; or

(b) the Company has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest, to pay and discharge the entire indebtedness on the Notes not delivered to the Trustee for cancellation for principal on, accrued and unpaid Fixed Interest to the date of Stated Maturity or, if prepaid in accordance with Section 3.07, to the prepayment date set forth in the notice contemplated by Section 3.01 and the maximum remaining amount of Contingent Interest payable on all Outstanding Notes;

(2) no Default or Event of Default shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under, any other material instrument to which the Company is a party or by which the Company is bound;

(3) the Company has paid or caused to be paid all sums payable by it under this Indenture; and

(4) the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or the prepayment date, as the case may be.

In addition, the Company must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee pursuant to subclause (b) of clause (1) of this Section, the provisions of Section 12.02 and Section 8.06 shall survive.

Section 11.02. **Application of Trust Money.**

Subject to the provisions of Section 8.06, all money deposited with the Trustee pursuant to Section 11.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and Interest, for whose payment such money has been deposited with the Trustee; *provided, however,* such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 11.01 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's Obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 11.01; *provided, however,* that if the Company has made any payment of principal of Interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

ARTICLE 12.
MISCELLANEOUS

Section 12.01. **Trust Indenture Act Controls.**

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by TIA §318(c), the imposed duties shall control.

Section 12.02. **Notices.**

Any notice or communication by the Company, the Trustee or the Collateral Agent to the other is duly given if in writing and delivered in Person or mailed by first class mail (registered or certified, return receipt requested), telecopier or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company:

The FINOVA Group Inc.
4800 North Scottsdale Road
Scottsdale, Arizona 85251-7623
Attention: President
(480) 636-4800
(480) 636-5036 (facsimile)

If to the Trustee:

The Bank of New York
101 Barclay Street, 21st Floor West
New York, New York 10286
Attention: Corporate Trust Administration
(212) 815-5915 (facsimile)

If to the Collateral Agent, at the address provided in the Security Agreements for notices to be sent.

The Company or the Trustee, by notice to the other may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied; and the next Business Day after timely delivery to the courier, if sent by overnight air courier promising next Business Day delivery, except that notices and communications to the Trustee or the Collateral Agent shall be deemed duly given and effective only upon receipt.

Any notice or communication to a Holder shall be mailed by first class mail or by overnight air courier promising next Business Day delivery to its address shown on the register kept by the Registrar. Any notice or communication shall also be so mailed to any Person described in TIA §313(c), to the extent required by the TIA. Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it shall mail a copy to the Trustee at the same time.

Section 12.03. **Communication by Holders of Notes with Other Holders of Notes.**

Holders may communicate pursuant to TIA §312(b) with other Holders with respect to their rights under this Indenture, the Notes and the Security Agreements. The Company, the Trustee, the Registrar and anyone else shall have the protection of TIA §312(c).

Section 12.04. **Certificate and Opinion as to Conditions Precedent.**

Upon any request or application by the Company to the Trustee and/or the Collateral Agent to take any action under this Indenture, the Company shall furnish to the Trustee, upon request:

(a) an Officer's Certificate in form and substance reasonably satisfactory to the Trustee, as applicable (which shall include the statements set forth in Section 12.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(b) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 12.05. **Statements Required in Certificate or Opinion.**

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to TIA §314(a)(4)) shall comply with the provisions of TIA §314(e) and shall include:

(a) a statement that the Person making such certificate or opinion has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 12.06. **Rules by Trustee and Agents.**

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 12.07. **No Personal Liability of Directors, Officers, Employees and Stockholders.**

No director, officer, employee, incorporator or stockholder of the Company, as such, shall have any liability for any obligations of the Company under the Notes, this Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 12.08. **Governing Law.**

THE INTERNAL LAW OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE AND THE NOTES WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Section 12.09. **No Adverse Interpretation of Other Agreements.**

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 12.10. **Successors.**

All agreements of the Company in this Indenture and the Notes shall bind its successors and assigns. All agreements of the Trustee and/or the Collateral Agent in this Indenture shall bind its successors and assigns.

Section 12.11. **Severability.**

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 12.12. **Counterpart Originals.**

The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

Section 12.13.  **Table of Contents, Headings, etc.**

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

[Signatures on following page]

SIGNATURES

Dated as of , 2001

THE FINOVA GROUP INC.

By:______________________________
Name:
Title:

THE BANK OF NEW YORK, as Trustee

By:______________________________
Name:
Title:

# EXHIBIT D

**BERKSHIRE HATHAWAY INC.**

**2001 ANNUAL REPORT**

**TABLE OF CONTENTS**

Business Activities .................................................. Inside Front Cover

Corporate Performance vs. the S&P 500 .............................................. 2

Chairman's Letter* .................................................................................. 3

Selected Financial Data For The
Past Five Years .................................................................................. 20

Acquisition Criteria ................................................................................ 21

Independent Auditors' Report ............................................................... 21

Consolidated Financial Statements ....................................................... 22

Management's Discussion ...................................................................... 47

Chairman's Memo to Managers
Following September 11th Terrorist Attack ........................................ 61

Owner's Manual ..................................................................................... 62

Shareholder-Designated Contributions .................................................. 69

Common Stock Data .............................................................................. 71

Subsidiary Listing .................................................................................. 72

Directors and Officers of the Company .........................Inside Back Cover

*Copyright © 2002 By Warren E. Buffett
All Rights Reserved

Business Activities

**Berkshire Hathaway Inc.** is a holding company owning subsidiaries engaged in a number of diverse business activities. The most important of these is the property and casualty insurance business conducted on both a direct and reinsurance basis through a number of subsidiaries. Included in this group of subsidiaries is GEICO Corporation, the sixth largest auto insurer in the United States and General Re Corporation, one of the four largest reinsurers in the world.

Investment portfolios of insurance subsidiaries include meaningful equity ownership percentages of other publicly traded companies. Investments with a market value in excess of $500 million at the end of 2001 include approximately 11% of the capital stock of American Express Company, approximately 8% of the capital stock of The Coca-Cola Company, approximately 9% of the capital stock of The Gillette Company, approximately 9% of the capital stock of H&R Block, Inc., approximately 15% of the capital stock of Moody's Corporation, approximately 18% of the capital stock of The Washington Post Company and approximately 3% of the capital stock of Wells Fargo and Company. Much information about these publicly-owned companies is available, including information released from time to time by the companies themselves.

Numerous business activities are conducted through non-insurance subsidiaries. *FlightSafety International* provides training of aircraft and ship operators. *Executive Jet* provides fractional ownership programs for general aviation aircraft. *Nebraska Furniture Mart, R.C. Willey Home Furnishings, Star Furniture,* and *Jordan's Furniture* are retailers of home furnishings. *Borsheim's, Helzberg Diamond Shops* and *Ben Bridge Jeweler* are retailers of fine jewelry. *Scott Fetzer* is a diversified manufacturer and distributor of commercial and industrial products, the principal products are sold under the *Kirby* and *Campbell Hausfeld* brand names.

Also included in the non-insurance subsidiaries are several large manufacturing businesses acquired during 2000 and 2001. *Shaw Industries* is the world's largest manufacturer of tufted broadloom carpet. *Benjamin Moore* is a formulator, manufacturer and retailer of architectural and industrial coatings. *Johns Manville* is a leading manufacturer of insulation and building products. *Acme Building Brands* is a manufacturer of face brick and concrete masonry products. *MiTek Inc.* produces steel connector products and engineering software for the building components market.

In addition, Berkshire's other non-insurance business activities include: *Buffalo News*, a publisher of a daily and Sunday newspaper; *See's Candies*, a manufacturer and seller of boxed chocolates and other confectionery products; *H.H. Brown, Lowell, Dexter* and *Justin Brands*, manufacturers and distributors of footwear under a variety of brand names; *International Dairy Queen*, which licenses and services a system of about 6,000 stores that offer prepared dairy treats and food; *CORT*, a provider of rental furniture, accessories and related services and *XTRA Corporation*, a leading operating lessor of transportation equipment.

Operating decisions for the various Berkshire businesses are made by managers of the business units. Investment decisions and all other capital allocation decisions are made for Berkshire and its subsidiaries by Warren E. Buffett, in consultation with Charles T. Munger. Mr. Buffett is Chairman and Mr. Munger is Vice Chairman of Berkshire's Board of Directors.

************

Note: The following table appears in the printed Annual Report on the facing page of the Chairman's Letter and is referred to in that letter.

## Berkshire's Corporate Performance vs. the S&P 500

| Year | Annual Percentage Change in Per-Share Book Value of Berkshire (1) | Annual Percentage Change in S&P 500 with Dividends Included (2) | Relative Results (1)-(2) |
|---|---|---|---|
| 1965 | 23.8 | 10.0 | 13.8 |
| 1966 | 20.3 | (11.7) | 32.0 |
| 1967 | 11.0 | 30.9 | (19.9) |
| 1968 | 19.0 | 11.0 | 8.0 |
| 1969 | 16.2 | (8.4) | 24.6 |
| 1970 | 12.0 | 3.9 | 8.1 |
| 1971 | 16.4 | 14.6 | 1.8 |
| 1972 | 21.7 | 18.9 | 2.8 |
| 1973 | 4.7 | (14.8) | 19.5 |
| 1974 | 5.5 | (26.4) | 31.9 |
| 1975 | 21.9 | 37.2 | (15.3) |
| 1976 | 59.3 | 23.6 | 35.7 |
| 1977 | 31.9 | (7.4) | 39.3 |
| 1978 | 24.0 | 6.4 | 17.6 |
| 1979 | 35.7 | 18.2 | 17.5 |
| 1980 | 19.3 | 32.3 | (13.0) |
| 1981 | 31.4 | (5.0) | 36.4 |
| 1982 | 40.0 | 21.4 | 18.6 |
| 1983 | 32.3 | 22.4 | 9.9 |
| 1984 | 13.6 | 6.1 | 7.5 |
| 1985 | 48.2 | 31.6 | 16.6 |
| 1986 | 26.1 | 18.6 | 7.5 |
| 1987 | 19.5 | 5.1 | 14.4 |
| 1988 | 20.1 | 16.6 | 3.5 |
| 1989 | 44.4 | 31.7 | 12.7 |
| 1990 | 7.4 | (3.1) | 10.5 |
| 1991 | 39.6 | 30.5 | 9.1 |
| 1992 | 20.3 | 7.6 | 12.7 |
| 1993 | 14.3 | 10.1 | 4.2 |
| 1994 | 13.9 | 1.3 | 12.6 |
| 1995 | 43.1 | 37.6 | 5.5 |
| 1996 | 31.8 | 23.0 | 8.8 |
| 1997 | 34.1 | 33.4 | .7 |
| 1998 | 48.3 | 28.6 | 19.7 |
| 1999 | .5 | 21.0 | (20.5) |
| 2000 | 6.5 | (9.1) | 15.6 |
| 2001 | (6.2) | (11.9) | 5.7 |
| Average Annual Gain – 1965-2001 | 22.6% | 11.0% | 11.6% |
| Overall Gain – 1964-2001 | 194,936% | 4,742% | 190,194% |

Notes: Data are for calendar years with these exceptions: 1965 and 1966, year ended 9/30; 1967, 15 months ended 12/31.

Starting in 1979, accounting rules required insurance companies to value the equity securities they hold at market rather than at the lower of cost or market, which was previously the requirement. In this table, Berkshire's results through 1978 have been restated to conform to the changed rules. In all other respects, the results are calculated using the numbers originally reported.

The S&P 500 numbers are **pre-tax** whereas the Berkshire numbers are **after-tax**. If a corporation such as Berkshire were simply to have owned the S&P 500 and accrued the appropriate taxes, its results would have lagged the S&P 500 in years when that index showed a positive return, but would have exceeded the S&P in years when the index showed a negative return. Over the years, the tax costs would have caused the aggregate lag to be substantial.

**BERKSHIRE HATHAWAY INC.**

**To the Shareholders of Berkshire Hathaway Inc.:**

Berkshire's *loss* in net worth during 2001 was $3.77 billion, which decreased the per-share book value of both our Class A and Class B stock by 6.2%. Over the last 37 years (that is, since present management took over) per-share book value has grown from $19 to $37,920, a rate of 22.6% compounded annually.*

Per-share intrinsic grew somewhat faster than book value during these 37 years, and in 2001 it probably decreased a bit less. We explain intrinsic value in our Owner's Manual, which begins on page 62. I urge new shareholders to read this manual to become familiar with Berkshire's key economic principles.

Two years ago, reporting on 1999, I said that we had experienced both the worst absolute and relative performance in our history. I added that "relative results are what concern us," a viewpoint I've had since forming my first investment partnership on May 5, 1956. Meeting with my seven founding limited partners that evening, I gave them a short paper titled "The Ground Rules" that included this sentence: "Whether we do a good job or a poor job is to be measured against the general experience in securities." We initially used the Dow Jones Industrials as our benchmark, but shifted to the S&P 500 when that index became widely used. Our comparative record since 1965 is chronicled on the facing page; last year Berkshire's advantage was 5.7 percentage points.

Some people disagree with our focus on relative figures, arguing that "you can't eat relative performance." But if you expect – as Charlie Munger, Berkshire's Vice Chairman, and I do – that owning the S&P 500 will produce reasonably satisfactory results over time, it follows that, for long-term investors, gaining small advantages annually over that index *must* prove rewarding. Just as you can eat well throughout the year if you own a profitable, but highly seasonal, business such as See's (which loses considerable money during the summer months) so, too, can you regularly feast on investment returns that beat the averages, however variable the absolute numbers may be.

Though our corporate performance last year was satisfactory, *my* performance was anything but. I manage most of Berkshire's equity portfolio, and my results were poor, just as they have been for several years. Of even more importance, I allowed General Re to take on business without a safeguard I knew was important, and on September 11th, this error caught up with us. I'll tell you more about my mistake later and what we are doing to correct it.

Another of my 1956 Ground Rules remains applicable: "I cannot promise results to partners." But Charlie and I *can* promise that your economic result from Berkshire will parallel ours during the period of your ownership: We will not take cash compensation, restricted stock or option grants that would make our results superior to yours.

Additionally, I will keep well over 99% of my net worth in Berkshire. My wife and I have never sold a share nor do we intend to. Charlie and I are disgusted by the situation, so common in the last few years, in which shareholders have suffered billions in losses while the CEOs, promoters, and other higher-ups who fathered these disasters have walked away with extraordinary wealth. Indeed, many of these people were urging investors to buy shares while concurrently dumping their own, sometimes using methods that hid their actions. To their shame, these business leaders view shareholders as patsies, not partners.

Though Enron has become the symbol for shareholder abuse, there is no shortage of egregious conduct elsewhere in corporate America. One story I've heard illustrates the all-too-common attitude of managers toward

---

*All figures used in this report apply to Berkshire's A shares, the successor to the only stock that the company had outstanding before 1996. The B shares have an ec onomic interest equal to 1/30th that of the A.

owners: A gorgeous woman slinks up to a CEO at a party and through moist lips purrs, "I'll do anything – *anything* – you want. Just tell me what you would like." With no hesitation, he replies, "Reprice my options."

One final thought about Berkshire: In the future we won't come close to replicating our past record. To be sure, Charlie and I will strive for above-average performance and will not be satisfied with less. But two conditions at Berkshire are far different from what they once were: Then, we could often buy businesses and securities at much lower valuations than now prevail; and more important, we were then working with far less money than we now have. Some years back, a good $10 million idea could do wonders for us (witness our investment in Washington Post in 1973 or GEICO in 1976). Today, the combination of *ten* such ideas and a triple in the value of *each* would increase the net worth of Berkshire by only ¼ of 1%. We need "elephants" to make significant gains now – and they are hard to find.

On the positive side, we have as fine an array of operating managers as exists at any company. (You can read about many of them in a new book by Robert P. Miles: *The Warren Buffett CEO*.) In large part, moreover, they are running businesses with economic characteristics ranging from good to superb. The ability, energy and loyalty of these managers is simply extraordinary. We now have completed 37 Berkshire years without having a CEO of an operating business elect to leave us to work elsewhere.

Our star-studded group grew in 2001. First, we completed the purchases of two businesses that we had agreed to buy in 2000 – Shaw and Johns Manville. Then we acquired two others, MiTek and XTRA, and contracted to buy two more: Larson-Juhl, an acquisition that has just closed, and Fruit of the Loom, which will close shortly if creditors approve our offer. All of these businesses are led by smart, seasoned and trustworthy CEOs.

Additionally, all of our purchases last year were for cash, which means our shareholders became owners of these additional businesses without relinquishing any interest in the fine companies they already owned. We will continue to follow our familiar formula, striving to increase the value of the excellent businesses we have, adding new businesses of similar quality, and issuing shares only grudgingly.

**Acquisitions of 2001**

A few days before last year's annual meeting, I received a heavy package from St. Louis, containing an unprepossessing chunk of metal whose function I couldn't imagine. There was a letter in the package, though, from Gene Toombs, CEO of a company called MiTek. He explained that MiTek is the world's leading producer of this thing I'd received, a "connector plate," which is used in making roofing trusses. Gene also said that the U.K. parent of MiTek wished to sell the company and that Berkshire seemed to him the ideal buyer. Liking the sound of his letter, I gave Gene a call. It took me only a minute to realize that he was our kind of manager and MiTek our kind of business. We made a cash offer to the U.K. owner and before long had a deal.

Gene's managerial crew is exceptionally enthusiastic about the company and wanted to participate in the purchase. Therefore, we arranged for 55 members of the MiTek team to buy 10% of the company, with each putting up a minimum of $100,000 in cash. Many borrowed money so they could participate.

As they would *not* be if they had options, all of these managers are true *owners*. They face the downside of decisions as well as the upside. They incur a cost of capital. And they can't "reprice" their stakes: What they paid is what they live with.

Charlie and I love the high-grade, truly entrepreneurial attitude that exists at MiTek, and we predict it will be a winner for all involved.

* * * * * * * * * * * *

In early 2000, my friend, Julian Robertson, announced that he would terminate his investment partnership, Tiger Fund, and that he would liquidate it entirely except for four large holdings. One of these was XTRA, a leading lessor of truck trailers. I then called Julian, asking whether he might consider selling his XTRA block or whether, for that matter, the company's management might entertain an offer for the entire company. Julian referred me to Lew Rubin, XTRA's CEO. He and I had a nice conversation, but it was apparent that no deal was to be done.

Then in June 2001, Julian called to say that he had decided to sell his XTRA shares, and I resumed conversations with Lew. The XTRA board accepted a proposal we made, which was to be effectuated through a tender offer expiring on September 11th. The tender conditions included the usual "out," allowing us to withdraw if

the stock market were to close before the offer's expiration. Throughout much of the 11th, Lew went through a particularly wrenching experience: First, he had a son-in-law working in the World Trade Center who couldn't be located; and second, he knew we had the option of backing away from our purchase. The story ended happily: Lew's son-in-law escaped serious harm, and Berkshire completed the transaction.

Trailer leasing is a cyclical business but one in which we should earn decent returns over time. Lew brings a new talent to Berkshire, and we hope to expand in leasing.

* * * * * * * * * * * *

On December 3rd, I received a call from Craig Ponzio, owner of Larson-Juhl, the U.S. leader in custom-made picture frames. Craig had bought the company in 1981 (after first working at its manufacturing plant while attending college) and thereafter increased its sales from $3 million to $300 million. Though I had never heard of Larson-Juhl before Craig's call, a few minutes talk with him made me think we would strike a deal. He was straightforward in describing the business, cared about who bought it, and was realistic as to price. Two days later, Craig and Steve McKenzie, his CEO, came to Omaha and in ninety minutes we reached an agreement. In ten days we had signed a contract.

Larson-Juhl serves about 18,000 framing shops in the U.S. and is also the industry leader in Canada and much of Europe. We expect to see opportunities for making complementary acquisitions in the future.

* * * * * * * * * * *

As I write this letter, creditors are considering an offer we have made for Fruit of the Loom. The company entered bankruptcy a few years back, a victim both of too much debt and poor management. And, a good many years before that, I had some Fruit of the Loom experience of my own.

In August 1955, I was one of five employees, including two secretaries, working for the three managers of Graham-Newman Corporation, a New York investment company. Graham-Newman controlled Philadelphia and Reading Coal and Iron ("P&R"), an anthracite producer that had excess cash, a tax loss carryforward, and a declining business. At the time, I had a significant portion of my limited net worth invested in P&R shares, reflecting my faith in the business talents of my bosses, Ben Graham, Jerry Newman and Howard (Micky) Newman.

This faith was rewarded when P&R purchased the Union Underwear Company from Jack Goldfarb for $15 million. Union (though it was then only a licensee of the name) produced Fruit of the Loom underwear. The company possessed $5 million in cash – $2.5 million of which P&R used for the purchase – and was earning about $3 million pre-tax, earnings that could be sheltered by the tax position of P&R. And, oh yes: Fully $9 million of the remaining $12.5 million due was satisfied by non-interest-bearing notes, payable from 50% of any earnings Union had in excess of $1 million. (*Those* were the days; I get goosebumps just thinking about such deals.)

Subsequently, Union bought the licensor of the Fruit of the Loom name and, along with P&R, was merged into Northwest Industries. Fruit went on to achieve annual pre-tax earnings exceeding $200 million.

John Holland was responsible for Fruit's operations in its most bountiful years. In 1996, however, John retired, and management loaded the company with debt, in part to make a series of acquisitions that proved disappointing. Bankruptcy followed. John was then rehired, and he undertook a major reworking of operations. Before John's return, deliveries were chaotic, costs soared and relations with key customers deteriorated. While correcting these problems, John also reduced employment from a bloated 40,000 to 23,000. In short, he's been restoring the old Fruit of the Loom, albeit in a much more competitive environment.

Stepping into Fruit's bankruptcy proceedings, we made a proposal to creditors to which we attached no financing conditions, even though our offer had to remain outstanding for many months. We did, however, insist on a very unusual proviso: John had to be available to continue serving as CEO after we took over. To us, John and the brand are Fruit's key assets.

I was helped in this transaction by my friend and former boss, Micky Newman, now 81. What goes around truly does come around.

* * * * * * * * * * * *

Our operating companies made several "bolt-on" acquisitions during the year, and I can't resist telling you about one. In December, Frank Rooney called to tell me H.H. Brown was buying the inventory and trademarks of Acme Boot for $700,000.

That sounds like small potatoes. But – would you believe it? – Acme was the second purchase of P&R, an acquisition that took place just before I left Graham-Newman in the spring of 1956. The price was $3.2 million, part of it again paid with non-interest bearing notes, for a business with sales of $7 million.

After P&R merged with Northwest, Acme grew to be the world's largest bootmaker, delivering annual profits many multiples of what the company had cost P&R. But the business eventually hit the skids and never recovered, and that resulted in our purchasing Acme's remnants.

In the frontispiece to *Security Analysis*, Ben Graham and Dave Dodd quoted Horace: "Many shall be restored that now are fallen and many shall fall that are now in honor." Fifty-two years after I first read those lines, my appreciation for what they say about business and investments continues to grow.

* * * * * * * * * * * *

In addition to bolt-on acquisitions, our managers continually look for ways to grow internally. In that regard, here's a postscript to a story I told you two years ago about R.C. Willey's move to Boise. As you may remember, Bill Child, R.C. Willey's chairman, wanted to extend his home-furnishings operation beyond Utah, a state in which his company does more than $300 million of business (up, it should be noted, from $250,000 when Bill took over 48 years ago). The company achieved this dominant position, moreover, with a "closed on Sunday" policy that defied conventional retailing wisdom. I was skeptical that this policy could succeed in Boise or, for that matter, anyplace outside of Utah. After all, Sunday is the day many consumers most like to shop.

Bill then insisted on something extraordinary: He would invest $11 million of his own money to build the Boise store and would sell it to Berkshire at cost (without interest!) if the venture succeeded. If it failed, Bill would keep the store and eat the loss on its disposal. As I told you in the 1999 annual report, the store immediately became a huge success — and it has since grown.

Shortly after the Boise opening, Bill suggested we try Las Vegas, and this time I was even more skeptical. How could we do business in a metropolis of that size and be closed on Sundays, a day that all of our competitors would be exploiting? Buoyed by the Boise experience, however, we proceeded to locate in Henderson, a mushrooming city adjacent to Las Vegas.

The result: This store outsells all others in the R.C. Willey chain, doing a volume of business that far exceeds the volume of any competitor and that is twice what I had anticipated. I cut the ribbon at the grand opening in October – this was after a "soft" opening and a few weeks of exceptional sales – and, just as I did at Boise, I suggested to the crowd that the new store was my idea.

It didn't work. Today, when I pontificate about retailing, Berkshire people just say, "What does Bill think?" (I'm going to draw the line, however, if he suggests that we also close on Saturdays.)

**The Economics of Property/Casualty Insurance**

Our main business — though we have others of great importance — is insurance. To understand Berkshire, therefore, it is necessary that you understand how to evaluate an insurance company. The key determinants are: (1) the amount of float that the business generates; (2) its cost; and (3) most critical of all, the long-term outlook for both of these factors.

To begin with, float is money we hold but don't own. In an insurance operation, float arises because premiums are received before losses are paid, an interval that sometimes extends over many years. During that time, the insurer invests the money. This pleasant activity typically carries with it a downside: The premiums that an insurer takes in usually do not cover the losses and expenses it eventually must pay. That leaves it running an "underwriting loss," which is the cost of float. An insurance business has value if its cost of float over time is less than the cost the company would otherwise incur to obtain funds. But the business is a lemon if its cost of float is higher than market rates for money.

Historically, Berkshire has obtained its float at a very low cost. Indeed, our cost has been less than zero in about half of the years in which we've operated; that is, we've actually been paid for holding other people's money. Over the last few years, however, our cost has been too high, and in 2001 it was terrible.

The table that follows shows (at intervals) the float generated by the various segments of Berkshire's insurance operations since we entered the business 35 years ago upon acquiring National Indemnity Company (whose traditional lines are included in the segment "Other Primary"). For the table we have calculated our float — which we generate in large amounts relative to our premium volume — by adding net loss reserves, loss adjustment reserves, funds held under reinsurance assumed and unearned premium reserves, and then subtracting insurance-related receivables, prepaid acquisition costs, prepaid taxes and deferred charges applicable to assumed reinsurance. (Got that?)

Yearend Float (in $ millions)

| Year | GEICO | General Re | Other Reinsurance | Other Primary | Total |
|---|---|---|---|---|---|
| 1967 | | | | 20 | 20 |
| 1977 | | | 40 | 131 | 171 |
| 1987 | | | 701 | 807 | 1,508 |
| 1997 | 2,917 | | 4,014 | 455 | 7,386 |
| 1998 | 3,125 | 14,909 | 4,305 | 415 | 22,754 |
| 1999 | 3,444 | 15,166 | 6,285 | 403 | 25,298 |
| 2000 | 3,943 | 15,525 | 7,805 | 598 | 27,871 |
| 2001 | 4,251 | 19,310 | 11,262 | 685 | 35,508 |

Last year I told you that, barring a mega-catastrophe, our cost of float would probably drop from its 2000 level of 6%. I had in mind natural catastrophes when I said that, but instead we were hit by a man-made catastrophe on September 11th – an event that delivered the insurance industry its largest loss in history. Our float cost therefore came in at a staggering 12.8%. It was our worst year in float cost since 1984, and a result that to a significant degree, as I will explain in the next section, we brought upon ourselves.

If no mega-catastrophe occurs, I – once again – expect the cost of our float to be low in the coming year. We will indeed need a low cost, as will *all* insurers. Some years back, float costing, say, 4% was tolerable because government bonds yielded twice as much, and stocks prospectively offered still loftier returns. Today, fat returns are nowhere to be found (at least *we* can't find them) and short-term funds earn less than 2%. Under these conditions, each of our insurance operations, save one, must deliver an underwriting profit if it is to be judged a good business. The exception is our retroactive reinsurance operation (a business we explained in last year's annual report), which has desirable economics even though it currently hits us with an annual underwriting loss of about $425 million.

**Principles of Insurance Underwriting**

When property/casualty companies are judged by their cost of float, very few stack up as satisfactory businesses. And interestingly – unlike the situation prevailing in many other industries – neither size nor brand name determines an insurer's profitability. Indeed, many of the biggest and best-known companies regularly deliver mediocre results. What counts in this business is underwriting discipline. The winners are those that unfailingly stick to three key principles:

1. *They accept only those risks that they are able to properly evaluate (staying within their circle of competence) and that, after they have evaluated all relevant factors including remote loss scenarios, carry the expectancy of profit. These insurers ignore market-share considerations and are sanguine about losing business to competitors that are offering foolish prices or policy conditions.*

2. *They limit the business they accept in a manner that guarantees they will suffer no aggregation of losses from a single event or from related events that will threaten their solvency. They ceaselessly search for possible correlation among seemingly-unrelated risks.*

3. *They avoid business involving moral risk: No matter what the rate, trying to write good contracts with bad people doesn't work. While most policyholders and clients are honorable and ethical, doing business with the few exceptions is usually expensive, sometimes extraordinarily so.*

The events of September 11th made it clear that our implementation of rules 1 and 2 at General Re had been dangerously weak. In setting prices and also in evaluating aggregation risk, we had either overlooked or dismissed the possibility of large-scale terrorism losses. That was a relevant underwriting factor, and we ignored it.

In pricing property coverages, for example, we had looked to the past and taken into account only costs we might expect to incur from windstorm, fire, explosion and earthquake. But what will be the largest insured property loss in history (after adding related business-interruption claims) originated from none of these forces. In short, all of us in the industry made a fundamental underwriting mistake by focusing on experience, rather than exposure, thereby assuming a huge terrorism risk for which we received no premium.

Experience, of course, is a highly useful starting point in underwriting most coverages. For example, it's important for insurers writing California earthquake policies to know how many quakes in the state during the past century have registered 6.0 or greater on the Richter scale. This information will not tell you the exact probability of a big quake next year, or where in the state it might happen. But the statistic has utility, particularly if you are writing a huge statewide policy, as National Indemnity has done in recent years.

At certain times, however, using experience as a guide to pricing is not only useless, but actually dangerous. Late in a bull market, for example, large losses from directors and officers liability insurance ("D&O") are likely to be relatively rare. When stocks are rising, there are a scarcity of targets to sue, and both questionable accounting and management chicanery often go undetected. At that juncture, experience on high-limit D&O may look great.

But that's just when *exposure* is likely to be exploding, by way of ridiculous public offerings, earnings manipulation, chain-letter-like stock promotions and a potpourri of other unsavory activities. When stocks fall, these sins surface, hammering investors with losses that can run into the hundreds of billions. Juries deciding whether those losses should be borne by small investors or big insurance companies can be expected to hit insurers with verdicts that bear little relation to those delivered in bull-market days. Even one jumbo judgment, moreover, can cause settlement costs in later cases to mushroom. Consequently, the correct rate for D&O "excess" (meaning the insurer or reinsurer will pay losses above a high threshold) might well, if based on *exposure*, be five or more times the premium dictated by *experience*.

Insurers have always found it costly to ignore new exposures. Doing that in the case of terrorism, however, could literally bankrupt the industry. No one knows the probability of a nuclear detonation in a major metropolis this year (or even multiple detonations, given that a terrorist organization able to construct one bomb might not stop there). Nor can anyone, with assurance, assess the probability in this year, or another, of deadly biological or chemical agents being introduced simultaneously (say, through ventilation systems) into multiple office buildings and manufacturing plants. An attack like that would produce astronomical workers' compensation claims.

Here's what we *do* know:

(a) The probability of such mind-boggling disasters, though likely very low at present, is not zero.

(b) The probabilities are increasing, in an irregular and immeasurable manner, as knowledge and materials become available to those who wish us ill. Fear may recede with time, but the danger won't – the war against terrorism can never be won. The best the nation can achieve is a long succession of stalemates. There can be no checkmate against hydra-headed foes.

(c) Until now, insurers and reinsurers have blithely assumed the financial consequences from the incalculable risks I have described.

(d) Under a "close-to-worst-case" scenario, which could conceivably involve $1 trillion of damage, the insurance industry would be destroyed unless it manages in some manner to dramatically limit its assumption of terrorism risks. Only the U.S. Government has the resources to absorb such a blow. If it is unwilling to do so on a prospective basis, the general citizenry must bear its own risks and count on the Government to come to its rescue after a disaster occurs.

Why, you might ask, didn't I recognize the above facts *before* September 11th? The answer, sadly, is that I did – but I didn't convert thought into action. I violated the Noah rule: Predicting rain doesn't count; building arks does. I consequently let Berkshire operate with a dangerous level of risk – at General Re in particular. I'm sorry to say that much risk for which we haven't been compensated remains on our books, but it is running off by the day.

At Berkshire, it should be noted, we have for some years been willing to assume more risk than any other insurer has *knowingly* taken on. That's still the case. We are perfectly willing to lose $2 billion to $2½ billion in a single event (as we did on September 11th) if we have been paid properly for assuming the risk that caused the loss (which on that occasion we weren't).

Indeed, we have a major competitive advantage because of our tolerance for huge losses. Berkshire has massive liquid resources, substantial non-insurance earnings, a favorable tax position and a knowledgeable shareholder constituency willing to accept volatility in earnings. This unique combination enables us to assume risks that far exceed the appetite of even our largest competitors. Over time, insuring these jumbo risks should be profitable, though periodically they will bring on a terrible year.

The bottom-line today is that we will write some coverage for terrorist-related losses, including a few non-correlated policies with very large limits. But we will not knowingly expose Berkshire to losses beyond what we can comfortably handle. We will control our total exposure, no matter what the competition does.

**Insurance Operations in 2001**

Over the years, our insurance business has provided ever-growing, low-cost funds that have fueled much of Berkshire's growth. Charlie and I believe this will continue to be the case. But we stumbled in a big way in 2001, largely because of underwriting losses at General Re.

In the past I have assured you that General Re was underwriting with discipline – and I have been proven wrong. Though its managers' intentions were good, the company broke each of the three underwriting rules I set forth in the last section and has paid a huge price for doing so. One obvious cause for its failure is that it did not reserve correctly – more about this in the next section – and therefore severely miscalculated the cost of the product it was selling. Not knowing your costs will cause problems in any business. In long-tail reinsurance, where years of unawareness will promote and prolong severe underpricing, ignorance of true costs is dynamite.

Additionally, General Re was overly-competitive in going after, and retaining, business. While all concerned may intend to underwrite with care, it is nonetheless difficult for able, hard-driving professionals to curb their urge to prevail over competitors. If "winning," however, is equated with market share rather than profits, trouble awaits. "No" must be an important part of any underwriter's vocabulary.

At the risk of sounding Pollyannaish, I now assure you that underwriting discipline is being restored at General Re (and its Cologne Re subsidiary) with appropriate urgency. Joe Brandon was appointed General Re's CEO in September and, along with Tad Montross, its new president, is committed to producing underwriting profits. Last fall, Charlie and I read Jack Welch's terrific book, *Jack, Straight from the Gut* (get a copy!). In discussing it, we agreed that Joe has many of Jack's characteristics: He is smart, energetic, hands-on, and expects much of both himself and his organization.

When it was an independent company, General Re often shone, and now it also has the considerable strengths Berkshire brings to the table. With that added advantage and with underwriting discipline restored, General Re should be a huge asset for Berkshire. I predict that Joe and Tad will make it so.

* * * * * * * * * * * *

At the National Indemnity reinsurance operation, Ajit Jain continues to add enormous value to Berkshire. Working with only 18 associates, Ajit manages one of the world's largest reinsurance operations measured by assets, and *the* largest, based upon the size of individual risks assumed.

I have known the details of almost every policy that Ajit has written since he came with us in 1986, and never on even a single occasion have I seen him break any of our three underwriting rules. His extraordinary discipline, of course, does not eliminate losses; it does, however, prevent foolish losses. And that's the key: Just as is the case in investing, insurers produce outstanding long-term results primarily by avoiding dumb decisions, rather than by making brilliant ones.

Since September 11th, Ajit has been particularly busy. Among the policies we have written and retained entirely for our own account are (1) $578 million of property coverage for a South American refinery once a loss there exceeds $1 billion; (2) $1 billion of non-cancelable third-party liability coverage for losses arising from acts of terrorism at several large international airlines; (3) £500 million of property coverage on a large North Sea oil platform, covering losses from terrorism and sabotage, above £600 million that the insured retained or reinsured elsewhere; and (4) significant coverage on the Sears Tower, including losses caused by terrorism, above a $500 million threshold. We have written many other jumbo risks as well, such as protection for the World Cup Soccer Tournament and the 2002 Winter Olympics. In all cases, however, we have attempted to avoid writing groups of policies from which losses might seriously aggregate. We will not, for example, write coverages on a large number of office and apartment towers in a single metropolis without excluding losses from both a nuclear explosion and the fires that would follow it.

No one can match the speed with which Ajit can offer huge policies. After September 11th, his quickness to respond, always important, has become a major competitive advantage. So, too, has our unsurpassed financial strength. Some reinsurers – particularly those who, in turn, are accustomed to laying off much of their business on a second layer of reinsurers known as retrocessionaires – are in a weakened condition and would have difficulty surviving a second mega-cat. When a daisy chain of retrocessionaires exists, a single weak link can pose trouble for all. In assessing the soundness of their reinsurance protection, insurers must therefore apply a stress test to all participants in the chain, and must contemplate a catastrophe loss occurring during a very unfavorable economic environment. After all, you only find out who is swimming naked when the tide goes out. At Berkshire, we retain our risks and depend on no one. And whatever the world's problems, our checks will clear.

Ajit's business will ebb and flow – but his underwriting principles won't waver. It's impossible to overstate his value to Berkshire.

* * * * * * * * * * * *

GEICO, by far our largest primary insurer, made major progress in 2001, thanks to Tony Nicely, its CEO, and his associates. Quite simply, Tony is an owner's dream.

GEICO's premium volume grew 6.6% last year, its float grew $308 million, and it achieved an underwriting profit of $221 million. This means we were actually paid that amount last year to hold the $4.25 billion in float, which of course doesn't belong to Berkshire but can be used by us for investment.

The only disappointment at GEICO in 2001 – and it's an important one – was our inability to add policyholders. Our preferred customers (81% of our total) grew by 1.6% but our standard and non-standard policies fell by 10.1%. Overall, policies in force fell .8%.

New business has improved in recent months. Our closure rate from telephone inquiries has climbed, and our Internet business continues its steady growth. We, therefore, expect at least a modest gain in policy count during 2002. Tony and I are eager to commit much more to marketing than the $219 million we spent last year, but at the moment we cannot see how to do so effectively. In the meantime, our operating costs are low and far below those of our major competitors; our prices are attractive; and our float is cost-free and growing.

* * * * * * * * * * * *

Our other primary insurers delivered their usual fine results last year. These operations, run by Rod Eldred, John Kizer, Tom Nerney, Michael Stearns, Don Towle and Don Wurster had combined premium volume of $579 million, up 40% over 2000. Their float increased 14.5% to $685 million, and they recorded an underwriting profit of $30 million. In aggregate, these companies are one of the finest insurance operations in the country, and their 2002 prospects look excellent.

**"Loss Development" and Insurance Accounting**

Bad terminology is the enemy of good thinking. When companies or investment professionals use terms such as "EBITDA" and "pro forma," they want you to unthinkingly accept concepts that are dangerously flawed. (In golf, my score is frequently below par on a *pro forma* basis: I have firm plans to "restructure" my putting stroke and therefore only count the swings I take before reaching the green.)

In insurance reporting, "loss development" is a widely used term – and one that is seriously misleading. First, a definition: Loss reserves at an insurer are not funds tucked away for a rainy day, but rather a liability account. If properly calculated, the liability states the amount that an insurer will have to pay for *all* losses (including associated costs) that have occurred prior to the reporting date but have not yet been paid. When calculating the reserve, the insurer will have been notified of many of the losses it is destined to pay, but others will not yet have been reported to it. These losses are called IBNR, for incurred but not reported. Indeed, in some cases (involving, say, product liability or embezzlement) the insured itself will not yet be aware that a loss has occurred.

It's clearly difficult for an insurer to put a figure on the ultimate cost of all such reported and unreported events. But the ability to do so with reasonable accuracy is vital. Otherwise the insurer's managers won't know what its actual loss costs are and how these compare to the premiums being charged. GEICO got into huge trouble in the early 1970s because for several years it severely underreserved, and therefore believed its product (insurance protection) was costing considerably less than was truly the case. Consequently, the company sailed blissfully along, underpricing its product and selling more and more policies at ever-larger losses.

When it becomes evident that reserves at past reporting dates understated the liability that truly existed at the time, companies speak of "loss development." In the year discovered, these shortfalls penalize reported earnings because the "catch-up" costs from prior years must be added to current-year costs when results are calculated. This is what happened at General Re in 2001: a staggering $800 million of loss costs that actually occurred in earlier years, but that were not then recorded, were belatedly recognized last year and charged against current earnings. The mistake was an honest one, I can assure you of that. Nevertheless, for several years, this underreserving caused us to believe that our costs were much lower than they truly were, an error that contributed to woefully inadequate pricing. Additionally, the overstated profit figures led us to pay substantial incentive compensation that we should not have and to incur income taxes far earlier than was necessary.

We recommend scrapping the term "loss development" and its equally ugly twin, "reserve strengthening." (Can you imagine an insurer, upon finding its reserves excessive, describing the reduction that follows as "reserve weakening"?) "Loss development" suggests to investors that some natural, uncontrollable event has occurred in the current year, and "reserve strengthening" implies that adequate amounts have been further buttressed. The truth, however, is that management made an error in estimation that in turn produced an error in the earnings previously reported. The losses didn't "develop" – they were there all along. What developed was management's understanding of the losses (or, in the instances of chicanery, management's willingness to finally fess up).

A more forthright label for the phenomenon at issue would be "loss costs we failed to recognize when they occurred" (or maybe just "oops"). Underreserving, it should be noted, is a common – and serious – problem throughout the property/casualty insurance industry. At Berkshire we told you of our own problems with underestimation in 1984 and 1986. Generally, however, our reserving has been conservative.

Major underreserving is common in cases of companies struggling for survival. In effect, insurance accounting is a self-graded exam, in that the insurer gives some figures to its auditing firm and generally doesn't get an argument. (What the *auditor* gets, however, is a letter from management that is designed to take his firm off the hook if the numbers later look silly.) A company experiencing financial difficulties – of a kind that, if truly faced, could put it out of business – seldom proves to be a tough grader. Who, after all, wants to prepare his own execution papers?

Even when companies have the best of intentions, it's not easy to reserve properly. I've told the story in the past about the fellow traveling abroad whose sister called to tell him that their dad had died. The brother replied that it was impossible for him to get home for the funeral; he volunteered, however, to shoulder its cost. Upon returning, the brother received a bill from the mortuary for $4,500, which he promptly paid. A month later, and a month after that also, he paid $10 pursuant to an add-on invoice. When a third $10 invoice came, he called his sister for an explanation. "Oh," she replied, "I forgot to tell you. We buried dad in a rented suit."

There are a lot of "rented suits" buried in the past operations of insurance companies. Sometimes the problems they signify lie dormant for decades, as was the case with asbestos liability, before virulently manifesting themselves. Difficult as the job may be, it's management's responsibility to adequately account for *all* possibilities. Conservatism is essential. When a claims manager walks into the CEO's office and says "Guess what just happened," his boss, if a veteran, does not expect to hear it's good news. Surprises in the insurance world have been far from symmetrical in their effect on earnings.

Because of this one-sided experience, it is folly to suggest, as some are doing, that all property/casualty insurance reserves be *discounted*, an approach reflecting the fact that they will be paid in the future and that therefore their present value is less than the stated liability for them. Discounting might be acceptable *if* reserves could be precisely established. They can't, however, because a myriad of forces – judicial broadening of policy language and medical inflation, to name just two chronic problems – are constantly working to make reserves inadequate. Discounting would exacerbate this already-serious situation and, additionally, would provide a new tool for the companies that are inclined to fudge.

I'd say that the effects from telling a profit-challenged insurance CEO to lower reserves through discounting would be comparable to those that would ensue if a father told his 16-year-old son to have a normal sex life. Neither party needs that kind of push.

**Sources of Reported Earnings**

The table that follows shows the main sources of Berkshire's reported earnings. In this presentation, purchase-accounting adjustments (primarily relating to "goodwill") are not assigned to the specific businesses to which they apply, but are instead aggregated and shown separately. This procedure lets you view the earnings of our businesses as they would have been reported had we not purchased them. In recent years, our "expense" for goodwill amortization has been large. Going forward, generally accepted accounting principles ("GAAP") will no longer require amortization of goodwill. This change will increase our reported earnings (though not our true economic earnings) and simplify this section of the report.

| | *(in millions)* | | | |
|---|---|---|---|---|
| | *Pre-Tax Earnings* | | *Berkshire's Share of Net Earnings (after taxes and Minority interests)* | |
| | *2001* | *2000* | *2001* | *2000* |
| Operating Earnings: | | | | |
| Insurance Group: | | | | |
| Underwriting – Reinsurance | $(4,318) | $(1,416) | $(2,824) | $(911) |
| Underwriting – GEICO | 221 | (224) | 144 | (146) |
| Underwriting – Other Primary | 30 | 25 | 18 | 16 |
| Net Investment Income | 2,824 | 2,773 | 1,968 | 1,946 |
| Building Products[(1)] | 461 | 34 | 287 | 21 |
| Finance and Financial Products Business | 519 | 530 | 336 | 343 |
| Flight Services | 186 | 213 | 105 | 126 |
| MidAmerican Energy (76% owned) | 600 | 197 | 230 | 109 |
| Retail Operations | 175 | 175 | 101 | 104 |
| Scott Fetzer (excluding finance operation) | 129 | 122 | 83 | 80 |
| Shaw Industries[(2)] | 292 | -- | 156 | -- |
| Other Businesses | 179 | 221 | 103 | 133 |
| Purchase-Accounting Adjustments | (726) | (881) | (699) | (843) |
| Corporate Interest Expense | (92) | (92) | (60) | (61) |
| Shareholder-Designated Contributions | (17) | (17) | (11) | (11) |
| Other | 25 | 39 | 16 | 30 |
| Operating Earnings | 488 | 1,699 | (47) | 936 |
| Capital Gains from Investments | 1,320 | 3,955 | 842 | 2,392 |
| Total Earnings – All Entities | $1,808 | $5,654 | $ 795 | $3,328 |

(1) *Includes Acme Brick from August 1, 2000; Benjamin Moore from December 18, 2000; Johns Manville from February 27, 2001; and MiTek from July 31, 2001.*

(2) *From date of acquisition, January 8, 2001.*

Here are some highlights (and lowlights) from 2001 relating to our non-insurance activities:

- Our shoe operations (included in "other businesses") lost $46.2 million pre-tax, with profits at H.H. Brown and Justin swamped by losses at Dexter.

  I've made three decisions relating to Dexter that have hurt you in a major way: (1) buying it in the first place; (2) paying for it with stock and (3) procrastinating when the need for changes in its operations was obvious. I would like to lay these mistakes on Charlie (or anyone else, for that matter) but they were mine. Dexter, prior to our purchase – and indeed for a few years after – prospered despite low-cost foreign competition that was brutal. I concluded that Dexter could continue to cope with that problem, and I was wrong.

  We have now placed the Dexter operation – which is still substantial in size – under the management of Frank Rooney and Jim Issler at H.H. Brown. These men have performed outstandingly for Berkshire, skillfully contending with the extraordinary changes that have bedeviled the footwear industry. During part of 2002, Dexter will be hurt by unprofitable sales commitments it made last year. After that, we believe our shoe business will be reasonably profitable.

- MidAmerican Energy, of which we own 76% on a fully-diluted basis, had a good year in 2001. Its reported earnings should also increase considerably in 2002 given that the company has been shouldering a large charge for the amortization of goodwill and that this "cost" will disappear under the new GAAP rules.

  Last year MidAmerican swapped some properties in England, adding Yorkshire Electric, with its 2.1 million customers. We are now serving 3.6 million customers in the U.K. and are its 2nd largest electric utility. We have an equally important operation in Iowa as well as major generating facilities in California and the Philippines.

  At MidAmerican – this may surprise you – we also own the second-largest residential real estate brokerage business in the country. We are market-share leaders in a number of large cities, primarily in the Midwest, and have recently acquired important firms in Atlanta and Southern California. Last year, operating under various names that are locally familiar, we handled about 106,000 transactions involving properties worth nearly $20 billion. Ron Peltier has built this business for us, and it's likely he will make more acquisitions in 2002 and the years to come.

- Considering the recessionary environment plaguing them, our retailing operations did well in 2001. In jewelry, same-store sales fell 7.6% and pre-tax margins were 8.9% versus 10.7% in 2000. Return on invested capital remains high.

  Same-store sales at our home-furnishings retailers were unchanged and so was the margin – 9.1% pre-tax – these operations earned. Here, too, return on invested capital is excellent.

  We continue to expand in both jewelry and home-furnishings. Of particular note, Nebraska Furniture Mart is constructing a mammoth 450,000 square foot store that will serve the greater Kansas City area beginning in the fall of 2003. Despite Bill Child's counter-successes, we will keep this store open on Sundays.

- The large acquisitions we initiated in late 2000 – Shaw, Johns Manville and Benjamin Moore – all came through their first year with us in great fashion. Charlie and I knew at the time of our purchases that we were in good hands with Bob Shaw, Jerry Henry and Yvan Dupuy, respectively – and we admire their work even more now. Together these businesses earned about $659 million pre-tax.

  Shortly after yearend we exchanged 4,740 Berkshire A shares (or their equivalent in B shares) for the 12.7% minority interest in Shaw, which means we now own 100% of the company. Shaw is our largest non-insurance operation and will play a big part in Berkshire's future.

- All of the income shown for Flight Services in 2001 – and a bit more – came from FlightSafety, our pilot-training subsidiary. Its earnings increased 2.5%, though return on invested capital fell slightly because of the $258 million investment we made last year in simulators and other fixed assets. My 84-year-old friend, Al Ueltschi, continues to run FlightSafety with the same enthusiasm and competitive spirit that he has exhibited since 1951, when he invested $10,000 to start the company. If I line Al up with a bunch of 60-year-olds at the annual meeting, you will not be able to pick him out.

After September 11th, training for commercial airlines fell, and today it remains depressed. However, training for business and general aviation, our main activity, is at near-normal levels and should continue to grow. In 2002, we expect to spend $162 million for 27 simulators, a sum far in excess of our annual depreciation charge of $95 million. Those who believe that EBITDA is in any way equivalent to true earnings are welcome to pick up the tab.

Our NetJets® fractional ownership program sold a record number of planes last year and also showed a gain of 21.9% in service income from management fees and hourly charges. Nevertheless, it operated at a small loss, versus a small profit in 2000. We made a little money in the U.S., but these earnings were more than offset by European losses. Measured by the value of our customers' planes, NetJets accounts for about half of the industry. We believe the other participants, in aggregate, lost significant money.

Maintaining a premier level of safety, security and service was always expensive, and the cost of sticking to those standards was exacerbated by September 11th. No matter how much the cost, we will continue to be the industry leader in all three respects. An uncompromising insistence on delivering only the best to his customers is embedded in the DNA of Rich Santulli, CEO of the company and the inventor of fractional ownership. I'm delighted with his fanaticism on these matters for both the company's sake and my family's: I believe the Buffetts fly more fractional-ownership hours – we log in excess of 800 annually – than does any other family. In case you're wondering, we use exactly the same planes and crews that serve NetJet's other customers.

NetJets experienced a spurt in new orders shortly after September 11th, but its sales pace has since returned to normal. Per-customer usage declined somewhat during the year, probably because of the recession.

Both we and our customers derive significant operational benefits from our being the runaway leader in the fractional ownership business. We have more than 300 planes constantly on the go in the U.S. and can therefore be wherever a customer needs us on very short notice. The ubiquity of our fleet also reduces our "positioning" costs below those incurred by operators with smaller fleets.

These advantages of scale, and others we have, give NetJets a significant economic edge over competition. Under the competitive conditions likely to prevail for a few years, however, our advantage will at best produce modest profits.

- Our finance and financial products line of business now includes XTRA, General Re Securities (which is in a run-off mode that will continue for an extended period) and a few other relatively small operations. The bulk of the assets and liabilities in this segment, however, arise from a few fixed-income strategies, involving highly-liquid AAA securities, that I manage. This activity, which only makes sense when certain market relationships exist, has produced good returns in the past and has reasonable prospects for continuing to do so over the next year or two.

**Investments**

Below we present our common stock investments. Those that had a market value of more than $500 million at the end of 2001 are itemized.

| Shares | Company | 12/31/01 Cost | 12/31/01 Market |
|---|---|---|---|
| | | *(dollars in millions)* | |
| 151,610,700 | American Express Company | $ 1,470 | $ 5,410 |
| 200,000,000 | The Coca-Cola Company | 1,299 | 9,430 |
| 96,000,000 | The Gillette Company | 600 | 3,206 |
| 15,999,200 | H&R Block, Inc. | 255 | 715 |
| 24,000,000 | Moody's Corporation | 499 | 957 |
| 1,727,765 | The Washington Post Company | 11 | 916 |
| 53,265,080 | Wells Fargo & Company | 306 | 2,315 |
| | Others | 4,103 | 5,726 |
| | Total Common Stocks | $8,543 | $28,675 |

We made few changes in our portfolio during 2001. As a group, our larger holdings have performed poorly in the last few years, some because of disappointing operating results. Charlie and I still like the basic businesses of all the companies we own. But we do not believe Berkshire's equity holdings as a group are undervalued.

Our restrained enthusiasm for these securities is matched by decidedly lukewarm feelings about the prospects for stocks in general over the next decade or so. I expressed my views about equity returns in a speech I gave at an Allen and Company meeting in July (which was a follow-up to a similar presentation I had made two years earlier) and an edited version of my comments appeared in a December 10th *Fortune* article. I'm enclosing a copy of that article. You can also view the *Fortune* version of my 1999 talk at our website www.berkshirehathaway.com.

Charlie and I believe that American business will do fine over time but think that today's equity prices presage only moderate returns for investors. The market outperformed business for a very long period, and that phenomenon had to end. A market that no more than parallels business progress, however, is likely to leave many investors disappointed, particularly those relatively new to the game.

Here's one for those who enjoy an odd coincidence: The Great Bubble ended on March 10, 2000 (though we didn't realize that fact until some months later). On that day, the NASDAQ (recently 1,731) hit its all-time high of 5,132. That same day, Berkshire shares traded at $40,800, their lowest price since mid-1997.

* * * * * * * * * * * *

During 2001, we were somewhat more active than usual in "junk" bonds. These are not, we should emphasize, suitable investments for the general public, because too often these securities live up to their name. We have *never* purchased a newly-issued junk bond, which is the only kind most investors are urged to buy. When losses occur in this field, furthermore, they are often disastrous: Many issues end up at a small fraction of their original offering price and some become entirely worthless.

Despite these dangers, we periodically find a few – a *very* few – junk securities that are interesting to us. And, so far, our 50-year experience in distressed debt has proven rewarding. In our 1984 annual report, we described our purchases of Washington Public Power System bonds when that issuer fell into disrepute. We've also, over the years, stepped into other apparent calamities such as Chrysler Financial, Texaco and RJR Nabisco – all of which returned to grace. Still, if we stay active in junk bonds, you can expect us to have losses from time to time.

Occasionally, a purchase of distressed bonds leads us into something bigger. Early in the Fruit of the Loom bankruptcy, we purchased the company's public and bank debt at about 50% of face value. This was an unusual bankruptcy in that interest payments on senior debt were continued without interruption, which meant we earned about a 15% current return. Our holdings grew to 10% of Fruit's senior debt, which will probably end up returning us about 70% of face value. Through this investment, we indirectly reduced our purchase price for the whole company by a small amount.

In late 2000, we began purchasing the obligations of FINOVA Group, a troubled finance company, and that, too, led to our making a major transaction. FINOVA then had about $11 billion of debt outstanding, of which we purchased 13% at about two-thirds of face value. We expected the company to go into bankruptcy, but believed that liquidation of its assets would produce a payoff for creditors that would be well above our cost. As default loomed in early 2001, we joined forces with Leucadia National Corporation to present the company with a prepackaged plan for bankruptcy.

The plan as subsequently modified (and I'm simplifying here) provided that creditors would be paid 70% of face value (along with full interest) and that they would receive a newly-issued 7½% note for the 30% of their claims not satisfied by cash. To fund FINOVA's 70% distribution, Leucadia and Berkshire formed a jointly-owned entity – mellifluently christened Berkadia – that borrowed $5.6 billion through FleetBoston and, in turn, re-lent this sum to FINOVA, concurrently obtaining a priority claim on its assets. Berkshire guaranteed 90% of the Berkadia borrowing and also has a secondary guarantee on the 10% for which Leucadia has primary responsibility. (Did I mention that I am simplifying?).

There is a spread of about two percentage points between what Berkadia pays on its borrowing and what it receives from FINOVA, with this spread flowing 90% to Berkshire and 10% to Leucadia. As I write this, each loan has been paid down to $3.9 billion.

As part of the bankruptcy plan, which was approved on August 10, 2001, Berkshire also agreed to offer 70% of face value for up to $500 million principal amount of the $3.25 billion of new 7½% bonds that were issued by FINOVA. (Of these, we had already received $426.8 million in principal amount because of our 13% ownership of the original debt.) Our offer, which was to run until September 26, 2001, could be withdrawn under a variety of conditions, one of which became operative if the New York Stock Exchange closed during the offering period. When that indeed occurred in the week of September 11th, we promptly terminated the offer.

Many of FINOVA's loans involve aircraft assets whose values were significantly diminished by the events of September 11th. Other receivables held by the company also were imperiled by the economic consequences of the attack that day. FINOVA's prospects, therefore, are not as good as when we made our proposal to the bankruptcy court. Nevertheless we feel that overall the transaction will prove satisfactory for Berkshire. Leucadia has day-to-day operating responsibility for FINOVA, and we have long been impressed with the business acumen and managerial talent of its key executives.

* * * * * * * * * * * *

It's déjà vu time again: In early 1965, when the investment partnership I ran took control of Berkshire, that company had its main banking relationships with First National Bank of Boston and a large New York City bank. Previously, I had done no business with either.

Fast forward to 1969, when I wanted Berkshire to buy the Illinois National Bank and Trust of Rockford. We needed $10 million, and I contacted both banks. There was no response from New York. However, two representatives of the Boston bank immediately came to Omaha. They told me they would supply the money for our purchase and that we would work out the details later.

For the next three decades, we borrowed almost nothing from banks. (Debt is a four-letter word around Berkshire.) Then, in February, when we were structuring the FINOVA transaction, I again called Boston, where First National had morphed into FleetBoston. Chad Gifford, the company's president, responded just as Bill Brown and Ira Stepanian had back in 1969 – "you've got the money and we'll work out the details later."

And that's just what happened. FleetBoston syndicated a loan for $6 billion (as it turned out, we didn't need $400 million of it), and it was quickly oversubscribed by 17 banks throughout the world. Sooooo . . . if you ever need $6 billion, just give Chad a call – assuming, that is, your credit is AAA.

* * * * * * * * * * * *

One more point about our investments: The media often report that "Buffett is buying" this or that security, having picked up the "fact" from reports that Berkshire files. These accounts are sometimes correct, but at other times the transactions Berkshire reports are actually being made by Lou Simpson, who runs a $2 billion portfolio for GEICO that is quite independent of me. Normally, Lou does not tell me what he is buying or selling, and I learn of his activities only when I look at a GEICO portfolio summary that I receive a few days after the end of each month. Lou's thinking, of course, is quite similar to mine, but we usually end up in different securities. That's largely because he's working with less money and can therefore invest in smaller companies than I. Oh, yes, there's also another minor difference between us: In recent years, Lou's performance has been far better than mine.

**Charitable Contributions**

Berkshire follows a highly unusual policy in respect to charitable contributions – but it's one that Charlie and I believe is both rational and fair to owners.

First, we let our operating subsidiaries make their own charitable decisions, requesting only that the owners/managers who once ran these as independent companies make all donations to their *personal* charities from their own funds, instead of using company money. When our managers are using company funds, we trust them to make gifts in a manner that delivers commensurate tangible or intangible benefits to the operations they manage. Last year contributions from Berkshire subsidiaries totaled $19.2 million.

At the parent company level, we make no contributions except those designated by shareholders. We do not match contributions made by directors or employees, nor do we give to the favorite charities of the Buffetts or the Mungers. However, prior to our purchasing them, a few of our subsidiaries had employee-match programs and we feel fine about their continuing them: It's not our style to tamper with successful business cultures.

To implement our *owners'* charitable desires, each year we notify registered holders of A shares (A's represent 86.6% of our equity capital) of a per-share amount that they can instruct us to contribute to as many as three charities. Shareholders name the charity; Berkshire writes the check. Any organization that qualifies under the Internal Revenue Code can be designated by shareholders. Last year Berkshire made contributions of $16.7 million at the direction of 5,700 shareholders, who named 3,550 charities as recipients. Since we started this program, our shareholders' gifts have totaled $181 million.

Most public corporations eschew gifts to religious institutions. These, however, are favorite charities of our shareholders, who last year named 437 churches and synagogues to receive gifts. Additionally, 790 schools were recipients. A few of our larger shareholders, including Charlie and me, designate their personal foundations to get gifts, so that those entities can, in turn, disburse their funds widely.

I get a few letters every week criticizing Berkshire for contributing to Planned Parenthood. These letters are usually prompted by an organization that wishes to see boycotts of Berkshire products. The letters are invariably polite and sincere, but their writers are unaware of a key point: It's not Berkshire, but rather its owners who are making charitable decisions – and these owners are about as diverse in their opinions as you can imagine. For example, they are probably on both sides of the abortion issue in roughly the same proportion as the American population. We'll follow their instructions, whether they designate Planned Parenthood or Metro Right to Life, just as long as the charity possesses 501(c)(3) status. It's as if we paid a dividend, which the shareholder then donated. Our form of disbursement, however, is more tax-efficient.

In neither the purchase of goods nor the hiring of personnel, do we ever consider the religious views, the gender, the race or the sexual orientation of the persons we are dealing with. It would not only be wrong to do so, it would be idiotic. We need all of the talent we can find, and we have learned that able and trustworthy managers, employees and suppliers come from a very wide spectrum of humanity.

* * * * * * * * * * * *

*To participate in our future charitable contribution programs, you must own Class A shares that are registered in the name of the actual owner, not the nominee name of a broker, bank or depository. Shares not so registered on August 31, 2002 will be ineligible for the 2002 program. When you get the contributions form from us, return it promptly. Designations received after the due date will not be honored.*

Remainder of Berkshire Hathaway Inc. 2001 Annual Report
omitted due to its length

# EXHIBIT E



# FORM 10-K

## FINOVA GROUP INC - FNV

Exhibit:

**Filed: March 22, 2005 (period: December 31, 2004)**

Annual report which provides a comprehensive overview of the company for the past year

## PART I

**Item 1.**  Business. 1

## PART I

**Item 1.**  Business.
**Item 2.**  Properties.
**Item 3.**  Legal Proceedings.
**Item 4.**  Submission of Matters to a Vote of Security Holders.

## PART II

**Item 5.**   Market for Registrant s Common Equity and Related Stockholder Matters.
**Item 6.**   Selected Financial Data.
**Item 7.**   Management s Discussion and Analysis of Financial Condition and Results of Operations.
**Item 7a.**  Quantitative and Qualitative Disclosure About Market Risk.
**Item 8.**   Financial Statements and Supplemental Data.
**Item 9.**   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.
**Item 9a.**  Controls and Procedures.
**Item 9b.**  Other Information.

## PART III

**Item 10.**  Directors and Executive Officers of the Registrant.
**Item 11.**  Executive Compensation.
**Item 12.**  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matt
**Item 13.**  Certain Relationships and Related Transactions.
**Item 14.**  Principal Accountant Fees and Services.

## PART IV

**Item 15.**  Exhibits and Financial Statement Schedules.
Signatures
**Item 7.**   Management s Discussion and Analysis of Financial Condition and Results of Operations.

EX-10.M.3 (AMENDED AND RESTATED SEVERANCE PAY PLAN AND SUMMARY PLAN DESCRIPTION.)
EX-10.P.4 (LETTER FROM FINOVA TO RICHARD A. ROSS DATED FEBRUARY 20)

EX-10.P.5 (LETTER FROM FINOVA TO RICHARD A. ROSS DATED AUGUST 17)

EX-10.P.6 (LETTER FROM FINOVA TO GLENN E. GRAY DATED MARCH 15)

EX-10.P.7 (LETTER FROM FINOVA TO RICHARD LEIBERMAN DATED MARCH 15)

EX-10.P.8 (LETTER FROM FINOVA TO RICHARD A. ROSS DATED MARCH 15)

EX-12 (COMPUTATION OF RATIO OF INCOME TO FIXED CHARGES.)

EX-21 (SUBSIDIARIES.)

EX-23 (CONSENT OF INDEPENDENT AUDITORS FROM ERNST YOUNG LLP.)

EX-31.1 (CERTIFICATION OF CEO PURSUANT TO RULE 13A-14(A) AND RULE 15D-14(A).)

EX-31.2 (CERTIFICATION OF CFO PURSUANT TO RULE 13A-14(A) AND RULE 15D-14(A).)

EX-32.1 (CERTIFICATION OF CEO PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002.)

EX-32.2 (CERTIFICATION OF CFO PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002.)

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

**Washington D.C. 20549**

## FORM 10-K

*Annual Report pursuant to Section 13 of the Securities Exchange Act of 1934*
For the fiscal year ended December 31, 2004
Commission file number 1-11011

# THE FINOVA GROUP INC.

(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 86-0695381 |
|---|---|
| (State or other jurisdiction of incorporation) | (I.R.S. employer identification no.) |

| 4800 North Scottsdale Road<br>Scottsdale, AZ | 85251-7623 |
|---|---|
| (Address of principal executive offices) | (Zip code) |

Registrant's Telephone Number, Including Area Code: 480-636-4800
Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:
*Title of Class:*
Common Stock, $0.01 par value

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Registration S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment of this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).

Yes ☐ No ☑

On March 18, 2005, the registrant had approximately 122,041,000 shares of Common Stock ($0.01 par value) outstanding.

Aggregate market value of Common Stock, held by nonaffiliates of the registrant as of June 30, 2004 (based on its closing price per share on that date of $0.15) was approximately $9.2 million.

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

Yes ☑ No ☐

**DOCUMENTS INCORPORATED BY REFERENCE:**

Proxy Statement relating to 2005 Annual Meeting of Shareholders of The FINOVA Group Inc. (but excluding information contained in that document furnished pursuant to items 306, 402(k) and (l) and item 601(b)(32) of SEC Regulation S-K) are incorporated by reference into Part III of this report.

TABLE OF CONTENTS
NAME OF ITEM

PART I

| | | |
|---|---|---|
| Item 1. | Business. | 1 |
| Item 2. | Properties. | 8 |
| Item 3. | Legal Proceedings. | 8 |
| Item 4. | Submission of Matters to a Vote of Security Holders. | 10 |
| Optional Item. | Executive Officers of Registrant. | 10 |

PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters. | 11 |
| Item 6. | Selected Financial Data. | 11 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 13 |
| Item 7a. | Quantitative and Qualitative Disclosure About Market Risk. | 13 |
| Item 8. | Financial Statements and Supplemental Data. | 13 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure. | 13 |
| Item 9a. | Controls and Procedures. | 13 |
| Item 9b. | Other Information. | 13 |

PART III

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant. | 14 |
| Item 11. | Executive Compensation. | 14 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 14 |
| Item 13. | Certain Relationships and Related Transactions | 14 |
| Item 14. | Principal Accountant Fees and Services. | 14 |

PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules. | 14 |
| Signatures | | 18 |

Table of Contents

PART I

**Item 1. Business.**

***General***

The following discussion relates to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital"). FINOVA is a financial services holding company. Through its principal operating subsidiary, FINOVA Capital, the Company has provided a broad range of financing and capital markets products, primarily to mid-size businesses.

The Company's business activities are limited to maximizing the value of its portfolio through the orderly collection of its assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments, sales of assets or collateral and may include efforts to retain certain customer relationships and restructure or terminate other relationships. The Company has sold portions of asset portfolios and will consider future sales of any asset if buyers can be found at acceptable prices; however, there can be no assurance that the Company will be successful in efforts to sell additional assets. Any funds generated in excess of cash reserves permitted by the Company's debt agreement are used to reduce FINOVA's obligations to its creditors. The Company is prohibited by the Indenture governing its Senior Notes (terms defined below) from engaging in any new lending activities, except to honor existing customer commitments and in certain instances, to restructure financing relationships to maximize value.

FINOVA is a Delaware corporation incorporated in 1991. FINOVA's principal executive offices are located at 4800 North Scottsdale Road, Scottsdale, Arizona 85251-7623, telephone (480) 636-4800.

***2001 Restructuring***

On March 7, 2001, FINOVA, FINOVA Capital and seven of their subsidiaries (the "Debtors") filed for protection pursuant to chapter 11, title 11, of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to enable them to restructure their debt. On August 10, 2001, the Bankruptcy Court entered an order confirming FINOVA's Third Amended and Restated Joint Plan of Reorganization (the "Plan"), pursuant to which the Debtors restructured their debt, effective August 21, 2001, when the Company emerged from bankruptcy.

Pursuant to the Plan, Berkadia LLC ("Berkadia"), an entity jointly owned by Berkshire Hathaway Inc. ("Berkshire") and Leucadia National Corporation ("Leucadia"), loaned $5.6 billion to FINOVA Capital on a senior secured basis (the "Berkadia Loan"). In February 2004, FINOVA fully repaid its loan from Berkadia. The Berkadia Loan was scheduled to mature in 2006, but was repaid earlier due to sooner-than-expected collections from FINOVA's liquidating portfolio. An affiliate of Berkadia continues to hold 61,020,581 shares of common stock issued in conjunction with the Plan, representing 50% of FINOVA's outstanding shares.

As of December 31, 2004, FINOVA remains obligated to repay $2.2 billion of principal on its 7.5% Senior Secured Notes (the "Senior Notes") issued in conjunction with the Plan. In accordance with the terms of the Indenture governing the Senior Notes (the "Indenture"), the Company is required to use any excess cash, as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at the Company's option. Although FINOVA has repaid approximately 37% of the Senior Notes as of the date of this report, the Company does not believe that it has sufficient assets to fully repay the Senior Notes.

FINOVA's business continues to be operated under a Management Services Agreement with Leucadia that expires in 2011. Pursuant to that agreement, Leucadia has designated its employees to act as Chairman of the Board (Ian M. Cumming), President (Joseph S. Steinberg) and Chief Executive Officer (Thomas E. Mara).

***High Investment Risk***

**As previously stated, FINOVA believes that it will be unable to fully repay its Senior Notes and that it is unlikely that it will be able to make distributions to its stockholders. Consequently, investing in the Senior Notes and common stock involves a high level of risk. Refer to Management's Discussion and Analysis of Financial Condition and Results of Operation for a further discussion of the Senior Notes and restrictions on distributions to stockholders.**

Table of Contents

Because substantially all of the Company's assets are pledged to secure the obligations under the Intercompany Notes (as defined in Management's Discussion and Analysis of Financial Condition and Results of Operations) securing the Senior Notes, FINOVA's ability to obtain additional or alternate financing is severely restricted. Berkadia has no obligation to lend additional sums to or to further invest in the Company. Accordingly, FINOVA intends to rely on internally generated cash flows from the liquidation of its assets as its only meaningful source of liquidity.

***Portfolio Descriptions***

The asset liquidation process has resulted in significant reductions in the size of many of the Company's niche portfolios. To facilitate the orderly collection of its remaining asset portfolios, FINOVA has combined its former operating segments into one operating unit; however, its assets continue to be concentrated in certain specific market niches, which are described below.

- *Transportation* – is primarily comprised of older vintage aircraft, often of class and configuration with limited demand in the aircraft market. FINOVA has a number of aircraft that are off-lease and anticipates that additional aircraft will be returned to the Company as leases expire or operators are unable or unwilling to continue making payments. The Company's portfolio of aircraft generally is not as desirable to domestic commercial airlines, and as a result, off-lease aircraft are primarily marketed in whole or part to carriers in developing countries.

- *Real Estate* – represents the combined remaining assets of the Company's resort and specialty real estate portfolios. This portfolio contains the lowest level of nonaccruing and impaired assets and represents approximately 81% of the Company's total unimpaired and performing assets. Transactions include senior term acquisition loans on hotel and resort properties, receivables financing for timeshare resorts and fractional interest resorts. FINOVA also provided equity investments in credit-oriented real estate sale-leasebacks.

- *All Other Portfolios* – is comprised of the remnants of several former portfolios (commercial equipment, communications, corporate finance, franchise, healthcare, mezzanine and rediscount) that for various reasons have not been sold or collected. The portfolio generally contains assets that are more difficult and work intensive to liquidate. Approximately 79% of these assets are impaired or nonaccruing. Many of the borrowers have missed payments, including balloon obligations, or are otherwise in default.

***Portfolio Composition***

The following details the composition and carrying amounts of FINOVA's total financial assets at December 31:

| **2004** | **Revenue Accruing Assets** | **Revenue Accruing Impaired** | **Nonaccruing Impaired Loans** | **Nonaccruing Leases & Other** | **Owned Assets & Investments** | **Total Financial Assets** | **%** |
|---|---|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | | | |
| Transportation | $ | $ 144,797 | $ 31,853 | $ 33,264 | $ 84,136 | $ 294,050 | 41.7 |
| Real estate | 105,641 | 79 | 50,330 | 6 | | 156,056 | 22.1 |
| All other portfolios | 24,733 | 57,573 | 135,041 | 8,871 | 29,611 | 255,829 | 36.2 |
| **Total financial assets** | $ 130,374 | $ 202,449 | $ 217,224 | $ 42,141 | $ 113,747 | $ 705,935 | 100.0 |
| Reserve for credit losses | | | | | | (101,270) | |
| **Total** | | | | | | $ 604,665 | |

| **2003** | **Revenue Accruing Assets** | **Revenue Accruing Impaired** | **Nonaccruing Impaired Loans** | **Nonaccruing Leases & Other** | **Owned Assets & Investments** | **Total Financial Assets** | **%** |
|---|---|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | | | |
| Transportation | $ | $ 180,260 | $ 86,261 | $ 54,823 | $ 127,447 | $ 448,791 | 24.9 |
| Real estate | 727,668 | 15,203 | 105,072 | 9,089 | | 857,032 | 47.4 |
| All other portfolios | 98,250 | 25,252 | 318,354 | 19,702 | 38,603 | 500,161 | 27.7 |
| **Total financial assets** | $ 825,918 | $ 220,715 | $ 509,687 | $ 83,614 | $ 166,050 | $ 1,805,984 | 100.0 |
| Reserve for credit losses | | | | | | (274,828) | |
| **Total** | | | | | | $ 1,531,156 | |

Table of Contents

The composition of the Company's portfolio has changed considerably during the last two years due to a series of specific events including, but not limited to the following:

During 2004, the Company completed multiple transactions to sell most of the Company's real estate leveraged lease portfolio for net proceeds of $132.5 million, resulting in a net gain from the sales of $9.0 million.

In June 2004, FINOVA completed the sale of a portion of its timeshare resort portfolio for $133.3 million of net cash proceeds, which were approximately $22 million in excess of FINOVA's carrying amount.

Throughout 2004, FINOVA collected in the ordinary course of business in excess of $300 million of prepayments from the real estate portfolio.

In December 2003, FINOVA received $276 million in final settlement of substantially all amounts owed from the Company's largest borrower, a timeshare resort development company. The cash settlement resulted in a $91.1 million recovery in excess of FINOVA's carrying amount.

In March 2003, rediscount assets with a carrying amount of $188.8 million were sold for $175.4 million of net cash proceeds and a $17.8 million participation in a performing loan, resulting in a net gain of $4.4 million.

In addition to these events, the Company experienced substantial runoff in the form of scheduled amortization, prepayments and individual asset sales.

At December 31, the Company's transportation portfolio consisted of the following aircraft:

**2004**

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (years) |
|---|---|---|---|---|
| Airbus 300 | 4 | | 4 | 21 |
| Boeing 727 | 11 | 4 | 7 | 25 |
| Boeing 737 | 25 | 25 | | 20 |
| Boeing 747 | 5 | 3 | 2 | 23 |
| Boeing 757 | 7 | 7 | | 11 |
| McDonnell Douglas DC 8 and DC 9 | 7 | 4 | 3 | 34 |
| McDonnell Douglas DC 10 | 12 | 3 | 9 | 27 |
| McDonnell Douglas MD series | 27 | 27 | | 19 |
| Regional jets, corporate aircraft and turbo props | 32 | 32 | | 12 |
| Total | 130 | 105 | 25 | 19 |

**2003**

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (years) |
|---|---|---|---|---|
| Airbus 300 | 4 | | 4 | 20 |
| Boeing 727 | 30 | 5 | 25 | 26 |
| Boeing 737 | 26 | 26 | | 19 |
| Boeing 747 | 12 | 5 | 7 | 21 |
| Boeing 757 | 8 | 8 | | 10 |
| Boeing 767 | 1 | 1 | | 17 |
| McDonnell Douglas DC 8 and DC 9 | 32 | 23 | 9 | 31 |
| McDonnell Douglas DC 10 | 15 | 4 | 11 | 25 |
| McDonnell Douglas MD series | 28 | 28 | | 18 |
| Regional jets, corporate aircraft and turbo props | 41 | 41 | | 12 |
| Total | 197 | 141 | 56 | 21 |

Table of Contents

The aircraft presented in the tables represent owned assets and collateral supporting financing arrangements. The Company continues to monitor all aircraft due to the significant level of defaults and returned aircraft.

At December 31, 2004, 50 aircraft with a carrying value of $156.3 million were operated by U.S. domiciled carriers and 61 aircraft with a carrying value of $108.9 million were operated by foreign carriers. Additionally, 19 aircraft with a carrying value of $14.2 million were off-lease, classified as assets held for the production of income and parked at various storage facilities in the United States and Europe, including 5 aircraft which were identified for potential dismantling or sale at scrap values.

At December 31, 2003, 66 aircraft with a carrying value of $240.8 million were operated by U.S. domiciled carriers and 69 aircraft with a carrying value of $167.0 million were operated by foreign carriers. Additionally, 62 aircraft with a carrying value of $25.6 million were off-lease, classified as assets held for the production of income and parked at various storage facilities in the United States and Europe, including 10 aircraft which were identified for potential dismantling or sale at scrap values.

Some of the off-lease aircraft are periodically placed in rental agreements with payments based on aircraft usage, commonly known as power-by-the-hour agreements. Often under these agreements there are no minimum rents due, and future cash flows are difficult to project. Additionally, FINOVA has been maximizing the value of the portfolio by using the remaining air-time of aircraft and engines, while minimizing the maintenance reinvestment into those assets. As remaining air-time was exhausted, numerous aircraft and engines were identified for potential dismantling or sale at scrap values; however, the reemergence of the aircraft-financing market during late 2004 has altered the Company's course of action to maximize value. As aircraft values have improved, it has made more economic sense in some instances to increase the maintenance reinvestment for certain types of aircraft. As a result, the number of aircraft being identified for potential dismantling or sale at scrap values has declined. This trend is expected to continue as long as it economically makes sense to reinvest in certain types of aircraft.

The following table details the composition of aircraft identified for potential dismantling or sale at scrap values during the years ended December 31:

| Aircraft Type | Aircraft at Dec. 31, 2003 | Additions | Aircraft Dismantled | Aircraft Sold at Scrap Values | Aircraft at Dec. 31, 2004 |
|---|---|---|---|---|---|
| Airbus 300 | | 1 | | | 1 |
| Boeing 727 | 1 | 9 | | (8) | 2 |
| Boeing 747 | | 3 | | (3) | |
| McDonnell Douglas DC 8 and DC 9 | 9 | 10 | (13) | (6) | |
| McDonnell Douglas MD Series | | 2 | | | 2 |
| Total | 10 | 25 | (13) | (17) | 5 |

| Aircraft Type | Aircraft at Dec. 31, 2002 | Additions | Aircraft Dismantled | Aircraft Sold at Scrap Values | Aircraft at Dec. 31, 2003 |
|---|---|---|---|---|---|
| Boeing 727 | 1 | 2 | (2) | | 1 |
| McDonnell Douglas DC 8 and DC 9 | | 10 | (1) | | 9 |
| McDonnell Douglas DC 10 | 1 | 1 | (2) | | |
| Total | 2 | 13 | (5) | | 10 |

In early 2004, the Company reassessed the likelihood of off-lease assets being re-leased, and identified 25 aircraft for potential dismantling or sale at scrap values, rather than continue to incur significant storage, maintenance and other costs to potentially return those aircraft to service. These 25 aircraft are in addition to 10 aircraft that were in the process of being dismantled at December 31, 2003. As of December 31, 2004, the Company had sold at scrap values or completely dismantled 30 of these aircraft, resulting in 5 aircraft, which have been identified for potential dismantling or sale at scrap values.

The Company's transportation portfolio also includes domestic railroad and other transportation equipment. The carrying value of this equipment was $14.7 million and $15.4 million at December 31, 2004 and 2003, respectively.

Table of Contents

In addition to the concentrated exposures within the transportation portfolio, the Company has certain concentrations within its real estate portfolio. At December 31, 2004 and 2003, the carrying amount of the real estate portfolio by industry was as follows:

| | 2004 | | 2003 | |
|---|---|---|---|---|
| | (Dollars in thousands) | | | |
| Hospitality | $115,663 | 74.1% | $224,965 | 26.2% |
| Resort and timeshare | 35,189 | 22.6% | 526,238 | 61.4% |
| Office | 5,204 | 3.3% | 72,512 | 8.5% |
| Other | | | 33,317 | 3.9% |
| Total | $156,056 | 100.0% | $857,032 | 100.0% |

The decline in the real estate portfolio was primarily due to asset sales and a significant level of prepayments during 2004. Refer to Management's Discussion and Analysis of Financial Condition and Results of Operations for a further discussion of portfolio activity.

***Customer Requirements***

FINOVA Capital's financing contracts and leases generally require the customer to pay taxes, license fees and insurance premiums and to perform maintenance and repairs at the customer's expense. Contract payment rates for existing customers are based on several factors, including the cost of borrowed funds, term of the contract, creditworthiness of the prospective customer, type and nature of collateral and other security and, in leasing transactions, the timing of tax effects and estimated residual values. In true lease transactions, lessees are granted an option to purchase the equipment at the end of the lease term at its then fair market value and, in some cases, are granted an option to renew the lease at its then fair rental value. The extent to which lessees exercise their options to purchase leased equipment varies from year to year, depending on, among other factors, the state of the economy, the financial condition of the lessee, interest rates, and technological developments.

***Portfolio Management***

FINOVA Capital's portfolio management personnel generally perform detailed reviews and assessments of customer financial statements to analyze financial performance and trends, conduct periodic assessments, appraisals and/or verification of the underlying collateral, seek to identify issues concerning strengths, weaknesses and vulnerabilities of the customer, seek to resolve outstanding issues with the customer, and periodically review and address covenant compliance issues.

Evaluations of borrower performance are an important aspect of the portfolio management review process. In conjunction with this process, portfolio managers update anticipated portfolio cash flows. These evaluations and cash flows serve as a significant component in the determination of portfolio impairment.

***Delinquencies and Workouts***

FINOVA Capital monitors the timing of payments on its accounts and has established policies and procedures for collection of delinquencies. These policies and procedures are generally employed, unless in the opinion of management, an alternate course is warranted. Generally, for term loans and leases, when an invoice is past due, the customer is contacted and a determination is made as to the extent of the problem, if any. A commitment for immediate payment is pursued and the account is observed closely. If an invoice for principal or interest becomes 31 days past due, it is reported as delinquent. A notice of default is generally sent prior to an invoice becoming 45 days past due if satisfactory discussions are not in progress. Between 60 and 90 days past the due date, if satisfactory negotiations are not underway, outside counsel may be retained to help protect FINOVA Capital's rights and to pursue its remedies. If satisfactory results are not obtained as a result of communication with the customer, guarantors, if any, are usually contacted to advise them of the situation and their potential obligation under the guarantee agreement.

Accounts are generally classified as "nonaccruing" when the earlier of the following events occur: (a) the borrower becomes 90 days past due on the payment of principal or interest or (b) when, in the opinion of management, a full recovery of contractual income and principal becomes doubtful. Impairment reserves may be required even when payments are current, if it is probable that the borrower will not be able to make all payments pursuant to the terms of its contract. When an account is classified as nonaccruing, all accrued and unpaid interest is reversed and future income recognition is suspended. In certain instances, accounts may be returned to accruing status if sustained contractual performance is demonstrated. Changes in borrower performance, assumptions, or estimates could result in a material change in nonaccruing account classification and income recognition. Foreclosed or

Table of Contents

repossessed assets are generally considered to be nonaccruing and are reported as such unless they generate sufficient cash to result in a market rate of return. Those accounts are periodically reviewed and write-downs are taken as deemed necessary. While pursuing collateral and obligors, FINOVA Capital generally continues to negotiate the restructuring or other settlement of the debt, as it believes appropriate.

***Governmental Regulation***

FINOVA Capital's domestic activities, including the financing of its operations, are subject to a variety of federal and state regulations, such as those imposed by the Federal Trade Commission, the Securities and Exchange Commission, the Internal Revenue Service, the Consumer Credit Protection Act, the Equal Credit Opportunity Act and the Interstate Land Sales Full Disclosure Act. Additionally, a majority of states have ceilings on interest rates that are charged to customers in financing transactions. Some of FINOVA Capital's financing transactions and servicing activities are subject to additional government regulation. For example, aircraft financing is regulated by the Federal Aviation Administration and communications financing is regulated by the Federal Communication Commission. FINOVA Capital's international activities are also subject to a variety of laws and regulations of the countries in which business is conducted. FINOVA's operations during the reorganization proceedings were also subject to oversight by the bankruptcy court, which has retained jurisdiction to resolve claims resulting from that restructuring.

***Employees***

At December 31, 2004, the Company had 101 employees compared to 213 and 319 at December 31, 2003 and 2002, respectively. The decrease is primarily attributable to the continued liquidation and sale of assets, the Company's efforts to trim operating expenses and attrition caused by the events of the past several years. FINOVA believes it continues to retain sufficient personnel to operate in the ordinary course. None of these employees are covered by collective bargaining agreements. FINOVA believes its employee relations remain satisfactory.

At its meeting on March 2, 2005, FINOVA's Board of Directors endorsed management's proposed reductions in personnel, which are designed to more closely align FINOVA's operating costs with the size of the remaining asset portfolio. These reductions include the scheduled departures by June 30, 2005 of two executive officers, Glenn E. Gray, the Chief Operating Officer and Richard Lieberman, Senior Vice President, General Counsel and Secretary.

In addition to the expected departure of the executive officers noted above, five of the eight other members of non-Leucadia senior management are scheduled to leave by mid-year. Total scheduled staff reductions include approximately 30% of the workforce by mid-2005 (including the senior management reductions) and an additional 15% of the workforce by year-end 2005. As of March 8, 2005, FINOVA's staff consists of 102 employees. These projected reductions may change due to the actual run-off of the portfolio, changes in FINOVA's operations, unanticipated staff departures or other factors. To help effect a smooth transition, the Company has commenced implementing a transfer of responsibilities to remaining personnel.

Management proposed these reductions due to the significant decline in FINOVA's remaining financial asset portfolio, which has been reduced to approximately $706 million of carrying value before reserves at the end of 2004. The remaining organizational structure is designed to retain appropriate oversight of the smaller operation in a more efficient manner.

Employees are covered by a severance program, which has been approved by the Board of Directors and continues with no fixed expiration date. The Company has also developed an annual performance-based incentive program for employees. In an effort to maintain the stability of its workforce through the remainder of the liquidation, FINOVA's Board of Directors approved the establishment of two grantor trusts to secure the Company's obligations under the outstanding severance and bonus programs. These trusts, which do not increase the Company's obligations to its employees, were funded during 2003 with approximately $24.0 million.

***Special Note Regarding Forward-Looking Statements***

Certain statements in this report are "forward-looking," in that they do not discuss historical fact, but instead reflect future expectations, projections, intentions, or other items. Forward-looking statements are made pursuant to the safe-harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include assumptions, estimates and valuations implicit in the financial statements and related notes as well as matters discussed throughout this report including sections captioned "Item 1. Business," "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Item 7a. Quantitative and Qualitative Disclosure About Market Risk." They are also made in documents incorporated in this report by reference, or in which this report may be incorporated.

Source: FINOVA GROUP INC, 10-K, March 22, 2005

Table of Contents

Forward-looking statements are inherently subject to risks and uncertainties, many of which cannot be predicted or quantified. When used in this report, the words "estimate," "expects," "anticipates," "believes," "plans," "intends" and similar expressions are intended to identify forward-looking statements that involve known and unknown risks and uncertainties. The risks, uncertainties and other factors that could cause FINOVA's actual results or performance to differ materially from those contemplated by the forward-looking statements include, but are not limited to those discussed or identified from time to time in our public filings including:

- The extent to which FINOVA is successful in implementing its business strategy, including the efforts to maximize the value of its portfolio through orderly collection or sales of assets. The carrying amounts and impairment of FINOVA's portfolio are based on estimates of asset value and the estimation and timing of future cash flows. Actual results may differ from the estimated amounts. Failure to fully implement its business strategy might result in adverse effects, impair the Company's ability to repay outstanding debt and other obligations and have a materially adverse impact on its financial position and results of operations.

- The effect of economic conditions and the performance of FINOVA's borrowers. Economic conditions in general or in particular market segments could impair the ability of FINOVA's borrowers to operate or expand their businesses, which might result in decreased performance, adversely affecting their ability to repay their obligations. The rate of borrower defaults or bankruptcies may increase. Changing economic conditions could adversely affect FINOVA's ability to realize estimated cash flows. Conversely, economic conditions and borrower performance could improve, resulting in better results than anticipated in the Company's cash flow estimates.

- Loss of employees. FINOVA must retain a sufficient number of employees with relevant knowledge and skills to continue to monitor, collect and sell its portfolio. Failure to do so could result in additional losses. Retention incentives intended to retain that employee base may not be successful in the future. In addition, as staff is reduced, internal controls and procedures must be readjusted to help assure proper handling and reporting of financial and other matters. Doing so becomes more difficult as staff is reduced, and the loss of key personnel could have a significant impact on the ability to monitor, collect and manage the portfolio.

- Conditions affecting the Company's aircraft portfolio, including changes in Federal Aviation Administration directives and conditions affecting the demand for used aircraft and the demand for aircraft spare parts. FINOVA's aircraft are often of older vintage and contain configurations of engines, avionics, fuel tanks and other components that may not be as high in demand as other available aircraft in that class. Future demand for those aircraft may decrease further as newer or more desirable aircraft and components become available.

- The process of selling aircraft parts inherently has more control risks than selling whole aircraft. The Company must maintain an adequate control environment for inventory, which includes having knowledgeable personnel and systems to monitor, collect and manage that process. Failure to maintain adequate controls can result in the loss of inventory or failure to maximize the value of those assets.

- Changes in government regulations, tax rates and similar matters. The Company has not recorded a benefit in its financial statements for its existing tax attributes and estimated future tax deductions since it does not expect to generate the future taxable income needed to use those tax benefits. The Company may never be able to use those tax attributes, including most of its net operating loss carryforwards.

- Potential liabilities associated with dispositions of assets.

- The accuracy of information relied upon by FINOVA, which includes information supplied by its borrowers or prepared by third parties, such as appraisers. Inaccuracies in that information could lead to inaccuracies in estimates, including asset valuation and cash flow projections.

- As the portfolio declines, increasing concentrations of financial assets in certain industries such as real estate and transportation could make the overall portfolio more subject to changes in performance in those industries. Additionally, the Company previously completed multiple financial transactions with individual borrowers and their affiliates, resulting in a greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including transportation) of such borrowers and their affiliates.

Table of Contents

- Risks of litigation. See "Item 3. Legal Proceedings," for a further discussion.

- Other risks detailed in this and FINOVA's other SEC reports or filings.

FINOVA does not intend to update forward-looking information to reflect actual results or changes in assumptions or other factors that could affect those statements. FINOVA cannot predict the risk from reliance on forward-looking statements in light of the many factors that could affect their accuracy.

***Investor Information***

FINOVA is subject to the informational requirements of the Securities Exchange Act of 1934 (the "Exchange Act"). Accordingly, FINOVA files periodic reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). Those reports, proxy statements and other information may be obtained by visiting the Public Reference Room of the SEC at 450 Fifth Street, NW, Washington, D.C. 20549 or by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains an Internet site (http://www.sec.gov) that contains reports, proxy and information statements and other information regarding issuers that file electronically.

You can access financial and other information on FINOVA's website. The address is www.finova.com. FINOVA also makes available on its website, free of charge, copies of its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act within two business days after filing that material with the SEC.

FINOVA has a Code of Conduct applicable to all FINOVA employees, including FINOVA's Chairman, President, Chief Executive Officer and Chief Financial Officer. A copy of the Code of Conduct is available on FINOVA's website. FINOVA intends to post any amendments to, or waivers from, the Code of Conduct applicable to the senior officers listed above.

**Item 2. Properties.**

FINOVA's principal executive offices are located at 4800 North Scottsdale Road, Scottsdale, Arizona 85251-7623, telephone (480) 636-4800. FINOVA Capital operates various additional offices in the United States and one in Europe. All of these properties are leased.

As a result of the continued liquidation and sale of assets, FINOVA has consolidated operations and reduced staffing, resulting in the need for less office space. FINOVA continues to negotiate its operating lease contracts in an effort to reduce operating lease costs. FINOVA has terminated all or a portion of multiple operating lease contracts and ceased using significant portions of several office locations. While the Company pursues subleasing opportunities, it continues to incur costs under these operating lease contracts without receiving economic benefit. The Company maintains a liability for lease termination damages and the estimated fair value of future rental payments, net of anticipated subrentals on office space the Company is no longer using. See Annex A, Notes to Consolidated Financial Statements, Note N "Costs Associated with Exit or Disposal Activities" for more information.

**Item 3. Legal Proceedings.**

***Legal Proceedings***

FINOVA is party either as plaintiff or defendant to various actions, proceedings and pending claims, including legal actions, some of which involve claims for compensatory, punitive or other damages in significant amounts. Litigation often results from FINOVA's attempts to enforce its lending agreements against borrowers and other parties to those transactions. Litigation is subject to many uncertainties. It is possible that some of the legal actions, proceedings or claims could be decided against FINOVA. Other than the matters described below, FINOVA believes that any resulting liability from its legal proceedings should not materially affect FINOVA's financial position, results of operations or cash flows. The following matters could have a material adverse impact on FINOVA's financial position, results of operations or cash flow.

If any legal proceedings result in a significant adverse judgment against the Company, which is not anticipated, it is unlikely that FINOVA would be able to satisfy that liability due to its financial condition. As previously noted, due to the Company's financial condition, it does not expect that it can satisfy all of its secured debt obligations at maturity. Attempts to collect on those judgments could lead to future reorganization proceedings of either a voluntary or involuntary nature.

Table of Contents

***Litigation Related to Loans to The Thaxton Group Inc. and Related Companies***

Between October 17, 2003, and January 13, 2004, FINOVA Capital Corporation was served with and named as a defendant (with other parties) in five lawsuits that relate to its loan to The Thaxton Group Inc. and several related entities (collectively the "Thaxton Entities"). Under its loan agreement, FINOVA has a senior secured loan to the Thaxton Entities of approximately $108 million at December 31, 2004. The Thaxton Entities were declared in default under their loan agreement with FINOVA after they advised FINOVA that they would have to restate earnings for the first two fiscal quarters of 2003, and had suspended payments on their subordinated notes. As a result of the default, FINOVA exercised its rights under the loan agreement, and accelerated the indebtedness. The Thaxton Entities then filed a petition for bankruptcy protection under chapter 11 of the federal bankruptcy code in the United States Bankruptcy Court for the District of Delaware on October 17, 2003, listing assets of approximately $206 million and debts of $242 million.

The first lawsuit, a complaint captioned *Earle B. Gregory, et al, v. FINOVA Capital Corporation, James T. Garrett, et al.,* (the "Gregory action") was filed in the Court of Common Pleas of Lancaster County, South Carolina, case no. 2003-CP-29-967, and was served on FINOVA on October 17, 2003. An amended complaint was served on November 5, 2003, prior to the deadline for FINOVA to answer, plead, or otherwise respond to the original complaint. The Gregory action was properly removed to the United States District Court for the District of South Carolina on November 17, 2003, pursuant to 28 U.S.C. §§ 1334 and 1452. The plaintiffs filed a motion to remand the case to state court, but the U.S. District Court denied this motion in an order dated December 18, 2003.

The second Thaxton-related complaint, captioned *Tom Moore, Anna Nunnery, et al., v. FINOVA Capital Corporation, Moore & Van Allen PLLC, and Cherry, Bekaert & Holland LLP*, case no. 8:03-372413 ("Moore"), was filed in the United States District Court for the District of South Carolina on November 25, 2003, and was served on FINOVA on December 2, 2003. The third complaint, captioned *Sam Jones Wood and Kathy Annette Wood, et al., v. FINOVA Capital Corporation, Moore & Van Allen PLLC, and Cherry, Bekaert & Holland LLP,* ("Wood") was filed in the Superior Court for Gwinnett County, Georgia, case no. 03-A13343-B, and was served on FINOVA on December 9, 2003. FINOVA properly removed the Wood action to the United States District Court for the Northern District of Georgia (Atlanta Division) on January 5, 2004. The fourth complaint, captioned *Grant Hall and Ruth Ann Hall, et al., v. FINOVA Capital Corporation, Moore & Van Allen PLLC, and Cherry, Bekaert & Holland LLP,* case no. 03CVS20572, ("Hall") was filed in the Mecklenburg County, North Carolina, Superior Court, and was also served on FINOVA on December 9, 2003. FINOVA properly removed the Hall action to the United States District Court for the Western District of North Carolina (Charlotte Division) on January 5, 2004. The fifth complaint, captioned *Charles Shope, et al., v. FINOVA Capital Corporation, Moore & Van Allen PLLC, and Cherry, Bekaert & Holland LLP*, case no. C 204022 ("Shope"), was filed in the United States District Court for the Southern District of Ohio, Eastern Division, and was served on FINOVA on January 13, 2004.

Each of the five Thaxton-related lawsuits are styled as class actions, purportedly brought on behalf of certain defined classes of people who had purchased subordinated notes from the Thaxton Entities. The complaints by the subordinated noteholders allege claims of fraud, securities fraud, and various other civil conspiracy and business torts in the sale of the subordinated notes. Each of the complaints seeks an unspecified amount of damages, among other remedies. In addition to FINOVA, the complaints each name as co-defendants Thaxton's accountants and attorneys, and in the Gregory case, several officers of the Thaxton Entities.

Upon motion by FINOVA to the United States Judicial Panel for MultiDistrict Litigation (Docket 1612), all five Thaxton-related actions were transferred on June 18, 2004 to the United States District Court for the District of South Carolina for coordinated pre-trial proceedings (the "MDL Litigation").

Thaxton had approximately 6,800 holders of its subordinated notes issued in several states, with a total subordinated indebtedness of approximately $122 million. Thaxton's unsecured creditors' committee has also filed an action in the Thaxton bankruptcy against FINOVA, seeking to set aside FINOVA's liens and payments collected due to alleged securities fraud, violations of banking regulations, preference payments and similar claims. The Company believes all the claims against FINOVA are without merit. FINOVA intends to vigorously defend the claims asserted against it in the MDL Litigation and by the creditors committee, and to protect its senior secured position in the bankruptcy proceedings for the Thaxton Entities.

FINOVA was recently sued by the trustee of the Thaxton Life Partners, Inc. ("TLP") bankruptcy proceedings, also pending in U.S. Bankruptcy Court for the district of Delaware, case no. 04-13005, for the return of a $4 million payment made by TLP to FINOVA. The complaint alleges the payment was a fraudulent transfer. FINOVA is investigating this complaint and intends to defend this matter in connection with its defense of the other Thaxton-related matters noted above.

Source: FINOVA GROUP INC, 10-K, March 22, 2005

Table of Contents

**Item 4. Submission of Matters to a Vote of Security Holders.**

No matters were submitted to a vote of security holders during the fourth quarter of 2004.

**Optional Item. Executive Officers of Registrant.**

Set forth below is information with respect to those individuals who serve as executive officers of FINOVA. Messrs. Cumming, Steinberg and Mara serve pursuant to the Management Services Agreement with Leucadia that expires in 2011. Messrs. Gray, Lieberman and Ross are "at will" employees and may be terminated at any time. Messrs. Gray and Lieberman are scheduled for departure by June 30, 2005. See "Employees" section of "Item 1. Business" for additional information on anticipated reductions in personnel.

| Name | Age | Position and Background |
|---|---|---|
| Ian M. Cumming | 64 | Chairman of the Board of FINOVA since 2001. Director and Chairman of the Board of Leucadia since 1978. |
| Joseph S. Steinberg | 61 | Director and President of FINOVA since 2001. Director of Leucadia since 1978 and President of Leucadia since 1979. |
| Thomas E. Mara | 59 | Director and Chief Executive Officer of FINOVA since 2002. Executive Vice President of Leucadia since 1980 and Treasurer of Leucadia since 1993. |
| Glenn E. Gray | 51 | Chief Operating Officer of FINOVA since 2002. Previously, Senior Vice President – Division Manager or similar positions of FINOVA and FINOVA Capital for more than five years. |
| Richard Lieberman | 45 | Senior Vice President, General Counsel & Secretary of FINOVA since 2001. Previously, Vice President – Deputy General Counsel or similar positions of FINOVA and FINOVA Capital for more than five years. |
| Richard A. Ross | 37 | Senior Vice President, Chief Financial Officer and Treasurer of FINOVA since 2004. Previously, Vice President – Chief Accounting Officer or similar positions of FINOVA and FINOVA Capital for more than five years. |

Remainder of Finova Form 10-K filed March 22, 2005
(2004 annual)
omitted due to its length

# EXHIBIT F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FINOVA CAPITAL CORPORATION<br><br>Reorganized Debtor | Chapter 11<br><br>Case Nos 01-0698 (PJW)<br><br>Jointly Administered<br><br>Objection Deadline: TBD<br>Hearing Date: TBD |

MOTION OF THE REORGANIZED DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE SECTION 1141 CLARIFYING PROVISION OF CONFIRMED PLAN

The above-captioned reorganized debtor (the "Reorganized Debtor" or "FNV Capital") hereby requests the entry of an order, pursuant to section 1141 of title 11 of the United States Code, 11 U S C §§ 101-1330 (the "Bankruptcy Code") clarifying certain provisions of the *Third Amended and Restated Joint Plan of Reorganization* [Docket No 534] (the "Plan"), as confirmed by order of this Court dated August 10, 2001 [Docket No 852] (the "Confirmation Order") In support of this Motion, the Reorganized Debtor respectfully represents as follows:

## JURISDICTION

This Court has jurisdiction to consider this Motion pursuant to 28 U S C §§ 157 and 1334 In addition, pursuant to Article 12, section 12 1(m) of the Plan, this Court has retained jurisdiction to grant the kind of relief requested herein Section 12 1(l) and (j) of the Plan provide respectively that "[t]he Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things [t]o hear and determine disputes arising in connection with the interpretation, implementation, or enforcement

RLF1-2858480-1

#22
4/1/05

of the Plan " to and "ensure that distributions and rights granted to holders of Allowed Claims and Allowed Interest are accomplished as provided [in the Plan] " This matter is a core proceeding under 28 U S C § 157(b),[1] and venue is proper pursuant to 28 U S C §§ 1408 and 1409 The statutory predicate for the relief requested herein is section 1141 of the Bankruptcy Code This Motion is properly brought as a contested matter, rather than an adversary proceeding *In re Applewood Chair Company*, 203 F 3d 914, 918 (5th Cir 2000) (motion for clarification of substantially consummated confirmed plan properly brought as a motion rather than adversary proceeding)

## BACKGROUND

1 On March 7, 2001 (the "Petition Date"), the Reorganized Debtor, along with its parent, FINOVA Group Inc ("FNV Group"), and certain other affiliates (collectively with the Reorganized Debtor and FNV Group, the "Reorganized Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code By order of this Court, the Reorganized Debtors' chapter 11 cases were jointly administered for procedural purposes only

2 On May 2, 2001, the Reorganized Debtors filed their plan of reorganization, which was subsequently amended on June 1, 2001, June 11, 2001, and June 14, 2001 This Court confirmed the Plan by the Confirmation Order on August 10, 2001 The Plan became effective on August 21, 2001 (the "Effective Date")

3 On each of November 18, 2003, December 29, 2004 and March 22, 2005, pursuant to section 350 of the Bankruptcy Code, this Court issued orders (each a "Final Decree,"

---

[1] *See In re U S. Brass Corp*, 301 F 3d 296, 205-306 (5th Cir 2002)(core jurisdiction over issues in substantially consummated plan granted by 28 U S C § 157)

and collectively, the "Final Decrees") closing the cases of certain of the Reorganized Debtors [2] Pursuant to each of the Final Decrees, this Court maintained jurisdiction of, among other things, "the enforcement of the provisions of the Plan (including all related documents contemplated by the Plan) and the Confirmation Order, and the entry of orders in aid of confirmation and consummation of the Plan, including, but not limited to, orders resolving disputes regarding distributions under the Plan "

## RELIEF REQUESTED

4 Pursuant to the Plan, the Reorganized Debtors are required to set aside 5% of their net cash after provision for payment of certain obligations and expenses ("Available Cash") to make distributions to equity interests in FNV Group However, the Plan prevents distributions to the equity interests under certain conditions of financial impairment of the Reorganized Debtors Because the Reorganized Debtors have determined that there is no reasonable chance that distributions can be made to equity interests, by this Motion, the Reorganized Debtor seeks an order of this Court authorizing it (i) to cease setting aside 5% of the Available Cash for the benefit of equity interests in FNV Group and (ii) to return the Available Cash in a separate account held for the benefit of the equity holders in FNV Group (the "Segregated Account") to the Reorganized Debtors for use in their businesses to pay expenses, debts and other obligations [3] This Motion was unanimously approved by FNV Group's Board of Directors, the majority of

---

[2] Pursuant to the November 18, 2003 Order, the case of FINOVA Portfolio Services Inc (Case No 01-0703) was closed Pursuant to the December 29, 2004 Order, the following cases were closed: FINOVA Group, Inc (Case No 01-0697); FINOVA (Canada) Capital Corporation (Case No 01-0699); FINOVA Capital plc (Case No 01-0700); FINOVA Loan Administration Inc (Case No 01-0701); FINOVA Technology Finance, Inc (Case No 01-0704); FINOVA Finance Trust (Case No 01-0705) Pursuant to the March 22, 2005 Order, the case of FINOVA Mezzanine Capital Inc (Case No 01-0702) was closed

[3] FNV Capital, a direct subsidiary of FNV Group, directly funded the 5% Available Cash to the Segregated Account

whom were originally appointed by Berkadia, LLC ("Berkadia"), whose affiliates own 50% of FNV Group's equity interests Thus, Berkadia's affiliates would be entitled to half of the approximately $57 8 million in the Segregated Account (or $28 9 million) if dividends were ever paid [4] Nevertheless, the Board of Directors has determined that due to the Reorganized Debtors' financial prospects, the funds rightfully belong to the creditors, not equity holders

## ARGUMENT AND BASIS FOR RELIEF

### A. Indenture Provisions

5 Pursuant to the Plan, holders of allowed unsecured claims against FNV Capital received among things, cash equal to 70% of their allowed claims and 7 5% Senior Secured Notes Maturing 2009 with Contingent Interest Due 2016 (the "New Senior Notes") of FNV Group in the face amount of 30% of their allowed claims against FNV Capital FNV Capital entered into an intercompany note with FNV Group, which backs up the payments to be made under the New Senior Notes and certain obligations to FNV Group's equity holders A term sheet describing the New Senior Notes was attached to the Plan, and, prior to the Effective Date, the forms of the Indenture (defined below) and the New Senior Notes were filed with the Court in that certain Plan Supplement With Respect to Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code dated July 20, 2001 [Docket No 745] (the "Plan Supplement") Pursuant to the Confirmation Order, the Plan Supplement was incorporated as part of the Plan

[4] Leucadia National Corporation ("Leucadia"), an affiliate of Berkadia, does not, to FINOVA's knowledge, own any of the New Senior Notes Therefore, if this Motion is granted, Leucadia will not receive any of the funds in the Segregated Account Berkshire Hathaway Inc , an affiliate of Berkadia, owns a portion of the New Senior Notes, but will receive a substantially lower amount as a holder of the New Senior Notes, as compared to the amount it would receive as an equity holder

6 The terms of the New Senior Notes are governed by the Indenture between The FINOVA Group Inc and The Bank of New York, as Trustee, dated as of August 22, 2001 (the "Indenture"), which provides that after the provision for payment of operating expenses and certain other obligations, FNV Group will, and will cause its subsidiaries, including FNV Capital, to use 95% of the Available Cash[5] to pay principal and interest on the New Senior Notes and to use 5% of the Available Cash to pay dividends to, or make repurchases of, FNV Group's equity interests[6]

7 The Section 4 06(v) of the Indenture specifically provides that in the event that the distribution to or repurchase of equity would be:

> "[an] Impermissible Restricted Payment, the Company [FNV Group] shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments "

An Impermissible Restricted Payment is defined as:

> a Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law[7]

---

[5] Section 4 06 of the Indenture sets forth the usage of the cash and cash equivalents of FNV Group and its subsidiaries

[6] "Fifth, until the principal of and Fixed Interest on the Notes are paid in full to (A) pay to the Company, when due the principal on the Intercompany Notes which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the Company, which amounts the Company shall use together with any other cash the Company has available for such purposes to make Restricted Payments *provided, however*, that each incremental payment of $0 95 pursuant to Clause (A) shall require a distribution or retention pursuant to clause (B) of $0 05; "

[7] Indenture at 6

A Restricted Payment is a declaration or distribution of a dividend or any distribution to, or repurchase of, FNV Group's equity interests [8]

8       While the Reorganized Debtors continue to pay their creditors in a timely manner, FNV Group concluded prior to making any payments on account of the Senior Notes that paying dividends to, or repurchasing, its equity interests would be Impermissible Restricted Payments Therefore, FNV Group caused the 5% of the Available Cash to be deposited into the Segregated Account  As of the date of this Motion, there is approximately $57 million in the Segregated Account

9       At this time, it is clear that FNV Group is insolvent  Using year-end 2004 figures, on a consolidated basis, FNV Group and its subsidiaries had cash of just over $480 million and net financial assets worth approximately $605 million (total assets of approximately $1 134 billion), and liabilities of approximately $2 187 billion [9]  Almost half of the financial assets consist of transportation assets, including many older, off-lease aircraft, which are generally not desirable to domestic commercial airlines and have limited prospects of substantially increasing in value. The remaining assets consist of financial assets, such as loans and leases, secured by real estate, equipment or other property, which for a variety of reasons have not previously been liquidated Because liabilities exceed assets by more than $1 billion, the recovery rate on the remaining financial assets would have to be approximately 274% to make up the shortfall in assets [10] Moreover, because the Indenture prohibits the Reorganized Debtors from engaging in new businesses, they do not have the ability to "grow" their way out of the current financial

---

[8]       Indenture at 11

[9]       Form 10-K, FINOVA Group Inc  filed March 22, 2005 for the period ending December 31, 2004 (the "FNV Group 10-K") at A-1

circumstances Accordingly, the Reorganized Debtors have determined that there is no reasonable chance of financial recovery, and therefore the Reorganized Debtor seeks an order of this Court to allow it (i) to cease depositing in the Segregated Account the Available Cash that would have been used to pay or repurchase equity securities and (ii) to use the funds in the Segregated Account to pay its obligations to creditors [11]

B. Applicable Law

10 FNV Group is a Delaware corporation and therefore its ability to declare and pay dividends is governed by the Delaware General Corporation Law (the "DGCL") Section 170 of the DGCL, which governs the ability of a Delaware corporation to declare and pay dividends, provides that a corporation may declare and pay dividends:

> "(1) out of its surplus or (2) in case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year "

Section 160 of the DGCL governs the ability of a Delaware corporation to purchase, redeem or otherwise acquire its own shares Section 160 provides that:

> " no corporation shall. (1) [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation "

Section 154 of the DGCL defines "Surplus" as.

> "[t]he excess , if any, at any given time, of the net assets of the corporation over the amount so determined to be capital "

[10] FNV Group 10-K at A-1

[11] FNV Capital is current on payments to post-confirmation creditors and in paying its operating expenses, therefore, as a practical matter, these amounts would be used to make payments on the New Senior Notes

Section 154 of the DGCL defines "Capital" as the.

> "amount equal to the aggregate par value of such shares having a par value, plus the amount of the consideration for such shares without par value"

Section 154 of the DGCL defines "Net assets" as:

> " the amount by which total assets exceed total liabilities"

11 By the date of the first distribution to holders of the New Senior Notes, FNV Group determined that it had neither "surplus" nor net profits Therefore, any dividend or distribution to, or repurchase of equity interests of, FNV Group would have been an Impermissible Restricted Payment As a result, in accordance with Section 4 06(a)(iv) of the Indenture, FNV Group retained the 5% of Available Cash in the Segregated Account with the intention that such funds would remain in the Segregated Account until the declaration and payment of dividends would not be Impermissible Restricted Payments [12]

12 Because FNV Group cannot, and has no reasonable prospect that it will be able to, pay dividends in the future, there is no purpose is requiring FNV Group to hold the 5% of Available Cash in the Segregated Account Such amounts should be available to satisfy the Reorganized Debtors' debts

## C. Need to Clarify Plan Provisions

13 The Indenture was incorporated into and is part of the Plan While the Indenture contemplated that dividends shall be retained if payments would be impermissible under applicable law, it did not describe what would happen to the amounts retained by FNV Group in the event that FNV Group would never be able to declare and pay dividends Therefore, this Motion

[12] FNV Group also believes that payments to equity holders cannot be made because such payments would render FNV Group insolvent and/or because FNV Group is already insolvent, and therefore, such payments would be fraudulent conveyances within the definition of Impermissible Restricted Payment

requests a clarification of the treatment of the funds retained by FNV Group in the present situation where there is no reasonable chance that the retained funds will ever be able to be paid to the equity holders of FNV Group

14 The equity holders of FNV Group will not be harmed by the relief requested in this Motion because the Plan specifically contemplates that the 5% of Available Cash would be retained by FNV Group if applicable law prevented FNV Group from declaring or paying dividends from funds in the Segregated Account The Plan's treatment of holders of the New Senior Notes will also not be changed, because the Plan contemplates that they will receive payment on account of the Notes and that equity holders will not receive dividends if such dividends are not permitted under applicable law Because the Plan's treatment of the New Senior Notes and FNV Group's equity will not be changed by this Motion, this Motion does not seek a modification of the Plan Therefore, the relief requested herein is not prohibited by Bankruptcy Code § 1127 *See In re Hubbard*, 161 B R 173 (Bankr N D Tx 1993) (in motion to clarify substantially consummated plan filed more than a year after confirmation, the court found that interest on non-dischargeable debt must be paid, despite plan provision that unsecured claims would receive no interest – decision reached because contrary interpretation of plan would cause it to contravene Bankruptcy Code § 523(a)(7)); *In re Conrad*, 142 B R 314 (Bankr E D Ark 1992) (in motion to clarify substantially consummated plan filed three (3) years after confirmation, court held that plan provided for post-petition interest and legal fees to secured creditor, even though plan did not specifically so provide – decision reached because plan provided that claimant was fully secured, therefore payment of post-petition interest and legal fees was implied) Requiring FNV Group to continue to hold the funds in the Segregated Account

and to continue to deposit 5% of the Available Cash therein would serve no purpose [13] Moreover, it is important to make clear to FNV Group's equity holders that there is no reasonable chance that they will ultimately receive a portion of the funds in the Segregated Account Therefore, the Reorganized Debtor respectfully requests the relief sought in this Motion

**BRIEFING**

15 The Reorganized Debtor submits that the relevant issues of law are adequately discussed in this Motion and, therefore, further briefing should not be required Accordingly, the Reorganized Debtor respectfully requests that the Court set aside the briefing schedule set forth in Rule 7 1 2(a) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, which is incorporated by reference into Rule 1001-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware

**NOTICE**

16 No trustee or examiner was appointed in the Reorganized Debtors' chapter 11 cases Notice of this Motion and any hearing thereon will be provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) The Bank of New York, as Trustee under the Indenture, (iii) all parties entitled to receive notice pursuant to Bankruptcy Rule 2002, (iv) the Securities and Exchange Commission (the "SEC"), (v) holders of equity interests in FNV Group by including such notice in the proxy materials sent to equity holders of record as of March 21, 2005 and (vi) the public by inclusion of such notice in a Current Report on SEC Form 8-K to be

[13] FNV Group is in the process of completing the liquidation of its assets and is significantly reducing the number of its employees

filed with the SEC In light of the nature of the relief requested herein, the Reorganized Debtors submit that no further notice need be given

**WHEREFORE**, the Reorganized Debtors request that this Court enter an order allowing the Reorganized Debtor (i) to cease setting aside 5% of the Available Cash for the benefit of equity interests in FNV Group, (ii) to return the Available Cash in the Segregated Account to FNV Capital for use in its business to pay expenses, debts and other obligations, and (iii) to grant such other and further relief as may be just and proper.

Dated: April 1, 2005
Wilmington, Delaware

Mark D Collins (No 2981)
Rebecca Booth (No 4031)
Jason M Madron (No 4431)
RICHARDS, LAYTON & FINGER, P A
One Rodney Square
P.O Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

Jonathan M Landers
Janet M Weiss
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-counsel to the Reorganized Debtor

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FINOVA CAPITAL CORPORATION<br><br>Reorganized Debtor | Chapter 11<br><br>Case Nos 01-0698 (PJW)<br><br>Jointly Administered<br><br>**Objection Deadline: TBD**<br>**Hearing Date: TBD** |

**NOTICE OF FILING**

PLEASE TAKE NOTICE that the above-captioned reorganized debtor (the "Reorganized Debtor") has today filed the attached **Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan** (the "Clarification Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court")

PLEASE TAKE FURTHER NOTICE that objections to the Clarification Motion, if any, must be filed with the Bankruptcy Court, served upon and received by the undersigned counsel on or before a **date to be determined by the Bankruptcy Court.**

PLEASE TAKE FURTHER NOTICE that if an objection is timely filed, served and received and such objection is not otherwise timely resolved, a hearing to consider such objection and the Clarification Motion will be held before The Honorable Peter J Walsh on a **date to be determined by the Bankruptcy Court** at the Bankruptcy Court

PLEASE TAKE FURTHER NOTICE that the Reorganized Debtor intends to provide separate notice of the objection deadline and hearing date with respect to the Clarification Motion, once established by the Bankruptcy Court

RLF1-2859156-1

Dated: April 1, 2005
Wilmington, Delaware

Mark D Collins (No 2981)
Rebecca Booth (No 4031)
Jason M Madron (No 4431)
RICHARDS, LAYTON & FINGER, P A
One Rodney Square
P.O Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

Jonathan M Landers
Janet M Weiss
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-counsel to the Reorganized Debtor

# Proposed Form of Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FINOVA CAPITAL CORPORATION,<br><br>Reorganized Debtor | Chapter 11<br><br>Case Nos 01-0698 (PJW)<br><br>Re: Docket No. ______ |

ORDER UNDER BANKRUPTCY CODE SECTION 1141
CLARIFYING PROVISION OF CONFIRMED PLAN

Upon the motion (the "Motion") of the above-captioned reorganized debtor (the "Reorganized Debtor," and together with its parent corporation and certain other affiliates, the "Reorganized Debtors") pursuant to section 1141 of the Bankruptcy Code[1] for an order clarifying certain provisions of the Plan to allow FNV Group to return the funds in the Segregated Account to the Reorganized Debtors and to use such funds to pay their creditors, the Court finds and concludes that: (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U S C §§ 157 and 1334, (ii) on May 2, 2001, the Reorganized Debtors filed the Plan, which was subsequently amended on June 1, 2001, June 11, 2001, and June 14, 2001; (iii) the form of the Indenture governing the New Senior Notes was filed with this Court in the Plan Supplement; (iv) this Court confirmed the Plan by order dated August 10, 2001; (v) due notice of the Motion has been provided to, inter alia:

(a) the Office of the United States Trustee,

(b) The Bank of New York as Trustee under the Indenture,

(c) the Securities and Exchange Commission (the "SEC"),

---

1 Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Motion

RLF1-2858480-1

(d) holders of equity interests in FNV Group by inclusion of such notice in the proxy materials sent to equity holders of record as of March 21, 2005, and

(e) the public by inclusion of such notice in a Current Report on SEC Form 8-K to be filed with the SEC,

and no other notice need be given; (vi) although the Indenture provides for the payment of 5% of Available Cash to the Equity Holders, such payment may not be made in certain circumstances including at times when that payment would be illegal under applicable law; (vii) for the reasons described in the Motion, there is no reasonable possibility that the FNV Group will ever be able to pay any amount to the Equity Holders; and (viii) the relief requested is in the Motion is in the best interests of the Reorganized Debtors

Based upon the above findings and conclusions; upon the Motion, the supporting papers, the files and records in these cases, and the proceedings had before the Court, if any; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED** that, the Motion is GRANTED; and it is further

**ORDERED** that FNV Group (i) may cease setting aside 5% of the Available Cash for the benefit of Equity Interests in FNV Group and (ii) may return the Available Cash in the Segregated Account to FNV Capital for use in its business to pay expenses, debts and other obligations

Dated: ________________, 2005
Wilmington, Delaware

______________________________
THE HONORABLE PETER J WALSH
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT G

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FINOVA CAPITAL CORPORATION, | Case No. 01-0698 (PJW) |
| Reorganized Debtor. | Re: Docket No. 33 |

**REORGANIZED DEBTOR'S OBJECTION TO THE MOTION OF EUGENE LINDEN FOR AN ORDER WHICH RECOGNIZES THE CONTINUED EXISTENCE OF THE OFFICIAL COMMITTEE OF EQUITY HOLDERS, OR IN THE ALTERNATIVE FOR THE RECONSTITUTION OF THE EQUITY COMMITTEE, FOR THE LIMITED PURPOSE OF RESPONDING TO THE DEBTORS' MOTION FOR AN ORDER CLARIFYING PROVISION OF CONFIRMED PLAN**

FINOVA Capital Corporation ("FNV Capital"), as reorganized debtor (the "Reorganized Debtor"), hereby objects to the Motion of Eugene Linden ("Linden") for an Order Which Recognizes the Continued Existence of the Official Committee of Equity Holders, or in the Alternative for the Reconstitution of the Equity Committee, for the Limited Purpose of Responding to the Debtors' Motion for an Order under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan, dated May 26, 2005 [Docket No. 33] (the "Motion"). In support of this Objection, the Reorganized Debtor respectfully states as follows:

**SUMMARY OF OBJECTION**

1. Linden requests that this Court find that the committee of equity security holders previously appointed in the Reorganized Debtor's chapter 11 case continues to exist, or in the alternative should be reconstituted, to respond to a motion filed by the Reorganized Debtor that seeks clarification of certain provisions of the Reorganized Debtor's confirmed chapter 11 plan. Linden's Motion is purportedly based upon the terms of the Reorganized Debtor's confirmed chapter 11 plan, which provide for the dissolution of all official committees upon the effective date of the plan except with respect to (a) post-confirmation modifications of the plan and (b)

RLF1-2883562-1

Docket No. 39
Date 6/3/2005

matters pending as of the effective date before the Court to which the applicable committee was a party. Because the Reorganized Debtor's motion to clarify the confirmed plan does not seek to modify the plan and was not pending before the Court as of the effective date of the plan, this Court should find that the equity committee does not continue to exist to respond to the motion. Further, this Court should not reconstitute the equity committee to respond to the Reorganized Debtor's motion for an order clarifying the confirmed chapter 11 plan because doing so would waste assets of Reorganized Debtors' estates, reconstitution is not necessary to assure that the interests of shareholders are protected, and fundamentally, the Clarification Motion will not adversely affect the rights of equity holders because applicable law and the terms of the Plan prevent distributions to equity holders by this insolvent company.

## BACKGROUND

2. On March 7, 2001 (the "Petition Date"), the Reorganized Debtor, along with its parent, The FINOVA Group Inc. ("FNV Group"), and certain other affiliates (together with the Reorganized Debtor and FNV Group, the "Reorganized Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. By order of the Court, the Debtors' chapter 11 cases were jointly administered for procedural purposes only.

3. On or about April 27, 2001, the United States Trustee appointed a committee of equity security holders (the "Equity Committee") in the Debtors' chapter 11 cases.

4. On August 10, 2001, this Court entered an order confirming the Debtors' Third Amended and Restated Joint Plan of Reorganization of the Debtors under Chapter 11 of the Bankruptcy Code, dated as of June 13, 2001 (as amended, supplemented or otherwise modified, the "Plan"). The Plan became effective on August 21, 2001 (the "Effective Date").

5. Pursuant to Section 13.2 of the Plan, the Equity Committee and the official committee of unsecured creditors were dissolved and ceased to exist as of the Effective Date,

except "solely with respect to (i) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional, and any matters pending as of the Effective Date in the Chapter 11 Cases, until such matters are finally resolved, (ii) any post-Confirmation modifications to the Plan or Confirmation Order and (iii) any matters pending as of the Effective Date before the Bankruptcy Court to which the applicable Official Committee is a party, until such matters are resolved."

6. On April 1, 2005, the Reorganized Debtor filed a motion (the "Clarification Motion") requesting clarification of the treatment of certain funds that the Reorganized Debtor has been required to set aside pursuant to the Plan for distributions to equity interests in FNV Group (the "Segregated Funds"). Specifically, under the plan, FNV Group is required to distribute approximately 5%[1] of their net cash after provision for payment of certain obligations and expenses to the holders of equity interests in FNV Group, but if FNV Group would be rendered insolvent or if the payment of the dividend would not be permitted by applicable law, the 5% was to be held in reserve by FNV Group. This is what happened – i.e., by the time payments of the 5% were required, FNV Group was insolvent and its directors determined that payment would not be permitted under the Indenture or applicable Delaware law, so the funds were held in reserve. The reserve now amounts to more than $60,000,000. However, the Plan did not specifically provide for the ultimate disposition of the funds if FNV Group was permanently unable to make a distribution to equity, except to the extent applicable law is incorporated in the Plan. Accordingly, FNV Capital filed the Clarification Motion, which alleges that (a) FINOVA Group is insolvent by more than $1 billion and the nature of the remaining

[1] For each $1 available for distribution, FNV Group was to pay $0.95 to the note holders and $0.05 to the equity holders Thus, the equity holders were to receive .05/.95 or 5 2631% of the amounts available for distribution. For ease of convenience, this Response sometimes refers to those payments as the "5%" payments or reserve.

assets is such that there was no reasonable possibility of financial recovery, (b) FNV Group cannot legally make a distribution on equity interests under Delaware law and such a payment could constitute a fraudulent conveyance, and there is no reasonable prospect it will be able to make such a distribution in the future, and (c) therefore, the funds in the reserve should be released to FNV Group for payment to creditors.

7. On May 26, 2005, Linden filed the Motion seeking an order finding that the Equity Committee still exists, or should be reconstituted, to respond to the Clarification Motion. Recognizing the limited existence of the Equity Committee following the Effective Date, Linden attempts to justify the relief requested in the Motion by characterizing the Clarification Motion as "an impermissible motion asking this Court to modify the Reorganized Debtors' obligations" under the Plan and by claiming that the Clarification Motion seeks to resolve a matter "pending" as of the Effective Date. Motion at ¶¶13, 16, 18. For the reasons stated below, the Reorganized Debtor disagrees.

**OBJECTION**

8. The Motion should be denied in its entirety. First, the Equity Committee does not remain in existence to respond to the Clarification Motion under the express terms of the Plan. The Plan specifically dissolved all official committees except with respect to post-confirmation modifications to the Plan and matters pending as of the Effective Date. The Clarification Motion is neither a post-confirmation modification of the Plan nor was it pending as of the Effective Date. Second, there is no cause to reconstitute the Equity Committee to respond to the Clarification Motion. The relief requested in the Clarification Motion will not adversely affect equity holders nor does it result from the Reorganized Debtor's failure to perform its obligations under the Plan (in fact, the opposite is true) to the detriment of equity holders. Finally, the

Reorganized Debtors are hopelessly insolvent so that the post-confirmation appointment of an equity committee is not warranted.

**A.    The Equity Committee Does Not Continue to
Exist to Respond to the Clarification Motion**

9.    Linden concedes that the express terms of the Plan limit the existence of the Equity Committee post-confirmation. Motion at ¶14. Linden claims, however, that responding to the Clarification Motion is within the scope of the Equity Committee's limited post-confirmation existence by characterizing the Clarification Motion as a post-confirmation modification of the Plan and as a matter pending as of the Effective Date. Motion at ¶¶13, 16, 18. The Clarification Motion, however, is neither. As a result, under the express terms of the Plan, the Equity Committee does not continue to exist to respond to the Clarification Motion.

**1.    The Clarification Motion Is Not a Request to Modify the Plan**

10.    The provision of Section 13.2 of the Plan continuing the Equity Committee with respect to post-confirmation plan modifications is inapplicable here because the Clarification Motion does not seek to modify the Plan. This Court has noted previously that courts distinguish between their "inability to 'modify' a plan and their ability to 'clarify a plan where it is silent or ambiguous.'" *In re Ampace Corp.*, 279 B.R. 145, 152-53 (Bankr. D. Del. 2002); *see also* 11 U.S.C. § 1127. In this regard, this Court has noted that "modification" has been interpreted as "a change to something" or "an alteration." *Ampace*, 279 B.R. at 153 n. 17 (quoting *Blacks Law Dictionary* 1020 (7th Ed. 1999)).

11.    Although Linden asserts that the Clarification Motion "*should* be deemed to substantively modify the Plan, as all contractual obligations under the Plan to the Reorganized Debtors' equity interests would be impermissibly negated," Motion at ¶16, it is clear that the Reorganized Debtor's request under the Clarification Motion *is* not a modification to the Plan

because the Clarification Motion does not seek to change or alter any terms of the Plan. Instead, the Clarification Motion seeks to expressly state what is implicit in the terms of the Plan and pursuant to applicable law. At most, the Clarification Motion seeks to resolve ambiguity in the Plan concerning the disposition of the Segregated Funds in the event of the Reorganized Debtor's continued insolvency. As shown above, although the Plan provided for reserving the 5% distributions to equity interests if payment to equity was not permitted, it did not specifically address what would happen if the Segregated Funds never can be distributed to equity. Because this issue was not expressly addressed in the Plan, the request for relief in relation to this issue in the Clarification Motion does not constitute a modification of the Plan.[2] *See In re Beal Bank, S.S.B. v. Jack's Marine, Inc.*, 201 B.R. 376 (E.D. Pa. 1996) ("[A] bankruptcy court may clarify a plan where it is silent or ambiguous.").

**2. The Clarification Motion Is Not a Matter <u>that Was Pending as of the Effective Date</u>**

12. The provision of Section 13.2 of the Plan continuing the Equity Committee to address "any matters pending as of the Effective Date before the Bankruptcy Court to which the [Equity Committee] is a party" is also inapplicable. The Clarification Motion, which was filed more than three years after the Effective Date, clearly was not a matter pending before the Court as of the Effective Date. Indeed, it is hard to imagine how the matter could have been pending before the Court on the Effective Date, because it has only arisen as a result of the Reorganized Debtor's post-confirmation insolvency.

13. Linden argues that the Clarification Motion addresses an issue that was pending as of the Effective Date simply because it involves an issue that requires the interpretation of the

[2] In fact, if the Clarification Motion sought to modify the Plan, it would not be permitted pursuant to section 1127 of the Bankruptcy Code because the Plan has been substantially consummated, as acknowledged by Linden. Motion at ¶16

Plan. Motion at ¶¶ 13, 18. But, if every *potential* issue that could arise from subsequent events was deemed to be a matter that was *pending* as of the Effective Date, then Section 13.2 of the Plan would be turned on its head. In addition, Linden's interpretation of Section 13.2 of the Plan ignores the specific language describing the pending matters as being "before the Bankruptcy Court to which the applicable Official Committee is a party." This language indicates that matters pending as of the Effective Date for which the Equity Committee continues to exist must be actual identifiable matters at that time. The Clarification Motion clearly was not identified or pending at confirmation of the Plan.

**3. The Case Law Does Not Support Linden's Argument that the Equity Committee Continues to Exist to Respond to the Clarification Motion**

14. Linden has cited only one case in support of his position that the Equity Committee still exists with respect to the Clarification Motion notwithstanding the Plan's specific dissolution of the committee. *See Equity Sec. Holders Comm. v. Wedgestone Fin. (In re Wedgestone Fin.)*, 152 B.R. 786 (Bankr. D. Mass. 1993). The *Wedgestone* case, however, is distinguishable from the present case and is thus inapplicable.

15. In *Wedgestone*, the bankruptcy court found that an equity committee continued in existence to pursue revocation of the confirmation order notwithstanding general language in the plan providing for the dissolution of all official committees. The bankruptcy court, without much analysis, determined that the language in the plan providing for the retention of the bankruptcy court's jurisdiction was *specific* and overrode the *general* provision in the plan providing for the dissolution of any committees as of the effective date. *Id.* at 788.

16. Here, the Plan does not contain general language dissolving all official committees as of the Effective Date, but instead, contains specific language that governs the dissolution of the committees except in certain limited and specifically described circumstances.

Moreover, there is no conflict between the Plan provisions retaining jurisdiction for specific matters and the provisions dissolving the Equity Committee. Thus, this is not a case where specific language in a contract overrides general language in the same contract. Further, nothing in the Plan indicates that the dissolution of the committees under Section 13.2 is subject to another provision of the Plan. As a result, Linden has not cited any law in support of his interpretation of the Plan that renders the Plan's specific dissolution of the official committees ineffective. *See In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 362 (E.D. Pa. 1996) ("Confirmed bankruptcy plans of reorganization are binding contracts that must be interpreted in accordance with applicable contract law.").

**B. The Equity Committee Should Not be <u>Reconstituted to Respond to the Clarification Motion</u>**

17. In addition to finding that the Equity Committee does not continue to exist to respond to the Clarification Motion, this Court should not reconstitute the Equity Committee for such purpose because doing so would waste assets of the Reorganized Debtors' estates, reconstitution of the Equity Committee is not necessary to assure that the interests of shareholders are protected, and fundamentally, the rights of equity holders will not be adversely affected by the Clarification Motion because applicable law and the terms of the Plan prevent distributions to equity holders by this insolvent company.

18. The Plan specifically recognized that payment to equity of 5% of the amount otherwise allocable to the New Senior Notes (defined in the Plan) was essentially a dividend and, as such, there were situations where payment of a dividend would not be permitted (called an Impermissible Restricted Payment). These circumstances would occur if the payment would render FNV Group insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law (here, Delaware). And, in such a

situation, the amounts were to be retained and could be used to make the payments "at such time or from time to time when such [payments] are not Impermissible Restricted Payments."[3] But, as described in the Clarification Motion, the Plan did not expressly deal with a situation where there is no reasonable chance that the retained funds can ever be paid to the equity holders of FNV Group.

19. Significantly, the Motion fails to discuss the above-described circumstances surrounding the Clarification Motion and contains several other important omissions. First, the Equity Committee has had no involvement whatsoever in this case in the more than three and a half years since confirmation of the Plan. Second, the financial situation of the Reorganized Debtors deteriorated very shortly after confirmation of the Plan, as a result of the events of 9/11. Both the deterioration itself and the magnitude thereof have been disclosed to the holders of equity interests in numerous public filings beginning soon after 9/11, all of which are readily available to equity holders. The fact that the liabilities of FNV Group exceed its assets by approximately $1 billion has been publicly disclosed for more than two years. In short, the holders of equity must have been well aware of the situation. Third, the Motion does not dispute the deficiency, nor give any reason to think there is any basis to dispute the magnitude of the deficiency. The deficiency is clearly set forth in FNV Group's SEC filings, which are subject to an annual audit by Ernst & Young, LLP, the company's independent auditors. Fourth, the Motion does not raise any question regarding the Plan provisions set forth in the Clarification Motion, and does not suggest any basis whatsoever on which a payment to equity interests would be permitted under the terms of the Plan, the Confirmation Order of this Court, the Disclosure Statement or the Indenture governing these payments, all of which are consistent with applicable

[3] *See* Indenture between The FINOVA Group and The Bank of New York, as Trustee, dated as of August 22, 2001 § 4 06(v)

law to prevent making such payments in the present circumstances.[4] Those circumstances have no reasonable likelihood of changing due to the Indenture's restrictions on doing new business and the advanced stage of Reorganized Debtors' liquidation.

20. In addition, there is no showing that the Equity Committee is necessary to protect the interests of equity holders. First, the Board of FNV Group examined the situation in detail and concluded that FNV Group was not permitted to make a payment to holders of equity interests. The Board's decision is particularly instructive because a majority of the Board are affiliated with two parties who hold, in the aggregate, 50% of the equity interest of FNV Group. Those parties would receive half of the reserve, which currently is in excess of $60 million. Second, as noted above, the issues on the Clarification Motion are relatively straight-forward. The issue of financial capability can be determined on the basis of publicly filed documents, and the legal issue of ability to pay can be determined from Plan documents and applicable Delaware and creditors' rights law. While a committee could theoretically conduct its own asset valuation, it would have to show that FNV Group was wrong by a very wide margin, which is extremely unlikely given the nature of the remaining assets of the Debtors. Moreover, Linden hasn't offered a shred of evidence suggesting the valuations are incorrect, let alone incorrect by the required margin. As can be calculated from FNV Group's financial statements for the quarter ended March 31, 2005, it would have to liquidate its remaining financial assets at approximately 300% of their "book value" to eliminate the deficit in assets to liabilities, even assuming no further operating expenses. On the legal issues, Linden has not suggested any questions regarding the Plan provisions and applicable law as set forth in the Clarification Motion. There

[4] The Debtors have been led to believe that the basis for the shareholder's claim that the Plan is somehow "ambiguous" is based on statements made by counsel or representatives of the Equity Committee to its members, which statements arguably conflict with the express terms of the Disclosure Statement, Plan, Confirmation Order and Indenture by 'promising the 5% payments regardless of FINOVA's situation.' Such statements, even if made, cannot serve as the basis to overturn the Plan, Confirmation Order and Indenture.

is no prima facie basis to think that there is even an issue here, as discussed more fully in note 4 above. Finally, there is no showing that individual equity holders could not raise and present any objections to the Clarification Motion. The motion for an extension of the hearing as filed by First Carolina Investors, Inc., holder of 2 million shares, suggests that there is at least one party with both the capability and interest to raise and present such matters to the Court. This equity holder has devoted considerable resources to seeking to reconstitute the equity committee and to postpone a decision on the merits regarding the disposition of the reserve account. Such resources could as easily have been directed to addressing the merits of the Clarification Motion.

21. Further, the present case is quite distinguishable from the two cases cited in the Motion in support of the request to reconstitute the Equity Committee. *See Creditors' Comm. v. Parks Jaggers Aerospace Co. (In re Parks Jaggers Aerospace Co.)*, 129 B.R. 265 (M.D. Fla. 1991); *In re Doctors' Hosp. of Tampa, Ltd.*, 183 B.R. 312 (Bankr. M.D. Fla. 1995). First, each of those cases involved either a situation where the debtor had failed to comply with the terms of a confirmed plan or had failed to take action that would have benefited its estate to the detriment of the committee that sought to be reconstituted. *See Parks Jaggers Aerospace*, 129 B.R. 265 (debtor failed to make timely payments to creditors under a confirmed plan); *Doctors' Hosp. of Tampa*, 183 B.R. 312 (debtor failed to object to certain claims).[5] Here, there is no claim that Reorganized Debtors have failed to comply with the terms of the Plan or have failed to perform any duties that would benefit the estate. Indeed, Linden is objecting to the FNV Group's

[5] Linden's citation to *Doctors' Hospital of Tampa* as "granting motion to reconstitute creditors committee over objections where majority of individual committee members agreed that committee should be reconstituted for limited purpose of prosecuting claims objections" is misleading. Motion at ¶23. In that case, the committee was not reconstituted simply because its members agreed it should be reconstituted. Instead, the plan did not expressly provide for the post-confirmation duties of the committee (or presumably the dissolution of the committee) and the bankruptcy court found that this created a presumption that the committee continued to exist post-confirmation. 183 B.R. at 314. The court then focused on whether the chairman of the committee, who was purporting to act on behalf of the committee, was really authorized to reconstitute the committee. Here, the Plan expressly provided for the dissolution of the Equity Committee.

compliance with the terms of the Plan, which prevent the distribution of the Segregated Funds to equity holders of FNV Group.

22.     Second, in both cases, the question before the court was whether an official committee still existed, or should be reconstituted, *in the absence* of a plan provision specifically addressing the post-confirmation existence of the official committee. *See Parks Jaggers Aerospace*, 129 B.R. at 268 (holding that "a creditors' committee does not *automatically* dissolve at the time a Chapter 11 reorganization plan is confirmed.") (emphasis added); *Doctors' Hosp. of Tampa*, 183 B.R. at 314 ("In this case it is quite apparent the plan does not expressly provide for the committee to function."). Here, the Plan expressly provided for the dissolution of the Equity Committee except for the limited purposes described earlier.

23.     Finally, both of the cited cases involve requests to reconstitute a creditors' committee and neither of the cases address the issue in this case – whether to reconstitute an equity committee post-confirmation when the reorganized debtor is insolvent. In this regard, the Reorganized Debtor submits that, just as it would be inappropriate to appoint an equity committee when a debtor appears hopelessly insolvent, it would be inappropriate to reconstitute the Equity Committee here when the Reorganized Debtor appears hopelessly insolvent, as described in the Clarification Motion. *Cf. In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 140 (Bankr. S.D. Cal. 2003) (stating that "[s]hareholders committees should be appointed when equity holders establish there is a substantial likelihood that they will receive a meaningful distribution in the case."); *In re Williams Communications Group, Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002) (stating that "the debtor's solvency is a major factor when considering the cost of appointing an equity committee."); 7 *Collier on Bankruptcy* ¶ 1102.03[2][a] (15th ed. rev. 2005) ("The threshold consideration . . . in determining whether to appoint a committee of

equity security holders is whether there is sufficient equity in the estate to justify the cost and expense of a separate committee.").

## CONCLUSION

24. For all the reasons stated above, the Reorganized Debtor submits that the Motion should be denied.

WHEREFORE, the Reorganized Debtor respectfully requests that this Court enter an order (i) denying Linden's Motion for an order recognizing the continued existence of the Equity Committee, or in the alternative reconstituting the Equity Committee, for the limited purpose of responding to the Clarification Motion, and (ii) granting the Reorganized Debtor such other and further relief as may be just and proper.

Dated: June 3, 2005
Wilmington, Delaware

Rebecca L. Booth

Mark D. Collins (No. 2981)
Rebecca Booth (No. 4031)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

Jonathan M. Landers
Janet M. Weiss
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-counsel to the Reorganized Debtor

# EXHIBIT H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re:<br><br>FINOVA CAPITAL CORPORATION,<br><br>Reorganized Debtor | Chapter 11<br><br>Case No. 01-0698 (PJW)<br><br>Jointly Administered<br><br>**Hearing Date: June 10, 2005 at 9:30 a.m.** |

**OBJECTION OF FIRST CAROLINA INVESTORS, INC.
TO MOTION OF REORGANIZED DEBTOR FOR AN
ORDER UNDER BANKRUPTCY CODE SECTION 1141
CLARIFYING PROVISION OF CONFIRMED PLAN (D.I. 22)**

First Carolina Investors, Inc. ("First Carolina") submits this response in opposition to the motion of the Reorganized Debtor dated April 1, 2005 (the "Motion") (D.I. 22) for an order pursuant to Section 1141 of the United States Bankruptcy Code clarifying certain provisions of the *Third Amended and Restated Joint Plan of Reorganization* (the "Plan"), as confirmed by order of this Court dated August 10, 2001 (the "Confirmation Order"). In opposition to the Motion, First Carolina respectfully represents as follows:

## INTRODUCTION

1. First Carolina agrees that this Court has jurisdiction to consider the issues raised in the Motion pursuant to the referenced statutory provisions and the articles and sections of the Plan set forth by the Reorganized Debtor in the jurisdiction paragraph of the Motion. First Carolina disagrees, however, that this Motion is properly brought as a contested matter, rather than as an adversary proceeding. This is a dispute in which the Debtor seeks an order from the

DKT. NO 40
DT. FILED 6/3/05

Court declaring that it has no obligation to pay $57 million currently held in escrow to the equity holders of FINOVA Group, Inc. ("FNV Group"), and no further obligation to pay money into escrow as required under the Plan documents.

2. For the reasons set forth below, First Carolina asserts that (i) the Motion is procedurally defective because the relief requested cannot be brought on as a contested matter, but must instead be sought in the context of an adversary proceeding, and (ii) regardless of the procedural manner with which this matter is brought before the Court, the relief requested should be denied, as the Motion seeks to improperly amend the Plan and eliminate the obligation to make distributions to equity holders, an obligation which was approved as part of the Plan confirmation process.

## BACKGROUND

3. The background facts set forth in paragraphs 1 through 3 of the Motion are incorporated by reference in this response. Capitalized terms not otherwise defined in this response shall have the meaning given them in the Motion, the Plan or the Indenture. Certain post confirmation events also bear on the relief requested in the Motion and have been set forth in the related pending "Motion for an Order Recognizing the Continued Existence of the Official Committee of Equity Holders or, in the Alternative, Reconstituting the Equity Committee for the Limited Purpose of Responding to the Debtors' Motion for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan", dated May 26, 2005 (the "Equity Committee Motion") and are re-stated verbatim as follows:

"In connection with the Plan, Berkadia LLC and its affiliates (collectively, "Berkadia") made a loan to the Debtors in the amount of approximately $6 billion (the "Berkadia Loan"). In addition, Berkshire Hathaway Inc. ("Berkshire") agreed that it would commence a tender offer (the "Tender Offer") for up to $500 million of the 7½ % Senior Secured Notes Maturing 2009 with Contingent Interest Due 2016 (the "New Senior Notes") which were issued pursuant to the Plan at a cash purchase price of 70% of par. However, Berkshire subsequently refused to proceed with the Tender Offer because it took the position that the events of September 11, 2001 terminated its obligation to go forward with the Tender Offer. Upon information and belief, neither the Reorganized Debtors nor Berkadia, which controls them, objected to Berkshire's refusal to proceed with the Tender Offer." *See Equity Committee Motion at ¶ 6.*

"Notwithstanding Berkshire's action, the Reorganized Debtors have asserted that they continue to remain current on all of their outstanding obligations. *See Motion at* ¶ 9, *n.* 11. Significantly, the Reorganized Debtors fully repaid the Berkadia Loan in February 2004, approximately two years before its maturity date. *See Reorganized Debtors' Form 10-K filed March 22, 2005 for the Fiscal Year ended December 31, 2004.* In addition, during 2004, the Reorganized Debtors made partial principal payments on the New Senior Notes totaling $801.3 million, and made three additional payments totaling $298.6 million during the first quarter of 2005. Id." *See Equity Committee Motion at* ¶7.

"The Plan expressly contemplates that as principal payments are made on the New Senior Notes, the Reorganized Debtors' shareholders are to receive distributions equal to 5.263% of each principal payment. However, even though the Reorganized Debtors have already made payments on the New Senior Notes totaling approximately $1.1 billion, the shareholders have not received a single distribution from the Reorganized Debtors because, as described in the Motion, the Reorganized Debtors, which are controlled by Berkadia, unilaterally determined more than a year ago to set that money aside and not to pay it to shareholders." *See Equity Committee Motion at* ¶8.

"Further, upon information and belief, to date, in addition to receiving all amounts outstanding under the Berkadia Loan, Berkadia has received tens of millions of dollars in additional

fees." *See Equity Committee Motion at* ¶9. (D.I. 33)

4. In fact, it is First Carolina's understanding that the benefits received by Berkadia are even greater than that stated in the Equity Committee Motion. Upon information and belief, Berkadia has received hundreds of millions of dollars in additional fees and through its net interest margin on the Berkadia Loan.

**RELIEF REQUESTED IN MOTION**

5. Under the terms of the Plan, the Reorganized Debtors are required to set aside 5% of their net cash after provision for payment of certain obligations and expenses ("Available Cash") to make distributions to equity interests in FNV Group. The Motion asserts that because the Reorganized Debtors have determined that there is no reasonable chance that distributions can be made to equity interests in light of the Plan provisions which allegedly prevent such distributions under certain conditions of financial impairment, the above Reorganized Debtor[1] seeks an order of this Court authorizing it (i) to cease setting aside 5% of the Available Cash for the benefit of equity interests in FNV Group and (ii) to return the Available Cash in a separate account held for the benefit of the equity holders in FNV Group (the "Segregated Account") to the Reorganized Debtors for use in their businesses to pay expenses, debts and other obligations.

---

[1] The Motion states that FNV Capital Corporation, a direct subsidiary of FNV Group, directly funded the 5% Available Cash to the Segregated Account.

## LEGAL ANALYSIS

### A. The Standing of First Carolina Investors, Inc.

6. First Carolina is the owner and holder of two million shares of common stock of FNV Group. First Carolina is therefore an equity security holder entitled to the distributions payable to the class of equity security holders (hereinafter "Equity Creditors") pursuant to the terms of the Plan and Indenture. As such, First Carolina has standing to object to the Motion since it will be adversely affected if the relief requested in the Motion is granted.

### B. The Relief Requested in the Motion is Procedurally Defective Because Such Relief Must Be Sought in an Adversary Proceeding and Not as a Contested Matter

7. Although First Carolina agrees that this Court has jurisdiction to consider the issues raised in the Motion, it disagrees that the issues may properly be considered and decided as a contested matter, rather than in the context of an adversary proceeding. Bankruptcy Rule 7001(2) provides that an adversary proceeding includes "a proceeding to determine the validity, priority or extent of a lien *or other interest in property*, other than a proceeding under Rule 4003(d)." Rule 7001(9) provides that an adversary proceeding includes a proceeding to obtain a declaratory judgment with respect to the other proceedings identified in Rule 7001, which necessarily includes Rule 7001(2). The relief sought in the Motion seeks a declaratory judgment by this Court with respect to certain property in which there are conflicting claims of ownership and entitlement and therefore must be sought through an adversary proceeding.

8. The Reorganized Debtor's citation to *In Re Applewood Chair Company,* 203 F.3d 914, 918 (5th Cir. 2000) as support for a contested matter as the proper procedural vehicle for the relief it seeks is inapposite. Finding that a secured creditor's request for clarification of the terms of a sale order was properly brought by a motion for clarification, as opposed to an adversary proceeding, the court in *Applewood* succinctly noted that "the validity of [the secured creditor's] lien against the equipment . . . was never in question." *Id.* at 918. Rather, the issue to be considered was whether the terms of a sale order approved by the court modified the terms of two guarantees provided by the debtor's non-debtor principals. The relief sought by means of the Motion, however, is clearly distinguishable.

9. Notwithstanding the Reorganized Debtor's attempts to characterize the Motion as one for "clarification," the essence of the Motion is to modify the Plan obligations of the Reorganized Debtor, since it seeks to *completely divest* the Equity Creditors of their interest in the approximately $57 million contained in the Segregated Account. Thus, this aspect of the Motion -- which seeks a declaratory judgment determining the validity, priority and/or extent of an interest in property -- falls squarely within the definition of "adversary proceeding ." *See Fed.R.Bank.P.* 7001(2)(9).

10. Unlike the "clarification motion" in *Applewood*, which concerned the liability of non-debtor guarantors vis-a-vis a secured creditor, the Motion is properly described as a challenge to the Equity Creditors' interest in property maintained by the Reorganized Debtor. As such, the Motion is procedurally defective as the Reorganized Debtor must proceed by adversary proceeding.

**C. The Motion is Jurisdictionally Defective Because It Was Not Served on Counsel to the Equity Holder's Committee**

11. After receiving the Motion and conferring with counsel, First Carolina made efforts to determine whether the Equity Committee appointed during the Debtors' cases would be responding to the Motion. By reviewing the docket, First Carolina determined that the Equity Committee had been represented by the New York law firm of Anderson Kill & Olick and the Delaware law firm of Rosenthal, Monheit, Gross & Goddess prior to confirmation of the Debtors' cases.

12. On May 12, 2005, local counsel for First Carolina contacted the Anderson Kill & Olick firm regarding the Motion and learned that the firm had not been served with a copy of the Motion. A copy of the Motion and the related Indenture was forwarded by First Carolina's local counsel to Anderson Kill & Olick by e-mail that same day.

13. Anderson Kill & Olick was also contacted by a former member of the Equity Committee, who expressed a desire to have the Equity Committee file a response on its behalf. First Carolina likewise expressed its desire to have the Equity Committee respond to the Motion, given the Equity Committee's previous involvement in the Plan process.

14. Further, the Reorganized Debtor denied the request of counsel to the Equity Committee for a continuance of the objection deadline date and the hearing date until after the Court has ruled on the motion to be filed by counsel to the Equity Committee asking the Court to recognize the continued existence of the Equity Committee, or to re-constitute it, for purposes of responding to the Motion. The Equity Committee Motion was filed on May 26, 2005 and under

applicable Court rules could not be made returnable earlier than June 10, 2005--the same hearing date as that of the Motion.

15. First Carolina strongly supports the Equity Committee Motion. First Carolina's ability to mount a proper response and objection to the Motion is unfairly limited by its lack of involvement in the proceedings that led to the confirmation of the Plan. The Equity Committee is in the best position to protect the interests of the Equity Creditors. Indeed, certain Equity Creditors may be under the mistaken assumption that the Equity Committee will automatically be representing them on the Motion, since the Committee has consistently done so throughout these bankruptcy proceedings whenever an equity security holder interest was involved.

16. From a fairness standpoint, the Reorganized Debtors should bear the fees, costs and expenses that are incurred by the Equity Creditors in having to respond to the Motion, since the Reorganized Debtors admit that an ambiguity in the Plan that they drafted has created the need for the Motion. This can best be accomplished by recognizing the continued existence of the Equity Committee, or to provide for its re-constitution, for purposes of responding to the Motion.

17. The Debtor's failure to serve counsel to the Equity Committee should alone serve as a basis to deny the relief requested (without prejudice to the re-filing and proper re-service of the Motion on all affected parties) and/or a continuance of the objection deadline date and hearing date in order to afford the Equity Committee and its counsel (assuming the Equity Committee Motion is granted) a reasonable period of time to respond to the Motion.

**D. To the Extent the Subject Plan Provision is Ambiguous, It Should be Construed Against the Reorganized Debtors, as the Drafters**

18. The Reorganized Debtor asserts that although the Indenture contemplated that dividends would be retained if payments would be impermissible under applicable law, it did not describe what would happen to such amounts in the event that FNV Group would never be able to declare and pay dividends. The Reorganized Debtor therefore requests a "clarification" of the treatment of such funds where there is no alleged reasonable chance that the retained funds will ever be able to be paid to the Equity Creditors.

19. Aside from the numerous other objectionable grounds to oppose the relief requested, since the Plan was drafted by the Reorganized Debtors, and not by the Equity Creditors, applicable law requires that the Plan provision be construed against the interests of the Reorganized Debtors and in favor of the Equity Creditors. *See In re Terex Corporation*, 984 F.2d. 170 (6th Cir. 1993) (ambiguity in plan language is fault of debtor - debtor has obligation of accurately stating what it intends to pay creditors); *In re McCalla,* 238 B.R. 94 (Bankr. M.D. Pa. 1999) ("typically speaking, the language of the plan is interpreted strictly against the drafter of the plan, the debtor").

20. Even if a plan of reorganization does not comply with the Bankruptcy Code, absent objection, the terms of a confirmed plan will be upheld. *See In re Szostek*, 886 F.2d. 1405 (3rd Cir. 1989). A Bankruptcy Court simply cannot rewrite a confirmed plan on the ground of perceived equities. *In re Beal Bank v. Jack's Marine, Inc.*, et al. 201 B.R. 376 (E.D. Pa. 1996). Confirmation orders are *res judicata* as to all issues decided, or which could have been decided

at the hearing on confirmation. *See In re Rexton,* 240 B.R. 211 (Bankr. E.D. Pa. 1999) (citing *In re Szostek*, 886 F.2d. 1405 (3rd Cir. 1989)). To the extent that an ambiguity in the Plan exists, any doubt concerning its terms must be resolved against the Debtors as the architects of the Plan. *Id*; *see also In re Fawcett,* 758 F.2d. 588 (11th Cir. 1985)

21. Here, the Reorganized Debtor seeks a "clarification" that results in an outcome extremely detrimental to the Equity Creditors--a complete elimination of all distributions required to be made to the Equity Creditors under the Plan--in favor of the Reorganized Debtor (a mere stakeholder as to these funds) to use for its own purposes and for the benefit of another creditor class under the Plan. Based on the above described and well recognized rule of contract construction, the "ambiguity" cannot properly be construed to provide the Reorganized Debtors with such a windfall at the expense of the Equity Creditors.

**E. Distribution of Funds Held in the Segregated Account to Equity Creditors is not a Prohibited Dividend Under Delaware Law**

22. The Reorganized Debtor refers in the Motion to Section 4.06(v) of the Indenture, which provides that where the distribution to or repurchase of equity would be an Impermissible Restricted Payment, FNV Group shall retain such amounts and any such retained amounts shall accumulate and be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments. *See Section* 4.06(v) *of the Indenture and the Motion at* ¶7. An Impermissible Restricted Payment is defined in the Indenture as "a Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not

be permitted to be made by such entity under applicable law." *See Section* 4.06(v) *of the Indenture and Motion at* ¶7.

23. The Reorganized Debtor asserts that its ability to declare and pay dividends is governed by the Delaware General Corporation Law and that such law presently prohibits the payment of any dividend or distribution to or repurchase of equity interests of FNV Group. Contrary to the Reorganized Debtor's position, distribution of the funds in the Segregated Account to equity security holders is not a prohibited dividend under applicable Delaware Law.

24. A distribution to equity from the productive assets of a company made pursuant to an order of Court is not a "dividend" under Delaware law. Dividends are used for the distribution of surplus earnings or net profits, whereas a Court-ordered distribution that is in effect a return of the stockholder's equity is not made on such a basis.

25. Delaware law defines a cash dividend as the corporate distribution of cash assets to its stockholders from the profits or surplus assets of the corporation, reducing the net assets of the corporation and transferring that amount of cash to its stockholders, thus generating a present cash return on their investment. *Lynam v. Gallagher*, 526 A.2d 878, 882 (Del. 1987). This is distinct from a stock dividend, which merely changes the form of the investment by increasing the outstanding number of shares, thereby diminishing the value of each share and leaving the aggregate value of their stock in the corporation the same. *Id.* Although the payment mandated under the indenture at issue ("Payment") is certainly a distribution of cash, it is not a dividend.

26. The Delaware Court of Chancery has held specifically that where a company makes a partial distribution of income-producing assets to its equity pursuant to a Court order and not as an ordinary *or* extra-ordinary dividend, the resulting income is not properly characterized as a "dividend" at all -- traditionally understood as a method for the distribution of excess *profits* -- but is actually a return of capital. *Fulweiler v. Spruance*, 222 A.2d 555 (Del. Ch. 1966).

27. The *Fulweiler* case dealt with a divorce agreement providing that the husband was to hold certain holding company stock and distribute both any cash dividends received and any shares of stock received as a stock dividend to his ex-wife. *Fulweiler,* 222 A.2d at 557. By virtue of a Court order, the duPont holding company whose stock was at issue was forced to divest itself of General Motors shares, and chose to do this by distributing the GM stock certificates themselves directly to its stockholders. *Id.* The ex-wife contended that these shares were either a cash dividend for which the husband should convey equal value to her, or were a stock dividend that should be turned over. *Id.* The Court, however, disagreed, noting that the resolution of the Board of Directors was careful not to describe the distribution as a dividend, but simply as a court-ordered distribution of income-producing assets. *Fulweiler,* 222 A.2d at 559. In substance, the Court held that the distribution of the shares was exactly that, a court-compelled return of capital to duPont's shareholders, and thus not a dividend either of cash or stock.

28. As explicitly stated by the *Fulweiler* Court, "[t]he question of what in fact the distribution is finds its answer in the facts surrounding it". *Fulweiler,* 222 A.2d 558. It reasoned

that a dividend is generally a distribution out of earnings, profits, or undivided surplus (essentially, profits), and the distributions were charged against paid-in surplus (i.e., the value of the equity over par) and not against the company's *earned* surplus. *Id. at* 559. In other words, dividends are paid out of profits, whereas the distribution in *Fulweiler* severed the value of the assets distributed (the GM stock) from the duPont company's stock and conveyed that value to current stockholders, without touching the duPont company's earnings.[2] *Id.*

29. Therefore, a cash distribution to equity compelled by a Court which is not based on the distribution of surplus earnings or net profits but which distributes the value of equity to stockholders, which is in essence what is required to be paid under the terms of the Plan to the Equity Creditors, is not a "dividend" but a return of capital.

**F. Distribution of Funds Held in the Segregated Account to Equity Creditors is not Prohibited or Governed by Delaware General Corporation Law Because the Obligation to the Equity Creditors under the Plan is in the Nature of Debt, Not Equity**

30. The sections of Delaware General Corporation Law cited in the Motion are inapplicable since the distribution obligations to the Equity Creditors under the Plan are debt obligations. It is well settled that a confirmed plan of reorganization constitutes a "new contract" between the debtor and its creditors. *See In re Ernst,* 45 B.R. 700, 702 (Bankr. D. Minn. 1985); *In re Consumers Realty & Development Company, Inc.*, 238 B.R. 418 (B.A.P. 8th Cir. 1999); *In*

2 "[T]he disbursement of current earnings for dividends leaves untouched the capital assets existing before payment.", *Weinberg v. Baltimore Brick Co.*, 114 A.2d 812, 820 (Del. Ch. 1955).

*re Potts*, 188 B.R. 575 (Bankr. N.D. Ind. 1995). By means of a confirmed plan of reorganization, the parties restructure their pre-petition relationship. In consideration for the discharge, other relief and benefits afforded a debtor, the debtor agrees to perform its obligations as required by the terms of the plan. *Id.* The terms of a confirmed plan are binding on the debtor and other parties, regardless of (i) whether such parties' claims are impaired, or (ii) their acceptance of the plan. *See* 11 U.S.C. § 1141(a). Indeed, confirmed plans are binding even if the plan does not comply with the Bankruptcy Code. *See In re Szostek*, 886 F.2d. 1405 (3rd Cir. 1989).

31. The Plan constitutes a recasting of the relationship between the Reorganized Debtors and other parties, including its pre-petition creditors and shareholders. Regardless of their pre-petition classification, the Plan ultimately memorializes, among other things, the Reorganized Debtors' debts, liabilities and obligations to these "distributees" under the Plan. As a result, each of the distributees is the holder of a debt obligation due and owing by the Reorganized Debtors pursuant to the terms of the Plan. That certain distributees also receive and/or retain their shares in FNV Group does not transform the basis for such distribution from debt into equity.

32. Furthermore, it is well settled in the bankruptcy context that the Supremacy Clause mandates that bankruptcy law prevails over conflicting state law. *Consumer Realty & Development* at 426 (citing *In re Ocasek v. Manville Corp. Asbestos Disease Compensation Fund*, 956 F.2d 152, 154 (7th Cir. 1992)). The Third Circuit has stated that "[i]f a provision of the Plan, a creature of federal law, conflicts with the law of a state and the state law 'frustrates

the full effectiveness of federal law [the state law] is rendered invalid by the Supremacy Clause.'" *Jones v. Keene Corp.*, 933 F.2d 209, 214 (3rd Cir. 1991) (quoting *Perez v. Campbell*, 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed. 2d 233 (1971)).

33. Based upon the foregoing, any attempt by the Reorganized Debtor (i) to advocate the disparate treatment of the Equity Creditors because their distributions have been cast in the form of equity, and (ii) to justify such disparate treatment based upon Delaware corporate law, must fail.

**G. The Monies in the Segregated Account are Being Held "in Trust" for the Equity Creditors and Cannot Be Used to Pay the Debtors' Expenses or to Fund its Obligation to Holders of the New Senior Notes**

34. The Reorganized Debtor has asked the Court to order the return to it of the funds held in the Segregated Account for the benefit of the Equity Creditors to enable the Reorganized Debtor to use such funds to pay expenses, debts and other obligations, including obligations owing under the New Senior Notes. There is no provision in the Plan or the Indenture that provides for the return to the Reorganized Debtor of these monies.

35. This request by the Reorganized Debtor is impermissible since the monies in the Segregated Account are in reality being held "in trust" for the Equity Creditors. Once the funds are transferred to the Segregated Account, the financial impairments identified in the Indenture and the Motion dictate only the *timing* of the distributions from such account to the Equity Creditors. As such, these funds cannot be used to make payments owed by the Reorganized Debtors to any other creditor class or generally for its own operating expenses.

36. Notwithstanding the broad scope of Bankruptcy Code Section 541, it has been held that "when a debtor holds only legal title to property with beneficial interests being held by another party, that property 'is included in the bankrupt's estate only to the extent of the debtor's legal title to the property and not to the extent of any interest in the property that the debtor does not hold'." *TTS, Inc v. Citibank, N.A., et al.*, 158 B.R. 583, 585 (D.Del. 1993) (citing *Universal Bonding v. Gittens & Sprinkle Enterprises, Inc.*, 960 F.2d 366, 371 (3rd Cir. 1992)).

37. In *TTS*, a debtor was denied its claimed interest in the contents of a deferred compensation escrow account which was established and funded by the debtor (on a pre-petition and post-petition basis) for the benefit of one of its key employees. The ultimate disbursement to the employee of the funds contained in the deferred compensation escrow account was contingent on the satisfaction of certain conditions and/or the absence of certain defaults. Much like the deferred compensation escrow agreement at issue in *TTS*, the intent of the parties in establishing and maintaining the Segregated Account is to provide a mechanism for the payment of distributions to Equity Creditors. Similarly to the holding in *TTS*, the Reorganized Debtor's equitable interest, if any, in the Segregated Account, is contingent in nature and "does not necessarily arise from having some ability to control the account." *TTS, Inc.*, 158 B.R. at 586-87. Even stronger indicia of ownership have not sustained a debtor's claim of entitlement to an escrow account. *See Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*, 72 B.R. 619 (E.D. Pa. 1985).

38. Upon information and belief, the Reorganized Debtor is current in its Plan obligations to pay the New Senior Notes and to fund the Segregated Account. Moreover, there is

no question that the Segregated Account serves a procedural purpose and overwhelmingly benefits Equity Creditors. The Reorganized Debtor's interest, if any, in such account is best described as equitable and contingent.

39. The Reorganized Debtors, including the sole Reorganized Debtor that has made the Motion, should be deemed to be nothing more than stakeholders with respect to the monies presently held in the Segregated Account. The Reorganized Debtors are obligated to both the holders of the New Senior Notes and the Equity Creditors under the terms of the Plan. They are not true parties-in-interest with respect to these monies. The Court should not permit the Reorganized Debtor to be heard on that part of the Motion which takes an adversarial position against the Equity Creditors (and in favor of the holders of the New Senior Notes) with respect to treatment of the funds presently held in the Segregated Account.

40. Accordingly, the Reorganized Debtor's attempt to assert a greater interest in the Segregated Account than it actually has must be denied. There exists no basis for the Reorganized Debtor's attempt to terminate its Plan mandated funding obligation, let alone a "grab" of the monies already on deposit in the Segregated Account.

**H. The Relief Requested in the Motion is Premature Because There Has Not Yet Been a Default Under the Indenture**

41. The Reorganized Debtor seeks the relief requested in the Motion even though there has been no payment default under the New Senior Notes. Indeed, under the terms of the Indenture, an Event of Default based on nonpayment does not occur unless and until there has been a failure to pay all or any part of the unpaid principal when due under the New Senior

Notes, or the failure to pay installments of Fixed Interest due under the New Senior Notes in full for two consecutive Interest Payment Dates. The relief requested in the Motion is therefore premature and not yet ripe for judicial review and determination. The Motion must be denied on this ground alone.

42. It is well settled that federal jurisdiction is limited to "actual cases and controversies." *See Armstrong World Industries, Inc. v. Adams, et al.*, 961 F.2d 405, 410 (3rd Cir. 1992). The purpose of this limitation is "to ensure that federal courts decide only those disputes of a "Judiciary nature...and stands as a direct prohibition on the issuance of advisory opinions. . . ." *Id.* (citing *Flast v. Cohen*, 392 U.S. 83, 96 (1968)). To qualify as a "case or controversy," an action must present "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution." *Id.* (quoting *International Brotherhood of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3rd Cir. 1987)).

43. A related concept is that of "ripeness." As stated by the Supreme Court, "[i]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbot Lab. v. Gardner*, 387 U.S. 136, 148 (1967). For purposes of determining ripeness, the Supreme Court will generally look to "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Id.* at 149. In the context of a judgment for declaratory relief, courts further require that "for there to be an actual controversy the defendant must be so situated that the

parties have adverse legal interests." *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 648 (3rd Cir. 1990). Where, as here, the relief sought is based upon a contingency, "it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III." *Id.*

44. While it has been held that a party need not suffer a "completed" harm to establish an adversity of interests, "to protect against a feared future event, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Armstrong World Industries* at 412 (quoting *Salvation Army v. Department of Community Affairs*, 919 F.2d 183, 192 (3rd Cir. 1990)).

45. Upon information and belief, the Reorganized Debtor is current with its creditors, as well as its Plan obligations relating to the payment of New Senior Notes and the funding of the Segregated Account. Nonetheless, the Reorganized Debtor seeks relief based upon its *projected* inability to comply with the Plan. As set forth above, such a contingency does not amount to a "case or controversy" for purposes of Article III. Accordingly, the Motion, which essentially seeks a declaratory judgment that the Reorganized Debtor cannot comply with its future Plan obligations to Equity Creditors, is not based upon an issue which is "ripe" for adjudication, and should be denied.

**I. The Relief Requested in the Debtor's Motion Amounts to a De Facto Modification of the Plan Which is Prohibited Because the Plan Has Already Been Substantially Consummated**

46. Notwithstanding the Reorganized Debtor's attempts to characterize the Motion as one for "clarification," the essence of the Motion is to modify the Plan obligations of the Reorganized Debtor. The requested modification seeks to *completely divest* the Equity Creditors of their interest in the approximately $57 million contained in the Segregated Account. Such an effort is clearly prohibited by the Bankruptcy Code because the Plan has already been substantially consummated. *See* 11 U.S.C. §§1101 and 1127.

47. The Reorganized Debtor asserts that its alleged insolvency and poor financial condition impair its ability to perform its obligations under the Plan. Even in the absence of substantial consummation, the ground asserted by the Reorganized Debtor would likely still be insufficient to justify modification of the Plan. It has been held that a debtor's inability to refinance its operations in order to pay creditors does not constitute cause for modification under Section 1127 of the Bankruptcy. *In re Dam Road Mini Storage*, 156 B.R. 270 (Bankr. S.D. Ca. 1993). Since a confirmed plan of reorganization is a contract, the insolvency or inability to perform of the promissor (debtor) does not discharge such party's duty to perform. *Id.*

48. In fact, once a plan has been substantially consummated, the general rule is that a reorganized debtor may not even file a new Chapter 11 proceeding for the indirect purpose of modifying its obligations of a prior confirmed plan. *See In re Tillotson d/b/a Cottonwood Farms,* 266 B.R. 565 (Bankr. W.D.N.Y. 2001)(citing *In re Adams*, 218 B.R. 597 (Bankr. D. Kan.

1998)); *see also In re Northampton Corporation*, 37 B.R. 110 (1984). The Court in *Adams* explained the rationale for such a prohibition as follows:

> The terms of a confirmed plan usually represent the results of negotiations between the debtor and its creditors, and the parties should be able to rely on the finality of those terms . . . . Once its plan is substantially consummated, the debtor should not be able to circumvent or evade its binding responsibilities by filing what is in effect a modified plan. Property has been transferred, management of the property has been assumed, and the distribution has commenced. The debtor and the creditors have now acted in reliance on the terms of the confirmed plan and in the interest of finality, the plan should no longer be subject to modification . . . . *In re Tillotson,* 266 B.R. at 569 (citing *In re Adams*, 218 B.R. at 600-601 (citing *In re Northampton Corp.*, 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984, aff'd 59 B.R. 963 (E.D. Pa. 1984); *In re Northtown Realty Co., L.P.*, 215 B.R. 906 (Bankr. N.D.N.Y. 1998)).

49. The same rationale against allowing modification of a plan through a subsequent Chapter 11 proceeding applies equally to the present circumstances. The Reorganized Debtor should be prohibited from relieving itself of an entire class of distributions that it had negotiated and embodied in its Plan, under the guise of seeking a "clarification" of the Plan almost four years after it was confirmed.

**CONCLUSION**

50. For all of the reasons stated in this response, First Carolina Investors, Inc., seeks an order denying the Motion, and for such other and further relief as the Court deems proper.

Dated: June 3, 2005
Wilmington, Delaware

**BUCHANAN INGERSOLL**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
The Nemours Building
1007 N. Orange Street, Suite 1110
Wilmington, DE 19801
Tel: (302) 428-5523
Fax: (302) 428-3996
email: sullivanwd@bipc.com

-- and --

**HODGSON RUSS LLP**
Garry M. Graber
David M. Stark
Cheryl R. Storie
One M&T Plaza, Suite 2000
Buffalo, NY 14203
Tel: (716) 856-4000
Fax: (716) 849-0349
email: g graber@hodgsonruss.com
dstark@hodgsonruss.com
cstorie@hodgsonruss.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:

FINOVA CAPITAL CORPORATION,

Reorganized Debtor

Chapter 11

Case No. 01-0698 (PJW)

Jointly Administered

**Hearing Date: June 10, 2005 at 9:30 a.m.**

## CERTIFICATE OF SERVICE

I hereby certify that on this, 3rd day of June, 2005, I served a copy of the foregoing *Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan*, via hand-delivery or overnight mail, upon the parties listed on the attached service list.

*/s/ William D. Sullivan*
William D. Sullivan (DE Bar I.D. 2820)

**SERVICE LIST**

***Via Hand-Delivery***
David Buchbinder
Office of the United States Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 119801

***Via UPS***
Jonathan M. Landers
Janet Weiss
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
*Representing Debtor*

***Via Hand-Delivery***
Howard A. Cohen
Reed Smith LLP
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
*Representing JP Morgan Chase Bank*

***Via UPS***
The Bank of New York
Corporate Trust Administration
101 Barclay Street, 21st Floor West
New York, NY 10286
*Representing the Bank of New York as the Indenture Trustee for Finova Group Inc.'s Bonds*

***Via UPS***
Martin Bienenstock
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153
*Representing Leucadia*

***Via UPS***
Securities & Exchange Commission
Attention: Nathan Fuchs
233 Broadway
New York, NY 10279

***Via Hand-Delivery***
Mark D. Collins
Richards Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801
*Representing the Debtor*

## File an answer to a motion:

01-00698-PJW FINOVA CAPITAL CORPORATION Reorganized Debtor

U.S. Bankruptcy Court

District of Delaware

Notice of Electronic Filing

The following transaction was received from Sullivan, William David entered on 6/3/2005 at 4:44 PM EDT and filed on 6/3/2005

**Case Name:** FINOVA CAPITAL CORPORATION Reorganized Debtor
**Case Number:** 01-00698-PJW
**Document Number:** 40

Docket Text:

Objection to *Motion of Reorganized Debtor For an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan* (related document(s)[22] ) Filed by First Carolina Investors, Inc. (Sullivan, William)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**I:\WDS\First Carolina v. Finova\Finova Objection.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=6/3/2005] [FileNumber=3858052-0]
[47f5acd8efc00d85bf42db874d831b573d4ab65f923eaee4f108094f2181a5198130c
e2ea5ed6e436ba4a439e1e873e05eb4e0107c5bc3d5dc0580f26d61c3af]]

**01-00698-PJW Notice will be electronically mailed to:**

Rebecca L. Booth rbgroup@rlf.com

Rebecca L. Booth rbgroup@rlf.com

Rebecca L. Booth booth@rlf.com, RBgroup@rlf.com

Mark D. Collins collins@RLF.com, rbgroup@rlf.com

David S. Leinwand     dleinwand@amroc.com,

Richard W. Riley     rwriley@duanemorris.com

William David Sullivan     bankruptcyemail@elzufon.com

**01-00698-PJW Notice will not be electronically mailed to:**

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE: . Case No. 01-698(PJW)

FINOVA CAPITAL CORPORATION,

Debtor. . Wilmington, DE
. June 10, 2005
. 9:30 a.m.

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| Finova Capital Corp. | Richards, Layton & Finger, P.A.<br>By: MARK D. COLLINS, ESQ.<br>One Rodney Square<br>920 N. King Street<br>P.O. Box 551<br>Wilmington, DE 19899 |
| Finova Capital Corp. | Gibson, Dunn & Crutcher, LLP<br>By: JONATHAN M. LANDERS, ESQ.<br>200 Park Avenue<br>New York, NY 10166-0193 |
| Finova Capital Corp. | The Finova Group Inc.<br>By: RICHARD LIEBERMAN, ESQ.<br>Finova Capital Corporation<br>4800 North Scottsdale Road<br>Scottsdale, AZ 85251-7623 |

Transcriber, Gina M. Cermak
**DIANA DOMAN TRANSCRIBING**
**P. O. Box 129**
**Gibbsboro, NJ 08026**
**Office: (856) 435-7172**
**Fax: (856) 435-7124**
**E-Mail: dianadoman@comcast.net**

Audio Recorded
Audio Operator, Sherry Scaruzzi

Docket No. 50
Date 6/28/2005

APPEARANCES: (cont'd)

| | |
|---|---|
| Rozann Chernov | Robbins & Green, P.C.<br>By: BRADELY J. STEVENS, ESQ.<br>3300 North Central Avenue<br>Suite 1800<br>Phoenix, Arizona 85012-2518 |
| Eugene Linden | Anderson Kill & Olick, P.C.<br>By: MARK D. SILVERSCHOTZ, ESQ.<br>By: JOHN SCOTT, ESQ.<br>1251 Avenue of the Americas<br>New York, NY 10020 |
| First Carolina Investors, Inc. | Buchanan Ingersoll, P.C.<br>By: WILLIAM D. SULLIVAN, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Suite 1110<br>Wilmington, DE 19801 |
| First Carolina Investors, Inc. | Hodgson Russ, LLP<br>By: DAVID M. STARK, ESQ.<br>By: GARRY M. GRABER, ESQ.<br>One M & T Plaza<br>Suite 2000<br>Buffalo, NY 14203 |
| U.S. Trustee | Office of the U.S. Trustee<br>By: DAVID L. BUCHBINDER, ESQ.<br>J. Caleb Boggs Federal Building<br>844 King Street<br>Suite 2313<br>Lockbox 35<br>Wilmington, DE 19801 |

THE COURT: Please be seated. Ready to proceed?

MR. LANDERS: Good morning, Your Honor. Jonathan Landers and Mark Collins for the debtors.

MR. SILVERSCHOTZ: Good morning, Your Honor. My name is Mark Silverschotz, I'm with John Scott. We're from Anderson Kill & Olick. We represent Eugene Linden today.

MR. SULLIVAN: Good morning, Your Honor. Bill Sullivan from Buchanan Ingersoll on behalf of First Carolina. Your Honor, with me is Garry Graber from the firm of Hodgson Russ. We filed a motion permission pro hac vice yesterday. Your chambers contacted us and said we needed to amend the certificate, so we're filing an amended version as we speak. But I have a copy of it.

THE COURT: Okay. That's all right. I don't need it.

MR. SULLIVAN: Okay. Thank you, Your Honor.

MR. LANDERS: Good morning, Your Honor. Jonathan Landers for the debtors. With me here this morning, Your Honor, is Mr. Glenn Gray, the new COO of Finova, Mr. Rick Lieberman, general counsel of Finova and Bill Donnally (phonetic), who is going to be the new general counsel effective of Finova at the end of the month.

Your Honor, we have today on the agenda Finova's motion to clarify the plan with respect to the 5 percent distribution to equity. I'm going to present my argument this

morning in four parts. First I'm going to talk about the plan provisions themselves, then I'm going to talk about the debtor's argument as to why the plan should be clarified along the lines of the motion. Then I'm going to talk about the First Carolina arguments. And finally, Your Honor, I am going to respond very briefly to the Equity committee's motion for the reconstituting of an Equity committee.

THE COURT: Let me just observe the objection filed by First Carolina Investors, in my view, raises some interesting issues. And I had hoped that you would have filed a response to that because I would want to read some of the cases that they've relied upon and whatever cases you rely upon.

MR. LANDERS: I didn't. I did not understand. I defer to Mr. Collins about this since it was our motion that we were permitted to file a response. But I'm sorry, Your Honor, we, of course, would be glad to file one afterwards.

THE COURT: Well, what I'd like to do is, time permitting, is read the motion papers before hearing argument because I find quite often that when I hear oral argument without any pre-knowledge of what they're going to talk about I'm often misled by what lawyers say cases stand for. And when I read them they stand for something else. And, quite frankly, the objection raised by First Carolina, there's at least a half a dozen issues they raise that I think are interesting.

MR. LANDERS: Well, I would agree that they're interesting, Your Honor. I don't believe -- our view of the case is that on the merits, putting aside the Equity committee issue, that the issues essentially can be resolved largely on the basis of the plan language and the disclosure statement language which are addressed in the papers of both parties. In fact, I think it's significant that the First Carolina papers really don't address the provisions of the plan. They really don't say, except somewhat obliquely, that they're even entitled to the funds and don't really give any reason why they're entitled to funds. We believe that the plan is very clear on these points and that the underlying documents really lead to only one interpretation and that was essentially the argument that I was going to make this morning. But I'll be guided by whatever the Court would like to do in --

THE COURT: Well, let me just take one example, the First Carolina objection says this matter is not controlled by Delaware Corporation law, it's controlled by a contract, a confirmed plan in the order and the indenture. And they develop a number of theories from that that -- and then cite a number of cases in support of that position. And I don't feel that I can rule from the bench today on those issues.

MR. LANDERS: Well, Your Honor, I guess my view would be, I think, that the plan itself, in effect, brings in Delaware law in terms of the underlying references and the

definitions of restricted payments and impermissible restricted payments. And that the only way one can read the definition of impermissible restricted payments and the notion that payments cannot be made if not permitted by applicable law is the applicable corporate law of Delaware. There's no indication that some other law applies. There's no indication in the plan that there's an attempt to preempt federal law which would trigger the kinds of cases that First Carolina raises. And that would be our argument. Again, I'd be guided by however the Court wants to proceed.

THE COURT: Let me ask another question. Is there a factual dispute as to whether the debtor will ever reach a point of not being insolvent?

MR. LANDERS: Well, we believe that there isn't -- and in essence, the debtor's assets as they stand now would have to appreciate by about 300 percent. When you look at those assets, Your Honor, what you find is the assets consist of financial contracts which also by definition can't appreciate beyond the face amount of the contract. And hold airplanes which are not likely to appreciate.

So, if you look how Finova has done in liquidating its portfolio, it's done a bit better than expected to do, but nothing like the kind -- the magnitude of changes that would be required to get even close to a point where --

THE COURT: Okay. Let me ask the objectors if they

think there's any factual issue to be resolved.

MR. SILVERSCHOTZ: Your Honor, Mark Silverschotz. To first answer Your Honor's question, we don't know. I mean, it may be at the end of the day after an investigation that we would agree with the debtor, that the debtor at present is insolvent. It may be that we disagree. But today I'm representing an individual who was a member of the Equity committee who loans 250,000 shares which have, I believe, a market value of $5,000 today. But we obviously haven't done the full investigation that one ordinarily would associate with a Committee's responsibilities.

THE COURT: What kind of an investigation would you want to take?

MR. SILVERSCHOTZ: On the issue of solvency, I think we'd want to, at the very least, be able to do -- hire an expert to perform an appropriate -- at least a prima facie analysis of what the debtor contends are the bona fides of the assertion regarding its solvency. The debtor, in it papers, says it's in default on the terms of the plan. It has been liquidating and paying debt, it paid off the Bricadia (phonetic) loan, it's been paying down the reorg notes that were issued and it's been setting aside the 5 percent for equity. The fundamental issue here is what happens to that 5 percent and whether we created a contract in the plan that says this is your money, equity holders, and it only gets paid out

at certain times. We think that the plan requires that payment to be made now irrespective of whether or not the debtor is insolvent.

THE COURT: Okay. That's a legal issue.

MR. SILVERSCHOTZ: That's a legal issue.

THE COURT: I want to focus on the factual issue.

MR. SILVERSCHOTZ: On the factual issue, Judge --

THE COURT: Because if they're not forever insolvent then I don't think they have a basis --

MR. SILVERSCHOTZ: That's correct, Your Honor.

THE COURT: -- for the motion.

MR. SILVERSCHOTZ: That's correct. And I suspect that debtor's counsel would agree with that. That if they thought there was a possibility that they would be solvent, they probably wouldn't be here for the relief that they seek. On the factual issue, we don't know if what they assert is true or not. And, frankly, the only way to find out is to put it to the test. But I will also tell Your Honor, I don't think at the end of the day what the plaintiff's written that's necessarily the controlling issue. But if Your Honor disagrees with us, then obviously we would want to have a chance to put in the proof. Procedurally --

THE COURT: Unless you're going to stipulate --

MR. SILVERSCHOTZ: We're not going to stipulate.

THE COURT: -- that the debtor is forever insolvent

--

MR. SILVERSCHOTZ: Correct.

THE COURT: Then I think we have to cross that factual threshold issue.

MR. SILVERSCHOTZ: I think that's probably correct, Your Honor. Procedurally, of course, since Your Honor has already articulated a desire to receive a reply from the debtor, which I guess ordinarily this district -- the Court wouldn't receive, but having requested it you should certainly get it, we're left with the motion to continue and the -- Mr. Linden's motion with respect to the metafiscal issue of whether or not the Equity committee still exists for purpose of resolving this dispute. I defer to Carolina's counsel whether they think -- it may be that Your Honor has effectively granted the motion to continue by simply observing that you want further briefing on it, but if Your Honor would like to hear argument on the more generic continuance motion first, I'd defer to Carolina counsel or if you want to hear argument on our motion, we're happy to go forward with that as well.

THE COURT: Mr. Lander's, don't you think we ought to address the factual dispute first?

MR. LANDERS: The --

THE COURT: Because if you're wrong and they're right, I'm going to deny your motion.

MR. LANDERS: Your Honor, we -- the factual dispute

is really is a red herring. The debtor has audited financial statements, the debtor has disclosed this deficiency for a two, three year period. There have been numerous contacts between Mr. Linden and Mr. Stark regarding the financial issues. No one has raised any question, there's no question raised in the papers that we might be wrong or anything like that. This is really --

THE COURT: They're raising them now.

MR. LANDERS: Well, no, Mr. -- I don't think Mr. Silverschotz raised it. He said he's not willing to concede it, which is somewhat different than raising it. If I was Mr. Silverschotz I wouldn't --

THE COURT: Well, if he's not willing to concede it, then I have to make a finding, don't I?

MR. LANDERS: Your Honor, I think that the Court can make a finding on the basis of the information that's publically available unless the summaries --

THE COURT: That's not before me.

MR. LANDERS: Well, we have not filed an affidavit. We have people here who can testify as to that matter. We can certainly put them on and they can testify as to the financial situation of Finova and the basis on which that financial situation was derived. And as I said, this not a new situation. This has existed for three or four years, it's been publically disclosed, there have been numerous discussions

between the parties. This is not a surprise. This is not something like they thought that we were okay and all of a sudden we're not. This deficiency of a billion dollars has been well publicized for a very long period of time and nobody has really raised any question about it. Again, we can produced evidence, we can produce it here today in the form of testimony. But I think Mr. Silverschotz's notion that we're going to get financial experts and the like is really just leads to considerable additional expense ultimately to be borne by the creditors of this company without any corresponding benefit unless they can show some prima facie reason to think that it might be wrong. I mean, these audited statements and the deficiency is very broad.

THE COURT: I know audited statements do not reflect value in many instances.

MR. LANDERS: Well, Your Honor, I think that's true in some instances, but in other instances, given the nature of these assets, I think that -- and the fact that there have been write downs to actual value, it's probably closer. And in addition, the company has a history of correcting these statements based on actual collections and proceeds. And while there have been some minor adjustments or percentage-wise minor adjustments, there have been no major adjustments.

The other point is, Your Honor, we're now at the end of our liquidation of the portfolio. And as might be expected,

the "good assets" have largely been sold. So the real question is whether if we present testimony there's any reasonable basis to do a lot of analysis at a lot of expense just to see whether that's correct without any basis whatsoever.

THE COURT: Well, I'm not sure it requires a lot of analysis at a lot of expense.

MR. LANDERS: But that's what happens when you get accountants in to look at it and --

THE COURT: I don't necessarily agree with that.

MR. LANDERS: Well, you may not.

THE COURT: I think a qualified accountant could come in and perhaps in three or four hours walk away and say it's hopelessly forever insolvent.

MR. LANDERS: Well, Your Honor, my experience is that they want to look more and it costs a lot more when you get people in. I mean, if this is going to be done, Your Honor, and we would hope it isn't, we would certainly hope that there would be a very serious cap on the expenses that would be involved. At least -- unless they can identify some prima facie basis not only to say that we're wrong, but that we're wrong by the -- I mean, by a 300 percent magnitude. That's what we're talking about. We've got to be wrong by 300 percent on financial assets and old airplanes, Your Honor. That's highly unlikely. Possible. Anything's possible, but highly unlikely.

MR. SILVERSCHOTZ: Your Honor, just to go back to what I said before, and perhaps this will assuage some of the concerns that Mr. Landers has, it may very well be that the debtor is insolvent, it may be that the debtor is not, I'm in no position to say. But I'm not certain that we're at the stage where as a matter of law the fortunes of the equity holders will rise or fall on the narrow factual question of whether or not the debtor is hopelessly insolvent today. If the debtor was not hopelessly insolvent, or insolvent at all on the effective date of the plan, or confirmation date of the plan, and the plan set forth the rights and the responsibilities of the debtor, vis a vis the different classes of creditors and interest holders. And the reason we're here today and the reason the debtor made the motion is to interpret what the plan means with respect to the current circumstances.

Now, it may very well be that Your Honor at some point will decide that Mr. Landers is right and First Carolina and Mr. Linden are wrong or perhaps the Equity committee is wrong, but until we get to that point, I'm not sure that the expense, or at least an extraordinary expense, that the debtor is rightly concerned with because we don't want to waste the state money because at the end of the day it may be my client's money too that gets affected. But we needn't spend substantial funds pursuing a solvency issue while we, at the outset, have substantial legal issues that require resolution.

Now, if Your Honor sees these matters conversely, then that wouldn't be the case. But our view is that if we deal with the legal issues first, which probably would be significantly, I don't want to say less expensive, but they're perhaps easier to control, then we won't have to deal with the solvency issue, at least right up front.

THE COURT: Well, here's my position. I think we should resolve the factual dispute and I want to see the debtor's response to the objection of First Carolina Investors. As I've indicated, they've raised a half a dozen interesting issues and I would like to have an opportunity to see what law the debtor's relying upon in response to those positions expressed by the investor. And then I think I can have a better understanding of what's going on and I can receive the oral argument on a more informed basis.

MR. SILVERSCHOTZ: Your Honor, it's sounds to me, at least, as if you are doing two things. You're directing the reply and effectively granting First Carolina's motion for a continuance for -- to a subsequent hearing following the filing of the reply by the debtor. That would leave only the -- if I'm correct in my interpretation, that would leave the Linden motion respecting the Committee which would allow us to know whether we're proceeding on behalf of the entirety of the equity class or on behalf of Mr. Linden by himself.

THE COURT: Okay. Well, I think that's -- you've

stated in a different fashion than I have. But the bottom line is I think the hearing should be continued to address the factual dispute. And, Mr. Landers, I don't think this is going to require any significant amount of professional help. My guess is you're absolutely right. But -- and I know a little bit about Finova. And I know one of their assets in particular that is in jeopardy. So at the end of the day, I think you're going to be right. But I want to resolve that issue and I also want to see a response to the "interesting issues" raised by the objection. I think we could hear the motion for the reconstitution of the Committee today.

MR. LANDERS: I mean, I think that's where the Court is going. I think we have to do that. Since the motion for the reconstitution --

MR. SILVERSCHOTZ: Your Honor, ordinarily at the beginning of the hearing, as I did this morning, I state my name and I announce the name of my client. And today, although I was counsel four plus years ago for the Equity committee, I'm appearing solely on behalf of Mr. Linden. And as I mentioned, Mr. Linden owns approximately 250,000 shares of Finova common. And our appearance on his behalf raises two questions. And the second question is whether or not he remains a member of the Equity committee and it's the second question because the first question, of course, is the one that poses the existential issue, does the Committee still exist?

Obviously, if the Equity committee exists for the purpose of the debtor's motion, and that's the only purpose for which we seek that recognition, then it suggests that the debtor made a sort of minor error when they served their papers because they treated the Equity committee as the late Equity committee, they didn't serve either me or Mr. Gross, who's our co-counsel. And if they had, maybe we would have been here a month ago on this motion and could have gotten the issue resolved then. I think for timing purposes, Your Honor's direction to the debtor is helpful because it will give us all, assuming Your Honor grants our relief, the issue of service will become moot and we'll all hopefully have enough time to deal with all the open issues. But today the debtor believes that the Equity committee no longer exists even for the purposes of this motion. And accordingly, I believe the notice to us was unnecessary. And in fairness to Mr. Landers, the continued existence, or not, of the Equity committee is a rather interesting legal issue. We've been cursed with a rather interesting legal issue because the plan, after all, does say that upon the effective date, the official committees, both creditors and equity security holders committees cease to exist except for three distinct areas pending fee applications, which this is not a plan or confirmation order modifications, which this may or may not be, but let's assume it's not for purposes of this argument and open disputes. And, you know,

door number two, which remains possibly open here, is the -- determine the plan was matters pending at the time of the effective date. And in our moving papers, we contend that the debtor's allegation of either ambiguity or absence of controlling language in the plan suggests the presence of what in our papers we refer to as a nascent dispute that existed as of the confirmation date. And I think that Mr. Landers and I could stand here for hours and debate and argue the matter. But I think at the end of the day what it comes down to is how Your Honor will interpret the term matters pending in the plan. And obviously this is a dispute on this motion over what the term in the plan, you know, means. And I don't think there's a dispute that this issue is properly before Your Honor in terms of the Court's jurisdiction to hear the issue and I don't think the debtor raised a contrary contention. We're getting perilously, I think, Your Honor, to debating, you know, the bankruptcy equivalent of how many angels can dance on the head of a pin. But the term matter in the plan, I note, simply says matter. It doesn't say contested matter, it doesn't say adversary proceeding. It's much more generic, it's much broad. And with deference in every direction to Mr. Landers, Judge, we think that the issue of whether or not $100 million plus of monies, right now it's 60, it's going to go up, that was designated for distribution to the equity holders, we think that's a matter. And not only is this dispute a matter, but we

think it's a matter that was "pending", in quotes again, "pending" at the time of the confirmation. And if I had to describe what this is in non-bankruptcy terms, I'd say this dispute was a ticking time bomb that was in the plan. It was slowly ticking. And we think that pending, in the context of the plan, is the equivalent of ticking. And in their opposition papers, debtors argue that pending matter meant essentially a pending adversary proceeding or a contested matter and one of us is right.

I note that either of us cited any specific references directly addressing the terms. And I took the liberty last night of printing out Black's Law Dictionary which sure enough defines both matter and pending. May I approach, Your Honor?

THE COURT: (No audible response)

MR. SILVERSCHOTZ: It's always dangerous when one goes to the dictionary because one never knows what one is going to find. Matter, according to Black's, is either -- and inevitably, the dictionary provides multiple definitions, but matter, according to Black's, is either a subject under consideration or, "Something that is to be tried or proved. An allegation forming the basis of a claim or defense." And the term pending, which is on the second -- the third page, Your Honor, I clipped them altogether. Your Honor may be interested to learn, according to Black's pending actually has four

possible meanings. Two of them are with the word as an adjective and two of them are with the word as a preposition. And the adjectival definitions include, "Remaining undecided. Pending decision." And preposition definitions include, "While awaiting."

We think, Your Honor, that under any reasonable analysis, the issue of what to do with this money, based upon the plan language or based upon the absence of plan language was, "Something to be tried or proved." And that this something, "Remained undecided pending decision." As of the effective date of the plan. Now, Mr. Landers --

THE COURT: Let me a question.

MR. SILVERSCHOTZ: Sure thing.

THE COURT: Aren't we here because post-911, the financial markets went south?

MR. SILVERSCHOTZ: Your Honor, I know that's the debtors' contention. The way we read the plan -- let me put it a different way. If it hadn't gone south, I'm sure the debtors wouldn't have made the application, but, it's almost a post hoc type of argument, Judge. Or I think it's -- it doesn't necessarily prove causality between 911 and the motion. The language was in dispute. There could have been any one of a number of reasons why the debtor decided -- it may just have been that the market for the particular collateral went bad. It didn't have to be a consequence of a catastrophic event.

The narrow legal issue is the interpretation of the plan contract and what it means. At the end of the day, if there isn't enough money to pay off the notes and the 5 percent fund is sitting in a bank account, who gets it? It's a question of interpretation of the plan.

THE COURT: Let me ask you another question, the very fact that the plan set forth this arrangement for equity holders to get something, doesn't that suggest that everybody believed at the time, particularly the proponents of the plan, believe that there would be funds available for the equity holders?

MR. SILVERSCHOTZ: Your Honor, that's a very good question. And that may be true that everyone believed that, but the question is, what did everybody do as a consequence of that belief, and the answer is the debtor wrote the plan as written and the various constituencies voted for the plan as described in the disclosure statement. And what the plan does not say, and I'm sure Mr. Landers will agree with me, is that the plan does not say, okay, we're going to recognize the debtor, we're going to give equity 50 percent or 49 -- I forget, we'll retain a portion of their equities, and we're going to liquidate out the assets, we can't go into any new businesses and we're going to set the debt for creditors at this level and after all the debt is paid off, whatever collateral we have left we'll continue to liquidate for the

benefit of shareholders. If you will, a somewhat strict absolute priority liquidation scheme. If that's what the plan said, then we probably wouldn't be here because we wouldn't have gotten to that point where there was anything at issue. But it's not what the plan says. The plan says as long as we're not in default, 95 percent is here, 5 percent is there. There are restrictions on when that money can be distributed. But the debtor has one interpretation of whether or not the monies can be distributed to equity and I suspect everyone to my left has a different interpretation. And that's the legal issue that I eluded to before which I believe does not rise or fall on the issue of the debtor's solvency.

So, to answer again Your Honor's question, it may very well have been that everyone believed that the debtor was solvent in August of 2001. And the debtor probably was solvent in 2001. I certainly believe that. But that was the circumstance that yielded the plan and the plan is the contract that binds us all today.

THE COURT: Okay. Now you're getting into the argument on the merits. I want to talk about the reconstitution of the --

MR. SILVERSCHOTZ: Absolutely, Your Honor. So --

THE COURT: And the reason I raised the question was because I don't think it can be viewed as a matter pending at the time of the confirmation of the plan.

MR. SILVERSCHOTZ: I'm sorry to hear that, Your Honor. It's interesting, Your Honor, because -- I'll give you an example of -- we cited the -- and I encourage Your Honor to reconsider the view that you just articulated. But the Wegstrong (phonetic) case out of the District -- the bankruptcy court in the District of Massachusetts where the plan didn't say that the Committee would exist for matters pending, the plan said -- it's a creditor's committee, admittedly, but so what, it simply wiped out the Committee on the effective date.

As of the effective date, the Committee won't exist anymore. The committee sought reconstitution with respect to a proceeding to revoke the plan. Now, obviously a revocation motion is not going to be the sort of motion that's going to be existing at the time of confirmation or an effective date. It's something that inevitably pops up down the road within 180 days, I believe, under the statute post-confirmation. Yet the court there said no, you may have gone away but I'm bringing you back for purpose of prosecuting this revocation proceeding.

Now, revocation motions require fraud and the circumstances are much more egress in that case and in any other case that involved 1144 and no one is suggesting anything of that sort that is present here, far be it. But to the extent Your Honor is suggesting that well, everybody thought that the debtor was solvent and we were going to go off happy go lucky into the future, I suspect that in the Massachusetts

case that was also the circumstances, but things changed. And in our case, yes, things changed and we looked back and what was pending was the absence of the language that requires resolution. Now --

THE COURT: Let me ask you a question. I haven't read the Massachusetts case, but did the court rely upon language of the plan or did it simply rely upon Section 105 and say this is the right thing to do?

MR. SILVERSCHOTZ: My recollection, Judge, is that there was a retention of jurisdiction. And --

THE COURT: Which we have here.

MR. SILVERSCHOTZ: Which we have here. There's no dispute that -- there. And I believe it was the general 105 authority. Of course 1102 says you can appoint the Committee, and I'll get to that in a second, anytime after the -- the case and there's no backdoor that closes on the Committee under 1102. And 105, of course, we only use when it's not inconsistent with other provisions of the code. And I'd suggest that either recognizing or reconstituting the Committee at this point is certainly not inconsistent. And my alternative argument, Your Honor, and we recognize that it's an issue as to whether or not we still exist, which is why we moved on behalf of Mr. Linden because we figured better to play it safe, but should Your Honor conclude that the Committee doesn't exist, you can, we think, nevertheless, put matters

right and create a level playing field for the equity holders. I can't imagine any of whom have a personal economic stake sufficient to justify the financial risk associated with pursing the litigation. And you can direct the U.S. Trustee to either reconstitute the Committee or appoint a new committee. And there are plenty of people out there who've expressed interest. I have two members of my old committee who are still holders and who said if we still exist then they're still happy to serve.

THE COURT: Let me ask you a question. If I were to grant your relief, can I direct the reconstitution of the Committee by saying the same members who were there before are now members at their election? Or do I have to defer to the U.S. Trustee to say form a new committee?

MR. SILVERSCHOTZ: Your Honor, I think that the U.S. Trustee -- thinking about that issue in the context of where the U.S. Trustee has appointed a committee and there's an issue about the composition of the Committee. And typically committee counsel will go to the U.S. Trustee and, you know, ask for someone to be thrown off or ask someone to be added. And my recollection is those matters are typically brought to the court and if there's a real problem in terms committee membership or behavior of a member of the Committee. And the U.S. Trustee generally prefers to get some sort of direction from the court. I'm quite certain that were Your Honor to say

to the U.S. trustee, appoint the new committee. And in that -- or can say the Committee still exists and the U.S. Trustee can add additional members as may be appropriate, the U.S. Trustee would do so.

THE COURT: There may be some former members who are no longer shareholders. And I think it would be inappropriate to put them on the Committee.

MR. SILVERSCHOTZ: I agree, Your Honor. And, in fact, I phoned -- there were seven members of the Committee, I reached six of them and there are two who are still shareholders who are willing to serve. One I could not reach. So I believe the U.S. Trustee would take Your Honor's -- whether it was Your Honor's order or Your Honor's advice and act appropriately. And I have every confidence that the U.S. Trustee will do what's appropriate.

The language in the plan in 12.1(g) gives Your Honor full authority to issue such orders as may be necessary to implement the plan. I'd suggest this is precisely the type of circumstance where Your Honor can issue an order directing the reconstitution of the Committee for purpose of leveling the playing field and implementing the plan, whatever the plan language means which Mr. Landers and I disagree on. Should you do it? Yes, Your Honor. It's $100 million. It may be in the context of a -- once a $6 billion case. That may be chicken feed, but I think it's meaningful at this point to the holders

of the shares. The U.S. Trustee hasn't filed any papers. But as I mentioned, I have every confidence that the U.S. Trustee would follow Your Honor's direction as, of course, that office always does. So in conclusion, Your Honor, at bottom, we think we exist because we do think the matter is a matter that was pending. If we don't exist, Your Honor has the jurisdiction and authority to direct the U.S. Trustee to make an appointment. And at bottom, Your Honor, this was a terrific case back in 2001. It got an excellent result, I think, for all parties, you know, and the -- I think the general happiness of that -- waiting for that result lasted for all of three weeks prior to 911. But there's a plan out there, it's confirmed and the debtor, as it states in its papers, continues to perform that plan. And there's been no default. And we just think that this dispute should move forward on a business like basis, as I said twice before, with a level playing field. And we think that the First Carolina papers are terrific, but they only scratch the surface and then a properly empowered committee can brief the matter even more fully and address the matter as it Should on behalf of the entire equity constituency.

So, I thank Your Honor for indulging my presentation. And, of course, I'd be happy to answer any other questions.

THE COURT: Okay. No questions at this point.

MR. SILVERSCHOTZ: Thank you.

MR. LANDERS: Thank you, Your Honor. The plan clearly provides the dissolution of the Equity committee. Mr. Silverschotz really doesn't contest that. He's not also argued that this is other than a clarification motion. So this does not come within the reservation of the Committee's existence for modifications. So I'm going to pass those issues.

I want to talk briefly about the pending matter issue, although I understand that the Court has --

THE COURT: You don't have to talk about it. I'm ruling on that one.

MR. LANDERS: Okay. Thank you, Your Honor.

THE COURT: It's not a pending matter.

MR. LANDERS: Okay. Thank you, Your Honor. I'll also just briefly --

THE COURT: The committee doesn't exist today.

MR. LANDERS: Okay. I don't know, I see Mr. Silverschotz here, so I'm -- he's here physically. But I also wanted to correct one thing, although the Court did rule it out of bounds and -- Mr. Silverschotz made a references to the 5 percent provision. In our view, Your Honor, just to state it very briefly, the 5 percent provision was simply an acceleration of money they'd get at the back-end of the case. It didn't give them a vested right. And it was not -- the only exception was not default, it was a number of other circumstances. So I just wanted to articulate that. And lt me

turn to the question whether the Committee should be --

THE COURT: Let me ask you the same question I asked counsel for the expired committee. Don't you think the plan was premised on an optimistic view of the outcome of the case and that there was -- that equity was in the money?

MR. LANDERS: Yes, Your Honor. It was clear that it was based on that premise.

THE COURT: And in your view, why did it turn out otherwise?

MR. LANDERS: It turned out otherwise because of exactly what the Court said, because of 911. When 911 -- the company had significant assets of exactly the type of deteriorated after 911. Airplane leases, I mean, as this Court knows from a number of cases, the airplane market generally went to the -- went into the doghouse for a number of years. The value of older aircraft, which Finova had. The leasing value went down considerably. A big area of Finova's business was resort financing and it had a number of receivables in those areas which again deteriorated in value. And there was a general deterioration in market values which occurred almost immediately after 911.

THE COURT: I don't recall the facts. Were they into financing the telecom industry?

MR. LANDERS: Yes, Your Honor. There were there too.

THE COURT: Which was an absolute total unmitigated

disaster.

MR. LANDERS: I mean, they were -- I mean, if you picked a list of businesses that were bad after 911 --

THE COURT: I probably had half of them in here.

MR. LANDERS: Right. Right, Your Honor. So, I mean, that's what happened. And the write downs, if you look at -- again, this is not -- this is not a new phenomenon. These write downs occurred very shortly afterwards. The fact of a huge deficiency has been known for really three plus years now.

THE COURT: Okay.

MR. LANDERS: As far as reconstituting the Committee, the Committee was dissolved. There was specific limitations. This clearly wasn't one of them. But the main point, Your Honor, we would make is that there's no need for the Committee. The first thing is the discussions have been going on between the parties and between counsel for the parties on these issues for some time. Mr. Linden and the First Carolina folks have been well represented, they've been represented by counsel through this process with letters from counsel, which we'd be glad to share with the Court. But they have presented their position very vigorously without the need or involvement of a creditor's committee.

Indeed, Your Honor, as the Court observed earlier, the First Carolina filed papers in this Court which were very extensive papers dealing with the underlying issues. So to us

that establishes that, in fact, first -- we assume First Carolina is not in the charity business. If they believe that they have a sufficient financial incentive to participate in this case. They have two lawyers here from different law firms, they clearly believe that this is a significant economic issue. And it is, Your Honor, with two million shares and let's say, I believe Mr. Silverschotz suggested a potential distribution of $100 million. Their stake with roughly 60 million shares. So if there should be $100 million in there -- in the fund, their stake is about three and a half million dollars in this matter. There may be other shareholders who have a similar stake, we don't know. Of course the largest shareholders that have about half and would get half the money are insiders Finova who, as members of the board, are supporting the Finova motion in this case because they believe it's the correct situation -- the correct approach to this particular issue. But first --

THE COURT: Do they have any stake, those board members have any stake as creditors?

MR. LANDERS: Yes, Your Honor. And we take that through the paper. One of them, Loucadia (phonetic), does not, we believe. Berkshire Hathaway (phonetic) does have a stake as a creditor, but it is significantly smaller than the benefit that they would get as an equity holder. I don't have the exact figures, but it's a significantly different -- different

amount as to what they would get. Again, we could get the information for the Court.

THE COURT: So they may have a conflict of interest?

MR. LANDERS: Well, in a sense they're supporting the view that is contrary to their interest. I mean, that's what it comes out to because, as I said, Loucadia would get roughly half of -- half of half. And Berkshire would get half of half. And what they would get is substantially greater as a shareholder than they would lose as a creditor.

THE COURT: Is that an undisputed fact?

MR. LANDERS: Well, we have not -- is it undisputed? They have not contested that and we'd be glad to provide the Court with the relevant information. I mean, the holdings --

THE COURT: I think that would be helpful.

MR. LANDERS: Okay. As I said, there is a reference in our papers to that fact, but the numbers are not there. As I said, First Carolina, as the holder -- by the way I spoke incorrectly, there's a total of -- there used to be 60 million, now there's about 122 million. First Carolina, as the holder of roughly 2 million shares has an interest of about $1.6 million which is still a substantial enough interest. And, Your Honor, we don't have to speculate on whether they think their interest is enough to participate and spend the money on these proceedings because they're doing it. They've spoken for themselves on this issue.

We believe it's not necessary to have an Equity committee because the issues are straightforward. The financial issues can be looked at. As I said, the financial information is largely a matter of public record. People can look at this and make some judgment about whether there's any basis whatsoever to believe that there's a chance, any chance at all that we're going to be able to pay equity or that the company will not pay its debt in full. And the legal issues we believe, notwithstanding some of the discussions this morning, are relatively straightforward.

We think that the essential issue here when you get -- when you cut through it all, is simply whether this was simply, as we've characterized it, as an advanced distribution to equity on something, as Mr. Silverschotz said, that they'd otherwise get at the back-end of the case if the company proved to have funds left over, which is our view. And that it was essentially similar to a dividend or other distribution under Delaware law which simply cannot be made. Or the debtors view that this is a binding contractual promise in the nature of a debt. And we think that's the issue.

If you -- if this was a debt, if they had a promissory note that said the company agrees to pay so much -- so many dollars we wouldn't be here today. But they don't have those kinds of documents and the plan, as we will articulate better when we file our response, is very clear that this is,

in essence, a contingent dividend to equity. This is a straightforward issue. It's been briefed by First Carolina. I have no doubt, Your Honor, that if new lawyers get in, if they can file additional briefs and make more arguments, but the bottom line is First Carolina has done as the Court observed, a very comprehensive job on these issues and I think that the issues are before the Court.

We're also concerned, Your Honor, about the mere fact that if we are correct, and I think deep down, so does Mr. Silverschotz doesn't really contest the fact that there's no likely to be any equity, if that's the case, if the Committee is reformed, Your Honor, basically you're taxing the creditors for the benefit of equity. And the case law is very strong that at least where there's no possibility of a distribution to equity that a committee ought not to be formed. This company is prima facie insolvent by a billion dollars. Any dollars that get paid to holders of equity ultimately come from the creditors. There's some talk in the First Carolina papers as if sort of this is a contest between the equity in Finova. It's not. It's a contest in a sense between two different constituencies. Between equity holders and creditors. Creditors that are not going to be paid probably in the magnitude of a billion dollars. That's what this is about. And any dollars that go to equity simply come from creditors. There's no other source of this. This is -- as a matter of

fact, the normal case is where equity is the company. In this case the company has looked at the situation. As I said, board members hold equity and have -- really financially their interests are more aligned with equity than with creditors yet they've resolved that they think that the payment to creditors is the right result under Delaware law and under the terms and conditions of the plan. But if the Court requires the appointment of an Equity Committee, it's just coming out of the creditor's hide. There's no other place for it come to. And the -- as I said, the cases are fairly consistent on the notion that creditors ought not to have to pay for an Equity Committee when there's no possibility that there's equity in the case.

So, Your Honor, for those reasons we really believe that this is not appropriate case for the appointment of an Equity Committee. That the equity can represent themselves if they're inclined to, that they've already done so. They've already -- not only -- and they've shown a willingness and ability to commit the kind of resources that are necessary to present an effective case in support of their position.

So for that reason, Your Honor, we would urge the Court not to appoint an Equity Committee. Thank you very much, Your Honor.

MR. SILVERSCHOTZ: Your Honor, very briefly and I'll yield in a moment to First Carolina's counsel. We think that applying the hopelessly insolvent test to this circumstance

begs the question of whether or not the rights of the former shareholders are in the nature of debt versus seeking --

THE COURT: I agree. If you're right there is -- equity is in the money.

MR. SILVERSCHOTZ: Well, nomenclature here, Your Honor, is really defitional in some many different respects.

THE COURT: You want to be called creditors, right?

MR. SILVERSCHOTZ: I want to be a creditor. I'm seeking the appointment of another creditor's committee, Your Honor. That's really what we're seeking here. Although I think we all got caught up in the original terminology associated with the plan at the outset. But I think the best way to deal with this is exactly as Your Honor just stated. And I'll yield to counsel for First Carolina.

MR. GRABER: Good morning, Your Honor. Garry Graber for First Carolina. First, thank you for letting me appear in front of you today. It's a pleasure. I think Mr. Silverschotz described our papers very well when he said they are terrific, because they are. But they also just scratch the surface because that's all they do. We have been able, through a lot of investigation and a lot of looking at history, to piece together what happened here. But First Carolina was not involved and we were not involved in the development and the negotiation of this plan. Mr. Silverschotz's firm was. Mr. Silverschotz is clearly the person, this firm, is clearly the

firm to be presenting the constituency in this case. They have the background, they have the history.

If you look at our papers you will see that we had to lift several paragraphs verbatim out of Mr. Silverschotz's papers consisting of history and a recitation of dynamics that we had been familiar with and could not have been familiar with not having been involved in this case. Could we do a good job? Sure we could. We're competent lawyers. We'll do the best we can and it will be a competent product. But the point is, Mr. Silverschotz's firm can do a better job whether it's dealing with the factual issues of which we think there will be a number, or the legal issues of which there are clearly a number.

There's also a question of fairness. Should the burden of paying for the resolution of an ambiguity in the plan which the debtor admits exists. And I'm not taking a shot at the debtor by saying that or its law firm was a good plan. Circumstances arose which now require a new interpretation. It seems imminently unfair to put the cost --

THE COURT: Okay. I didn't understand the debtor arguing that the plan was ambiguous.

MR. GRABER: Well, it's motion seeks a clarification. Use of the word clarification to me says --

THE COURT: As I understand the motion, it's saying tell us today that equity gets nothing rather than five years

from now.

MR. GRABER: Well, I think it does say that. But I think it also seeks a determination on your part that equity does get nothing whether today or five years from now. And that is a question with which we obviously seriously disagree. We believe equity has the status at this point of a claim holder and a creditor under that plan. We think the plan was intended to convey that status to it. There's still equity because they own the shares, but they also have rights. Vested rights and money that's specifically been set aside for them. The money is there with which to pay for the representation. And to the extent that we're right, it will be our constituency which will bear the proportionate cost of the resolution of this issue.

I mean, when you come right down to it there's no money to pay any of the counsel here today in front of you except what's held by the debtor today and what will be received by the debtor in the future. Where I come from, $100 million is still a lot of money. And even 2 percent of that is still a lot of money. However, to require that 2 percent stakeholder to fund this entire proceeding I think is unfair and I would hope that the Court would appoint a representative who will speak for the entire body of parties who are in my client's position and that of Mr. Linden as well.

THE COURT: Okay. Under the authority of Section

105, I'm going to appoint an Equity Committee. But I'm going to put a cap on their professional expenses. And I'll get back to that in a moment. But I think we do need to go -- at least touch base with the U.S. Trustee to see to what extent they want to be involved and if they don't then you can come back and we can set the Committee up very quickly. But I suspect that it may appropriate for the U.S. Trustee to get involved. It seems to me that the factual issue that we talked about the outset of this hearing is not going to require a significant amount of professional help. Point number one.

Point number two, I think it's really a legal issue and the objection that's already on file here by First Carolina I thought did a pretty effective job in raising some interesting issues. So I don't even think that the legal issues are going to require a lot of work by whatever counsel is retained by the Committee. So I don't view this as a complicated matter or a matter that's going to take a lot of time. And therefore, I'm going to put a cap on the professional fees. have a number in mind, but I will ask respective counsel as to what they think an appropriate number is.

Let me just state that, it seems to me that we ought to be back here 60 days from now, maybe 90, and have a final hearing and a decision.

MR. SILVERSCHOTZ: Your Honor, in -- first, I think

the idea of putting a cap is entirely appropriate. And I'm frankly sorry I didn't mention that myself because I didn't want in anyway suggest that we thought this should be a free for all in any way. That said, standing here right now I really don't know what the right number is, but I suspect that if Mr. Landers and I consult with the U.S. Trustee, we'll probably be able to get within, you know, arms reach each other and come up with a figure that doesn't shock the conscience or -- on one end or completely hamstring the issue on the other.

THE COURT: I didn't see Mr. Buchbinder here. I didn't realize a U.S. Trustee representative was here. I would have invited you to jump in sooner in terms of selecting the Committee and that type of issue. And, in fact, if you want to jump in on the cap, you can do that too.

MR. BUCHBINDER: No, Your Honor. We'll defer to the Court on this. Dave Buchbinder on behalf of the United States Trustee. We have carefully reviewed all of these motions. We have no position on any of them at this time. We'll follow the Court's direction. We did do a preliminary investigation to summarize what Mr. Silverschotz has stated at a couple of different times. There were seven members on the Equity Committee. One of them cannot be found, four others are no longer shareholders and There are two remaining members who are willing to continue to serve. If I understand what I'm hearing from the Court this morning and reading the pertinent part of

Section 2 of 1103, if the Court's direction is for us to appoint a new Equity Committee, I will need to consult with my immediate superior and we'll need to take the appropriate procedures to set up a meeting to form that Committee.

THE COURT: Okay.

MR. BUCHBINDER: And that's the primary difference between reconstituting or whatever you'd like to call it and appointing a new committee. But I think that's what we would have to do is to follow those procedures.

THE COURT: Okay. Then why don't we -- the Order will direct the U.S. Trustee to select the Committee.

MR. BUCHBINDER: That's fine, Your Honor.

THE COURT: And with respect to the cap, I have a number in mind. Would it be helpful if we took a five minute recess and see how far apart you guys are and then --

MR. LANDERS: That will be helpful. But we would like to come back because we do have a number in mind as well, Your Honor. But I'd be glad to share it with --

MR. SILVERSCHOTZ: I'll be interested in hearing --

THE COURT: All right. Well, why don't we take a five minute recess and see if you can maybe reach an agreement.

MR. SILVERSCHOTZ: That's fine. Before we take that recess, Your Honor, just one related point which is that listening to Mr. Buchbinder I had a sudden bad memory come forward which was the last time I was here, unfortunately,

which was on a fee application for my firm. And Your Honor may recall that we were involved in this case during the pre-petition period and we got to know counsel from Gibbs and Dunn over the period of several months, pre-petition. The petition was actually filed not precipitously, but a bit suddenly. And there was a two month gap, and we had a pre-petition equity committee, there was a two month gap between the petition date and the appointment of the Equity Committee because the U.S. Trustee, rather than simply appointing the pre-petition Equity Committee, did a solicitation and a canvas. I think it's a fair description to say the first two months of this case were pretty busy. And Anderson Kill was not in a position to say, well, you know, sorry Equity Committee that we've been representing for the last, you know, four or five months, we can't go to court and we have to sit back and wait for the Committee to be appointed. We came in, we participated and we billed our time. And we sought nunc pro tunc representation, it was denied. We sought substantial contribution payment, it was denied. And it we sought, since we had a contract with the debtor to pay our fees, we sought to treat -- have our contract treated as assumed, that was denied. So we ended up, basically, eating the fees That we expended and expenses that we expended during the first 60 days of the case.

THE COURT: I did all that to you?

MR. SILVERSCHOTZ: Your Honor, I'm sure at the time

it seemed like a good idea.

THE COURT: I don't recall.

MR. SILVERSCHOTZ: And if Your Honor would like to reconsider that, I'm sure I can make an application on That as well. But the reason I suddenly leap up prior to our brief recess is recognition That if the U.S. Trustee is going to do an equivalent sort of canvas, and it's going to take 30 to 60 days, I don't want the 60 to 90 days That Your Honor spoke of previously to start today, discover we don't have the Committee until 30 to 60 days hence and then we're caught back in that same little gap. So that's not something we have to worry about right now, but it just -- it's an issue that's nascent.

THE COURT: Okay. Well, quite frankly, I mean, I would -- if you're eventually retained I would view that your work started today. Okay. Do you want to take a five minute recess?

MR. LANDERS: Yes, Your Honor. Thank you.

(Recess)

COURT OFFICER: Please rise.

THE COURT: Please be seated.

MR. SILVERSCHOTZ: Your Honor, unfortunately I wasn't able, to put it on the most human terms as possible, I wasn't able to reach the person who's going to yell at me if I get this wrong on the cap. And thinking about it, and -- we don't have an agreement. And we haven't consulted with the U.S.

Trustee on this, which probably we should have done. If this is a litigation, you know, involving $100 million at the end and we're spending 90 days on it, I can very easily spending, you know, upwards -- at an outer limit, I can very easily see spending $100,000 a month on it between -- well, local counsel is diminimus cost usually in these types of cases. But -- and the -- that was my suggestion to debtor's counsel. Debtor's counsel has suggested that, you know, an aggregate cap of $75,000 would be appropriate. I think that's simply not enough. We have a sort of base brief, but if we get involved in a true factual dispute here, and I frankly hope that we can avoid it, but it may be that Your Honor's right and that the fact issue isn't going to be that much and that if we have a dispute of fact on the interpretation or intent of parties or things like that, then we have to start taking depositions and depositions is usually where all the costs start piling up.

So, I think that subject to -- as I said to Mr. Landers, I think that my reputation, my firm's reputation is certainly not one of those firms out there that milk cases. We don't milk cases, we don't milk our clients and we don't file fee applications that make jaws drop and we're not going to do that here. And, of course, the U.S. Trustee and the debtor would be free to object to any application that we filed. But we think that we'd be doing a disservice to this constituency and the potential $100 million if we nickeled and dimed the

case. And we think that, you know, $100,000 a month or for 90 days, you know, a $300,000 is appropriate. And that's my view standing here. I haven't had a chance to consult with my colleague who I would ordinarily look to on this.

MR. LANDERS: Your Honor, our number is $75,000. And the way we got there was taking the Court to heart, on the financial aspect it probably shouldn't take more than a few hours work. So that we'd regard virtually all the fees really allocable to legal. I think where we probably differ in amount is we think that First Carolina did a good job. They did a good enough job to persuade the Court really that there was serious and contested issues in this case. $75,000 buys 50 -- let's see -- 150, I'm sorry, 150 hours times $500 an hour. And we think that that's what it takes. We don't think they have to go back and restate the wheel. I'm sure that the Hodgson Russ people will cooperate and give the background and the benefit of their research to Mr. Silverschotz. And we think that that's what's necessary to do the job here.

THE COURT: Okay. I'm going to cap it at $100,000. But with leave for the committee to come back in and to seek to bump it up during the -- before we come back for the next hearing. In other words, I'm convinced -- I believe that the fact finding with respect to the insolvency is not a difficult issue. I don't think you've got to spend more than $10,000 or $15,000 on that. And I don't think there's a lot much more to

do on the legal issues. You can pick up -- I think they did a pretty effective job of brining the issues to the attention and devising some, for one of a better word, clever arguments. So I don't think there's a whole lot do. But 30 days from now if you feel that the cap is going to hurt your committee's efforts then you can come on back and seek relief.

MR. SILVERSCHOTZ: I'll do that, Your Honor, if I see that it's an issue. And I thank Your Honor for directing the reappointment. We'll do a good job. And we will use the First Carolina papers, of course, as a foundation. And I take it as a challenge, Your Honor, to find something they didn't think of in our committee papers. And if we see any issue, we'll come back and ask -- so essentially it's a cap subject to -- without prejudice to reapplication.

THE COURT: Yes.

MR. SILVERSCHOTZ: Thank you.

THE COURT: And I assume counsel can get together and do an Order because I want the Order to identify the schedule for the briefing so that they're -- the Committee will file a response to the objection and the debtor can reply to that response. And I don't -- you may have to wait for the factual examination first before you agree to that or put that schedule in.

MR. SILVERSCHOTZ: Your Honor's not looking for that schedule this afternoon.

THE COURT: Right. I'm not.

MR. SILVERSCHOTZ: Okay.

THE COURT: I think you can work it out. But I would that we would be back here within 90 days. And it would be helpful if you, in working out the Order, you agreed upon a schedule and then firmed up a hearing date.

MR. SILVERSCHOTZ: I'm sure we can do that.

MR. LANDERS: Would the Court like to give us a hearing date 90 days out or something back into so that we set all the other dates by it?

MR. SILVERSCHOTZ: If not a formal date, maybe a range or an area that Your Honor has open. I don't -- they snatched my Blackberry at the gate here, so I don't have my calendar with me. I know that around September 11th I'm lecturing in Denver that week. And it's the beginning of the school year as well. Late September, I think, is --

THE COURT: Mr. Buchbinder, did --

MR. BUCHBINDER: Yes, Your Honor. Dave Buchbinder here. I'm not so sure that we ought to set a specific date right now because until we have an Order on today's hearing I can't move forward with taking the steps that we need to take to recreate an Equity Committee. We'll move forward as quickly as possible, but until we do that, technically Mr. Silverschotz -- technically the Committee that's going to exist again is going to have to be formulated and have to retain professionals

and that may or may not be the case that the same professionals are retained and we should be cognizant of those issues and we'll move forward as fast as we can.

THE COURT: All right. Let me suggest this. Why don't we have the Order simply say that once the Committee is formed and retains counsel then counsel will get together and set up the briefing schedule and the hearing date schedule -- and the hearing date.

MR. BUCHBINDER: I think that's prudent. Otherwise we could -- if it takes longer than a very short period of time to formulate a committee, then we'll be running into these deadlines and it will create problems.

THE COURT: Okay.

MR. SILVERSCHOTZ: Great.

THE COURT: All right. Anything else?

MR. SILVERSCHOTZ: No, Your Honor.

THE COURT: Okay. We stand in recess.

MR. SILVERSCHOTZ: Thank you, Your Honor.

MR. LANDERS: Thank you, Your Honor.

* * * * *

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my ability from the record of proceedings in the above-entitled matter.

DIANA DOMAN TRANSCRIBING
BY: GINA M. CERMAK

DATED: June 20, 2005

# EXHIBIT J

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FINOVA CAPITAL CORPORATION, | Case Nos. 01-0698 (PJW) |
| | Jointly Administered |
| Reorganized Debtor. | Hearing Date: November 29, 2005 at 2:30 p.m. |

**REPLY TO OBJECTION OF FIRST CAROLINA INVESTORS, INC. TO MOTION OF REORGANIZED DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE SECTION 1141 CLARIFYING PROVISION OF CONFIRMED PLAN [DOCKET NO. 22]**

Mark D. Collins (No. 2981)
Rebecca Booth (No. 4031)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

Jonathan M. Landers
Janet M. Weiss
Jessica I. Basil
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-counsel to the Reorganized Debtor

Dated: September 16, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

A. General Background ..... 2

B. Background Regarding Reorganized Debtors' Financial Condition ..... 3

C. Background Regarding Distributions to Creditors and Shareholders ..... 5

D. Procedural History ..... 7

ARGUMENT ..... 9

A. The Obligations to the Shareholders under the Plan are Not in the Nature of Debt ..... 9

B. The Monies in the Segregated Account are Not Being Held "in Trust" for the Shareholders ..... 13

C. Distribution of Funds Held in the Segregated Account to the Shareholders is Prohibited Under the Express Terms of the Indenture ..... 19

D. The Plan Cannot be Construed to Allow for the Payment of Distributions to the Shareholders ..... 24

E. The Relief Requested in the Clarification Motion is Not Procedurally Defective, is Ripe for Judicial Review and Does not Amount to a De Facto Modification of the Plan ..... 26

a. The Relief Requested is Properly Sought Through a Motion. ..... 26

b. The Relief Requested in the Clarification Motion is Ripe for Judicial Review. ..... 27

c. The Relief Requested in the Clarification Motion Does Not Amount to a De Facto Modification of the Plan. ..... 28

CONCLUSION ..... 30

RLF1-2923132-1

## TABLE OF AUTHORITIES

### CASES

*In re Applewood Chair Company*,
203 F.3d 914 (5th Cir. 2000) ....27

*In re Apponline.com., Inc.*,
315 B.R. 259 (Bankr. E.D.N.Y. 2004), *citing In re Ames Dep't Stores, Inc.*,
274 B.R. 600 (Bankr. S.D.N.Y. 2002) ....14, 15, 16

*Armstrong World Industries, Inc. v. Adams, et al.*,
961 F.2d 405 (3d Cir. 1992) ....28

*In re Beal Bank, S.S.B.*,
201 B.R. 376 (E.D. Pa. 1996) ....29, 30

*In re Brentwood-Lexford Partners, LLC*,
292 B.R. 255 (Bankr. N.D. Tx. 2003) ....21

*Carrieri v. Jobs.com Inc.*,
393 F.3d 508 (5th Cir. 2004) ....11

*In re Color Tile, Inc.*,
2000 WL 152129 (D. Del. Feb 9 2000) ....21

*Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*,
72 B.R. 619 (E.D. Pa. 1985) ....17

*Elyachar v. Gerel Corporation*,
583 F. Supp. 907 (S.D.N.Y. 1984) ....14

*Fin Hay Realty Co. v. United States*,
398 F.2d 694 (3d Cir. 1968) ....11

*In re First Central Financial Corporation*,
377 F.3d 209 (2d Cir. 2004) ....15

*Fulweiler v. Spruance*,
222 A.2d 555 (Del. Ch. 1966) ....22, 23

*Geftman v. Commission of Internal Revenue*,
154 F.3d 61 (3d Cir. 1998) ....11, 12

*In re Georgetown Bldg. Assocs.*,
240 B.R. 124 (Bankr. D.D.C. 1999) ....11

*In re Handy Andy Home Improvement Centers, Inc.*,
196 B.R 87 (Bankr. N.D. Ill. 1996) ....19

*In re Health Care Products, Inc.*,
159 B.R. 332 (M.D. Fla. 1993) .......... 16

*In re Howard's Appliance Corp.*,
874 F.2d 88 (2d Cir. 1989) .......... 14

*In re Koreag, Controle et Revision S.A.*,
961 F.2d 341 (2d Cir. 1992), *cert. denied* 506 U.S. 865 (1992) .......... 14

*In re McCalla*,
238 B.R. 94 (M.D. Pa. 1999) .......... 24

*In re O'Brien*,
94 B.R. 583 (W.D. Mo. 1988) .......... 19

*Rexton*,
240 B.R. 211 (Banrk. E.D. Pa. 1999) .......... 30

*In re Szostek*,
886 F.2d 1405 (3d Cir. 1989) .......... 30

*TTS, Inc. v. Citibank, N.A. et al.*,
158 B.R. 583 (D. Del. 1993) .......... 17

*In re Terex Corporation*,
984 F.2d 170 (6th Cir. 1993) .......... 24

*In re Trace International Holdings, Inc.*,
289 B.R. 548 (Bankr. S.D.N.Y. 2003) .......... 21

*United States of America v. APT Industries, Inc.*,
128 B.R. 145 (W.D.N.C 1991) .......... 28

*In re Washington Group, International, Inc.*,
2003 Bankr. LEXIS 1669 (Bankr. D. Nv. 2003) .......... 26

**STATUTES**

Section 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 .......... 1

The above-captioned reorganized debtor (the "Reorganized Debtor" or "FNV Capital") hereby submits this reply to the objection of First Carolina Investors, Inc. ("First Carolina") dated June 3, 2005 (the "Objection") [Docket No. 46] in opposition to the Reorganized Debtor's motion dated April 1, 2005 (the "Clarification Motion") [Docket No. 22] for an order pursuant to Section 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") clarifying certain provisions of the *Third Amended and Restated Joint Plan of Reorganization* [Docket No. 534] (the "Plan"), as confirmed by order of this Court dated August 10, 2001 [Docket No. 852] (the "Confirmation Order"). In support of this Reply, the Reorganized Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

The Plan Documents provide that the Reorganized Debtors will make payments on account of Equity Interests of 5% of the amounts paid on the New Senior Notes unless the payments would render the Reorganized Debtors insolvent, would be a fraudulent conveyance, or would "not be permitted under applicable law." It is difficult to imagine more straightforward language. It is likewise difficult to understand how such language could possibly be construed to permit payments to the Reorganized Debtors' Shareholders at a time when the Reorganized Debtors' debts exceed their assets by more than $1 billion. Nevertheless, First Carolina has raised a number of theories which would give Shareholders rights that they did not obtain under the Plan or and Plan Documents.

Specifically, First Carolina argues that the obligation of the Reorganized Debtors is essentially a debt obligation, even though this theory finds no support in any language in the Plan or Plan Documents, and such documents specifically describe the obligation as being "on account of equity." First Carolina then argues that the funds involved are held in escrow or are trust funds even

though the Plan and Plan Documents do not describe them as such, there are no provisions for a trust or escrow relationship, and the Reorganized Debtors' only obligation is to "retain the funds." Finally, First Carolina specifically ignores the condition precedent to any equity distribution – that it would not render the Reorganized Debtors insolvent, would constitute a fraudulent transfer, or would not be permitted under applicable law. It neither suggests that these conditions are satisfied – an argument that would be frivolous given the Reorganized Debtors' financial condition – nor does it offer any legal basis for ignoring the conditions. Briefly, the holders of Equity Interests simply do not have a vested interest in any funds or a right to receive anything, now or in the future.

First Carolina does not disagree that the Plan is silent with respect to the treatment of funds now held in the Segregated Account if the conditions precedent to making distributions will *never* be satisfied, as is presently the case. For this reason, the Reorganized Debtors have filed the Clarification Motion to allow the Reorganized Debtors to return the funds to their creditors. Because First Carolina has not shown that the Shareholders are the holders of debt or are the beneficiaries of a trust or escrow, and have not shown that the condition precedent to making distributions can ever be satisfied, this Court should grant the relief requested in the Clarification Motion.

## BACKGROUND

### A.    General Background

1.    On March 7, 2001 (the "Petition Date"), the Reorganized Debtor, along with its parent, FINOVA Group Inc. ("FNV Group" or the "Company"), and certain other affiliates (collectively with the Reorganized Debtor and FNV Group, the "Reorganized Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. By order of this Court, the Reorganized Debtors' chapter 11 cases were jointly administered for procedural purposes only.

2. On May 2, 2001, the Reorganized Debtors filed their plan of reorganization, which was subsequently amended on June 1, 2001, June 11, 2001, and June 14, 2001. This Court confirmed the Plan by the Confirmation Order on August 10, 2001. The Plan became effective on August 21, 2001 (the "Effective Date").

3. On each of November 18, 2003, December 29, 2004 and March 22, 2005, pursuant to section 350 of the Bankruptcy Code, this Court issued orders (collectively, the "Final Decrees," individually a "Final Decree") closing the cases of certain of the Reorganized Debtors.[2] Pursuant to each of the Final Decrees, this Court retained jurisdiction for, among other things, "the enforcement of the provisions of the Plan (including all related documents contemplated by the Plan) and the Confirmation Order, and the entry of orders in aid of confirmation and consummation of the Plan, including, but not limited to, orders resolving disputes regarding distributions under the Plan."

## B. Background Regarding Reorganized Debtors' Financial Condition

4. It is clear that the Reorganized Debtors are insolvent and have been insolvent for some time. Attached hereto is the Declaration of Richard Ross in Support of Reply to Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan (the "Ross Declaration"). Mr. Ross is the Chief Financial Officer of the Reorganized Debtors and attached to the Ross Declaration is the Form 10-Q Statement for FNV Group filed with the Securities and Exchange Commission on or about August 11, 2005 ("Form 10-Q"). Briefly, the Form 10-Q shows that, as of June 30, 2005 (all figures

[1] Pursuant to the November 18, 2003 Order, the case of FINOVA Portfolio Services Inc. (Case No. 01-0703) was closed. Pursuant to the December 29, 2004 Order, the following cases were closed: FINOVA Group, Inc. (Case No 01-0697); FINOVA (Canada) Capital Corporation (Case No. 01-0699); FINOVA Capital plc (Case No. 01-0700); FINOVA Loan Administration Inc. (Case No 01-0701); FINOVA Technology Finance, Inc. (Case No. 01-0704); FINOVA Finance Trust (Case No. 01-0705). Pursuant to the March 22, 2005 Order, the case of FINOVA Mezzanine Capital Inc (Case No. 01-0702) was closed.

are in thousands of dollars), (a) the Reorganized Debtors have assets of $789,084 and liabilities of approximately $1,870,000,[2] (b) most of the Reorganized Debtors' remaining assets consist of (i) cash ($249,271) and restricted cash ($60,921) which do not appreciate except for minimal short term earnings, (ii) financial assets which have a maximum value of the face amounts of the instruments (and no appreciation potential), many of which are currently in default and not paying interest, and (iii) used aircraft, many of which are older aircraft not in great demand, (c) although the Reorganized Debtors have recently experienced some recoveries on both financial assets and the value of aircraft, such recoveries were not significant in light of the deficiency of more than $1 billion, and (d) the Reorganized Debtors' non-cash assets of roughly $480,000 would have to more than triple in value to pay their obligations. No serious argument can be made that this is a realistic possibility. Finally, the Reorganized Debtors are prohibited by the Indenture between The FINOVA Group Inc. and The Bank of New York, as Trustee, dated as of August 22, 2001 (the "Indenture") governing the New Senior Notes from engaging in new businesses and have no ability to "grow" their way out of their financial circumstances. For this reason, the Reorganized Debtors advised FNV Group's equity security holders (the "Shareholders") that they do not have sufficient assets to fully repay the New Senior Notes, that it will rely on the continued liquidation of assets as the only meaningful source of liquidity, and that "Stockholders should not expect any payments or distributions." Form 10-Q, at p. 9. Similar statements have repeatedly been made in prior filings.

[2] The balance sheet shows the liability on the New Senior Notes for accounting purposes of $1,251,673, which amount reflects the unamortized portion of discount resulting from the use of fresh start accounting upon the emergence from bankruptcy. The actual liability on the 7.5% Senior Secured Notes Maturing 2009 with Contingent Interest Due 2016 of FNV Group (the "New Senior Notes") is approximately $1,800,000.

## C. Background Regarding Distributions to Creditors and Shareholders

5. Pursuant to the Plan, holders of allowed unsecured claims against FNV Capital received, among other things, cash equal to 70% of their allowed claims and New Senior Notes in the face amount of 30% of their allowed claims against FNV Capital. FNV Capital entered into an intercompany note with FNV Group, which backs up the payments to be made under the New Senior Notes and certain obligations to FNV Group's equity holders. A term sheet describing the New Senior Notes was attached to the Plan, and prior to the Effective Date, the forms of the Indenture and the New Senior Notes were filed with the Court in that certain Plan Supplement With Respect to Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code dated July 20, 2001 [Docket No. 745] (the "Plan Supplement"). Pursuant to the Confirmation Order, the Plan Supplement was incorporated as part of the Plan.

6. The terms of the New Senior Notes are governed by the Indenture, which contains detailed provisions for using cash, and a so-called waterfall of payments which can be made. It provides that after the provision for payment of operating expenses and certain other obligations, FNV Group will, and will cause its subsidiaries, including FNV Capital, to use 95% of their net cash after provision for payment of certain obligations and expenses ("Available Cash")[3] to pay principal and interest on the New Senior Notes and to use 5% of the Available Cash to pay dividends to, make distributions on account of, or make repurchases of, FNV Group's equity interests. Specifically, Section 4.06(a)(v) of the Indenture provides that, the Reorganized Debtors shall apply cash and Cash Equivalents:

[3] Section 4.06 of the Indenture sets forth the usage of the cash and cash equivalents of FNV Group and its subsidiaries.

> ". . . until the principal of and Fixed Interest on the Notes are paid in full to (A) pay to the Company, when due the principal on the Intercompany Notes . . . which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes . . . and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the Company, which amounts the Company shall use together with any other cash the Company has available for such purposes to make Restricted Payments . . . *provided, however*, that each incremental payment of $0.95 pursuant to Clause (A) shall require a distribution or retention pursuant to clause (B) of $0.05;"

7. The Indenture defines "Restricted Payments" as:

> "(i) the declaration or payment of any dividend or the making of any distribution on account of the Company's [FNV Group's] Equity Interests (other than dividends or distributions payable in Equity Interests of the Company); or
>
> (ii) the purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company other than redemptions, acquisitions or retirements solely in exchange for Equity Interests of the Company."

Indenture at 11. Therefore, any distributions to Shareholders under the Indenture constitute "Restricted Payments." Section 4.06(a)(v) of the Indenture specifically provides that in the event that any such Restricted Payment to the Shareholders would be:

> "[an] Impermissible Restricted Payment, the Company [FNV Group] shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments . . . . ."

An Impermissible Restricted Payment is defined as:

> "a Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law."

Indenture at p. 6. As such, it is a condition precedent to the Shareholders' right to receive any distributions under the Plan that such distributions do not constitute Impermissible Restricted Payments.

8. While the Reorganized Debtors continue to pay their creditors in a timely manner, FNV Group concluded before making any payments on account of the New Senior Notes that any distribution to Shareholders would be an Impermissible Restricted Payment. Therefore, FNV Group caused the 5% of the Available Cash to be deposited into a separate account (the "Segregated Account") for possible distributions to Shareholders if and when such distributions are not Impermissible Restricted Payments. As of August 15, 2005, there was approximately $65.5 million in the Segregated Account. Such retained amounts are being reflected as restricted cash on the balance sheet, pending their final disposition.

**D. Procedural History**

9. The Reorganized Debtors have determined that they will never be able to make the Restricted Payments to Shareholders because of their financial condition. However, although the Indenture provides for "retain[ing]" and "accumulat[ing" such funds until they are no longer Impermissible Restricted Payments, it does not provide for the situation where the Reorganized Debtors will never be able to make the payments because the condition to payment never can be satisfied. The Reorganized Debtors' believe it is implicit in the Plan that, in such event, the funds are to be used to pay creditors. Therefore, on April 1, 2005, the Reorganized Debtor filed the Clarification Motion seeking clarification of the treatment of the funds retained by FNV Group and seeking an order of this Court authorizing it (i) to cease setting aside 5% of the Available Cash and

(ii) to return the funds in the Segregated Account to FNV Capital for use in its business to pay expenses, debts and other obligations.[4]

10. In response to the Clarification Motion, on May 26, 2005, Eugene Linden filed a motion for an order recognizing the continued existence of the official committee of equity holders or in the alternative for the reconstitution of the equity committee, for the limited purpose of responding to the Clarification Motion. [Docket No. 35 ]. Also on May 26, 2005, First Carolina filed a motion for continuance of the objection deadline and the hearing on the Clarification Motion. [Docket No. 39]. Rozann Chernov filed a joinder to each of these motions. [Docket Nos. 34 and 35]. In response to these pleadings, on June 1, 2005 the Reorganized Debtors filed their response and objection to the motion for continuance of the objection deadline and hearing on the Clarification Motion. [Docket No. 37] and on June 3, 2005 the Reorganized Debtors filed their objection to the motion of Eugene Linden [Docket No. 39]. On June 3, 2005, First Carolina filed the Objection.

11. A hearing was held on June 10, 2005 to consider the Clarification Motion and the related pleadings. The Court determined that the equity committee was not still in existence, but the Court exercised its authority under section 105 of the Bankruptcy Code and appointed an Equity Committee with a $100,000 cap on its professional fees. *See* Transcript of Motion Hearing before Honorable Peter J. Walsh on June 10, 2005 at 9:30 a.m. [Docket No. 50] (the "Transcript"), at p.27 lines 12-15; p.38 lines 1-2; p. 44 line 19; *see also* Order Directing the United States Trustee to Appoint an Official Committee of Equity Security Holders for a Limited Purpose and Granting Related Relief [Docket No. 48]. The Court also decided that it would not rule on the Clarification

[4] FNV Capital, a direct subsidiary of FNV Group, directly funded the 5% Available Cash to the Segregated Account

Motion and directed the Reorganized Debtors to respond to the issues raised in the Objection. Transcript p. 4 lines 10-13; p. 15 lines 8-10. The Court also determined that it would continue the hearing to allow the parties time to address the factual issue of the Reorganized Debtor's solvency. Transcript p. 15 lines 1-3.

12. On August 26, 2005, the Court entered a scheduling order [Docket No. 59] (the "Scheduling Order") ordering the record on the Clarification Motion to be supplemented as follows: (a) the Reorganized Debtors shall file a reply to the Objection by September 16, 2005; (b) the Shareholders shall file a response to the Reorganized Debtors reply by October 18, 2005; and (c) the Reorganized Debtors may, but are not required to, file a sur-reply to the Shareholders response by November 8, 2005.

13. In accordance with the Scheduling Order, the Reorganized Debtors have filed this Reply to respond to the issues raised in the Objection.

## ARGUMENT

### A. The Obligations to the Shareholders under the Plan are Not in the Nature of Debt

14. First Carolina asserts that, because the Shareholders' conditional right to distributions is set forth in a confirmed plan of reorganization, any such distributions are in the form of debt, not equity. Objection ¶¶ 30-31. Although it is true that the Plan describes the Reorganized Debtors' debts, liabilities and obligations to creditors and stockholders, it does not follow that all obligations are debt obligations. Quite the contrary: over and over again, the rights of Shareholders to the 5% payment is described as a conditional distribution on account of their equity interests and not as a debt. For Example, the Disclosure Statement discusses the payment in the section on "Dividends" as a "distribution[] to stockholders" which is subject to "meeting legal requirements for distributions to stockholders . . . ." Disclosure Statement pp. 41-42. Indeed, the only authorization for making the

payment at all is a limited conditional carve out from the general prohibition on Restricted Payments.[5]

15. The Indenture specifically describes the obligation to shareholders as a Restricted Payment, and a Restricted Payment is defined as a "dividend or the making of any distribution on account of the Company's Equity Interests . . . ," a distribution on account of equity interests, or the purchase, redemption or acquisition of equity interests. These definitions are especially significant because they parallel the distributions which may be made to shareholders under Delaware law – a purchase, redemption or acquisition (8 Del. C. §160(a)), dividend (8 Del. C. § 170(a)), or reduction of capital (8 Del. C. § 244). Significantly, each of these forms of distributions to Shareholders under Delaware law is subject to conditions which are similar to those which would make the payments to Shareholders an Impermissible Restricted Payment under the Indenture – *e.g.*, 6 Del. C. § 1304 (fraudulent conveyance law), 8 Del. C. § 244(b) (reductions in capital not permitted when remaining assets are insufficient to pay debt), 8 Del. C. § 160 (redemption subject to conditions in section 244); and 8 Del. C. § 170 (dividends payable out of surplus or net profits; the Reorganized Debtors have neither). Thus, contrary to First Carolina's claim that the fact that the Shareholders hold shares in FNV Group has no bearing on the determination of whether a distribution is equity or debt, here, their only right to payment is "on account of equity" – *i.e.*, the holding of shares in FNV Group. In short, the Shareholders have a conditional contractual right to payment on account of their equity

[5] Under the terms of the Indenture, distributions to Shareholders constitute "Restricted Payments" and FNV Group specifically covenanted not to make any Restricted Payments except as permitted by Section 4.06 or Section 4.07(b) of the Indenture. Indenture at p. 32. Rather than an absolute right of payment, Section 4.06(a)(v) of the Indenture grants the Shareholders only a contingent right to payment by providing that FNV Group will *not* make any distributions to Shareholders if "the making of any such Restricted Payment would be an Impermissible Restricted Payment. . ." Indenture at p. 30. As such, there is a condition precedent to the Reorganized Debtors making of, and the Shareholders right to receive, distributions – that such Restricted Payments are not Impermissible Restricted Payments. In order for this condition precedent to be satisfied, the making of the distribution must not (i) render the Reorganized Debtors insolvent, (ii) be a fraudulent conveyance or (ii) be prohibited under applicable law. Indenture at 6.

holdings. *See Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 525 (5th Cir. 2004) (finding that the terms "claim" and "debt" "obviously do not include a right to payment based on an equity security or other interest in the debtor arising from capital contributions" and that "[j]ust because the 'interest in the debtor gives rise to a right to payment does not make that interest a claim.'" ); *citing In re Georgetown Bldg. Assocs.*, 240 B.R. 124, 139 (Bankr. D.D.C. 1999).

16. The Plan could have provided for a distribution of debt to the Shareholders but it did not do so. Clearly the parties knew how to create a debt instrument or obligation because they did so with respect to the New Senior Notes. However, at no time was the obligation to the Shareholders recorded as a debt on the Reorganized Debtors' balance sheets and financial records, or reported as debt in it public filings. *See* Ross Declaration at ¶ 4. Moreover, the potential distributions to Shareholders as described in the Indenture do not have any of the indicia of debt. In a case analyzing the proper characterization of payments from a trust, the court in *Geftman v. Commission of Internal Revenue*, 154 F.3d 61 (3d Cir. 1998) noted that "[t]he necessary intent to create a bona fide indebtedness can be inferred not only from expressions of the parties intentions, but also from objective aspects of the transaction such as the presence *vel non* of notes or other debt instruments, security or collateral, interest charges, repayment schedules or deadlines, book entries recording loan balances or payments, actual repayments, or any other factors indicative of an unconditional obligation to repay." *Id.* at 70; *see also Fin Hay Realty Co. v. United States,* 398 F.2d 694, 696 (3d Cir. 1968). In making a determination of whether an advance was a capital contribution or a true indebtedness, the court listed the following criteria by which to judge whether an investment is a debt:

> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the

> holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Id.* While not all of these factors are relevant, those that are present clearly demonstrate that there is no debt.

17. Looking at the "objective aspects of the transaction" as set forth in *Geftman*, neither the Plan nor the Indenture provide the slightest hint of a "bona fide indebtedness" – *i.e.*, there are no notes or debt instruments, security or collateral, interest charges, repayment schedules or deadlines, book entries recording loan balances or payments, actual repayments or other factors indicating an "unconditional obligation to repay." Instead, the Plan, Disclosure Statement and Indenture consistently describe the distributions as Restricted Payments on account of equity interests. A clearer evidence of intent is hard to imagine. Turning to the sixteen factors identified in *Geftman*, none is suggestive of debt but many indicate the contrary. Thus, ostensible creditors and shareholders are the same and, indeed, the "purported debt" travels with the shares (#2), there is no formal indicial of debt (#7), no interest is paid (#10), there is a contingency on repayment (#11), there is no payment schedule or fixed maturity date (#13), and there was no advance but, instead, the obligation was granted specifically to Shareholders *qua* Shareholders as part of the Plan (#16). Indeed, in light of the clear and express contingency on the obligation to pay the Shareholders the distributions, the Shareholders cannot show that the Reorganized Debtors have undertaken an

"unconditional obligation to repay." Given the lack of any formal indicia showing otherwise, there is no basis for First Carolina's claim that the Shareholders are the holders of debt.

18. First Carolina's reliance on the Supremacy Clause mandating that bankruptcy law prevails over conflicting state law to bolster its argument that the Shareholders are the holders of debt is similarly misplaced. Objection at ¶ 32. According to First Carolina, although Delaware law prohibits the Reorganized Debtors from making any distributions to Shareholders, under federal law the distributions would be allowed. To be sure, if the Plan provided for an absolute right of payment that otherwise would have been prohibited by Delaware law then First Carolina might have a valid argument that the Plan trumps the provisions of Delaware Law. But this is not the case. As discussed below, under the clear terms of the Plan, there is no absolute right of payment; instead, distributions to Shareholders can only be made if such distributions are permitted to be made under applicable law. Therefore, rather than superseding or overriding state law, the Plan specifically incorporates state law. As such, there is no conflict between federal and state law in this case.

**B. The Monies in the Segregated Account are Not Being Held "in Trust" for the Shareholders**

19. First Carolina also asserts that the funds held in the Segregated Account are held "in trust" for the Shareholders and as the beneficiaries of the trust, they have a vested interest in the funds. Objection at ¶ 34. However, First Carolina has provided no basis for this assertion. There is clearly no escrow agreement or express trust. The Indenture, which contains all of the rights of the Shareholders with respect to any distributions or monies held in the Segregated Account, is governed by New York law. Under New York law, in order to establish an express trust there must be "(i) a designated beneficiary; (ii) a designated trustee who is not the beneficiary; (iii) a fund or other property sufficient designated or identified to enable title thereto to pass to the trustee; and (iv) the

actual delivery or legal assignment of the fund or other property." *In re Apponline.com., Inc.*, 315 B.R. 259, 274 (Bankr. E.D.N.Y. 2004), *citing In re Ames Dep't Stores, Inc.*, 274 B.R. 600, 623 (Bankr. S.D.N.Y. 2002).

20.     The Indenture does not create a trust arrangement in favor of the Shareholders. All that the Indenture provides is that if the Reorganized Debtors cannot make a distribution to the Shareholders because such payments would be Impermissible Restricted Payments, the Reorganized Debtors "shall *retain* such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payment at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments." Indenture at Section 4.06(v) (emphasis added). These provision hardly establish a designated trustee, title passing to the trustee, and a delivery of legal assignment of the funds as required to establish a trust. Indeed, the Indenture does not even require segregation of the funds and does not come close to meeting the required showing that the grantor's "intent to create a trust [has been] established beyond any reasonable doubt." *Elyachar v. Gerel Corporation*, 583 F. Supp. 907, 922 (S.D.N.Y. 1984).

21.     Likewise, First Carolina has not made out a case under a constructive trust theory. One must look to state law to determine whether a court will impose a constructive trust on property and "as a general rule, the law of the situs of the property, and therefore the trust, governs this determination." *In re Howard's Appliance Corp.*, 874 F.2d 88, 93-94 (2d Cir. 1989). Therefore, because the Segregated Account is in New York, the laws of New York apply. The elements of constructive trust under New York law are: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied, (3) a transfer made in reliance on that promise and (4) unjust enrichment." *Apponline.com*, 315 B.R. at 276 (citing *In re Koreag, Controle et Revision S.A.*, 961

F.2d 341, 352 (2d Cir. 1992), *cert. denied* 506 U.S. 865 (1992). The Second Circuit has recognized that the fourth element is the most important, and has held that there is a general rule barring a finding of unjust enrichment when there is a valid and enforceable written agreement between the parties. *In re First Central Financial Corporation*, 377 F.3d 209, 213 (2d Cir. 2004). In the present case, the Indenture is an enforceable agreement and the Indenture specifically prohibits distributions to Shareholders if such payments constitute Impermissible Restricted Payments. Requiring the Reorganized Debtors to make the distributions notwithstanding the clear prohibition in the Indenture would result in an unjust enrichment of the *Shareholders* because they would obtain greater rights than they were otherwise provided. Further, there is no evidence of any fraud or wrongdoing by the Reorganized Debtors to otherwise support a constructive trust. While not explicitly a requisite element, the Second Circuit has noted that the New York law is clear that "a constructive trust is an equitable remedy intended to be 'fraud-rectifying' rather than 'intent-enforcing.'" *Id.* at 216.

22. First Carolina then argues that the funds are held in escrow. But the Indenture also does not create an escrow arrangement. Under New York law, in order to establish an escrow arrangement "there must be a written agreement under which the grantor deposits property with and *relinquishes control to* an escrowee with the subsequent delivery of the property by the escrowee to the grantee conditioned upon the happening of some event." *Apponline.com,* 315 B.R. at 274 (emphasis added) *citing In re Treiling*, 21 B.R. 940, 943 (Bankr. E.D.N.Y. 1982). Not only is the Indenture not a written escrow agreement, it does not even require that the Reorganized Debtors create a segregated account let alone relinquish control of the funds. While the Reorganized Debtors have chosen to place the funds in the Segregated Account for tracking and accounting purposes, the Reorganized Debtors never relinquished legal title to the funds and at all time exercised dominion

and control over those funds. In addition, a proponent "must also show that the alleged escrow agent agreed to accept that responsibility." *Apponline.com,* 315 B.R. at 274 *citing Friedman v. Stern*, 1992 WL 58878, *2 (S.D.N.Y. 1992). The Indenture does not provide for a designated trustee or escrow agent to hold the funds and the Reorganized Debtors never expressly agreed to operate as such for the benefit of the Shareholders. As New York law makes clear, "neither the 'understanding" [of the parties] nor 'standard industry practice' is sufficient to overcome the requirement that a binding escrow agreement be in writing, or that an entity agreed to assume the responsibilities of an escrow agent, or that any of the elements of an express trust were met. . ." *Apponline.com,* 315 B.R. at 275.

23. Under analogous facts, the court in *In re Health Care Products, Inc.*, 159 B.R. 332 (M.D. Fla. 1993) held that the creation of a segregated account is not sufficient to support a finding that an escrow arrangement was created. *Health Care Products* involved a debtor that was required, under the terms of a consent decree, to open "segregated accounts" in order to assure payment of restitution amounts to certain consumers. *Id.* at 334. The consent decree provided that the funds could not be withdrawn from the account without the consent of both the Debtor and the State of Iowa. *Id.* at 338. The court found that the "Segregated Account" required by a consent decree did *not* constitute an escrow account because the segregated account "was not ordered to be held by a third party depository; the accounts were titled only in Debtor's name". *Id.* As in the *Health Care Products* case, the Segregated Account is not held by a third party, the Segregated Account is titled only in the Reorganized Debtors' names and the Reorganized Debtor retained control over withdrawals. As such, the Segregated Account is not an escrow account and, absent a formal escrow arrangement, the designation of a trustee or escrow agent and the passing of legal title, First Carolina's argument that the monies held in the Segregated Account are held "in trust" must fail.

24.     First Carolina's reliance on *TTS, Inc. v. Citibank, N.A. et al.*, 158 B.R. 583 (D. Del. 1993) and *Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*, 72 B.R. 619 (E.D. Pa. 1985) to bolster its argument that the Shareholders have greater rights to the funds is misplaced because both of these cases involved actual escrow agreements and cases whose existence of an escrow was not in dispute. Objection at ¶¶ 36-37. This distinction is critical because the grantor in an escrow arrangement has made an irrevocable transfer of funds and placed them beyond its possession and control, thereby giving the grantee a vested interest as the named beneficiary of the escrow account. The holder of a conditional contractual right of payment has no such vested interest. In the present case, the funds in the Segregated Account remained in possession and control of the Reorganized Debtors, there is no escrow agent and there is no indication that the depositing of funds in the Segregated Account constituted an irrevocable transfer. First Carolina has not made any showing that the Shareholders hold a vested equitable interest in funds in an escrow account and cannot simply declare that the Shareholders are entitled to greater rights than the Indenture and the Plan provide.

25.     In fact, even if this Court found that the Segregated Account is held "in trust" for the Shareholders, there is still no basis for First Carolina's claim that the Shareholders are entitled to the funds. The establishment of a trust does not, in and of itself, entitle beneficiaries to payment. If the Segregated Account is to be viewed as a trust then it must be viewed as a trust with a condition precedent on payment – *i.e.* that payment does not constitute an Impermissible Restricted Payment. Moreover, the condition is valid and central to the very purpose of the "trust". *See* The Law of Trusts – Fourth Edition, Aspen Publishers, Inc., ("Scott on Trusts") Vol. 1, Chpt. 1, Trusts Sec. 11 (stating that it is possible for the owner of a property to create a trust under which the interest of a

beneficiary is subject to a condition and "[i]f the condition is valid and has not been performed, the beneficiary will not be entitled to the interest."). When a condition precedent fails for impossibility, whether the beneficiary has a right in the property depends on "what the settlor intended or probably would have intended if he had foreseen the failure of the condition." Scott on Trusts, Vol. 1A, Chpt. 2, Topic 13A. Although the Plan does not state that the funds in the Segregated Account should be returned to the Reorganized Debtor, the Plan clearly states that the Reorganized Debtors did not intend for funds to go to the Shareholders if the condition precedent is not satisfied. Declaring the funds in the Segregated Account to be held in trust does not mean that the conditions to payment can be ignored just because they are not going to be met, especially when they are central to the purpose of the "trust" and the Reorganized Debtors clearly expressed their intent that the funds would not be paid to the Shareholders unless and until such payment would not constitute an Impermissible Restricted Payment. First Carolina has not provided any support for their assertion that they are entitled to payment notwithstanding the existence of a condition that is not capable of being met.

26.      First Carolina's efforts to circumvent this express condition by arguing that the financial impairments identified in the Indenture and the Clarification Motion dictate only the timing of the distributions to the Shareholders must also fail. Objection at ¶ 35. The nature of the condition on payment was such that it was possible, as is the case now, that there would *never* be a time when the Shareholders are entitled to payment. If the Reorganized Debtors were required to make the payments at some point and could not otherwise use the funds for other purposes, there would have been no purpose in delaying the payments to the Shareholders in the first place. Significantly, the clear language on the Indenture does *not* state that the Shareholders have an absolute right of

payment that is subject only to restrictions on the timing of payout; rather, the condition limits the Shareholders underlying right to receive the payment at all.

27. Moreover First Carolina's reliance on section 541 of the Bankruptcy Code is inapposite. To begin with, the Reorganized Debtors are not in bankruptcy and this Court need not ascertain what constitutes a "bankruptcy estate." Even if the Reorganized Debtors were in bankruptcy, numerous cases hold that, under comparable circumstances, that the Segregated Account would be property of the Reorganized Debtors' estates, and the Shareholders would not be able to establish the necessary escrow or trust arrangement to avoid such result pursuant to section 541(d) of the Bankruptcy Code. *See, e.g.*, *In re Handy Andy Home Improvement Centers, Inc.*, 196 B.R. 87, 92 (Bankr. N.D. Ill. 1996) (finding that funds in a segregated account were property of the estate because the there was no showing that the debtor was limited in its access to the funds and no showing that there was an escrow account or resulting trust); *see also In re O'Brien*, 94 B.R. 583 (W.D. Mo. 1988) (finding that debtor's Keogh account balance held as a segregated account and the debtor's account balance in a corporate profit sharing plan were included in the bankruptcy estate because they were not spendthrift trusts). And, in any event, any rights of Shareholders would be limited by the condition on payment since it is well established that a debtor takes property *cum onere* – *i.e.*, subject to all limitations. It is First Carolina, not the Reorganized Debtors, that is asserting greater rights to the Segregated Account than it actually has.

## C. Distribution of Funds Held in the Segregated Account to the Shareholders is Prohibited Under the Express Terms of the Indenture

28. First Carolina has asserted that, even if distributions do not constitute debt and are not held in an escrow or trust, the distributions are not Impermissible Restricted Payments because they are not prohibited by applicable law and, as such, the condition precedent to the Shareholders' right

to receive such distributions has been satisfied. Objection at ¶ 23. However, the Indenture specifically prohibits the distributions to Shareholders if (a) FNV Group would be rendered insolvent,[6] (b) the payment would be a fraudulent conveyance or (c) the payment would "not be permitted to be made by such entity under applicable law." While only one of these conditions is sufficient to preclude making a payment, here each condition prevents the payment.

29. First Carolina has asserted that, even if distributions do not constitute debt and are not held in an escrow or trust, the distributions are not Impermissible Restricted Payments because they are not prohibited by applicable law and, as such, the condition precedent to the Shareholders' right to receive such distributions has been satisfied. Objection at ¶ 23. However, the Indenture specifically prohibits the distributions to Shareholders if (a) FNV Group would be rendered insolvent,[7] (b) the payment would be a fraudulent conveyance or (c) the payment would "not be permitted to be made by such entity under applicable law." While only one of these conditions is sufficient to preclude making a payment, here each of the conditions prevent the payment.

30. First, distributions to Shareholders are not permitted if such payment would "render [FNV Group] insolvent." Here, FNV Group already is insolvent and there is no hope of financial recovery. *See* Ross Declaration at ¶¶ 3,4. Certainly, First Carolina cannot seriously argue that a distribution which would render FNV Group insolvent cannot be made, but the payment can be made if it already insolvent. Instead, distributions to Shareholders are now and will always be

[6] Similarly, any subsidiary of FNV Group would be prohibited from making a Restricted Payment if such Restricted Payment would render it insolvent. Indenture at 6.

[7] Similarly, any subsidiary of FNV Group would be prohibited from making a Restricted Payment if such Restricted Payment would render it insolvent. Indenture at 6.

Impermissible Restricted Payments which cannot be made under the Indenture. It is noteworthy that First Carolina has not argued that the payment can be made under this provision.

31. Second, distributions to Shareholders are not permitted if such payment would "be a fraudulent conveyance by such entity." While the Indenture does not identify what law provides guidance, the result is the same under either Delaware law or section 548 of the Bankruptcy Code. Case law makes it clear that distributions "on account of equity" are not for "reasonably equivalent value" under either section 548 or Delaware law. *See, e.g., In re Brentwood-Lexford Partners, LLC,* 292 B.R. 255, 267 (Bankr. N.D. Tx. 2003) (interpreting section 548 and finding that distributions to equity holders on account of their equity interest amounted to dividends and "[a]s a result, [the debtor] did not receive reasonably equivalent value for the distributions."). Given that, and given the fact that FNV Capital is insolvent, there is a classic fraudulent conveyance. *See, e.g., In re Trace International Holdings, Inc.*, 289 B.R. 548, 560-561 (Bankr. S.D.N.Y. 2003) (interpreting Delaware law and section 548 of the Bankruptcy Code and finding that (a) an insolvent Delaware corporation cannot pay a dividend and "the unlawful dividend is voidable and may be recovered by the trustee as a fraudulent transfer" and (b) insolvent corporations cannot make distributions to shareholders, by redemption or dividend, even if the corporation purportedly enters into a contract obligating it to pay a dividend) (internal citations omitted); *see also In re Color Tile, Inc.*, 2000 WL 152129 at *5 (D. Del. Feb 9 2000) (finding that a dividend declared by an insolvent Delaware corporation is not "lawful" and is not an "antecedent debt" under fraudulent transfer law) (reversed on other grounds). And, while the result might be different if the obligation was a "debt," we have shown above that the obligation has none of the characteristics of debt. Again, distributions to Shareholders now and will

always be Impermissible Restricted Payments which cannot be made under the Indenture. It is again noteworthy that First Carolina has not argued that the payment can be made under this provision.

32. Third, the payment is not permitted if it is "not permitted to be made by [FNV Group] . . . under applicable law." Indenture at p. 6. FNV Group is a Delaware corporation and therefore the appropriate "applicable law" governing any distribution to Shareholders is the Delaware General Corporation Law ("DGCL"). Whether described as dividends or any other distribution to Shareholders on account of their equity interest, the distributions are prohibited by Delaware law and First Carolina does not argue otherwise. *See ¶ 15, supra.* Thus, the Court need not decide whether the distributions to Shareholders permitted by the Indenture are "dividends" because, regardless of the name ascribed, the DCGL and the Indenture prohibit the Reorganized Debtors from making such distributions.

33. First Carolina argues that the distribution of the funds in the Segregated Account to the Shareholders is not a prohibited dividend under the DGCL, but rather is a distribution of the productive assets of a company made pursuant to an order of the Court, thereby constituting a "return of capital." Objection at ¶¶24, 29. First Carolina's view is an oversimplification of the facts and its reliance on *Fulweiler v. Spruance*, 222 A.2d 555 (Del. Ch. 1966) is misplaced. *Fulweiler* was not a case which involved the legality of a payment to shareholders by a corporation or even the character of the distribution as debt or equity by the corporation. Instead, *Fulweiler* was a dispute between a former husband and wife under their divorce agreement, in which dividends were treated in one way and a return of capital in a different way. Ultimately, the Court analyzed the nature of a distribution of GM stock that duPont holding company made to its shareholders when forced by court order to divest itself of GM stock and found that the distribution of GM stock was a return of capital (a court-

ordered distribution of income producing assets). But for the present, the significant facts are that the Court did not decide and had no reason to decide whether the payment constituted payment of a "debt," the Court was not asked to decide whether duPont could properly make the distribution under applicable law, and in fact, whether characterized as a dividend or a return of capital, the distribution could not have been made under Delaware law if duPont had been in financial distress, insolvent, or if the distribution would be a fraudulent conveyance. Moreover, regardless of the nature of the obligation, here the distribution – whatever its character – is subject to specific conditions.

34. The Plan itself has no mention of a distribution of the Reorganized Debtors "productive assets," and by approving the Plan, the Court ordered the Reorganized Debtors to comply with the terms of the Indenture which specifically set forth the condition governing distributions. Instead, the Plan permits "distributions in respect of. . .Equity Interests. . .to make Restricted Payments," which are specifically defined as dividends, distributions on account of equity or redemptions or repurchases of stock. Indenture at p. 11. Delaware corporate law does not even contain a provision dealing with distributions of "productive assets." Regardless of what they are called, the conditional distributions to holders of equity interests on account of such interests are prohibited by Delaware law.

35. Most importantly, however, First Carolina completely ignores the fact that even if such distributions were somehow deemed to be a return of capital, the DGCL still prohibits FNV Group from making such distributions. While the Court in *Fulweiler* discussed the nature of a distribution, tax consequences relating to its nature and proper allocation in the hands of the recipient, the Court did not address the *legality* or the *ability* of the company to make such a distribution in the first place, which is the issue at hand in the present case. Even assuming that

capital can be returned to shareholders absent a declaration of a dividend or a stock repurchase, any return of capital by a company, by definition, must reduce the capital of the company. Section 244 of the DGCL, which governs the ability of a Delaware corporation to reduce its capital, provides that

> ". . .no reduction of capital shall be made or effected unless the assets of the corporation remaining after such reduction shall be sufficient to pay any debts of the corporation for which payment has not been otherwise provided."

As discussed above, FNV Group is insolvent and does not believe that there are sufficient assets to fully repay the New Senior Notes. Therefore, FNV Group cannot reduce its capital because there will not be sufficient assets remaining to pay its debts. In short, the distributions to Shareholders are Impermissible Restricted Payments which cannot be made.

**D. The Plan Cannot be Construed to Allow for the Payment of Distributions to the Shareholders**

36. First Carolina has asserted that the Plan should be construed against the Reorganized Debtors in an effort to bolster its claim that the Shareholders should receive the funds held in the Segregated Account. Objection at ¶ 21. However, the Reorganized Debtors are seeking clarification as to a point on which the Plan is *silent* and even construing the Plan against the interests of the Reorganized Debtors, as First Carolina urges this Court to do, there is no way in which the silence can be construed so as to allow the Shareholders to receive any distributions. None of the cases cited by First Carolina is applicable in the present case. The Court in *In re Terex Corporation*, 984 F.2d 170, (6th Cir. 1993) provides that "[i]t is the debtor's obligation when seeking the court's confirmation to specify as accurately as possible the amounts which it intends to pay the creditors." However, in the present case there is no ambiguity in the Plan regarding the dollar amount to be paid to the Shareholders, provided that the condition precedent is satisfied. Additionally, while the Court in *In re McCalla*, 238 B.R. 94 (M.D. Pa. 1999) addressed a chapter 13 plan and the interpretation of

mortgage claims and noted that plan language is typically interpreted against a drafter, it did not make a determination regarding plan language.

37. The Indenture is clear when it states that the Shareholders are not entitled to receive any distributions if such distributions are Impermissible Restricted Payments. This is not an ambiguous condition that needs to be interpreted by this Court. First Carolina would have this Court ignore this clear and express condition simply because the Plan is silent as to how the funds should be treated if the condition is never capable of satisfaction, and rewrite the Plan based on perceived inequities. As such, First Carolina is asking this Court to ignore the fact that a strict reading of the Plan would require the Reorganized Debtors to continue to retain funds in perpetuity because there will never be a time when the condition precedent to the Shareholders' right to receive the funds will be satisfied and instead rewrite the Plan based on its own perceived inequities. However, the Shareholders are not entitled to more than what is provided for in the Plan – to find otherwise would provide an unjust windfall to the Shareholders.

38. Moreover, this is not really a dispute between the Reorganized Debtors on the one hand and the Shareholders on the other. If the Court grants the Clarification Motion, the Reorganized Debtors will not profit; rather, the funds will be distributed to creditors, who, given the Reorganized Debtors' financial condition, will not be paid in full. In determining the proper treatment of the retained funds, the Court should consider the absolute priority rule which provides that creditors must get paid in full before there can be a distribution on account of equity. Indeed, the condition set forth in the Indenture, which specifically prohibits the Reorganized Debtors from making distributions to the Shareholders if this would render them insolvent or if such distributions are not permitted under applicable law, should be viewed as a means of ensuring compliance with

the absolute priority rule. The Court should not construe the silence in the Plan as a deviation from this creditor protection.

**E. The Relief Requested in the Clarification Motion is Not Procedurally Defective, is Ripe for Judicial Review and Does not Amount to a De Facto Modification of the Plan**

**a. The Relief Requested is Properly Sought Through a Motion.**

39. First Carolina has argued that that, because the relief requested in the Clarification Motion involves a declaratory judgment with respect to certain property in which there are conflicting claims of ownership and entitlement, the relief must be sought through an adversary proceeding. Objection at ¶ 9. First Carolina relies on Rule 7001(a) which defines an adversary proceeding to include a proceeding "to determine the validity, priority or extent of a lien or other interest in property. . ." However, as discussed above, it is clear that the Shareholders do not hold a lien or security interest in any property, any specific interest or entitlement, or interest in an escrow fund or property held in trust, but only a conditional right of payment. While the Reorganized Debtors are not disputing or challenging the fact that the Shareholders have a right to future distributions *if and when* the condition precedent is satisfied, this conditional right to payment does not fall within the interest in property as per a lien covered by Rule 7001(2) of the Federal Rules of Bankruptcy Procedure. Here, because distributions to Shareholders will always be Impermissible Restricted Payments, (i) the condition precedent to the Shareholders' right to receive any distributions is never capable of satisfaction and (ii) the Shareholders have no right to receive any payments under the Plan. And, there is no indication that an adversary proceeding is required to determine contract rights of a type asserted by the Shareholders. Instead, the claim is similar to that of a contract creditor asserting a claim and such matters can be resolved on motion. *See, e.g., In re Washington Group, International, Inc.*, 2003 Bankr. LEXIS 1669 at * 9 (Bankr. D. Nv. 2003)

(determining that the legal question of whether an insurance policy provided for coverage for certain claims can raised through a motion commencing a contested matter and need not be determined by an adversary proceeding).

40. As in *In re Applewood Chair Company*, 203 F.3d 914, 918 (5th Cir. 2000), the Reorganized Debtors are merely seeking a clarification of the terms of a substantially consummated confirmed plan. While it is true that the court in *Applewood* noted that the validity of the lien of the creditor requesting the clarification was not in question, this is a distinction without substance because the Shareholders have no lien, valid or otherwise, in the present case. As noted above, the Reorganized Debtors are not seeking to modify or challenge any interests of the Shareholders and the relief sought in the Clarification Motion will in no way affect the Shareholders rights because the Shareholders are not entitled to any distributions under the express language of the Indenture. Here, the Reorganized Debtors are only seeking a clarification as to a point on which the Plan is silent, namely how to treat the funds that they are otherwise required to retain indefinitely, and, as the court in *Applewood* noted, this relief is properly sought through a motion.

**b. The Relief Requested in the Clarification Motion is Ripe for Judicial Review.**

41. First Carolina has argued that the relief requested in the Clarification Motion is premature because there has been no payment default under the New Senior Notes and the Reorganized Debtors are merely projecting an inability to comply with the Plan in the future. Objection at ¶¶41, 45. However, contrary to First Carolina's assertion, the relief requested in the Clarification Motion is ripe for judicial review. The Reorganized Debtors' declaration that they will be unable to pay the New Senior Notes in full and that the condition precedent to making distributions to Shareholders will never be satisfied in the future is not mere conjecture. Because the

Indenture prohibits the Reorganized Debtors from engaging in new business, thereby preventing them from growing their way out of the current financial circumstances, the Reorganized Debtors have no reasonable chance of financial recovery. Absent a financial recovery, there are simply not enough assets to pay the New Senior Notes in full and distributions to Shareholders will always constitute Impermissible Restricted Payments, both because of the Reorganized Debtors' insolvency and because the Reorganized Debtors will never have surplus or net profits from which they can declare a dividend. As such, there is no possible way that the Shareholders will ever be entitled to distributions under the Plan.

42. The Reorganized Debtors are, therefore, not faced with an abstract concern regarding how to treat the funds held in the Segregated Account and funds that will be retained due to future distributions being Impermissible Restricted Payments. Rather, because the condition precedent to the Shareholders ability to receive a distribution under the Plan is *never* capable of satisfaction, and the Plan is silent on how to treat funds in such a situation, there is a real legal controversy that affects parties in a concrete manner with issues that are sharp enough for judicial resolution. *See Armstrong World Industries, Inc. v. Adams, et al.*, 961 F.2d 405, 410 (3d Cir. 1992). Given the fact that the estate is winding down quickly, there is no reason for this court to postpone making a determination on the relief requested in the Clarification Motion.

**c. The Relief Requested in the Clarification Motion Does Not Amount to a De Facto Modification of the Plan.**

43. First Carolina has asserted that, through the relief requested in the Clarification Motion, the Reorganized Debtors are seeking to modify the Plan. Objection at ¶ 46. However, as set forth in the Clarification Motion and herein, the Reorganized Debtors are merely seeking *clarification* with respect to a point on which the Plan is silent – the treatment of funds where there is

no reasonable chance that the condition precedent to distributing funds to the Shareholders will ever be satisfied – and such relief does not amount to a modification of the Plan. *See United States of America v. APT Industries, Inc.*, 128 B.R. 145, 147 (W.D.N.C 1991) (stating that when an order did not change any material terms of the plan, but instead clarified the plan where previously it had been silent, "[t]he Court does not believe such an Order amounts to a modification."); *see also In re Beal Bank, S.S.B.*, 201 B.R. 376, 380 (E.D. Pa. 1996) (stating that a bankruptcy court may clarify a plan where it is silent or ambiguous).

44. The fact that the Shareholders will not receive distributions from the Reorganized Debtors does not transform the Clarification Motion into a request to modify the Plan because it is the impossibility of the express condition in the Indenture, not any action on the part of the Reorganized Debtors or any relief requested in the Clarification Motion, that prevents the Reorganized Debtors from ever making distributions to the Shareholders. There is no harm to the Shareholders in granting the relief requested in the Clarification Motion because the Shareholders never had an absolute unconditional right of payment under the Plan and the Plan provides that funds will be retained by the Reorganized Debtors if the condition precedent to payment is not satisfied. Likewise, the Plan's treatment of holders of the New Senior Notes will not be changed because the Plan already contemplates that they will receive payment on account of their New Senior Notes and that Shareholders will not receive distributions if such distributions are prohibited due to the Reorganized Debtors' financial condition or otherwise under applicable law.

45. Contrary to First Carolina's assertion that the Reorganized Debtors are seeking to rewrite the Plan in order to "completely divest" the Shareholders of their interest in the funds contained in the Segregated Account, it is First Carolina who is seeking a modification of the Plan in

order to obtain a payment to which it is not entitled. Objection at ¶¶ 9, 46. First Carolina is asking this Court to both (i) ignore the conditions to Shareholder distributions and (ii) interpret the silence with respect to the ultimate disposition of funds when the condition precedent to making distributions has not been satisfied as a justification to ignore this express condition precedent, and instead determine that the Shareholders have some sort of vested interest in the funds. It is clear that First Carolina is unsatisfied with the terms of the Plan but, as First Carolina itself has noted through its citations of *In re Szostek*, 886 F.2d 1405 (3d Cir. 1989), *In re Beal Bank,* 201 B.R. 376 and *In re Rexton*, 240 B.R. 211 (Banrk. E.D. Pa. 1999) to support its assertion that the terms of a confirmed plan should be upheld and cannot be rewritten, the Court cannot rewrite the Plan based on perceived inequities. Objection at ¶ 20. The Plan has been substantially consummated and, as such, the Court cannot make the modification that First Carolina is seeking.

**CONCLUSION**

WHEREFORE, for all of the reasons stated in this Reply, the Reorganized Debtors respectfully request entry of the order submitted to this Court with the Clarification Motion allowing the Reorganized Debtors (i) to cease setting aside 5% of the Available Cash for the benefit of the Shareholders, (ii) to return the Available Cash in the Segregated Account to FNV Capital for use in its business to pay expenses, debts and other obligations and (iii) to grant such other and further relief as may be just and proper.

Dated: September 16, 2005
Wilmington, Delaware

Mark D. Collins (No. 2981)
Rebecca Booth (No. 4031)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

Jonathan M. Landers
Janet M. Weiss
Jessica I. Basil
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Co-counsel to the Reorganized Debtor

**Exhibit A**

Ross Declaration

i

RLF1-2923132-1

396

**Exhibit A**

**Ross Declaration**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>**FINOVA CAPITAL CORPORATION,**<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 01-0698 (PJW)<br><br>Jointly Administered<br><br>**Hearing Date: November 29, 2005 at 2:30 P.M.** |

**DECLARATION OF RICHARD A. ROSS IN SUPPORT OF REPLY TO OBJECTION OF FIRST CAROLINA INVESTORS, INC. TO MOTION OF REORGANIZED DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE SECTION 1141 CLARIFYING PROVISION OF CONFIRMED PLAN**

Richard A. Ross hereby submits this Declaration under Penalty of Perjury, and states as follows:

1. I am the Senior Vice President, Chief Financial Officer and Treasurer of The FINOVA Group Inc. ("FINOVA"), and am the designated "principal financial officer" for SEC reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The facts and opinions in this Declaration are known to me personally, and I would be a competent witness as to such matters.

2. I have been employed by FINOVA for eleven years, and for the last four years have held various positions as a senior financial officer. I am fully familiar with the books and records of FINOVA and its subsidiaries and affiliates, and its financial reporting. On or about August 11, 2005, FINOVA filed its 10-Q report with the SEC which is attached hereto as Exhibit B (the "10-Q Report"). The 10-Q Report was prepared under my supervision and pursuant to my

direction, and I am fully familiar with its contents. I executed the 10-Q Report as the "principal financial officer" of FINOVA.

3. The financial situation of FINOVA and its subsidiaries is set forth in great detail in the 10-Q Report, and I will only summarize the highlights here (all figures as of June 30, 2005, and dollars are in thousands). In addition, I have updated this information to reflect recent developments.

(a) FINOVA had total assets of $789,084, including $249,271 in cash and $60,921 in restricted cash arising from the amount retained and not paid to shareholders on account of the so-called 5% obligation. Since June 30, assets have declined by about 10% (cash has declined to approximately $200,000) and restricted cash has increased to $65,607.

(b) FINOVA had liabilities of approximately $1,880,000, most of which reflects a $1,810,499 obligation on the New Senior Notes. This liability is recorded on the balance sheet as $1,251,673 because, for accounting purposes, the liability on the New Senior Notes must be reduced by unamortized fresh start discount determined upon the emergence from bankruptcy. Since June 30, payments of $89,000 were made on the New Senior Notes.

(c) FINOVA's liabilities exceed its assets by more than $1 billion.

(d) FINOVA has noncash assets of a carrying value of approximately $480,000. These are comprised largely of (i) various financial instruments and obligations, which cannot increase in value beyond the face amount of the instrument or obligation, many of which are in default or otherwise disputed, and (ii) owned asset, most significantly, various types of aircraft, most of which are older models and are not in great demand. In order to pay FINOVA's obligations, these assets would have to more than triple in value. There is, in my judgment, no realistic chance that this would occur. Moreover, these figures do not reflect

continuing interest accruals on the New Senior Notes and continued (albeit reduced) operating expenses.

(e) While there have been some recoveries on assets, sales of assets above book value, and collections of amounts in excess of book value, the total of these has been only a small fraction of the accumulated deficiency. In the 10-K Report for the year 2004, which I signed, FINOVA stated that:

> "...unless the actual cash flows from the collection of FINOVA's asset portfolio are substantially greater than the amount assumed to determine the carrying amounts of its assets, FINOVA will not have sufficient assets to fully repay its Senior Debt Obligations. The Company has been successful in its efforts to maximize the value of the portfolio as evidenced by the decline in the asset shortfall, which declined from a high point of $1.7 billion at December 31, 2001 to $1.1 billion at December 31, 2004; however, to eliminate the shortfall, FINOVA would have to liquidate all of its remaining total financial assets at 274% of their book value. Despite the income recorded over the last three years and the progress that has been made in liquidating assets, the required recovery rate to eliminate the shortfall has continued to grow. While the net asset liquidation and collection efforts to date have been in excess of their recorded book values, those recoveries on average have been far below the rate of return necessary to fully repay the Senior Debt Obligations. If this trend continues, a greater asset return must be realized to fully satisfy the obligations. The Company does not believe that the future asset realization will increase sufficiently to fully offset the shortfall due to the fact that many of the more attractive assets within the portfolio have already been liquidated and the Company continues to have significant exposure in its portfolio to non-performing assets and used aircraft."

At present, with a smaller balance of financial assets, FINOVA would have to liquidate such assets at more than 300% of book value to pay its debts without considering interest on the New Senior Notes or continuing expenses.

4. In connection with the provision of the Plan requiring 5% of payments on the New Senior Notes to be set aside for the holders of equity, such obligation was never recorded on the books and records of FINOVA as debt and was never shown on any financial statement (including the 10-Q Report) as a liability or debt obligation. As Chief Financial Officer, I have

always considered this obligation as in the nature of a dividend or similar type of distribution to holders of equity interests in FINOVA.

5. This Declaration is submitted under Penalty of Perjury.

Dated: September 15, 2005

Richard A. Ross
Richard A. Ross

80340176_2.DOC



10kWIZARD
SEC POWER SEARCH

# FORM 10-Q

## FINOVA GROUP INC – FNV

**Filed: August 11, 2005 (period: June 30, 2005)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

PART I

FINANCIAL INFORMATION
Item 1. Financial Statements 1

PART I

FINANCIAL INFORMATION
Item 1. Financial Statements
Item 2. Management s Discussion and Analysis of Financial Condition and Results of Operations
Item 3. Quantitative and Qualitative Disclosure About Market Risk
Item 4. Controls and Procedures

PART II

OTHER INFORMATION
Item 1. Legal Proceedings
Item 4. Submission of Matters to a Vote of Security Holders
Item 6. Exhibits
Signatures
EXHIBIT INDEX
EX-10.A.1

EX-10.A.2

EX-10.A.3

EX-10.A.4

EX-10.B

EX-31.1

EX-31.2

EX-32.1

EX-32.2

Table of Contents

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington D.C. 20549**

# FORM 10-Q

*Quarterly Report pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934*

For the quarterly period ended June 30, 2005

Commission file number 1-11011

# THE FINOVA GROUP INC.

**(Exact name of registrant as specified in its charter)**

| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **86-0695381**<br>(I.R.S. employer identification no.) |
|---|---|
| **4800 North Scottsdale Road**<br>**Scottsdale, AZ**<br>(Address of principal executive offices) | **85251-7623**<br>(Zip code) |

Registrant's telephone number, including area code: 480-636-4800

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐ No ☑

**APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PRECEDING FIVE YEARS:**
Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by the court.

Yes ☑ No ☐

**APPLICABLE ONLY TO CORPORATE ISSUERS:**
As of August 10, 2005, approximately 122,041,000 shares of Common Stock ($0.01 par value) were outstanding.

Table of Contents

THE FINOVA GROUP INC.

TABLE OF CONTENTS

| | | Page No. |
|---|---|---|
| | PART I FINANCIAL INFORMATION | |
| Item 1. | Financial Statements | 1 |
| | Condensed Consolidated Balance Sheets | 1 |
| | Condensed Statements of Consolidated Operations | 2 |
| | Condensed Statements of Consolidated Cash Flows | 3 |
| | Condensed Statements of Consolidated Stockholders' Equity | 4 |
| | Notes to Interim Condensed Consolidated Financial Statements | 5 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| | Special Note Regarding Forward–Looking Statements | 26 |
| Item 3. | Quantitative and Qualitative Disclosure About Market Risk | 28 |
| Item 4 | Controls and Procedures | 28 |
| | PART II OTHER INFORMATION | |
| Item 1 | Legal Proceedings | 29 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 29 |
| Item 6. | Exhibits | 29 |
| Signatures | | 30 |

Table of Contents
**PART I FINANCIAL INFORMATION**

**Item 1. Financial Statements**

**THE FINOVA GROUP INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Dollars in thousands)**

| | June 30, 2005 (Unaudited) | December 31, 2004 (Audited) |
|---|---|---|
| **ASSETS:** | | |
| Cash and cash equivalents | $ 249,271 | $ 480,485 |
| Restricted cash – impermissible restricted payments | 60,921 | 142,176 |
| **Financing Assets:** | | |
| Loans and other financing contracts, net | 257,605 | 416,695 |
| Direct financing leases | 95,338 | 132,995 |
| Total financing assets | 352,943 | 549,690 |
| Reserve for credit losses | (47,610) | (101,270) |
| Net financing assets | 305,333 | 448,420 |
| **Other Financial Assets:** | | |
| Operating leases | 67,588 | 69,310 |
| Assets held for the production of income | 32,456 | 14,855 |
| Investments | 25,401 | 29,582 |
| Assets held for sale | 17,381 | 42,498 |
| Total other financial assets | 142,826 | 156,245 |
| **Total Financial Assets** | 448,159 | 604,665 |
| Other assets | 30,733 | 6,799 |
| | $ 789,084 | $ 1,134,125 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Liabilities:** | | |
| Senior Notes, net (principal amount due of $1.8 billion and $2.2 billion, respectively) | $ 1,251,673 | $ 1,586,957 |
| Interest payable | 17,350 | 20,742 |
| Accounts payable and accrued expenses | 48,967 | 58,361 |
| Deferred income taxes, net | 2,490 | 2,742 |
| **Total Liabilities** | 1,320,480 | 1,668,802 |
| **Stockholders' Equity:** | | |
| Common stock, $0.01 par value, 400,000,000 shares authorized and 125,873,000 shares issued | 1,259 | 1,259 |
| Additional capital | 113,140 | 113,140 |
| Accumulated deficit | (644,728) | (632,702) |
| Accumulated other comprehensive loss | (531) | (15,838) |
| Common stock in treasury, 3,832,000 shares | (536) | (536) |
| Total Stockholders' Equity | (531,396) | (534,677) |
| | $ 789,084 | $ 1,134,125 |

*See notes to interim condensed consolidated financial statements*

Table of Contents

**THE FINOVA GROUP INC.**
**CONDENSED STATEMENTS OF CONSOLIDATED OPERATIONS**
**(Dollars in thousands, except per share data)**
**(Unaudited)**

| | Three Months Ended June 30, 2005 | Three Months Ended June 30, 2004 | Six Months Ended June 30, 2005 | Six Months Ended June 30, 2004 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Interest income | $ 6,011 | $ 33,934 | $ 16,149 | $ 82,343 |
| Rental income | 2,897 | 9,346 | 6,810 | 15,121 |
| Operating lease income | 12,545 | 14,331 | 23,224 | 29,146 |
| Fees and other income | 3,877 | 7,283 | 7,449 | 12,402 |
| **Total Revenues** | 25,330 | 64,894 | 53,632 | 139,012 |
| Interest expense | (44,591) | (67,638) | (92,498) | (133,841) |
| Operating lease and other depreciation | (1,918) | (4,239) | (4,387) | (9,228) |
| **Interest Margin** | (21,179) | (6,983) | (43,253) | (4,057) |
| **Other Revenues and (Expenses):** | | | | |
| Reversal of provision for credit losses | 24,930 | 19,673 | 45,340 | 70,363 |
| Net gain on financial assets | 4,468 | 19,852 | 20,581 | 32,680 |
| Portfolio expenses | (8,194) | (4,424) | (10,532) | (10,584) |
| General and administrative expenses | (11,535) | (13,128) | (24,162) | (27,338) |
| **Total Other Revenues and (Expenses)** | 9,669 | 21,973 | 31,227 | 65,121 |
| (Loss) income before income taxes | (11,510) | 14,990 | (12,026) | 61,064 |
| Income tax expense | — | — | — | — |
| **Net (Loss) Income** | $ (11,510) | $ 14,990 | $ (12,026) | $ 61,064 |
| Basic/diluted (loss) earnings per share | $ (0.09) | $ 0.12 | $ (0.10) | $ 0.50 |
| Weighted average shares outstanding | 122,041,000 | 122,041,000 | 122,041,000 | 122,041,000 |

*See notes to interim condensed consolidated financial statements*

Table of Contents

# THE FINOVA GROUP INC.
## CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS
(Dollars in thousands)
(Unaudited)

| | Six Months Ended June 30, | |
|---|---|---|
| | 2005 | 2004 |
| **Operating Activities:** | | |
| Net (loss) income | $ (12,026) | $ 61,064 |
| Adjustments to reconcile net (loss) income to net cash used by operating activities: | | |
| Reversal of provision for credit losses | (45,340) | (70,363) |
| Net cash gain on disposal of financial assets | (21,105) | (40,131) |
| Net non–cash charge–off of financial assets | 524 | 7,451 |
| Depreciation and amortization | 4,784 | 10,130 |
| Deferred income taxes, net | (252) | (119) |
| Fresh–start accretion – assets | (1,254) | (18,123) |
| Fresh–start discount amortization – Senior Notes | 20,870 | 22,458 |
| Change in assets and liabilities: | | |
| (Increase) decrease in other assets | (2,450) | 2,378 |
| Decrease in accounts payable and accrued expenses | (13,559) | (23,156) |
| Decrease in interest payable | (3,392) | (3,814) |
| **Net Cash Used by Operating Activities** | (73,200) | (52,225) |
| **Investing Activities:** | | |
| Proceeds from disposals of leases and other owned assets | 26,784 | 35,604 |
| Proceeds from sales of investments | 3,087 | 79,193 |
| Proceeds from sales of loans and financing leases | 27,041 | 133,270 |
| Collections and prepayments from financial assets | 161,423 | 523,525 |
| Fundings under existing customer commitments | (7,741) | (43,002) |
| Deposit of impermissible restricted payments into restricted cash account | (18,745) | (12,500) |
| Recoveries of loans previously written off | 6,291 | 21,776 |
| **Net Cash Provided by Investing Activities** | 198,140 | 667,866 |
| **Financing Activities:** | | |
| Principal repayments of Berkadia Loan | | (525,000) |
| Principal prepayments of Senior Notes | (356,154) | (237,500) |
| **Net Cash Used by Financing Activities** | (356,154) | (762,500) |
| **Decrease in Cash and Cash Equivalents** | (231,214) | (146,859) |
| **Cash and Cash Equivalents, beginning of year** | 480,485 | 789,138 |
| **Cash and Cash Equivalents, end of period** | $249,271 | $ 642,279 |

*See notes to interim condensed consolidated financial statements*

Table of Contents

**THE FINOVA GROUP INC.**
**CONDENSED STATEMENTS OF CONSOLIDATED STOCKHOLDERS' EQUITY**
**(Dollars in thousands)**
**(Unaudited)**

| | Common Stock | Additional Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Common Stock in Treasury | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| Balance, January 1, 2004 | $ 1,259 | $ 108,256 | $ (764,715) | $ 2,989 | $ (536) | $ (652,747) |
| Comprehensive income: | | | | | | |
| Net income | | | 132,013 | | | 132,013 |
| Minimum pension liability adjustment | | | | (16,494) | | (16,494) |
| Net change in unrealized holding gains (losses) | | | | (2,220) | | (2,220) |
| Net change in foreign currency translation | | | | (113) | | (113) |
| Comprehensive Income | | | | | | 113,186 |
| Benefits realized from pre-confirmation tax contingencies | | 4,884 | | | | 4,884 |
| Balance, December 31, 2004 | 1,259 | 113,140 | (632,702) | (15,838) | (536) | (534,677) |
| Comprehensive income: | | | | | | |
| Net loss | | | (12,026) | | | (12,026) |
| Minimum pension liability adjustment | | | | 16,494 | | 16,494 |
| Net change in unrealized holding gains (losses) | | | | (1,282) | | (1,282) |
| Net change in foreign currency translation | | | | 95 | | 95 |
| Comprehensive income | | | | | | 3,281 |
| Balance, June 30, 2005 | $ 1,259 | $ 113,140 | $ (644,728) | $ (531) | $ (536) | $ (531,396) |

*See notes to interim condensed consolidated financial statements*

Table of Contents

THE FINOVA GROUP INC.
NOTES TO INTERIM CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
JUNE 30, 2005
(Dollars in thousands in tables)
(Unaudited)

A. Nature of Operations

The accompanying financial statements and notes hereto should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2004. Capitalized terms not defined herein are used as defined in the Form 10-K.

The notes to the financial statements relate to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital") FINOVA is a financial services holding company. Through its principal operating subsidiary, FINOVA Capital, the Company has provided a broad range of financing and capital markets products, primarily to mid-size businesses.

The Company's business activities are limited to maximizing the value of its portfolio through the orderly collection of its assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments, sales of assets or collateral and may include efforts to retain certain customer relationships and restructure or terminate other relationships. The Company has sold substantial portions of asset portfolios and will consider future sales of any asset if buyers can be found at acceptable prices; however, there can be no assurance that the Company will be successful in efforts to sell additional assets Any funds generated in excess of cash reserves permitted by the Company's debt agreement are used to reduce FINOVA's obligations to its creditors. The Company is prohibited by the Indenture governing its Senior Notes from engaging in any new lending activities, except to honor existing customer commitments and in certain instances, to restructure financing relationships to maximize value.

Because substantially all of the Company's assets are pledged to secure the obligations under the Intercompany Notes securing the Senior Notes, FINOVA's ability to obtain additional or alternate financing is severely restricted Accordingly, FINOVA intends to rely on internally generated cash flows from the liquidation of its assets as its only meaningful source of liquidity.

FINOVA's business continues to be operated under a Management Services Agreement with Leucadia National Corporation that expires in 2011. Pursuant to that agreement, Leucadia has designated its employees to act as Chairman of the Board (Ian M Cumming), President (Joseph S. Steinberg) and Chief Executive Officer (Thomas E Mara).

*Going Concern*

As of June 30, 2005, the Company has a substantial negative net worth While FINOVA continues to pay its obligations as they become due, the ability of the Company to continue as a going concern is dependent upon many factors, particularly the ability of its borrowers to repay their obligations to FINOVA and the Company's ability to realize the value of its portfolio. Even if the Company is able to recover the book value of its assets, and there can be no assurance of the Company's ability to do so, the Company would not be able to repay the Senior Notes in their entirety at maturity in November 2009. The accompanying consolidated financial statements do not include any adjustments relating to the recoverability and classification of assets or the amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern The Company's independent registered public accountants have qualified their report on the Company's financial statements since 2001 due to concerns regarding the Company's ability to continue as a going concern.

B. Significant Accounting Policies

The preparation of financial statements in conformity with U.S generally accepted accounting principles requires FINOVA to use estimates and assumptions that affect reported amounts of assets and liabilities, revenues and expenses and disclosure of contingent liabilities. Those estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. Significant estimates include anticipated amounts and timing of future cash flows used in the calculation of the reserve for credit losses and measurement of

Table of Contents

impairment. Other estimates include selection of appropriate risk adjusted discount rates used in net present value calculations, determination of fair values of certain financial assets for which there is not an active market, residual assumptions for leasing transactions and the determination of appropriate valuation allowances against deferred tax assets. Actual results could differ from those estimated

For a listing of the Company's significant accounting policies, see Note B Significant Accounting Policies in the Company's Annual Report on Form 10-K for the year ended December 31, 2004.

*Consolidation of Interim Reporting*

The interim condensed consolidated financial statements present the financial position, results of operations and cash flows of FINOVA and its subsidiaries, including FINOVA Capital and its subsidiaries. These financial statements have been prepared in accordance with U.S. generally accepted accounting principles. All intercompany balances have been eliminated in consolidation

The interim condensed consolidated financial information is unaudited. In the opinion of management, all adjustments consisting of normal recurring items necessary to present fairly the financial position as of June 30, 2005 and the results of operations and cash flows presented herein have been included in the condensed consolidated financial statements. Interim results are not necessarily indicative of results of operations for a full year.

## C. Total Financial Assets

Total financial assets represent the Company's portfolio of investment activities, which primarily consist of secured financing contracts (such as loans and direct financing leases). In addition to its financing contracts, the Company has other financial assets, including assets held for sale, owned assets (such as operating leases and assets held for the production of income) and investments. As of June 30, 2005 and December 31, 2004, the carrying amount of total financial assets (before reserves) was $495.8 million and $705.9 million, respectively

The following table details the composition and carrying amounts of FINOVA's total financial assets at June 30, 2005:

| | Revenue Accruing Assets | Revenue Accruing Impaired | Nonaccruing Impaired Loans | Nonaccruing Leases & Other | Owned Assets & Investments | Total Financial Assets | % |
|---|---|---|---|---|---|---|---|
| Transportation | $ | $ 88,887 | $ 38,207 | $ 17,450 | $ 100,017 | $ 244,561 | 49.3 |
| Real estate | 30,161 | 41 | 30,087 | 123 | | 60,412 | 12.2 |
| All other portfolios | 21,956 | 39,487 | 98,268 | 5,657 | 25,428 | 190,796 | 38.5 |
| Total financial assets | $ 52,117 | $ 128,415 | $ 166,562 | $ 23,230 | $ 125,445 | $ 495,769 | 100.0 |
| Reserve for credit losses | | | | | | (47,610) | |
| Total | | | | | | $ 448,159 | |

Since FINOVA's total financial assets are concentrated in specialized industries, the Company is subject to both general economic risk and the additional risk of economic downturns within individual sectors of the economy. The Company has also completed multiple financial transactions with individual borrowers and their affiliates, resulting in a greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including transportation) of those borrowers and their affiliates

Table of Contents

At June 30, 2005, the Company's transportation portfolio consisted of the following aircraft:

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (in years) |
|---|---|---|---|---|
| Airbus 300 | 4 | | 4 | 22 |
| Boeing 727 | 10 | 4 | 6 | 26 |
| Boeing 737 | 18 | 18 | | 20 |
| Boeing 747 | 2 | | 2 | 24 |
| Boeing 757 | 5 | 5 | | 21 |
| McDonnell Douglas DC8 and DC9 | 7 | 4 | 3 | 35 |
| McDonnell Douglas DC10 | 11 | 2 | 9 | 27 |
| McDonnell Douglas MD Series | 20 | 20 | | 19 |
| Regional jets, corporate aircraft and turbo props | 30 | 30 | | 12 |
| Total | 107 | 83 | 24 | 20 |

At June 30, 2005, 43 aircraft with a carrying value of $131.4 million were operated by domestic carriers and 52 aircraft with a carrying value of $68.3 million were operated by foreign carriers. Additionally, 12 aircraft with a carrying value of $25.2 million were off-lease, classified as assets held for the production of income and parked at various storage facilities in the United States and Europe, including 3 aircraft which have been identified for potential dismantling or sale at scrap values.

The Company's transportation portfolio also includes aircraft engines and parts, domestic railroad and other transportation equipment. The carrying value of this equipment was $19.7 million at June 30, 2005.

In addition to the concentrated exposures within the transportation portfolio, the Company has certain concentrations within its real estate portfolio. At June 30, 2005, the carrying amount of the real estate portfolio by industry was as follows:

| | Carrying Amount | % |
|---|---|---|
| Resort and timeshare | $30,280 | 50.1% |
| Hospitality | 30,132 | 49.9% |
| Total | $60,412 | 100.0% |

D. **Reserve For Credit Losses**

The following table presents the balances and changes to the reserve for credit losses:

| | Six Months Ended June 30, | |
|---|---|---|
| | 2005 | 2004 |
| Balance, beginning of year | $101,270 | $274,828 |
| Reversal of provision for credit losses | (45,340) | (70,363) |
| Write-offs | (14,611) | (52,409) |
| Recoveries | 6,291 | 21,776 |
| Balance, end of period | $47,610 | $173,832 |

For the six months ended June 30, 2005, the Company recorded a $45.3 million reversal of provision for credit losses to reduce its reserve for credit losses. The reserve reduction was primarily due to proceeds received from prepayments and asset sales exceeding recorded carrying amounts (net of reserves), improvement in collection experience on certain assets, recoveries of amounts previously written off and the Company's detailed assessment of estimated inherent losses in the portfolio.

Table of Contents

A summary of the reserve for credit losses by impaired and other assets was as follows:

| | June 30, 2005 | December 31, 2004 |
|---|---|---|
| Reserves on impaired assets | $45,000 | $ 96,245 |
| Other reserves | 2,610 | 5,025 |
| Reserve for credit losses | $47,610 | $ 101,270 |

At June 30, 2005, the total carrying amount of impaired loans and leases was $316.3 million, of which $128.4 million were revenue accruing. The Company has established impairment reserves of $45.0 million related to $106.4 million of impaired assets. At December 31, 2004, the total carrying amount of impaired loans and leases was $458.8 million, of which $202.4 million were revenue accruing. Impairment reserves at December 31, 2004 totaled $96.2 million related to $169.2 million of impaired assets.

Reserves on impaired assets decreased due to write–offs, an improvement in pay–off and collection experience on certain assets previously reserved and the Company's application of cash received on nonaccruing assets, thus reducing the impairment reserves required on those assets.

Other reserves related to estimated inherent losses on unimpaired assets decreased as a result of prepayments, collections and the migration of certain accounts to impaired assets

Accounts classified as nonaccruing were $189.8 million or 38.3% of total financial assets (before reserves) at June 30, 2005 as compared to $259.4 million or 36.7% at December 31, 2004. The decline in nonaccruing assets was primarily attributed to collections and asset sales of $37.6 million and write–offs and net valuation markdowns of $22.7 million. Also contributing to the decline was the classification of newly repossessed aircraft as assets held for the production of income, which are excluded from nonaccruing assets

The composition of nonaccruing assets included in total financial assets was as follows:

| | June 30, 2005 | December 31, 2004 |
|---|---|---|
| Contracts | $187,850 | $ 256,313 |
| Repossessed assets | 1,942 | 3,052 |
| Total nonaccruing assets | $189,792 | $ 259,365 |
| Nonaccruing assets as a percentage of total financial assets (before reserves) | 38.3% | 36.7% |

**E. Debt**

A summary of the Company's total debt outstanding was as follows:

| | June 30, 2005 | December 31, 2004 |
|---|---|---|
| Senior Notes: | | |
| Principal | $ 1,810,449 | $ 2,166,603 |
| Fresh–start discount | (558,776) | (579,646) |
| Senior Notes, net | $1,251,673 | $ 1,586,957 |

During the second quarter of 2005, the Company made a $59.4 million partial principal prepayment on the Senior Notes, which reduced the outstanding principal to $1.8 billion. In July 2005, FINOVA announced an additional $89.0 million prepayment that will be made during the third quarter of 2005. Following this prepayment, cumulative principal prepayments from May 2004 through the third quarter of 2005 will have totaled $1.2 billion or 42% of the face amount ($2.97 billion) of the Senior Notes

Table of Contents

In accordance with the terms of the Indenture, the Company is required to use any excess cash as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at the Company's option.

The Company does not believe that it has sufficient assets to fully repay the Senior Notes, and the Indenture prohibits the Company from engaging in new business. Therefore, FINOVA intends to rely on the liquidation of its remaining assets as its only meaningful source of liquidity.

At June 30, 2005, the Senior Notes are reflected on the Company's balance sheet net of a remaining $558.8 million unamortized fresh-start discount. The book value of the Senior Notes is scheduled to increase over time through the partial amortization of the discount as interest expense. Discount amortization was accelerated following each of the principal prepayments, which occurred earlier than originally anticipated when fresh-start guidelines were applied upon emergence. Discount amortization is expected to be further adjusted as principal prepayments are made.

Stockholders should not expect any payments or distributions from FINOVA. The Indenture contemplates that as principal payments are made on the Senior Notes, FINOVA stockholders will receive a distribution equal to 5.263% (i.e. 5%/95%) of each principal prepayment. Ninety-five percent (95%) of the remaining available cash after establishment of cash reserves as defined in the Indenture will be used to make prepayments of principal on the Senior Notes and five percent (5%) is identified for distributions to and/or repurchases of stock from common stockholders. However, the Indenture prohibits FINOVA from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law. Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture. Given the Company's significant negative net worth and its belief that the Senior Notes will not be fully repaid, FINOVA is required to retain impermissible restricted payments until such time, if ever, that it is no longer restricted from making a distribution to its stockholders or until it is necessary to use the cash to satisfy its debt obligations. In conjunction with the prepayments of Senior Notes noted above, the Company will have retained a total of $65.6 million by August 15, 2005. Retained amounts are being segregated and reflected as restricted cash on the balance sheet, pending their final disposition. The Company anticipates that the retained amounts will eventually be paid to the creditors, not the stockholders. If the funds were to be paid to the stockholders, affiliates of Berkadia (jointly owned by Berkshire Hathaway and Leucadia), which own 50% of FINOVA's common stock, would receive half of the retained amounts. Berkadia has advised the Company that it does not believe that stockholders are entitled to the retained amounts since FINOVA cannot fully satisfy its creditor obligations.

In April 2005, FINOVA filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) FINOVA no longer needs to direct funds into a restricted account, and (2) FINOVA may use the funds in the restricted account to satisfy its obligations to creditors. A hearing on the motion was held on June 10, 2005 before the Bankruptcy Court. At that time, the Bankruptcy Court ordered that the former Equity Committee (the "Equity Committee") be reconstituted. The Equity Committee was reconstituted on July 14, 2005 with three members. As a precursor to the Bankruptcy Court ruling upon FINOVA's motion, the Equity Committee shall have the opportunity to independently review FINOVA's state of solvency.

F. Pension Plan

The Company sponsored a trusteed, noncontributory pension plan that covered substantially all of its employees. Benefits were based primarily on final average salary and years of service. The Company terminated the pension plan effective December 31, 2004, and has submitted proposed plan amendments implementing that termination to the Internal Revenue Service. No pension benefits will accrue beyond December 31, 2004, and participant benefits under the plan fully vested and became non-forfeitable as of that date.

*Cash Flows*

The Company had no minimum funding requirement for its pension plan for the six months ended June 30, 2005 and 2004. FINOVA's Board of Directors approved discretionary contributions, which are expected to be sufficient to fully fund and enable the plan to pay all of its obligations to each participant. The Company made discretionary contributions of $10.0 million during the first quarter of 2005 and $2.0 million in April 2005 to improve the funded status of the plan and will make a final contribution, if necessary, later in the year to fully fund the plan once the final costs of terminating the plan have been determined.

Table of Contents

As a result of the $10.0 million discretionary contribution, the Company's minimum pension liability was eliminated, and the Company recorded a $21.9 million prepaid pension asset at March 31, 2005 (included within other assets on the balance sheet), which will ultimately be charged to operations along with termination costs following the final settlement and distribution of the trust's assets to participants

## G. Costs Associated with Exit or Disposal Activities

| | Termination Benefits | Contract Termination Costs |
|---|---|---|
| Balance, beginning of year | $ 4,252 | $ 2,573 |
| Payments | (2,540) | (576) |
| Net additions | 5,164 | — |
| Balance, end of period | $ 6,876 | $ 1,997 |

As of June 30, 2005, FINOVA had accrued a liability for termination benefits (including severance) of $6.9 million related to 85 individuals at various levels within the Company. During the six months ended June 30, 2005, the Company paid termination benefits of $2.5 million and recorded a net charge of $5.2 million to partially accrue for employees notified of their pending termination. The liability as of June 30, 2005 includes approximately $4.0 million for individuals terminated at the end of the second quarter whose termination benefits will begin to be paid during the third quarter.

As of June 30, 2005, the Company had a total liability for terminated leases and office space it has ceased using of $2.0 million. The decrease since December 31, 2004 was due to the payment of scheduled lease rentals (net of sublease income).

## H. Income Taxes

For the six months ended June 30, 2005 and 2004, income tax expense related to pre-tax book income was entirely offset by a decrease in valuation allowances against deferred tax assets, which were previously established due to the Company's concern regarding its ability to utilize income tax benefits generated from losses in prior periods. The Company may not be able to utilize all the deferred tax assets due to uncertainty about the amount of future earnings, a variety of loss or other tax attribute carryover limitations in the various jurisdictions in which the Company files tax returns and uncertainty regarding the timing of the reversal of deferred tax liabilities. As of June 30, 2005, the Company had federal net operating losses of $1.2 billion available for carryforward.

## I. Litigation and Claims

*Legal Proceedings*

FINOVA is party either as plaintiff or defendant to various actions, proceedings and pending claims, including legal actions, some of which involve claims for compensatory, punitive or other damages in significant amounts. Litigation often results from FINOVA's attempts to enforce its lending agreements against borrowers and other parties to those transactions. Litigation is subject to many uncertainties. It is possible that some of the legal actions, proceedings or claims could be decided against FINOVA. Other than the matters described below, FINOVA believes that any resulting liability from its legal proceedings should not materially affect FINOVA's financial position, results of operations or cash flows. The following matters could have a material adverse impact on FINOVA's financial position, results of operations or cash flows.

If any legal proceedings result in a significant adverse judgment against the Company, which is not anticipated, it is unlikely that FINOVA would be able to satisfy that liability due to its financial condition. As previously noted, due to the Company's financial condition, it does not expect that it can satisfy all of its secured debt obligations at maturity. Attempts to collect on those judgments could lead to future reorganization proceedings of either a voluntary or involuntary nature

Table of Contents

*Litigation Related to Loans to The Thaxton Group Inc. and Related Companies*

Between October 17, 2003, and January 13, 2004, FINOVA Capital Corporation was served with and named as a defendant (with other parties) in five lawsuits that relate to its loan to The Thaxton Group Inc. and several related entities (collectively the "Thaxton Entities"). Under its loan agreement, FINOVA has a senior secured loan to the Thaxton Entities of approximately $108 million at June 30, 2005. The Thaxton Entities were declared in default under their loan agreement with FINOVA after they advised FINOVA that they would have to restate earnings for the first two fiscal quarters of 2003, and had suspended payments on their subordinated notes. As a result of the default, FINOVA exercised its rights under the loan agreement, and accelerated the indebtedness. The Thaxton Entities then filed a petition for bankruptcy protection under chapter 11 of the federal bankruptcy code in the United States Bankruptcy Court for the District of Delaware on October 17, 2003, listing assets of approximately $206 million and debts of $242 million

The first lawsuit, a complaint captioned *Earle B Gregory, et al. v. FINOVA Capital Corporation, James T. Garrett, et al.*, (the "Gregory action") was filed in the Court of Common Pleas of Lancaster County, South Carolina, case no. 2003-CP-29-967, and was served on FINOVA on October 17, 2003. An amended complaint was served on November 5, 2003, prior to the deadline for FINOVA to answer, plead, or otherwise respond to the original complaint. The Gregory action was properly removed to the United States District Court for the District of South Carolina on November 17, 2003, pursuant to 28 U.S.C. §§ 1334 and 1452. The plaintiffs filed a motion to remand the case to state court, but the United States District Court denied this motion in an order dated December 18, 2003.

The second Thaxton-related complaint, captioned *Tom Moore, Anna Nunnery, et al., v. FINOVA Capital Corporation, Moore & Van Allen PLLC, and Cherry, Bekaert & Holland LLP*, case no. 8:03-372413 ("Moore"), was filed in the United States District Court for the District of South Carolina on November 25, 2003, and was served on FINOVA on December 2, 2003. The third complaint, captioned *Sam Jones Wood and Kathy Annette Wood, et al., v. FINOVA Capital Corporation, Moore & Van Allen PLLC, and Cherry, Bekaert & Holland LLP*, ("Wood") was filed in the Superior Court for Gwinnett County, Georgia, case no. 03-A13343-B, and was served on FINOVA on December 9, 2003 FINOVA properly removed the Wood action to the United States District Court for the Northern District of Georgia (Atlanta Division) on January 5, 2004 The fourth complaint, captioned *Grant Hall and Ruth Ann Hall, et al., v. FINOVA Capital Corporation, Moore & Van Allen PLLC, and Cherry, Bekaert & Holland LLP*, case no. 03CVS20572, ("Hall") was filed in the Mecklenberg County, North Carolina, Superior Court, and was also served on FINOVA on December 9, 2003. FINOVA properly removed the Hall action to the United States District Court for the Western District of North Carolina (Charlotte Division) on January 5, 2004. The fifth complaint, captioned *Charles Shope, et al., v. FINOVA Capital Corporation, Moore & Van Allen PLLC, and Cherry, Bekaert & Holland LLP*, case no. C204022 ("Shope"), was filed in the United States District Court for the Southern District of Ohio, Eastern Division, and was served on FINOVA on January 13, 2004.

Each of the five Thaxton-related lawsuits are styled as class actions, purportedly brought on behalf of certain defined classes of people who had purchased subordinated notes from the Thaxton Entities. The complaints by the subordinated note holders allege claims of fraud, securities fraud, and various other civil conspiracy and business torts in the sale of the subordinated notes. Each of the complaints seeks an unspecified amount of damages, among other remedies. In addition to FINOVA, the complaints each name as co-defendants Thaxton's accountants and attorneys, and in the Gregory case, several officers of the Thaxton Entities.

Upon motion by FINOVA to the United States Judicial Panel for MultiDistrict Litigation (Docket 1612), all five Thaxton-related actions were transferred on June 18, 2004 to the United States District Court for the District of South Carolina for coordinated pre-trial proceedings (the "MDL Litigation").

Thaxton had approximately 6,800 holders of its subordinated notes issued in several states, with a total subordinated indebtedness of approximately $122 million Thaxton's unsecured creditors' committee has also filed an action in the Thaxton bankruptcy against FINOVA, seeking to set aside FINOVA's liens and payments collected due to alleged securities fraud, violations of banking regulations, preference payments and similar claims The Company believes all the claims against FINOVA are without merit. FINOVA intends to vigorously defend the claims asserted against it in the MDL Litigation and by the creditors committee, and to protect its senior secured position in the bankruptcy proceedings for the Thaxton Entities.

A court-ordered mediation regarding the securities litigation was held the first week of August 2005. No resolution of the litigation was realized at the meeting.

Table of Contents

As Thaxton has liquidated assets, a portion of the payments collected have been deposited into a reserve account in the name of both FINOVA and the Thaxton bankruptcy. The reserve account is expected to remain until resolution of the litigation noted above. The reserve account totaled approximately $68 million at June 30, 2005. The amount of the reserve account is not reflected in FINOVA's balance sheet.

FINOVA was sued by the trustee of the Thaxton Life Partners, Inc ("TLP") bankruptcy proceedings, in United States Bankruptcy Court for the District of Delaware, case no. 04-13005, for the return of a $4 million payment made by TLP to FINOVA. The complaint alleged the payment was a fraudulent transfer. FINOVA, Thaxton and TLP entered into a settlement agreement, which provided in part for FINOVA to pay the TLP estate $4.1 million in return TLP dismissed its motion to seek substantive consolidation of its bankruptcy case with that of the Thaxton case, as well as other claims TLP holds in the Thaxton bankruptcy case. That settlement also resulted in the dismissal of the TLP complaint with prejudice and FINOVA received an allowed unsecured claim in the Thaxton bankruptcy estate in the amount of $1.5 million. In entering into the settlement, FINOVA did not admit any wrongdoing, but believed the dismissal of the substantive consolidation motion and other concessions made by TLP, made the settlement in FINOVA's best interest. The Bankruptcy Court approved the settlement, which was paid by FINOVA in May 2005.

*Motion Regarding Distributions to Shareholders*

As discussed more fully in Note E Debt above, the Indenture contemplates that as principal payments are made on the Senior Notes, FINOVA stockholders will receive a distribution equal to 5.263% of each principal prepayment. The Indenture prohibits distribution of those amounts due to FINOVA's financial condition. Those amounts are held in a restricted account and will total $65.6 million by August 15, 2005. Because FINOVA will not be able to repay the Senior Notes in full, it has filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order (1) to cease directing funds into a restricted account and (2) to allow FINOVA to use the funds in the restricted account to satisfy its obligations to creditors. A hearing on the motion was held on June 10, 2005 before the Bankruptcy Court. At that time, the Bankruptcy Court ordered that the former Equity Committee (the "Equity Committee") be reconstituted. The Equity Committee was reconstituted on July 14, 2005 with three members. As a precursor to the Bankruptcy Court ruling upon FINOVA's motion, the Equity Committee shall have the opportunity to independently review FINOVA's state of solvency.

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following section should be read in conjunction with the Company's Annual Report on Form 10-K for the year ended December 31, 2004 and the Special Note Regarding Forward-Looking Statements included herein. Capitalized terms not defined herein are used as defined in the Form 10-K. The following discussion relates to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including its principal operating subsidiary, FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital").

OVERVIEW

**Restrictions on Business Activities.** The Company's business activities are limited to maximizing the value of its portfolio through the orderly collection of its assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments, sales of assets or collateral and may include efforts to retain certain customer relationships and restructure or terminate other relationships. The Company has sold substantial portions of asset portfolios and will consider future sales of any asset if buyers can be found at acceptable prices; however, there can be no assurance that the Company will be successful in efforts to sell additional assets. Any funds generated in excess of cash reserves permitted by the Company's debt agreement are used to reduce FINOVA's obligations to its creditors. The Company is prohibited by the Indenture governing its Senior Notes from engaging in any new lending activities, except to honor existing customer commitments and in certain instances, to restructure financing relationships to maximize value.

**Company Direction.** The Company expects to continue its present course by seeking to maximize the value of the remaining portfolio through the orderly collection or sale of financial assets. During the second quarter of 2005, the Company evaluated multiple offers to purchase a substantial portion of the remaining assets; however, prices for those assets were not acceptable. FINOVA will continue to consider future sales of all or substantially all of the remaining portfolio, if one or more buyers can be found at acceptable prices; however, there can be no assurance that FINOVA will be successful in efforts to sell additional assets. The Company anticipates that when all or substantially all of the assets have been liquidated that the Company's

Table of Contents

affairs will need to be wound-up. The Company continues to analyze the potential methods of wind-up, which might involve a sale of the remaining assets, an assignment for the benefit of the creditors, or some other proceeding, any of which may or may not be in conjunction with bankruptcy or state law liquidation proceedings. We cannot predict the timing or nature of that final wind-up, but the Company is working towards accomplishing that end in a prudent manner.

The Company completed another step in its liquidation process by reducing a substantial portion of its senior management to more closely align FINOVA's operating costs with the size of the remaining asset portfolio. These reductions included the departures on June 30, 2005 of two executive officers (Glenn E. Gray, former Chief Operating Officer and Richard Lieberman, former Senior Vice President, General Counsel and Secretary), as well as five other members of senior management that terminated on or shortly before that date. FINOVA's business continues to be operated under a Management Services Agreement with Leucadia.

**Collection/Liquidation of Assets.** During the six months ended June 30, 2005, internally generated net cash flows from the portfolio totaled $195.8 million. These net cash flows together with existing cash on hand at year-end were used to fund operations and service the Company's debt obligations.

Total financial assets, net of the reserve for credit losses, declined to $448.2 million at June 30, 2005, down from $604.7 million at December 31, 2004. The asset decline was primarily attributable to customer prepayments, scheduled collections and individual asset sales. In late 2004, the aircraft-financing market began showing some signs of improvement, which has resulted in an increased level of activity and in certain instances realization of assets in excess of recorded carrying amounts (net of reserves). This positive trend continued throughout the second quarter of 2005; however, the Company still does not believe realization will increase sufficiently to fully offset the Company's deficit. The Company is also cautious regarding the trend in the aircraft-financing market due to uncertainty in the airline industry. Refer below to Results of Operations for a further discussion of industry trends.

The decline in net financial assets was partially offset by $39.3 million of non-cash activity, primarily the reversal of reserve for credit losses. Reserve reversals are down from the prior year, but FINOVA continues to experience better than previously anticipated realization on the Company's total portfolio. The majority of the reversal activity has been driven by prepayments and asset sales in excess of recorded carrying amounts (net of reserves) and improved collection experience.

The non-cash reversal of reserve for credit losses and cash gains realized from asset sales were not sufficient to fully offset the Company's negative interest margin and operating costs for 2005. As a result, the Company posted a $12.0 million net loss for the six months ended June 30, 2005.

**Liquidity.** Because substantially all of the Company's assets are pledged to secure the obligations under the Intercompany Notes securing the Senior Notes, FINOVA's ability to obtain additional or alternate financing is severely restricted. Berkadia has no obligation to lend additional sums to or to further invest in the Company. Accordingly, FINOVA intends to rely on internally generated cash flows from the liquidation of its assets as its only meaningful source of liquidity.

**Partial Prepayment of Senior Notes.** During the second quarter of 2005, the Company made a $59.4 million partial principal prepayment on the Senior Notes, which reduced the outstanding principal to $1.8 billion. In July 2005, FINOVA announced an additional $89.0 million prepayment that will be made during the third quarter of 2005. Following this prepayment, cumulative principal prepayments from May 2004 through the third quarter of 2005 will have totaled $1.2 billion or 42% of the face amount ($2.97 billion) of the Senior Notes.

Table of Contents

A summary of prepayment activity on the Senior Notes is as follows:

| Prepayment Date | Record Date | Principal Amount | Percentage of Principal Prepaid |
|---|---|---|---|
| | | (Dollars in thousands) | |
| Cumulative Prepayments through December 31, 2004 | | $ 801,346 | 27% |
| 2005 Prepayment Activity: | | | |
| January 18, 2005 | January 10, 2005 | 178,077 | 6% |
| February 15, 2005 | February 8, 2005 | 59,359 | 2% |
| March 15, 2005 | March 8, 2005 | 59,359 | 2% |
| May 16, 2005 | May 9, 2005 | 59,359 | 2% |
| August 15, 2005 | August 8, 2005 | 89,038 | 3% |
| | | 445,192 | 15% |
| Cumulative Prepayments through August 15, 2005 | | $1,246,538 | 42% |

In accordance with the terms of the Indenture, the Company is required to use any excess cash, as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at the Company's option.

The Company does not believe that it has sufficient assets to fully repay the Senior Notes, and the Indenture prohibits the Company from engaging in new business. Therefore, FINOVA intends to rely on the liquidation of its remaining assets as its only meaningful source of liquidity.

**No Stockholder Payments Anticipated.** Stockholders should not expect any payments or distributions from FINOVA. The Indenture contemplates that as principal payments are made on the Senior Notes, FINOVA stockholders will receive a distribution equal to 5.263% of each principal prepayment. However, the Indenture prohibits FINOVA from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law. Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture. Given the Company's significant negative net worth and its belief that the Senior Notes will not be fully repaid, FINOVA is required to retain impermissible restricted payments until such time, if ever, that it is no longer restricted from making a distribution to its stockholders or until it is necessary to use the cash to satisfy its debt obligations. The Company anticipates that the retained amounts will eventually be paid to the creditors, not the stockholders. If the funds were to be paid to the stockholders, affiliates of Berkadia, which own 50% of FINOVA's common stock, would receive half of the retained amounts

In April 2005, FINOVA filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) FINOVA no longer needs to direct funds into a restricted account, and (2) FINOVA may use the funds in the restricted account to satisfy its obligations to creditors

In June 2005, the Bankruptcy Court ordered that the former Equity Committee (the "Equity Committee") be reconstituted. The Equity Committee was reconstituted on July 14, 2005. As a precursor to the Bankruptcy Court ruling upon FINOVA's motion, the Equity Committee shall have the opportunity to independently review FINOVA's state of solvency. Refer to Financial Condition, Liquidity and Capital Resources for a further discussion of the motion and the restricted stockholder payments.

**HIGH INVESTMENT RISK OF SECURITIES. As previously stated, FINOVA believes that it will be unable to fully repay its Senior Notes and that it is unlikely that it will be able to make any distributions to its stockholders, absent a court order. Consequently, investing in the Senior Notes and common stock involves a high level of risk.**

CRITICAL ACCOUNTING POLICIES

The Company's consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles. The preparation of these financial statements requires FINOVA to use estimates and assumptions that affect

Table of Contents

reported amounts of assets and liabilities, revenues and expenses and disclosure of contingent liabilities. These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. The Company believes the following to be among the most critical judgment areas in the application of its accounting policies.

*Significant Use of Estimates*

Several of the Company's accounting policies pertain to the ongoing determination of impairment reserves on financing assets and the carrying amount valuation of other financial assets. Determination of impairment reserves and carrying amounts rely, to a great extent, on the estimation and timing of future cash flows. FINOVA's cash flow estimates assume that its asset portfolios are collected in an orderly fashion over time. These cash flows do not represent estimated recoverable amounts if FINOVA were to liquidate its asset portfolios over a short period of time. Management believes that a short-term asset liquidation could have a material negative impact on the Company's ability to recover recorded amounts

FINOVA's process of determining impairment reserves and carrying amounts includes a periodic assessment of its portfolios on a transaction-by-transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning general economic conditions and trends, specific market segments, the financial condition of the Company's customers and FINOVA's collateral. In addition, assumptions are sometimes necessary concerning the customer's ability to obtain full refinancing of balloon obligations or residuals at maturity. As a result, the Company's cash flow estimates assume FINOVA incurs refinancing discounts for certain transactions.

Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, impairment reserves and carrying amounts.

Impairment of financing assets (subsequent to implementation of fresh-start reporting) is recorded through the Company's reserve for credit losses, and accounting rules permit the reserve for credit losses to be increased or decreased as the facts and assumptions change. However, certain financing assets were previously marked down for impairments that existed at the time fresh-start reporting was implemented. These marked-down values became the Company's cost basis in those assets, and accounting rules do not permit the carrying value of these assets to be increased above that fresh-start cost basis if subsequent facts and assumptions result in a projected increase in value. Recoveries of amounts in excess of the fresh-start cost basis are recorded through operations when collected.

Impairment of other financial assets is marked down directly against the asset's carrying amount. Accounting rules permit further markdown if changes in facts and assumptions result in additional impairment; however, most of these assets (except certain investments and assets held for sale, which may be marked up for subsequent events) may not be marked up if subsequent facts and assumptions result in a projected increase in value Recoveries of previous markdowns are recorded through operations when collected.

Because of these accounting restrictions, FINOVA is not permitted to fully reflect some estimated improvements in the portfolio until they are actually realized.

The carrying amounts and reserve for credit losses recorded on FINOVA's financial statements reflect the Company's expectation of collecting less than the full contractual amounts owed by some of its customers and recovering less than its original investment in certain owned assets. The Company continues to pursue collection of the full contractual amounts and original investments, where appropriate, in an effort to maximize the value of its asset portfolios.

FINOVA has a number of aircraft that are off-lease and anticipates that additional aircraft will be returned to the Company as leases expire or operators are unable or unwilling to continue making payments In accordance with the provisions of SFAS No. 144 "Accounting for the Impairment or Disposal of Long-Lived Assets," FINOVA has recorded impairment losses on owned aircraft by calculating the present value of estimated cash flows. For many of these aircraft, scrap values were assumed, but for certain aircraft, the Company elected (or anticipates electing upon return of the aircraft) to park and maintain the aircraft under the assumption that they will be re-leased or sold in the future despite limited demand for certain of these aircraft today. While the current market makes it difficult to quantify, the Company believes that the recorded values determined under this methodology may significantly exceed the values that the Company would realize if it was required to

Table of Contents

liquidate those aircraft today; however, actual amounts recovered from these aircraft may differ from recorded amounts and will be significantly impacted by the used aircraft market in the future, which is difficult to predict

The process of determining appropriate carrying amounts for these aircraft is particularly difficult and subjective, as it requires the Company to estimate future demand, lease rates and scrap values for assets for which there is limited demand. The Company reassesses its estimates and assumptions each quarter. In particular, the Company assesses market activity and the likelihood that certain aircraft types, which are forecast to go back on lease in the future, will in fact be re-leased.

**Reserve for Credit Losses.** The reserve for credit losses represents FINOVA's estimate of losses inherent in the portfolio and includes reserves on impaired assets and on assets that are not impaired. Impairment reserves are created if the carrying amount of an asset exceeds its estimated recovery, which is measured by estimating the present value of expected future cash flows (discounted at contractual rates), market value or the fair value of collateral. These methodologies include the use of significant estimates and assumptions regarding future customer performance (which are inherently dependent upon assumptions about general economic conditions and those affecting the customer's business), amount and timing of future cash flows and collateral value. Reserves on assets that are not impaired are based upon assumptions including general economic conditions, overall portfolio performance, including loss experience, delinquencies and other inherent portfolio characteristics. Actual results have in the past and could in the future, differ from these estimates, resulting in an increase or reversal of reserves. As of June 30, 2005 and December 31, 2004, the reserve for credit losses totaled $47.6 million and $101.3 million, respectively

**Owned Assets.** Assets held for the production of income and operating leases are carried at amortized cost with impairment adjustments, if any, recorded as permanent markdowns through operations An owned asset is considered impaired if anticipated undiscounted cash flows are less than the carrying amount of the asset. Once the asset has been deemed impaired, accounting rules allow for several acceptable methods for measuring the amount of the impairment. FINOVA's typical method of measuring impairment is based on the comparison of the carrying amount of those assets to the present value of estimated future cash flows, using risk adjusted discount rates These estimates include assumptions regarding lessee performance, the amount and timing of future cash flows, selection of risk-adjusted discount rates for net present value calculations and residual value assumptions for leases. If future portfolio assessments indicate additional impairment, additional markdowns may be necessary. Recoveries of previous markdowns are recorded through operations when collected As of June 30, 2005 and December 31, 2004, owned assets totaled $100.0 million and $84.2 million, or 20.2% and 11.9% of total financial assets (before reserves), respectively.

**Assets Held for Sale.** Assets held for sale are comprised of assets previously classified as financing transactions and other financial assets that management does not have the intent and/or the expected ability to hold to maturity. These assets are revalued quarterly and are carried at the lower of cost or market less anticipated selling expenses, with adjustment to estimated market value, if any, recorded as a gain or loss on financial assets. Market value is often determined by the estimation of anticipated future cash flows discounted at risk adjusted market rates to determine net present value. Valuation of assets held for sale includes estimates regarding market conditions and ultimate sales prices. Actual sales prices could differ from estimates, impacting results from operations. As of June 30, 2005 and December 31, 2004, assets held for sale totaled $17.4 million and $42.5 million, or 3.5% and 6.0% of total financial assets (before reserves), respectively.

**Nonaccruing Assets.** Accounts are generally classified as nonaccruing and recognition of income is suspended when a customer becomes 90 days past due on the payment of principal or interest, or earlier, if in the opinion of management, full recovery of contractual income and principal becomes doubtful. The decision to classify accounts as nonaccruing on the basis of criteria other than delinquency, is based on certain assumptions and estimates including current and future general economic condition, industry specific economic conditions, customer financial performance, the ability of customers to obtain full refinancing of balloons or residuals due to FINOVA at maturity and FINOVA's ability or willingness to provide such refinancing In certain instances, accounts may be returned to accruing status if sustained contractual performance is demonstrated. Changes in borrower performance, assumptions or estimates could result in a material change in nonaccruing account classification and income recognition. As of June 30, 2005 and December 31, 2004, $189.8 million and $259.4 million, or 38.3% and 36.7% of total financial assets (before reserves), were classified as nonaccruing, respectively

**Fresh-Start Reporting.** Upon emergence from chapter 11, the Company adopted fresh-start reporting, which resulted in material adjustments to the carrying amounts of the Company's assets and liabilities. The asset adjustment was based on the present value of estimated future cash flows discounted at appropriate risk adjusted interest rates selected at that time. A portion of the asset adjustment was originally scheduled to accrete into income over the life of the underlying transactions. As

Table of Contents

of June 30, 2005, the unamortized amount totaled $54.5 million. If the underlying transactions are subsequently classified as nonaccruing, amortization ceases. As of June 30, 2005, accretion had been suspended on $28.8 million of the amortizable balance. The Senior Notes were initially recorded at their estimated fair value based upon their trading price shortly after they were issued. The original discount is being partially amortized as additional interest expense over the term of the notes. As of June 30, 2005, the unamortized discount totaled $558.8 million. Discount amortization is adjusted as principal payments are made. The amortization will continue to increase the recorded amount of the debt to the principal amount expected to be repaid at the time of emergence, which was originally $2.8 billion. In the event that any Senior Notes are repurchased and extinguished, the unamortized fresh–start adjustment related to those notes is written off and reflected as part of the gain or loss recognized from extinguishment of the debt.

The adjustments relating to the adoption of fresh–start reporting were based on estimates of anticipated future cash flows, risk adjusted discount rates and the market value of the Company's debt securities shortly after emergence, but prior to September 11, 2001. Changes to estimated cash flows could further impact the reserve for credit losses or cause additional write downs of assets. Generally accepted accounting principles in the United States do not permit additional fair value adjustments to the Senior Notes after the initial fresh–start reporting date, including those that would have resulted from the impact of September 11.

## RESULTS OF OPERATIONS

As a result of the Company's continued asset liquidation, shrinking operations and application of fresh–start reporting guidelines upon emergence from bankruptcy, the consolidated financial statements are not necessarily comparable from period to period. Trends during any given period may not be indicative of future trends; however, the following discussion of results may provide useful information regarding the current status of the Company

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | Change | 2005 | 2004 | Change |
| | (Dollars in thousands) | | | | | |
| Interest margin | $ (21,179) | $ (6,983) | $ (14,196) | $ (43,253) | $ (4,057) | $ (39,196) |
| Reversal of provision for credit losses | 24,930 | 19,673 | 5,257 | 45,340 | 70,363 | (25,023) |
| Net gain on financial assets | 4,468 | 19,852 | (15,384) | 20,581 | 32,680 | (12,099) |
| Portfolio expenses | (8,194) | (4,424) | (3,770) | (10,532) | (10,584) | 52 |
| General and administrative expenses | (11,535) | (13,128) | 1,593 | (24,162) | (27,338) | 3,176 |
| Net (loss) income | $ (11,510) | $ 14,990 | $ (26,500) | $ (12,026) | $ 61,064 | $ (73,090) |

### *Six Months Ended June 30, 2005 and 2004*

**Net (Loss) Income.** For the six months ended June 30, 2005, the Company reported a net loss of $12.0 million compared to net income of $61.1 million for the six months ended June 30, 2004.

In general, the decrease in net income was primarily attributable to the six months ended June 30, 2005 containing a lower level of asset realization in excess of recorded carrying amounts. Asset realization in excess of recorded carrying amounts is primarily reflected within the financial statements in the form of reversal of excess reserve for credit losses, net gains from the sale of assets and the recognition of suspended income upon the payoff of assets.

Even though year–to–date asset realization for 2005 did not reach the level of 2004, the Company still experienced better than anticipated realization and performance of asset portfolios. The Company has been cautioning investors that asset realization trends were not expected to continue at the same level as prior periods. Many of the Company's more desirable and marketable assets have been liquidated and the remaining portfolio is becoming more concentrated in non–performing assets and used aircraft, both of which have been work intensive and difficult to liquidate at acceptable prices. However, the aircraft–financing market continued to display increased activity and aircraft values. As a result, the Company had a greater level of asset realization in excess of recorded carrying amounts from its transportation portfolio during the first half of 2005 than occurred in 2004, while the remainder of the portfolio experienced a significant decline in the level and volume of assets liquidated in excess of carrying amounts. The Company has seen an increase in demand for certain types of aircraft; however, the Company remains cautious because of uncertainty in the airline industry. The uncertainty in the airline industry

Table of Contents

in general and our ability to realize values in particular centers on what might happen to aircraft lease rates and values if additional carriers go into liquidation and excess aircraft are parked and forced into the market, among other factors Most major domestic carriers continue to post substantial losses due in part to high fuel costs coupled with a high cost structure. If the high fuel costs continue for a lengthy period of time or airlines are not able to efficiently compete with low–cost carriers, additional airlines may be put on bankruptcy watch by the marketplace. As of June 30, 2005, a number of prominent domestic airlines were in bankruptcy with others threatening to file if certain cost reductions cannot be realized.

In certain instances, assets liquidated during 2005 returned amounts in excess of recorded values, but as expected, realization has slowed from prior periods. Opportunities for recoveries in excess of recorded values continue to exist and are expected to occur, but the Company expects those events to continue to become more sporadic. The Company is encouraged by the positive signs in the aircraft–financing market, but remains cautious due to the fragile nature of the airline industry. As a result, the Company expects net income for 2005 to continue to trail the prior year level

**Interest Margin.** For the six months ended June 30, 2005, interest margin decreased $39 2 million to a negative $43.3 million as compared to a negative margin of $4.1 million for the six months ended June 30, 2004. The decline in interest margin was primarily attributable to the recognition of a lower level of suspended and deferred income ($9.6 million and $60.4 million for the six months ended June 30, 2005 and 2004, respectively), which was generated from payoffs of certain assets in excess of their carrying amounts and the return to earning status of certain assets following demonstration of sustained performance. Income recognition is suspended when an account is classified as a nonaccruing asset and any subsequent interest payments received are applied against its carrying amount to mitigate the Company's exposure. In certain instances, suspended income is recognized upon payoff, if proceeds realized are in excess of the carrying amount or if after sustained performance is demonstrated, the account is returned to accruing status.

The Company believes that further instances where it will recognize suspended and deferred income may occur; however, any income recognition in future periods is not expected to reach 2004 levels. The portfolio is considerably smaller and the Company is currently monitoring only a few accounts with suspended income for potential stabilization and demonstration of sustained performance.

The Company's interest margin was significantly impacted by a lower level of earning assets ($180.5 million and $613.8 million at June 30, 2005 and 2004, respectively) than the principal amount of outstanding debt ($1.8 billion and $2 7 billion at June 30, 2005 and 2004, respectively) and the Company's high aggregate cost of funds (aggregate effective rate of 13.4% and 11.2% for the six months ended June 30, 2005 and 2004, respectively). The increase in the aggregate effective rate was primarily due to the acceleration of fresh–start discount amortization following principal prepayment of the Senior Notes earlier than originally anticipated when fresh–start guidelines were applied upon emergence.

**Reversal of Provision for Credit Losses.** For the six months ended June 30, 2005 and 2004, the Company recorded reversals of provision for credit losses of $45.3 million and $70.4 million, respectively, to reduce its reserve for credit losses. The reserve reduction was primarily due to recoveries ($6.3 million and $21.8 million for the six months ended June 30, 2005 and 2004, respectively) of amounts previously written off, proceeds received from prepayments and asset sales exceeding recorded carrying amounts (net of reserves), improved collection experience and the Company's detailed assessment of estimated inherent losses in its portfolio.

In addition, the Company's income recognition policy for nonaccruing accounts can result in periodic reserve reductions In accordance with SFAS No. 114, "Accounting by Creditors for Impairment of a Loan," impairment reserves are recorded if the carrying amount of a loan exceeds the net present value of expected cash flows. For nonaccruing accounts, any cash received is applied against the carrying amount of the transaction. As a result, carrying amounts decline at a faster pace than net present value, thus reducing the impairment reserve. This policy had a greater impact on the reversal of provision for credit losses in 2004 than in 2005 due to the reinstatement of accounts to accruing status over the last year. The majority of accounts currently classified as nonaccruing are not making payments on a regular basis.

The pace of collections and account payoffs has continued to be faster than expected. In most portfolios, amounts collected have often exceeded anticipated cash flows, resulting in a partial reversal of previously established reserves. The Company believes it is unlikely that asset realization trends for 2005 will continue at the same rate as 2004.

The measurement of credit impairment and asset valuation is dependent upon the significant use of estimates and management discretion when predicting expected cash flows. These estimates are subject to known and unknown risks,

Table of Contents

uncertainties and other factors that could materially impact the amounts reported and disclosed herein See Critical Accounting Policies and the Special Note Regarding Forward-Looking Statements for a discussion of these and additional factors impacting the use of estimates

**Net Gain on Financial Assets.** The Company realized a net gain on financial assets of $20.6 million for the six months ended June 30, 2005 compared to a net gain of $32 7 million for the six months ended June 30, 2004. Gains are sporadic in nature and not necessarily comparable from one period to the next; however, the decrease over the prior year was primarily attributable to the prior year including a one-time gain from the sale of a substantial portion of the Company's timeshare portfolio, partially offset by increased activity and realization from the Company's transportation portfolio during 2005

The net gain during the first six months of 2005 was primarily attributable to sales of owned assets and financing contracts in excess of carrying amounts, the most significant of which included $21.1 million of net gains realized from sales of aircraft and parts, and the forfeiture by aircraft operators of security deposits and maintenance reserves, $2.8 million of net gains realized from the sale and valuation of private and public investments and $5.3 million of net gains from the valuation and sale of the Company's last two remaining real estate leveraged leases, which was finalized during the second quarter of 2005. Partially offsetting the gain activity were $8.0 of net valuation markdowns within the transportation leveraged lease portfolio.

The net gain during the first six months of 2004 was primarily attributable to sales of owned assets and financing contracts in excess of carrying amounts, the most significant of which included a $21 4 million gain realized on the sale of a portion of the Company's timeshare resort portfolio, $5.0 million of net gains realized on the sale of private and public investments and $13.0 million of net gains realized from sales of aircraft and parts, and the forfeiture by aircraft operators of security deposits and maintenance reserves Partially offsetting these net gains were $10.0 million of impairment markdowns within the Company's real estate leveraged lease portfolio.

The Company entered into a number of transactions to sell assets over the last couple of years and expects asset sales to continue. However, barring continued improvement in the aircraft-financing market, the Company generally does not expect to maintain aggregate gain realization levels comparable to those years in future asset sales, due to the fact that many of its more attractive and marketable assets within the portfolio have been liquidated, sold or collected. The Company's remaining portfolio of assets is concentrated in owned aircraft and impaired loans and financing leases. As previously discussed, improvements within the aircraft-financing market have generated increased volume and realization from the Company's transportation portfolio, but the Company is skeptical about whether this trend will be sustained and if so, for how long.

FINOVA will continue to consider future sales of all or substantially all of the remaining portfolio, if one or more buyers can be found at acceptable prices; however, there can be no assurance that FINOVA will be successful in efforts to sell additional assets In evaluating offers, FINOVA will generally compare offers against FINOVA's internal net present value of estimated future cash flows projected to be collected from those assets less the net present value of FINOVA's operating costs to collect those assets

**Portfolio Expense.** For the six months ended June 30, 2005, portfolio expenses totaled $10.5 million compared to $10 6 million for the same period of 2004. The Company has continued to experience a decline in the level of problem account and workout expenses as assets have declined, except for transportation related assets.

The transportation portfolio continues to incur the majority of the Company's portfolio costs ($6 9 million and $6.4 million during the six months ended June 30, 2005 and 2004, respectively) As aircraft values have improved, it has made more economic sense in some instances to increase the maintenance reinvestment for certain types of aircraft. As a result, the transportation portfolio has experienced an increase in portfolio expenses, while the level of assets has declined. Portfolio costs within the transportation portfolio will fluctuate with the timing and number of maintenance reinvestment projects. The Company expects to continue to reinvest in certain types of aircraft as long as it economically makes sense.

**General and Administrative Expenses.** General and administrative expenses decreased $3.2 million to $24.2 million for the six months ended June 30, 2005. The decrease was primarily due to $4.9 million of cost savings resulting from staffing and office occupancy reductions (75 employees at June 30, 2005 compared to 137 at June 30, 2004), partially offset by higher severance accruals ($2.5 million) related to the Company's recent staffing reductions and to notifications of future terminations. The Company expects the dollar level of general and administrative expenses to continue to decrease as portfolio and staffing levels decrease; however, general and administrative expenses as a percentage of assets or revenues

Table of Contents

will likely increase over time as a result of certain fixed costs, the costs of being a public company and the high level of work intensive assets in the portfolio.

As previously discussed, the Company accelerated numerous staff reductions, which were designed to more closely align FINOVA's operating costs with the size of the remaining portfolio. The costs savings from these reductions will not begin to be seen until the second half of 2005 and their full benefit will not be realized until 2006. A portion of the savings in 2005 will be offset by increased severance costs.

**Income Tax Expense.** For the six months ended June 30, 2005 and 2004, income tax expense related to pre-tax book income was entirely offset by a decrease in valuation allowances against deferred tax assets, which were previously established due to the Company's concern regarding its ability to utilize income tax benefits generated from losses in prior periods. As of June 30, 2005, the Company had federal net operating losses of $1.2 billion available for carryforward

*Three Months Ended June 30, 2005 and 2004*

**Net (Loss) Income.** For the three months ended June 30, 2005, the Company reported a net loss of $11.5 million compared to net income of $15.0 million for the three months ended June 30, 2004

In general, the decrease in net income was primarily attributable to the second quarter of 2005 containing a lower level of asset realization in excess of recorded carrying amounts. Asset realization in excess of recorded carrying amounts is primarily reflected within the financial statements in the form of reversal of excess reserve for credit losses, net gains from the sale of assets and the recognition of suspended income upon the payoff of assets.

Even though asset realization for the second quarter of 2005 did not reach the level of 2004, the Company still experienced better than anticipated realization and performance of asset portfolios. The Company has been cautioning investors that asset realization trends were not expected to continue at the same level as prior periods. Many of the Company's more desirable and marketable assets have been liquidated and the remaining portfolio is becoming more concentrated in non-performing assets and used aircraft, both of which have been work intensive and difficult to liquidate at acceptable prices. However, the aircraft-financing market continued to display increased activity and aircraft values. As a result, the Company had a greater level of asset realization in excess of recorded carrying amounts from its transportation portfolio during the second quarter of 2005 than occurred in 2004, while the remainder of the portfolio experienced a significant decline in the level and volume of assets liquidated in excess of carrying amounts. The Company has seen an increase in demand for certain types of aircraft; however, the Company remains cautious because of uncertainty in the airline industry. The uncertainty in the airline industry in general and our ability to realize values in particular centers on what might happen to aircraft lease rates and values if additional carriers go into liquidation and excess aircraft are parked and forced into the market, among other factors. Most major domestic carriers continue to post substantial losses due in part to high fuel costs coupled with a high cost structure. If the high fuel costs continue for a lengthy period of time or airlines are not able to efficiently compete with low-cost carriers, additional airlines may be put on bankruptcy watch by the marketplace. As of June 30, 2005, a number of prominent domestic airlines were in bankruptcy with others threatening to file if certain cost reductions cannot be realized.

In certain instances, assets liquidated during the second quarter of 2005 returned amounts in excess of recorded values, but as expected, realization has slowed from prior periods. Opportunities for recoveries in excess of recorded values continue to exist and are expected to occur, but the Company expects those events to continue to become more sporadic. The Company is encouraged by the positive signs in the aircraft-financing market, but remains cautious due to the fragile nature of the airline industry. As a result, the Company expects net income for 2005 to continue to trail the prior year level.

**Interest Margin.** For the three months ended June 30, 2005, interest margin decreased $14.2 million to a negative $21.2 million as compared to a negative margin of $7.0 million for the three months ended June 30, 2004. The decline in interest margin was primarily attributable to the recognition of a lower level of suspended and deferred income ($3.7 million and $25.7 million for the three months ended June 30, 2005 and 2004, respectively), which was generated from payoffs of certain assets in excess of their carrying amounts and the return to earning status of certain assets following demonstration of sustained performance. Income recognition is suspended when an account is classified as a nonaccruing asset and any subsequent interest payments received are applied against its carrying amount to mitigate the Company's exposure. In certain instances, suspended income is recognized upon payoff, if proceeds realized are in excess of the carrying amount or if after sustained performance is demonstrated, the account is returned to accruing status.

Table of Contents

The Company believes that further instances where it will recognize suspended and deferred income may occur; however, any income recognition in future periods is not expected to reach 2004 levels. The portfolio is considerably smaller and the Company is currently monitoring only a few accounts with suspended income for potential stabilization and demonstration of sustained performance.

The Company's interest margin was significantly impacted by a lower level of earning assets ($180.5 million and $613.8 million at June 30, 2005 and 2004, respectively) than the principal amount of outstanding debt ($1.8 billion and $2.7 billion at June 30, 2005 and 2004, respectively) and the Company's high aggregate cost of funds (aggregate effective rate of 13.6% and 11.8% for the three months ended June 30, 2005 and 2004, respectively). The increase in the aggregate effective rate was primarily due to the acceleration of fresh-start discount amortization following principal prepayment of the Senior Notes earlier than originally anticipated when fresh-start guidelines were applied upon emergence

**Reversal of Provision for Credit Losses.** For the three months ended June 30, 2005 and 2004, the Company recorded a reversal of provision for credit losses of $24.9 million and $19.7 million, respectively, to reduce its reserve for credit losses. The reserve reduction was primarily due to recoveries ($1.2 million and $4.7 million for the three months ended June 30, 2005 and 2004, respectively) of amounts previously written off, proceeds received from prepayments and asset sales exceeding recorded carrying amounts (net of reserves), improved collection experience and the Company's detailed assessment of estimated inherent losses in its portfolio.

In addition, the Company's income recognition policy for nonaccruing accounts can result in periodic reserve reductions. In accordance with SFAS No. 114, "Accounting by Creditors for Impairment of a Loan," impairment reserves are recorded if the carrying amount of a loan exceeds the net present value of expected cash flows For nonaccruing accounts, any cash received is applied against the carrying amount of the transaction As a result, carrying amounts decline at a faster pace than net present value, thus reducing the impairment reserve. This policy had a greater impact on the reversal of provision for credit losses in 2004 than in 2005 due to the reinstatement of accounts to accruing status over the last year. The majority of accounts currently classified as nonaccruing are not making payments on a regular basis.

The pace of collections and account payoffs has continued to be faster than expected. In most portfolios, amounts collected have often exceeded anticipated cash flows, resulting in a partial reversal of previously established reserves. The Company believes it is unlikely that asset realization trends for 2005 will continue at the same rate as 2004.

The measurement of credit impairment and asset valuation is dependent upon the significant use of estimates and management discretion when predicting expected cash flows. These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed herein. See Critical Accounting Policies and the Special Note Regarding Forward-Looking Statements for a discussion of these and additional factors impacting the use of estimates.

**Net Gain on Financial Assets.** The Company realized a net gain on financial assets of $4.5 million for the three months ended June 30, 2005 compared to a net gain of $19.9 million for the three months ended June 30, 2004 Gains are sporadic in nature and not necessarily comparable from one period to the next; however, the decrease over the prior year was primarily attributable to the prior year including a one-time gain from the sale of a substantial portion of the Company's timeshare portfolio, partially offset by increased activity and realization from the Company's transportation portfolio during 2005.

The net gain during the second quarter of 2005 was primarily attributable to sales of owned assets and financing contracts in excess of carrying amounts, the most significant of which included $9.5 million of net gains realized from sales of aircraft and parts, and the forfeiture by aircraft operators of security deposits and maintenance reserves, partially offset by $3.6 million of net valuation markdowns within the transportation leveraged lease portfolio.

The net gain during the second quarter of 2004 was primarily attributable to sales of owned assets and financing contracts in excess of carrying amounts, the most significant of which included a $21.4 million gain realized on the sale of a portion of the Company's timeshare resort portfolio and $6.2 million of gains realized from sales of aircraft and parts, and the forfeiture by aircraft operators of security deposits and maintenance reserves. Partially offsetting these net gains were $10.0 million of impairment markdowns within the Company's real estate leveraged lease portfolio.

The Company entered into a number of transactions to sell assets over the last couple of years and expects asset sales to continue. However, barring continued improvement in the aircraft-financing market, the Company generally does not expect to

Table of Contents

maintain aggregate gain realization levels comparable to those years in future asset sales, due to the fact that many of its more attractive and marketable assets within the portfolio have been liquidated, sold or collected The Company's remaining portfolio of assets is concentrated in owned aircraft and impaired loans and financing leases. As previously discussed, improvements within the aircraft–financing market have generated increased volume and realization from the Company's transportation portfolio, but the Company is skeptical about whether this trend will be sustained and if so, for how long

During the second quarter of 2005, the Company evaluated multiple offers to purchase a substantial portion of the remaining assets; however, prices for those assets were not acceptable. FINOVA will continue to consider future sales of all or substantially all of the remaining portfolio, if one or more buyers can be found at acceptable prices; however, there can be no assurance that FINOVA will be successful in efforts to sell additional assets. In evaluating offers, FINOVA will generally compare offers against FINOVA's internal net present value of estimated future cash flows projected to be collected from those assets less the net present value of FINOVA's operating costs to collect those assets

**Portfolio Expense.** For the three months ended June 30, 2005, portfolio expenses totaled $8.2 million compared to $4.4 million for the same period of 2004. The increase was primarily due to the timing and level of maintenance reinvestment projects within the transportation portfolio.

The transportation portfolio continues to incur the majority of the Company's portfolio costs ($5.4 million and $2.7 million during the three months ended June 30, 2005 and 2004, respectively). As aircraft values have improved, it has made more economic sense in some instances to increase the maintenance reinvestment for certain types of aircraft. As a result, the transportation portfolio has experienced an increase in portfolio expenses, while the level of assets has declined. Portfolio costs within the transportation portfolio will fluctuate with the timing and number of maintenance reinvestment projects. The Company expects to continue to reinvest in certain types of aircraft as long as it economically makes sense.

**General and Administrative Expenses.** General and administrative expenses decreased $1.6 million to $11.5 million for the three months ended June 30, 2005. The decrease was primarily due to $2.2 million of cost savings resulting from staffing and office occupancy reductions (75 employees at June 30, 2005 compared to 137 at June 30, 2004), partially offset by higher severance accruals ($1.4 million) related to notifications of future terminations. The Company expects the dollar level of general and administrative expenses to continue to decrease as portfolio and staffing levels decrease; however, general and administrative expenses as a percentage of assets or revenues will likely increase over time as a result of certain fixed costs, the costs of being a public company and the high level of work intensive assets in the portfolio.

As previously discussed, the Company accelerated numerous staff reductions, which were designed to more closely align FINOVA's operating costs with the size of the remaining portfolio. The costs savings from these reductions will not begin to be seen until the second half of 2005 and their full benefit will not be realized until 2006. A portion of the savings in 2005 will be offset by increased severance costs.

**Income Tax Expense.** For the three months ended June 30, 2005 and 2004, income tax expense related to pre–tax book income was entirely offset by a decrease in valuation allowances against deferred tax assets, which were previously established due to the Company's concern regarding its ability to utilize income tax benefits generated from losses in prior periods. As of June 30, 2005, the Company had federal net operating losses of $1.2 billion available for carryforward.

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

Because substantially all of the Company's assets are pledged to secure the obligations under the Intercompany Notes securing the Senior Notes, FINOVA's ability to obtain additional or alternate financing is severely restricted. Berkadia has no obligation to lend additional sums to or to further invest in the Company. Accordingly, FINOVA intends to rely on internally generated cash flows from the liquidation of its assets as its only meaningful source of liquidity

The terms of the Indenture prohibit the Company from using available funds (after certain permitted uses) for any purpose other than to satisfy its obligations to creditors and to make limited payments to stockholders in certain circumstances. Under the terms of the Indenture, the Company is permitted to establish a cash reserve in an amount not to exceed certain defined criteria. Due to the Company's limited sources of liquidity, the estimation of cash reserves is critical to the overall liquidity of the Company. Cash reserve estimations are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts determined Failure to adequately estimate a cash reserve in one period could result in

Table of Contents

insufficient liquidity to meet obligations in that period, or in a subsequent period, if actual cash requirements exceed the cash reserve estimates. Generally speaking, cash reserves typically equal anticipated cash flows to cover operating costs, tax payments, fundings under existing customer commitments, interest payments and any other necessary cash flows expected to occur during the next six month period. The Company has the discretion to, and has from time to time, adjusted its cash reserve methodology

During the second quarter of 2005, the Company made a $59.4 million partial principal prepayment on the Senior Notes, which reduced the outstanding principal to $1 8 billion. In July 2005, FINOVA announced an additional $89.0 million prepayment that will be made during the third quarter of 2005. Following this prepayment, cumulative principal prepayments from May 2004 through the third quarter of 2005 will have totaled $1 2 billion or 42% of the face amount ($2.97 billion) of the Senior Notes.

In accordance with the terms of the Indenture, the Company is required to use any excess cash, as defined in the Indenture, to make semi–annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at the Company's option.

The Company does not believe that it has sufficient assets to fully repay the Senior Notes, and the Indenture prohibits the Company from engaging in new business. Therefore, FINOVA intends to rely on the liquidation of its remaining assets as its only meaningful source of liquidity. The Senior Notes have a first priority security interest in substantially all of FINOVA's remaining assets

Stockholders should not expect any payments or distributions from FINOVA The Indenture contemplates that as principal payments are made on the Senior Notes, FINOVA stockholders will receive a distribution equal to 5.263% of each principal prepayment. However, the Indenture prohibits FINOVA from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law. Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture. Given the Company's significant negative net worth and its belief that the Senior Notes will not be fully repaid, FINOVA is required to retain impermissible restricted payments until such time, if ever, that it is no longer restricted from making a distribution to its stockholders or until it is necessary to use the cash to satisfy its debt obligations. In conjunction with the prepayments of Senior Notes noted above, the Company will have retained a total of $65.6 million by August 15, 2005. Retained amounts are segregated and reflected as restricted cash on the balance sheet, pending their final disposition. The Company anticipates that the retained amounts will eventually be paid to the creditors, not the stockholders. If the funds were to be paid to the stockholders, affiliates of Berkadia (jointly owned by Berkshire Hathaway and Leucadia), which own 50% of FINOVA's common stock, would receive half of the retained amounts. Berkadia has advised the Company that it does not believe that stockholders are entitled to the retained amounts since FINOVA cannot fully satisfy its creditor obligations.

In April 2005, FINOVA filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) FINOVA no longer needs to direct funds into a restricted account, and (2) FINOVA may use the funds in the restricted account to satisfy its obligations to creditors.

In June 2005, the Bankruptcy Court ordered that the former Equity Committee (the "Equity Committee") be reconstituted. The Equity Committee was reconstituted on July 14, 2005. As a precursor to the Bankruptcy Court ruling upon FINOVA's motion, the Equity Committee shall have the opportunity to independently review FINOVA's state of solvency.

**The Company has a negative net worth of $531.4 million as of June 30, 2005 ($1.1 billion if the Senior Notes are considered at their principal amount due). Based on the Company's current financial condition (including having only $448.2 million of net financial assets), it is highly unlikely there will be funds available to fully repay the outstanding principal on the Senior Notes at maturity or make any 5% distribution to common stockholders, absent a court order. As a result, there would not be a return to the Company's stockholders. Consequently, investing in the Senior Notes and common stock involves a high level of risk.**

*Obligations and Commitments*

For a detailed listing of FINOVA's significant contractual obligations and contingent commitments, refer to the Company's Annual Report on Form 10–K for the year ended December 31, 2004. There have not been any material changes during the

Table of Contents

six months ended June 30, 2005, except for the Senior Note prepayments discussed throughout this document and the motion filed related to the restricted stockholder distributions.

*Collection of the Portfolio*

As noted previously, the Company's current business activities are limited to maximizing the value of its portfolio through the orderly collection of its assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments, sales of assets or collateral and may include efforts to retain certain customer relationships and restructure or terminate other relationships. During the second quarter of 2005, the Company evaluated multiple offers to purchase a substantial portion of the remaining assets; however, prices for those assets were not acceptable. FINOVA will continue to consider future sales of all or substantially all of the remaining portfolio, if one or more buyers can be found at acceptable prices; however, there can be no assurance that FINOVA will be successful in efforts to sell additional assets. Due to restrictions contained in the Indenture as well as its general inability to access capital in the public and private markets, the Company's only viable source of cash flow is from the collection of its portfolio.

The following table presents the activity in total financial assets, net of the reserve for credit losses for the six months ended June 30, 2005:

| (Dollars in thousands) | |
|---|---|
| Total financial assets at December 31, 2004 | $604,665 |
| Cash activity: | |
| Fundings under existing customer commitments | 7,741 |
| Collections and proceeds from financial assets | (203,521) |
| Net cash flows | (195,780) |
| Non-cash activity: | |
| Reversal of provision for credit losses | 45,340 |
| Net loss on financial assets | (1,746) |
| Other non-cash activity | (4,320) |
| Net non-cash activity | 39,274 |
| Total financial assets at June 30, 2005 | $ 448,159 |

Total financial assets, net of the reserve for credit losses, declined to $448.2 million at June 30, 2005, down from $604.7 million at December 31, 2004. During 2005, net cash flows from the portfolio totaled $195.8 million, while non-cash activity resulted in a $39.3 million increase in net financial assets. Components of net cash flows included $167.7 million of collections from financial assets (including recoveries) and $35.8 million from the sale of assets (excluding cash gains), offset by $7.7 million of fundings under existing customer commitments. Collections from financial assets include prepayments (customer payments in advance of scheduled due dates). Non-cash activity included a $45.3 million reversal of reserves, partially offset by a $1.7 million net decrease related to the valuation of owned assets and other non-cash activity of $4.3 million.

The real estate portfolio (combined remaining resort and specialty real estate portfolios) declined to a carrying amount of $60.4 million or 12.2% of the Company's total financial assets (before reserves) at June 30, 2005 as compared to $156.1 million or 22.1% of the Company's total financial assets (before reserves) at December 31, 2004. The decline was primarily attributable to prepayments, assets sales and scheduled amortization. During the second quarter of 2005, the Company completed the sale of its last two real estate leveraged leases for net proceeds of $14.1 million. Additionally, the Company has been formally notified that certain customers intend to prepay their respective obligations during the second half of 2005. As a result, the remainder of the real estate portfolio is expected to continue to have accelerated runoff, primarily from its accruing assets. These accruing assets are generally recorded at a low discount to par and their liquidation is not expected to generate significant returns in excess of par or contractual amounts. The nonperforming assets within the portfolio have been marked down and/or reserved due to certain issues or uncertainties with the customers or the underlying collateral. These assets have the potential for recoveries in excess of their net carrying amounts.

Table of Contents

The carrying amount of the Company's transportation portfolio declined $49.5 million since December 31, 2004 to $244.6 million at June 30, 2005, which represents 49.3% of the Company's total financial assets (before reserves) The decline was primarily attributable to prepayments, asset sales, scheduled amortization and valuation adjustments to the transportation leveraged lease portfolio. The decline was partially offset by the prepayment of $12.5 million of non-recourse debt associated with two leveraged leases. FINOVA repossessed the underlying collateral (an aircraft and a spare engine) related to these leveraged leases during the first quarter of 2005. The transportation portfolio is primarily comprised of older vintage aircraft, often of class and configuration with limited demand in the aircraft market. FINOVA has a number of aircraft that are off-lease and anticipates that additional aircraft will be returned to the Company as leases expire or operators are unable or unwilling to continue making payments The Company's portfolio of older aircraft generally is not desirable to domestic commercial airlines and as a result, off-lease aircraft are primarily marketed in whole or part to carriers in developing countries. FINOVA continues to reassess the likelihood of certain off-lease assets being re-leased or sold The potential for substantial recoveries on these accounts continues to be hampered by the uncertainty in the airline industry. A market for many of these aircraft may never fully return, but the Company believes the course of action to maximize their value is to patiently work and market these assets and wait for opportune moments to sell or lease the assets that have the potential to return to service, and scrap those assets that are not likely to return to service. As previously discussed, the aircraft-financing market continued to display increased activity and aircraft values. As a result, the Company had a greater level of asset realization in excess of recorded carrying amounts from its transportation portfolio during the first half of 2005 than occurred in 2004. While the Company has seen an increase in demand for certain types of aircraft, the Company remains cautious because of uncertainty in the airline industry.

All other portfolios (carrying amount of $190.8 million at June 30, 2005) are comprised of the remnants of former portfolios (commercial equipment, communications, corporate finance, franchise, healthcare, mezzanine, public and rediscount) that for various reasons have not been sold or collected. The decline in the portfolio was primarily attributable to numerous prepayments, asset sales and scheduled amortization. This portfolio represents 38.5% of the Company's total financial assets (before reserves) and generally contains assets that are more difficult and work intensive to liquidate. Approximately 75% of these assets are impaired or nonaccruing. Many of the borrowers have missed payments, including balloons obligations, or are otherwise in default The Company expects runoff within this portfolio to continue at somewhat the same pace as 2004; however, the pace of runoff will be largely dependent on the resolution of a few significant accounts within the portfolio, including the litigation related to loans to The Thaxton Group Inc. and related companies described in Part I, Item 1, Legal Proceedings, of this report. Because this portfolio has been significantly marked down and reserved, the potential exists for recoveries in excess of carrying amounts; however, there can be no assurance that the Company will be successful in recovering amounts in excess its carrying amounts.

The Company anticipates that when all or substantially all of the assets have been liquidated that the Company's affairs will need to be wound-up. The Company is analyzing the potential methods of wind-up, which might involve a sale of the remaining assets, an assignment for the benefit of the creditors, or some other proceeding, any of which may or may not be in conjunction with bankruptcy or state law liquidation proceedings We cannot predict the timing or nature of that final wind-up, but the Company is working towards accomplishing that end in a prudent manner.

FINOVA's reserve for credit losses decreased to $47.6 million at June 30, 2005 from $101.3 million at December 31, 2004. At June 30, 2005, the total carrying amount of impaired loans and leases was $316.3 million, of which $128.4 million were revenue accruing. The Company has established impairment reserves of $45.0 million related to $106.4 million of impaired assets At December 31, 2004, the total carrying amount of impaired loans and leases was $458.8 million, of which $202.4 million were revenue accruing. Impairment reserves at December 31, 2004 totaled $96.2 million related to $169.2 million of impaired assets.

Reserves on impaired assets decreased due to write-offs, an improvement in pay-off and collection experience on certain assets previously reserved and the Company's application of cash received on nonaccruing assets, thus reducing the impairment reserves required on those assets.

Other reserves related to estimated inherent losses on unimpaired assets decreased as a result of prepayments, collections and the migration of certain accounts to impaired assets.

Accounts classified as nonaccruing were $189.8 million or 38.3% of total financial assets (before reserves) at June 30, 2005 as compared to $259.4 million or 36.7% at December 31, 2004. The decline in nonaccruing assets was primarily attributed to collections and asset sales of $37.6 million and write-offs and net valuation markdowns of $22.7 million. Also contributing to

Table of Contents

the decline was the classification of newly repossessed aircraft as assets held for the production of income, which are excluded from nonaccruing assets.

The Company continues to be concerned regarding its ability to fully collect principal and interest on certain nonaccruing assets that have significant balloon payments or residual values due to FINOVA at maturity, because those customers may not have the ability to obtain refinancing at maturity for the full amount of these residual/balloon payments. FINOVA's ability or willingness to continue to extend credit to these borrowers may be affected by its own capital resources and its assessment of the costs and benefits of doing so. In certain of these cases, FINOVA has classified transactions as nonaccruing even though principal and interest payments are current. If necessary, impairment reserves on these transactions are established in accordance with SFAS No. 114.

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this report are "forward-looking," in that they do not discuss historical fact, but instead reflect future expectations, projections, intentions or other items. Forward-looking statements are made pursuant to the safe-harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include assumptions, estimates and valuations implicit in the financial statements and related notes as well as matters discussed throughout this report including sections captioned Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations and Item 3. Quantitative and Qualitative Disclosure About Market Risk. They are also made in documents incorporated in this report by reference, or in which this report may be incorporated.

Forward-looking statements are inherently subject to risks and uncertainties, many of which cannot be predicted or quantified. When used in this report, the words "estimate," "expects," "anticipates," "believes," "plans," "intends" and similar expressions are intended to identify forward-looking statements that involve known and unknown risks and uncertainties. The risks, uncertainties and other factors that could cause FINOVA's actual results or performance to differ materially from those contemplated by the forward-looking statements include, but are not limited to those discussed or identified from time to time in our public filings including:

- The extent to which FINOVA is successful in implementing its business strategy, including the efforts to maximize the value of its portfolio through orderly collection or sales of assets. The carrying amounts and impairment of FINOVA's portfolio are based on estimates of asset value and the estimation and timing of future cash flows. Actual results may differ from the estimated amounts. Failure to fully implement its business strategy might result in adverse effects, impair the Company's ability to repay outstanding debt and other obligations and have a materially adverse impact on its financial position and results of operations. Conversely, successful implementation could result in unanticipated recoveries in excess of estimated values.

- The effect of economic conditions and the performance of FINOVA's borrowers. Economic conditions in general or in particular market segments could impair the ability of FINOVA's borrowers to operate or expand their businesses, which might result in decreased performance, adversely affecting their ability to repay their obligations. The rate of borrower defaults or bankruptcies may increase. Changing economic conditions could adversely affect FINOVA's ability to realize estimated cash flows. Conversely, economic conditions and borrower performance could improve, resulting in better results than anticipated in the Company's cash flow estimates.

- Loss of employees. FINOVA must retain a sufficient number of employees with relevant knowledge and skills to continue to monitor, collect and sell its portfolio. Failure to do so could result in additional losses. Retention incentives intended to retain that employee base may not be successful in the future. In addition, as staff is reduced, internal controls and procedures must be readjusted to help assure proper handling and reporting of financial and other matters. Doing so becomes more difficult as staff is reduced, and the loss of key personnel could have a significant impact on the ability to monitor, collect and manage the portfolio.

- Conditions affecting the Company's aircraft portfolio including changes in Federal Aviation Administration directives and conditions affecting the demand for used aircraft and the demand for aircraft spare parts. FINOVA's aircraft are often of older vintage and contain configurations of engines, avionics, fuel tanks and other components that may not be in as high a demand as other available aircraft in that class. Future demand for those aircraft may decrease further as newer or

Table of Contents

more desirable aircraft and components become available. High fuel prices may adversely affect the demand for less fuel–efficient aircraft, including many of those in FINOVA's portfolio.

- The process of selling aircraft parts inherently has more control risks than selling whole aircraft. The Company must maintain an adequate control environment for inventory, which includes having knowledgeable personnel and systems to monitor, collect and manage that process. Failure to maintain adequate controls can result in the loss of inventory or failure to maximize the value of those assets.

- Changes in government regulations, tax rates and similar matters The Company has not recorded a benefit in its financial statements for its existing tax attributes and estimated future tax deductions since it does not expect to generate the future taxable income needed to use those tax benefits. The Company may never be able to use those tax attributes, including most of its net operating loss carryforwards

- Potential liabilities associated with dispositions of assets.

- The accuracy of information relied upon by FINOVA, which includes information supplied by its borrowers or prepared by third parties, such as appraisers Inaccuracies in that information could lead to inaccuracies in the estimates, including asset valuation and cash flow projections.

- As the portfolio declines, increasing concentrations of financial assets in certain industries such as transportation could make the overall portfolio more subject to changes in performance in that industry. Additionally, the Company previously completed multiple financial transactions with individual borrowers and their affiliates, resulting in a greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including transportation) of such borrowers and their affiliates.

- Risks of litigation. See Part II Item 1 Legal Proceedings, for a further discussion.

- Others risk detailed in this and FINOVA's other SEC reports or filings.

FINOVA does not intend to update forward–looking information to reflect actual results or changes in assumptions or other factors that could affect those statements FINOVA cannot predict the risk from reliance on forward–looking statements in light of the many factors that could affect their accuracy.

Table of Contents

**Item 3. Quantitative and Qualitative Disclosure About Market Risk**

There were no material changes from the information provided in the Company's Annual Report on Form 10-K for the year ended December 31, 2004

**Item 4. Controls and Procedures**

(a) The Company's management evaluated, with the participation of the Company's principal executive and principal financial officer, the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of June 30, 2005. Based on their evaluation, the Company's principal executive and principal financial officer concluded that the Company's disclosure controls and procedures were effective as of June 30, 2005.

(b) There has been no change in the Company's internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the Company's fiscal quarter ended June 30, 2005, that has materially affected or is reasonably likely to materially affect, the Company's internal control over financial reporting.

As a result of Section 404 of the Sarbanes-Oxley Act of 2002 and the rules issued thereunder, the Company is scheduled to include in its Annual Report on Form 10-K for the year ending December 31, 2006 a report on management's assessment of the effectiveness of the Company's internal controls over financial reporting. The Company's independent registered public accountants will also be required to attest to and report on management's assessment.

The process of complying with these requirements includes a comprehensive evaluation and documentation of the Company's internal controls over financial reporting. In this regard, management is prepared to dedicate internal resources and adopt a detailed plan to (i) document the Company's internal controls over financial reporting, (ii) assess the adequacy of the Company's internal controls over financial reporting, (iii) take steps to improve control processes where appropriate and (iv) validate through testing that controls are functioning as documented. There can be no assurance that deficiencies or weaknesses in the design or operation of internal controls over financial reporting will not be found and, if found, that the Company will have sufficient time to remediate any such deficiencies or weaknesses and perform testing procedures before the end of 2006.

The Company believes that any system of internal accounting controls, no matter how well designed and operated, can provide only reasonable (and not absolute) assurance that all of its objectives will be met, including the detection of fraud. Furthermore, no evaluation of internal accounting controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

The Company continues to reduce its workforce, consolidate its operations and outsource certain functions. Accordingly, responsibility for administration, management and review of many of the Company's assets has transitioned among FINOVA's remaining personnel. Management has supervised these transitions and has implemented procedures it believes provide effective disclosure and internal controls over financial reporting. The Company is assessing the efficacy of these procedures and will continue to do so in subsequent periods. FINOVA recognizes that a substantial unanticipated reduction in employees could increase internal control risk.

Table of Contents

**PART II OTHER INFORMATION**

**Item 1. Legal Proceedings**

See Part I, Item 1, Note I Litigation and Claims for a discussion of certain legal proceedings

**Item 4. Submission of Matters to a Vote of Security Holders**

The Annual Meeting of Shareowners of the Company was held on May 18, 2005. At that meeting, stockholders owning 115,335,165 shares of the Company's Common Stock were present in person or by proxy. The stockholders approved the election of each director nominee by the following plurality:

| | Number of Votes | |
|---|---|---|
| | For | Withheld |
| Thomas F. Boland | 109,466,884 | 5,868,281 |
| Ian M. Cumming | 109,370,450 | 5,964,715 |
| G. Robert Durham | 109,461,389 | 5,873,776 |
| Thomas E. Mara | 109,382,392 | 5,952,773 |
| R. Gregory Morgan | 109,449,689 | 5,885,476 |
| Kenneth R. Smith | 109,380,304 | 5,954,861 |
| Joseph S. Steinberg | 109,365,982 | 5,969,183 |

**Item 6. Exhibits**

a) Exhibits

| | |
|---|---|
| 10.A.1 | Letter from FINOVA to Philip A. Donnelly dated July 6, 2005. |
| 10.A.2 | Letter from FINOVA to Jeffrey D. Weiss dated March 15, 2005. |
| 10.A.3 | Letter from FINOVA to James M. Wifler dated July 6, 2005. |
| 10.A.4 | Letter from FINOVA to Richard A. Ross dated July 6, 2005. |
| 10.B | Amended and Restated Severance Pay Plan and Summary Plan Description. |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes–Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes–Oxley Act of 2002. |
| 32.1 | Certification of Chief Executive Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002. |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 |

Table of Contents

THE FINOVA GROUP INC.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

THE FINOVA GROUP INC.

THE FINOVA GROUP INC.

(Registrant)

Date: August 11, 2005

By: /s/ Richard A. Ross
Richard A. Ross, Senior Vice President – Chief Financial Officer & Treasurer (principal financial officer)

**CERTIFICATE OF SERVICE**

I, Mark D. Collins, do hereby certify that on September 16, 2005, I caused copies of the foregoing **Reply to Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan** to be served upon the following service list in the manner indicated thereon:

Mark D. Collins (No. 2981)

**In re: The FINOVA Group 01-00698 (PJW)**
**Bankruptcy Rule General Service List**

**Via Hand Delivery:**
David Buchbinder
Office of the United States Trustee
844 King St., Suite 2313
Lockbox 35
Wilmington, DE 19801

(Representing Olsen Industries)
Regina A. Iorii
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899

(Representing JPMorgan Chase Bank)
Howard A. Cohen
Reed Smith LLP
1201 N. Market Street, Suite 1500
Wilmington, DE 19801

**Via Federal Express:**
(Representing SMMPP, Inc.)
Gerald. K. Kitano
3435 Wilshire Boulevard, Suite 1800
Los Angeles, CA 90010

(Representing Leucadia)
Martin Bienenstock
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

(Representing HYNIX Semiconductor America, Inc.
f/k/a Hyundai Electronic America ("HYNIX")
Robert J. Rohrberger
Fox and Fox LLP
70 South Orange Avenue
Livingston, NJ 07039

(Representing JPMorgan Chase Bank)
Robert C. Shenfeld
Reed Smith Crosby Heafey LLP
355 S. Grand Avenue, Suite 2900
Los Angeles, CA 90071

(Representing GE Capital Mortgage Insurance)
Glenn M. Reisman
Two Corporate Drive
P.O. Box 861
Shelton, CT 06484-0861

(Representing Federal Express Corporation)
Charles J. Filardi, Jr.
Pepe & Hazard LLP
30 Jelliff Lane
Southport, CT 06890-1436

(Representing Debtor)
Jonathan M. Landers
Janet Weiss
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

(Representing the Bank of New York as the Indenture Trustee for Finova Group Inc.'s Bonds)
The Bank of New York
Corporate Trust Administration
101 Barclay Street, 21st Floor West
New York, NY 10286

Securities & Exchange Commission
Attention: Nathan Fuchs
233 Broadway
New York, NY 10279

RLF1-2882708-1

**Special Service Parties (via Hand Delivery and Federal Express)**

(Representing First Carolina Investors, Inc.)
William D Sullivan
Jami B. Nimeroff
Buchanan Ingersoll
The Nemours Building
1007 N. Orange Street, Suite 1110
Wilmington, DE 19801

(Representing First Carolina Investors, Inc.)
David M. Stark
Garry M. Graber
Cheryl M. Storie
Hodgson Russ LLP
One M&T Plaza, Suite 2000
Buffalo, NY 14203-2391

(Representing Eugene Linden)
Mark D. Silverschotz
John L. Scott, Jr.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182

# **EXHIBIT K**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| FINOVA CAPITAL CORPORATION | : | Case Nos. 01-0698 (PJW)<br>Jointly Administered |
| Reorganized Debtor | : | |
| | : | Related Docket Nos.: 22, 33, 35, 39, 48, 61. |
| | : | Hearing Date: November 29, 2005 |

**THE EQUITY COMMITTEE'S RESPONSE TO THE REORGANIZED DEBTOR'S REPLY TO OBJECTION OF FIRST CAROLINA INVESTORS, INC. TO MOTION OF REORGANIZED DEBTOR FOR AN ORDER UNDER BANKRUPTCY CODE SECTION 1141 CLARIFYING PROVISION OF CONFIRMED PLAN**

William D. Sullivan (No. 2820)
Jami B. Nimeroff (No. 4049)
BUCHANAN INGERSOLL
The Nemours Building
1007 N. Orange Street, Suite 1110
Wilmington, DE 19801
Telephone: (302) 428-5500
Facsimile: (302) 428-3996

-- and --

Mark D. Silverschotz
James M. Andriola
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182
Telephone: (212) 278-1000
Facsimile: (212) 278-1733

Docket No. 62
Date 10/18/2005

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....1

THE RELEVANT PROVISIONS OF THE CONTROLLING DOCUMENTS AND THE USE OF CASH TO DATE ....2

THE CLARIFICATION MOTION AND THE APPOINTMENT OF THE EQUITY COMMITTEE ....5

THE FINANCIAL CONDITION OF THE REORGANIZED DEBTOR ....6

ARGUMENT ....6

A. New York State Contract Law Governs The Reorganized Debtor's Clarification Motion ....6

B. The Terms Of The Controlling Documents Do Not Support The Clarification Proposed By The Reorganized Debtor ....7

C. The Well-Settled And Basic Law Of Contracts Does Not Support The Clarification Proposed By The Reorganized Debtor ....11

D. The Reorganized Debtor Has Failed To Rebut The Objections Of First Carolina Investors, Inc ....14

1. The Reorganized Debtor Misapprehends The Nature Of Its Payment Obligations Under The Plan ....14

2. Under Any Analysis The Required Payments To The Equity Security Holders Cannot Be Impermissible Restricted Payments ....19

3. Under New York Law The Funds In The Segregated Account Are Being Held In Trust For The Equity Security Holders ....22

CONCLUSION ....1

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

Atlanta Shipping Corp. v. Chem. Bank, 818 F.2d 240, 249 (2d Cir. 1987) ................................21

Brass v. America Film Technologies, Inc., 987 F.2d 142 (2d Cir. 1993)....................................11

Carrieri v. Jobs.com, Inc., 393 F.3d 508 (5th Cir. 2004)........................................................16

Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.), 221 B.R. 298 (2d Cir. BAP 1998)..........................................................................................6, 7

In re Consumers Realty & Development Co., Inc., 238 B.R. 418 (8th Cir. BAP 1999) ...............14

Counihan v. Allstate Insurance Co., 194 F.3d 357 (2d Cir. 1999) ..................................22, 23, 24

In re Ernst, 45 B.R. 700 (Bankr. D. Minn. 1985) ......................................................................14

Geftman v. Commissioner of Internal Revenue, 154 F.3d 61 (3d Cir. 1998) ........................ 16-17

In re Georgetown Building Associates, 240 B.R. 124 (Bankr. D.D.C. 1999)..............................16

Gerlach v. The Horn & Hardart Co., 683 F. Supp. 342 (S.D.N.Y. 1988) ...................................12

Golden Budha Corp. v. Canadian Land Co. of America, 931 F.2d 196 (2d Cir. 1991)......... 22-23

I.R.V. Merchandising Corp. v. Jay Ward Productions, Inc., 856 F. Supp. 168 (S.D.N.Y. 1994) ...........................................................................................................10

In re JLH, L.L.C., 239 F.3d 366 (5th Cir. 2000).........................................................................9

International Multifoods Corp. v. Commercial Union Insurance Co., 309 F.3d 76 (2d Cir. 2002) ...........................................................................................................8

Jones v. Keene Corp., 933 F.2d 209 (3d Cir. 1991) ..................................................................20

Jordanos', Inc. v. Commissioner of Internal Revenue, 396 F.2d 829 (9th Cir. 1968)..................17

Kreiss v. McCown De Leeuw & Co., 131 F. Supp. 2d 428 (S.D.N.Y. 2001)..............................11

Lomalio Assocs. Inc. v. LBK Mktg. Corp., No. 94 CIV. 3208 (KTD), 1999 WL. 705208 (S.D.N.Y. Sept. 10, 1999)........................................................................................10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

In re Leslie Fay Companies, Inc., 207 B.R. 764 (Bankr. S.D.N.Y. 1997)....................................20

In re McCalla, 238 B.R. 94 (Bankr. M.D. Pa. 1999) ............................................................ 12-13

O'Sullivan v. Comm'r of Internal Revenue., No. 30571-88, 1994 WL 444419 (T.C. Aug. 18, 1994) .............................................................................................................................17

In re Penrod, 169 B.R. 910 (Bankr. N.D. Ind. 1994)..................................................................14

Pereira v. Dow Chemical Co. (In re Trace International Holdings, Inc.), 301 B.R. 801 (Bankr. S.D.N.Y. 2003) ..........................................................................................................21

In re Potts, 188 B.R. 575 (Bankr. N.D. Ind. 1995) ........................................................................14

Record Club of America v. United Artists Records, Inc., 890 F.2d 1264 (2d Cir. 1989) .............11

Sergi v. Everett Savings Bank (In re Sergi), 233 B.R. 586 (1st Cir. BAP 1999) ........................6, 7

In re Sugarhouse Realty, Inc., 192 B.R. 355 (E.D. Pa. 1996) .........................................................7

In re Terex Corporation, 984 F.2d 170 (6th Cir. 1993) .......................................................... 12-13

U.S. v. Coluccio, 51 F.3d 337 (2d Cir. 1995)............................................................................ 22-23

In re Water Gap Village, 99 B.R. 226 (Bankr. D.N.J. 1989).......................................................14

**STATE CASES**

220 West 42 Associates v. Ronbet Newmark Co., 84 Misc.2d 259, 375 N.Y.S.2d 255 (Sup. Ct. N.Y. County 1975) .......................................................................................11

Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378 (N.Y. 1919) .....................23

Campanile v. State Farm, 161 A.D.2d 1052, 558 N.Y.S.2d 203 (3d Dep't 1990) ................. 13-14

Coco v. Coco, 107 A.D.2d 21, 485 N.Y.S.2d 286 (2d Dep't 1985)............................................24

Faircloth v. Rash, 373 A.2d 870 (Del. Super. Ct. 1977)...............................................................21

Fulweiler v. Spruance, 222 A.2d 555 (Del. Ch. 1966) .................................................................18

G & M Motor Co. v. Thompson, 567 P.2d 80 (Okla. 1977).........................................................23

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Goldfield Corp. v. General Host Corp., 29 N.Y.2d 264, 277 N.E.2d 387, 327 N.Y.S.2d 330 (N.Y. 1971) ....................11

Grossman Steel & Aluminum Corp. v. Samson Window Corp., 54 N.Y.2d 653, 426 N.E.2d 176, 442 N.Y.S.2d 769 (N.Y. 1981).................... 8-9

Grossman Steel & Aluminum Corp. v. Samson Window Corp., 78 A.D.2d 871, 433 N.Y.S.2d 31 (2d Dep't 1980) ....................9

Jacobson v. Sassower, 66 N.Y.2d 991, 489 N.E.2d 1283, 499 N.Y.S.2d 381 (N.Y. 1985) ..........12

Latham v. Father Divine, 299 N.Y. 22, 85 N.E.2d 168 (N.Y. 1949)....................23

Lui v. Park Ridge at Terryville Association, Inc., 196 A.D.2d 579, 601 N.Y.S.2d 496 (2d Dep't 1993)....................10

Manning v. Michaels, 149 A.D.2d 897, 540 N.Y.S.2d 583 (3d Dep't 1989) ....................10

McGrath v. Hilding, 41 N.Y.2d 625, 363 N.E.2d 328, 394 N.Y.S.2d 603 (N.Y. 1977) ...............23

Miller v. Schloss, 219 N.Y. 400, 113 N.E. 337 (N.Y. 1916)....................23

Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 660 N.E.2d 415, 636 N.Y.S.2d 734 (N.Y. 1995) ....................10

Palazzo v. Palazzo, 121 A.D.2d 261, 503 N.Y.S.2d 381 (1st Dep't 1986)....................24

Reape v. New York News, Inc., 122 A.D.2d 29, 504 N.Y.S.2d 469 (2d Dep't 1986), cert. denied, 68 N.Y.2d 610, 501 N.E.2d 600, 508 N.Y.S.2d 1027 (1986) .................... 11-12

In re Rehabilitation of National Heritage Life Ins. Co., 656 A.2d 252 (Del. Ch. 1994) ...............22

Reiner v. Reiner, 100 A.D.2d 872, 474 N.Y.S.2d 538 (2d Dep't 1984) ....................24

Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 385 N.E.2d 566, 412 N.Y.S.2d 827 (1978)....................7

Schuler-Hass Electric Corp. v. Aetna Casualty & Surety Co., 40 N.Y.2d 883, 357 N.E.2d 1003, 389 N.Y.S.2d 348 (N.Y. 1976) ....................9

Sharp v. Kosmalski, 40 N.Y.2d 119, 351 N.E.2d 721, 386 N.Y.S.2d 72 (N.Y. 1976)...........23, 24

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Simonds v. Simonds, 45 N.Y.2d 233, 380 N.E.2d 189, 408 N.Y.S.2d 359 (N.Y. 1978)........22-23

State v. Benson, 32 Del. 576, 128 A. 107 (Del. Super. Ct. 1924) ................................................20

Tordai v. Tordai, 109 A.D.2d 996, 486 N.Y.S.2d 802 (3d Dep't 1985) ........................................24

Trojan Hardware Co. v. Bonacquisti Construction Corp., 141 A.D.2d 278, 534 N.Y.S.2d 789 (3d Dep't 1988)............................................................................................................ 14-15

Twin City Fire Ins. Co. v. Delaware Racing Ass'n, 840 A.2d 624 (Del. 2003)............................12

Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 807 N.E.2d 876, 775 N.Y.S.2d 765 (N.Y. 2004) ..............................................................................8, 13

William A. White/Tishman East, Inc. v. Banko, 171 A.D.2d 401, 566 N.Y.S.2d 628 (1st Dep't 1991)..........................................................................................................................12

**FEDERAL STATUTES**

11 U.S.C. § 101(5)(A)...............................................................................................................14

11 U.S.C. § 101(12) ....................................................................................................................14

**STATE STATUTES**

DEL. CODE ANN. tit. 6, § 1303 ........................................................................................................21

DEL. CODE ANN. tit. 8, § 170 .................................................................................................... 19-20

DEL. CODE. ANN. tit. 8, § 244 ........................................................................................................20

**MISCELLANEOUS**

Restatement (Second) of Contracts § 227(1) (1981) ...................................................................10

The Official Committee of Equity Security Holders (the "Equity Committee"), on behalf of the shareholders (the "Equity Security Holders") of Finova Group, Inc., the corporate parent of the above captioned reorganized debtor (the "Reorganized Debtor"), by and through its undersigned counsel, as its memorandum of law in opposition to: (a) the *Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan*, dated April 1, 2005 (Docket No. 22) (the "Clarification Motion"); and (b) the *Reply to Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan* (Docket No. 61) (the "Reply to Objection"), respectfully states as follows:

**PRELIMINARY STATEMENT**

1. This memorandum demonstrates that the Clarification Motion must be denied, as a matter of law, irrespective of the within debtor's solvency. At least four distinct and independently sufficient grounds exist for denying the requested relief:

- First, the Reorganized Debtor has not (and cannot) cite to any actual provision or language in the controlling documents that would support its position that the Equity Security Holders must now forfeit the funds set aside on their behalf. Rather, the Reorganized Debtor is left to argue merely that such a forfeiture is "implicit." The controlling documents – the Plan and the Indenture (each defined below) – each dictate that for every $0.95 of available cash that is used to pay principal and interest on the New Senior Notes, $0.05 must be distributed to, or retained on behalf of, the Equity Security Holders. This pittance in consideration was given to the Equity Security Holders under the Plan to which their class consented. As a matter of hornbook contract law, such consideration cannot be taken away as the consequence of an inference.

- Second, well-settled principles of the law of contract interpretation prohibit the "clarification" proposed by the Reorganized Debtor. While studiously avoiding use of the term "ambiguous," the Reorganized Debtor admits that the Indenture was ambiguously drafted in that "it did not describe what would happen to the amounts retained by FNV Group," that would have otherwise been distributed to Equity Security Holders but for certain financial conditions alleged by the Reorganized Debtor to currently exist. See Clarification Motion at ¶ 13. The Reorganized Debtor then asks this Court to issue an order directing that the amounts retained on account of the Equity Security

Holders under the terms of the Indenture be returned to the Reorganized Debtor "for use in its business to pay expenses, debts and other obligations." Proposed Order at p. 2. As will be discussed in more detail below, the Court should not grant the proposed relief because it would require the Court to impermissibly effect a forfeiture and to incorrectly interpret an ambiguous contract provision in favor of the party that drafted that provision.

- Third, in the Reply to Objection, the Reorganized Debtor does not rebut the arguments set forth in the *Objection of First Carolina Investors, Inc. to Motion of Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan* (the "First Carolina Objection"). Most notable is the Reorganized Debtor's inability to rebut the inarguable proposition that the confirmed Plan created binding payment obligations owed by the Reorganized Debtor to, among others, the Equity Security Holders.

- Fourth, contrary to the Reorganized Debtor's assertion, the distributions to the Equity Security Holders set forth in the Plan and Indenture are not Impermissible Restricted Payments, as that term is defined in the Indenture. This memorandum will demonstrate that the payments to Equity Security Holders are not Impermissible Restricted Payments because such payments merely fulfill the debt obligations set forth in the Plan and Indenture. Moreover, even if the Reorganized Debtor is correct and the called-for payments are currently Impermissible Restricted Payments, they will no longer be once the Reorganized Debtor ceases to function as an on-going business enterprise.

2. Accordingly, the Clarification Motion must be denied in order to maintain the status quo and to prevent the Reorganized Debtor from unjustly enriching itself by retroactively rewriting the Plan so as to render forfeit the distributions on its debts owed to Equity Security Holders.

**THE RELEVANT PROVISIONS OF THE CONTROLLING DOCUMENTS AND THE USE OF CASH TO DATE**

3. On or about May 2, 2001, the Reorganized Debtor (and related companies) filed their plan of reorganization (together with all subsequent amendments thereto, the "Plan"), which this Court confirmed by order dated August 10, 2001. The Indenture between the Finova Group, Inc. and The Bank of New York, as Trustee, dated as of August 22, 2001 (the

"Indenture"), was included in the "Plan Supplement" and, pursuant to the confirmation order, the Plan Supplement was incorporated into and made part of the Plan.

       4.     The parties agree that this Court should decide the instant motion based on the terms of the Plan and Indenture.[1] It is not disputed that the Indenture sets forth a series of provisions which govern the use of cash by the Reorganized Debtor. In the words of the Reorganized Debtor, the Indenture "contains detailed provisions for using cash, and a so-called waterfall of payments which can be made." (Reply to Objection at ¶ 6). The waterfall of payments is set forth in Section 4.06(a) of the Indenture. The parties also agree that cash has been applied to the first four waterfall provisions set forth at Sections 4.06(a)(i)-(iv). In February 2004 (approximately two years before the maturity date), the Reorganized Debtor fully repaid the Berkadia Loan described in the fourth waterfall provision. Indenture at § 4.06(a)(4).

       5.     The provision at issue in this case is the fifth waterfall provision, Section 4.06(a)(v), which states in its entirety:

> FIFTH, until the principal of and Fixed Interest on the Notes are each paid in full, to (A) pay to the Company, when due, principal on the Intercompany Notes in an amount equal to the amount of cash and Cash Equivalents of the Company and its Subsidiaries, after deducting for items (i) through (iv) above, at any date (as determined by the Company) on or after the applicable Reference Date, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes until the principal and accrued and unpaid Fixed Interest have been paid in full, and, at the Company's option, to make prepayments at any time of principal and accrued and unpaid interest on the Intercompany Notes, which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to prepay all or part of the principal and accrued and unpaid Fixed Interest on the Notes pursuant to Section 3.07, and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the

---

[1] By letter dated October 12, 2005, the Reorganized Debtor has expressly stated that it "does not intend to present oral testimony regarding the background and drafting history of pertinent provisions of the Note Indenture, the Plan and the Disclosure Statement...."

> Company, which amounts the Company shall use together with any other cash the Company has available for such purposes to make Restricted Payments unless either (x) the making of any such Restricted Payment would be an Impermissible Restricted Payment, in which event the Company shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments, or (y) a Default or Event of Default has occurred and is continuing, in which event the Company shall retain such amounts and any such retained amounts shall accumulate and shall, subject to Article 6 hereof, be used to make such Restricted Payments at such time or from time to time when such Default or Event of Default is no longer continuing; *provided, however*, that each incremental payment of $0.95 pursuant to clause (A) shall require a distribution or retention pursuant to clause (B) of $0.05.

6. Pursuant to Section 4.06(a)(v)(A), the Reorganized Debtor has made principal payments in excess of $1.1 billion on the New Senior Notes (term defined in Clarification Motion), and, pursuant to Section 4.06(a)(v)(B), the Reorganized Debtor has retained approximately $65.5 million in a segregated account. This conforms with the obligation "that each incremental payment of $0.95 pursuant to clause (A) shall require a distribution or retention pursuant to clause (B) of $0.05." Indenture at 4.06(a)(v).

7. The Reorganized Debtor, however, will not transfer the funds held in the segregated account to the Equity Security Holders because it has decided on its own that such a transfer would at this time, and for perpetuity, be an Impermissible Restricted Payment under the Indenture. Under the Indenture, an "'Impermissible Restricted Payment' means a Restricted Payment that, if made by the [Reorganized Debtor], would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law." Indenture at p. 6. Under the Indenture, a "'Restricted Payment' means the declaration or payment of any dividend ***or*** the making of a distribution on account of the [Reorganized Debtor's] Equity Interests..." Indenture at p. 11 (emphasis added).

8. The dispute between the parties may be put as follows: The Reorganized Debtor believes the distributions are Impermissible Restricted Payments, and believes further that such status is permanent. The Equity Committee believes that these distributions were (and are) on account of contractual debt obligations and, therefore, are not Impermissible Restricted Payments. Significantly, under the Reorganized Debtor's theory, insolvency **must** be found in order for it to prevail. Conversely, solvency is irrelevant to the Equity Committee's analysis.[2]

**THE CLARIFICATION MOTION AND THE APPOINTMENT OF THE EQUITY COMMITTEE**

9. On or about April 1, 2005, the Reorganized Debtor filed the Clarification Motion. By the Clarification Motion, the Reorganized Debtor seeks an Order of this Court permitting it to cease distributing cash to, or retaining cash on behalf of, the Equity Security Holders. The Reorganized Debtor also asks this Court to enter an order which would effect a forfeiture of all rights that the Equity Security Holders may have to the approximately $65 million being held on their behalf in a segregated account.

10. On or about June 3, 2005, the First Carolina Objection was filed by First Carolina Investors, Inc. ("First Carolina"). The Equity Committee hereby incorporates the factual and legal arguments set forth in the First Carolina Objection.

11. At a hearing on June 10, 2005, the Court appointed an Official Committee of Equity Security Holders for the limited purpose of responding to the Clarification Motion.

2 In light of the limited budget provided to the Equity Committee (subject to re-visitation upon motion on notice to the Reorganized Debtor), the Equity Committee has not expended substantial funds in pursuit of a plenary forensic accounting analysis of Finova's books and records. Given its view that solvency is of no moment, such expenditure would have been wasteful at best. Rather, the Equity Committee will likely bring on a motion to increase its cap to allow it to conduct such a plenary review were the Court (erroneously, in the Committee's view) to conclude that solvency was a significant issue. In the interim, it is expected that such a motion will be made solely with respect to increasing the cap for the full legal and limited-review financial expert fees incurred to date and projected through oral argument in late November, which amount ought to aggregate well-less than $200,000.

See Transcript of Motion Hearing before Honorable Peter J. Walsh on June 10, 2005 at 9:30 A.M. (Docket No. 50) (the "Transcript") at p. 27, lines 12-15; p. 38 lines 1-2; p. 44, line 19; see also Order directing the United States Trustee to Appoint an Official Committee of Equity Security Holders for a Limited Purpose and Granting Related Relief (Docket No. 48).

12. On or about September 19, 2005, the Reorganized Debtor filed its Reply to Objection, the assertions of which are addressed herein.

## THE FINANCIAL CONDITION OF THE REORGANIZED DEBTOR

13. In making the instant motion, the Reorganized Debtor has stressed to the Court that it and its related companies "are insolvent and have been insolvent for some time." (Reply to Objection at ¶ 4). The Equity Committee has retained an expert to review (on paper) the Reorganized Debtor's portfolio of airplanes. Based on the Equity Committee's limited budget, it does not have the financial resources necessary to conduct a comprehensive analysis of even the Reorganized Debtor's airplane portfolio, let alone a plenary analysis of the Reorganized Debtor's alleged insolvency. The Equity Committee believes, however, that the Reorganized Debtor's financial condition is wholly irrelevant to the proposed Clarification Motion because that motion should be denied as a matter of law.

## ARGUMENT

### A. New York State Contract Law Governs The Reorganized Debtor's Clarification Motion

14. It is undisputed that Section 1141(a) of the Bankruptcy Code "establishes the general rule that 'the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor....'" Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.), 221 B.R. 298, 303 (2d Cir. BAP 1998). For this reason, a

"confirmed plan of reorganization is a binding contract...[which] is subject to interpretation pursuant to relevant rules of contract interpretation and construction." Sergi v. Everett Sav. Bank (In re Sergi), 233 B.R. 586, 589 (1st Cir. BAP 1999) (citing In re Sugarhouse Realty, Inc., 192 B.R. 355, 362 (E.D. Pa. 1996)); see also Victory Markets, Inc., 221 B.R. at 303 (holding that "a confirmed plan holds the status of a binding contract").

15. Of course, state law provides the relevant rules of contract interpretation and construction. See, e.g., Sergi, 233 B.R. at 589 (applying Massachusetts contract law to interpret confirmed plan of reorganization); Victory Markets, Inc., 221 B.R. at 303 (applying New York contract law in interpreting allegedly ambiguous provision of confirmed plan of reorganization). In the present case, the Plan and Indenture each include provisions stating expressly that New York law is to be used in construing those documents. See Plan at § 13.9 and Indenture at § 12.08. As it must, the Reorganized Debtor agrees that New York law governs the Indenture. (Reply to Objection at ¶ 19) ("The Indenture ... is governed by New York law.").

**B. The Terms Of The Controlling Documents Do Not Support The Clarification Proposed By The Reorganized Debtor**

16. In the instant motion, the Reorganized Debtor argues that "it is **implicit** in the Plan," that under certain financial conditions, the Equity Security Holders must forfeit the entirety of the consideration ($65 million and rising) provided to them under the Plan. (Reply to Objection at ¶ 9) (emphasis added). By making such an argument, the Reorganized Debtor admits that **there is no express language** in the Plan or Indenture that provides for such a forfeiture. In such circumstances, "courts should be extremely reluctant to interpret an agreement as **impliedly** stating something which the parties have neglected to specifically include." Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572, 412 N.Y.S.2d 827, 833 (N.Y. 1978) (emphasis added).

17.     The language of the Indenture provision at issue states that "each incremental payment of $0.95 [to the Company to pay principal and interest on the New Senior Notes] **shall require** a distribution [to Equity Security Holders] or retention [on their behalf]. Indenture at § 4.06(a)(v) (emphasis added).  Under New York law, the terms of a contract generally are afforded their plain and ordinary meaning.  See Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879, 775 N.Y.S.2d 765, 767-68 (N.Y. 2004) (holding that "when parties set down their agreement in a clear, complete document, their writing should…be enforced according to its terms" and "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."); Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 85-87 (2d Cir. 2002).  The plain meaning of this provision is that for every $0.95 that is used to pay principal on the New Senior Notes, $0.05 goes to the Equity Security Holders either at the time of distribution to Senior Noteholders or later.  In order to avoid the obvious impact of such plain language, the Reorganized Debtor argues that discrete limitations placed on the timing of the distribution of funds to the Equity Security Holders, i.e., when such distributions are Impermissible Restricted Payments, create a "condition precedent" to the Equity Security Holders **ever** receiving any payment.  (Reply to Objection at p. 2) ("First Carolina ignores the **condition precedent** to **any** equity distribution – that it would not render the Reorganized Debtors insolvent, would constitute a fraudulent transfer, or would not be permitted under applicable law." (emphasis added)).

18.     The Reorganized Debtor's attempt to conjure a "condition precedent" runs counter to the applicable New York law and, therefore, its repeated incantation of the term "condition precedent" is both wrong and misleading.  Under New York law, language akin to

that relied upon by the Reorganized Debtor has been found **not** to establish a "condition precedent," but rather merely to establish a **time** for payment. The case of Grossman Steel & Aluminum Corp. v. Samson Window Corp., 54 N.Y.2d 653, 426 N.E.2d 176, 442 N.Y.S.2d 769 (N.Y. 1981) is highly instructive.[3] In Grossman Steel, a subcontractor sued the general contractor to recover the balance due on a subcontract. The general contractor argued that a condition precedent to its duty to pay the subcontractor was its receipt of payment from the owner. Id. at 871, 433 N.Y.S.2d at 32. The provision in the subcontract at issue provided, in relevant part: "Retained percentages will be paid to [subcontractor] as and when [general contractor] receive[s] such payment from the [owner] and in the same proportions." Id. The Appellate Division, Second Department held that the "plaintiff subcontractor is entitled to payment of the retained percentage in the sum of $35,000, which represents the balance due on its subcontract with defendants...despite the fact that the [owner] has not yet paid said defendants." Id. (citations omitted). In affirming the decision of the Appellate Division, the New York Court of Appeals held that the "disputed language...of the contract **did not create a condition precedent to payment** to the subcontractor, **but rather established a time for payment**." Grossman Steel & Aluminum Corp. v. Samson Window Corp., 54 N.Y.2d 653, 654, 426 N.E.2d 176, 177, 442, N.Y.S.2d 769, 770 (N.Y. 1981) (citing Schuler-Hass Elec. Corp. v. Aetna Cas. & Sur. Co., 40 N.Y.2d 883, 357 N.E.2d 1003, 389 N.Y.S.2d 348 (N.Y. 1976)) (emphasis added); see also In re JLH, L.L.C., 239 F.3d 366 (5th Cir. 2000) (applying New York law to find that language of agreement at issue did not create a condition precedent.).

---

[3] The relevant facts come from the New York Supreme Court, Appellate Division's decision reported at Grossman Steel & Aluminum Corp. v. Samson Window Corp., 78 A.D.2d 871, 433 N.Y.S.2d 31 (2d Dep't 1980).

19. Therefore, under applicable New York law, the language in Section 4.06(a)(v) of the Indenture relied upon by the Reorganized Debtor does not establish a condition precedent to payment to the Equity Security Holders, but rather a time for payment. Moreover, to the extent this Court believes there is an ambiguity as to whether or not the language creates a condition precedent, "it is well settled under New York law that where a contract term is ambiguous, **the creation of a condition precedent is disfavored.**" Lomalio Assocs. Inc. v. LBK Mktg. Corp., No. 94 CIV. 3208 (KTD), 1999 WL 705208, at *7 (S.D.N.Y. Sept. 10, 1999) (citing I.R.V. Merch. Corp. v. Jay Ward Prods., Inc., 856 F. Supp. 168, 174 (S.D.N.Y. 1994); Lui v. Park Ridge at Terryville Ass'n, Inc., 196 A.D.2d 579, 581-82, 601 N.Y.S.2d 496, 499 (2d Dep't 1993); and Manning v. Michaels, 149 A.D.2d 897, 898, 540 N.Y.S.2d 583, 584 (3d Dep't 1989)) (emphasis added). As per the Court of Appeals, New York courts avoid interpreting "doubtful language" in a contract to be an express condition precedent **"when a finding of [such] an express condition [precedent] would increase the risk of forfeiture by the obligee."** Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 691, 660 N.E.2d 415, 418, 636 N.Y.S.2d 734, 737 (N.Y. 1995) (citing Restatement (Second) of Contracts § 227(1) (1981)) (emphasis added).

20. The foregoing establishes that the Equity Security Holders received an unconditional right to payment under the Plan and Indenture, subject only to timing constraints. Moreover, the Reorganized Debtor is wrong in its assertion that any payment to the Equity Security Holders is now and forever will be an Impermissible Restricted Payment under the Plan. See section D, 2, infra, at p. 19.

**C. The Well-Settled And Basic Law Of Contracts Does Not Support The Clarification Proposed By The Reorganized Debtor**

21. The Reorganized Debtor strains to avoid saying explicitly that the Indenture is "ambiguous." Instead, the Reorganized Debtor asserts that the Indenture is "silent" (see Reply to Objection at ¶ 36) as to a term that it obviously believes is material and the absence of which prompted the instant motion. It is clear, however, that silence as to a material term in a contract is a **type** of ambiguity recognized by the courts. See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 149 (2d Cir. 1993) (holding a contract to be ambiguous where there was "nothing said in the contract" about whether stock shares to be reserved were to be restricted or unencumbered); Record Club of Am. v. United Artists Records, Inc., 890 F.2d 1264, 1269-71 (2d Cir. 1989) (finding a contractual ambiguity rendering summary judgment inappropriate where contract was silent as to the timing of royalty payments); Goldfield Corp. v. Gen. Host Corp., 29 N.Y.2d 264, 272-73, 277 N.E.2d 387, 392-93, 327 N.Y.S.2d 330, 337 (N.Y. 1971) (involving an "ambiguity [in a security agreement] created by silence ….").

22. The Reorganized Debtor's studied reluctance to declare the Indenture "ambiguous" clearly is because it hopes to avoid the fundamental rules of construction that courts must follow when interpreting ambiguous provisions of disputed contracts. It is beyond peradventure that the "clarification" sought by the Reorganized Debtor would effect a forfeiture of the funds currently being "retained" on account of the Plan-given rights of the Equity Security Holders. Further, it is well-settled that "New York courts will not interpret provisions that are ambiguous on their face to effect a forfeiture…." Kreiss v. McCown De Leeuw & Co., 131 F.Supp.2d 428, 436 (S.D.N.Y. 2001); see also 220 West 42 Assocs. v. Ronbet Newmark Co., 84 Misc.2d 259, 264, 375 N.Y.S.2d 255, 261 (Sup. Ct. N.Y. County 1975) ("[C]ourts should interpret contracts to avoid [forfeiture]"). Accordingly, under this basic rule, Section 4.06(a)(v)

of the Indenture cannot mean that the Equity Security Holders contractual right to payment under the Plan is rendered forever forfeit based on the alleged financial condition of the Reorganized Debtor.

23.    In addition, this Court should construe any and all ambiguities in the Plan and Indenture against the Reorganized Debtor as the drafter of those documents. See Reape v. New York News, Inc., 122 A.D.2d 29, 30, 504 N.Y.S.2d 469, 470 (2d Dep't 1986) (holding that "ambiguities in an agreement should be interpreted most strongly against the draftsman"), cert. denied, 68 N.Y.2d 610, 501 N.E.2d 600, 508 N.Y.S.2d 1027 (1986); William A. White/Tishman East, Inc. v. Banko, 171 A.D.2d 401, 566 N.Y.S.2d 628 (1st Dep't 1991) (same); Gerlach v. The Horn & Hardart Co., 683 F.Supp. 342, 344 (S.D.N.Y. 1988) (noting that "in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language" (quoting Jacobson v. Sassower, 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (N.Y. 1985))); Twin City Fire Ins. Co. v. Delaware Racing Ass'n, 840 A.2d 624, 630 (Del. 2003) (noting that the well-accepted doctrine of construction, contra preferentem, is that ambiguities in a contract should be construed against the drafter). This is not only true as a matter of basic New York and Delaware contract law, but has also been recognized in the bankruptcy plan context. See First Carolina Objection at ¶ 19 (citing In re Terex Corporation, 984 F.2d 170 (6th Cir. 1993) and In re McCalla, 238 B.R. 94 (Bankr. M.D. Pa. 1999)).

24.    To its credit, the Reorganized Debtor does not attempt to dispute the black letter concept that an ambiguous contract provision is to be construed against its drafter. Further, the Reorganized Debtor's conclusory responses to the authorities cited by First Carolina are unavailing. For example, in addressing In re McCalla, supra, the Reorganized Debtor admits that

the court in that case "noted that plan language is typically interpreted against a drafter." (Reply to Objection at ¶ 36). Similarly, in addressing In re Terex Corporation the Reorganized Debtor correctly observes that it is the debtor's obligation "to specify as accurately as possible the amounts which it intends to pay creditors." (Reply to Objection at ¶ 36).

25. Here, to the extent the Reorganized Debtor believed that under the Plan and Indenture, in the event of certain financial conditions, the Equity Security Holders would forfeit for all time their right to payment, it was the Reorganized Debtor's obligation to include in the controlling documents an express and unambiguous forfeiture provision.[4]

26. The Reorganized Debtor failed to insert such a forfeiture clause into section 4.06(a)(v) at the time it was drafted and the Plan's acceptance was solicited. Accordingly, this Court should not now imply such a term. See Vermont Teddy Bear Co., 1 N.Y.3d at 476, 807 N.E.2d at 880, 775 N.Y.S.2d at 768(declining to add a notice provision where "[t]he parties could have [but did not] negotiated and included an explicit notice requirement").

27. Based on the foregoing, the Reorganized Debtor has failed to demonstrate that the Court should do anything other than construe the Plan and Indenture against its drafter, the Reorganized Debtor, and against an interpretation that effects a forfeiture. Clearly, the Reorganized Debtor has not in this regard met its burden of proof. See Campanile v. State Farm, 161 A.D.2d 1052, 1054, 558 N.Y.S.2d 203, 204 (3d Dep't 1990) (holding that burden of proof is

---

4 It should be noted that an appropriately express and unambiguous forfeiture provision is found elsewhere in the controlling documents. See Plan at ¶ 9.4(b) ("Any distributions made under the Plan that [are unclaimed or undeliverable for a period of one year] shall be revested in the applicable Reorganized Debtor free of any restrictions thereon, and any entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and forever barred.").

on drafter of agreement and the drafter must show that its construction of the agreement is the "only construction that can be fairly placed upon it").

## D. The Reorganized Debtor Has Failed To Rebut The Objections Of First Carolina Investors, Inc.

### 1. The Reorganized Debtor Misapprehends The Nature Of Its Payment Obligations Under The Plan

28. As the First Carolina Objection conclusively established, "a confirmed plan of reorganization constitutes a 'new contract' between the debtor and its creditors," to which both a debtor and its creditors are legally bound. See First Carolina Objection at ¶ 30 (citing In re Ernst, 45 B.R. 700, 702 (Bankr. D. Minn. 1985), In re Consumers Realty & Development Co., Inc., 238 B.R. 418 (8th Cir. BAP 1999); and In re Potts, 188 B.R. 575 (Bankr. N.D. Ind. 1995)). As the court wrote in In re Ernst, "[t]he effect of confirmation is to discharge the entire preconfirmation debt, replacing it with a new **indebtedness** as provided in the confirmed plan." 45 B.R. at 702 (emphasis added); see also In re Consumers Realty & Development Co., Inc., 238 B.R. 418, 425 (8th Cir. BAP 1999) (confirmation of plan had the effect of replacing the obligations under the promissory notes with the obligations as provided in that plan); In re Penrod, 169 B.R. 910, 916 (Bankr. N.D. Ind. 1994) (effect of confirmation is to discharge the entire pre-confirmation debt, replacing it with a new indebtedness as provided in the confirmed plan.); In re Water Gap Village, 99 B.R. 226, 229 (Bankr.D.N.J.1989).

29. In addition, under the Bankruptcy Code, "debt" is defined as "liability on a claim" (11 U.S.C. § 101(12)), and "claim" is defined broadly as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). This definition is instructive to the case at hand, and the at-issue payment obligations to the Equity Security Holders fall under such a definition of "debt." The Reorganized Debtor's

payment obligations to the Equity Security Holders, however, also fall under more narrow definitions of debt. For example, in New York, in Trojan Hardware Co. v. Bonacquisti Construction Corp., 141 A.D.2d 278, 534 N.Y.S.2d 789 (3d Dep't 1988), the court defined debt "as a fixed and certain obligation," and stated that "debt is generally evidenced by a contract and is a readily discernible amount which can be expected in the normal course of events to be due and owing in the future, although the obligation has not yet ripened." Id. at 281, 534 N.Y.S.2d at 791 (citations omitted). The contractual obligation to pay the Equity Security Holders $0.05 for every $0.95 paid as principal on the New Senior Notes once available cash had been used to fulfill the four prior waterfall provisions, clearly falls under this more narrow definition of debt as well. Further, it is undisputed that in the absence of the language in the Plan providing them with the five cents per dollar of liquidation proceeds, no independent contractual basis for such distribution would exist.

30.    The foregoing establishes: (a) that the Plan constituted a new contract between the Reorganized Debtor and, inter alia, the Equity Security Holders; (b) that pursuant to this new contract (the Plan), the Reorganized Debtor became obligated to make certain payments to Equity Security Holders (and the Equity Security Holders were given the right to such payment); and (c) that such obligations and rights of the respective parties created new "debt" running from the Reorganized Debtor to the Equity Security Holders.

31.    Nevertheless, the Reorganized Debtor boldly argues that its obligations to make certain payments to Equity Security Holders under the plan are simply not "debt

obligations." (Reply to Objection at ¶ 14).[5] The Reorganized Debtor, however, fails to demonstrate an adequate factual or legal basis to support this position. None of the bankruptcy cases cited by the Reorganized Debtor in any way address the **post-confirmation rights** of a party to receive payments **provided for by a plan**, and therefore none are relevant to the present dispute. Rather, the cited cases deal with the rights of parties respecting **pre-petition** claims. For example, Carrieri v. Jobs.com, Inc., 393 F.3d 508 (5th Cir. 2004) involved the objection of a Chapter 11 debtor as to certain proofs of pre-petition claims filed by shareholders holding its stock and stock warrants, and In re Georgetown Bldg. Assocs., 240 B.R. 124 (Bankr. D.D.C. 1999), involved a determination as to how certain pre-petition promissory notes would be classified under the plan there at issue.

32. The Reorganized Debtor argues that "the potential distributions to Shareholders as described in the Indenture do not have any of the indicia of debt." (Reply to Objection at ¶ 16). Given the above definitions of debt and the contractual nature of a debtor's obligations to make payments under a confirmed plan, the Reorganized Debtor's argument fails. In other words, the "indicia of debt" are the express payment obligations set forth in the Plan and Indenture. The Reorganized Debtor relies heavily on Geftman v. Commissioner of Internal Revenue, 154 F.3d 61 (3d Cir. 1998). This reliance is misplaced. In Geftman, the court had to decide whether the transaction at issue was a loan or a gift. The Third Circuit found that the transaction at issue was a gift (rather than a loan) because $2.85 million in credit was extended "with no promise of repayment, no interest charges, no security, and no repayment schedule..."

---

[5] The Reorganized Debtor makes this argument despite the concessions in its papers that: "the Plan describes the Reorganized Debtors' debts, liabilities and obligations to creditors and **stockholders**..." (Reply to Objection at ¶ 14) and that "the [equity security holders] have a conditional **contractual right to payment** on account of their equity holdings." (Reply to Objection at ¶ 15) (emphases added).

Id. at 75. Clearly, Geftman is not relevant to the instant motion. In the present case, the Plan and Indenture evidence the Reorganized Debtor's express contractual obligation to make payments to Equity Security Holders and others.

33. The Reorganized Debtor has repeatedly argued that its payment obligations to the Equity Security Holders are in the nature of a "dividend," rather than a debt. One purported basis for this argument is that "at no time was the obligation to the Shareholders recorded as a debt on the Reorganized Debtors' balance sheets or financial records...." (Reply to Objection at ¶ 16). This argument mistakenly presumes that the Court is beholden to the Reorganized Debtor's internal book-keeping practices. Of course, the Court is not so obliged. See Jordanos', Inc. v. Comm'r of Internal Revenue., 396 F.2d 829 (9th Cir. 1968) (holding that the court was not bound by classification of gratuity contained in corporate resolutions and it was the substance of the action taken, not the form of the designation, which would control); O'Sullivan v. Comm'r of Internal Revenue., No. 30571-88, 1994 WL 444419 (T.C. Aug. 18, 1994) ("[t]his Court is not bound by petitioner's self-serving classification of the payments").

34. The Reorganized Debtor also asserts that the language used in the Disclosure Statement, Plan, and Indenture supports its argument concerning "dividend" versus "debt." (See Reply to Objection at ¶¶ 14-16). In fact, the opposite is true. The Disclosure Statement contains a section entitled: "3. Potential Limitations on or Inability to **Repay Debt** or Make Contingent Interest Payments." (Disclosure Statement at p. 37) (emphasis added). The distributions to Equity Security Holders that are the subject of the Clarification Motion are explicitly described under this heading. See id. ("FNV Group's ability to pay the principal of, and interest on the New Senior Notes, **to make distributions to holders of FNV Group common stock...is dependent on the generation of cash flow....**") (emphasis added).

35. The Reorganized Debtor in error relies on the definition of "Restricted Payment" found in the Indenture. The Indenture, however, states that a Restricted Payment is "the declaration or payment of any dividend ***or*** the making of an distribution **on account of** the [Reorganized Debtor's] Equity Interests…." (emphasis added). If it was the intent of the parties that Restricted Payment could mean **only** a "dividend" then the latter portion of the definition would have been superfluous. Of course, it must be remembered that the Reorganized Debtor drafted these documents and, thus, if there is any ambiguity over a term's meaning, it must be construed against the Reorganized Debtor.

36. Moreover, as the First Carolina Objection demonstrates, the "Delaware Court of Chancery has held specifically that where a company makes a partial payment of income-producing assets to its equity pursuant to a Court order and not as ordinary ***or*** extra-ordinary dividend, the resulting income is not properly characterized as a 'dividend at all.'" First Carolina Objection at ¶¶ 26 – 28 (discussing Fulweiler v. Spruance, 222 A.2d 555 (Del. Ch. 1966)) (emphasis in original). The Reorganized Debtor argues that Fulweiler is not relevant to the present case because the court in that case "was not asked to decide whether DuPont could properly make the distribution under applicable law…" (See Reply to Objection at ¶ 33). This argument is unavailing since in Fulweiler the court held that the court-ordered distribution to the shareholder therein (like the payments provided for in the Plan and Indenture herein) is **not** a dividend. See Fulweiler, 222 A.2d at 559. In any event, the Reorganized Debtor does not (and cannot) contest the analysis of Fulweiler set forth in the First Carolina Objection. (See Reply to Objection at ¶ 33).

### 2. Under Any Analysis The Required Payments To The Equity Security Holders Cannot Be Impermissible Restricted Payments

37. The Reorganized Debtor argues that a transfer of the funds being held on account of the Equity Security Holders in a segregated account will forever be Impermissible Restricted Payments under the Indenture. This position is wrong. Under the Indenture, an "'Impermissible Restricted Payment' means a Restricted Payment that, if made by the [Reorganized Debtor], would render such entity insolvent, would be a fraudulent conveyance by such entity or would not be permitted to be made by such entity under applicable law." Indenture at p. 6. None of these categories describe the Plan-mandated payments to the Equity Security Holders.

38. The Reorganized Debtor argues that transfer of the funds is against applicable Delaware law since an entity in its financial condition may not declare "dividends" or "reduce capital." Delaware law cannot help the Reorganized Debtor for two reasons. First, it has already been demonstrated (see section D, 1, supra, at p. 14) that the Reorganized Debtor's payment obligations under the Plan and Indenture are **not** in the nature of a dividend. Second, even if the distribution to the Equity Security Holders is in the nature of a "dividend" as argued by the Reorganized Debtor, the payment of such a "dividend" to the Equity Security Holders at this time would not violate Delaware law. The Delaware statute relied on by the Reorganized Debtor, 8 DEL. CODE ANN. § 170, for its proposition that dividends may only be paid out of "surplus or net profits" has an express exception (applicable to this case) which states: "Nothing in this subsection shall invalidate or otherwise effect a note, debenture or other obligation of the corporation paid by it as a dividend on shares of its stock, or any payment made thereon, if at the time of such note, debenture or obligation was delivered by the corporation, the corporation has either surplus or net profits ... from which the dividend could lawfully have been paid." DEL.

CODE ANN. tit. 8, § 170. This carve out is obviously meant to stop a corporation from reneging on a contractual payment obligation made to a stockholder undertaken while the company was solvent, based on a later assertion of insolvency. In other words, this exception was meant to stop exactly what the Reorganized Debtor is attempting to do in this case. The Reorganized Debtor was clearly solvent when the plan was confirmed, and it became contractually committed to the Equity Security Holders to make the disputed payments.[6] Therefore, it cannot selectively renege on such debt obligations based on its current financial condition.

39.    Third, the reduction of capital provision cited by the Reorganized Debtor, DGCL § 244 (DEL. CODE. ANN. tit. 8, § 244), was designed to protect, among others, the stockholders of a corporation. See State v. Benson, 32 Del. 576, 128 A. 107 (Del. Super. Ct. 1924). This section should not be used as a vehicle to obliterate all rights that the Equity Security Holders were given under the Plan.

40.    Further, the Reorganized Debtor has failed to cite any authority for its proposition that Delaware law concerning the declaration of dividends trumps its express payment obligations under a confirmed bankruptcy plan, particularly **those to which affected creditors consented**. In fact, as the First Carolina Objection demonstrated: "[i]f a provision of the Plan, a creature of federal law, conflicts with the law of a state and the state law 'frustrates the full effectiveness of federal law [the state law] is rendered invalid by the Supremacy Clause." First Carolina Objection at ¶ 32 (quoting Jones v. Keene Corp., 933 F.2d 209, 214 (3d Cir. 1991).

---

[6]    In the Disclosure Statement, the Reorganized Debtor stated that it and its related companies "believe that the Plan complies with the financial feasibility standard for confirmation." Disclosure Statement at p. 48. And, it is well settled that "feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success." In re Leslie Fay Companies, Inc., 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997).

41. The Reorganized Debtor argues that the transfer of funds presumptively would be a fraudulent conveyance since in theory it is now insolvent. This argument also fails since it has been demonstrated (see section D, 1, supra, at p. 14) that the Reorganized Debtor's payment obligations under the plan are in the nature of a "debt," and it is well-settled that "[a]n 'antecedent debt' satisfies the requirements of fair consideration and reasonably equivalent value, and...the payment of an existing liability is not fraudulent." Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.), 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) ("Trace II") (citing Atlanta Shipping Corp. v. Chem. Bank, 818 F.2d 240, 249 (2d Cir. 1987)).

42. The same is true under Delaware law. As one Delaware court observed, "It is clear that under the statute [DEL. CODE ANN. tit. 6, § 1303] an antecedent debt can constitute fair consideration to the extent that such debt is supportable in light of the relationship existing between debtor and creditor." Faircloth v. Rash, 373 A.2d 870, 872 (Del. Super. Ct. 1977); see also DEL. CODE ANN. tit. 6, § 1303 ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied....").

43. Finally, the Reorganized Debtor maintains that it is at present balance sheet insolvent (see, e.g., Reply to Objection at ¶ 4) and that, therefore, it may not transfer the segregated funds at this time to the Equity Security Holders since it would render it (or render it further) insolvent. For a number of reasons this argument makes no sense. First, the funds at issue have **already been paid out**: $1.1 billion (or 95%) has been used to make principal payments on the New Senior Notes, and $65.5 million (or 5%) has been deposited into a segregated account on behalf of the Equity Security Holders. Thus, the transfer of the segregated funds to the Equity Security Holders would not **render** the Reorganized Debtor (or render it

further) insolvent. Second, since the Reorganized Debtor's Plan-based payment obligations are in the nature of a debt owed to Equity Security Holders, any payment of such debt will not negatively impact the Reorganized Debtor's balance sheet.

44.    It is clear that, contrary to Reorganized Debtor's argument, the transfer of the funds in the segregated account to the Equity Security Holders is not an Impermissible Restricted Payment. Furthermore, the Reorganized Debtor has stated that its "estate is winding down quickly" (Reply to Objection at ¶ 42) based on the "continued liquidation of assets." (Reply to Objection at ¶ 4). Thus, in a short period of time the Reorganized Debtor will no longer be insolvent; it will be non-existent. See In re Rehabilitation of National Heritage Life Ins. Co., 656 A.2d 252, 260 (Del. Ch. 1994) ("[U]pon dissolution the corporation will cease to exist as a legal entity."). Thus, even if the even if the Reorganized Debtor is right and the called-for payments are currently Impermissible Restricted Payments, they will no longer be once the Reorganized Debtor ceases to function as an on-going business enterprise.

### 3.    Under New York Law The Funds In The Segregated Account Are Being Held In Trust For The Equity Security Holders

45.    As First Carolina has already demonstrated, the segregated funds are held "in trust" for the Equity Security Holders entitled to distributions under the Plan. (First Carolina Objection at ¶¶ 34-40). Such a segregated account is at least susceptible to imposition of a constructive trust for their protection and benefit.

46.    Under New York law, a "constructive trust is an equitable remedy, necessarily flexible to accomplish its purpose." Counihan v. Allstate Ins. Co., 194 F.3d 357, 361 (2d Cir. 1999) (citing Simonds v. Simonds, 45 N.Y.2d 233, 241, 380 N.E.2d 189, 408 N.Y.S.2d 359 (N.Y. 1978)). "'[A] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the

legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.'" Id. (quoting Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378 (N.Y. 1919)). As noted by the Second Circuit, "[c]onstructive trusts have been imposed in a variety of situations where equity had dictated such a remedy." Counihan, 194 F.3d at 360 (citing U.S. v. Coluccio, 51 F.3d 337, 340 (2d Cir. 1995); Golden Budha Corp. v. Canadian Land Co. of America, 931 F.2d 196, 202 (2d Cir. 1991); Latham v. Father Divine, 299 N.Y. 22, 29, 85 N.E.2d 168 (1949) ; and G & M Motor Co. v. Thompson, 567 P.2d 80, 84 (Okla. 1977)).

    47.    The purpose of a constructive trust is to prevent unjust enrichment, and thus, a court will impose one where it "identif[ies] a party who is holding property 'under circumstances that in equity and good conscience he ought not to retain it.'" Counihan, 194 F.3d at 361 (quoting Miller v. Schloss, 219 N.Y. 400, 407, 113 N.E. 337 (N.Y. 1916)). "Whether a party is unjustly enriched is a legal conclusion 'reached through the application of principles of equity.'" Counihan, 194 F.3d at 361 (quoting Sharp v. Kosmalski, 40 N.Y.2d 119, 123, 351 N.E.2d 721, 386 N.Y.S.2d 72 (N.Y. 1976)). The Second Circuit stresses that "[u]njust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain." Counihan, 194 F.3d at 361 (citing McGrath v. Hilding, 41 N.Y.2d 625, 629, 363 N.E.2d 328, 394 N.Y.S.2d 603 (N.Y. 1977)).

    48.    In the case of Sharp v. Kosmalski, 40 N.Y.2d 119, 351 N.E.2d 721, 386 N.Y.S.2d 72 (N.Y. 1976), the Court of Appeals of New York noted four elements often considered by courts in determining whether to impose a constructive trust: "(1) a confidential or fiduciary relation; (2) a promise; (3) a transfer in reliance thereon and (4) unjust enrichment." Id. at 121 (citations omitted). Although the Reorganized Debtor cites these elements, it fails to

point out that "the power of equity to employ a constructive trust to reach a just result is not strictly limited by the conditions set forth in Sharp v. Kosmalski... Rather, the remedy is available to prevent unjust enrichment in a wide range of circumstances." Palazzo v. Palazzo, 121 A.D.2d 261, 503 N.Y.S.2d 381, 383-84 (1st Dep't 1986); see also Tordai v. Tordai, 109 A.D.2d 996, 486 N.Y.S.2d 802, 804 (3d Dep't 1985) (noting that the Sharp v. Kosmalski factors are not rigid, but flexible considerations for the court to apply in determining whether a constructive trust should be imposed); Coco v. Coco, 107 A.D.2d 21, 485 N.Y.S.2d 286, 289 (2d Dep't 1985) (holding that the Sharp v. Kosmalski factors are "are merely useful guides and are not talismanic" (quoting Reiner v. Reiner, 100 A.D.2d 872, 474 N.Y.S.2d 538, 541 (2d Dep't 1984))). "What the New York courts do insist upon is a showing that property is held under circumstances that render unconscionable and inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment." Counihan, 194 F.3d at 362.

49. In this instance, the Sharp v. Kosmalski factors, as well as the general principles set forth above, support the finding of a constructive trust. The funds were put in a segregated account based on the Reorganized Debtor's obligation (or promise) to make payments to the Equity Security Holders under the Plan and Indenture. As the only consideration provided to the Equity Security Holders under the Plan, the Equity Security Holders obviously relied on the receipt of these funds in consenting to the Plan. Finally, the proposed order submitted with the instant motion contains a provision stating that it is "ORDERED that FNV Group...(ii) may return the Available Cash in the Segregated Account to FNV Capital for use in its business to pay expenses, debts and other obligations." See Proposed Order at p. 2. Clearly, the Reorganized Debtor would be unjustly enriched to the tune of $65 million and counting if this Court does not impose a constructive trust in this case.

50.    The Reorganized Debtor also argues that "even if this Court found that the Segregated Account is held 'in trust' for the [Equity Security Holders]," the Equity Security Holders are not entitled to the funds therein since "it must be viewed as a trust with a condition precedent on payment – i.e., that payment does not constitute an Impermissible Restricted Payment." (Reply to Objection at ¶ 25). This argument also must fail since it has been established that: (a) the Impermissible Restricted Payment language does not create a "condition precedent;" and (b) the transfer of funds from the segregated account would not constitute an Impermissible Restricted Payment.

**CONCLUSION**

The foregoing establishes that neither the language of the controlling documents nor the well-settled and applicable principles of contract construction support the "clarification" proposed by the Reorganized Debtor. The Reorganized Debtor's contractual payment obligations under the Plan and Indenture are in the nature of debt and the transfer to the Equity Security Holders of the funds which are currently being held in a segregated account on their behalf, would not now, and certainly will not forever, constitute an Impermissible Restricted Payment.

**WHEREFORE**, for the reasons set forth herein and in the First Carolina Objection, the Equity Committee respectfully requests that this Court: (i) deny the Clarification Motion in its entirety; and (ii) grant to the Equity Committee such other and further relief as may be just and proper under the circumstances.

Dated: October 18, 2005
Wilmington, Delaware

**BUCHANAN INGERSOLL**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
Jami B. Nimeroff (No. 4049)
The Nemours Building
1007 N. Orange Street, Suite 1110
Wilmington, DE 19801
Tel: (302) 428-5500
Fax: (302) 428-3996
email: sullivanwd@bipc.com

-- and --

**ANDERSON KILL & OLICK, P.C.**
Mark D. Silverschotz
James M. Andriola
1251 Avenue of the Americas
New York, NY 10020-1182
(212) 278-1000

# EXHIBIT L

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Bankruptcy No. 01-0698 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| FINOVA CAPITAL CORPORATION, | ) | Wilmington, DE |
| | ) | November 29, 2005 |
| Debtor. | ) | 2:31 p.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:

MARK D. COLLINS, ESQUIRE
REBECCA L. BOOTH, ESQUIRE
RICHARDS, LAYTON, & FINGER, P.A.
One Rodney Square
920 North King Street
P.O. Box 551
Wilmington, DE 19899

JONATHAN M. LANDERS, ESQUIRE
JESSICA BASIL, ESQUIRE
GIBSON, DUNN & CRUTCHER, L.L.P.
200 Park Avenue
New York, NY 10166-1093

PHILLIP DONNELLY, ESQUIRE
THE FINOVA GROUP, INC.
Finova Capital Corporation
4800 North Scottsdale Road
Scottsdale, AZ 85251-7623

Olsen Industries:
(Via Telephone)

MICHAEL W. BISHOP, ESQUIRE
LOOPER, REED & MCGRAW
4100 Thanksgiving Tower
1601 Elm Street
Dallas, TX 75201

REGINA IORRI, ESQUIRE
ASHBY & GEDDES

Docket No. 80
Date 12/13/2005

222 Delaware Avenue
Wilmington, DE 19801

The Equity Committee: MARK SILVERSCHOTZ, ESQUIRE
JAMES ANDRIOLA, ESQUIRE
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020

WILLIAM D. SULLIVAN, ESQUIRE
BUCHANAN INGERSOLL, P.C.
The Nemours Building
1007 North Orange Street, Suite 1110
Wilmington, DE 19801-1236

Audio Operator: SHERRY SCARUZZI

Transcribed by: DIANA DOMAN TRANSCRIBING
P.O. Box 129
Gibbsboro, New Jersey 08026-0129
Office: (856) 435-7172
Fax: (856) 435-7124
E-mail: Dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X

| ARGUMENT: | PAGE NUMBER |
|---|---|
| Motion on Status Conference: | |
| Ms. Booth | 5 |
| Mr. Bishop | 5 |
| Motion to Cease Setting Aside: | |
| Mr. Landers | 7, 60, 73 |
| Mr. Silverschotz | 22, 57 |
| Motion to Increase Cap on Fees | |
| Mr. Silverschotz | 72 |
| Mr. Landers | 73 |
| RULINGS BY THE COURT: | |
| Motion on Status Conference | 6 |
| Motion to Cease Setting Aside | 52, 72 |
| Motion to Increase Cap on Fees | 76 |

(The following was heard in open court at 2:31 p.m.)

THE COURT: Please be seated.

MS. BOOTH: Good afternoon, Your Honor. Rebecca Booth of Richards, Layton and Finger, on behalf of Finova Capital Corporation, the reorganized debtor in this case.

There are three matters on the Court's agenda for today and we will be taking them in order. The first item on the agenda is a status conference in the matter of Olsen Industries. Essentially, the procedural posture, Your Honor, is that Olsen filed a proof of claim alleging damages. The debtors filed an objection to the proof of claim and we have been conducting discovery and moving forward towards a resolution of that.

At the -- at this point, I think all we need to do is present to the Court what we believe to be an agreed upon form of scheduling order and request from the Court some trial dates. Finova proposes trial towards the end of July, early August. We believe that will provide sufficient time for the Court to rule on any dispositive motions. According to our scheduling order, those would be due on April 13th of this year.

Mr. Bishop from Looper, Reed and McGraw is on the phone and this I already can introduce him.

MR. BISHOP: Your Honor, Mike Bishop from the law firm of Looper, Reed and McGraw in Dallas, Texas on behalf of

Olsen Industries, the claimant.

THE COURT: Yes?

MS. BOOTH: Your Honor, next year, not this year obviously.

THE COURT: Yes?

MR. BISHOP: Your Honor, we have agreed to the form of the stipulation and I believe Ms. Iorii has signed off on that form of stipulation on our behalf. With respect to the trial setting, one of the concerns we have, Your Honor, is that under the plan, the Court's aware that Finova's continuing to liquidate assets and to the extent that continues, I guess the concern is that there won't be sufficient assets to pay the claim at the end of the day if the Court ultimately allows a claim.

So, we would request a trial sooner rather than later after the dispositive motion deadline.

THE COURT: When is the dispositive motion deadline?

MS. BOOTH: It's April 13th, Your Honor.

THE COURT: How much trial time do you need?

MS. BOOTH: The debtors would anticipate probably two days, Your Honor.

MR. BISHOP: I agree with that, Your Honor.

THE COURT: Okay, let's try it for May 8 and 9.

MS. BOOTH: Your Honor, I don't even believe that provides sufficient time to complete briefing on the

dispositive motions. If the dispositive motions are due on April 13th --

THE COURT: Oh, okay, I thought the -- the briefing would be completed by April --

MS. BOOTH: No, I'm sorry, Your Honor. We believe the briefing to be completed in, you know, mid-May.

THE COURT: Okay.

MS. BOOTH: And will all due respect, these -- this claim and the objection have been outstanding since 2001, so we think that any urgency in having them resolved is not necessarily fair. We would request again, early August or late July for a trial date.

THE COURT: How about Monday, July 18 and Tuesday?

MS. BOOTH: That would be fine, Your Honor. Thank you. I'll write those dates into the stipulation and then hand it up?

THE COURT: Okay.

MS. BOOTH: July 18th, Your Honor?

THE COURT: Yes.

MS. BOOTH: May I approach?

THE COURT: Yes. Okay.

MS. BOOTH: Thank you, Your Honor. The other two items on the agenda relate to the debtor's motion to cease setting aside 5 percent under the plan and the Equity Committee's motion for an increase in their cap on fees.

I will let Mr. Landers from Gibson Dunn handle those matters.

MR. BISHOP: Your Honor, Mike Bishop on the phone. May I be excused?

THE COURT: Yes.

MR. BISHOP: Thank you, Your Honor.

THE COURT: I assume no one else is on the phone?

MS. BOOTH: No, Your Honor.

MR. LANDERS: Thank you, Your Honor. Jonathon Landers and Jessica Basil, Gibson Dunn and Crutcher; Mark Collins with Richards, Layton for Finova. With me here today is Mr. Rick Ross, who's the chief financial officer of Finova, as well as Phil Donelly, who is the general counsel of Finova.

Your Honor, we're here on a motion to clarify the plan with respect to the 5 percent distribution on account of Equity, which the debtors believe cannot be made and can never be made. My presentation this morning -- this afternoon will be in three parts. First I'm going to talk about the provisions of the plan. Second, I'm going to talk about the debtor's argument. And finally, I'm going to talk about the Committee's response.

The key plan provision is section 4.06(E)(v) of the indenture, which is one of the plan documents. It says that, "The debtor shall apply cash to repay principal on the new senior notes" -- and here's the critical language -- "and make

distributions to Finova Group" -- which is the parent -- "which Finova Group will use to make restricted payments" -- that's the term of (indiscernible) -- "unless a restricted payment would be an impermissible restricted payment, in which case Finova shall retain the amounts until the restricted payments are no longer impermissible restricted payments."

As an aside, I'd observe that -- that there are virtually identical provisions dealing with an event of default. If there's an event of default, the money is not paid. It's set aside until the event of default ceases.

Under the indenture, a restricted payment is defined as a dividend -- any distribution on account of equity interests, and that's key language, including the purchase, redemption or acquisition of equity.

Then we turn to the definition of an impermissible restricted payment. An impermissible restricted payment is a restricted payment that would render Finova Group insolvent, would be a fraudulent conveyance, or which would not be permitted under applicable law.

Then we turn to section 4.07 of the indenture, which prohibits restricted payments unless authorized by section 4.07(B), which nobody has argued is applicable here, or section 4.06, which is the section I just referred to. For the basic -- for the payments here, Equity must look to section 4.06.

What to do these provisions essentially do? Well, they clearly define any payment to Equity whatsoever, as a restricted payment. A restricted payment is defined as payment on account of Equity interests. The second thing they do, which is critical, is that they effectively condition any payment on Equity interests to a bunch of conditions, which makes it clear that shareholders do not have an absolute right to payment. That's the situation. That's what the indenture says and that's -- that's in essence, the structure that we face.

Now, let me turn to the second area, which is the motion. The basis for the debtor's motion here was simple and straightforward. It is that the 5 percent payment was on account of Equity interests. That's what the indenture says. It is that the 5 percent payment cannot be made now because of the conditions to making a restricted payment. We believe that all three conditions that are conditions of a restricted payment, cannot be satisfied; that is, insolvency, that the payments would be a fraudulent conveyance, and that the payments are not permitted under applicable law.

In that connection, Your Honor, we attach to our original papers, both a declaration of Mr. Richard Ross, who is here in court, as well as Finova's mid-year 10-Q statement. Each of these documents showed that liabilities of Finova exceeded assets by more than $1 billion and that the existing

assets other than cash would have to more than triple in value in order that Finova would not be insolvent. Mr. Ross's declaration showed that given the nature of the assets that was simply impossible to occur and would not occur.

The Equity Committee hasn't, in any way, contested that showing. They did some diligence but I think in light of the overwhelming showing, I think we understand why they did not contest this. So that I think we're in a situation now where Finova Capital, under the -- I'm sorry -- Finova Group, the parent, under the indenture, is never going to be permitted to make these -- these payments.

Now, the plan itself did not provide specifically for this contingency. There is a provision in section 9.4 of the plan, which we believe could be applicable by an analogy, which dealt with unclaimed or undeliverable funds. And it says basically, that the funds revert to Finova after a year and the claim or interest giving rise to the right to the funds or claim on the funds, is extinguished or barred.

I think this is a common provision in plans and I would not argue that it's directly intended to deal with these situations but provides what I think is the only analogy that -- that may bear on this situation under the plan.

Now in it's response, the Equity Committee has not really contested the plan language. They haven't said and they haven't raised any question about financial condition.

They haven't suggested in any way that these conditions might be satisfied or that the conditions themselves were ambiguous in some way; none of these things.

And significantly, Your Honor, they haven't referred at all to pages 41 and 42 of the disclosure statement, which specifically specifies that distributions to stockholders will be subject to meeting legal requirements permitting distributions to stockholders. It won't be paid if Finova Group is insolvent. And as we understand it, Delaware law would, in this regard --

THE COURT: I'm sorry. You say page 41 and 42?

MR. LANDERS: It's 41 and 42. It's really on the top of page 42 of the disclosure statement.

THE COURT: I think I have a different copy of the disclosure statement than you do. Mine is docket number 3 -- I'm sorry, docket --

MR. LANDERS: Yeah, I have --

THE COURT: -- number 533.

MR. LANDERS: I have the printed version, Your Honor, of the disclosure statement. It is under the section "Special Risks for Equity Holders", and it's right at the end of --

THE COURT: Okay. It's on page 48 of my copy.

MR. LANDERS: Okay, thank you, Your Honor.

THE COURT: And you're referring to --

MR. LANDERS: I'm referring to right at the end before the subsection (c) where it says, "subject to meeting the legal requirements" --

THE COURT: -- Okay, I see --

MR. LANDERS: -- "permitting distributions to stockholders."

THE COURT: I see it.

MR. LANDERS: Okay. Thank you, Your Honor.

The Equity Committee has not referred at all to that section, nor to the requirement that to make any distribution to stockholders would require action of the Finova Board of Directors.

Let me turn to the arguments of the Equity Committee. Essentially, Your Honor, when you go through their arguments, all of them seek to ignore in one way or another, the plain meaning of the document, and the conditions precedent in the document to payment. When you come right to it, all of them say for one reason or another, we don't want to follow those conditions. We want something that we did not get under the plan. And all assume in one way or another, that Equity has some sort of vested or unconditional right to the funds, which is simply inconsistent with the plan language.

First argument in the argument that the Equity Committee makes is that the distribution is really a debt, and

not a distribution on account of Equity interests. Initially, Your Honor, the argument is contradicted by the express terms of the plan, the definition of restricted payment. The indenture specifically says that the 5 percent goes to make restricted payments and restricted payments are defined as payments on account of Equity interests. That's why they get the money.

In addition, Your Honor, that argument confuses the concept of obligation with -- with debt. If you take that argument literally, any obligation under the plan, even the stockholders for Equity would be a debt because it's an obligation. The case law -- and we've cited the Carrieri case -- suggests that there is a distinction between those cases and in that case, the Courts specifically distinguish between various rights of shareholders and -- and whether or not they constituted claims and said that those were not claims even though they were obligations.

In addition, Your Honor, this -- this provision, the 5 percent provision, has none of the characteristics of debt. We've discussed those in our memorandum and in, very briefly, Your Honor. We don't have a note. We don't have a fixed obligation, we don't have interest payments, we don't have -- we would have to declare a dividend or a distribution on the part of the Board of Directors. These are characteristics of equity interests, not debt.

In any event, even if in some sense it wasn't debt, it would still be subject to the condition. The Equity Committee has not explained how we do away with the condition. Well, then the Equity Committee's second argument is well, we'll admit the condition but we believe the condition is simply a priming restriction.

Well, first of all, Your Honor, that argument is simply inconsistent with the language of the plan and with the retention provision. The indenture specifically says if you can't make the distribution, you retain it. There would be no purpose in this case of simply retaining the money indefinitely. What purpose does it serve? What objective does it serve to say you've got to retain the money indefinitely, unless it's a condition on ultimate payment.

The Equity Committee has not suggested a reason or a meshing of their argument that it's simply a timing restriction and the fact there is this retention provision. And again, we turn to the fact that the same provision exists with regard to a default.

Again, I think it's implicit in the plan that if there's a default and it continues indefinitely, payment to equity holders would never be paid. And you've got the identical parallel language for the default provision and the situation where you have an impermissible restricted payment.

The debtor then turns and cites various cases that

deal with pay, when paid provisions in relationships between contractors and subcontractors. As we have suggested in our papers, Courts have clearly distinguished those provisions from ordinary conditions.

In fact, the Otis Eastern case, which is cited on page 13 of our memorandum, specifically deals with that issue and specifically upholds a requirement that in order to get paid, a subcontractor has to submit a lien release, which incidentally, Your Honor, included a general release as well. The Court said that condition had to be -- had to be followed.

I think if one goes back to the pay when paid provisions, they originated in the case in the -- in the New York courts which basically dealt with situations where a subcontractor was suing on a surety bond and the surety was asserting one of these pay when paid provisions. And the Court basically said look, that's just inconsistent with the notion of a surety bond but that has to application to this situation.

There's no attempt here, and the Equity Committee has not suggested there's been any attempt to transfer risk to a third party of somebody else's default.

Finally, Your Honor, the provision does not suggest timing issue in any respect. The Equity Committee says that various conditions precedent are not favored, but again, we have no ambiguity here, we have the -- the clear language of

the provision.

Then the Equity Committee says well, this would be a forfeiture and everybody knows that the law disfavors forfeitures. Well, Your Honor, the problem with that argument is that is proves too much. Any condition of a payment of any sort which is not satisfied, in those terms affects a forfeiture in the sense that you don't get what you hoped to get. The issue is not whether it's a forfeiture or not, but rather whether the condition has been satisfied.

In this case, the Equity Committee -- the equity interests simply have no lien or security interest or entitlement of a type that you can say is forfeited. They have a conditional right to payment, which condition was simply not -- not followed.

Might -- the rule might be different as the Equity Committee suggests of this ambiguity, but there is simply no ambiguity on the conditional nature of the payment. The ambiguity or the uncertainty, if any there is, is simply what happens if the condition not only cannot be satisfied, but can never be satisfied. But that's a separate -- that's a different question from whether there is an ambiguity in the conditional nature of the payment in the first instance.

The Equity Committee says that the plan should be construed against the drafter. Well, Your Honor, I'm not sure that that's even applicable here. Normally the cases they

 cite are situations where equity interests are asserting that -- that kind of -- I'm sorry -- where creditors who are seeking rights under a plan, are seeking rights that the equity interests say that they shouldn't have.

In this case, it's the equity interests that are asserting this issue vis a vie creditors. But in any case, Your Honor, Finova really stands in the position of a stakeholder here. It doesn't benefit in some way, in the way those cases addressed. In this case, either Equity or creditors are going to get the money; it's one or the other. And that's where we are.

This is not a situation where, in some way, equity holders are going to try to give creditors less than the creditors think they're entitled to in order to get more under -- under a plan. The cases, in fact -- and these are cases that are cited by the Equity Committee -- suggest that while the cases that they cite are cited for the proposition that a treatment under a plan creates a new obligation. What those cases also establish is that whatever the rights are under the plan, the parties getting those rights under the plan are stuck with those rights even if they're worse than what they up.

For example, the Consumers Realty case, involved a situation where the creditor was entitled to interest and didn't get it under the plan. Yet the Court said that they're

stuck with no interest. Similarly, the Penrod case involved a secured creditor who found that the lien was taken away by virtue of Section 1141 of the Bankruptcy Code. Again, the Court said, well, you're just stuck with your -- your treatment under the plan.

In addition, Your Honor, in this particular case, the obligation to Equity did not replace debt; it replaced equity. In fact, it didn't replace anything. It just gave Equity certain conditional rights under the plan and it has again, none of the characteristics of -- of debt.

The Equity Committee says, well, this is not a dividend and cites various cases relating to that issue. But, Your Honor, we don't think that that makes any difference because this is a distribution by the very terms of the plan on account of equity. And the disclosure statement makes it clear that it is subject to legal requirements dealing with distributions to shareholders.

Even if this is construed as some sort of return of capital or something like that, Section 244(b) of the Delaware Corporations Code specifically says that a reduction of capital is not permitted if the remaining assets are insufficient to pay debt. In fact, Your Honor, the provisions dealing with restricted payments are parallel in a very significant way, the restrictions under Delaware law on distributions to shareholders.

Not only has the Equity Committee not argued that the terms of the plan permit these distributions, but in fact, they've not argued that Delaware law permits these distributions either. To be sure, they have cited the Fulweiler case, which dealt with whether the spinoff of GM stock by DuPont, should be allocated to the allocated to the husband or the wife under a divorce -- divorce decree.

But, Your Honor, that has nothing to do with the question of whether DuPont could have conducted the spinoff as a matter of corporate Delaware law in the first place. That's the issue here. The issue is not what side of the ledger it goes on once the funds are distributed.

Then the Equity Committee cites Section 170 of the Corporations Code, which says that well, if you deliver a note at a time when you could have declared a dividend, the note is in effect, valid and should be paid. And then they say, well, this applies because the note, the obligation was, in effect, delivered at the time of plan when Finova could have paid a dividend. Your Honor, again, that argument fails on multiple grounds.

For one thing, in this particular case, a dividend could not have been paid at the time of the plan because the indenture specifically required -- required full payment of the Berkadia loan before any amount was paid on the 5 percent. What they are, in effect, arguing really, again proves too

much. Their argument would be that any general authorization to pay dividends at some point in the future takes the dividends when paid out of the restrictions in Delaware law governing the payment of dividends.

There's no indication that I know of that the Delaware statute was intended to basically approve forever and ever, dividends which are not declared but which might be declared in the future. And as I said before, in this particular case before any distribution whatsoever was distributed to shareholders, it would have to be approved before the Board of Directors. That simply did not happen when any of these -- when any of these conditions could be satisfied, nor can they be satisfied now.

Finally, the Equity Committee says -- says that the plan provisions trump state law if there is an inconsistency. That may be true, Your Honor, but here there is no inconsistency because the plan specifically incorporates state law. The plan says you can't pay these things if there's a fraudulent conveyance, state law, or it would not be permitted by applicable law, which in this case would be the law of Delaware.

So this is not a -- a situation where in some way -- this is not what I call a hell or high water provision where the plan said you got to pay this 5 percent to Equity, regardless of anything else. It's not that kind of provision

at all. It's a provision which is subject to conditions and the conditions specifically incorporate state law.

Finally, Your Honor, the Equity Committee says that because Finova chose to set aside the 5 percent in a segregated account gives rise to some sort of constructive trust. Initially, Your Honor, I observed that there was no segregation requirement under the indenture. The indenture simply says that the funds must be retained. According to the indenture, the funds could have been retained in a general bank -- bank account just as well as in a separate -- in a separate account.

But in addition, Your Honor, the case law that we've cited establishes that Courts will generally not impose a constructive trust when there is a specific agreement. Instead, the constructive trust remedy is a remedy that's employed when a party gets or retains something, that for a legal reason or an equitable reason, really belongs to a third party.

Here, however, Equity does not have a claim of entitlement. They have a conditional right to payment. And Equity is really trying to get funds which they are not entitled to under the plan. This is not a case where somehow Finova got the funds by virtue of wrongdoing or fraud or something like that. And the Equity Committee has not suggested any -- any such things.

Instead, it's simply a case where the Equity Committee would like to obtain funds in a way that, in effect, would require a skewing of the plan provisions and a total disregard of the conditions to payment.

Let me conclude, Your Honor. We believe that the documents are crystal clear that the plain meaning of the documents is clear that this is a restricted payment on account of Equity. It's subject to conditions and cannot be made. Therefore, not only can it not be made, but it never can be made. And therefore, we would urge the Court to grant Finova's motion.

Thank you very much, Your Honor.

MR. SILVERSCHOTZ: Good afternoon, Your Honor. I'm Mark Silverschotz from the Anderson Kill firm and I'm here today with my colleague, James Andriola -- also from Anderson Kill -- and William Sullivan from Buchanan Ingersoll. And we are counsel to the reconstituted Committee, the Equity Security Holders of the Finova Group.

That Committee was formed by the U. S. Trustee at Your Honor's discretion for the sole purpose of responding to the debtor's motion to clarify, which I suppose is the first time anyone has been asked to respond to clarify crystal clear documents.

We came into being on the 10th of July and Your Honor, the debtor's motion is ten pages long and there was a

flurry of motion practice back and forth after that was filed. But if you ignore the intervening motions and just look at the response of First Carolina, the debtor's reply to First Carolina -- our papers and then the debtor's ultimate reply papers -- we have about 100 pages of pleadings which cite, in the aggregate, 117 separate decisions.

I am not going to march all 117 opinions but it's appropriate that both the debtor and the Committee and First Carolina cited all these cases because I think, fundamentally we have an issue of law. And Mr. Landers and I, I believe, agree that we have fundamentally an issue of law.

The language of the plan is what it is, and the disclosure statement and the indenture as well, state what they state. The really key operative documents, of course, are the indenture -- and I agree with Mr. Landers there -- and the plan.

And I think Mr. Landers would agree there is no intrinsic -- extrinsic -- excuse me -- evidence of which certainly, we're aware that would demonstrate any expectation on the part of any party that on the 9th -- excuse me -- on the 11th of September of 2001, terrorists would fly planes into the Pentagon and the fields of Pennsylvania and the World Trade Towers.

And why am I bringing that up? A month prior to that, Your Honor, the plan was uncontested as -- as we stood

before you and it was found feasible and it certainly was. And it's important that we put the motion in context because one significant component of the various transactions contemplated by the plan was a $500 million tender that Berkshire Hathaway was expected to make for the new senior notes that were issued pursuant to the plan.

And we will recall that after 9/11, exercising what it believed to be its contractual rights, Berkshire Hathaway declined to tender the $500 million for the notes pro rata, asserting, I believe, force majeure and the debtor nevertheless, and I think appropriately, continued on with the effectuation of the plan, which had already gone. A final had been substantively consummated.

And this plan is, as we all agree, a plan of liquidation. It provided for Berkadia management, it provided the management fees, which we all know are substantial, and creditors got under the plan 70 cents cash on the barrel head and they got new senior notes in the amount of the balance of 30 cents. And as Mr. Landers mentioned, the notes had an indenture and fundamentally, it is the indenture why we are here today.

In their motion, the debtor points to the waterfall of payments that's laid out in the indenture and they say we're insolvent, we will always be insolvent. We therefore, can never distribute the funds to Equity, so therefore, let us

take the cash that's on hand now. It was $65 million; presumably it has gone up somewhat. And the addendum in their motion and the form of order that they propose says they want to use those funds to "pay expenses, debts and other obligations".

However, I think more accurately and in fairness to the debtor, as expressed in footnote 11 of their motion, they -- they gently drop the point that the funds that have been set aside for Equity are actually going to be used to pay either principal or interest on the new senior notes.

So, as I stand here, Judge, I think contextually, it's important to recognize that the effect, if not the formal intent, of the motion is to use the funds that were set aside for Equity to pick up. And we think it's going to go up to about $100 million dollars if we're lucky. They're going to pick up about one-fifth of the obligation that was declined by Berkshire Hathaway when after 9/11 they declined to tender for the notes.

So, what the debtor's really asking for here, contrary, I believe, to what Mr. Landers said, is asking for the Court, after the fact, after confirmation, after substantive consummation, substantial consummation -- excuse me -- first to shift the risk of that non-tender to the Equity and secondly, because the 5 percent that we're talking about is within the fifth tier of the waterfall, where 95 percent

goes to the note holders, is asking Your Honor to subordinate that 5 percent to the 95 percent. And of course, the 95 percent is paying the 30 percent that wasn't paid after the 70 percent was paid.

The indenture is silent with respect to what the debtor is asking the Court to do and because of that, Your Honor, we think, and for a variety of other reasons that we've expressed in our papers that I'm going to go through quickly -- and I'm not going to simply regurgitate my papers -- we think that the debtor's not entitled to the relief, the specific relief that's requested in the motion.

Our argument, Your Honor, is that the motion is contrary to law and it should be denied for that reason. And if we pause the 100 pages and the 115 opinions, we think the argument is fairly simple. The language of the indenture simply does not say what the debtor wants it to say. At best, it's ambiguous. And the silence plays into that ambiguity. It certainly emphasizes the ambiguity.

But either way, whether it's silent or not, the payment of the funds reserved for equity is a payment of a plan created contractual obligation. And that obligation is in the nature of a debt, not a dividend.

The debtor's solvency is not a condition precedent to the payment in the fifth charge. If the operative documents had provided otherwise, we would not be here today,

Your Honor, because we would have had an express condition precedent that Mr. Landers has articulated. But it exists in the ether, it doesn't exist in black and white on paper.

And because of that ambiguity, whether of a consequence of the document's silence or otherwise, the language has to be construed in favor of the equity holders because under New York law first, as a matter of contract law, one does not construe ambiguous language to find a condition precedent -- period.

Two, one does not under New York law under contracts, construe ambiguous language to effect forfeiture. Three, one does construe language against the drafter, and four, one does construe a plan against a plan proponent under traditional bankruptcy interpretation or more or less, basic contract concepts.

The sub issues that, I think, exude from everything Mr. Landers has said and everything I've said thus far and probably will say hereafter. We're down to, is it a debt and is solvency a condition precedent to any and every distribution of every sort contemplated by the plan, contemplated by the indenture to the senior notes?

The waterfall of issues, as opposed the waterfall of payments, is more or less, flows from those two concepts. The indenture contains that payment waterfall that Mr. Landers went to right away, as well he should have. The first

obligation under that waterfall is for the debtor to pay all of its current debts. The debts of its liquidation, the associated costs, the obligations at the subsidiary level -- and let us recall it is the subsidiaries that are doing the liquidating, paying their costs of liquidating. And only if they are able to generate positive cash flow, upstream the funds to Group according to the 95/5 split.

The indenture says that it has to either distribute or reserve the funds for equity within that fifth tier. And the 5 cents must be upstreamed according to the expressed language in the indenture. The end language in that fifth tranche -- and I'll use the term tranche even though it's probably technically inaccurate, but I'm stuck with it because that's what I've written in my notes. The end language at that fifth tranche says, "Each incremental payment of 95 cents pursuant to clause (a) shall require a distribution or retention pursuant to clause (b) of 5 cents.

Now, the 5 cent language is interesting because it says those funds are to be used "to make distributions in respect of Finova Capital's equity interests held by the company." It says that those funds are then held and then indenture says that if they are retained, "any such retained amounts shall accumulate." Now, Mr. Landers says what's the point of accumulating those funds? And that's a fair question and I'm going answer that but I have to come around to it and

I will do that in a second, Your Honor.

Mr. Landers also points out that the indenture says that if a restricted payment is impermissible, the funds shall accumulate. So, the core of the debtor's contention is that if the funds were once moved up were forever more impermissible, because they would either have paid, would render them insolvent or be a fraudulent conveyance or otherwise impermissible under Delaware law, then they could never do it. It's the debtor's contention that all three of those apply. It's our contention contrarily and I suppose, inevitably, that none of them apply.

But we also believe, Your Honor, that even if all of them apply and those funds simply accumulate, they're still ours at the end of the day because the first tranche requires everything to be paid. The 2nd, 3rd and 4th tranches get paid in order and then they get to the 5th tranche, and the 95 cents goes to the creditors and the 5 cents gets upstreamed and held for us.

The indenture is silent on what happens, even to an impermissible restricted payment at the end of the day. Now, at the end of the day is an interesting concept. And now I'm going to explain why I think it's a significant concept, and I'd like to posit what I'll call a hypothetical but I think it's really something that should happen at the end of the day.

Let us presume that the debtor liquidates out completely and does a perfect job. And there's a hundred -- and they continue to reserve the 5 percent and at the end of the day, $100 million is sitting in a segregated account and they've paid every last debt of every last subsidiary and every claim has been resolved forever. And all that's left is cash that's been segregated, and some senior -- new senior notes that are unpaid. At that time, how would this motion be considered?

In theory, Your Honor, the merits of the motion on that happy day, the merits of the motion should and would be in our view, exactly the same as they are today. You have creditors who got 70 cents in cash and 30 percent notes, who hopefully will have been paid most of that 30 percent. But they would have been paid what they were paid out of the 95 cents and who already consented in the plan to the split articulated in the fifth tranche, because that's the indenturous part of the plan supplement the debtor points out accurately -- the plan supplement as we always do -- was incorporated into the plan. And at the end of the day, we have the 5 percent in the bank account and unpaid senior notes.

What the debtor would have the Court do is effectively take that 5 percent and subordinate below the 95 percent which is something that the plan did not do and the

indenture doesn't do. We really think that the debtor has gone through a somewhat extraordinary circumlocution to get to that point, you know, articulating various legal theories, particularly in the absence of express language, producing the result that they seek. And their argument is essentially, and I'll come back to the word essentially, but taking it right out of their papers, they're arguing that this is what common sense requires and that the result is a consequence of the implicit meaning in the plan.

Your Honor, we disagree because we think the history of jurisprudence on our collective topics makes clear that common sense means that if you intend for a material term to be in a contract, you put it in. And if you haven't, one, you don't construe, under New York law, a condition precedent out of gossamer, and two, you don't cause a forfeiture to result as the consequence of an inference. And that's what the debtor's trying to do.

I've framed what we see as the legal issue and, Your Honor, I'd like to just go right into, more or less, pure law that we've all talked about. And I want to complement the debtor on their pleadings. I thought, just as counsel to counsel, I thought they were -- they did an excellent job. I think our's are pretty good, too. And Mr. Landers got last licks when he filed his papers earlier this month. If I bring up anything new it will be extremely minor and only in

response to something that he may have said in his last set of papers. And I said before, I'm not going through all 117 that we've collectively cited.

There is much about which the debtor and the Equity agree. We agree the plan is a contract. It embodies the plan supplement, as I just said, and it binds the parties. The debtor, when they opposed Mr. Linden's motion to reconstitute the Committee, said that the debtor's goal "is to expressly state what is implicit in the plan and pursuant to applicable law. At most, the clarification motion seeks to resolve ambiguity in the plan concerning the disposition of the segregated funds." And that's in the debtor's opposition to Mr. Linden's motion and at page six of their opposition.

And a couple of pages later, they go on to say, "The plan recognized that the payment to Equity of the 5 percent of the amount otherwise allocable to the new senior notes, was essentially a dividend." And Mr. Landers, I believe, used the word essentially during his presentation. And I have a term for essentially. It is a weasel word, Your Honor, and I don't think Mr. Landers is a weasel. I think he's an excellent attorney. But anything can follow the word essentially.

We can say that the payments are essentially a dividend. We can say they're essentially a prune danish. It is either is a dividend or it is not as a matter of law. And we believe it is not. But what we agree about is that the

plan does not expressly state what the debtor wants it to say and that the 5 percent allocated to Equity was not expressly stated to be a dividend. And we certainly disagree with the notion that the debtor's contractual burden embodied in the indenture is essentially anything other than a contractual obligation creating a debt.

In reply to the First Carolina objection, the debtor's said that, "The shareholders are not entitled to more than what is provided for in the plan and to find otherwise would provide an unjust windfall to the shareholders", and we absolutely agree with that assertion. And I'm sure the debtor would agree that to give the note holders more than they were given by the plan would similarly result in an unjust windfall.

We also agree with the debtor, Your Honor, that the contract -- that is the indenture included within the contract that is the plan -- is governed by New York law. And I'd like briefly to run through some New York contract law.

And New York law provides that when one is alleging that a result is implicit or essential, but not express, it is a high bar indeed that must be cleared. The New York Court of Appeals says, "A party who asserts the existence of an implied in fact covenant bears a heavy burden for it is not the function of the Courts to remake the contract agreed to by the parties, but rather enforce it as it exists."

And following on, "This is especially so where the implied covenant sought to be recognized and enforced is of a type not favored by the Courts." And that's the Rowe versus Great Atlantic and Pacific Tea Company, at 46 NYS2d 62. That opinion says that where a party is seeking the imposition of a disfavored covenant, failure to impose the unexpressed covenant, has to deprive the party of the "fruits of his bargain" -- quote, unquote -- fruits of his bargain, nor it could gain a judicial imposition.

And as I've said before, the plan gave unsecured creditors 70 cents cash, 30 cents in notes. The notes yield 7½ percent. The notes are not in default. Mr. Landers alluded before to the default provisions in the indenture. The notes are not in default today and that's important. And every penny that's been set aside thus far has been set aside because the contract required it because there is -- there is no default.

But the plan gave Equity 1/20th of the 30 percent -- 5 percent of the 95 percent. Or if you want to do the math slightly differently, 1.5 percent of aggregate distribution, on face at least, taking the notes at par, that was given to the creditors. So where the motion granted, who would be deprived of the "fruits of their bargain"? It's our view, Judge, that it's not the creditors. Not the creditors to whom the debtor seeks to give the funds that have been set aside.

We think it's the equity holders who consented to the plan, who didn't stage evaluation fight at confirmation, did dispute the management fees, did dispute the coupon on the notes. They got what they got under the plan. The creditors got what they got under the plan and we believe the fruit of our bargain is the 5 percent up front where we sit pari passu with the 95 percent distribution to Equity.

Fairly recently, the New York Court of Appeals again -- and the New York Court of Appeals is the highest Court, for reasons that no one has really explained to me, rather than being the Supreme Court. But the Court of Appeals said, "Courts may not by construction add or exercise terms nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." And that's the Reese versus Financial Performance Corp. case, citing the case with my favorite name of all the 117, The Vermont Teddy Bear Company, Incorporated, and that's at 1 N.Y.3d 72

Your Honor, the debtor contends that solvency is an absolute condition precedent to any distributions by the Finova Group to its shareholders, even where those funds have been properly upstreamed. And even where the senior note holders have received their 95 percent of the windfall.

Your Honor, the debtor is seeking to impose a condition precedent that's not written in the papers. And

under New York law, that relief is not available because we referred before under the Rowe versus A & P case, among the disfavored implied covenants are those that seek to imply a condition precedent. And in a federal case before Judge Duffy in the Southern District of New York, in the Lomaglio case, Judge Duffy noted that in New York, condition precedent imposition is so disfavored that it wouldn't even be done against the drafter, where the shoe on the other foot here, Judge Duffy would not impose a condition precedent that wasn't expressed, even against the drafter of the contract.

So, we think that our argument goes even further because we think from the Court of Appeals is that the language at issue doesn't create a condition precedent at all. The language of the indenture that the debtor believes creates this condition precedent, we think again, we think it's created out of -- out of the ether, not out the language because we believe, as Mr. Landers correctly described our view, that the language in the indenture creates a question of timing by the use of the word "when" rather than the creation of the condition of precedent or an issue as to if or unless certain conditions are met, the distributions would be made.

I'm going to come back to the word "when", Your Honor, and that's going to be one of the points that I'm going to make a fresh point later on. But if you think about it, Your Honor, when we talked about the position of the equity

funds in the hierarchy of the waterfall, the payment waterfall, the timing restriction makes sense because those funds really ought to be reserved until such time as it is clear that the higher tranches of debt have been paid.

And if the consequence of the reservation is that there is a measure of risk associated with the reservation of funds, that is not borne by the 95 percent -- with respect to the 95 percent received by the shareholders. It should still be at the end of the day, the funds are available but there may be some risk associated with it and the segregated cash should remain on hand.

Treating solvency as a permanent condition precedent makes no sense because if the debtor, as I expect, will have done everything right, and at the end of the day all those higher tranches will have been paid in full from the other $400 million in cash that they're holding onto right now. And the only party that remains that is contesting the allocability of those -- that 5 percent is the party that's already consented to it in the plan.

To suggest that the note holder creditors within the same fifth tranche get a second bite at that 1/20 of the distribution reserved for the equity shareholder creditors, we think is not supported by the express language in the plan. And it doesn't even make the common sense that the debtor would suggest to Your Honor -- has suggested to Your Honor.

And to do it by implication in the absence of that language is essentially to effect a subordination of the similarly situated parties within that fifth tranche, and we know under New York law, we don't do that.

Over the years, there's been a fair amount written, and I confess that I even wrote an article once about the so-called rule of explicitness. And it's usually in happier cases that we express the rule of explicitness, Judge, because there's a question of whether or not post-petition interest is susceptible to subordination in the absence of express language that specifically talks about post-petition interests. And we know that in New York -- although in other states it's not the case -- but in New York, the rule of explicitness is still good law. And that rule means that we do not impose subordination clauses that haven't been written out in black and white and we think that subordination by implication is exactly what the debtor is arguing for here and we think it's expressly contrary to the law of contracts in New York.

We also think that in the presence of an ambiguity in the documents, to effect the forfeiture of the funds set aside on behalf of the parties who agreed previously to the split, is independently disfavored -- and we talked about the Rowe case again referring to disfavored clauses -- and forfeitures are always disfavored, particularly so when it's

being done by implication.

The Oppenheimer case explained quite clearly the difference between and expressed and an implied one. It basically adopts a combination of Williston and Restatement. And where there's a disproportionate forfeiture, Oppenheimer won't -- the law of New York is that you don't impose that forfeiture where you have an ambiguous contract.

Now, what is the forfeiture that we're talking about here? The Restatement definition is more or less adopted by the Court in New York in the Oppenheimer case. And the restatement says forfeiture is "the denial of compensation that results when the obligee loses its right to the agreed exchange after it has relied substantially as by preparation or performance on the expectation of that exchange. And there's some editorial changes for grammar in there, but that's the language expressly out of Oppenheimer. And that's from Restatements, Comment (b) to Section 229 of the Restatement (Second) of Contracts.

Your Honor, as I said before, the Equity voted for the plan. They voted to be diluted, they voted to accept the benefits of the plan such as they were. We think that's the performance that can trigger a forfeiture or a concern for forfeiture.

So, we believe that on our various uncontested facts, the imposition of continued solvency as a condition

precedent where it's not expressed in the operative documents, would cause that disproportion forfeiture to the shareholders and we believe that the presence of solvency after all creditors, save for the note holders, have been paid was not a material exchange so you wouldn't be depriving the note holders of a material value that they bargained for. And we think thus under the Oppenheimer case, the motion is not according to law, not consistent with New York law and should be denied.

Now, the debtor and we cite a lot of the same cases and it should be no shock, and I'm sure will be no shock to Your Honor, that we each read them in completely opposite directions. And the debtor cites the language in Oppenheimer to the effect that where the operative language uses "if" -- in quotes -- or "unless and until", then it's appropriate to find an express condition in everything that I've talked about thus far. Thus far falls by the wayside if there's an express condition in the language.

The indenture doesn't use that language, Your Honor, and it's important to read Oppenheimer and the indenture side by side. It says, "When the restricted payments shall no longer be impermissible", and as we said before under the Grossman case, when is a word of temporal impact only. It's not if and when and the debtor's asking Your Honor to read into the document, really, a non-existent "if". We think

again, that it produces -- the word "when" produces an issue of timing, not an issue of right.

We have a disagreement about the impact of the silence of the document, Your Honor, and in its final set of papers, the debtor engages in really some furious backpedaling away from the proposition that the plan is ambiguous. And I think it's not surprising that they're doing that because from what we've seen, they really have to because the consequences of ambiguity are not good for their arguments.

And they cite a variety of cases to the effect that if a plan is otherwise clear, silence on a point, where there's absolutely no other conceivable result, will not in isolation produce ambiguity. And I agree with that as a proposition. But I think as we've seen thus far, Your Honor, it is a stretch to allege that these documents are so clear that ambiguity cannot be read into them; not after 100 pages of pleadings and 117 different opinions.

And the Goldfield case from the Court of Appeals in New York also expressly notes the potential presence of "ambiguity created by silence." So, we think that the logical syllogism that the debtor is stuck with, essentially flows from that silence and the indenture's part of the plan. The indenture is silent on this particular point of concern.

Silence equals ambiguity in our case because the operative documents are not clear. The ambiguity is construed

against the plan proponent. An implied condition precedent can't be imposed. Forfeiture, under the Restatement definition, would be experienced by the equity creditors, not by the senior note holders if the motion was granted.

So, we think the debtor's motion has to be denied for each of these reasons and we haven't even gotten to the issue of whether or not the obligation under the plan is a dividend or a debt. And First Carolina made, we think, crystal clear in their papers from last summer, that the obligation and the indenture to distribute or segregate the 5 percent that was -- the 5 percent that was slated for the equity creditors in the indenture -- is a dead obligation.

And again, we agree with the debtor, the plan is a contract. We agree that the rights under the plan are substituted for all the rights that existed prior to confirmation. Confirmation brings a new day and supervening obligations between the parties.

And of course, we disagree with respect to whether or not it creates a debt. Let's go back to New York law, the Trojan Hardware case from the Third Department. That's an intermediate appellate decision, Judge; not the Court of Appeals, but still useful. It says, "Debt is generally evidenced by a contract and it is a readily discernible amount which can be expected in the normal course of events to be due and owing in the future, although the obligation has not yet

 ripened."

Now, to the equity creditors, that sounds suspiciously familiar. Our debt is evidenced by a contract, the contract being the plan. The readily discernible amount is the 5 percent of the amount distributed on account of tranche five of the waterfall. So, we think this debt, even under the debtor's analysis, depending on the solvency of the debtor or not, it's either a current obligation or it's due and owing in the future. But it's a debt, but it's not a dividend.

And the debtor relies very heavily in their, I think, in both sets of papers that followed the original motion on the Geftman test -- the 16 steps of looking for a debt. But Geftman was -- we think Geftman is useful for another purpose. Geftman was a gift versus debt analysis in a tax context. And I think the lesson from Geftman is you're not, or one is not, and a Court is specifically not constricted by the categorization of a particular obligation based on how it's booked by in Geftman the taxpayer, or here the debtor.

Your Honor need not do what the IRS did in Geftman and go through that 16 step test because we have the benefit of having a confirmed plan that creates its own set of obligations in accordance with the language contained within its four corners, including the indenture.

The fifth tranche doesn't, or I should say, didn't get paid until the Berkadia loan was paid in full, and Mr. Landers noted that I didn't reference, I think, page 41 and 42 of the disclosure statement. And I will notice in turn that he didn't reference page 37 of the disclosure statement where the mechanism for payments is laid out. And I won't go through that, Judge, it's in our papers.

And I'm sure that Mr. Landers will agree with me that disclosure statements are not operative documents. They may convey a sense of what the parties believe at a particular time, but I can't recall seeing a plan or a set of plan papers that didn't have something to the effect that the words of the disclosure statement are superceded by the plan in the event of any conflict between the two.

And I'm sure we can find misplaced commas in, or colons that benefit either side and throw them back and forth at each other. But I think we have to focus, essentially, on the key operative documents, which are the plan and the indenture.

What is obviously missing in both the disclosure statement, the indenture and the plan, is the word dividend, appended to the 5 percent. It's not there. The debtor points to the term restricted payment. But restricted payment is worded a little more broadly than the debtor would have Your Honor find. And I don't want to accuse Mr. Landers of

anything except perhaps, you know, a logical fallacy. And I think what he's arguing is the -- is a proposition that falls to the fallacy of the excluded middle.

The distribution of the 5 percent is a restricted payment but it's not a dividend. Nor is it a payment in any way that's contrary to the Delaware statute. And we've had that all in our papers, Judge, and I'm -- I don't want to use up all the time. I know you have a 4:00 hearing.

Ultimately we think the dividend debt issue is interesting but it's really academic because the obligation is one that's set forth in the plan. The plan obligation is express and the only party at the end of the day that would be affected by it is the party that's already consented to it.

The debtor's sole reply repeats, more or less, the arguments they made in their original papers. It has six sections and I can go through them very quickly and just touch on them.

In the first section, they reiterate the contention that the plan obligations don't create debt an page six of their sur-reply, they bold the language that indicates that the debtor is supposed to "make restricted payments unless" -- dot, dot, dot -- "the making of any such restricted payment would be an impermissible restricted payment."

But they continue on but they don't bold the -- what the important language because the paragraph continues and

says that if the restricted payment is impermissible, then "the company shall retain such amounts and any such retained amounts shall accumulate and shall be used to make restricted payments at such time, or from time to time, when such restricted payments are not impermissible." Again, we're back to the word "when" and Grossman makes very clear that -- that's a word of timing.

The other minor newish point I'd like to describe to Your Honor is over the weekend, looking for the word "when" in some New York law and I found it. And this is 100 percent an argument by analogy but I think it's -- it's useful. There's a surrogate's case called In Re O'Hanlon's Will, (phonetic) it's from 1941 and it's cited at 27 NYS2d 889. And I don't think the case is going to rise or fall on this but it's an interesting case.

And involved the will that said that a beneficiary of the will would retain a benefit -- excuse me -- obtain a benefit when they turned 23, I think the age was 23. And unfortunately, the beneficiary died before they got to age 23 and as wills often do, there was a residual beneficiary. And there were also heirs to the beneficiary who didn't make it to 23. So the question was, who got that share, the heirs of the beneficiary who didn't make it to 23 or the residual heirs who would get the reversionary interest?

And since I'm citing it, Your Honor, you probably

can probably guess that the heirs of the beneficiary who was to receive the funds when he reached age 23 got the rights, because the rights were vested in the will, not upon the arrival at the age of 23. It was as in Grossman; it's a timing issue. The use of the word "when" in New York is interpreted as a question of timing.

The -- at page seven, the debtor attempts to foist on us, whether it was really a (indiscernible) by contending that we say that all obligations under a plan to equity are debts. Of course, we contend nothing of the sort. Using the debtor's example, a plan provision providing for a distribution of preferred stock, certainly doesn't convert that security into a debt instrument. The instrument is what it is.

But I think it's interesting, Judge, because if the debtor failed to issue the security, failed to perform under the plan, I think a different sort of claim would arise and what's even more interesting is that the example that the debtor gave is exactly what we don't have here. We didn't get preferred stock. We didn't get put into the junior tranche. We're in the fifth tranche of the waterfall of the indenture. We are there ratable with the 95 percent that goes to the senior note holders.

The debtor's second point focuses again on this condition precedent issue and the debtor says the following:

"The plan language is not rendered ambiguous by the plan's failure to state how the funds should be treated if the conditions are never capable of satisfaction." Au contraire.

We think that the word "unless" does only one thing and it establishes the time for the funds being upstreamed; they're either upstreamed for distribution or upstreamed for segregation. And the plan says shall, shall, shall when, with respect to our funds. The ambiguity in the plan, as the debtor admits, is that the plan is silent on what happens when "when" is never; if "when" is never.

And what the debtor really has put together and is presenting to Your Honor for approval is -- is the idea that when everyone north of the sixth tranche -- and that's the one below us -- other than the senior note holders has been paid in full, the senior note holders are entitled to pick our pocket as if we had a subordination.

The plan doesn't say that expressly. If it did, we wouldn't be here. And because of that, the motion has to be denied. And they say at page 13 that the debtors are not contractors attempting to distinguish and we agree that the debtor's not a contractor. There it contends at page 14 that our argument would render plan language superfluous. We disagree with that, obviously.

Their third point is that the distribution of the segregated funds would be impermissible restricted and we

disagree because we believe those funds are paid when they're upstreamed. And we believe that the senior note holders consented to the distribution out or segregation at the time they consented to the plan. And even if we're wrong on that point, Judge, and I don't we are, the status of impermissibility really is only there to protect the interest of the senior tranches, not the parties that have consented to a distribution.

The debtor's fourth point is back to forfeiture. They set up what I think is a straw man when they say that it's -- it's error that our argument is that any -- they say, "any contractual condition to a payment effects a forfeiture." And Mr. Landers said that when he was just standing here right before. If that's what we had said, then I would agree with that we were wrong. We do not believe that every failure of the condition -- we don't contend that every failure of condition creates a forfeiture.

We say there is not condition and to take our money away would, in fact, cause a forfeiture. If I had to put what we're saying in one long and fairly complex sentence, I'd say our argument is this: We say it is impermissible where a document is silent and thus ambiguous, to judicially impose against a non-drafter and non-proponent, a condition precedent that was not clearly expressed in the documents and the consequence of which is the forfeiture of material

consideration expected by that non-drafter, non-proponent, or the subordination of those rights in violation of the rule of explicitness respecting subordination.

As we mentioned before, New York courts interpreting New York contract law are so loathe to impose a condition precedent by implication, they won't even do it against the drafter of a document. And at page 16 and 17 of their -- their final set of papers, the Judge asks the Court essentially, pay no attention to the admission of ambiguity that they made in page 6 of their opposition to Linden reappoint the committee motion.

You know, so now, and we heard it during argument, everything is crystal clear. And I think Mr. Landers may have actually used the phrase "crystal clear"; if he didn't, I apologize. Reading this part of the debtor's sur-reply, Judge, given all the protestations by the debtor as to how clear the operative documents supposedly are, one would think that it was the Committee that filed the clarification motion and not the debtor.

The debtor's fifth argument is to challenge the idea that silence can produce ambiguity. We agree that if a document is utterly clear and if no possible result would exist, other than the result being proposed, a side issue inconsequential silence, isn't by itself going to create ambiguity. We don't -- we don't think that that is our set of

facts.

We think at page 19 of their final brief, they ultimately paints itself into a corner, where it contends at long last that "because there's no ambiguity, there's nothing for this Court to construe against the reorganized debtor." And I have to ask, then why are we here? We're not the ones making the motion. And we believe that the idea that there's no ambiguity in these documents is an unrealistic assertion.

The last argument Mr. Landers made -- and to his credit it was a throwaway argument and I think he more or less threw it away during his presentation -- was the idea that the funds are undeliverable and hence they fall into the lawyer-plagued undeliverability clause that's in every plan where somebody has moved and hasn't provided forwarding information or otherwise shown up. And administratively, to clean up the case, we either pay the money into the registry or have it go to the reorganized debtor. We agree that -- with the implicit suggestion that that's not really an applicable clause.

Finally, the final argument is the issue of -- of constructive trust status. I don't want to spend a lot of time on it, Judge. I think that under New York law, the key issue here is unjust enrichment and the imposition of constructive trust in this context is more an issue of remedy rather than the existence per se of a trust in the current status of things. We think that a constructive trust may be

imposed over the funds to ensure that they are reserved for the parties who are entitled to those funds. We think that party are the equity creditors, whose rights are parried with the 95 percent interest in the fifth tranche of the indenture.

Silence in the indenture on this point can only devolve to the benefit of the equity shareholders and not to the senior note holders. With respect to silence, Your Honor, I'd like to close with an observation made by Thomas Hardy, "that a man's silence is wonderful to listen to." And with that, I'll sit down. Thank you.

THE COURT: Okay. I don't need anymore. I've had enough.

I've spent a lot of time with the relevant documents. I don't think they're ambiguous and I think the debtor has it right.

The multitudinous arguments offered by the Committee, for the most part, are either irrelevant or off the wall. The concept of forfeiture, subordination, constructive trust, sharing pari passu is all in gross conflict with the terms of the plan and the disclosure statement. And I want to go through the disclosure statement and the plan and the indenture to -- to make clear why I agree with the debtor on this issue. I don't think -- the documents are verbose and a bit complex, but I think they are clear on this point.

I first looked at the disclosure statement and the

summary description of the classes and the treatment of those classes. And in my copy of the disclosure statement, I'm looking at page 14, which contains a portion of the table describing the classes and the treatment, and the FNV Group 6 interest as a relevant class for the Equity Committee.

And there it says, "On and after the distribution date, the legal, equitable and contractual rights of holders of allowed interest in class FNV Group 6 (interest), shall remain in effect" -- let me just pause. What it says there, the interest remain interest -- i.e., the interest is a stock interest. Then it says, "subject to, number one, additional group common stock to Berkadia and the issuance of additional preferred stock." And romanette (iii) it says, "the other terms and conditions of the plan."

Now, if we then look at the plan on page 21 of my copy where it defines the -- where it describes the class FNV Group 6 (interest), like the summary says, "On and after the distribution date, the legal, equitable and contractual rights of holders of allowed interest in class FNV Group 6 shall remain in effect subject to the effect of, one" -- and then it makes reference to the additional common stock to be issued -- "two, the issuance of preferred stock", and romanette (iii), the other terms and conditions of the plan as more fully -- more fully described in sections 6.2, 6.3, et cetera.

I then turn to the plan section 6.2, which is

obviously a description of the senior notes. And that description refers us to the interim exhibit 6.2(C)(1) and the interim exhibit 6.2(C)(1) -- which is the term sheet -- then describes in detail the, number one, the cash distribution, the waterfall and then it says as a caption -- and there's no pagination for this -- limitation on restricted payments.

I quote: "FNV Group will not directly or indirectly make any restricted payments other than the restricted payments under the 'use of cash' covenant described above." In my view, that is a very plain statement that unless the restricted payments can be made, which are not impermissible restricted payments, then no payments will be made. The indenture, as I will point out later, makes that point equally, if not equally clear, when I get to it.

What is also interesting about this particular provision is in defining the restricted payment, it defines it as a declaration or payment of any dividend or the making of any distribution. The debtor's position doesn't turn on labeling these as dividends. It's a distribution with respect to the equity position.

It goes on to say, "provided however, the restricted payments shall not include" -- and it then lists five items. It does not include the elimination of fractional shares. It does not include payments in cash in lieu of fractional shares. It does not include payments to dissenting

shareholders, and most importantly, it does not include repurchases, redemptions, acquisitions or retirements to employees, directors or officers.

Then it goes on to say, "provided that the aggregate of all payments in clauses 1, 2, 4, and 5 shall not exceed $5 million dollars per calender year." My interpretation of -- well, let me get -- let me go now to the indenture.

The indenture, of course, in section -- we've focused on section 4.06, which is the waterfall distribution. But equally important is my view, is 4.07 and that says, and I quote, "The company shall not and shall not permit any of its subsidiaries to directly or indirectly make any restricted payments except such restricted payments that are permitted or required by section 4.06" -- and that's the waterfall -- or section 4.07(B) hereof." 4.07(B) hereof, is the, what was also referred to in the plan as to the five exceptions to the payment of restricted payments, including redemption of shares of directors and employees provided that that will not exceed $5 million dollars in any calender year.

Now, I now want to get back to the disclosure statement and elaborate a little further on the point that Mr. Landers made at the outset. In my -- I'm looking in my copy of the disclosure statement, docket number 533 on page 48. It's a -- it's a discussion captioned "Special risk for equity holders". Sub part (a) talks about the dilution resulting

from the distribution of, to Berkadia, of half of the equity position.

The next caption on the top of page 49 is labeled "Dividends". The second -- third sentence of that paragraph says -- and this is a lengthy reading but I think it's important -- "Subject to applicable corporate law (which limits the circumstances which corporations may legally make distributions to shareholders), limited distributions to shareholders will be permitted as the new senior notes are paid off as described in the next paragraph."

I want to then skip to the third -- the fourth sentence of the next paragraph, and it says, "If FNV Group does not have sufficient funds ultimately to repay the new senior notes in full (together with accrued interest therein), it is likely that only limited distributions will be made to shareholders." Let me pause for a moment and observe that I think that sentence of limited distribution refers to the five exceptions in exhibit 6.2(C)(1) of the plan. In other words, the $5 million limitation distribution.

The next sentence, "There can be no assurance that FNV Group will make any distributions to its equity holders, even if all the contractual prohibitions thereto have been exercised." That says to me, you are shareholders. You may or may not get a distribution and if applicable law precludes a distribution or a dividend being made, you get nothing.

It goes on to say, "Subject to meeting the legal requirements permitting distributions to shareholders, applicable law and Delaware law, and so long as the making of any such distribution would not render FNV group insolvent" -- the issue we have here -- "FNV Group currently intends to make distributions permitted under the terms of the new senior notes as soon as possible."

That provision, together with 4.7 of the indenture, in my view shouts at us when it says there are circumstances, plain and simple, which would preclude any payment to any of the shareholders.

And now the only question is will these events never go away? And you've ducked that issue. Should we just wait until the debtor is finally wound down and you still get nothing? Or do you want to debate whether those conditions can ever be satisfied?

MR. SILVERSCHOTZ: Your Honor, if the question is do we want to have a lengthy and expensive investigation on whether or -- there are all sorts of issue -- whether you address what we've done, what we haven't done.

When last we were here, Your Honor made quite clear that we had a limited budget. Your Honor felt we could spend about $20,000 -- and I think that was the number that was expressed on the record -- to do a, I don't want to use the phrase drive-by, but a low intensity evaluation of the

debtor's assets. What the Committee did was, after much searching, we found what we thought was an ideal person to review the aircraft assets which are by far, and counsel will correct me if I'm wrong, the largest group of assets of this debtor.

THE COURT: Are these actually aircraft or are they --

MR. SILVERSCHOTZ: They're aircraft --

THE COURT: -- claims against aircraft?

MR. SILVERSCHOTZ: I believe, well, it's probably a combination of -- of every conceivable asset that one can have associated with aircraft. We'll call them the aircraft related assets, including ownership of -- of planes themselves that are out on lease and there's an income stream.

This gentleman had a good, preexisting working knowledge of the Finova fleet. And working with -- after we entered into a confidentiality agreement, he prepared a report, which we have not shared with the debtor. His review was -- the results of his review were that he believed that the actual value of the planes was at the very high end of the range that the debtor had given, but it was certainly not a multiple of the values, of the range of values that the debtor gave.

So, that's -- that's one thing that we know. Whether we would automatically extrapolate from that, that

point, an overall evaluation -- to do an overall evaluation, Judge, I mean, you do that practically every day of the week sitting where you are. And we all know --

THE COURT: I don't do it. I hear others do it.

MR. SILVERSCHOTZ: Well, yes. But Your Honor sits in judgement of what the work that other people -- the work that other people have done. And it is expensive, it is time-consuming and we think it would have been an error for us to go off and -- and hire, you know, Shannon or Price Waterhouse or one of the other bankruptcy evaluation gurus. And we haven't done an evaluation of what the debtor's net operating loss is worth in the marketplace.

We don't know if the debtor has the ability to use some of that cash and buy back notes and produce value. We don't know if the debtor had litigation claims. We don't know if the Berkadia -- excuse me -- the Berkshire Hathaway assertion of force majeure was valid or not.

There are all sorts of issue that in theory could --

THE COURT: But that's -- that's an event that took place four years ago, isn't it?

MR. SILVERSCHOTZ: Your Honor, if it's a six year statute on breach of contract, you know, I don't know even as the point Your Honor makes is whether or not that means it's beyond the statute of limitations or not.

I can't stand here today, Your Honor, and say -- and

throw up my hands and say, sure, they're insolvent today and they're going to be insolvent for all time. Our view, Judge, is that on the effective date, they had $600 million in shareholders equity and they entered into a contract to pay us 5 percent and made it a contract.

And I know Your Honor said our arguments were off the wall. I prefer to think of them as creative and thoughtful.

THE COURT: Maybe some of them were creative.

MR. SILVERSCHOTZ: Thank you, Your Honor.

But, we're working here with the -- the facts, the time, the budget and the documents that we have. If we --

THE COURT: Let me hear from the -- tell me about the wind-up of this corporation. What is the timetable?

MR. LANDERS: Your Honor, we were specifically talking about that about three hours ago. And Finova has at least, and I'm a little hesitant to say very much because Finova still isn't public, isn't a public company and some of these things are not public.

But as of now, Finova is proceeding to liquidate its assets internally. Whether at some point there'll be a change in direction is not clear. Finova has made some efforts to sell assets in bulk to purchasers like a GECC, or somebody like that. And in general they found that -- that the benefits to everybody -- new senior note holders in Equity --

would be served by continuing the litigation, having considering -- continuing the internal liquidation itself rather than a sale in bulk.

I'd say only two other things --

THE COURT: What are the bulk of the assets? Are they the airplanes?

MR. LANDERS: They are largely aircraft. In some cases, they're on lease and some cases they're not on lease. Again, if the Court wants to inquire further, Mr. Ross is here and he can -- he's really on this --

THE COURT: I'm just trying to find out, is it next year, two years from now, five years from now?

MR. LANDERS: Well, some of them come off lease periodically but I will say that in the last -- in the last quarter, the company did, unfortunately because of the Northwest bankruptcy, have a further write-down of its -- of its Northwest lease, of its various lease portfolios.

I think if Mr. Ross and the Court is free, I would be glad to have Mr. Ross address the Court and answer these questions. But in essence, the planes tend to be older planes. Some of them are on lease, some of them not. Northwest, as you might expect, is making noises about trying to --

THE COURT: Here's -- let me tell you what I'm getting at. Should we give the Committee more money to do

evaluation --

MR. LANDERS: Well, Your Honor --

THE COURT: -- or should we sit back and wait until the wind-down is completed?

MR. LANDERS: Well, Your Honor, I don't think that that's -- I don't' think that's fair to anybody and I'll tell you why. We have made -- if you look at our 10-Qs, our 10-Qs gives intimate detail about the liquidation. Our 10-Qs, for about four years, have specifically said that we're not likely to have enough assets to repay the new senior notes.

It sets forth that information in great detail. That information is reviewed on a quarterly basis and updated. And the situation is that we still have a deficiency of well over $1 billion, with an asset pool of -- I mean, when you look at the assets, you've got to look at them as in different categories. A portion of the assets are cash, which doesn't appreciate in value. A portion of the assets are simply receivables from customers that were financed by Finova. They can't get above the face amount of the paper.

Theoretically, the airplanes could decrease but -- but the fact of the matter is that the disclosure -- that the 10-Qs set out in great detail the present value of the aircraft and gives figures for the values of the various portfolios, and they're very substantially under water. They did have a consultant who familiar with the portfolio who

looked at these things and one can only assume that he didn't find any basis to think that the assets would be worth anything like the multiple that would be required. And we're not talking about 10 or 15 percent difference. We're talking about a 300 percent increase in value of basically used aircraft.

I mean, I think the odds of that happening are very, very remote and I think that's why the Equity Committee chose not to pursue it. But that information is all a matter of public record and shareholders have access to that information for four years, and as I said --

THE COURT: That doesn't mean the Committee's not entitled to challenge it.

MR. LANDERS: No, it doesn't mean that, Your Honor, but -- but you have to come -- you have to get to a point where a challenge is frivolous, Your Honor. I mean, you have to just get to that point where -- where it's so out of line, it's so unlikely that there's no -- that there's no basis for it. I mean, we have -- well, we have -- okay.

THE COURT: Well, look, but now that I've turned away their -- their legal argument, we have the issue of whether your client is forever insolvent. And until they say they agree with that, then I say somebody's got to prove it to me.

MR. LANDERS: Well, Your Honor, we -- we have Mr.

Ross here. We didn't -- we didn't prepare to put him on but I'm prepared to have him testify today --

THE COURT: I'm sure the Committee's not prepared to examine him.

MR. LANDERS: No, I know they're not prepared but they were on notice that he was coming and that the reason he was coming was specifically to address these questions if raised by the Court. And I'd be more than glad to just ask him to come up and tell the Court what the situation is and let the Court determine on the basis of somebody who has the information whether --

THE COURT: Can he tell me how -- when the end of the wind-down will be?

MR. LANDERS: Yes. It will be no later than 2009.

THE COURT: 2009 --

MR. LANDERS: Nine, yes. And probably before that but that would be the latest possible.

MR. SILVERSCHOTZ: Your Honor, all that suggests to me is that the motion although the debtor may be entitled relief, today it's not emergent.

THE COURT: So, what do you want, to wait until 2009?

MR. SILVERSCHOTZ: Well, I'd like to wait forever, Your Honor, but if made until 2009, it certainly, at least as Your Honor reads the documents, if we don't get the money, the

money we think has to be reserved under the documents as they're written, at the very least.

MR. LANDERS: Your Honor, there's simply no purpose in spending more money to do -- to do this. We have conducted the liquidation -- again I defer to Mr. Ross -- but of the assets we started with in 2001 when the plan was confirmed, probably something like 80 to 90 percent of them have been liquidated.

THE COURT: The portfolio of -- of obligations; I don't imagine there's much debate about that. If they're being paid currently, then presumably they're worth face value. But most of them, if they're not being current, then look, bankers -- bankers make these judgments every day, whether a claim is collectible and to what extent it's collectible. You're client has done it.

MR. LANDERS: Yes, Your Honor. We have done it --

THE COURT: Shouldn't they be able to do that?

MR. LANDERS: Your Honor, they can do it and they don't really even have to do it because it's set forth in the -- in the 10-Q that we filed. There are judgments made about what the portfolio is and there are reserves taken which are updated on a quarterly basis, based on collections and developments and the like.

And there are numbers behind that, which is our matter of public record. Now, I mean, theoretically they can

look at it, but at the end of the day as you say, people would have to make evaluations of what the worth. But they can't be worth more than the face value of the paper. Virtually all of them are in default.

The "good" obligations have been collected, were collected a long time ago. So we're dealing with defaulted obligations and I think this Court, for example, is familiar with one of the larger ones in the portfolio and that may be on a larger scale, typical of what's left in the portfolio.

THE COURT: That would may be resolved after 2009.

MR. LANDERS: Your Honor, if it's ever resolved.

THE COURT: I'm not talking about this level. I'm talking about the appellate level.

MR. LANDERS: Oh, appellate level.

THE COURT: It'll be resolved at this level long before that.

MR. LANDERS: But the bottom line, that's what's there, is obligations such as that. I think that may be the biggest one in the -- in the portfolio. Even if you valued you at the face, which -- you're still not even -- I mean, there's a deficiency of, I've said about a billion two, a billion three in dollars. You just can't take, let's say, $500 million or $400 million of paper, aircraft leases and aircraft and say that's going to appreciate to -- appreciate and cover a gap of $1.2 billion. It's just not realistic.

Now, I mean, the other point I'd make is that the situation has continued through periods. In other words, if you look at Finova's statements over the last four years, you'll see that this deficit, in effect, has existed for a long time. And it hasn't come down in --

THE COURT: I understand everything --

MR. LANDERS: Okay --

THE COURT: -- you're saying.

MR. LANDERS: Okay.

THE COURT: But the Committee doesn't sign off on it.

MR. LANDERS: Well, Your Honor, I think that the question ultimately is --

THE COURT: -- Then --

MR. LANDERS: -- whether the company should pay for it --

THE COURT: -- Don't we have to have a hearing on that?

MR. LANDERS: Well, I don't think so, Your Honor. We had -- we had a declaration from Mr. Ross, which described the situation and Mr. Ross is here to testify to that if the Court wants to hear it, and he'll be glad to testify.

THE COURT: No, they took a position that made that issue go away.

MR. LANDERS: Well, but --

THE COURT: But now it's back in front of us.

MR. LANDERS: But, Your Honor, they made it go away because they knew that deep down that there was no basis for that position given where -- where things were. I mean, if again, I think it's a question it's fair to tax the creditors for the costs of doing this and what purpose it served. In another words, this is not a case where they have a raised a doubt, for example, or whether there's some question or something like that.

This is a question where the evidence is here. It's in court today. We're prepared to put it -- put it on and the question is whether they've had a preliminary expert look at it. It's obvious that he was not able to suggest anything that would indicate a major variance in what we're saying. The question is whether they ought to be allowed to do -- I mean, it sort of like, slaying a dragon. You just can't -- you just can't prove a negative like this any other way than to say these are the value, these are the assets and reasonable people have to make judgments as the Court said.

I mean, people do this kind of valuations all the time. And the people who are doing it at Finova are experienced. They've been doing it for four years. We have accountants verifying this. We're an audited company. I mean, at some point you have to say these people know what they're talking about.

So I would urge the Court not to impose this expense on the company. If they want to do it at the expense of Equity, well, maybe that's okay. But I don't think this expense should be imposed on the company to do this at this point. And I can't say it any more strongly, Your Honor.

THE COURT: Well, my view is that they have a bona fide belief that they're in the money. They should be given an opportunity to prove that.

MR. LANDERS: But they haven't said that, Your Honor. Mr. Silverschotz has been very careful and I respect him for being careful. He hasn't -- I mean, a lawyer can always go before the Court and say, well, Your Honor, if you look around you never can tell what we'll find. And that's probably -- probably true, but you have to deal with probabilities and reasonable expectations and those kinds of things.

And you have to basically ask a question whether a whole bunch of people who know enough -- a lot about this asset -- are not only wrong, but wrong by such a wide margin that -- that they ought to be allowed to investigate. I mean, I think that's the issue. I mean, to allow them to investigate, you have to say that the company's internal accounting people -- again, Mr. Ross is here -- and their outside accounting just don't know what they're talking about by a wide margin. At least, I would hope that the Court would

not permit them to look on that basis.

And again, Mr. Silverschotz has not said anything to suggest any infirmity in the presentation that we've offered on these points. But again, I'd urge the Court to listen to Mr. Ross and make its own -- make its own conclusions on this.

THE COURT: Well, I don't think today is the appropriate time to do that. I'm sure that the Committee is not prepared to cross-examine him.

MR. LANDERS: I would agree with that, Your Honor; they're not. There's nothing else I can say, Your Honor. Thank you.

THE COURT: Do you want to pursue a challenge to the valuation that the debtor has submitted to show that they are insolvent and will forever remain so?

MR. SILVERSCHOTZ: Your Honor, I think the first thing that I'd like to be able to think about, challenging with deference in every direction to Your Honor and the reasons you gave for your ruling, the first thing I'd like to consider is the appellate rights of the Committee on the legal issues.

We think they are interesting. We think there's enough to fight about and we think that looking at the various, you know, toggles of issues as we go through this matter, it may be less expensive to simply pursue the legal issues on an appellate level than engage in a valuation contest and ultimately it becomes a question of cost.

Mr. Landers is right. I don't have the top ten reasons why I think the debtor is solvent today. And it is quite possible that even after spending a lot of money, I still won't have those top ten reasons. But I don't know that one or way another as I stand here today. Nor could I even give Your Honor an idea of how much such an undertaking would cost. I frankly have no idea at all. Nor do I know how long it would take, even with parties working as at optimal efficiency and speed.

But I think that taking Your Honor -- I don't know if Your Honor intends to simply so order the transcript or write an opinion on this one, but however we go up, I don't know if I'm glad or not to hear that the process is going to take another 2, 3, 4 years before it wraps up. We have plenty of time to go all the way up as far as it's going to go. And I think between the two -- the two sides, we've identified every conceivable legal issue that might, that has to be briefed for consideration.

So, it may make more sense to hold that fact issue in abeyance. It's better to hold the cash as well while we pursue our remedies before the District Court or the Court of Appeals and at the end of the day, see where we are. It may very well be that at that time, the Committee's view or the debtor's view is different than it is now as to the need to pursue the fact that -- presumably more expensive fact

determination.

And who knows? Maybe the matter will resolve itself in another matter -- another matter. But I think that's -- as a lawyer standing here now, that's the process that I'm thinking about most.

THE COURT: Okay. Well, look, I think we need to then address an order. And my view is that to simply recite that for the reasons that I gave in open court -- refer to the transcript -- I would grant the debtor's motion to the extent that the debtor is presently and will be forever insolvent. But leaving open the issue of whether the debtor is presently or forever insolvent.

That way, you can pursue your appeal on the legal issue and if you want to pursue the question of whether there is presently and forever will be an insolvency, we can do that also.

MR. SILVERSCHOTZ: Your Honor, what I would do is consult with my -- I am just the lawyer, and I will consult with my client.

We have the -- the interim budget issue. There's the -- the third matter on the agenda was our firm's motion to increase the cap to 200 and I wish had left that first number blank so I could fill it in, based on the results here today. But on the -- on the calender is that motion. I believe the debtor wanted to meet us halfway but I think we're easily

going to exceed even the -- over the next month or so, or maybe even this month, we've still two days left -- 200,000.

I am -- I am very leery of, and although I appreciate very much Your Honor's invitation to pursue the fact issue, we were very careful in our first step. And I expect us to continue to be very careful in how we pursue the issue because I do not want to treat the debtor's assets like a smorgasbord for professionals.

And I know that I want to spend the right amount of money and we -- I think we're appropriately aggressive in terms of pursuing legal issues and I think we'll be equally so on the appeal. I don't want to be excessively aggressive on the fact issue because those numbers can -- can mount up. I think our collective experience is that the process of doing this kind of valuation analysis can become very expensive very quickly.

So, I'm going to consult with my clients with respect to how they wish to proceed. But in fairness to Your Honor and fairness to the debtor, the last thing I want to do is, in response to Your Honor, say, you know, yippee, you know, off to the races we go. Because I think that would be inappropriate and I want to do one thing at a time. And I think right now, our principal focus should be on the -- on the appellate review of Your Honor's decision, with deference in every direction to Your Honor's decision.

MR. LANDERS: Your Honor, just -- just one thing. Notwithstanding the Court's direction in the order -- obviously we will draft it that way -- but I would like the opportunity, if Mr. Silverschotz consents, to submit an order which resolves the financial issues, which I think at the end of the day I'd like to try to convince him. Because I don't think if you don't do that, that he's going to have a final order for PLR. I think he's going to have to fuss with that issue on appeal.

And I'm not sure, given the relative risks of on the question of insolvency and financial condition versus getting bounced up and down a couple of times, I'd like to try to persuade him that he really doesn't want -- want that kind of order; if the Court would find that acceptable.

THE COURT: Yes, look, these have been SEC filings, representations made under oath. My guess is that you're probably right, but I just can't deny them your right --

MR. LANDERS: No, I understand, Your Honor --

THE COURT: -- their right to challenge you.

MR. LANDERS: But all I'm saying is if I was in his position, I would -- I would want a clean, final order to take up to the Appellate Court rather than the uncertainty of when an order like this sort of, is final and it's not final, which I have to say, Your Honor, is an issue that I think the court's have not reached broad consensus on when that occurs.

In any case --

THE COURT: Look, I think at the end of the day, what they'll do -- and this is pure speculation -- what I would do is concede on the insolvency, get more money and to take the appeal.

MR. LANDERS: That's -- that's I think what I would do, too, Your Honor, but for the present -- for the present, we still are sticking with our offer of $150,000. We continue to believe that this is just taking money from creditors, that that is inappropriate and that there's insufficient interest of the equity side to finance these costs, as they've demonstrated consistently throughout this -- this process, to justify putting the burden on them to finance it rather than the creditors or the debtor.

THE COURT: How much have you spent to date?

MR. SILVERSCHOTZ: Your Honor, our bill through September that gave to Mr. Landers was 115 -- that's just Anderson Kill. I subsequently got my October bill, which is another 50. I do not have my November bill.

The -- I'm pleased to say that Mr. Sullivan's bill is very small. I think it's less than $5,000.

THE COURT: Okay, what's the total to date?

MR. SILVERSCHOTZ: The total, excluding November, which again, I don't have, we are at 135 including our expert. Just shy of 140 with our -- with Mr. Sullivan. And if we add

the 50 that came in afterwards from October from Anderson Kill, that's 190. I asked for the cap to be increased to 200 but I suppose -- I'm sorry. Did I -- 190 -- I asked for the account to be increased to 200 but I know I'm going to ask for more in the future if we're going to take an appeal. Because that obviously doesn't include the month of November and it doesn't include anything for -- for appellate purposes.

THE COURT: Okay. Well, I'm going to authorize -- I'm going to increase it to 200 and you can file your notice of appeal after the order is entered. And if you want further financing, you're going to have to come back and apply for it.

MR. SILVERSCHOTZ: I will do that, Your Honor.

THE COURT: And given my view of the merits of your case, it will be an interesting discussion.

MR. SILVERSCHOTZ: Message received, Your Honor.

THE COURT: Okay. We stand in recess.

(Proceedings concluded at 4:31 p.m.)

* * *

C E R T I F I C A T I O N

I, Susan A. Geddes, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Susan Geddes Digitally signed by Susan Geddes DN: CN = Susan Geddes, C = US Date: 2005.12.09 14:51:34 -05'00'

December 8, 2005

SUSAN A. GEDDES

DIANA DOMAN TRANSCRIBING

# EXHIBIT M

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

JUDGE PETER J. WALSH

824 MARKET STREET
WILMINGTON, DE 19801
(302) 252-2925

December 2, 2005

Mark D. Collins
Daniel J. DeFranceschi
Deborah E. Spivack
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

William D. Sullivan
Jami B. Nimeroff
Buchanan Ingersoll
The Nemours Building
1007 N. Orange Street
Suite 1110
Wilmington, DE 19801

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
Thayer H. Thompson
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193

Counsel for Reorganized Debtor

Mark D. Silverschotz
James M. Andriola
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182

Counsel for the Equity Committee

**Re: Finova Capital Corporation**
**Case No. 01-0698**

Dear Counsel:

This is a follow-up to my ruling with respect to the Reorganized Debtor's motion for an order clarifying the confirmed plan (Doc. # 22).

Although at the conclusion of the November 29, 2005 hearing I stated my views with respect to the Equity Committee's position on the matter, I did not have time to specifically comment on a particularly misleading point made by the Committee in its

Docket No. 78
Date 12/5/2005

response (Doc. # 62). In paragraph 34 of the response, the Committee asserts that the disclosure statement supports its position that equity is owed a debt. (Doc. # 62, p.17). To come to this conclusion, the Committee relies on the phrase "common stock" being mentioned under Section VII.D.3.'s heading entitled "Potential Limitations on or Inability to Repay Debt or Make Contingent Payments." (Doc. # 62, p.17). I agree with the Reorganized Debtor that section headings are used for convenience of reference and will ordinarily not modify or restrict the unambiguous terms of an agreement. (Doc. # 65, p.9).

However, I think that the Committee's reliance on this heading is misplaced for another more important reason: the provision simply was not intended to address the treatment of equity interests.[1] Rather, the provision deals with the payments on the New Senior Notes and the Contingent Interest on those Notes. Under the waterfall structure of payments, Contingent Interest is not paid until after specified appropriate equity payments. Thus, to address Contingent Interest, one must at least mention those common stock distributions first as it has a higher priority.

The way the Committee presents the provision is misleading. In a parenthetical, the Committee quotes the provision

[1]Equity interests are addressed in subsection thirteen, which states, in part, "[t]here can be no assurance that FNV Group will make any distributions to its equityholders . . . ." (Disclosure Statement, Section VII.D.13. (b)).

as stating: "FNV Group's ability to pay the principal of, and interest on the New Senior Notes, **to make distributions to holders of FNV Group common stock . . . is dependent on the generation of cash flow** . . . ." (Doc. # 62, p.17)(bold in original). However, that clause reads in full as: "FNV Group's ability to pay the principal of, and interest on, the New Senior Notes, to make distributions to holders of FNV Group common stock or New Group Preferred Stock and to make payments of Contingent Interest (as defined in the term sheet for the New Senior Notes) is dependent on the generation of cash flow by its subsidiaries and the ability of the subsidiaries to make cash available to FNV Group, by dividend or otherwise."

The Committee omits the phrase discussing Contingent Interest, which is the main point. Thus, by use of an ellipsis and some bold font, the Committee has shifted the focus of the clause from Contingent Interest to common stock. In short, one cannot explain the waterfall entitlement of the Noteholders to the Contingent Interest without noting the preceding Restricted Payments to the shareholders.

Very truly yours,

Peter J. Walsh

PJW:ipm

# EXHIBIT N

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| FINOVA CAPITAL CORPORATION, | : | Case Nos. 01-0698 (PJW) |
| Reorganized Debtor | : | Jointly Administered |
| | : | Re: Docket No. 22, 99 |

**ORDER REGARDING DEBTORS' MOTION**
**REQUESTING CLARIFICATION OF CONFIRMED CHAPTER 11 PLAN**

This matter coming before the Court on the Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provisions of the Confirmed Plan, dated April 1, 2005 [Docket No. 22] (the "Clarification Motion"),[1] filed by above-captioned reorganized Debtor (the "Reorganized Debtor"); the Court having reviewed the Clarification Motion and having heard the statements of counsel regarding the Clarification Motion and any objections thereto at a hearing held before the Court on November 29, 2005 (the "Hearing"); the Court having determined that the legal and factual bases set forth in the Clarification Motion establish just cause for the relief granted herein; the Court having found that notice of the Clarification Motion as set forth in the Order Approving the Form and Manner of Notice of the Reorganized Debtor's Motion to Approve Form and Manner of Notice and to Limit Notice of the Motion of the Reorganized Debtor for an Order Clarifying Provision of Confirmed Plan [Docket No. 25] was sufficient under the circumstances and that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefore;

[1] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Clarification Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. For the reasons set forth on the record at the Hearing [Docket No. 80] and in the Court's Letter to Counsel With Respect to Court's Ruling on the Reorganized Debtor's Motion for an Order Clarifying the Confirmed Plan, dated December 2, 2005 [Docket No. 78], the Clarification Motion is hereby APPROVED to the extent that the Debtor is presently and will be forever insolvent.

2. Nothing in this order shall be construed as a finding that the Debtors presently are or will forever be insolvent.

3. This Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Order.

Dated: Feb 1, 2006
Wilmington, Delaware

THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT O

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| THE FINOVA GROUP INC., FINOVA CAPITAL CORPORATION, | § | Case Nos. 01-0698 (PJW) |
| | § | Jointly Administered |
| Reorganized Debtor | § | **Re: Docket Nos. 22, 100, 196** |

**ORDER GRANTING DEBTORS' MOTION REQUESTING**
**CLARIFICATION OF CONFIRMED CHAPTER 11 PLAN**

On April 1, 2005, the Debtors filed their Motion of the Reorganized Debtor for an Order Under Bankruptcy Code Section 1141 Clarifying Provisions of the Confirmed Plan [Dkt. No. 22] (the "Clarification Motion"). A hearing was held on November 29, 2005, following which on February 1, 2006 this Court entered an Order Regarding Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan [Dkt. No. 100], which specifically provided that, inter alia, (1) the Clarification Motion is "APPROVED to the extent that the Debtor is presently and will be forever insolvent", and (2) the Order shall not "be construed as a finding that the Debtors presently are or will forever be insolvent."

On January 8, 2007, the Debtors filed a Request for Entry of Final Order in Clarification Motion Contested Matter [Dkt. No. 196], which included the Supplemental Declaration of Richard Ross relating to the financial condition of the Debtors and attached filings of the Debtors with the SEC. The Official Committee of Equity Security Holders ("Equity Committee") objected to this Request, and sought an increase in the fee cap for the purpose, inter alia, of retaining a Financial Consultant for the limited purpose of reviewing the financial situation of the Debtors. On January 29, 2007, this Court held a hearing on the Request, and at the hearing, heard direct and cross-examination of Richard A. Ross on the financial condition of

RLF1-3167993-2

Docket No. 220
Date 6/26/2007

the Debtors. Mr. Ross testified, in essence, that the Debtors were hopelessly insolvent and there was no realistic possibility that the situation would change. On February 6, 2007, the Court entered an Order [Dkt. Item 205] which authorized the increase in the fee cap so that the Debtors could retain a Financial Consultant. The Equity Committee retained Traxi LLC ("Traxi") as its Financial Consultant. On or about April 2, 2007, Traxi furnished its report which concluded that it has "no reason to dispute the solvency position of the Company at any prior date as reported in Finova's filing with the SEC."

Based on the record at the January 29, 2007 hearing, the Supplemental Declaration of Richard A. Ross and the 10Q Report attached to said Supplemental Declaration, the testimony of Richard A. Ross at the January 29, 2007 hearing, and the Traxi Report, as well as the prior proceedings and hearings relating to the Clarification Motion, the Court hereby finds that (1) the Debtors presently are and will be forever insolvent, (2) under the Indenture dated as of August 22, 2001 governing the issuance of the 7.5% Senior Secured Notes Maturing 2009 of The FINOVA Group Inc. (the "New Senior Notes"), the payment of any amount to or on account of the Equity Interests of The FINOVA Group Inc. ("FNV Group") would be an Impermissible Restricted Payment and cannot be made pursuant to section 4.06(a)(v), FIFTH, clause (x) of the Indenture, (3) there is no reasonable probability that, under the terms of the Indenture, any such payment on account of the Equity Interests of FNV Group will be permitted in the future, and (4) the legal and factual basis set forth in record of hearings on the Motion, and prior rulings and orders of this Court, establish just cause for the relief set forth in the Clarification Motion. Based on the foregoing and paragraph 1 of the Order of February 1, 2006 referred to above,

IT IS HEREBY ORDERED THAT:

1. The Clarification Motion is granted in its entirety and on a Final basis. All objections to the Clarification Motion or the relief requested therein that have not been withdrawn, waived or settled, are hereby overruled on the merits.

2. The Debtors (a) shall be permitted to use the funds presently set aside in a segregated account in the amount of 5% of Available Cash for possible distribution to holders of Equity Interests in FNV Group (as described in the Clarification Motion), in the approximate amount of $81,228,000 (as of May 15, 2007) (the "5% Funds") for general corporate purposes including, without limitation, payment of amounts due on the New Senior Notes, and (b) shall no longer be required to set aside 5% of Available Cash or any other amounts for possible distribution to holders of Equity Interests in FNV Group; provided, however, that the Debtors shall not distribute or otherwise use the 5% Funds for a period of 30 days following the entry of this Order.

3. The Court shall retain jurisdiction over all matters relating to this Order.

Dated: June 26, 2007
Wilmington Delaware

THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

RLF1-3167993-2

# EXHIBIT P

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br><br>THE FINOVA GROUP INC.,<br>FINOVA CAPITAL CORPORATION,<br><br>Reorganized Debtor | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case Nos. 01-0698 (PJW)<br><br>Jointly Administered<br><br>Re: Docket No. 22, 100, 196 |

**DECLARATION OF RICHARD A. ROSS RELATING TO APPEAL BOND**

Richard A. Ross, for his Declaration, hereby states the foregoing, under Penalty of Perjury:

1. I am the Senior Vice President, Chief Financial Officer and Treasurer of The FINOVA Group, Inc. ("FINOVA") and its designated "principal financial officer" for SEC reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The facts and opinions in this Declaration are known to me personally, and I would be a competent witness as to such matters.

2. I have been employed by FINOVA for thirteen years, and for the last six years have held various positions as a senior financial officer. In that capacity, I have directly supervised the continued liquidation of the assets the above-captioned debtors ("Debtors") and the planning for a complete termination their business activities. As of now, substantially all of the assets of the Debtors have been liquidated.

3. On December 4, 2006, this Court entered an order which authorized the implementation of procedures to accomplish the final wind-down of all business operations of the Debtors and the termination of FINOVA as a legal entity. In FINOVA's 10-Q Report, filed

Docket No. 229
Date 7/11/2007

on May 9, 2007 ("FQR"), FINOVA stated that its goal was to wind-up all business activities and terminate its existence by the end of 2007, and it had prepared its budgets on the assumption of a December 2007 wind-up. FQR pp. 5, 13. A copy of the FQR is attached hereto as Exhibit A. As of today, this continues to be the corporate objective of FINOVA; however, delays in resolving this matter before the Court may necessitate extending the Liquidation period.

4. I am fully familiar with matters relating to the Clarification Motion and the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, dated June 24, 2007 ("Clarification Order"), and the motion of the Official Committee of Equity Security Holders ("Equity Committee") for a stay of the Clarification Order ("Stay Motion"). In connection with that Stay Motion, I would bring the following facts to the Court's attention:

a. In light of the Clarification Motion and the wind-down schedule, FINOVA anticipates distributing the amount in the Restricted Fund containing 5% of Available Cash to holders of New Senior Notes some time during the Third or Fourth Quarters of this year.

b. From the time the decision is made to distribute funds to holders of New Senior Notes until the actual distribution requires a period of approximately 45 days. Among the steps required are the initial notification of the trustee and confirmation of a date of record; sending formal written notification in accordance with the Indenture to the trustee including a notice of prepayment, an Officers Certificate, legal opinion and the form of notice of partial prepayment the trustee will send to holders of New Senior Notes; filing a Form 8-K with the SEC announcing the prepayment; the trustee sending formal notice to the Noteholders instructing physical holders to surrender their physical notes in order to receive their payment and receive a new note of their remaining balance; and confirmation between the trustee and FINOVA of the total amount due including principal and interest.

c. If the Stay Motion is granted and FINOVA cannot distribute the funds in the Restricted Fund and must keep setting aside 5% of distributions of Available Cash, it will be unable to wind-up its affairs by the end of 2007, and it will continue to incur operating expenses including employees, administrative costs and supplies, professional costs and rent in 2008 and possibly thereafter. Among other things, FINOVA would have to maintain continuing records, and the administrative staff to make an eventual distribution of funds. Moreover, since FINOVA is an SEC reporting company, it would have to continue as such and would have to comply with various SEC reporting and record keeping requirements. The latter is necessary because, if the Clarification Order is reversed, FINOVA would be required to distribute funds to holders of common stock.

5. I am advised by counsel that the timing of the appellate process could last well into 2008, or later. During the existence of a stay, the expenses described in paragraph 4(c) would be incurred, and there would be an additional period of approximately 90-120 days for completing the wind-up after a final and unstayed order was entered. FINOVA estimates that the cost of such process would range between $14 and $18 million for the full year of 2008, and additional amounts thereafter. Under these circumstances, I believe that a bond in the amount of $25 million would be necessary to protect FINOVA during the appellate process.

6. As stated above, it is FINOVA's corporate goal to wind-up by the conclusion of 2007. However, I should note that matters other than the Clarification Motion which could delay the wind-up, including but are not limited to the resolution of outstanding litigation and bankruptcy claims, the withdrawal of doing business in each state, unforeseen new litigation and dissolution of legal entities. See FQR p. 13. Nevertheless, I believe that the 2007 wind-up goal

is realizable and, in any event, it is likely that the wind-up can occur early in 2008 but for any proceedings on the Clarification Motion.

       7. I will be present in Court at the hearing on the Stay Motion, and will be prepared to testify to the foregoing.

       8. The above is submitted under Penalty of Perjury.

Dated: July 11, 2008

Phoenix, Arizona

                                Richard A. Ross

# Exhibit A



# FORM 10-Q

## FINOVA GROUP INC - FNV

**Filed: May 09, 2007 (period: March 31, 2007)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I

FINANCIAL INFORMATION

Item 1. Financial Statements

## PART I

FINANCIAL INFORMATION

Item 1. Financial Statements

Item 2. Management s Discussion and Analysis of Financial Condition and Results of Operations

Item 3. Quantitative and Qualitative Disclosure About Market Risk

Item 4. Controls and Procedures

## PART II

OTHER INFORMATION

Item 1. Legal Proceedings

Item 1A. Risk Factors

Item 6. Exhibits

Signatures

EXHIBIT INDEX

EX-31.1 (CERTIFICATION OF CEO PURSUANT TO SECTION 302)

EX-31.2 (CERTIFICATION OF CFO PURSUANT TO SECTION 302)

EX-32.1 (CERTIFICATION OF CEO PURSUANT TO SECTION 906)

EX-32.2 (CERTIFICATION OF CFO PURSUANT TO SECTION 906)

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549

## FORM 10-Q

☑ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2007

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to

Commission file number 001-11011

# THE FINOVA GROUP INC.
(Exact name of registrant as specified in its charter)

| Delaware | 86-0695381 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I R S. employer identification no.) |

| 8320 North Hayden Road, Suite C112<br>Scottsdale, AZ | 85258 |
|---|---|
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: 480-624-4988

N/A

(Former name, former address and former fiscal year. if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months. (or for such shorter period that the registrant was required to file such reports). and (2) has been subject to such filing requirements for the past 90 days

Yes ☑ No☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (Check one):

Large accelerated filer ☐ Accelerated filer ☐ Non-accelerated filer ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)

Yes ☐ No ☑

APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PRECEDING FIVE YEARS:

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by the court

Yes ☑ No ☐

APPLICABLE ONLY TO CORPORATE ISSUERS:

As of May 8, 2007, approximately 122,041,000 shares of Common Stock ($0 01 par value) were outstanding

Table of Contents

THE FINOVA GROUP INC.

TABLE OF CONTENTS

| | | Page No. |
|---|---|---|
| | **PART I FINANCIAL INFORMATION** | |
| Item 1 | Financial Statements | |
| | Consolidated Statements of Net Assets in Liquidation (liquidation basis) at March 31, 2007 (unaudited) and December 31, 2006 | 1 |
| | Consolidated Statement of Changes in Net Assets in Liquidation (liquidation basis) (unaudited) for the Three Months Ended March 31, 2007 | 2 |
| | Condensed Statement of Consolidated Operations (going concern basis) (unaudited) for the Three Months Ended March 31, 2006 | 3 |
| | Condensed Statement of Consolidated Cash Flows (going concern basis) (unaudited) for the Three Months Ended March 31, 2006 | 4 |
| | Notes to Interim Condensed Consolidated Financial Statements (unaudited) | 5 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations Special Note Regarding Forward-Looking Statements | 12 |
| Item 3 | Quantitative and Qualitative Disclosure about Market Risk | 20 |
| Item 4 | Controls and Procedures | 20 |
| | **PART II OTHER INFORMATION** | |
| Item 1 | Legal Proceedings | 21 |
| Item 1A | Risk Factors | 21 |
| Item 6 | Exhibits | 21 |
| Signatures | | 22 |

Table of Contents

PART I FINANCIAL INFORMATION

Item 1. Financial Statements

THE FINOVA GROUP INC.

CONSOLIDATED STATEMENTS OF NET ASSETS IN LIQUIDATION (LIQUIDATION BASIS)
(Dollars in thousands)

| | March 31, 2007 (Unaudited) | December 31, 2006 (Audited) |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 235,562 | $ 177,311 |
| Restricted cash—impermissible restricted payments | 78,104 | 78,104 |
| **Liquidating Portfolio:** | | |
| Net realizable value supported by underlying loan or direct financing agreements | 88,152 | 105,829 |
| Net realizable value supported by underlying operating leases and other owned assets | 21,504 | 68,624 |
| Investments | 9,463 | 11,091 |
| **Total Liquidating Portfolio** | 119,119 | 185,544 |
| Other assets and deposits | 2,046 | 2,877 |
| **Total Assets** | $ 434,831 | $ 443,836 |
| **LIABILITIES (excluding Senior Notes)** | | |
| Interest payable on the Senior Notes | $ 42,046 | $ 14,222 |
| Accounts payable and other liabilities | 10,328 | 14,727 |
| Reserve for estimated costs during the liquidation period | 18,772 | 24,259 |
| **Total Liabilities (excluding Senior Notes)** | 71,146 | 53,208 |
| **Net Assets Available for Settlement of Senior Notes** | 363,685 | 390,628 |
| Senior Notes with outstanding principal of $1.5 billion, at estimated settlement amount | 363,685 | 390,628 |
| **Net Assets in Liquidation** | $ — | $ — |

*See notes to interim condensed consolidated financial statements*

Table of Contents

THE FINOVA GROUP INC.

CONSOLIDATED STATEMENT OF CHANGES IN NET ASSETS IN LIQUIDATION (LIQUIDATION BASIS)

FOR THE THREE MONTHS ENDED MARCH 31, 2007
(Dollars in thousands)
(Unaudited)

| | |
|---|---|
| **Net Assets in Liquidation at December 31, 2006** | $ — |
| **Changes in net assets in liquidation from January 1, 2007 through March 31, 2007:** | |
| Change in estimated net realizable value of assets | (1,810) |
| Interest earned on investment of cash reserves and other operating activity | 3,416 |
| Increase in estimated costs during the liquidation period | (724) |
| Interest accruing on the Senior Notes | (27,825) |
| Reduction in the estimated settlement of the Senior Notes | 26,943 |
| **Net Change in Net Assets in Liquidation from January 1, 2007 through March 31, 2007** | $ — |
| **Net Assets in Liquidation at March 31, 2007** | $ — |

*See notes to interim condensed consolidated financial statements*

Table of Contents

THE FINOVA GROUP INC.

CONDENSED STATEMENT OF CONSOLIDATED OPERATIONS (GOING CONCERN BASIS)

FOR THE THREE MONTHS ENDED MARCH 31, 2006
(Dollars in thousands, except per share data)
(Unaudited)

| | |
|---|---|
| **Revenues:** | |
| Interest income | $ 3,714 |
| Rental income | 1,481 |
| Operating lease income | 8,389 |
| Fees and other income | 5,322 |
| **Total Revenues** | 18,906 |
| Interest expense | (38,976) |
| Operating lease depreciation | (1,658) |
| **Interest Margin** | (21,728) |
| **Other Revenues and (Expenses):** | |
| Reversal of provision for credit losses | 21,103 |
| Net gain on financial assets | 28,783 |
| Portfolio expenses | (5,484) |
| General and administrative expenses | (7,329) |
| **Total Other Revenues and (Expenses)** | 37,073 |
| Income before income taxes | 15,345 |
| Income tax expense | — |
| **Net Income** | $ 15,345 |
| Basic/diluted earnings per share | $ 0.13 |
| Weighted average shares outstanding | 122,041,000 |

*See notes to interim condensed consolidated financial statements*

Table of Contents

THE FINOVA GROUP INC.

CONDENSED STATEMENT OF CONSOLIDATED CASH FLOWS (GOING CONCERN BASIS)

FOR THE THREE MONTHS ENDED MARCH 31, 2006
(Dollars in thousands)
(Unaudited)

| | |
|---|---|
| **Operating Activities:** | |
| Net income | $ 15,345 |
| Adjustments to reconcile net income to net cash used by operating activities: | |
| Reversal of provision for credit losses | (21,103) |
| Net cash gain on disposal of financial assets | (27,820) |
| Net non-cash gain on financial assets | (963) |
| Depreciation and amortization | 1,849 |
| Deferred income taxes, net | (126) |
| Fresh-start accretion—assets | (289) |
| Fresh-start discount amortization—Senior Notes | 8,028 |
| Change in assets and liabilities: | |
| Decrease in other assets | 435 |
| Decrease in accounts payable and accrued expenses | (9,748) |
| Increase in interest payable | 30,036 |
| **Net Cash Used by Operating Activities** | (4,356) |
| **Investing Activities:** | |
| Proceeds from disposals of leases and other owned assets | 26,431 |
| Proceeds from sales of investments | 1,809 |
| Proceeds from sales of loans and financing leases | 34,078 |
| Collections and prepayments from financial assets | 32,658 |
| Fundings under existing customer commitments | (3,636) |
| Deposit of impermissible restricted payments into restricted cash account | (3,125) |
| Recoveries of loans previously written off | 1,503 |
| **Net Cash Provided by Investing Activities** | 89,718 |
| **Financing Activities:** | |
| Principal prepayments of Senior Notes | (59,359) |
| **Net Cash Used by Financing Activities** | (59,359) |
| **Increase in Cash and Cash Equivalents** | 26,003 |
| **Cash and Cash Equivalents, beginning of year** | 212,317 |
| **Cash and Cash Equivalents, end of period** | $238,320 |

*See notes to interim condensed consolidated financial statements*

Source: FINOVA GROUP INC. 10-Q. May 09. 2007

THE FINOVA GROUP INC.

NOTES TO INTERIM CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

MARCH 31, 2007
(Dollars in thousands in tables)
(Unaudited)

**A. Nature of Operations and Plan of Liquidation**

The accompanying financial statements and notes hereto should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006 Capitalized terms not defined herein are used as defined in the Form 10-K

The notes to the financial statements relate to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital") FINOVA is a financial services holding company Through its principal operating subsidiary, FINOVA Capital, the Company provided a broad range of financing and capital markets products, primarily to mid-size businesses Throughout this document, "we," "us" and "our" also refer to The FINOVA Group Inc and its subsidiaries

Since emergence from chapter 11 bankruptcy proceedings in August 2001, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of our assets These activities have included collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral We have sold substantial portions of asset portfolios and are considering future sales of our remaining assets if buyers can be found at acceptable prices; however, there can be no assurance that we will be successful in efforts to sell additional assets We are currently offering to sell our remaining assets both by portfolio and individual asset We are prohibited by the Indenture governing our 7 5% Senior Secured Notes (the "Senior Notes") from engaging in any new lending activities or other business, except to honor existing customer commitments and in certain instances, to restructure financing relationships to maximize value Any funds generated in excess of cash reserves permitted by our debt agreements have been used to reduce obligations to our creditors

Because substantially all of our assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure obligations under the promissory notes of FINOVA Capital issued to us in the aggregate principal amount of the Senior Notes (the "Intercompany Notes"), our ability to obtain additional or alternate financing is severely restricted Accordingly, we intend to rely on internally generated cash flows from the liquidation of assets as our only meaningful source of liquidity

**Plan of Liquidation**

On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") On December 4, 2006, the Bankruptcy Court granted our Motion and approved (i) the previously announced settlement of various litigations associated with The Thaxton Group, Inc (the "Thaxton Settlement"), (ii) the ongoing sale of our remaining assets, the orderly windup of our operations and our future dissolution, (iii) our sale of all or substantially all of our assets without stockholder approval and our future dissolution without stockholder approval at such time as our Board deems to be appropriate and (iv) channeling to the Bankruptcy Court any claims against us that the holders of our Senior Notes or the indenture trustee for the Senior Notes may have arising from or in any way related to our joint chapter 11 plan, the ongoing liquidation of FINOVA, the senior secured notes, or the windup of our operations

Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008 The reserve for estimated costs reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

As a result of the aforementioned approvals, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10-Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States Historical information

for periods prior to December 5, 2006 is presented on a going concern basis of accounting. Under the liquidation basis of accounting, we are required to value all assets at their estimated net realizable value, while liabilities are reported at their estimated net settlement amount Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense) These estimates will be periodically reviewed and adjusted as appropriate There can be no assurance that these estimated values will be realized Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution

We will continue to operate as a public company throughout the liquidation period under a Management Services Agreement with Leucadia National Corporation ("Leucadia") that expires in 2011 Pursuant to that agreement, Leucadia has designated its employees to act as Chairman of the Board (Ian M Cumming), President (Joseph S Steinberg) and Chief Executive Officer (Thomas E Mara) We continue to maintain adequate cash reserves to pay all operating expenses as they come due in accordance with the Indenture

## B. Significant Accounting Policies

The preparation of financial statements in conformity with U S generally accepted accounting principles requires us to use estimates and assumptions that affect reported amounts of assets and liabilities These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements Significant estimates include anticipated amounts and timing of future cash flows used in the calculation of net realizable value, reserve for future costs and settlement amounts Actual results could differ from those estimated

*Consolidation of Interim Reporting*

The interim consolidated financial statements have been prepared in accordance with U S generally accepted accounting principles All intercompany balances have been eliminated in consolidation The interim consolidated financial information is unaudited. In the opinion of management, all adjustments consisting of normal recurring items necessary to present fairly our net assets in liquidation as of March 31, 2007 and the changes in net assets presented herein have been included in our consolidated financial statements

For a complete listing of our significant accounting policies, see Note B "Significant Accounting Policies" in our Annual Report on Form 10-K for the year ended December 31, 2006 The policies related to the liquidation basis of accounting were the only policies presented herein With the adoption of the liquidation basis of accounting, all anticipated improvements or deterioration in the portfolio are fully reflected in our financial statements as facts and assumptions change

*Liquidation Basis of Accounting*

With the approval of our Plan of Liquidation by the Bankruptcy Court, our complete liquidation is considered to be imminent and as such, we adopted the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States A Statement of Net Assets in Liquidation and a Statement of Changes in Net Assets in Liquidation are the principal financial statements presented under the liquidation basis of accounting Under the liquidation basis of accounting, assets are stated at their estimated net realizable value, which is the non-discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non-discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense) These estimates will be periodically reviewed and adjusted as appropriate There can be no assurance that these estimated values will be realized Such amounts should not be taken as an indication of the timing or amount of future distributions to be made The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances, of the net realizable value of the assets and the costs associated with carrying out the Plan of Liquidation based on the assumptions set forth below The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation Accordingly, it is not possible to predict with certainty the timing or aggregate amount which will ultimately be distributed to note holders and no

assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statement of Net Assets in Liquidation or the price at which our Senior Notes have traded or are expected to trade in the future

The following are the significant assumptions utilized by management in assessing the value of our liquidating portfolio and the expected settlement amount of liabilities included in the Statement of Net Assets in Liquidation at March 31, 2007 and December 31, 2006

**Net Realizable Value Supported by Underlying Loan or Direct Financing Agreements.** All loans and direct financing leases were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales and settlement proceeds, principal collections, scheduled rental payments and interest Anticipated cash collections were partially offset by any known direct costs and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts, settlement agreements or letters of intent to sell The net realizable values for the remainder of the loans and direct financing leases were based upon estimated cash flows on a transaction–by–transaction basis Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, the financial condition of our customers and collateral Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values

**Net Realizable Value Supported by Underlying Operating Leases and Other Owned Assets.** All owned assets (operating leases and off–lease assets) were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales proceeds and scheduled rental payments Anticipated cash collections were partially offset by any known direct costs such as maintenance and make ready costs for certain aircraft and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected The majority of the estimated net realizable values were determined primarily based on signed contracts or letters of intent to sell The net realizable values for the remainder of the owned assets were based upon estimated cash flows on a transaction–by–transaction basis Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, lessee performance and residual value assumptions for leases Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values

**Investments.** All investments are reported at either their fair value or estimated net realizable values, based on published information, quotes by registered securities brokers or signed contracts Investments for which market information is not readily available were valued based on estimated future cash flows that may be realized from the investment, if any

**Reserve for Estimated Costs during the Liquidation Period.** Under the liquidation basis of accounting, we are required to estimate and accrue for costs associated with implementing and completing the Plan of Liquidation The reserve for estimated costs includes four primary areas of accruals including people costs (payroll, benefits and severance), Leucadia management fees, professional services and litigation costs and corporate expenses (insurance, directors' fees and entity related expenses) These amounts can vary significantly due to, among other things, the timing of assets sales, the timing and amounts associated with discharging known and contingent liabilities and claims, the costs associated with cessation of our operations including an estimate of costs subsequent to that date (which would include reserve contingencies for the appropriate statutory periods) and the costs of retaining knowledgeable personnel and others to oversee the liquidation. As a result, we have accrued the projected costs including corporate overhead and specific liquidation costs of severance and performance bonuses, professional fees and various other wind–up costs expected to be incurred during the projected period to complete the liquidation and dissolution. These expense accruals will be periodically reviewed for adequacy and adjusted from time to time as projections and assumptions change Changes to the accruals will be recorded as adjustments to net assets in liquidation in future periods

## C. Effects of the Liquidation Basis of Accounting

During the three months ended March 31, 2007, the estimated net realizable value of our liquidating portfolio decreased a net $1 8 million primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset Additionally, during the three months ended March 31, 2007, we accrued $27 8 million of additional interest on the Senior Notes and earned interest income on cash investments and

Table of Contents

other operating activity of $3 4 million As a result of the adoption of the liquidation basis of accounting and valuation of our liquidating portfolio at its estimated net realizable value, income is no longer being recognized on our portfolio All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection

Under the liquidation basis of accounting, we are also required to establish and maintain a reserve for all future general and administrative expenses and other costs expected to be incurred during the liquidation period (estimated to be the end of 2007) The following is a summary of and changes to the reserve for estimated costs during the liquidation period:

| | December 31, 2006 | Adjustments and Payments | March 31, 2007 |
|---|---|---|---|
| People costs (payroll, benefits and severance) | $ 4,144 | $ (1,318) | $ 2,826 |
| Leucadia management fees | 8,000 | (2,000) | 6,000 |
| Professional services and litigation costs | 10,431 | (2,003) | 8,428 |
| General corporate expenses | 1,684 | (166) | 1,518 |
| Total reserve for estimated costs during the liquidation period | $ 24,259 | $ (5,487) | $ 18,772 |

During the three months ended March 31, 2007, the reserve declined to $18 8 million due to the payment of expenses, partially offset by an increase caused by retaining certain employees for a slightly longer period of time than previously estimated. The staff retention is directly related to aircraft sales sliding into the second quarter and additional time consumed by the equity committee's review of our solvency (for further details, see Note G "Litigation and Claims"), both of which have caused delays to the overall liquidation process (including the dissolution of entities and resolution of claims)

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes During the three months ended March 31, 2007, the estimated settlement amount of the Senior Notes was reduced by $26 9 million to a balance of $363 7 million; however, we currently estimate the Senior Note holders will receive total liquidation distributions (total principal and interest) of approximately $405 7 million, which is a $0 9 million increase over our year–end estimate

**D. Liquidating Portfolio**

As a result of the adoption of the liquidation basis of accounting, most of the prior disclosures related to total financial assets are no longer applicable Our liquidating portfolio is now recorded at its estimated net realizable value, which incorporates all future cash flows, including earnings expected to be collected

Since our total financial assets were primarily concentrated in specialized industries, we were subject to both general economic risk and the additional risk of economic downturns within individual sectors of the economy, particularly those impacting the aviation industry We also completed multiple financial transactions with individual borrowers and their affiliates, resulting in a greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including aviation) of those borrowers and their affiliates

At March 31, 2007, the carrying value on a liquidation basis of our top 10 aggregate exposures to borrowers and their affiliates totaled approximately $109 4 million and represented 98 5% of our liquidating portfolio (excluding the severance and bonus trusts of $8 1 million), as compared to our top 10 exposures (on a liquidation basis) at December 31, 2006 of $148 9 million, which represented 84 8% of our liquidating portfolio (excluding the severance and bonus trusts of $10.1 million) The top 10 exposures at March 31, 2007 were primarily concentrated in aviation assets and the loan to The Thaxton Group, which alone made up 75 3% of the net realizable value expected from our liquidating portfolio We subsequently received $83 7 million on April 16, 2007 in full and final settlement of the Thaxton loan As of the date of this report, all of our top 10 exposures have either been liquidated; are under binding definitive agreements or letters of intent to sell; or are subject to a negotiated settlement

Table of Contents

At March 31, 2007, our transportation portfolio consisted of the following aircraft:

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (in years) |
|---|---|---|---|---|
| McDonnell Douglas DC10 | 1 | | 1 | 32 |
| McDonnell Douglas MD-80 Series | 7 | 7 | | 23 |
| Regional jets, corporate aircraft and turbo props | 7 | 7 | | 24 |
| Total | 15 | 14 | 1 | 24 |

At March 31, 2007, five aircraft were operated by domestic carriers, while 10 aircraft were operated by foreign carriers In addition to the aircraft, our transportation portfolio also includes two aircraft engines, a small number of miscellaneous parts and some unsecured aviation notes and claims with a total carrying value on a liquidation basis of approximately $1 0 million as of March 31, 2007. As of the date of this report, we had 15 aircraft with a total carrying value on a liquidation basis of approximately $24 7 million All of these assets have either been liquidated subsequent to March 31, 2007 or are subject to a definitive agreement to sell Due to the fact that these aircraft are operating throughout the world, additional time will be necessary to close the sales It is to our advantage to close these transactions when the aircraft are in tax friendly jurisdictions to minimize transfer taxes No assurance can be given that all of these commitments will result in actual sales or the timing of such sales, but the remaining aircraft are targeted to close during the second quarter of 2007

Our non-aviation portfolio, in addition to the Thaxton loan, at March 31, 2007 was comprised of assets with a net realizable value of approximately $9 7 million, including our $8 1 million investment in two grantor trusts to secure severance and bonus obligations to our employees These assets are held primarily for the benefit of our employees, but are recorded as investments due to our retained interest in any excess assets Substantially all of the other non-aviation assets are in the process of being liquidated

The estimated net realizable value of our portfolio included, among other transactions, a number of customer judgments and claims, non-marketable private equity securities and certain obligations owed to us by companies that are in liquidation In many of these instances, we did not attribute any net realizable value to these assets due to our inability to predict the collection of any cash flows from the transactions with even a remote level of confidence Most of these transactions were previously included in due diligence materials in an attempt to sell the assets, but were excluded on multiple occasions by prospective buyers because of costs of collection and potential liability concerns of the buyers We continue to monitor these accounts for changes in facts and circumstances that would allow us to attribute value to these assets As a result, there is the possibility that some net realizable value will be attributed to these assets in the future An increase in the estimated net realizable value of these assets, if any, will be reflected as a change in net assets in liquidation in future filings Additionally, we continue to occasionally receive small amounts of proceeds typically from trustees for assets that in certain cases were written off years ago These cash flows are reflected as a change in net assets in liquidation as they are received

E. Debt

A summary of our total debt outstanding on a liquidation basis was as follows:

| | March 31, 2007 | December 31, 2006 |
|---|---|---|
| Senior Notes: | | |
| Principal | $ 1,483,975 | $ 1,483,975 |
| Senior Notes principal estimated to not be settled or repaid | (1,120,290) | (1,093,347) |
| Senior Notes | $ 363,685 | $ 390,628 |

During the first quarter of 2007, we made no principal prepayments on the Senior Notes In April 2007, we announced a partial prepayment of $59 4 million that will be paid on May 15, 2007 Following this prepayment, cumulative prepayments will total $1 54 billion or approximately 52% of the face amount ($2 97 billion) of the Senior Notes Additionally, bonds with a face amount of $900 thousand and outstanding principal balance of $450 thousand reverted back to us under the sunset provisions of the Indenture and on April 5, 2007 the trustee cancelled these bonds, reducing the March 31, 2007, principal amount by

Table of Contents

$450 thousand. Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405 7 million, which is considerably less than the total principal and interest due of approximately $1 5 billion The estimated settlement amount was determined solely based on the net assets available for settlement of the Senior Notes and is subject to change due to changes in the estimated net realizable value of our net assets We clearly do not have sufficient assets to fully repay the Senior Note obligation

While, the Senior Notes have a first priority security interest in substantially all of our remaining assets, the Indenture requires us to first use any cash and cash equivalents to pay or fund operating expenses, taxes and reasonable reserves for commitments and general corporate purposes In accordance with the terms of the Indenture, we are required to use any excess cash as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at our option, which we have previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed below in Note G "Litigation and Claims", we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of our remaining assets, the resolution of claims and other litigation matters, the extent to which reserves for current or future liabilities are required and the length of time required to settle all of our matters Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008

Stockholders should not expect any payments or distributions The Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5 263% (i e , 5%/95%) of each principal prepayment Ninety-five percent (95%) of the remaining available cash after establishment of cash reserves as defined in the Indenture will be used to make semi-annual prepayments of principal on the Senior Notes and five percent (5%) is identified for distributions to and/or repurchases of stock from common stockholders However, the Indenture prohibits us from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture Based upon the fact that the Senior Notes will not be fully repaid, we are required to retain impermissible restricted payments until such time, if ever, that we are no longer restricted from making a distribution to our stockholders or until it is necessary to use the cash to satisfy our debt obligations

In conjunction with the prepayments of Senior Notes noted above, we will have retained a total of $81.2 million as of May 15, 2007 Retained amounts are being segregated and reflected as restricted cash in our financial statements, pending their final disposition We anticipate that the retained amounts will eventually be paid to our creditors, not our stockholders If the funds were to be paid to our stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of our common stock, would receive half of the retained amounts Berkadia has advised us that it does not believe that stockholders are entitled to the retained amounts since we cannot fully satisfy our creditor obligations

As previously reported, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors For a further discussion of the motion and its status, see Note G "Litigation and Claims"

F. Income Taxes

Our federal net operating loss carryforwards of $1 3 billion have remained relatively unchanged since year end No income tax expense or benefit was recorded during the three months ended March 31, 2007 and 2006 Any income or loss has been entirely offset by a decrease or increase in valuation allowances against deferred tax assets, which were previously established due to concern regarding our ability to utilize income tax benefits generated from losses in prior periods We do not expect to be able to utilize all the deferred tax assets due to uncertainty about the amount of future earnings, a variety of loss or other tax attribute carryover limitations in the various jurisdictions in which we file tax returns and uncertainty regarding the timing of the reversal of deferred tax liabilities

Table of Contents

**G. Litigation and Claims**

*Legal Proceedings*

We are party either as plaintiff or defendant to various actions, proceedings and pending claims, including legal actions, some of which involve claims for compensatory, punitive or other damages in significant amounts Litigation often results from our attempts to enforce our lending agreements against borrowers and other parties to those transactions Litigation is subject to many uncertainties It is possible that some of the legal actions, proceedings or claims could be decided against us Other than the matters described below, we believe that any resulting liability from our legal proceedings should not materially affect our net assets in liquidation or cash flows The following matters could have a material adverse impact on our net assets in liquidation or cash flows

Historically, it was our policy to accrue for loss contingencies, including litigation, only when the losses were probable and estimable The determination of when losses became probable and estimable was inherently subjective and required significant judgment Under the liquidation basis of accounting, liabilities for loss contingencies and claims are reported at their estimated net settlement amount, which is the non-discounted amount of cash expected to be paid to liquidate or settle an obligation in the due course of business

If any legal proceedings result in a significant adverse judgment against us, it is unlikely that we would be able to satisfy that liability due to our financial condition As previously noted, due to our financial condition, we do not expect that we can satisfy all of our secured debt obligations at maturity Attempts to collect on those judgments could lead to future reorganization proceedings of either a voluntary or involuntary nature

*Litigation Related to Loans to The Thaxton Group Inc. and Related Companies*

Our prior periodic filings with the Securities and Exchange Commission have disclosed ongoing litigation against FINOVA Capital with respect to The Thaxton Group Inc ("TGI") and several related entities (collectively, the "Thaxton Entities")

Pursuant to an order of the Thaxton Entities bankruptcy court dated September 11, 2006, we transferred all of the cash received from the Thaxton Entities since commencement of the Thaxton Entities chapter 11 proceedings in October 2003, together with interest earned thereon (an aggregate of approximately $97 2 million), to a trust account to be held by Thaxton under order of the bankruptcy court

On September 12, 2006, we reached a preliminary settlement (the "Settlement") to resolve all outstanding claims in the ongoing litigation between us, the Thaxton Entities, the holders of subordinated notes issued by the Thaxton Entities (the "Noteholders"), and the Official Committee of Unsecured Creditors of the Thaxton Entities This Settlement will settle all of the actions involving us and the Thaxton Entities, in particular the actions pending in the United States District Court for the District of South Carolina, Anderson Division (the "District Court"), including the previously described new Thaxton action commenced in the District Court in June 2006, as well as claims in the Thaxton Entities chapter 11 proceedings (collectively, the "Thaxton Litigation")

The principal terms of the Settlement were approved by our Board of Directors on September 11, 2006 and the bankruptcy court for the FINOVA Capital and Thaxton Entities bankruptcies in December 2006 The Thaxton Plan of Reorganization was approved by the bankruptcy court on April 3, 2007, and became effective on April 16, 2007 On April 16, 2007, we received $83 7 million, representing all amounts we transferred into the trust on September 11, 2006 – i e all amounts paid by the Thaxton Entities to us since commencement of the Thaxton Entities chapter 11 proceedings in October 2003 (together with interest earned thereon), minus $16 million, plus interest actually earned thereon from August 16, 2006, which will be retained by the Thaxton Entities In addition, we received complete releases from all Thaxton parties for all matters related to the Thaxton Entities and the summary judgment order of the District Court was vacated

*Thaxton Life Partners Litigation*

On February 14, 2007, a group of noteholders of Thaxton Life Partners, Inc ("TLP") filed suit against the Company and FINOVA Capital (the "TLP Action"), unrelated to the Thaxton Entities litigation noted above The TLP Action purports to be a class action filed on behalf of approximately 150 TLP note holders with claims related to approximately $20 million in TLP

Table of Contents

notes The TLP Action alleges that, in connection with TLP's sale of its notes, the Company, FINOVA Capital, and several other defendants participated in a civil conspiracy, violated the South Carolina Unfair Trade Practices Act, violated the civil RICO statute, and were unjustly enriched In its various counts, the TLP Action seeks actual, treble, and/or punitive damages

The TLP Action is currently pending in the United States District Court for the District of South Carolina (the "South Carolina District Court") We believe that, under the terms of the TLP notes, the TLP Action must move forward in arbitration The Company and FINOVA Capital have filed a motion with the South Carolina District Court seeking an order compelling such arbitration No order has yet been issued with respect to this issue We also believe that all claims against both us and FINOVA Capital are without merit The Company and FINOVA Capital intend to vigorously defend against the TLP note holders' claims asserted against them If, however, the TLP Action results in a significant adverse final determination against us or FINOVA Capital, which is not anticipated, it is unlikely that the Company or FINOVA Capital would be able to satisfy that liability due to our financial condition As previously disclosed, due to our financial condition, we do not expect that we can satisfy all of our secured debt obligations at maturity Attempts to collect on any such judgment could lead to future reorganization proceedings of either a voluntary or involuntary nature

*Motion Regarding Distributions to Stockholders*

As discussed more fully in Note E "Debt", the Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5 263% of each principal prepayment However, the Indenture prohibits distribution of those amounts due to our financial condition Those amounts are held in a restricted account, and will total $81 2 million as of May 15, 2007 Because we will not be able to repay the Senior Notes in full, on April 1, 2005, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order (1) to cease directing funds into the restricted account and (2) to allow us to use the funds in the restricted account to satisfy our obligations to creditors

On February 1, 2006, the Bankruptcy Court issued its order approving our April 1, 2005 motion to the extent that we will be forever insolvent The Bankruptcy Court did not find that we are presently or will be forever insolvent As a result, we will continue to direct funds into the restricted account until such time that we are deemed to be forever insolvent

On December 22, 2006, the reconstituted equity committee filed a motion with the Bankruptcy Court seeking among other things, appointment of a financial expert to review the issue of our solvency, and up to $100,000 to accomplish this task Over our objection, the Bankruptcy Court granted the equity committee's motion, ordering that the evaluation be completed within sixty (60) days of an order being entered approving the motion As expected, the financial expert concluded that FINOVA is insolvent The parties will seek a final order of the bankruptcy court declaring FINOVA's insolvency Once issued, the equity committee may then appeal the underlying ruling of the bankruptcy court should they so desire

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following section should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2006 and the Special Note Regarding Forward-Looking Statements included herein Capitalized terms not defined herein are used as defined in the Form 10-K The following discussion relates to The FINOVA Group Inc and its subsidiaries (collectively "FINOVA" or the "Company"), including its principal operating subsidiary, FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital")

## OVERVIEW

During the first quarter of 2007, we continued to make significant progress in the orderly collection and liquidation of our assets Our liquidating portfolio declined by approximately 36% since year-end 2006, reducing the net realizable value of our remaining assets to just over $119 million at March 31, 2007 As we previously mentioned, it has become increasingly more difficult for us to offset the incremental costs of collecting our assets in an orderly fashion and as a result, to maximize the value of our remaining assets, we initiated efforts to accelerate the liquidation process The vast majority of the remaining assets are expected to be liquidated during the second quarter of 2007

**Plan of Liquidation.** On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") On December 4, 2006, the Bankruptcy Court granted our Motion and approved (i) the previously announced settlement of various litigations associated with The Thaxton Group, Inc (the "Thaxton

Settlement"), (ii) the ongoing sale of our remaining assets, the orderly windup of our operations and our future dissolution, (iii) our sale of all or substantially all of our assets without stockholder approval and our future dissolution without stockholder approval at such time as our Board deems to be appropriate and (iv) channeling to the Bankruptcy Court any claims against us that the holders of our Senior Notes or the indenture trustee for the Senior Notes may have arising from or in any way related to our joint chapter 11 plan, the ongoing liquidation of FINOVA, the senior secured notes, or the windup of our operations

As a result of the aforementioned approvals, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10-Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States Historical information for periods prior to December 5, 2006 is presented on a going concern basis of accounting Under the liquidation basis of accounting, we are required to value all assets at their estimated net realizable value, while liabilities are reported at their estimated net settlement amount Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense) These estimates will be periodically reviewed and adjusted as appropriate There can be no assurance that these estimated values will be realized Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of the remaining assets, the resolution of claims and other litigation matters, the extent to which reserves for current or future liabilities are required and the length of time required to settle all our matters Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008 The reserve for estimated costs ($18 8 million) reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

We continue to retain sufficient cash reserves to fund our expenses, including the costs associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton As a result, we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures and claims, which could limit our ability to make and the timing of future voluntary principal prepayments

**Anticipated Shortfall.** In April 2007, we announced a partial prepayment of $59 4 million that will be paid on May 15, 2007 Following this prepayment, cumulative prepayments will total $1 54 billion or approximately 52% of the face amount ($2 97 billion) of the Senior Notes Based on the revaluation of our assets at their estimated net realizable value and liabilities at estimated net settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405 7 million, which is considerably less than the total principal and interest due of approximately $1 5 billion We clearly do not have sufficient assets to fully repay the Senior Note obligation In order to eliminate the shortfall, the remaining assets (excluding cash and cash equivalents), which have already been marked up from their historical going concern basis, would have to increase in value by more than ten times their already marked up value We do not believe there is any chance of this occurring

**No Stockholder Payments Anticipated.** While the Indenture contemplated we would make payments to our stockholders as the Senior Notes were repaid, we have not made those payments Distributions to stockholders are prohibited due to our financial condition Based on our liquidation basis financial statements, we will not be able to repay more than $1 1 billion of the Senior Notes As a result, stockholders should not expect any payments or return on their common stock Funds related to the restricted distributions are currently being held in a segregated account, pending their final disposition We anticipate that those funds will eventually be paid to our creditors, not to our stockholders If the funds were to be paid to our stockholders, affiliates of Berkadia (which are owned by Berkshire Hathaway and Leucadia), as owner of 50% of our stock, would receive half of those payments

As discussed in Note G "Litigation and Claims," we filed a motion in the United States Bankruptcy Court for the District of Delaware, seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors

Table of Contents

**No Restructuring Plan Contemplated.** On numerous occasions, we have been asked whether there is some plan to save the Company and our net operating loss carryforwards ("NOL") As we have noted for some time, the Board remains willing to consider legitimate proposals presented by note holders or others, but we are not formulating a restructuring plan intended to enable us to emerge as a healthy company

Many obstacles exist to creation of a viable restructuring plan A restructuring presumes a sensible business plan emerging from that process In light of our dwindling asset base, the composition of our remaining assets and the competitive environment, we believe it would be difficult, if not futile, in these circumstances to develop a business model that can produce returns to the creditors and/or new investors greater than that expected from the present course Absent that, or a substantial new investment in FINOVA, we believe it would be difficult to obtain the requisite approval to restructure the present debt obligations The task becomes more difficult as the portfolio continues to shrink We caution investors to carefully evaluate applicable tax regulations, which restrict the ability to transfer or use NOLs in a variety of circumstances Our financial statements do not anticipate using the NOLs for those and other reasons

**HIGH INVESTMENT RISK OF SECURITIES. As previously stated, we will not be able to fully repay the Senior Notes or make any distributions to our stockholders, absent a court order in connection with the motion referred to above. Consequently, investing in our Senior Notes and common stock involves a high level of risk.**

## CRITICAL ACCOUNTING POLICIES

Our consolidated financial statements continue to be prepared in accordance with U S generally accepted accounting principles. The preparation of these financial statements requires us to use estimates and assumptions that affect reported amounts of assets and liabilities These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. See Item 1A "Risk Factors" and "Special Note Regarding Forward-Looking Statements" in our Annual Report on Form 10-K for the year ended December 31, 2006 for more information on these risks and uncertainties We believe the following to be among the most critical judgment areas in the application of our accounting policies

*Liquidation Basis of Accounting*

With the approval of our Plan of Liquidation by the Bankruptcy Court, our complete liquidation is considered to be imminent and as such, we adopted the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States A Statement of Net Assets in Liquidation and a Statement of Changes in Net Assets in Liquidation are the principal financial statements presented under the liquidation basis of accounting Under the liquidation basis of accounting, assets are stated at their estimated net realizable value, which is the non-discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non-discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense) These estimates will be periodically reviewed and adjusted as appropriate There can be no assurance that these estimated values will be realized Such amounts should not be taken as an indication of the timing or amount of future distributions to be made The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances, of the net realizable value of the assets and the costs associated with carrying out the Plan of Liquidation based on the assumptions set forth below The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation. Accordingly, it is not possible to predict with certainty the timing or aggregate amount which will ultimately be distributed to note holders and no assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statement of Net Assets in Liquidation or the price at which our Senior Notes have traded or are expected to trade in the future

The following are the significant assumptions utilized by management in assessing the value of our liquidating portfolio and the expected settlement amount of liabilities included in the Statement of Net Assets in Liquidation at March 31, 2007 and December 31, 2006

Table of Contents

**Net Realizable Value Supported by Underlying Loan or Direct Financing Agreements.** All loans and direct financing leases were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales and settlement proceeds, principal collections, scheduled rental payments and interest Anticipated cash collections were partially offset by any known direct costs and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts, settlement agreements or letters of intent to sell The net realizable values for the remainder of the loans and direct financing leases were based upon estimated cash flows on a transaction-by-transaction basis Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, the financial condition of our customers and collateral Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values

**Net Realizable Value Supported by Underlying Operating Leases and Other Owned Assets.** All owned assets (operating leases and off-lease assets) were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales proceeds and scheduled rental payments Anticipated cash collections were partially offset by any known direct costs such as maintenance and make ready costs for certain aircraft and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected The majority of the estimated net realizable values were determined primarily based on signed contracts or letters of intent to sell The net realizable values for the remainder of the owned assets were based upon estimated cash flows on a transaction-by-transaction basis Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, lessee performance and residual value assumptions for leases Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values

**Investments.** All investments are reported at either their fair value or estimated net realizable values, based on published information, quotes by registered securities brokers or signed contracts Investments for which market information is not readily available were valued based on estimated future cash flows that may be realized from the investment, if any

**Reserve for Estimated Costs during the Liquidation Period.** Under the liquidation basis of accounting, we are required to estimate and accrue for costs associated with implementing and completing the Plan of Liquidation The reserve for estimated costs includes four primary areas of accruals including people costs (payroll, benefits and severance), Leucadia management fees, professional services and litigation costs and corporate expenses (insurance, directors' fees and entity related expenses) These amounts can vary significantly due to, among other things, the timing of assets sales, the timing and amounts associated with discharging known and contingent liabilities and claims, the costs associated with cessation of our operations including an estimate of costs subsequent to that date (which would include reserve contingencies for the appropriate statutory periods) and the costs of retaining knowledgeable personnel and others to oversee the liquidation As a result, we have accrued the projected costs including corporate overhead and specific liquidation costs of severance and performance bonuses, professional fees and various other wind-up costs expected to be incurred during the projected period to complete the liquidation and dissolution. These expense accruals will be periodically reviewed for adequacy and adjusted from time to time as projections and assumptions change Changes to the accruals will be recorded as adjustments to net assets in liquidation in future periods

With the adoption of the liquidation basis of accounting, all anticipated improvements or deterioration in the portfolio are fully reflected in our financial statements as facts and assumptions change

Table of Contents

CHANGES IN NET ASSETS AND RESULTS OF OPERATIONS

The following table summarizes the changes in net assets in liquidation for the three months ended March 31. 2007 (dollars in thousands):

| | |
|---|---|
| **Net Assets in Liquidation at December 31, 2006** | $ — |
| **Changes in net assets in liquidation for the three months ended March 31, 2007:** | |
| Change in estimated net realizable value of assets | (1,810) |
| Interest earned on investment of cash reserves and other operating activity | 3,416 |
| Increase in estimated costs during the liquidation period | (724) |
| Interest accruing on the Senior Notes | (27,825) |
| Reduction in the estimated settlement of the Senior Notes | 26,943 |
| Net change in value of assets and liabilities | — |
| **Net Assets in Liquidation at March 31, 2007** | $ — |

**Changes in Net Assets in Liquidation for the three months ended March 31, 2007**

During the three months ended March 31, 2007, the estimated net realizable value of our liquidating portfolio decreased a net $1 8 million primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset

During the three months ended March 31. 2007. we accrued $27 8 million of additional interest on the Senior Notes and earned interest income on cash investments and other operating activity of $3.4 million As a result of the adoption of the liquidation basis of accounting and valuation of our liquidating portfolio at its estimated net realizable value, income is no longer being recognized on the portfolio All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection

Additionally. as previously discussed. we established a reserve for estimated costs during the liquidation period (estimated to be the end of 2007) and all future expenditures for operating expenses are charged directly against the reserve During the three months ended March 31, 2007, the reserve declined to $18 8 million due to the payment of expenses, partially offset by an increase caused by retaining certain employees for a slightly longer period of time than previously estimated. The staff retention is directly related to aircraft sales sliding into the second quarter and additional time consumed by the equity committee's review of our solvency (for further details. see Note G "Litigation and Claims"), both of which have caused delays to the overall liquidation process (including the dissolution of entities and resolution of claims)

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes During the three months ended March 31. 2007. the estimated settlement amount of the Senior Notes was reduced by $26 9 million to a balance of $363 7 million; however, we currently estimate the Senior Notes holders will receive total liquidation distributions (total principal and interest) of approximately $405 7 million. which is a $0 9 million increase over our year-end estimate

**Results of Operations for the three months ended March 31, 2006**

During the three months ended March 31. 2006. we generated net income (on a going concern basis) of $15 3 million In general. the net income was primarily attributable to asset realization in excess of recorded carrying amounts, partially offset by a negative interest margin and normal operating expenses Under the going concern basis, asset realization in excess of recorded carrying amounts was primarily reflected in the financial statements as reversals of excess reserve for credit losses, net gains from sales of financial assets and the recognition of suspended income upon the payoff of assets

Table of Contents

During 2006, the aircraft-finance market continued to display a high level of activity and in certain instances improved aircraft values. As a result, our transportation portfolio continued to generate cash in excess of recorded carrying amounts, which resulted in $23 5 million of the $28 8 million net gains we recognized during the first quarter of 2006 Additionally, results for the first quarter of 2006 were enhanced by a revaluation of our non-aviation assets in conjunction with their classification as held for sale and subsequent sale, which resulted in $14 7 million of our $21 1 million reversal of provision for credit losses

Our asset realization in excess of recorded carrying amounts was partially offset by a $21 7 million negative interest margin, which is primarily due to our portfolio containing a lower level of earning assets ($104 7 million at March 31, 2006) than the principal amount of outstanding debt ($1 6 billion at March 31, 2006) and a high aggregate cost of funds (aggregate effective rate of 13 6% for the first quarter of 2006)

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

Because substantially all of our assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure obligations under the Intercompany Notes securing the Senior Notes, our ability to obtain additional or alternate financing is severely restricted Berkadia has no obligation to lend additional sums to or to further invest in FINOVA Accordingly, we intend to rely on internally generated cash flows from the liquidation of assets as our only meaningful source of liquidity

The terms of the Indenture prohibit us from using available funds (after certain permitted uses) for any purpose other than to satisfy our obligations to creditors and to make limited payments to stockholders in certain circumstances Under the terms of the Indenture, we are permitted to establish a cash reserve in an amount not to exceed certain defined criteria Due to our limited sources of liquidity, the estimation of cash reserves is critical to our overall liquidity. Cash reserve estimations are subject to known and unknown risks, uncertainties, and other factors that could materially impact the amounts determined. Failure to adequately estimate a cash reserve in one period could result in insufficient liquidity to meet obligations in that period, or in a subsequent period, if actual cash requirements exceed the cash reserve estimates Historically, cash reserves typically equaled anticipated cash flows to cover operating costs, tax payments, fundings under existing customer commitments, interest payments and any other necessary cash flows expected to occur during the next six month period. We have the discretion to and have from time to time adjusted our cash reserve methodology As we continue to liquidate assets, our incoming cash flows will diminish and the estimation of cash reserves will become increasingly more critical to ensure we retain sufficient funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process

In accordance with the terms of the Indenture, we are required to use any excess cash, as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes Additionally, the Indenture permits voluntary prepayments at our option, which we have previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed in Note G "Litigation and Claims," we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of our remaining assets, the resolution of claims and other litigation matters, the extent to which reserves for current or future liabilities are required and the length of time required to settle all of our matters Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008. The reserve for estimated costs ($18 8 million) reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

During the first quarter of 2007, we made no principal prepayments on the Senior Notes In April 2007, we announced a partial prepayment of $59 4 million that will be paid on May 15, 2007. Following this prepayment, cumulative prepayments will total $1 54 billion or approximately 52% of the face amount ($2 97 billion) of the Senior Notes Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405 7 million, which is considerably less than the total principal and interest due of approximately $1 5 billion The estimated settlement amount was determined solely based on the net assets available for settlement of the Senior Notes and is subject to change due to changes in the estimated net realizable value of our net assets We clearly do not have sufficient assets to fully repay the Senior Note obligation

Table of Contents

The Senior Notes have a first priority security interest in substantially all of our remaining assets; however, as noted above, the Indenture requires us to first use any cash and cash equivalents to pay or to fund operating expenses, taxes and reasonable reserves for commitments and general corporate purposes

Stockholders should not expect any payments or distributions The Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5.263% of each principal prepayment However, the Indenture prohibits us from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture Based upon the fact that the Senior Notes will not be fully repaid, we are required to retain impermissible restricted payments until such time, if ever, that we are no longer restricted from making a distribution to our stockholders or until it is necessary to use the cash to satisfy our debt obligations

In conjunction with the prepayments of Senior Notes noted above, we will have retained a total of $81.2 million as of May 15, 2007 Retained amounts are being segregated and reflected as restricted cash in our financial statements, pending their final disposition We anticipate that the retained amounts will eventually be paid to our creditors, not our stockholders If the funds were to be paid to our stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of our common stock, would receive half of the retained amounts Berkadia has advised us that it does not believe that stockholders are entitled to the retained amounts since we cannot fully satisfy our creditor obligations

As previously reported, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors For a further discussion of the motion and its status, see Note G "Litigation and Claims"

**Based on our financial condition and imminent liquidation, there will not be sufficient funds available to fully repay the outstanding principal on the Senior Notes or make any 5% distribution to common stockholders, absent a court order in connection with the motion referred to above. As a result, there will not be a return to our stockholders. Consequently, investing in the Senior Notes and common stock involves a high level of risk.**

*Obligations and Commitments*

For a detailed listing of our significant contractual obligations and contingent commitments, refer to our Annual Report on Form 10-K for the year ended December 31, 2006 There have not been any material changes during the three months ended March 31, 2007, except for the payment of our quarterly management fees to Leucadia

*Collection of the Portfolio*

As noted previously, our current business activities have been limited to maximizing the value of our portfolio through the orderly collection of assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments, sales of assets or collateral We have sold substantial portions of asset portfolios and are considering future sales of our remaining assets if buyers can be found at acceptable prices; however, there can be no assurance that we will be successful in efforts to sell additional assets We are currently offering to sell our remaining assets both by portfolio and individual asset Due to restrictions contained in the Indenture as well as our general inability to access capital in the public and private markets, our only viable source of cash flow is from the collection of our portfolio

Table of Contents

The following table presents the activity in our liquidating portfolio for the three months ended March 31, 2007:

| | |
|---|---|
| **Liquidating Portfolio at December 31, 2006** | $185,544 |
| **Cash activity:** | |
| Collections and proceeds | (64,442) |
| **Non-cash activity:** | |
| Change in estimated net realizable value of assets | (1,983) |
| **Liquidating Portfolio at March 31, 2007** | $119,119 |

Our liquidating portfolio declined to $119.1 million at March 31, 2007, down from $185.5 million at December 31, 2006. During the first quarter of 2007, our cash activity was comprised of customer collections (including recoveries) and proceeds received from the sale of assets, while non-cash activity resulted in a decrease to the estimated net realizable value of certain assets. The decrease in value of these assets was primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset.

The remaining portfolio as of March 31, 2007 is primarily comprised of aviation assets and the loan to The Thaxton Group. Refer to Note G "Litigation and Claims" for a further discussion of the settlement of the Thaxton litigation.

As of the date of this report, we had 15 aircraft with a total carrying value on a liquidation basis of approximately $24.7 million. All of these assets have either been liquidated subsequent to March 31, 2007 or are subject to a definitive agreement to sell. Due to the fact that these aircraft are operating throughout the world, additional time will be necessary to close the sales. It is to our advantage to close these transactions when the aircraft are in tax friendly jurisdictions to minimize transfer taxes. No assurance can be given that all of these commitments will result in actual sales or the timing of such sales, but the remaining aircraft are targeted to close during the second quarter of 2007. In addition to the aircraft, our transportation portfolio also includes two aircraft engines, a small number of miscellaneous parts and some unsecured aviation notes and claims with a total carrying value on a liquidation basis of approximately $1.0 million as of March 31, 2007.

Our non-aviation portfolio, in addition to the Thaxton loan, at March 31, 2007 was comprised of assets with a net realizable value of approximately $9.7 million, including our $8.1 million investment in two grantor trusts to secure severance and bonus obligations to our employees. These assets are held primarily for the benefit of our employees, but are recorded as investments due to our retained interest in any excess assets. Substantially all of the other non-aviation assets are in the process of being liquidated.

The estimated net realizable value of our portfolio included, among other transactions, a number of customer judgments and claims, non-marketable private equity securities and certain obligations owed to us by companies that are in liquidation. In many of these instances, we did not attribute any net realizable value to these assets due to our inability to predict the collection of any cash flows from the transactions with even a remote level of confidence. Most of these transactions were previously included in due diligence materials in an attempt to sell the assets, but were excluded on multiple occasions by prospective buyers because of costs of collection and potential liability concerns of the buyers. We continue to monitor these accounts for changes in facts and circumstances that would allow us to attribute value to these assets. As a result, there is the possibility that some net realizable value will be attributed to these assets in the future. An increase in the estimated net realizable value of these assets, if any, will be reflected as a change in net assets in liquidation in future filings. Additionally, we continue to occasionally receive small amounts of proceeds typically from trustees for assets that in certain cases were written off years ago. These cash flows are reflected as a change in net assets in liquidation as they are received.

As we continue to liquidate assets, our incoming cash flows will diminish and the estimation of cash reserves will become increasingly more critical to ensure we retain sufficient funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process. Due to the uncertainty of cash requirements associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed in Note G "Litigation and Claims," we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments.

Table of Contents

Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008 We will continue to operate as a public company throughout the liquidation period under a Management Services Agreement with Leucadia that expires in 2011

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this report are "forward-looking," in that they do not discuss historical fact, but instead reflect future expectations, projections, intentions, or other items. Forward-looking statements are made pursuant to the safe-harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include assumptions, estimates and valuations implicit in the financial statements and related notes, as well as matters discussed throughout this report including, but not limited to projections, our Plan of Liquidation, sections captioned Item 2 "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 3 "Quantitative and Qualitative Disclosure About Market Risk " They are also made in documents incorporated in this report by reference, or in which this report may be incorporated

Forward-looking statements are inherently subject to risks and uncertainties, many of which cannot be predicted or quantified When used in this report, the words "estimate," "expects," "anticipates," "believes," "plans," "intends" and similar expressions are intended to identify forward-looking statements that involve known and unknown risks and uncertainties. The risks, uncertainties and other factors that could cause our actual results or performance to differ materially from those contemplated by the forward-looking statements include, but are not limited to, the following: whether we can assure Senior Note holders of the timing or amount of their liquidating distributions; whether potential purchasers of our assets may try to take advantage of our liquidation process and offer less-than-optimal prices for our assets; the increasing difficulty in offsetting costs of collecting the remaining portfolio in view of our decreasing asset pool; our Board may abandon the Plan of Liquidation; whether new securities lawsuits will be filed against us; our ability to sell the remaining assets; the impact of general economic conditions and the performance of our borrowers; the instability and uncertainty in the airline industry, which could adversely affect the value of our aircraft portfolio, lease rates and demand; our reliance on third parties for information that may not be accurate; our increasing exposure to concentrations of credit risk; current and future legal and administrative claims and proceedings against us that may result in increased costs and diversion of management's attention; current and future obligations to creditors; our ability to meet obligations is impacted by cash reserve estimations; cash investments are subject to credit exposure and interest rate fluctuations; our ability to retain our employees; our ability to utilize tax attributes; and our ability to be exempt from the registration requirements of the Investment Company Act of 1940 For additional information, see Part I, Item 1A Risk Factors in our Annual Report on Form 10-K for the year ended December 31, 2006

Undue reliance should not be placed on these forward-looking statements, which are applicable only as of the date of this Report We do not intend to update forward-looking information to reflect actual results or changes in assumptions or other factors that could affect those statements We cannot predict the risk from reliance on forward-looking statements in light of the many factors that could affect their accuracy

Item 3. Quantitative and Qualitative Disclosure About Market Risk

There were no material changes from the information provided in our Annual Report on Form 10-K for the year ended December 31, 2006

Item 4. Controls and Procedures

(a) Our management evaluated, with the participation of our principal executive and principal financial officers, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of March 31, 2007 Based on their evaluation, our principal executive and principal financial officers concluded that our disclosure controls and procedures were effective as of March 31, 2007

Table of Contents

(b) There has been no change in our internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during our fiscal quarter ended March 31, 2007, that has materially affected or is reasonably likely to materially affect, our internal control over financial reporting

As a result of Section 404 of the Sarbanes-Oxley Act of 2002 and the rules issued there under, we are scheduled to include in our Annual Report on Form 10-K for the year ending December 31, 2007 a report on management's assessment of the effectiveness of our internal controls over financial reporting Our independent registered public accountants will not be required to attest to and report on management's assessment until the end of 2008

The process of complying with these requirements includes a comprehensive evaluation and documentation of our internal controls over financial reporting In this regard, management is prepared to dedicate internal resources and adopt a detailed plan to (i) document our internal controls over financial reporting, (ii) assess the adequacy of our internal controls over financial reporting, (iii) take steps to improve control processes where appropriate and (iv) validate through testing that controls are functioning as documented. There can be no assurance that deficiencies or weaknesses in the design or operation of internal controls over financial reporting will not be found and, if found, that we will have sufficient time to remediate any such deficiencies or weaknesses and perform testing procedures before the end of 2007

We believe that any system of internal accounting controls, no matter how well designed and operated, can provide only reasonable (and not absolute) assurance that all of our objectives will be met, including the detection of fraud Furthermore, no evaluation of internal accounting controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected

We continue to reduce our workforce, consolidate operations and outsource certain functions Accordingly, responsibility for administration, management and review of many of our assets has transitioned among our remaining personnel In conjunction with further reductions in personnel and the relocation of our corporate office, we have transitioned most of our accounting and business support applications to manual processes supported by a system of manual internal controls and spreadsheets Management has supervised these transitions and has implemented procedures we believe provide effective disclosure and internal controls over financial reporting We are assessing the efficacy of these procedures and will continue to do so in subsequent periods

## PART II OTHER INFORMATION

### Item 1. Legal Proceedings

See Part I, Item 1, Note G "Litigation and Claims" for a discussion of certain legal proceedings

### Item 1A. Risk Factors

There were no material changes from the information provided in our Annual Report on Form 10-K for the year ended December 31, 2006

### Item 6. Exhibits

| | |
|---|---|
| 31 1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31 2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32 1 | Certification of Chief Executive Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32 2 | Certification of Chief Financial Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

Table of Contents

THE FINOVA GROUP INC.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

THE FINOVA GROUP INC
(Registrant)

Date: May 9, 2007

By: /s/ Richard A. Ross
Richard A Ross, Senior Vice President – Chief Financial Officer & Treasurer
(principal financial officer)

Table of Contents

EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 31 1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31 2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32 1 | Certification of Chief Executive Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32 2 | Certification of Chief Financial Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

Exhibit 31.1

CERTIFICATIONS

I, Thomas E Mara, certify that:

1 I have reviewed this quarterly report on Form 10-Q of The FINOVA Group Inc :

2 Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3 Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4 The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5 The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 9, 2007

By: /s/ Thomas E. Mara
Thomas E Mara
Chief Executive Officer

Source: FINOVA GROUP INC. 10-Q. May 09. 2007

Exhibit 31.2

CERTIFICATIONS

I, Richard A Ross, certify that:

1 I have reviewed this quarterly report on Form 10-Q of The FINOVA Group Inc :

2 Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3 Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4 The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5 The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 9, 2007

By: /s/ Richard A. Ross
Richard A Ross
Chief Financial Officer
(principal financial officer)

Exhibit 32.1

CERTIFICATION

PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Thomas E Mara, as Chief Executive Officer of The FINOVA Group Inc (the "Company") certify, pursuant to 18 U S C ss 1350. as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that to my knowledge:

(1) the accompanying Form 10–Q report for the quarterly period ended March 31, 2007 as filed with the U.S. Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934. as amended; and

(2) the information contained in the Report fairly presents, in all material respects. the financial condition and results of operations of the Company

Date: May 9, 2007

By: /s/ Thomas E. Mara
Thomas E Mara
Chief Executive Officer

Exhibit 32.2

CERTIFICATION

PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Richard A Ross, as Chief Financial Officer of The FINOVA Group Inc (the "Company") certify, pursuant to 18 U S C ss 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) the accompanying Form 10-Q report for the quarterly period ended March 31, 2007 as filed with the U.S. Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934. as amended; and

(2) the information contained in the Report fairly presents. in all material respects, the financial condition and results of operations of the Company

Date: May 9, 2007

By: /s/ Richard A. Ross
Richard A Ross
Chief Financial Officer
(principal financial officer)

Created by 10KWizard www.10KWizard.com

# EXHIBIT Q

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FINOVA GROUP INC., | ) | Case No. 01-0698 (PJW) |
| FINOVA CAPITAL CORPORATION, | ) | |
| | ) | Jointly Administered |
| Reorganized Debtors. | ) | |
| | ) | |
| Official Committee of Equity Security | ) | |
| Holders, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-480 (JJF) |
| | ) | |
| Finova Group Inc. and | ) | Bankruptcy Case No. 01-698 |
| Finova Capital Corporation, | ) | AP 07-70 |
| | ) | |
| Appellees. | ) | |
| | ) | |

**OBJECTION AND ANSWERING BRIEF OF FINOVA GROUP, INC. AND FINOVA CAPITAL CORP. TO MOTION AND OPENING BRIEF OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS IN SUPPORT OF A STAY PENDING APPEAL OF THE BANKRUPTCY COURT'S FINAL CLARIFICATION ORDER**

Dated: September 20, 2007
Wilmington, Delaware

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

-and-

Jonathan M. Landers
Robert K. Dakis
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166

*Co-Counsel to the Reorganized Debtors, Appellees*

RLF1-3203029-1

Docket No. 6
Date 9/20/2007

# TABLE OF CONTENTS

Table of Authorities ..... ii

Preliminary Statement ..... 1

Background ..... 4

I. General Background ..... 4

A. Background Regarding Reorganized Debtors' Financial Condition ..... 4

B. Background Regarding Distributions to Creditors and Shareholders ..... 4

C. Proceedings in Front of the Bankruptcy Court ..... 6

The Equity Committee Has Failed to Satisfy the Standards for Granting a Stay Pending Appeal ..... 10

A. The Equity Committee Cannot Demonstrate that It Has A Likelihood of Success on the Merits of the Appeal ..... 11

B. The Equity Committee Should Not Be Relieved of Its Burden to Demonstrate A Strong Likelihood of Success on the Merits ..... 16

C. The Equity Committee Has Shown No Irreparable Injury. ..... 17

D. The Debtors Will Be Harmed By a Stay ..... 19

E. The Public Interest Would Not Be Served By A Stay. ..... 20

In The Event The Court Grants a Stay, the Equity Committee Should be Required To Post a Bond ..... 21

Conclusion ..... 23

## TABLE OF AUTHORITIES

### CASES

*In re 203 N. LaSalle Street Partnership*,
190 B.R. 595 (N.D. Ill. 1995) .......... 18

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) .......... 17, 18

*In re Adelphia Communications Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) .......... 18, 19, 21, 22

*In re ANC Rental Corp.*,
2002 WL 1058196 at *2 (D. Del. May 22, 2002) .......... 10

*In re Armstrong World, Inc.*,
432 F.3d 507 (3d Cir. 2005) .......... 20

*In re Blackwell*,
162 B.R. 117 (E.D. Pa. 1993) .......... 10

*In re Camden Ordnance Manufacturing Co. of Arkansas, Inc.*,
238 B.R. 292 (E.D. Pa. 1999) .......... 10

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992) .......... 16

*In re Dakota Rail, Inc.*,
111 B.R. 818 (Bankr. D. Minn. 1990) .......... 18

*In re Dow Corning Corp.*,
456 F.3d 668 (6th Cir. 2006) .......... 16

*Evans v. Buchanan*,
435 F. Supp. 832 (D. Del. 1977) .......... 11

*Family Kingdom, Inc. v.* EMIF *New Jersey L.P.*,
225 B.R. 65 (D.N.J. 1998) .......... 16, 17

*First Pennsylvania Bank N.A. v. Intermet Realty Partnership (In re Intermet Realty P'ship)*,
27 B.R. 938 (Bankr. E.D. Pa. 1983) .......... 21

*First Western SBLC, Inc. v. Mac-Tav, Inc.*,
231 B.R. 878 (D.N.J. 1999) .......... 16

*In re Forty-Eight Insulations Corporation*,
115 F.3d 1294 (7th Cir. 1997) ....................17

*Geftman v. Commissioner of Internal Revenue*,
154 F.3d 61 (3d Cir. 1998)....................12

*Hill Int'l v. Nat'l R.R. Passenger Corp.*,
957 F.Supp. 548 (D.N.J. 1996) ....................17

*Hoxworth v. Blinder, Robinson & Co., Inc.*,
903 F.2d 186 (3d Cir. 1990)....................16

*In re John Joseph Edwards*,
228 B.R. 573 (Bankr. E.D. Pa. 1999) ....................11

*Pension Benefit Guaranty Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*,
159 B.R. 730 (Bankr. W.D. Pa. 1993) ....................10

*In re Polaroid Corp.*,
*2004* WL 253477 *1 (D. Del. 2004) ....................10, 11

*In re Public Serv. Co. of N.H.*,
116 BR 347 (Bankr. D.N.H. 1990) ....................11

*Reserve Mining Co. v. United States*,
498 F.2d 1073 (8th Cir. 1974) ....................11

*In re Richmond Metal Finishers, Inc.*,
6 B.R. 270 (Bankr. E.D. Va. 1984)....................11

*Schulz v. United States Boxing Association*,
05 F.3d 127 (3d Cir. 1997)....................16

*In re The Columbia Gas Sys., Inc.*,
1992 U.S. Dist. LEXIS 3253 at *4 (D. Del. Mar. 10, 1992)....................11

*In re Trans World Airlines, Inc.*,
2001 WL 1820019 *1 (Bankr. D. Del. Mar. 16, 2001)....................10, 11, 18

*In re United Merchants & Manufacturers, Inc.*,
138 B.R. 426 (D. Del. 1992)....................21

*VFB L.L.C. v. The Money's Trust (In re VF Brands, Inc.)*,
282 B.R. 134 (Bankr. D. Del. 2002) ....................10, 11

**OTHER**

8 Del. Code Ann. § 170 ........................................................................................15

Fed. R. Bankr. P. 8005 ........................................................................................10, 21

The FINOVA Group, Inc. ("FNV Group") and FINOVA Capital Corporation (together "FINOVA" or the "Debtors"), hereby submit the following opposition to the Motion and Opening Brief of the Official Committee of Equity Security Holders (the "Equity Committee") in Support of a Stay Pending Appeal of the Bankruptcy Court's Final Clarification Order (the "Stay Motion"). For the reasons stated below, the Stay Motion should be denied as the Equity Committee has failed to satisfy the requirements for a stay pending appeal; however, should the District Court be inclined to grant the relief requested in the Stay Motion, such order should be conditioned on the Equity Committee's posting of a bond.

## PRELIMINARY STATEMENT

1. In March of 2001, the Debtors filed for relief under chapter 11 of the Bankruptcy Code. The Debtors moved swiftly to negotiate and confirm a plan of reorganization (the "Plan") that would have paid creditors in full and, if the Debtors remained solvent, would have provided limited recovery to equity holders. Pursuant to the Plan, the Debtors' unsecured creditors received notes in an aggregate amount of $3,250,478,000 (the "New Senior Notes") in partial satisfaction of their claims. This appeal involves the question whether certain funds set aside for possible payments on account of Equity Interests should be used to pay the operating expenses and obligations of the Debtors (including the New Senior Notes) or to make a distribution on account of Equity Interests (i.e., to Shareholders).

2. The Indenture governing the New Senior Notes (the "Indenture"), attached to the Stay Motion as Exhibit A,[1] has a waterfall provision for distribution of cash ("Available Cash"). This dispute revolves around the provisions of the Fifth Step in the waterfall, which

[1] Many of the pertinent documents are contained in the Appendix filed with the Stay Motion, and are cited by this reference.

provides that (a) Available Cash will be distributed to repay the principal on the New Senior Notes, (b) 5% of the distribution (the "5% Payment") shall be used with other cash which is available to make "Restricted Payments" (i.e., a dividend or "any distribution on account of . . . Equity Interests") to Shareholders, and (c) if the "making of any such Restricted Payment would be an Impermissible Restricted Payment" (one that would render the company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law), FINOVA would retain and accumulate the amount of the 5% Payment and make the Restricted Payments when they were no longer Impermissible Restricted Payments. The Indenture did not, however, specifically provide for a situation where FINOVA was "forever insolvent," and as a result, any payments to Shareholders would always be Impermissible Restricted Payments. In fact, as a result of factors beyond the Debtors' control, they became hopelessly insolvent.

3.    In April, 2005, with the Debtors insolvent by more than $1 billion dollars, they filed a Clarification Motion which alleged that (a) the Debtors would be forever insolvent, (b) any payment on account of Equity Interests would always be an "impermissible restricted payment" and could never be made, and (c) therefore, the Debtors should be authorized to cease setting aside the 5% Payment and the accumulated amounts (approximately $81,228,000), and should be permitted to use the amounts for general purposes, largely to pay the New Senior Notes. (Stay Motion Exhibit B.) Several holders of Equity Interests objected. Thereafter, the Bankruptcy Court authorized the reformation of an Equity Committee to review the Clarification Motion and, if it deemed appropriate, object to the Motion, and provided for limited funding (which was increased three times).

4.    Ultimately, the Equity Committee objected to the Clarification Motion. The Committee's objection ignored the language of the Indenture which forbade any payment

which would be an Impermissible Restricted Payment but, instead, argued that the payments were in the nature of a debt and a variety of state law doctrines required payment. The Bankruptcy Court, after voluminous briefing and a lengthy hearing, found that there was absolutely no merit to the Equity Committee's arguments and, indeed, that they were largely "either irrelevant or off the wall" (Stay Motion Exhibit D, p. 52), but reserved decision on whether the Debtors were "forever insolvent." Later, after further proceedings, the Bankruptcy Court granted the Clarification Motion in its entirety and entered an order providing that the Debtors could stop setting 5% of Available Cash as a possible distribution to holders of Equity Interests, and could use the funds previously set aside for possible distribution to holders of Equity Interests for general corporate purposes, including payments on the New Senior Notes. (Clarification Order, at Stay Motion Exhibit H.)

5. The Equity Committee has appealed the Clarification Order, and moved in the Bankruptcy Court for a stay pending appeal. The Bankruptcy Court granted a 90-day stay despite stating that it couldn't "overstate how strongly I feel there is no merit to the Committee's position" and that the issues in the Committee's appeal were straight forward and should take the District Court little more than three or four hours to decide. (Stay Motion Exhibit K, pp. 47, 48) Now, the Equity Committee is seeking to extend the 90-day stay until this Court decides the merits of the appeal. The Equity Committee has not, however, presented any support for its arguments. In the first instance, the Equity Committee has made no showing that it is likely to win on appeal and, instead, reiterates precisely the same arguments categorically rejected by the Bankruptcy Court. In apparent recognition of the weaknesses of its arguments on the merits, the Equity Committee argues that a strong showing of a likelihood of success is not necessary because irreparable harm would result from allowing the Debtors to access the segregated funds.

This argument misconstrues relevant Third Circuit case law, which has plainly rejected the notion of a sliding scale with respect to the likelihood of success in preliminary injunction cases, and misconstrues applicable law on the "irreparable harm" element.

6. There are strong public policy reasons for not extending the stay pending appeal. From its inception, the Equity Committee has shifted the burdens of this case to the Debtors and their creditors, in complete violation of the absolute priority rule and principles of fairness and equity. Indeed, the real harm of granting any extension of the stay pending appeal falls directly upon the Debtors and their creditors.

## BACKGROUND

### I. GENERAL BACKGROUND

7. On March 7, 2001, the Debtors, and certain other affiliates, each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On May 2, 2001, the Debtors filed the Plan which was subsequently amended on June 1, 2001, June 11, 2001, and June 14, 2001. On August 10, 2001, the Bankruptcy Court confirmed the Plan.

#### A. Background Regarding Reorganized Debtors' Financial Condition

8. The Debtors have been clearly insolvent for a long time, and have disclosed the insolvency in public filings going back more than three years. When the Clarification Motion was filed, the Debtors were insolvent by more than $1 billion dollars and, by that time, had already liquidated 92% of their assets and there was no reasonable chance of reversing the situation.

#### B. Background Regarding Distributions to Creditors and Shareholders

9. At the center of this dispute is the Bankruptcy Court's interpretation of key provisions of the Indenture. (Stay Motion Exhibit A) Section 4.06(a) provides that the Debtors shall not "use cash and Cash Equivalents in a manner prohibited or not provided for" by

this Section 4.06. Section 4.06(a)(v) then provides that, after the provision for payment of operating expenses and certain other obligations, the Debtors will use 95% of their Available Cash to pay principal and interest on the New Senior Notes and to use 5% of the Available Cash to make Restricted Payments, i.e., on account of Equity Interests. Specifically, section 4.06(a)(v) provides that, the Debtors shall apply cash and Cash Equivalents:

> ". . . until the principal of and Fixed Interest on the Notes are paid in full to (A) pay to the Company [FNV Group], when due the principal on the Intercompany Notes . . . which amounts the Company shall use together with any other cash or Cash Equivalents the Company has available for such purpose on such date to repay principal of the Notes . . . and (B) to make distributions in respect of FINOVA Capital's Equity Interests held by the Company, which amounts the Company shall use together with any other cash the Company has available for such purposes to make Restricted Payments unless the making of any such Restricted Payment would be an Impermissible Restricted Payment, the Company shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments; *provided*, *however*, that each incremental payment of $0.95 pursuant to Clause (A) shall require a distribution or retention pursuant to clause (B) of $0.05;"

10. Any distributions to Shareholders constitute "Restricted Payments." The Indenture defines "Restricted Payments" as:

> "(i) the declaration or payment of any dividend or the making of any distribution on account of the Company's [FNV Group's] Equity Interests (other than dividends or distributions payable in Equity Interests of the Company); or
>
> (ii) the purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company other than redemptions, acquisitions or retirements solely in exchange for Equity Interests of the Company."

Indenture at p. 11.

11. An Impermissible Restricted Payment is defined as:

> "a Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law."

Indenture at p. 6.

12. Finally, section 4.07 prohibits Restricted Payments except those permitted by sections 4.06 or 4.07. Under section 4.06(a)(v) discussed above, it is a condition precedent to the Shareholders' right to receive any distributions under the Plan that such distributions do not constitute Impermissible Restricted Payments. Here, given the insolvency of the Debtors, any distribution to equity clearly would be Impermissible Restricted Payments and cannot be made under section 4.06; the distributions permitted by section 4.07(b) are not pertinent to the 5% Payment.

13. In sum, the key provisions of the Indenture are as follows. First, any use of cash or cash equivalents is prohibited unless permitted by the Indenture. Second, 5% of Available Cash may be used to make Restricted Payments. Third, a Restricted Payment is the payment of a dividend or any payment on account of Equity Interests. Fourth, a Restricted Payment may not be made if, as here, the payment would be an Impermissible Restricted Payment. Fifth, sections 4.06 and 4.07 specifically prohibit the making of Restricted Payments if not specifically authorized, and the making of an Impermissible Restricted Payments is prohibited and the funds must be retained by FINOVA. There simply is no way around these provisions, and the Equity Committee has never suggested otherwise.

### C. Proceedings in Front of the Bankruptcy Court

14. On or about April 1, 2005, the Debtors filed their Motion of the Reorganized Debtor for an Order Under Bankruptcy Code 1141 Clarifying Provision of Confirmed Plan of Reorganization (the "Clarification Motion") [Docket no. 22]. The

Clarification Motion sought a determination that, under the Indenture, the Debtors were not required to set aside 5% of Available Cash on account of the Shareholders so long as the Debtors were insolvent or in financial distress and, since the Debtors would be "forever insolvent," funds previously placed in a segregated fund should be returned to the Debtors for payment of operating expenses, distributions to creditors or other corporate purposes.

15. The Equity Committee was re-formed to investigate and, if appropriate object to, the Clarification Motion. The Equity Committee filed an objection arguing that the Debtors' obligations to the Shareholders under the Plan and Indenture were essentially "debt" obligations because the payment provisions were part of the Plan (although the Indenture provided otherwise), and that various state law doctrines required payment.

16. At a hearing held on November 29, 2005, the Bankruptcy Court ruled that the Equity Committee's construction of the arguments was not sound and that it was granting the Clarification Motion insofar as the Debtors were insolvent. At the beginning of its ruling on the Clarification Motion, the Court said:

> The multitudinous arguments offered by the Committee, for the most part, are either irrelevant or off the wall. The concept of forfeiture, subordination, constructive trust, sharing pari passu is all in gross conflict with the terms of the plan and disclosure statement.

(Stay Motion Exhibit D, p. 47) The Bankruptcy Court said that it "spent a lot of time with the relevant documents [and] I don't think they're ambiguous and I think the debtor has it right." *Id.* In order to provide some context to its discussion, the Bankruptcy Court first noted that the disclosure statement approved in connection with the Plan stated that "'the legal, equitable and contractual rights of holders of allowed interest in class FNV Group 6 (interest), shall remain in effect,'" that "the interest is a stock interest," and that the stock interest was subject to "'the other terms and conditions of the plan.'" *Id.*

17. The Court next examined the Plan, which contained similar language, and referred specifically to section 6.2 of the Plan and the attached term sheet for the New Senior Notes. The Court found that section 6.2 of the Plan, and the term sheet, clearly set out the terms of the cash distribution and the "limitation on restricted payments," which prevented the use of cash "to make any restricted payments except such restricted payments" as referred to in either (i) the waterfall now reflected in section 4.06 (which prevented impermissible restricted payments) or (ii) section 4.07 which contained five exceptions to provision preventing restricted payments (none of which is applicable here). The Bankruptcy Court further noted that the disclosure statement, in a section titled "'special risks for equity holders,'" clearly explained that "'[s]ubject to applicable corporate law (which limits the circumstances which corporations may legally make distributions to shareholders),'" limited distributions could be made to Shareholders, but added that "'[i]f FNV Group does not have sufficient funds ultimately to repay the new senior notes in full . . . it is likely that only limited distributions will be made to shareholders . . .'" *Id.* p. 50-51.)

18. The Bankruptcy Court further explained that the Plan clearly warned Shareholders that: "[Y]ou are shareholders. You may or may not get a distribution and if applicable law precludes a distribution or a dividend being made, you get nothing." *Id.* at 51. Further, subject to meeting the legal requirements for distributions to shareholders and "'so long as the making of any such distribution would not render FNV group insolvent'" -- which is precisely what occurred -- the Debtors intended to make the distributions. The Bankruptcy Court concluded that this provision, together with 4.07 of the Indenture, "in my view shouts at us when it says there are circumstances, plain and simple, which would preclude any payment to any of

the shareholders." *Id.*[2] On February 1, 2006, the Bankruptcy Court entered an order memorializing its opinion. (Stay Motion Exhibit E.)

19. On June 26, 2007, the Bankruptcy Court, after a subsequent hearing, entered the Clarification Order, finding that the Debtors were forever insolvent. Under the Clarification Order, the Debtors were authorized to cease setting aside 5% of Available Cash for possible distribution to holders of Equity Interests in FNV Group and were further authorized to use funds in the segregated account consisting of 5% Available Cash for general corporate purposes, including payment on the New Senior Notes. The Clarification Order also provided that the Debtors would not make any such distributions for 30 days following entry of the Final Order so that the Equity Committee could file a motion for a stay pending appeal.

20. On June 28, 2007, the Equity Committee filed its motion seeking a stay pending appeal. The Bankruptcy Court held a hearing on the first stay motion on July 24, 2007. At the hearing the Bankruptcy Court found that "I can't overstate how strongly I feel that there is no merit to the Committee's position." *See* Stay Motion Exhibit K. The Bankruptcy Court, however, granted a 90-day stay pending appeal, and its ruling was further influenced by the belief that

> it's going to be a very thin record. As far as I'm concerned, there's only three documents involved. And if the Committee files the -- if they complete the briefing and they file a motion with the District Court for a stay, my guess is that a District Court Judge, in three to

[2] Thereafter, in a follow up letter of December 2, 2005, the Bankruptcy Court found that the Equity Committee's pleadings were intentionally "misleading," because the Committee:

> by the use of an ellipsis and some bold font, . . . [had] shifted the focus of the clause from Contingent Interest to common stock. In short, one cannot explain the waterfall entitlement of the Noteholders to the Contingent Interest without noting the preceding Restricted Payments to the shareholders.

> four hours, could read the documents and come to a conclusion either, one, that I'm right. Or, two, that I'm wrong. Or, three, it's a close question.

*Id.*

**THE EQUITY COMMITTEE HAS FAILED TO SATISFY THE STANDARDS FOR GRANTING A STAY PENDING APPEAL.**

21. Bankruptcy Rule 8005 provides that a bankruptcy court may "suspend or order the continuation of other proceedings . . . or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest." Fed. R. Bankr. P. 8005. Rule 8005, however, does not provide any standards for granting a stay pending appeal. Courts in this circuit have likened a stay pending appeal to a preliminary injunction and have applied a similar test in granting relief:

> (1) that there is a strong likelihood of success of the appeal on the merits; (2) that the movant will suffer substantial irreparable injury if the stay is denied; (3) that substantial harm will not be suffered by other parties if the stay is granted; and (4) that issuance of the stay would not involve harm to the public interest.

*In re Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 238 B.R. 292, 293 (E.D. Pa. 1999); *In re Blackwell*, 162 B.R. 117, 119 (E.D. Pa. 1993); *see also*, *In re Trans World Airlines, Inc.*, 2001 WL 1820019 *1 (Bankr. D. Del. Mar. 16, 2001); *Pension Benefit Guaranty Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 733 (Bankr. W.D. Pa. 1993).

22. This Court has found that a failure to satisfy one of the elements is grounds to deny a stay pending appeal. *See*, *e.g.*, *In re Polaroid Corp.*, 2004 WL 253477, *1 (D. Del. 2004) (denying a stay pending appeal because the applicant failed to establish a likelihood pf success on the merits and holding that "[i]f a party fails to establish one of the four prongs, a court may deny the requested stay"); *see also*, *In re ANC Rental Corp.*, 2002 WL 1058196 at *2 (D. Del. May 22, 2002); *In re Blackwell*, 162 B.R. at 120; *VFB L.L.C. v. The*

*Money's Trust (In re VF Brands, Inc.)*, 282 B.R. 134, 137-40 (Bankr. D. Del. 2002) (denying stay pending appeal and holding applicant failed to satisfy any factor); *In re Trans World Airlines, Inc.*, 2001 WL 1820019 at *1 (denying a stay pending appeal where the applicant failed to satisfy any of the factors).

**A. The Equity Committee Cannot Demonstrate that It Has A Likelihood of Success on the Merits of the Appeal.**

23. First, the Equity Committee must demonstrate "a strong showing that [it] is likely to succeed on the merits of the appeal . . . " *Reserve Mining Co. v. United States*, 498 F.2d 1073, 1076 (8th Cir. 1974), *cited in Evans v. Buchanan*, 435 F. Supp. 832, 844 (D. Del. 1977). This element is satisfied where the movant has established that it has "a 'substantial case,' or a strong case on appeal. *In re Polaroid Corp.*, 2004 WL 253477, at *1, *citing In re The Columbia Gas Sys., Inc.*, 1992 U.S. Dist. LEXIS 3253 at *4 (D. Del. Mar. 10, 1992) (quoting *In re Public Serv. Co. of N.H.*, 116 BR 347, 349 (Bankr. D.N.H. 1990). Courts generally look to whether there is a "divergence of legal authority or case law on a particular question . . . ." *In re Edwards*, 228 B.R. at 576 (quoting *In re Richmond Metal Finishers, Inc.*, 36 B.R. 270, 272 (Bankr. E.D. Va. 1984)). Indeed, the applicant for a stay pending appeal must do more than simply repeat its prior arguments. *See, e.g.*, *In re Olick*, 1996 WL 287344, *1 (E.D. Pa. May 29, 1996) (dismissing motion seeking stay pending appeal, *inter alia*, where applicant failed to satisfy likelihood of success on the merits and holding "with respect to the instant motion, [the applicant] has not presented any arguments or authority not considered previously by this court"). The Committee has not come close to meeting this standard.

24. To the Debtors (and the Bankruptcy Court), the issue begins and ends with the terms of the Indenture. The Indenture could not be more clear that 5% of each payment of principal of the New Senior Notes was to be used to make "Restricted Payments," which are

specifically defined as the payment of "any dividend or the making of any distribution on account of the Company's Equity Interests." Likewise, it is clear that, given the financial condition of the Debtors, any such payment on account of Equity Interests would be an Impermissible Restricted Payment, and the Debtors cannot make the payment but must "accumulate" the funds to make payments "when such Restricted Payments are not Impermissible Restricted Payments." This condition can never occur because the Debtors will be "forever insolvent" so the payments can never be made. This point is emphasized by the proviso to section 4.06(v) which states that each payment of $.95 on the New Senior Notes "shall require a distribution or retention... of 0.05." (emphasis added). In fact, the Equity Committee never contested the Debtors' construction of the words of the Indenture.

25.    The Indenture provisions for distributions to Shareholders have none of the characteristics of debt--i.e., the recipients are Shareholders (and were shareholders before the Plan was confirmed), the payments are "on account of Equity Interests," the payments are not reflected in notes or similar debt instruments, no interest is paid or accrued, the payment restrictions in the definition of Impermissible Restricted Payments are akin to restrictions under both bankruptcy law and Delaware law to restrictions on distributions to shareholders, the introduction to section 4.06(a) and section .07 of the Indenture specifically prohibit payments which are prohibited or not specifically permitted, payments of debt are ordinarily not conditional in this manner, and the obligation was granted specifically to Shareholders qua Shareholders under the Plan. *See Geftman v. Commissioner of Internal Revenue,* 154 F.3d 61 (3d Cir. 1998) (listing objective aspects of transactions giving rise to debt; none is suggestive of debt and ##2, 7, 10, 11, 13 and 16 are suggestive of equity) Indeed, the Committee has never argued that the 5% Payment should not have been withheld in the first place, never explained

why the funds would be withheld if the obligations were "debts" which must ultimately be paid, and never explained the provision that the funds should "accumulate" until the payments "are not Impermissible Restricted Payments."

26. The Equity Committee, apparently recognizing that there is no basis for their arguments under the Plan and Indenture, retreats to arguing that the Debtors' obligation is akin to a "debt" obligation, even though this argument finds no support in any document and the Indenture specifically describes the obligation as a Restricted Payment – *i.e.*, "on account of Equity Interests." The Equity Committee offers a series of arguments which were extensively considered in briefs filed in the Bankruptcy Court, which are attached hereto as Exhibits 1 and 2. Briefly, these arguments are discussed below.

(a) The Committee argues that the Plan is a binding contract and, under New York law, and the Indenture clearly provides that each incremental payment "shall require" a distribution [to Equity Security Holders] or retention [on their behalf]." Stay Motion ¶ 16. The Indenture says no such thing and the Equity Committee's quote is misleading. What the Indenture says is that each incremental payment "shall require, to the extent permitted by applicable law, a distribution pursuant to clause (B)"; the Equity Committee has omitted the phrase "to the extent permitted by law," and the bracketed "on their behalf" does not appear in the Indenture. What does appear in the Indenture is that the payment is a Restricted Payment and cannot be made if it is an Impermissible Restricted Payment. To the extent New York law insists on the enforcement of contractual provisions as made, the Equity Committee is bound by these provisions. Moreover, the notion that the Clarification Order is a "forfeiture" is absurd; one cannot forfeit what one never had and, because of the conditions to payment, Shareholders never had any right to the 5% Payment. The fact is that the Shareholders do not hold a lien or

security interest in any property or any specific interest or entitlement or interest in an escrow fund or property, but only a conditional right to a payment which condition has not been met.

(b) The Committee argues that the condition in the Indenture that the payment not be an Impermissible Restricted Payment was not really a condition to payment but merely specified a time for payment. At the outset, this argument is inconsistent with the words themselves which never specify a time for the 5% Payment but prohibit it as long as the conditions to payment are not met. As shown in the Debtors' Sur Reply Brief (Exhibit 2), such conditions in the Indenture are conditions precedent to payment under New York law, and the cases cited by the Committee involve so-called "pay-when-paid" contracts involving contractors and subcontractors which have nothing to do with the present situation.

(c) The Committee argues that ambiguities in the contract should be construed against the Debtor as drafters of the documents. Initially, this has no application because, as shown above, there is no ambiguity of any sort. Instead, the Committee mistakenly conflates any potential "ambiguity" caused by the silence of the Indenture regarding the situation where the Debtors are forever insolvent, with the conditions precedent to distributions to holders of Equity Interests which are clear and unambiguous. The fact is that Shareholders are not entitled to payments if, as here, they would be Impermissible Restricted Payments. Moreover, it must be remembered that the Debtors drafted the Plan on behalf of all parties, creditors and equity, and in fact, debtors are more often identified with equity interests than creditor interests. In essence, this is a fight between creditors and equity, not equity and the Debtors.

(d) The Committee argues that the Plan was a new contract, but then go on to assume that the Bankruptcy Court "essentially wiped out the new contractual obligation running in favor of the Equity Holders." In fact, the Bankruptcy Court didn't wipe out anything,

but simply enforced the provisions of the Indenture which made it clear that the Debtors' obligation was conditional, and that the condition had not been met and could never be met. In fact, the Equity Committee is trying to rewrite the Indenture to give Shareholders funds to which they have no legal entitlement.

(e)    The Committee argues that, pursuant to 8 Del. Code Ann. § 170, the payment obligation essentially accrued when the Plan was confirmed. This is completely inconsistent with Delaware law and the Indenture. It assumes the "obligation" was unconditional when it was in fact conditional and the conditions have not been met. It ignores the character of the payments as "Restricted Payments," ignores the fact that under Delaware law, such payments cannot be made unless and until authorized by the Board of Directors, and ignores Delaware law which would forbid payments to shareholders on account of equity interests by a company that is "forever insolvent." And, it ignores the fact that, because of the waterfall provisions, no payment would ever be made until the first four steps in the waterfall were satisfied and, even then, could only be made out of Available Cash.

(f)    Finally, the Bankruptcy Court did not "rely" on the disclosure statement. Instead, the Bankruptcy Court meticulously reviewed the Indenture and the Plan, and found the provisions unambiguous. In that context, it noted that the Disclosure Statement alerted creditors to the fact that if the Debtors ran out of money, they probably would receive no distribution.

27.    In light of these entirely meritless arguments, and the Bankruptcy Court's harsh rejection of the Equity Committee's position, it is hard to understand the basis of the Equity Committee's argument that it is likely to prevail on appeal. Indeed, such a possibility is even more remote given the fact that appellate Courts give particular deference to a Bankruptcy

Judge construing a plan which he confirmed. *See In re Dow Corning Corp.*, 456 F.3d 668, 676 (6th Cir. 2006) ("Although the interpretation of an amended plan of reorganization is analogous in many respects to the construction of a contract, we remain mindful that the law of this circuit requires that we review a bankruptcy court's interpretation of its own decisions with significant deference"); *First Western SBLC, Inc. v. Mac-Tav, Inc.*, 231 B.R. 878, 883-84 (D.N.J. 1999) (collecting cases and holding that the court reviews "the bankruptcy court's interpretation of the Confirmation Plan under the abuse of discretion standard"). In short, the Equity Committee does not come close to establishing the success on the merits factor.

**B. The Equity Committee Should Not Be Relieved of Its Burden to Demonstrate A Strong Likelihood of Success on the Merits.**

28. The Equity Committee argues that the Third Circuit has adopted a sliding scale with respect to these elements such that where the applicant demonstrates significant harm, it can make a less than strong showing of its likelihood of success on the merits of this appeal. *See* Stay Motion at 10. This position has been rejected by courts in this Circuit.

Most recently, in a case before the District of New Jersey, an applicant seeking a stay pending appeal before the district court "suggested that the 'likelihood of success' factor may be 'relaxed' where the party moving for the stay has made affirmative showings on the three other factors." *Family Kingdom, Inc. v. EMIF New Jersey L.P.*, 225 B.R. 65, 69 n.6 (D.N.J. 1998). The court rejected this position and held that "this is not the rule for preliminary injunctions in the Third Circuit" *Id.*, *citing Schulz v. United States Boxing Ass'n*, 105 F.3d 127, 131 n. 6 (3d Cir. 1997) ("In district courts within this circuit, in order to support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm") (internal quotations omitted); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90-91 (3d Cir. 1992); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197 (3d Cir.

1990); *Hill Int'l v. Nat'l R.R. Passenger Corp.*, 957 F.Supp. 548 (D.N.J. 1996). Indeed, the Third Circuit has held that:

> In order to obtain a preliminary injunction, plaintiffs must show both (1) that they are likely to experience irreparable harm without an injunction and (2) that they are reasonably likely to succeed on the merits. A court may not grant this kind of injunctive relief without satisfying these requirements, regardless of what the equities seem to require. If relevant, the court should also examine the likelihood of irreparable harm to the nonmoving party and whether the injunction serves the public interest.

*Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000) (citations omitted) (considering whether there was a showing of success on the merits even after the Court found that there was irreparable harm). Thus:

> not only is the "relaxation principle" not the law in the Third Circuit or in the majority of circuits, some courts have held that "in the context of a stay pending appeal, where the applicant's arguments have already been evaluated on the success scale, the applicant must make a stronger threshold showing of likelihood of success to meet [its] burden." *See*, *e.g.*, *Forty-Eight Insulations*, 115 F.3d at 1301 (emphasis added).

*Family Kingdom, Inc.*, 225 B.R. at 69 n.6.

For nearly two years, the Bankruptcy Court has cautioned the Equity Committee that its arguments were simply not supportable. *See*, *e.g.*, Stay Motion Exhibit D, p. 47 ("The multitudinous arguments offered by the Committee, for the most part, are either irrelevant or off the wall"); Stay Motion Exhibit K, p. 47 ("I can't overstate how strongly I feel that there is no merit to the Committee's position"). The Equity Committee should not be excused from making a strong showing of a likelihood of success on the merits simply because it has a weak case.

**C. The Equity Committee Has Shown No Irreparable Injury.**

29. Second, the applicant must demonstrate that it will be irreparably injured if a stay is not granted. But, "more than preservation of the status quo is necessary to show

irreparable harm." *In re Edwards*, 228 B.R. 573, 580 (Bankr. E.D. Pa. 1999) (finding no irreparable injury to individual debtor seeking to challenge a sale of his assets); *In re Trans World Airlines*, 2001 WL 1820325 (Bankr. D. Del. Mar. 27, 2001) (finding no irreparable injury where granting a stay pending appeal will not result in any greater recovery for the applicant). "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d at 484-485.

      30.    In the first instance, the courts in this Circuit have held that, absent some mitigating factor such as a likelihood of success on appeal, the mere fact that an appeal could be rendered moot does not rise to the level of irreparable injury. *See In re Trans World Airlines, Inc.*, 2001 WL 1820325 at * 10 (noting that "[i]t is well settled that an appeal being moot does not itself constitute irreparable harm" (quoting *In re 203 N. LaSalle Street P'ship*, 190 B.R. 595, 598 (N.D. Ill. 1995)); *In re Dakota Rail, Inc.*, 111 B.R. 818, 821 (Bankr. D. Minn. 1990) ("But the mooting of his appeal is not sufficient, by itself, to establish that Ross will be injured by denying the stay"). Absent any suggestion of injury apart from the possible mooting of its appeal, the Equity Committee has not shown any irreparable injury.

      31.    The Equity Committee attempts to rely on the Southern District of New York's opinion in *In re Adelphia Communications Corp.*, 361 B.R. 337 (S.D.N.Y. 2007), for the proposition that rendering its appeal moot would somehow cause irreparable harm. In *Adelphia*, however, the District Court found that there was a substantial chance appellants would succeed, and described in considerable detail the likely erroneous rulings of the Bankruptcy Court. Here, the Equity Committee's entire appeal is premised on an argument that the Bankruptcy Court wrongly interpreted the Plan and Indenture. For the reason set forth above, the Equity

Committee cannot demonstrate a strong likelihood that it will succeed on appeal and therefore reliance on *Adelphia* is misplaced. And despite the finding of likely success, the Court in *Adelphia* ordered a bond exceeding $1 billion dollars. Ultimately, there is no irreparable injury if a stay is not granted.

**D. The Debtors Will Be Harmed By a Stay.**

32. The Committee argues that there is no harm to the Debtors if the stay is granted because (i) the funds have been segregated for some time, (ii) a delay would have very little effect on the Reorganized Debtors' operations, and (iii) in any event, the Debtors cannot completely wind down while this appeal is pending. They do not discuss the factual basis for these arguments and, instead, completely misconstrue the Debtors' position before the Bankruptcy Court.

33. The Debtors have submitted the Declaration of Richard A. Ross with this Brief. Mr. Ross's declaration shows that (a) the Debtors seek the power to distribute the funds involved when warranted in their corporate judgment, (b) their winding up process is nearly complete, there is only one major matter outstanding, the Thaxton Life Partners matter, which could delay final liquidation and dissolution, (c) the Debtors now hope to wind up by the end of the first quarter of 2008, although there is a possibility this could be delayed, (d) the pendency of this appeal would not stop any final liquidation unless a stay is granted and (e) if a stay is granted by this court which delays the ability of the Debtors to liquidate and dissolve, significant costs and expenses, including the costs of remaining a public company, ultimately will be borne by the holders of the New Senior Notes.

34. Finally, the Committee states that "The Bankruptcy Court has already determined that no other party to this proceeding will be injured if a stay pending appeal is granted." Stay Motion, p. 12. The Court made no such determination. The Court did state that

two other factors were primarily implicated (Stay Motion Exhibit K, p. 47) and separately asked if the funds were earning interest, but the Court made no ruling on the question of whether the Debtors or any other party would be harmed. The Committee then repeats the argument that the noteholders did not even lodge an objection to the stay motion. *Id.* However, there is absolutely no reason for the noteholders to object under present circumstances. Instead, as Mr. Ross states in his Declaration, the Debtors have consistently taken the position that they thought the funds in question should be paid to the holders of New Senior Notes, and that they have told him that they had not objected because FINOVA was taking their side in the dispute.[3]

**E. The Public Interest Would Not Be Served By A Stay.**

35. The Equity Committee conceded that a stay pending appeal would not benefit the public interest. Public interest, however, clearly militates in favor of not extending the stay, and therefore this Court should not ignore the factor.

36. Here, continuing the stay pending appeal would sanction the continued violation the principles of the absolute priority rule, which is a basic element of bankruptcy law. *See, e.g., In re Armstrong World, Inc.*, 432 F.3d 507 (3d Cir. 2005) (denying plan of reorganization as violative of absolute priority rule). At the outset, the appointment of the Equity Committee was not justified because it was clear that there were equity holders of Equity Interests who had the financial interest and resources to oppose the Clarification Motion. Thereafter, the Equity Committee has received more than $400,000 for professional assistance, all of which comes dollar for dollar from holders of New Senior Notes, who face a deficiency exceeding $1 billion. Now, the Equity Committee seeks to impose only costs and delays in

[3] Note that this statement is not submitted for the truth of the facts, but simply, for Mr. Ross's statement that that is what he was told.

winding up which result from this appeal by seeking a stay. Such efforts reflect a direct violation of the fair and equitable principle and involve a transfer of value from creditors to equity. At the end of the day, this is a fight between debt and equity, and the Equity Committee seeks to require the creditors to pay for both sides.

**IN THE EVENT THE COURT GRANTS A STAY, THE EQUITY COMMITTEE SHOULD BE REQUIRED TO POST A BOND**

37. Bankruptcy Rule 8005 provides that the "district court . . . may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court." Fed. R. Bankr. P. 8005. The purpose of the bonding requirements is to "protect the adverse party from potential losses resulting from the stay." *In re United Merchants & Manufacturers, Inc*, 138 B.R. 426, 430 (D. Del. 1992); *First Pennsylvania Bank N.A. v. Intermet Realty P'ship (In re Intermet Realty P'ship)*, 27 B.R. 938, 940 (Bankr. E.D. Pa. 1983) (requiring a bond to mitigate loss to bank as a result of stay preventing bank from liquidating real property). Absent exceptional circumstances, an applicant for a stay pending appeal must post a bond. *See*, *e.g.*, *In re Adelphia Communications Corp.*, 361 B.R. at 350. ("Because a supersedeas bond is designed to protect the appellee, the party seeking a stay without bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment.") Merely setting the bond does not establish the amount that must be paid by Appellant but, instead, the Debtors will still have to prove their actual damages from the stay. *See In re Adelphia Communications Corp.*, 361 B.R. at 368 n.167 ("Rather, if Appellants ultimately lose the appeal, in order for Appellees to recover any portion of the bond they will be required to prove up the amount of damages that they actually suffered during and as a result of

the stay. Once proven, that amount will be drawn from the bond fund, and the remainder will revert to Appellants.").

38. The Equity Committee failed to argue before the Bankruptcy Court, and similarly has neglected to argue here, why it should not be required to post a bond. And, the Bankruptcy Court made no findings on this issue. Indeed, given the substantial likelihood that the Equity Committee will not be successful on appeal, a bond is particularly appropriate. The Debtors and their creditors could suffer financial harm as a result of a stay of this appeal, and given the weaknesses of the Equity Committee's case, the potential risks of harm should be imposed on the Committee. Moreover, given the weaknesses of the Committee's case and the absolute priority rule, the Equity Committee should bear the risk of delaying the ability to wind up and dissolve because of a stay, and any damages that may result. Indeed, in *Adelphia*, notwithstanding the Court's view that the appeal was probably meritorious, a bond exceeding $1 billion dollars was required. As a result, the Debtors request a bond in the amount of $25 million.

## CONCLUSION

39. For the reasons stated, the Debtors request that the Stay Motion be denied or, if the Court is inclined to grant, that the Equity Committee be required to post a bond in the amount of $25 million.

Dated: September 20, 2007
Wilmington, Delaware

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Telecopy: (302) 651-7701

-and-

Jonathan M. Landers
Robert K. Dakis
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

*Co-Counsel to the Reorganized Debtors, Appellees*

# EXHIBIT R

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>THE FINOVA GROUP INC.,<br>FINOVA CAPITAL CORPORATION,<br><br>Reorganized Debtors. | Chapter 11<br><br>Case No. 01-0698 (PJW)<br><br>Jointly Administered |
| Official Committee of Equity Security Holders,<br><br>Appellant,<br><br>v.<br><br>Finova Group Inc. and<br>Finova Capital Corporation,<br><br>Appellees. | C.A. No. 07-480 (JJF)<br><br>Bankruptcy Case No. 01-698<br>AP 07-70 |

**DECLARATION OF RICHARD A. ROSS**
**RELATING TO APPEAL BOND (DISTRICT COURT)**

Richard A. Ross, for his Declaration, hereby states the foregoing, under Penalty of Perjury:

1. I am the Senior Vice President, Chief Financial Officer and Treasurer of The FINOVA Group, Inc., ("FINOVA") and its designated "principal financial officer" for SEC reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The facts and opinions in this Declaration are known to me personally, and I would be a competent witness to such matters.

2. I have been employed by FINOVA for thirteen years, and for the last six years have held various positions as a senior financial officer. In that capacity, I have directly supervised the continued liquidation of the assets of the above-captioned debtors ("Debtors") and the planning for a complete termination of their business activities. On December 4, 2006, the Bankruptcy Court entered an order which authorized the implementation of procedures to accomplish the final wind-

RLF1-3203077-1

Docket No. 7
Date 9/20/2007

down of all business operations of the Debtors and the termination of FINOVA as a legal entity. As of now, substantially all of the assets of the Debtors have been liquidated.

3. In FINOVA's 10-Q Report dated May 9, 2007, FINOVA stated that its goal was to wind-up all business activities and terminate its existence by the end of 2007, and it had prepared budgets on that assumption. In my Declaration of July 11, 2007, attached as Exhibit A, filed in connection with the Motion of the Equity Committee for a Stay in the Bankruptcy Court, I stated that this continued to be the objective of FINOVA, but that matters other than the Clarification Motion could delay the wind-up including "outstanding litigation and bankruptcy claims." Ross Decl. ¶¶ 3, 7. In Finova's Second quarter 10-Q Report dated August 10, 2007, FINOVA reiterated its goal, but stated that delays in resolving legal matters had "increased the likelihood of the liquidation period extending beyond 2007," accordingly, it had increased reserves for estimated wind-down costs to assume a liquidation in the First Quarter of 2008 (and there was no assurance that the liquidation would be completed in that period and could extend through the end of 2008). FINOVA 10-Q Report, pp. 5-6, 10 (August 10, 2007). A copy of the Second Quarter Report is attached as Exhibit B hereto.

4. As of today, the situation remains as stated in the Second Quarter 10-Q Report. Aside from this proceeding relating to the Clarification Motion, the major outstanding matter is the resolution of the Thaxton Life Partners matter--a litigation by noteholders of Thaxton Life Partners ("TLP") against the Debtors and others arising from the sale of notes brought in the United States District Court for the District of South Carolina. On motion of the Debtors, the Court directed arbitration of the TLP matter and, at present the arbitration is proceeding; also, the arbitration decision has been appealed. It is impossible to say how long the TLP matter will proceed. It could

end abruptly, the arbitration could be completed within months, or the proceedings could take longer. The TLP matter is discussed in somewhat more detail in the Second Quarter Report, p. 11.

5. Once the TLP matter is resolved, FINOVA can proceed as expeditiously as possible to complete the wind-up process, unless there is a stay of the effect of the Clarification Order which prevents FINOVA from ceasing to set aside 5% of Available Cash for holders of Equity Interests and from applying the funds previously accumulated to the payments of operating expenses and payments on the New Senior Notes. In this regard, FINOVA believes it is important to have the flexibility to cease setting aside the 5% of Available Cash and to use the funds presently held. And, as noted in my Declaration of July 11, 2007, there are built-in delays in making distributions of such funds to the holders of New Senior Notes.

6. In my view, the issue here is who should bear the risk of any delay and inability to wind up FINOVA as soon as the wind-up is complete, and who should bear any losses that result from a stay. FINOVA's view is that (a) the Indenture clearly establishes the right of the holders of the New Senior Notes to all remaining assets of FINOVA and does not entitle the holders of Equity Interests to any payments given FINOVA's financial condition and (b) FINOVA is hopelessly insolvent and more than $1 billion in principal on the New Senior Notes will not be paid. Moreover, I have been present in Court several times when Judge Walsh clearly stated that the position of the Committee was unjustified and not credible. For these reasons, I would urge the Court to deny a stay but, if a stay is granted, to require a significant bond in the amount of $25 million. In regard to a bond, FINOVA fully understands that, if a bond is posted and FINOVA prevails on the appeal, it would still have to prove its actual losses to recover on the bond.

7. Since the very beginning of this litigation, FINOVA has taken the position that the 5% Payment should not be made and the funds should be distributed to the holders of New Senior Notes. This has been the position of its Board of Directors, and this position has consistently been stated in 10-Q and 10-K Reports filed with the SEC over a period of almost three years. It is also the position that has been taken in meetings with individual Shareholders as well as noteholders. No one could have been confused or misled by FINOVA's position. With that background, it is particularly unfortunate to see the Equity Committee repeatedly arguing that noteholders somehow don't care about the Clarification Motion because they did not "lodge an objection to the Equity Committee's motion for a stay in the Bankruptcy Court." Committee Brief, p. 12. Of course they did not lodge an objection. They had no reason to object because FINOVA was so clearly taking a position supporting their right to the funds in question. Indeed, I have been in conversations with noteholders that they had not intervened because FINOVA was taking their side in the dispute. Finally, there is no organized group akin to the Equity Committee which represents the noteholders.

8. This Declaration is submitted under Penalty of Perjury.

Richard A. Ross

Dated: September 20, 2007
Phoenix, Arizona

10030071 l_1 DOC

# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:<br><br>THE FINOVA GROUP INC,<br>FINOVA CAPITAL CORPORATION,<br><br>Reorganized Debtor | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case Nos. 01-0698 (PJW)<br><br>Jointly Administered<br><br>Re: Docket No. 22, 100, 196 |

**DECLARATION OF RICHARD A. ROSS RELATING TO APPEAL BOND**

Richard A. Ross, for his Declaration, hereby states the foregoing, under Penalty of Perjury:

1. I am the Senior Vice President, Chief Financial Officer and Treasurer of The FINOVA Group, Inc ("FINOVA") and its designated "principal financial officer" for SEC reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The facts and opinions in this Declaration are known to me personally, and I would be a competent witness as to such matters

2. I have been employed by FINOVA for thirteen years, and for the last six years have held various positions as a senior financial officer In that capacity, I have directly supervised the continued liquidation of the assets the above-captioned debtors ("Debtors") and the planning for a complete termination their business activities. As of now, substantially all of the assets of the Debtors have been liquidated.

3 On December 4, 2006, this Court entered an order which authorized the implementation of procedures to accomplish the final wind-down of all business operations of the Debtors and the termination of FINOVA as a legal entity. In FINOVA's 10-Q Report, filed

on May 9, 2007 ("FQR"), FINOVA stated that its goal was to wind-up all business activities and terminate its existence by the end of 2007, and it had prepared its budgets on the assumption of a December 2007 wind-up FQR pp. 5, 13. A copy of the FQR is attached hereto as Exhibit A. As of today, this continues to be the corporate objective of FINOVA; however, delays in resolving this matter before the Court may necessitate extending the Liquidation period.

4. I am fully familiar with matters relating to the Clarification Motion and the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, dated June 24, 2007 ("Clarification Order"), and the motion of the Official Committee of Equity Security Holders ("Equity Committee") for a stay of the Clarification Order ("Stay Motion") In connection with that Stay Motion, I would bring the following facts to the Court's attention:

a. In light of the Clarification Motion and the wind-down schedule, FINOVA anticipates distributing the amount in the Restricted Fund containing 5% of Available Cash to holders of New Senior Notes some time during the Third or Fourth Quarters of this year.

b. From the time the decision is made to distribute funds to holders of New Senior Notes until the actual distribution requires a period of approximately 45 days. Among the steps required are the initial notification of the trustee and confirmation of a date of record; sending formal written notification in accordance with the Indenture to the trustee including a notice of prepayment, an Officers Certificate, legal opinion and the form of notice of partial prepayment the trustee will send to holders of New Senior Notes; filing a Form 8-K with the SEC announcing the prepayment; the trustee sending formal notice to the Noteholders instructing physical holders to surrender their physical notes in order to receive their payment and receive a new note of their remaining balance; and confirmation between the trustee and FINOVA of the total amount due including principal and interest.

c. If the Stay Motion is granted and FINOVA cannot distribute the funds in the Restricted Fund and must keep setting aside 5% of distributions of Available Cash, it will be unable to wind-up its affairs by the end of 2007, and it will continue to incur operating expenses including employees, administrative costs and supplies, professional costs and rent in 2008 and possibly thereafter. Among other things, FINOVA would have to maintain continuing records, and the administrative staff to make an eventual distribution of funds. Moreover, since FINOVA is an SEC reporting company, it would have to continue as such and would have to comply with various SEC reporting and record keeping requirements The latter is necessary because, if the Clarification Order is reversed, FINOVA would be required to distribute funds to holders of common stock.

5. I am advised by counsel that the timing of the appellate process could last well into 2008, or later. During the existence of a stay, the expenses described in paragraph 4(c) would be incurred, and there would be an additional period of approximately 90-120 days for completing the wind-up after a final and unstayed order was entered. FINOVA estimates that the cost of such process would range between $14 and $18 million for the full year of 2008, and additional amounts thereafter. Under these circumstances, I believe that a bond in the amount of $25 million would be necessary to protect FINOVA during the appellate process.

6. As stated above, it is FINOVA's corporate goal to wind-up by the conclusion of 2007 However, I should note that matters other than the Clarification Motion which could delay the wind-up, including but are not limited to the resolution of outstanding litigation and bankruptcy claims, the withdrawal of doing business in each state, unforeseen new litigation and dissolution of legal entities. See FQR p. 13. Nevertheless, I believe that the 2007 wind-up goal

is realizable and, in any event, it is likely that the wind-up can occur early in 2008 but for any proceedings on the Clarification Motion.

7. I will be present in Court at the hearing on the Stay Motion, and will be prepared to testify to the foregoing.

8. The above is submitted under Penalty of Perjury.

Dated: July 11, 2008

Phoenix, Arizona

Richard A. Ross

# Exhibit A

**Finova Form 10-Q filed March 9, 2007 (1st Qtr.)**
**(omitted)**

# EXHIBIT S

Westlaw.

Not Reported in F.Supp.2d Page 1

Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

H

Lomaglio Associates Inc. v. LBK Marketing Corp.
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
LOMAGLIO ASSOCIATES INCORPORATED, Plaintiff,
v.
LBK MARKETING CORP., Defendant.
**No. 94 CIV. 3208(KTD).**

Sept. 10, 1999.

Perry Ashley, Esq., Seaman and Ashley, New York, for Plaintiff.
Marc Cohn, Esq., Robert J. Dubyak, Esq., McCarthy, Lebit, Crystal & Haiman Co., L.P.A., Cleveland, OH, for Defendant.

OPINION

DUFFY, D.J.
*1 Plaintiff Lomaglio Associates Incorporated ("Lomaglio, Inc.") brought this diversity action for breach of contract against defendant LBK Marketing Corporation ("LBK").

The dispute centers around a written agreement between the parties whereby the parties agreed that Lomaglio would serve as LBK's exclusive sales representative to Avon Products Incorporated ("Avon"). Lomaglio, Inc. claims that it is owed $128,132.00 in commissions under the agreement for an order Avon placed with LBK and that LBK agreed to but subsequently failed to fill.

The parties stipulated to an agreed set of facts in the Joint Pre-Trial Order ("JPTO"). I heard testimony and received evidence at the two-day bench trial of this matter on May 4 and 5, 1999. The following constitutes my findings of fact and conclusions of law.

*Findings of Fact*

Plaintiff Lomaglio, Inc. is a corporation organized under the laws of New Jersey engaged in the business of marketing services and contract manufacturing. (JPTO at 3; Pl.Ex. 1.) Defendant LBK is a corporation organized under the laws of Ohio with offices in Jacksonville, Florida, engaged in the production of ceramic products. (JPTO at 3; Pl.Ex. 3.)

A. The Sales Representation Agreement

In September or October 1992, executives from LBK attended a "Bed and Bath Show" at the Jacob Javitz Center in New York City. (Trial Tr. at 5-6; Gleason Dep. at 11-12.) Al Lomaglio, president of Lomaglio, Inc., also attended the Show and met with the LBK executives. (Trial Tr. at 5-6; Gleason Dep. at 12-13.)

At the Show and on other occasions, Lomaglio and LBK executives discussed Lomaglio, Inc. serving as LBK's sales representative to various consumers of porcelain products. (Gleason Dep. at 11-14.) Lomaglio, Inc. had established business relationships with several such consumers, including the Avon Corporation-the cosmetics giant based in New York City. (Trial Tr. at 58-59.)

These discussions led to a one page written agreement entitled "Sales Representation Agreement" and dated October 12, 1992 (the "Agreement"). The Agreement was signed by Al Lomaglio and David Gleason, LBK's Vice-President of National Accounts.

The Agreement provides, in pertinent part:
It is agreed that [Lomaglio, Inc.] will act as [LBK's] exclusive sales representative to Avon Products. LBK agrees to refrain from calling on Avon Products directly or through middlemen. [Lomaglio, Inc.] agrees to refrain from presenting any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

630

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Spli... 10/19/2007

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

competing suppliers to Avon.
Commissions will be determined prior to quoting and will be included in the cost quoted to the customer. Commissions will be paid upon payment for merchandise by the customer. Deductions will be made for returns or credits.

(Agreement, Pl.Ex. 1.)

B. Negotiations With Avon

Shortly after the Agreement was signed, Lomaglio arranged a meeting between representatives of LBK and Avon at Avon's headquarters in New York City. The meeting took place in late October 1992, as Lomaglio accompanied Gleason to Avon's offices, where the pair met with Mary McHugh, a manager for purchasing and materials at Avon. (JPTO at 3; Trial Tr. at 9-10; Gleason Dep. at 17 .) Gleason brought samples of ceramic products to the meeting for McHugh's inspection. (Trial Tr. at 10.)

*2 Either at the meeting or in telephone conversations shortly after the meeting, McHugh, Gleason and Lomaglio discussed LBK's producing a particular figurine for Avon-the "Mrs. Albee figurine". (Trial Tr. at 10.) Thousands of the nine-and-three-quarter inch porcelain likenesses of the first "Avon Lady" are presented by Avon to its representatives each year. (Trial Tr. at 57-58.) Gleason and Lomaglio hoped to obtain an order for the 1994 Mrs. Albee figurine.

On November 3, 1992, McHugh and others from Avon joined Gleason and Lomaglio on a trip to Piedras Negras, Mexico to visit the factory where LBK's porcelain products were manufactured-the " Cermex" factory. (Trial Tr. at 60.)

Over the next several months, discussions continued concerning the Mrs. Albee figurine. On May 26, 1993, Lomaglio sent a letter to McHugh stating in relevant part:
This will serve as our quotation for the Mrs. Albee statue, a sample of which was left with you recently.
The cost price of $21.97 per unit includes all packaging identical to the packaging components provided by you. This price assumes a total usage of 80,000 pieces and is quoted FOB Eagle Pass, Texas on a letter of credit basis. As you know the item is manufactured in Pedras Negras, Mexico.

(Pl.Ex. 7.) Lomaglio also sent a copy of this letter to Gleason along with a cover letter. The cover letter, also dated May 26, states that the letter to McHugh "reflects the details you and I worked out on Tuesday and today" and that Lomaglio, Inc.'s commission on the order would be $1.555 per unit. (Pl.Ex. 6.)

C. Avon Awards the Mrs. Albee Order to LBK

On or about June 7, 1993, McHugh called Lomaglio and stated that Avon had awarded LBK the order to produce the Mrs. Albee figurines. (Trial Tr. at 65.) Lomaglio immediately informed representatives of LBK about the Mrs. Albee order. (Trial Tr. at 17.)

On June 8, 1993, the following letter on LBK letterhead was sent to McHugh:
Al Lomaglio informed us on Monday afternoon that you have awarded LBK the order to produce the " Mrs. Albee" figurine for 1994.
David Bailys and I are most appreciative of this opportunity for our Cermex factory, but also very much aware of the responsibility that goes along with a project of this magnitude ...
Again, Mary, thank you for this nice order and we look forward to a positive working relationship with you and Avon.

(Pl.Ex. 8.) The letter was signed by Gleason and David Bailys, President of LBK.

Over the remainder of the summer of 1993, Lomaglio, Gleason, McHugh and others at Avon exchanged correspondence concerning the manufacture of the Mrs. Albee figurines. A timetable for delivery was established, with the shipments to begin in December 1993 and continue through January 1995 at the rate of several thousand units per month. (Pl.Ex. 12, 14.) In addition, Avon increased the amount of figurines in the order to 82,400 units-and LBK accepted this increase. (Pl.Ex. 14.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

631

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Spli... 10/19/2007

Not Reported in F.Supp.2d Page 3

Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*3 Samples of the figurine were also exchanged throughout the summer, as Avon made comments and alterations to the design, and those changes were conveyed by Gleason to the Cermex factory. (Pl.Exs.13-15.) In a letter dated August 10, 1993 on "Cermex Limited Corporation" letterhead [FN1], Gleason wrote to Mary McHugh that "the majority of the design corrections" for the figurine had been completed. (Def.Ex. 3.)

FN1. The address and phone number of Cermex on this letterhead is precisely the same as the address and phone number of LBK on its letterhead.

In the same letter, Gleason also stated that:
As I stated last month after we were awarded this important Avon order, Cermex would be comfortable with a stand by [letter of credit] ...

(Def.Ex. 3.) Thus, Gleason requested that a stand by letter of credit be opened on October 1, 1993 in favor of Cermex in the amount of $325,000. Gleason also stated that "Payment is due Cermex Limited Corporation 10 days upon receipt of invoice."[FN2](Def.Ex. 3.)

FN2. Apparently, Avon's "standard" practice was to make payment thirty days after invoice. (Trial Tr. at 36, 79.)

D. The Alleged Superseding Agreement

On or about August 16, 1999, Lomaglio received a letter-again on Cermex letterhead-which read in its entirety:
Dear Lomaglio & Associates:
I am writing to confirm that Cermex Ltd. Corp. will be producing Avon's Mrs. Albee Award for 1994.
The price to Avon will be $21.97 per unit, F.O.B., Eagle Pass, Texas, payable net 10 days. In consideration for Lomaglio & Associates services, Cermex Ltd Corp. will pay a commission to Lomaglio & Associates of $1.555 per unit shipped. Commissions will be paid on the 15th of the month following shipment.
Please acknowledge you are in agreement with the above information by signing below.
Sincerely,
Cermex Ltd. Corp.
Hideo Asai
President

(Def.Ex. 4A.) The sole signature on the letter was that of Al Lomaglio-who signed the letter in accordance with the instruction .[FN3](Trial Tr. at 39-40.)

FN3. Lomaglio testified that Gleason discussed the letter with him, they exchanged drafts, and Lomaglio eventually faxed it back to Gleason. Later, during his closing, counsel for LBK indicated that Gleason sent the letter to Lomaglio. (Trial Tr. at 114.) However, in his deposition, Gleason claimed that he had no involvement in the preparation and exchange of the letter. (Gleason Dep. at 38-39.)

Through September 1, progress continued on the Mrs. Albee order. Additional representatives from Avon visited the Cermex factory and, by all indications, the Mrs. Albee order was going forward. (Pl.Ex. 17.)

In fact, in a memorandum from Gleason to Avon dated September 16, 1993, Gleason included photographs of the Cermex factory that, he claimed, showed "our personnel putting the final quality touches on Avon's Mrs. Albee figurine 1994." (Def.Ex. 24.) Apparently, this memorandum was never sent.

On or about September 12, 1993, Gleason visited Lomaglio at his offices in New Jersey and informed him that the Mrs. Albee figurines would not be produced for "financial reasons". (JPTO at 4; Trial Tr. at 25-26.) Both Lomaglio and McHugh tried to persuade Gleason and others at LBK to reconsider, but to no avail. (Trial Tr. 25-26, 70-72.)

Needless to say, LBK never advanced Lomaglio, Inc. commissions pursuant to the Agreement. (Trial Tr. 28-29.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

632

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Spli... 10/19/2007

Not Reported in F.Supp.2d Page 4

Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

E. Testimony Concerning the LBK/Cermex Relationship

One issue which remains unclear-even after a review of the testimony and exhibits in this case-is the relationship between LBK and Cermex.

The sole witness called by LBK at trial, William Rein, claimed to be the chairman of the board of directors and major shareholder of Cermex Ltd. Corp. (Trial Tr. at 93.) Rein testified that Cermex was an entirely separate company from LBK, and that there was no connection between the two companies other than the fact that "a couple of the executives at LBK were shareholders of Cermex." (Trial Tr. at 93-94.)

*4 However, Rein later admitted when questioned by the court that these "common" shareholders also worked for Cermex. (Trial Tr. at 106.) Rein also admitted-as evidenced by the letterhead-that LBK and Cermex conducted business activities out of the same offices in Jacksonville. (Trial Tr. at 106.)

Similarly, the fact that Gleason continually referred to the Mexican facility as "our Cermex" factory in correspondence seeking the Mrs. Albee order-all on LBK letterhead-further undercuts Rein's claims. (Pl.Exs.2, 3, 4, 8.)

Gleason's deposition testimony also contains similar waffling and inconsistencies with regard to the relationship between Cermex and LBK. (Gleason Dep. 36-37.) Moreover, Al Lomaglio testified that Gleason told him that LBK owned Cermex. (Trial Tr. at 12-13.)

Perhaps most damning is Defendants Exhibit 24B-a draft of Defendant's Exhibit 24, the memorandum dated September 16, 1993. In Exhibit 24B, Cermex is described as a "separate operating division of LBK Marketing Corporation."[FN4]

FN4. Defendant's Exhibit 24 describes Cermex as a "sister corporation" to LBK.

The nature of the relationship between Cermex and LBK is, essentially, irrelevant to my decision in this case.[FN5] However, Gleason and Rein's transparent attempts-for whatever reason-to color-over the relationship between LBK and Cermex have cast the credibility of all their testimony in doubt.

FN5. The nature and existence of a Cermex corporate entity is also irrelevant to my decision. Accordingly, LBK's post-trial motion to supplement the record with evidence of Cermex's incorporation and dissolution in the state of Delaware is denied as moot.

F. The Reasons for the Failure to Produce the Figurines

Rein also claimed that the reason the Mrs. Albee figurines were not produced is because-as of early September 1993-Avon never issued a written purchase order or opened a letter of credit. (Trial Tr. at 99.) Rein's claim is, however, against the weight of the evidence. That fact, plus the questions regarding Rein's credibility raised above, lead me to the conclusion that Rein's claims as to the reasons for the failure to produce the figurines cannot be believed.

The evidence that contradicts Rein's claims includes Gleason's testimony in his deposition and his handwritten notes introduced at trial. In his testimony and his notes, Gleason listed several reasons why the figurines would not be produced. Gleason explained that the reasons were provided by LBK and Cermex officials-and most strikingly, Avon's failure to provide a written purchase order and letter of credit were not among those reasons. (Gleason Dep. 57-73; Pl.Ex. 21.)

Moreover, in the reams of correspondence exchanged between LBK, Cermex, Avon and Lomaglio, Inc.-all addressing a host of concerns-there is no mention of the lack of a written purchase order or the fact that the letter of credit had not been opened as of early September. Nor is there even the hint that these two factors could in any way affect production of the figurines.

In addition, Lomaglio and McHugh testified that no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

633

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Spli... 10/19/2007

one from LBK verbally requested a written purchase order or indicated that the lack of a written purchase order would affect production of the figurines. (Trial Tr. at 25, 72.) Lomaglio and McHugh also testified that no one from LBK or Cermex ever raised concerns about the timing of the letter of credit that would preclude production of the figurines. (Trial Tr. at 25-26, 71-72.) Moreover, both Lomaglio and McHugh testified that, in speaking to representatives of LBK and Cermex after learning that the figurines would not be produced, they were not told that the absence of a written purchase order or concerns about the letter of credit were factors in the decision not to produce the figurines. (Trial Tr. 25-26, 71-72.)

*5 Similarly, Lomaglio testified that he met with Rein shortly after he was informed that the figurines would not be produced. Lomaglio testified that he asked Rein why the figurines were not produced, and Rein informed him that financial problems were the cause. Lomaglio also stated that Rein never mentioned the letter of credit or the purchase order as possible causes. (Trial Tr. at 52.)

In sum, I find Rein's claim that the failure to produce the Mrs. Albee figurine was somehow caused by Avon's failure to produce a written purchase order or open a line of credit in early September to be entirely unworthy of belief.

*Conclusions of Law* [FN6]

FN6. Both parties agree that New York law governs in this case.

At trial, Lomaglio, Inc. advanced only one legal theory-that LBK breached the Agreement by refusing to pay Lomaglio, Inc. commissions with regard to the Mrs. Albee order.[FN7] Lomaglio, Inc. contends that this alleged breach gives rise to an actionable breach of contract claim against LBK for the commissions.

FN7. This breach of contract claim is Lomaglio, Inc.'s first cause of action in the amended complaint. Lomaglio, Inc. has withdrawn its second cause of action for harm to its business reputation, and the third cause of action for misrepresentation was dismissed. (JPTO at 2.)

Under New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."*First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir.1998) (internal quotation marks and citation omitted).

Here, the existence of a contract between Lomaglio and LBK-the Agreement-has clearly been established. As detailed below, Lomaglio, Inc. has established each of the other above-mentioned elements by a preponderance of the evidence. Moreover, LBK has failed to come forward with any credible evidence to support the defenses it claims.

A. Lomaglio, Inc. Rendered Full Performance Under the Agreement

Pursuant to the Agreement, Lomaglio, Inc. was to act as LBK's "exclusive sales representative" to Avon. The evidence adduced at trial clearly demonstrates that Lomaglio, Inc. fully performed its services as such a representative. Lomaglio, Inc.'s efforts led to a completed sale in the form of an enforceable contract between LBK and Avon for the 1994 Mrs. Albee figurine.

That contract is embodied in LBK's offer to Avon-communicated through their sales representative, Lomaglio, Inc. As evidenced by Plaintiff's Exhibits 6 and 7-letters from Lomaglio, Inc. to Avon and LBK-the offer clearly indicated price, quantity and delivery terms.

Avon accepted the offer orally-again through Lomaglio, Inc., LBK's sales representative. LBK then confirmed the order by letter signed by two of its officers the following day. These events gave rise to a binding contract, and LBK's arguments to the contrary are to no avail.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 6

Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

1. The LBK/Avon Contract Is Not Barred by the Statute of Frauds

LBK argues that any contract between LBK and Avon would not be enforceable because it could not satisfy the requirements of the New York Statute of Frauds. In support of this claim, LBK points to Section 2-201(1) of the New York Uniform Commercial Code.Section 2-201(1) provides that a contract for the sale of goods over $500-like the contract between Avon and LBK-must be in writing and signed by the party to be charged in order to be enforced.

***6** However, Section 2-201(2) provides that "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of" Section 2-201(1). Here, the confirmatory letter sent on LBK letterhead to Avon constitutes just such a confirmation. Accordingly, LBK's contention that the contract would be unenforceable for lack of a sufficient writing is without merit.[FN8]

FN8. LBK also contends that Avon's failure to issue a purchase order somehow affected the formation or performance of the contract. Aside from the credibility problems with this claim detailed above, I fail to see how the lack of a purchase order has any affect at all on the contract-especially in light of the fact that LBK confirmed the order in writing. Moreover, there is no credible evidence that LBK insisted upon or even requested a written purchase order, and all parties conducted themselves as if the order was going forward regardless of the issuance of such an order.

2. The LBK/Avon Contract Would Not Fail for Lack of Definiteness

LBK also contends that any contract between LBK and Avon for the production of the Mrs. Albee figurines would fail for lack of definiteness. This contention is also entirely without merit.

Courts are loath to deny enforcement of agreements on indefiniteness grounds.*Cleveland Wrecking Co. v. Hercules Const. Co.,* 23 F.Supp.2d 287, 293 (E.D.N.Y.1998). Generally, a contract must be definite with respect to essential terms in order to be enforceable. *Fakhoury Enterprises, Inc. v. J.T. Distributors,* No. 94 Civ. 2729(PKL), 1997 WL 291961, at *3 (S.D.N .Y. June 2, 1997) (citing John D. Calamari & Joseph M. Perillo, Contracts § 2-13, at 43 (2d ed.1977)).

"In a contract for a sale of goods, the essential terms are quantity, price, and time and manner of delivery."*Id.* at *3 (quoting *Judal Indus. v. Welsbach Elec. Corp.,* 526 N.Y.S.2d 154, 156 (2d Dept.1988)). The fact that one or more of these terms is left open is not fatal. *Id. See also City Univ. of New York v. Finalco, Inc.,* 461 N.Y.S.2d 830, 831-32 (1st Dept.1983). However, when a dispute as to a material term manifests a lack of intention to form a contract, no enforceable contract results. *Fakhoury,* 1997 WL 291961, at *3 (citing *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.,* 363 N.E.2d 701, 702 (N.Y.1977)).

Here, none of the "essential" terms remained open. Agreements had been reached between Avon and LBK as to quantity, price and time and manner of delivery for the figurines. The only alleged dispute over a possibly essential term-whether payment would be made ten or thirty days after shipment of each batch of figurines-was not a dispute at all. Avon had not specifically responded to this request, but it was clear that it would not, according to McHugh, be a "problem".

Finally, LBK claims that if an enforceable contract for the production of the Mrs. Albee figurines existed, it existed between Avon and Cermex. This contention is absolutely ridiculous. There is no writing, no admissible testimony-no evidence of any sort-that any agreement at all existed between Avon and Cermex.

In sum, an enforceable contract existed between Avon and LBK for the production of the 1994 Mrs. Albee figurines.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

635

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Spli... 10/19/2007

Not Reported in F.Supp.2d Page 7

Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

B. LBK Breached the Agreement

By failing to pay Lomaglio, Inc. its agreed upon commission after Lomaglio, Inc. fully performed its obligations under the Agreement, LBK breached the Agreement. LBK's contentions to the contrary are again entirely without merit.

1. Payment by Avon was not a Condition Precedent to Payment of the Commissions

*7 LBK argues that, because the Agreement provides that "Commissions will be paid upon payment for the merchandise by the customer", Avon's payment to LBK was a condition precedent to payment of Lomaglio, Inc.'s commissions. LBK argues that this language is "an ambiguity", and because the Agreement was drafted by Al Lomaglio, the language must be construed against Lomaglio, Inc. to constitute a condition precedent.

While it may be that ambiguous contract language is generally construed against the drafter, it is well settled under New York law that where a contract term is ambiguous, the creation of a condition precedent is disfavored. *See, e.g., I.R.V. Merchandising Corp. v. Jay Ward Prod., Inc.,* 856 F.Supp. 168, 174 (S.D.N.Y.1994); *Lui v. Park Ridge at Terryville Ass'n, Inc.,* 601 N.Y.S.2d 496, 499 (2d Dept.1993); *Manning v. Michaels,* 540 N.Y.S.2d 583, 584 (3rd Dept.1989). Moreover, absent a clear expression to the contrary, a "pay-when-paid" clause does not establish a condition precedent but merely fixes a time for payment. *See, e.g., Grossman Steel and Aluminum Corp. v. Samson Window Corp.,* 426 N.E.2d 176, 177 (N.Y.1981), *aff'g,*433 N.Y.S.2d 31, 32 (2d Dept.1980); *Otis Elevator Co. v. George A. Fuller Co.,* 569 N.Y.S.2d 118, 120 (2d Dept.1991); *Action Interiors, Inc. v. Component Assembly Systems, Inc.,* 535 N.Y.S.2d 55, 56 (2d Dept.1991).

Thus, the ambiguous language can only be interpreted as fixing a time for payment of the commissions, and certainly not a condition precedent to their payment.[FN9]

FN9. Even if the language in the Agreement did constitute a condition precedent, LBK still could not avoid liability under the Agreement because it was their failure to produce the figurines pursuant to the contract with Avon that prevented Avon from making payment. *See Cauff, Lippman & Co. v. Apogee Fin Group,* 807 F.Supp. 1007, 1022 (S.D.N.Y.1992).

2. The Agreement was not "Superseded"

LBK also contends that the Agreement was "superseded" by an agreement between Cermex and Lomaglio, Inc. (Trial Tr. at 9.) LBK claims that the superseding agreement is embodied in Defendant's Exhibit 4A-the letter from Cermex to Lomaglio, Inc.

However, all Defendant's Exhibit 4A demonstrates is that Lomaglio, Inc. consented to payment of its commissions from Cermex. There is absolutely is no evidence that Lomaglio, Inc. intended such consent to act as a complete substitute for the Agreement. Similarly, there is no evidence that Lomaglio, Inc. intended to release LBK from its obligations if Cermex failed to pay the commissions.

To prove that a new arrangement is a substituted agreement or novation that superseded the Agreement, LBK must, *inter alia,* demonstrate that both parties clearly expressed or manifested such an intent. *See Chardin v. Turkie,* No. 97 Civ. 4643(JSM), 1999 WL 194626, at *2 (S.D.N.Y. April 9, 1999) (citing *Northville Indus. v. Fort Neck Oil Terminals Corp.,* 474 N.Y.S.2d 122, 125 (2d Dept.1984)).*See also Lloyds Bank PLC v. Republic of Ecuador,* No. 96 Civ. 1789(DC), 1998 WL 118170, at *10 (S.D.N.Y. March 16, 1998); *VJK Prods., Inc. v. Friedman/Meyer Prods., Inc.,* 565 F.Supp. 916, 921 (S.D.N.Y.1983) ("a novation [must] never be presumed").

Because there is no evidence that Lomaglio, Inc. intended there to be a substituted agreement or novation, the arrangement between Cermex and Lomaglio, Inc. was merely an accord in which Lomaglio, Inc. agreed to accept payment of its commissions under the Agreement from Cermex

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

636

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Spli... 10/19/2007

Not Reported in F.Supp.2d Page 8

Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

rather than LBK. *See Chardin,* 1999 WL 194626, at *2 (citing *Denberg v. Parker Chapin Flattau & Kimpl,* 624 N.E.2d 995, 1000-01 (N.Y.1993)).

***8** Because Cermex never paid the commissions, the accord was never satisfied. Unlike a novation or a substitute agreement, an accord does not extinguish an existing contract. Thus, LBK is not relieved of its responsibilities under the agreement to pay Lomaglio, Inc. its commissions.*Id. See also Koening Iron Works, Inc. v. Sterling Factories, Inc.,* No. 89 Civ. 4257(THK), 1999 WL 178785, at *7-8 (S.D.N.Y. March 30, 1999).

C. Damages

In assessing damages, it is axiomatic that a party injured by a breach of contract must be placed in the same economic position in which he would have been, had the contract been fully performed. *V .S. Intern. S.A. v. Boyden World Corp.,* 862 F.Supp. 1188, 1197 (S.D.N.Y.1994) (citing cases). With respect to proving such damages, the plaintiff must demonstrate the existence of damages with certainty in order to recover for breach of contract. *Id.* (citing cases).

Here, it is certain that had the Agreement been fully performed by LBK, Lomaglio, Inc. would have received a commission of $1.555 per figurine. Because the contract between Avon and LBK called for 82,400 figurines to be produced, Lomaglio, Inc.'s commission would have been $128,132.00.

*Conclusion*

For the reasons stated above, this court finds for plaintiff Lomaglio, Inc. on the sole claim advanced at trial.

Lomaglio, Inc. is directed to submit a proposed judgment to the court- including a revised commissions schedule reflecting interest calculations up to and including the date of this Memorandum and Order-within ten days.

After entering said judgment, the Clerk of the Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,1999.
Lomaglio Associates Inc. v. LBK Marketing Corp.
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

637

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Spli... 10/19/2007