## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| THE FINOVA GROUP, INC., and | ) | Case No. 01-0698 (PJW) |
| FINOVA CAPITAL CORPORATION, | ) | |
| | ) | |
| Reorganized Debtors. | ) | |
| | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF EQUITY | ) | |
| SECURITIES HOLDERS of FINOVA GROUP, | ) | |
| INC., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-480 (JJF) |
| | ) | |
| THE FINOVA GROUP INC. and | ) | Bankruptcy Case No. 01-698 |
| FINOVA CAPITAL CORPORATION, | ) | AP 07-70 |
| | ) | |
| Appellees. | ) | |

## APPELLEE'S RESPONSE TO APPELLANT'S OPENING BRIEF AND OPENING
## BRIEF ON CROSS-APPEAL

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 658-6541
Telecopy: (302) 658-6548

-and-

Jonathan M. Landers
Robert K. Dakis
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Dated: November 21, 2007          *Attorneys for Appellees The FINOVA Group*
    Wilmington, Delaware          *Inc. and FINOVA Capital Corporation*

## TABLE OF CONTENTS

Page

I. STATEMENT AND NATURE OF THE CASE ........................................................................ 1

II. SUMMARY OF THE ARGUMENT.................................................................................. 2

    A.    The Bankruptcy Court's Construction of the Plan and Indenture is Not Manifestly Unreasonable.......................................................................................................... 2

    B.    The Equity Committee Order and the Fee Cap Orders Should be Reversed......... 3

III. BACKGROUND .......................................................................................................... 3

    A.    General Background ............................................................................................ 3

    B.    Background Regarding Distributions to Creditors and Shareholders.................... 4

    C.    Proceedings Before the Bankruptcy Court ......................................................... 6

    D.    The Bankruptcy Court Granted the Clarification Motion in its Entirety. ............... 8

    E.    Background Regarding Reorganized Debtors' Financial Condition. .................. 10

    F.    The Bankruptcy Court Serially Increased the Amount of the Equity Committee Fee Cap. .......................................................................................................... 11

    G.    Appeals. ........................................................................................................... 12

IV. STANDARD OF REVIEW......................................................................................... 12

V. THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION BY CONSTRUING THE PLAN TO PRECLUDE PAYMENT OF THE RETAINED FUNDS TO SHAREHOLDERS .................................................................................................... 14

    A.    The Bankruptcy Court Correctly Interpreted the Terms of the Indenture to Create a Condition Precedent to Payment of the Retained Funds to Shareholders......... 15

    B.    The Provisions of the Indenture Are Not Merely Timing Provisions.................. 17

    C.    The Bankruptcy Court's Ruling Properly Applied the Rules of Contract Interpretation.................................................................................................... 19

    D.    The Bankruptcy Court Properly Relied On The Disclosure Statement As Support For Its Opinion.................................................................................................. 22

VI. THE BANKRUPTCY COURT CORRECTLY RULED THAT THE PLAN DID NOT CREATE A NEW DEBT OBLIGATION.................................................................... 23

**Table of Contents**
**(Continued)**

Page

VII. THE PLAN CANNOT BE CONSTRUED TO ALLOW FOR THE PAYMENT OF
DISTRIBUTIONS TO THE SHAREHOLDERS............................................................ 29

    A.    The Distinction Between Dividends and Distributions is Not Relevant.............. 30

    B.    The Bankruptcy Court Correctly Found that Distribution of the Retained Funds
Would Violate Delaware Law. ............................................................................... 30

    C.    Any Distributions Made While the Debtors Were Insolvent Would be Fraudulent
Conveyances. ......................................................................................................... 31

    D.    The Bankruptcy Court Correctly Found That The Debtors' Financial Condition
Prevents the Debtors From Making the Restricted Payments. ............................. 33

VIII. THE BANKRUPTCY COURT'S RULING DOES NOT EFFECT AN IMPERMISSIBLE
FORFEITURE ................................................................................................................ 34

I. CROSS APPEAL -- THE COURT ERRED IN RECONSTITUTING THE EQUITY
COMMITTEE AND ENTERING THE FEE CAP ORDERS.......................................... 35

    A.    The Bankruptcy Court Erred in Appointing the Equity Committee.................... 35

    B.    The Bankruptcy Court Erred By Entering The Fee Cap Orders.......................... 37

    C.    The Appointment and Increases of Fees On Behalf of the Equity Committee
Violate the Absolute Priority Rule........................................................................ 39

CONCLUSION................................................................................................................... 40

RLF1-3226616-1

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Brass v. Am. Film Techs., Inc.,*
987 F.2d 142 (2d Cir. 1992) .................................................................................................. 20

*Bridgepoint Nurseries,*
190 B.R. 215 (Bankr. D.N.J. 1996) ........................................................................................ 22

*Carrieri v. Jobs.com Inc.,*
393 F.3d 508 (5th Cir. 2004) ........................................................................................... 27, 28

*Exide Techs. v. Wis. Inv. Bd.,*
2002 U.S. Dist. LEXIS 27210 (D. Del. Dec. 23, 2002)........................................................ 35, 36

*Fin Hay Realty Co. v. United States,*
398 F.2d 694 (3d Cir. 1968) ................................................................................................. 28

*Fulweiler v. Spruance,* 222 A.2d 555 (Del. Ch. 1966) ................................................................. 31

*Geftman v. Commission of Internal Revenue,*
154 F.3d 61 (3d Cir. 1998) .................................................................................................. 28

*Gerlach v. The Horn & Hardart Co.,*
683 F. Supp. 342 (S.D.N.Y. 1988) ........................................................................................ 21

*Ginett v. Computer Task Group, Inc.,*
962 F.2d (2d Cir. 1992) ....................................................................................................... 16

*Grossman Steel & Aluminum Corp. v. Samson Window Corp.,*
54 N.Y. 2d 653 (N.Y. 1981) ................................................................................................. 17

*Hatzel & Buehler, Inc. v. Lovisa Construction Co., Inc.,*
1993 U.S. Dist. (E.D.N.Y. Jul. 20, 1993) ............................................................................. 18

*In re Armstrong World Indus. Inc.,* 432, F.3d 507 (3d. Cir. 2005)............................................. 39

*In re Brentwood-Lexford Partners, LLC,*
292 B.R. 255 (Bankr. N.D. Tx. 2003) ................................................................................... 32

*In Re Color Tile, Inc.,*
2000 WL 152129 (D. Del. Feb 9 2000) ................................................................................. 32

*In re Consumers Realty & Development Co., Inc,*
238 B.R. 418 (8th Cir. BAP 1999) ....................................................................................... 27

*In re Duplin Corp.,* 212 F.3d 144 (2d Cir. 2000)................................................................... 13

RLF1-3226616-1

**Table of Authorities**
**(Continued)**

Page(s)

*In re Emons Industries, Inc.*, 50 B.R. 692 (Bankr. S.D.N.Y. 1985) ................................................ 39

*In re Estill Medical Technologies, Inc.*, 2004 WL 1773436 (N.D. Tex. Aug.. 20, 2004) ............ 22

*In re Finova Group, Inc.*,
01-0698 (Bankr. D. Del.), June 10, 2005.......................................................................... 7, 8, 9

*In re Georgetown Bldg. Assocs.*,
240 B.R. 124 (Bankr. D.D.C. 1999) ................................................................................. 27

*In re JLH, LLC.*,
239 F.3d 366 (5th Cir. 2000) ........................................................................................... 18

*In re Kaiser Group Int'l., Inc.*,
307 B.R. 449 (D. Del. 2004)............................................................................................. 12

*In re Leap Wireless Int'l, Inc.*,
295 B.R. 135 (Bankr. S.D. Cal. 2003).............................................................................. 36

*In re Penrod*,
169 B.R. 910 (Bankr. N.D. Ind. 1994).............................................................................. 27

*In re Shenango Group Inc.*,
501 F.3d 338 (3d Cir. 2007) ......................................................................................... passim

*In re Sims*,
358 B.R. 217 (Bankr. E.D. Pa. 2006) .............................................................................. 21

*In re Sugarhouse Realty, Inc.*,
192 B.R. 355 (E.D. Pa. 1996) .......................................................................................... 22

*In re Terex Corp.*,
984 F.2d 170 (6th Cir. 1993) ........................................................................................... 21

*In re Toney*,
349 B.R. 516 (Bankr. E.D. Tenn. 2006) .......................................................................... 21

*In re Trace International Holdings, Inc.*,
289 B.R. 548 (Bankr. S.D.N.Y. 2003).............................................................................. 32

*In re Turek*,
346 B.R. 350 (Bankr. M.D. Pa. 2006) ............................................................................. 21

*In re Williams Communications Group, Inc.*,
281 B.R. 216 (Bankr. S.D.N.Y. 2002).............................................................................. 36

iv

## Table of Authorities
### (Continued)

Page(s)

*In re WorldCom, Inc.*, 352 B.R. 369 (Bankr. S.D.N.Y. 2006)..................................................... 22

*Kirschten v. Research Insts. of Am., Inc.*,
    1997 U.S. Dist. LEXIS 24037 (S.D.N.Y. Jul. 24, 1997) .............................................. 20

*Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*,
    1999 WL 705208 (S.D.N.Y. Sept. 10, 1999)................................................................ 18

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y. 2d (N.Y. 1995) ................................................................................. 16, 34, 35

*Otis Eastern Service, Inc. v. Raytheon Engineers & Constructors, Inc.*,
    15 F. Supp. 2d 318, (W.D.N.Y. 1998)......................................................................... 17

*Schuler-Hass Elec. Corp. v. Aetna Cas. & Cur. Co.*,
    40 N.Y. 2d 883 (N.Y. 1976) ...................................................................................... 17

*Twin City Fire Ins. co. v. Delaware Racing Assn.*,
    840 A.2d 624................................................................................................................ 21

*William A White/Tishman East, Inc. v. Banko.*,
    171 A.D.2d 401 (N.Y. App. Div. 1991) ..................................................................... 21

### Statutes

11 U.S.C. § 1129(b)(2)(B) ..................................................................................................... 39

11 U.S.C. § 330(a)(1)(A) ....................................................................................................... 37

6 Del. C. § 1304 ..................................................................................................................... 26

8 Del. C. § 160 ....................................................................................................................... 26

8 Del. C. § 170 ....................................................................................................................... 26

8 Del. C. § 170(a) ................................................................................................................... 26

8 Del. C. § 244 ....................................................................................................................... 26

8 Del. C. § 244(b) .................................................................................................................. 26

8 Del. C. §160(a)..................................................................................................................... 26

Del. C. § 170 .......................................................................................................................... 32

RLF1-3226616-1

**Table of Authorities**
**(Continued)**

Page(s)

**Other Authorities**

7 *Collier on Bankruptcy* ¶ 1102.03[2][a] (15th ed. rev. 2005) ...................................................... 36

**Rules**

Restatement (Second) of Contracts § 226 ............................................................................ 16

Restatement (Second) of Contracts § 227 ............................................................................ 35

Restatement (Second) of Contracts § 229 ............................................................................ 35

## I. **STATEMENT AND NATURE OF THE CASE**

Appellees, and cross-appellants, The FINOVA Group Inc. ("FNV Group") and FINOVA Capital Corporation (together, the "Debtors") respond to the Opening Brief of the Official Committee of Equity Security Holders (the "Equity Committee").[1]

On the Grounds set forth below, the Debtors cross-appeal from: (i) Order Directing United States Trustee to Appoint an Official Committee of Equity Security Holders for a Limited Purpose and Granting Related Relief, entered by the Bankruptcy Court on June 17, 2005 (the "Equity Committee Order") (Bankr. D.I. 48) [Supp. App. Ex. A]; (ii) Order Increasing the Cap Previously Imposed on Fees and Expenses Which Can be Incurred on Behalf of the Equity Committee, entered by the Bankruptcy Court on January 3, 2006 (the "First Fee Cap Order") (Bankr. D.I. 93) [Supp. App., Ex. B]; (iii) Order Regarding Application for an Order, Pursuant to Section 327(e) of the Bankruptcy Code and Fed. R. Bankr. P. 2017, Increasing the Cap on Fees and Expenses Which Can Be Incurred on Behalf of the Equity Committee and the Final Order Request, entered by the Bankruptcy Court on February 6, 2007 (the "Second Fee Cap Order") (Bankr. D.I. 205) [Supp App., Ex. C]; and (iv) Order Increasing the Cap Previously Imposed on Fees and Expenses Which Can Be Incurred on Behalf of the Equity Committee, entered by the Bankruptcy Court on July 26, 2007 (the "Third Fee Cap Order," and together with the First Fee Cap Order and the Second Fee Cap Order, the "Fee Cap Orders") (Bankr. D.I. 225) [Supp. App., Ex. D].

---

[1] The Equity Committee appeals from: (i) the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on June 26, 2007 (the "First Clarification Order") (Bankr. D.I. 200) [App., Ex. O]; and (ii) the Order Regarding Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, entered by the Bankruptcy Court on February 1, 2007 (the "Second Clarification Order" and together with the First Clarification Order, the "Clarification Order") (Bankr. D.I. 100) [App., Ex. N].

RLF1-3226616-1

## II. SUMMARY OF THE ARGUMENT

**A.    The Bankruptcy Court's Construction of the Plan and Indenture is Not Manifestly Unreasonable.**

1.    The Debtors' Third Amended and Restated Joint Plan of Reorganization (the "Plan") provided for the issuance of New Senior Notes. Pursuant to Plan and Indenture governing the New Senior Notes (the "Indenture"), if principal payments were made on the New Senior Notes, 5% of the payments would be used for "Restricted Payments" – distributions on account of equity interests. The Indenture further provided that if, at the time of the payment on the New Senior Notes, the Debtors would become insolvent, such distribution would be a fraudulent conveyance, or would not otherwise be permitted under applicable law, the payments would be retained by the Debtors until the disabling conditions no longer existed. The Plan and the Indenture did not specifically provide for the situation where the retained payments could never be made because the Debtors were forever insolvent and the disabling conditions would continue indefinitely. This is what occurred.

2.    This appeal concerns the Bankruptcy Court's interpreting the Plan, Disclosure Statement and Indenture as unambiguous and providing that the Debtors could cease setting retaining payments on account of equity and could use funds previously retained for general corporate purposes because the Debtors were "forever insolvent." The Third Circuit in *In re Shenango Group Inc.*, 501 F.3d 338 (3d Cir. 2007), recently agreed with the majority view that "a bankruptcy court's interpretation of its own order ought to be subject to review for an abuse of discretion," and if ambiguous, the Court would "defer to the Bankruptcy Court's interpretation unless it is unreasonable under the circumstances." *Id.* at 346. The Equity Committee has not come close to meeting this standard.

2

3.    The Equity Committee has now appealed the Clarification Order and in its opening brief simply reiterates its arguments, which were entirely rejected by the Bankruptcy Court. The Equity Committee acknowledges that the Plan was ambiguous (Opening Brief at 20-25), but completely failed to set forth any evidence or argument establishing that the Bankruptcy Court abused its discretion in determining that the plain language of the Plan and Indenture created a condition precedent to payment that could never be satisfied, as required by the *Shenango Group* decision. Thus, this Court should affirm the Clarification Order.

**B.    The Equity Committee Order and the Fee Cap Orders Should be Reversed.**

4.    The Debtors have filed a cross-appeal of the Equity Committee Order and the Fee Cap Orders. Although appointment of an equity committee is reserved for situations where there is the potential for recovery for Shareholders, there was no real question that the Debtors were forever insolvent, that there was little to no chance for equity to recover anything, and there were Shareholders who were ready, willing and able to oppose the Clarification Motion. Thus, it was improper to reconstitute the Equity Committee. In addition, the Bankruptcy Court also erred by increasing the Fee Cap without even finding that the initial cap was insufficient or that the fees incurred were reasonable. Moreover, given the fact that the Debtors were and remain forever insolvent, the initial approval of a Fee Cap and the subsequent increases of that cap are in complete disregard of the absolute priority rule. Therefore, this Court should reverse the Equity Committee Order and Fee Cap Orders and require the Equity Committee to disgorge those funds.

## III. <u>BACKGROUND</u>

**A.    General Background**

5.    On March 7, 2001 (the "<u>Petition Date</u>"), the Debtors, and certain other affiliates, each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. [App. at 30, Ex. A]. On June 14, 2001, the Debtors filed the Plan. The Bankruptcy Court confirmed the Plan

3

on August 10, 2001. Corrected Order Confirming the Third Amended and Restated Joint Plan of

Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code, *The FINOVA Group, Inc.*,

01-0697 (Bankr. D. Del. August 10, 2001) (the "Confirmation Order"). [Supp. App., Ex. E].

The Plan became effective on August 21, 2001.

## B.    Background Regarding Distributions to Creditors and Shareholders

6.    Pursuant to the Plan, holders of allowed unsecured claims against FNV Capital

received, among things, cash equal to 70% of their allowed claims and New Senior Notes in the

face amount of 30% of their allowed claims against FNV Capital. [App. at 99, Ex. B.] The

terms of the New Senior Notes are governed by the Indenture. Section 4.06(a) of the Indenture

provides that the Debtors shall not "use cash and Cash Equivalents in a manner prohibited or not

provided for" by section 4.06. [App. at 185, Ex. C.] Section 4.06(a)(v) then provides that, after

the provision for payment of operating expenses and certain other obligations, the Debtors will

use 95% of their Available Cash to pay principal on the New Senior Notes and to use 5% of the

Available Cash to make Restricted Payments. [App. at 186-87, Ex. C.] Specifically, section

4.06(a)(v) provides that, the Debtors shall apply cash and Cash Equivalents:

> ". . . until the principal of and Fixed Interest on the Notes are paid in full to (A)
> pay to the Company [FNV Group], when due the principal on the Intercompany
> Notes . . . which amounts the Company shall use together with any other cash or
> Cash Equivalents the Company has available for such purpose on such date to
> repay principal of the Notes . . . and (B) to make distributions in respect of
> FINOVA Capital's Equity Interests held by the Company, which amounts the
> Company shall use together with any other cash the Company has available for
> such purposes to make Restricted Payments unless either (x) the making of any
> such Restricted Payment would be an Impermissible Restricted Payment, in
> which event the Company shall retain such amounts and any such retained
> amounts shall accumulate and shall be used to make Restricted Payments at such
> time or from time to time when such Restricted Payments are not Impermissible
> Restricted Payments, or (y) a Default or Event of Default has occurred and is
> continuing, in which event the Company shall retain such amounts and any such
> retained amounts shall accumulate and shall, subject to Article 6 hereof, be used
> to make such Restricted Payments at such time or form time to time when such
> Default or Event of Default is no longer continuing; *provided*, *however*, that each

incremental payment of $0.95 pursuant to Clause (A) shall require a distribution or retention pursuant to clause (B) of $0.05;"

[App. at 186-87, Ex. C.][2]

7.    The Indenture defines "Restricted Payments" as:

"(i)    the declaration or payment of any dividend or the making of any distribution on account of the Company's [FNV Group's] Equity Interests (other than dividends or distributions payable in Equity Interests of the Company); or

(ii)    the purchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company other than redemptions, acquisitions or retirements solely in exchange for Equity Interests of the Company."

[App. at 169-70, Ex. C.] An "Impermissible Restricted" Payment is defined as "a Restricted Payment that, if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law." [App. at 165, Ex. C.]

8.    Finally, section 4.07 prohibits Restricted Payments unless permitted by sections 4.06 or 4.07.[3] [App. at 188-89, Ex. C.] Under section 4.06(a)(v) discussed above, it is a condition precedent to distributions to Shareholders under the Plan that such distributions do not constitute Impermissible Restricted Payments. Here, given the Debtors' insolvency, any distributions on account of Equity Interests clearly would be Impermissible Restricted Payments and thus prohibited by section 4.06.

9.    There is little doubt that the Shareholders were put on notice that the Debtors may be unable to make distributions on account of the Shareholders' equity interests. Section 5.1(f) of the Plan provides that Shareholder's "legal, equitable and contractual rights . . . shall remain in

---

[2] The form of Indenture located at Exhibit C in the Equity Committee's Appendix is not the final form of the Indenture, and this fails to include certain clauses referenced above. However, the Equity Committee did properly quote the final form of the Indenture in the Opening Brief.

[3] The distributions permitted by section 4.07(b) are not pertinent to the 5% Payment.

effect, subject to the effects of . . . (iii) the other terms and conditions of the Plan (including the cancellation of certain options, warrants and rights), as more fully described in Sections 6.2, 6.3(a), 6.6(a) and 7.1." [App. at 90, Ex. B.][4]  The Third Amended and Restated Disclosure Statement With Respect to Joint Plan of Reorganization of Debtors under Chapter 11 of the Bankruptcy Code (the "Disclosure Statement") further provided that equity interests will remain in effect subject to the other conditions of the Plan.[5]  [App. at 17, Ex. A.]

**C.    Proceedings Before the Bankruptcy Court**

10.    As a result of the events of September 11, 2001, the Debtors suffered a significant reduction in the value of their assets.  Nevertheless, the Debtors continued to maximize the value of their assets for the benefit of all constituencies; however, it became crystal clear that the Debtors could never make Restricted Payments to Shareholders because they were forever

---

[4] The New Senior Notes Terms Sheet (the "Term Sheet"), which was incorporated into the Plan as Exhibit 6.2(c) further provided that "FNV Group will not directly or indirectly make any Restricted Payments under than Restricted Payments permitted under the 'Use of Cash' covenant described above." [App. at 99, 141, Ex. B.]

[5] The Disclosure Statement further provided that:

(b)    Dividends.  Post-confirmation equity holders will be precluded from receiving dividends or other distributions from FNV Group until the Berkadia Loan is repaid.  If New Group Preferred Stock is issued, distributions to common stockholders will not be permitted to be made unless a concurrent distribution is made to holders of the New Group Preferred Stock.  **Subject to applicable corporate law (which limits the circumstances in which corporations may legally make distributions to stockholders),** limited distributions to stockholders will be permitted as the New Senior Notes are paid off, as described in the next paragraph.

The New Senior Notes will provide that after repayment in full of the Berkadia Loan, 5% of the Debtors' cash available for this purpose (as defined in the New Senior Notes Indenture) will be used to make distributions to stockholders.  Accordingly, unless principal payments are made on the New Senior a Notes, no distributions will be made to stockholders.  Further, such distributions will not be made if any default exists under the New Senior Notes.  If FNV Group does not have sufficient funds ultimately to repay the New Senior Notes in full (together with accrued interest thereon), it is likely that only limited distributions would be made to stockholders. There can be no assurance that FNV Group will make any distributions to its equity holders even if all contractual prohibits thereto have expired.  **Subject to meeting the legal requirements permitting distributions to stockholders, and so long as the making of any such distributions would not render FNV Group insolvent, FNV Group currently intends to make distributions permitted under the terms of the New Senior Notes as soon as practicable.**  It is likely that FNV Group will not fully repay the New Senior Notes in fewer than eight years.

[App. at 48-49, Ex. A] (emphasis added).

RLF1-3226616-1

insolvent, and thus any Restricted Payments would forever be Impermissible Restricted Payments.[6]  [App. at 261-64, Ex. F.]    Although the Indenture provides for "retain[ing]" and "accumulat[ing]" such funds until they are no longer Impermissible Restricted Payments, it did not provide for the situation where the Reorganized Debtors will never be able to make the payments because the conditions precedent to payment never can be satisfied.  Thus, on April 1, 2005, the Debtors filed the Clarification Motion, which sought a determination that, under the Indenture since the Debtors would be "forever insolvent," the Retained Funds should be returned to the Debtors for payment of operating expenses, distributions to creditors or other corporate purposes.  [App. at 268, Ex. F.]

11.    In response to the Clarification Motion, certain equity holders moved the Court to recognize the continued existence of the official committee of equity security holders or, in the alternative, to reconstitute the equity committee for the limited purpose of responding to the Clarification Motion.  [App. at 274, Ex. G.]    On June 10, 2005, the Bankruptcy Court reconstituted the Equity Committee with a $100,000 cap on its professional fees.  *See* Transcript, *In re Finova Group, Inc.,* 01-0698 (Bankr. D. Del.), June 10, 2005, (the "June Transcript"), at 27:12-15; 38:1-2; 44:19 [App. at 339, 350, 356, Ex. I]; *see also* Equity Committee Order [Supp. App. at 639, Ex. A.]  The Equity Committee subsequently objected to the Clarification Motion arguing that the Debtors' obligations to the Shareholders under the Plan and Indenture were essentially "debt" obligations because the payment provisions were part of the Plan (although the Indenture provided otherwise), and that various state law doctrines required payment.  [App. at Ex. K.]

---

[6] Under the Indenture, the Debtors were not permitted to engage in new business activities.  [App. at 168, 188, Ex. C.]

**D.**     **The Bankruptcy Court Granted the Clarification Motion in its Entirety.**

12.     At a hearing held on November 29, 2005, the Bankruptcy Court granted the Clarification Motion insofar as the Debtors were forever insolvent. At the beginning of its ruling, the Bankruptcy Court said that the "multitudinous arguments offered by the Committee, for the most part, are either irrelevant or off the wall. The concept of forfeiture, subordination, constructive trust, sharing pari passu is all in gross conflict with the terms of the plan and disclosure statement." Transcript, *In re Finova Group, Inc.,* 01-0698 at 52:16-20 (Bankr. D. Del. November 29, 2005) (the "November Transcript") [App. at 522, Ex. L].[7] The Bankruptcy Court said that it "spent a lot of time with the relevant documents [and] I don't think they're ambiguous and I think the debtor has it right." *Id.*

13.     To provide some context to its discussion, the Bankruptcy Court first noted that the Disclosure Statement stated that "'the legal, equitable and contractual rights of holders of allowed interest in class FNV Group 6 (interest), shall remain in effect,'" that "the interest is a stock interest," and that the stock interest was subject to "'the other terms and conditions of the plan.'" *Id.* at 53. [App. at 523, Ex. L.] The Bankruptcy Court next examined the Plan, which contained similar language, and referred specifically to section 6.2 of the Plan and the attached term sheet describing the New Senior Notes. The Court found that section 6.2 of the Plan, and the Term Sheet, clearly set out the terms of the cash distribution and the "limitation on restricted payments," which prevented the use of cash "to make any restricted payments except such restricted payments" referred to in either (i) the waterfall now reflected in section 4.06 of the Indenture (which prevented impermissible restricted payments) or (ii) section 4.07 which

---

[7] The Bankruptcy Court echoed this sentiment during the hearing regarding the Equity Committee's motion for a stay pending appeal that "I can't overstate how strongly I feel that there is no merit to the Committee's position." Transcript, *In re Finova Group, Inc.,* 01-0698 at 49 (Bankr. D. Del. July 24, 2005)

RLF1-3226616-1

contained five exceptions to provision preventing restricted payments (none of which is applicable here). *Id.* at 53:15-54:20 [App. at 523-24, Ex. L] The Bankruptcy Court further noted that the Disclosure Statement, in a section titled "'special risks for equity holders,'" clearly explained that "'[s]ubject to applicable corporate law (which limits the circumstances which corporations may legally make distributions to shareholders),'" distributions could be made to Shareholders on account of their Equity Interests, but added that "'[i]f FNV Group does not have sufficient funds ultimately to repay the new senior notes in full . . . it is likely that only limited distributions will be made to shareholders . . . .'"[8] *Id.* at 55:20-56:25 [App. at 525-26, Ex. K.]

14.    The Bankruptcy Court interpreted the applicable provisions of the Plan as saying that: "[Y]ou are shareholders. You may or may not get a distribution and if applicable law precludes a distribution or a dividend being made, you get nothing." *Id.* at 56:23-25 [App. at 526, Ex. K.] Further, subject to meeting the legal requirements for distributions to shareholders and "'so long as the making of any such distribution would not render FNV group insolvent'" -- which is precisely what occurred -- the Debtors intended to make the distributions. The Bankruptcy Court concluded that this provision, together with 4.07 of the Indenture, "in my view shouts at us when it says there are circumstances, plain and simple, which would preclude any payment to any of the shareholders." *Id.* at 57:8-11 [App. at 527, Ex. L.][9] On February 1, 2006,

---

[8] The Equity Committee has argued that the Bankruptcy Court misread language in the Plan and Disclosure Statement discussing the "limited circumstances" in which the Debtors can make distributions to apply to limitations set forth in section 4.7 of the Indenture. (Opening Brief at 18-19.) However, as shown below, it is not sufficient for the Equity Committee to merely contend that the Bankruptcy Court misread the document, the Equity Committee must demonstrate some abuse of discretion.

[9] Thereafter, in a follow up letter of December 2, 2005, the Bankruptcy Court found that the Equity Committee's pleadings were intentionally "misleading," because the Equity Committee:

> by the use of an ellipsis and some bold font, . . . [had] shifted the focus of the clause [section 4.6 of the Indenture] from Contingent Interest to common stock. In short, one cannot explain the waterfall entitlement of the Noteholders to the Contingent Interest without noting the preceding Restricted Payments to the shareholders.

(Continued)

9

the Bankruptcy Court entered an order memorializing its opinion (the "First Clarification Order"). [App. Ex. N.] The First Clarification Order specifically left open questions regarding the Debtors' financial condition. [App. at 552, Ex. N]

15.    The Equity Committee never fully contested the Debtors' construction of the Indenture, but urged that the documents were ambiguous, the 5% Payment obligation was a debt, and a variety of state law doctrines required payment. The Bankruptcy Court specifically rejected these arguments as follows: "The concept of forfeiture, subordination, constructive trust, sharing pari passu is all in gross conflict with the terms of the plan and disclosure statement." November Transcript at 52:18-20 [App. at 522, Ex. L.]

16.    On this appeal, it is not enough for the Equity Committee to demonstrate these arguments are plausible. Instead, the *Shenango Group* decision requires the Equity Committee to show that the Bankruptcy Court's view was an abuse of discretion and was "unreasonable under the circumstances" since the law accords "great weight to the Bankruptcy Court's construction of an order with which it is familiar by virtue of its direct involvement in the proceedings." *Shenango Group*, 501 F.3d at 346. The Equity Committee has not attempted to make such a showing and could not do so.

**E.    Background Regarding Reorganized Debtors' Financial Condition.**

17.    In the Clarification Motion, the Debtors alleged that they were insolvent by more than $1 billion, that approximately 90% of their post-confirmation assets had been liquidated, including the best and strongest assets, and that the remaining assets would have to increase in value by more than 300%. The Equity Committee never contested these allegations, but consistently took the position that it had inadequate information to take a position on this issue.

_____

[App. at 550, Ex. M]

It continued to take that position even after its own aircraft expert essentially agreed with the position of the Debtors. [App. at 554, Ex. O.] Notwithstanding such evidence, the Bankruptcy Court, authorized the expenditure of an additional $100,000 (of which only $27,000 was spent) for a further financial investigation, which once completed fully supported the Debtors' position.[10] [Supp. App. at 641, Ex. B.] On June 26, 2007, the Bankruptcy Court entered the Second Clarification Order,[11] which authorized the Debtors to cease setting aside the 5% Payments and further authorized use of the Retained Funds for general corporate purposes, including payments on the New Senior Notes. [App. at 555, Ex. O.] This appeal followed.[12]

## F.    The Bankruptcy Court Serially Increased the Amount of the Equity Committee Fee Cap.

18.    When the Equity Committee was reconstituted, the Bankruptcy Court limited the scope of the Equity Committee's duties and capped its fees accordingly. Notwithstanding the Equity Committee's limited charge, the Equity Committee quickly moved to *double* the fee cap, explaining that it had already exceeded its $100,000 fee cap by $40,000. At the hearing on November 10, 2006, the Bankruptcy Court granted the request in full, providing the Equity Committee an additional cushion of over $60,000 to cover any remaining costs in finalizing any remaining issues regarding solvency and any other actions that the Equity Committee considered appropriate.

---

[10]    The Court also noted that: (i) "I'm convinced – I believe that the fact finding with respect to insolvency is not a difficult issue. I don't think you've got to spend more than $10,000 or $15,000 on that," June Transcript at 44:22-25 [App. at 356, Ex. I], and (ii) "I think a qualified accountant could come in and perhaps in three or four hours walk away and say its hopelessly insolvent," id. at 12:11-13 [App. at 324, Ex. I].

[11]    The Equity Committee apparently concedes that the Bankruptcy Court correctly ruled that the Debtors are forever insolvent as they have not raised it in this appeal.

[12]    On July 7, 2007, the Equity Committee moved for a stay pending appeal. Notwithstanding its serious questions regarding the merits of any appeal, the Bankruptcy Court granted a 90 day stay. The District Court subsequently extended the stay through the conclusion of this appeal.

11

19.    Notwithstanding a caution from the Bankruptcy Court, and seemingly in disregard to the Equity Committee's counsel's statement that he did "not want to treat the debtor's assets like a smorgasbord for professionals," the Equity Committee moved for a second increase in its fee cap in **more than double** the already doubled initial fee cap.  November Transcript at 73:6-8 [App. at 543, Ex. L]  The Bankruptcy Court again increased the cap by an additional $100,000 for the "sole purpose" of permitting further financial investigation (of which only $27,000 was actually expended for the investigation).  [Supp. App. at 642-43, Ex. C.]  The Bankruptcy Court subsequently granted a third increase of the fee cap to $388,393.[13]  [Supp. App. Ex. D.]

**G.    Appeals.**

20.    The Equity Committee filed a Notice of Appeal of the Clarification Orders on July 6, 2007.  The Debtors filed a Notice of Cross Appeal on July 16, 2007.

## IV.  STANDARD OF REVIEW

21.    A district court reviews a bankruptcy courts' factual determination for clear error and its legal conclusions *de novo*.  *In re Kaiser Group Int'l., Inc.*, 307 B.R. 449, 453-54 (D. Del. 2004).  A bankruptcy courts' interpretation of its own orders, including a plan of reorganization and confirmation order, are reviewed for abuse of discretion.  *See In re Shenango Group, Inc.*, 501 F.3d at 345-46 (adopting majority position that a bankruptcy court's interpretation of ambiguous provision in plan of reorganization is reviewed for abuse of discretion).

22.    The ruling in *Shenango Group*, *supra*, is in many ways dispositive of this appeal. There, the Debtor appealed a bankruptcy court order construing an ambiguous provision of its confirmed plan of reorganization.  The Third Circuit initially noted that while construing a confirmed plan involves the application of contract principles,

---

[13]    The increase included use of approximately $73,000 which had not been used for the Equity Committee's financial expert.

> [w]e must be mindful, however, that a confirmed plan of reorganization is an
> order of the bankruptcy court. . . . There is a difference between reviewing the
> straightforward application of contract principles, and reviewing a bankruptcy
> court's interpretation of its own order contained in a confirmed plan of
> reorganization.

*Id.* at 345. The Court then considered and rejected the de novo standard of review,[14] and instead,

agreed with the majority view that "a bankruptcy court's interpretation of its own order ought to

be subject to review for an abuse of discretion." *Id.* at 345. The Court acknowledged that the

deferential standard would not apply to questions of law, and reasoned that such a "bifurcated

approach both ensures the appropriate role of this Court to review de novo pure questions of law,

and also accords great weight to the Bankruptcy Court's construction of an order with which it is

familiar by virtue of its direct involvement in the proceedings." *Id.* at 346.

      23.    The Court thus applied a two step approach. First, the determination whether a

plan is ambiguous is subject to de novo review. Second, if the plan is ambiguous, the Court will

"defer to the Bankruptcy Court's interpretation unless it is unreasonable under the

circumstances." *Id.* On this appeal, the Equity Committee has acknowledged that the plan is

ambiguous and, indeed, has argued at length that the plan is ambiguous thus warranting the

application of state law contract doctrines. (Opening Brief at 20-25). Under these

circumstances, there is no basis for a de novo review. The sole issue is whether the Bankruptcy

Court's construction of the plan is an abuse of discretion in light of the great weight given to the

Bankruptcy Court's interpretation of its own order confirming the Plan.

      24.    Finally, *Shenango Group* dealt with a situation where the Bankruptcy Court found

the plan to be unambiguous and in favor of the winning party and, on appeal, the appellate court

---

[14] For reasons that are not clear, the Equity Committee did not cite *Shenango Group* and, instead, relied almost exclusively on the *Taylor* case in the Second Circuit, which adopted the de novo standard. The Court in *Shenango* rejected the de novo standard as reflected in the Second Circuit's decision in *In re Duplin Corp.*, 212 F.3d 144 (2d Cir. 2000). The *Taylor* Court had relied almost exclusively on *Duplan* in applying the de novo standard.

determined that the plan in fact was ambiguous and whether, under such circumstances, a remand is required. The Third Circuit held that it was not necessary to vacate the Bankruptcy Court's judgment and remand for an interpretation of the Plan because there are findings of fact which were not disputed and which supported the Bankruptcy Court's construction. The Court noted that the Bankruptcy Court had considered the context of the dispute, the provisions of the Plan and the history of negotiations, and the purpose of the pertinent provisions, and thus "deferred to the interpretation of the Bankruptcy Court, which was directly involved in this lengthy and complex proceeding." *Id.* at 348. The same standard should apply here even if, contrary to the Bankruptcy Court, this Court finds the provisions of the plan ambiguous.

## V. THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION BY CONSTRUING THE PLAN TO PRECLUDE PAYMENT OF THE RETAINED FUNDS TO SHAREHOLDERS

25. This appeal concerns the construction of unambiguous provisions of the Plan and Indenture that set forth a condition precedent to Shareholders receiving cash distributions on account of their equity interests. In basic terms, the Plan and Indenture together provide that holders of the Debtors' equity interests may receive a distribution of Available Cash if the distribution would be permitted under applicable law, the Debtors would not be insolvent as a result of the distribution, and the distribution would not be a fraudulent conveyance. Indenture at 26 [App. at 186-87, Ex. C.] The Bankruptcy Court carefully reviewed the Plan, Indenture, Term Sheet describing the Indenture and the Disclosure Statement and concluded that the documents clearly provided that the Shareholders' interests are equity interests, and that as a result of the Debtors' financial condition, the Shareholders are not now, and would never be, entitled to any distribution on account of their equity interests. November Transcript at 52:11-57:16 [App. at 522-27, Ex. L.] The Equity Committee has failed to show that such provisions are ambiguous. However, even assuming *arguendo* that the provisions are ambiguous, as argued by the Equity

14

Committee, the Committee has failed to even allege, much less prove, that the Bankruptcy

Court's interpretation of the Indenture and related documents was an abuse of the Bankruptcy

Court's discretion, as required by *Shenango*.

**A.    The Bankruptcy Court Correctly Interpreted the Terms of the Indenture to Create a Condition Precedent to Payment of the Retained Funds to Shareholders.**

26.    The Equity Committee argues that the Bankruptcy Court misread the provisions

of the Indenture to create a condition precedent to distribution of the Retained Funds to

Shareholders, whereas the provisions should be interpreted as providing only a time for payment,

relying on various state law cases. (Opening Brief at 26-30). As discussed earlier, it is not

enough for the Equity Committee to say that the provisions are ambiguous and that its

interpretation is preferable. Instead, the Committee must show that the Bankruptcy Court's

ruling was "unreasonabl[e] under the circumstances" and constituted an abuse of discretion.

This standard has not and cannot be met.

27.    At the outset, the Equity Committee's position makes no sense. According to the

Committee, the 5% Payments were to be retained by the Debtors but ultimately, regardless of

their financial condition, were to be distributed to Shareholders. (Opening Brief at 26).

However, if the Shareholders in fact had a vested right to receive a payment, there would have

been no purpose in delaying the payments to the Shareholders in the first place. The Equity

Committee's interpretation renders the provision clearly stating that distributions can not be

made if such distributions would be Impermissible Restricted Payments irrelevant.

28.    Even assuming some ambiguity whether the provisions are conditions or timing

rules, there is ample legal support for the Bankruptcy Court's construction of the Indenture. A

condition precedent is "an act or event, other than a lapse of time, which, unless the condition is

excused, must occur before a duty to perform a promise in the agreement arises" *Oppenheimer*

15

*& Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y. 2d 685, 690 (N.Y. 1995). Parties often use language such as "if," "on condition that," "provided that," "in the event that" and "subject to" to make an event a condition, but other words may suffice. Restatement (Second) of Contracts § 226; *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1100 (2d Cir. 1992); *Oppenheimer*, 86 N.Y. 2d at 691 (finding that the language of the agreement unambiguously established an express condition precedent rather than a promise, "as the parties employed the unmistakable language of condition ('if', 'unless and until').").

29.    The Bankruptcy Court correctly found that the Indenture and Plan create conditions precedent to the payment of any dividends to Shareholders. Section 4.07 of the indenture strictly limits the Debtors' ability to make distributions to holders of equity interests. It states that the Debtors shall not "directly or indirectly, make any Restricted Payment, except such Restricted Payments that are permitted or required by Section 4.06 or Section 4.07(b) hereof." Indenture at 28-29 [App. at 188-89, Ex. C]. The Indenture provides, in pertinent part, that "the declaration or payment of any dividend or the making of any distribution on account of [the Debtors] Equity Interests (other than dividends or distributions payable in Equity Interests of the Company) are "Restricted Payments." *See* Indenture at 9-10 [App. at 169-70, Ex. C.] A Restricted Payment becomes an "Impermissible Restricted Payment" where such payment if made by the Company or any of its Subsidiaries, would (i) render such entity insolvent, (ii) be a fraudulent conveyance by such entity or (iii) not be permitted to be made by such entity under applicable law. Indenture at 5 [App. at 165, Ex. C.] Section 4.06(v) of the Indenture provides that in the event that a distribution to, or repurchase of, equity would be:

> "[an] Impermissible Restricted Payment, the Company [FNV Group] shall retain such amounts and any such retained amounts shall accumulate and shall be used to make Restricted Payments at such time or from time to time when such Restricted Payments are not Impermissible Restricted Payments . . . . ."

Indenture at 27 [App. at 187, Ex. C.] Thus, pursuant to the Indenture, the Debtors cannot make any payment to Shareholders. The Bankruptcy Court found these provisions were "clear on this point." See November Transcript at 52:23-24 [App. at 522, Ex. L.].[15] The fact is that the Equity Committee never argues that the Court's interpretation is manifestly unreasonable.

## B.    The Provisions of the Indenture Are Not Merely Timing Provisions.

30.    There is also ample legal support for the Bankruptcy Court's construction of the Plan as creating conditions precedent to distributions rather than limitations placed on the timing of distributions. The Equity Committee relies primarily on the rationale underlying *Grossman Steel & Aluminum Corp. v. Samson Window Corp.*, 54 N.Y. 2d 653 (N.Y. 1981) and *Schuler-Hass Elec. Corp. v. Aetna Cas. & Cur. Co.*, 40 N.Y. 2d 883 (N.Y. 1976) as support for its argument that the Indenture creates a timing limitation. (Opening Brief at 27-28). However, the contracts in question in *Grossman Steel* and *Schuler-Haas* were so-called "pay-when-paid" contracts in the context of contractors and subcontractors. In finding that there was a condition precedent to a payment, the court in *Otis Eastern Service, Inc. v. Raytheon Engineers & Constructors, Inc.*, 15 F. Supp. 2d 318, 322 n.4 (W.D.N.Y. 1998) (resolving a dispute between a contractor and a subcontractor and determining that contractual language that provided that payment would not be made to a subcontractor until a release is executed creates a condition precedent, not mere timing restriction) distinguished the line of cases dealing with "pay-when-paid" provisions by noting that because the present case "was not a situation where a contractor

---

[15] The relief granted by the Bankruptcy Court is contemplated within the four corners of the Plan. As the Equity Committee conceded before the Bankruptcy Court, the Plan provides that "[a]ny distribution made under the Plan that [are unclaimed or undeliverable for a period of one year] shall be revested in the applicable Reorganized Debtor free of any restrictions thereon, and any entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and forever barred." Plan at 38 [App. at 107, Ex. B.]. The Retained Funds are, in fact, "undeliverable" because the conditions precedent to their delivery will never be satisfied. This plan provision applies to **all** distributions under the Plan, and specifically includes distributions to Shareholders.

17

was attempting to transfer risk of nonpayment or default by the owner to the subcontractor. . .the "pay-when-paid" provisions are not relevant to the issue before the court." *See also Hatzel & Buehler, Inc. v. Lovisa Construction Co., Inc.*, 1993 U.S. Dist. LEXIS 9899, *8 (E.D.N.Y. Jul. 20, 1993) (stating that "Schuler-Haas stands **only** for the proposition that absent a clearly expressed intent that no subcontractor has a right to be paid or to sue on a payment bond until the owner has paid the general contractor, a pay when paid clause will not be construed to condition payment of the subcontractor on the general contractor's actual receipt of payment from the owner.") (emphasis added).

31.    The Equity Committee cites to a pair of cases for the proposition that *Grossman Steel* and *Schuler-Haas* are applicable outside of the context of the contractor-subcontractor relationship. (Opening Brief at 28). However, the cases cited by the Equity Committee each concern the timing of payments made to agents pursuant to sales contracts, and thus are both similar to the contractor-subcontractor situation. *See In re JLH, LLC.*, 239 F.3d 366 (5th Cir. 2000) (discussing timing of payment to agent in contract for sale of debtors' real property); *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 1999 WL 705208 (S.D.N.Y. Sept. 10, 1999) (applying *Grossman Steel* to contract between company and outside sales representative). There is no suggestion that the rationale of either *Grossman Steel* or *Schuler-Haas* should apply where, as here, there is no agency relationship.[16]

---

[16] The Equity Committee further argues that *In re O'Hanlon's Will*, 27 N.Y.S. 2d 889 (Sur. Ct. Richmond Cty. 1941) supports its position. (Opening Brief at 29). This case, however, is entirely distinguishable from this case. The *O'Hanlon's Will* case deals with the construction of a specific bequest in a will and whether the language used therein creates a vested right in the devisee or was rather a conditional gift. The Court, relying on the New York law estate law, held that a condition in a will that is likely to occur creates a vested right to the gift. *Id.* at 897-98. There is no discussion of general principles of contract interpretation. Moreover, the Debtors have been unable to locate any case applying *O'Hanlon* outside of the wills context.

32.    To the extent that there is a disputed issue whether the provisions are a condition precedent to payment or a timing provision, the Bankruptcy Court has clearly resolved that issue against the Equity Committee's interpretation. Not surprisingly, the Equity Committee has failed to set forth any argument that the Bankruptcy Court abused its discretion or was clearly erroneous in interpreting the Indenture to create a condition precedent.

## C.    The Bankruptcy Court's Ruling Properly Applied the Rules of Contract Interpretation.

33.    The Equity Committee next argues that the Bankruptcy Court erred by failing to apply New York Law which, the Equity Committee contends, required the Bankruptcy Court to construe the "ambiguous" provisions of the Plan and Indenture against the Debtors, as the drafters of the documents. (Opening Brief at 24-25). The Equity Committee attempts to avoid the clear language of the Plan and Indenture by arguing that the Debtors' conceded that the Indenture was ambiguous by filing the Clarification Motion. (Opening Brief at 20-22). This argument completely misconstrues the relief requested in the Clarification Motion. Thus, notwithstanding the arguments of the Equity Committee, both to this Court and the Bankruptcy Court, the Debtors never suggested, and the Bankruptcy Court refused to find, that there was any ambiguity in the plain language of the Indenture requiring the withholding of the Retained Funds. November Transcript at 52:16-24 [App. at 522, Ex. L.] The only ambiguity in the Plan and Indenture concerns the treatment of the Retained Funds if the conditions precedent to the distribution of the Retained Funds to the Shareholders can never be satisfied. *See* Clarification Motion at 8-9 [App. at 265-66, Ex. F.].[17] Since the Debtors cannot hold the Retained Funds

---

[17] Indeed, the course of dealings among the parties provides strong evidence that all parties considered the language of the Indenture clear. The Debtors have been segregating 5% of Available Cash for later distribution to the Shareholders for several years because such funds could not be distributed because any payment would be an
(Continued)

forever, it is hardly surprising that the Bankruptcy Court construed the Plan to require the Retained Funds to revert to the Debtors in such a situation, and such a construction is not manifestly unreasonable.

34.    Here, the Indenture is clear that distributions to Shareholders are not permitted when the conditions precedent to distribution are not met, but is silent for the situation where the conditions could never be met because the Debtors are insolvent. The Equity Committee relies on the case of *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 149 (2d Cir. 1992), for the proposition that a contract is ambiguous where there is silence as to a particular provision. This entirely misconstrues the holding of *Brass*, which found that the omission of a description of the type of stock issued pursuant to a stock sale contract rendered the clause subject to multiple interpretations and thus was ambiguous. *Id.*

35.    When courts have spoken of an agreement's silence on an issue as having the effect of rendering the agreement "ambiguous," it is only in cases in which the issue is one material to the contract. *Kirschten v. Research Insts. of Am., Inc.*, 1997 U.S. Dist. LEXIS 24037 at *22 n.4 (S.D.N.Y. Jul. 24 1997). The Equity Committee's arguments merely conflated the Indenture's silence with respect to the distribution of funds if certain conditions precedent are not capable of satisfaction with an "ambiguity" in the conditions precedent themselves in an effort to ignore these conditions. As noted above, the Bankruptcy Court examined the language of the Plan and found its meaning to be unambiguous, noting that the provisions of the Plan and Disclosure Statement "together with 4.7 of the indenture, in my view shouts at us when it says there are circumstances, plain and simple, which would preclude any payment to any of the shareholders." Transcript at 57: 8-11 [App. at 527, Ex. L.]. Finally, even assuming that this

_____

Improper Restricted Payment. The Shareholders have never suggested that the Debtors had improperly retained the funds.

creates some ambiguity, there has been no attempt to show that the Bankruptcy Court's construction was manifestly unreasonable.

36.    Furthermore, cases setting forth the principle that an ambiguous provision is construed against the drafter are not readily applicable where, as here, the drafter has no pecuniary interest in the outcome of the litigation.   Most of the cases cited by the Equity Committee concern a two party dispute where the drafter, as counter party to the contract at issue, has some pecuniary interest in the outcome of the case.   (Opening Brief at 24); *see also*, *William A White/Tishman East, Inc. v. Banko.*, 171 A.D.2d 401 (N.Y. App. Div. 1991) (dispute between drafter and counterparty regarding drafter's obligation to pay additional service fees); *Gerlach v. The Horn & Hardart Co.*, 683 F. Supp. 342 (S.D.N.Y. 1988) (two party dispute between employer and employee over whether employer may unilaterally extend the agreement); *Twin City Fire Ins. Co. v. Delaware Racing Assn.*, 840 A.2d 624 (two party dispute between insurance company and owner of a horse racing facility).   The cases cited by the Equity Committee applying this principle to a plan of reorganization similarly arise in two party disputes, mostly between individual debtors and mortgagors.   (Opening Brief at 24-25); *In re Terex Corp.*, 984 F.2d 170 (6th Cir. 1993) (dispute between debtor and insurance carrier); *In re Turek*, 346 B.R. 350 (Bankr. M.D. Pa. 2006) (dispute between chapter 13 debtor and secured lender); *In re Toney*, 349 B.R. 516 (Bankr. E.D. Tenn. 2006); *In re Sims*, 358 B.R. 217 (Bankr. E.D. Pa. 2006) (same).   These cases have no application here and, even if they did, the Bankruptcy Court's construction of the documents is clearly supportable as discussed above. Indeed, in a corporate bankruptcy case, the debtor is normally thought to be aligned with the equity interests and it is extremely doubtful that the rules of construction proposed by the Equity Committee apply.

21

**D.**    **The Bankruptcy Court Properly Relied On The Disclosure Statement As Support For Its Opinion.**

37.    The Equity Committee next argues that the Bankruptcy Court erred in relying on the Disclosure Statement as support for its holding that the Plan and Indenture preclude payments to Shareholders. (Opening Brief at 16-20). There is little question that in construing the terms of a plan of reorganization, a bankruptcy court can rely on all documents drafted at the same time, including the disclosure statement.[18]

38.    The cases cited by the Equity Committee (Opening Brief at 16) do not counsel a different result because they involve the attempted use of a disclosure statement to either vary specific plan language, or as binding admissions when the case was converted to chapter 7. *In re Northwestern Corp.*, 324 B.R. 529, 533-35 (Bankr. D. Del. 2005); (attempting to vary plan language); *In re Bridgepoint Nurseries,* 190 B.R. 215, 222-231 (Bankr. D.N.J. 1996) (attempting to use disclosure statement as binding admission post-conversion to chapter 7). In fact, the Bankruptcy Court's reference to the Disclosure Statement finds strong support in the reference in *Shenango Group* to the fact that the Bankruptcy Court considered the "context of the dispute and the history of negotiations between parties." 501 F.3d at 347. Here, the Bankruptcy Court properly relied on the Disclosure Statement as an aid in construing the Indenture and Plan.

---

[18]    *See, e.g., In re Estill Medical Technologies, Inc*, 2004 WL 1773436, *3 (N.D. Tex. Aug. 20, 2004) ("In determining contractual intent, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another. Thus, the plan and disclosure statement are construed together to ascertain the intent of the parties") (internal citations omitted); *In re Sugarhouse Realty, Inc*, 192 B.R. 355, 363 (E.D. Pa. 1996) ("According to bankruptcy law, the confirmed plan or contract includes 'all documents which were confirmed together to form the contract.' The Sugarhouse Realty confirmed plan or contract therefore includes the Plan, the Agreement of Sale, and the complete Second Amended Disclosure Statement . . .") (internal citations omitted); *In re WorldCom, Inc*, 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006) ("For purposes of interpretation, 'all documents which were confirmed together to form the contract' are added to the Plan itself. Thus, the Plan and the Third Supplement to Debtors' Disclosure Statement should be read together to ascertain the meaning of Plan provisions") (internal citations omitted).The Confirmation Order further supports the Bankruptcy Court's use of the Disclosure Statement. The Confirmation Order provides the Debtors with authority to effectuate the terms of the restructuring transaction as set forth in the Plan, Plan Supplement and Disclosure Statement See Confirmation Order at 19 [Supp. App. at 665, Ex. E.]

## VI. THE BANKRUPTCY COURT CORRECTLY RULED THAT THE
## PLAN DID NOT CREATE A NEW DEBT OBLIGATION

39.     The Equity Committee further argues that the Shareholders' conditional rights to

distributions are debt obligations, not equity, by virtue of the fact that they are provided for in the

Plan. (Opening Brief at 30-32). The Bankruptcy Court reviewed the provisions of the Plan and

flatly rejected this argument.[19] The Bankruptcy Court found that the Plan:

> says, "On and after the distribution date, the legal, equitable and contractual rights
> of holders of allowed interest in class FNV Group 6 (interest), shall remain in
> effect" -- let me just pause. What it says there, the interest remain interest -- i.e.,
> the interest is a stock interest.

November Transcript at 53:6-11 [App. at 523, Ex. L.] The Equity Committee again fails to even

argue that the Bankruptcy Court abused its discretion in reading the plain language of the Plan to

mean that the 5% was a distribution on account of equity interests rather than a debt. Moreover,

even if there was some ambiguity, the Equity Committee does not argue that the obligation is a

debt as a matter of law or that the Bankruptcy Court's conclusion was manifestly unreasonable.

40.     First, the Bankruptcy Court's determination finds direct support in the language of

the Indenture since any argument that the Shareholders have debt-like interests contradicts the

specific language of section 4.06(a)(v) of the Indenture, which authorizes use of Available Cash

to (A) pay an intercompany note that ultimately reduces principal of the New Senior Notes and

(B) make distributions on account of Equity Interests, which are used "to make Restricted

---

[19] The Equity Committee here also argues that the obligation is debt because it is discussed at one point in the Disclosure Statement under the heading relating to limitations or inability to "Repay Debt." (Opening Brief at 19). However, it is standard in contract construction and interpretation that section headings are inserted for convenience of reference only and are not intended to modify or restrict any of the terms or provisions of the agreement. In this regard, the Disclosure Statement specifically provides that "all summaries are qualified by the Plan itself, which is controlling in the event of any inconsistency." Disclosure Statement at 2 [App. at 6, Ex. A.]. In addition, section 13.11 of the Plan specifically provides that headings in the Plan are "for convenience and reference only and not intended to be a part of or affect the interpretation of the Plan." Plan at 45 [App. at 114, Ex. B.] Because the Indenture clearly states that distributions to Shareholders are Restricted Payments and not debt, the Equity Committee's reference to a section heading in the Disclosure Statement is unavailing.

Payments unless the making of any such payment would be an Impermissible Restricted Payment." Indenture at 26-27 [App. at 186-87, Ex. C.] This section clearly distinguishes payment of a debt and equity distributions, and completely negates the notion that the 5% Payment is a debt. Moreover, the proviso to section 4.06(a)(v)(B) says that payment under section (A) requires a distribution or "retention" under (B). *Id.* In other words, there was no absolute obligation to pay anything. The only possible reference of the term "retention" in the proviso was to the withholding of any distribution that would be an Impermissible Restricted Payment.[20]

41.    Further support for the Bankruptcy Court's construction is found in the purpose of the provision. Section 4.06 reflects the principles of the absolute priority rule that shareholders should not receive payments when the debtor is insolvent and will be unable to pay creditors in full. Thus, it is not surprising that the conditions in the definition of Impermissible Restricted Payments -- i.e.., insolvency, fraudulent conveyance, and not permitted under applicable law -- are parallel with provisions of Delaware law which limit distributions to shareholders. The purpose of the retention provision was clearly to prevent distributions to Shareholders if FINOVA Group was in financial distress (as measured by these conditions), but to provide a period of time during which the situation might change and distributions could then be made. It is significant that in the volumes of paper filed by the Equity Committee, it has never offered any credible explanation of any purpose for the retention provision which is consistent with an

---

[20]    On two occasions, the Committee has inserted the language "on their behalf" in reference to the term "retention" in the proviso to section 4.06(v). (Opening Brief at 26, 36). However, there is no indication that the funds were being held on behalf of any particular party, and no basis for this language. Here there was no set aside, escrow or trust arrangement which might be expected if the funds were being retained specifically for Shareholders as suggested by the Equity Committee. The more logical reading of the term "retention" is that the funds should be retained pending further developments − i.e. to see whether they should be paid to shareholders if the financial situation improved or used by the Debtors to pay creditors.

24

eventual distribution of the funds to Shareholders regardless of the financial condition of the Debtors.  Finally, the Court's construction finds support in the little discussed provision of section 4.06(a)(v)(y) which provides that if a Default or Event of Default has occurred and is continuing, the Debtors shall retain the funds and use them to make Restricted Payments at such time or times that the Default or Event of Default is no longer continuing.[21]  The Equity Committee has not argued that the 5% Payment could ever be made if there were a Default or Event of Default. This again suggests that the retention provision was designed to preserve the ultimate priority of the obligations to creditors over Shareholders.

42.    Second, there is absolutely no language in the Plan, Disclosure Statement or Indenture to support the Equity Committee's argument that the Plan changes its pre-petition equity interest into post-petition debt. Quite the contrary, the Bankruptcy Court found that the Plan and related documents clearly described the rights of Shareholders to the 5% payment as a conditional distribution on account of their equity interests and not as a debt. For example, the Bankruptcy Court examined the Disclosure Statement and found that the provisions thereby clearly designate the payment as a "Dividends" as a "distribution[] to stockholders" which is subject to "meeting legal requirements for distributions to stockholders . . . ." Disclosure Statement at. 41-42  [App. at 48-49, Ex. A.].  Also, as noted, the Indenture specifies the 5% Payment as a "Restricted Payment" – i.e., a distribution on account of equity interests. Indenture at 26-27 [App. at 186-87, Ex. C.] Indeed, the only authorization for making the payment at all is

---

[21] While this clause appears in the final form of the Indenture and is quoted by the Equity Committee in the Opening Brief (see Opening Brief at 9), it was not in the form of Indenture submitted as part of the Plan Supplement, and thus is not in the form of the Indenture in the Appendix.

a limited conditional carve out from the general prohibition on Restricted Payments.[22]  Indenture

at 188-89 [App. at 40-41, Ex. C.]

43.    The Indenture specifically describes the obligation to shareholders as a Restricted

Payment, and a Restricted Payment is defined as a "dividend or the making of any distribution

on account of the Company's Equity Interests . . . ," or the purchase, redemption or acquisition of

equity interests.    These definitions are especially significant because they parallel the

distributions which may be made to shareholders under Delaware law – a purchase, redemption

or acquisition (8 Del. C. §160(a)), dividend (8 Del. C. § 170(a)), or reduction of capital (8 Del.

C. § 244).    Significantly, each of these forms of distributions to Shareholders under Delaware

law is subject to conditions which are similar to those which would make the payments to

Shareholders an Impermissible Restricted Payment under the Indenture – e.g., 6 Del. C. § 1304

(fraudulent conveyance law), 8 Del. C. § 244(b) (reductions in capital not permitted when

remaining assets are insufficient to pay debt), 8 Del. C. § 160 (redemption subject to conditions

in section 244); and 8 Del. C. § 170 (dividends payable out of surplus or net profits; the

Reorganized Debtors have neither).    Thus, contrary to the Equity Committee's assertions that the

fact that the Shareholders hold shares in FNV Group has no bearing on the determination of

whether a distribution is equity or debt, the Bankruptcy Court held that Shareholders' only right

to payment is "on account of equity."  November Transcript at 54:15-20 [App. at 524, Ex. L.]  In

short, the Shareholders have a conditional contractual right to payment on account of their equity

---

[22]  Under the terms of the Indenture, distributions to Shareholders constitute "Restricted Payments" and
FNV Group specifically covenanted not to make any Restricted Payments except as permitted by Section 4.06 or
Section 4.07(b) of the Indenture.  Indenture at 30 [App. at 190, Ex. C.]  Rather than an absolute right of payment,
Section 4.06(a)(v) of the Indenture grants the Shareholders only a contingent right to payment by providing that
FNV Group will *not* make any distributions to Shareholders if "the making of any such Restricted Payment would
be an Impermissible Restricted Payment  . . ."  *Id*  As such, there is a condition precedent to the Reorganized
Debtors making of, and the Shareholders right to receive, distributions – that the making of the distribution must not
(i) render the Reorganized Debtors insolvent, (ii) be a fraudulent conveyance or (ii) be prohibited under applicable
law.  Indenture at 5 [App. at 165, Ex. C.].

holdings. *See Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 525 (5th Cir. 2004) (finding that the terms "claim" and "debt" "obviously do not include a right to payment based on an equity security or other interest in the debtor arising from capital contributions" and that "[j]ust because the 'interest in the debtor gives rise to a right to payment does not make that interest a claim.'" ); *citing In re Georgetown Bldg. Assocs.*, 240 B.R. 124, 139 (Bankr. D.D.C. 1999).

44.    Rather than attempt to argue that any particular provision of the Plan or Indenture transforms the Equity Interests into debt, the Equity Committee relies on a line of cases for the proposition that any post-confirmation distribution from a debtor is automatically a debt obligation. (Opening Brief at 31-32). However, the cited cases each deal with the treatment of **creditors** who receive set distributions under confirmed plans of reorganization and the Equity Committee inappropriately applies their holdings to distributions to **shareholders**. By the Equity Committee's own admission, *In re Consumers Realty & Development Co., Inc*, 238 B.R. 418, 425 (8th Cir. BAP 1999) and *In re Penrod*, 169 B.R. 910, 916 (Bankr. N.D. Ind. 1994), all dealt with the discharge of pre-confirmation *debt* and the creation of new obligations to *creditors* under a confirmed plan and did not address the treatment of shareholders or dividends or distributions "on account of equity." (Opening Brief at 30). Here, the Shareholders were **not** creditors of the Debtors and were **not** holders of pre-confirmation debt that was discharged. As such, the authority cited by the Equity Committee is clearly distinguishable.

45.    Moreover, following the Equity Committee's logic that *all* distributions under a plan, whether to creditors or shareholders, are debt obligations simply because they are set forth in a confirmed plan, leads to an absurd result. For example, certainly a plan provision providing for a distribution on preferred stock does not transform such stock into a debt instrument because distributions were provided for in a plan. Here, the Plan clearly identifies the distribution as a

27

Restricted Payment – *i.e.*, a "dividend or the making of any distribution on account of the Company's Equity Interests. . ." Indenture at 19-10 [App. at 169-70, Ex. C.].

46.     Third, the Bankruptcy Court's finding that the distribution obligation is not a debt is also supported by the case law.     As the Equity Committee acknowledges, a plan of reorganization creates a "new contract" and all prior obligations and rights of the parties are extinguished and replaced by the plan.  (Opening Brief at 30.)  As such, case law discussing the necessary attributes or indicia of contractual obligations that should be present in a contract for such obligations to constitute "debt" are relevant to the present dispute.  S*ee, e.g., Carrieri v. Jobs.com, Inc.*, 393 F.3d 508 (5th Cir. 2004) (finding that the terms "claim" and "debt" "obviously do not include a right to payment based on an equity security or other interest in the debtor arising from capital contribution"); *Geftman v. Commission of Internal Revenue*, 154 F.3d 61 (3d Cir. 1998) (setting forth the criteria by which to judge whether an investment is a debt).

47.     In *Geftman v. Commission of Internal Revenue*, 154 F.3d 61 (3d Cir. 1998), the court noted that "[t]he necessary intent to create a bona fide indebtedness can be inferred not only from expressions of the parties intentions, but also from objective aspects of the transaction such as the presence *vel non* of notes or other debt instruments, security or collateral, interest charges, repayment schedules or deadlines, book entries recording loan balances or payments, actual repayments, or any other factors indicative of an unconditional obligation to repay." *Id.* at 70; *see also Fin Hay Realty Co. v. United States,* 398 F.2d 694, 696 (3d Cir. 1968).   The Bankruptcy Court, examined the "objective aspects of the transaction" as set forth in *Geftman*, held that neither the Disclosure Statement, Plan, nor the Indenture provide the slightest hint of a "bona fide indebtedness."   Indeed, there are no notes or debt instruments, security or collateral, interest charges, repayment schedules or deadlines, book entries recording loan balances or

payments, actual repayments or other factors indicating an "unconditional obligation to repay." Instead, the Plan, Disclosure Statement and Indenture consistently describe the distributions as Restricted Payments on account of equity interests. A clearer evidence of intent is hard to imagine.[23]

48.    In short, the Bankruptcy Court found that the 5% Payment was not a debt, and this finding is supported by the Indenture and case law analyzing the characteristics of debt. There is no showing that this determination is manifestly unreasonable as is required by the *Shenango Group* decision.

### VII. THE PLAN CANNOT BE CONSTRUED TO ALLOW FOR THE PAYMENT OF DISTRIBUTIONS TO THE SHAREHOLDERS

49.    The Equity Committee next argues that, the Bankruptcy Court erred by finding that the distributions to Shareholders on account of their equity interests would forever be an "Impermissible Restricted Payment." (Opening Brief at 33-36). The Equity Committee concedes that the Indenture specifically prohibits the distributions to Shareholders if (a) FNV Group would be rendered insolvent, (b) the payment would be a fraudulent conveyance or (c) the payment would "not be permitted to be made by such entity under applicable law."[24] (Opening Brief at 33) Again, the Equity Committee has not shown that these conditions have been met as a matter of law, and has failed to show that the Bankruptcy Court's determinations were

---

[23]    Indeed, if the sixteen factors identified in *Geftman*, none is suggestive of debt but many indicate the contrary. Thus, ostensible creditors and shareholders are the same and, indeed, the "purported debt" travels with the shares (#2), there is no formal indicial of debt (#7), no interest is paid (#10), there is a contingency on repayment (#11), there is no payment schedule or fixed maturity date (#13), and there was no advance but, instead, the obligation was granted specifically to Shareholders *qua* Shareholders as part of the Plan (#16). Indeed, in light of the clear and express contingency on the obligation to pay the Shareholders the distributions, the Shareholders cannot show that the Reorganized Debtors have undertaken an "unconditional obligation to repay." Given the lack of any formal indicia showing otherwise, there is no basis for The Equity Committee's claim that the Shareholders are the holders of debt.

[24]    Similarly, any subsidiary of FNV Group would be prohibited from making a Restricted Payment if such Restricted Payment would render it insolvent. Indenture at 5 [App. at 165, Ex. C.]

29

manifestly unreasonable. In fact, the Bankruptcy Court's ruling finds broad support in the Indenture and applicable law.

## A.    The Distinction Between Dividends and Distributions is Not Relevant.

50.    The Indenture prevents any distribution to the Shareholders if it is "not permitted to be made by [FNV Group] . . . under applicable law." Indenture at 5 [App. at 165, Ex. C.] FNV Group is a Delaware corporation and therefore the appropriate "applicable law" governing any distribution to Shareholders is the Delaware General Corporation Law ("DGCL"). The Equity Committee attempts to draw a distinction between the treatment of a "dividend" and the treatment of a "distribution on account of equity." (Opening Brief at 33-34). Whether described as dividends or any other distribution to Shareholders on account of their equity interest, however, the distributions are prohibited by Delaware law. Indeed, the decision of the Bankruptcy Court did not rest on whether the distributions to Shareholders permitted by the Indenture are "dividends" because, regardless of the name ascribed, the DGCL and the Indenture prohibit the Reorganized Debtors from making such distributions. Finally, the Indenture, itself, described Restricted Payments in terms of dividends and distributions on account of equity, not dividends alone.

## B.    The Bankruptcy Court Correctly Found that Distribution of the Retained Funds Would Violate Delaware Law.

51.    The Equity Committee argues that the distribution of the funds in the Segregated Account to the Shareholders is not a prohibited dividend under the DGCL, but rather is a distribution of the productive assets of a company made pursuant to an order of the Court, thereby constituting a "return of capital." (Opening Brief at 35-36) Here, the Indenture permits "distributions in respect of . . .Equity Interests . . . to make Restricted Payments," which are specifically defined as dividends, distributions on account of equity or redemptions or

repurchases of stock. Indenture at 9-10 [App. at 169-70, Ex. C.]. . Delaware corporate law does not even contain a provision dealing with distributions of "productive assets." Regardless of what they are called, the conditional distributions to holders of equity interests on account of such interests are prohibited by the Indenture.[25]

52.    Most importantly, however, The Equity Committee completely ignores the fact that even if such distributions were somehow deemed to be a return of capital, the DGCL still prohibits FNV Group from making such distributions. Any return of capital by a company, by definition, must reduce the capital of the company. Section 244 of the DGCL, which governs the ability of a Delaware corporation to reduce its capital, provides that

> ". . .no reduction of capital shall be made or effected unless the assets of the corporation remaining after such reduction shall be sufficient to pay any debts of the corporation for which payment has not been otherwise provided."

As discussed above, FNV Group is insolvent and cannot reduce its capital because there will not be sufficient assets remaining to pay its debts. In short, the distributions to Shareholders are Impermissible Restricted Payments which cannot be made.

## C.    Any Distributions Made While the Debtors Were Insolvent Would be Fraudulent Conveyances.

53.    Distributions to Shareholders are not permitted if such payment would "be a fraudulent conveyance by such entity." It is well established that payments or distributions on

---

[25] The Equity Committee further attempts to rely on *Fulweiler v. Spruance*, 222 A.2d 555 (Del. Ch. 1966) for the proposition that a distribution of "income producing" assets is not a distribution. (Opening Brief at 32 n 9) This reliance is misplaced. Fulweiler id not involve the legality of a payment to shareholders by a corporation or even the character of the distribution as debt or equity by the corporation; instead, the dispute was between a former husband and wife regarding a divorce agreement which treated dividends and returns of capital differently. Ultimately, the Court analyzed the nature of a distribution of GM stock that duPont holding company made to its shareholders when forced by court order to divest itself of GM stock and found that the distribution of GM stock was a return of capital (a court-ordered distribution of income producing assets). But the Court did not decide, and had no reason to decide, whether the payment constituted payment of a "debt," and the Court was not asked to decide whether the distribution was prohibited under applicable law. Moreover, regardless of the nature of the obligation, the distribution here – whatever its character – is subject to specific conditions.

31

account of equity interests are classic fraudulent conveyances and are not for "reasonably equivalent value" under either section 548 or Delaware law. *See, e.g.*, *In re Brentwood-Lexford Partners, LLC,* 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003) (interpreting section 548 to apply to dividends); *In re Trace International Holdings, Inc.*, 289 B.R. 548, 560-561 (Bankr. S.D.N.Y. 2003) (finding dividend voidable under Delaware law and section 548 of the Bankruptcy Code) (internal citations omitted); *see also, In re Color Tile, Inc.*, 2000 WL 152129 at *5 (D. Del. Feb 9, 2000) (finding that a dividend declared by an insolvent Delaware corporation is not "lawful" and is not an "antecedent debt" under fraudulent transfer law) *rev'd on other grounds*, 278 B.R. 366 (D. Del. 2002).

54.    The Equity Committee attempts to circumvent the clear implication of Delaware fraudulent transfer law by arguing that any distribution of the Retained Funds would not be a fraudulent transfer because the distribution would be on account of an antecedent debt – i.e., that the Plan created a fixed obligation at confirmation, and thus, Delaware Code section 170 applies to the situation. (Opening Brief at 34-36). That section provides that the restriction on dividends shall not:

> invalidate or otherwise effect a note, debenture or other obligation of the corporation paid by it as a dividend on shares of its stock, or any payment made thereon, if at the time such note, debenture or obligation was delivered by the corporation, the corporation has either surplus or net profits . . . From which the dividend could lawfully be paid.

Del. C. § 170. The Equity Committee's reliance on this carve out is misplaced. First, as discussed above, the Reorganized Debtors have not issued a note or created a debt obligation in favor of the Shareholders. Second, even if this Court was inclined to find that such a debt obligation was created, such obligation would not have been created on the date of the Confirmation Order, as the Equity Committee asserts, but rather on the date that the payment to the Shareholders was first due. As described above, section 4.06(a)(v)(B) provides that

32

Available Cash may be used to "make Restricted Payments." The use of "make" clearly refers to the date of the proposed distribution; it does not suggest payment of an already existing obligation. And, as of such date, the Reorganized Debtors had neither surplus nor net profits, which is why the Reorganized Debtors have been retaining funds in the Segregated Account since the very first payments on account of the New Senior Notes. Moreover, no payment could ever be made until prior provisions of the waterfall were satisfied, which occurred several years after confirmation. Third, the Equity Committee's arguments assume that the dividend was declared at confirmation without any showing that the Board in fact declared such a dividend or could have declared such a dividend. In fact, the 5% payment could not be made to shareholders as a matter of corporate law unless authorized by the Board. There is no showing that the Bankruptcy Court's rejection of the argument that there was a fixed obligation at confirmation was manifestly unreasonable.

**D.    The Bankruptcy Court Correctly Found That The Debtors' Financial Condition Prevents the Debtors From Making the Restricted Payments.**

55.    The Indenture clearly prevents distributions to Shareholders if such payment would "render [FNV Group] insolvent." Here, the Bankruptcy Court found that the FNV Group was "forever insolvent." Certainly, The Equity Committee cannot seriously argue that a distribution which would render FNV Group insolvent cannot be made, but the payment can be made if it is already insolvent. Instead, distributions to Shareholders are now and will always be Impermissible Restricted Payments which cannot be made under the Indenture.

56.    The assertion that the Shareholders are entitled to the distribution because the Debtors declared the dividend at the time they confirmed the Plan, and Delaware law actually prevents the Debtors from now refusing to make the payment (Opening Brief at 34) is, as shown

33

above, not applicable and directly contradicted by the plain language of the Plan, Indenture, Disclosure Statement and Term Sheet.

## VIII. THE BANKRUPTCY COURT'S RULING DOES NOT EFFECT AN IMPERMISSIBLE FORFEITURE

57.    The Equity Committee frequently argues that the Reorganized Debtors are trying to bring about a "forfeiture," but all of these arguments simply ignore the specific language in the Plan. (Opening Brief at 22-24). Indeed, the Equity Committee's argument is essentially that any contractual condition to payment effects a "forfeiture." (Opening Brief at 23) The term "forfeiture" has been defined as "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance on the expectation of that exchange." *Oppenheimer & Co., Inc. v. Oppenheim, Appel , Dixon & Co.*, 86 N.Y. 2d at 691 n.2 (citing Restatement (Second) of Contracts at § 229 comment b. Here, however, the Shareholders' property interest at issue is merely a conditional right to payment, which does not change as a result of the bankruptcy.[26] The Debtors have not sought to alter this interest. The failure of a condition precedent to occur, however, does not effect a forfeiture. Indeed, because the conditions in precedent to payment are never capable of being satisfied, the Shareholders will never have a vested right to receive a distribution which is capable of forfeiture.

58.    The Equity Committee relies on case law that states that New York courts will not interpret provisions that are ambiguous on their face to effect a forfeiture. (Opening Brief at 22-23). However, in the present case there is neither a forfeiture nor ambiguous language for the

---

[26] The Equity Committee argues that Shareholders have a property interest in the right to receive payments. However, that property interest is in their conditional rights to payment under the Indenture. The problem here is that the Shareholders are not content with their existing property interest and want to delete the conditions which limit that interest.

Court to interpret. The Court in *Oppenheimer* clearly stated that interpretation of the terms of a contract as a means of reducing the risk of forfeiture cannot be employed if "the occurrence of the event as a condition is expressed in unmistakable language." *Id.* (citing Restatement (Second) of Contracts § 299, comment a, at 185; § 227, comment b (where language is clear, "(t)he policy favoring freedom of contract requires that, within broad limits, the agreement of the parties should be honored even through forfeiture results."). As discussed above, the terms of the Plan unambiguously state that there are conditions precedent to the making of a distribution to Shareholders. This is the "agreed upon exchange" and the fact that the Shareholders will never receive a distribution because the conditions precedent cannot be satisfied does not allow the Equity Committee to rewrite the Plan and create a better deal. Moreover, even if there is some ambiguity as suggested by the Committee, there is no showing that the Bankruptcy Court's rejection of the forfeiture argument was manifestly unreasonable.

## I. CROSS APPEAL -- THE COURT ERRED IN RECONSTITUTING THE EQUITY COMMITTEE AND ENTERING THE FEE CAP ORDERS.

59.     Notwithstanding the obvious evidence that Shareholders were not entitled to receive any distributions pursuant to the Plan and Indenture and, as a result of the Debtors' financial condition, would never be entitled to receive distributions, the Bankruptcy Court ordered the Equity Committee to be reconstituted and subsequently increased the amounts the Debtors were required to pay to the Equity Committee three-fold. The Equity Committee should not have been reconstituted and the increases should have been denied.

### A.     The Bankruptcy Court Erred in Appointing the Equity Committee

60.     This Court has held that appointment of an equity committee should be the exception, and not the rule. *See Exide Techs. v. Wis. Inv. Bd.*, 2002 U.S. Dist. LEXIS 27210 *4 (D. Del. Dec. 23, 2002). Indeed, an equity committee should not be appointed unless:

35

(i) there is a substantial likelihood that [shareholders] will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee.

*Id.* (citing *In re Williams Communications Group, Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002)). Indeed, a bankruptcy court will not appoint an equity committee where the debtor is hopelessly insolvent. *See, e.g.*, *In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 140 (Bankr. S.D. Cal. 2003) (stating that "[s]hareholders committees should be appointed when equity holders establish there is a substantial likelihood that they will receive a meaningful distribution in the case."); *In re Williams Communications Group, Inc.*, 281 B.R. at 220 (stating that "the debtor's solvency is a major factor when considering the cost of appointing an equity committee."); 7 *Collier on Bankruptcy* ¶ 1102.03[2][a] (15th ed. rev. 2005) ("The threshold consideration . . . in determining whether to appoint a committee of equity security holders is whether there is sufficient equity in the estate to justify the cost and expense of a separate committee.").

61. In the case at bar, the Bankruptcy Court appointed the Equity Committee notwithstanding the moving Shareholders' failure to demonstrate the likelihood of any recovery, much less a chance of a "meaningful recovery." Indeed, the Debtors filed the Clarification Motion as a result of being hopelessly insolvent, a fact which was never credibly challenged throughout the proceedings below. Notwithstanding this situation, the Bankruptcy Court failed to make any finding that the Equity Committee was necessary to protect the interests of the Shareholders, and approved reformation of the Equity Committee notwithstanding the fact that that certain shareholders had both the interest, ability and resources to advocate the Shareholders' interests in respect of the Clarification Motion. [See Supp. App. at 638, Ex. A (finding only "good and sufficient cause").] Thus, First Carolina Corp. a large shareholder, had filed a substantive objection to the Clarification Motion prior to the Bankruptcy Court's decision

36

to reconstitute the Equity Committee. Since (i) there was little chance that there would ever be a distribution to Shareholders and (ii) certain Shareholders showing their willingness and ability to bear the expense of litigating the Clarification Motion, the Bankruptcy Court clearly erred in appointing the Equity Committee.

**B.    The Bankruptcy Court Erred By Entering The Fee Cap Orders.**

62.    The Bankruptcy Court further erred by granting the Fee Cap Orders. In appointing the Equity Committee, the Bankruptcy Court specifically found that the Equity Committee's role was neither complicated nor time consuming, and therefore its fees should be capped to avoid unreasonable expenditures:

> It seems to me that the factual issue that we talked about [at] the outset of this hearing [e.g., insolvency] is not going to require a significant amount of professional help. Point number one.
>
> Point number two, I think it's really a legal issue and the objection that's already on file here did a pretty effective job in raising some interesting issues. So I don't even think that the legal issues are going to require a lot of work by whatever counsel is retained by the Committee. So I don't view this as a complicated matter that going to take a lot of time. And therefore, I'm going to put a cap on the professional fees.

June Transcript at 38:6-19 [App. at 350, Ex. I.] Given the limited scope and the Bankruptcy Court's charge, the expenses incurred by the Equity Committee were simply unreasonable and failed to provide any benefit to the Debtors' estate.[27] The Equity Committee and its counsel had a very limited set of tasks: (a) arguing the legal issues in connection with the Clarification Motion, (b) investigating the issues connected with the Reorganized Debtors' insolvency, and (c) investigating whether the Reorganized Debtors would be forever insolvent. The Equity

---

[27] While not directly applicable to the post-confirmation period, Section 330 of the Bankruptcy Code limits compensation of professional persons such that a professional retained in a chapter 11 case, including those retained by an equity committee, only receive "reasonable compensation for actual, necessary services . . . ." 11 U.S.C. § 330(a)(1)(A). Here, the Bankruptcy Court found that the $100,000 was reasonable compensation given the limited scope of the Equity Committee's charge.

RLF1-3226616-1

Committee made no showing of any sort, and the Bankruptcy Court never found, that the $100,000 initial Fee Cap was not adequate for such a purpose.

63.    In addition, the orders granting the serial increases in the fee cap should be reversed. In granting the increases, the Bankruptcy Court expressed reservations about the positions taken by the Equity Committee and, on several occasions, intimated further increases would not be authorized. Indeed, counsel for the Equity Committee stated that he did "not want to treat the debtor's assets like a smorgasbord for professionals . . . ." November Transcript at 73:7-8 [App. at 543, ex. L.] However, notwithstanding such statements, the Equity Committee ultimately sought four times the amount of the initial Fee Cap. Each time, the Equity Committee failed to show, and the Bankruptcy Court failed to find, that the additional expenses were reasonable or necessary. It is significant that each order granting an increase in the Fee Cap failed to find that the prior amounts awarded were inadequate, that there was a change in circumstances requiring more fees, or that there was some necessity for granting of fees.[28]

64.    Moreover, in failing to make any findings, the Bankruptcy Court disregarded its own prior statements as well as a number of objections the Debtors raised to the Fee Orders. In short, the Fee Cap Orders do not reflect reasonable or justified expenses and they should be reversed.[29]

---

[28] See First Fee Order at 1 [Supp. App. at 640. Ex. B] (finding only that the relief requested was in the "best interests" of the Debtors and Shareholders); Second Fee Cap Order at 1 [Supp. App. at 642, Ex. C] (finding only "cause" for the relief); Third Fee Cap Order at 1 [Supp. App. at 45. Ex. D] (finding only that the relief requested was in the "best interests" of the Debtors and Shareholders).

[29] These included: (a) the Court found the Clarification Motion involved the construction of the Indenture any opposition would not require extensive legal research, (b) the Court ultimately described the Committee's arguments as irrelevant and off the wall, thus there was little benefit to the estate from the research conducted, (c) the Equity Committee had the benefit of the work of First Carolina, and agreed to use that as a starting point, June Transcript at 45:9-10 [App. at 357. Ex. I], (c) there were virtually no factual issues and minimal discovery, (d) a significant portion of the fees were incurred after the Bankruptcy Court initially rendered its decision construing the Indenture, (e) the fees included substantial amounts for committee contact activities, (f) the fees expended in objecting to additional relief sought by the Debtors, to "preserve" the Equity Committee's rights were excessive, and
(Continued)

**C.    The Appointment and Increases of Fees On Behalf of the Equity Committee Violate the Absolute Priority Rule.**

65.    The Fee Cap Orders are especially unreasonable in light of the Debtors' insolvency, meaning that every cent paid over to the Equity Committee reduces the recoveries of creditors.   The absolute priority rule provides, in brief, that unless a class consents, no junior class of claims or interests can receive a distribution unless the senior class is paid in full.   See, e.g., 11 U.S.C. § 1129(b)(2)(B).   Indeed, the Third Circuit recently stressed the importance of the absolute priority rule in the context of a plan of reorganization where one class of creditors attempted to "gift" a portion of their recovery to a junior class of creditors.   *See In re Armstrong World Indus. Inc.*, 432, F.3d 507 (3d. Cir. 2005).   In *Armstrong*, the Third Circuit flatly rejected a plan of reorganization where one class of creditors attempted to give a piece of their recover to a junior class of creditors where an intermediate class was not paid in full.   This corresponds with the general rule that "no equity committee should be appointed when it appears that a debtor is hopelessly insolvent because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift."   *In re Emons Industries, Inc.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985).

66.    In this case, there was no challenge to the fact that the Debtors were insolvent, yet the Bankruptcy Court entered the Fee Cap Orders, granting nearly $400,000 to investigate the Clarification Motion.   By shifting a significant portion of the creditors' recovery to benefit equity, the Bankruptcy Court has plainly violated the absolute priority rule.   This dollar-for-dollar reduction in the amount of the creditors' recovery violates provisions regarding

---

(g) there were numerous items of duplication and inefficiencies.   *See* Debtors Statement for Status Conference of June 26, 2007, dated June 22, 2006, at 4-6 (Bankr. D.I. 216) [Supp App., Ex. F at 688-90].

RLF1-3226616-1

Impermissible Restricted Payments, discussed earlier, and the absolute priority rule. Thus, the Bankruptcy Court's increases of the Fee Cap should be reversed.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Debtors respectfully request the Court enter an order (i) affirming the Clarification Order, (ii) reversing the order reconstituting the Equity Committee and the Fee Cap Orders and (iii) granting such other relief as may be just and necessary.

Dated:  November 21, 2007
       Wilmington, Delaware

                    Mark D. Collins (No. 2981)
                    Jason M. Madron (No. 4431)
                    RICHARDS, LAYTON & FINGER, P.A.
                    One Rodney Square
                    920 North King Street
                    Wilmington, Delaware  19801
                    Telephone:  (302) 658-6541
                    Telecopy:  (302) 658-6548

                    -and-

                    Jonathan M. Landers
                    Robert K. Dakis
                    GIBSON, DUNN & CRUTCHER LLP
                    200 Park Avenue
                    New York, New York  10166
                    Telephone:  (212) 351-4000
                    Telecopy:  (212) 351-4035

                    *Attorneys for Appellees The FINOVA Group Inc.*
                    *and FINOVA Capital Corporation*

40

## CERTIFICATE OF SERVICE

I, Jason M. Madron, do hereby certify that on November 21, 2007 a copy of the foregoing

**Appellee's Response to Appellant's Opening Brief and Opening Brief on Cross-Appeal** was

served on the following party and in the manner indicated on the attached service list:

Jason M. Madron (Bar No. 4431)

## FINOVA Capital Corporation - Service List

**Via Hand Delivery**

David Buchbinder, Esq.
Office of the United States Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE  19801


William D. Sullivan, Esq.
WILLIAM D. SULLIVAN, LLC
4 East 8th Street, Suite 400
Wilmington, DE  19801

**Via First Class Mail**

Jonathan M. Landers, Esq.
Robert J. Dakis, Esq.
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166


Mark D. Silverschotz, Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY  10020