## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| THE FINOVA GROUP, INC., and<br>FINOVA CAPITAL CORPORATION, | Case No. 01-0698 (PJW) |
| Reorganized Debtors. | |
| OFFICIAL COMMITTEE OF EQUITY<br>SECURITIES HOLDERS of FINOVA GROUP,<br>INC., | |
| Appellant, | |
| v. | Civil Action No. 07-480 (JJF) |
| THE FINOVA GROUP INC. and<br>FINOVA CAPITAL CORPORATION, | Bankruptcy Case No. 01-698<br>AP 07-70 |
| Appellees. | |

## SUPPLEMENTAL APPENDIX OF EXHIBITS TO APPELLEE'S RESPONSE TO APPELLANT'S OPENING BRIEF AND OPENING BRIEF ON CROSS-APPEAL

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 658-6541
Telecopy: (302) 658-6548

-and-

Jonathan M. Landers
Robert K. Dakis
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Telecopy: (212) 351-4035

Dated: November 21, 2007
    Wilmington, Delaware

*Attorneys for Appellees The FINOVA Group
Inc. and FINOVA Capital Corporation*

## Index of Exhibits

A.    Order Directing the Office of the United States  Trustee to Appoint an Official
      Committee of Equity Security Holders For A Limited Purpose
      and Granting Related Relief (June 17, 2005) (Bankr. D.I. 48)............................638

B.    Order Pursuant to Section 328 of the Bankruptcy Code Increasing the
      Cap Previously Imposed on Fees and Expenses of the Equity
      Committee (January 3, 2006) (Bankr. D.I. 93)....................................................640

C.    Order (Related Dkt. Item No. 194) (February 6, 2006) (Bankr. D.I. 205) ..........642

D.    Order Pursuant to Section 327(E) of the Bankruptcy Code Increasing
      the Cap Previously Imposed on Fees and Expenses of the Equity
      Committee (July 26, 2007) (Bankr. D.I. 225)......................................................645

E.    Corrected Order Confirming the Third Amended and Joint Plan of
      Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code
      (August 10, 2001) (*In re Finova Group*, 01-0697, Bankr. D. Del) ....................647

F.    Debtors' Statement for Status Conference of June 26, 2007
      (June 22, 2007) (Bankr. D.I. 216).......................................................................685

## Unreported Decisions

G.    *Exide Techs. v. Wis. Inv. Bd.*, 2002 U.S. Dist. LEXIS 27210
      (D. Del. Dec. 23, 2002)........................................................................................692

H.    *Hatzel & Buehler, Inc. v. Lovisa Construction Co., Inc.*,
      1993 U.S. Dist. LEXIS 9899 (E.D.N.Y. Jul. 20, 1993)..................................695

I.    *In Re Color Tile, Inc.*, 2000 WL 152129 (D. Del. Feb 9 2000)...........................700

J.    *In re Estill Medical Technologies, Inc.*, 2004 WL 1773436
      (N.D. Tex. Aug. 4, 2004).....................................................................................706

K.    *In re Stock Exchanges Options Trading Antitrust Litigation*,
      2005 U.S. DIST. LEXIS 13734 *23 (S.D.N.Y. Jul. 11, 2005)......................710

L.    *Kirschten v. Research Insts. of Am., Inc.*,
      1997 U.S. Dist. LEXIS 24037 (S.D.N.Y. Jul. 24, 1997) ................................725

M.    *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 1999 WL 705208
      (S.D.N.Y. Sept. 10, 1999)....................................................................................749

1

# **EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                     Chapter 11

**FINOVA CAPITAL CORPORATION,**           Case Nos. 01-0698 (PJW)

      Reorganized Debtor.           **Re: Docket Nos. 33, 35 and 39**

## ORDER DIRECTING THE OFFICE OF THE UNITED STATES TRUSTEE TO APPOINT AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR A LIMITED PURPOSE AND GRANTING RELATED RELIEF

This matter coming before the Court on the Motion of Eugene Linden for an Order Which Recognizes the Continued Existence of the Official Committee of Equity Holders, or in the Alternative for the Reconstitution of the Equity Committee, for the Limited Purpose of Responding to the Debtors' Motion for an Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan [Docket No. 33] (the "Motion"); and Rozann Chernov having filed a joinder to the Motion [Docket No. 35] (the "Joinder"); and the above-captioned reorganized debtor (the "Reorganized Debtor") having objected to the relief sought in the Motion [Docket No. 39] (the "Objection"); and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and a hearing on the Motion, the Joinder and the Objection having been held before the Court on June 10, 2005 (the "Hearing"); and after due deliberation and good and sufficient cause appearing therefor,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    Pursuant to section 105(a) of title 11 of the United States Code, the Office of the United States Trustee for the District of Delaware is hereby directed, pursuant to 11 U.S.C.

**638**

§ 1102, to appoint an Official Committee of Equity Security Holders (the "Equity Committee")

in the above-captioned chapter 11 case for the limited and exclusive purpose of reviewing and, if

it deems appropriate, objecting to the Motion of the Reorganized Debtor for an Order Under

Bankruptcy Code Section 1141 Clarifying the Provision of Confirmed Plan [Docket No. 22] (the

"Clarification Motion").

        3.     Within 7 days of its selection, counsel for the Equity Committee shall

meet and confer with counsel for the Reorganized Debtor with respect to a schedule for

additional briefing and a hearing on the Clarification Motion.

        4.     The Reorganized Debtor shall be responsible for the satisfaction of the

allowed fees and expenses incurred by the Equity Committee and its professionals (including,

without limitation, its attorneys, accountants, investment bankers and other advisors) in

responding to the Clarification Motion; provided, however, that in no event shall the

Reorganized Debtor's liability for the Equity Committee's or its professionals' fees and expenses

exceed $100,000 absent further order of the Court.

        5.     This Court shall retain jurisdiction to interpret and enforce the terms of

this Order.

Dated: _____ , 2005
Wilmington, Delaware

_____
THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

**639**

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FINOVA CAPITAL CORPORATION | : | Case Nos. 01-0698 (PJW) |
| | : | |
| Reorganized Debtor | : | Jointly Administered |
| | : | |
| | : | **Related to: D.I. 69** |
| | : | |

## ORDER PURSUANT TO SECTION 328 OF THE
## BANKRUPTCY CODE INCREASING THE CAP
## PREVIOUSLY IMPOSED ON FEES AND EXPENSES
## WHICH CAN BE INCURRED ON BEHALF OF THE EQUITY COMMITTEE

Upon the application (the "Application") of the Official Committee of Equity

Security Holders (the "Equity Committee"), on behalf of the shareholders (the "Equity Holders")

of Finova Group, Inc., the corporate parent of the above-captioned reorganized debtor (the

"Reorganized Debtor"), for an order, pursuant to section 328 of title 11 of the United States Code

(the "Bankruptcy Code), increasing the aggregate limit initially placed by this Court on the

amount of fees and expenses that the Equity Committee and its professional are authorized to

incur in responding to the Motion of the Reorganized Debtor for an Order Under Bankruptcy

Code Section 1141 Clarifying Provision of Confirmed Plan [Docket No. 22] (the "Clarification

Motion"), and the Court being satisfied, based upon the representations made in the Application,

that the relief requested therein is in the best interest of the Reorganized Debtor and the Equity

Holders; and it further appearing that appropriate Notice of the Application has been given, and

that no other or further notice need be given; and after due deliberation and sufficient cause

appearing therefore, it is

**640**

**ORDERED** that the initial aggregate limited placed on the amount of fees and expenses that the Equity Committee and its professionals are authorized to incur in responding to the Clarification Motion is hereby increased to $200,000; and it is further

**ORDERED** that the Reorganized Debtor's liability for the Equity Committee's and/or its professionals' fees shall not exceed $200,000 absent further order of the Court; and it is further

**ORDERED** that this Court shall retain jurisdiction to interpret and enforce the terms of this Order.

Dated: December 30, 2005
      Wilmington, Delaware

HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

2

641

# <u>EXHIBIT C</u>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FINOVA CAPITAL CORPORATION, | : | Case Nos. 01-0698 (PJW) |
| | .: | |
| Reorganized Debtor. | : | (Jointly Administered) |
| | : | |

### ORDER (Related Dkt. Item No. 194)

This matter coming before the Court on the *Application for an Order, Pursuant to Section 327(E) of the Bankruptcy Code and Fed.R.Bankr.P.2017, Increasing the Cap on Fees and Expenses Which Can Be Incurred on Behalf of the Equity Committee* (the "Motion") and the *Request for Entry of Final Order in Clarification Motion Contested Matter* ("Request"); the Court having reviewed the Motion, the responses to the Motion and Request, and all related pleadings; and having heard the statements of counsel and the testimony of Richard Ross with respect thereto at a hearing held before the Court on January 29, 2007 (the "Hearing"); the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish sufficient cause for the limited relief granted herein; and for the reasons stated by the Court on the record at that Hearing,

IT IS HEREBY ORDERED as follows:

1.      The Motion is Granted to the extent set forth below.

2.      The current aggregate limit placed on the amount of fees and expenses that the Equity Committee and its professionals are authorized to incur in responding to the *Motion of the Reorganized Debtor for an Order under Bankruptcy Code Section 1141 Clarifying the Provision of the Confirmed Plan* [D.I. 22] and the *Reorganized Debtor's Request for Entry of Final Order in Clarification Motion Contested Matter* [D.I. 196] is hereby increased to $300,000 for the sole

purpose of the Equity Committee retaining a financial consultant (the "Financial Consultant") to evaluate the Reorganized Debtor's contention that it is presently insolvent and will remain insolvent permanently.  No part of this incremental increase in the aggregate limit shall be used for reimbursement of the outstanding fees and expenses of the Equity Committee's counsel.

3.    The Reorganized Debtor shall be responsible for the payment of the fees and expenses incurred by the Financial Consultant who shall submit requests for payment of such fees and expenses to the Reorganized Debtor on a monthly basis.

4.    On or before March 30, 2007, the Financial Consultant will provide the Equity Committee and the Debtors with his opinion and/or report with respect to the Reorganized Debtor's contention that it is presently insolvent and will remain insolvent permanently.

5.    The Court will hold a status conference on both the Motion and the Request following the Financial Consultant's report to the Equity Committee.  The status conference will be scheduled at the convenience of the parties.

6.    With respect to the request for an increase in aggregate limit on the attorneys' fees and expenses incurred by the Equity Committee, counsel to the Equity Committee is directed to submit its outstanding invoices for fees and expenses to the Reorganized Debtor for review.  The Court will consider matters relating to that part of the Motion seeking reimbursement of the Equity Committee's outstanding attorneys' fees and the Request of the Reorganized Debtors at the status conference to be scheduled pursuant to the previous paragraph.

7.    This Court shall retain jurisdiction to interpret and enforce the terms of this Order.

643

Dated: _Nov. 6_, 2007
Wilmington, Delaware

_____
The Honorable Peter J. Walsh
United States Bankruptcy Judge

3

644

# EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                        :      Chapter 11

                             :

FINOVA CAPITAL CORPORATION    :      Case Nos. 01-0698 (PJW)

                             :

       Reorganized Debtor        :      Jointly Administered

                             :

                             :      RE: Docket No. *224, 196, 194*

## ORDER PURSUANT TO SECTION 327(E) OF THE BANKRUPTCY CODE INCREASING THE CAP PREVIOUSLY IMPOSED ON FEES AND EXPENSES WHICH CAN BE INCURRED ON BEHALF OF THE EQUITY COMMITTEE

Upon the application (the "Application") of the Official Committee of Equity

Security Holders (the "Equity Committee"), on behalf of the shareholders (the "Equity Holders")

of Finova Group, Inc., the corporate parent of the above-captioned reorganized debtor (the

"Reorganized Debtor"), for an order, pursuant to section 327(e) of title 11 of the United States

Code (the "Bankruptcy Code), increasing the aggregate limit placed by this Court on the amount

of fees and expenses that the Equity Committee and its professionals are authorized to incur in

responding to and addressing the issues raised in the Motion of the Reorganized Debtor for an

Order Under Bankruptcy Code Section 1141 Clarifying Provision of Confirmed Plan [Docket

No. 22] (the "Clarification Motion"), and the Court being satisfied, based upon the

representations made in the Application, that the relief requested therein is in the best interest of

the Reorganized Debtor and the Equity Holders; and it further appearing that appropriate Notice

of the Application has been given, and that no other or further notice need be given; and after

due deliberation and sufficient cause appearing therefore, it is

**ORDERED** that the aggregate limit placed on the amount of fees and expenses

that the Equity Committee and its professionals are authorized to incur in responding to the

NYDOCS1-846323.1

Clarification Motion is hereby increased from $300,000 to $388,813 and, notwithstanding any limitations on the use of the funds within the aggregate limit referenced in the Court's order of February 6, 2007, all funds within such aggregate limit may be used for, among other things, reimbursement of the outstanding fees and expenses of the Equity Committee's counsel, and it is further

**ORDERED** that the Reorganized Debtor shall be responsible for the payment of the fees and expenses incurred by the Equity Committee's professionals up to the aggregate limit set forth in this Order, and it is further

**ORDERED** that the Reorganized Debtor's liability for the Equity Committee's and/or its professionals' fees and expenses shall not exceed $388,813 absent further order of the Court; and it is further

**ORDERED** that this Court shall retain jurisdiction to interpret and enforce the terms of this Order.

Dated: July, _6_, 2007
         Wilmington, Delaware


HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT E

# ORIGINAL

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE FINOVA GROUP INC., <br> FINOVA CAPITAL CORPORATION, <br> FINOVA (CANADA) CAPITAL CORPORATION, <br> FINOVA CAPITAL PLC, <br> FINOVA LOAN ADMINISTRATION INC., <br> FINOVA MEZZANINE CAPITAL INC., <br> FINOVA PORTFOLIO SERVICES, INC, <br> FINOVA TECHNOLOGY FINANCE, INC., AND <br> FINOVA FINANCE TRUST, | Case Nos. 01-0697 (PJW) through <br> 01-0705 (PJW) <br><br> Jointly Administered |
| Debtors. | |

*CORRECTED* ✱
## ORDER CONFIRMING THE THIRD AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WHEREAS, The FINOVA Group Inc. ("FNV Group") and its affiliated debtors

and debtors in possession (together with FNV Group, collectively, the "Debtors") having filed the

Third Amended and Restated Joint Plan of Reorganization of Debtors Under Chapter 11 of the

Bankruptcy Code (as amended and supplemented, the "Plan")[1] and the Third Amended and

Restated Disclosure Statement with Respect to Joint Plan of Reorganization of Debtors Under

Chapter 11 of the Bankruptcy Code (the "Disclosure Statement"), each dated as of June 13, 2001;

and

WHEREAS on July 20, 2001, the Debtors filed the Plan Supplement with respect

to the Plan, and on August 1, 2001, the Debtors filed the Supplement to Exhibit 7.1 to the Plan

Supplement, and on August 3, 2001, the Debtors filed the Amendment to Exhibits 7.1 and 7.1 to

the Plan Supplement, on August 10, 2001, the Debtors filed the Amended and Restated Plan

---

[1]    Unless otherwise defined, capitalized terms used herein shall have the meanings set forth
    in the Plan.

2346260_2.DOC 8/10/01 10:18 AM

✱ *Corrected to show signature date is August 10, not August 9.*

852

647

Supplement, on August 10, 2001, the Debtors filed the Amended and Restated Plan Supplement with respect to the Plan (collectively, and together with further amendments to the Plan Supplement filed prior to the Effective Date, the "Plan Supplement"); and

WHEREAS, on August 8, 2001, the Debtors filed their Technical Amendments to the Plan (the "Plan Amendments"); and

WHEREAS, on August 10, 2001, the Debtors filed the Revised Technical Amendment to Third Amended and Restated Joint Plan of Reorganization of Debtors Dated as of June 14, 2001 (together with the August 8 Plan Amendments, the "Plan Amendments"); and

WHEREAS the Plan as supplemented and amended by the Plan Supplement and the Plan Amendments constitutes the "Plan" that is before this Court for purposes of confirmation; and

WHEREAS, on June 14, 2001, upon finding that the Disclosure Statement satisfied the requirements of section 1125 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), after due notice and hearings, this Court entered an order (the "Disclosure Statement Order"), inter alia, approving the Disclosure Statement, approving the form of ballots and master ballots and solicitation procedures, fixing the voting deadline at 5:00 p.m. (Mountain Standard Time) on August 1, 2001, fixing the deadline for objecting to confirmation of the Plan at 4:00 p.m. on August 3, 2001, fixing the Confirmation Hearing for August 10, 2001 at 9:30 a.m., and approving the forms of notice to be sent to each Class of Claims or Interests, including the notice of the Confirmation Hearing (the "Confirmation Notice"), all in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure; and

WHEREAS, Claudia King & Associates, Inc., the Voting Agent, caused to be transmitted to all known creditors and equity holders the Disclosure Statement, the Disclosure

Statement Order, the Confirmation Notice, and related solicitation materials on or before June

25, 2001, and such transmission is attested to in the following affidavits, each of which were

filed with the Clerk of this Court: (i) Affidavit of Mailing re Solicitation and Notification

Package for Debtors' Third Amended and Restated Disclosure Statement with Respect to Joint

Plan of Reorganization, (referring to certain solicitation packages distributed by King &

Associates); (ii) Affidavit of Mailing re Solicitation and Notification Package for Debtors' Third

Amended and Restated Disclosure Statement with Respect to Joint Plan of Reorganization

(referring to certain solicitation packages distributed by the Covington Group); (iii) Affidavit of

Mailing re Solicitation and Notification Package for Debtors' Third Amended and Restated

Disclosure Statement with Respect to Joint Plan of Reorganization (referring to certain

solicitation packages distributed by the Covington Group); (iv) Affidavit of Mailing re

Solicitation and Notification Package for Debtors' Third Amended and Restated Disclosure

Statement with Respect to Joint Plan of Reorganization (referring to the solicitation packages

distributed by Apple Direct Mail Center); and (v) Affidavit of Mailing re Solicitation and

Notification Package for Debtors' Third Amended and Restated Disclosure Statement with

Respect to Joint Plan of Reorganization (referring to certain solicitation packages distributed by

King & Associates) (the foregoing affidavits collectively referred to herein as the "Mailing

Affidavits"); and

WHEREAS, the Debtors caused the Confirmation Notice to be published in the

national editions of USA Today, The Wall Street Journal, and The New York Times on or before

July 2, 2001, and such publication is attested to in the Affidavits of Publication of Hearing to

Consider Confirmation of Joint Plan of Reorganization of Debtors Under Chapter 11 of the

Bankruptcy Code, filed on July 10, 2001, with the Clerk of this Court; and

2346260_2.DOC 8/10/01 10:18 AM          3

WHEREAS, the Debtors filed the affidavit of Claudia King , sworn to on August 8, 2001, attesting to the tabulation of all ballots received on or before the Voting Deadline from holders of Claims and Interests entitled to vote on the Plan[2] and the supplemental affidavit of Claudia King, sworn to on August 9, 2001, attesting to the tabulation of all ballots received on or before August 9, 2001 at 5:00 p.m. (MST) from the holders of TOPrS entitled to vote on the Plan (collectively, the "King Affidavit"); and

WHEREAS, the King Affidavit reflects that the Plan obtained the requisite acceptances for each Debtor and from each Class to support Confirmation of the Plan;

WHEREAS, the Court received those objections to Confirmation of the Plan set forth in the Summary of Debtors' Responses to Objections to Confirmation of Third Amended and Restated Joint Plan of Reorganization, dated August 8, 2001; and

WHEREAS, the Debtors have entered into the following stipulations resolving certain objections to claims for voting purposes only: (i) Stipulation Resolving Response of Creditor Consolidated Rail Corporation to Debtors' Omnibus Objection to Claims for Voting Purposes Only, dated August 10, 2001, and (ii) Stipulation Resolving Limited Objection of U.S. Bank Trust National Association to Debtors' Omnibus Objection to Claims for Voting Purposes, dated August 10, 2001; and

---

2    The Debtors note that, pursuant to the Disclosure Statement Order, only holders of claims not subject to any objection are entitled to vote upon the Plan. Pursuant to the Debtors' Omnibus Objection to Claims for Voting Purposes Only, dated June 20, 2001, which was served upon all recipients of any Solicitation Package or Notice Package pursuant to the Disclosure Statement Order, the Debtors have objected to all claims (i) to the extent that that they were not listed on the Schedules; (ii) to the extent that that they were listed on the Schedules as contingent, unliquidated or disputed or (iii) if listed on the Schedules and not listed as contingent, unliquidated or disputed, but asserted in excess of the scheduled amount, then to the extent of such excess (the "Disputed Claims"). Votes cast by holders of Disputed Claims were not considered in the tabulation of votes to accept or reject the Plan.

2346260_2.DOC 8/10/01 10:18 AM            4

WHEREAS, the Debtors have entered into stipulations and agreements resolving

certain filed and informal objections to the Plan (together with the stipulations referenced in the

preceding paragraph, the "Plan Stipulations"), as follows:

(a) Stipulation and Order Regarding Claims of the Bank of Nova Scotia, as Administrative Agent, Against FINOVA (Canada) Capital Corporation;

(b) Stipulation and Order Regarding Claims of (I) ABN Amro Bank, N.V., Individually and as Agent and (II) the Prepetition Lenders to FINOVA Capital PLC Against FINOVA Capital PLC and FINOVA Capital Corporation;

(c) Letter Agreement resolving objections to confirmation of Plan by Aransas County, Arlington, Balch Springs, Bastrop CAD, Bexar County, Bosque County, Brownsville ISD, Caldwell CAD, Cameron County, Carrollton, Dallas County, Denton, DeSoto, DeWitt County, Ector County, El Paso, Fort Bend County, Fort Bend ISD, Frisco, Gonzales County, Grayson County, Gregg County, Hamilton CAD, Harris County, Hidalgo County, Houston, Houston ISD, Hunt County, Jefferson County, Kermit ISD, Lamar CISD, Madison County, McAllen, Montgomery County, New Braunfels ISD, Nueces County, Pharr-San Juan-Alamo ISD, Rockwall CAD, Rockwall County, Roma ISD, Sherman, Smith County, Stephenville, Stephenville ISD, Tarrant County, Victoria County, Wilkler County, and Yoakum ISD;

(d) Letter Agreement resolving objections to confirmation of the Plan by County of Anderson, Bastrop I.S.D., Tax Appraisal District of Bell County, County of Bowie, County of Brazor, City of Bryan, Bryan I.S.D., County of Comal, County of Denton, County of Henderson, County of Kendall, Midland Central Appraisal District, County of Wilbarger, City of Vernon, Vernon Legional Junior College, and Veron I.S.D;

(e) Stipulation Resolving Louisiana Department of Revenue's Objection to Confirmation of the Joint Plan of Reorganization of Debtors Under Chapter 11 of the Bankruptcy Code;

(f) Stipulation Resolving Objection of CalFox, Inc. to the Third Amended and Restated Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code, Specifically to the Cure Amount;

(g) Stipulation Resolving Golden Corral Corporation's Limited Objection to Confirmation of the Third Amended Plan of Reorganization; and

(h) Stipulation and Order re Claims of BNP Paribas and Chase Manhattan Bank. ⟵ (the "FINOVA plc Stipulation")

WHEREAS, the Debtors submitted the Affidavit of William J. Hallinan, the President and Chief Executive Officer of the Debtors (the "Hallinan Affidavit"), and the Affidavit of Todd R. Snyder, Managing Director of Rothschild Inc., financial advisor and investment banker to the Debtors (the "Snyder Affidavit"), both in support of the Debtors' Plan; and

WHEREAS, the Debtors filed a memorandum of law in support of confirmation of the Plan (the "Confirmation Memorandum"), and a summary of evidence in support of confirmation of the Plan (the "Offer of Proof"); and

WHEREAS, the Confirmation Hearing was held on August 10, 2001;

NOW, THEREFORE, the Court having considered the King Affidavit, the Hallinan Affidavit, the Snyder Affidavit, the Confirmation Memorandum, the Offer of Proof, the Disclosure Statement and the Exhibits thereto, the record of the Confirmation Hearing, all other papers filed in support of the Plan and in response to objections and the entire record of these Chapter 11 Cases, and after due deliberation thereon and sufficient cause therefor;

IT IS HEREBY FOUND AND DETERMINED that:

1.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

2.      To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

3.      Jurisdiction (28 U.S.C. § 157(b)(2)). This Court has jurisdiction under sections 157 and 1334(a) and (b) of title 28 of the United States Code to consider confirmation of

the Plan and all provisions thereof. Confirmation of the Plan is a core proceeding under 28

U.S.C. § 157(b)(2) and this Court has jurisdiction to enter a final order with respect thereto.

4.      Transmittal and Mailing of Materials; Notice. The Disclosure Statement,

notice of the Confirmation Hearing, Disclosure Statement Order, and the ballots were transmitted

and served in compliance with the Disclosure Statement Order and the Bankruptcy Rules and

such transmittal and service were adequate and sufficient. As described in the Mailing

Affidavits, all parties required to be given notice of the Confirmation Hearing (including notice

of the deadline for filing and serving objections to confirmation of the Plan) have been given due,

proper, timely, and adequate and sufficient notice of such hearing in accordance with the

Bankruptcy Rules and the Disclosure Statement Order, and have had an ample opportunity to

appear and be heard with respect thereto, and no further notice is required.

5.      Voting. Votes to accept and reject the Plan have been solicited and

tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the

Bankruptcy Rules, the Disclosure Statement Order and industry practice, including with respect

to procedures used for extension of certain deadline and acceptance of transmission of certain

votes of TOPrS holders by electronic means.

6.      Plan Compliance With Bankruptcy Code (11 U.S.C. § 1129(a)(1)). The

Plan complies with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules

thereby satisfying 11 U.S.C. § 1129(a)(1).

a.      Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)). The Plan provides

for separate Classes of Claims and Classes of Interests as appropriate for each of the Debtors.

Classification of these Claims and Interests in each Plan is proper and consistent with Section

1122 of the Bankruptcy Code because each Claim and each Interest classified in such Classes is

2346260_2.DOC 8/10/01 10:18 AM              7

substantially similar to the other Claims and Interests therein and a reasonable basis exists for each classification in the Plan. The Plan properly complies with the subordination provisions of section 510(b) of the Bankruptcy Code with respect to the Claims in Classes FNV Group-7 (Equity Securities § 510(b) Claims), FNV Capital-5 (Debt Securities § 510(b) Claims) and FNV Mezzanine-6 (Equity Securities § 510(b) Claims). The Plan thereby satisfies Section 1123(a)(1) of the Code.

b.    Specified Treatment of Unimpaired Classes (11 U.S.C. §§ 1123(a)(2)). The Plan specifies that Classes FNV Group-1, FNV Group-2, FNV Group-4, FNV Group-5, FNV Capital-1, FNV Capital-2, FNV Capital-6, FNV Canada-1, FNV Canada-2, FNV Canada-3, FNV Canada-4, FNV UK-1, FNV UK-2, FNV UK-3, FNV UK-4, FNV UK-5, FNV Loan-1, FNV Loan-2, FNV Loan-3, FNV Loan-4, FNV Loan-5, FNV Mezzanine-1, FNV Mezzanine-2, FNV Mezzanine-3, FNV Mezzanine-4, FNV Portfolio-1, FNV Portfolio-2, FNV Portfolio-3, FNV Portfolio-4, FNV Portfolio-5, FNV Technology-1, FNV Technology-2, FNV Technology-3, FNV Technology-4, FNV Technology-5, FNV Trust-1, FNV Trust-2, FNV Trust-3 and FNV Trust-4 (the "Unimpaired Classes") are not impaired under the Plan, thereby satisfying Section 1123(a)(2) of the Bankruptcy Code.

c.    Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). The Plan specifies the treatment of each impaired Class under the Plan; specifically, FNV Group-3, FNV Group-6, FNV Group-7, FNV Capital-3, FNV Capital-4, FNV Capital-5, FNV Mezzanine-5, FNV Mezzanine-6, FNV Trust-5 and FNV Trust-6 (the "Impaired Classes"), thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

d.    No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same treatment for each Allowed Claim or Allowed Interest in each respective Class unless the

2346260_2.DOC 8/10/01 10:18 AM          8

654

holder of such Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying Section 1123(a)(4) of the Bankruptcy Code.

      e.      <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>. Articles VII and IX of the Plan and the various documents and agreements set forth in the Plan Supplement provide adequate and proper means for implementation of the Plan by providing for the implementation of the Restructuring Transactions, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

      f.      <u>Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6))</u>. The Plan provides for each of the Reorganized Debtors to be governed by the New Corporate Documents which, among other things, will prohibit the issuance of non-voting equity securities, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

      g.      <u>Designation of Corporate Officers and Directors (11 U.S.C. § 1123(a)(7))</u>. The initial board of directors of Reorganized FNV Group and Reorganized FNV Capital as it is comprised as of the Effective Date shall be Ian M. Cumming; Joseph S. Steinberg, Lawrence S. Hershfield; R. Gregory Morgan; G. Robert Durham, Kenneth R. Smith; and one member designated by the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee"). The boards of directors of the other Reorganized Debtors shall be constituted as set forth in the Plan Supplement. The executive officers of each of the Reorganized Debtors on the Effective Date shall be those persons designated in the Plan Supplement. These provisions are consistent with the interests of creditors and equity security holders and consistent with public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

h.    Impairment of Classes (11 U.S.C. § 1123(b)(1)).  In accordance with section 1123(b)(1) of the Bankruptcy Code, Article V of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests under the Plan.

i.    Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).  In accordance with section 1123(b)(2) of the Bankruptcy Code, the Plan provides for the (a) assumption as of the Effective Date of all executory contracts and unexpired leases to which such Debtor is a party including, but not limited to, the contracts and leases specified in Exhibit 7.2 to the Plan filed in the Plan Supplement, except the contracts and leases specified in Exhibit 7.1 to the Plan filed in the Plan Supplement, with cure payments to be made on the Distribution Date, and (b) rejection as of the Effective Date of the executory contracts and unexpired leases specified in Exhibit 7.1 of the Plan.

j.    . Settlement of Claims (11 U.S.C. § 1123(b)(3)):  In accordance with section 1123(b)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, the settlements and compromises reflected in the following motions and stipulations in aid of Confirmation of the Plan are hereby authorized and approved in all respects:  (i) the Securities Settlement Motion (as defined in the Hallinan Affidavit), (ii) Stipulation and Order Regarding Claims of ABN AMRO Bank, N.V., Individually and as Agent; and the Prepetition Lenders to FINOVA Capital PLC Against FINOVA Capital PLC and FINOVA Capital Corporation, dated August 9, 2001, and (iii) Stipulation and Order Regarding Claims of the Bank of Nova Scotia, as Administrative Agent, Against FINOVA (Canada) Capital Corporation, dated August 9, 2001.

7.    <u>Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>.
The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby

satisfying section 1129(a)(2) of the Bankruptcy Code.

8.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors have

proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying

section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts and

records of this case, the Disclosure Statement and the hearing thereon, and the record of the

Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  All matters relating

to the Plan and the confirmation thereof have been fully disclosed, and there are no special

arrangements, amounts to be paid, or transactions not provided for in the Plan and the Plan

Documents.

9.    <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>.
Any payment made or to be made by any Debtor for services or for costs and expenses in or in

connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter

11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby

satisfying section 1129(a)(4) of the Bankruptcy Code.

10.    <u>Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))</u>.  The

requirements of section 1129(a)(5) of the Bankruptcy Code are satisfied because (a) the Debtors

have identified, in the Disclosure Statement and the Plan Supplement, the identity and affiliations

of any individual proposed to serve as a director or executive officer of any Reorganized Debtor,

and the Debtors participating in the Plan, (b) the appointment to, or continuance in such office of

such individual is consistent with the interests of creditors and equity security holders and with

public policy, and (c) the Debtors have disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider.

      11.    <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>.  The Debtors are not subject to any governmental regulatory commissions and section 1129(a)(6) of the Bankruptcy Code is therefore inapplicable.

      12.    <u>Best Interests of Creditors Test (11 U.S.C. § 1129(a)(7))</u>.  The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  Specifically:

      a.    The liquidation analysis provided in the Snyder Affidavit and the Disclosure Statement is satisfactory and has not been controverted by other evidence.

      b.    As evidenced by the Snyder Affidavit, with respect to each impaired Class, each holder of a Claim against or an Interest in a Debtor either has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is significantly more than such holder would receive or retain if such Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.  No class has made an election under section 1111(b)(2) of the Bankruptcy Code.

      13.    <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>.  The Unimpaired Classes are unimpaired under the Plan, are conclusively deemed pursuant to section 1126(f) to have voted to accept the Plan, and therefore satisfy section 1129(a)(8)(B).  Of the Impaired Classes, holders of Claims and Interests in Classes FNV Group-3, FNV Group-6, FNV Capital-3, FNV Capital-4, FNV Mezzanine-5, FNV Trust-5 and FNV Trust-6 have affirmatively voted to accept the Plan by the requisite majorities that meet the acceptance requirements of sections 1126(c) and (d).  As to each of these classes, the requirements of section 1129(a)(8)(A) have been satisfied.  No holders of Claims or Interests in the Securities Litigation Classes held allowed

claims or interests eligible to vote. Accordingly, the Securities Litigation Classes did not vote to accept the Plan by the requisite statutory majorities. Nonetheless, as to such Classes, the Plan may be confirmed under the cram-down provisions of section 1129(b) of the Bankruptcy Code.

14.    Treatment of Administrative and Tax Claims (11 U.S.C. § 1129(a)(9)). The treatment of Administrative Claims and Priority Tax Claims under Article II of the Plan satisfies the requirements of sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, and the treatment of Other Priority Claims under Sections 5.1(b), 5.2(b), 5.3(b), 5.4(b), 5.5(b), 5.6(b), 5.7(b), 5.8(b) and 5.9(b) of the Plan satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code.

15.    Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10)). Section 1129(a)(10) of the Bankruptcy Code is satisfied with respect to the Plan for each Debtor as follows:

a.    With respect to the Plan for FNV Group and FNV Mezzanine, there are no impaired non-insider classes of Claims which were eligible to vote on the Plan, making the requirements of section 1129(a)(10) inapplicable;

b.    With respect to the Plan for FNV Capital, more than a majority in number and two-thirds in dollar amount of the non-insider Creditors voted to accept the Plan;

c.    With respect to the Plan for FNV Canada, FNV UK, FNV Loan, FNV Portfolio, FNV Technology and FNV Trust, there are no impaired classes of Claims and the requirements of section 1129(a)(10) are inapplicable.

16.    Feasibility (11 U.S.C. § 1129(a)(11)). As evidenced by the Snyder Affidavit and the Disclosure Statement (including the 10-K and 10-Q reports attached as Exhibits J and K thereto), except with respect to FNV Trust, confirmation of the Plan is not likely to be

followed by the liquidation, or the need for further financial reorganization, of the Reorganized

Debtors or any successors thereof, and there is a reasonable prospect that the Debtors will meet

their financial obligations under the Plan, the Debtors will have sufficient cash on hand at

Confirmation and cash flow to (a) make all payments required under the Plan upon Confirmation,

(b) repay the Berkadia Loan and pay the New Senior Notes as and when they become due, and

(c) fund the costs and expenses of the operations of the Reorganized Debtors. The Plan itself

calls for the liquidation of FNV Trust; therefore, confirmation of the Plan is not likely to be

followed by the need for further financial reorganization of FNV Trust. For these reasons, the

Plan satisfies (or eliminates the need to consider) section 1129(a)(11) of the Bankruptcy Code

with respect to each of the Debtors.

      17.    Payment of Fees (11 U.S.C. § 1129(a)(12)). All fees under 28 U.S.C. §

1930 presented to date have been paid or provided for, thereby satisfying section 1129(a)(12) of

the Bankruptcy Code. Such fees shall be paid postconfirmation to the extent required by 28

U.S.C. § 1930.

      18.    Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)). Sections

7.3(c) and 7.3(g) of the Plan provide for the continuation after the Effective Date of payment of

all retiree benefits, as that term is described in section 1114 of the Bankruptcy Code, thereby

satisfying the requirements of section 1129(a)(13) of the Bankruptcy Code.

      19.    Identification of Plan Proponents (Fed. R. Bankr. P. 3016(a)). As required

by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the Plan proponents.

      20.    Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b)).

Pursuant to section 1129(b) of the Bankruptcy Code, the Court finds that the Plan does not

discriminate unfairly with respect to each of Class FNV Group-7, Class FNV Capital-5 and Class

FNV Mezzanine-6 (collectively referred to as the "Securities Litigation Classes") because the treatment of such Classes is mandated by the Bankruptcy Code and there are no other Classes of Claims or Interests that are substantially similar to the Securities Litigation Classes that are treated differently therefrom. The Plan is fair and equitable with respect to the Securities Litigation Classes because the holders of such Claims shall receive property of a value equal to the allowed amount of their respective Claims. Thus, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to each of the Classes described above.

21.     Principal Purpose of Plan (11 U.S.C. § 1129(d)). The principal purpose of the Plan is not the avoidance of taxes and no party in interest that is a governmental unit has so alleged.

22.     Assumption and Rejection (11 U.S.C. § 365(b)). Article VII of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code.

23.     Conditions to Confirmation. The conditions to confirmation set forth in Section 11.1 of the Plan (i.e., approval of the Disclosure Statement, the Commitment Letter and the Management Agreement) have been satisfied.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT,

24.     Amendments. The modifications of the plan reflected in the Plan Amendment meet the requirements of Sections 1127(a) and (c), such modifications do not adversely change the treatment of the Claim of any creditor or the Interest of any equity security holder within the meaning of Federal Rule of Bankruptcy Procedure 3019, and no further solicitation or voting is required.

25.    Confirmation.  The Plan is hereby confirmed with respect to each of the

Debtors. The terms of the Plan are incorporated by reference into, and are an integral part of, this

Order.

26.    Stipulations and Agreements.  The Plan Stipulations are hereby approved

and incorporated by reference into the Plan and this Order.  In the event of any inconsistency

between the provisions of the Plan and the Plan Stipulations, the terms of the Plan Stipulations

shall govern. Further, the following agreement is recognized and the Objection of Certain

Pharmacists, Veterinarians and Optometrists to Confirmation of the Plan is withdrawn as a result

thereof:

> Notwithstanding anything contained herein or in the Plan, the
> Motion of Pharmacists, Veterinarians and Optometrists for
> Abstention (Docket No. 790), which requests that the Bankruptcy
> Court abstain from adjudicating the claims of the MDL
> Pharmacists currently pending before the United States District
> Court for the Middle District of Florida, Tampa Division, will be
> heard at the first regularly-scheduled omnibus hearing date,
> following the Confirmation hearing, which is on scheduled on
> September 10, 2001, at 10:00 a.m. Furthermore, the rights of the
> MDL Pharmacists to contend that (i) the claims in MDL #1118
> (and any related action), currently pending before the United States
> District Court for the Middle District of Florida, Tampa Division,
> should be liquidated in appropriate fora other than this Court and
> (ii) the resolution of the claims warrant a right to a trial by jury,
> shall not be precluded by the Plan, including but not limited to the
> provisions relating to the injunction, discharge or estimation
> provisions of Articles IX and X and shall be unaltered by the Plan
> and Plan confirmation.

27.    Objections.  All of the objections to confirmation of the Plan and all

reservations of rights included therein that have not been withdrawn, rendered moot or resolved

by the Plan Stipulations are overruled.  All objections that are withdrawn, are deemed withdrawn

with prejudice.

2346260_2.DOC 8/10/01 10:18 AM                16

28.   Waiver of Bankruptcy Rule 3020. The ten-day stay of this Order imposed by Bankruptcy Rule 3020(e) is waived. The Debtors are authorized to consummate the Plan and the transactions contemplated thereby in accordance with the terms of the Plan.

29.   Assumption, Rejection and Cure Amounts. (a) The Debtors are hereby authorized to (i) reject the executory contracts and unexpired leases listed on Exhibit 7.1 to the Plan and (ii) assume the executory contracts and unexpired leases listed on Exhibit 7.2 to the Plan and all other executory contracts and unexpired leases not listed on Exhibit 7.1 to the Plan, and make cure payments with respect thereto in accordance with the provisions of Sections 7.2(d) and 7.2(e) of the Plan. Such assumptions and rejections may be amended prior to the Effective Date and shall be effective and binding on the Effective Date.

(b)   Any monetary amounts required as cure payments on each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases otherwise may agree. In the event of a dispute regarding (i) the amount of any cure payment, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, adequate assurance or the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be subject to the jurisdiction of the Bankruptcy Court and made or carried out following the entry of a Final Order or agreement of the parties resolving such dispute.

30.   Release and Injunctions. The release and injunction provisions contained in Section 10.5 of the Plan are fair and equitable, are given for valuable consideration, and are in

the best interests of the Debtors and their chapter 11 estates, and such provisions shall be effective and binding upon all Persons and entities. All injunctions provided for in the Chapter 11 Case, whether under section 105 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date or the date on which the last Disputed Claim has been resolved, whether by consent, Final Order or otherwise.

31.    Binding Effect. Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, in accordance with section 1141(a) of the Bankruptcy Code, the Plan, its provisions, and this Order shall be binding upon: (i) the Debtors; (ii) the Berkadia Parties, (iii) any party to an executory contract of any Debtor; and (iv) any Creditor or Interest holder of any Debtor, whether or not the Claim or Interest of such Creditor or Interest holder is impaired under the Plan and whether or not such Creditor or Interest holder has accepted the Plan.

32.    General Authorizations. The Debtors, the Reorganized Debtors and each of their respective directors, officers, employees, trustees, agents and attorneys are hereby authorized and empowered pursuant to section 1142(b) of the Bankruptcy Code to execute, deliver, record and file, and to take such action as is necessary or appropriate to effectuate the terms of, the instruments, agreements, and documents contemplated by the Plan, and take any or all corporate actions authorized to be taken pursuant to the Plan, whether or not specifically referred to in the Plan or any exhibit thereto, without further order of the Court.

33.    The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority of any Debtor or Reorganized Debtor to take any and all actions necessary or appropriate to implement, effectuate

and consummate the Plan, this Confirmation Order and the respective transactions contemplated thereby and hereby. Without limiting the generality or effect of any other provision of this Confirmation Order, the appropriate Debtors and Reorganized Debtors shall be, and they hereby are, specifically authorized and empowered to take any and all such actions as any of their respective officers may determine are necessary or appropriate to implement, effectuate and consummate the Plan and this Confirmation Order and the transactions respectively contemplated thereby and hereby, all in accordance with the terms of the Plan, the Disclosure Statement and this Confirmation Order. Each of the officers of each Debtor and Reorganized debtor shall be, and hereby is, authorized to execute, deliver, file or record such contracts, instruments, releases, notes, indentures, mortgages, deeds, assignments, leases or other agreements or documents and take such other actions as such officer may determine are necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and this Confirmation Order and the transactions respectively contemplated thereby and hereby, all without further application to or order of this Court and whether or not such actions or document are specifically referred to in the Plan, the Disclosure Statement, the Disclosure Statement Order, this Confirmation Order or the Exhibits to any of the foregoing, and the Secretary or any Assistant Secretary of each such Debtor or Reorganized Debtor shall be, and hereby is, authorized to certify or attest to any of the foregoing actions. To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the directors or stockholders of any Debtor or Reorganized Debtor this Confirmation Order shall constitute such consent to approval, and such actions shall be, and hereby are, deemed to have been taken by unanimous action of the directors and stockholders of the appropriate Debtor or Reorganized Debtor.

34.    All transfers, security interests, grants, liens and guarantees given by any of the Debtors in conjunction with the implementation of the Plan have been based upon fair consideration, are in the best interests of the creditors of the Debtors and, accordingly, are not subject to avoidance under the Bankruptcy Code or any other applicable law.

35.    As of the Effective Date, (a) boards of directors of the Debtors shall no longer serve in their offices (except as provided pursuant to the Plan) and the appointment of the directors of the Reorganized Debtors shall become effective pursuant to and in accordance with the Plan, and (b) the executive officers of the Debtors shall no longer serve in their offices (except as provided pursuant to the Plan) and the executive officers of the Reorganized Debtors shall become effective pursuant to and in accordance with the Plan, together with such other executive officers as the Reorganized Debtors shall designate in their discretion. The remaining non-executive officers of the Debtors immediately prior to the Effective Date shall become officers of the respective Reorganized Debtors retaining their then-current positions, but nothing in this Order shall affect the "at-will" nature of any officer's position with a Reorganized Debtor.

36.    The adoption, on the Effective Date, of the Restated Certificates of Incorporation and the By-laws of the Reorganized Debtors is authorized and approved in all respects, in each case, without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors. As of the Effective Date, the Reinstatement of all Interests and issuance of Additional Common Stock, the imposition of stock transfer restrictions set forth in the Restated Certificates of Incorporation or By Laws of Reorganized FNV Group, and the certificates and other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred, be authorized,

666

and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the directors, trustees or stockholders of the Debtors or the Reorganized Debtors or any rule of or agreement with any securities exchange.

37.    Exemption from Registration of Securities.    Section 1145 of the Bankruptcy Code shall apply to the fullest extent possible in respect of any and all securities under the Plan.

38.    In accordance with section 6.2(f) of the Plan, and the provisions of the Amended and Restated Bylaws of FNV Group, each certificate representing Interests in FNV Group shall bear a legend referring to the restrictions on transferability of such Interest, and FNV Group is hereby authorized to take such actions to replace and prevent the transfer of such certificates without such legend as FNV Group determines to be appropriate, which may include providing that stock certificates that do not bear such legend will not be recognized by FNV Group as "good delivery" for transfer of such securities, as well as providing that no distributions or dividends will be paid in respect of any such securities represented by certificates that do not bear such legend, with any such amounts not so paid to be held for the benefit of such security holder in accordance with the Plan and applicable law.

39.    On the Effective Date, in accordance with the Plan, FNV Group shall issue to Berkadia shares (the "50% Number") of Additional Group Common Stock which constitute 50% of the outstanding common stock of Reorganized FNV Group on a Fully Diluted Basis as of the Effective Date (the "50% Number"); provided, however, that if the 50% Number exceeds the "Maximum Number" (as defined below), then FNV Group shall be treated as having issued to Berkadia, on the Effective Date pursuant to the Plan, only the Maximum Number of shares. The "Maximum Number" is the maximum number of shares that Reorganized FNV Group can issue

to Berkadia on the Effective Date pursuant to the Plan and have the "Ownership Change" (as defined below) that occurs on the Effective Date qualify for the special rule afforded under section 382(l)(5) of the Internal Revenue Code of 1986 as amended (the "IRC"), when considering all the facts and circumstances existing as of the Effective Date. "Ownership Change" means "ownership change" within the meaning of section 382 of the IRC. Notwithstanding the foregoing, if the Ownership Change does not qualify for such special rule for a reason other than the 50% Number exceeding the Maximum Number, then the proviso to the first sentence of this paragraph shall be inapplicable and FNV Group shall be treated as having issued the 50% Number of shares to Berkadia on the Effective Date pursuant to the Plan. In addition, on or after the Effective Date, pursuant to the Plan, FNV Group may, at its sole discretion, issue to a Creditor or Creditors in settlement of their Disputed Claims shares of common stock of Reorganized FNV constituting up to 1% in the aggregate of the common stock of Reorganized FNV outstanding as of the Effective Date (such outstanding amount to be calculated assuming the issuance to Berkadia of the 50% Number of shares).

40.    First Union National Bank of North Carolina, not individually, but solely in its capacity as the Trustee under that certain Rabbi Trust Agreement, dated November 8, 1995, by and between FNV Group and the Trustee (the "Trust Agreement"), entered into in connection with those certain benefit plans described in the Trust Agreement and the schedules and exhibits thereto (collectively, the "Benefit Plans"), is hereby directed (i) to reimburse FNV Group, pursuant to section 2.3 of the Trust Agreement, from the Trust funds, for Benefit Plan benefits paid directly by FNV Group to any participant in the Benefit Plans and (ii) in the event it is determined at the end of any Benefit Plan year that the value of the Trust fund is greater than one hundred ten percent (110%) of the accrued obligations of all participants of the Benefit Plans

668

supported by the Trust, to return to FNV Group, in accordance with section 4.1 of the Trust

Agreement, such funds from the Trust so as to reduce the Trust fund value to no less than one

hundred ten percent (110%) of the then accrued obligations of all Benefit Plan participants.

41.     Revesting of Property.  Pursuant to section 1141 of the Bankruptcy Code,

on the Effective Date, and except as otherwise provided in the Plan, (a) all of the property of the

Debtors' estates is vested in the Reorganized Debtors, respectively, (b) the transfer of any assets

by the Debtors or the Reorganized Debtors, as contemplated by the Plan, and the vesting of the

assets in the Reorganized Debtors, are free and clear of all liens, security interests, claims, and

interests, and all such liens, security interests, claims and interests shall be extinguished, and (c)

the Debtors may operate their businesses and may use, acquire and dispose of property and

compromise or settle any Claims or Interests, including Disputed Claims or Disputed Interests,

without supervision or approval by the Bankruptcy Court and free of any restrictions of the

Bankruptcy Code or Bankruptcy Rules unless otherwise expressly imposed by the Plan and this

Confirmation Order.

42.     Tax Provisions.  Pursuant to section 1146(c) of the Bankruptcy Code and

in accordance with section 6.7 of the Plan, no stamp, ~~real estate transfer, mortgage recording~~ or

~~other~~ similar tax may be imposed upon the issuance, registration, transfer or exchange of notes or

equity securities under the Plan, including, without limitation, the New Senior Notes, any notes

related to the Berkadia Loan, the Berkadia Credit Agreement, all debt public and private, the

New Group Preferred Stock (if any is issued), the Additional Group Common Stock or the

Additional Mezzanine Common Stock (if any is issued), the creation of any Lien, the making,

assignment or surrender of any lease or sublease, the creation of any mortgage, deeds of trust or

other security interest, the making or delivery of any deed, bill of sale or other instrument of

transfer under, in furtherance of, or in connection with the Plan, whether involving real or personal property, including, without limitation, any merger agreements or agreements of amalgamation or consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan.

43.    Failure To Consummate Plan. If the Effective Date does not occur, then (a) the Plan, (b) assumption or rejection of executory contracts or unexpired leases pursuant to the Plan, (c) any document or agreement executed pursuant to the Plan, and (d) any actions, releases, waivers, or injunctions authorized by this Confirmation Order or any order in aid of consummation of the Plan shall be deemed null and void. In such event, nothing contained in this Confirmation Order, any order in aid of consummation of the Plan, or the Plan, and no acts taken in preparation for consummation of the Plan, (i) shall be deemed to constitute a waiver or release of any Claims or Interests by or against any Debtor or any other Person, to prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving such Debtor or otherwise, or to constitute an admission of any sort by any Debtor or any other Person as to any issue including, without limitation, issues relating to the ownership by or the rights of any Debtor in all or any part of the property owned, sold, held by or in the possession of any Debtor or (ii) shall be construed as a finding of fact or conclusion of law in respect thereof.

44.    Retention of Jurisdiction. The Court shall retain jurisdiction in accordance with the terms of Section 12.1 of the Plan, the other provisions of this Confirmation Order and sections 1141 and 1142 of the Bankruptcy Code. Until these Chapter 11 Cases are closed, any party in interest may commence a proceeding in the Court in respect of any matter as to which jurisdiction has been retained.

Notwithstanding the foregoing, failure of the Effective Date shall not invalidate that portion of the FINOVA plc Stipulation allowing in full the claims asserted by the Agent and the PLC Lenders (as such terms are defined in the FINOVA plc Stipulation), without offset, defense or counterclaim.

45.    Notice of Effective Date. Within ten Business Days after the occurrence of the Effective Date, the Debtors will give notice of the occurrence of the Effective Date by United States first class mail postage prepaid, by hand, or by overnight courier service to (a) the United States Trustee, (b) counsel for each Official Committee, (c) the Securities and Exchange Commission at Washington, D.C., (d) entities who objected to the Disclosure Statement or confirmation of the Plan, (e) entities who requested notices under Bankruptcy Rule 2002, (f) each Indenture Trustee, (g) each Administrative Agent or Paying Agent under a Bank Credit Agreement, (h) all parties to executory contracts or unexpired leases assumed or rejected pursuant to the Plan, (i) all creditors who have filed proofs of claim in these Chapter 11 Cases or who are listed in the Debtors' schedules of assets and liabilities or any amendment or modification thereto and (j) all known holders of outstanding claims against the Debtors arising after the Petition Date and before the Effective Date. In addition to such notice, the Debtors shall serve a copy of this Confirmation Order upon each of the parties listed in subparagraphs (a), (b), (c), (d), (e), (f), (g) and (h) hereof.

46.    Publication Notice. The Debtors shall cause to be published a Notice of the Effective Date of the Plan as promptly as practicable after the occurrence of the Effective Date once in each of The Wall Street Journal (National Edition) and The New York Times (National Edition).

47.    Bar Date for Administrative Claims. Except as otherwise provided in paragraph 48 hereof, all persons and entities seeking payment from the Debtors or their Estates on account of any Administrative Claims which have not been paid or otherwise satisfied prior to the date hereof shall file a request for allowance and payment of such claim with the Bankruptcy Court and serve such request upon counsel for the Debtors and each Official Committee no later

*Further, notwithstanding anything contained in paragraphs 47 and 48 hereof, Allowed ~~Entire~~ Claims of Indenture Trustees, including, without limitation, Claims for professional fees, are to*
than thirty days after the Effective Date (the "Administrative Bar Date"). Unless the Debtors *be treated and paid*
object to an Administrative Claim within thirty days after the Administrative Bar Date, such *Indenture Trustee according to Article*
Administrative Claim shall be deemed to be Allowed in the amount requested. In the event that *Fees I of*
the Debtors object to an Administrative Claim, this Court shall determine the allowed amount of *the Plan and not*
such Administrative Claim, unless otherwise agreed to by the parties to that dispute. *as Administrative*
Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed *Claims.*
with respect to an Administrative Claim which was previously approved by the Court, or which *P/W*
is paid or payable by a Debtor in the ordinary course of its business, or for fees due to the United
States Trustee under chapter 123 of title 28 of the United States Code.

48.    Bar Date for Claims for Professional Fees and Substantial Contribution.

Any Person seeking an award of an Allowed Administrative Claim on account of Professional Fees or services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code shall file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date no later than the Administrative Bar Date (except to the extent that such Person is an Ordinary Course Professional, in which case the procedures set forth in the Ordinary Course Professional Order shall be followed). Objections to final applications for payment of Professional Fees must be filed no later than 60 days after the Administrative Bar Date. All Professional Fees for services rendered in connection with the chapter 11 Cases and the Plan after the Confirmation Date including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of causes of action preserved hereunder and the resolution of Disputed Claims, shall be paid by the applicable Debtor promptly following receipt of an invoice therefor, together with reasonably detailed documentation in

support of same, or on such other terms as such Debtor may agree to, without the requirement of

further Bankruptcy Court authorization or entry of a Final Order. The requirements of the

Ordinary Course Professionals Order shall expire and shall be of no further effect after the

Confirmation Date.

49.    Bar Date for Rejection Damage Claims. If the rejection of any executory

contract, unexpired lease, option, warrant, right of conversion or the Rights Plan pursuant to

Section 7.1(a) of the Plan gives rise to a Claim by the non-Debtor party or parties to such

contract, lease, option, warrant or right, such Claim shall be forever barred and shall not be

enforceable against the Debtors, the Reorganized Debtors, their respective successors or their

respective properties unless a proof of Claim is filed and served on the appropriate Reorganized

Debtor no later than 30 days after the date of service of the Effective Date Notice, with the

Confirmation Order, pursuant to section 7.1(b) of the Plan and paragraph 44 of this Order.

50.    Notice of Bar Dates. Within ten Business Days after the occurrence of the

Effective Date, the Debtors will give notice of each of the bar dates established by paragraphs 47,

48 and 49 hereof, substantially in the form attached hereto as Exhibit A (the "Notice of Important

Dates"), by United States first class mail postage prepaid, by hand, or by overnight courier

service to (a) all known holders of Administrative Claims, (b) all Ordinary Course Professionals

and all Professionals retained in these Chapter 11 Cases, (c) all known persons seeking or, to the

Debtors' knowledge, intending to seek an award of an Allowed Administrative Claim on account

of services rendered or reimbursement of expenses incurred through and including the Effective

Date under sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, and (d) all

non-Debtor parties to any executory contract, unexpired lease, option, warrant, right of

conversion or the Rights Plan rejected pursuant to Section 7.1(a) of the Plan. The Notice of Important Dates may be included in or with the other notices referenced in this Order.

      51.    <u>Distributions on Account of Bank Claims, Debt Securities Claims and Other Claims.</u> (a)    Notwithstanding any provision in the Plan to the contrary, any distributions made pursuant to the Plan on account of Bank Claims shall be paid to the applicable Administrative Agent or Paying Agent pursuant to the applicable Bank Credit Agreement as listed in Exhibit 1.11 to the Plan, or any successor Agent, and any distributions made pursuant to the Plan on account of Debt Securities Claims shall be paid to the applicable Indenture Trustee as listed in Exhibit 1.69 to the Plan, or any successor Indenture Trustee, in either case for distribution by such Agent or Indenture Trustee to the holders of the Bank Claims and Debt Securities Claims as soon as practicable pursuant to the terms of the applicable Bank Credit Agreement or Debt Securities Indenture. The Debtors may aggregate any or all Claims for each such agreement or series of securities and need not itemize the holders of the Claims or the specific Claims satisfied by such payments. The Agents or Indenture Trustees, as the case may be, shall distribute the amounts to the appropriate holders of the Claims. The Debtors shall have no further responsibility or liability for making those distributions to the extent that they have provided the applicable Agent or Indenture Trustee with payment for those Claims. If any Bank Claim or Debt Securities Claim is a Disputed Claim, the Debtors shall pay the undisputed portion of such Claim to the applicable Agent or Indenture Trustee for distribution to the holder of the Disputed Claim, and the Debtors shall pay the disputed portion of such claim when the dispute is resolved in accordance with Section 9.2 of the Plan. Payment of the undisputed portion of a Disputed Claim shall be without prejudice to the Debtors' rights to assert all objections and defenses to payment of the Disputed portion of the Claim.

2346260_2.DOC 8/10/01 10:18 AM       28

*but except as otherwise provided in the Plan Stipulations*

(b) Notwithstanding any provision in the Plan to the contrary, before, on or as soon as practicable after the Effective Date, the Debtors shall circulate to each Agent and Indenture Trustee the Debtors' calculation of the aggregate amount due (including all applicable interest and fees payable pursuant to the terms of the Plan) on account of the undisputed Bank Claims or undisputed Debt Securities Claims represented by such Agent or Indenture Trustee (the "Undisputed Claim Amount") and shall pay the Undisputed Claim Amount to the applicable Agent or Indenture Trustee as soon as practicable after the Effective Date (whether or not the Debtors' calculation thereof has been received by the applicable Agent or Indenture Trustee), pursuant to paragraph 51(a) hereof. If any Agent or Indenture Trustee disputes the Undisputed Claim Amount, it must serve notice of such dispute upon the Debtors as soon as practicable, but in no event later than ten (10) business days after circulation of the Disputed Claim Amount, and the dispute will be resolved pursuant to the mechanism set forth in Section 9.2 of the Plan.

(c)      Other than as provided in subparagraphs (a) and (b) above, all payments or distributions required to be made by or for the benefit of the Debtors pursuant to the Plan shall be made within the time provided by the Plan and shall be deemed timely and proper if mailed by first class mail on or before the distribution dates set forth in the Plan to the last known address of the persons entitled thereto, including, without limitation, the address set forth in the transfer records of the transfer agent on the Record Date with respect to the issued and outstanding common stock of FNV Group, or as otherwise specifically provided in the Plan. None of the Debtors or the Reorganized Debtors shall have any obligation to recognize any transfer of a Claim or Interest occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes under the Plan with only those record holders listed on the (i) Schedules or the claims register maintained by the Clerk of the Court or the agent of the Clerk

appointed in the Chapter 11 Cases (for Claims) and (ii) transfer ledgers maintained by the transfer agent(s) (for Interests) as of the close of business on the Distribution Record Date.

(d)     Subject to Bankruptcy Rule 9010, and except as provided in subparagraph (b) above, distribution shall be made as provided in the Plan. This Court retains jurisdiction to review and require the return of distributions made in error.

52.     Except as expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce any claims, rights and causes of action, whether arising before or after the Petition Date, that any Debtor or Estate may hold against any entity or Person. The Reorganized Debtors or their successors may pursue such retained claims, rights or causes of action, as appropriate, in their discretion, in accordance with the best interests of the Reorganized Debtors or the successors holding such rights of action. The Reorganized Debtors may pursue, abandon, settle or release any or all such claims, rights and causes of action, as they may deem appropriate. No creditor or shareholder shall have any right or power to pursue or commence any litigation, whether direct, indirect or derivative, in regard to such claims, rights and causes of action.

53.     <u>Conflicts Between Order and Plan.</u>  (a) To the extent of any inconsistency between the provisions of the Plan and this Order, the terms and conditions contained in this Order shall govern.

(b)    The provisions of this Order are integrated with each other and are

nonseverable and mutually dependent unless expressly stated by further order of this Court.

Dated: Wilmington, Delaware
      August _____, 2001

UNITED STATES BANKRUPTCY JUDGE

80188895_10.DOC

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

**THE FINOVA GROUP INC.,**
**FINOVA CAPITAL CORPORATION,**
**FINOVA (CANADA) CAPITAL CORPORATION,**
**FINOVA CAPITAL PLC,**
**FINOVA LOAN ADMINISTRATION INC.,**
**FINOVA MEZZANINE CAPITAL INC.,**
**FINOVA PORTFOLIO SERVICES, INC.,**
**FINOVA TECHNOLOGY FINANCE, INC., AND**
**FINOVA FINANCE TRUST,**

Debtors.

Chapter 11

Case Nos. 01-0697 (PJW) through
01-0705 (PJW)

Jointly Administered

## NOTICE OF IMPORTANT DATES

### TO ALL PERSONS AND ENTITIES WITH CLAIMS, INCLUDING ADMINISTRATIVE EXPENSE CLAIMS, REJECTION DAMAGE CLAIMS, AND GOVERNMENTAL CLAMS AGAINST ANY OF THE FOLLOWING DEBTORS:

| DEBTOR | OTHER NAMES USED | TAX I.D. NUMBER | CASE NUMBER |
|---|---|---|---|
| The FINOVA Group Inc. | | 86-0695381 | 01-0697(PJW) |
| FINOVA Capital Corporation | Ambassador Factors Corporation<br>BATCL-1992-I, Inc.<br>Desert Hospitality II, Inc.<br>FCS 505, Inc.<br>FINOVA Capital Funding, Inc.<br>FINOVA Capital Funding, L.P.<br>FINOVA Capital Markets Inc.<br>FINOVA Realty Capital Inc.<br>FINOVA Realty Capital of Greater Florida Inc.<br>FINOVA Realty Capital Warehouse Funding, LP<br>FINOVA Medical Receivables, Inc.<br>FINOVA Warehouse Funding Inc.<br>Fremont Financial Corporation<br>Fremont Funding, Inc.<br>Fremont VFC Funding Corporation<br>Greycas, Inc.<br>Greyhound Financial Capital Corporation<br>Greyhound Investors Corporation<br>Greyhound Inter-American Aircraft Leasing, Ltd.<br>Greyhound Real Estate Investment Ten Inc.<br>Greyship Corp.<br>Northern Investment Corporation<br>TriCon Capital Corporation | 94-1278569 | 01-0698(PJW) |

678

| FINOVA (Canada) Capital Corporation | FINOVA (Canada) Resorts Corporation | N/A | 01-0699(PJW) |
|---|---|---|---|
| FINOVA Capital plc | FINOVA Capital Limited<br>Greyhound Financial Services Limited | N/A | 01-0700(PJW) |
| FINOVA Loan Administration Inc. | Electronic Payment Systems, Inc. | 87-0460709 | 01-0701(PJW) |
| FINOVA Mezzanine Capital Inc. | AC Contact Lens, Inc.<br>Sirrom Capital West, Inc.<br>FINOVA Newco Inc.<br>Sirrom Investments, Incl<br>Sirrom Capital Corporation<br>Tandem Capital, Inc. | 62-1583116 | 01-0702(PJW) |
| FINOVA Portfolio Services, Inc. | | 86-0695380 | 01-0703(PJW) |
| FINOVA Technology Finance, Inc. | Denton Imaging, Inc.<br>FSI Funding Corp. I<br>International, Inc.<br>Financing for Science International Inc.<br>FSI Funding Corp. II<br>Melville Holding Co., Inc.<br>FINOVA Business Credit Corp.<br>Highland Park Medical Imaging, Inc. | 06-1179144 | 01-0704(PJW) |
| FINOVA Finance Trust | | 86-6263801 | 01-0705(PJW) |

## PLEASE TAKE NOTICE THAT:

1.    On March 7, 2001, The FINOVA Group Inc. and eight of its affiliates as listed above (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Their cases are being jointly administered under Case No. 01-0697(PJW).

2.    The Debtors filed a disclosure statement and accompanying joint plan of reorganization on May 2, 2001, an amended and restated disclosure statement and accompanying amended and restated joint plan of reorganization on June 1, 2001, a second amended and restated disclosure statement and accompanying second amended and restated joint plan of reorganization on June 11, 2001, and a third amended and restated disclosure statement and accompanying third amended and restated joint plan of reorganization on June 14, 2001. By order dated June 14, 2001, the Bankruptcy Court

2

approved the Debtors' Third Amended and Restated Disclosure Statement With Respect to the Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code (the "Disclosure Statement"), as accompanied by the Debtors' Third Amended and Restated Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code (the "Plan").

3.      A hearing was held on August 10, 2001, to consider confirmation of the Plan, and by order dated August ___, 2001, the Plan was confirmed by the Bankruptcy Court.

## IMPORTANT DATES

4.      **REJECTION DAMAGE CLAIM BAR DATE:** Pursuant to Section 7.1(b) of the Plan, if the rejection of any excutory contract, unexpired lease, option, warrant, right of conversion, warrant or Rights Plan pursuant to Section 7.1(a) of the Plan gives rise to a Claim (as that term is defined in the Plan) by a non-Debtor party or parties to such contract, lease, option, warrant or right, such claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors (as that term is defined in the Plan), their respective successors or their respective properties, unless a proof of Claim is filed with the Claims Administration Center (as defined below),as provided for in paragraph 10 herein, **on or before September ___, 2001.**

5.      **EFFECTIVE DATE OF PLAN:** the Plan became effective on **August ___, 2001.**

6.      **ADMINISTRATIVE BAR DATE:** Pursuant to Section 2.2 of the Plan the last day to file Administrative Claims (as that term is defined in the Plan) is **September ___, 2001.**

3

7.  **OBJECTION DEADLINE TO PROFESSIONAL COMPENSATION AND
    EXPENSE REIMBURSEMENT CLAIMS:** Pursuant to Section 2.3 of the Plan,
    objections, if any, to final applications for payment of Professional Fees (as that term is
    defined in the Plan) must be filed with the United States Bankruptcy Court for the
    District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801, and
    served in accordance with the local rules and orders of the Bankruptcy Court **on or
    before September ___, 2001.**

8.  **GOVERNMENTAL UNIT BAR DATE:** The bar date for governmental units (as that
    term is defined in section 101(27) of the Bankruptcy Code) is **September 3, 2001.**

9.  **OBJECTIONS TO CURE AMOUNTS:** Pursuant to Section 7.1(e) of the Plan,
    objections, if any, to Cure Amounts (as that term is defined in the Plan) listed in Exhibit
    7.2 of the Plan must be filed no later than **August ___, 2001.**

### FILING PROOFS OF CLAIM AND OBJECTIONS

10. **Proofs of Claim** for any Claim described in paragraphs 4, 6, and 8 herein must be filed
    so as to be received on or before **4:00 p.m. (Mountain Standard Time) on the date
    specified in paragraphs 4, 6, and 8 herein** at the following address (the "Claims
    Administration Center"):

**FGI
CLAIMS ADMINISTRATION CENTER
P.O. BOX 8980
SCOTTSDALE, ARIZONA 85252-8980
or (if by overnight mail or courier)
FGI
CLAIMS ADMINISTRATION CENTER
4800 N. SCOTTSDALE ROAD, 6th FLOOR
SCOTTSDALE, ARIZONA 85251-7623
(tel.: (480) 636-4800)**

A proof of Claim will be deemed timely filed only if the original proof of Claim is actually received by the Claims Administration Center on or before the Bar Date. Proofs of Claim may not be delivered by facsimile or telecopy.

11. If you file a proof of Claim, your filed proof of Claim must (i) be written in the English language, (ii) be denominated in lawful currency of the United States, and (iii) conform substantially to Official Form 10. YOU SHOULD ATTACH TO YOUR COMPLETED PROOF OF CLAIM FORM COPIES OF ANY WRITINGS UPON WHICH SUCH CLAIM IS BASED.

12. YOU MUST SPECIFICALLY IDENTIFY THE DEBTOR AGAINST WHICH YOU ASSERT A CLAIM. YOU SHOULD INCLUDE ALL CLAIMS AGAINST A PARTICULAR DEBTOR IN A SINGLE PROOF OF CLAIM FORM. IF YOU HAVE A CLAIM AGAINST MORE THAN ONE DEBTOR YOU MUST FILE A SEPARATE PROOF OF CLAIM FORM AGAINST EACH SUCH DEBTOR.

13. **ANY CREDITOR WHO FAILS TO FILE A PROOF OF CLAIM FOR ANY CLAIM DESCRIBED ABOVE ON OR BEFORE 4:00 P.M. (MOUNTAIN STANDARD TIME) ON THE DATES SPECIFIED IN PARAGRAPHS 4, 6, AND 8 HEREIN FOR REJECTION DAMAGE CLAIMS, ADMINISTRATIVE CLAIMS, AND GOVERNMENTAL UNIT CLAIMS, RESPECTIVELY, FOR ANY CLAIM SUCH CREDITOR HOLDS OR WISHES TO ASSERT AGAINST THE DEBTORS, WILL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH CLAIM (OR FILING A PROOF OF CLAIM WITH RESPECT TO SUCH CLAIM) AGAINST THE DEBTORS AND THE REORGANIZED DEBTORS, AND THE DEBTORS AND THE REORGANIZED**

DEBTORS AND THEIR PROPERTY, WILL BE FOREVER DISCHARGED
FROM ANY AND ALL INDEBTEDNESS OR LIABILITY WITH RESPECT TO
SUCH CLAIM, AND SUCH HOLDER SHALL NOT PARTICIPATE IN ANY
DISTRIBUTION IN THESE CHAPTER 11 CASES ON ACCOUNT OF SUCH
CLAIM, OR TO RECEIVE FURTHER NOTICES REGARDING SUCH CLAIM.

14.   **Objections**, if any, of the types described in paragraphs 7 and 9 herein must be filed with
the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th
Floor, Wilmington, Delaware 19801, and served in accordance with the local rules and
orders of the Bankruptcy Court and must be sent via facsimile or overnight courier to (i)
co-counsel to the Debtors:  Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York,
New York 10166, ATTN: Jonathan M. Landers (facsimile number 212-351-4035); (ii)
co-counsel to the Debtors:  Richards,  Layton & Finger, P.A., One Rodney Square, P.O.
Box 551, Wilmington, Delaware 19899, ATTN: Mark D. Collins (facsimile number 302-
658-6548); (iii) the office of the United States Trustee, 601 Walnut Street, Room 950
West, Philadelphia, PA 19106, ATTN: George Conway III (facsimile number (302) 573-
6497); (d) counsel to the Creditors' Committee: Wachtel, Lipton, Rosen & Katz, 51 West
52nd Street, New York, NY, 10019, ATTN: Chaim J. Fortgang (facsimile number (212)
403-2203); and (v) counsel to the Equity Committee: Anderson, Kill & Olick, P.C., 1251
Avenue of the Americas, 42nd Floor, New York, NY 10020, ATTN: Mark Silverschotz
(facsimile number (212) 278-1733)

6

15.    **If you have any questions concerning the filing, amount, nature, or processing of a proof of claim, or objection please call 888-534-6682. YOU SHOULD CONSULT YOUR ATTORNEY REGARDING ANY OTHER INQUIRIES, SUCH AS WHETHER YOU SHOULD FILE A PROOF OF CLAIM OR OBJECTION. <u>DO NOT ATTEMPT TO CONTACT THE COURT FOR ADVICE.</u>**

DATED:          August ___, 2001                    **BY ORDER OF THE COURT:**
                                                     **Hon. Peter J. Walsh,**
                                                     **Chief United States Bankruptcy Judge**

80189129_1.DOC

7

684

# **EXHIBIT F**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| THE FINOVA GROUP INC., FINOVA CAPITAL CORPORATION, | § § § § | Case Nos. 01-0698 (PJW) |
| Reorganized Debtors | § § § § | Jointly Administered Re: Docket No. 22, 99 |
| | § | |

## DEBTORS' STATEMENT FOR STATUS CONFERENCE OF JUNE 26, 2007

The FINOVA Group, Inc. and FINOVA Capital Corp., the above named debtors ("Debtors") hereby submit this Statement for Status Conference of June 26, 2007.

      1. Background.

          (a) On or about April 1, 2005, the Debtors filed their Clarification Motion seeking a determination that they were insolvent and otherwise in financial distress, and were no longer required to set aside 5% of Available Cash for possible payment to Equity Security Holders (the "5% Payment") pursuant to the Indenture governing the New Senior Notes. On February 1, 2006, this Court entered an order which approved the Clarification Motion to the extent the Debtor" is presently and will be forever insolvent, but left the "forever insolvent" issue open for further proceedings. On or about January 8, 2007, the Debtors filed a Request for the Court to enter a final order on the Clarification Motion, and submitted a Declaration of Richard A. Ross and supporting 10-Q Report stating that the Debtors were insolvent by more than $1 billion, and there was no reasonable prospect that the situation would change. The Official Committee of Equity Security Holders ("Equity Committee") filed an objection to the Request and a motion to delay the hearing, and a parallel motion to increase the fee cap from the present

$200,000 to $465,000 to include both additional fees of $165,000 for counsel to the Committee and $100,000 for a requested Financial Consultant. The Court held a hearing on January 29, 2007, and Mr. Ross testified at length regarding the Debtors' financial condition and prospects and several exhibits were admitted into evidence. Mr. Ross testimony and the Exhibits showed that the Debtors were hopelessly insolvent and there was no reasonable prospect the situation would change materially. The Equity Committee did not introduce any rebuttal evidence but simply argued its need for a Financial Consultant. There were also arguments on the fee cap issues.

(b) At the conclusion of the January 29 hearing, the Court ruled that the fee cap should be increased by up to $100,000 for the sole purpose of permitting the Equity Committee to retain a Financial Consultant to deal with the solvency issue, and any rulings on the Debtors Clarification Motion and the fee cap issue should be deferred. An Order was entered in accordance with the Court's oral ruling which provided that following receipt of the report of the Equity Committee's Financial Consultant, the Court would hold a status conference to consider (i) the Request of the Debtors for entry of a final order on the Clarification Motion and (ii) the Equity Committee's Motion to increase the fee cap. This hearing on June 26, 2007 is that status conference.

2. Developments Since Hearing of January 29.

(a) Expert Report. On April 2, 2007, Traxi LLC ("Traxi"), the Equity Committee's Financial Consultant, furnished its report. Traxi concluded that it has "no reason to dispute the solvency position of the Company at any prior date as reported in Finova's filing with the SEC." In requesting the appointment of a Financial Consultant, the Equity Committee had noted that the probability that the Debtors would ask for a final determination on the "forever

insolvent" issue, and stated: "Should a financial professional retained by the Equity Committee concur with that assessment [that the Debtor is now and will forever be insolvent], the Equity Committee likely would not oppose such a motion". Fee Cap Increase Motion, p. 10, n. 7. A copy of the Traxi report is attached as Exhibit A.

(b) <u>Financial Condition of Debtors</u>. On or about May 9, 2007, the Debtors filed their 10-Q Report for the First Quarter (the "FQR"). The FQR, which was prepared on the basis of liquidation accounting, indicated a projected shortfall in the New Senior Notes of more than $1.1 billion. It also noted that the Debtors' total noncash assets were approximately $119,000,000 as of March 31 and $83,000,000 had been received in April from the Thaxton settlement, leaving a balance of noncash assets of approximately $36,000,000.[1] It also noted that all of the top ten exposures "have either been liquidated; are under binding definitive agreements or letters of intent to sell; or are subject to settlement." (FQR p. 8). Finally, the FQR stated that "[o]ur goal is to wind-up the affairs of the Company during 2007" and that the reserves for estimated costs and expenses" assumes a liquidation period through the end of 2007." (FQR p. 5) A copy of the FQR is attached as Exhibit B.

3. <u>Final Order on Clarification Motion</u>. The Debtors believe there is absolutely no basis for delaying the entry of a final order on the Clarification Motion. The Declaration of Richard Ross, the testimony of Richard Ross and the Exhibits introduced at the hearing of January 29, and the Traxi report establish beyond any doubt that these Debtors are "hopelessly insolvent" and there is no prospect of change. Significantly, the conclusions of both Ross and

---

[1]  These assets would have to go up by more than 3000% to cover the projected deficit exceeding $1.1 billion. Virtually all of the assets have been liquidated during the second quarter of 2007 for the approximate amounts estimated at March 31.

Traxi are further confirmed by the FQR. For this reason, the Debtors have submitted a proposed order granting the Clarification Motion, which is attached as Exhibit C.

      4. <u>Fee Cap Increase</u>. In its Fee Cap Increase Motion, the Committee requested $165,000 to pay attorneys fees incurred above the original $200,000 cap. This issue was fully briefed in connection with the January 29, 2007 hearing, and the Debtors' arguments will be summarized very briefly here. The Debtors oppose any increase in the fee cap because:

    (a) The Debtors have a $1.1 billion deficit and every dollar paid to or for the benefit of the Equity Committee reduces distributions to creditors by that amount.

    (b) The Equity Committee has had $180,000 ($200,000 less $20,000 paid to its earlier financial advisor) to perform two tasks - - researching and arguing the legal issues in the Clarification Motion and inquiring into the solvency issue - - and now seeks an additional $165,000 (a 92% increase) to perform these tasks. The Debtors believe that the original amount was more than an adequate and such a funding is implicit in the Court's prior rulings. The burden should be on the Committee to show that the authorized amount has proven inadequate because of unforeseen circumstances, more complex or difficult legal issues, or similar factors. However, aside from saying that the additional fees have been incurred above the cap, the Committee has offered no explanation why the authorized amount was inadequate and no support for additional funds such as unforeseen circumstances or unanticipated additional tasks or legal issues.

(c) The absence of support for the requested 92% increase is especially significant since (i) the issues on the Clarification Motion were primarily legal and had been clearly identified at the time the cap was increased to $200,000, (ii) discovery was minimal, (iii) in setting the initial cap at $100,000, this Court noted that the Committee already had the benefit of extensive briefing of the issues by First Carolina, and (iv) the lion's share of the additional fees now being sought were incurred after the Court rendered its decision interpreting the Indenture, leaving only the "forever insolvent" issue remaining.

(d) In increasing the cap to $200,000, this Court strongly intimated that such amount was more than adequate, and has referred to the Committee's legal arguments as "irrelevant or off the wall" and separately as to one of them, "misleading." An increase in the cap would be contrary to such prior rulings and could serve to discourage parties from complying with caps.

(e) The Committee's request to increase the cap is not consistent with its prior request in terms of timing of expenses before and after the first request to increase the request.

(f) The present request is hardly the last since it does not cover the present proceedings or any appeals.

5. Reservation re Specific Items. For the reasons stated, the Debtors strongly object to any increase in the fee cap and, unless such an increase is approved, no purpose would be served by objections to requested reimbursement for specific tasks and to individual items of expense. The Debtors do believe that the requested fees are excessive and unreasonable and

have numerous specific objections including, without limitation, (a) excessive amounts for committee and administrative tasks given the appointment of the Committee for the "limited and exclusive purpose" of reviewing and objecting to the Clarification Motion and not as a committee in an operating case, (b) objections to all fees for the Committee's ill-fated appeal after receiving fair notice from Debtors' counsel that the order was not final and that the Debtors would object, (c) objections to fees for a response to the Court's letter ruling, on the ground that this problem resulted from actions of Committee counsel, (d) objections to most of the fees for the Committee's limited objection to the Debtors' Thaxton Settlement/Windup Motion which sought to assure continuance of the Equity Committee and provide funding, since such results could have been obtained by stipulation rather than papers and a personal appearance at the hearing,[2] (e) objections to most fees incurred after the Court's decision on the Indenture issues, and (f) numerous objections to specific items. The Debtors specifically reserve all of such objections and, if the Court grants an increase in the fee cap, requests the Court set a further hearing on such matters.

6. Summary/Position of Debtors. The Debtors request that this Court enter the proposed order granting the Clarification Motion and deny any increase in the fee cap. In connection with the fee cap, the Debtors wish to convey to the Court, the opposition of the Debtors, their Senior Management and their Board of Directors to any increase in the fee cap, and any further erosion of the amounts available to satisfy the claims of the New Senior Notes.

---

[2]    At the hearing, counsel for the Committee acknowledges that the limited objection "was simply to remind the Debtor that -- that we're still here. We know your Honor knows we're still here. . . .[O]n the merits, . . . we leave the issue to the U.S. Trustee, and we have no formal retractions, because, frankly, think they were beyond the scope of our very limited appointment in this case." Transcript of 12/11/06, at 23.

Dated: June 22, 2007  
Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.,

By:   /s/ Mark D. Collins  
      Mark D. Collins (N0. 2981)  
      Michael J. Merchant (No. 3854)  
      One Rodney Square  
      P.O. Box 551  
      Wilmington, Delaware  
      Telephone: (302) 651-7700  
      Telecopy:   (302) 651-7701

      GIBSON DUNN & CRUTCHER LLP  
      Jonathan M. Landers  
      200 Park Avenue  
      New York, New York 10166  
      Telephone: (212) 351-4059  
      Telecopy:   (212) 351-4035

      Co-Counsel to the Reorganized Debtors

# **EXHIBIT G**

LEXSEE 2002 U.S. DIST. LEXIS 27210

**EXIDE TECHNOLOGIES, et al., AND CREDIT SUISSE FIRST BOSTON,
Appellants, v. STATE OF WISCONSIN INVESTMENT BOARD, Appellee, and
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF EXIDE
TECHNOLOGIES, et al., Intervenor. OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF EXIDE TECHNOLOGIES, et. al., Appellant, v. STATE OF
WISCONSIN INVESTMENT BOARD, Appellee, and OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS OF EXIDE TECHNOLOGIES, et al.**

**Appeal No. C.A. No. 02-1572-SLR, Bank. Case No. 02-11125-KJC, Appeal No. C.A.
No. 02-1610-SLR, Bank. Case No. 02-11125-KJC**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 27210*

**December 23, 2002, Decided**

**DISPOSITION:**  [*1]  Affirmed.

**COUNSEL:** For EXIDE TECHNOLOGIES, EXIDE DELAWARE LLC, EXIDE ILLINOIS INC., RBD LIQUIDATION LLC, debtors (02-CV-1572): James E. O'Neill, III, Pachulski, Stang, Ziehl, Young & Jones, P.C., Wilmington, DE.

For EXIDE TECHNOLOGIES, EXIDE DELAWARE LLC, EXIDE ILLINOIS INC., RBD LIQUIDATION LLC, appellants (02-CV-1572): James E. O'Neill, III, Pachulski, Stang, Ziehl, Young & Jones, P.C., Wilmington, DE.

For PREPETITION SECURED LENDERS, CREDIT SUISSE FIRST BOSTON, appellant (02-CV-1572): Etta R. Wolfe, Richards, Layton & Finger, Wilmington, DE.

For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, appellant (02-CV-1572): Adam Hiller, Pepper Hamilton LLP, Wilmington, DE.

For OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS, appellee (02-CV-1572): William Anthony Hazeltine, Potter Anderson & Corroon, LLP, Wilmington, DE.

For STATE OF WISCONSIN INVESTMENT BOARD, appellee (02-CV-1572): Stuart M. Grant, Grant &

Eisenhofer, P.A., Wilmington, DE.

MARK S. KENNEY, trustee (02-CV-1572), Pro se, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM ORDER**

At Wilmington this 23d day of December, 2002, having  [*2]  reviewed the papers and heard oral argument;

IT IS ORDERED that the bankruptcy court's September 23, 2002 decision in the above captioned matter is affirmed and the appeal denied, for the reasons that follow:

1. This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to *28 U.S.C. § 158(a)*. In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d*

*Cir. 1999).* With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991)* (citing *Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)).* The district court's **[*3]** appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a *de novo* basis bankruptcy court opinions. *In re Hechinger Inv. Co., 298 F.3d 219, 224 (3d Cir. 2002); In re Telegroup, Inc., 281 F.3d 133, 136 (3d Cir. 2002).*

2. The bankruptcy court decision which is the subject of this appeal involves the appointment of an equity committee [1] pursuant to *11 U.S.C. § 1102(a)(2),* which provides in relevant part that,

> on request of a party in interest, the court may order the appointment of ... committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

The statute does not define the term "adequate representation;" therefore, the bankruptcy court "retains the discretion to appoint an equity committee based on the facts of each case." *In re Williams Communications Group, Inc., 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002).* Generally, however, the appointment of an official equity **[*4]** committee "should be the rare exception" and should not be appointed unless equity holders establish [2] that

> (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee.

*Id. at 223.* In determining whether equity holders are likely to receive a distribution, courts review the costs associated with appointing an official committee as compared to the debtor's solvency. If a debtor appears to

be "hopelessly insolvent," the appointment of an official equity committee is generally regarded as unjustified. If a debtor does not appear to be "hopelessly insolvent,' courts consider the following additional factors in determining whether the equity holders are adequately represented without the appointment of an official committee:

> . Whether the shares are widely held and publicly traded;
>
> . The size and complexity of the Chapter 11 case; and
>
> . The timing of the motion relative to the status of the Chapter 11 case.

*See Matter of Kalvar Microfilm, Inc., 195 B.R. 599, 600 (Bankr. D. Del. 1995).* **[*5]**

> 1  See the September 23, 2002 decision of the court at D.I. 24, Ex. B at 4-15.
> 2  The parties agree that the burden of proof is by a preponderance of the evidence.

3. The bankruptcy court employed the correct legal standard in its decision to appoint an equity committee. (D.I. 24, Ex. B at 4-11) Keeping in mind that the decision to appoint an equity committee rests within the sound discretion of the bankruptcy court, this court finds as well that the bankruptcy court's decision is based on facts of record that are not clearly erroneous.

a. First, the motion for appointment of the equity committee came early in this complex Chapter 11 proceeding. Consequently, in balancing the costs of supporting an equity committee with the admittedly speculative prospects for a recovery for equity, the bankruptcy court did not err by finding that debtors were not hopelessly insolvent. More specifically, the bankruptcy court found that the appellee "presented credible evidence of equity value of the Debtors on a cash flow **[*6]** basis." (D.I. 24, Ex. B at 11) Although appellants argue that such evidence is comprised of little more than assumptions and economic speculation, nevertheless, appellee presented expert evidence consistent with the expectation that debtors intend to reorganize and not liquidate. (See D.I. 24, Ex. B at 13) Thus, although some of the bankruptcy court's apparent findings of fact may not be supported by the record, [3] there is evidence of record that the debtor is not

2002 U.S. Dist. LEXIS 27210, *6

hopelessly insolvent.

> 3    For instance, there is no evidence of hidden assets by way of debtors' foreign subsidiaries.

b. Second, although appellee is a substantial equity holder capable of representing itself in the bankruptcy proceeding, the bankruptcy court concluded that the Chapter 11 process would benefit from having an official committee of equity holders. Although different judges would employ their discretion differently when faced

with the facts of record, this court sees no clear error in the bankruptcy court's decision to be more inclusive [*7] in this complex Chapter 11 case.

4. For the reasons stated above, the September 23, 2002 decision of the bankruptcy court is affirmed and the appeal denied.

Sue L. Robinson

United States District Judge

# **EXHIBIT H**

LEXSEE 1993 U.S. DIST. LEXIS 9899

**HATZEL & BUEHLER, INC., Plaintiff, v. LOVISA CONSTRUCTION CO., INC., AETNA CASUALTY & INSURANCE CO., STANDARD FIRE INSURANCE CO., ALL STATE INSURANCE CO., and NORTH AMERICAN REINSURANCE CO., Defendants.**

**CV-92-384**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*1993 U.S. Dist. LEXIS 9899*

**July 13, 1993, Decided
July 20, 1993, Filed**

**JUDGES:** [*1] DEARIE

**OPINION BY:** RAYMOND J. DEARIE

**OPINION**

*MEMORANDUM AND ORDER*

DEARIE, District Judge.

Defendant Lovisa, a general contractor, and its sureties move for summary judgment dismissing plaintiff's claim for the balance allegedly due on its construction subcontract with Lovisa. In the alternative, defendant Lovisa moves for a stay pending the resolution of litigation involving the prime contract between Lovisa and the New York City Transit Authority. Plaintiff cross-moves for summary judgment in the amount of $ 82,645.00, the balance it claims is due. The subcontract at issue contains a "pay-when-paid" clause which is the focus of these motions.

For the reasons set forth below, defendants' motion for summary judgment is denied and plaintiff's cross-motion for summary judgment is denied. Defendants' motion for a stay pending the resolution of the litigation between Lovisa and the New York City Transit Authority is granted.

**Background**

Defendant Lovisa entered into a contract (the "prime contract") with the New York City Transit Authority (the "owner") to perform construction work for the Linden Yard Development Program. On or about April 6, 1983, Lovisa (the "general contractor") entered into [*2] a subcontract with Hatzel & Buehler (the "subcontractor") for the performance of electrical work on the Linden Yard project. The other defendants in this action, Aetna Casualty & Insurance, Standard Fire Insurance, All State Insurance, and North American Reinsurance, issued performance bonds on behalf of Lovisa. In May of 1989, plaintiff brought this action against the defendants for $ 82,645.00, the amount it claims remains due under the subcontract. [1]

> 1    This action was originally commenced as an adversary proceeding in bankruptcy court in Delaware.

To date, Lovisa has paid plaintiff those amounts received from the owner for plaintiff's work. However, Lovisa has not received full payment on the prime contract. Lovisa and the owner are currently litigating a contract dispute involving $ 289,358.69, the alleged balance due on the prime contract. That litigation is in the discovery phase. The owner refuses to pay the balance due Lovisa, including the money allegedly due the plaintiff in this action, for a [*3] variety of reasons, including Lovisa's alleged failure to provide the proper insurance. Lovisa denies any breach of the prime contract.

1993 U.S. Dist. LEXIS 9899, *3

## Claims

Lovisa does not contend that plaintiff should never be paid. (Aff. in Supp. of Mot. for Summ. J., P 41). Rather, it claims that, under the terms of the subcontract, plaintiff has no current right to payment. Relying on a "pay-when-paid" clause in the subcontract, defendants move for summary judgment, arguing that because Lovisa has not yet received its final payment from the owner, plaintiff is not entitled to its final payment. They also contend that plaintiff should presently be barred from recovery because the owner's refusal to make its final payment is, at least in part, a result of plaintiff's failure to fully perform its obligations to provide insurance and a maintenance bond.

Plaintiff cross-moves for summary judgment on the grounds that the pay-when-paid clause does not make payment by the owner a condition precedent to the subcontractor's right to payment. Plaintiff further claims that Lovisa's failure to maintain insurance is the cause of the owner's failure to make final payment and that it is in no way responsible for the [*4] owner's failure to pay. Plaintiff contends that there is no genuine issue of material fact as to its entitlement to recover $ 82,645.00, the claimed balance due under the subcontract, notwithstanding some evidence that Lovisa owes only $ 76,134.10 as a result of certain "backcharges." *(See* Letter dated December 24, 1991 from Hatzel & Buehler to Lovisa, attached as Ex. D to Aff. in Opp'n to Defs.' Mot. for Summ. J.) Plaintiff argues that Lovisa forfeited its right to claim any backcharges by failing to assert the backcharges as a counterclaim in its answer to plaintiff's complaint.

## Discussion

### *"Pay-When-Paid" Clause*

The primary issue in these motions for summary judgment is whether under the terms of the contract, the general contractor's receipt of payment from the owner is a condition precedent to the subcontractor's right to payment. The "pay-when-paid" clause in the subcontract provides:

> The Contractor agrees to pay the Subcontractor within ten (10) days after payment is received from the Owner and to pay the Subcontractor according to the terms by which the Contractor receives

> payment, *it being expressly understood and agreed and the intent of the parties* [*5] *that Subcontractor shall be paid only* from funds received by Contractor from Owner *and that the intent of the parties is that Subcontractor assumes the credit risk* incurred by the Contractor as respects payment from the Owner.

(Subcontract Agreement, Line No. 102-108, attached as Ex. D to Aff. in Supp. of Mot. for Summ. J. (emphasis added)).

Pay-when-paid clauses generally specify that the subcontractor will be paid after the general contractor receives payment from the owner. Depending upon the particular language of these clauses, they are construed either (1) as allowing the general contractor to delay payment for a reasonable amount of time after the subcontract is completed or (2) as allowing the general contractor to delay payment until he actually receives payment from the owner. Based on the case law, it is clear that a clause that states that a subcontractor shall be paid only after the general contractor is paid by the owner, standing alone, does not create a condition precedent to payment of the subcontractor. Nevertheless, the law does not support plaintiff's claim that the words "condition precedent" must actually appear in the pay-when-paid clause in [*6] order to create a condition precedent of payment by the owner.

In *Schuler-Haas Electric Corp. v. Aetna Casualty & Surety Co.*, 49 A.D.2d 60, 371 N.Y.S.2d 207 (4th Dep't 1975), *aff'd*, 40 N.Y.2d 883, 389 N.Y.S.2d 348, 357 N.E.2d 1003 (1976), the seminal New York case on the construction of pay-when-paid clauses, the Appellate Division held:

> if the parties clearly expressed an intention that no subcontractor . . . should have the right to be paid or to sue on the payment bond until all questions relating to the contracts have been resolved and the owner has made his final payment due under the contract to the general contractor, such agreement would be binding, and it would constitute a condition precedent to [a subcontractor's]

action against the surety.

. . . .

In the absence of a clear expression in the contract papers that the credit risk of the general contractor and the delay in payment frequently attending on construction projects are meant to be shifted to such suppliers and subcontractors, the contract instruments should not be construed as intending such assumption. Indeed, it is presumed that the parties did not intend that payment of the small subcontractors [*7] should await the determination of an extended legal dispute between the owner and general contractor over an issue not concerning him or his work.

*371 N.Y.S.2d at 210* (citations omitted). In affirming the decision, the Court of Appeals held:

If as here there is no express language to the contrary in the written document (and no extrinsic evidence), the standard would seem to be that where payment is stipulated to occur on an event, the occurrence of the event fixes only the time for payment; it is not to be imported as a substantive condition of the legal responsibility to pay.

*389 N.Y.S.2d at 348-49.* Defendants rely on this case for the proposition that if, in addition to conditioning payment on the general contractor's receipt of payment from the owner, a pay-when-paid clause clearly and expressly shifts the risk of nonpayment by the owner to the subcontractor, the clause bars the subcontractor from recovering payment from the general contractor until the general contractor receives payment from the owner. Plaintiff, in contrast, relies on this case for the proposition that a subcontract must clearly state that [*8] payment by the owner is a condition precedent to payment to the subcontractor in order to condition the general contractor's liability to the subcontractor on payment by the owner. That is, plaintiff contends that a pay-when-paid clause must actually include the words "condition precedent" to create such a condition precedent.

Plaintiff misconstrues *Schuler-Haas. Schuler-Haas* stands only for the proposition that absent a clearly expressed intent that no subcontractor has a right to be paid or to sue on a payment bond until the owner has paid the general contractor, a pay-when-paid clause will not be construed to condition payment of the subcontractor on the general contractor's actual receipt of payment from the owner. As the defendants argue, *Schuler-Haas* requires a clear expression of intent, not an expression of particular words. Magic words are not required so long as the language employed by the parties makes clear their intention.

It is clear that clauses that merely provide that the subcontractor will be paid after the owner pays the general contractor do not create a condition precedent to payment of the subcontractor. They are construed as allowing the general [*9] contractor to postpone payment to the subcontractor for a reasonable period of time after the completion of the subcontract work. *See Schuler-Haas,* 389 N.Y.S.2d at 348-49; *Action Interiors, Inc. v. Component Assembly Systems, Inc.,* 144 A.D.2d 606, 535 N.Y.S.2d 55, 56 (2d Dep't 1988) (provision that payment to subcontractor not due until owner paid general contractor, "while providing for a postponement of payment to permit the general contractor an opportunity to obtain funds from the owner, only requires that payment be delayed for a reasonable time after completion of the subcontract work." (citations omitted)); *Mass Transportation Electrical Construction v. Penta Construction Corp.,* 140 A.D.2d 174, 527 N.Y.S.2d 422, 424 (1st Dep't 1988) (subcontract provision stating that "'the Contractor's obligation to make payment to the Subcontractor shall be limited to funds actually received by the Contractor from the Owner in payment of work performed by the Subcontractor'" not construed as setting forth payment from the owner to the general contractor as a condition precedent to payment to the subcontractor); *Grossman Steel and Aluminum Corp. v. Samson Window Corp.,* 54 N.Y.2d 653, 442 N.Y.S.2d 769, 770, 426 N.E.2d 176 (1981), [*10] *aff'g,* 433 N.Y.S.2d 31 (2d Dep't 1980) (subcontract provision specifying that "'Retained percentages will be paid to [subcontractor] as and when [general contractor] receive[s] such payment from the [owner] and in the same proportions'" does not create a condition precedent to payment to the subcontractor, but rather establishes a time for payment).

697

It is also clear that the words "condition precedent" are not required to create a condition precedent to the general contractor's obligation to pay the subcontractor. While plaintiff is correct that in the cases in which a pay-when-paid clause has been held to create a condition precedent, the clause has included the words "condition precedent," the holdings in those cases are not grounded on the presence of those words. Rather, a provision specifying that the subcontractor will be paid after the general contractor receives payment from the owner *together with* a provision specifying that the subcontractor assumes the credit risk incurred by the contractor with respect to payment by the owner creates a condition precedent to the subcontractor's right to payment. *See Crown Plastering Corp. v. Elite Associates, Inc., 166 A.D.2d 495, 560 N.Y.S.2d 694* [*11] (2d Dep't 1990) (provision specifying that subcontractor would be paid after contractor received payment from owner, read in conjunction with provision that subcontractor "relies on the credit of the Owner, not the Contractor, for payment of its work," clearly manifested parties' intention to shift the credit risk of the general contractor and delays in payment to the subcontractor, and, therefore, created a condition precedent to final payment to subcontractor); *Riverside Iron Works, Inc. v. Insurance Company of North America, 156 A.D.2d 919, 549 N.Y.S.2d 877* (3d Dep't 1989) (provision in subcontract specifying that subcontractor agrees to accept the risk that it will not be paid for its work to the extent the general contractor is not paid by the owner distinguished it from pay-when-paid clause in subcontract in *Schuler-Haas* and created a condition precedent to general contractor's obligation to pay).

Finally, plaintiff contends that defendants cannot rely on the portion of the pay-when-paid clause that states that the "subcontractor assumes the credit risk incurred by the contractor as respects payment from the owner" to avoid its present obligation to pay plaintiff [*12] because the owner's failure to pay Lovisa does not involve a "credit risk." Plaintiff argues that the owner's failure to pay is not due to its inability to pay, but, rather, is due to a dispute with Lovisa, and that the owner's inability to pay is all that is contemplated by the terms "credit risk incurred by the contractor." However, the owner's failure to pay the general contractor because of a dispute is a risk clearly contemplated by *Schuler-Haas* and its progeny. *See Schuler-Haas, 371 N.Y.S.2d at 210* (in the absence of a clear expression to the contrary, "it is presumed that the parties did not

intend that payment of the small subcontractors should await the determination of an extended legal dispute between the owner and general contractor over an issue not concerning him or his work."); *Crown Plastering, 560 N.Y.S.2d at 696* (in action by subcontractor against general contractor where general contractor and owner were, in a separate action, litigating over owner's alleged wrongful termination of prime contract, provision specifying that subcontractor hereby acknowledges that it relies [*13] on the credit of the owner, not the contractor for payment of its work," together with provision specifying that subcontractor would be paid after contractor received payment from owner, held to create a condition precedent precluding summary judgment in favor of subcontractor for balance due). Therefore, the pay-when-paid clause in the subcontract between plaintiff and defendant Lovisa creates a condition precedent to plaintiff's right to payment.

Although the Court concludes that, as a matter of law, the pay-when-paid clause creates a condition precedent, if Lovisa has frustrated or prevented the occurrence of the condition precedent, that is, the owner's payment, Lovisa is not entitled to rely on the condition precedent to bar any present obligation to pay plaintiff. *See Crown Plastering, 560 N.Y.S.2d at 696.* Considering the evidence currently before the Court, the Court concludes that a material issue of fact exists as to whether Lovisa performed or substantially performed its duties under the prime contract and, therefore, whether Lovisa is entitled to rely on the condition precedent to avoid paying plaintiff. *See Spence v. Ham, 163 N.Y. 220, 225, 57 N.E. 412 (1900)* [*14] (quoting *Woodward v. Fuller, 80 N.Y. 312, 315* for the proposition that "'where a builder has in good faith intended to comply with the contract, and has substantially complied with it, although there may be slight defects, caused by inadvertence or unintentional omission, he may recover the contract price, less the damages on account of such defects.'"). Given the evidence that Lovisa failed to perform some of its duties under the prime contract, [2] defendants are not entitled to summary judgment dismissing plaintiff's claims. Plaintiff is likewise not entitled to summary judgment because it has not shown that Lovisa lacked a good faith intention to comply with the prime contract or that Lovisa failed to substantially comply with the prime contract. [3] Moreover, as discussed above, the owner's failure to pay because of a dispute with the general contractor is a risk clearly contemplated by the parties as evidenced by the pay-when-paid clause in their contract. Absent a showing

of a breach of the prime contract so material that bypassing the pay-when-paid clause is warranted, plaintiff is not entitled to summary judgment.

    2  *See* Aff. in Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Pl.'s Cross-Mot. for Summ. J., P 7 & Ex. E., Letter from New York City Transit Authority to Lovisa, dated December 19, 1989. ("Lovisa has not complied with the following: 1. Submission of acceptable proof of insurance. . . . 2. Submission of a Guarantee Bond . . . to ensure that the roofing and flashing . . . does not leak. . . . 3. Execution and submission of the required release form.")

[*15]

    3  *See* Aff. in Supp. of Defs.' Mot. for Summ. J., P 14 & Ex. E., Letter from New York City Transit Authority to Lovisa to M. Reigh, Hardesty & Hanover, dated January 13, 1986. ("The Contractor achieved Substantial Completion of the work under this contract on December 30, 1985 as described in Article 2.02 of the specifications.")

*Backcharges*

At oral argument, plaintiff requested the Court to specifically rule on the issue of whether as a result of its failure to counterclaim for backcharges, Lovisa has forfeited its right to claim such backcharges. Lovisa argues that it need not have asserted the backcharges as a counterclaim because plaintiff has the burden of proving the amount due on the contract. According to Lovisa, the backcharges are a result of plaintiff's failure to produce certain drawings pursuant to the contract, plaintiff's damage to electrical manhole covers in carrying out its work, delays and deficiencies in plaintiff's work necessitating a watchman service at Lovisa's expense, and plaintiff's failure to erect certain signs. (Aff. in Supp. of Defs.' Mot. for Summ. [*16] J. and in Opp'n. to Pl.'s Cross-Mot. for Summ. J., P 27-31.) Neither plaintiff nor Lovisa has cited any authority indicating whether a claim for backcharges in a contract action is a compulsory counterclaim.

Although the Court is not aware of any case law precisely addressing this issue, the Court concludes, upon review of *Rule 13 of the Federal Rules of Civil Procedure*, that a claim for backcharges is a compulsory counterclaim. Moreover, Lovisa's claim for backcharges is analogous to a claim for recoupment. As such, it is a

compulsory counterclaim. *See First Nat. Bank v. Master Auto Service Corp., 693 F.2d 308, 310 n.1 (4th Cir. 1982)* (in action to recover amount due for tires sold, buyer's claim against seller for a reduction in amount due for honoring customers' claims under the seller's tire warranty constituted claim for recoupment); *Hunt v. Bankers Trust Co., 689 F. Supp. 666 (N.D.Tex. 1987)* (recoupment applies to compulsory counterclaims under *F.R.C.P. 13*); 6 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure §§ 1401, 1409 (1990) (recoupment is a claim arising from the same transaction [*17] as plaintiff's claim used to defeat or diminish plaintiff's recovery; a compulsory counterclaim interposed solely to defeat or diminish plaintiff's recovery is analogous to the common-law claim for recoupment). Therefore, defendants' failure to assert the backcharges as a counterclaim will preclude it from bringing an independent action on the backcharges. The Court notes, however, that *Rule 13(f) of the Federal Rules of Civil Procedure* provides that the Court may grant leave to amend to include counterclaims omitted through "oversight, inadvertence, or excusable neglect, or when justice so requires." Such leave is generally liberally granted. 6 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1430 (1990). Accordingly, leave will be granted here.

**Conclusion**

Under the subcontract, receipt of payment by Lovisa from the New York City Transit Authority is a condition precedent to Hatzel & Buehler's right to final payment. However, because there are issues of material fact as to whether Lovisa may rely on the New York City Transit Authority's failure to pay to deny payment to Hatzel & Buehler at this time, both defendants' motion and plaintiff's [*18] motion for summary judgment are denied. This action shall be stayed pending the resolution of the litigation between Lovisa and the New York City Transit Authority.

    SO ORDERED.

    Dated: Brooklyn, New York

    July 13, 1993

    RAYMOND J. DEARIE

    United States District Judge

# **EXHIBIT I**



Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2000 WL 152129 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**In re Color Tile, Inc.
D.Del.,2000.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
In re: COLOR TILE, INC., et al., Debtor,
OFFICIAL COMMITTEE OF THE UNSECURED
CREDITORS OF COLOR TILE, INC., et al.,
Plaintiff,
v.
BLACKSTONE FAMILY INVESTMENT
PARTNERSHIP, L.P., et al., Defendants.
**Nos. 96-76 (HSB), 96-80(HSB), Civ.A. 98-358-
SLR, A-98-90, 96-77(HSB), 96-78(HSB), 96-
79(HSB).**

Feb. 9, 2000.

Ian Connor Bifferato, of Bifferato, Bifferato &
Gentilotti, Wilmington, Delaware, David F. Heroy,
Brian E. Martin, Bruce E. Lithgow, of Bell, Boyd &
Lloyd, Chicago, Illinois, for Plaintiff, of counsel.
Kevin Gross, of Rosenthal, Monhait, Gross &
Goddess, P.A., Wilmington, Delaware, David I.
Blejwas, of Hahn & Hessen LLP, New York, New
York, for Blackstone Defendants and Saloman Smith
Barney, of counsel.
Joseph Grey, of Stevens & Lee, Wilmington,
Delaware, Louis J. Sinatra, Ronald L. Daugherty, and
James C. Shah, of Pelino & Lentz, P.C., Philadelphia,
Pennsylvania, for Bankers Trust Company, of
counsel.
Richard K. Herrmann, and Mary B. Matterer, of
Blank, Rome, Comisky & McCauley LLP,
Wilmington, Delaware, Richard F. Lubarsky, of Levi
& Lubarsky, New York, New York, for Northeast
Investors Trust, Northern Trust Company, Morgan
Guaranty Trust Company, of counsel.
John D. Demmy, and Eric D. Schwartz, of Morris,
James, Hitchens & Williams, Wilmington, Delaware,
for Reliance Insurance Company.
Charlene D. Davis, John H. Newcomer, Jr., and
Michael L. Vild, of the Bayard Firm, Wilmington,
Delaware, Christopher D. Loizides, and Magdalen
Braden, of Dechert Price & Rhoads, Philadelphia,
Pennsylvania, for Northstar High Yield Bond Fund,
of counsel.
Laurie Selber Silverstein, and William A. Hazeltine,
of Potter, Anderson & Corroon LLP, Wilmington,
Delaware, Michael P.O'Neill, of Freeborn & Peters,

Chicago, Illinois, for BTC U.S. High Yield Fund, of
counsel.

MEMORANDUM OPINION
ROBINSON, J.

I. INTRODUCTION

**\*1** Currently before the court are motions to dismiss
the instant adversary proceeding. The motions have
been filed by the Blackstone defendants and a variety
of other alleged recipients of preferred stock
dividends issued by the debtor, Color Tile, Inc.
("Color Tile").[FN1] Plaintiff, the Official Committee of
Unsecured Creditors of Color Tile, is the fiduciary
appointed to represent the interests of bondholders
and trade and other unsecured creditors who hold
more than $300 million in unpaid claims against the
bankruptcy estates of Color Tile and its affiliates.

> FN1. Defendants include insurance
> companies, high-yield mutual funds,
> business trusts, investment companies and
> partnerships, securities firms and two high
> net worth individuals. Unless otherwise
> specified, the court shall refer to defendants
> collectively as the Blackstone defendants.
> According to plaintiff, all defendants are
> wealthy, sophisticated "accredited investors"
> and "qualified institutional buyers."

The court has jurisdiction pursuant to 28 U.S.C. §
1334. For the following reasons, the court shall deny
the motions to dismiss.

II. BACKGROUND

The court gleans the following facts from plaintiff's
complaint and the attached documents. For purposes
of this motion, the court accepts as true the facts
asserted therein.

Plaintiff seeks restoration to the estate of
approximately $10,077,500 in dividends that Color
Tile paid to holders of its Class B, Series A, Senior
Increasing Rate Preferred Stock ("preferred
shares").[FN2] In 1992, Color Tile issued 2,200,000
shares of the preferred stock, the proceeds of which it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 152129 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

used to retire approximately $47,700,000 in debt associated with Color Tile's Senior Notes. The terms governing the preferred shares were outlined in a June 24, 1992 Private Placement Memorandum and in an August 7, 1992 supplement thereto. The sale of the preferred shares replaced the existing debt on Color Tile's Senior Notes with a new obligation redeemable after ten years, at an amount equal to the purchase price of the preferred shares plus any unpaid and accrued dividends. The preferred shares carried a lower stated dividend than the interest carried on the Senior Notes. The dividend payments began on or about January 1, 1994.

> FN2. Due in part to the financial sophistication of the defendants, the preferred stock was exempt from the registration and prospectus delivery requirements of the Securities and Exchange Act of 1933. *See* D.I. B27, Ex. C, at 1.

On January 24, 1996, Color Tile filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On January 15, 1998, plaintiff commenced this action against the Blackstone defendants and the other recipients of the dividends. The complaint asserts claims under the Delaware Fraudulent Transfer Act, 6 Del. C. § 1301 *et seq.* (the "DFTA"), and 11 U.S.C. §§ 544(b) and 548(a)(2). In essence, the complaint alleges that the preferred stock dividends were fraudulent transfers under the DFTA because they left Color Tile with unreasonably small capital and caused it to incur debts beyond its ability to pay. Plaintiff seeks to avoid these transfers under 11 U.S.C. § 544. The complaint also seeks recovery under 11 U.S.C. § 548(a)(2) for transfers that occurred within one year prior to the petition date. With respect to these payments, the complaint alleges that Color Tile received less than reasonably equivalent value in exchange for these dividends and that it was insolvent on the date of the dividend payments or became insolvent because of such payments.

Defendants seek dismissal of the complaint on several grounds. First, they allege that the DFTA is inapplicable to plaintiff's claims because "its application would improperly nullify the Delaware General Corporation Law ["DGCL"] remedial statutory scheme, which specifically addresses the recovery of unlawful dividends from shareholders."(D.I. B26 at 2) Second, defendants argue that the court must dismiss the DFTA claim because plaintiff fails to allege that defendants knew the dividend payments were unlawful. Third, even if the DFTA claim were viable, defendants contend that plaintiff cannot establish that the payments constituted fraudulent transfers because defendants provided Color Tile with reasonably equivalent value for the dividends and because the dividends were payments in satisfaction of antecedent debt.

**\*2** In addition to these arguments, defendants BTC U.S. High Yield Fund, Brinson Trust Company, and Northstar High Yield Bond Fund move to dismiss the complaint as time barred. (D.I.B77, D37) The court shall address each of these arguments in turn.

### III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint in favor of the plaintiff, accepting as true all material allegations of the complaint. *SeeTrump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998)."A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."*Id.* A court may dismiss claims pursuant to Rule 12(b)(6) only if the plaintiff cannot demonstrate any set of facts that would entitle it to relief. *SeeConley v. Gibson,* 355 U.S. 41, 45-46 (1957). The moving party has the burden of persuasion. *SeeKehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

### IV. DISCUSSION

#### A. Plaintiff May Proceed Under the DFTA

Defendants argue that § 174 of the DGCL trumps the DFTA and that, therefore, plaintiff's sole remedy is to proceed under the DGCL and recover the dividend payments from the directors of Color Tile rather than from the preferred shareholders. Defendants do not cite a single case supporting this proposition. Instead, defendants rely on general principles of statutory construction. Specifically, they argue that when two acts touch upon the same subject, the general statute (here the DFTA) should not prevail over the more specific statute (allegedly the dividend recovery provisions of the DGCL). Otherwise, defendants argue, the DFTA would nullify the DGCL.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 152129 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Upon closer inspection, however, the two statutes serve distinct purposes and provide different remedies. Section 1305(a) [FN3] of DFTA provides, in pertinent part, that:

> FN3. Plaintiff asserts under both §§ 1304(a)(2) and 1305(a) of the DFTA. Section 1304 applies to present and future creditors whereas § 1305 applies only to present creditors. The language in both sections, however, is substantially the same.

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

6 Del. C. § 1305(a). Once a transfer is found to be fraudulent, § 1307 of the DFTA enables a creditor to avoid the transfer to the extent necessary to satisfy the creditor's claim. The DFTA thus focuses on ensuring that creditors recover fraudulent transfers to third parties. Section 174 of the DGCL, on the other hand, imposes liability on corporate directors for approving unlawful dividend payments. Unlike the DFTA's avoidance provision, the DGCL provides for damages against corporate directors. Because it makes directors (rather than the recipients of the dividends) primarily liable, § 174 is designed to discourage directors from depleting a corporation's ability to repay its debts. Section 174 focuses on deterrence rather than on returning fraudulent payments to creditors. Thus, contrary to defendants' assertion, the DGCL and the DFTA serve different purposes.

**\*3** The DFTA's focus on ensuring the equitable distribution of assets to a debtor's rightful creditors also makes it the more appropriate statute in the context of a bankruptcy proceeding. Indeed, the DFTA looks to the economic effects of the transfer on a debtor's creditors rather than to the debtor's mere compliance with corporate governance rules. *See China Resource Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc., 788 F.Supp. 815, 818 (D.Del.1992)* (noting that Delaware's fraudulent transfer act "judges a transaction by its effect on the debtor's unsecured creditors"). Moreover, statutes like § 170 of the

DGCL lack the DFTA's "equity-oriented, purposive concept of capital, which is much more relevant to the question of risk actually posed to creditors." *See* Robert Charles Clark, *The Duties of the Corporate Debtor to its Creditors, 90 Harv. L.Rev. 505, 556 (1977); see also* 1 R. Franklin Balotti et al., *The Delaware Law of Corporations & Business Organizations* § 5.22, at 5-48 n. 309 (3d ed.1999).

For instance, the DFTA requires proof only of inequivalent value in exchange for the payment and the debtor's resulting or contemporaneous insolvency. On the other hand, to state a cause of action under § 174, a creditor first must prove that the corporation depleted its surplus in paying the dividend. *See Del. C. § 170(a)(1).* The directors, however, have almost unfettered discretion in defining the extent of the corporation's surplus. The Delaware Code defines surplus as the value of net assets over the par value of the stock. *See 8 Del. C. § 154;* 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 20.03[2], at 20-9 -11 (1999). In determining the value of net assets, the directors are not tied to any formal financial appraisal of their assets. They need only "evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present 'values.' " *Morris v. Standard Gas & Elec. Co., 63 A.2d 577, 582 (Del. Ch.1949); see also Klang v. Smith's Food & Drug Centers, Inc., 702 A.2d 150, 152 (Del.1997).* By manipulating the value of net assets, directors can skew the calculation of surplus and thereby render "lawful" (in a strictly formalistic sense) dividend payments that otherwise would qualify as fraudulent transfers under the DFTA. The easy manipulation of a corporation's surplus has prompted one commentator to note that statutes prohibiting payments of dividends out of surplus are "virtually meaningless." *See* Clark, *supra,* at 556.This conclusion is buttressed by the fact that directors can easily insulate themselves from liability under § 170 of the DGCL by demonstrating that they relied on the reports of employees, committees of the board, or experts "selected with reasonable care by or on behalf of the corporation" as to the availability of surplus. *See 8 Del. C. § 172.*

For these reasons, plaintiff may proceed under the DFTA against defendants. Plaintiff is not required to proceed against Color Tile's directors under the DGCL simply because the allegedly fraudulent transfers took the form of dividend payments. *See Stanley v. Brock (In re Kettle Fried Chicken of*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Am., Inc.), 513 F.2d 807, 814 (6th Cir.1975)* (explaining that the Delaware legislature, in providing a specific remedy against corporate directors, "in no way intended to relieve shareholders of liability").

### B. The DFTA Does Not Require Knowledge of the Allegedly Fraudulent Dividends

**\*4** Quoting the DGCL, defendants also argue that plaintiff's DFTA claim is invalid because the complaint does not allege that defendants received the dividends with knowledge that they were unlawful. *See* D.I. B26 at 12 (quoting 8 Del. C. § 174(c)). The DGCL has no bearing on the pleading requirements under the DFTA. The DFTA requires only that a plaintiff plead and prove (1) a transfer, (2) made without receiving reasonably equivalent value in exchange, and (3) resulting or contemporaneous insolvency. *See*6 Del. C. §§ 1304(a), 1305(a); *Corporate Property Assocs. 8, L.P. v. Amersig Graphics, Inc.,* Civ. A. No. 13241, 1994 WL 148269, at *2 (Del. Ch. Mar. 31, 1994) (construing the Delaware Fraudulent Conveyances Act, 6 Del. C. § 1304). Knowledge of the fraudulent transfer on the part of the recipient is not an element of a DFTA claim.

### C. The Dividends Were Not Payments in Satisfaction of Antecedent Debt

Defendants next argue that the purchase of the preferred shares was tantamount to a $52 million loan to Color Tile and that the dividends were payments in satisfaction of this antecedent debt. Construed as such, the dividend payments could not have been fraudulent transfers. *See*6 Del. C. § 1303(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, ... an antecedent debt is secured or satisfied...."). At issue, then, is whether the purchasers of the preferred shares held equity or debt in Color Tile.

Whether a security constitutes equity or debt depends on the interpretation of the contract between the corporation and the security holders. *See*Wolfensohn *v. Madison Fund, Inc.,* 253 A.2d 72, 75 (Del.1969); *accord*Drexler,*supra,* at 17-5 n. 8. In interpreting the contract, courts consider numerous factors, including: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of

principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation. *See*Slappey Drive Indus. Park v. United States, 561 F.2d 572, 581-82 (5th Cir.1977); Moore v. American Fin. & Secs. Co., 73 A.2d 47, 48 (Del. Ch.1950); *Drexler,supra,* at 17-5 n. 8.

In light of these standards, there is little doubt that the preferred shares and their accompanying Private Placement Memorandum (the "Memorandum") contemplated an equity interest in Color Tile. The instrument, itself, is denoted as "Series A Senior Increasing Rate Preferred Stock."(*See* D.I. B27 at 1) Although the dividend and redemption dates were projected, the very first page of the Memorandum warns purchasers that, "[t]he Company's ability to pay dividends on the Shares and to redeem or repurchase the Shares is subject to the satisfaction of certain covenants and restrictions under the Company's credit facilities, the Company's Certificate of Incorporation and the Delaware General Corporation Law."(D.I. B27 at 1) This caveat is repeated elsewhere in the Memorandum. For instance, the terms of the Memorandum limit the payment of dividends to "funds legally available therefor." (D.I. B27 at 7) The Memorandum also states that, "pursuant to the terms of its Senior Credit Agreement, its Certificate of Incorporation and the DGCL under certain circumstances the Company will be restricted from repurchasing the Shares."(D.I. B27 at 9) More tellingly, the "Investment Considerations" section of the Memorandum warns that Color Tile is "substantially leveraged" and that, due to

**\*5** the degree to which the Company is leveraged, the need to apply a substantial portion of the Company's cash flow from operations to pay principal of and interest on indebtedness, and the operating and financial restrictions contained in the agreements governing the Company's credit facilities could have important consequences to holders of the Shares, including the following: (1) the Company's ability to pay dividends, including dividends on the [Preferred] Shares, may be restricted....

(D.I. B27 at 12) Thus, the Memorandum explicitly distinguishes between Color Tile's "credit facilities," which enjoy priority, and its preferred shareholders, whose interests are junior to such secured creditors.

If there were any doubt as to the true nature of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 152129 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

preferred shareholders' interest, it is dispelled by the Memorandum's description of the liquidation preference: "[H]olders of the [Preferred] Shares will be entitled to be paid out of the assets of the Company available to its stockholders an amount in cash equal to $25.00 for each Share outstanding."(D.I. B27 at 8 (emphasis added)) In other words, the preferred shareholders enjoy priority only with respect to the funds available to stockholders, whose interests as a class are junior to the corporation's secured creditors in the context of liquidation. Thus, there is no certainty of payment of accrued dividends or of redemption of the shares upon liquidation. Where such certainty of payment is missing, the security is equity, not debt. See*Moore, 73 A.2d at 48*.

The fact that the preferred shareholders held equity is further evidenced by the fact that the Memorandum accorded shareholders voting rights if Color Tile failed to pay dividends for six consecutive quarters or if it failed to redeem the shares in 2003. (See D.I. B27 at 8) In discussing the tax ramifications of the security, the Memorandum also states that, "[t]he Company believes that the [Preferred] Shares will constitute equity for Federal income tax purposes and that distributions on the Shares ... will constitute dividends."(D.I. B27 at 59)

Despite defendants' vehement protestations to the contrary, the preferred shares constituted equity, not debt. Therefore, their attempt to characterize the dividend payments as payments in satisfaction of antecedent debt is unavailing. Equally unavailing is defendants' attempt to characterize the declaration of the dividend as creating a debt, the payment of which constitutes "fair consideration" under the DFTA. Under Delaware law, a declaration of a dividend gives rise to a debt only if the dividends are lawfully declared. See*Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1175 (Del.1988)* (noting that "upon a valid declaration of a dividend the corporation becomes indebted to the stockholder") (emphasis added). Construed broadly, the complaint alleges that Color Tile lacked legally available funds at the time of the dividend declaration. For purposes of this motion only, the court shall presume that the dividends were not validly declared and that, therefore, they did not constitute payment of an antecedent debt.

### D. Count II of the Complaint

*6 Count II of the complaint asserts a claim under § 548(a)(2) of the Bankruptcy Code and seeks to avoid dividend payments made within one year of the petition date (i.e., January 24, 1996). Defendants claim that the last dividend payment was made no later than January 17, 1995. (See D.I. B26 at 20) The timing of the dividend payments, however, is a question of fact and inappropriate for resolution at this stage of the proceedings. Accordingly, for all these reasons, the court shall deny the Blackstone defendants' motion to dismiss.

### E. The Motion to Dismiss of BTC U.S. High Yield Fund, Brinson Trust Company, and Northstar High Yield Bond Fund

Defendants BTC U.S. High Yield Fund ("BTC"), Brinson Trust Company ("Brinson"), and Northstar High Yield Bond Fund ("Northstar") contend that plaintiff's amended complaint is time barred. Plaintiff's initial complaint, filed on January 15, 1998, listed Cede & Co. ("Cede") as a defendant.[FN4]Plaintiff soon learned that Cede served as the nominee of, and conduit for, the dividend payments made to Northstar, BTC, and Brinson. Plaintiff then stipulated to a dismissal of Cede and, on September 18, 1998, amended its complaint to include Northstar, BTC, and Brinson as defendants. Plaintiff filed the amended complaint more than two years after Color Tile's bankruptcy filing. Consequently, the amended complaint against BTC, Brinson, and Northstar falls outside the two year statute of limitations period imposed by 11 U.S.C. § 108(a)(2). Unless the amended complaint relates back to the filing date of the original complaint, plaintiff's action against BTC, Brinson, and Northstar must be dismissed. The court finds that the amended complaint does relate back to the filing date of the original complaint.

> FN4. Cede is the partnership nominee of the Depository Trust Company ("DTC"), a securities depository and clearing agency registered with the Securities and Exchange Commission.

For an amended complaint to relate back to the filing date of the original complaint, the claim must have arisen out of the same transaction or occurrence set forth in the original pleading and,
within the period provided by Rule 4(m) for service of the summons and complaint [i.e., 120 days after filing of the complaint], the party to be brought in by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 152129 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c). Courts have interpreted the notice requirement under Rule 15(c) broadly to include actual, constructive, or imputed notice through formal and informal channels. *See Resource Ventures, Inc. v. Resources Management Int'l, Inc.*, 42 F.Supp.2d 423, 429 (D.Del.1999).

Except for the substitution of the aforementioned defendants for Cede, the amended complaint is identical to the original complaint. It is not disputed that the amended complaint arises out of the same transaction or occurrence as the initial complaint. At issue is (1) whether BTC, Brinson, and Northstar received actual or constructive notice of plaintiff's suit within 120 days following the filing of plaintiff's complaint and (2) whether these defendants knew, or should have known, that but for plaintiff's mistake, they would have been named instead of Cede.

*7 BTC, Brinson, and Northstar do not dispute that Cede served as the conduit for the dividend payments from Color Tile. Furthermore, they do not dispute that Cede received timely notice of plaintiff's suit. Cede's operating rules require it to notify its participants of "documents received ... with respect to a Participant's Deposited Securities."(*See* D.I. 42, Ex. A) In light of this delivery rule, defendants received constructive notice of plaintiff's suit when plaintiff served Cede. As sophisticated investors who chose to use Cede as an intermediary, BTC, Brinson, and Northstar assumed the risk that suits arising out of their ownership of Color Tile preferred shares would name only Cede. These defendants also assumed the risk that service upon Cede would enable a later complaint to relate back. For these same reasons, these defendants knew, or should have known, that the original complaint mistakenly named Cede and that they were the real parties in interest. Accordingly, the court shall deny the motions to dismiss of BTC, Brinson, and Northstar.

### V. CONCLUSION

For the aforementioned reasons, the court shall deny defendants' motions to dismiss. An appropriate order

shall issue.

D.Del.,2000.
In re Color Tile, Inc.
Not Reported in F.Supp.2d, 2000 WL 152129 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J



Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 1773436 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

In re Estill Medical Technologies, Inc.
N.D.Tex.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Texas, Fort Worth
Division.
In re: ESTILL MEDICAL TECHNOLOGIES, INC.,
Debtor.
EAGLE EQUITY I, L.P., Appellant,
v.
ESTILL MEDICAL TECHNOLOGIES, INC.,
Appellee.
**No. 4:04-CV-400-A.**

Aug. 4, 2004.

Bruce W. Akerly, Bell Nunnally & Martin, Dallas,
TX, for Appellant.
David L. Woods, McGuire Craddock & Strother,
Dallas, TX, for Appellee.
Dennis Michael Lynn, Fort Worth, TX, pro se.
Case Admin Sup FW, Fort Worth, TX, pro se.

*MEMORANDUM OPINION* and *ORDER*
MCBRYDE, J.
*1 This action comes before the court as an appeal
from memorandum opinions and orders of the United
States Bankruptcy Court for the Northern District of
Texas, Fort Worth Division, the Honorable Dennis
Michael Lynn presiding. The court, having
considered the briefs of appellant, Eagle Equity I,
L.P., and appellee, Estill Medical Technologies, Inc.,
("debtor"), the record on appeal, and applicable
authorities, finds that the bankruptcy court's rulings
should be affirmed.

I.

*Jurisdiction*

This is an appeal from a series of memorandum
opinions and orders entered September 12, 2003,
January 8, 2004, and March 26, 2004, ultimately
determining that appellant holds an unsecured claim
in the amount of $247,500.00. This court's
jurisdiction exists pursuant to 28 U.S.C. § 158(a).

II.

*Underlying Proceedings*

On or about June 15, 1999, appellant and debtor
entered into an agreement pursuant to which they
agreed to execute two royalty agreements, each for
the granting of a royalty interest in a patent
application made by debtor for the Thermal Angel
Portable I.V. Fluid Warming System. They also
entered into the first "royalty agreement" [FN1] whereby
debtor agreed, in exchange for a payment made by
appellant to debtor, to make payments to appellant
based on a per-unit amount for sales of certain types
of products. Specifically, debtor agreed to pay
appellant twenty cents for each unit sold until such
time as appellant had received payments in the
aggregate amount of $200,000.00 and thereafter to
pay eight cents per unit in perpetuity. On or about
July 30, 1999, the parties entered into a second
agreement containing payment obligations identical
to the first. The agreements were filed of record with
the United States Department of Commerce, Patent
and Trademark Office.

> FN1. The court questions the accuracy of the
> characterization of the agreements in
> question as "royalty agreements." They
> appear simply to be commitments by the
> debtor, in exchange for a payment made by
> appellant, to make future payments to
> appellant based on a per-unit amount for
> sales of certain types of products, which
> may or may not be covered by a patent or a
> patent application.

On November 2, 2001, debtor filed its petition under
Chapter 11 of the United States Bankruptcy Code in
Case No. 01-48064-DML.Both before and during the
bankruptcy, debtor made payments to appellant in
accordance with the agreements. Appellant filed two
proofs of claim. One was in the amount of $406.00,
representing payments due as of the filing of the case.
That claim was treated as an unsecured claim under
the plan. The second gave notice of the agreements
and appellant's claim for payments thereunder
(hereinafter "the claim").

Debtor filed a plan and disclosure statement that did
not specifically address appellant's claim for future
payments. Exhibit C to the disclosure statement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1773436 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

included a line item for "royalties" that included amounts payable to appellant and was intended to show that debtor would be able to continue to make those payments if the plan were confirmed. Tr. at 1578-79. By order signed February 13, 2003, the bankruptcy court approved debtor's plan of reorganization.

In early April 2003, debtor filed its omnibus objection to claims, specifically objecting that appellant's claim should be recharacterized as equity and cancelled in accordance with the confirmed plan. Tr. at 360. On May 19, 2003, the bankruptcy court held a hearing on the objection to appellant's claim. At the conclusion of the hearing, the bankruptcy judge directed the parties to submit briefing on additional issues. On September 12, 2003, the bankruptcy judge signed a memorandum opinion and order ruling that appellant's claim should not be recharacterized as an equity interest.[FN2] The bankruptcy judge went on to find that appellant held a general unsecured claim in an unliquidated amount. He instructed the parties to schedule a hearing so that the amount of the claim could be estimated. On November 18, 2003, the parties presented evidence as to the value of the royalty interests.

> FN2. The September 12, 2003, ruling should have been the end of the matter since the sole objection before the court was that appellant's claim should be recharacterized as equity and cancelled. Nevertheless, appellant does not raise as a ground on appeal that the bankruptcy court went beyond the scope of the issue before it. The additional issues appear to have been tried by consent.

*2 By order signed January 7, 2004, the bankruptcy judge noted that Exhibit C to the disclosure statement included the line item for "royalties." He ordered that a further hearing be set to determine whether appellant relied upon the disclosure and whether debtor should be precluded from challenging appellant's right to payments. On February 23, 2004, the bankruptcy court held the hearing contemplated by its January 7 order. Following the hearing, appellant sought leave to reopen the record to submit an affidavit of its former counsel to support the contention that appellant had relied upon the item in Exhibit C to the disclosure statement. By order signed March 26, 2004, the court denied the motion to reopen. By separate memorandum opinion and

order, the bankruptcy court ruled that appellant is a general unsecured creditor and allowed it a claim in the amount of $247,500.00.

### III.

#### Issues on Appeal

Appellant raises three grounds on appeal.[FN3] First, appellant acquired a valuable right that survived debtor's plan confirmation, and the bankruptcy court erred in ruling otherwise. Second, appellant's interest is worth more than the $247,500.00 found by the bankruptcy judge. And, third, the bankruptcy judge erred in refusing to grant appellant's motion to reopen the testimony to allow consideration of the affidavit of its former counsel.

> FN3. Appellant's statement of issues is so poorly worded that the court is defining the issues as it understands them. Appellant's Br. at 2-3.

### IV.

#### Standard of Review

To the extent the appeal presents questions of law, the bankruptcy court's judgment is subject to *de novo* review. *Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*, 785 F.2d 1249, 1252 (5th Cir.1986). Findings of fact, however, will not be set aside unless clearly erroneous. *Memphis-Shelby County Airport Authority v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1287 (5th Cir.1986). A finding is clearly erroneous, although there is evidence to support it, when the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* The mere fact that this court would have weighed the evidence differently if sitting as the trier of fact is not sufficient to set aside the bankruptcy court's order if that court's account of the evidence is plausible in light of the record viewed in its entirety. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

### V.

#### Discussion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1773436 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

### A. *Interpretation of the Plan.*

The bankruptcy court vacillated on how to interpret the plan. *See, e.g.,* Mar. 26, 2004, Mem. Op. at 3 (consider the text of the plan without any concern for the effect of Exhibit C); 2 n. 2 (court must look to the plan and associated documents to determine appellant's rights); 5 (referring to the plan and disclosure statement). By its January 7, 2004, order, the bankruptcy court suggested that if appellant relied on Exhibit C, the plan would be res judicata against debtor and appellant's payment entitlement would have survived. Then, having decided not to accept appellant's testimony on the issue of reliance, the bankruptcy court ruled that the plan's silence would be interpreted against appellant. Reliance on certain language, however, should have played no role in plan interpretation.

*3 A plan is to be interpreted by rules of contract interpretation. *See* *Official Creditors Comm. of Stratford of Tex., Inc. v. Stratford of Tex., Inc. (In re Stratford of Tex., Inc.),* 635 F.2d 365, 368 (5th Cir.1981). In determining contractual intent, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another. *Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir.1990); *Olm Assocs. v. Bright Banc Sav. Ass'n (In re Olm Assocs.),* 98 B.R. 271, 274 (Bankr.N.D.Tex.1989); *Dewitt County Elec. Coop. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999). Thus, the plan and disclosure statement are construed together to ascertain the intent of the parties. *In re Sugarhouse Realty, Inc.,* 192 B.R. 355, 363 (E.D.Pa.1996). Further, because the reference to royalties in Exhibit C is not otherwise explained, the parties' intent must be determined from extrinsic evidence. *Stratford,* 635 F.2d at 368.

Here, the plan and disclosure statement together indicate that debtor was aware of the payment obligation when the plan was formulated. The testimony previously cited confirms that debtor intended by Exhibit C to show that it would be able to continue to make the payments if required to do so. The plan itself did not impose any obligation to do so. Rather, it clearly provided that property of the estate would remain vested in the debtor.[FN4] And, 11 U.S.C. § 541(a)(6) states that property of the estate includes "proceeds ... or profits of or from property of the estate." *Louisiana World Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition,*

*Inc.),* 832 F.2d 1391, 1401 (5th Cir.1987). Profit from the sale of debtor's products falls into that category, no matter what arguments the parties made or failed to make.[FN5]

> FN4. At best, the reference to royalties in Exhibit C created an ambiguity that the bankruptcy court resolved in favor of debtor based on the testimony of its comptroller that the item was included to show that debtor could make the payments if required to do so.

> FN5. Appellant intimates that its interest could not have constituted an interest in accounts receivable, because neither party had made such a contention. Appellant's Br. at 13.

Appellant's argument that its right to receive payments constitutes a valuable property right that passed outside the bankruptcy estate is merely that. Appellant cannot, and does not, cite any authority to support its claim, finally admitting that "at the very least the [royalty] agreements conveyed a contractual right to payment based on future sales" by debtor. Appellant's Br. at 16. That the right was valuable does not mean that it was unaffected by debtor's bankruptcy. *See* *In re Dias,* 24 B.R. 542 (Bankr.D.Idaho 1982). The bankruptcy court did not err in concluding that appellant has an unsecured claim.

### B. *Valuation of the Claim.*

Appellant next argues that its royalty claim "was worth millions" instead of the $247,500.00 found by the bankruptcy court. Appellant's Br. at 29. It was the bankruptcy judge's prerogative to assess and evaluate the testimony. *See* *In re Chavin,* 150 F.3d 726, 728 (7th Cir.1998) (credibility issues are to be left to the trier of fact). Appellant has not shown that the fact-findings in regard to valuation of the claim were clearly erroneous. *Anderson,* 470 U.S. at 573-74.[FN6]

> FN6. In light of the evidence, it appears that the bankruptcy court's valuation of appellant's claim was generous.

### C. *Failure to Reopen the Record.*

*4 Finally, appellant complains that the bankruptcy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 1773436 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

court refused to reopen the record to permit appellant to include the testimony of its former counsel. As appellant notes, it bears the burden to show an abuse of discretion in denying the motion to reopen. *In re Liljeberg Enter., Inc.,* 304 F.3d 410, 433 n. 43 (5th Cir.2002). This it has not done. Appellant knew long before the February 23, 2004, hearing of the purpose for which it had been set. The bankruptcy court should not be blamed for appellant's apparent failure to be prepared to present testimony.

VI.

*Order*

For the reasons discussed herein,

The court ORDERS that the rulings of the bankruptcy court the subject of this appeal be, and are hereby, affirmed.

N.D.Tex.,2004.
In re Estill Medical Technologies, Inc.
Not Reported in F.Supp.2d, 2004 WL 1773436 (N.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K

LEXSEE 2005 U.S. DIST. LEXIS 13734

In Re: STOCK EXCHANGES OPTIONS TRADING ANTITRUST LITIGATION;
This Document Relates To: ALL ACTIONS

99 Civ. 0962 (RCC), MDL No. 1283, Master Docket No. M-21-79 (RCC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2005 U.S. Dist. LEXIS 13734; 2005-1 Trade Cas. (CCH) P74,872*

July 8, 2005, Decided
July 11, 2005, Filed

**SUBSEQUENT HISTORY:** As Corrected, July 15, 2005.
Class certification granted by, Resettlement denied, Costs and fees proceeding at, Motion granted by, in part, Motion denied by, in part *In re Stock Exchs. Options Trading Antitrust Litig., 2006 U.S. Dist. LEXIS 87825 (S.D.N.Y., Dec. 4, 2006)*

**PRIOR HISTORY:** *Miller v. Am. Stock Exch., Inc. (In re Stock Exchs. Options Trading Antitrust Litig.), 317 F.3d 134, 2003 U.S. App. LEXIS 277 (2d Cir. N.Y., 2003)*

**DISPOSITION:** [*1] Plaintiffs' motion for preliminary approval of settlement agreements DENIED IN PART and GRANTED IN PART.

**COUNSEL:** For Robert Strougo, individually and on behalf of all others similarly situated, Plaintiff: Andrew David Friedman, Samuel K. Rosen, Stuart D. Wechsler, Wechsler, Harwood, L.L.P., New York, NY.

For LSP Partners L.P., Mark Steinberg, Ram Yariv, Alan Haenel, Yakov Prager, Alan Boryk, Thomas Lynch, Dr. Mary Chiu, Harry Binder, Edward Meisel, Bruce McCall, Jeffrey Broderick, Adam Edelstein, Alan Nussbaum, George R. Kinney, Ronald K. Drucker, Robert L. Dunn, Wilson N. Krahnke, Marc Seidband, Lonnie B. Reiver, Ronnie A. Yarboraough, Jason Silver, Elliot Braun, Plaintiffs: Andrew David Friedman, Wechsler, Harwood, L.L.P., New York, NY.

For Lynn S. Miller, individually and on behalf of all others similarly situated, Mark Steinberg, individually

and on behalf of all others similarly situated, Ram Yariv, individually and on behalf of all others similarly situated, Alan Haenel, individually and on behalf of all others similarly situated, Yakov Prager, individually and on behalf of all others similarly situated, Thomas Lynch, individually and on behalf of all others similarly situated, [*2] Dr. Mary Chiu, individually and on behalf of all others similarly situated, Harry Binder, individually and on behalf of all others similarly situated, Estate of Wanda Graham, on behalf of itself and all others similarly situated, William Thedford, Individually and on behalf of all others similarly situated, Consolidated Plaintiffs: Andrew David Friedman, Wechsler, Harwood, L.L.P., New York, NY.

For Chicago Board Options Exchange, Inc., a Delaware not for profit corporation, Defendant: Charles A. Loughlin, Howrey Simon Arnold & White LLP, Washington, DC.

For Philadelphia Stock Exchange, Inc., a Delaware not for profit corporation, Defendant: William H. Rooney, Willkie, Farr & Gallagher, L.L.P., New York, NY.

For Pacific Exchange, Inc., a California corporation, Defendant: Louis Richard Cohen, Wilmer, Cutler & Pickering (Washington), Washington, DC.

For Omega Options, LLC, Movant: David C. Bohan, Sachnoff & Weaver, Chicago, IL.

For Susquehanna International Group, LLP, formerly known as Susquehanna Partners, G.P., Intervenor: Karen R. Kowalski, KING & SPALDING LLP, New York, NY;

2005 U.S. Dist. LEXIS 13734, *2; 2005-1 Trade Cas. (CCH) P74,872

Richard A. Cirillo, King & Spalding LLP (DC), Washington, DC.

For Barry Pinkowitz, Plaintiff: Thomas J. McKenna, Gainey & McKenna, New York, NY; Andrew David Friedman, Wechsler Harwood, L.L.P., New York, NY.

For Rachel Chuang, Plaintiff: [*3] Craig C. Corbitt, Zelle Hofmann Voelbel Mason & Gette, LLP, San Francisco, CA; Andrew David Friedman, Wechsler Harwood, L.L.P., New York, NY.

For John P. Abbamondi, Richard T. DeVincent, I. Scott Edelstein, Plaintiffs: Joseph C. Kohn, Kohn, Swift & Graf, P.C., Philadelphia, PA; Andrew David Friedman, Wechsler, Harwood, L.L.P., New York, NY.

For Oppenheimer, Noonan, Weiss L.P., Defendant: Terrence Callan, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, CA.

For Professional Edge Fund, L.P., Defendant: Walter Weir, Jr., Weir & Partners, L.L.P., Philadelphia, PA.

For Beartooth Trading Inc., Defendant: Saul P Morgenstern, Kaye Scholer, LLP (NYC), New York, NY.

For LETCO, Defendant: David C. Bohan, Sachnoff & Weaver, Chicago, IL.

For Kalb, Voorshi & Co., LLC, Defendant: Mark Scott Gregory, Kelley Drye & Warren LLP, New York, NY.

For Binary Traders, Inc., Defendant: Steven R. Waxman, Kleinbard, Bell & Breker, Philadelphia, PA.

**JUDGES:** Richard Conway Casey, U.S.D.J.

**OPINION BY:** Richard Conway Casey

**OPINION**

## MEMORANDUM & ORDER

### RICHARD CONWAY CASEY, United States District Judge:

Plaintiffs brought these consolidated putative class actions against five national [*4] stock exchanges and other defendants alleging violations of the antitrust laws regarding the listing and trading of equity options.

Plaintiffs have submitted three settlement agreements for the Court's preliminary approval pursuant to *Federal Rule of Civil Procedure 23(e)*. Some of the defendants have raised objections to such approval. For the following reasons, Plaintiffs' motion for preliminary approval of the settlement agreements is **DENIED IN PART and GRANTED IN PART.**

## I. BACKGROUND

### A. History of the Class Actions [1]

1  For a more thorough statement of the claims and procedural history of these actions, see *Miller v. Am. Stock Exch., Inc. (In re Stock Exchs. Options Trading Antitrust Litig.), 317 F.3d 134, 138-44 (2d Cir. 2003); In re Stock Exchs. Options Trading Antitrust Litig., 171 F. Supp. 2d 174, 175-77 (S.D.N.Y. 2001); In re Stock Exchs. Options Trading Antitrust Litig., 2001 U.S. Dist. LEXIS 1381, MDL No. 1283, M-21-79 (RCC), 99 Civ. 962 (RCC), 2001 WL 128325, at *1-6 (S.D.N.Y. Feb. 15, 2001).*

[*5] Plaintiffs, a putative class of equity-options purchasers, brought more than twenty class actions in district courts throughout the country alleging that the defendants conspired to confine the listing and trading of certain options to only one stock exchange at a time, in violation of section 1 of the Sherman Antitrust Act, *15 U.S.C. § 1.* Defendants in these suits originally were a group of stock exchanges--the American Stock Exchange ("AMEX"); the Chicago Board Options Exchange, Inc. ("CBOE"); the New York Stock Exchange ("NYSE"); the Pacific Stock Exchange, Inc. ("PCX"); and the Philadelphia Stock Exchange, Inc. ("PHLX")--and a group of twenty-eight market makers and options-trading specialists ("Market-Maker Defendants"). The Judicial Panel on Multidistrict Litigation transferred all the actions to this Court for consolidated pretrial proceedings, and Plaintiffs filed a consolidated complaint.

In January 2000, Defendants moved to dismiss the consolidated complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, arguing that Congress had impliedly repealed the antitrust laws with respect to the listing and trading [*6] of options by giving the Securities and Exchange Commission the power to regulate the area in the Securities Exchange Act of 1934, *15 U.S.C. § 78a et seq.* The Court converted the motions to motions for

summary judgment and so notified the parties, providing time for additional briefing. While the motions were pending, Plaintiffs entered into three separate settlement agreements with PCX, PHLX, and a group of defendants including AMEX, CBOE, and eighteen of the Market-Maker Defendants, which were submitted for the Court's approval pursuant to *Federal Rule of Civil Procedure 23(e)*. The Court deferred ruling on the motions for preliminary approval of the three settlement agreements until after it had ruled on the converted motions for summary judgment. On February 14, 2001, the Court granted the motions for summary judgment on the ground of implied repeal of the antitrust laws. *See In re Stock Exchs. Options Trading Antitrust Litig., 2001 U.S. Dist. LEXIS 1381, MDL No. 1283, M-21-79 (RCC), 99 Civ. 962 (RCC), 2001 WL 128325 (S.D.N.Y. Feb. 15, 2001)*. The Court then entered a final judgment dismissing the consolidated complaint.

In [*7] March 2001, Plaintiffs moved pursuant to *Federal Rule of Civil Procedure 59(e)*, to amend the judgment so that it would not apply to those defendants that had entered into settlement agreements prior to the Court granting summary judgment, and moved for preliminary approval of the settlements. In a decision dated April 24, 2001, the Court denied the motion to amend the judgment and denied preliminary approval of the settlements, concluding that it lacked subject matter jurisdiction to approve the settlement agreements because, when the Court granted summary judgment in the defendants' favor, "there was no longer any cause of action over which the Court could exercise jurisdiction." *In re Stock Exchs. Options Trading Antitrust Litig., 171 F. Supp. 2d 174, 178 (S.D.N.Y. 2001)*. The Court stated, "Plaintiffs' motions for preliminary approval of their settlement agreements and to alter or amend the Court's judgment . . . are hereby denied." *Id. at 179*.

Plaintiffs appealed the Court's summary-judgment decision and its decision that it lacked subject matter jurisdiction to approve the settlement agreements. The Second [*8] Circuit affirmed dismissal of the complaint, agreeing that the Sherman Act had been impliedly repealed with regard to the listing and trading of equity options. *See In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d 134, 148 (2d Cir. 2003)*. However, the Second Circuit reversed this Court's determination that it lacked subject matter jurisdiction to approve the settlements, holding:

> Since the parties sought approval of their settlement agreements before the court had adjudicated the immunity defense [conveyed by implied repeal of the antitrust laws], and since such a defense may be waived, the court had jurisdiction to entertain and rule on the motions for approval of the proposed settlements. Having entered a final judgment without dealing with those pending motions, the court should have entertained them in conjunction with the subsequent motion to alter or amend the final judgment, and it should have granted the latter motion if it approved the proposed settlements.

*Id. at 153*. The Second Circuit also noted that LETCO, one of the Market-Maker Defendants, had raised the argument that the settlement agreement to which it [*9] was a party became void by its own terms upon this Court's denial of the motion to preliminarily approve it in April 2001. *Id.* The court stated, "We express no view as to the correctness of LETCO's contention . . . . That question may be considered by the district court on remand." *Id.*

Plaintiffs once against seek preliminary approval of the settlement agreement with PCX ("PCX Settlement"); the agreement with PHLX ("PHLX Settlement"); and the agreement with AMEX, CBOE, and the Market-Maker Defendants, which Plaintiffs refer to as the "Global Settlement." Along with the agreements, Plaintiffs seek preliminary approval of a Proposed Plan of Distribution ("Distribution Plan") for the settlement payments ("Settlement Fund"), a Notice of Pendency of the class action ("Notice"), a Proof of Claim and Release form ("Proof of Claim"), a Summary Notice of the class action ("Summary Notice"), and an Order Preliminarily Approving the Proposed Settlement ("Preliminary-Approval Order"). Multiple defendants and one third-party intervenor have raised various objections to approval of the agreements and the other documents.

**B. Objections to the Global Settlement**

Some defendants and [*10] a third-party intervenor raise objections to approval of the Global Settlement. Market-Maker Defendants LETCO, Omega Options LLC ("Omega"), Cranmer & Cranmer, Inc. ("Cranmer"), Kalb Voorhis & Co. ("Kalb"), and AGS Specialist Partners

Case 1:07-cv-00480-JJF    Document 24-12    Filed 11/21/2007    Page 5 of 16

Page 4
2005 U.S. Dist. LEXIS 13734, *10; 2005-1 Trade Cas. (CCH) P74,872

("AGS"), and third-party Susquehanna International Group, LLP ("Susquehanna") (collectively, "Objecting Market Makers") raise the argument that LETCO made on appeal. [2] They maintain that the Global Settlement was rendered void upon entry of this Court's April 2001 decision denying the motions for preliminary approval under a provision of the Global Settlement that states, "In the event . . . the Court denies the motion for preliminary or final approval of this Settlement Agreement or any material part of it . . . the settlement provided for by this Settlement Agreement shall be rescinded and be null and void . . . ." (Global Settlement P22, Ex. C to Compendium of Settlement Documents Supp. Pls.' Mot. Preliminary Approval of the Proposed Class Action Settlement ("Settlement Compendium").) The Objecting Market Makers therefore oppose preliminary approval of the Global Settlement and cross-move for an order that the payments they already made should be returned [*11] to them with interest under paragraph 23 of the Global Agreement: "In the event the settlement is terminated, rescinded, or is null and void for any reason, within five (5) business days of such an event the Settlement Fund . . ., including interest, shall be dispersed to such Settling Parties in proportion to their contributions . . . ." (*Id.* P23.)

> 2    These defendants raise other objections as well, but it is unnecessary for the Court to reach them as explained herein.

CBOE maintains that the Global Settlement cannot be approved because Plaintiffs breached the agreement when Plaintiffs' lead counsel commenced a suit in the Northern District of Illinois, *Last Atlantis LLC v. Chicago Bd. Options Exch., Inc.,* No. 04 C 0397, asserting claims that purportedly fall within the scope of a release and covenant not to sue in the Global Agreement (*see* Global Agreement P25). CBOE contends that Plaintiffs have asserted that the release and covenant not to sue would be impermissible under *National Super Spuds, Inc. v. New York Mercantile Exchange, Inc., 660 F.2d 9 (2d Cir. 1981),* [*12] if given its plain meaning and therefore cannot be read as broadly as its terms. CBOE disagrees with Plaintiffs' purported interpretation of the release and covenant not to sue. [3] It is CBOE's position that the provision protects it from any potential claims that have any connection to the allegations in Plaintiffs' consolidated complaint. CBOE essentially asks the Court for a ruling on the scope of the release and covenant, and, if its meaning brings it into conflict with

the Second Circuit's decision in *Super Spuds,* then requests that the Court deny preliminary approval of the settlement agreement. CBOE also argues that when Plaintiffs' lead counsel filed the *Lost Atlantis* suit in the Northern District of Illinois, Plaintiffs breached their covenant of good faith and fair dealing that is implied in the Global Settlement and a contractual provision that requires Plaintiffs to use their best efforts to effectuate the settlement.

> 3    Market Maker Defendant Arbitrade Holdings, LLC, joins in CBOE's arguments as does PHLX.

[*13]    In addition, CBOE objects to (1) a provision of the Notice that would require it to post copies of the Summary Notice on its website with a link to a website created and maintained by Plaintiffs; (2) a provision of the Preliminary-Approval Order also requiring it to post a link on its website to Plaintiffs' website and a statement announcing the settlement; and (3) a provision of the Distribution Plan providing for a "Supplemental Notice Program" if a significant number of class members do not submit claim forms, and a method of distribution of excess funds after such supplemental notice. Finally, CBOE does not join the Objecting Market Makers' argument that the Global Settlement is void, but, like AMEX, contends that if the Court accepts this argument, the agreement should be rendered void as to CBOE as well.

AMEX does not oppose preliminary approval of the Global Settlement, but states that should the Court determine the scope of the release and covenant not to sue is less extensive than the plain language provides, then AMEX would object to approval. AMEX also submits that if the Court sustains the objection of the Objecting Market Makers that the Global Agreement was rescinded [*14] upon this Court's denial of preliminary approval in April 2001, then that ruling should render the agreement void as to all settling defendants and not just the Objecting Market Makers.

## C. Objections to the PCX Settlement

PCX argues that it has already paid all of the settlement funds that the PCX Settlement requires, and seeks an order from the Court to that effect. The PCX Settlement contains a provision that Plaintiffs and PCX agree entitles PCX to a 50% reduction in the amount that PCX must pay because the Court granted the motions for summary judgment. PCX has already made one payment

713

2005 U.S. Dist. LEXIS 13734, *14; 2005-1 Trade Cas. (CCH) P74,872

under the agreement, of which Plaintiffs returned a portion. PCX argues that Plaintiffs should be ordered to recalculate the amount to be returned, as the amount returned was not a full 50% of the payment made. PCX also argues that the agreement does not require it to pay anything further. PCX also objects to the Notice and Preliminary-Approval Order provisions that would require it to post a copy of the Summary Notice and a link on its website to Plaintiffs' website, and to the provision of the Distribution Plan addressing excess funds in the Settlement Fund and the Supplemental Notice Program.

### [*15] D. Objections to the PHLX Settlement

PHLX raises a number of objections to preliminary approval of its agreement with Plaintiffs. First, it joins in CBOE's request that the Court define the scope of the release and covenant not to sue in the Global Agreement, which is substantially the same as to the release and covenant in the PHLX Settlement. Second, PHLX seeks an equitable recoupment or set off regarding the payment it made under the PHLX Settlement based on Plaintiffs' failure to secure releases from the other settling defendants for any claims the other settling defendants might have against PHLX relating to the subject matter of these actions. Third, PHLX objects to the Notice and Preliminary-Approval Order because they do not require opting-out class members to provide sufficient information about themselves and their claims; PHLX seeks the addition of language requiring information and language in the Preliminary-Approval Order that requires Plaintiffs to comply with their obligations to the settling defendants to provide information about the opting-out class members. Fourth, PHLX maintains that it should get the benefit of any ruling that PCX need not make any additional [*16] payment under the PCX Settlement. Fifth, it requests additional language in the Proof of Claim and Release and the Notice to explain the scope of the release contained in the PHLX Settlement. Finally, PHLX claims that, if the Global Settlement is null and void, so too is the PHLX Settlement because the latter contains an identical clause to paragraph 22 of the Global Settlement.

## II. DISCUSSION

### A. Standard for Preliminary Approval of a Class-Action Settlement

No certified class action may be settled without court

approval. *Fed. R. Civ. P. 23(e)(1)(A)* ("The court must approve any settlement . . . of a certified class action."). Preliminary approval is generally the first step in a two-step process before a class-action settlement is approved. *In re NASDAQ Market-Makers Antitrust Litig., 176 F.R.D. 99, 102 (S.D.N.Y. 1997)* (citing *Manual for Complex Litigation, Third,* § 30.41). As the court in *NASDAQ Market-Makers* explained:

> In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice. Where the proposed settlement appears to be the [*17] product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.

*Id.* In the context of settlement, courts often provisionally certify the class along with preliminary approval of the settlement. *See Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 2005 U.S. Dist. LEXIS 2507, No. 03 Civ. 5460 (SAS), 2005 WL 388562, at *24 (S.D.N.Y. Feb. 18, 2005)* ("Courts have frequently certified settlement classes on a preliminary basis, at the same time as the preliminary approval of the fairness of the settlement, and solely for the purpose of settlement, deferring final certification of the class until after the fairness hearing."). The second step is to give notice to class members and to hold a hearing to determine whether final approval of the settlement should be given. *NASDAQ Market-Makers, 176 F.R.D. at 102.*

There is little question that the settlement agreements here are fair and adequate to the class because they would provide what further litigation could not--any recovery for class members. [*18] While the settlement agreements in total provide for a Settlement Fund of more than $ 80 million, Plaintiffs have no viable cause of action that any further litigation could vindicate. *See In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d at 148.* The objections to the settlement agreements concern potential deficiencies that have little to do with the reasonableness of the settlement, but regard the scope and proper interpretation of the agreements.

### B. Impediments to Preliminary Approval of the

Case 1:07-cv-00480-JJF    Document 24-12    Filed 11/21/2007    Page 7 of 16

Page 6

2005 U.S. Dist. LEXIS 13734, *18; 2005-1 Trade Cas. (CCH) P74,872

## Settlement Agreements

### 1. The Global Settlement Was Rendered Null and Void

The Objecting Market Makers argue that this Court's order of April 24, 2001 rendered the Global Settlement null and void under paragraph 22 of that settlement agreement, and therefore there is no settlement for the Court to approve. [4] Paragraph 22 states:

> In the event (i) the Court denies the motion for preliminary or final approval of this Settlement Agreement or any material part of it, (ii) the Court denies the motion for entry of a final judgment of the Court . . ., (iii) the final judgment . . . shall have been vacated, reversed or modified upon appeal, or (iv) **[*19]** the Settlement Agreement is rescinded, withdrawn, or otherwise terminated in accordance with its terms, the settlement provided for by this Settlement Agreement shall be rescinded and be null and void, unless some or all Settling Parties shall proceed with the Settlement Agreement as modified.

(Global Settlement P22.) In the April 2001 decision, the Court held that it could not preliminarily approve the settlement agreements because it lacked subject matter jurisdiction, having granted summary judgment to the defendants. *See In re Stock Exchs. Options Trading Antitrust Litig., 171 F. Supp. 2d at 178*. Accordingly, the Court stated, "Plaintiffs' motions for preliminary approval of their settlement agreements . . . are hereby denied." *Id. at 179*.

> 4    As Plaintiffs acknowledge, the Second Circuit's opinion expressly permits the Objecting Market Makers to raise this issue on remand. *See In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d at 153* ("We express no view as to the correctness of LETCO's contention that the [Global] settlement agreement became void . . . . That question may be considered by the district court on remand.").

**[*20]** Plaintiffs argue that the Objecting Market Makers incorrectly interpret paragraph 22; that the Court did not actually deny the motion for preliminary approval

because it held that it had no subject matter jurisdiction to consider the motion; and that because the Court's April 2001 decision was vacated it can give rise to no legal rights or obligations.

On Plaintiffs' first contention, the determinative question is whether paragraph 22 of the Global Settlement only applies to a denial of preliminary approval that is upheld on appeal. The matter is one of contractual interpretation, on which this Court must follow state law. [5] *See Volt Info. Sciences, Inc. v. Bd. of Trus., 489 U.S. 468, 474, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989)*. Although the parties did not brief which state law applies, most rely on New York law and none suggest that a different state's law applies, which is sufficient to render New York law, as the forum state's law, applicable. *See Tehran-Berkeley Civil & Environmental Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)* (applying New York law when, although the parties did not brief the issue, they relied on New York law in their briefs because "implied consent to use a forum's **[*21]** law is sufficient choice of law"). Accordingly, the Court turns to New York contract principles.

> 5    "Neither the Federal Rules of Civil Procedure nor any statute give federal courts the inherent power to interpret . . . settlement agreements, even those that pertain to litigation originally pending in federal courts, absent some independent basis of jurisdiction." *Nat'l Presto Indus., Inc. v. Dazey Corp., 107 F.3d 1576, 1580 (7th Cir. 1997)* (citing *Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 378, 128 L. Ed. 2d 391, 114 S. Ct. 1673 (1994)*). The Second Circuit has informed this Court that it has subject matter jurisdiction to approve the settlement agreements despite the dismissal of the underlying action. *See In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d at 153*. Accordingly, if the Court has jurisdiction to approve the settlements, it must have jurisdiction to interpret them as necessary in aid of the approval process.

"Under New York law, a written contract is to be interpreted **[*22]** so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000)*. The task of the Court

Case 1:07-cv-00480-JJF   Document 24-12   Filed 11/21/2007   Page 8 of 16

Page 7

2005 U.S. Dist. LEXIS 13734, *22; 2005-1 Trade Cas. (CCH) P74,872

interpreting a contract is to give effect to the parties' intent. *Civil Serv. Employees Ass'n, Inc. v. Plainedge Union Free Sch. Dist., 12 A.D.3d 395, 786 N.Y.S.2d 59, 60 (App. Div. 2004).* The Court must read the contract as a whole to determine that intent. *Aimco Chelsea Land, LLC v. Bassey, 6 A.D.3d 367, 773 N.Y.S.2d 908, 909 (App. Div. 2004).* When a contract is unambiguous on its face, "the intent of the parties must be gleaned from the four corners of the instrument, and not from extrinsic evidence." *Rainbow v. Swisher, 72 N.Y.2d 106, 527 N.E.2d 258, 259, 531 N.Y.S.2d 775 (N.Y. 1988).*

Plaintiffs argue that the parties did not contemplate a dismissal for lack of subject matter jurisdiction when they agreed to rescind the Global Settlement upon "denial [of] the motion for preliminary or final approval." As Plaintiffs put it, "even if Paragraph 22 were found to be ambiguous, the provision may not be construed to terminate the Settlement as a result of a wholly unanticipated decision [*23] by the Court, issued *sua sponte,* that it lacked subject matter jurisdiction to hear the motion." (Pls.' Reply at 10-11.) But paragraph 22 contains no ambiguity. "[A] contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138-39 (2d Cir. 2000)* (applying New York law). There is a difference, however, between contractual language that is ambiguous and a contractual provision that simply omits certain language. *See Reiss v. Fin. Performance Co., 97 N.Y.2d 195, 764 N.E.2d 958, 961, 738 N.Y.S.2d 658 (N.Y. 2001).*

In *Reiss,* the defendant corporation had issued warrants to the plaintiffs for the purchase of a certain number of shares at the price of 10 cents per share. *Id. at 959.* The defendant's shareholders approved a one-for-five reverse stock split, which meant that each shareholder owned only one-fifth of his or her original number of shares but at a value of five times more per share. *Id. at 960.* The warrants, which were contractually binding, did not provide [*24] for the circumstances of a stock split. *Id. at 959-60.* The plaintiffs sought to exercise the warrants to purchase stock at 10 cents per share but without adjustment in the number of shares that could be purchased to reflect the reverse stock split, a request that the defendant rejected. *Id. at 960.* The Appellate Division held that the warrants did not provide for the contingency of a stock split, were therefore missing an essential term,

and looked to the parties' intent to imply a term that required adjustment in the provisions of the warrant to account for the reverse stock split. *Id.* The Court of Appeals reversed, holding that the warrants were contracts that were complete in that they contained all the essential elements of a contract and could be enforced according to their terms. *Id.*

The Court of Appeals explained that the warrants were not ambiguous merely because they were silent as to the contingency of a reverse stock split. *See id.* ("An omission or mistake in a contract does not constitute an ambiguity. . . ." (internal quotation marks omitted)). Furthermore, the court stated, "where a contingency has been omitted, we will not [*25] necessarily imply a term since courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Id.* The court therefore held that in New York, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *Id. at 960* (internal quotation marks omitted).

The terms of paragraph 22 render the Global Settlement null and void upon denial of the motion for preliminary approval; the paragraph omits any reference to the fate of such a denial on appeal. To imply a clause such as "unless vacated on appeal" or "except for lack of subject matter jurisdiction" would be to make a new contract under the guise of contractual interpretation rather than to enforce the writing according to its terms. [6] As in *Reiss,* the Global Settlement is complete and clear and can be enforced according to its terms. Therefore, the Court must do so rather than reading in a clause that is absent.

> 6 Whether the settlement is ambiguous is for the Court to determine as a matter of law. *Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 780 N.E.2d 166, 170, 750 N.Y.S.2d 565 (N.Y. 2002).* Because the Global Settlement is not ambiguous, the Court may not refer to the extrinsic evidence that Plaintiffs proffer in support of their construction of paragraph 22. *See id.* ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous.").

[*26] That this is the correct interpretation is confirmed by reading paragraph 22 in context with other provisions of the Global Settlement. The parties expressly

Case 1:07-cv-00480-JJF    Document 24-12    Filed 11/21/2007    Page 9 of 16

Page 8

2005 U.S. Dist. LEXIS 13734, *26; 2005-1 Trade Cas. (CCH) P74,872

contemplated that this Court might grant the pending motions to dismiss (which the Court converted to motions for summary judgment). The parties agreed that the Court's ruling on those motions would have no effect, in contrast to denial of preliminary approval of the Global Settlement: "The parties' obligations in this Settlement Agreement shall not be altered or affected by the outcome of any motions pending or hereafter made in the Class Action except any motion with respect to the preliminary or final approval of the settlement contemplated herein . . . ." (Global Settlement P13(d).) The parties did not condition their obligations on anything but this Court's decisions; no mention of appeals was made with regard to either the motions to dismiss or the preliminary-approval motion.

In contrast, other provisions of the Global Settlement do tie obligations to results on appeal. The parties agreed in paragraph 21 that the Global Settlement would become final on the date upon which:

> The time for any appeal from the final [*27] judgment of dismissal and the Court's approval of this Settlement Agreement pursuant to *Fed. R. Civ. P. 23* shall have expired, or, if appealed, the final judgment has been affirmed in its entirety by the Court of last resort to which any such appeal has been taken and such affirmance has become no longer subject to further appeal or review.

(*Id.* P21.) Although the parties conditioned the agreement's effective date on the conclusion of appeals, they omitted such a condition with regard to the agreement's rescission. The Court must conclude that they did so purposefully in both cases.

A different clause in paragraph 22 addresses reversal on appeal. It provides for rescission of the Global Agreement if "the final judgment . . . shall have been vacated, reversed or modified upon appeal." (Global Settlement P22.) Thus, in the very same paragraph as the one at issue here, the parties expressly included a provision providing for rescission in the event that the Second Circuit reversed this Court's entry of final judgment. The fact that they omitted such a provision earlier in the paragraph again suggests that the omission was intentional [*28] and that the parties did not intend the clause providing for rescission upon denial of

preliminary approval to include the limitation, "unless reversed on appeal." It is therefore apparent that the parties did not fail to anticipate appellate proceedings regarding approval of the settlement.

Plaintiffs argue that the Court did not deny the motions for preliminary approval because it held that it lacked subject matter jurisdiction to approve them. However, the Court expressly stated, "Plaintiffs' motions for preliminary approval of their settlement agreements . . . are hereby *denied.*" *171 F. Supp. 2d at 179* (emphasis added). Paragraph 22 conditions rescission on the fact of the Court's denial of the motion for preliminary approval, not on the propriety of such a denial. The relevant question is whether the Court denied the motion, not whether it was correct to do so. On the former question, the Court could not have been any clearer.

Plaintiffs also rely on the proposition that a lower-court order vacated on appeal has no legal effect. But parties can contract beyond the rights to which statutory or common law would entitle them, provided it is not against public policy [*29] or illegal. *See 64th Assocs., L.L.C. v. Manhattan Eye, Ear & Throat Hosp., 2 N.Y.3d 585, 813 N.E.2d 887, 889, 780 N.Y.S.2d 746 (N.Y. 2004).* The parties were free to contract for rights to rescind the Global Settlement beyond what rights this Court's now-vacated order might have provided. The cases that Plaintiffs cite do not command a different result. They merely stand for the unremarkable proposition that orders vacated by the court that entered them or by a higher court cannot themselves give rise to any rights or responsibilities. *See United States v. Jerry, 487 F.2d 600, 607 (3d Cir. 1973)* (holding that vacataur of an order granting a motion to withdraw a guilty plea resulted in reinstatement of the defendant to the position he occupied before the motion was granted); *Wynne v. Rochelle, 385 F.2d 789, 796 (5th Cir. 1967)* (holding that court's vacataur of its own order meant that "the prior status of the case [was] restored"); *In re Rochester Sanitarium & Baths Co., 222 F. 22, 26 (2d Cir. 1915)* (holding that court's order vacating its prior order discharging bankruptcy trustee reinstated trustee). The rights and responsibilities here arise by [*30] way of contract and not from the Court's order itself.

Because the clear and unequivocal terms of the Global Settlement provide that it was rendered null and void when the Court denied preliminary approval in April 2001, there is no agreement for the Court to approve now.

Case 1:07-cv-00480-JJF    Document 24-12    Filed 11/21/2007    Page 10 of 16

Page 9
2005 U.S. Dist. LEXIS 13734, *30; 2005-1 Trade Cas. (CCH) P74,872

However, paragraph 22 of the Global Settlement contains an exception; it provides that, despite rescission upon denial of the motion for preliminary approval, "some or all Settling Parties and Plaintiffs [may] agree to proceed with the settlement as and if modified by the Court, in which event the Plaintiffs and such Settling Parties shall proceed with the Settlement Agreement as modified." (Global Settlement P22.) There is a dispute about whether some parties to the agreement did so agree after the Court's April 2001 decision. Plaintiffs acknowledge that the Objecting Market Makers did not agree to proceed. (Pls.' Mem. at 30.) On the record before the Court, however, it is not possible to conclusively determine whether AMEX, CBOE, and the other Market-Maker Defendants agreed to proceed in accordance with this clause of the settlement.

AMEX contends that if the Court adopts the Objecting Market Makers' argument, [*31] then the Global Settlement should be disapproved in its entirety. The terms of paragraph 22, however, contemplate a different result. The agreement states that it is null and void "unless *some or all* Settling Parties shall proceed with the Settlement Agreement as modified." (Global Settlement P22 (emphasis added).) It thus provides for a settlement among some but not all of the parties to it. CBOE admits that both it and AMEX confirmed in a letter to Plaintiffs that the Global Settlement remained in effect pending Plaintiffs' appeal. (CBOE Objs. at 13.) But that letter was sent before the Court's April 2001 decision, and, according to CBOE, did not modify, amend, or renew the Global Settlement. CBOE therefore contends that it did not agree to proceed under paragraph 22. In light of the Court's determination that paragraph 22 did provide for rescission of the Global Settlement, and the uncertainty as to whether CBOE, AMEX, and the Market-Maker Defendants other than the Objecting Market Makers agreed to proceed under paragraph 22, the Court directs that supplemental briefing address the issue.

Finally, the Objecting Market Makers move for an order that Plaintiffs return payments [*32] made under the Global Settlement because that settlement is null and void. Paragraph 23 of the Global Settlement provides that "in the event the settlement is terminated, rescinded, or is null and void for any reason, within (5) business days of such event the Settlement Fund (or any portion of it attributable to each Settling Party), including interest, shall be disbursed to such Settling Parties in proportion to

their contributions . . . ." (Global Settlement P23.) The Objecting Market Makers made payments under the agreement before the Court denied preliminary approval of it and now seek their money back under paragraph 23. Because the Global Settlement was rendered null and void under paragraph 22, the Objecting Market Makers have a contractual right to a return of the payments made under paragraph 23. Plaintiffs are thus ordered to return the Objecting Market Makers' payments made under the Global Settlement plus interest.

## 2. PCX's Payment Obligations Are Unenforceable For Frustration of Purpose

PCX opposes preliminary approval of the PCX Settlement because the proposed order approving it would require PCX to make additional payments into the Settlement Fund. Paragraph [*33] 6 of the PCX Settlement sets forth the payment obligations:

> PCX shall pay the sum of $ 4.5 million in full settlement of the Released Claims . . . . Payments will be due and payable on the following dates in the specified amounts . . .:

> (i) the first payment, in the amount of $ 1 million, shall be due and payable on the third business day following execution of this Settlement Agreement; (ii) the second payment, in the amount of $ 1 million shall be due and payable on the third business day following PCX's receipt of notice that the Court has entered an order preliminarily approving the Settlement Agreement in accordance with paragraph 12 below; (iii) the third payment, in the amount of $ 1 million, shall be due and payable 60 days after the due date of the second payment; and (iv) the fourth payment, in the amount of $ 1.5 million, shall be due and payable on the third business day after PCX receives notice of the Court's entry of judgment finally approving the Settlement Agreement . . . .

(PCX Settlement P6, Ex. A to Settlement Compendium.) Paragraph 12 provides that the Plaintiffs were to submit a motion for preliminary approval of the PCX Settlement

Case 1:07-cv-00480-JJF    Document 24-12    Filed 11/21/2007    Page 11 of 16

Page 10
2005 U.S. Dist. LEXIS 13734, *33; 2005-1 Trade Cas. (CCH) P74,872

no later than **[\*34]** thirty days after the parties executed the agreement, which they did. (*Id.* P12.) Paragraph 16 addresses the motions to dismiss, and states:

> Should the Court, at any time prior to the complete disbursement of the entire Settlement Fund (or such portion of such Fund attributable to PCX), grant one or more of the Motions [to Dismiss] and enter judgment dismissing the claims against all of the Exchange Defendants in their entirety and with prejudice from the above-referenced Class Action, then as to any remaining portion of the Settlement Fund (or such portion of such Fund as is attributable to PCX), Counsel for Plaintiffs shall immediately cease all disbursements of the Settlement Fund other than those necessary to pay for the continuing administration of such Fund.

(*Id.* P16.)

That paragraph of the PCX Settlement also provides for a return of 50% of payments made by PCX should dismissal be affirmed on appeal:

> Within ten (10) days of the expiration of any time period during which such judgment of dismissal may be appealed or, if any appeal from such judgment is taken, upon approval of such judgment by the court of last resort (or the highest court to **[\*35]** which any such appeal is taken), an amount equal to fifty percent of the Settlement Fund (or the portion thereof attributable to PCX) less the costs of providing notice to the Class and Administrative Costs . . . shall be returned to PCX. Should the Court's judgment of dismissal be finally reversed upon appeal, and be no longer subject to any further appeal, then Counsel for the Plaintiffs may . . . at once continue to disburse the remaining Settlement Fund as if such judgment of dismissal were never entered.

(*Id.*)

PCX made one payment of $ 1 million pursuant to paragraph 6. After the Court granted the converted

motions for summary judgment and the Second Circuit affirmed, Plaintiffs returned $ 482,309 to PCX. Plaintiffs contend that paragraph 16 requires PCX to make the three additional payments required by paragraph 6, but reduced by 50%. PCX argues that the consideration it bargained for is now worthless and therefore its obligations to make additional payments are unenforceable. The Court agrees.

The doctrine of frustration of purpose provides:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the **[\*36]** occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

*Restatement (Second) of Contracts § 265* (1981). Here, PCX's main purposes in executing the settlement agreement were to expeditiously terminate the claims against it and to avoid the risk of greater liability. After the Second Circuit affirmed this Court's summary-judgment decision, that risk was removed and a central purpose of the settlement was rendered moot. It is clear from the language of the agreement that both parties assumed that this Court would only dismiss the claims, if at all, *after* it had granted preliminary approval to the PCX Settlement.

The only consequence in the agreement of an order of dismissal is that "counsel for Plaintiffs shall immediately cease all disbursements of the Settlement Fund other than those necessary to pay for the continuing administration of such Fund" (PCX Settlement P16), suggesting that distributions would have already begun. No distribution of the Settlement Fund **[\*37]** could have occurred until after the Court finally approved the settlement because class-action settlements require court approval to take effect. *Fed. R. Civ. P. 23(e).* The assumption was that PCX would have paid into the Settlement Fund the entire amount due, and Plaintiffs' counsel would begin distributing the Fund to class members, before the Court dismissed the case against the nonsettling defendants. Thus, dismissal prior to preliminary approval was an event that the parties assumed would not occur and resulted in frustration of

Case 1:07-cv-00480-JJF    Document 24-12    Filed 11/21/2007    Page 12 of 16

Page 11

2005 U.S. Dist. LEXIS 13734, *37; 2005-1 Trade Cas. (CCH) P74,872

one principal purpose for which PCX agreed to the settlement. That event rendered PCX's remaining payment obligations unenforceable. *See City of New York v. Long Island Airports Limousine Serv. Corp., 96 A.D.2d 998, 467 N.Y.S.2d 93, 94-95 (App. Div. 1983), aff'd, 62 N.Y.2d 846, 466 N.E.2d 153, 477 N.Y.S.2d 613 (N.Y. 1984).*

In *Long Island Airports,* the Appellate Division considered the enforceability of a franchise contract between a transportation company and the City of New York that allowed the company to transport passengers to and from the City and New York airports. At the time of the contract, the City's consent to [*38] operate the transportation route was required by statute; however, the law was amended such that the City's consent was no longer necessary. *See id. at 94.* The franchise contract required the company to pay compensation to the City in exchange for its consent to operate the route. *Id.* The court held that the company's payment obligation was discharged because the purpose of the contract had been frustrated:

> The only possible reason for the franchise contract . . . was that the city's consent was required by statute before [the defendant company] was entitled to operate its omnibus route . . . . The statutory changes have made the contract worthless to [the defendant] and also made performance of the contract vastly different from what could reasonably have been within the contemplation of the parties when the contract was made. Given these altered circumstances, it is clear that reasonable men would not have made the subject contract, and that the contract has been rendered worthless to [the defendant]. Therefore, the consideration supporting the contract has failed, and [the defendant's] performance thereof is excused.

*Id. at 94-95* [*39] (internal citations omitted).

Similarly, the consideration that PCX would receive under the PCX Settlement has also failed. While the settlement would dispose of Plaintiffs' claims against PCX, the Second Circuit has held that those claims are meritless and the time for further appeals has long since

expired. The risk of greater liability that PCX sought to avoid by settling no longer exists, and it was that risk that was at the heart of the agreement. Just as the main purpose of the franchise contract in *Long Island Airport* was frustrated, making the consideration in that contract legally worthless, *467 N.Y.S.2d at 94-95,* the main purpose of the PCX Settlement has also been frustrated. And, just as the parties agreed to the franchise contract based on the assumption that the City's consent was required for the operation of the defendant's business, *id. at 94,* the PCX Settlement assumed that PCX was at risk of greater liability in this suit and that the risk would only be alleviated (by court decision) *after* the settlement was made effective under *Federal Rule of Civil Procedure 23.*

Frustration of purpose [*40] is not applicable if the language of the contract suggests that the frustrated party's obligations will continue even in the face of an unforseen event. *Restatement (Second) of Contracts § 265.* Plaintiffs maintain that the language of the PCX Settlement makes the doctrine inapplicable because it provides that if the Court were to grant the motions to dismiss and that decision were to be affirmed on appeal, PCX would be entitled to a return of 50% of its payments. (*See* PCX Settlement P16.) But the language of the agreement concerns different circumstances than those that actually occurred. The agreement only contemplates dismissal of the claims after PCX had made all of its payments and distributions had begun; it is silent on whether the payment obligations would continue despite the Court's removal of the risk of greater liability to PCX before the settlement became effective under *Rule 23.* The provision for return of 50% of PCX's payments does not render the doctrine of frustration of purpose inapplicable because that language only applies if the settlement was approved before the claims were dismissed. *See Long Island Airports Limousine Serv. Corp. v. City of New York, 466 N.E.2d at 153.* [*41]

When the Court of Appeals addressed the lower court's holding that the contract in *Long Island Airports* was no longer enforceable, it considered whether the language of the agreement provided for the situation that occurred, which would make frustration of purpose inapplicable. The franchise contract stated that the defendant company was required to continue paying compensation to the City as long as it operated an omnibus transportation route, even if the franchise agreement was otherwise cancelled or terminated. *See id.* The City maintained that the contract required continued

payments even though the term of the contract had expired because the company was still operating its transportation route. The Court of Appeals concluded that the language in the contract requiring continued payments only applied to circumstances in which the City's consent was required for the transportation company to operate its business. *See id.* The contract's payment provisions did not apply to the situation in which the City's consent was not legally required. The Court of Appeals therefore upheld that Appellate Division's decision freeing the company of its further payments under the contract. [*42] *See id.*

As the Court of Appeals' decision in *Long Island Airports* suggests, parties to a contract may bargain for a specific result if an uncontrollable event occurs rendering consideration to one party worthless, but that is not what occurred here. The doctrine of frustration of purpose discharges the frustrated party's obligations "unless the language or the circumstances [of the contract] indicate the contrary." *Restatement (Second) of Contracts § 265.* Like the franchise contract in *Long Island Airports,* however, the language of the PCX Settlement fails to provide a result other than discharge of payment obligations in the event that PCX's purpose in entering the settlement was frustrated. The language that Plaintiffs cite, like the language in the *Long Island Airports* franchise contract, does not contemplate the events that occurred. Paragraph 16 merely provides that PCX is entitled to a return of 50% of its payments if the Court were to dismiss the claims after, but not before, it had approved the PCX Settlement. It is apparent from the language that requires Plaintiffs counsel to cease disbursements of settlement proceeds [*43] upon dismissal and that entitles PCX to a return of 50% of its payments less costs of notice to the class; no funds could be dispersed and no costs expended for notice if the Court had not yet approved the settlement. As in *Long Island Airports,* the failure of the contractual language to provide a result here other than discharge of the payment obligations for the situation that actually occurred means that the parties did not bargain away the chance that one of their central purposes for the settlement would be frustrated and the consideration rendered worthless as a result.

The revelation that Plaintiffs' claims had no merit prior to approval of the PCX Settlement was an event that the parties assumed would not occur, and the assumption was central to the settlement. It was also an event that substantially frustrated one of PCX's main purposes in settling--to avoid the risk of greater liability. Because the parties did not bargain for a different result in the PCX Settlement, the doctrine of frustration of purpose discharges PCX's remaining payment obligations. Therefore, the PCX Settlement shall be approved, but only to the extent that the settlement requires one payment of [*44] $ 1 million, with 50% of which to be returned to PCX minus the costs of class notice. [7] That amount is fair and reasonable to the class because the class is not entitled to any recovery at all.

> 7    PCX also maintains that the $ 482,309 that Plaintiffs returned was insufficient because Plaintiffs miscalculated the costs of notice. The Court defers ruling on this issue until such time as the costs of notice are incurred.

### 3. No Equitable Recoupment or Set Off is Due Under the PHLX Settlement

A clause of the PHLX Settlement, which was executed in June 2000, states:

> Plaintiffs and the Class shall not enter into any settlement with any person in respect to any claims of any nature relating to the subject matter of the Class Action unless the terms of that settlement include a release of all claims of any nature which such person then has or may thereafter have against PHLX arising out of or relating to the subject matter of the Class Action.

(PHLX Settlement P28(a), Ex. B to Settlement Compendium. [*45] ) PHLX contends that Plaintiffs have breached this provision because they did not obtain releases from the defendants that are parties to the Global Settlement, and that the amount PHLX must pay into the Settlement Fund should be reduced as a matter of equitable recoupment or set off. This argument is meritless.

"In order to assert the defense of equitable recoupment, a party must have a legally subsisting cause of action upon which it could maintain an independent claim." *Telmark, Inc. v. C&R Farms, Inc., 115 A.D.2d 966, 497 N.Y.S.2d 536, 537 (App. Div. 1985).* Only if PHLX had a cause of action for damages against Plaintiffs could it assert equitable recoupment. *Id.* PHLX

Case 1:07-cv-00480-JJF    Document 24-12    Filed 11/21/2007    Page 14 of 16

Page 13
2005 U.S. Dist. LEXIS 13734, *45; 2005-1 Trade Cas. (CCH) P74,872

has no such cause of action because, even if the failure to obtain releases was a breach of the PHLX Settlement, it is not a material breach of the agreement. *See 41-41 51st Street Realty Assocs. v. Tura Assocs., 207 A.D.2d 524, 616 N.Y.S.2d 73, 75 (App. Div. 1994)* (holding no breach of contract when alleged breach was not material). A material breach under New York law is one that goes to the root of the agreement between the parties. *Felix Frank Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997)*; [*46] *Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004)*.

The root of the agreement here was that the class would release all claims against PHLX arising out of the subject matter of these actions. These releases, on the other hand, would merely require PHLX's codefendants to give up all claims they might have against PHLX related to Plaintiffs' cause of action. PHLX is silent on what benefit these releases might secure to it, and the Court finds it dubious that there would be any significant benefit given that Plaintiffs have no viable antitrust claim, there is no right to contribution among antitrust coconspirators, *Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 646, 68 L. Ed. 2d 500, 101 S. Ct. 2061 (1981)*, and the Global Settlement is void as to at least some and potentially all of the defendants that are parties to it. The breach of paragraph 28(a) provides no basis for avoiding PHLX's payment obligations or reducing them by way of equitable recoupment or set off.

PHLX also asserts that its agreement contains a provision substantially identical to paragraph 22 of the Global Settlement, which the Court has held rendered the Global Settlement [*47] null and void when the Court denied the original motion for preliminary approval. Because the Court also denied preliminary approval of the PHLX Settlement in April 2001, PHLX contends that paragraph 20 of its agreement makes the agreement null and void. PHLX admits that it confirmed a contrary interpretation of paragraph 20 in a letter to Plaintiffs dated April 18, 2001. Whether this letter constitutes an agreement to continue obligations under the PHLX Settlement is something that Plaintiffs and PHLX may address in supplemental briefing. [8]

> 8    PHLX maintains that any ruling in PCX's favor should also apply to it "as a matter of fairness, equity, and legal construction." (PHLX Mem. at 7.) PHLX provides no support for this broad proposition, and the PHLX Settlement is

not identical in pertinent part to the PCX Settlement. Nevertheless, PHLX may, if it so chooses, address in the supplemental briefing ordered herein the reasons why the Court's holding as to the PCX Settlement also applies to the PHLX Settlement.

### [*48]  C. Effect of the *Last Atlantis* Complaint

PHLX, CBOE, AMEX, and Market Maker Arbitrade Holdings, LLC (a party to the Global Settlement) ("Arbitrade") argue that Plaintiffs have breached the PHLX and Global Settlements by filing a complaint in the Northern District of Illinois against them and other defendants. [9] Specifically, these defendants contend that the Global Settlement provides for a release and covenant not to sue on any claim:

> known and unknown, suspected or unsuspected, asserted or unasserted, in law or equity, that any Plaintiffs or Class members ever had, now have, or hereafter can, shall, or may have, arising out of, or having connection in any way whatsoever with, any fact, omission, cause, claim, count, matter or allegation that in whole or in part is the subject of, asserted in, or could have been asserted in, any of the complaints (including without limitation the Consolidated Complaint) filed in the above-captioned cases . . . .

(Global Settlement P25.) The PHLX Settlement contains a similar provision. (*See* PHLX Settlement, Ex. 1 P7) (amending P30 of PHLX Settlement).)

> 9    Some of these defendants argue that there was a breach, while others simply seek a clarification of the scope of the release before agreeing to preliminary approval.

[*49]  The defendants maintain that Plaintiffs' lead counsel has taken the position that this release is narrower than the defendants believed it to be. Counsel purportedly took this position in *Last Atlantis*, filed against many of the same defendants involved in these suits. The defendants argue that the release bars the claims in *Last Atlantis*. Furthermore, they assert that Plaintiffs have suggested the Second Circuit's decision in *National Super Spuds, Inc. v. New York Mercantile Exchange, Inc., 660 F.2d 9 (2d Cir. 1981)*, would render

2005 U.S. Dist. LEXIS 13734, *49; 2005-1 Trade Cas. (CCH) P74,872

the release unenforceable if it were interpreted as the defendants contend it should be.

Plaintiffs respond that the release provisions are extremely broad and bar class members from asserting any claim in any way related to the facts giving rise to these class actions. Contrary to the defendants representations, therefore, Plaintiffs do not contest the breadth of the release nor do they argue that such a broad release would be unenforceable under *National Super Spuds*. [10] There appears to be no dispute at all as to the scope or enforceability of the release, and therefore nothing for this Court to resolve in determining whether [*50] the settlements should be given preliminary approval. The Court cannot provide an advisory opinion as to the scope of the release. *See Woodford v. Cmty. Action Agency of Greene County, Inc., 239 F.3d 517, 525 (2d Cir. 2001)* ("An Article III federal court . . . has no jurisdiction to render advisory opinions.").

> 10 Plaintiffs submit that the release is not barred under *National Super Spuds* because that case dealt with a release for claims *not* asserted in the class action and *not* factually related to those claims that were asserted. *See Nat'l Super Spuds, 660 F.2d at 18.* The Second Circuit noted that "a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts." *Id. at 18 n.7.*

CBOE also argues that the Global Settlement should not be preliminarily approved because Plaintiffs' [*51] lead counsel has breached the agreement by representing the plaintiffs in the *Last Atlantis* case. Plaintiffs respond that the plaintiffs in *Last Atlantis* are not members of the class because they did not purchase or sell the relevant options during the relevant time period. Whether Plaintiffs are correct or not, the *Last Atlantis* plaintiffs could opt out of this settlement even if they were class members, a point that CBOE seems to concede. CBOE's argument that the value of the Global Settlement has been decreased by the conduct of Plaintiffs' counsel, and therefore should not be approved, is meritless. Even assuming that the agreement could be breached by Plaintiffs' counsel, the release could not protect CBOE against claims by nonmembers of the class and class members who opt out of the settlement. The objection on

the ground that the *Last Atlantis* suit is a breach of the Global Settlement is rejected. [11]

> 11 The Court takes no position on whether the plaintiffs' claims in *Last Atlantis* would be barred by the release if they do not opt out of the class.

### [*52] D. Objections to the Proposed Notice, Summary Notice, and Distribution Plan

CBOE, PCX, and PHLX raise objections to provisions of the Notice, Summary Notice, and Distribution Plan. First, CBOE and PCX object to the Notice and Summary Notice provisions requiring them to post a link on their websites to a website that Plaintiffs will operate and maintain and to post a copy of the Summary Notice. The former objection is based on clauses in the settlement agreements that limit the defendants' obligations with regard to class notice to cooperating with Plaintiffs in determining the form, content, timing, and method of notice, and to using their best efforts to minimize costs of notice. (*See, e.g.,* Global Settlement PP6, 16.) These defendants contend that they cannot be forced to bear the costs associated with posting and maintaining the Summary Notice and link on their websites. Again, there is no dispute to be resolved because Plaintiffs agree to reimburse the reasonable costs associated with posting the Summary Notice and links to their website that the defendants incur. Therefore, the objection to the Notice and Summary Notice provisions is denied.

Second, CBOE, PCX, and [*53] PHLX object to a provision of the Distribution Plan that provides:

> If it is subsequently determined that a significant number of Class members have not submitted claims, Class Counsel may implement a Supplemental Notice Program which shall include causing Summary Notice to be published in a wider range of publications and/or disseminated through broadcast media. After such Supplemental Notice Program, excess amount remaining in the Settlement Fund, after payment of all claims, administrative expenses and any attorneys fees and costs awarded by the Court, will be distributed according to a *cy pres* program approved by the Court.

2005 U.S. Dist. LEXIS 13734, *53; 2005-1 Trade Cas. (CCH) P74,872

(Distribution Plan at 3.) CBOE, PCX, and PHLX contend that this provision is too vague to be approved and improperly limits the Court's discretion in allocating excess funds. The defendants further argue that the pro rata distribution in the plan would not leave any excess in the Settlement Fund. The Court need not address the issue of excess funds especially if the pro rata distribution plan will consume all of the funds. Therefore, the last sentence of the Supplemental Notice provision in the Distribution Plan should be stricken, and be **[*54]** replaced by the sentence: "If any excess amount remains in the Settlement Fund after such Supplemental Notice Program and after the payment of all claims, administrative expenses, and any attorneys fees and costs awarded by the Court, the Court shall determine the manner in which any such excess is distributed." Finally, the Supplemental Notice provision should also be amended to state, "If it is subsequently determined by the Court following an application by Plaintiffs' Counsel that a significant number of Class members have not submitted claims . . . ." This amendment will cure the vagueness of the term "significant" by leaving that definition to the Court after providing the parties a chance to be heard on the matter.

Finally, PCX requests additional language to be added to the Proof of Claims and Release and Notice regarding the scope of the release, and PHLX requests that the Notice and Preliminary Approval Order be amended to require additional information from opting-out class members. In both cases, the language may be added if Plaintiffs so agree, but the Court sees no basis for ordering that it be added.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' **[*55]** motion for preliminary approval of the settlement agreements is **DENIED IN PART and GRANTED IN PART.** The Court concludes that: (1) the Global Settlement is null and void as to the Objecting Market Makers (LETCO, Omega, Cranmer, Kalb, AGS, and Susquehanna); (2) further briefing is required on the issue of whether the other Market-Maker Defendants, CBOE, AMEX, and PHLX remain bound by the Global and PHLX Settlements; (3) the PCX Settlement is preliminarily approved but PCX is not obligated to make additional payments, and PCX's argument that it is due additional money because Plaintiffs miscalculated the costs of class notice will be addressed on a later date; (4) PHLX's claim for equitable recoupment or set off is denied; (5) the Distribution Plan shall be amended as set forth above; and (6) Plaintiffs shall return the sums paid by the Objecting Market Makers under the Global Settlement plus interest. Plaintiffs shall serve moving papers addressing which defendants they claim remain bound under paragraph 22 of the Global Settlement or paragraph 20 of the PHLX Settlement by July 26, 2005; class defendants shall serve opposition briefs on Plaintiffs by August 9, 2005; and Plaintiffs' **[*56]** reply shall be due, and all of the supplemental briefs filed together with courtesy copies to the Court, by August 16, 2005.

**So Ordered:** New York, New York

July 8, 2005

**Richard Conway Casey, U.S.D.J.**

# **EXHIBIT L**

LEXSEE 1997 U.S. DIST. LEXIS 24037

**BARBARA KIRSCHTEN, Plaintiff, -against- RESEARCH INSTITUTES OF AMERICA, INC., and THOMSON HOLDINGS DELAWARE d/b/a THOMSON PUBLISHING/INFORMATION GROUP, Defendants.**

**94 Civ. 7947 (DC)(SEG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 24037*

**July 23, 1997, Decided
July 24, 1997, Filed**

**DISPOSITION:** [*1] Magistrate recommended that defendant's motion for judgment on the pleadings should be granted as to all claims.

**COUNSEL:** For BARBARA KIRSCHTEN, plaintiff: David S. Douglas, Kornstein Viesz & Wexler, New York, Ny.

For BARBARA KIRSCHTEN, plaintiff: Lynne Bernabei, Bernabei & Katz, Washington, D.C.

For RESEARCH INSTITUTES OF AMERICA, INC., defendant: James F. Rittinger, Satterlee Stephens Burke & Burke, New York, NY USA.

**JUDGES:** SHARON E. GRUBIN, United States Magistrate Judge.

**OPINION BY:** SHARON E. GRUBIN

**OPINION**

*REPORT AND RECOMMENDATION TO THE HONORABLE DENNY CHIN*

SHARON E. GRUBIN, United States Magistrate Judge:

Pending in this action for breach of contract and violation of the Lanham Act, *15 U.S.C. § 1125(a)*, are defendants' motions for summary judgment and for

judgment on the pleadings. Plaintiff Barbara Kirschten is the co-author with Frances R. Hill and three "contributing authors" of a loose-leaf legal treatise published on November 18, 1994 by Warren Gorham & Lamont ("WGL") entitled *Federal and State Taxation of Exempt Organizations* (hereinafter, "the Book"). WGL is a division of defendant Research Institute of America, Inc., which is a [*2] subsidiary of defendant Thomson Holdings Delaware. On March 6, 1991 plaintiff, Hill and four contributing authors (Bonnie Susan Brier, Robert Edward Atkinson, Jr., Leonard J. Henzke, Jr. and Suzanne Ross McDowell) entered into a contract with WGL (hereinafter, "the Agreement") to prepare the Book. By amendment on September 20, 1993, Wendell R. Bird was added, and Henzke and McDowell deleted, as contributing authors. Of the Book's fifteen chapters, plaintiff was responsible for writing Chapters 12 ("Exemption Applications, Annual Information Returns, and Other Filing and Disclosure Requirements"), 13 ("Foreign Charitable Organizations and Conducting Charitable Activities Abroad") and 14 ("State Law Issues"), and, with Hill, Chapters 2 ("Section 501(c)(3) Organizations") and 6 ("Private Foundations").

Plaintiff's Second Amended Complaint (hereinafter, "Complaint") asserts three claims against defendants. Count One, for breach of contract, is the main claim. Plaintiff alleges that WGL breached the Agreement because it:

(a) "refused to incorporate Ms. Kirschten's edits into chapters of the Book for which she is responsible and made certain changes to her chapters, in particular to

725

1997 U.S. Dist. LEXIS 24037, *2

Chapter [*3] 12, only after plaintiff filed this action";

(b) "refused to allow her to review the final galleys of Chapter 12";

(c) "refused to provide Ms. Kirschten a reasonable opportunity to review and edit other chapters of the Book, including Chapters 2 and 6, and, thereby, included inaccurate and untimely information in the Book";

(d) "failed to ensure coordination among the authors";

(e) "refused to name Ms. Kirschten as the first author";

(f) "failed to provide Ms. Kirschten with page proofs for what was originally the preface";

(g) "failed to provide Ms. Kirschten with the opportunity to read and edit the acknowledgements to the Book";

(h) "did not provide Ms. Kirschten with any information concerning any personal dedication for the Book, and has continued to fail to provide her any information about the arrangement concerning the division of royalties among the authors";

(i) failed to provide her "any information regarding marketing of the Book"; and

(j) "imposed new and burdensome requirements on Ms. Kirschten to submit her supplemental materials to Ms. Hill, a requirement which is contrary to the Contract, contrary to the practice used in the writing of the Book and its supplements, [*4] and a process that would compromise the writing of the Book. When she refused to comply with these new and burden-some requirements, WGL rejected her supplements for the Book." Complaint P 74.

Plaintiff also alleges that WGL is in "anticipatory breach" of the Agreement due to its alleged stated intent to require her to pay all costs associated with changing Chapter 12 to correct legal errors and omissions that she pointed out to WGL in a timely manner and which, she contends, WGL was required to correct under the Agreement. Id. P 75.

In Count Two, plaintiff claims that WGL breached an implied covenant of good faith and fair dealing by intentionally engaging in the conduct set forth in Count One. Id. P 80.

In Count Three, plaintiff claims that WGL has violated the Lanham Act, because its actions are likely to cause confusion or to deceive the public as to the origin, sponsorship or approval of the publication by her in that by using her name on work which she has not authorized and which WGL knows to be outdated and inaccurate, WGL has misrepresented to the public that she has authorized the work, and that WGL's refusal to use supplements prepared by plaintiff and its assignment [*5] of their preparation to another person who does not have her national reputation and expertise will lower the quality of the Book. Id. PP 85-86.

Defendants move for summary judgment on the three counts and defendant Thomson Holdings Delaware also moves for judgment on the pleadings. Defendants have responded to a document request and interrogatories in conformity with this court's former local Civil Rule 46, and plaintiff has taken a one-day deposition of co-author Hill. All other discovery has been stayed pending a determination on these motions. For the reasons set forth below, I recommend that defendants' motion for summary judgment be granted as to all claims in the Complaint, except that contained in paragraph (j) of Count One and that contained in a related part of Count Two, and that defendant Thomson Holdings Delaware's motion for judgment on the pleadings be granted dismissing all claims against it.

### I. Standards for Summary Judgment and Judgment on the Pleadings

Under Fed. R. Civ. P. 56(c), a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show [*6] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), by "a showing sufficient to establish the existence of [every]

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. at 322.*

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); Hathaway v. Coughlin, 841 F.2d 48, 50 (2d Cir. 1988);* [*7] *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 94 L. Ed. 2d 762, 107 S. Ct. 1570 (1987).* But the court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986),* and to grant summary judgment where the nonmovant's evidence is irrelevant or merely colorable, conclusory, speculative or not significantly probative. *Id. at 249-50; Knight v. U.S. Fire Ins. Co., 804 F.2d at 12, 15; Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 45 (2d Cir. 1986), cert. denied, 479 U.S. 1088, 94 L. Ed. 2d 151, 107 S. Ct. 1295 (1987).* To determine whether the non-moving party has met his or her burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs," and a dispute over irrelevant or unnecessary [*8] facts will not preclude summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.* In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)(quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).*

The standard for determining whether to grant a motion for judgment on the pleadings under *Rule 12(c) of the Federal Rules of Civil Procedure* is the same as that governing a motion to dismiss for failure to state a claim under *Rule 12(b)(6). Sheppard v. Beerman, 18 F.3d 147, 150* (2d Cir.), *cert. denied, 513 U.S. 816, 130 L. Ed. 2d 28, 115 S. Ct. 73 (1994); Ad-Hoc Committee of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College, 835 F.2d 980, 982 (2d Cir. 1987).* The court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. [*9] *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992), cert. denied, 507 U.S. 961, 122 L. Ed. 2d 762, 113 S. Ct. 1387 (1993) and 507 U.S. 972 (1993); Ad-Hoc Committee of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College, 835 F.2d at 982.* "Consideration is limited to the factual allegations in [the] complaint, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993).* A complaint should not be dismissed unless, "after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York, 974 F.2d at 298* [*10] (quotation omitted). *See Sheppard v. Beerman, 18 F.3d at 150; Ad-Hoc Committee of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College v. Bernard M. Baruch College, 835 F.2d at 982.*

## II. *Count One*

### A. *The Claimed Right to Be Listed First*

In support of their motion for summary judgment on claim 1(e), that WGL breached the Agreement by not listing plaintiff as the first name on the Book, defendants point to paragraph 17 of the Agreement which provides:

> 17. *Designation of Authors' Names on Work; Coordinating Author.* The names of Frances R. Hill and Barbara L. Kirschten shall appear on the spine, front cover, and title page of the Work. The names of Bonnie Susan Brier, Robert Edward Atkinson, Jr., Leonard J. Henzke, Jr., and Suzanne Ross McDowell shall appear on the title page of the Work below the words "Contributing Authors."

> Frances R. Hill shall coordinate the preparation of the manuscript by the Authors and shall be the liaison between the Publisher's editorial staff and the Authors.

1997 U.S. Dist. LEXIS 24037, *10

Ensminger Aff., Ex. F. (As noted, the September 20, 1993 amendment to the Agreement provided that Wendell R. Bird would be [*11] added as an author and that Henzke and McDowell would no longer be authors. *Id.*, Ex. G.)

Defendants argue that the Agreement itself thus provides that Hill's name shall precede Kirschten's on the spine, cover and title page since it provides, they contend, that the names shall be "designated" as they appear in paragraph 17, *i.e.*, with Hill's name followed by plaintiff's. Defendants point out as additional support for this conclusion that Hill's name invariably precedes plaintiff's throughout the Agreement and that Hill (and not plaintiff) is denominated the Book's "Coordinating Author."

As plaintiff argues in response, however, paragraph 17 deals with placement of the co-authors' names as compared with placement of the contributing authors' names and not with the order in which members of each group shall appear.

That defendants may not have viewed the order of listing within each group of authors in paragraph 17 as determinative of the order of listing on the Book itself is apparently reflected in the difference between the order in which the contributing authors are listed in paragraph 17 and the order in which they appear on the title page of the Book itself. Although Brier [*12] is listed before Atkinson in the Agreement, she is listed after Atkinson on the title page, *i.e.*, the contributing authors are listed in alphabetical order. (Those alphabetical listings, however, provide little support for plaintiff as, on the basis of either the order of listing in paragraph 17 or alphabetical order, Hill comes before Kirschten.) As noted below, defendants, in fact, argue that it is "the custom and practice in this industry, and at WGL, that the order of the authors' names on the Contract indicates the order in which the authors' names will be listed on the Book and, absent some other agreement to the contrary, reflects the authors' agreement as to this listing." Ensminger Aff. P 23. Defendants further aver that "it is universally known and understood that an alphabetical listing indicates no primacy of one author over another, but rather that both authors are equally credited for the book." *Id.* P 22. Plaintiff counters this with an affidavit of Charles Abernathy, a Professor of Law at the Georgetown Law Center who has had three books published (two by West

Publishing Company and one by WGL). Abernathy states: "The practice in the industry is to have the more [*13] senior and well-known author of a book or article named as the first author, regardless of the number of pages that person has written." Abernathy Aff. P 5. Plaintiff avers that she is the senior and more well-known of the two co-authors and attempts to show the quality of her reputation in the tax exempt field.

This evidence of plaintiff on custom or practice, however, does not contradict defendants' position. Presumably, whoever is to be listed first in the Book is also listed first in the contract's listing. Given that Hill is listed before plaintiff in paragraph 17 of the Agreement and that she is without exception listed first in all other places in the Agreement, Professor Abernathy does not address the relevant question, which is, assuming plaintiff is the senior and more well-known of the two, whether his explanation of custom and practice in favor of listing the more senior and well-known author first prevails even when the co-authors are listed in a different order in the contract and when there is no oral or other written agreement between the co-authors as to their listing on the book. Abernathy's affidavit is entirely consistent with leaving the decision to the co-authors [*14] themselves (an option that was unavailable here, since Hill and plaintiff disagreed and Hill believed she, not plaintiff, was to be listed first) or to the discretion of the publisher (which WGL exercised by having recourse to the listing in the Agreement and the alphabetical order of the authors' names in the absence of any agreement between them or any attendant compelling alternative principle). Defendant WGL's Senior Managing Editor for Tax Periodicals John Ensminger states in his own affidavit that it is the custom and practice in his industry and at WGL that, absent an agreement between authors or a contractual provision to the contrary, multiple authors are listed in the order in which they are named in the contract. This is borne out, he states, by his review of all contracts entered into by WGL's tax division since January 1, 1990. Ensminger Aff. P 23.

Plaintiff seeks to explain why the contract lists Hill first, but I find that her explanation only buttresses defendants' position. According to her, WGL's early drafts of the contract listed her ahead of Hill, Complaint P 46, but plaintiff switched the order of the names in the early drafts of the contract to list Hill's name [*15] first in the final draft only to "avoid an awkward situation" with her law firm, which had just brought in as a partner

in plaintiff's department an attorney who had published the leading treatise in the field, and she "did not intend to, nor did she, cede lead author status to Ms. Hill." *Id. P 47.* However, plaintiff does not contend that she ever communicated to WGL her reason for reversing the order of names in the contract which she negotiated and to which she agreed. [1]

> 1    From the documents in this lengthy record, plaintiff appears to have been a sophisticated negotiator who had no trouble communicating either orally or in writing.

There is no evidence that Hill ever agreed that plaintiff's name would appear first, and it would have been natural for defendants to assume the change plaintiff made was because she and Hill had agreed to the listing of Hill first. On the one hand, plaintiff maintains that she revised the Agreement to list Hill first to avoid waving a red flag before the new partner at her [*16] law firm; in other words, that listing herself first in the Agreement would have implied that she was the "lead author," who would be listed first on the Book itself. By the same logic, then, listing Hill first in the Agreement must have had the connotation either that Hill would be the "lead author" or that there was no "lead author" and they were to be listed alphabetically. And if the partner at her law firm -- an expert in plaintiff's own field of tax-exempt organizations who presumably had negotiated a contract of his own with the publisher of his own treatise -- would have drawn those implications, the editors at WGL can hardly have been expected not to have drawn them as well. Moreover, plaintiff's explanation lacks credibility because it lacks common sense. If, indeed, her partner were to be offended by her being a lead author or listed first, the partner would likely be so by plaintiff's being listed first on the spine, cover and title page of the Book, rather than in her contract with the publisher. Her purported reason for putting Hill first in the final draft and the contract itself as executed makes little sense if she were afraid of offending her partner but yet expected [*17] to be listed first in the Book itself when published and advertised.

Defendants further argue that, even if paragraph 17 is not found to provide that Hill's name precede plaintiff's in the Book, paragraphs 12 and 13 of the Agreement gave WGL the right to determine the order of the names on the cover and title page. Those paragraphs provide:

> 12. *Publication.* The Publisher will publish the Work at its own expense under the title, in the style, and at the price the Publisher considers best suited to its sale so long as the manuscript is delivered in accordance with the terms of this Agreement and its content is approved by the Publisher.

> 13. *Marketing and Advertising.* The Publisher will market and advertise the Work as it deems proper and profitable and at its sole cost and expense. The Publisher may distribute free copies for review or promotion. The Publisher may permit others to publish selections from the Work, without payment, if the Publisher determines that this will advance sales.

Ensminger Aff., Ex. F. Claiming that the order in which the authors' names are to be listed is something that involves the Book's style and marketing, they argue the Agreement thus [*18] reserves it to WGL's discretion. As plaintiff plausibly responds, however, the order of listing the authors is a question of neither the Book's "title" nor its "style," nor does paragraph 13, which on its face involves methods of marketing and advertising, embrace the question of the order in which the authors are to be listed in the Book itself.

In elaborate submissions, the parties spend much time discussing much evidence on the basis of which plaintiff argues that a trier of fact would conclude that she was to be listed first and defendant argues that no reasonable trier of fact could conclude that she had such right or that there was any such mutual intention. [2] Even if this evidence were probative on the question of the order in which co-authors' names should be listed or the intent of the parties in that regard in this case -- and I find, to the contrary, that most of it is simply irrelevant to such question -- the law is clear that it is not to be considered by us on the issue in question.

> 2    For example, plaintiff attempts to show "lead author" status in that she did more work on the book than Hill; that she initiated the project; that the three contributing authors, whom she solicited, regarded her as the "first author"; that the early drafts of the contract by defendants

listed her ahead of Hill in paragraph 17; that she was the more "well-regarded" and well-known author in the field; and that defendants' conduct and prior custom and practice show that they viewed her as lead author. Defendants, on the other hand, put forward evidence that purportedly, among other things, would show that Hill did more work on the book than plaintiff; that they had not viewed her as the "lead author"; that neither their conduct nor custom and practice shows an intention that she be listed first; and that plaintiff's other contentions are inaccurate.

[*19] The court's duty in a case involving a contractual dispute is to determine the intent of the parties and to give effect to their intentions as expressed in the agreement. *Record Club of America, Inc. v. United Artists Records, Inc., 890 F.2d 1264, 1271 (2d Cir. 1989)*; *Schmidt v. Magnetic Head Corp., 97 A.D.2d 151, 157, 468 N.Y.S.2d 649, 654 (2d Dept. 1983).* [3] If a contract is found to be ambiguous on an issue, extrinsic evidence of the parties' intent may be considered to determine what meaning is to be ascribed to the contract. *See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)*; *Brass v. American Film Technologies, Inc., 987 F.2d at 149*; *Curry Road Ltd. v. K Mart Corp., 893 F.2d 509, 511-12 (2d Cir. 1990).* Such evidence may include the conduct of the parties, the circumstances surrounding the execution of the contract and the custom and usage in the trade. *Christiania General Ins. Corp. v. Great American Ins. Co., 979 F.2d 268, 274 (2d Cir. 1992)*; *Roberts v. Consolidated Rail Corp., 893 F.2d 21, 24 (2d Cir. 1989)*; [*20] *Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 264 (2d Cir. 1987).* And, "when resort to extrinsic evidence is necessary to shed light on the parties' intent summary judgment ordinarily is not an appropriate remedy...and must be denied unless, viewing the evidence in a light most favorable to the nonmovant and resolving all doubts in its favor, no reasonable trier of fact could find against the movant." *Christiania General Ins. Corp. v. Great American Ins. Co., 979 F.2d at 274. See also Brass v. American Film Technologies, Inc., 987 F.2d at 149.* However, when language contained in a contract is clear or where any ambiguity may be resolved by reference to other parts of the contract itself, the court is to construe the contract and grant summary judgment without reference to extrinsic evidence. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d at 1094-95*; *Brass v. American Film Technologies,*

*Inc., 987 F.2d at 148*; *Curry Road Ltd. v. K Mart Corp., 893 F.2d at 511-12.* "Whether an ambiguity exists in a contract is a threshold question of law to [*21] be resolved by the court." *Brass v. American Film Technologies, Inc., 987 F.2d at 149. See also Schmidt v. Magnetic Head Corp., 97 A.D.2d at 156, 468 N.Y.S.2d at 653.*

> 3 Paragraph 25 of the Agreement provides that it is to be interpreted under New York law.

It is quite clear in the instant case that this contract simply does not provide the order in which the names of the authors are to appear in the Book. It does not address the issue at all. Plaintiff has not pointed to any clause that does so, and, indeed, plaintiff admits that the contract is silent on the issue, as she must. But, because a court may not resort to extrinsic evidence to construe a contract unless the written agreement is ambiguous, plaintiff must segue from silence to "ambiguity." Thus, she argues that "the Contract is clearly silent and therefore ambiguous as to the order in which the authors...should be listed." Plaintiff's Opposition at 40. However, when a contract is silent on a point that the parties [*22] dispute, evidence outside the language of the contract itself may be considered only if the point in issue is one that is "essential" to the contract, *i.e.*, without which a contract could not be found. [4] Plaintiff, however, argues flatly that "the Second Circuit has expressly ruled that when a contract is silent as to particular rights or obligations, the contract is considered ambiguous as to those rights or obligations," citing two cases, *Brass v. American Film Technologies, Inc. and Record Club of America, Inc. v. United Artists Records, Inc, supra.* Plaintiff's Opposition, p. 41. But plaintiff misconstrues the holdings in these cases and her application of the principle of ambiguity to the instant case is erroneous.

> 4 While courts have spoken of an agreement's silence on an issue as having the effect of rendering the agreement "ambiguous," it is only in cases in which the issue is one material to the contract that the court is empowered to go outside the agreement itself to construe the parties' intent on the issue in order to supply the element needed to complete the contract, as will be discussed.

[*23] It is only in rare cases that silence on an issue empowers the courts to resort to extrinsic evidence to construe the parties' intent. Rather, the black letter rule of law is that "an omission...in a contract does not constitute

an ambiguity and...the question of whether an ambiguity exists must be ascertained from the face of the agreement without regard to extrinsic evidence." *Schmidt v. Magnetic Head Corp., 97 A.D.2d at 157, 468 N.Y.S.2d at 654* (citations omitted). A reading of the Agreement does not show any ambiguity on the order of listing; it shows simply nothing in that regard. On this point, the two parties *agree*, and that they also alternatively twist various provisions in the contract obviously meant to deal with other issues to arrive at their respective conclusions on the issue of the order of listing is of no import. The situation is similar to that in *Schmidt*, where the issue was whether the minority shareholders or the majority of a corporation had the right to designate certain directors. The court explained:

> Basically, it is plaintiffs' position that extrinsic evidence should be received because the failure of the agreement to delineate [*24] the succession of directors renders it ambiguous....
>
> ...Our reading of the shareholders agreement compels us to conclude that there is simply no ambiguity with respect to the selection of a director in the event of a vacancy on the board. *Completely absent is any allusion to the procedure to be employed in the filling of such vacancy.* An omission or mistake in a contract does not constitute an ambiguity.

*Schmidt v. Magnetic Head Corp., 97 A.D.2d at 156-57, 468 N.Y.S.2d at 653-54* (emphasis added; citations omitted). The court went on to state that "it is fundamental that courts enforce contracts and do not rewrite them," and, quoting *Morlee Sales Corp. v. Manufacturers Trust Co., 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 518, 172 N.E.2d 280 (1961)*, that a court "may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing.'" *Schmidt v. Magnetic Head Corp., 97 A.D.2d at 157, 468 N.Y.S.2d at 654. See also Ingle v. Glamore Motor Sales, Inc., 111 A.D.2d 746, 490 N.Y.S.2d 240 (2d Dept. 1985).* In *Brass* **[*25]** *v. American Film Technologies, Inc.*, on which plaintiff relies to support her "ambiguity" theory, the Second Circuit explained that summary judgment is not appropriate when language that does exist in a contract could be construed to lead to

more than one reasonable alternative on an issue which is not squarely addressed in the contract. "Ambiguous language is that which is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *987 F.2d at 149* (quoting *Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d at 263*). The instant contract does not contain language that is ambiguous as to whether Hill or Kirschten is to be listed first on the Book's cover, spine or title page. There are, of course, a myriad of items that this Agreement does not address, just as in any contract; nevertheless, it is a complete contract in itself. In these circumstances, we cannot turn to extrinsic evidence to determine what the parties **[*26]** *might* have put about listing of co-authors at the time they wrote this contract if they had wanted to address it. The landmark case of *Trustees of Freeholders & Commonalty v. Jessup, 173 N.Y. 84, 65 N.E. 949 (1903), writ of error dismissed, 195 U.S. 624 (1904)*, is another instructive one on this issue. The New York Court of Appeals explained therein that parol evidence is to be received by a court only "where doubt arises upon the face of the instrument as to its meaning" and continued as follows:

> What ambiguous word or expression of doubtful meaning is there is the resolution relating to the material out of which the roadway was to be constructed? None whatever, for the writing is silent upon the subject. The defendant was given liberty to make a roadway, but nothing was said as to how it should be made or what it should be made out of. An ambiguity, in order to authorize parol evidence, must relate to a subject treated of in the paper, and must arise out of words used in treating that subject. Such an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful. **[*27]** Nothing is said in the resolution before us upon the subject of the material to be used, or the method to be employed, in making the roadway, and hence there is no ambiguity arising out of the words used with reference to that subject. Witnesses cannot be permitted to swear something into the instrument

which neither explains nor interprets any language used therein. They cannot swear a wooden roadway into a franchise which is silent, even to the exclusion of implication, as to the substance out of which the roadway is to be made. That would be making a new contract instead of explaining an old one, and would violate the principle upon which parol evidence is received, to aid in interpreting an ambiguous word or expression. Since the plaintiffs gave the defendant the right to make a roadway, but did not restrict him to the use of wood, he was not obliged to use wood.

*Id., 173 N.Y. 84 at 89-90, 65 N.E. 949 at 951. See also, e.g., Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1515 (S.D.N.Y. 1989)*("While it may be true that no explicit provision either permits or prohibits an LBO, such contractual silence itself cannot create ambiguity [*28] to avoid the dictates of the parol evidence rule...."); *Kaplan v. Cott Beverage Corp., 27 Misc. 2d 655, 656-57, 212 N.Y.S.2d 103, 105 (Sup. Ct. N.Y. Co. 1961)*("The written contract makes no mention of any adjustment in purchase price because of any variation in inventory and it is silent on the subject of any adjustments as to rent, taxes, etc. on closing of title. The plaintiff sought to overcome this apparent difficulty by asserting that the written contract is ambiguous and that the real intent of the parties may be shown by their conduct.... The written agreement is clear in its terms and purports to express the entire arrangement of the parties.... Therefore it may not be varied nor [sic] explained. All that can be said is that the plaintiff is the victim of his own circumstances.") [5]

> 5    To the extent the parties have attempted to present custom and practice on the issue of who is a "lead author" and therefore named first in a book, while plaintiff, through the Abernathy affidavit, argues that she should have been listed before Hill, her explanation of her having changed the final draft of paragraph 17 to list Hill first therein so that the new partner of her law firm would think that Hill and not she was the lead author directly undercuts her custom and practice contention as well as her credibility. Moreover, accepting her explanation of her change in paragraph 17 leads us to the conclusion that

paragraph of the Agreement does provide the order of listing as between her and Hill and the Agreement is, therefore, *not* silent on the question but shows Hill is to be listed first. Thus, in either event, defendants prevail.

[*29]   The decision of this court in *Jacobs v. Carsey-Werner Distribution, Inc., 1994 U.S. Dist. LEXIS 3746*, No. 93 Civ. 6825 (LMM), 1994 WL 116077 (S.D.N.Y. Mar. 30, 1994), is directly on point with the instant case and, furthermore, explains the difference between the circumstances here and those in the very two cases on which plaintiff relies. In *Jacobs*, the dispute concerned an employment contract that provided for four weeks of vacation annually and, specifically, whether the plaintiff, a former employee, was entitled to monetary compensation for his unused vacation time. The contract contained provisions stating that vacation was to be taken at times mutually agreed upon by the employee and employer and "without deduction of salary or other compensation." The plaintiff had taken one day out of his entitlement to four weeks although he had apparently sought longer vacations on various occasions, but he and his employer failed to agree upon convenient times, and plaintiff on at least one occasion cancelled vacation plans in order to do work the employer needed. When he learned his employment would not be renewed, he sought and received confirmation that he would be compensated for his unused [*30] accrued vacation time, and it was, furthermore, his understanding that the defendant employer, as a matter of company policy, paid its departing employees for unused vacation time. However, upon termination, the employer refused to so compensate the plaintiff.

The court noted that the employment contract nowhere provided an indication that cash payment could be claimed for unused vacation time (nor did it provide it could not) and that, therefore, "the Court cannot find an issue of material fact...unless it considers extrinsic evidence." In words uncannily echoing the instant case, this court then held as follows:

> A court may not resort to parol evidence to construe a contract unless the written agreement is ambiguous. *See, e.g., Brass v. American Film Technologies, Inc., 987 F.2d at 148-50.* Jacobs, however, does not allege that any of the terms actually in the Contract are ambiguous; rather, he

maintains that the Contract is ambiguous because it is silent as to the issue of whether Jacobs could cash out his unused vacation time.

There is little authority for the proposition that silence per se constitutes ambiguity. Although Plaintiff has brought to the [*31] Court's attention certain cases in which contracts have been found ambiguous on the basis of silence as to issues necessary to construe an agreement's written provisions, see *Allstate Ins. Co. v. White Metal Rolling & Stamping Corp., 466 F. Supp. 419, 421 (E.D.N.Y. 1979)*(insurer's right to retain outside counsel was "dealt with in the formal contract," but the "language [was] ambiguous as to the result" because the written agreement "contained no words explicitly describing the circumstances" when such retention was to be permitted); *Brass v. American Film Technologies, 987 F.2d at 149* (contract is ambiguous where there was "nothing said in the contract" about whether stock shares to be reserved were to be restricted or unencumbered); *Record Club of America v. United Artists Records, Inc., 890 F.2d at 1269-71* (silence as to timing of royalty payments found a contractual ambiguity rendering summary judgment inappropriate), no such infirmity afflicts the Employment Contract. The Contract is perfectly intelligible at face value without taking recourse to supplying a term providing for payment for unused vacation time.

[*32] *Id., 1994 U.S. Dist. LEXIS 3746, 1994 WL 116077* at *2.

So, too, here the contract is perfectly intelligible without supplying a term for it as to whether Hill's name should or should not precede plaintiff's on the Book they co-authored. This case does not present one of those situations in which contractual silence leads to a finding of contractual ambiguity that in turn permits resolution of an issue on the basis of extrinsic evidence. The instant case is not a situation where language possibly governing a matter is ambiguous and can be reasonably interpreted

in favor of either party; where the contract is silent on a specific issue but other contractual provisions can reasonably be read to imply a right claimed by either party; or where the contract is silent on a specific issue but its resolution is required as an essential element of the contract in order to construe the contract's other provisions. The order in which the two authors are to be listed is simply not an "issue necessary to construe [the] agreement's written provisions." *Id., 1994 U.S. Dist. LEXIS 3746, 1994 WL 116077* at *2.

This conclusion is further reinforced by two additional facts. First, the Agreement contains a merger clause, [*33] expressly providing that the Agreement as written stands as the parties' "entire understanding." [6] Where the parties have entered a written agreement that "was assented to by both parties as a complete and exclusive statement of the terms[,]...evidence of the alleged making of consistent additional terms must be kept from the trier of fact." *Restatement (Second) of Contracts § 210, Comment a. See Fogelson v. Rackfay Constr. Co., 300 N.Y. 334, 338, 90 N.E.2d 881, 882 (1950).*

6   That paragraph provides:

> 23. *Entire Understanding.* This Agreement contains the entire understanding between the Authors and the Publisher and supersedes all previous agreements regarding the Work, whether oral or in writing. This Agreement may not be modified or terminated except in accordance with its terms or by a writing signed by the Authors and the Publisher.

Ensminger Aff., Ex. F.

Second, as mentioned earlier, plaintiff clearly was and is an intelligent, sophisticated tax lawyer and negotiator, [*34] who apparently felt no need to have an attorney represent her during any of the negotiations with defendants on the Book. All the correspondence to her from defendants was sent by them directly to her, she wrote directly to them, and she spoke with them without any attorney. She was the one who marked up all the drafts of the Agreement, and, indeed, as we know, it was her deliberate revision of paragraph 17 in the last draft

Case 1:07-cv-00480-JJF    Document 24-13    Filed 11/21/2007    Page 11 of 25

Page 10
1997 U.S. Dist. LEXIS 24037, *34

which listed Hill before her. As she is quick to point out to show that she was more well-known and highly regarded than Hill, she had already had published two prior books and, thus, was not a novice in the book publishing world. In the face of paragraph 23, plaintiff's burden, in order to have parol evidence of the understanding she alleges existed on the order of listing in the Book, would be to put forward "credible contrary evidence" that the contract to which she assented as an expression of the entire understanding should nonetheless be supplemented by an additional understanding on the issue of which co-author shall be listed first. *Restatement (Second) of Contracts § 210, Comment b.* At the very least, she would have had to demonstrate that this subject [*35] was not "so clearly connected" with the Agreement that the parties could ordinarily have been expected to embody it therein. *Fogelson v. Rackfay Constr. Co., 300 N.Y. at 338, 90 N.E.2d at 882.* Obviously, plaintiff cannot meet this burden. There is no doubt that plaintiff could have expressly addressed in the drafts of the Agreement the issue of who was to be listed first in the Book if she had so wished. [7] Again, in terms uncannily applicable to the instant case, Judge McKenna in *Jacobs v. Carsey-Werner Distribution, Inc.,* after finding the contract in issue silent on the disputed question of vacation pay, explained:

> Jacobs was presumably a sophisticated bargainer. He negotiated a lengthy, detailed agreement which simply did not provide for the benefit he now claims the Contract provided. Thus, because there is no material ambiguity in the Contract, the Court cannot consider parol evidence in order to construe the agreement. This conclusion is only bolstered by the specific language of the Contract precluding consideration of modifications not written and signed by both parties.

*1994 U.S. Dist. LEXIS 3746, 1994 WL 116077* at *3.

7   In the *Fogelson* case, concerning a written lease, the tenants claimed that the landlords' having supplied bus service for many years prior thereto and other evidence showed the parties' understanding that bus service was to be provided even though the lease did not address the subject. Judge Fuld, in language equally applicable to plaintiff's contention here that she should have the right to show custom, practice and the parties' understanding as to the "lead author" listing although not addressed in the Agreement, explained that the existence of the landlords' voluntary undertaking for many years to provide bus service neither created a duty nor imposed an obligation on them to do so in the face of the lease's merger clause and the parol evidence rule. *Id., 300 N.Y. at 340, 90 N.E.2d at 884.*

[*36]   For all the foregoing reasons, summary judgment should be granted to the defendants on claim 1(e). [8]

8   Plaintiff, pursuant to *Fed. R. Civ. P. 56(f),* has asked to take additional discovery to respond more fully to defendants' allegations. She seeks depositions of various WGL editors and other personnel that she contends would rebut defendants' contentions on this motion, *inter alia,* that it was not their intent to list her first and that their custom and practice dictated otherwise. Insofar as any such parol evidence, even assuming she could show it, could not be considered for these purposes for the reasons discussed above, the further discovery has not been allowed during the pendency of these motions.

**B.** *The Corrections Issue*

As stated earlier, plaintiff's claims 1(a), (b) and (c) involve her contention that WGL breached the Agreement by not incorporating her edits in the chapters of the Book for which she was responsible (Chapters 12, 13 and 14) and making her changes to Chapter 12 only after [*37] she filed this action, by not allowing her to review final galleys of Chapter 12 and by not providing a reasonable opportunity to review and edit other chapters, including 2 and 6 for which both she and Hill were responsible. Paragraph 8 of the Agreement is pertinent to these claims and also to her claim of anticipatory breach of the Agreement by WGL's stating she would have to bear the financial cost of the changes made to Chapter 12:

> 8. *Galleys and Proofs.* The Authors will respond promptly to editorial questions. The Authors will promptly read and correct all galleys and page proofs sent by the Publisher and return them to the Publisher. If the Authors fail to return galleys or page proofs, the Publisher may

publish the Work as submitted....

Ensminger Aff., Ex. F. Defendants point to the following evidence as showing that any deficiencies from lack of editing of the chapters written wholly or partly by plaintiff were not their fault but the fault of plaintiff. According to Daniel Henson, the editor of the Book at WGL, although publication had originally been scheduled in 1993, the Book fell seriously behind schedule because the authors missed the Agreement's March 1, 1993 deadline [*38] for a completed manuscript and missed further subsequent deadlines through 1993 which had been negotiated and confirmed orally and in letters. Finally, by the September 20 amendment to the Agreement, the deadline for the completed manuscript was extended to November 15, 1993. Henson Aff. P 3. He and others at WGL emphasized to the authors that it was necessary that the Book be published no later than November 1994, a publication date much later than originally anticipated, and that because the authors had already missed deadlines, the turnaround time on editing page proofs -- the final drafts of chapters -- would be tight and reviewed pages would have to be returned timely. Id. P 4. (Publication was scheduled for November 11, 1994, which meant the manuscript had to go to press no later than October 3, 1994.) In a memorandum to Hill and the contributing authors on May 30, 1994, plaintiff confirmed Henson's request "that each author review and return proofs within 4 days of our receipt of them." She continued:

> He has emphasized that at the page proof stage, we are to ensure the accuracy of the content of the text and footnotes, and not focus on style, and that alterations [*39] should be kept to a minimum. He expressly asked me to tell you that he has been advised that changes cannot be made in the manuscript from this point on; however, he added that it may be possible to add minimal changes to the text or to footnotes.... He also expressly asked that no footnotes be added or deleted.

Id., Ex. B P 5. According to Henson, before September 29, 1994, plaintiff never voiced an objection about the page proof guidelines and schedule. Id. P 7. What did intervene, however, was the dispute between plaintiff and Hill over whether plaintiff would be designated "lead author." Plaintiff sent Hill a twelve-page letter on June

22, 1994 demanding that she be designated the "lead author" of the Book, Ensminger Aff., Ex. K, and a letter to Wayne Barr, Director of New Tax Publications at WGL, on June 29, 1994 regarding her "entitlement to be first author" in which she also criticized how Hill had dealt with problems with the chapter written by Atkinson. Id., Ex. L. After Thomas J. Kelly, Senior Vice President/Publisher at WGL, responded in a letter of July 6, 1994 explaining WGL's reasons for deciding to list Hill before plaintiff on the Book, plaintiff's [*40] attorney Lynne Bernabei wrote Kelly on August 1, 1994 to set forth plaintiff's position on the first authorship issue "in an attempt to avoid what is likely to become costly litigation and the delay or cancellation of publication of the book." Id., Ex. N.

On August 16, 1994 Henson sent plaintiff the page proofs of Chapters 12, 13 and 14. Henson Aff. P 9. His cover letter requested that plaintiff return any changes by August 23. He stated: "Because we are so pressed for time, please make only the most necessary changes. In addition, please save lengthy inserts for the first supplement, and please do not add or delete footnotes." Id., Ex. D. Plaintiff did not return the page proofs on August 23, 1994, but rather wrote five days later in a letter to Henson of August 28, 1994 as follows:

> I have completed review and changes to the page proofs for Chapters 12, 13, and 14 for the above book, and will be happy to complete page proofs for Chapters 2 and 6 as soon as they are available.
>
> However, at this time, I have been advised not to return page proofs to Warren Gorham & Lamont until the controversy between my co-author and myself is resolved, which I hope will be soon.

[*41] Id., Ex. E. Henson wrote back on September 13, 1994 that "publishing realities dictate that the production process must continue; if we receive your author's alterations timelessly, we shall incorporate any essential corrections. Otherwise, any changes you might have will be included in the first supplement." Id., Ex. F. WGL did not receive plaintiff's page proofs for these three chapters until October 17, 1994, two weeks after the Book had gone to press.

In her cover letter to Henson of October 14, 1994 enclosing her proofs, plaintiff pointed out that the proofs for Chapter 12 Henson had sent had not incorporated updated text and footnotes that she had sent him in her second draft of the chapter on March 24, 1994 but instead were virtually identical to the first draft submitted back on February 23, 1993. The page proofs thus contained "significant and lengthy substantive errors and omissions" which "cannot be published in their present form." Kirschten Aff., Ex. 13.

Plaintiff explains in her affidavit on this motion that when she sent her second draft to Henson on March 24, 1994 which had updated then outmoded material in the first draft, the computer disk she copied and sent [*42] was mistakenly one of an earlier draft, although the hard copy that accompanied it was the correct March 24 version. Henson explains that WGL edited the Book on computer and used the hard copy "for backup purposes only." Henson Aff. P 11 n. 1. Plaintiff states that she did not discover that the proofs sent to her on August 16 did not reflect the edits she had made in the March 24 draft until October 13, when "for the first time, I compared the Chapter 12 page proofs to the second draft...which I had submitted to WGL on March 24, 1994." Kirschten Aff. P 30. When she sent Henson the new page proofs the next day she informed him for the first time in her cover letter that the proofs sent by WGL did not contain the March 24 changes and requested assurance that publication of Chapter 12 would contain her edits as of March 24. As of this time, she was not aware of the mistake she had made in sending the uncorrected disk on March 24 and learned of her error only when WGL, after the commencement of this litigation, examined the hard copy sent on March 24, discovered it was different from the disk she had sent and so informed her. She argues now that her error is irrelevant because she understood [*43] that WGL worked from hard copy, not computer disks. She states Henson's initial instructions that revisions to first drafts were to be made on hard copy and that it was only after one of the contributing authors suggested disks should be submitted with the second drafts to simplify proofreading that Henson requested disks be submitted as well as hard copies. She says WGL never discussed with her how they would use the disk or the hard copy of materials submitted. She maintains conclusively that "WGL was responsible for comparing the hard copy with the disk and alerting me to any error." Id. P 36.

On October 28, 1994 plaintiff commenced this action

in state court and moved to enjoin the Book's publication scheduled for November 11, 1994 on the grounds, *inter alia*, that Chapter 12 contained serious errors and omissions. (The case was removed to this Court on November 3, 1994.) On November 8, WGL agreed to print a new version of Chapter 12 incorporating the changes in plaintiff's March 24, 1994 second draft, thus delaying publication for a week -- the Book was published November 18, 1994 -- and plaintiff dropped her motion for a preliminary injunction. WGL told plaintiff [*44] it intended to charge her for the cost of the late charges to Chapter 12. This cost issue is raised by plaintiff in her anticipatory breach claim of Count One. The Book as published did not include the edits to Chapters 13 and 14 that plaintiff sent WGL on October 14, 1994. Consequently, she claims, these chapters were outdated when published.

With respect to Chapters 2 and 6 that both plaintiff and Hill wrote, Henson sent to Hill and plaintiff by overnight mail page proofs of Chapter 2 on September 23, 1994 and of Chapter 6 on September 27, 1994. Henson Aff. P 15. With each proof Henson sent plaintiff and Hill identical cover letters, informing them to each make changes only in the part of the chapters that she had written and make "only the most necessary changes" as "we are extremely pressed for time." He told them that the production department had to have any changes by October 3 because "the chapter must go to press on that date." He also told them to not hesitate to call him if they had any questions. Henson Aff., Ex. I. Hill submitted her corrections by October 3. Plaintiff, however, wrote a letter to Henson on September 29 stating that because of the length of the chapters, [*45] "it is simply impossible for me to review accurately and to correct this amount of material in 2 or 3 business days, and particularly in light of my other professional commitments on September 28 through 30." She further pointed out that WGL had given other authors up to two weeks to review page proofs for much shorter chapters and that, during the five-month period that WGL had the final draft, one of the Internal Revenue Service rulings discussed at length in the text of Chapter 6 had been revoked. She concluded, "I shall review these proofs as soon as possible." Id., Ex. J. It was not until October 17, 1994 that plaintiff returned the page proofs to Chapters 2 and 6 to Henson. In her cover letter she stated that because she had received them "without advance notice as to when they would be sent," it was not possible "to review and to return them to you by October 3. Moreover, with minor exceptions, I have not had time

to review the footnotes to ensure that they are current and accurate due to the length and detail of these chapters." *Id.*, Ex. M. The Book as published, which had already of course gone to press, did not contain plaintiff's October 17, 1994 corrections [*46] to Chapters 2 and 6.

With respect to all five chapters, defendants argue that it was plaintiff who breached the Agreement by failing to "promptly read...correct...and return" the page proofs to WGL as required under Paragraph 8 of the Agreement. Ensminger Aff., Ex. F. Accordingly, as it provides that "if the Authors fail to return galleys or page proofs, the Publisher may publish the Work as submitted," WGL was entitled to print the chapters without her late corrections.

Regarding Chapters 12, 13 and 14, I find that no reasonable trier of fact could find that plaintiff, by taking two months to read, correct and return the page proofs, did so "promptly." On August 28, twelve days after her receipt of them, plaintiff wrote to Henson that she had *completed* her review and changes to the page proofs for these three chapters and would be "happy to complete page proofs for Chapters 2 and 6 as soon as they are available," but had "been advised" not to return page proofs "until the controversy between my co-author and myself is resolved, which I hope will be soon." Despite her knowledge that the Book had to go to press by October 3, Henson did not receive the proofs from plaintiff until [*47] October 17. As pointed out by Henson, she said nothing in her August 28 letter about the nature of the changes she had nor did she communicate with WGL further despite Henson's letter of September 13 informing her that, despite her August 28 letter, "the production process must continue" and if WGL did not receive her corrections in a timely way, they would be included in the first supplement instead of the first publication of the Book. Henson states, and it is of course undisputed, that had she sent her corrections in mid-September, most of her requested changes would have been made; indeed, he could have made changes as late as October 3. Plaintiff, instead, expressly withheld the page proofs on the unjustified ground that her dispute with Hill over being designated "lead author" should be resolved first. There was, however, no contractual basis for plaintiff to make the return of the page proofs contingent on that issue. Plaintiff's only proffered justification is apparently that in withholding the page proofs she "was attempting to ensure WGL's compliance with its contractual obligations" concerning her "lead author" issue and its purported refusal "to take any actions to guarantee [*48] proper coordination of the Book [*see* Claim 1(d), below]." Plaintiff's Opposition, p. 63. As discussed earlier, plaintiff's position as to "lead author" is unavailing. Yet, even if her position on that issue had been correct, it would not have given her a basis to refuse to promptly read, correct and return the page proofs. She cannot reasonably maintain that the seven weeks from August 16 to October 3 did not afford her a "reasonable opportunity to review and edit these chapters." Complaint P 74(c). She well knew, moreover, of the publication schedule and could have been under no illusion that publication would not go forward. Indeed, it is she who moved to enjoin it from going forward.

Plaintiff's claims of anticipatory breach of the Agreement -- because of WGL's stated intention to charge her for the cost of making the changes to Chapter 12 after she commenced suit and it was learned of the mistake she had made in sending the wrong computer disk with her second draft -- and that WGL breached the Agreement by not showing her revised galleys after the changes had been made (Claim 1(b)) are red herrings. It was plaintiff's unjustified failure to promptly read, correct and return [*49] the proofs received August 16 (as well as her mistake with the disk) that caused this additional expense. If there was an "anticipatory breach," it was hers. Plaintiff's explanation on this motion that it was not until October 13 when she reviewed the proofs for Chapter 12 that she discovered the changes she had made in the prior draft had not been incorporated simply confirms the fact that had she reviewed it earlier, she would have discovered the error and there would have been plenty of time before publication to correct it. [9] Similarly, her after-the-fact argument now that she expected WGL to work with the hard copy, not the disk, is not persuasive, nor is there any reasonable basis for it. It is not disputed that the authors were told to make their corrections on both the disks and the hard copy. Although she baldly asserts that WGL was "responsible" for comparing the disks to the hard copy, plaintiff does not attempt to explain for what purpose she thought she and the other authors were sending the disks if not for WGL to use them.

> [9] It does not reflect well on plaintiff's credibility that her letter of August 28 to Henson stated "I have completed review and changes to the page proofs for Chapters 12, 13 and 14" (although had been advised not to return them). Clearly, she had

not done so.

[*50]  With respect to claims 1(a) and 1(c) regarding Chapters 2 and 6, WGL argues that plaintiff and all the other authors had been advised repeatedly that because the Book was behind schedule they would have only a limited time to make a minimum of changes; that plaintiff knew of and had, in fact, confirmed to the authors that WGL expected a turnaround of four days; and that plaintiff was actually afforded more than ten days (from September 23 and 26 to October 3) to make the corrections. Plaintiff maintains that "promptness" under paragraph 8 must be interpreted so as to be reasonable and that it was unreasonable for WGL to expect her to review and edit 600 manuscript pages of a technical legal treatise in "three business days." Plaintiff's Opposition, p. 66. Since plaintiff claims to have received the two sets of page proofs on September 27 and 28 (there is no explanation as to why Henson's overnight mailing of Chapter 2 on September 23 was not received by her until September 27), she apparently counts Wednesday, Thursday and Friday (September 28-30, 1994) as the "three business days" she was given to return them. She does not explain why she could not have worked on Saturday and Sunday, [*51] October 1-2. She lays the blame for her failure to return them until October 17 at WGL's door because she was sent them "without advance notice as to when they would be sent." Henson Aff., Ex. M.

Plaintiff's argument ignores certain salient facts. Plaintiff could have picked up the telephone and called Henson to explain she would need more time and arrange for late corrections. Despite her letter of September 29, saying she would review the proofs "as soon as possible," she did not return them until close to three weeks later. Nor did she offer *any* corrections on September 29 or anytime in between her receipt of the proofs and October 17. Her argument that she should have received advance notice of when the proofs would be sent makes no sense in the context. Neither she nor any other author ordinarily received such "advance notice." Henson, himself, does not know when page proofs will be available for publications until he receives them from WGL's production department. Henson Aff. P 19. He says that, as was customary, he sent out the proofs for Chapters 2 and 6 the very same days he received them from the production department.

Plaintiff simply has no reasonable explanation [*52]

for why it took her until October 17. What she ignores which I believe must weigh heavily into the equation is that, as of the time Henson sent her the proofs of Chapters 2 and 6, as of the time she wrote her letter of September 29 and as of the time the Book went to press, October 3, she had still not returned her corrections to Chapters 12, 13 and 14 which she had since August 16 and to which she had claimed in her August 28 letter her review and changes had been made. Any reasonable person in WGL's shoes would have expected that she, having been "advised" not to return any proofs until resolution to her satisfaction of the "lead author" issue, was planning to hold Chapters 2 and 6 as well. Indeed, her August 28 letter explicitly stated she would be "happy to complete page proofs, for Chapters 2 and 6," but had been advised not to return any proofs. Her letter of September 29 made no mention of Chapters 12, 13 or 14. She neither indicated when -- if ever -- she planned to return them nor when she would be able to complete her review or give to WGL any corrections to Chapters 2 and 6. Hill had returned her proofs of Chapters 2 and 6 by that time. Under these circumstances, to [*53] expect WGL not to allow publication to go forward as scheduled on October 3 would surely be unreasonable. [10] As discussed, moreover, under paragraph 8 of the Agreement, WGL had the right to do so.

> [10]  Plaintiff's contention that the amount of material contained in Chapters 2 and 6, the number of substantive changes necessary and the amount of time review could have reasonably been expected to take are genuine issues of material fact is, for this reason as well as others, disingenuous. Additionally, she knew very well before receiving these proofs of these chapters the amount of material they contained and what their contents were. Indeed, she could have been updating the information in them prior to receiving the proofs; she undoubtedly had the prior draft she had sent on her computer. Moreover, in reality plaintiff had very few substantive changes to make to these chapters as seen by the proofs when she finally returned them. In fact, examination of the changes she wanted reveals only their triviality and how her claims border on the frivolous. (*See* pp. 64-65, below).

[*54]  Accordingly, defendants' motion for summary judgment should be granted on claims 1(a), 1(b), 1(c) and

her claim under Count One of the Complaint of anticipatory breach as to the additional expense incurred in reprinting Chapter 12.

## C. *The Coordination Issue*

Plaintiff's claim 1(d) is that WGL breached the Agreement by "failing to ensure coordination among the authors." Defendants claim that plaintiff is asking the court to create a contractual provision that does not exist in the Agreement. Defendants point out that under paragraph 7 of the Agreement it was the authors' responsibility, not WGL's, to "deliver to the Publisher...a final manuscript...with content satisfactory in the Publisher's judgment for the market for which the Work is intended," Ensminger Aff., Ex. F, and toward that end, it was the authors' responsibility to coordinate the preparation of the manuscript.

In response, plaintiff argues that, although the Agreement provides at paragraph 17 that "Frances R. Hill shall coordinate the preparation of the manuscript by the Authors and shall be the liaison between the Publisher's editorial staff and the Authors," Hill failed to perform this function to the detriment [*55] of the work. Specifically, plaintiff contends that she undertook the coordination role and that she, not Hill, reviewed the chapters of the three contributing authors and sent them comments; that Hill failed to circulate to her and the other authors Hill's draft chapters, and thus they were unable to coordinate their work with Hill's; that she purportedly brought to the attention of Barr and Henson problems that were occurring because of Hill's failure to relay instructions and information from WGL to the authors (although a memorandum in which she claims to have done so does not appear to be in the record); and that WGL's failure "to monitor the progress of the Book and to ensure that the work of the...contributing authors was properly coordinated" led to "inconsistencies between the chapters and lowered the quality of the Book." Kirschten Aff. PP 55, 57, 61-62; Atkinson Decl. PP 5-7; Bird Aff. P 5; Brier Aff. P 5. Plaintiff contends that the intent of the parties in agreeing to paragraph 17 was "to write and publish a Book in which the various chapters of the Book are coordinated with one another" and that paragraph 17 would be rendered "meaningless" unless the Agreement is read [*56] "to obligate WGL to ensure that the coordinating author fulfills her responsibilities, or that coordination is ensured in some other manner." Plaintiff's Opposition, p. 69. Plaintiff thus argues that, "since the

Contract is ambiguous as to whether WGL is to be responsible for coordination of the Book, this court must deny summary judgment on this...claim." *Id.* In their reply memorandum, defendants point out that plaintiff has offered no evidence as to WGL's intent or to custom and practice in support of her claim that WGL had a contractual duty to ensure that Hill performed the duties of coordinating author.

Plaintiff again attempts to use inappropriately the doctrine of ambiguity to avoid summary judgment. There is nothing ambiguous about the language of paragraph 17. Plaintiff is correct in pointing out that a court must "avoid an interpretation that would leave contractual clauses meaningless." *Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.,* 853 F. Supp. 791, 795 *(S.D.N.Y. 1994)*(quoting *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Associates,* 63 N.Y.2d 396, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984)). However, although the [*57] purpose for designating a coordinating author may have been to bring about a coordinated book, on the face of the Agreement that purpose is served by obligating Hill to "coordinate the preparation of the manuscript" in paragraph 17. Since it may be presumed that a material failure by Hill to perform this function would breach the Agreement, it may also be presumed that the threat of her liability to the other authors as well as to WGL would serve to induce Hill to perform it. Thus, constructing a contractual duty for the publisher to somehow police the work among the authors is obviously not necessary to render paragraph 17 meaningful, nor would it make sense in this contract. The plain meaning of the sentence in the context is that Hill was to coordinate the work among the authors so that the publisher received a coordinated final manuscript. There is no ambiguity in paragraph 17 that would allow this court to invent some implied obligation on the part of WGL to guarantee Hill fulfills her duties under the contract, and defendants' motion should therefore be granted on claim 1(d).

## D. *The Royalties Issue*

There is similarly no basis for the part of plaintiff's claim 1(h) that [*58] alleges that WGL breached the Agreement by not providing her "any information about the arrangement concerning the division of royalties among the authors." Complaint P 74(h). As defendants point out, the Agreement provides in paragraph 18(a) through (d) for certain percentages of the net cash

proceeds to be paid to the "Authors" or their representatives and leaves the division of the royalties to be determined by the authors themselves. It then provides:

> (e) All royalties earned hereunder shall be divided as determined by Hill, Kirschten, Brier, Atkinson, Henzke and McDowell in a writing delivered to the Publisher signed by the six of them.

Ensminger Aff., Ex. F. Plaintiff's argument in response is a string of non sequiturs:

> A reasonable interpretation of P18(e) would be that WGL must approve and implement any royalty agreement between the authors, because WGL pays out the royalties. If WGL refuses to co-operate with the lead author, Ms. Kirschten, about setting up an agreement to distribute the royalties, there is simply no manner in which the authors can receive the royalties.

Plaintiff's Opposition, p. 70. However, there is simply nothing in paragraph [*59] 18(e) that would require WGL to "approve and implement" the authors' royalty agreement or to play any role whatsoever in "the arrangement concerning the division of royalties among the authors." Complaint P 74(h). Nor does plaintiff explain why her purported role as "lead author" is material to such an agreement or implicates WGL in bringing one about.

### E. *The Front-Matter and Marketing Issues*

Plaintiff's submissions on these claims serve to confirm that this case is little more than the result of the anger of a proud, talented author who was unable to have a work published that met her own strict standards and, unfortunately, has sought to remedy the problem in court, suing on a contract that as written simply does not provide her with the niceties she would like. Her refusal to accept the fact that she did not become "first author" has caused her to raise all sorts of petty squabbles into "claims" of breach of contract and submit hundreds of pages of argument on issues that could and should be resolved among the authors themselves and the defendant publisher in an informal manner out of court.

In claim 1(f) plaintiff claims WGL breached the contract because it did not provide [*60] her with page proofs for "what was originally the preface of the Book." In claim 1(g) she claims breach of contract because WGL did not give her the opportunity to edit the Book's acknowledgements. In claim 1(h) she claims further breach of the Agreement because WGL did not provide her "with any information concerning any personal dedication for the Book." In claim 1(i) she alleges breach because WGL did not provide her with "information regarding marketing of the Book."

Defendants argue that the Agreement does not provide plaintiff with the right to be furnished with any of the items. With respect to the preface and acknowledgements, paragraph 8 of the Agreement, as we have already discussed, states, "The Authors will promptly read and correct all galleys and page proofs *sent by the Publisher*.... If the Authors fail to return galleys or page proofs, the Publisher may publish the work as submitted." Ensminger Aff., Ex. F (emphasis added). Defendants contend that nothing in the contract obligates them to send proofs of *any* parts of the Book, much less these "front-matter" items. Moreover, they state, as paragraph 17 provides that Hill "shall coordinate the preparation of the [*61] manuscript by the Authors and shall be the liaison between the Publisher's editorial staff and the Authors," if they were required to send the page proofs of this material to anyone, that person was Hill, not plaintiff.

Plaintiff responds to these arguments by claiming that the provision about the authors' promptly reading, correcting and returning page proofs would be meaningless if WGL were not required to send any, and that because they must therefore be required to send proofs of some pages, it has to mean they were required to send proofs of *all* pages. She further maintains that as these front-matter sections require input of all the authors, including the contributing ones, the contract could not have intended that they be reviewed only by Hill.

I find plaintiff's arguments not persuasive. Quite clearly, the contract does not provide that all authors are to receive proofs of everything. Indeed, it would be inefficient and wasteful to send each and every proof to Hill, Kirschten and the three contributing authors and receive back five different versions rather than to send them to a coordinating author whose role obviously was

to consult with the others and return one final [*62] version to the publisher.

Plaintiff's recitation of the facts reveals that her problem, of course, was with Hill. However, she cannot seek to hold *defendants* liable on a contract for her inability to work with Hill and Hill's alleged shortcomings. Thus, she explains as follows:

> [In late November] I learned for the first time that Ms. Hill had drafted and submitted the preface to the Book to the publisher without notifying me, or seeking my permission, even though I am the lead author on the Book. Subsequently, in early April 1994, Ms. Hill misled me into believing that the final draft of the Preface was due to WGL by May 1, 1994. I subsequently learned from Mr. Henson that this was not the case. It was not until or about April 20, 1994 that Ms. Hill first provided me with a draft of the Preface. It was substantially similar to the draft Preface that Ms. Hill surreptitiously telecopied to Mr. Henson on November 15, 1993....
>
>                     * * *
>
> WGL failed to provide me, as the lead author for the Book, with page proofs for what originally had been the preface to the Book and which Ms. Hill has rewritten to be the first chapter of the Book. I had, in May and June 1994, edited the draft [*63] Preface Ms. Hill had written and I rewrote substantial portions of it. WGL similarly failed to provide me with proofs for acknowledgements for the Book, which I wrote jointly with Ms. Hill.

Kirschten Aff. PP 59-60. Without intending sarcasm, one cannot but ask with respect to the above "issues," "So what?" While it may be buried somewhere in her lengthy submissions, I do not find any allegation that the preface or the acknowledgements as published somehow caused plaintiff damage, or even that she would have changed them had she seen the final proofs.

With respect to her "personal dedication" allegation in claim 1(h), the only expounding of the nature of the

claim I can find is in paragraph 66 of plaintiff's affidavit where she states simply, "WGL failed to provide me, as the lead author of the Book, with any information concerning whether either of the principal co-authors could include a personal dedication in the Book (in addition to the acknowledgements made to the authors' professional colleagues)." I infer from this that she asked WGL whether she could have a dedication in the Book and WGL never responded. Can plaintiff truly be claiming that this slight amounts to a [*64] breach of an elaborate formal publishing contract -- and one that does not even mention anything with respect to any dedication?

With respect to plaintiff's claim 1(h) that WGL did not provide her with "any information regarding marketing of the Book," defendants point to paragraph 13 of the Agreement which gives WGL complete discretion: "The Publisher will market... the Work as it deems proper and profitable and at its sole cost and expense." Ensminger Aff., Ex. F. In her affidavit, plaintiff merely states:

> WGL failed to provide me, as the lead author on the Book, any information regarding marketing issues. In fact, WGL has never even sent me a copy of the brochure it prepared to advertise or solicit orders for the Book. As a result of WGL's refusal to communicate with me, some of these issues remain unresolved.

Kirschten Aff. P 67. As far as I can determine from her 100-page memorandum, plaintiff has not responded to defendants' argument as to paragraph 13 of the Agreement, and I agree that marketing is left in the contract to the sole prerogative of defendants. Whatever information plaintiff believes she is entitled to as the alleged "lead author" is certainly not a [*65] contractual matter.

For the above reasons, defendants' motion for summary judgment must be granted as to claims 1(f), 1(g), 1(h) concerning a personal dedication [11] and 1(i).

> 11    The remainder of claim 1(h) concerns plaintiff's allegation as to information about royalties which we have discussed immediately above and on which summary judgment is also recommended.

## F. *The Supplement Issue*

Claim 1(j), added to this case by the Second Amended Complaint, concerns preparation of the Book's first supplement. It is the only part of Count One on which I find issues of fact precluding summary judgment.

Paragraph 10 of the Agreement provides as follows:

> 10. *Supplements.* The Authors have the first option to prepare all Supplements for the Work. This option must be exercised within thirty (30) days after the Publisher notifies the Authors that it wishes to publish a Supplement. The preparation by the Authors and the publication and sale of any Supplement prepared by the Authors is subject to all the provisions [*66] of this Agreement as if it were the original Work. If the Authors exercise the option, the Authors must prepare and deliver a manuscript for the Supplement within six (6) months following the date on which the Publisher notified the Authors in writing that it wishes to publish a Supplement. If an Author does not exercise such Author's option to prepare a particular Supplement or if an Author fails to deliver the manuscript within the six-month period, the Publisher, in consultation with Hill and Kirschten, may have that portion of that Supplement prepared by any person or persons that the Publisher deems qualified, including in-house personnel. The Publisher may give the individuals who prepared the Supplement such Author's credit as it deems appropriate. If any one or more Authors fails to exercise the option or fails to deliver a timely manuscript for any three consecutive supplements, that Author shall lose his or her option to prepare all subsequent supplements under the terms of this Article 10.

Ensminger Aff., Ex. F. On September 28, 1994 (before, of course, receiving plaintiff's September 29, 1994 letter), Henson wrote plaintiff to notify her that the first supplement [*67] to the Book was being planned and that the manuscript would be due January 20, 1995.

Ensminger Aff., Ex. R. By letter of October 24, 1994 plaintiff told him she did "not anticipate any difficulties in meeting that schedule." *Id.*, Ex. S. On December 5, 1994 Ensminger wrote plaintiff that she should "arrange to have your material to Frances Hill by January 15, 1995, so that she can submit a consolidated supplement manuscript to us by [January 20, 1995]." *Id.*, Ex. T. He asked plaintiff to advise him in writing by December 29 as to whether she would be able to adhere to this schedule. Ensminger explains in his affidavit that after Henson's letter, plaintiff continued to refuse to return her page proofs until after the Book had gone to press and that this attempt by plaintiff "to sabotage the Book's publication" deprived her of any rights under the Agreement. *Id. P 31.* He then adds:

> Nonetheless, in an effort to do what was best for the Book, WGL attempted to resume a working relationship with Kirschten, but also sought assurance that she would not again use the editorial process as a means of extortion. Therefore...I requested that Kirschten agree in writing to submit [*68] material for the First Supplement to Hill, the "coordinating author" named in the Contract, by January 15, 1995 (so that the January 20 manuscript due date could be met).

*Id. P 32.* It might also be noted that this case, as discussed above, had already been commenced. In a letter to Ensminger on December 29, plaintiff's attorney reiterated that plaintiff anticipated that she would be able to meet the schedule but wrote that "Ms. Kirschten and the Contributing Authors are unwilling to coordinate submission of their supplements through Frances Hill" and that "because of Ms. Hill's failure to meet her contractual obligations to coordinate the treatise, and WGL's breaches in failing to ensure that Ms. Hill properly fulfilled her coordination role," plaintiff and the contributing authors would work with WGL on the supplements only if plaintiff were "the point of coordination." The letter stated the requirement that plaintiff send her work to Hill to coordinate was a threat to the "quality of the supplements." *Id.*, Ex. U. The letter told Ensminger that it was plaintiff who had coordinated the second draft manuscripts for Chapters 2 and 6 which she had co-authored with Hill [*69] because, after having sent Hill her drafts for the first manuscript, Hill had omitted portions of her work and caused her and

Henson to expend a great deal of effort to produce a working manuscript.

Ensminger states, "We attempted one last time to give Kirschten an opportunity to work on the First Supplement," *id. P 33*, so in a letter to plaintiff on January 10, 1995, he told her attorney's letter indicated that plaintiff did not wish to exercise her option to prepare supplement material unless WGL abandoned its procedures, which it would not do since they were "in complete accord with both custom and practice and the publishing contract, which names Frances Hill as coordinating author." He stated that WGL would make other arrangements to have the material updated unless plaintiff notified WGL by January 13, 1995 that she was willing to send her material to Hill. However, Ensminger added that she could instead submit her material directly to WGL by January 18, 1995, and WGL would forward it to Hill. *Id.*, Ex. V. On January 16, plaintiff's attorney responded to Ensminger that plaintiff was unwilling to have her manuscript submitted to Hill and that WGL's insistence that **[*70]** she do so constituted a further breach of the Agreement. *Id.*, Ex. W. WGL arranged for an in-house writer to provide supplement material for the chapters and subchapters written by plaintiff. That material, as well as material submitted to WGL directly by two of the contributing authors, was subsequently reviewed by Hill. *Id. PP 33, 35*. By January 21, 1995 WGL had received directly from plaintiff her draft for the supplement, which was returned to her, unopened, on January 25. Kirschten Aff. PP 86-87, Ex. 43. In April 1995 plaintiff's attorney told WGL that plaintiff wished WGL to have her name appear on the title page of the first supplement (although the supplement would contain none of plaintiff's work) and WGL agreed to do so. [12] Ensminger Aff. P 36; Ex. Y.

> 12    Given plaintiff's insistence that the Book as published reflect her high substantive standards and that submission of the work to Hill for coordination would compromise the Book's quality; that it was "particularly important" that this treatise for practitioners be up to date and accurate, Kirschten Aff. P 11; and that WGL's failure to ensure previously that Hill properly coordinated the Book's preparation "led to inconsistencies between the chapters and lowered the quality of the Book... [which] reflected, and continues to reflect, poorly on my professional reputation," *id. P 55*, it is curious that she would

wish her name to appear on something which she played no role in preparing. More curious is her claim under Count Three that, because WGL refused to use her supplement material and instead had it written by someone else, it violated the Lanham Act by the false and deceptive use of her name.

**[*71]** Plaintiff's claim 1(j) for breach of contract is that the requirement by WGL to submit her material to Hill was "new and burdensome," "contrary to the Contract, contrary to the practice used in the writing of the Book and its supplements, and a process that would compromise the writing of the Book." Complaint P 74(j). Defendants offer three arguments in support of their motion for summary judgment on this claim. The first is that because plaintiff breached the Agreement as well as her implied covenant of good faith and fair dealing by "attempting to sabotage the publication of the Book by holding her page proofs hostage" even though she knew they omitted her second draft changes for Chapter 12, thereby causing WGL to go to press with material she considered unpublished, she was thereafter deprived of all rights under the Agreement. Defendants' Memorandum, p. 50. This contention must fail. Although it is clear that plaintiff did not promptly return the proofs as we have discussed, defendants assume without proving that her failure to do so constituted a "material" breach, *i.e.*, a failure to "substantially perform" the contract that "discharged [WGL] from performing [its] **[*72]** obligation." *Jafari v. Wally Findlay Galleries, 741 F. Supp. 64, 68 (S.D.N.Y. 1990)*. However, defendants have not shown how WGL was damaged by its having exercised its option to "publish the Work as submitted." It is not self-evident at this stage, especially in view of the many obligations arising from the Agreement, that plaintiff's failure in this respect was a material breach that abrogated the contract. *See Restatement (Second) of Contracts § 241*. Defendants' only argument in this context for plaintiff's actions having been a "material" breach and an instance of bad faith is that she "willfully" withheld from WGL her knowledge that the page proofs for Chapter 12 were deficient until after they went to press, thereby attempting to "sabotage" the Book. However, this is a disputed factual issue. Plaintiff avers that she did not become aware of the omissions until October 13, 1994, ten days after they went to press, and thus denies that she violated her implied covenant of good faith and fair dealing. Given her concern that the Book carrying her name be of the quality she deemed

appropriate, it is more than reasonable to believe that, if she had known of the [*73] error earlier she would have at least alerted WGL to the fact that the proofs were not of her prior draft. In any event, we accept plaintiff's allegations as true for the purposes of this motion.

Moreover, defendants' behavior was contrary to their contention now that plaintiff's actions nullified the Agreement. Rather, they continued to offer the contractual right to write the supplement. As noted above, even though he argues plaintiff was deprived of "any rights" under the Agreement, Ensminger states that "nonetheless...WGL attempted to resume a working relationship with Kirschten." Ensminger Aff. P 32. WGL insists by requiring plaintiff's work to be submitted to Hill for coordination, it was only acting pursuant to the contract, and, even after plaintiff refused to comply, · WGL still "attempted one last time" to have her write the supplement. Id. P 33. Finally, in his letter of January 10, 1995 Ensminger informed plaintiff that her stated unwillingness to comply with the requirement would be deemed to indicate that she did not wish "to exercise [her] option" under the Agreement to prepare the supplement. He did not say that she no longer had the contractual "option" because [*74] she no longer had any contractual rights.

Defendants' further argue in support of summary judgment that, even if plaintiff retained any right to contribute to the supplement, paragraph 10 of the Agreement makes it clear that Hill was still to be the "coordinating author" as provided by paragraph 17 and requiring plaintiff to submit her work to Hill for coordination was not a breach of the Agreement. Third, they contend that, even if WGL's right to have Hill act as coordinating author for the supplement were not explicitly set forth in the Agreement, WGL had the right, pursuant to custom and practice, to establish "any reasonable procedure for coordinating and editing the book." Defendants' Memorandum, pp. 50-51. However, it is undisputed that submission of manuscript material to Hill rather than directly to WGL was not the procedure that had been used in preparing the Book. All authors had submitted their draft manuscripts to WGL. On the other hand, it is unclear how plaintiff was damaged by the new requirement which, at least arguably, was WGL's right under the contract. Plaintiff argues, however, that WGL had to know that the quality of the work would be compromised by Hill's "coordination" [*75] and that WGL required this of her after she had filed this lawsuit

and in bad faith in order to have it appear that Hill had been the coordinating author even though plaintiff had undertaken that role because of Hill's default in her obligations. The question of defendants' good faith in this regard is an issue of fact. Moreover, although defendants contend custom and practice authorized them to require this procedure for "coordination," they have proffered no evidence as to custom and practice, and it is apparent that, at least with respect to all earlier preparation of this Book itself, that was not the practice. Finally, what is perhaps most salient in this long tawdry scenario is that plaintiff, having been told by Ensminger's January 10 letter that she could submit her material directly to WGL by January 18 and it would then be forwarded to Hill for coordination, did submit her material to WGL but WGL simply returned it to her. (It is unclear whether plaintiff sent it January 18 or January 20, but it is clear that a few days' tardiness would have hardly made a difference in the supplement's preparations.) Whether or not the events entitled WGL to reject her submission is an [*76] issue precluding summary judgment. Further, its refusal to accept her material at that point raises further questions as to WGL's good faith in having put the new "coordination" procedure in place.

### III. *Count Two*

Plaintiff contends that WGL violated its implied covenant of good faith and fair dealing by intentionally engaging in each of the enumerated acts in Count One that allegedly breached the contract, thereby damaging her professional reputation, causing her a loss of career opportunities and income, and causing her "embarrassment, humiliation and pain and suffering." Complaint P 81. To the extent we have found that, but for the claim as to the Book's first supplement in paragraph (j), those acts by WGL did not constitute breach of the Agreement, in order to sustain a claim under Count Two plaintiff must show that an act nonetheless had "the effect of destroying or injuring [her right] to receive the fruits of the contract" or constituted a breach of an "implied promise [which] was 'so interwoven in the whole writing' of a contract as to be necessary for effectuation of the purposes of the contract." *M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)* [*77] (citations omitted). With respect to all the claims in Count One on which summary judgment is to be granted, defendants correctly argue that there is no evidence that remotely establishes that WGL breached its implied covenant of good faith and fair dealing. Accordingly, summary

Case 1:07-cv-00480-JJF    Document 24-13    Filed 11/21/2007    Page 22 of 25

Page 21
1997 U.S. Dist. LEXIS 24037, *77

judgment also should be granted with respect to Count Two of the Complaint, except as to the final allegation of P 80, that WGL breached its covenant of good faith and fair dealing by "intentionally denying plaintiff the right to write supplemental materials for her chapters of the treatise."

## IV. *Count Three*

Plaintiff claims that defendants violated the Lanham Act in taking the actions set forth in the Complaint because they used her name "on work which she [had] not authorized and which WGL [knew] was outdated and inaccurate" and by then further lowering the quality of the Book as a whole by refusing to use the supplement material prepared by her and assigning the work instead to another person who did not have her reputation and expertise. Defendants' motion for summary judgment must be granted on this claim as well.

While defendants cite *Bear Creek Productions, Inc. v. Saleh, 643 F. Supp. 489, 494 (S.D.N.Y. 1986)*, [*78] for the proposition that the existence of a contract between parties setting forth their rights and obligations with respect to a work in dispute ordinarily places that dispute outside the scope of the Lanham Act where the aggrieved party seeks remedies for breach of contract, *see also Feerick v. Arthur Young & Co., 715 F. Supp. 1234, 1236 (S.D.N.Y. 1989)*, any relevance of this proposition to the circumstances here is complicated by defendants' claim as to the supplement issue in Count One that plaintiff materially breached the Agreement so as to discharge WGL from its own obligation to perform. *See Schoenberg v. Shapolsky Publishers, Inc., 971 F.2d 926, 932 (2d Cir. 1992)* ("If the breach would create a right of rescission, then the asserted claim arises under the Copyright Act.") However, the parties agree that a contract between the parties does not preclude a claim that a party's editing of an original work may have "mutilated" it and thereby violated the Lanham Act by falsely associating its author with the mutilated result. *See Gilliam v. American Broadcasting Cos., 538 F.2d 14, 24 (2d Cir. 1976)*. Defendants thus argue that (1) [*79] no reasonable trier of fact could find that the alleged errors and omissions in Chapters 2, 6, 13 and 14 so "mutilated" the work as to violate the Lanham Act (Chapter 12, as discussed above, was the one for which plaintiff sent an outdated computer disk, and it was reprinted with corrections); (2) plaintiff's claim is barred by the doctrine of unclean hands insofar as she willfully

withheld her revisions from WGL until it was too late for them to be incorporated in the Book; and (3) plaintiff's request that her name appear on the title page of the supplement precludes any claim that it violates her rights under the Lanham Act.

Plaintiff's failure to promptly return the page proofs precludes her Lanham Act claim. As discussed at length above, she knowingly and deliberately withheld her corrections until weeks after the date the final manuscript had to be sent for publication. The bulk of her recitation of errors in these chapters involve material that became "outdated" during the time between the second draft in March and publication. It was plaintiff who was responsible for failing to provide updated material in a timely way. Moreover, as defendants point out, this sort of "correction" [*80] is precisely what supplements to legal treatises provide -- updates to material that appears in the main text -- and buyers of the Book were informed that it would be supplemented regularly. Furthermore, plaintiff belies her own argument by her very statements of it. She claims a Lanham Act violation because defendants "used [her] name in a way that misrepresents to the public that she approved work that became inaccuracies and outdated legal authority" and "used [her] name on the spine and title page in a way that misrepresents her contribution to the Book" since she, not Hill, should have been listed first. Thus, she alleges a claim because, on the one hand, WGL published a Book with her name that was allegedly outdated and inaccurate and, on the other hand, because WGL did not list her name on the Book as the first author to reflect that it was she who did the most work and otherwise deserved credit as "lead author." Plaintiff's Opposition, p. 82. [13]

> 13  It might be noted that nowhere in the Book is it indicated which author wrote which chapters or subchapters in any event.

[*81] With respect to the supplement, plaintiff's continued claim of a Lanham Act violation may constitute sanctionable conduct. She claims that WGL's use of the work written by one of its in-house attorneys rather than hers lowers the quality of work attributed to her and is likely to cause confusion and deceive the public as to the origin, sponsorship and approval of work by her; thus, she states, "they have assigned those supplements to an individual less qualified than plaintiff, while continuing to attribute this work to her." Plaintiff's Opposition, p. 90. Yet, it was she who expressly

demanded in April 1995, after the material had been written by the person whose lack of reputation and expertise she claims was detrimental to the work, that her name be listed on the title page of the supplement.

Although we need not address it for resolution of this claim, plaintiff's allegation as to the inaccuracy of the Book because her revisions to Chapters 13, 14, 2 and 6 were not incorporated in its initial publication deserves some mention. Her allegations of the Book's inaccuracies consist of typographical errors in Chapters 13 and 14 except for one change in Chapter 14 that relates to a [*82] change in authority that occurred just before she submitted her page proofs in October 1994 after the Book had gone to press. As to Chapters 2 and 6, she alleges a litany of purported errors. I have thoroughly reviewed the page proofs containing her revisions that she submitted in October 1994 which, she contends, required inclusion. Henson Aff., Appendix B. This page-by-page review has proved how utterly misleading and hyperbolic are plaintiff's allegations of the amount and importance of the "errors and omissions." Chapters 2 and 6 are 362 pages of dense legal text of roughly 400 words per page, not counting numerous footnotes on each page adding an average of several hundred more words per page. The errors and omissions alleged by plaintiff are almost entirely minor editing matters and relate to material appropriately updated by the supplement. On at least 80% of the pages, she found nothing to correct at all. While my count may be slightly off, I found that on about 52 pages, she marked instances of incorrect use or omission of hyphens, typos, spacing errors, incorrect margins, or errors in capitalization. (She claims that incorrect hyphenation or capitalization of letters in [*83] words of art in tax law reflect poorly on the work.) On 12 pages, she would have changed legal citations or made minor word changes. On 8 pages, she would have made what may be seen as substantive changes or insertions. There is no doubt that if such complaints can rise to a level of "mutilation," every dispute between an editor and a writer would become the basis for a Lanham Act trial. In *Choe v. Fordham Univ. School of Law, 920 F. Supp. 44 (S.D.N.Y. 1995), aff'd, 81 F.3d 319 (2d Cir. 1996)*, Judge Mukasey granted the motion of defendants Fordham Law School and Fordham International Law Journal for summary judgment, ruling that the author of a law review comment, who alleged that there were errors in the published version on every page and "scores of alleged typographical and substantive errors," could not maintain a Lanham Act claim on the basis of the law review

editors' alleged "mangling" of his comment as it did not depart so substantially from his original work that he could not longer be called its author. *920 F. Supp. at 48-49*. In view of the vast amount of text she would have left completely unchanged and the relative unimportance [*84] of almost all of the corrections she would have made even in Chapters 2 and 6, plaintiff's claim is clearly much weaker than even the claim found wanting by Judge Mukasey. See also *Considine v. Penguin, U.S.A., 1992 U.S. Dist. LEXIS 10570, No. 91 Civ. 4405 (JSM), 24 U.S.P.Q.2D (BNA) 1947, 1992 WL 183762* at *4-5 (S.D.N.Y. 1992). Accordingly, for this additional reason there can be no issue of material fact on this claim warranting denial of summary judgment. [14] Similarly, I agree with defendants that plaintiff can hardly claim a Lanham Act violation on the basis of the supplement when she expressly requested that her name appear on it.

> 14  Ensminger points out in his affidavit dated April 25, 1995 that as of that time the Book had sold approximately 2000 copies and had received a quite favorable review in *The Exempt Organization Tax Review*. That review concludes as follows:
>
> > The decision to buy *Federal and State Taxation of Exempt Organizations* is a no brainer. Hill and Kirschten along with their contributing authors, have done a marvelous job in pulling together a tremendous amount of EO tax material. If you have $ 175, go for it!
>
> Ensminger Aff., Ex. Q.

[*85] V. *Claims Against Defendant Thomson Holdings Delaware*

"A parent corporation may become a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract...[or] if the subsidiary is shown to be a mere shell dominated and controlled by the parent for the parent's own purposes." *Warnaco Inc. v. VF Corp., 844 F. Supp. 940, 946 (S.D.N.Y. 1994)*. See also *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc., 758 F. Supp. 908, 913-14 (S.D.N.Y. 1991)*. The complaint identifies Thomson Holdings Delaware ("Thomson") in its second paragraph and

conclusively alleges that "Thomson [] and WGL entered into a contract with plaintiff and four other authors" in the third paragraph. However, apart from use of the word "defendants" in referring to the various acts alleged in the complaint, the complaint nowhere alleges any conduct specifically by Thomson or any basis on which it could be held liable for the contract or conduct of its subsidiary Research Institute of America (of which WGL is a division). Plaintiff quotes *Warnaco Inc. v. VF Corp., 844 F. Supp. at 946*, to the effect that [*86] a parent corporation's intent "can be inferred from the parent's participation in the negotiations of the contract." Plaintiff's Opposition, pp. 98-99. But as her sole basis for contending that Thomson should be held to have been a party to the Agreement, plaintiff refers to a letter of August 10, 1994 from Thomson Information/Publishing Group Assistant General Counsel Edward A. Friedland to her attorney, which was written in response to the letter her attorney had written August 1, 1994 to Kelly, Senior Vice President of WGL, wherein she set forth plaintiff's arguments as to why Hill should not be the "lead author." Friedland, saying Kelly had asked him to respond (assumed because WGL wanted a response by an attorney to an attorney's letter), sets forth WGL's position on the "lead author" dispute. Even if it were appropriate to take this letter outside the pleadings into consideration, it hardly supports plaintiff's position as it had nothing to do whatsoever with participation in the negotiations of the contract which took place four years earlier. Plaintiff has put forward no basis at all for including Thomson as a party in her complaint or for otherwise claiming it is a "party" [*87] to the Agreement for these purposes. The Agreement was signed solely by a senior vice president of WGL and the authors. Plaintiff's complaint contains no allegations as to any conduct by Thomson that might indicate any intent to be bound by the contract. Indeed, it contains no specific reference to Thomson at all beyond the introductory paragraph, but rather names WGL in connection with most of the alleged actionable conduct.

Plaintiff further contends that she should be permitted to amend her complaint again to make an appropriate allegation. This suggestion cannot be adopted given the utter absence of any evidence that such an allegation has any basis in fact. She also argues she should be permitted discovery as to the relationship between Thomson and its subsidiary before consideration of the motion. This request, too, is meritless. She points to nothing she might hope to find that could support her claim. Indeed, if Thomson participated in the negotiations

for this contract or otherwise somehow indicated its intent to be a party to it, plaintiff would know, as she herself was the one who took part in the negotiations and all relevant subsequent events. While I usually refrain [*88] from the use of the term "fishing expedition," this would truly be one in deep sea water.

## VI. *Conclusion*

For the foregoing reasons I recommend that defendants' motion for summary judgment be granted with respect to all claims except the claim in Count One that defendants breached the contract by their failure to permit her work to be published in the supplement and the claim in Count Two that in doing so they breached their covenant of good faith and fair dealing. Defendant Thomson Holdings Delaware's motion for judgment on the pleadings should be granted as to all claims.

There is one final matter I take the liberty of addressing. Apparently about three months ago plaintiff applied to your Honor for leave to file a third amended complaint, the purpose of which essentially would be to add additional claims of breaches of contract because WGL has continued to produce supplements to the Book without plaintiff's participation since, according to plaintiff's motion, she has continued to refuse demands made by them that she submit her material to Hill and that she withdraw this lawsuit. It appears that new supplements are being published about twice per year. Given my recommendation [*89] herein that all claims in this action be dismissed except that related to WGL's refusal to accept plaintiff's work for the first supplement, if your Honor agrees with that recommendation, I would suggest that you request the parties to take part in the Court's formal mediation program with a view to ending this affair and working out a solution as to all future supplements.

Copies of this Report and Recommendation have been mailed this date to the following:

> David S. Douglas, Esq. Kornstein, Veisz & Wexler 757 Third Avenue New York, New York 10017

> Lynne Bernabei, Esq. Bernabei & Katz 1773 T Street, N.W. Washington, D.C. 20009

> James F. Rittinger, Esq. Satterlee

1997 U.S. Dist. LEXIS 24037, *89

Stephens Burke & Burke, LLP 230 Park Avenue New York, New York 10169

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of Court and send copies to the Honorable Denny Chin, to the opposing party and to the undersigned. Failure to file objections within ten (10) days will preclude later appellate review of any order that will be entered by Judge Chin. *See* **[*90]** *28 U.S.C. § 636(b)(1); Rules 6(a), 6(e)* and *72(b) of the Federal Rules of Civil Procedure; Thomas v. Arn, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir.*

*1993), cert. denied, 513 U.S. 822, 130 L. Ed. 2d 38, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300* (2d Cir.), *cert. denied, 506 U.S. 1038, 121 L. Ed. 2d 696, 113 S. Ct. 825 (1992); Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989)*(per curiam); *Wesolek v. Canadair Ltd., 838 F.2d 55, 58 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237 (2d Cir. 1983)* (per curiam).

Dated: New York, New York

July 23, 1997

SHARON E. GRUBIN

United States Magistrate Judge

# **EXHIBIT M**

Westlaw

Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**Lomaglio Associates Inc. v. LBK Marketing Corp.
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
LOMAGLIO ASSOCIATES INCORPORATED,
Plaintiff,
v.
LBK MARKETING CORP., Defendant.
**No. 94 CIV. 3208(KTD).**

Sept. 10, 1999.

Perry Ashley, Esq., Seaman and Ashley, New York,
for Plaintiff.
Marc Cohn, Esq., Robert J. Dubyak, Esq., McCarthy,
Lebit, Crystal & Haiman Co., L.P.A., Cleveland, OH,
for Defendant.

OPINION
DUFFY, D.J.
*1 Plaintiff Lomaglio Associates Incorporated
("Lomaglio, Inc.") brought this diversity action for
breach of contract against defendant LBK Marketing
Corporation ("LBK").

The dispute centers around a written agreement
between the parties whereby the parties agreed that
Lomaglio would serve as LBK's exclusive sales
representative to Avon Products Incorporated
("Avon"). Lomaglio, Inc. claims that it is owed
$128,132.00 in commissions under the agreement for
an order Avon placed with LBK and that LBK agreed
to but subsequently failed to fill.

The parties stipulated to an agreed set of facts in the
Joint Pre-Trial Order ("JPTO"). I heard testimony
and received evidence at the two-day bench trial of
this matter on May 4 and 5, 1999. The following
constitutes my findings of fact and conclusions of
law.

*Findings of Fact*

Plaintiff Lomaglio, Inc. is a corporation organized
under the laws of New Jersey engaged in the business
of marketing services and contract manufacturing.
(JPTO at 3; Pl.Ex. 1.) Defendant LBK is a
corporation organized under the laws of Ohio with

offices in Jacksonville, Florida, engaged in the
production of ceramic products. (JPTO at 3; Pl.Ex.
3.)

A. The Sales Representation Agreement

In September or October 1992, executives from LBK
attended a "Bed and Bath Show" at the Jacob Javitz
Center in New York City. (Trial Tr. at 5-6; Gleason
Dep. at 11-12.) Al Lomaglio, president of Lomaglio,
Inc., also attended the Show and met with the LBK
executives. (Trial Tr. at 5-6; Gleason Dep. at 12-13.)

At the Show and on other occasions, Lomaglio and
LBK executives discussed Lomaglio, Inc. serving as
LBK's sales representative to various consumers of
porcelain products. (Gleason Dep. at 11-14.)
Lomaglio, Inc. had established business relationships
with several such consumers, including the Avon
Corporation-the cosmetics giant based in New York
City. (Trial Tr. at 58-59.)

These discussions led to a one page written
agreement entitled "Sales Representation
Agreement" and dated October 12, 1992 (the
"Agreement"). The Agreement was signed by Al
Lomaglio and David Gleason, LBK's Vice-President
of National Accounts.

The Agreement provides, in pertinent part:
It is agreed that [Lomaglio, Inc.] will act as [LBK's]
exclusive sales representative to Avon Products. LBK
agrees to refrain from calling on Avon Products
directly or through middlemen. [Lomaglio, Inc.]
agrees to refrain from presenting any competing
suppliers to Avon.
Commissions will be determined prior to quoting and
will be included in the cost quoted to the customer.
Commissions will be paid upon payment for
merchandise by the customer. Deductions will be
made for returns or credits.

(Agreement, Pl.Ex. 1.)

B. Negotiations With Avon

Shortly after the Agreement was signed, Lomaglio
arranged a meeting between representatives of LBK

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

and Avon at Avon's headquarters in New York City. The meeting took place in late October 1992, as Lomaglio accompanied Gleason to Avon's offices, where the pair met with Mary McHugh, a manager for purchasing and materials at Avon. (JPTO at 3; Trial Tr. at 9-10; Gleason Dep. at 17 .) Gleason brought samples of ceramic products to the meeting for McHugh's inspection. (Trial Tr. at 10.)

**\*2** Either at the meeting or in telephone conversations shortly after the meeting, McHugh, Gleason and Lomaglio discussed LBK's producing a particular figurine for Avon-the "Mrs. Albee figurine". (Trial Tr. at 10.) Thousands of the nine-and-three-quarter inch porcelain likenesses of the first "Avon Lady" are presented by Avon to its representatives each year. (Trial Tr. at 57-58.) Gleason and Lomaglio hoped to obtain an order for the 1994 Mrs. Albee figurine.

On November 3, 1992, McHugh and others from Avon joined Gleason and Lomaglio on a trip to Piedras Negras, Mexico to visit the factory where LBK's porcelain products were manufactured-the "Cermex" factory. (Trial Tr. at 60.)

Over the next several months, discussions continued concerning the Mrs. Albee figurine. On May 26, 1993, Lomaglio sent a letter to McHugh stating in relevant part:
This will serve as our quotation for the Mrs. Albee statue, a sample of which was left with you recently. The cost price of $21.97 per unit includes all packaging identical to the packaging components provided by you. This price assumes a total usage of 80,000 pieces and is quoted FOB Eagle Pass, Texas on a letter of credit basis. As you know the item is manufactured in Pedras Negras, Mexico.

(Pl.Ex. 7.) Lomaglio also sent a copy of this letter to Gleason along with a cover letter. The cover letter, also dated May 26, states that the letter to McHugh "reflects the details you and I worked out on Tuesday and today" and that Lomaglio, Inc.'s commission on the order would be $1.555 per unit. (Pl.Ex. 6.)

C. Avon Awards the Mrs. Albee Order to LBK

On or about June 7, 1993, McHugh called Lomaglio and stated that Avon had awarded LBK the order to produce the Mrs. Albee figurines. (Trial Tr. at 65.) Lomaglio immediately informed representatives of

LBK about the Mrs. Albee order. (Trial Tr. at 17.)

On June 8, 1993, the following letter on LBK letterhead was sent to McHugh:
Al Lomaglio informed us on Monday afternoon that you have awarded LBK the order to produce the "Mrs. Albee" figurine for 1994.
David Bailys and I are most appreciative of this opportunity for our Cermex factory, but also very much aware of the responsibility that goes along with a project of this magnitude ...
Again, Mary, thank you for this nice order and we look forward to a positive working relationship with you and Avon.

(Pl.Ex. 8.) The letter was signed by Gleason and David Bailys, President of LBK.

Over the remainder of the summer of 1993, Lomaglio, Gleason, McHugh and others at Avon exchanged correspondence concerning the manufacture of the Mrs. Albee figurines. A timetable for delivery was established, with the shipments to begin in December 1993 and continue through January 1995 at the rate of several thousand units per month. (Pl.Ex. 12, 14.) In addition, Avon increased the amount of figurines in the order to 82,400 units-and LBK accepted this increase. (Pl.Ex. 14.)

**\*3** Samples of the figurine were also exchanged throughout the summer, as Avon made comments and alterations to the design, and those changes were conveyed by Gleason to the Cermex factory. (Pl.Exs.13-15.) In a letter dated August 10, 1993 on "Cermex Limited Corporation" letterhead [FN1], Gleason wrote to Mary McHugh that "the majority of the design corrections" for the figurine had been completed. (Def.Ex. 3.)

> FN1. The address and phone number of Cermex on this letterhead is precisely the same as the address and phone number of LBK on its letterhead.

In the same letter, Gleason also stated that:
As I stated last month after we were awarded this important Avon order, Cermex would be comfortable with a stand by [letter of credit] ...

(Def.Ex. 3.) Thus, Gleason requested that a stand by letter of credit be opened on October 1, 1993 in favor of Cermex in the amount of $325,000. Gleason also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

stated that "Payment is due Cermex Limited Corporation 10 days upon receipt of invoice."[FN2](Def.Ex. 3.)

> FN2. Apparently, Avon's "standard" practice was to make payment thirty days after invoice. (Trial Tr. at 36, 79.)

### D. The Alleged Superseding Agreement

On or about August 16, 1999, Lomaglio received a letter-again on Cermex letterhead-which read in its entirety:

Dear Lomaglio & Associates:

I am writing to confirm that Cermex Ltd. Corp. will be producing Avon's Mrs. Albee Award for 1994.

The price to Avon will be $21.97 per unit, F.O.B., Eagle Pass, Texas, payable net 10 days. In consideration for Lomaglio & Associates services, Cermex Ltd Corp. will pay a commission to Lomaglio & Associates of $1.555 per unit shipped. Commissions will be paid on the 15th of the month following shipment.

Please acknowledge you are in agreement with the above information by signing below.

Sincerely,

Cermex Ltd. Corp.

Hideo Asai

President

(Def.Ex. 4A.) The sole signature on the letter was that of Al Lomaglio-who signed the letter in accordance with the instruction .[FN3](Trial Tr. at 39-40.)

> FN3. Lomaglio testified that Gleason discussed the letter with him, they exchanged drafts, and Lomaglio eventually faxed it back to Gleason. Later, during his closing, counsel for LBK indicated that Gleason sent the letter to Lomaglio. (Trial Tr. at 114.) However, in his deposition, Gleason claimed that he had no involvement in the preparation and exchange of the letter. (Gleason Dep. at 38-39.)

Through September 1, progress continued on the Mrs. Albee order. Additional representatives from Avon visited the Cermex factory and, by all indications, the Mrs. Albee order was going forward. (Pl.Ex. 17.)

In fact, in a memorandum from Gleason to Avon dated September 16, 1993, Gleason included photographs of the Cermex factory that, he claimed, showed "our personnel putting the final quality touches on Avon's Mrs. Albee figurine 1994."(Def.Ex. 24.) Apparently, this memorandum was never sent.

On or about September 12, 1993, Gleason visited Lomaglio at his offices in New Jersey and informed him that the Mrs. Albee figurines would not be produced for "financial reasons". (JPTO at 4; Trial Tr. at 25-26.) Both Lomaglio and McHugh tried to persuade Gleason and others at LBK to reconsider, but to no avail. (Trial Tr. 25-26, 70-72.)

Needless to say, LBK never advanced Lomaglio, Inc. commissions pursuant to the Agreement. (Trial Tr. 28-29.)

### E. Testimony Concerning the LBK/Cermex Relationship

One issue which remains unclear-even after a review of the testimony and exhibits in this case-is the relationship between LBK and Cermex.

The sole witness called by LBK at trial, William Rein, claimed to be the chairman of the board of directors and major shareholder of Cermex Ltd. Corp. (Trial Tr. at 93.) Rein testified that Cermex was an entirely separate company from LBK, and that there was no connection between the two companies other than the fact that "a couple of the executives at LBK were shareholders of Cermex."(Trial Tr. at 93-94.)

*4 However, Rein later admitted when questioned by the court that these "common" shareholders also worked for Cermex. (Trial Tr. at 106.) Rein also admitted-as evidenced by the letterhead-that LBK and Cermex conducted business activities out of the same offices in Jacksonville. (Trial Tr. at 106.)

Similarly, the fact that Gleason continually referred to the Mexican facility as "our Cermex" factory in correspondence seeking the Mrs. Albee order-all on LBK letterhead-further undercuts Rein's claims. (Pl.Exs.2, 3, 4, 8.)

Gleason's deposition testimony also contains similar waffling and inconsistencies with regard to the relationship between Cermex and LBK. (Gleason

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

Dep. 36-37.) Moreover, Al Lomaglio testified that Gleason told him that LBK owned Cermex. (Trial Tr. at 12-13.)

Perhaps most damning is Defendants Exhibit 24B-a draft of Defendant's Exhibit 24, the memorandum dated September 16, 1993. In Exhibit 24B, Cermex is described as a "separate operating division of LBK Marketing Corporation."[FN4]

> FN4. Defendant's Exhibit 24 describes Cermex as a "sister corporation" to LBK.

The nature of the relationship between Cermex and LBK is, essentially, irrelevant to my decision in this case.[FN5] However, Gleason and Rein's transparent attempts-for whatever reason-to color-over the relationship between LBK and Cermex have cast the credibility of all their testimony in doubt.

> FN5. The nature and existence of a Cermex corporate entity is also irrelevant to my decision. Accordingly, LBK's post-trial motion to supplement the record with evidence of Cermex's incorporation and dissolution in the state of Delaware is denied as moot.

### F. The Reasons for the Failure to Produce the Figurines

Rein also claimed that the reason the Mrs. Albee figurines were not produced was because-as of early September 1993-Avon never issued a written purchase order or opened a letter of credit. (Trial Tr. at 99.) Rein's claim is, however, against the weight of the evidence. That fact, plus the questions regarding Rein's credibility raised above, lead me to the conclusion that Rein's claims as to the reasons for the failure to produce the figurines cannot be believed.

The evidence that contradicts Rein's claims includes Gleason's testimony in his deposition and his handwritten notes introduced at trial. In his testimony and his notes, Gleason listed several reasons why the figurines would not be produced. Gleason explained that the reasons were provided by LBK and Cermex officials-and most strikingly, Avon's failure to provide a written purchase order and letter of credit were not among those reasons. (Gleason Dep. 57-73; Pl.Ex. 21.)

Moreover, in the reams of correspondence exchanged between LBK, Cermex, Avon and Lomaglio, Inc.-all addressing a host of concerns-there is no mention of the lack of a written purchase order or the fact that the letter of credit had not been opened as of early September. Nor is there even the hint that these two factors could in any way affect production of the figurines.

In addition, Lomaglio and McHugh testified that no one from LBK verbally requested a written purchase order or indicated that the lack of a written purchase order would affect production of the figurines. (Trial Tr. at 25, 72.) Lomaglio and McHugh also testified that no one from LBK or Cermex ever raised concerns about the timing of the letter of credit that would preclude production of the figurines. (Trial Tr. at 25-26, 71-72.) Moreover, both Lomaglio and McHugh testified that, in speaking to representatives of LBK and Cermex after learning that the figurines would not be produced, they were not told that the absence of a written purchase order or concerns about the letter of credit were factors in the decision not to produce the figurines. (Trial Tr. 25-26, 71-72.)

*5 Similarly, Lomaglio testified that he met with Rein shortly after he was informed that the figurines would not be produced. Lomaglio testified that he asked Rein why the figurines were not produced, and Rein informed him that financial problems were the cause. Lomaglio also stated that Rein never mentioned the letter of credit or the purchase order as possible causes. (Trial Tr. at 52.)

In sum, I find Rein's claim that the failure to produce the Mrs. Albee figurine was somehow caused by Avon's failure to produce a written purchase order or open a line of credit in early September to be entirely unworthy of belief.

### Conclusions of Law [FN6]

> FN6. Both parties agree that New York law governs in this case.

At trial, Lomaglio, Inc. advanced only one legal theory-that LBK breached the Agreement by refusing to pay Lomaglio, Inc. commissions with regard to the Mrs. Albee order.[FN7] Lomaglio, Inc. contends that this alleged breach gives rise to an actionable breach of contract claim against LBK for the commissions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

FN7. This breach of contract claim is Lomaglio, Inc.'s first cause of action in the amended complaint. Lomaglio, Inc. has withdrawn its second cause of action for harm to its business reputation, and the third cause of action for misrepresentation was dismissed. (JPTO at 2.)

Under New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."*First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998) (internal quotation marks and citation omitted).

Here, the existence of a contract between Lomaglio and LBK–the Agreement–has clearly been established. As detailed below, Lomaglio, Inc. has established each of the other above-mentioned elements by a preponderance of the evidence. Moreover, LBK has failed to come forward with any credible evidence to support the defenses it claims.

A. Lomaglio, Inc. Rendered Full Performance Under the Agreement

Pursuant to the Agreement, Lomaglio, Inc. was to act as LBK's "exclusive sales representative" to Avon. The evidence adduced at trial clearly demonstrates that Lomaglio, Inc. fully performed its services as such a representative. Lomaglio, Inc.'s efforts led to a completed sale in the form of an enforceable contract between LBK and Avon for the 1994 Mrs. Albee figurine.

That contract is embodied in LBK's offer to Avon–communicated through their sales representative, Lomaglio, Inc. As evidenced by Plaintiff's Exhibits 6 and 7-letters from Lomaglio, Inc. to Avon and LBK–the offer clearly indicated price, quantity and delivery terms.

Avon accepted the offer orally–again through Lomaglio, Inc., LBK's sales representative. LBK then confirmed the order by letter signed by two of its officers the following day. These events gave rise to a binding contract, and LBK's arguments to the contrary are to no avail.

1. The LBK/Avon Contract Is Not Barred by the Statute of Frauds

LBK argues that any contract between LBK and Avon would not be enforceable because it could not satisfy the requirements of the New York Statute of Frauds. In support of this claim, LBK points to Section 2-201(1) of the New York Uniform Commercial Code.Section 2-201(1) provides that a contract for the sale of goods over $500-like the contract between Avon and LBK-must be in writing and signed by the party to be charged in order to be enforced.

*6 However, Section 2-201(2) provides that "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of"Section 2-201(1). Here, the confirmatory letter sent on LBK letterhead to Avon constitutes just such a confirmation. Accordingly, LBK's contention that the contract would be unenforceable for lack of a sufficient writing is without merit.FN8

FN8. LBK also contends that Avon's failure to issue a purchase order somehow affected the formation or performance of the contract. Aside from the credibility problems with this claim detailed above, I fail to see how the lack of a purchase order has any affect at all on the contract-especially in light of the fact that LBK confirmed the order in writing. Moreover, there is no credible evidence that LBK insisted upon or even requested a written purchase order, and all parties conducted themselves as if the order was going forward regardless of the issuance of such an order.

2. The LBK/Avon Contract Would Not Fail for Lack of Definiteness

LBK also contends that any contract between LBK and Avon for the production of the Mrs. Albee figurines would fail for lack of definiteness. This contention is also entirely without merit.

Courts are loath to deny enforcement of agreements on indefiniteness grounds.*Cleveland Wrecking Co. v. Hercules Const. Co.*, 23 F.Supp.2d 287, 293 (E.D.N.Y.1998). Generally, a contract must be definite with respect to essential terms in order to be enforceable. *Fakhoury Enterprises, Inc. v. J.T.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

*Distributors,* No. 94 Civ. 2729(PKL), 1997 WL 291961, at *3 (S.D.N .Y. June 2, 1997) (citing John D. Calamari & Joseph M. Perillo, Contracts § 2-13, at 43 (2d ed.1977)).

"In a contract for a sale of goods, the essential terms are quantity, price, and time and manner of delivery."*Id.* at *3 (quoting *Judal Indus. v. Welsbach Elec. Corp.,* 526 N.Y.S.2d 154, 156 (2d Dept.1988)). The fact that one or more of these terms is left open is not fatal. *Id. See also City Univ. of New York v. Finalco, Inc.,* 461 N.Y.S.2d 830, 831-32 (1st Dept.1983). However, when a dispute as to a material term manifests a lack of intention to form a contract, no enforceable contract results. *Fakhoury,* 1997 WL 291961, at *3 (citing *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.,* 363 N.E.2d 701, 702 (N.Y.1977)).

Here, none of the "essential" terms remained open. Agreements had been reached between Avon and LBK as to quantity, price and time and manner of delivery for the figurines. The only alleged dispute over a possibly essential term-whether payment would be made ten or thirty days after shipment of each batch of figurines-was not a dispute at all. Avon had not specifically responded to this request, but it was clear that it would not, according to McHugh, be a "problem".

Finally, LBK claims that if an enforceable contract for the production of the Mrs. Albee figurines existed, it existed between Avon and Cermex. This contention is absolutely ridiculous. There is no writing, no admissible testimony-no evidence of any sort-that any agreement at all existed between Avon and Cermex.

In sum, an enforceable contract existed between Avon and LBK for the production of the 1994 Mrs. Albee figurines.

### B. LBK Breached the Agreement

By failing to pay Lomaglio, Inc. its agreed upon commission after Lomaglio, Inc. fully performed its obligations under the Agreement, LBK breached the Agreement. LBK's contentions to the contrary are again entirely without merit.

### 1. Payment by Avon was not a Condition Precedent to Payment of the Commissions

*7 LBK argues that, because the Agreement provides that "Commissions will be paid upon payment for the merchandise by the customer", Avon's payment to LBK was a condition precedent to payment of Lomaglio, Inc.'s commissions. LBK argues that this language is "an ambiguity", and because the Agreement was drafted by Al Lomaglio, the language must be construed against Lomaglio, Inc. to constitute a condition precedent.

While it may be that ambiguous contract language is generally construed against the drafter, it is well settled under New York law that where a contract term is ambiguous, the creation of a condition precedent is disfavored. *See, e.g., I.R.V. Merchandising Corp. v. Jay Ward Prod., Inc.,* 856 F.Supp. 168, 174 (S.D.N.Y.1994); *Lui v. Park Ridge at Terryville Ass'n, Inc.,* 601 N.Y.S.2d 496, 499 (2d Dept.1993); *Manning v. Michaels,* 540 N.Y.S.2d 583, 584 (3rd Dept.1989). Moreover, absent a clear expression to the contrary, a "pay-when-paid" clause does not establish a condition precedent but merely fixes a time for payment. *See, e.g., Grossman Steel and Aluminum Corp. v. Samson Window Corp.,* 426 N.E.2d 176, 177 (N.Y.1981), *aff'g.*433 N.Y.S.2d 31, 32 (2d Dept.1980); *Otis Elevator Co. v. George A. Fuller Co.,* 569 N.Y.S.2d 118, 120 (2d Dept.1991); *Action Interiors, Inc. v. Component Assembly Systems, Inc.,* 535 N.Y.S.2d 55, 56 (2d Dept.1991).

Thus, the ambiguous language can only be interpreted as fixing a time for payment of the commissions, and certainly not a condition precedent to their payment.[FN9]

> FN9. Even if the language in the Agreement did constitute a condition precedent, LBK still could not avoid liability under the Agreement because it was their failure to produce the figurines pursuant to the contract with Avon that prevented Avon from making payment. *See Cauff, Lippman & Co. v. Apogee Fin Group,* 807 F.Supp. 1007, 1022 (S.D.N.Y.1992).

### 2. The Agreement was not "Superseded"

LBK also contends that the Agreement was "superseded" by an agreement between Cermex and Lomaglio, Inc. (Trial Tr. at 9.) LBK claims that the superseding agreement is embodied in Defendant's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Exhibit 4A-the letter from Cermex to Lomaglio, Inc.

However, all Defendant's Exhibit 4A demonstrates is that Lomaglio, Inc. consented to payment of its commissions from Cermex. There is absolutely no evidence that Lomaglio, Inc. intended such consent to act as a complete substitute for the Agreement. Similarly, there is no evidence that Lomaglio, Inc. intended to release LBK from its obligations if Cermex failed to pay the commissions.

To prove that a new arrangement is a substituted agreement or novation that superseded the Agreement, LBK must, *inter alia,* demonstrate that both parties clearly expressed or manifested such an intent. *See Chardin v. Turkie,* No. 97 Civ. 4643(JSM), 1999 WL 194626, at *2 (S.D.N.Y. April 9, 1999) (citing *Northville Indus. v. Fort Neck Oil Terminals Corp.,* 474 N.Y.S.2d 122, 125 (2d Dept.1984)).*See also Lloyds Bank PLC v. Republic of Ecuador,* No. 96 Civ. 1789(DC), 1998 WL 118170, at *10 (S.D.N.Y. March 16, 1998); *VJK Prods., Inc. v. Friedman/Meyer Prods., Inc.,* 565 F.Supp. 916, 921 (S.D.N.Y.1983) ("a novation [must] never be presumed").

Because there is no evidence that Lomaglio, Inc. intended there to be a substituted agreement or novation, the arrangement between Cermex and Lomaglio, Inc. was merely an accord in which Lomaglio, Inc. agreed to accept payment of its commissions under the Agreement from Cermex rather than LBK. *See Chardin,* 1999 WL 194626, at *2 (citing *Denberg v. Parker Chapin Flattau & Kimpl,* 624 N.E.2d 995, 1000-01 (N.Y.1993)).

*8 Because Cermex never paid the commissions, the accord was never satisfied. Unlike a novation or a substitute agreement, an accord does not extinguish an existing contract. Thus, LBK is not relieved of its responsibilities under the agreement to pay Lomaglio, Inc. its commissions.*Id. See also Koening Iron Works, Inc. v. Sterling Factories, Inc.,* No. 89 Civ. 4257(THK), 1999 WL 178785, at *7-8 (S.D.N.Y. March 30, 1999).

### C. Damages

In assessing damages, it is axiomatic that a party injured by a breach of contract must be placed in the same economic position in which he would have been, had the contract been fully performed. *V .S.* *Intern. S.A. v. Boyden World Corp.,* 862 F.Supp. 1188, 1197 (S.D.N.Y.1994) (citing cases). With respect to proving such damages, the plaintiff must demonstrate the existence of damages with certainty in order to recover for breach of contract. *Id.* (citing cases).

Here, it is certain that had the Agreement been fully performed by LBK, Lomaglio, Inc. would have received a commission of $1.555 per figurine. Because the contract between Avon and LBK called for 82,400 figurines to be produced, Lomaglio, Inc.'s commission would have been $128,132.00.

### Conclusion

For the reasons stated above, this court finds for plaintiff Lomaglio, Inc. on the sole claim advanced at trial.

Lomaglio, Inc. is directed to submit a proposed judgment to the court- including a revised commissions schedule reflecting interest calculations up to and including the date of this Memorandum and Order-within ten days.

After entering said judgment, the Clerk of the Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,1999.
Lomaglio Associates Inc. v. LBK Marketing Corp.
Not Reported in F.Supp.2d, 1999 WL 705208 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Jason M. Madron, do hereby certify that on November 21, 2007 a copy of the foregoing **Supplemental Appendix of Exhibits to Appellee's Response to Appellant's Opening Brief and Opening Brief on Cross-Appeal** was served on the following party and in the manner indicated on the attached service list:

Jason M. Madron (Bar No. 4431)

**<u>FINOVA Capital Corporation - Service List</u>**

**<u>Via Hand Delivery</u>**

David Buchbinder, Esq.
Office of the United States Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE  19801


William D. Sullivan, Esq.
WILLIAM D. SULLIVAN, LLC
4 East 8th Street, Suite 400
Wilmington, DE  19801

**<u>Via First Class Mail</u>**

Jonathan M. Landers, Esq.
Robert J. Dakis, Esq.
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166


Mark D. Silverschotz, Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY  10020