## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FINOVA GROUP, INC., and | ) | Case Nos. 01-0698 (PJW) |
| FINOVA CAPITAL CORPORATION, | ) | |
| | ) | Jointly Administered |
| Reorganized Debtors. | ) | |
| | ) | |
| THE OFFICIAL COMMITTEE OF EQUITY | ) | |
| SECURITY HOLDERS of FINOVA GROUP, INC. | ) | |
| | ) | |
| Appellant, | ) | Civil No. 07-480 (JJF) |
| | ) | |
| v. | ) | Bankruptcy Case No. 01-698 |
| | ) | AP 07-70 |
| THE FINOVA GROUP, INC., and | ) | |
| FINOVA CAPITAL CROPORATION, | ) | |
| | ) | |
| Appellees. | ) | |

## APPELLANT'S REPLY BRIEF

WILLIAM D. SULLIVAN, LLC
William D. Sullivan (No. 2820)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195

-- and --

ANDERSON KILL & OLICK, P.C.
Mark D. Silverschotz, Esq.
James Andriola, Esq.
Han J. Ahn, Esq.
1251 Avenue of the Americas
New York, NY 10020-1182
Tel: (212) 278-1000
Fax: (212) 278-1733

Dated: December 5, 2007
Wilmington, Delaware

*Attorneys for Appellant,*
*The Official Committee of Equity Security*
*Holders of Finova Group Inc.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION...........................................................................................................1

ARGUMENT ...............................................................................................................1

**THE FIRST CLARIFICATION ORDER AND THE FINAL CLARIFICATION ORDER
SHOULD BE REVERSED OR, AT THE LEAST, VACATED**.................................. 1

A.   **It Is Beyond Dispute That The Plan and Indenture Are Ambiguous** ............................2

B.   **Given The Ambiguity In The Plan, The Bankruptcy Court Was Required
To, But Did Not, Undertake A Rigorous Analysis To Resolve The Ambiguity** ..............4

C.   **Were The Bankruptcy Court To Conduct The Required Analysis And Apply
The Controlling Law As It Should Have In The First Place, Any Resolution
Of The Ambiguity In Favor Of The Debtors Would Be Unreasonable Under
The Circumstances**..................................................................................................6

   1.   **The Disclosure Statement, To The Extent Applicable, Does Not
Support The Debtors' Interpretation**.................................................................6

   2.   **The Bankruptcy Court Was Required To, But Did Not, Construe The
Ambiguous Plan Against The Debtors As Drafters** .............................................7

   3.   **The Bankruptcy Court's Adoption Of The Debtors' Interpretation
Would Effect An Impermissible Forfeiture**.........................................................9

   4.   **The Terms Of The Controlling Documents Do Not Support The
Debtors' Interpretation** .................................................................................10

   5.   **The Bankruptcy Court Committed An Error Of Law By Finding A
Condition Precedent To The Equity Holders Ever Receiving Any
Payment Under The Plan And Indenture**...........................................................12

   6.   **The Bankruptcy Court's Determination, Which Failed to Recognize
That The Indenture Created Debt Obligations Running From the
Debtors to the Equity Holders, Was Unreasonable Under The
Circumstances** ............................................................................................14

   7.   **The Bankruptcy Court's Determination That Plan Mandated
Payments To Equity Holders Would Violate Delaware Corporate
Law Was Unreasonable Under the Circumstances** .............................................18

## TABLE OF CONTENTS

**Page**

**D.     In The Event The Court Finds That The Plan And Indenture At Issue Are Unambiguous, Then Upon Its *De Novo* Review, It Should Reverse The Appealed Orders** ................................................................................................19

**E.     Appellees Improperly Included Arguments On Their "Cross-Appeal" In Their Response Brief** ..........................................................................................19

**CONCLUSION** ...........................................................................................................20

## TABLE OF AUTHORITIES

**Page**

### CASES

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*,
  No. 04CIV10014, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005) ....................................15

*Campanile v. State Farm*,
  161 A.D.2d 1052, 558 N.Y.S.2d 203 (3d Dep't 1990) .........................................................8

*Geftman v. Commission of Internal Revenue*,
  154 F.3d 61 (3d Cir. 1998) .................................................................................................16

*Grossman Steel & Aluminum Corp. v. Samson Window Corp.*,
  54 N.Y.2d 653, 426 N.E.2d 176, 442 N.Y.S.2d 769 (1981) ...............................................12

*Int'l Multifoods Corp. v. Comm. Union Ins. Co.*,
  309 F.3d 76 (2d Cir. 2002) .................................................................................................16

*Koon v. U.S.*,
  518 U.S. 81 (1996) ...................................................................................................... passim

*Kreiss v. McCown De Leeuw & Co.*,
  131 F. Supp. 2d 428 (S.D.N.Y. 2001) ...................................................................................9

*Lomaglio Assocs. Inc. v. LBK Mktg. Corp*,
  No. 94 Civ 3208, 1999 WL 705208 (S.D.N.Y. Sept. 10, 1999) .........................................12

*Mazzaferro v. RLI Ins. Co.*,
  50 F.3d 137 (2d Cir. 1995) .................................................................................................16

*In re O'Hanlon's Will*,
  27 N.Y.S.2d 889 (Sur. Ct. Richmond County 1941) .........................................................13

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*,
  86 N.Y.2d 685, 660 N.E.2d 415, 636 N.Y.S.2d 734 (1995) ....................................9, 13, 14

*Rowe v. Great Atl. & Pac. Tea Co.*,
  46 N.Y.2d 62, 385 N.E.2d 566, 412 N.Y.S.2d 827 (1978) .................................................11

*Schuler-Hass Elec. Corp. v. Aetna Cas. & Sur. Co.*,
  40 N.Y.2d 883, 357 N.E.2d 1003, 389 N.Y.S.2d 348 (1976) .............................................12

## TABLE OF AUTHORITIES

**Page**

*In re Shenango Group, Inc.*,
    501 F.3d 338 (3d Cir. 2007).................................................................................... passim

*U.S. v. McBroom*,
    124 F.3d 533 (3d Cir. 1997)................................................................................... passim

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470, 807 N.E.2d 876, 775 N.Y.S.2d 765 (2004)...........................................9, 11

## STATUTES

Del. Code Ann. tit. 8, § 170 ...................................................................................................18, 19

## MISCELLANEOUS

Restatement (Second) of Contracts at § 229 cmt. b.........................................................................9

11 Williston on Contracts § 32:5 (4th ed. 2002) ........................................................................15

## INTRODUCTION

Appellant, the Official Committee of Equity Security Holders (the "Equity Committee"), on behalf of the shareholders (the "Equity Holders") of Finova Group, Inc., the corporate parent of Finova Capitol Corporation (collectively "Debtors" or "Reorganized Debtors"), submits this brief in reply and response to Appellee's Response to Appellant's Opening Brief and Opening Brief on Cross Appeal (D.I. 23).[1]

## ARGUMENT

### THE FIRST CLARIFICATION ORDER AND THE FINAL CLARIFICATION ORDER SHOULD BE REVERSED OR, AT THE LEAST, VACATED

The Equity Committee's Opening Brief established that the Bankruptcy Court committed a number of critical, reversible errors in issuing the Final Clarification Order (Bankr. D.I. 220) [App., Ex. O] and the First Clarification Order (Bankr. D.I. 100) [App., Ex. N]. In an effort to gloss over these errors, the Debtors' response (the "Response Brief") focuses heavily on a recent decision of the Third Circuit Court of Appeals in *In re Shenango Group, Inc.*, 501 F.3d 338 (3d Cir. 2007). While, due to its very recent vintage, *Shenango Group* was not discussed in the Appellant's Opening Brief (the "Opening Brief") (D.I. 17), contrary to the Debtors' assertions, this decision strongly supports the Equity Committee's position on the present appeal. First, *Shenango Group* demonstrates that where a plan is silent as to a key term and the parties involved have offered plausible alternative interpretations, the Plan is ambiguous. *Shenango Group*, 501 F.3d at 346-47. Second, where a plan is ambiguous, the Bankruptcy Court must undertake a rigorous

---

[1] "Bankr. D.I." refers to the docket of the Bankruptcy Court in case no. 01-00698-PJW and "Bankr. (Case No. 697) D.I." refers to the docket of the Bankruptcy Court in case no. 01-00697-PJW. "D.I." refers to the docket of this Court in case no. 07-480 (JJF) and "D.I. (Case No. 487)" refers to the docket of this Court in case no. 07-487 (JJF). References to the Appendix of Exhibits submitted in connection with this motion and brief will be made as "App., Ex. __" or, for a particular page of an Exhibit, "App. at __, Ex. __".

analysis to resolve the ambiguity involved. *Id.* at 344-45. Third, in conducting such an analysis the Bankruptcy Court should "apply contract principles." *Id.* at 344.

In this case, the Bankruptcy Court erred in finding a lack of ambiguity (even though such ambiguity had been admitted by the Debtors) and it is beyond dispute that the Bankruptcy Court did not undertake any analysis to resolve the ambiguity in the Plan or apply basic contract principles as part of such an analysis. For these reasons alone, the Equity Committee submits that this Court should at the least vacate the Final Clarification Order and the First Clarification Order and remand this case to the Bankruptcy Court for further proceedings that conform with the *Shenango Group* decision. The Equity Committee additionally submits that, rather than simply vacate and remand, this Court can and should *reverse* the appealed orders. Reversal is appropriate because if the Bankruptcy Court conducted the required analysis and applied New York state contract law, any resolution of the ambiguity in favor of the interpretation offered by the Debtors would be "unreasonable under the circumstances."[2]

## A.     It Is Beyond Dispute That The Plan and Indenture Are Ambiguous

Pursuant to *Shenango Group*, the first step in the review process for this Court is to conduct a *de novo* review and make a determination as to whether the Plan at issue is ambiguous. *Shenango Group*, 501 F.3d at 345. The Opening Brief demonstrated that the Debtors, in making

---

[2] *Shenango Group*, 501 F.3d at 346 ("If the Plan is ambiguous, we will defer to the Bankruptcy Court's interpretation unless it is ***unreasonable under the circumstances***."). At certain points in their response, the Debtors have given the Bankruptcy Court an even higher level of deference than that provided by the Third Circuit in *Shenango Group*. *See, e.g.*, Response Brief at p. 2, Heading A ("The Bankruptcy Court's Construction of the Plan and Indenture is Not ***Manifestly Unreasonable***"). Another inaccuracy by the Debtors is their assertion that "the Committee has failed to even allege, much less prove, that the Bankruptcy Court's interpretation of the Indenture and related documents was an abuse of the Bankruptcy Court's discretion as required by *Shenango*." Response at ¶ 25. As will be demonstrated repeatedly herein, this statement is simply wrong. Also patently wrong is the Debtors' statement that the "Equity Committee never fully contested the Debtors' construction of the Indenture." Response at ¶ 15. That is the very issue that was litigated before the Bankruptcy Court.

the Clarification Motion, admitted that the Plan was ambiguous. *See* Opening Brief at pp. 20-22 (quoting, *inter alia*, Debtor's Objection to Equity Committee Reconstitution (Bankr. D.I. 39 at ¶ 11) [App. at 279, Ex. G]: "[a]t most, the Clarification Motion seeks to resolve ***ambiguity*** in the Plan concerning the disposition of the Segregated Funds in the event of the Reorganized Debtor's continued insolvency.") (emphasis added). At the outset of their response, the Debtors, as part of an unsuccessful effort to invoke *Shenango Group* in their favor, argue that the "Equity Committee acknowledges that the Plan was ambiguous. . ." Response Brief at ¶ 3. By making such an assertion, the Debtors now apparently agree that the Plan is ambiguous and hope to rely on this fact.[3]

It is then surprising that the Debtors continue at other parts of their response with an argument they made before the Bankruptcy Court, that while the Plan and Indenture are silent, silence does not equal an ambiguity. *See* Response Brief at ¶¶ 34 and 35.[4]  However, in *Shenango Group*, the Third Circuit found that the plan at issue in that case was ***ambiguous*** since a particular section of the plan did "not address the timing of Shenango's funding obligation [i.e., it was silent as to the timing of the funding] and . . . the alternative interpretations offered by the parties are plausible." *Shenango Group*, 501 F.3d at 347. In this case, the Debtors themselves have argued that the Plan and Indenture do not address what should happen to the Segregated Funds under the

---

[3] The Debtors also state that: [t]he only ***ambiguity*** in the Plan and Indenture concerns the treatment of the Retained Funds if the conditions precedent to the distribution of the Retained Funds to the Shareholders can never be satisfied." Response at ¶33 (Emphasis added). While their framing of the issue is inaccurate and misleading, this is yet another admission by the Debtors that the Plan and Indenture are ambiguous.

[4] The Debtors make the uninteresting observation that "[w]hen courts have spoken of an agreement's silence on an issue having the effect of rendering the agreement 'ambiguous,' it is only in cases in which the issue is one material to the contract." Response Brief at ¶ 35 (citations omitted). If the Debtors believed that the provision at issue in the Clarification Motion was not "material," then they would not have wasted the time and money of all involved by making the Clarification Motion in the first place.

present circumstances and the parties have offered competing interpretations to resolve the dispute. The interpretation offered by the Debtors is that, under the circumstances, the Segregated Funds they had retained on behalf of Equity Holders pursuant to the Indenture should be used by the Debtors "for general corporate purposes including, without limitation, payment of amounts due on the New Senior Notes." *See* Final Clarification Order at 3, ¶ 1. The more plausible interpretation offered by the Equity Committee is that, under the circumstances, the Segregated Funds should be distributed to the Equity Holders at once or when the Debtors' assets are fully liquidated and the Debtors cease to function as on-going business enterprises.

Based on the foregoing, and the reasons set forth in the opening brief, the Equity Committee submits that upon its *de novo* review, this Court should find that the relevant provisions of the Plan and Indenture are ambiguous.

**B.  Given The Ambiguity In The Plan, The Bankruptcy Court Was Required To, But Did Not, Undertake A Rigorous Analysis To Resolve The Ambiguity**

*Shenango Group* teaches that where there is an ambiguity in a confirmed plan of reorganization, the Bankruptcy Court must undertake a rigorous analysis to determine which of the two plausible alternative interpretations offered by the parties is correct under the circumstances. *See Shenango Group*, 501 F.3d at 346-47 (finding that remand was not necessary in that case since the "Bankruptcy Court's analysis included findings of fact" and the Bankruptcy Court had considered, among other things, "the history of the negotiations between the parties which resulted in the retirees' claim to the pension plan surplus.").[5] In addition, in conducting such an analysis of

---

[5] While the Debtors argue that "[t]he same standard should apply here even if … this Court finds the provisions of the plan ambiguous" (Response at ¶ 24), the Debtors do not even attempt to argue that the Bankruptcy Court in the present case conducted the same type of analysis or made a similar level of findings as the lower court in the *Shenango Group* case. *See also* Opening Brief at pp. 15- 16 (pointing out

a confirmed plan of reorganization, the Bankruptcy Court is required to "apply contract principles." *Shenango Group*, 501 F.3d at 344. Thus, given the ambiguity of the Plan and Indenture, the Bankruptcy Court was required to conduct an analysis as to the propriety of the competing interpretations offered by the Debtors and the Equity Committee as to the ownership of the Segregated Funds under the circumstances. And, the Bankruptcy Court's analysis should have been guided by the basic interpretation principles of New York State contract law, which the Debtors agreed were applicable. *See, e.g.,* Debtor's Clarification Motion Reply. (Bankr. D.I. 61) at ¶ 19 ("The Indenture … is governed by New York law.") [App. at 377, Ex. J].

As the record makes clear, the Bankruptcy Court chose not to conduct the appropriate analysis. Instead, despite the Debtors' admissions to the contrary, the Bankruptcy Court found that it did not think the Plan and Indenture were ambiguous. *See* November 29, 2005 Transcript 52:13-14 (Bankr. D.I. 80) [App. at 522, Ex. L]. In addition, as per the Debtor's response: "[A]t the beginning of its ruling, the Bankruptcy Court said that the 'multitudinous arguments offered by the Committee, for the most part, are either irrelevant or off the wall. The concept of forfeiture, subordination, constructive trust, sharing pari passu is all in gross conflict with the terms of the plan and the disclosure statement." Response at ¶ 12 (citations omitted). In other words, right from the outset, the Bankruptcy Court rejected the idea that it needed to consider applicable New York state contract law principles.

No matter what level of deference is given, the Final Clarification Order and the First Clarification Order should be vacated because of the Bankruptcy Court's failure to conduct the appropriate analysis and apply the governing law. *See U.S. v. McBroom*, 124 F.3d 533, 541-42

---

that the Bankruptcy Court's entire analysis was done on the record and is set forth on only 5 pages of the hearing transcript).

(3d Cir. 1997) (quoting *Koon v. U.S.*, 518 U.S. 81, 100 (1996)) ("'A district court by definition abuses its discretion when it makes an error of law.'"). The Court's failure, of course, stems from its determination that the Plan and Indenture were not ambiguous, a determination at odds with *Shenango Group* and with the Debtors' own arguments.

C.    **Were The Bankruptcy Court To Conduct The Required Analysis And Apply The Controlling Law As It Should Have In The First Place, Any Resolution Of The Ambiguity In Favor Of The Debtors Would Be Unreasonable Under The Circumstances**

The foregoing sections demonstrate that, at the very least, this Court should vacate the Final Clarification Order and the First Clarification Order and remand this case to the Bankruptcy Court for further proceedings that conform with the *Shenango Group* decision. In addition, the Equity Committee submits that rather than vacate and remand, this Court can and should *reverse* the appealed orders since, were the Bankruptcy Court to conduct the required analysis and apply New York state contract law, any resolution of the ambiguity in favor of the interpretation offered by the Debtors would be unreasonable under the circumstances.

1.    **The Disclosure Statement, To The Extent Applicable, Does Not Support The Debtors' Interpretation**

The Equity Committee's Opening Brief demonstrated the Bankruptcy Court's over-reliance on the Disclosure Statement in this case. *See* Opening Brief at p. 5. In response, the Debtors argue "in construing the terms of a plan of reorganization, a bankruptcy court can rely on all documents drafted at the same time, including the disclosure statement." Response at ¶ 37 (citations omitted). Assuming *arguendo* that the Debtors are correct as to the applicability of the Disclosure Statement, the Opening Brief demonstrated how the key provision from that document that the Bankruptcy Court relied on actually favors the interpretation proffered by the Equity Committee. *See* Opening Brief at pp. 16-20. The section at issue, which is set forth in its entirety at p. 17 of the Opening Brief, contains the following statement: "[i]f FNV Group does not have

sufficient funds ultimately to repay the New Senior Notes in full (together with accrued interest

thereon), *it is likely that only limited distributions would be made to stockholders*." (emphasis

added). The plain meaning of this language is that even if the Debtors can not ultimately pay the

New Senior Notes in full (the situation at hand), the Equity Holders will still receive **some** level of

distribution, i.e., a nickel for each payment of $0.95 given to noteholders at least until such time as

the Debtors run out of non-reserved funds to keep making such $0.95 payments.

      The Bankruptcy Court over-looked this obvious meaning and stated: "I think that

sentence of limited distribution refers to the five exceptions in exhibit 6.2(C)(1) of the Plan,"

which is the New Senior Notes Term Sheet. *See* November 29, 2005 transcript 56:16-18 [App. at

526, Ex. L]. The Opening Brief thoroughly demonstrated that the Bankruptcy Court's reasoning

on this issue was illogical. In their response, the Debtors do not contest any of the factual or legal

assertions made in this section of the Opening Brief and, but for a short footnote, they completely

ignore the entire discussion. Furthermore, in their lone footnote on the topic, the Debtors' merely

argue that "it is not sufficient for the Equity Committee to merely contend the Bankruptcy Court

misread the document, the Equity Committee must demonstrate some abuse of discretion."

Response Brief at ¶ 13, n.8. It is, however, obviously reversible error, no matter what standard

applies, for the Bankruptcy Court to conclude as it did that the Disclosure Statement actually

supports the Debtors' position given the Equity Committee's uncontested demonstration as to the

true and plain meaning of the provision at issue.

> **2.    The Bankruptcy Court Was Required To, But Did Not, Construe The
> Ambiguous Plan Against The Debtors As Drafters**

      The Opening Brief established that the Bankruptcy Court, as part of its analysis,

was required to construe any and all ambiguities in the Plan and Indenture against the Debtors as

the drafter of those documents. *See* Opening Brief at pp. 24-25. As part of this demonstration, the

Equity Committee cited a number of cases where this principle has been applied in the bankruptcy context. *See id.* In response the Debtors assert, without any authority, that "[t]hese cases have no application here. . ." Response at ¶ 36. Given the lack of any counter-authority, this legal principle was clearly applicable to Debtors' Clarification Motion and it was unreasonable under the circumstances for the Bankruptcy Court to ignore such a well-established rule of construction. *See U.S. v. McBroom*, 124 F.3d 533, 541-42 (3d Cir. 1997) (quoting *Koon v. U.S.*, 518 U.S. 81, 100 (1996)) ("'A district court by definition abuses its discretion when it makes an error of law.'").[6]

Finally, on this topic, the Debtors argue that "in a corporate bankruptcy case, the debtor is normally thought to be aligned with the equity interests" and thus "it is extremely doubtful" that this rule of construction applies to the Clarification Motion. *See* Response Brief at ¶ 36 (citing no authority). This is a remarkable argument given that in recent motion practice before this Court, in addressing why the noteholders had not as of that time filed any objection to the Equity Committee's motion for a stay pending appeal, the Debtors' Chief Financial Officer declared under penalty of perjury that: "[o]f course the [noteholders] did not lodge an objection. They had no reason to object because FINOVA was so clearly taking a position supporting their right to the funds in question." (Ross Decl. Sept. 20, 2007 at ¶ 7) [App. Ex. R]. For the Debtors to turn around and now argue that this rule of construction should not be applied to the Clarification Motion since their interests are aligned with the Equity Holders is preposterous.

---

[6] *See also Campanile v. State Farm*, 161 A.D.2d 1052, 1054, 558 N.Y.S.2d 203, 204 (3d Dep't 1990) (holding that burden of proof is on drafter of agreement and the drafter must show that its construction of the agreement is the "only construction that can be fairly placed upon it"). The Debtors have completely failed to make such a demonstration.

3. **The Bankruptcy Court's Adoption Of The Debtors' Interpretation Would Effect An Impermissible Forfeiture**

As per the Opening Brief, it is well-settled that "New York courts will not interpret provisions that are ambiguous on their face to effect a forfeiture…." *See* Opening Brief at pp. 22-24 (quoting *Kreiss v. McCown De Leeuw & Co.*, 131 F. Supp. 2d 428, 436 (S.D.N.Y. 2001). And, as per the Debtors' response: "[t]he term 'forfeiture' has been defined as the 'denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance on the expectation of that exchange." Response Brief at ¶ 57 (quoting *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d at 691 n.2 and citing Restatement (Second) of Contracts at § 229 cmt. b). Such a "forfeiture" is exactly what will occur if the Bankruptcy Court is affirmed in this case. The Equity Holders consented to a Plan which diluted, by half, their shares. In exchange, under the Plan and Indenture, for every $0.95 of available cash that was used to pay principal and interest on the New Senior Notes, $0.05 was to be distributed to, or retained on behalf of, the Equity Holders. The interpretation proffered by the Debtors and accepted by the Bankruptcy Court, has the Equity Holders forfeiting their right to even this meager amount in consideration that was given to them under the Plan.

The Debtors have never been able to counter the argument that, to the extent the Debtors believed that under the Plan and Indenture in the event of certain financial conditions the Equity Holders would forfeit, for all time, their right to payment, it was the Debtors' obligation to include in the controlling documents language that was express and unambiguous. The Debtors failed to insert such a clause into section 4.06(a)(v) at the time it was drafted and the Plan's acceptance was solicited, and such a term cannot now be implied. *See Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 476, 807 N.E.2d 876, 880, 879, 775 N.Y.S.2d 765, 768

(2004) (declining to add a notice provision where "[t]he parties could have [but did not] negotiated and included an explicit notice requirement").

Moreover, the Debtors assert that "[i]n short, the Shareholders have a conditional contractual right to payment on account of their equity interests." Response Brief at ¶ 43. While the Equity Committee disagrees that its right to payment under the Plan was "conditional" or "contingent" (*see* section 5, below), the Opening Brief established that, under the law, the loss of such a right is still a forfeiture of property. *See* Opening Brief at pp. 23-24. The Debtors do not address any of these controlling cases, but instead argue that this rule of construction should not apply because the provisions at issue are unambiguous. *See* Response at ¶ 58. The asserted lack of ambiguity obviously is wrong.

Given the applicability of this well-established rule of construction, it was unreasonable under the circumstances for the Bankruptcy Court to interpret an ambiguous provision to effect a forfeiture. *See U.S. v. McBroom*, 124 F.3d 533, 541-42 (3d Cir. 1997) (quoting *Koon v. U.S.*, 518 U.S. 81, 100 (1996)) ("'A district court by definition abuses its discretion when it makes an error of law.'").

### 4.    The Terms Of The Controlling Documents Do Not Support The Debtors' Interpretation

The Indenture provision at issue states that "each incremental payment of $0.95 pursuant to Clause A [to the Company to pay principal and interest on the New Senior Notes] *shall require* a distribution [to Equity Security Holders] or retention [on their behalf] pursuant to Clause (B) of $0.05." Indenture at § 4.06(a)(v) (emphasis added) [App. at 187, Ex. C]. Furthermore, the Equity Committee's opening brief made clear that that *there is no express language* in the Plan or Indenture that provides for the relief sought by the Debtors and that "courts should be extremely reluctant to interpret an agreement as *impliedly* stating something which the parties have neglected

to specifically include." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 385 N.E.2d 566,

572, 412 N.Y.S.2d 827, 833 (1978) (emphasis added). *See also Vermont Teddy Bear Co.*, 1

N.Y.3d at 475, 807 N.E.2d at 879, 775 N.Y.S.2d at 767-68 (holding that "when parties set down

their agreement in a clear, complete document, their writing should…be enforced according to its

terms" and "courts may not by construction add or excise terms, nor distort the meaning of those

used and thereby make a new contract for the parties under the guise of interpreting the writing.").

  The Debtors' response does not question the applicability of the above-cited cases

and, as to express language in the Plan, the Debtors rely solely on the following provision: "Any

distributions made under the Plan that [are unclaimed or undeliverable for a period of one year]

shall be revested in the applicable Reorganized Debtor free of any restrictions thereon, and any

entitlement of any holder of any Claim or Interest to such distributions shall be extinguished and

forever barred." *See* Plan at ¶ 9.4(b). This provision is clearly not applicable to the circumstances

before this Court. First, the Segregated Funds have certainly been "claimed" by the Equity

Holders via the Equity Committee. Second, "undeliverable" is defined in the dictionary as

"[d]ifficult or impossible to deliver: *undeliverable mail*.[7] It is self-evident that this provision does

not apply to the situation at hand.

  At the end of the day, the Debtors can not avoid the reality that, under New York

law, the terms of a contract generally are afforded their plain and ordinary meaning and the plain

meaning of the Indenture provision at issue is that for every $0.95 that is used to pay principal on

the New Senior Notes, $0.05 goes to the Equity Holders either at the time of distribution to Senior

Noteholders or later.

---

[7] *See* www.dictionary.com (last visited Dec. 3, 2007) (emphasis in original).

5.    **The Bankruptcy Court Committed An Error Of Law By Finding A Condition Precedent To The Equity Holders Ever Receiving Any Payment Under The Plan And Indenture**

It is beyond serious dispute that the Indenture provision at issue is ambiguous and that under New York law "where a contract term is ambiguous, *the creation of a condition precedent is disfavored*" (*Lomaglio Assocs. Inc. v. LBK Mktg. Corp*, No. 94 Civ 3208, 1999 WL 705208, at *7 (S.D.N.Y. Sept. 10, 1999) (citations omitted) (emphasis added) [App. at 636, Ex. S]). Despite the foregoing, the Debtors have argued, and the Bankruptcy Court apparently agreed, that the Indenture provision at issue created a "condition precedent" to the Equity Holders *ever* receiving any payment.

As demonstrated in the Opening Brief, the Bankruptcy Court's decision (and the Debtors' argument) runs directly counter to New York law. *See* Opening Brief at pp. 27-30. To summarize, in a number of cases, including *Grossman Steel & Aluminum Corp. v. Samson Window Corp.*, 54 N.Y.2d 653, 426 N.E.2d 176, 442 N.Y.S.2d 769 (1981) and *Schuler-Hass Elec. Corp. v. Aetna Cas. & Sur. Co.*, 40 N.Y.2d 883, 357 N.E.2d 1003, 389 N.Y.S.2d 348 (1976), language akin to that relied upon by the Debtors has been found *not* to establish a "condition precedent," but rather merely to establish a *time* for payment. The Debtors have gone to great lengths to avoid the applicability of this case law. For example, the Debtors have previously argued to the Bankruptcy Court that the holding of *Grossman Steel* and progeny are restricted to the construction industry. (Bankr. D.I. 65) at ¶ 10. After the Equity Committee's Opening Brief demonstrated that New York courts have applied the underpinnings of *Grossman Steel* outside the construction context (*see* Opening Brief at p. 28), the Debtors were left to argue in their response (without authority) that "[t]here is no suggestion that the rationale of *Grossman Steel* or *Schuler-Haas* should apply where, as here, there is no agency relationship." Response Brief at ¶ 31. With all due respect, that is making a distinction without a difference.

The Debtors purport to rely on the *Oppenheimer* case for their argument that the Indenture provision at issue created a condition precedent to the Equity Holders ever receiving any payment. *See* Response Brief at ¶ 29 (citing and quoting *Oppenheimer* as follows: "finding that the language of the agreement unambiguously established an express condition precedent rather than a promise, as the parties employed the unmistakable language of condition (if, unless and until)." (internal quotation marks omitted). In *Oppenheimer*, the agreement stated that the parties "agree not to execute and exchange the Sublease ***unless and until*** ... the conditions set forth in paragraph (c) above are timely satisfied." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 688, 660 N.E.2d 415, 636 N.Y.S.2d 734 (1995). In the present case, however, such unmistakable language of condition does not remotely exist.[8] Rather, the Indenture provision at issue in this case directs the Debtors "to make distributions [to Equity Holders]... ***unless*** ..." [App. at 187, Ex. C]. The Equity Committee submits that the language in the present case is the polar opposite of the language in *Oppenheimer* creating a condition precedent. One says, in effect, "don't pay *unless and until*..." and the other says "pay *unless*..." Of course, in *Oppenheimer*, the New York Court of Appeals instructed that courts should avoid interpreting "doubtful language" in a contract to be an express condition precedent "***when a finding of [such] an express condition [precedent] would increase the risk of forfeiture by the obligee***." *Oppenheimer & Co.*, 86 N.Y.2d at 691, 660 N.E.2d at 418, 636 N.Y.S.2d at 737 (citing Restatement (Second) of Contracts § 227(1) (1981)) (emphasis added).

---

[8] Debtors' brief observes that: "[p]arties often use language such as 'if,' 'on condition that,' provided that,' 'in the event that' and 'subject to' to make an event a condition . . ." Response Brief at ¶ 28 (citations omitted). Most significantly, however, none of the cited examples appear in the Indenture provision at issue.

Given the foregoing, it was unreasonable under the circumstances for the

Bankruptcy Court to find a condition precedent in the Indenture provision at issue. *See U.S. v.*

*McBroom*, 124 F.3d 533, 541-42 (3d Cir. 1997) (quoting *Koon v. U.S.*, 518 U.S. 81, 100 (1996))

("'A district court by definition abuses its discretion when it makes an error of law.'").  In other

words, as a matter of law, there is no "condition" in the Indenture that would prevent the Equity

Committee from ultimately receiving the Segregated Funds.

### 6.    The Bankruptcy Court's Determination, Which Failed to Recognize That The Indenture Created Debt Obligations Running From the Debtors to the Equity Holders, Was Unreasonable Under The Circumstances

According to the Debtors' Disclosure Statement, "[t]he Plan as confirmed by the

Bankruptcy Court is binding on and shall inure to the benefit of the Debtors and all holders of

Claims and Interests."  [App. at 36, Ex. A. at 30].  Moreover, the Debtors concede in their response

that based on the Plan, "the Shareholders have a conditional contractual right to payment on

account of their equity interests."  Response Brief at ¶ 43.  While the Equity Committee disagrees

that its right to payment under the Plan is "conditional" (*see* section 5, above), at least the Debtors

acknowledge that the Plan provides the Equity Holders with a ***contractual right to payment***.

As per its own terms, "[t]he purpose of this Disclosure Statement is to enable

you, . . . as an equity interest holder whose equity interest is impaired under the Plan, to make an

informed decision in exercising your right to accept or reject the Plan."  [App. at 6, Ex. A at 2].  It

should be remembered too that the Debtors themselves stressed in their Response Brief that:

"[t]here is little doubt that in construing the terms of a plan of reorganization, a bankruptcy court

can rely on . . . the disclosure statement.  Response Brief at ¶ 37 (citations omitted).  And, most

significantly, the Opening Brief established that the Disclosure Statement described the Debtors'

ability to, *inter alia*, "make distributions to holders of FNV Group common stock" under the

heading "Potential Limitations on or Inability to **Repay Debt** or Make Contingent Interest."

(Opening Brief at p. 19) (citing App. at 43-Ex. A at 37) (emphasis added). This is a concrete

demonstration of the Debtors themselves describing the Plan-based distributions to Equity Holders

as **debt**. The Debtors seek to get around this provision with the following argument: "section

13.11 of the Plan specifically provides that headings in the Plan are 'for convenience and reference

only and not intended to be part of or affect the interpretation of the Plan.'"  Response at ¶ 39, n.19

[App. at 114, Ex. B at 45]. This is quite misleading on the part of the Debtors since the heading at

issue comes from the **Disclosure Statement and not the Plan** and thus the Disclosure Statement is

not subject to section 13.11 of the Plan.[9]

        In addition, despite the Debtor's unsupported assertion to the contrary, "[e]xcept to

the extent that the parties manifest a contrary intent, by stating, for example, that recitals or

headings are not to be considered or given effect in determining the meaning of their agreement,

every word, phrase or term of a contract must be given effect." 11 Williston on Contracts § 32:5

(4th ed. 2002); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*, No. 04CIV10014,

2005 WL 1950116, at *5 n.6 (S.D.N.Y. Aug. 12, 2005) (noting that the court did not factor the

Indenture's paragraph heading into its analysis of ambiguity because the indenture had an express

provision stating that paragraph headings shall not affect construction of the Indenture). Here,

there was no such provision in the Disclosure Statement that prevented the Bankruptcy Court from

considering the section heading in its analysis, and its failure to do so was an error of law. *See*

*also Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir. 2002) (quoting

*Mazzaferro v. RLI Ins. Co.*, 50 F.3d 137, 140 (2d Cir. 1995)) ("[a] contract of insurance must be

---

[9] The Disclosure Statement was sent to, *inter alia*, Equity Holders to solicit their votes. Its purpose was to describe the Plan and to allow impaired classes to be informed about what they were to give up, and what they were to get in exchange.

read as a whole, including any introductory clause or heading, to determine the intent of the parties.").

As part of their argument that the payment obligations to Equity Holders under the Plan and Indenture are something other than "debt" obligations, the Debtors quote the Bankruptcy Court as follows: "'On and after the distribution date, the legal, equitable and contractual rights of holders of allowed interest in class FNV Group 6 (interest) shall remain in effect' – let me just pause. What it says there, the interest remain interest – i.e., the interest is a stock interest." Response at ¶ 39 (quoting November Transcript at 53:6-11) [App. at 523, Ex. L].  The provision that was quoted by the Bankruptcy Court goes on to say that the Equity Holders' interests are "subject to the effects of . . . (iii) the other terms and conditions of the Plan . . ." [App. at 17, Ex. A 12].  Put another way, the "legal, equitable and contractual rights" of Equity Holders are subject to the "terms and conditions of the Plan."  Thus, when looked at as a whole, this provision does not support the Debtors' position as to there being no debt obligations running to the Equity Holders. Rather, this provision simply states that going forward the Equity Holders rights are governed by the Plan, including their right to payment under the fifth waterfall provision of the Indenture.

The provision discussed in the preceding paragraph as well as the fact that "[t]he Plan as confirmed by the Bankruptcy Court is binding on and shall inure to the benefit of the Debtors and all holders of Claims and Interests" (App. at 36, Ex. A at 30), completely undermine the Debtors' argument that there is no "debt instrument" memorializing the Debtors' payment obligations to the Equity Holders (i.e., the Plan itself is the debt instrument – a written promise to repay a debt).  Furthermore, the inapplicability of *Gefman v. Commission of Internal Revenue*, 154 F.3d 61 (3d Cir. 1998), upon which the Debtors continue to rely, was pointed out in the Opening Brief.  *See* Opening Brief at p. 32.

The Debtors' invocation of the absolute priority rule also is unavailing. According to the Debtors, the "the absolute priority rule provides, in brief, that unless a class consents, no junior class of claims or interests can receive a distribution unless the senior class is paid in full." Response at ¶ 66 (citations omitted). However, the Debtors themselves would agree that pursuant to the Indenture provision at issue, so long as the Debtors were presently solvent, for each payment of $0.95 for principal and interest on the New Senior Notes, $0.05 could have been distributed to Equity Holders. And, when such payment and distributions were periodically made, there would be no guarantee that noteholders would, as a class, be eventually paid in full. Thus, the Indenture itself, as drafted by the Debtors, would violate the absolute priority rule. It is doubtful that the Debtors would embrace that position. Further, the holders of New Senior Notes consented to the treatment to which, under the Plan, the Equity Holders are entitled.

The remainder of the Debtors' arguments on this topic flow from their assertion that the Equity Holders' right to payment under the Indenture is "conditional." These arguments fail since, as discussed in section 5, above, the fifth waterfall provision is devoid of an express condition precedent to the Equity Holders' right to payment, and no such condition may properly be implied.

The Bankruptcy Court's failure to recognize that the Indenture created debt obligations, running from the Debtors to the Equity Holders, was unreasonable under the circumstances. *See U.S. v. McBroom*, 124 F.3d 533, 541-42 (3d Cir. 1997) (quoting *Koon v. U.S.*, 518 U.S. 81, 100 (1996)) ("'A district court by definition abuses its discretion when it makes an error of law.'").

or net profits . . ." DEL. CODE ANN. tit. 8, § 170 (emphasis added). This makes clear that it is the time of delivery of the note, debenture or obligation at issue that governs.

**D.    In The Event The Court Finds That The Plan And Indenture At Issue Are Unambiguous, Then Upon Its *De Novo* Review, It Should Reverse The Appealed Orders**

The Equity Committee respectfully submits that the Plan and Indenture are ambiguous. *See* sections A-C, above and Opening Brief at 20-24. If, however, this Court finds that the provisions at issue are ***unambiguous***, then *Shenango Group* dictates that this Court should undertake a *de novo* review. The Equity Committee submits that, were this Court to undertake such a *de novo* review, it should adopt the interpretation of the Plan and Indenture proffered by the Equity Committee and reverse the Final Clarification Order and the First Clarification Order.

**E.    Appellees Improperly Included Arguments On Their "Cross-Appeal" In Their Response Brief**

The last section of Appellee's Response is captioned "Cross Appeal – The Court Erred in Reconstituting the Equity Committee and Entering the Fee Cap Orders." Response, pp. 35-40. References to the Debtors' "Cross Appeal" also appear in the "Statement and Nature of Case" (p.1), "Summary of Argument" (p.3), and "Background" (pp. 11-12). The inclusion of these sections in the Response and the Debtors' references to its "Cross Appeal" are entirely erroneous. The "cross-appeal" is in reality an entirely separate appeal of four distinct orders: the order re-constituting the Equity Committee and the three subsequent orders increasing the cap of the fees which the Equity Committee's professionals can incur. The appeal of these orders has been assigned its own case number in this Court, Civil Action No. 07-487. In addition, since the Equity Committee is not the Appellant for that appeal, those issues were not addressed in the Equity Committee's Opening Brief, and are likewise not addressed here. The Equity Committee will

address these arguments in connection with briefing in appeal No. 07-487, and the Court should

disregard the sections of the brief identified above which are improperly included in this appeal.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons and the reasons set forth in the Opening

Brief, the Equity Committee respectfully requests that this Court enter an order: (i) reversing the

First Clarification Order and the Final Clarification Order; and (ii) granting such other and further

relief as may be just and proper under the circumstances.

Dated:   December 5, 2007
          Wilmington, Delaware

**WILLIAM D. SULLIVAN, LLC**

William D. Sullivan (No. 2820)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
email: bill@williamdsullivanllc.com

-- and --

**ANDERSON KILL & OLICK, P.C.**
Mark D. Silverschotz, Esq.
James Andriola, Esq.
Han J. Ahn, Esq.
1251 Avenue of the Americas
New York, NY 10020-1182
Tel: (212) 278-1000
Fax: (212) 278-1733

## CERTIFICATE OF SERVICE

I, William D. Sullivan, do hereby certify I am not less than 18 years of age and that on this 5th day of December 2007, I caused a copy of the foregoing *Appellant's Reply Brief* to be served upon the parties listed below in the manner indicated.

**HAND DELIVERY**
Mark D. Collins, Esq
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19801

**FIRST CLASS MAIL**
Jonathan M. Landers, Esq.
Paul Guillotte, Esq.
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

**HAND DELIVERY**
David L. Buchbinder, Esq.
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801

**FIRST CLASS MAIL**
James Gadsden, Esq.
Carter Ledyard & Milburn, LLP
2 Wall Street
New York, NY 10005

Under penalty of perjury, I declare that the foregoing is true and correct.

*December 5, 2007*
Date

*/s/ William D. Sullivan*
William D. Sullivan