## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE: Finova Group et al

| | | |
|---|---|---|
| Official Committee of Equity Securities Holders, | ) ) ) | Civil Action No. 07-480 (JJF) |
| Appellant | ) ) | |
| v. | ) ) | |
| Finova Group Inc. and Finova Capital Corporation, | ) ) ) | Bankruptcy Case No. 01-698 AP 07-70 |
| Appellees. | ) | |

## APPELLANTS' MOTION FOR STAY PENDING APPEAL

**SULLIVAN · HAZELTINE · ALLINSON LLC**
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
Elihu E. Allinson, III (No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195

**REED SMITH LLP**
Mark D. Silverschotz, Esq.
James M. Andriola, Esq.
Han J. Ahn, Esq.
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
Fax: (212) 521-5450

*Attorneys for Appellant, the Official Committee of Equity Security Holders*

Dated: September 4, 2008

## **Table of Contents**

Page

INTRODUCTION ........................................................................................... 1

THE NATURE AND STAGE OF THE PROCEEDINGS.............................. 1

SUMMARY OF ARGUMENT ...................................................................... 2

ARGUMENT................................................................................................... 2

THIS COURT SHOULD ISSUE A STAY PENDING APPEAL...................... 2

## Table of Authorities

Page(s)

### CASES

*Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811 (3d Cir. 1978) ........................................ 2, 5

*Evans v. Buchanan*, 435 F. Supp. 832 (D. Del. 1977) .................................................... 5

*Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, No. 00-02692, 2007 WL 1321730 (Bankr. D. Del. May 4, 2007) ...................................................................... 5

*In re Miraj & Sons, Inc.*, 201 B.R. 23 (Bankr. D. Mass. 1996) ...................................... 5

*In re Netia Holdings, S.A.*, 278 B.R. 344 (Bankr. S.D.N.Y. 2002) ................................ 3

*Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653 (3d Cir. 1991) ..................... 2

*Rubin v. Pringle (In re Focus Media, Inc.)*, 387 F.3d 1077 (9th Cir. 2004) .................................. 3

*Shenango*, 501 F.3d at 338 (3d Cir. 2007) ..................................................................... 5

## INTRODUCTION

The Appellant, the Official Committee of Equity Security Holders (the "Equity Committee"), on behalf of the shareholders (the "Equity Holders") of Finova Group, Inc., the corporate parent of Finova Capital Corporation (collectively, the "Debtors" or "Reorganized Debtors"), by and through its undersigned counsel, submits this motion, pursuant to Bankruptcy Rule 8017, seeking a stay pending further appeal of the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), dated June 26, 2007 (the "Final Clarification Order") (Bankr. D.I. 220).

## THE NATURE AND STAGE OF THE PROCEEDINGS

On August 26, 2008, this Court issued a Final Order (D.I. 32) and Memorandum Opinion (D.I. 31) (the "District Court Clarification Order") (Ex. A) affirming, among other things, the Final Clarification Order.

Previously, on October 31, 2007, this Court, pursuant to Bankruptcy Rule 8005, issued a Memorandum Order "granting a stay pending resolution of the underlying appeal in this action." (the "District Court Stay Order") (D.I. 19) (Ex. B). By the instant motion, the Equity Committee respectfully requests that this Court, pursuant to Bankruptcy Rule 8017, extend the District Court Stay Order until the Final Clarification Order can be further appealed to the Court of Appeals for the Third Circuit.[1]

---

[1]    The standards for granting a stay pursuant to Bankruptcy Rule 8017 are the same as those governing motions filed pursuant to Bankruptcy Rule 8005. *See* 10 *Collier on Bankruptcy*, ch. 8017 (Matthew Bender 15th ed. rev. 2007) (citing *In re Winslow*, 123 B.R. 647 (D. Colo. 1991)).

## SUMMARY OF ARGUMENT

The District Court Stay Order should be extended and/or converted into a stay pending final resolution of the District Court Clarification Order by the Third Circuit because: (i) the Equity Holders will suffer irreparable harm in the absence of a stay; (ii) the issuance of a stay will not substantially injure the Debtors or any note holders with an interest in this proceeding; (iii) given the significant risk of harm to the Equity Holders, the Equity Committee has made a sufficiently strong demonstration as to the merits of its appeal; and (iv) the public interest is not impacted, in any way, by the instant request for a stay pending appeal.

## ARGUMENT

### THIS COURT SHOULD ISSUE A STAY PENDING APPEAL

To demonstrate that a stay pending appeal is justified, the moving party must establish: (1) a strong showing of likelihood of success on the merits, (2) irreparable harm absent a stay, (3) that issuance of the stay will not substantially injure the other parties to the proceeding, and (4) that a stay is in the public interest. *See, e.g.*, *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). Furthermore, where a factor such as irreparable harm strongly favors the moving party, an injunction might be appropriate "even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required." *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978).

As set forth below, the Equity Committee submits that it has made the requisite showing to warrant a stay pending appeal because:

1.    There has already been a determination by this Court that in the absence of a stay pending appeal, the Equity Holders "risk of irreparable harm is real and substantial." (D.I.

19) (Ex. B) (citing *Rubin v. Pringle (In re Focus Media, Inc.)*, 387 F.3d 1077, 1086 (9th Cir. 2004) and *In re Netia Holdings, S.A.*, 278 B.R. 344, 357 (Bankr. S.D.N.Y. 2002)).  The Bankruptcy Court had made a similar determination as well. *See* Transcript of Hearing before the Honorable Peter J. Walsh on July 24, 2007 (the "July 24, 2007 Transcript") (Bankr. D.I. 240) at 47:17-18 ("if I'm wrong and they're right then I think there is a serious risk of irreparable harm…" if a stay pending appeal is not granted.) (Ex. C).  The harm being that without the stay, the Debtors will disperse over $81 million in funds that are the subject of the pending appeal before the Third Circuit can ultimately resolve the merits of the Equity Committee's appeal. Nothing has changed with respect to this factor since the issuance of the District Court Stay Order.

       2.     Both this Court and the Bankruptcy Court before it have recognized that a stay pending appeal will not cause harm to the note holders who will receive the funds at issue if this Court is affirmed on appeal because said funds are held in an interest bearing account, and have been for many years.  ("Moreover, as the Bankruptcy Court recognized, the disputed funds are earning interest, and therefore, the Court concludes that the distributees of the funds will not suffer substantial harm from the extension of the stay.") (Ex. B).  Again, to the best of the Equity Committee's knowledge, nothing relevant to this topic has changed since the issuance of the District Court Stay Order.

       As to the harm alleged by the Debtors - that the requested stay would prevent the Debtors from winding up their affairs and thereby cause the incursion of additional expenses to keep up the Debtors' existence (Bankr. D.I. 228 at ¶ 18) - the Bankruptcy Court observed that so long as there is a possibility of a reversal on appeal, "it may well be that even without a stay, the company will not be able to wind up."  (Ex. B) (quoting July 24, 2007 Transcript at 47:12-48:12)

3

(Ex. C).[2]  In other words, regardless of whether or not a stay is issued, the Debtors cannot wind

up their affairs until the appeal of the Final Clarification Order is concluded.  Based on this

reason alone, the Debtors will not be harmed by the issuance of a stay.

The Bankruptcy Court also observed that the Debtors were not likely to wind up

in the near term because of the "Thaxton Life Partners suit [a lawsuit which was then recently

commenced against the Debtors] which, in my view, would have to be resolved in order for this

company to terminate all employees and turn off the lights and terminate all kinds of D and O

insurance." (July 24, 2007 Transcript (Bankr. D.I. 240) at 47:19–48:6) (Ex. C).  And, in a prior

submission to this Court, the Debtor's Chief Financial Officer admitted that a wind up is not

possible until the resolution of the "Thaxton Life Partners matter – a litigation by noteholders of

Thaxton Life Partners ("TLP") against the Debtors."  ("Ross Decl. (September 20, 2007)") (D.I.

7) at ¶ 4 (Ex. E).  According to an August 13, 2008 filing made by the Debtors with the S.E.C.,

"the Company and FINOVA Capital intend to vigorously defend against the TLP note holders'

claims asserted against the Company and FINOVA Capital in the pending arbitration.  The

arbitration continues to move along as scheduled.  The plaintiffs and FINOVA have both filed

briefs in support of their arbitration cases and a hearing on the merits of the TLP Action is

scheduled for late third quarter of 2008." The Finova Group, Inc., Quarterly Report (Form 10-

Q), at 9 (Aug. 13, 2008) (Ex. F).  There is no indication when the matter with TLP will

ultimately be resolved.  In the same 10Q, the Debtors state that: "[c]ertain legal matters continue

to take longer than anticipated to resolve, while others are not expected to be resolved until late

---

[2]     This finding was actually supported by the submission of the Debtor's Chief Financial Officer
who swore under oath that "I believe that the 2007 wind-up goal is realizable and, in any event, it
is likely that the wind-up can occur early in 2008 *but for any proceedings* on the Clarification
Motion. *See* Ross Decl. (July 11, 2007) at ¶ 6 (Bankr. D.I. 229) (Ex. D) (emphasis added).

third quarter of 2008 *at the earliest*." The Finova Group, Inc., Quarterly Report (Form 10-Q), at 3 (Aug. 13, 2008) (Ex. F) (emphasis added).[3]

        3.     For the reasons set forth at length in the Appellant's Brief (D.I. 4) and Appellant's Reply Brief (D.I. 10), the Equity Committee believes it is likely to prevail on the merits on appeal before the Third Circuit.[4]  Given its affirmance of the Final Clarification Order, this Court obviously does not agree.  But, as per the same Bankruptcy Court that issued the Final Clarification Order, "it does not matter whether this Court believes that [the party seeking stay on appeal] should succeed on appeal" because "[i]t seems illogical…to require that the court in effect conclude that its original decision in the matter was wrong before a stay can be issued." *Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, No. 00-02692, 2007 WL 1321730, at *4 (Bankr. D. Del. May 4, 2007) (quoting *Evans v. Buchanan*, 435 F. Supp. 832, 844 (D. Del. 1977)).  "In fact, a court may grant a motion for a stay pending appeal even when it has 'confidence in the rectitude of its decision.'"  *Haskell*, 2007 WL 1321730, at *4 (quoting *In re Miraj & Sons, Inc.*, 201 B.R. 23, 27 (Bankr. D. Mass. 1996)).  Indeed, in granting the District Court Stay Order, this Court noted that "[g]iven the significant risk of harm to Appellant, the Court is inclined to give less weight to Appellant's likelihood of success on the merits.  (D.I. 19) (citing *Constrs. Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978)).

        Moreover, this Court noted that "[b]oth parties cite to the Third Circuit's decision in *Shenango*, 501 F.3d at 338 (3d Cir. 2007) in support of their contentions."  (D.I. 31) at p. 8.

---

[3]    Based on similar reasoning, this Court previously "declined to condition the stay on the posting of a bond."  (Ex. B).  The Equity Committee submits that, in the event Court grants the instant motion, it should again exercise its discretion to not require the posting of a bond.

[4]    For the sake of brevity, these arguments will not be repeated herein, but are incorporated by reference.

(Ex. A). While this Court agreed with the Debtors' application of *Shenango* to these proceedings, the Equity Committee submits that there are substantial grounds for a difference of opinion, and that upon its review, the Third Circuit may very well find that the Plan at issue was ambiguous and/or that the interpretation offered by the Debtors was unreasonable under the circumstances. The Equity Committee submits that this Court should enter the requested stay and give the Third Circuit an opportunity to apply the principles it only recently articulated in *Shenango* to the case at hand.

4.      As to the public interest prong, this Court has already found that "this prong of the stay inquiry is not at issue in this appeal." (Ex. B).

Finally, the Debtors would not consent to the relief requested in the instant motion.

**WHEREFORE**, for the foregoing reasons, the Equity Committee respectfully requests that this Court enter an order: (i) staying the effect of the Bankruptcy Court's Final Clarification Order pending final resolution of any appeal of same and/or District Court Clarification Order; and (ii) granting such other and further relief as may be just and proper under the circumstances.

Date:  September 4, 2008
       Wilmington, DE            **SULLIVAN · HAZELTINE · ALLINSON LLC**

                                 _____
                                 William D. Sullivan (No. 2820)
                                 4 East 8th Street, Suite 400
                                 Wilmington, DE  19801
                                 Tel: (302) 428-8191
                                 Fax: (302) 428-8195

                                 -- and --

**REED SMITH LLP**
Mark D. Silverschotz, Esq.
James M. Andriola, Esq.
Han J. Ahn, Esq.
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
Fax: (212) 521-5450

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | : |
| | : Chapter 11 |
| THE FINOVA GROUP, INC., and | : Case No. 01-0698-PJW |
| a Delaware corporation, et al., | : Jointly Administered |
| | : |
| Debtors. | : Adv. Pro. No. 07-50004-CSS |
| | : |

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF EQUITY | : |
| SECURITY HOLDERS of FINOVA GROUP, | : |
| INC., | : |
| | : |
| Appellant, | : Civil No. 07-480-JJF and |
| | : Civil No. 07-487-JJF |
| | : |
| v. | : Bankruptcy Case No. 01-698 |
| | : AP 07-70 |
| THE FINOVA GROUP, INC., and | : |
| FINOVA CAPITAL CORPORATION, | : |
| | : |
| Appellants. | : |

**FINAL ORDER**

At Wilmington, this 26th day of August 2008, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1.    The Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, entered by the Bankruptcy Court on June 26, 2007 is **AFFIRMED**.

2.    The Order Regarding Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, entered by the Bankruptcy Court on February 1, 2006 is **AFFIRMED**.

3.    The Order Directing United States Trustee to Appoint an Official Committee of Equity Security Holders for a Limited Purpose and Granting Related Relief, entered by the Bankruptcy

Court on June 17, 2005 is **AFFIRMED**.

    4.   The Order Increasing the Cap Previously Imposed on Fees and Expenses Which Can be Incurred on Behalf of the Equity Committee, entered by the Bankruptcy Court on January 3, 2006 is **AFFIRMED**.

    5.   The Order Regarding Application for an Order, Pursuant to Section 327(e) of the Bankruptcy Code and Fed. R. Bankr. P. 2017, Increasing the Cap on Fees and Expenses Which Can be Incurred on Behalf of the Equity Committee and the Final Order Request, entered by the Bankruptcy Court on February 6, 2007 is **AFFIRMED**.

    6.   The Order Increasing the Cap Previously Imposed on Fees and Expenses Which Can be Incurred on Behalf of the Equity Committee, entered by the Bankruptcy Court on July 26, 2007 is **AFFIRMED**.

    7.   The Official Committee of Equity Security Holders's Motion to Strike (D.I. 27) is **DENIED**.

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | : |
| | : Chapter 11 |
| THE FINOVA GROUP, INC., and | : Case No. 01-0698-PJW |
| a Delaware corporation, et al., | : Jointly Administered |
| | : |
| Debtors. | : Adv. Pro. No. 07-50004-CSS |
| | : |

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF EQUITY | : |
| SECURITY HOLDERS of FINOVA GROUP, | : |
| INC., | : |
| | : |
| Appellant, | : Civil No. 07-480-JJF and |
| | : Civil No. 07-487-JJF |
| | : |
| v. | : Bankruptcy Case No. 01-698 |
| | : AP 07-70 |
| THE FINOVA GROUP, INC., and | : |
| FINOVA CAPITAL CORPORATION, | : |
| | : |
| Appellants. | : |

Mark D. Silverschotz, Esquire; James Andriola, Esquire and Han J. Ahn, Esquire of ANDERSON KILL & OLICK, P.C., New York, New York. William D. Sullivan, Esquire of WILLIAM D. SULLIVAN, LLC, Wilmington, Delaware.

Attorneys for Appellant.

Jonathan M. Landers, Esquire and Robert K. Dakis, Esquire of GIBSON, DUNN & CRUTCHER LLP, New York, New York. Mark D. Collins, Esquire and Jason M. Madron, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware.

Attorneys for Appellees.

### MEMORANDUM OPINION

August 26, 2008
Wilmington, Delaware

*Joseph J. Farnan Jr.*

Farnan, District Judge.

Pending before the Court in these actions are two appeals
involving six orders entered by the United States Bankruptcy
Court for the District of Delaware ("Bankruptcy Court").  The
Official Committee of Equity Security Holders (the "Equity
Committee") on behalf of the shareholders (the "Equity Holders")
of Finova Group, Inc., the corporate parent of Finova Capital
Corporation (collectively, the "Debtors"), appeals from two
orders of the Bankruptcy Court: (i) the Order Granting Debtors'
Motion Requesting Clarification of Confirmed Chapter 11 Plan,
entered on June 26, 2007 ("the Final Clarification Order"), and
(ii) the Order Regarding Debtors' Motion Requesting Clarification
of Confirmed Chapter 11 Plan entered on February 1, 2006 (the
"First Clarification Order") (D.I. 1).[1]  In addition, the Debtors
cross-appeal from (i) the Order Directing United States Trustee
to Appoint an Official Committee of Equity Security Holders for a
Limited Purpose and Granting Related Relief, entered on June 17,
2005 ("the Equity Committee Order"); (ii) the Order Increasing
the Cap Previously Imposed on Fees and Expenses Which Can be
Incurred on Behalf of the Equity Committee, entered on January 3,
2006 (the "First Fee Cap Order"); (iii) the Order Regarding
Application for an Order, Pursuant to Section 327(e) of the

---

[1]    All Docket Item ("D.I.") numbers are from Civil Action
No. 07-480, unless otherwise noted.

1

Bankruptcy Code and Fed. R. Bankr. P. 2017, Increasing the Cap on Fees and Expenses Which Can be Incurred on Behalf of the Equity Committee and the Final Order Request, entered on February 6, 2007 (the "Second Fee Cap Order"); and (iv) the Order Increasing the Cap Previously Imposed on Fees and Expenses Which Can be Incurred on Behalf of the Equity Committee, entered on July 26, 2007 (the "Third Fee Cap Order", and together with the First Fee Cap Order and the Second Fee Cap Order, the "Fee Cap Orders") (D.I. 23; D.I. 1 in C.A. 07-487). The Equity Committee has also filed a Motion to Strike those portions of the Debtors' Response to Appellant's Opening Brief and Opening Brief on Cross-Appeal which address the Debtors' Cross-Appeal (D.I. 27). For the reasons discussed, the Court will (1) deny the Equity Committee's Motion to Strike; (2) affirm the Bankruptcy Court's Final and First Clarification Orders; and (3) affirm the Bankruptcy Court's Equity Committee Order and Fee Cap Orders.

## I.    The Equity Committee's Motion to Strike

By its Motion, the Equity Committee moves to strike those portions of Appellee-Debtor's Response to Appellant's Opening Brief and Opening Brief on Cross-Appeal ("Response Brief") (D.I. 23) which address Debtor's Cross-Appeal. The Equity Committee contends that the Cross-Appeal should not have been labeled as such, as it is an entirely separate appeal and assigned its own case number in this Court, Civil Action No. 07-487 ("the Cross-

2

Appeal Docket"). The Equity Committee contends that the 10-day appeal period with respect to the Equity Committee Order, the December 2005 Fee Cap Order and the February 6, 2007 Fee Cap Order has long since expired, and the Equity Committee filed a motion to dismiss the Debtor's appeal of these orders in the Cross-Appeal Docket. The Equity Committee also contends that briefing on the Debtors' cross-appeal is premature because the Debtors' cross-appeal was never referred to mediation and a separate briefing schedule for the cross-appeal was never set on the Cross-Appeal Docket.

In response, the Debtors contend that the Equity Committee's Motion to Strike should be denied because the orders involved in the cross-appeal were rendered during the proceedings on the Clarification Motion, and related to the Clarification Motion. The Debtors further argue that the Motion to Strike should be dismissed to the extent it seeks to introduce the Equity Committee's substantive response to the Debtor's cross-appeal, because the Equity Committee failed to brief the cross-appeal issues in its responsive brief and, as a result, exceeded page limitations by filing a separate brief addressing the cross-appeal.

The Court has previously addressed the timeliness of the Debtors' cross-appeal in the context of adjudicating the Equity Committee's Motion to Dismiss filed in Civil Action No. 07-487.

3

In re Finova Group, Inc., 2008 WL 522965 (D. Del. Feb. 26, 2008). In that decision, the Court concluded that the cross-appeal was not untimely because the Orders being appealed were related to the Debtors' Clarification Motion, and therefore, were timely appealed once the Bankruptcy Court resolved the Debtors' Clarification Motion. In light of this conclusion, the Court likewise concludes that the Debtors' appeal is properly considered a cross-appeal. Fed. R. Bankr. P. 8002(a) & related Advisory Committee notes. While the Court acknowledges that briefing in this case did not proceed consistently with the Bankruptcy Rules or the Local Rules, the Court, in its discretion, finds this discrepancy to be insufficient to strike the Equity Committee's substantive response at this time. The Debtors have filed a Reply (D.I. 29) to the Equity Committee's substantive response to their cross-appeal, and the parties have fully briefed all the issues related to both the appeal and cross-appeal. Because the parties have had sufficient opportunity to present their substantive arguments to the Court, the Court will treat both the appeal and cross-appeal as fully and completely briefed, and therefore, the Court will deny the Equity Committee's Motion To Strike and proceed to resolve on the merits the issues presented in both the appeal and cross-appeal.

## II.   The Equity Committee's Appeal from the Bankruptcy Court's First and Final Clarification Orders

By their Clarification Motion filed April 1, 2005, the Debtors sought an order from the Bankruptcy Court clarifying the Plan with respect to the 5% distribution on account of Equity Holders.  According to the Debtors, this distribution could not be made in light of the provisions in the Plan preventing such distributions to Equity Holders under conditions of financial impairment.  At a hearing on November 29, 2005, the Bankruptcy Court granted the Debtor's Clarification Motion to the extent that the Debtor is presently and will be forever insolvent and concluded that the Plan and Indenture were not ambiguous and that the Equity Committee's arguments were "either irrelevant or off-the-wall." (D.I. 18, Exh. L at 52-57.)  On February 1, 2006, the Bankruptcy Court entered an order memorializing its opinion (the "First Clarification Order,"), which left open questions regarding the Debtor's financial condition.  (D.I. 18 at Exh. N.)  On June 26, 2007, the Bankruptcy Court entered the Final Clarification Order, which found that the Debtors "presently are and will be forever insolvent," and that:

> ...under the Indenture dated as of August 22, 2001 governing the issuance of the 7.5% Senior Secured Notes Maturing 2009 of The FINOVA Group Inc. (the "New Senior Notes"), the payment of any amount to or on account of the Equity Interests of The FINOVA Group Inc. ("FNV Group") would be an Impermissible Restricted Payment and cannot be made pursuant to section 4.06(a)(v), FIFTH, clause (x) of the Indenture, (3) there is no reasonable probability that, under the terms of the

Indenture, any such payment on account of the Equity
Interests of FNV will be permitted in the future...

(Id. at Exh. O.)

### A.    Parties' Contentions

The Equity Committee contends that the Bankruptcy Court
erred when it determined that the Disclosure Statement, Plan and
Indenture are not ambiguous.  The Equity Committee contends that
the Debtors' filing of a motion to "clarify" constitutes a tacit
admission by the Debtors that the Plan and Indenture at issue are
ambiguous.  The Equity Committee further contends that, "when
read properly," the Disclosure Provisions indicate that, under
the Plan, even if the Debtors cannot pay the New Senior Notes in
full, the Equity Holders will still receive some level of
distribution.  The Equity Committee contends that the Bankruptcy
Court ignored or misapprehended well-established contract
principles, as the Bankruptcy Court: (1) should have construed
all ambiguities in the Plan and Indenture against the Debtors;
(2) erred when it interpreted the provisions of the Plan and
Indenture to effect the forfeiture of the Equity Holders' right
to payment; (3) erred in its interpretation of the controlling
documents; and (4) erred when it interpreted the Plan and
Indenture in a way that created a condition precedent to the
Equity Holders' right to payment.  The Equity Committee contends
that the Bankruptcy Court should have recognized that the Plan
constituted a new contract between the Debtors and the Equity

6

Holders, and pursuant to this contract, the Debtors were obligated to make payments to the Equity Holders, which payments should be considered "Plan-created debt." (D.I. 17 at 6.) Finally, the Equity Committee contends that Debtor's argument that payment of funds to the Equity Holders would be an "impermissible restricted payment" is not supported by the applicable law.

In response to the Equity Committee's arguments, the Debtors point out that this appeal "concerns the Bankruptcy Court's interpreting the Plan, Disclosure Statement and Indenture as unambiguous and providing that the Debtor could cease setting retaining payments on account of equity and could use funds previously retained for general corporate purposes because the Debtors were 'forever insolvent.'" (D.I. 23 at 2.)  Accordingly, the Debtors contend, that the Third Circuit's recent holding in In re Shenango Group Inc., 501 F.3d 338, 346 (3d Cir. 2007), applies, under which a bankruptcy court's interpretation of its own order is subject to review for an abuse of discretion.  The Debtors contend that, under Shenango, the Court should defer to the Bankruptcy Court's interpretation unless it is unreasonable under the circumstances, a standard which the Debtors contend, the Equity Committee has not come close to meeting.  The Debtors further contend that the Equity Committee's appeal is a reiteration of those arguments that were already rejected in

7

their entirety by the Bankruptcy Court.

    B.   Standard of Review

    The Court has jurisdiction to hear an appeal from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a).  In undertaking a review of the issues on appeal, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions.  See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999).  With mixed questions of law and fact, the Court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991) (citations omitted).  The appellate responsibilities of the Court are further understood by the jurisdiction exercised by the Third Circuit, which focuses and reviews the Bankruptcy Court decision on a de novo basis in the first instance.  In re Telegroup, 281 F.3d 133, 136 (3d Cir. 2002).

    C.   Discussion

    Both parties cite to the Third Circuit's decision in Shenango, 501 F.3d at 338 (3d Cir. 2007) in support of their contentions.  The Court's reading of Shenango supports the

Debtors' arguments.  In <u>Shenango</u>, the Third Circuit held that a Bankruptcy Court's interpretation of its own order is subject to review for an abuse of discretion, unless the issue being reviewed presents only a question of law, in which case it is subject to *de novo* review.  <u>Id.</u> at 346.  The Third Circuit then concluded that the determination of whether relevant documents are ambiguous in the first instance is subject to *de novo* review. The Third Circuit went on to state that if "the Plan is ambiguous, we will defer to the Bankruptcy Court's interpretation unless it is unreasonable under the circumstances."  <u>Id</u>.

Reviewing the decision of the Bankruptcy Court in light of the applicable standard of review and governing legal principles, the Court concludes that the Bankruptcy Court correctly determined that the provisions of the Plan and Indenture are unambiguous, and that together, they provide that Equity Holders may receive a distribution if the distribution is permissible under applicable law, the Debtors would not be insolvent as a result of the distribution, and the distribution would not be a fraudulent conveyance.  In reaching this conclusion, the Court agrees with and adopts the Bankruptcy Court's analysis and interpretation of the Plan and Indenture.[2]  (D.I. 18, Exh. L at

---

[2]     While the Court agrees with the Bankruptcy Court that the documents at issue are unambiguous, the Court reaches the same result even if it concludes that the documents present an ambiguity, because the Court cannot conclude that the Bankruptcy Court's interpretation of the documents was unreasonable.

52-57.)   The Court further finds that the Bankruptcy Court

properly determined whether the relevant documents were ambiguous

by hearing the proffer of the Equity Committee first (D.I. 18 at

26-27, 38, 41-42) and then determining that the relevant

documents were not susceptible of different meanings, and

therefore not ambiguous.   See In re New Valley Corp., 89 F.3d

143, 150 (3d Cir. 1996) ("To decide whether a contract is

ambiguous, we do not simply determine whether, from our point of

view, the language is clear. Rather, we hear the proffer of the

parties and determine if there [are] objective indicia that, from

the linguistic reference point of the parties, the terms of the

contract are susceptible of different meanings.") (internal

citations omitted).   Accordingly, the Court will affirm the

Bankruptcy Court's First and Final Clarification Orders.

## III. The Debtor's Appeal from the Bankruptcy Court's Reconstitution of the Equity Committee and Fee Cap Orders

### A.   Parties' Contentions

The Debtor contends that, despite the obvious evidence that

the Equity Holders were not entitled to receive any distributions

pursuant to the Plan and Indenture and, as a result of the

Debtor's condition, would never be entitled to receive

distributions, the Bankruptcy Court erroneously ordered the

reconstitution of the Equity Committee, and increased the amounts

---

Shenango, 501 F.3d at 346.

the Debtors were required to pay the Equity Committee three times.  The Debtors contend that the Bankruptcy Court should not have appointed the Equity Committee because there was little chance there would ever be a distribution to shareholders, and certain shareholders, like First Carolina Corp., had shown their willingness and ability to bear the expense of litigating the Clarification Motion.  The Debtors further contend that the Bankruptcy Court should not have granted the Fee Cap Orders since the Equity Committee and its counsel had a very limited task, and accordingly, the Fee Cap Orders do not reflect "reasonable or justified" expenses.  (D.I. 23 at 38.)

In response, the Equity Committee first contends that the Equity Holders were entitled to receive distributions pursuant to the Plan and Indenture, and Debtor's status as insolvent is not a dispositive barrier to the appointment of an equity committee. The Equity Committee further argues that the relevant authority does not support the Debtors' contention that the willingness and ability of certain shareholders to bear the expense of litigating is a basis upon which to find that the Bankruptcy Court abused its discretion.  The Equity Committee also contends that the Bankruptcy Court's Fee Cap Orders should be affirmed because the Debtors have not established that the Bankruptcy Court abused its discretion.

11

B.   Discussion

The decision to appoint an equity committee rests within the sound discretion of the bankruptcy court.   Exide Technologies v. State of Wisconsin Invest. Bd., No. 02-1572-SLR, 2002 WL 32332000, at *2 (D. Del. Dec. 23, 2002).   The Court finds that Bankruptcy Court heard and fully considered the Debtor's arguments regarding the reconstitution of the Equity Committee (see, e.g., D.I. 18, Exh. I at 15-45) and, after reviewing the parties' contentions in light of the applicable legal standard, the Court concludes that the Debtors have not established that the Bankruptcy Court's decision to reconstitute the Equity Committee was an abuse of discretion.   Accordingly, the Court will affirm the Bankruptcy Court's Equity Committee Order.

Like the decision to appoint an equity committee, the Bankruptcy Court's decision to award fees is reviewed for an abuse of discretion.   Although the Bankruptcy Court initially estimated that little work would need to be performed by counsel retained by the Equity Committee, it later considered the briefing before it, including the written applications by counsel for fee increases, and the representations made by counsel at the hearings and concluded that the increases were warranted.   The Bankruptcy Court did not make a blanket authorization for increases without due consideration, but instead carefully considered the parties' positions apportioning certain fees for

certain experts and disallowing other fees for work which the
Bankruptcy Court found was "ill-advised." See Transcript of
Hearing before the Honorable Peter J. Walsh on June 26, 2007
(Bankr. D.I. 223). All totaled, a fee of $388,813 was awarded to
the Equity Committee for services rendered from June 2005 through
March 2007, including the work of two law firms and two financial
consultants. In these circumstances, the Court cannot conclude
that the Bankruptcy Court's Fee Cap Orders were an abuse of
discretion. Accordingly, the Court will also affirm the Fee Cap
Orders.

**IV.    CONCLUSION**

For the reasons discussed, the Court will deny the Equity
Committee's Motion To Strike and affirm the Bankruptcy Court's
Final and First Clarification Orders, the Equity Committee Order
and the Fee Cap Orders.

An appropriate Order will be entered.

13

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | Chapter 11 |
| THE FINOVA GROUP INC., | : | |
| | : | Bankr. Case No. 01-698-PJW |
| Debtor. | : | |

OFFICIAL COMMITTEE OF EQUITY   :
SECURITY HOLDERS,              :
                              :
            Appellant,         :
                              :
        v.                     :   Civil Action No. 07-480-JJF
                              :
FINOVA GROUP INC. and FINOVA  :
CAPITAL CORPORATION,           :
                              :
            Appellees.         :

### MEMORANDUM ORDER

Pending before the Court is Appellant's Motion And Opening Brief In Support Of Stay Pending Appeal Of The Bankruptcy Court's Final Clarification Order (D.I. 4).[1]  The Bankruptcy Court granted Appellant a 90-day stay through and including October 22, 2007.  For the reasons discussed, the Court will grant Appellant's Motion.

To demonstrate that a stay pending appeal is justified, the moving party must establish: (1) a strong showing of likelihood

---

[1]    The Debtors have also filed a Motion For Leave To File A Sur Reply (D.I. 13) to correct the record and add new information not previously available to the Debtors.  Appellant opposes the Motion.  The Court will deny the Debtors' Motion on the grounds that the Sur Reply fails to comport with the purposes for which it was offered and fails to respond to new issues raised in the Reply Brief.

of success on the merits, (2) irreparable harm absent a stay, (3)
that issuance of the stay will not substantially injure the other
parties to the proceeding, and (4) that a stay is in the public
interest.  See e.g., Republic of Phillippines v. Westinghouse
Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991).  These factors are
the same as those required for the issuance of a preliminary
injunction.  In re Delaware & Hudson Railway Co., 90 B.R. 90, 91
(Bankr. D. Del. 1988).

In evaluating these factors in the context of this case, the
Bankruptcy Court recognized a strong tension between the first
and second factors.  Specifically, the Bankruptcy Court
emphasized its view that Appellant's argument had no merit, but
acknowledged that if its view was erroneous and its decision was
overturned, Appellant would suffer a serious risk of irreparable
harm.  In determining that a 90 day stay was appropriate, the
Bankruptcy Court envisioned that briefing would be complete on
the underlying appeal so that this Court could review the merits
of the appeal.

Independently evaluating the factors required for a stay,
the Court concludes that an extension of the Bankruptcy Court's
stay is warranted.  The Debtors argue that they will suffer
substantial injury if a stay is granted, because they will be
precluded from winding-up their affairs.  While the Debtors have
expressed the hope that they might be able to wind-up their

affairs by the end of 2007, the have acknowledged that "the
liquidation period may extend beyond 2007 and conservative
estimates are up to the end of 2008." (D.I. 5 at Ex. J.)
Indeed, the Bankruptcy Court recognized that the Debtors wind-up
period may be longer than expected:

> If there is a possibility that this ruling could be
> reversed on appeal, and I don't claim to have any
> expertise in this area, I strongly suspect that the
> company would have to continue SEC compliance because
> there's a potential for equity interest involved, and I
> assume the equity interest is what requires the filing
> of the   - of the periodic reports.
>
> So, it may well be that even without a stay, this
> company will not be able to wind up.
>
> Secondly, we have the Thaxton Life Partners suit
> [a lawsuit recently commenced against the Debtors]
> which, in my view, would have to be resolved in order
> for this company to terminate all employees and turn
> off the lights and terminate all kinds of D and O
> insurance.

(Id. at Ex. K at 387.)

Further, it appears that the Debtors have now planned for
the liquidation to take at least until the first quarter of 2008.
Briefing on the underlying appeal in this case is due to be
completed in early December, and therefore, the Court will be
able to resolve this matter within the time frame currently
contemplated by the Debtors for their liquidation.  Thus, the
Court does not find that an extension of the stay will cause the
Debtors substantial injury.  Moreover, as the Bankruptcy Court
recognized, the disputed funds are earning interest, and

therefore, the Court concludes that the distributees of the funds will not suffer substantial harm from an extension of the stay.

In contrast, Appellant's risk of irreparable harm is real and substantial.  The Debtors have advised the Bankruptcy Court that absent a stay, they intend to distribute the Segregated Funds to holders of New Senior Notes.  Once this distribution is made, Appellant will have little or no recourse available to reclaim the funds.  See e.g., Rubin v. Pringle (In re Focus Media Inc.), 387 F.3d 1077, 1086 (9th Cir. 2004) (holding that bankruptcy court did not abuse its discretion by granting preliminary injunction where "specter" of irreparable harm existed if funds were dissipated); In re Netia Holdings, S.A., 278 B.R. 344, 357 (Bankr. S.D.N.Y. 2002) (finding balance of hardships weighed in favor of granting preliminary injunction and stating that "[i]f the funds leave State Street, they will be distributed to diverse parties, and be difficult or impossible to recover.  This is of course a concrete example exemplifying the well-established principle that piecemeal distribution of a debtor's estate constitutes irreparable harm.").  Given the significant risk of harm to Appellant, the Court is inclined to give less weight to Appellant's likelihood of success on the merits.  See e.g., Constrs. Ass'n of W. Pa. v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978).  As for the public interest, the Court

finds that this prong of the stay inquiry is not at issue in this appeal.

Accordingly, the Court finds that on balance, the factors weigh in favor of granting a stay pending resolution of the underlying appeal in this action. Because the Court envisions the stay lasting no more than another 90 days and the Court finds no substantial harm will come to the Debtors as a result of this stay, the Court will, at this juncture, decline to condition the stay on the posting of a bond.NOW THEREFORE, IT IS HEREBY ORDERED that:

1.    Appellant's Motion And Opening Brief In Support Of Stay Pending Appeal Of The Bankruptcy Court's Final Clarification Order (D.I. 4) is **GRANTED**.

2.    The Debtors' Motion For Leave To File A Sur Reply (D.I. 13) is **DENIED**.

October 3|, 2007
　　　DATE

UNITED STATES DISTRICT JUDGE

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              )   Case No. 01-000698(PJW)
                                    )   Chapter 11
FINOVA CAPITAL CORPORATION          )
and THE FINOVA GROUP, INC.,         )
                                    )   Courtroom No. 2
        Reorganized Debtors.        )   824 Market Street
                                    )   Wilmington, Delaware 19801
                                    )
                                    )   July 24, 2007
                                    )   1:27 P.M.


TRANSCRIPT OF MOTION FOR STAY PENDING APPEAL
BEFORE HONORABLE PETER J. WALSH
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:        Richards Layton & Finger, PA
                        By:  MARK COLLINS, ESQ.
                        One Rodney Square, P.O. Box 551
                        Wilmington, Delaware 19899

                        Gibson Dunn & Crutcher
                        By:  ROBERT DAKIS, ESQ.
                             JONATHAN LANDERS, ESQ.
                        200 Park Avenue
                        New York, New York 10166-0193


ECR Operator:           Anissa Cothran


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

---

# TRANSCRIPTS PLUS
### 435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail CourtTranscripts@aol.com

### 215-862-1115    (FAX) 215-862-6639


Docket No. 240
Date 7/31/2007

2

**Appearances:**
**(Continued)**

| | |
|---|---|
| **For the Equity**<br>**Committee:** | **William D. Sullivan LLC**<br>**By:  ELIHU ALLINSON, ESQ.**<br>**4 East 8th Street, Suite 400**<br>**Wilmington, Delaware 19801** |
| | **Anderson Kill and Olick, P.C.**<br>**By:  JAMES ANDRIOLA, ESQ**<br>**1251 Avenue of the Americas**<br>**New York, NY 10020** |

3

<u>INDEX</u>

| <u>WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|

RICHARD A. ROSS
  By Mr. Andriola        5
  By Mr. Landers                  31

| <u>EVIDENCE</u> | | <u>ID</u> | <u>EVID</u> |
|---|---|---|---|
| Exhibit 1 | Declaration | 5 | 35 |
| Exhibit 4 | Notice of cross appeal | 19 | 35 |
| Exhibit 3 | Agreement with Leucadia | 27 | 35 |

4

1           THE COURT:  Please be seated.  Ready to proceed?

2           MR. ANDRIOLA:  Good afternoon, Your Honor.  James

3  Andriola of Anderson Kill and Olick on behalf of the Equity

4  Committee.

5           Your Honor, in opposing our motion for a stay, the

6  debtor submitted a declaration from Richard Ross, the CFO and

7  Treasurer of Finova Group, Inc.

8           In his declaration, Mr. Ross states that he will be

9  present in court at the hearing.  And I actually recognize him

10  from prior hearings.

11          He also says he'll be prepared to testify about his

12  declaration.

13          So, what I would like to do at this time is go ahead

14  and call Mr. Ross to the stand for a brief cross examination

15  about his declaration.  After my examination, my follow-up by

16  Mr. Landers, I'd like to then just come back and briefly go

17  over the factual and legal basis upon which the Equity

18  Committee believes the stay should be granted.

19          THE COURT:  Any objection?

20          UNIDENTIFIED ATTORNEY:  No, Your Honor.

21          THE COURT:  Okay.  Proceed.

22          MR. ANDRIOLA:  Your Honor, I have a bound copy of the

23  few exhibits I have for this witness for Your Honor.

24          THE COURT:  Okay.

25          MR. ANDRIOLA:  May I approach?

Ross – Direct                                         5

1                      **(Pause)**

2              **CLERK:  Please state and spell your full name for the**

3  **record.**

4              **MR. ROSS:  Richard A. Ross, R-O-S-S.**

5        **RICHARD A. ROSS, EQUITY COMMITTEE'S WITNESS, SWORN**

6                      **DIRECT EXAMINATION**

7  **BY MR. ANDRIOLA:**

8  Q    Good afternoon, Mr. Ross.

9  A    Good afternoon.

10 Q    I'd like to -- in front of you I've placed a small stack

11 of exhibits.  If I could ask you to look at Exhibit Number 1.

12 A    Okay.

13 Q    Is that -- do you recognize this document?

14 A    Yes, it's the declaration that I prepared with, uh -- with

15 assistance of an attorney.

16 Q    Okay.  And that's your signature that appears on Page 4 of

17 this document, correct?

18 A    It is.

19 Q    And is there an exhibit that was attached to your

20 declaration?

21 A    Uh, probably the 10Q, first quarter 10Q filing is

22 attached.

23 Q    And that's a Form 10Q that was filed by, uh, Finova on May

24 9th, 2007?

25 A    Filed with the SEC, yes.

1 Q    Okay.  Did you personally have any role in preparing the

2 Form 10Q?

3 A    I did.

4 Q    Could you describe your role?

5 A    Uh, you know, I participated in a lot of the drafting of

6 the 10Q, and I provided my certification in conjunction with

7 that, as well.

8 Q    Okay.  Now, is it your testimony, Mr. Ross, that without

9 the stay sought by the Equity Committee here today Finova will

10 definitely wind up its affairs during 2007?

11 A    I would not say definitely.  That is our goal, that's what

12 we're working towards.  There's a number of factors that could

13 come up that could delay that that are beyond our control.  But

14 as of this point, nothing has -- other than the motions by the

15 Equity Committee, nothing has come up that would -- that would

16 cause us at this point to think that we won't get done by year

17 end.

18 Q    Okay.  Now, I want to draw your attention to Paragraph 6

19 of your declaration.

20 A    6, okay.  Yes.

21 Q    And the -- I'm going to read into the record the sentence

22 that begins, "Nevertheless."  That's the third sentence into

23 the paragraph.

24 A    Okay.

25 Q    Quote, "Nevertheless, I believe that the 2007 wind up goal

Ross - Direct                                    7

1   is realizable.  And, in any event, it is likely the wind up can

2   occur early in 2008 but for any proceedings on the

3   clarification motion."

4            Did I read that correctly?

5   A    Yes.

6   Q    Okay.

7   A    Yeah.

8   Q    Now, what did you mean by early in 2008?

9   A    My thought would be that the latest by the first quarter

10  of 2008.  But as stated, our goal is still to wind up in '07.

11  Q    But based on what -- what you drafted here and prepared in

12  Paragraph 6, isn't what you're saying here is that even if the

13  Equity Committee were to dissolve tomorrow, and the appeal goes

14  away, Finova's wind up is likely to occur in early 2000 --

15  early in 2008 as opposed to during 2007?

16  A    No.  I think it's most likely to occur in '07.  And if you

17  look at our -- our public filing, we -- we clearly state in

18  there that our goal is to wind up in '07, and then we set up a

19  liability that estimated a taking through the end of '07.

20           We were merely saying that there are things beyond

21  our control that could cause delays, none of those have arisen

22  yet.  So, our goal and our best intentions at this point is to

23  wrap up by the end of '07, barring items that can delay it.

24  And we think those things that can delay it more likely would

25  just slide it to early '08.

Ross - Direct                                    8

1  Q     Okay.  You agree with me that in Paragraph 6, you say that

2  it's likely that the wind up can occur in early 2008, correct?

3  A     Correct.

4  Q     Okay.

5  A     Despite that.

6  Q     And also prior to -- that's the nevertheless sentence in

7  Paragraph 6, you list a number of factors other than the

8  clarification motion and any appeal of the clarification motion

9  which could delay the debtors' wind up, correct?

10 A     Correct.

11 Q     Now I want to draw your attention to Page 5 of the 10Q,

12 it's attached to your declaration.

13 A     All right.

14 Q     It's the -- the paragraph I'm going to be asking you

15 about is the second paragraph under the heading Plan of

16 Liquidation.

17         THE COURT:  I'm sorry.  Where do I find the

18 pagination?

19         MR. ANDRIOLA:  Uh, it should be --

20         THE COURT:  Okay.  I think I found it.

21         MR. ANDRIOLA:  -- in the middle.  Small number in the

22 middle of --

23         THE COURT:  I see it.

24         MR. ANDRIOLA:  And, again, for the sake of the

25 record, I'll go ahead and read in that very small paragraph or

348

Ross - Direct                                               9

1  two-sentence that's there.  Quote, "Our goal is to wind up the

2  affairs of the company during 2007.  However, we cannot control

3  the exact time of resolving legal matters and claims.

4  Accordingly, the liquidation period may extend beyond 2007 and

5  conservative estimates are up to the end of 2008."

6  BY MR. ANDRIOLA:

7  Q    And did I read that accurately into the record?

8  A    Yes, you did.

9  Q    Okay.  Did you draft this specific language?

10 A    I did.

11 Q    What did you mean by conservative estimates?

12 A    Well, what I'm meaning with that -- that sentence is our

13 goal and what we're shooting for is to wind up by the end of

14 '07.  But in SEC filings, anything that's an estimate, you're

15 supposed to put sensitivities and let the reader understand

16 where it could take longer.

17      And so we feel that it could -- if everything kind of

18 went against us and contemplating taking in consideration the

19 Equity Committee appeal, so that conservative estimates was

20 assuming that the Equity Committee would have an appeal and

21 would lose the first appeal, and even go on to a second appeal.

22 And that's where we get to the estimates that the most

23 conservative being that it could be at the end of '08.

24      Do we believe that's going to happen?  No, and that's

25 why further in that sentence it says, we assumed a liquidation

Ross - Direct                                      10

1  period through the end of '07, which the accounting rules say

2  that you have to put your best estimate of what you think the

3  costs are going to be.

4         So, at this point, we think the costs are going to

5  run through the end of '07.  Now with this matter before the

6  Court, and depending how this turns out, we may have to change

7  our estimates and expand those out further.

8  Q    Okay.

9  A    This -- so, this is just forewarning that our goal is '07,

10 but things could -- that are beyond our control could arise

11 that could cause it to be later.

12 Q    And this was a -- you use -- actually it says conservative

13 estimates, plural.  Who -- who made these estimates?

14 A    Oh, well, it's based off discussions with myself, with

15 management.  And a lot of it came from talking also with our --

16 our counsel who had told me that if the appeal process went on

17 and went through multiple layers of appeal, it could take up to

18 a year to get through that process.

19         So, that is most specifically tied to the appeal of

20 the Equity Committee in the matters before the Court.

21 Q    Okay.  And this estimate -- this 10Q was prepared before

22 the current motion for a stay was filed, correct?

23 A    That's correct.

24 Q    Okay.  In making your estimate, did you anticipate a stay

25 being requested and actually granted?

Ross - Direct                                11

1  A    I did not -- I did not think of the stay, but I did assume

2  an appeal.

3  Q    Okay.

4  A    And from my, you know, lay terms, an appeal would mean

5  that we were barred from paying out the money and that we would

6  have to wait to hear us through the appeal before the funds

7  could be disbursed.

8  Q    When is it that you gained that lay understanding of --

9  A    Uh, probably in -- probably third quarter of '06 through

10  discussions with counsel and as the matters were proceeding

11  and, you know, constantly we -- we talk about the next steps

12  that we have, and which are the obstacles that can delay

13  things.  And so there was talk for some time that we felt we

14  would prevail in the matters, but that there could have to be

15  more legal hurdles that we would have to go through before we

16  can get resolutions.

17  Q    But it was your understanding an appeal itself would

18  prevent Finova from disbursing the segregated funds, is that

19  your testimony?

20  A    That was -- you know, that was never told to me.  But that

21  was just my understanding that I just assumed that if an appeal

22  was -- was filed, that we would be restricted at that point in

23  time.  I'm not as familiar with the stays and appeals, what's

24  all encompassed with each -- each one of those items.

25  Q    And is that still your understanding of what would happen

Ross - Direct                                     12

1  under -- when an appeal is filed?

2  A    No.  I mean through this, I -- I've got clarification that

3  the stay would be the thing that would stop us from being able

4  to disburse the funds.  And the appeal is just appealing the

5  actual ruling that happened.

6          So, I understand that if a stay is not granted today,

7  we would be allowed to disburse the funds.

8  Q    In the event the Court were to issue a six-month stay

9  today, I'm not saying it will, but just in -- in that event,

10  would such a six-month period fit within the conservative

11  estimate you give for winding up the affairs of the company?

12  A    Well, I don't know that it's the stay itself.  It's going

13  through the whole appeal process.  So, it was my understanding

14  that you have also filed an appeal.  So, however long it takes

15  for the appeal to potentially also be heard, and if we have to

16  still come before the Court and deal with things.

17          But, you know, our goal would be to -- once that stay

18  would be lifted, would be to disburse the funds.

19  Q    Okay.  And going back to my question, I'm sorry, I don't

20  think I got an answer there.

21  A    All right.

22  Q    If -- if the Court told you you can't disburse the funds

23  for six months from today --

24  A    Right.

25  Q    -- would that impact on your conservative estimate?  Or

Ross - Direct                                    13

1  would that time frame actually fit within your conservative

2  estimate --

3  A    I --

4  Q    -- in the 10Q?

5  A    I think there's a chance that it would cause our estimate

6  to slide into that early part of '08.  I -- I wouldn't think

7  that it would cause it to go beyond the early '08.  But it

8  could take it beyond the end of '07.

9  Q    Okay.  And I was referring to your conservative estimate

10 of up to the end of 2008.

11 A    Oh, no.  I think it would stay within that -- that '08.

12 Because that '08 assumed not only a first level appeal, but

13 going through a second layer of appeals.

14 Q    Okay.  Is Finova -- is it Finova's intention that -- or

15 understanding of how this process works that the company can't

16 wind up its affairs until the appeal is concluded?  Regardless

17 of whether a stay is issued?

18 A    No, but it -- it causes delays with just everything else

19 from dissolving the entities -- because it's my understanding

20 that we need to keep the legal entities still in place.  And we

21 wouldn't dissolve until after all the matters before the Court

22 were resolved and the funds were disbursed.

23 Q    Okay.  Going back to your language from 10K that we talked

24 about -- I'm sorry, Paragraph 6 of your declaration.  You

25 stating that -- I'm picking up in the middle of the sentence,

1  quote, "It is likely that the wind up can occur early in 2008,

2  but for any proceedings on the clarification motion."  Correct?

3  A    Where are you at?

4  Q    I'm in your Paragraph 6 --

5  A    Oh.

6  Q    -- the sentence that begins, "Nevertheless" --

7  A    Okay.

8  Q    -- in your declaration.

9  A    Okay.  I'm -- I'm at the spot.  Now, what's your question

10  again?  I'm sorry.

11  Q    Quoting the portion where it states, quote, "It is likely

12  that the wind up can occur early in 2008, but for any

13  proceedings on the clarification motion."  Do you recall --

14  A    Okay.

15  Q    -- preparing that language?

16  A    Yes.

17  Q    Okay.  And, again, that -- that means -- what you meant by

18  that is the existence of any proceedings on the clarification

19  motion will prevent Finova from winding up, correct?

20  A    Uh, I -- I wouldn't say necessarily any -- anything.  But

21  that was assuming that this caused further delays that the stay

22  would probably be granted and an appeal process would go

23  forward.

24  Q    Okay.  But in your -- in your declaration, you don't

25  mention anything about a stay.  You say "but for any

Ross - Direct                                        15

1  proceedings on the clarification motion."

2  A    Right.

3  Q    Okay.

4  A    Right.

5  Q    So, it is your testimony before this Court that as long as

6  the appeal process exists on the clarification motion, the

7  company won't be able to wind up its affairs, correct?

8          MR. LANDERS:  Your Honor, I object.  This has been

9  asked and answered several times.  And Mr. Ross clarified his

10  testimony about that.  That matter is repetitive.  And I'd also

11  say it's duplicate of a prior testimony.

12          THE COURT:  I think it's repetitious.

13  BY MR. ANDRIOLA:

14  Q    Let's -- let's turn to your Paragraph 4C of your

15  declaration.  The -- midway through the paragraph, there's a

16  sentence that begins with, "Moreover."   And I'll read it for

17  the -- for the record, quote, "Moreover, since Finova is an SEC

18  reporting company, it would have to continue as such and would

19  have to comply with various SEC reporting and record keeping

20  requirements.  That latter is necessary because if the

21  clarification order is reversed, Finova would be required to

22  distribute funds to holders of common stock."

23          Did I read those two sentences accurately?

24  A    Yes, sir.

25  Q    Okay.  And, again, this -- Finova's need to continue its

Ross - Direct                                16

1  existence as an SEC reporting company would -- would -- would

2  happen whether or not a stay is granted today, correct?

3           MR. LANDERS:  Your Honor, object.  Counsel has not

4  called Mr. Ross's attention to the preface of that which

5  Paragraph C says, "If the stay motion is granted," and then

6  says a bunch of things.  And counsel is asking the question

7  totally out of context.

8           MR. ANDRIOLA:  I don't mean to do that.

9  BY MR. ANDRIOLA:

10 Q    Feel free to read the whole paragraph before answering my

11 question.

12                        (Pause)

13 A    Okay.  So, what this paragraph is saying is if Finova has

14 to continue to stay in existence because there's matters before

15 the Court, and we have not been able to dissolve the entity, we

16 are a public company and have to comply with the rules of the

17 SEC.

18 Q    Okay.

19 A    So, as long as we are an existing company, we have to

20 comply with the SEC rules, is my understanding.  If -- if you

21 know of a way that we can dissolve the company and still keep

22 everything here, you know, but I -- but it was not my

23 understanding.

24 Q    Okay.  And those requirements will be in effect regardless

25 of whether a stay is entered today, correct?

 1            MR. LANDERS:  Objection, the --

 2  Q    So long as the appeal exists, correct?

 3            MR. LANDERS:  Objection, Your Honor.

 4  Mischaracterizes the testimony.

 5            THE COURT:  I'm sorry.  Restate your question,

 6  please.  I missed it.

 7  Q    The question was whether the -- the SEC reporting

 8  requirements are going to keep going forward regardless of

 9  whether a stay is granted so long as the appeal exists,

10  correct?

11  A    I think what this paragraph is saying, if we're not able

12  to wind up by the end of '07, and we have to keep the company

13  running to '08, then we will have to comply with the SEC

14  rules.

15            And we are saying in this paragraph that we feel that

16  we still can continue to wind up this year, aside from the

17  matters before the Court here.  So, if these matters continue

18  on, we feel there's a likelihood that that could cause us to be

19  extended further.  And as such, we have to continue to be a

20  public company and continue to pay all expenses in accordance

21  with the contracts and everything that's in place.

22  Q    All right.  I -- I thought my question was just more

23  focused.  I understand you invoking the whole paragraph.  My

24  only question is, is it your testimony that so long as the

25  appeal is going forward, the SEC requires you to not wind up

Ross - Direct                                              18

1  your affairs as a company?

2              MR. LANDERS:  Your Honor, object.  It calls for a

3  legal conclusion.

4              THE COURT:  Well, he's --

5              MR. ANDRIOLA:  He's opined on it in his Paragraph C.

6              THE COURT:  Yeah, I think he can answer.

7              MR. LANDERS:  Well, I don't -- I don't -- okay.  Your

8  Honor, I don't think he said that.  I think he -- as I said,

9  the preface says if the stay motion is granted, and then it

10 says a bunch of things that will happen.  It isn't a general

11 discuss of thing about what happens under SEC requirements

12 regardless of the stay motion.  It talks specifically about the

13 stay motion.

14             MR. ANDRIOLA:  See, what's going on here, Your Honor,

15 and I'm -- the witness will get the advantage of hearing me ask

16 -- you know, explain to you why I'm asking these questions.

17 The -- when you look at Mr. Ross's declaration, it's hard to

18 get a sense of --

19             THE COURT:  Let me -- let me ask a question.

20             MR. ANDRIOLA:  Okay.

21             THE COURT:  If the stay is not granted, but there

22 exists the possibility that on appeal, my ruling would be

23 reversed, would that require you to maintain compliance with

24 the SEC?

25             MR. ANDRIOLA:  I would say not necessarily.  You

Ross - Direct                                19

1  know, from what I've been told from our counsel, if -- if this

2  -- if the stay is granted and the appeal moves forward, that

3  it's going to cause delays in our whole process.

4           If the stay is not granted, I'm not completely sure

5  whether the appeal has the same strength to it and would that -

6  - because we would then disburse the funds and we could

7  continue to wrap up a lot of the other matters.

8           THE COURT:  Okay.  Well, I guess that is a legal

9  question then.  I don't know the answer.

10 BY MR. ANDRIOLA:

11 Q    I'd like you to take a look at Exhibit 4 that I've given

12 you in the -- should be at the bottom of the pile.

13 A    Okay.

14 Q    Do you recognize this document?

15 A    I have seen it, yes.

16 Q    Okay.  Could you just tell us for the record what your

17 understanding of this document is?

18 A    I would not say that I have -- I was not involved with the

19 preparation of this document.  So, I wouldn't say that I have a

20 strong legal understanding of the document.

21 Q    Just your lay understanding of the document.

22 A    That it's a notice of cross appeal.  That Finova is

23 appealing, as well, as to your appeal.

24 Q    Okay.  And what exactly is it?  Do you know what Finova's

25 appealing?

Ross - Direct                              20

1  A    Yeah, I mean exactly what it's -- it's saying in here.

2  Finova is appealing the existence of the Equity Committee, that

3  it -- that it was ever formed, and the fees that were paid to

4  the Committee.

5  Q    Does the existence of Finova's cross appeal have any

6  affect on Finova's ability to wind up, do you know?

7  A    Not that I'm aware of.

8  Q    It's Finova's intention to go forward with the wind up

9  regardless of the existence of that cross appeal.

10 A    I would think, you know, that would be our intent, yes.

11 Q    And your Paragraph 4B of your declaration, you describe

12 certain actions that you say Finova must take to distribute the

13 segregated funds to holders of new senior notes, correct?

14 A    Correct.

15 Q    Okay.  And when I say the segregated funds, you know what

16 I'm referring to?

17 A    Well, this is talking about any distribution, that's the

18 way it was written, the process we go through in making any

19 distribution to the senior note holders.

20 Q    Okay.  And just so the record's clear, when I -- the term

21 segregate funds as used in the motion papers, what is your

22 understanding of the segregated funds?

23 A    It's the five percent that was set aside that was to be

24 paid to the shareholders, but was impermissible under the

25 indenture, and was required to be set aside.

Ross - Direct                              21

1  Q    Okay.  And what's the current amount of that segregated

2  funds?

3  A    A little over $81 million.

4  Q    Okay.

5  A    I don't know the exact number.

6  Q    And correct me if I'm wrong, but you state it will take

7  approximately 45 days to complete the actions that are

8  described in Paragraph 4B, is that correct?

9  A    Yeah, that's what we've mutually agreed with the Trustee

10 all along, that they wanted 45 days.  So, that was a little

11 different than what's in the actual agreement.  But the Trustee

12 had requested additional time, and we've always complied with

13 that.

14 Q    Okay.  Well, have you begun any of the actions that appear

15 in Paragraph 4B?

16 A    In regards to -- we've done these with other payments

17 we've made.  We have not done any of this in regards to the --

18 this -- the $81 million.  Because at this point, we're still

19 told -- we don't make any decision.  Because once you send that

20 first notice, it's an irrevocable payment.  So, the process

21 doesn't even begin until we know we have funds that's available

22 to be disbursed.  We never do it based on any projection of

23 funds that we may receive.  We've always done it that way.  We

24 -- we look at funds available on a particular date, and then we

25 begin from that point.

Ross - Direct                                22

1  Q    And that's a notice that's given to the -- to the --

2  A    To the Trustee.

3  Q    -- to the note holders.  Oh, to the Trustee?

4  A    We give notice to the Trustee, which is Bank of New York.

5  Bank of New York, in turn, as it's spelled out here, then gives

6  notice to the actual bond holders.

7  Q    Okay.  And the notice with respect to the 40 -- 81 million

8  hasn't been given, correct?

9  A    No.

10 Q    Are there certain expenses that will be incurred by Finova

11 in this notice process?

12 A    Very minimal expenses.

13 Q    That's something that's -- the Trustee handles or --

14 A    Yeah.  I mean we -- we virtually have no expenses, other

15 than we do an 8K filing with the SEC.  So, we have a small

16 Edgar fee filing, and we may have some legal review costs of

17 that 8K filing.  So, very minimal expenses from -- from our

18 standpoint.

19       And a Trustee incurs the expenses of notices to the

20 bondholders, but then the Trustee has annual fees.  And if they

21 have any additional legal costs, we're required to pay that on

22 top of their annual fees, which we have, from time to time, had

23 to pay.

24 Q    So, now I'm going to jump ahead to your Paragraph 5.

25 A    Okay.

Ross - Direct                                          23

1 Q    And in this paragraph, you give an estimate of additional

2 costs that you believe Finova would incur as a result of the

3 stay being granted, is that correct?

4 A    No.  These are an estimate of costs if the company's

5 around one more full year, which would be the very

6 conservative.  If the stay is granted, and things are resolved

7 sooner, we would have lower costs than this.  This clearly says

8 if we were required to be a full year of 2008, here's the

9 estimate of cost that would be incurred.

10 Q    Okay.  And these costs would -- let me scratch that.  Can

11 you give us a brief breakdown of the cost and where you get to

12 the fourteen to $18 million range?

13 A    Yeah.  The largest individual component are management

14 fees to Leucadia, which are $8 million annually.  The next

15 largest portion would be what I refer to as public company

16 cost, such as we have to continue to carry D and O insurance,

17 we'd have to continue to be audited by a public accounting

18 firm.

19        And then the next largest individual component would

20 probably be additional people cost, which are salaries of the

21 employees that would be maintained, any training, any

22 certifications, insurance, benefits, et cetera, bonuses that

23 would go to those employees.

24 Q    All right.  And --

25 A    And then you'd have various miscellaneous kind of office

Ross - Direct                                  24

1  costs, archiving, you know, other items.

2  Q    What's your early rent these days, sir, for the year?

3  This calendar year, what would it be?

4  A    I think -- calendar -- we pay about 8,000 a month.  So,

5  under $100,000, or about 100,000.

6  Q    And how many employees are left working at Finova at this

7  time?

8  A    We currently have six, and we have leaving at the end of

9  August, so we'll be down to four employees at the end of

10  August.

11  Q    And what would -- if they -- can you project what those

12  four employees would be paid during the year 2008?

13  A    You know, I don't know the exact thing.  Three of those

14  four employees would be officers.  It would be myself, a

15  controller for -- financial controller, and a tax controller.

16  So, it's the fairly senior employees that have the knowledge to

17  deal with the things, and then one administrative person.

18  Q    All right.

19  A    But I would -- the salaries for -- just the straight

20  salaries for those people would be under a half million

21  dollars.

22  Q    Are there any budgeted -- would there be any bonuses

23  budgeted for 2008?

24  A    There would be bonuses budgeted, which is a real guessing

25  game because we don't control what those bonuses would be.  But

1   we would, you know, there's a range that each employee has

2   applicable to them, and we would have probably factored in the

3   higher end of that range just to make sure that we -- you know,

4   we would err on the high side rather than the low side.  But

5   the numbers could come slightly less than that.

6   Q    And what was the last year you -- what was your salary and

7   bonus for '06?  You personally.

8   A    Uh, '06, my salary was -- I think about $210,000.  And

9   then I was paid a bonus this past year of 300,000.

10  Q    And the other officers, same approximate level?

11  A    Uh, their salaries would have been anywhere from the one

12  thirty to one seventy range.  And their bonuses would have been

13  no higher probably than one fifty.

14  Q    Does Leucadia play any role in the day-to-day management

15  of Finova?

16  A    I would not say in the day-to-day kind of operations.  But

17  any time there's any decision, anything that we're doing that

18  hasn't been approved, we contact Tom Mara, the CO, and if there

19  was anything that was a large scale, we would contact the Board

20  and the other members, which include two other Leucadia

21  employees, as well.

22          But any significant decision has to go through either

23  Tom and/or the Board.

24  Q    Is there any reason Leucadia couldn't -- Leucadia

25  employees couldn't handle your job, as well as the other two

1 officers?

2 A    Uh, you know, in theory, they could.  In practicality, it

3 would be difficult because of the historical knowledge.  What's

4 left and what we're having to do are the tax filings, which it

5 would take a lot more work for them to do it without any of the

6 historical knowledge, any information.  They would have a

7 harder time talking to our company and knowing what's going on

8 on a daily basis.  And then there would have to be someone who

9 would be willing to do the financial certifications under the

10 SEC Rules, which there is liability and exposure.  And I don't

11 -- I wouldn't say that's something that someone should do

12 without having detailed knowledge of the financial information

13 and financial reporting.

14          It's not that they couldn't get there, but it would

15 take some time to get up to speed.

16 Q    In your most recent 10Q, I believe you -- the company

17 talks about its continuing obligations to Leucadia, is that

18 correct?

19 A    There's a management service agreement that runs through,

20 I believe, November, 2009.  And so we continue to honor that

21 agreement.

22          And in that agreement, it says that as long as we are

23 a company that's in operation.  So, it's my understanding and

24 my interpretation of that agreement that when we ceased to

25 exist as a company, so when the entity is dissolved, we will no

Ross - Direct                                27

1  longer be making payments to them.

2          So, the longer this gets stretched out, we pay them

3  $2 million quarterly in advance under that agreement.

4  Q    All right.  And that's -- what you just described for me,

5  your understanding of, I guess, Finova's ability to end its --

6  prematurely end its obligations to Leucadia, that's not

7  described anywhere in your 10Q, is it?

8  A    Well, we talked about the management agreement, and then

9  we actually filed -- the management agreement has been filed

10  and it's on record with the SEC, and we talked about it -- uh,

11  this Q talks about Anu (phonetic/sic) but in some of our 10K's,

12  we talked about that that's paid quarterly and -- and in

13  advance.

14  Q    But you don't mention the fact that you can prematurely

15  end the management fees to Leucadia, do you, in the 10Q?

16  A    I don't recall that we ever have.  But the actual

17  agreement, so a reader can -- has every bit of the information

18  that we -- that we have.

19  Q    All right.  And the agreement that -- look at Exhibit 3,

20  if you don't mind.

21  A    Okay.

22  Q    Is this the effective agreement for Leucadia?  Or the

23  effective management agreement?

24  A    I can only assume that it is because this is not an

25  executed copy.  It looks like an electronically filed one.  So,

367

1  I assume if you took this from our SEC -- from the SEC web

2  site, that this is the executed one.  So, that's what we filed

3  with the SEC.

4  Q    Just for your -- I'll make the representation I was able

5  to print it from the Finova web site as an attachment to an 8Q

6  -- I'm sorry -- 8A --

7  A    Okay.

8  Q    -- several years back.

9  A    Okay.

10 Q    Could you demonstrate to me where Finova would be allowed

11 to cease making payments?

12 A    You know, I'm not actually the most familiar with this.  I

13 haven't looked at this one in some time.  So, I'd have to have

14 a look at it here.

15                          (Pause)

16 A    I'm personally not seeing it.  And off -- offhand, I know

17 we have the agreement reviewed by outside counsel who said that

18 in their opinion, and that was by Weil Gotshal, we utilized

19 them, that their initial interpretation was that the fees would

20 continue only as long as the company continued to be in

21 operation.  I'm not seeing the specific reference to that.  I

22 would -- you know, so I would have to kind of defer or consult

23 with them to kind of point out exactly the language since I'm

24 not an attorney, that they were seeing and understanding it.

25 Q    Okay.

Ross - Direct                                      29

1        MR. ANDRIOLA:  I'm almost done, Your Honor.

2    Q    Do you personally have an employment contract with Finova?

3    A    I -- I would say I do not have an employment contract.  I

4    do have a letter that was issued to me that just outlined what

5    my severance benefits are, but I do not consider that to be an

6    employment contract.

7    Q    Have you begun to search for post Finova employment?

8    A    I have not yet because of, you know, the exact timing of

9    it.  People want to know -- I've received numerous calls at

10   times with people having jobs available, but I keep telling

11   them I don't know the exact timing.  And I will start here if -

12   - if things look like they continue to proceed, I'll start here

13   shortly.

14   Q    Okay.  And the last time you were here and testifying, you

15   went over a booklet that set forth certain assets of Finova

16   that --

17   A    Right.

18   Q    -- still remain to be liquidated, is that correct?

19   A    Uh, yes, the last time I was here.

20   Q    Can you give a generalized description or estimate of --

21   really a generalized description of what assets are left to be

22   liquidated at this point.

23   A    Very little.  Virtually everything that we estimated with

24   value at that last time has been liquidated.  We no longer have

25   any aircraft.  We liquidated all assets with any significant

Ross - Direct                                30

1  value.

2          There were a few things listed on that last time,

3  like various claims and judgment that we could not estimate any

4  value and some old securities.  Those are the things that are

5  still left.  So, I wouldn't say that there's any real value.

6  We will make a final decision kind of on those.

7          But I would think the assets that are left in total,

8  probably a couple million dollars worth in value, at most.

9  Q    And what's Finova's intentions with those assets?

10 A    The last ones will be liquidated.  We actually had

11 meetings today to accelerate the final disposition of those

12 final remaining ones since there's no substantial value and we

13 want to continue on with our plan to be wrapped up by the end

14 of the year.

15          So, we're working towards a year end wrap up.  You

16 know, and we've begun the next stage in our process since the

17 assets have been substantially liquidated, we've moved on to

18 the next steps in the liquidation process.

19          MR. ANDRIOLA:  I -- I have nothing further for the

20 witness, Your Honor.

21          THE COURT:  Do you have any questions?

22          MR. LANDERS:  Yes, Your Honor.  I have very, very

23 few.

24                      CROSS EXAMINATION

25 BY MR. LANDERS:

1  Q    First of all, Mr. Ross, let me confirm.  Your

2  understanding is that if -- if a stay is entered by this Court,

3  Finova must remain as a public company?

4  A    It -- it is my understanding we would not be able to

5  disburse the funds, which then requires us to stay around until

6  we can take care of the matters that we have to.  So, -- and if

7  we stay around as a company, we would stay around as a public

8  company, yes.

9  Q    I'm just asking now for your understanding.  And you've

10 testified that you're not a lawyer.  But it's your

11 understanding that if the company dissolves, it no longer has

12 to pay the fees to Leucadia.

13 A    That is my understanding, yes.

14 Q    And finally, Mr. Ross, I'd like to very briefly go through

15 some of these costs.  You said that the Leucadia fees are $8

16 million per year.

17 A    Correct.

18 Q    You said that the second biggest component was public

19 company costs.

20 A    Correct.

21 Q    Can you say about how much those would be?

22 A    I would say they're probably in the two to two and a half

23 million.  One thing that's difficult for us to exactly

24 estimate, unfortunately if we go beyond year end, Finova then

25 has to comply with the Sarbanes-Oxley 404 rules for

Ross - Cross                                           32

1  certification of internal controls.  So, we don't know exactly

2  how much that's going to cost us, but that's going to be a very

3  cumbersome process that we really would like to try to avoid

4  because everything I've read is not the most pleasing thing to

5  deal with and it's not going to add value to the company.

6  Q    You said basically your best estimate is two -- two and a

7  half million dollars?

8  A    Two to two and a half, yes.

9  Q    And that -- what -- what does that include?

10  A    The largest things in there would be insurance, D and O

11  insurance, fidelity insurance, fiduciary insurance.  And then

12  the other one would be auditor cost for the -- using Ernst &

13  Young as our public accounting firm for their audit, their

14  quarterly reviews out of any other plans that we have.

15  Q    Now, you testified on salaries.  And when I added up the

16  numbers that you came to, I came to numbers between an

17  aggregate assuming that they were the same from year-to-year,

18  between a million and a million and a half dollars.  Is that --

19  and I'm looking obviously for an all end cost, including

20  benefits and the like.  Is that a reasonable amount?

21  A    Yeah, probably a little higher than a million to a million

22  and a half, probably in that million and a half to a million

23  seven fifty range.  Because also in there are benefits that we

24  did not talk about, training, workers' comp insurance, we put

25  in that because they're all related to employees.  So, we refer

Ross - Cross                                33

1  to those as people cost.  Travel, you know, travel, et cetera.

2  Q    Now, in addition, would you expect that there'd be

3  professional costs?

4  A    That would be the other component that's -- what causes

5  the big range.  We're about to speak to that, kind of with it.

6  That's a wild card.  You know, the longer we seem to be around,

7  the more things come out of -- out of the, you know, out of the

8  woodwork.  We thought we were completely done with the Thaxton

9  matter as soon as we reached a settlement in that, and it was

10 done, then -- now we get filed a new Thaxton TLP settlement.

11 And, you know, so -- those things could happen, those can

12 happen whether we're around or not.  But our, you know, the

13 longer we stay an existing company, we believe there's -- we

14 kind of continue to be a target out there and it increases the

15 likelihood that more lawsuits will be filed against us.

16            MR. LANDERS:  I have no further questions, Your

17 Honor.

18            THE COURT:  Okay.  I just have a couple questions.

19            THE WITNESS:  Yes.

20            THE COURT:  Did you say the Thaxton Life Partners

21 suit has been settled?

22            THE WITNESS:  No.  The Thaxton -- the -- the Thaxton

23 Group suit was settled.  Thaxton Life Partners came about right

24 while the other Thaxton Group was settled.  We never

25 contemplated that one coming about.

Ross - Court                                              34

1              THE COURT:  Okay.  And I see that was just filed in

2    February of this year.

3              THE WITNESS:  Yes.

4              THE COURT:  Now, in the -- on Page 5 of the 10Q where

5    you talked about winding up the affairs.  And that's the term

6    you used, wind up the affairs of the company --

7              THE WITNESS:  Yes.

8              THE COURT:  -- what do you mean by that?  Is that --

9              THE WITNESS:  The wind up is --

10             THE COURT:  -- spend the last dollar --

11             THE WITNESS:  Right.

12             THE COURT:  -- employees are gone, turn out --

13             THE WITNESS:  Everything.

14             THE COURT:  -- the lights?

15             THE WITNESS:  Yeah.  Liquidate -- liquidated all

16   assets, shut down all programs, withdrew licenses from every

17   state that we were allowed to do business, finalize last tax

18   filings, you know, with the IRS, and got tax clearance --

19             THE COURT:  Okay.

20             THE WITNESS:  -- for the --

21             THE COURT:  And I --

22             THE WITNESS:  -- withdraw, and then dissolving the

23   entity.

24             THE COURT:  Okay.  And I assume that also means the

25   conclusion of the Thaxton Life Partners litigation.

35

1        THE WITNESS:  Thaxton Life Partners, you know, that's
2    one thing that we've always said could be.  That we could set
3    money aside for that, or we can stay around.  So, that one
4    could go kind of either way since that's kind of -- we can set
5    -- set funds aside.

6        But for all intents and purposes, we wouldn't
7    probably stay around to resolve that, as well, if possible.
8    But a decision has to be made as we progress.

9        THE COURT:  Okay.  That's all I have.

10        MR. LANDERS:  Your Honor, at this point, I'd like to
11    move the admission of the four exhibits that you introduced.

12        MR. ANDRIOLA:  We have no objection, Your Honor.

13        THE COURT:  Okay.  They're admitted

14        MR. ROSS:  Am I excused?

15        THE COURT:  Oh, you may step down.

16        MR. ROSS:  Thank you.

17                    (Pause)

18        THE COURT:  Anything else?

19        MR. ANDRIOLA:  If the Court would permit it, I would
20    just kind of briefly summarize our arguments, but --

21        THE COURT:  Okay.  Proceed.

22        MR. ANDRIOLA:  At the outset, I want to -- I took
23    some advice from your decision in the In Re: Genesis Health
24    Ventures case.  And that is as to the limited nature of the
25    stay that you granted.  And I'd like to clarify and modify the

36

1  request in our papers to seek the same sort of stay that was

2  granted in that case, Your Honor.  And that was a stay that

3  would expire at the earliest of six months, or entry of a

4  ruling affirming your decision on the clarification motion.

5       I think that would resolve realistically the concerns

6  Finova has and would fall squarely within their conservative

7  estimate, as I thought the witness acknowledged.

8       Just very briefly, Your Honor.  On the issue of harm.

9  We submit to you if the stay is not granted -- well, if the

10 stay is not granted, they've told us they're going to disburse

11 the $81 million in segregated funds that are subject of the

12 clarification motion.  That is being appealed to the District

13 Court.

14      We think it's obviously that once such a distribution

15 is made, it's going to be next to impossible for the equity

16 holders to somehow reclaim those funds.  We think that is a

17 clear demonstration of irreparable harm that the equity holders

18 will suffer if the stay is not granted.

19      The next party, I think we need to consider, are the

20 note holders.  And I would just say that they failed to file

21 any objection to the stay requested in this case.

22      Finally we have the debtor who did file an objection

23 to the requested stay.  And essentially the debtor alleges that

24 it would be harmed if a stay is granted, as opposed to the

25 other way around, as we allege.  And the alleged harm being an

37

1  additional year's worth of operating expenses.

2         I submit to the Court that the only reasonable

3  interpretation of Mr. Ross's testimony, based on what he said

4  in court today and what actually appears in his -- his

5  declaration is that it is the existence of the appeal that

6  will, if anything, require Finova's continued existence.  Those

7  are the words in his declaration, I know he, I think, changed

8  that slightly today, and I think it's up to the Court to judge

9  on that.

10        The -- I'll just repeat again that the six-month

11 stay, I've now told you that we're seeking, falls within the

12 conservative estimates of all the different 10Q filings.

13        On the topic of merits, I'm obviously not going to

14 convince you that your decision was wrong in the first place.

15 Thankfully that's not a requirement for a stay pending -- uh --

16 since such requirement would, I think for all intense and

17 purposes, be illogical.

18        I do want to point out that I think this -- this is a

19 case where -- really a case of first impression in that I don't

20 have all the briefs memorized by heart, but I don't remember

21 either party claiming -- even claiming the existence of case

22 law that is directly on point to the situation that was raised

23 by this case.  So, I think that's important to note.

24        I also -- in conclusion on the merits issue, I think

25 this is a case where the Court should agree to disagree with

38

1  the Equity Committee as to the legal issues on appeal, but

2  grant the limited requested stay because of the irreparable

3  harm to the Equity Committee in the absence of a stay and the

4  lack of any demonstrable harm to the other interested parties.

5          Thank you, Your Honor.

6          MR. LANDERS:  Your Honor, I will take a few minutes

7  longer than Mr. Andriola.

8          I will respond in due course to his request for

9  basically a six-month stay.  But I think that that puts the

10  cart before the -- before the horse.

11          The issue here is whether they're entitled to a stay.

12  Whether it be a six-day stay, or anything else.  And the fact

13  of the matter is, Your Honor, that they haven't demonstrated

14  that they have any right to any stay whatsoever under the

15  criteria that have been recognized by this Court, and a number

16  of other courts in this Circuit.

17          Your Honor, at the outset, this is a dispute between

18  creditors and equity.  And for the better part of two years,

19  the creditors have been bearing both the risk and the expense

20  for both sides.

21          At no point has the Equity Committee or members of

22  equity been willing to step up and say we ought to bear the

23  risks here.  And that's really what's at stake here.

24          Now, the factual background of this case is very well

25  known to the Court.  Mr. Andriola says, well, there's no case

39

1  law.  Of course, there's no case law.  There's no case law

2  because the case involved the construction of an indenture.

3  The indenture said, you're limited in making restricted

4  payments.  You can't make them if it would constitute an

5  impermissible restricted payment.  And that was defined as a

6  payment that would cause insolvency, would lead to a possible

7  fraudulent transfer, or would be illegal under State law.

8       This Court read the indenture in great detail in its

9  opinion, went through the -- went through the language of the

10  opinion, went through the disclosure statement and said it's

11  clear.  It's clear that the -- under the indenture itself, that

12  the equity are not entitled to these payments if the conditions

13  are not met.

14       What's more, the Court went on and said the equity,

15  the shareholders had fair warning of this from the disclosure

16  statement and other documents that were executed at the time of

17  the plan.

18       And that's the situation we have here.  I can't

19  imagine that there would ever be a case, a reported case in

20  which this Court would find a situation that is really close.

21  Actually there is a case.  Um -- uh -- and I'm just trying to

22  find it.  And it's a case that the Committee cited where what

23  happened was there was -- um -- the plan provided that a class

24  of creditors would get money from one pot and money from

25  another pot, which was supposed to add up to 100 percent.  And,

40

1  in fact, what happened was they got more money in one pot than

2  was expected, than was anticipated, and the result was they

3  received an over-recovery.

4          The proponent of the plan then sought to modify the

5  plan basically to prevent the -- it's the <u>Saint Mary's</u> case, by

6  the way, Your Honor.  The proponents sought to modify the plan

7  to basically limit the amount of the recovery to the amount of

8  the claims.

9          And the Court said in connection with denying a --

10  denying a stay, the Court said, here this -- the plan wasn't

11  ambiguous.  There's no ambiguity and we're not going to create

12  ambiguity.  And we're not going to -- and this is the Court's

13  words, torture the language to create an ambiguity.

14          And that's what's involved here, Your Honor.  It's a

15  reading of an indenture.  It doesn't take any more or less than

16  that.

17          Now, let's turn specifically to the four stay

18  factors:

19          First of all, a strong showing on the merits.  That's

20  what they're required to prove, and that -- Courts say that's

21  the most important factor.  They turn this factor -- they turn

22  this factor around and say, well, we really don't have to

23  comply with this because the Court will -- the Court which

24  ruled against us is never going to find that factor satisfied.

25          But that's not what the cases say.  The cases are

41

1  legion, including a large number that they cited in which

2  courts decided against the party then went on in connection

3  with the stay to say that the test -- the strong likelihood of

4  success on the merit test is death.  And this Court went

5  through just such an analysis in the <u>Genesis</u> case.  So, courts

6  do that.

7          The fact that this Court rules -- ruled against them

8  is not a factor in favor of the stay, and they are trying to

9  turn it around to that.

10          The fact of the matter is that in all of the papers,

11  and they had two sets of papers here, they haven't filed one

12  piece of paper which suggests anything new, any new factor, any

13  new case or anything else that would suggest that the Court's

14  decision was wrong, was likely to be reversed, or that they

15  were likely to win -- win on appeal.

16          The case does not involve factual issues.  It's a

17  simple construction of -- of an indenture.  The fact of the

18  matter is they simply haven't attempted to satisfy that prong

19  of the stay test.

20          The second test is irreparable injury.  First they

21  talk about mootness and not being able to get the money back.

22  But the cases, including cases cited in their own memoranda,

23  suggest that simply preserving the -- a desire to preserve the

24  status quo is not irreparable injury.  That they're not

25  entitled to irreparable -- uh -- a stay simply to preserve the

42

1    status quo.

2         The Courts find a change in -- the kind of injury

3    that's being talked about here involves major changes in

4    position, being asked to give something up that you already

5    have.  Or never being able to confirm a plan.

6         Or, in one case that they cite, which is not a

7    bankruptcy case, <u>Evans against Buchanan</u>, the Court's approval

8    of a very comprehensive desegregation plan that would almost be

9    impossible to unscramble.  Nothing of that sort is involved

10   here.

11        The third element of the test is injury to the

12   debtors and -- and its creditors.  Well, first of all, the

13   first thing they say is they make what I consider a somewhat

14   disingenuous argument.  That no bondholder has stepped up to

15   oppose the stay.

16        Well, Your Honor, the debtor has been fighting this

17   battle on behalf of bondholders for two years.  There's

18   absolutely no reason for a bondholder at this point, after the

19   debtor has prevailed on the merits of this dispute, to say, oh,

20   we object to the stay.  Why would anybody want to take the

21   Court's time with that kind of pleading when it's clear that

22   the debtors are prosecuting this case in order to pay its

23   creditors, in order to make up the deficiency of over $1

24   billion to creditors?  There's no reason at all for bondholders

25   to make an appearance and go through that.

43

1          And finally we have the public interest.  The

2   Committee doesn't even argue this point.  As we suggest in our

3   memorandum, there are no public interest factors.  This is a

4   dispute between -- between creditors and equity, and that's all

5   it is.

6          We suggest, however, there are two public interest

7   factors that support the debtor's request:

8          One is simply the Absolute Priority Rule.  And the

9   fact of the matter is that every dollar that goes to this,

10  every delay simply is taking money from unsecured credit --

11  from creditors that are not going to get paid in full that are

12  suffering a one -- over a $1 billion deficiency.  That's what

13  all this is about.

14          THE COURT:  But the $81 million is earning interest,

15  isn't it?

16          MR. LANDERS:  The 81 is, but if we have to --

17          THE COURT:  So, the --

18          MR. LANDERS:  If --

19          THE COURT:  So, the pot is improving --

20          MR. LANDERS:  The pot is --

21          THE COURT:  -- with every day.

22          MR. LANDERS:  The pot is improving, although, Your

23  Honor, you will not be surprised that some of our investors are

24  bondholders and hedge funds and things like that, and think

25  that they can get a bit more on the -- in the market than we're

44

1  getting.

2          But the fact of the matter is I'm talking about the

3  expenses of proceeding and the possible expenses of an extra

4  year, which I'll come back to in a minute.

5          If we have to bear those expenses without -- if we

6  have to bear those expenses, that money is coming dollar-for-

7  dollar from creditors.  And also, the strong preference

8  recognition of courts, the deference to the Court that is

9  interpreting its own plan.

10          The Committee cites a 2nd Circuit opinion that

11  purports to follow a different rule.  But if you trace that

12  case back, it really is generated from an insurance -- an

13  insurance contract case and the Court didn't really analyze the

14  unique situation of a court interpreting the plan.

15          And we've cited in our memorandum the First Western

16  case which discusses this issue and cites decisions from the

17  6th, 7th and 11th Circuits which specifically recognize the

18  special deference given to the Bankruptcy Court.

19          The bottom line, Your Honor, is they haven't

20  satisfied any of the standards at all for granting a stay of

21  even one day, let alone six months, which is what they're --

22  they're asking for.

23          Now, let's turn to the six-month request.  I would

24  suggest at the outset, if the Court is inclined to do that, the

25  Court should require them to post a bond.  The cases on posting

45

1 a bond are quite clear that posting a bond by the losing party

2 is -- is the norm.  Judge Scheindlin, in the recent Adelphia

3 case said that you ought to provide a bond except for

4 exceptional circumstances and a good reason for not posting a

5 bond.

6          The Committee has not shown any reason at all for not

7 posting a bond in this case.  And they simply haven't satisfied

8 the burden that is imposed on them.

9          Well, they say, why not just let six months.  Well,

10 let's -- let's just play that out.  If we have -- I mean

11 obviously, Your Honor, there's some period of time.  Six days,

12 12 days, that won't cause prejudice.  But it's a slippery slope

13 here.

14          Mr. Ross has already testified that it takes 45 days

15 to distribute the funds.  So, assuming that you've got to give

16 notices beforehand, that really puts early November as the

17 latest time that you could distribute the funds.

18          I'm not sure if you distributed early November that

19 you could get the liquidation complete by the end of the year.

20 Remember we've got to distribute the funds as a prelude to

21 liquidation.  So, you've got to distribute the funds and then

22 you've got to take whatever other steps have to be taken after

23 that.

24          Mr. Ross testified -- Mr. Ross's declaration talked

25 about a period, I believe, of 90 to 120 days after everything

46

1 was sort of over for the final wind down, closing up shop,

2 turning off the lights and all those things to be done.  And

3 that's why the company specifically suggested in Mr. Ross's

4 declaration that the distribution would be made in the third or

5 very early fourth quarter.  So, that the notices could be given

6 earlier, and so that the company would have a substantial

7 period to wind up its affairs.

8          That's -- that's where we are.  Mr. Ross's testimony,

9 I think, is very strong on the amount involved.  He's gone

10 through the numbers and he's explained exactly what the cost

11 items are.  And the bottom line here, Your Honor, is that if --

12 if they lost, if anybody takes the risk here, the Committee

13 ought to take the risk of the appeal.  I mean that's where we

14 are.  Somebody's got to bear the risks and the costs of the

15 appeal.  The Committee ought to bear the costs and risks of an

16 appeal, and not -- not the debtors in -- in this case.

17          As I said, the burden is simply on them to do it.

18 The timing simply doesn't work for six months.  You just -- you

19 just won't get the thing done in a six-month period.

20          And finally, Your Honor, I'd emphasize one point:

21          If they post the bond and the appeal gets over early,

22 we can wind up early or something like that, no damages are

23 due.  The cases are clear, cited by both parties.  That the

24 bond simply is a cap on damages.  It does not establish -- if

25 they post a bond for X million, it doesn't mean if they lose

47

1  the appeal, they put up X million.  We still have to prove our

2  damages.

3          But the point is, there's money there that's

4  collectible to stand for the damages.  And our point would be

5  that if there's any risk here at all, they ought to bear that

6  risk, not the company.

7          For those reasons, Your Honor, we would urge the

8  Court, number one, to deny a stay what -- at all.  But if

9  granting a stay, to require them to post a substantial bond and

10 bear the risk of the appeal.

11         Thank you very much.

12         THE COURT:  Okay.  There's two factors that are

13 primarily implicated in this matter, and they're conflicting.

14         Number one, the merits of the appeal, I can't

15 overstate how strongly I feel that there is no merit to the

16 Committee's position.

17         On the other hand, if I'm wrong and they're right,

18 then I think there is a serious risk of irreparable harm, which

19 raises this point:  If there is a possibility that this ruling

20 could be reversed on appeal, and I don't claim to have any

21 expertise in this area, I strongly suspect that the company

22 would have to continue SEC compliance because there's a

23 potential for equity interest being involved, and I assume the

24 equity interest is what requires the filing of the -- of the

25 periodic reports.

48

1        So, it may well be that even without a stay, this

2    company will not be able to wind up.

3        Secondly, we have the Thaxton Life Partners suit

4    which, in my view, would have to be resolved in order for this

5    company to terminate all employees and turn off the lights and

6    terminate all kinds of O and D insurance.

7        But given the fact I feel so strongly that there's no

8    merit to the Committee's position, I'm going to suggest what I

9    hope will be a solution:

10        I'm going to grant a 90-day stay.  And within that

11    period, I would assume that the appeal briefing will be

12    completed.  And I suspect it's going to be a very thin record.

13    As far as I'm concerned, there's only three documents involved.

14    And if the Committee files the -- if they complete the briefing

15    and they file a motion with the District Court for a stay, my

16    guess is that a District Court Judge, in three to four hours,

17    could read the documents and come to a conclusion either, one,

18    that I'm right.  Or, two, that I'm wrong.  Or, three, it's a

19    close question.  And with respect to the latter two, he might,

20    therefore, be inclined to grant a stay.

21        So, given the fact that I think the District Court's

22    decision will not be difficult to be arrived at, restating, I

23    think, in three to four hours any reasonable judge could

24    conclude as to the merits of the Committee's position.

25        Now, having said that, I have no idea how the

49

1  District Court will look at this matter or whether they will
2  simply say to the appellant, you have to stand in line and
3  we've got a year or two of cases ahead of you, or whether they
4  would take it out of order.

5          And I should also observe that we're one judge short
6  over there.  So, I suspect their calendar is pretty crowded.

7          But in any event, I think the appropriate way is to
8  allow someone other than myself, i.e., the District Court
9  Judge, to look at what I looked at.  And hopefully would, if
10 not rule on the merits, then at least be able to make a
11 judgment as to whether a stay should be authorized by the
12 District Court.

13         And I will not require the posting of a bond.

14         Any questions?

15         MR. LANDERS:  Yes, Your Honor.  I guess I would -- I
16 would -- I don't -- I'm not going to reargue the issues, but --
17 but I just think that there's no evidence in the record which
18 suggests that Finova will have to stay as a public company if
19 there's no -- if there's no stay entered.

20         That's -- if that's the critical thing, we'd like an
21 opportunity to specifically present some data on that.  Mr.
22 Ross testified he's not a lawyer.  And -- and that's really a
23 legal question --

24         THE COURT:  Well, aside from that --

25         MR. LANDERS:  -- at the end.

50

1          THE COURT:  -- I think he testified he didn't know

2  whether they will have to stay in business to address the

3  Thaxton Life Partners.

4          MR. LANDERS:  That's true.  That's true, Your Honor.

5          THE COURT:  So, that means they might and they might

6  not.

7          MR. LANDERS:  That's right, Your Honor.  I just

8  wanted to be -- I just wanted to be clear on the other point,

9  Your Honor, because I think that, as I said, we're not -- there

10 is no real evidence of somebody who knows whether we have to

11 stay in existence because --

12         THE COURT:  Okay.

13         MR. LANDERS:  -- of Thaxton.

14         THE COURT:  Okay.  All right.  I'll ask the Committee

15 to submit an order on notice.

16         MR. LANDERS:  And --

17         THE COURT:  And --

18         MR. LANDERS:  -- just --

19         THE COURT:  Yes?

20         MR. LANDERS:  Just so I understand, Your Honor, the

21 90 days begins from today?

22         THE COURT:  Today.

23         MR. LANDERS:  Thank you, Your Honor.

24         THE COURT:  Any other questions?

25         MR. ANDRIOLA:  No, Your Honor.

51

1          THE COURT:  Okay.  We stand in recess.

2               (Proceedings Adjourn at 2:39 P.M.)

3

4

5                    C E R T I F I C A T I O N

6

7          I, Karen Hartmann, certify that the foregoing is a

8    correct transcript to the best of my ability, from the

9    electronic sound recording of the proceedings in the above-

10   entitled matter.

11

12   _/s/  Karen Hartmann_____          Date:   July 29, 2007

13   TRANSCRIPTS PLUS

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT D**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:<br><br>THE FINOVA GROUP INC ,<br>FINOVA CAPITAL CORPORATION,<br><br>        Reorganized Debtor | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case Nos. 01-0698 (PJW)<br><br>Jointly Administered<br><br>Re: Docket No. 22, 100, 196 |

## DECLARATION OF RICHARD A. ROSS RELATING TO APPEAL BOND

Richard A. Ross, for his Declaration, hereby states the foregoing, under Penalty of Perjury:

1. I am the Senior Vice President, Chief Financial Officer and Treasurer of The FINOVA Group, Inc.  ("FINOVA") and its designated "principal financial officer" for SEC reporting purposes.  I am licensed as a Certified Public Accountant in the State of Arizona.  The facts and opinions in this Declaration are known to me personally, and I would be a competent witness as to such matters.

2. I have been employed by FINOVA for thirteen years, and for the last six years have held various positions as a senior financial officer.  In that capacity, I have directly supervised the continued liquidation of the assets the above-captioned debtors ("Debtors") and the planning for a complete termination their business activities.  As of now, substantially all of the assets of the Debtors have been liquidated.

3. On December 4, 2006, this Court entered an order which authorized the implementation of procedures to accomplish the final wind-down of all business operations of the Debtors and the termination of FINOVA as a legal entity.  In FINOVA's 10-Q Report, filed

556

on May 9, 2007 ("FQR"), FINOVA stated that its goal was to wind-up all business activities and terminate its existence by the end of 2007, and it had prepared its budgets on the assumption of a December 2007 wind-up. FQR pp. 5, 13. A copy of the FQR is attached hereto as Exhibit A. As of today, this continues to be the corporate objective of FINOVA; however, delays in resolving this matter before the Court may necessitate extending the Liquidation period.

4. I am fully familiar with matters relating to the Clarification Motion and the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, dated June 24, 2007 ("Clarification Order"), and the motion of the Official Committee of Equity Security Holders ("Equity Committee") for a stay of the Clarification Order ("Stay Motion"). In connection with that Stay Motion, I would bring the following facts to the Court's attention:

a. In light of the Clarification Motion and the wind-down schedule, FINOVA anticipates distributing the amount in the Restricted Fund containing 5% of Available Cash to holders of New Senior Notes some time during the Third or Fourth Quarters of this year.

b. From the time the decision is made to distribute funds to holders of New Senior Notes until the actual distribution requires a period of approximately 45 days. Among the steps required are the initial notification of the trustee and confirmation of a date of record; sending formal written notification in accordance with the Indenture to the trustee including a notice of prepayment, an Officers Certificate, legal opinion and the form of notice of partial prepayment the trustee will send to holders of New Senior Notes; filing a Form 8-K with the SEC announcing the prepayment; the trustee sending formal notice to the Noteholders instructing physical holders to surrender their physical notes in order to receive their payment and receive a new note of their remaining balance; and confirmation between the trustee and FINOVA of the total amount due including principal and interest.

c. If the Stay Motion is granted and FINOVA cannot distribute the funds in the Restricted Fund and must keep setting aside 5% of distributions of Available Cash, it will be unable to wind-up its affairs by the end of 2007, and it will continue to incur operating expenses including employees, administrative costs and supplies, professional costs and rent in 2008 and possibly thereafter. Among other things, FINOVA would have to maintain continuing records, and the administrative staff to make an eventual distribution of funds. Moreover, since FINOVA is an SEC reporting company, it would have to continue as such and would have to comply with various SEC reporting and record keeping requirements. The latter is necessary because, if the Clarification Order is reversed, FINOVA would be required to distribute funds to holders of common stock.

5. I am advised by counsel that the timing of the appellate process could last well into 2008, or later. During the existence of a stay, the expenses described in paragraph 4(c) would be incurred, and there would be an additional period of approximately 90-120 days for completing the wind-up after a final and unstayed order was entered. FINOVA estimates that the cost of such process would range between $14 and $18 million for the full year of 2008, and additional amounts thereafter. Under these circumstances, I believe that a bond in the amount of $25 million would be necessary to protect FINOVA during the appellate process.

6. As stated above, it is FINOVA's corporate goal to wind-up by the conclusion of 2007. However, I should note that matters other than the Clarification Motion which could delay the wind-up, including but are not limited to the resolution of outstanding litigation and bankruptcy claims, the withdrawal of doing business in each state, unforeseen new litigation and dissolution of legal entities. See FQR p. 13. Nevertheless, I believe that the 2007 wind-up goal

is realizable and, in any event, it is likely that the wind-up can occur early in 2008 but for any proceedings on the Clarification Motion.

7. I will be present in Court at the hearing on the Stay Motion, and will be prepared to testify to the foregoing.

8. The above is submitted under Penalty of Perjury.

Dated: July 11, 2008

Phoenix, Arizona

_____
Richard A. Ross

# **<u>Exhibit A</u>**



# FORM 10-Q

## FINOVA GROUP INC – FNV

**Filed: May 09, 2007 (period: March 31, 2007)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I

FINANCIAL INFORMATION
**Item 1.**    Financial Statements

## PART I

FINANCIAL INFORMATION
**Item 1.**    Financial Statements
**Item 2.**    Management s Discussion and Analysis of Financial Condition and Results of
            Operations
**Item 3.**    Quantitative and Qualitative Disclosure About Market Risk
**Item 4.**    Controls and Procedures

## PART II

OTHER INFORMATION
**Item 1.**    Legal Proceedings
**Item 1A.** Risk Factors
**Item 6.**    Exhibits
Signatures
EXHIBIT INDEX
EX-31.1 (CERTIFICATION OF CEO PURSUANT TO SECTION 302)

EX-31.2 (CERTIFICATION OF CFO PURSUANT TO SECTION 302)

EX-32.1 (CERTIFICATION OF CEO PURSUANT TO SECTION 906)

EX-32.2 (CERTIFICATION OF CFO PURSUANT TO SECTION 906)

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549

## FORM 10-Q

☑    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2007

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from          to

Commission file number 001-11011

# THE FINOVA GROUP INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 86-0695381 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer Identification no.) |

| | |
|---|---|
| 8320 North Hayden Road, Suite C112 | |
| Scottsdale, AZ | 85258 |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: 480-624-4988

N/A
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days

Yes ☑  No☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer  See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act  (Check one):

Large accelerated filer ☐    Accelerated filer ☐    Non-accelerated filer ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)

Yes ☐  No ☑

### APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PRECEDING FIVE YEARS:

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by the court

Yes ☑  No ☐

### APPLICABLE ONLY TO CORPORATE ISSUERS:

As of May 8, 2007, approximately 122,041,000 shares of Common Stock ($0.01 par value) were outstanding

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

# THE FINOVA GROUP INC.
## TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| Item 1 | Financial Statements | |
|  | Consolidated Statements of Net Assets in Liquidation (liquidation basis) at March 31, 2007 (unaudited) and December 31, 2006 | 1 |
|  | Consolidated Statement of Changes in Net Assets in Liquidation (liquidation basis) (unaudited) for the Three Months Ended March 31, 2007 | 2 |
|  | Condensed Statement of Consolidated Operations (going concern basis) (unaudited) for the Three Months Ended March 31, 2006 | 3 |
|  | Condensed Statement of Consolidated Cash Flows (going concern basis) (unaudited) for the Three Months Ended March 31, 2006 | 4 |
|  | Notes to Interim Condensed Consolidated Financial Statements (unaudited) | 5 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations Special Note Regarding Forward-Looking Statements | 12 |
| Item 3 | Quantitative and Qualitative Disclosure about Market Risk | 20 |
| Item 4 | Controls and Procedures | 20 |
| **PART II** | **OTHER INFORMATION** | |
| Item 1 | Legal Proceedings | 21 |
| Item 1A | Risk Factors | 21 |
| Item 6 | Exhibits | 21 |
| Signatures | | 22 |

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents
PART I    FINANCIAL INFORMATION

Item 1.     Financial Statements

THE FINOVA GROUP INC.

CONSOLIDATED STATEMENTS OF NET ASSETS IN LIQUIDATION (LIQUIDATION BASIS)
(Dollars in thousands)

| | March 31, 2007 (Unaudited) | December 31, 2006 (Audited) |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 235,562 | $ 177,311 |
| Restricted cash—impermissible restricted payments | 78,104 | 78,104 |
| Liquidating Portfolio: | | |
| Net realizable value supported by underlying loan or direct financing agreements | 88,152 | 105,829 |
| Net realizable value supported by underlying operating leases and other owned assets | 21,504 | 68,624 |
| Investments | 9,463 | 11,091 |
| Total Liquidating Portfolio | 119,119 | 185,544 |
| Other assets and deposits | 2,046 | 2,877 |
| Total Assets | $ 434,831 | $ 443,836 |
| | | |
| **LIABILITIES (excluding Senior Notes)** | | |
| Interest payable on the Senior Notes | $ 42,046 | $ 14,222 |
| Accounts payable and other liabilities | 10,328 | 14,727 |
| Reserve for estimated costs during the liquidation period | 18,772 | 24,259 |
| Total Liabilities (excluding Senior Notes) | 71,146 | 53,208 |
| Net Assets Available for Settlement of Senior Notes | 363,685 | 390,628 |
| Senior Notes with outstanding principal of $1 5 billion, at estimated settlement amount | 363,685 | 390,628 |
| Net Assets in Liquidation | $ — | $ — |

*See notes to interim condensed consolidated financial statements*

1

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

565

Table of Contents

THE FINOVA GROUP INC.

CONSOLIDATED STATEMENT OF CHANGES IN NET ASSETS IN LIQUIDATION (LIQUIDATION BASIS)

FOR THE THREE MONTHS ENDED MARCH 31, 2007
(Dollars in thousands)
(Unaudited)

| | |
|---|---:|
| Net Assets in Liquidation at December 31, 2006 | $  — |
| Changes in net assets in liquidation from January 1, 2007 through March 31, 2007: | |
| Change in estimated net realizable value of assets | (1,810) |
| Interest earned on investment of cash reserves and other operating activity | 3,416 |
| Increase in estimated costs during the liquidation period | (724) |
| Interest accruing on the Senior Notes | (27,825) |
| Reduction in the estimated settlement of the Senior Notes | 26,943 |
| Net Change in Net Assets in Liquidation from January 1, 2007 through March 31, 2007 | $  — |
| Net Assets in Liquidation at March 31, 2007 | $  — |

*See notes to interim condensed consolidated financial statements*

2

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

THE FINOVA GROUP INC.

CONDENSED STATEMENT OF CONSOLIDATED OPERATIONS (GOING CONCERN BASIS)

FOR THE THREE MONTHS ENDED MARCH 31, 2006
(Dollars in thousands, except per share data)
(Unaudited)

| | | |
|---|---|---:|
| **Revenues:** | | |
| Interest income | $ | 3,714 |
| Rental income | | 1,481 |
| Operating lease income | | 8,389 |
| Fees and other income | | 5,322 |
| **Total Revenues** | | 18,906 |
| Interest expense | | (38,976) |
| Operating lease depreciation | | (1,658) |
| **Interest Margin** | | (21,728) |
| **Other Revenues and (Expenses):** | | |
| Reversal of provision for credit losses | | 21,103 |
| Net gain on financial assets | | 28,783 |
| Portfolio expenses | | (5,484) |
| General and administrative expenses | | (7,329) |
| **Total Other Revenues and (Expenses)** | | 37,073 |
| Income before income taxes | | 15,345 |
| Income tax expense | | — |
| **Net Income** | $ | 15,345 |
| Basic/diluted earnings per share | $ | 0.13 |
| Weighted average shares outstanding | | 122,041,000 |

*See notes to interim condensed consolidated financial statements*

3

Source: FINOVA GROUP INC. 10-Q, May 09. 2007

Table of Contents

**THE FINOVA GROUP INC.**

**CONDENSED STATEMENT OF CONSOLIDATED CASH FLOWS (GOING CONCERN BASIS)**

**FOR THE THREE MONTHS ENDED MARCH 31, 2006**
(Dollars in thousands)
(Unaudited)

| | |
|---|---:|
| **Operating Activities:** | |
| Net income | $ 15,345 |
| Adjustments to reconcile net income to net cash used by operating activities: | |
| Reversal of provision for credit losses | (21,103) |
| Net cash gain on disposal of financial assets | (27,820) |
| Net non-cash gain on financial assets | (963) |
| Depreciation and amortization | 1,849 |
| Deferred income taxes, net | (126) |
| Fresh-start accretion—assets | (289) |
| Fresh-start discount amortization—Senior Notes | 8,028 |
| Change in assets and liabilities: | |
| Decrease in other assets | 435 |
| Decrease in accounts payable and accrued expenses | (9,748) |
| Increase in interest payable | 30,036 |
| Net Cash Used by Operating Activities | (4,356) |
| **Investing Activities:** | |
| Proceeds from disposals of leases and other owned assets | 26,431 |
| Proceeds from sales of investments | 1,809 |
| Proceeds from sales of loans and financing leases | 34,078 |
| Collections and prepayments from financial assets | 32,658 |
| Fundings under existing customer commitments | (3,636) |
| Deposit of impermissible restricted payments into restricted cash account | (3,125) |
| Recoveries of loans previously written off | 1,503 |
| Net Cash Provided by Investing Activities | 89,718 |
| **Financing Activities:** | |
| Principal prepayments of Senior Notes | (59,359) |
| Net Cash Used by Financing Activities | (59,359) |
| Increase in Cash and Cash Equivalents | 26,003 |
| Cash and Cash Equivalents, beginning of year | 212,317 |
| Cash and Cash Equivalents, end of period | $238,320 |

*See notes to interim condensed consolidated financial statements*

4

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

568

Table of Contents

### THE FINOVA GROUP INC.

#### NOTES TO INTERIM CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

**MARCH 31, 2007**
**(Dollars in thousands in tables)**
**(Unaudited)**

#### A.    Nature of Operations and Plan of Liquidation

The accompanying financial statements and notes hereto should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006 Capitalized terms not defined herein are used as defined in the Form 10-K

The notes to the financial statements relate to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital") FINOVA is a financial services holding company Through its principal operating subsidiary, FINOVA Capital, the Company provided a broad range of financing and capital markets products, primarily to mid-size businesses Throughout this document, "we," "us" and "our" also refer to The FINOVA Group Inc and its subsidiaries

Since emergence from chapter 11 bankruptcy proceedings in August 2001, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of our assets These activities have included collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral We have sold substantial portions of asset portfolios and are considering future sales of our remaining assets If buyers can be found at acceptable prices; however, there can be no assurance that we will be successful in efforts to sell additional assets We are currently offering to sell our remaining assets both by portfolio and individual asset We are prohibited by the indenture governing our 7.5% Senior Secured Notes (the "Senior Notes") from engaging in any new lending activities or other business, except to honor existing customer commitments and in certain instances, to restructure financing relationships to maximize value Any funds generated in excess of cash reserves permitted by our debt agreements have been used to reduce obligations to our creditors

Because substantially all of our assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure obligations under the promissory notes of FINOVA Capital issued to us in the aggregate principal amount of the Senior Notes (the "Intercompany Notes"), our ability to obtain additional or alternate financing is severely restricted Accordingly, we intend to rely on internally generated cash flows from the liquidation of assets as our only meaningful source of liquidity

#### Plan of Liquidation

On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") On December 4, 2006, the Bankruptcy Court granted our Motion and approved (i) the previously announced settlement of various litigations associated with The Thaxton Group, Inc (the "Thaxton Settlement"), (ii) the ongoing sale of our remaining assets, the orderly windup of our operations and our future dissolution, (iii) our sale of all or substantially all of our assets without stockholder approval and our future dissolution without stockholder approval at such time as our Board deems to be appropriate and (iv) channeling to the Bankruptcy Court any claims against us that the holders of our Senior Notes or the indenture trustee for the Senior Notes may have arising from or in any way related to our joint chapter 11 plan, the ongoing liquidation of FINOVA, the senior secured notes, or the windup of our operations

Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008 The reserve for estimated costs reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

As a result of the aforementioned approvals, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10-Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States Historical information

5

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

for periods prior to December 5, 2006 is presented on a going concern basis of accounting. Under the liquidation basis of accounting, we are required to value all assets at their estimated net realizable value, while liabilities are reported at their estimated net settlement amount. Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). These estimates will be periodically reviewed and adjusted as appropriate. There can be no assurance that these estimated values will be realized. Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution.

We will continue to operate as a public company throughout the liquidation period under a Management Services Agreement with Leucadia National Corporation ("Leucadia") that expires in 2011. Pursuant to that agreement, Leucadia has designated its employees to act as Chairman of the Board (Ian M. Cumming), President (Joseph S. Steinberg) and Chief Executive Officer (Thomas E. Mara). We continue to maintain adequate cash reserves to pay all operating expenses as they come due in accordance with the Indenture.

**B.    Significant Accounting Policies**

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires us to use estimates and assumptions that affect reported amounts of assets and liabilities. These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. Significant estimates include anticipated amounts and timing of future cash flows used in the calculation of net realizable value, reserve for future costs and settlement amounts. Actual results could differ from those estimated.

*Consolidation of Interim Reporting*

The interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles. All intercompany balances have been eliminated in consolidation. The interim consolidated financial information is unaudited. In the opinion of management, all adjustments consisting of normal recurring items necessary to present fairly our net assets in liquidation as of March 31, 2007 and the changes in net assets presented herein have been included in our consolidated financial statements.

For a complete listing of our significant accounting policies, see Note B "Significant Accounting Policies" in our Annual Report on Form 10-K for the year ended December 31, 2006. The policies related to the liquidation basis of accounting were the only policies presented herein. With the adoption of the liquidation basis of accounting, all anticipated improvements or deterioration in the portfolio are fully reflected in our financial statements as facts and assumptions change.

*Liquidation Basis of Accounting*

With the approval of our Plan of Liquidation by the Bankruptcy Court, our complete liquidation is considered to be imminent and as such, we adopted the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States. A Statement of Net Assets in Liquidation and a Statement of Changes in Net Assets in Liquidation are the principal financial statements presented under the liquidation basis of accounting. Under the liquidation basis of accounting, assets are stated at their estimated net realizable value, which is the non-discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non-discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs. Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). These estimates will be periodically reviewed and adjusted as appropriate. There can be no assurance that these estimated values will be realized. Such amounts should not be taken as an indication of the timing or amount of future distributions to be made. The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances, of the net realizable value of the assets and the costs associated with carrying out the Plan of Liquidation based on the assumptions set forth below. The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material. In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation. Accordingly, it is not possible to predict with certainty the timing or aggregate amount which will ultimately be distributed to note holders and no

6

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

570

Table of Contents

assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statement of Net Assets in Liquidation or the price at which our Senior Notes have traded or are expected to trade in the future

The following are the significant assumptions utilized by management in assessing the value of our liquidating portfolio and the expected settlement amount of liabilities included in the Statement of Net Assets in Liquidation at March 31, 2007 and December 31, 2006

**Net Realizable Value Supported by Underlying Loan or Direct Financing Agreements.** All loans and direct financing leases were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales and settlement proceeds, principal collections, scheduled rental payments and interest. Anticipated cash collections were partially offset by any known direct costs and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts, settlement agreements or letters of intent to sell. The net realizable values for the remainder of the loans and direct financing leases were based upon estimated cash flows on a transaction-by-transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, the financial condition of our customers and collateral. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values

**Net Realizable Value Supported by Underlying Operating Leases and Other Owned Assets.** All owned assets (operating leases and off-lease assets) were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales proceeds and scheduled rental payments. Anticipated cash collections were partially offset by any known direct costs such as maintenance and make ready costs for certain aircraft and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts or letters of intent to sell. The net realizable values for the remainder of the owned assets were based upon estimated cash flows on a transaction-by-transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, lessee performance and residual value assumptions for leases. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values

**Investments.** All investments are reported at either their fair value or estimated net realizable values, based on published information, quotes by registered securities brokers or signed contracts. Investments for which market information is not readily available were valued based on estimated future cash flows that may be realized from the investment, if any

**Reserve for Estimated Costs during the Liquidation Period.** Under the liquidation basis of accounting, we are required to estimate and accrue for costs associated with implementing and completing the Plan of Liquidation. The reserve for estimated costs includes four primary areas of accruals including people costs (payroll, benefits and severance), Leucadia management fees, professional services and litigation costs and corporate expenses (insurance, directors' fees and entity related expenses). These amounts can vary significantly due to, among other things, the timing of assets sales, the timing and amounts associated with discharging known and contingent liabilities and claims, the costs associated with cessation of our operations including an estimate of costs subsequent to that date (which would include reserve contingencies for the appropriate statutory periods) and the costs of retaining knowledgeable personnel and others to oversee the liquidation. As a result, we have accrued the projected costs including corporate overhead and specific liquidation costs of severance and performance bonuses, professional fees and various other wind-up costs expected to be incurred during the projected period to complete the liquidation and dissolution. These expense accruals will be periodically reviewed for adequacy and adjusted from time to time as projections and assumptions change. Changes to the accruals will be recorded as adjustments to net assets in liquidation in future periods

C.    Effects of the Liquidation Basis of Accounting

During the three months ended March 31, 2007, the estimated net realizable value of our liquidating portfolio decreased a net $1.8 million primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset. Additionally, during the three months ended March 31, 2007, we accrued $27.8 million of additional interest on the Senior Notes and earned interest income on cash investments and

7

Table of Contents

other operating activity of $3 4 million  As a result of the adoption of the liquidation basis of accounting and valuation of our liquidating portfolio at its estimated net realizable value, income is no longer being recognized on our portfolio  All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments  Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection

Under the liquidation basis of accounting, we are also required to establish and maintain a reserve for all future general and administrative expenses and other costs expected to be incurred during the liquidation period (estimated to be the end of 2007)  The following is a summary of and changes to the reserve for estimated costs during the liquidation period:

|  | December 31, 2006 | Adjustments and Payments | March 31, 2007 |
|---|---|---|---|
| People costs (payroll, benefits and severance) | $ 4,144 | $ (1,318) | $ 2,826 |
| Leucadia management fees | 8,000 | (2,000) | 6,000 |
| Professional services and litigation costs | 10,431 | (2,003) | 8,428 |
| General corporate expenses | 1,684 | (166) | 1,518 |
| Total reserve for estimated costs during the liquidation period | $ 24,259 | $ (5,487) | $ 18,772 |

During the three months ended March 31, 2007, the reserve declined to $18 8 million due to the payment of expenses, partially offset by an increase caused by retaining certain employees for a slightly longer period of time than previously estimated  The staff retention is directly related to aircraft sales sliding into the second quarter and additional time consumed by the equity committee's review of our solvency (for further details, see Note G "Litigation and Claims"), both of which have caused delays to the overall liquidation process (including the dissolution of entities and resolution of claims)

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes  During the three months ended March 31, 2007, the estimated settlement amount of the Senior Notes was reduced by $26 9 million to a balance of $363 7 million; however, we currently estimate the Senior Note holders will receive total liquidation distributions (total principal and interest) of approximately $405 7 million, which is a $0 9 million increase over our year-end estimate

### D.   Liquidating Portfolio

As a result of the adoption of the liquidation basis of accounting, most of the prior disclosures related to total financial assets are no longer applicable  Our liquidating portfolio is now recorded at its estimated net realizable value, which incorporates all future cash flows, including earnings expected to be collected

Since our total financial assets were primarily concentrated in specialized industries, we were subject to both general economic risk and the additional risk of economic downturns within individual sectors of the economy, particularly those impacting the aviation industry  We also completed multiple financial transactions with individual borrowers and their affiliates, resulting in a greater total exposure to those borrowers beyond the typical transaction size and increased concentration risk to economic events affecting the industries (including aviation) of those borrowers and their affiliates

At March 31, 2007, the carrying value on a liquidation basis of our top 10 aggregate exposures to borrowers and their affiliates totaled approximately $109 4 million and represented 98 5% of our liquidating portfolio (excluding the severance and bonus trusts of $8 1 million), as compared to our top 10 exposures (on a liquidation basis) at December 31, 2006 of $148 9 million, which represented 84 8% of our liquidating portfolio (excluding the severance and bonus trusts of $10.1 million)  The top 10 exposures at March 31, 2007 were primarily concentrated in aviation assets and the loan to The Thaxton Group, which alone made up 75 3% of the net realizable value expected from our liquidating portfolio  We subsequently received $83 7 million on April 16, 2007 in full and final settlement of the Thaxton loan  As of the date of this report, all of our top 10 exposures have either been liquidated; are under binding definitive agreements or letters of intent to sell; or are subject to a negotiated settlement

8

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

At March 31, 2007, our transportation portfolio consisted of the following aircraft:

| Aircraft Type | Number of Aircraft | Passenger | Cargo | Approximate Average Age (in years) |
|---|---|---|---|---|
| McDonnell Douglas DC10 | 1 | | 1 | 32 |
| McDonnell Douglas MD–80 Series | 7 | 7 | | 23 |
| Regional jets, corporate aircraft and turbo props | 7 | 7 | | 24 |
| Total | 15 | 14 | 1 | 24 |

At March 31, 2007, five aircraft were operated by domestic carriers, while 10 aircraft were operated by foreign carriers. In addition to the aircraft, our transportation portfolio also includes two aircraft engines, a small number of miscellaneous parts and some unsecured aviation notes and claims with a total carrying value on a liquidation basis of approximately $1 0 million as of March 31, 2007 As of the date of this report, we had 15 aircraft with a total carrying value on a liquidation basis of approximately $24 7 million All of these assets have either been liquidated subsequent to March 31, 2007 or are subject to a definitive agreement to sell Due to the fact that these aircraft are operating throughout the world, additional time will be necessary to close the sales It is to our advantage to close these transactions when the aircraft are in tax friendly jurisdictions to minimize transfer taxes No assurance can be given that all of these commitments will result in actual sales or the timing of such sales, but the remaining aircraft are targeted to close during the second quarter of 2007

Our non–aviation portfolio, in addition to the Thaxton loan, at March 31, 2007 was comprised of assets with a net realizable value of approximately $9 7 million, including our $8 1 million investment in two grantor trusts to secure severance and bonus obligations to our employees These assets are held primarily for the benefit of our employees, but are recorded as investments due to our retained interest in any excess assets Substantially all of the other non–aviation assets are in the process of being liquidated

The estimated net realizable value of our portfolio included, among other transactions, a number of customer judgments and claims, non–marketable private equity securities and certain obligations owed to us by companies that are in liquidation In many of these instances, we did not attribute any net realizable value to these assets due to our inability to predict the collection of any cash flows from the transactions with even a remote level of confidence Most of these transactions were previously included in due diligence materials in an attempt to sell the assets, but were excluded on multiple occasions by prospective buyers because of costs of collection and potential liability concerns of the buyers We continue to monitor these accounts for changes in facts and circumstances that would allow us to attribute value to these assets As a result, there is the possibility that some net realizable value will be attributed to these assets in the future An increase in the estimated net realizable value of these assets, if any, will be reflected as a change in net assets in liquidation in future filings Additionally, we continue to occasionally receive small amounts of proceeds typically from trustees for assets that in certain cases were written off years ago These cash flows are reflected as a change in net assets in liquidation as they are received

E.    Debt

A summary of our total debt outstanding on a liquidation basis was as follows:

| | March 31, 2007 | December 31, 2006 |
|---|---|---|
| Senior Notes: | | |
| Principal | $ 1,483,975 | $ 1,483,975 |
| Senior Notes principal estimated to not be settled or repaid | (1,120,290) | (1,093,347) |
| Senior Notes | $ 363,685 | $ 390,628 |

During the first quarter of 2007, we made no principal prepayments on the Senior Notes In April 2007, we announced a partial prepayment of $59 4 million that will be paid on May 15, 2007 Following this prepayment, cumulative prepayments will total $1 54 billion or approximately 52% of the face amount ($2 97 billion) of the Senior Notes Additionally, bonds with a face amount of $900 thousand and outstanding principal balance of $450 thousand reverted back to us under the sunset provisions of the Indenture and on April 5, 2007 the trustee cancelled these bonds, reducing the March 31, 2007, principal amount by

9

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

$450 thousand. Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405.7 million, which is considerably less than the total principal and interest due of approximately $1.5 billion. The estimated settlement amount was determined solely based on the net assets available for settlement of the Senior Notes and is subject to change due to changes in the estimated net realizable value of our net assets. We clearly do not have sufficient assets to fully repay the Senior Note obligation.

While, the Senior Notes have a first priority security interest in substantially all of our remaining assets, the Indenture requires us to first use any cash and cash equivalents to pay or fund operating expenses, taxes and reasonable reserves for commitments and general corporate purposes. In accordance with the terms of the Indenture, we are required to use any excess cash as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at our option, which we have previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed below in Note G "Litigation and Claims", we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments.

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of our remaining assets, the resolution of claims and other litigation matters, the extent to which reserves for current or future liabilities are required and the length of time required to settle all of our matters. Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims. Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008.

Stockholders should not expect any payments or distributions. The Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5.263% (i.e., 5%/95%) of each principal prepayment. Ninety-five percent (95%) of the remaining available cash after establishment of cash reserves as defined in the Indenture would be used to make semi-annual prepayments of principal on the Senior Notes and five percent (5%) is identified for distributions to and/or repurchases of stock from common stockholders. However, the Indenture prohibits us from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law. Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture. Based upon the fact that the Senior Notes will not be fully repaid, we are required to retain impermissible restricted payments until such time, if ever, that we are no longer restricted from making a distribution to our stockholders or until it is necessary to use the cash to satisfy our debt obligations.

In conjunction with the prepayments of Senior Notes noted above, we will have retained a total of $81.2 million as of May 15, 2007. Retained amounts are being segregated and reflected as restricted cash in our financial statements, pending their final disposition. We anticipate that the retained amounts will eventually be paid to our creditors, not our stockholders. If the funds were to be paid to our stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of our common stock, would receive half of the retained amounts. Berkadia has advised us that it does not believe that stockholders are entitled to the retained amounts since we cannot fully satisfy our creditor obligations.

As previously reported, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors. For a further discussion of the motion and its status, see Note G "Litigation and Claims."

F.    Income Taxes

Our federal net operating loss carryforwards of $1.3 billion have remained relatively unchanged since year end. No income tax expense or benefit was recorded during the three months ended March 31, 2007 and 2006. Any income or loss has been entirely offset by a decrease or increase in valuation allowances against deferred tax assets, which were previously established due to concern regarding our ability to utilize income tax benefits generated from losses in prior periods. We do not expect to be able to utilize all the deferred tax assets due to uncertainty about the amount of future earnings, a variety of loss or other tax attribute carryover limitations in the various jurisdictions in which we file tax returns and uncertainty regarding the timing of the reversal of deferred tax liabilities.

10

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

G. Litigation and Claims

*Legal Proceedings*

We are party either as plaintiff or defendant to various actions, proceedings and pending claims, including legal actions, some of which involve claims for compensatory, punitive or other damages in significant amounts. Litigation often results from our attempts to enforce our lending agreements against borrowers and other parties to those transactions. Litigation is subject to many uncertainties. It is possible that some of the legal actions, proceedings or claims could be decided against us. Other than the matters described below, we believe that any resulting liability from our legal proceedings should not materially affect our net assets in liquidation or cash flows. The following matters could have a material adverse impact on our net assets in liquidation or cash flows.

Historically, it was our policy to accrue for loss contingencies, including litigation, only when the losses were probable and estimable. The determination of when losses became probable and estimable was inherently subjective and required significant judgment. Under the liquidation basis of accounting, liabilities for loss contingencies and claims are reported at their estimated net settlement amount, which is the non-discounted amount of cash expected to be paid to liquidate or settle an obligation in the due course of business.

If any legal proceedings result in a significant adverse judgment against us, it is unlikely that we would be able to satisfy that liability due to our financial condition. As previously noted, due to our financial condition, we do not expect that we can satisfy all of our secured debt obligations at maturity. Attempts to collect on those judgments could lead to future reorganization proceedings of either a voluntary or involuntary nature.

*Litigation Related to Loans to The Thaxton Group Inc. and Related Companies*

Our prior periodic filings with the Securities and Exchange Commission have disclosed ongoing litigation against FINOVA Capital with respect to The Thaxton Group Inc. ("TGI") and several related entities (collectively, the "Thaxton Entities")

Pursuant to an order of the Thaxton Entities bankruptcy court dated September 11, 2006, we transferred all of the cash received from the Thaxton Entities since commencement of the Thaxton Entities chapter 11 proceedings in October 2003, together with interest earned thereon (an aggregate of approximately $97.2 million), to a trust account to be held by Thaxton under order of the bankruptcy court

On September 12, 2006, we reached a preliminary settlement (the "Settlement") to resolve all outstanding claims in the ongoing litigation between us, the Thaxton Entities, the holders of subordinated notes issued by the Thaxton Entities (the "Noteholders"), and the Official Committee of Unsecured Creditors of the Thaxton Entities. This Settlement will settle all of the actions involving us and the Thaxton Entities, in particular the actions pending in the United States District Court for the District of South Carolina, Anderson Division (the "District Court"), including the previously described new Thaxton action commenced in the District Court in June 2006, as well as claims in the Thaxton Entities chapter 11 proceedings (collectively, the "Thaxton Litigation")

The principal terms of the Settlement were approved by our Board of Directors on September 11, 2006 and the bankruptcy court for the FINOVA Capital and Thaxton Entities bankruptcies in December 2006. The Thaxton Plan of Reorganization was approved by the bankruptcy court on April 3, 2007, and became effective on April 16, 2007. On April 16, 2007, we received $83.7 million, representing all amounts we transferred into the trust on September 11, 2006 – i.e. all amounts paid by the Thaxton Entities to us since commencement of the Thaxton Entities chapter 11 proceedings in October 2003 (together with interest earned thereon), minus $16 million, plus interest actually earned thereon from August 16, 2006, which will be retained by the Thaxton Entities. In addition, we received complete releases from all Thaxton parties for all matters related to the Thaxton Entities and the summary judgment order of the District Court was vacated

*Thaxton Life Partners Litigation*

On February 14, 2007, a group of noteholders of Thaxton Life Partners, Inc. ("TLP") filed suit against the Company and FINOVA Capital (the "TLP Action"), unrelated to the Thaxton Entities litigation noted above. The TLP Action purports to be a class action filed on behalf of approximately 150 TLP note holders with claims related to approximately $20 million in TLP

11

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

notes The TLP Action alleges that, in connection with TLP's sale of its notes, the Company, FINOVA Capital, and several other defendants participated in a civil conspiracy, violated the South Carolina Unfair Trade Practices Act, violated the civil RICO statute, and were unjustly enriched In its various counts, the TLP Action seeks actual, treble, and/or punitive damages

The TLP Action is currently pending in the United States District Court for the District of South Carolina (the "South Carolina District Court") We believe that, under the terms of the TLP notes, the TLP Action must move forward in arbitration The Company and FINOVA Capital have filed a motion with the South Carolina District Court seeking an order compelling such arbitration No order has yet been issued with respect to this issue We also believe that all claims against both us and FINOVA Capital are without merit The Company and FINOVA Capital intend to vigorously defend against the TLP note holders' claims asserted against them If, however, the TLP Action results in a significant adverse final determination against us or FINOVA Capital, which is not anticipated, it is unlikely that the Company or FINOVA Capital would be able to satisfy that liability due to our financial condition As previously disclosed, due to our financial condition, we do not expect that we can satisfy all of our secured debt obligations at maturity Attempts to collect on any such judgment could lead to future reorganization proceedings of either a voluntary or involuntary nature

*Motion Regarding Distributions to Stockholders*

As discussed more fully in Note E "Debt", the Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5 263% of each principal prepayment However, the Indenture prohibits distribution of those amounts due to our financial condition Those amounts are held in a restricted account, and will total $81.2 million as of May 15, 2007 Because we will not be able to repay the Senior Notes in full, on April 1, 2005, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order (1) to cease directing funds into the restricted account and (2) to allow us to use the funds in the restricted account to satisfy our obligations to creditors

On February 1, 2006, the Bankruptcy Court issued its order approving our April 1, 2005 motion to the extent that we will be forever insolvent The Bankruptcy Court did not find that we are presently or will be forever insolvent As a result, we will continue to direct funds into the restricted account until such time that we are deemed to be forever insolvent

On December 22, 2006, the reconstituted equity committee filed a motion with the Bankruptcy Court seeking among other things, appointment of a financial expert to review the issue of our solvency, and up to $100,000 to accomplish this task Over our objection, the Bankruptcy Court granted the equity committee's motion, ordering that the evaluation be completed within sixty (60) days of an order being entered approving the motion As expected, the financial expert concluded that FINOVA is insolvent The parties will seek a final order of the bankruptcy court declaring FINOVA's insolvency Once issued, the equity committee may then appeal the underlying ruling of the bankruptcy court should they so desire

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following section should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2006 and the Special Note Regarding Forward-Looking Statements included herein Capitalized terms not defined herein are used as defined in the Form 10-K The following discussion relates to The FINOVA Group Inc and its subsidiaries (collectively "FINOVA" or the "Company"), including its principal operating subsidiary, FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital")

**OVERVIEW**

During the first quarter of 2007, we continued to make significant progress in the orderly collection and liquidation of our assets Our liquidating portfolio declined by approximately 36% since year-end 2006, reducing the net realizable value of our remaining assets to just over $119 million at March 31, 2007 As we previously mentioned, it has become increasingly more difficult for us to offset the incremental costs of collecting our assets in an orderly fashion and as a result, to maximize the value of our remaining assets, we initiated efforts to accelerate the liquidation process The vast majority of the remaining assets are expected to be liquidated during the second quarter of 2007

**Plan of Liquidation.** On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") On December 4, 2006, the Bankruptcy Court granted our Motion and approved (i) the previously announced settlement of various litigations associated with The Thaxton Group, Inc (the "Thaxton

12

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

576

Table of Contents

Settlement"). (ii) the ongoing sale of our remaining assets, the orderly windup of our operations and our future dissolution, (iii) our sale of all or substantially all of our assets without stockholder approval and our future dissolution without stockholder approval at such time as our Board deems to be appropriate and (iv) channeling to the Bankruptcy Court any claims against us that the holders of our Senior Notes or the indenture trustee for the Senior Notes may have arising from or in any way related to our joint chapter 11 plan, the ongoing liquidation of FINOVA, the senior secured notes, or the windup of our operations

As a result of the aforementioned approvals, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10-Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States. Historical information for periods prior to December 5, 2006 is presented on a going concern basis of accounting. Under the liquidation basis of accounting, we are required to value all assets at their estimated net realizable value, while liabilities are reported at their estimated net settlement amount. Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). These estimates will be periodically reviewed and adjusted as appropriate. There can be no assurance that these estimated values will be realized. Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of the remaining assets, the resolution of claims and other litigation matters. The extent to which reserves for current or future liabilities are required and the length of time required to settle all our matters. Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims. Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008. The reserve for estimated costs ($18.8 million) reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

We continue to retain sufficient cash reserves to fund our expenses, including the costs associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton. As a result, we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures and claims, which could limit our ability to make and the timing of future voluntary principal prepayments

**Anticipated Shortfall.** In April 2007, we announced a partial prepayment of $59.4 million that will be paid on May 15, 2007. Following this prepayment, cumulative prepayments will total $1.54 billion or approximately 52% of the face amount ($2.97 billion) of the Senior Notes. Based on the revaluation of our assets at their estimated net realizable value and liabilities at estimated net settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405.7 million, which is considerably less than the total principal and interest due of approximately $1.5 billion. We clearly do not have sufficient assets to fully repay the Senior Note obligation. In order to eliminate the shortfall, the remaining assets (excluding cash and cash equivalents), which have already been marked up from their historical going concern basis, would have to increase in value by more than ten times their already marked up value. We do not believe there is any chance of this occurring

**No Stockholder Payments Anticipated.** While the Indenture contemplated we would make payments to our stockholders as the Senior Notes were repaid, we have not made those payments. Distributions to stockholders are prohibited due to our financial condition. Based on our liquidation basis financial statements, we will not be able to repay more than $1.1 billion of the Senior Notes. As a result, stockholders should not expect any payments or return on their common stock. Funds related to the restricted distributions are currently being held in a segregated account, pending their final disposition. We anticipate that those funds will eventually be paid to our creditors, not to our stockholders. If the funds were to be paid to our stockholders, affiliates of Berkadia (which are owned by Berkshire Hathaway and Leucadia), as owner of 50% of our stock, would receive half of those payments

As discussed in Note G "Litigation and Claims," we filed a motion in the United States Bankruptcy Court for the District of Delaware, seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors

13

Table of Contents

**No Restructuring Plan Contemplated.** On numerous occasions, we have been asked whether there is some plan to save the Company and our net operating loss carryforwards ("NOL") As we have noted for some time, the Board remains willing to consider legitimate proposals presented by note holders or others, but we are not formulating a restructuring plan intended to enable us to emerge as a healthy company

Many obstacles exist to creation of a viable restructuring plan A restructuring presumes a sensible business plan emerging from that process In light of our dwindling asset base, the composition of our remaining assets and the competitive environment, we believe it would be difficult, if not futile, in these circumstances to develop a business model that can produce returns to the creditors and/or new investors greater than that expected from the present course Absent that, or a substantial new investment in FINOVA, we believe it would be difficult to obtain the requisite approval to restructure the present debt obligations The task becomes more difficult as the portfolio continues to shrink We caution investors to carefully evaluate applicable tax regulations, which restrict the ability to transfer or use NOLs in a variety of circumstances Our financial statements do not anticipate using the NOLs for those and other reasons

**HIGH INVESTMENT RISK OF SECURITIES.** As previously stated, we will not be able to fully repay the Senior Notes or make any distributions to our stockholders, absent a court order in connection with the motion referred to above. Consequently, investing in our Senior Notes and common stock involves a high level of risk.

## CRITICAL ACCOUNTING POLICIES

Our consolidated financial statements continue to be prepared in accordance with US generally accepted accounting principles. The preparation of these financial statements requires us to use estimates and assumptions that affect reported amounts of assets and liabilities These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. See Item 1A "Risk Factors" and "Special Note Regarding Forward-Looking Statements" in our Annual Report on Form 10-K for the year ended December 31, 2006 for more information on these risks and uncertainties We believe the following to be among the most critical judgment areas in the application of our accounting policies

### *Liquidation Basis of Accounting*

With the approval of our Plan of Liquidation by the Bankruptcy Court, our complete liquidation is considered to be imminent and as such, we adopted the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States A Statement of Net Assets in Liquidation and a Statement of Changes in Net Assets in Liquidation are the principal financial statements presented under the liquidation basis of accounting Under the liquidation basis of accounting, assets are stated at their estimated net realizable value, which is the non-discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non-discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense) These estimates will be periodically reviewed and adjusted as appropriate There can be no assurance that these estimated values will be realized Such amounts should not be taken as an indication of the timing or amount of future distributions to be made The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances, of the net realizable value of the assets and the costs associated with carrying out the Plan of Liquidation based on the assumptions set forth below The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation. Accordingly, it is not possible to predict with certainty the timing or aggregate amount which will ultimately be distributed to note holders and no assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statement of Net Assets in Liquidation or the price at which our Senior Notes have traded or are expected to trade in the future

The following are the significant assumptions utilized by management in assessing the value of our liquidating portfolio and the expected settlement amount of liabilities included in the Statement of Net Assets in Liquidation at March 31, 2007 and December 31, 2006

14

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents
Net Realizable Value Supported by Underlying Loan or Direct Financing Agreements. All loans and direct financing leases were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales and settlement proceeds, principal collections, scheduled rental payments and interest. Anticipated cash collections were partially offset by any known direct costs and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based on signed contracts, settlement agreements or letters of intent to sell. The net realizable values for the remainder of the loans and direct financing leases were based upon estimated cash flows on a transaction−by−transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, the financial condition of our customers and collateral. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values.

Net Realizable Value Supported by Underlying Operating Leases and Other Owned Assets. All owned assets (operating leases and off−lease assets) were adjusted to their estimated net realizable values, which represent all future undiscounted cash flows expected to be collected from each of these transactions including sales proceeds and scheduled rental payments. Anticipated cash collections were partially offset by any known direct costs such as maintenance and make ready costs for certain aircraft and liabilities assumed by buyers including aircraft maintenance reserves and security deposits that were previously collected. The majority of the estimated net realizable values were determined primarily based upon signed contracts or letters of intent to sell. The net realizable values for the remainder of the owned assets were based upon estimated cash flows on a transaction−by−transaction basis. Cash flow estimates are based on current information and numerous assumptions concerning future general economic conditions, specific market segments, lessee performance and residual value assumptions for leases. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values.

Investments. All investments are reported at either their fair value or estimated net realizable values, based on published information, quotes by registered securities brokers or signed contracts. Investments for which market information is not readily available were valued based on estimated future cash flows that may be realized from the investment, if any.

Reserve for Estimated Costs during the Liquidation Period. Under the liquidation basis of accounting, we are required to estimate and accrue for costs associated with implementing and completing the Plan of Liquidation. The reserve for estimated costs includes four primary areas of accruals including people costs (payroll, benefits and severance), Leucadia management fees, professional services and litigation costs and corporate expenses (insurance, directors' fees and entity related expenses). These amounts can vary significantly due to, among other things, the timing of assets sales, the timing and amounts associated with discharging known and contingent liabilities and claims, the costs associated with cessation of our operations including an estimate of costs subsequent to that date (which would include reserve contingencies for the appropriate statutory periods) and the costs of retaining knowledgeable personnel and others to oversee the liquidation. As a result, we have accrued the projected costs including corporate overhead and specific liquidation costs of severance and performance bonuses, professional fees and various other wind−up costs expected to be incurred during the projected period to complete the liquidation and dissolution. These expense accruals will be periodically reviewed for adequacy and adjusted from time to time as projections and assumptions change. Changes to the accruals will be recorded as adjustments to net assets in liquidation in future periods.

With the adoption of the liquidation basis of accounting, all anticipated improvements or deterioration in the portfolio are fully reflected in our financial statements as facts and assumptions change.

15

Source: FINOVA GROUP INC, 10-Q, May 09, 2007

Table of Contents
CHANGES IN NET ASSETS AND RESULTS OF OPERATIONS

The following table summarizes the changes in net assets in liquidation for the three months ended March 31, 2007 (dollars in thousands):

| | |
|---|---:|
| Net Assets in Liquidation at December 31, 2006 | $ — |
| | |
| Changes in net assets in liquidation for the three months ended March 31, 2007: | |
| Change in estimated net realizable value of assets | (1,810) |
| Interest earned on investment of cash reserves and other operating activity | 3,416 |
| Increase in estimated costs during the liquidation period | (724) |
| Interest accruing on the Senior Notes | (27,825) |
| Reduction in the estimated settlement of the Senior Notes | 26,943 |
| Net change in value of assets and liabilities | — |
| Net Assets in Liquidation at March 31, 2007 | $ — |

Changes in Net Assets in Liquidation for the three months ended March 31, 2007

During the three months ended March 31, 2007, the estimated net realizable value of our liquidating portfolio decreased a net $1.8 million primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset

During the three months ended March 31, 2007, we accrued $27.8 million of additional interest on the Senior Notes and earned interest income on cash investments and other operating activity of $3.4 million. As a result of the adoption of the liquidation basis of accounting and valuation of our liquidating portfolio at its estimated net realizable value, income is no longer being recognized on the portfolio. All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments. Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection

Additionally, as previously discussed, we established a reserve for estimated costs during the liquidation period (estimated to be the end of 2007) and all future expenditures for operating expenses are charged directly against the reserve. During the three months ended March 31, 2007, the reserve declined to $18.8 million due to the payment of expenses, partially offset by an increase caused by retaining certain employees for a slightly longer period of time than previously estimated. The staff retention is directly related to aircraft sales sliding into the second quarter and additional time consumed by the equity committee's review of our solvency (for further details, see Note G "Litigation and Claims"), both of which have caused delays to the overall liquidation process (including the dissolution of entities and resolution of claims)

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes. During the three months ended March 31, 2007, the estimated settlement amount of the Senior Notes was reduced by $26.9 million to a balance of $363.7 million; however, we currently estimate the Senior Notes holders will receive total liquidation distributions (total principal and interest) of approximately $405.7 million, which is a $0.9 million increase over our year-end estimate

Results of Operations for the three months ended March 31, 2006

During the three months ended March 31, 2006, we generated net income (on a going concern basis) of $15.3 million. In general, the net income was primarily attributable to asset realization in excess of recorded carrying amounts, partially offset by a negative interest margin and normal operating expenses. Under the going concern basis, asset realization in excess of recorded carrying amounts was primarily reflected in the financial statements as reversals of excess reserve for credit losses, net gains from sales of financial assets and the recognition of suspended income upon the payoff of assets

16

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents

During 2006, the aircraft-finance market continued to display a high level of activity and in certain instances improved aircraft values. As a result, our transportation portfolio continued to generate cash in excess of recorded carrying amounts, which resulted in $23 5 million of the $28 8 million net gains we recognized during the first quarter of 2006 Additionally, results for the first quarter of 2006 were enhanced by a revaluation of our non-aviation assets in conjunction with their classification as held for sale and subsequent sale, which resulted in $14 7 million of our $21 1 million reversal of provision for credit losses

Our asset realization in excess of recorded carrying amounts was partially offset by a $21 7 million negative interest margin, which is primarily due to our portfolio containing a lower level of earning assets ($104 7 million at March 31, 2006) than the principal amount of outstanding debt ($1 6 billion at March 31, 2006) and a high aggregate cost of funds (aggregate effective rate of 13 6% for the first quarter of 2006)

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

Because substantially all of our assets (except for a few assets that could not be pledged because those assets already secured other obligations) are pledged to secure obligations under the Intercompany Notes securing the Senior Notes, our ability to obtain additional or alternate financing is severely restricted Berkadia has no obligation to lend additional sums to or to further invest in FINOVA Accordingly, we intend to rely on internally generated cash flows from the liquidation of assets as our only meaningful source of liquidity

The terms of the Indenture prohibit us from using available funds (after certain permitted uses) for any purpose other than to satisfy our obligations to creditors and to make limited payments to stockholders in certain circumstances Under the terms of the Indenture, we are permitted to establish a cash reserve in an amount not to exceed certain defined criteria Due to our limited sources of liquidity, the estimation of cash reserves is critical to our overall liquidity. Cash reserve estimations are subject to known and unknown risks, uncertainties, and other factors that could materially impact the amounts determined. Failure to adequately estimate a cash reserve in one period could result in insufficient liquidity to meet obligations in that period, or in a subsequent period, if actual cash requirements exceed the cash reserve estimates Historically, cash reserves typically equaled anticipated cash flows to cover operating costs, tax payments, fundings under existing customer commitments, interest payments and any other necessary cash flows expected to occur during the next six month period. We have the discretion to and have from time to time adjusted our cash reserve methodology As we continue to liquidate assets, our incoming cash flows will diminish and the estimation of cash reserves will become increasingly more critical to ensure we retain sufficient funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process

In accordance with the terms of the Indenture, we are required to use any excess cash, as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes Additionally, the Indenture permits voluntary prepayments at our option, which we have previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed in Note G "Litigation and Claims," we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments

The timing and amount of distributions to Senior Note holders will depend on the timing and amount of proceeds we receive upon the sale of our remaining assets, the resolution of claims and other litigation matters, the extent to which reserves for current or future liabilities are required and the length of time required to settle all of our matters Our goal is to wind-up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008. The reserve for estimated costs ($18 8 million) reflected in our Statement of Net Assets in Liquidation assumes a liquidation period through the end of 2007

During the first quarter of 2007, we made no principal prepayments on the Senior Notes In April 2007, we announced a partial prepayment of $59 4 million that will be paid on May 15, 2007. Following this prepayment, cumulative prepayments will total $1 54 billion or approximately 52% of the face amount ($2 97 billion) of the Senior Notes Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (total principal and interest) of approximately $405 7 million, which is considerably less than the total principal and interest due of approximately $1 5 billion The estimated settlement amount was determined solely based on the net assets available for settlement of the Senior Notes and is subject to change due to changes in the estimated net realizable value of our net assets We clearly do not have sufficient assets to fully repay the Senior Note obligation

17

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

Table of Contents
The Senior Notes have a first priority security interest in substantially all of our remaining assets; however, as noted above, the Indenture requires us to first use any cash and cash equivalents to pay or to fund operating expenses, taxes and reasonable reserves for commitments and general corporate purposes

Stockholders should not expect any payments or distributions  The Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders would receive a distribution equal to 5.263% of each principal prepayment  However, the Indenture prohibits us from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law  Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture  Based upon the fact that the Senior Notes will not be fully repaid, we are required to retain impermissible restricted payments until such time, if ever, that we are no longer restricted from making a distribution to our stockholders or until it is necessary to use the cash to satisfy our debt obligations

In conjunction with the prepayments of Senior Notes noted above, we will have retained a total of $81.2 million as of May 15, 2007  Retained amounts are being segregated and reflected as restricted cash in our financial statements, pending their final disposition  We anticipate that the retained amounts will eventually be paid to our creditors, not our stockholders  If the funds were to be paid to our stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of our common stock, would receive half of the retained amounts  Berkadia has advised us that it does not believe that stockholders are entitled to the retained amounts since we cannot fully satisfy our creditor obligations

As previously reported, we filed a motion in the United States Bankruptcy Court for the District of Delaware seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use the funds in the restricted account to satisfy our obligations to creditors  For a further discussion of the motion and its status, see Note G  "Litigation and Claims "

**Based on our financial condition and imminent liquidation, there will not be sufficient funds available to fully repay the outstanding principal on the Senior Notes or make any 5% distribution to common stockholders, absent a court order in connection with the motion referred to above. As a result, there will not be a return to our stockholders. Consequently, investing in the Senior Notes and common stock involves a high level of risk.**

### *Obligations and Commitments*

For a detailed listing of our significant contractual obligations and contingent commitments, refer to our Annual Report on Form 10-K for the year ended December 31, 2006  There have not been any material changes during the three months ended March 31, 2007, except for the payment of our quarterly management fees to Leucadia

### *Collection of the Portfolio*

As noted previously, our current business activities have been limited to maximizing the value of our portfolio through the orderly collection of assets. These activities include collection efforts pursuant to underlying contractual terms, negotiation of prepayments, sales of assets or collateral  We have sold substantial portions of asset portfolios and are considering future sales of our remaining assets if buyers can be found at acceptable prices; however, there can be no assurance that we will be successful in efforts to sell additional assets  We are currently offering to sell our remaining assets both by portfolio and individual asset  Due to restrictions contained in the Indenture as well as our general inability to access capital in the public and private markets, our only viable source of cash flow is from the collection of our portfolio

18

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

**Table of Contents**
The following table presents the activity in our liquidating portfolio for the three months ended March 31, 2007:

| | |
|---|---|
| **Liquidating Portfolio at December 31, 2006** | $185,544 |
| **Cash activity:** | |
| Collections and proceeds | (64,442) |
| **Non-cash activity:** | |
| Change in estimated net realizable value of assets | (1,983) |
| **Liquidating Portfolio at March 31, 2007** | $119,119 |

Our liquidating portfolio declined to $119.1 million at March 31, 2007, down from $185.5 million at December 31, 2006. During the first quarter of 2007, our cash activity was comprised of customer collections (including recoveries) and proceeds received from the sale of assets, while non-cash activity resulted in a decrease to the estimated net realizable value of certain assets. The decrease in value of these assets was primarily due to revised purchase prices on certain committed aircraft following their revaluation based upon updated aircraft specifications and usage reports and a slight decline in the estimated net realizable value of an engine based upon bids obtained through an auction process to liquidate the asset.

The remaining portfolio as of March 31, 2007 is primarily comprised of aviation assets and the loan to The Thaxton Group. Refer to Note G "Litigation and Claims" for a further discussion of the settlement of the Thaxton litigation.

As of the date of this report, we had 15 aircraft with a total carrying value on a liquidation basis of approximately $24.7 million. All of these assets have either been liquidated subsequent to March 31, 2007 or are subject to a definitive agreement to sell. Due to the fact that these aircraft are operating throughout the world, additional time will be necessary to close the sales. It is to our advantage to close these transactions when the aircraft are in tax friendly jurisdictions to minimize transfer taxes. No assurance can be given that all of these commitments will result in actual sales or the timing of such sales, but the remaining aircraft are targeted to close during the second quarter of 2007. In addition to the aircraft, our transportation portfolio also includes two aircraft engines, a small number of miscellaneous parts and some unsecured aviation notes and claims with a total carrying value on a liquidation basis of approximately $1.0 million as of March 31, 2007.

Our non-aviation portfolio, in addition to the Thaxton loan, at March 31, 2007 was comprised of assets with a net realizable value of approximately $9.7 million, including our $8.1 million investment in two grantor trusts to secure severance and bonus obligations to our employees. These assets are held primarily for the benefit of our employees, but are recorded as investments due to our retained interest in any excess assets. Substantially all of the other non-aviation assets are in the process of being liquidated.

The estimated net realizable value of our portfolio included, among other transactions, a number of customer judgments and claims, non-marketable private equity securities and certain obligations owed to us by companies that are in liquidation. In many of these instances, we did not attribute any net realizable value to these assets due to our inability to predict the collection of any cash flows from the transactions with even a remote level of confidence. Most of these transactions were previously included in due diligence materials in an attempt to sell the assets, but were excluded on multiple occasions by prospective buyers because of costs of collection and potential liability concerns of the buyers. We continue to monitor these accounts for changes in facts and circumstances that would allow us to attribute value to these assets. As a result, there is the possibility that some net realizable value will be attributed to these assets in the future. An increase in the estimated net realizable value of these assets, if any, will be reflected as a change in net assets in liquidation in future filings. Additionally, we continue to occasionally receive small amounts of proceeds typically from trustees for assets that in certain cases were written off years ago. These cash flows are reflected as a change in net assets in liquidation as they are received.

As we continue to liquidate assets, our incoming cash flows will diminish and the estimation of cash reserves will become increasingly more critical to ensure we retain sufficient funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process. Due to the uncertainty of cash requirements associated with the wind-up of our affairs, resolution of outstanding bankruptcy claims and matters related to Thaxton, discussed in Note G "Litigation and Claims," we anticipate maintaining a higher cash reserve to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments.

19

Source: FINOVA GROUP INC, 10-Q, May 09, 2007

**Table of Contents**

Our goal is to wind–up the affairs of the Company during 2007; however, we cannot control the exact timing of resolving legal matters and claims. Accordingly, the liquidation period may extend beyond 2007 and conservative estimates are up to the end of 2008. We will continue to operate as a public company throughout the liquidation period under a Management Services Agreement with Leucadia that expires in 2011.

## SPECIAL NOTE REGARDING FORWARD–LOOKING STATEMENTS

Certain statements in this report are "forward–looking," in that they do not discuss historical fact, but instead reflect future expectations, projections, intentions, or other items. Forward–looking statements are made pursuant to the safe–harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward–looking statements include assumptions, estimates and valuations implicit in the financial statements and related notes, as well as matters discussed throughout this report including, but not limited to, projections, our Plan of Liquidation, sections captioned Item 2 "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 3 "Quantitative and Qualitative Disclosure About Market Risk." They are also made in documents incorporated in this report by reference, or in which this report may be incorporated.

Forward–looking statements are inherently subject to risks and uncertainties, many of which cannot be predicted or quantified. When used in this report, the words "estimate," "expects," "anticipates," "believes," "plans," "intends" and similar expressions are intended to identify forward–looking statements that involve known and unknown risks and uncertainties. The risks, uncertainties and other factors that could cause our actual results or performance to differ materially from those contemplated by the forward–looking statements include, but are not limited to, the following: whether we can assure Senior Note holders of the timing or amount of their liquidating distributions; whether potential purchasers of our assets may try to take advantage of our liquidation process and offer less–than–optimal prices for our assets; the increasing difficulty in offsetting costs of collecting the remaining portfolio in view of our decreasing asset pool; our Board may abandon the Plan of Liquidation; whether new securities lawsuits will be filed against us; our ability to sell the remaining assets; the impact of general economic conditions and the performance of our borrowers; the instability and uncertainty in the airline industry, which could adversely affect the value of our aircraft portfolio, lease rates and demand; our reliance on third parties for information that may not be accurate; our increasing exposure to concentrations of credit risk; current and future legal and administrative claims and proceedings against us that may result in increased costs and diversion of management's attention; current and future obligations to creditors; our ability to meet obligations is impacted by cash reserve estimations; cash investments are subject to credit exposure and interest rate fluctuations; our ability to retain our employees; our ability to utilize tax attributes; and our ability to be exempt from the registration requirements of the Investment Company Act of 1940. For additional information, see Part I, Item 1A Risk Factors in our Annual Report on Form 10–K for the year ended December 31, 2006.

Undue reliance should not be placed on these forward–looking statements, which are applicable only as of the date of this Report. We do not intend to update forward–looking information to reflect actual results or changes in assumptions or other factors that could affect those statements. We cannot predict the risk from reliance on forward–looking statements in light of the many factors that could affect their accuracy.

**Item 3.      Quantitative and Qualitative Disclosure About Market Risk**

There were no material changes from the information provided in our Annual Report on Form 10–K for the year ended December 31, 2006.

**Item 4.      Controls and Procedures**

(a)   Our management evaluated, with the participation of our principal executive and principal financial officers, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a–15(e) and 15d–15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of March 31, 2007. Based on their evaluation, our principal executive and principal financial officers concluded that our disclosure controls and procedures were effective as of March 31, 2007.

20

Table of Contents

(b)    There has been no change in our internal controls over financial reporting (as defined in Rules 13a−15(f) and 15d−15(f) under the Exchange Act) that occurred during our fiscal quarter ended March 31, 2007. that materially affected or is reasonably likely to materially affect. our internal control over financial reporting

As a result of Section 404 of the Sarbanes−Oxley Act of 2002 and the rules issued there under, we are scheduled to include in our Annual Report on Form 10−K for the year ending December 31. 2007 a report on management's assessment of the effectiveness of our internal controls over financial reporting Our independent registered public accountants will not be required to attest to and report on management's assessment until the end of 2008

The process of complying with these requirements includes a comprehensive evaluation and documentation of our internal controls over financial reporting In this regard, management is prepared to dedicate internal resources and adopt a detailed plan to (i) document our internal controls over financial reporting, (ii) assess the adequacy of our internal controls over financial reporting. (iii) take steps to improve control processes where appropriate and (iv) validate through testing that controls are functioning as documented. There can be no assurance that deficiencies or weaknesses in the design or operation of internal controls over financial reporting will not be found and. if found, that we will have sufficient time to remediate any such deficiencies or weaknesses and perform testing procedures before the end of 2007

We believe that any system of internal accounting controls. no matter how well designed and operated, can provide only reasonable (and not absolute) assurance that all of our objectives will be met, including the detection of fraud Furthermore, no evaluation of internal accounting controls can provide absolute assurance that all control issues and instances of fraud. if any, have been detected

We continue to reduce our workforce. consolidate operations and outsource certain functions Accordingly, responsibility for administration, management and review of many of our assets has transitioned among our remaining personnel In conjunction with further reductions in personnel and the relocation of our corporate office, we have transitioned most of our accounting and business support applications to manual processes supported by a system of manual internal controls and spreadsheets Management has supervised these transitions and has implemented procedures we believe provide effective disclosure and internal controls over financial reporting We are assessing the efficacy of these procedures and will continue to do so in subsequent periods

## PART II    OTHER INFORMATION

### Item 1.    Legal Proceedings

See Part I, Item 1. Note G "Litigation and Claims" for a discussion of certain legal proceedings

### Item 1A.    Risk Factors

There were no material changes from the information provided in our Annual Report on Form 10−K for the year ended December 31. 2006

### Item 6.    Exhibits

| | |
|---|---|
| 31 1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes−Oxley Act of 2002 |
| 31 2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes−Oxley Act of 2002 |
| 32 1 | Certification of Chief Executive Officer pursuant to 18 U S C 1350. as adopted pursuant to Section 906 of the Sarbanes−Oxley Act of 2002. |
| 32 2 | Certification of Chief Financial Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes−Oxley Act of 2002 |

21

Source: FINOVA GROUP INC. 10−Q, May 09. 2007

Table of Contents

THE FINOVA GROUP INC.

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

THE FINOVA GROUP INC
(Registrant)

Date: May 9, 2007

By:  /s/ Richard A. Ross
Richard A  Ross, Senior Vice President – Chief Financial Officer & Treasurer
(principal financial officer)

22

Source: FINOVA GROUP INC, 10-Q. May 09. 2007

**Table of Contents**

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 31 1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes–Oxley Act of 2002 |
| 31 2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes–Oxley Act of 2002 |
| 32 1 | Certification of Chief Executive Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 |
| 32 2 | Certification of Chief Financial Officer pursuant to 18 U S C 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 |

Source: FINOVA GROUP INC. 10–Q, May 09. 2007

Exhibit 31-1

## CERTIFICATIONS

I, Thomas E Mara, certify that:

1      I have reviewed this quarterly report on Form 10-Q of The FINOVA Group Inc :

2      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made. in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition. results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries. is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)      Designed such internal control over financial reporting. or caused such internal control over financial reporting to be designed under our supervision. to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures. as of the end of the period covered by this report based on such evaluation; and

    d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected. or is reasonably likely to materially affect. the registrant's internal control over financial reporting; and

5      The registrant's other certifying officer and I have disclosed. based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process. summarize and report financial information; and

    b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 9, 2007

By:  /s/ Thomas E. Mara
        Thomas E  Mara
        Chief Executive Officer

Source: FINOVA GROUP INC. 10-Q. May 09. 2007

Exhibit 31.2

## CERTIFICATIONS

I, Richard A. Ross, certify that:

1    I have reviewed this quarterly report on Form 10-Q of The FINOVA Group Inc.:

2    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 9, 2007

By:  /s/ Richard A. Ross
　　　　Richard A. Ross
　　　　Chief Financial Officer
　　　　(principal financial officer)

Source: FINOVA GROUP INC. 10-Q, May 09, 2007

589

Exhibit 32.1

CERTIFICATION

PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED BY SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002

I, Thomas E. Mara, as Chief Executive Officer of The FINOVA Group Inc. (the "Company") certify, pursuant to 18 U.S.C. ss. 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that to my knowledge:

(1) the accompanying Form 10–Q report for the quarterly period ended March 31, 2007 as filed with the U.S. Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company

Date: May 9, 2007

By:    /s/ Thomas E. Mara
        Thomas E. Mara
        Chief Executive Officer

Source: FINOVA GROUP INC, 10–Q, May 09, 2007

Exhibit 32.2

## CERTIFICATION

### PURSUANT TO 18 U.S.C. SECTION 1350,
### AS ADOPTED BY SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002

I, Richard A Ross, as Chief Financial Officer of The FINOVA Group Inc (the "Company") certify, pursuant to 18 U S C ss 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that to my knowledge:

(1) the accompanying Form 10–Q report for the quarterly period ended March 31, 2007 as filed with the U.S. Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934. as amended; and

(2) the information contained in the Report fairly presents. in all material respects, the financial condition and results of operations of the Company

Date: May 9, 2007                                  By:  /s/ Richard A. Ross
                                                        Richard A  Ross
                                                        Chief Financial Officer
                                                        (principal financial officer)

Created by 10KWizard    www.10KWizard.com

Source: FINOVA GROUP INC, 10–Q. May 09. 2007

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re )| Chapter 11 |
| ) | |
| THE FINOVA GROUP INC., ) | Case No. 01-0698 (PJW) |
| FINOVA CAPITAL CORPORATION, ) | |
| ) | Jointly Administered |
| Reorganized Debtors. ) | |
| ) | |
| Official Committee of Equity Security ) | |
| Holders, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | C.A. No. 07-480 (JJF) |
| ) | |
| Finova Group Inc. and ) | Bankruptcy Case No. 01-698 |
| Finova Capital Corporation, ) | AP 07-70 |
| ) | |
| Appellees. ) | |
| ) | |

## DECLARATION OF RICHARD A. ROSS
## RELATING TO APPEAL BOND (DISTRICT COURT)

Richard A. Ross, for his Declaration, hereby states the foregoing, under Penalty of Perjury:

1.     I am the Senior Vice President, Chief Financial Officer and Treasurer of The

FINOVA Group, Inc., ("FINOVA") and its designated "principal financial officer" for SEC

reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The

facts and opinions in this Declaration are known to me personally, and I would be a competent

witness to such matters.

2.     I have been employed by FINOVA for thirteen years, and for the last six years have

held various positions as a senior financial officer. In that capacity, I have directly supervised the

continued liquidation of the assets of the above-captioned debtors ("Debtors") and the planning for a

complete termination of their business activities. On December 4, 2006, the Bankruptcy Court

entered an order which authorized the implementation of procedures to accomplish the final wind-

RLF1-3203077-1

Docket No. 7
Date 9/20/2007

down of all business operations of the Debtors and the termination of FINOVA as a legal entity. As of now, substantially all of the assets of the Debtors have been liquidated.

3. In FINOVA's 10-Q Report dated May 9, 2007, FINOVA stated that its goal was to wind-up all business activities and terminate its existence by the end of 2007, and it had prepared budgets on that assumption. In my Declaration of July 11, 2007, attached as Exhibit A, filed in connection with the Motion of the Equity Committee for a Stay in the Bankruptcy Court, I stated that this continued to be the objective of FINOVA, but that matters other than the Clarification Motion could delay the wind-up including "outstanding litigation and bankruptcy claims." Ross Decl. ¶¶ 3, 7. In Finova's Second quarter 10-Q Report dated August 10, 2007, FINOVA reiterated its goal, but stated that delays in resolving legal matters had "increased the likelihood of the liquidation period extending beyond 2007," accordingly, it had increased reserves for estimated wind-down costs to assume a liquidation in the First Quarter of 2008 (and there was no assurance that the liquidation would be completed in that period and could extend through the end of 2008). FINOVA 10-Q Report, pp. 5-6, 10 (August 10, 2007). A copy of the Second Quarter Report is attached as Exhibit B hereto.

4. As of today, the situation remains as stated in the Second Quarter 10-Q Report. Aside from this proceeding relating to the Clarification Motion, the major outstanding matter is the resolution of the Thaxton Life Partners matter--a litigation by noteholders of Thaxton Life Partners ("TLP") against the Debtors and others arising from the sale of notes brought in the United States District Court for the District of South Carolina. On motion of the Debtors, the Court directed arbitration of the TLP matter and, at present the arbitration is proceeding; also, the arbitration decision has been appealed. It is impossible to say how long the TLP matter will proceed. It could

end abruptly, the arbitration could be completed within months, or the proceedings could take longer. The TLP matter is discussed in somewhat more detail in the Second Quarter Report, p. 11.

5.      Once the TLP matter is resolved, FINOVA can proceed as expeditiously as possible to complete the wind-up process, unless there is a stay of the effect of the Clarification Order which prevents FINOVA from ceasing to set aside 5% of Available Cash for holders of Equity Interests and from applying the funds previously accumulated to the payments of operating expenses and payments on the New Senior Notes. In this regard, FINOVA believes it is important to have the flexibility to cease setting aside the 5% of Available Cash and to use the funds presently held. And, as noted in my Declaration of July 11, 2007, there are built-in delays in making distributions of such funds to the holders of New Senior Notes.

6.      In my view, the issue here is who should bear the risk of any delay and inability to wind up FINOVA as soon as the wind-up is complete, and who should bear any losses that result from a stay. FINOVA's view is that (a) the Indenture clearly establishes the right of the holders of the New Senior Notes to all remaining assets of FINOVA and does not entitle the holders of Equity Interests to any payments given FINOVA's financial condition and (b) FINOVA is hopelessly insolvent and more than $1 billion in principal on the New Senior Notes will not be paid. Moreover, I have been present in Court several times when Judge Walsh clearly stated that the position of the Committee was unjustified and not credible. For these reasons, I would urge the Court to deny a stay but, if a stay is granted, to require a significant bond in the amount of $25 million. In regard to a bond, FINOVA fully understands that, if a bond is posted and FINOVA prevails on the appeal, it would still have to prove its actual losses to recover on the bond.

3

7.    Since the very beginning of this litigation, FINOVA has taken the position that the 5% Payment should not be made and the funds should be distributed to the holders of New Senior Notes. This has been the position of its Board of Directors, and this position has consistently been stated in 10-Q and 10-K Reports filed with the SEC over a period of almost three years. It is also the position that has been taken in meetings with individual Shareholders as well as noteholders. No one could have been confused or misled by FINOVA's position. With that background, it is particularly unfortunate to see the Equity Committee repeatedly arguing that noteholders somehow don't care about the Clarification Motion because they did not "lodge an objection to the Equity Committee's motion for a stay in the Bankruptcy Court." Committee Brief, p. 12. Of course they did not lodge an objection. They had no reason to object because FINOVA was so clearly taking a position supporting their right to the funds in question. Indeed, I have been in conversations with noteholders that they had not intervened because FINOVA was taking their side in the dispute. Finally, there is no organized group akin to the Equity Committee which represents the noteholders.

8.    This Declaration is submitted under Penalty of Perjury.

_Richard A. Ross_
Richard A. Ross

Dated: September 20, 2007
Phoenix, Arizona

# <u>Exhibit A</u>

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| THE FINOVA GROUP INC , FINOVA CAPITAL CORPORATION, | § § § | Case Nos. 01-0698 (PJW) |
| Reorganized Debtor | § § § § § | Jointly Administered Re: Docket No. 22, 100, 196 |

### DECLARATION OF RICHARD A. ROSS RELATING TO APPEAL BOND

Richard A. Ross, for his Declaration, hereby states the foregoing, under Penalty of Perjury:

1. I am the Senior Vice President, Chief Financial Officer and Treasurer of The FINOVA Group, Inc ("FINOVA") and its designated "principal financial officer" for SEC reporting purposes. I am licensed as a Certified Public Accountant in the State of Arizona. The facts and opinions in this Declaration are known to me personally, and I would be a competent witness as to such matters

2. I have been employed by FINOVA for thirteen years, and for the last six years have held various positions as a senior financial officer In that capacity, I have directly supervised the continued liquidation of the assets the above-captioned debtors ("Debtors") and the planning for a complete termination their business activities. As of now, substantially all of the assets of the Debtors have been liquidated.

3 On December 4, 2006, this Court entered an order which authorized the implementation of procedures to accomplish the final wind-down of all business operations of the Debtors and the termination of FINOVA as a legal entity. In FINOVA's 10-Q Report, filed

on May 9, 2007 ("FQR"), FINOVA stated that its goal was to wind-up all business activities and terminate its existence by the end of 2007, and it had prepared its budgets on the assumption of a December 2007 wind-up  FQR pp. 5, 13.  A copy of the FQR is attached hereto as Exhibit A. As of today, this continues to be the corporate objective of FINOVA; however, delays in resolving this matter before the Court may necessitate extending the Liquidation period.

4. I am fully familiar with matters relating to the Clarification Motion and the Order Granting Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan, dated June 24, 2007 ("Clarification Order"), and the motion of the Official Committee of Equity Security Holders ("Equity Committee") for a stay of the Clarification Order ("Stay Motion")  In connection with that Stay Motion, I would bring the following facts to the Court's attention:

a. In light of the Clarification Motion and the wind-down schedule, FINOVA anticipates distributing the amount in the Restricted Fund containing 5% of Available Cash to holders of New Senior Notes some time during the Third or Fourth Quarters of this year.

b. From the time the decision is made to distribute funds to holders of New Senior Notes until the actual distribution requires a period of approximately 45 days. Among the steps required are the initial notification of the trustee and confirmation of a date of record; sending formal written notification in accordance with the Indenture to the trustee including a notice of prepayment, an Officers Certificate, legal opinion and the form of notice of partial prepayment the trustee will send to holders of New Senior Notes; filing a Form 8-K with the SEC announcing the prepayment; the trustee sending formal notice to the Noteholders instructing physical holders to surrender their physical notes in order to receive their payment and receive a new note of their remaining balance; and confirmation between the trustee and FINOVA of the total amount due including principal and interest.

c. If the Stay Motion is granted and FINOVA cannot distribute the funds in the Restricted Fund and must keep setting aside 5% of distributions of Available Cash, it will be unable to wind-up its affairs by the end of 2007, and it will continue to incur operating expenses including employees, administrative costs and supplies, professional costs and rent in 2008 and possibly thereafter. Among other things, FINOVA would have to maintain continuing records, and the administrative staff to make an eventual distribution of funds. Moreover, since FINOVA is an SEC reporting company, it would have to continue as such and would have to comply with various SEC reporting and record keeping requirements. The latter is necessary because, if the Clarification Order is reversed, FINOVA would be required to distribute funds to holders of common stock.

5. I am advised by counsel that the timing of the appellate process could last well into 2008, or later. During the existence of a stay, the expenses described in paragraph 4(c) would be incurred, and there would be an additional period of approximately 90-120 days for completing the wind-up after a final and unstayed order was entered. FINOVA estimates that the cost of such process would range between $14 and $18 million for the full year of 2008, and additional amounts thereafter. Under these circumstances, I believe that a bond in the amount of $25 million would be necessary to protect FINOVA during the appellate process.

6. As stated above, it is FINOVA's corporate goal to wind-up by the conclusion of 2007. However, I should note that matters other than the Clarification Motion which could delay the wind-up, including but are not limited to the resolution of outstanding litigation and bankruptcy claims, the withdrawal of doing business in each state, unforeseen new litigation and dissolution of legal entities. See FQR p. 13. Nevertheless, I believe that the 2007 wind-up goal

is realizable and, in any event, it is likely that the wind-up can occur early in 2008 but for any proceedings on the Clarification Motion.

7. I will be present in Court at the hearing on the Stay Motion, and will be prepared to testify to the foregoing.

8. The above is submitted under Penalty of Perjury.

Dated: July 11, 2008

Phoenix, Arizona

Richard A. Ross

I00257174_3 DOC                          4

628

# **Exhibit A**
**Finova Form 10-Q filed March 9, 2007 (1st Qtr.)
(omitted)**

# EXHIBIT F

10-Q 1 d10q.htm FORM 10-Q

<u>Table of Contents</u>

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

# FORM 10-Q

[√] **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2008

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 001-11011

# THE FINOVA GROUP INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **86-0695381** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |
| **8320 North Hayden Road, Suite C112** | |
| **Scottsdale, AZ** | **85258** |
| (Address of principal executive offices) | (Zip code) |

**Registrant's telephone number, including area code: 480-624-4988**

**N/A**

(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☑ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐ No ☑

**APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PRECEDING FIVE YEARS:**

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or

15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by the court.

Yes ☑   No ☐

**APPLICABLE ONLY TO CORPORATE ISSUERS:**

As of August 11, 2008, approximately 122,041,000 shares of Common Stock ($0.01 par value) were outstanding.

**Table of Contents**

## THE FINOVA GROUP INC.

## TABLE OF CONTENTS

                                                                        **Page No.**

### PART I FINANCIAL INFORMATION

| | | |
|---|---|---|
| Item 1. | Financial Statements | |
| | Consolidated Statements of Net Assets in Liquidation (liquidation basis) at June 30, 2008 (unaudited) and December 31, 2007 | 1 |
| | Consolidated Statements of Changes in Net Assets in Liquidation (liquidation basis) (unaudited) for the Three and Six Months Ended June 30, 2008 and 2007 | 2 |
| | Notes to Interim Condensed Consolidated Financial Statements (unaudited) | 3 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 9 |
| | Special Note Regarding Forward-Looking Statements | 17 |
| Item 4. | Controls and Procedures | 17 |

### PART II OTHER INFORMATION

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 18 |
| Item 1A. | Risk Factors | 18 |
| Item 6. | Exhibits | 18 |
| Signatures | | 19 |

Table of Contents

**PART I FINANCIAL INFORMATION**

Item 1.    **Financial Statements**

**THE FINOVA GROUP INC.**
**CONSOLIDATED STATEMENTS OF NET ASSETS IN LIQUIDATION (LIQUIDATION BASIS)**
**(Dollars in thousands)**

|  | June 30, 2008 (Unaudited) | | December 31, 2007 (Audited) | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents | $ | 121,509 | $ | 175,140 |
| Restricted cash - impermissible restricted payments | | 81,228 | | 81,228 |
| Liquidating portfolio | | 1,600 | | 6,271 |
| Other assets and deposits | | 1,133 | | 1,369 |
| **Total Assets** | $ | 205,470 | $ | 264,008 |
| **LIABILITIES (excluding Senior Notes)** | | | | |
| Interest payable on the Senior Notes | $ | 13,648 | $ | 13,648 |
| Accounts payable and other liabilities | | | | 574 |
| Reserve for estimated costs during the liquidation period | | 8,530 | | 15,791 |
| **Total Liabilities (excluding Senior Notes)** | | 22,178 | | 30,013 |
| **Net Assets Available for Settlement of Senior Notes** | | 183,292 | | 233,995 |
| Senior Notes with outstanding principal of $1.4 billion at estimated settlement amount | | 183,292 | | 233,995 |
| **Net Assets in Liquidation** | $ | — | $ | — |

*See notes to interim condensed consolidated financial statements.*

1

Table of Contents

### THE FINOVA GROUP INC.
### CONSOLIDATED STATEMENTS OF CHANGES IN NET ASSETS IN LIQUIDATION (LIQUIDATION BASIS)
#### (Dollars in thousands)
#### (Unaudited)

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2008 | 2007 | 2008 | 2007 |
|---|---|---|---|---|
| **Net Assets in Liquidation, beginning of period** | $ — | $ — | $ — | $ — |
| **Changes in net assets in liquidation:** | | | | |
| Change in estimated net realizable value of assets and other liabilities | 28 | 983 | 246 | (827) |
| Interest earned on investment of cash reserves and other operating activity | 2,009 | 4,794 | 4,247 | 8,210 |
| Change in estimated costs during the liquidation period | (2,968) | (2,834) | (1,790) | (3,558) |
| Interest accruing on the Senior Notes | (26,703) | (27,234) | (53,406) | (55,059) |
| Reduction in the estimated settlement of the Senior Notes | 27,634 | 24,291 | 50,703 | 51,234 |
| **Net Change in Net Assets in Liquidation** | $ — | $ — | $ — | $ — |
| **Net Assets in Liquidation, end of period** | $ — | $ — | $ — | $ — |

*See notes to interim condensed consolidated financial statements.*

2

Table of Contents

### THE FINOVA GROUP INC.
### NOTES TO INTERIM CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
### JUNE 30, 2008
#### (Dollars in thousands in tables)
#### (Unaudited)

### A.   Nature of Operations and Plan of Liquidation

The accompanying financial statements and notes hereto should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K"). Capitalized terms not defined herein are used as defined in the 2007 Form 10-K.

The notes to the financial statements relate to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital"). FINOVA was a financial services holding company. Through its principal operating subsidiary, FINOVA Capital, the Company provided a broad range of financing and capital markets products, primarily to mid-size businesses. Throughout this document, "we," "us" and "our" also refer to The FINOVA Group Inc. and its subsidiaries.

Since emergence from chapter 11 bankruptcy proceedings in August 2001, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of our assets. These activities included collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral. We have substantially completed the liquidation of our portfolio and our focus has shifted to the continued wind down of our operations and future dissolution of our entities. We are prohibited by the Indenture (the "Indenture") governing our 7.5% Senior Secured Notes (the "Senior Notes") from engaging in any new lending activities or other business. Any funds generated in excess of cash reserves permitted by our debt agreements have been used to reduce obligations to our creditors.

Because substantially all of our assets (including cash reserves) are pledged to secure obligations under the promissory notes of FINOVA Capital issued to us in the aggregate principal amount of the Senior Notes (the "Intercompany Notes"), our ability to obtain additional or alternate financing is severely restricted. As a result of this and the substantial liquidation of our portfolio, our only meaningful source of liquidity is cash reserves held by the Company.

### Plan of Liquidation

On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). On December 4, 2006, the Bankruptcy Court granted our Motion and approved (i) the previously announced settlement of various litigations associated with The Thaxton Group, Inc. (the "Thaxton Settlement"), (ii) the ongoing sale of our remaining assets, the orderly windup of our operations and our future dissolution, (iii) our sale of all or substantially all of our assets without stockholder approval and our future dissolution without stockholder approval at such time as our Board deems to be appropriate and (iv) channeling to the Bankruptcy Court any claims against us that the holders of our Senior Notes or the indenture trustee for the Senior Notes may have arising from or in any way related to our joint chapter 11 plan, the ongoing liquidation of FINOVA, the senior secured notes, or the windup of our operations.

We have continued with efforts to wind-up our affairs in a timely manner; however, as previously noted we cannot control the timing of resolving legal matters. Certain legal matters continue to take longer than anticipated to resolve, while others are not expected to be resolved until late third quarter of 2008 at the earliest. Once the legal matters have been resolved, FINOVA will still need a short period of time to complete the final wind-up of our affairs. As a result, the reserve for estimated costs reflected in our Statement of Net Assets in Liquidation was adjusted to assume a liquidation period through the fourth quarter of 2008. There can be no assurance we will complete our liquidation in this time period, and the resolution of the various legal matters may extend for a longer period of time. We will continue to evaluate our progress in resolving the outstanding legal matters on at least a quarterly basis and re-evaluate our reserve for estimated costs. Refer below to Note G. "Litigation and Claims" for the status of our outstanding legal matters.

3

### Table of Contents

We will continue to operate as a public company throughout the liquidation period under a Management Services Agreement with Leucadia National Corporation ("Leucadia") that expires in 2011. Pursuant to that agreement, Leucadia has designated its employees to act as Chairman of the Board (Ian M. Cumming), President (Joseph S. Steinberg) and Chief Executive Officer (Thomas E. Mara). In accordance with the Indenture, we currently maintain cash reserves that we believe are adequate to pay our operating expenses as they come due.

### B.    Significant Accounting Policies

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires us to use estimates and assumptions that affect reported amounts of assets and liabilities. These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. Significant estimates include anticipated amounts and timing of future cash flows used in the calculation of net realizable value, reserve for future costs and settlement amounts. Actual results could differ from those estimated.

#### *Interim Reporting*

The interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles. The interim consolidated financial information is unaudited. In the opinion of management, all adjustments consisting of normal recurring items necessary to present fairly our net assets in liquidation as of June 30, 2008 and the changes in net assets presented herein have been included in our consolidated financial statements.

For a complete listing of our significant accounting policies, see Note B. "Significant Accounting Policies" in our 2007 Form 10-K. The policies related to the liquidation basis of accounting were the only policies presented herein. With the adoption of the liquidation basis of accounting, all anticipated improvements or deterioration in the portfolio are fully reflected in our financial statements as facts and assumptions change.

#### *Liquidation Basis of Accounting*

As a result of the approval of our Plan of Liquidation by the Bankruptcy Court, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10-Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States. A Statement of Net Assets in Liquidation and a Statement of Changes in Net Assets in Liquidation are the principal financial statements presented under the liquidation basis of accounting. Under the liquidation basis of accounting, assets are stated at their estimated net realizable value, which is the non-discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non-discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs. Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). These estimates will be periodically reviewed and adjusted as appropriate. There can be no assurance that these estimated values will be realized. Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution. The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances, of the net realizable value of the assets and the costs associated with carrying out the Plan of Liquidation based on the assumptions set forth below. The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material. In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation. Accordingly, it is not possible to predict with certainty the timing or aggregate amount which will ultimately be distributed to note holders and no assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statements of Net Assets in Liquidation or the price at which our Senior Notes have traded or are expected to trade in the future.

The following are the significant assumptions utilized by management in assessing the value of our liquidating portfolio and the expected settlement amount of liabilities included in the Statements of Net Assets in Liquidation at June 30, 2008 and December 31, 2007.

**Liquidating Portfolio.** The remaining liquidating portfolio is primarily comprised of judgments and claims against former customers and non-marketable private equity and other securities. All assets were adjusted to their estimated net realizable values, which represented all future undiscounted cash flows expected to be collected from each of these transactions

including sales and settlement

4

Form 10-Q

### Table of Contents

proceeds, principal collections, scheduled rental payments and interest. Cash flow estimates for these assets are based on current information obtained from trustees and others, collection efforts, customer collateral and the financial condition of these former customers. Certain investments are reported at their fair value, based on published information or quotes by registered securities brokers. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values.

**Reserve for Estimated Costs during the Liquidation Period.** Under the liquidation basis of accounting, we are required to estimate and accrue for costs associated with implementing and completing the Plan of Liquidation. The reserve for estimated costs includes four primary areas of accruals including people costs (payroll and benefits), Leucadia management fees, professional services and litigation costs and corporate expenses (insurance, directors' fees and entity related expenses). These amounts can vary significantly due to, among other things, the timing of asset sales, the timing and amounts associated with discharging known and contingent liabilities and claims, the costs associated with cessation of our operations including an estimate of costs subsequent to that date (which would include reserve contingencies for the appropriate statutory periods) and the costs of retaining knowledgeable personnel and others to oversee the liquidation. As a result, we have accrued the projected costs including corporate overhead and specific liquidation costs of performance bonuses, professional fees and various other wind-up costs expected to be incurred during the projected period to complete the liquidation and dissolution. These expense accruals will be periodically reviewed for adequacy and adjusted from time to time as projections and assumptions change. Changes to the accruals will be recorded as adjustments to net assets in liquidation in future periods.

### C. Changes in Net Assets in Liquidation

During the six months ended June 30, 2008, the estimated net realizable value of our assets and liabilities increased a net $0.2 million; while during the same period of 2007, the estimated net realizable value decreased $0.8 million. The increase during 2008 was primarily due to higher than previously anticipated recoveries of cash amounts posted to secure potential obligations and liquidation distributions received from trustees of former customers, partially offset by a decline in the value of certain cash investments; the decrease during 2007 was primarily attributed to a decline in the value of certain aviation assets. Additionally, during the six months ended June 30, 2008 and 2007, we accrued $53.4 million and $55.1 million, respectively, of additional interest on the Senior Notes and earned interest income on cash investments and other operating activity of $4.2 million and $8.2 million, respectively. All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments. Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection. Amounts received during 2008 and 2007 were not considered to be significant.

The net realizable value of our assets does not take into consideration all future interest to be earned on cash and cash equivalents. Interest earned on the investment of cash reserves is shown separately as a change in net assets. As of June 30, 2008, our short-term investments are primarily comprised of low risk money markets, U.S. Treasuries and certificates of deposit.

Under the liquidation basis of accounting, we were also required to establish and maintain a reserve for all future general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). The following is a summary of and changes to the reserve for estimated costs for the six months ended June 30, 2008:

|  | December 31, 2007 | | Net Adjustments and Payments | June 30, 2008 |
|---|---|---|---|---|
| People costs (payroll and benefits) | $ | 3,319 | $ (2,227) | $1,092 |
| Leucadia management fees |  | 6,000 | (2,000) | 4,000 |
| Professional services and litigation costs |  | 4,955 | (1,860) | 3,095 |
| General corporate expenses |  | 1,517 | (1,174) | 343 |
| Total reserve for estimated costs during the liquidation period | $ | 15,791 | $ (7,261) | $8,530 |

During the six months ended June 30, 2008, the reserve declined by $7.3 million due to the payment of expenses of $9.1 million and a reduction in our estimate as a result of certain actual and future expenses being lower than originally anticipated, partially offset by an increase in our estimate due to the extension of the estimated liquidation period through the fourth quarter of 2008.

5

Table of Contents

We have continued with efforts to wind-up our affairs in a timely manner; however, as previously noted we cannot control the timing of resolving legal matters. Certain legal matters continue to take longer than anticipated to resolve, while others are not expected to be resolved until late third quarter of 2008 at the earliest. Once the legal matters have been resolved, FINOVA will still need a short period of time to complete the final wind-up of our affairs. As a result, the reserve for estimated costs reflected in our Statement of Net Assets in Liquidation was adjusted to assume a liquidation period through the fourth quarter of 2008. There can be no assurance we will complete our liquidation in this time period, and the resolution of the various legal matters may extend for a longer period of time. We will continue to evaluate our progress in resolving the outstanding legal matters on at least a quarterly basis and to re-evaluate our reserve for estimated costs. Refer below to Note G. "Litigation and Claims" for the status of our outstanding legal matters.

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes. During the six months ended June 30, 2008, the estimated settlement amount of the Senior Notes (principal only) was reduced by $50.7 million to a balance of $183.3 million; however, we currently estimate the Senior Note holders will receive total liquidation distributions (principal and interest) of approximately $196.9 million, which when combined with $53.4 million of interest already distributed during 2008, is a $2.7 million increase over our 2007 year-end estimate.

### D.   Liquidating Portfolio

Our liquidating portfolio is recorded at its estimated net realizable value, which incorporates all future cash flows, including earnings expected to be collected.

The following table presents the activity in our liquidating portfolio for the six months ended June 30, 2008:

| | |
|---|---|
| **Liquidating Portfolio at December 31, 2007** | $ 6,271 |
| **Cash Activity:** | |
| Collections and proceeds | (4,598) |
| **Non-Cash Activity:** | |
| Change in estimated net realizable value of assets | (73) |
| **Liquidating Portfolio at June 30, 2008** | $ 1,600 |

As of June 30, 2008, we have substantially completed the liquidation of our portfolio. Our liquidating portfolio declined to $1.6 million at June 30, 2008. Cash activity primarily included the liquidation of our investments in the severance and bonus trusts and recoveries on accounts and claims previously not anticipated, while the non-cash decrease in the value of assets was primarily due to a decline in the value of certain cash investments.

As of June 30, 2008, the remaining portfolio value is primarily comprised of a number of judgments and claims against former customers (net realizable value of $1.5 million) and a few non-marketable private equity and other securities. In the majority of these instances, we did not attribute any net realizable value to these assets due to our inability to predict the collection of any cash flows from the transactions with even a remote level of confidence. Most of these transactions were previously included in due diligence materials in an attempt to sell the assets, but were excluded on multiple occasions by prospective buyers because of costs of collection and potential liability concerns of the buyers. Prospective buyers that specialize in these types of residual assets and claims performed due diligence, but were not interested in making an offer. We continue to monitor these accounts for changes in facts and circumstances that would allow us to attribute value to these assets or events that would resolve their ultimate disposition. As a result, there is the possibility that some net realizable value will be attributed to these assets in the future. An increase in the estimated net realizable value of these assets, if any, will be reflected as a change in net assets in liquidation in future filings. Additionally, we continue to occasionally receive proceeds from trustees and liquidators for assets that in certain cases were written off years ago. These cash flows are typically immaterial and are reflected as a change in net assets in liquidation as they are received. We expect certain of these assets will out last the Company. In connection with or prior to the final dissolution of our entities, we anticipate assigning or transferring the rights to collection of these assets to a trustee or receiver for the benefit of the Senior Note holders.

6

Table of Contents

### E.  Debt

A summary of our total debt outstanding on a liquidation basis was as follows:

|                                                                  | June 30, 2008 | December 31, 2007 |
|------------------------------------------------------------------|--------------:|------------------:|
| Senior Notes:                                                    |               |                   |
| Principal                                                        | $ 1,424,166   | $ 1,424,166       |
| Principal of Senior Notes estimated to not be settled or repaid  | (1,240,874)   | (1,190,171)       |
| Senior Notes                                                     | $    183,292  | $   233,995       |

During the six months ended June 30, 2008, we made one interest payment of $53.4 million and no principal prepayments on the Senior Notes. Cumulative prepayments through June 30, 2008 totaled $1.54 billion, which reduced the outstanding principal to $1.4 billion and represented approximately 52% of the principal being repaid. Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (principal and interest) of approximately $196.9 million, which when combined with $53.4 million of interest already distributed during 2008, is a $2.7 million increase over our 2007 year-end estimate, but considerably less than the total principal and interest due of approximately $1.4 billion. The estimated settlement amount was determined solely based on the net assets available for settlement of the Senior Notes and is subject to change due to changes in the estimated net realizable value of our net assets. We clearly do not have sufficient assets to fully repay the Senior Note obligation.

While the Senior Notes have a first priority security interest in substantially all of our remaining assets, the Indenture requires us to first use any cash and cash equivalents to pay or fund operating expenses, taxes and reasonable reserves for commitments and general corporate purposes. In accordance with the terms of the Indenture, we are required to use any excess cash, as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at our option, which we have previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the wind-up of our affairs and resolution of matters related to the TLP Action, discussed below in Note G. "Litigation and Claims," we anticipate maintaining cash reserves to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments.

The timing and amount of distributions to Senior Note holders will primarily depend on the resolution of legal matters, the extent to which reserves for current or future liabilities are required, the length of time required to settle all of our matters and to a lesser extent, the timing and amounts we receive for our remaining assets. Refer below to Note G. "Litigation and Claims" for the status of our outstanding legal matters and a discussion of the equity committee's appeal of the Bankruptcy Court's order that authorized us to use the funds in the restricted cash account for general corporate purposes, including payment to Senior Note holders.

Stockholders should not expect any payments or distributions. The Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders may receive a distribution equal to 5.263% (i.e., 5%/95%) of each principal prepayment. Ninety-five percent (95%) of the remaining available cash after establishment of cash reserves as defined in the Indenture may be used to make prepayments of principal on the Senior Notes and five percent (5%) is identified for distributions to and/or repurchases of stock from common stockholders. However, the Indenture prohibits us from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law. Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture.

In conjunction with the prepayments of the Senior Notes noted above, we have retained a total of $81.2 million as of June 30, 2008. Retained amounts have been segregated and reflected as restricted cash in our financial statements, pending their final disposition. We anticipate that the retained amounts will eventually be paid to our creditors, not our stockholders. If the funds were to be paid to our stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of our common stock, would receive half of the retained amounts. Berkadia has advised us that it does not believe that stockholders are entitled to the retained amounts since we cannot fully satisfy our creditor obligations.

7

Table of Contents

As previously reported, in June 2007 the Bankruptcy Court determined that (1) we no longer need to direct funds into a restricted account, and (2) we may use those funds for general corporate purposes. The Bankruptcy Court order has been stayed pending final resolution of an appeal to the Delaware District Court by the equity committee. For a further discussion of the appeal and its status, see Note G. "Litigation and Claims."

## F.  Income Taxes

Our federal net operating loss carryforwards of $1.6 billion have remained relatively unchanged since year end. No income tax expense or benefit was recorded during the six months ended June 30, 2008 and 2007. Any income or loss has been entirely offset by a decrease or increase in valuation allowances against deferred tax assets, which were previously established due to concerns regarding our ability to utilize income tax benefits generated from losses in prior periods. We do not expect to be able to utilize all the deferred tax assets due to uncertainty about the amount of future earnings, a variety of loss or other tax attribute carryover limitations in the various jurisdictions in which we file tax returns and uncertainty regarding the timing of the reversal of deferred tax liabilities.

## G.  Litigation and Claims

### *Legal Proceedings*

We are party either as plaintiff or defendant to various actions, proceedings and pending claims, including legal actions, some of which involve claims for compensatory, punitive or other damages in significant amounts. Litigation often results from our attempts to enforce our lending agreements against borrowers and other parties to those transactions. Litigation is subject to many uncertainties. It is possible that some of the legal actions, proceedings or claims could be decided against us. Other than the matters described below, we believe that any resulting liability from our legal proceedings should not materially affect our net assets in liquidation or cash flows. The following matters could have a material adverse impact on our net assets in liquidation or cash flows.

Historically, it was our policy to accrue for loss contingencies, including litigation, only when the losses were probable and estimable. The determination of when losses became probable and estimable was inherently subjective and required significant judgment. Under the liquidation basis of accounting, liabilities for loss contingencies and claims are reported at their estimated net settlement amount, which is the non-discounted amount of cash expected to be paid to liquidate or settle an obligation in the due course of business.

If any legal proceedings were to result in a significant adverse judgment against us, it is possible that we would not be able to satisfy that liability due to our financial condition. As previously noted, due to our financial condition, we do not expect that we can satisfy all of our secured debt obligations at maturity.

### *Thaxton Life Partners Litigation*

On September 29, 2006, a group of noteholders of Thaxton Life Partners, Inc. ("TLP") filed suit against the Company and FINOVA Capital (the "TLP Action"), unrelated to the previously settled litigation involving The Thaxton Group, Inc. The Company and FINOVA Capital were served with the TLP Action in February of 2007. The TLP Action purports to be a class action filed on behalf of approximately 150 TLP note holders with claims related to approximately $20 million in TLP notes. The TLP Action alleges that, in connection with TLP's sale of its notes, the Company, FINOVA Capital, and several other defendants participated in a civil conspiracy, violated the South Carolina Unfair Trade Practices Act, violated the civil RICO statute, and were unjustly enriched. In its various counts, the TLP Action seeks actual, treble, and/or punitive damages.

The TLP Action was filed in the South Carolina Court of Common Pleas of Lancaster County, Sixth Judicial Circuit, and was removed on February 6, 2007 to the United States District Court for the District of South Carolina (the "South Carolina District Court"). We believe that all claims against both us and FINOVA Capital are without merit, and that, under the terms of the TLP notes, the TLP Action must move forward in arbitration. Upon motion by the Company and FINOVA Capital to the South Carolina District Court seeking an order compelling such arbitration, the South Carolina District Court granted the relief sought and entered an order dismissing the action on May 30, 2007. On June 19, 2007, the TLP plaintiffs appealed such order to the United States Court of Appeals for the Fourth Circuit (the "Fourth Circuit"). Further, on June 29, 2007, the TLP plaintiffs filed an arbitration demand with the American Arbitration Association. On August 16, 2007, the Company and FINOVA Capital filed a response to the arbitration demand denying any liability. On December 20, 2007, the TLP plaintiffs' appeal was denied by the Fourth Circuit. On January 23,

8

**Table of Contents**

2008, a petition for rehearing by the TLP plaintiffs was also denied by the Fourth Circuit. The Company and FINOVA Capital intend to vigorously defend against the TLP note holders' claims asserted against the Company and FINOVA Capital in the pending arbitration. The arbitration continues to move along as scheduled. The plaintiffs and FINOVA have both filed briefs in support of their arbitration cases and a hearing on the merits of the TLP Action is scheduled for late third quarter of 2008.

*Motion Regarding Distributions to Stockholders*

As discussed more fully in Note E. "Debt", the Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders may receive a distribution equal to 5.263% of each principal prepayment. However, the Indenture prohibits distribution of those amounts due to our financial condition. Those amounts have been held in a restricted account, and totaled $81.2 million as of June 30, 2008. Because we will not be able to repay the Senior Notes in full, on April 1, 2005, we filed a motion in the Bankruptcy Court seeking an order (1) to cease directing funds into the restricted account and (2) to allow us to use those funds for general corporate purposes.

On June 26, 2007, the Bankruptcy Court issued a final order (the "Final Clarification Order") finding, among other things, that FINOVA is presently and will be forever insolvent, and lifted the requirement that FINOVA segregate the funds into a restricted account enabling FINOVA to use these funds for general corporate purposes. The equity committee subsequently filed a motion requesting a stay in the distribution of funds held in the restricted account pending appeal of the final order to the United States District Court for the District of Delaware (the "Delaware District Court"), which was filed on July 6, 2007. The Bankruptcy Court granted the equity committee a ninety (90) day stay, which expired October 22, 2007, and directed that all further action related to this matter be heard in the Delaware District Court. On August 31, 2007, the equity committee filed a motion with the Delaware District Court requesting a stay pending final resolution of any appeal. On October 31, 2007, the Delaware District Court granted a stay pending appeal of the Bankruptcy Court's Final Clarification Order. The Delaware District Court was expected to rule on the appeal during the first quarter of 2008, but the Delaware District Court has not yet issued a ruling on this matter.

Through December 31, 2007, we had been required to pay fees and expenses incurred by the equity committee's professionals up to an aggregate limit of $388,000. Subsequent to year end, the equity committee was seeking a further increase in the aggregate limit placed on the amount of fees and expenses. A hearing was held on this matter on January 10, 2008 and the Bankruptcy Court ordered that the aggregate limit placed on the amount of fees and expenses that the equity committee and its professionals were authorized to incur in objecting to, and addressing the issues raised in connection with, the clarification motion be increased to $473,751. The increase granted by the Bankruptcy Court represented one-half of the equity committee's requested amount. The Bankruptcy Court also ordered that the equity committee shall not submit any further motions or requests for fees and expenses unless they prevailed in the pending appeal of the Final Clarification Order.

On July 16, 2007, FINOVA filed a notice of cross-appeal with the Delaware District Court contesting the Bankruptcy Court's order that re-formed the equity committee and the three fee cap orders. In December 2007, the equity committee filed a motion to strike our cross-appeal on the basis that the cross-appeal was untimely. On February 26, 2008, the Delaware District Court issued a memorandum opinion denying the equity committee's motion to strike our cross-appeal, which is still pending.

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following section should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K") and the Special Note Regarding Forward-Looking Statements included herein. Capitalized terms not defined herein are used as defined in the 2007 Form 10-K. The following discussion relates to The FINOVA Group Inc. and its subsidiaries (collectively "FINOVA" or the "Company"), including its principal operating subsidiary, FINOVA Capital Corporation and its subsidiaries ("FINOVA Capital").

9

Table of Contents

**OVERVIEW**

**Plan of Liquidation.** On November 1, 2006, our Board of Directors (the "Board") approved the Plan of Complete Liquidation and Dissolution (the "Plan of Liquidation") and the filing of a motion (the "Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which was approved by the Bankruptcy Court on December 4, 2006. As a result of these approvals, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10-Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States.

As of June 30, 2008, we had substantially completed the liquidation of our asset portfolio. Our attention is focused on the wind down of our operations, resolution of legal matters and the future dissolution of our entities. We are in the process of withdrawing our authority to conduct business in the states that we no longer have active assets or legal requirements that necessitate our continued authorization to conduct business. As of June 30, 2008, we have completed the withdrawal process for 42 states, while others are pending. The timing and amount of distributions to Senior Note holders will primarily depend on the resolution of legal matters, the extent to which reserves for current or future liabilities are required, the length of time required to settle all our matters and, to a lesser extent, the timing and amounts we receive for our remaining assets.

We have continued with efforts to wind-up our affairs in a timely manner; however, as previously noted we cannot control the timing of resolving legal matters. Certain legal matters continue to take longer than anticipated to resolve, while others are not expected to be resolved until late third quarter of 2008 at the earliest. Once the legal matters have been resolved, FINOVA will still need a short period of time to complete the final wind-up of our affairs. As a result, the reserve for estimated costs reflected in our Statement of Net Assets in Liquidation was adjusted to assume a liquidation period through the fourth quarter of 2008. There can be no assurance we will complete our liquidation in this time period, and the resolution of the various legal matters may extend for a longer period of time. We will continue to evaluate our progress in resolving the outstanding legal matters on at least a quarterly basis and re-evaluate our reserve for estimated costs. Refer above to Note G, "Litigation and Claims" for the status of our outstanding legal matters.

We continue to retain cash reserves to fund our expenses, including the costs associated with the wind-up of our affairs and matters related to the TLP Action, which could limit our ability to make and the timing of future voluntary principal prepayments.

**Forever Insolvent.** As of June 30, 2008, we have repaid $1.54 billion or approximately 52% of the principal on the Senior Notes. Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (principal and interest) of approximately $196.9 million, which when combined with $53.4 million of interest already distributed during 2008, is a $2.7 million increase over our 2007 year-end estimate, but considerably less than the total principal and interest due of approximately $1.4 billion. We clearly do not have sufficient assets to fully repay the Senior Note obligation. On June 26, 2007, the Bankruptcy Court issued a final order finding, among other things, that FINOVA is presently and will be forever insolvent.

**No Stockholder Payments Anticipated.** While the Indenture contemplated we would make payments to our stockholders as the Senior Notes were repaid, we have not made those payments. Distributions to stockholders are prohibited due to our financial condition. Based on our liquidation basis financial statements, we will not be able to repay approximately $1.2 billion of the Senior Notes. As a result, stockholders should not expect any payments or return on their common stock. Funds related to the restricted distributions have been held in a segregated account, pending their final disposition. We anticipate that those funds will eventually be paid to our creditors, **not** to our stockholders. If the funds were to be paid to our stockholders, affiliates of Berkadia (which are owned by Berkshire Hathaway and Leucadia), as owner of 50% of our stock, would receive half of those payments.

As discussed in Note G, "Litigation and Claims," we filed a motion in the Bankruptcy Court, seeking an order that (1) we no longer need to direct funds into a restricted account, and (2) we may use those funds for general corporate purposes. On June 26, 2007, the Bankruptcy Court issued a final order that granted our motion in its entirety, but the order has been stayed pending final resolution of an appeal to the Delaware District Court by the equity committee.

10

Table of Contents

**No Restructuring Plan Contemplated.** On numerous occasions, we have been asked whether there is some plan to restructure the Company so as to be able to realize value from our net operating loss carryforwards ("NOL"). We are not formulating a restructuring plan. However, as we have noted for some time, the Board remains willing to consider legitimate proposals presented by note holders or others. Multiple groups have made proposals or presented us with concepts designed to save the NOLs. In each and every instance to date, the proposals and concepts were determined to not be viable under the applicable tax regulations and/or did not make economic sense.

Many obstacles exist to creation of a viable restructuring plan. A restructuring presumes a sensible business plan emerging from that process. In light of our dwindling asset base, lack of retained business knowledge and the competitive environment, we believe it would be difficult, if not futile, in these circumstances to develop a business model that can produce returns to the creditors and/or new investors greater than that expected from the present course. Absent that, or a substantial new investment in FINOVA, we believe it would be difficult to obtain the requisite approval to restructure the present debt obligations. The task has become more difficult due to the substantial liquidation of our portfolio and continuation of the wind-up process. We caution investors to carefully evaluate applicable tax regulations, which restrict the ability to transfer or use NOLs in a variety of circumstances. As previously disclosed, our financial statements do not anticipate using the NOLs. Upon final dissolution of our entities, the NOLs will be extinguished.

**HIGH INVESTMENT RISK OF SECURITIES. As previously stated, we will not be able to fully repay the Senior Notes or to make any distributions to our stockholders, absent a court order in connection with the appeal referred to above. Consequently, investing in our Senior Notes and common stock involves a high level of risk.**

## CRITICAL ACCOUNTING POLICIES

Our consolidated financial statements continue to be prepared in accordance with U.S. generally accepted accounting principles. The preparation of these financial statements requires us to use estimates and assumptions that affect reported amounts of assets and liabilities. These estimates are subject to known and unknown risks, uncertainties and other factors that could materially impact the amounts reported and disclosed in the financial statements. See Item 1A. "Risk Factors" and "Special Note Regarding Forward-Looking Statements" in our 2007 Form 10-K for more information on these risks and uncertainties. We believe the following to be among the most critical judgment areas in the application of our accounting policies.

### *Liquidation Basis of Accounting*

As a result of the approval of our Plan of Liquidation by the Bankruptcy Court, we took steps to initiate our complete liquidation and as such, the information provided in this Report on Form 10-Q reflects our adoption of the liquidation basis of accounting effective the close of business on December 4, 2006 in accordance with accounting principles generally accepted in the United States. A Statement of Net Assets in Liquidation and a Statement of Changes in Net Assets in Liquidation are the principal financial statements presented under the liquidation basis of accounting. Under the liquidation basis of accounting, assets are stated at their estimated net realizable value, which is the non-discounted amount of cash, or its equivalent, into which an asset is expected to be converted in the due course of business less direct costs, while liabilities are reported at their estimated net settlement amount, which is the non-discounted amounts of cash, or its equivalent, expected to be paid to liquidate an obligation in the due course of business, including direct costs. Additionally, under the liquidation basis of accounting, we are required to establish a reserve for all future estimated general and administrative expenses and other costs expected to be incurred during the liquidation (exclusive of interest expense). These estimates will be periodically reviewed and adjusted as appropriate. There can be no assurance that these estimated values will be realized. Such amounts should not be taken as an indication of the timing or amount of future distributions or our actual dissolution. The valuation of assets at their net realizable value and liabilities at their anticipated settlement amount represent estimates, based on present facts and circumstances, of the net realizable value of the assets and the costs associated with carrying out the Plan of Liquidation based on the assumptions set forth below. The actual values and costs associated with carrying out the Plan of Liquidation are expected to differ from amounts reflected in the accompanying financial statements because of the plan's inherent uncertainty. These differences may be material. In particular, the estimates of our costs will vary with the length of time necessary to complete the Plan of Liquidation. Accordingly, it is not possible to predict with certainty the timing or aggregate amount which will ultimately be distributed to note holders and no assurance can be given that the distributions will equal or exceed the estimate presented in the accompanying Statements of Net Assets in Liquidation or the price at which our Senior Notes have traded or are expected to trade in the future.

11

Table of Contents

The following are the significant assumptions utilized by management in assessing the value of our liquidating portfolio and the expected settlement amount of liabilities included in the Statements of Net Assets in Liquidation at June 30, 2008 and December 31, 2007.

**Liquidating Portfolio.** The remaining liquidating portfolio is primarily comprised of judgments and claims against former customers and non-marketable private equity and other securities. All assets were adjusted to their estimated net realizable values, which represented all future undiscounted cash flows expected to be collected from each of these transactions including sales and settlement proceeds, principal collections, scheduled rental payments and interest. Cash flow estimates for these assets are based on current information obtained from trustees and others, collection efforts, customer collateral and the financial condition of these former customers. Certain investments are reported at their fair value, based on published information or quotes by registered securities brokers. Changes in facts and assumptions have resulted in, and may in the future result in, significant positive or negative changes to estimated cash flows and therefore, net realizable values.

**Reserve for Estimated Costs during the Liquidation Period.** Under the liquidation basis of accounting, we are required to estimate and accrue for costs associated with implementing and completing the Plan of Liquidation. The reserve for estimated costs includes four primary areas of accruals including people costs (payroll and benefits), Leucadia management fees, professional services and litigation costs and corporate expenses (insurance, directors' fees and entity related expenses). These amounts can vary significantly due to, among other things, the timing of assets sales, the timing and amounts associated with discharging known and contingent liabilities and claims, the costs associated with cessation of our operations including an estimate of costs subsequent to that date (which would include reserve contingencies for the appropriate statutory periods) and the costs of retaining knowledgeable personnel and others to oversee the liquidation. As a result, we have accrued the projected costs including corporate overhead and specific liquidation costs of performance bonuses, professional fees and various other wind-up costs expected to be incurred during the projected period to complete the liquidation and dissolution. These expense accruals will be periodically reviewed for adequacy and adjusted from time to time as projections and assumptions change. Changes to the accruals will be recorded as adjustments to net assets in liquidation in future periods.

With the adoption of the liquidation basis of accounting, all anticipated improvements or deterioration in the portfolio are fully reflected in our financial statements as facts and assumptions change.

**CHANGES IN NET ASSETS IN LIQUIDATION**

The following table summarizes the changes in net assets in liquidation for the three and six months ended June 30, 2008 and 2007 (dollars in thousands):

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2008 | 2007 | 2008 | 2007 |
| Net Assets in Liquidation, beginning of year | $ — | $ — | $ — | $ — |
| Changes in net assets in liquidation: | | | | |
| Change in estimated net realizable value of assets and other liabilities | 28 | 983 | 246 | (827) |
| Interest earned on investment of cash reserves and other operating activity | 2,009 | 4,794 | 4,247 | 8,210 |
| Change in estimated costs during the liquidation period | (2,968) | (2,834) | (1,790) | (3,558) |
| Interest accruing on the Senior Notes | (26,703) | ( 27,234) | ( 53,406) | (55,059) |
| Reduction in the estimated settlement of the Senior Notes | 27,634 | 24,291 | 50,703 | 51,234 |
| Net Change in Net Assets in Liquidation | $ — | $ — | $ — | $ — |
| Net Assets in Liquidation, end of period | $ — | $ — | $ — | $ — |

12

Table of Contents

**Changes in Net Assets in Liquidation for the three months ended June 30, 2008 and 2007**

During the three months ended June 30, 2008, the estimated net realizable value of our assets and liabilities on a net basis was virtually unchanged; while during the same period of 2007, the estimated net realizable value increased $1.0 million. During 2008, recoveries of cash amounts posted to secure potential obligations and liquidation distributions received from trustees of former customers were almost entirely offset by a decline in the value of certain cash investments. The increase during 2007 was primarily due to an increase in the value of certain aviation assets and the settlement of certain claims for lower than previously anticipated amounts. Additionally, during the three months ended June 30, 2008 and 2007, we accrued $26.7 million and $27.2 million, respectively, of additional interest on the Senior Notes and earned interest income on cash investments and other operating activity of $2.0 million and $4.8 million, respectively. All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments. Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection. Amounts received during 2008 and 2007 were not considered to be significant.

The net realizable value of our assets does not take into consideration all future interest to be earned on cash and cash equivalents. Interest earned on the investment of cash reserves is shown separately as a change in net assets. As of June 30, 2008, our short-term investments are primarily comprised of low risk money markets, U.S. Treasuries and certificates of deposit.

Additionally, as previously discussed, we established a reserve for estimated costs during the liquidation period and all future expenditures for operating expenses are charged directly against that reserve. During the three months ended June 30, 2008, the reserve declined by $0.8 million due to the payment of expenses of $3.8 million, partially offset by a $3.0 million net increase in our estimate due to the extension of the estimated liquidation period through the fourth quarter of 2008. During the three months ended June 30, 2007, the reserve for estimated costs declined due to the payment of expenses and a reduction in our estimate as a result of certain actual expenses being lower than originally anticipated, partially offset by a net increase to the reserve caused by the extension of the estimated liquidation period.

We have continued with efforts to wind-up our affairs in a timely manner; however, as previously noted we cannot control the timing of resolving legal matters. Certain legal matters continue to take longer than anticipated to resolve, while others are not expected to be resolved until late third quarter of 2008 at the earliest. Once the legal matters have been resolved, FINOVA will still need a short period of time to complete the final wind-up of our affairs. As a result, the reserve for estimated costs reflected in our Statement of Net Assets in Liquidation was adjusted to assume a liquidation period through the fourth quarter of 2008. There can be no assurance we will complete our liquidation in this time period, and the resolution of the various legal matters may extend for a longer period of time. We will continue to evaluate our progress in resolving the outstanding legal matters on at least a quarterly basis and re-evaluate our reserve for estimated costs. Refer above to Note G. "Litigation and Claims" for the status of our outstanding legal matters.

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes. During the three months ended June 30, 2008, the estimated settlement amount of the Senior Notes (principal only) was reduced by $27.6 million to a balance of $183.3 million; however, we currently estimate the Senior Note holders will receive total liquidation distributions (principal and interest) of approximately $196.9 million, which when combined with $53.4 million of interest already distributed during 2008, is a $2.7 million increase over our 2007 year-end estimate.

**Changes in Net Assets in Liquidation for the six months ended June 30, 2008 and 2007**

During the six months ended June 30, 2008, the estimated net realizable value of our assets and liabilities increased a net $0.2 million; while during the same period of 2007, the estimated net realizable value decreased $0.8 million. The increase during 2008 was primarily due to higher than previously anticipated recoveries of cash amounts posted to secure potential obligations and liquidation distributions received from trustees of former customers, partially offset by a decline in the value of certain cash investments; the decrease during 2007 was primarily attributed to a decline in the value of certain aviation assets. Additionally, during the six months ended June 30, 2008 and 2007, we accrued $53.4 million and $55.1 million, respectively, of additional interest on the Senior Notes and earned interest income on cash investments and other operating activity of $4.2 million and $8.2 million, respectively. All cash received on the portfolio is applied against its estimated net realizable value, which took into consideration all expected interest and rental payments. Any cash received in excess of an individual asset's estimated net realizable value is shown as a change in net assets in the period of collection. Amounts received during 2008 and 2007 were not considered to be significant.

13

Table of Contents

Additionally, as previously discussed, we established a reserve for estimated costs during the liquidation period and all future expenditures for operating expenses are charged directly against the reserve. During the six months ended June 30, 2008, the reserve declined by $7.3 million due to the payment of expenses of $9.1 million and a reduction in our estimate as a result of certain actual and future expenses being lower than originally anticipated, partially offset by an increase in our estimate due to the extension of the estimated liquidation period through the fourth quarter of 2008. During the six months ended June 30, 2007, the reserve for estimated costs declined due to the payment of expenses and a reduction in our estimate as a result of certain actual expenses being lower than originally anticipated, partially offset by a net increase to the reserve caused by the extension of the estimated liquidation period.

Due to the fact that we do not have sufficient assets to fully satisfy all obligations to our creditors, any change to the estimated net realizable value of our assets and liabilities results in a corresponding adjustment to the estimated settlement amount of the Senior Notes. During the six months ended June 30, 2008, the estimated settlement amount of the Senior Notes (principal only) was reduced by $50.7 million to a balance of $183.3 million; however, we currently estimate the Senior Note holders will receive total liquidation distributions (principal and interest) of approximately $196.9 million, which when combined with $53.4 million of interest already distributed during 2008, is a $2.7 million increase over our 2007 year-end estimate.

## FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

Since emergence from chapter 11 bankruptcy proceedings in August 2001, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of our assets. These activities included collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral. We have substantially completed the liquidation of our portfolio and our focus has shifted to the continued wind down of our operations and future dissolution of our entities. We are prohibited by the Indenture governing our 7.5% Senior Secured Notes from engaging in any new lending activities or other business. Any funds generated in excess of cash reserves permitted by our debt agreements have been used to reduce obligations to our creditors.

Because substantially all of our assets (including cash reserves) are pledged to secure obligations under the Intercompany Notes securing the Senior Notes, our ability to obtain additional or alternate financing is severely restricted. Berkadia has no obligation to lend additional sums to or to further invest in FINOVA. As a result of these factors and the substantial liquidation of our portfolio, our only meaningful source of liquidity is cash reserves held by the Company.

The terms of the Indenture prohibit us from using available funds (after certain permitted uses) for any purpose other than to satisfy our obligations to creditors and to make limited payments to stockholders in certain circumstances. Under the terms of the Indenture, we are permitted to establish a cash reserve in an amount not to exceed certain defined criteria. Due to our limited sources of liquidity, the estimation of cash reserves is critical to our overall liquidity. Cash reserve estimations are subject to known and unknown risks, uncertainties, and other factors that could materially impact the amounts determined. Failure to adequately estimate a cash reserve in one period could result in insufficient liquidity to meet obligations in that period, or in a subsequent period, if actual cash requirements exceed the cash reserve estimates. Historically, cash reserves typically equaled anticipated cash flows to cover operating costs, tax payments, fundings under existing customer commitments, interest payments and any other necessary cash flows expected to occur during the next six month period. We have the discretion to and have from time to time adjusted our cash reserve methodology. Due to the substantial liquidation of our portfolio, our incoming cash flows have significantly diminished and the estimation of cash reserves has become increasingly more critical to ensure we retain funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process. Generally, our cash reserve methodology has been altered to retain our maximum potential cash requirements. As a result, we are reserving cash for the full amount of legal claims even though we anticipate settling or resolving the matters for considerably less. Additionally, our cash reserve methodology assumes a longer liquidation period than our reserve for estimated costs, as well as a contingency for unknown matters that may arise as we complete the wind-up process.

In accordance with the terms of the Indenture, we are required to use any excess cash, as defined in the Indenture, to make semi-annual interest and principal payments on the Senior Notes. Additionally, the Indenture permits voluntary prepayments at our option, which we have previously elected to make from time to time; however, due to the uncertainty of cash requirements associated with the wind-up of our affairs and matters related to the TLP Action, discussed in Note G. "Litigation and Claims," we anticipate maintaining cash reserves to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments.

Form 10-Q

14

## Table of Contents

The timing and amount of distributions to Senior Note holders will primarily depend on the resolution of legal matters, the extent to which reserves for current or future liabilities are required, the length of time required to settle all of our matters and, to a lesser extent, the timing and amounts we receive for our remaining assets. Refer to Note G. "Litigation and Claims" for the status of our outstanding legal matters.

During the six months ended June 30, 2008, we made one interest payment of $53.4 million and no principal prepayments on the Senior Notes. Cumulative prepayments through June 30, 2008 totaled $1.54 billion, which reduced the outstanding principal to $1.4 billion and represented approximately 52% of the principal being repaid. Based on the valuation of our assets at their estimated net realizable value and liabilities at estimated settlement amount, we currently estimate the Senior Note holders will receive additional liquidation distributions (principal and interest) of approximately $196.9 million, which when combined with $53.4 million of interest already distributed during 2008, is a $2.7 million increase over our 2007 year-end estimate, but considerably less than the total principal and interest due of approximately $1.4 billion. The estimated settlement amount was determined solely based on the net assets available for settlement of the Senior Notes and is subject to change due to changes in the estimated net realizable value of our net assets. We clearly do not have sufficient assets to fully repay the Senior Note obligation.

The Senior Notes have a first priority security interest in substantially all of our remaining assets; however, as noted above, the Indenture requires us to first use any cash and cash equivalents to pay or to fund operating expenses, taxes and reasonable reserves for commitments and general corporate purposes.

Stockholders should not expect any payments or distributions. The Indenture contemplates that as principal payments are made on the Senior Notes, our stockholders may receive a distribution equal to 5.263% of each principal prepayment. However, the Indenture prohibits us from making distributions to and/or repurchases from stockholders if the payments would render the Company insolvent, would be a fraudulent conveyance or would not be permitted to be made under applicable law. Any such distribution and/or repurchase would be considered an impermissible restricted payment under the Indenture.

In conjunction with the prepayments of the Senior Notes noted above, we have retained a total of $81.2 million as of June 30, 2008. Retained amounts have been segregated and reflected as restricted cash in our financial statements, pending their final disposition. We anticipate that the retained amounts will eventually be paid to our creditors, **not** our stockholders. If the funds were to be paid to our stockholders, affiliates of Berkadia (jointly owned by Leucadia and Berkshire Hathaway), which owns 50% of our common stock, would receive half of the retained amounts. Berkadia has advised us that it does not believe that stockholders are entitled to the retained amounts since we cannot fully satisfy our creditor obligations.

As previously reported, in June 2007 the Bankruptcy Court determined that (1) we no longer need to direct funds into a restricted account, and (2) we may use those funds for general corporate purposes. The Bankruptcy Court order has been stayed pending final resolution of an appeal to the Delaware District Court by the equity committee. For a further discussion of the appeal and its status, see Note G. "Litigation and Claims."

**Based on our financial condition, there will not be sufficient funds available to fully repay the outstanding principal on the Senior Notes or to make any 5% distribution to common stockholders, absent a court order in connection with the appeal referred to above. As a result, there will not be a return to our stockholders. Consequently, investing in the Senior Notes and common stock involves a high level of risk.**

### Obligations and Commitments

For a detailed listing of our significant contractual obligations and contingent commitments, refer to our 2007 Form 10-K. There has not been any material changes during the six months ended June 30, 2008, except for payment of our quarterly management fees ($4.0 million as of June 30, 2008) to Leucadia.

15

**Table of Contents**

*Collection of the Portfolio*

As noted previously, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of assets. These activities included collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral. As of June 30, 2008, we had substantially completed the liquidation of our asset portfolio.

The following table presents the activity in our liquidating portfolio for the six months ended June 30, 2008:

| | |
|---|---|
| **Liquidating Portfolio at December 31, 2007** | $ 6,271 |
| **Cash Activity:** | |
| Collections and proceeds | (4,598) |
| **Non-Cash Activity:** | |
| Change in estimated net realizable value of assets | (73) |
| **Liquidating Portfolio at June 30, 2008** | $ 1,600 |

Our liquidating portfolio declined to $1.6 million at June 30, 2008. Cash activity primarily included the liquidation of our investments in the severance and bonus trusts and recoveries on accounts and claims previously not anticipated, while the non-cash decrease in the value of assets was primarily due to a decline in the value of certain cash investments.

As of June 30, 2008, the remaining portfolio value is primarily comprised of a number of judgments and claims against former customers (net realizable value of $1.5 million) and a few non-marketable private equity and other securities. In the majority of these instances, we did not attribute any net realizable value to these assets due to our inability to predict the collection of any cash flows from the transactions with even a remote level of confidence. Most of these transactions were previously included in due diligence materials in an attempt to sell the assets, but were excluded on multiple occasions by prospective buyers because of costs of collection and potential liquidity concerns of the buyers. Prospective buyers that specialize in these types of residual assets and claims performed due diligence, but were not interested in making an offer. We continue to monitor these accounts for changes in facts and circumstances that would allow us to attribute value to these assets or events that would resolve their ultimate disposition. As a result, there is the possibility that some net realizable value will be attributed to these assets in the future. An increase in the estimated net realizable value of these assets, if any, will be reflected as a change in net assets in liquidation in future filings. Additionally, we continue to occasionally receive proceeds from trustees and liquidators for assets that in certain cases were written off years ago. These cash flows are typically immaterial and are reflected as a change in net assets in liquidation as they are received. We expect certain of these assets will out last the Company. In connection with or prior to the final dissolution of our entities, we anticipate assigning or transferring the rights to collection of these assets to a trustee or receiver for the benefit of the Senior Note holders.

*Liquidation Process*

Due to the substantial liquidation of our portfolio, our incoming cash flows have significantly diminished and the estimation of cash reserves has become increasingly more critical to ensure we retain funds to meet obligations (including, but not limited to, interest payments on the Senior Notes, settlement of known and unknown claims and normal operating expenses) as they become due throughout the liquidation process. Generally, our cash reserve methodology has been altered to retain our maximum potential cash requirements. Due to the uncertainty of cash requirements associated with the wind-up of our affairs and resolution of matters related to the TLP Action, discussed in Note G. "Litigation and Claims," we anticipate maintaining cash reserves to cover these potential and uncertain expenditures, which could limit our ability to make future voluntary prepayments.

Our liquidation process is now focused on the wind down of our operations, resolution of legal matters and the future dissolution of our entities. We are in the process of withdrawing our authority to conduct business in the states that we no longer have active assets or legal requirements that necessitate our continued authorization to conduct business. The estimated time required to withdraw our licenses will vary by state. Many states have only taken a month or two to complete, while certain states have a more prolonged process that may take a number of months. Additionally, there are a handful of states such as Arizona and Delaware, among others, where we do not anticipate commencing the withdrawal process until all outstanding claims and litigation have been resolved or active assets liquidated. As of June 30, 2008, we have completed the withdrawal process for 42 states, while others are pending.

16

Table of Contents

We have continued with efforts to wind-up our affairs in a timely manner; however, as previously noted we cannot control the timing of resolving legal matters. Certain legal matters continue to take longer than anticipated to resolve, while others are not expected to be resolved until late third quarter of 2008 at the earliest. Once the legal matters have been resolved, FINOVA will still need a short period of time to complete the final wind-up of our affairs. As a result, the reserve for estimated costs reflected in our Statement of Net Assets in Liquidation was adjusted to assume a liquidation period through the fourth quarter of 2008. There can be no assurance we will complete our liquidation in this time period, and the resolution of the various legal matters may extend for a longer period of time. We will continue to evaluate our progress in resolving the outstanding legal matters on at least a quarterly basis and re-evaluate our reserve for estimated costs. Refer above to Note G. "Litigation and Claims" for the status of our outstanding legal matters.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this report are "forward-looking," in that they do not discuss historical fact, but instead reflect future expectations, projections, intentions, or other items. Forward-looking statements are made pursuant to the safe-harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include assumptions, estimates and valuations implicit in the financial statements and related notes, as well as matters discussed throughout this report including, but not limited to projections, our Plan of Liquidation and the section captioned Item 2. "Management's Discussion and Analysis of Financial Condition and Results of Operations." They are also made in documents incorporated in this report by reference, or in which this report may be incorporated.

Forward-looking statements are inherently subject to risks and uncertainties, many of which cannot be predicted or quantified. When used in this report, the words "estimate," "expects," "anticipates," "believes," "plans," "intends" and similar expressions are intended to identify forward-looking statements that involve known and unknown risks and uncertainties. The risks, uncertainties and other factors that could cause our actual results or performance to differ materially from those contemplated by the forward-looking statements include, but are not limited to, the following: whether we can assure Senior Note holders of the timing or amount of their liquidating distributions; whether potential purchasers of our assets may try to take advantage of our liquidation process and offer less-than-optimal prices for our assets; the increasing difficulty in offsetting costs of collecting the remaining portfolio; our Board may abandon the Plan of Liquidation; whether we transfer any assets to a liquidating trust; whether new securities lawsuits will be filed against us; our ability to sell the remaining assets; the impact of general economic conditions and the performance of our borrowers; current and future legal and administrative claims and proceedings against us that may result in increased costs and diversion of management's attention; current and future obligations to creditors; our ability to meet obligations is impacted by cash reserve estimations; cash investments are subject to credit exposure and interest rate fluctuations; our ability to retain our employees; our ability to utilize tax attributes; and our ability to be exempt from the registration requirements of the Investment Company Act of 1940. For additional information, see Part I, Item 1A. Risk Factors in our 2007 Form 10-K.

Undue reliance should not be placed on these forward-looking statements, which are applicable only as of the date of this Report. We do not intend to update forward-looking information to reflect actual results or changes in assumptions or other factors that could affect those statements. We cannot predict the risk from reliance on forward-looking statements in light of the many factors that could affect their accuracy.

### Item 4.     Controls and Procedures

(a)  Our management evaluated, with the participation of our principal executive and principal financial officers, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of June 30, 2008. Based on their evaluation, our principal executive and principal financial officers concluded that our disclosure controls and procedures were effective as of June 30, 2008.

(b)  There has been no change in our internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during our fiscal quarter ended June 30, 2008, that has materially affected or is reasonably likely to materially affect, our internal control over financial reporting.

17

Table of Contents

**PART II OTHER INFORMATION**

**Item 1.      Legal Proceedings**

See Part I, Item 1, Note G. "Litigation and Claims" for a discussion of certain legal proceedings.

**Item 1A.   Risk Factors**

There were no material changes from the information provided in our Annual Report on Form 10-K for the year ended December 31, 2007.

**Item 6.      Exhibits**

31.1    Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2    Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1    Certification of Chief Executive Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2    Certification of Chief Financial Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

18

Table of Contents

## THE FINOVA GROUP INC.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**THE FINOVA GROUP INC.**
(Registrant)

Date: August 13, 2008              By: /s/ Richard A. Ross
                                   _____
                                   Richard A. Ross, Senior Vice President – Chief
                                   Financial Officer & Treasurer
                                   (principal financial officer)

19

Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Chief Executive Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Chief Financial Officer pursuant to 18. U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

## CERTIFICATE OF SERVICE

I, William D. Sullivan, do hereby certify I am not less than 18 years of age and that on this 4th day of September 2008, I caused a copy of the foregoing *Appellant's Motion for Stay Pending Appeal* to be served upon the parties listed below in the manner indicated.

**E-MAIL & HAND DELIVERY**
Mark D. Collins, Esq
Richards Layton & Finger
One Rodney Square
Wilmington, DE 19801

**E-MAIL & HAND DELIVERY**
David L. Buchbinder, Esq.
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801

**E-MAIL & FIRST CLASS MAIL**
Jonathan M. Landers, Esq.
Paul Guillotte, Esq.
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

**E-MAIL & FIRST CLASS MAIL**
James Gadsden, Esq.
Carter Ledyard & Milburn, LLP
2 Wall Street
New York, NY 10005

Under penalty of perjury, I declare that the foregoing is true and correct.

*September 4, 2008*
Date

*/s/ William D. Sullivan*
William D. Sullivan